BLOCK, O'TOOLE & MURPHY, LLP
One Penn Plaza
Suite 5315
New York, NY 10119
Tel.: (212) 736-5300
abenno@blockotoole.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIDNEY MANES, administrator of the estate of HECTOR RIVAS,<br><br>                              Plaintiff,<br><br>         vs.<br><br>ONONDAGA COUNTY, CITY OF SYRACUSE, WILLIAM FITZPATRICK, DR. ERIK MITCHELL, AND "JOHN DOES 1-10",<br><br>                              Defendants. | FIRST AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by and through his undersigned attorneys, alleges as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff brings this action for compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of his civil rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

2.      On May 12, 1993 in Onondaga County Supreme Court, Hector Rivas was convicted of second-degree murder arising out of a March 30, 1987 incident in Syracuse, New York.

3.      Between November 1992 until his death on or about July 10, 2016, plaintiff's decedent, Hector Rivas, spent nearly twenty-five years incarcerated for a crime he did not commit.

FIRST AMENDED COMPLAINT - 1

## JURISDICTION

4.     This Court has jurisdiction over plaintiff's federal law claims under 28 U.S.C §§ 1331, 1343(a), (3), and (4).

## VENUE

5.     Venue is proper for the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

## JURY TRIAL DEMANDED

6.     Plaintiff demands trial by jury of all issues properly triable thereby.

## THE PARTIES

1.     Plaintiff Sidney Manes was and is at all times described in this Complaint the personal representative of the estate of plaintiff's decedent Hector Rivas, and is a resident of the State of New York.

2.     Prior to his incarceration, plaintiff's decedent, Hector Rivas, was a resident of the Bronx, and his estate – including his surviving wife, child, and relatives – all reside in the Bronx.

3.     That at all relevant times herein, defendant Onondaga County (hereinafter "County") was and is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

4.     That at all relevant times herein, defendant County was also authorized to act through the Onondaga County District Attorney's Office in regard to investigation, evaluation and prosecution of alleged criminal conduct within the County of Onondaga and City of Syracuse.

5.     That at all relevant times herein, the Onondaga County District Attorney's Office was at all times relevant herein a municipal entity created and authorized under the laws of the

FIRST AMENDED COMPLAINT - 2

1    State of New York to investigate and prosecute criminal conduct within the County of

2    Onondaga and City of Syracuse.

3        6.    That at all relevant times herein, defendant City of Syracuse (hereinafter "City")

4    was and is a municipal corporation, duly organized and existing under and by virtue of the laws

5    of the State of New York.

6        7.    That at all relevant times herein, defendant City operated, controlled and

7    maintained a police force known as the Syracuse Police Department ("hereinafter "SPD").

8        8.    That at all relevant times herein, defendant William Fitzpatrick ("Fitzpatrick")

9    was the Onondaga County District Attorney.

10        9.    That at all relevant times herein, defendant Fitzpatrick was responsible for, and

11    the chief architect of, the policies, practices and customs of the Onondaga County District

12    Attorney's Office ("OCDAO").

13        10.    That at all times relevant herein, defendant Fitzpatrick was an officer, employee,

14    and/or agent of the Onondaga County District Attorney's Office.

15        11.    That at all times relevant herein, defendant Fitzpatrick was acting as an officer,

16    servant, employee, and/or agent of the Onondaga County District Attorney's Office.

17        12.    That at all times relevant herein, defendant Fitzpatrick was acting within the

18    scope and course of his employment with the Onondaga County District Attorney's Office, and

19    under color of state law, and otherwise performed and engaged in conduct incidental to the

20    performance of his lawful pursuit of his duties as an officer, servant, employee, and/or agent of

21    the Onondaga County District Attorney's Office.

22        13.    That defendant Fitzpatrick is sued in both his individual and official capacities.

FIRST AMENDED COMPLAINT - 3

14.     That at all relevant times herein, defendant County was also authorized to act through the Onondaga County Medical Examiner's Office ("OCMEO").

15.     That at all relevant times herein, The OCMEO was a municipal entity created and authorized under the laws of the State of New York to conduct investigations into persons who die within Onondaga County from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner.

16.     Bodies of deceased persons are brought to OCMEO because the law requires that the medical examiner investigate deaths of persons dying from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility, or in any suspicious or unusual manner. The medical examiner is responsible for determining the cause and manner of death.

17.     That at all times herein mentioned, defendant Dr. Erik Mitchell (hereinafter, "Mitchell") was an OCMEO physician employed by defendant County.

18.     That at all times herein mentioned, defendant Mitchell was acting within the course and scope of his employment with defendant County.

19.     That at all times herein mentioned, defendant Mitchell was acting under color of state law.

20.     Defendant Mitchell is sued herein in both his individual and official capacities.

21.     That at all times herein mentioned, defendants John/Jane Does 1 through 10 (hereinafter, "Does 1-10") were and are personnel employed by and/or acting on the behalf of defendant County and/or defendant City.

FIRST AMENDED COMPLAINT - 4

22.   That at all times herein mentioned, defendants Does 1-10 were acting within the course and scope of their employment with defendant County and/or defendant City.

23.   That at all times herein mentioned, defendants Does 1-10 were acting under color of state law.

24.   The names "John Does 1 through 10" are fictitious, as these defendants' true names are presently unknown.

25.   That defendants Does 1-10 are sued herein in their individual capacities.

26.   That at all times herein mentioned, defendants County and City were under an obligation to use reasonable care in the hiring, training, retention, and supervision of its employees, including, without limitation, defendants Mitchell, Fitzptrick, and Does 1-10 .

27.   At all relevant times herein, the individual defendants acted jointly and in concert with each other.

28.   Each individual defendant had the duty and the opportunity to protect plaintiff's decedent from the unlawful actions of the other individual defendants, but each individual defendant failed and refused to perform such duty, thereby proximately causing plaintiff's decedent's injuries.

## **FACTUAL BACKROUND**

29.   The facts stated in this complaint are based, <u>inter alia</u>, on the personal knowledge of plaintiff and upon information and belief. The sources of "information and belief" factual statements are primarily documents from the underlying criminal prosecution and related public documents which are currently available to plaintiff. Those sources are incomplete, particularly, without limitation, as to numerous documents and court exhibits. This complaint is drawn without the benefit of full discovery proceedings.

FIRST AMENDED COMPLAINT - 5

**THE MURDER OF VALERIE HILL**

30.    At approximately 11:45 a.m. on Monday, March 30, 1987, Randall Hill discovered the lifeless body of his twenty-eight-year-old daughter, Valerie Hill, on the living-room floor of her apartment on Hickok Avenue in Syracuse, New York.

31.    Randall had last seen his daughter on Friday night, March 27, 1987 when the two met for dinner at a nearby restaurant. During their conversation, Hill informed her father that she was planning to spend the weekend visiting a friend in the Albany area and would not return until Sunday evening. Hill left the restaurant at approximately 8:15 p.m. on Friday.

32.    The friend Hill planned to visit, Laura Adams, later testified that she called Hill dozens of times on Friday night and throughout the weekend, but never reached her, although she encountered at least one busy signal.  Randall also had no success when he attempted to call Hill on Sunday night and again Monday morning.

33.    On Monday morning, Randall went to the hospital where Hill was employed as a pediatric nurse and discovered that Hill had not reported to work.  Concerned, he drove to Hill's apartment, where he found her car parked in the driveway. Randall let himself in through the unlocked side door and discovered Hill lying face down on the carpet in her living room. She was wearing a bathrobe, which was pulled up around her shoulders, and was otherwise naked. The belt of the bathrobe was wrapped around her neck.

34.    Randall immediately called the police, as did his son, David.

**THE POLICE INVESTIGATION**

35.    Arriving at the scene, police investigators found no signs of forced entry into Hill's apartment, which was on the bottom floor of a two-family house.

FIRST AMENDED COMPLAINT - 6

36.    The apartment was very neat, and at first nothing appeared to be out of order. A number of cigarettes of the brand Rivas smoked were found in an ashtray in Hill's kitchen.

37.    Later testing revealed that fingerprints on the ashtray, as well as on a bottle of wine, belonged to Rivas. In addition to Rivas's and Hill's fingerprints, an unidentified set of prints was taken from the telephone. Missing from the apartment was an airline ticket that Hill had collected from her travel agent on the afternoon of Friday, March 27.

38.    After learning from Randall and David that Hill had recently broken up with Rivas, police officers went to Rivas's house in Cazenovia, a town about twenty miles southeast of Syracuse.

39.    Rivas agreed to accompany the officers to the Syracuse police station. Sergeant John D. Brennan later testified that Rivas appeared nervous, but was cooperative.

40.    At the police station, Rivas was taken to an interrogation room where police proceeded to question him for approximately twelve hours. Despite the fact that he was interrogated at length regarding his activities the weekend of Hill's death, Rivas was never informed of his Miranda rights because, the police officers later insisted, he was not regarded as a suspect at that time. At approximately 5:30 p.m., after over two hours of questioning, police informed Rivas that Hill had been killed.

41.    During the interview, Rivas told the police that he had last seen Hill four days earlier, on the evening of Thursday, March 26, 1987, when he had gone to her house and talked to her for half an hour. He had also driven by Hill's apartment at 2:00 p.m. the following day, Friday, March 27, and again approximately four hours later, at 6:00 p.m.

42.    Rivas claimed he did not linger on either occasion after discovering that Hill was not home. Rivas said that he had spent most of Friday evening with friends at various bars in

FIRST AMENDED COMPLAINT - 7

Syracuse and Cazenovia.  He stated that he was at Coleman's Bar in Syracuse from about 6:00 to 11:00 p.m. He then went to Albert's Bar in Cazenovia and stayed there until 2:00 a.m., before returning to Syracuse to get breakfast at an all-night diner.

43.    He finally went home and fell asleep at 4:00 a.m. Rivas claimed that he awoke at 11:30 a.m. on Saturday and returned to Albert's to do some plumbing work. He remained for lunch and then went home to take care of some yard work. He then returned to Albert's to watch Syracuse compete in the "Final Four" of the NCAA Men's Basketball Tournament. He remained at Albert's until approximately 8:00 p.m., whereupon he went to a party at a friend's house until 4 a.m. on Sunday, March 29, before returning home to bed. As Rivas stated in the interview, many people saw him and spoke with him on Saturday night.

44.    While Rivas was being questioned at the station, other police officers put together an application for a warrant to search his residence. The affidavit stated that the Onondaga County Medical Examiner, Dr. Erik Mitchell, had estimated the time of Hill's death to be sometime between Saturday the 28th of March afternoon and Sunday morning the 29th of March 1987.

45.    Inside a bedroom closet in Rivas's home, investigators observed what they described as a "shrine," consisting of a large statue of the Virgin Mary surrounded by two smaller candles and a photograph of Hill.  No photographs were taken of the "shrine."

46.    Despite a thorough investigation, neither Rivas nor anyone else was charged with, or even publicly identified as a suspect in, Hill's murder, which remained a "cold case" for five years.

47.     This case had garnered a tremendous amount of media publicity in the Syracuse area, and the fact that it remained unsolved was a blemish on the Onondaga District Attorney's Office.

## THE ONONDAGA COUNTY MEDICAL EXAMINER'S OFFICE

48.     In 1992, defendant Mitchell was the Onondaga County Medical Examiner.

49.     Mitchell was known to defendant County and defendant Fitzpatrick for misconduct.

50.     Indeed, prior to 1992 and thereafter, multiple subordinates of defendant Mitchell at the OCMEO had submitted "whistleblower" complaints against Dr. Mitchell to defendant County, Onondaga County D.A.'s Office, the New York State Department of Health, the New York State Department of Environmental Conservation, and the Syracuse Police Department.

51.     The first – Dr. William R. Sawyer – worked under the direct supervision of Dr. Mitchell from 1988 through 1993.

52.     Dr. Sawyer stated under oath that he had witnessed Mitchell "slant the interpretation of evidence and/or exclude evidence to serve his predetermined objectives," that that Dr. Mitchell routinely and as a matter of practice "offered opinions without any scientific evidence to support his conclusion," and he further averred that "Dr. Mitchell's opinions and interpretations of evidence cannot be trusted as impartial or accurate."

53.     The second – Dr. David A. Rigle – an assistant medical examiner who worked daily with Dr. Mitchell, stated that Mitchell had instructed him to fashion his autopsy reports in a way that would allow for manipulation of the case findings, that Dr. Mitchell had instructed him and all of the assistant medical examiners in the office that reports had to be "crafted" in

FIRST AMENDED COMPLAINT - 9

1    such a manner that the wording would allow change to opinions, at any time, concerning cause

2    and/or manner of death.

3        54.    Dr. Mitchell further informed Dr. Rigle that he had become very adept at this and

4    could change the basis of his expert opinions at any time as the case progressed.

5        55.    Dr. Mitchell informed Dr. Rigle that the medical examiners worked for

6    Onondaga County and were there solely to serve the needs of the District Attorney's Office.

7        56.    Dr. Mitchell also told Dr. Rigle that "he had never come across a suspect he

8    couldn't convict."

9        57.    Under Mitchell, the OCMEO abandoned any and all medical and scientific

10   objectivity and served only on purpose, to ensure the convictions and deprivation of liberty of

11   individuals being prosecuted by the Onondaga County District Attorney's Office, regardless of

12   the facts and regardless if medical and scientific evidence suggested lack of criminal culpability.

13       58.    At all relevant times, this was the policy, practice, and custom of the OCMEO,

14   and defendants County, City, Mitchell and Fitzpatrick, as well as the Onondaga County D.A.'s

15   Office, were fully aware of this policy, embraced it, encouraged it, and conspired to keep it

16   secret from the public, the courts, and all criminal defendants, including Hector Rivas.

17       59.    Defendants County and Fitzpatrick were on notice of Mitchell's propensities for

18   misconduct, manipulation of evidence, fabrication of findings, and constitutionally violative

19   behaviors, as well as of Mitchell's conspicuous and regular pattern of conduct in depriving

20   criminal defendants of their right to a fair trial, but acquiesced in his misconduct and took no

21   steps to discipline him, train him, correct his abuse of authority, or discourage his unlawful use

22   of authority.

23

FIRST AMENDED COMPLAINT - 10

## REVIVING THE COLD CASE

60.    In January 1992, William Fitzpatrick, was sworn in as District Attorney of Onondaga County, having previously served in that office as an Assistant District Attorney.

61.    Upon information and belief, Fitzpatrick had campaigned on a promise of re-opening and solving cold cases, including the Valerie Hill murder case.

62.    According to his biography on the Onondaga County District Attorney's website, when he was Chief Assistant District Attorney, "Fitzpatrick specialized in re-opening cases that had previously been considered inactive and, with the cooperation of various police agencies in Onondaga County and the state of New York, he brought numerous killers to justice in cases that were thought to be un-winnable."

63.    Rivas's alibi was uncorroborated and incomplete for a three-and-a-half hour window-between approximately 9:00 p.m. on Friday, March 27, 1987, and 12:30 a.m. on Saturday, March 28, 1987.

64.    The prosecution had no reasonable or probable cause to believe that Rivas had anything to do with the murder and sexual assault of Hill – and therefore had no case against him for those crimes – unless it could prove that Hill died on Friday night, March 27, 1987.

65.    Shortly after becoming District Attorney, Fitzpatrick approached Mitchell, the medical examiner, and requested that he revise Hill's autopsy report to expand the time of death to include Friday, March 27, 1987, when Rivas's alibi was not as strong.

66.    At the time this request was made, Mitchell was under criminal investigation by Fitzpatrick's office, as well as by the Department of Health and the Department of Environmental Conservation for varieties of misconduct, including improper disposal of waste and stealing and mishandling of body parts.

FIRST AMENDED COMPLAINT - 11

67.     Fitzpatrick promised Mitchell that if Mitchell revised and expanded Hill's time of death to include Friday, March 27, 1987, that Fitzpatrick would make the investigations into Mitchell's conduct go away.

68.     Mitchell complied with this request.

69.     Between January 1992, when Fitzpatrick was sworn in as the Onondaga County District Attorney, and November 1992, Mitchell revised his estimate of Hill's time of death to include Friday, March 27, 1987.  He made this revision out of pure self-interest and self-preservation, and the revised conclusion was false, inaccurate, and unsupported by any scientific evidence whatsoever.  In fact, both Fitzpatrick and Mitchell knew that the expansion of Hill's time of death to include Friday, March 27th, was a lie, and was baseless, fabricated, and entirely contrary to science.

70.     Mitchell revised the time of death knowing that doing so was necessary to allow Fitzpatrick and his office to arrest, charge, prosecute, and convict Rivas for Hill's sexual assault and murder.

71.     Mitchell and Fitzpatrick knew that the fabricated time of death was given simply to ensure Rivas's arrest and prosecution for a crime for which he otherwise had an airtight alibi and for which there was no eyewitness or forensic evidence implicating Rivas.

**THE INDICTMENT OF HECTOR RIVAS**

72.     According to plan, once Mitchell provided Fitzpatrick with the revised time of death, Fitzpatrick took affirmative steps to have Rivas arrested and formally charged with Hill's murder and sexual assault.

1

2

3

73.     At Fitzpatrick's direction, Mitchell perpetuated the lie Hill's time of death included Friday, March 27, 1987 and falsely testified to that in the grand jury in or about November 1992.

4

5

6

74.     To the grand jury, Mitchell presented fabricated and false testimony and suppressed and concealed the truth in an effort to secure Hector Rivas's prosecution, indictment, and conviction at all costs.

7

8

9

75.     Fitzpatrick and Mitchell and Does 1-10 deliberately withheld from the grand jury the fact that Mitchell had previously determined that Hill's homicide had occurred, at the absolute earliest, in the afternoon of Saturday, March 28, 1987.

10

11

12

13

14

76.     Mitchell and Fitzpatrick and Does 1-10 also deliberately withheld from the grand jury the fact that Mitchell was under investigation for multiple wrongdoings and that he had brokered a deal with Fitzpatrick that 1987 in exchange for expanding Hill's time of death to include Friday, March 26, 1987, Mitchell would receive favorable treatment from Fitzpatrick and the other agencies investigating Mitchell's illegal conduct.

15

16

17

77.     Upon information and belief, Mitchell repeated to the Grand Jury the false and fabricated allegations that he had forwarded to the District Attorney, and which formed the basis of Hector Rivas's prosecution.

18

19

20

21

22

78.     Defendants Mitchell and Fitzpatrick and Does 1-10 consciously disregarded known and excessive risks to plaintiff's decedent's liberty and welfare and engaged in a pattern of behavior and conduct in furtherance of securing and sustaining an unjust conviction against plaintiff's decedent, including but not limited to engaging in a pattern and course of conduct of deceit whereby these defendants failed to disclose material exculpatory and/or impeaching

FIRST AMENDED COMPLAINT - 13

evidence before, during, and after the grand jury presentation in plaintiff's decedent's criminal case, they fabricated evidence, and testified falsely and/or suborned perjury.

79.     All defendants also concealed and conspired to conceal the existence of and facts contained in the aforementioned exculpatory / Brady evidence from the  grand jury in order to obtain an indictment.

80.     Based on defendants' false and fraudulent testimony in the grand jury, their suborning of perjurious testimony from witnesses, and defendants' concealment from the grand jury of material exculpatory facts, Hector Rivas was, in or around November 1992, indicted for the murder and sexual assault of Hill.

81.     The grand jury's indictment alleged that Rivas killed Hill on Friday, March 27, 1987.

82.     No new evidence that came to light between March 1987 and November 1992 that led to the indictment.  The only thing that changed during that span of time was Mitchell's estimation of the time of death.

83.      Upon information and belief, this indictment would not have been voted were it not for defendants' fraud, perjury, and suppression/fabrication of evidence.

## THE PROSECUTION OF HECTOR RIVAS

84.     At Rivas's arraignment on the indictment, he pleaded not guilty to all counts.

85.     Rivas declined any plea offers and consistently maintained his innocence.

86.     All defendants were aware that Mitchell's revised time of death and testimony to the grand jury were untrue, but none of them took any steps to correct the false statements, to intervene in order to prevent the continued fabrication of false statements and manufacture of

FIRST AMENDED COMPLAINT - 14

1    evidence, or to inform the court, or Rivas's attorney, or Rivas himself of their falsity.  Instead,

2    all defendants affirmatively concealed their wrongdoing and suppressed the truth.

3        87.    And despite having been aware of defendants' propensities for lying, falsifying

4    evidence, and concealing the truth, defendant County took no steps to discipline, train, or

5    otherwise supervise them to ensure against their continued fabrications and to prevent against

6    the continued unlawful prosecution, detention, and conviction of Hector Rivas, an innocent man.

7        88.    On March 16, 1993, upon the motion of the People, the court dismissed the

8    sexual assault count of the indictment.

9                            **HECTOR RIVAS'S TRIAL**

10        89.    In March 1993, Rivas proceeded to trial one the sole remaining count in the

11    indictment – Murder in the Second Degree – before the Onondaga County Court Judge J. Kevin

12    Mulroy and a jury.

13        90.    The People's case was almost entirely circumstantial.  While several of Rivas's

14    fingerprints had been found on items in Hill's house, the prosecution acknowledged that Rivas

15    had been an invited guest in Hill's apartment many times before, including in the week prior to

16    Hill's death.

17        91.    Fitzpatrick, who tried the case himself, presented Rivas as an obsessive, jilted

18    lover who harassed Hill following their breakup and was pushed over the edge when he learned

19    that Hill was planning to take a trip to the Bahamas alone.

20                        **The People's Case – Lay Witnesses**

21        92.    Several witnesses testified regarding Rivas's whereabouts on Friday, March 27,

22    1987, the alleged date of the murder. Taken together, the testimony of these witnesses suggested

23    that there may have been a window of time during which Rivas could have gone to Hill's house

FIRST AMENDED COMPLAINT - 15

1    and strangled her while en route from Coleman's in Syracuse to Albert's in Cazenovia, about

2    thirty minutes away. Prosecution witnesses testified that Rivas left Coleman's at around 9:00 or

3    9:30 p.m. and did not arrive at Albert's until sometime between 11:00 p.m. and 12:30 a.m.

4        93.    One witness, a clerk at a liquor store near Hill's apartment, testified that he saw

5    Rivas enter the store between 9:30 and 10:00 p.m.  Two witnesses testified that they observed

6    Rivas smoking a cigarette in his car, which was parked outside Hill's house, sometime between

7    11:00 p.m. and 12:00 a.m. that night—around the time that the prosecution theorized Hill was

8    murdered.

9        94.    The People also elicited testimony from Joe Fields, an acquaintance of Rivas,

10   who encountered him at Albert's bar approximately three weeks after the murder. Rivas had

11   been drinking heavily and was crying over Hill's death. According to Fields, at a moment when

12   Rivas did not know that Fields was in earshot, he said to himself, "Valerie, Valerie, I didn't

13   mean to do it."

14                     **The People's Case – Expert Witness**

15       95.    No matter how much circumstantial evidence the prosecution could amass

16   tending to link Rivas to the crime, however, it had no case unless it could prove that Hill died

17   on Friday night. Indeed, Fitzpatrick himself acknowledged that Rivas's alibi was "complete—

18   for Saturday night."

19       96.    Therefore, the prosecution's case rested almost entirely on the testimony of

20   Mitchell, the medical examiner, to persuade the jury that Hill died on Friday night and not on

21   Saturday as Mitchell had initially determined.

FIRST AMENDED COMPLAINT - 16

97.    Mitchell testified that, when he first observed Hill's body on the afternoon of Monday, March 30, it "was in rigor," and that by the time he performed an autopsy later that day, "[s]he was coming out of rigor."

98.    Although Mitchell acknowledged that in most cases rigor mortis relaxes within twenty-four to forty-eight hours (which would have put Hill's time of death somewhere between Saturday and Sunday afternoon), he suggested that the cool temperatures in Hill's apartment could have retarded the process.

99.    Mitchell further testified when he reviewed autopsy sectional slides of Hill's brain before trial, he noticed in them "some decomposition to the brain." This, he stated, "tends to push the [time] limits further out."

100.    Mitchell stated that it was his opinion, "within a reasonable degree of medical certainty," that Hill died as a result of being strangled, and that "it's more likely that she died Friday night, to possibly very early Saturday morning" than on Saturday night.

**The Defense Case**

101.    At the close of the People's case, Fitzpatrick for the first time disclosed the existence of an August 1988 affidavit from one Joe Morgan, in which Morgan attested that an individual named Patsy Barricella had admitted to Morgan that he (Barricella) murdered Hill.

102.    Defendant Fitzpatrick and Does 1-10 had known about this exculpatory affidavit for a long time, but deliberately withheld it from the defense in violation of his obligations under Brady and its progeny.

103.    The trial judge recognized that this evidence was "exculpatory without a doubt," and allowed Rivas's attorney to decide whether to adjourn and attempt to call Morgan or Barricella as witnesses, or instead to bring out the information contained in the affidavit by

FIRST AMENDED COMPLAINT - 17

examining the Syracuse police officer who had interviewed Morgan. Rivas's attorney opted to draw the information out of the police officer, Michael Ostuni.

104.    According to Officer Ostuni, Morgan claimed that he had a conversation with his friend and neighbor Barricella in March 1988, at which time Barricella confessed to killing "the girl on Hickok Avenue."

105.    In addition, Barricella had, according to Morgan, driven by the crime scene several times as police were investigating Hill's murder and was stopped by police as a result.

106.    A contemporaneous police report corroborated Barricella's account, and revealed that Barricella had, in fact, been stopped by police after driving by the crime scene repeatedly.

107.    On cross examination, Officer Ostuni also testified that Morgan was a career criminal who had contacted the police from a county jail cell and demanded release as a quid pro quo for cooperation.

108.    Evidence also was adduced that, on Friday afternoon, a witness had seen a Stephen King novel that Hill had checked out from the Cazenovia Public Library in the back seat of Hill's car.

109.    Evidence was introduced that this book was returned to the library's drop box sometime between Saturday afternoon and Sunday morning, suggesting that Hill (the most likely person to have returned it) was alive at least as late as Saturday afternoon.

110.    Rivas's attorney also called a witness who claimed to have seen Rivas at Albert's in Cazenovia as early as 7:30 p.m. on Friday.

111.    Rivas did not testify in his own defense.

FIRST AMENDED COMPLAINT - 18

1

## **Summations**

2       112.    Rivas's attorney argued what had, in fact happened, that the Hill murder had

3  been solved backwards: The police and the District Attorney's Office had decided at the outset

4  that Rivas was the killer and then set out to fabricate the proof of the murder from there,

5  ignoring other potential leads along the way.

6       113.    With respect to the time of death, Rivas's attorney argued that Mitchell had to

7  stretch science beyond the breaking point to opine at trial that it was more likely that Hill had

8  been killed on Friday than on Saturday.

9       114.    Rivas's attorney did not explicitly challenge Mitchell's credibility or suggest that

10  he might be beholden to the District Attorney's Office. Indeed, neither Rivas nor his attorney

11  was aware of the investigations into Mitchell's conduct at the time of the trial.

12       115.    Fitzpatrick, in his summation, defended Mitchell's placing the time of death on

13  Friday, March 27, 1987.  He argued that the temperature in Hill's home was between 62-64

14  degrees, and therefore that the process of rigor mortis was slowed.

15       116.    Fitzpatrick also argued that Mitchell had "had a chance to review autopsy

16  sectional slides of the brain," which tended to expand the range of possible times of death, and

17  had led Mitchell to opine that it was most likely that Hill died on Friday, March 27.

18       117.    Defendants Mitchell and Fitzpatrick and Does 1-10 consciously disregarded

19  known and excessive risks to Rivas's liberty and welfare and engaged in a pattern of behavior

20  and conduct in furtherance of securing and sustaining an unjust conviction against Rivas,

21  including but not limited to engaging in a pattern and course of conduct of deceit whereby these

22  defendants failed to disclose material exculpatory and/or impeaching evidence before, during,

23  and after the trial in Rivas's criminal case and fabricated evidence.

FIRST AMENDED COMPLAINT - 19

118.    By doing the aforementioned, said defendants perjured themselves and/or suborned perjurious testimony, fabricated evidence against Rivas, and suppressed the truth.

## **The Verdict and Sentencing**

119.    The jury deliberated for eight hours over the course of one day, during which time it asked for further instructions on the meaning of "reasonable doubt."

120.    At approximately 10:45 p.m. on March 25, 1993, nearly six years to the day after Valerie Hill was killed, Hector Rivas was found guilty of second-degree murder.

121.    On May 12, 1993, Hector Rivas was sentenced to an indeterminate term of imprisonment of from twenty-five years to life, and remanded to the custody of the New York State Department of Corrections.

## **THE RESIGNATION OF DR. MITCHELL**

122.    After Hector Rivas was convicted, Dr. Mitchell resigned from his position as Onondaga Medical Examiner, and defendant Fitzpatrick dropped his office's criminal investigation into Mitchell, as was the New York State Department of Health's investigation into Mitchell.

## **POST-TRIAL PROCEEDINGS**

### **The Appeal**

123.    Rivas, with the assistance of new counsel, appealed his conviction, but it was affirmed by the Appellate Division of the New York Supreme Court.

124.    Rivas's application for leave to appeal to the New York Court of Appeals was thereafter denied on August 15, 1995.

FIRST AMENDED COMPLAINT - 20

1

**The Post-Judgment Motion**

2      125.    Subsequently, with the assistance of yet another lawyer, Rivas filed a motion to

3    vacate the judgment of conviction pursuant to N.Y. Criminal Procedure Law § 440.10, which

4    provides the means of collateral attack on a criminal judgment in New York state courts.

5      126.    In that application, Rivas alleged that he had been the victim of a "concerted

6    effort to convict that was severed from concerns over actual guilt very early on in this

7    investigation and was orchestrated by the District Attorney himself, William J. Fitzpatrick, who

8    personally prosecuted this case."

9      127.    Principal among Rivas's allegations was that Mitchell, the medical examiner,

10   had altered his original estimate of the time of Hill's death in order to satisfy the District

11   Attorney in hopes of avoiding prosecution for alleged criminal misconduct.

12     128.    Rivas did not know about the investigation of Mitchell and his office until after

13   the trial, when Mitchell was indeed forced to resign to avoid prosecution by Fitzpatrick's office.

14     129.    Additionally, Rivas discovered only after the trial that, despite Mitchell's

15   testimony that he had examined "slides" in coming to the conclusion that Hill most likely died

16   on the night of Friday, March 27, 1987, and despite Fitzpatrick's characterization of these slides

17   in his summation as "autopsy sectional slides," there were, in fact, no sectional slides of Hill's

18   brain in the medical examiner's file.

19     130.    Mitchell's testimony about having reviewed slides was false and entirely

20   fabricated – a fact known by defendant Fitzpatrick and Does 1-10.

21     131.    Rivas also pointed to "new evidence," in the form of an affidavit by Dr. Cyril H.

22   Wecht, an expert in forensic pathology, who attested that Mitchell's calculations of the cause of

23   death were "misguided," and that, in his expert opinion, "based upon a reasonable degree of

FIRST AMENDED COMPLAINT - 21

1    medical certainty, the length of time between the death of Valerie J. Hill and the time she was

2    found was less than 48 hours, and more likely less than 36 hours."

3        132.    In other words, according to Wecht, Hill died between 3:30 p.m. on Saturday,

4    March 28, and 3:30 a.m. on Sunday, March 29 – during a time when Rivas's alibi was airtight.

5        133.    In addition, a significant amount of exculpatory material had withheld from the

6    defense at trial including the following:

7            a.    An affidavit taken from one of Hill's neighbors, Mary Lazarski, in which

8                Lazarski attested that, late in the evening of Saturday, March 28 or early in the

9                morning of Sunday, March 29, while she was watching "Saturday Night Live"

10               on television, she heard through her open window "a loud shriek or scream [that]

11               seemed to cut off."  Lazarski stated that "[t]he voice was a woman's voice and it

12               sounded like someone was in trouble and not like anyone kidding around";

13           b.    An affidavit from Lazarski's husband in which he confirmed that his wife woke

14               him up and told him about the incident that night;

15           c.    A police report memorializing an interview with another unnamed neighbor had

16               been withheld from him.  In this affidavit, the unidentified neighbor told police

17               that he heard a dog barking and a car speed away from the vicinity of Hill's

18               house at around 11:00 Saturday night;

19           d.    A police report regarding an interview with a neighbor who had seen Hill

20               intimately embracing a man other than Rivas a few days prior to her murder;

21           e.    A police report of another interview stating that Hill had been involved in an

22               intimate relationship with a man other than Rivas at the time of her death;

FIRST AMENDED COMPLAINT - 22

f.    Information that one of Hill's neighbors had previously been arrested for burglary and was known to peer through windows in the neighborhood;

g.    Information that an employee at the hospital where Hill worked had been disciplined after Hill made a complaint against him;

h.    Information regarding a purported "sexual deviant" who was residing in Hill's neighborhood;

i.    The fact that one of the prosecution witnesses had a prior conviction;

j.    Valerie Hill's diary, which Syracuse police investigators retrieved from Hill's apartment; and

k.    The affidavit stating that Patsy Barricella, not Rivas, had committed the crime.

134.    During his investigation into the cold case Hill murder, defendant Fitzpatrick came into possession of the aforesaid exculpatory/<u>Brady</u> evidence and deliberately concealed, suppressed, and buried every shred of it, failed to disclose it to the courts or to the defense, and did so in order to guarantee that the investigation pointed in one direction only – that Hector Rivas would be indicted, arrested, prosecuted, and convicted for Hill's murder.

135.    Fitzpatrick also concealed this evidence from the grand jury.

136.    Alternatively, these items of <u>Brady</u> evidence were withheld from the prosecution, the D.A.'s Office, the courts, and the defense by Syracuse Police Department personnel, including John Doe defendants herein, pursuant to police department policy, custom, and practice.

137.    On April 7, 2000, Acting Onondaga County Supreme Court Justice John J. Brunetti conducted an evidentiary hearing in connection with Rivas's § 440.10 motion. At the close of the hearing, Rivas's motion was denied.

FIRST AMENDED COMPLAINT - 23

1

**The Habeas Petition**

2      138.    On June 19 2002, Rivas filed a petition for a writ of habeas corpus pursuant to 28

3  U.S.C. § 2254.

4      139.    In it, he raised substantially the same claims that he had advanced before the

5  state court in his § 440.10 motion. Principally, he claimed that he was entitled to a new trial in

6  light of newly discovered evidence of misconduct and false testimony by the medical examiner.

7      140.    The district court dismissed Rivas's claims as time-barred under 28 U.S.C. §

8  2244(d). Rivas v. Fischer, No. 01–cv–1891 (GLS), 2005 WL 8165617 (N.D.N.Y. Jan. 28,

9  2005) ("Rivas I").

10     141.    Rivas appealed the district court's decision to the United States Court of Appeals

11 for the Second Circuit.

12     142.    By summary order dated October 2, 2008, the Second Circuit vacated and

13 remanded the judgment of the district court, holding that additional fact-finding on the issues of

14 timeliness and actual innocence was required. Rivas v. Fischer, 294 Fed.Appx. 677, 678–79 (2d

15 Cir. 2008) ("Rivas II).

16     143.    The Second Circuit therefore remanded the case to the district court with

17 instructions that it "make specific factual findings" regarding the timeliness of Rivas's claims,

18 noting that, in order to be timely, Rivas's claims must not have been discoverable through the

19 exercise of due diligence prior to May 8, 1999, one year prior to the actual filing of his petition

20 (not including periods of time during which the statute of limitations was tolled).

21     144.    In addition, the Second Circuit stated that should the district court determine that

22 Rivas had not satisfied the requirements of § 2244(d)(1)(D), it "should then make specific

FIRST AMENDED COMPLAINT - 24

findings as to whether Rivas has established a credible claim of actual innocence" under applicable Supreme Court and Second Circuit standards.

145.    After a hearing, the magistrate judge issued a Report and Recommendation recommending that Rivas's petition be dismissed as untimely.  Rivas v. Fischer, No. 01–cv–1891 (GLS/DEP), 2010 WL 1257938 (N.D.N.Y. Jan. 8, 2010) ("Rivas III").

146.    Rivas filed timely objections to the Report and Recommendation. After further briefing from both sides, U.S. District Judge Gary L. Sharpe, upon de novo review, adopted the magistrate judge's Report and Recommendation and dismissed the petition without reaching the merits. Rivas v. Fischer, No. 01–cv–1891 (GLS), 2010 WL 1257935 (N.D.N.Y. Mar. 26, 2010) ("Rivas IV").

147.    On appeal, the Second Circuit again reversed, holding as a matter of first impression in this Circuit that a "credible" and "compelling" showing of actual innocence warrants an equitable exception to the AEDPA's limitation period, allowing a petitioner to have his otherwise time-barred claims heard by a federal court. Rivas v. Fischer, 687 F.3d 514, 517–18 (2d Cir. 2012) ("Rivas V").

148.    The Second Circuit concluded that Rivas had made such a showing, having produced essentially unchallenged expert testimony "which call[ed] into serious doubt the central forensic evidence linking him to the crime," and, as a result, "a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit."

149.    Having determined unanimously that Rivas's habeas petition fell into the actual innocence exception to the one-year limitation period governing habeas petitions under the AEDPA, the Second Circuit subsequently remanded the case for Rivas's petition to be heard on the merits.

FIRST AMENDED COMPLAINT - 25

1    150.    After hearing oral argument, the District Court nonetheless denied Rivas's

2    petition in its entirety. Rivas v. Fischer, No. 01-cv-1891 (GLS), 2013 WL 4026844 (N.D.N.Y.

3    Aug. 6, 2013) ("Rivas VI").

4    151.    Upon further appeal, the Second Circuit again unanimously reversed. Rivas v.

5    Fischer, 780 F.3d 529 (2d Cir. 2015) ("Rivas VII").

6    152.    The Second Circuit found that Rivas's alibi was uncorroborated and incomplete

7    for a key three-and-a-half hour window-between approximately 9:00 p.m. on Friday, March 27,

8    1987, and 12:30 a.m. on Saturday, March 28, 1987, and that, not coincidentally, the core of the

9    prosecution's case was that Rivas killed Hill during this exact time frame.

10    153.    The indictment charged Rivas with killing Hill "on or about the 27th day of

11    March"; the People's Bill of Particulars stated that Rivas was alleged to have killed Hill "[o]n

12    March 27th, 1987 between the hours of 9:00pm and 12:00 midnight at 248 Hickok Avenue in

13    the City of Syracuse"; the prosecution argued repeatedly in its opening and its closing that

14    Rivas killed Hill on Friday, March 27, 1987; and finally the Certificate of Conviction states that

15    Rivas was indicted for, and convicted of, second-degree murder "committed on March 27,

16    1987."

17    154.    The Second Circuit stated that "the case therefore turned on rebutting the

18    prosecution's theory as to the time of death."

19    155.    Although the Second Circuit did not go so far as to determine that Mitchell

20    intentionally lied on the stand or that District Attorney Fitzpatrick suborned perjury, it

21    concluded that a reasonable juror would discredit Mitchell's testimony upon learning that he

22    had been subject to numerous investigations for misconduct and official malfeasance and was

23    under investigation for potentially criminal misconduct at the very moment that he was

FIRST AMENDED COMPLAINT - 26

1    providing testimony in the criminal trial. Thus, any reasonable juror would almost certainly

2    credit Wecht over Mitchell and would therefore, more likely than not, harbor a reasonable doubt

3    about Rivas's guilt.

4        156.    As a result, the Second Circuit Court unanimously reversed the judgment of the

5    district court denying habeas relief and remanded the cause, holding that on remand, the district

6    court "shall issue a writ of habeas corpus to Rivas by the sixtieth calendar day after the issuance

7    of our mandate unless the state has, by that time, taken concrete and substantial steps

8    expeditiously to retry Rivas."

9        157.    The Second Circuit issued its mandate on March 11, 2015.

10    **VACATUR OF RIVAS'S JUDGMENT OF CONVICTION**

11        158.    After the mandate issued, the prosecution – led by defendant Fitzpatrick – took

12    no steps to vacate Rivas's judgment of conviction, a necessary prerequisite to retrying him for

13    Hill's murder.

14        159.    This was because defendant Fitzpatrick and his office had no intention of

15    retrying Hector Rivas (because they knew that they could not prove Mr. Rivas's guilt of the

16    charged crimes), but they wanted to extend Rivas's detention and delay the dismissal of his

17    indictment as long as possible.

18        160.    Since the People, at Fitzpatrick's direction, were deliberately refusing to move to

19    vacate Rivas's conviction, Rivas's attorney ultimately brought the motion to vacate the

20    conviction.

21        161.    The Onondaga District Attorney's Office, and defendant Fitzpatrick, did not

22    consent or join in this application, but they did not oppose the motion either.

FIRST AMENDED COMPLAINT - 27

162.    The reason that the People would not consent or join in Rivas's motion to vacate his criminal conviction was because they had no intention of retrying Rivas, they knew that Rivas was innocent and that they could not prove Rivas's guilt of any crime whatsoever, and defendant Fitzpatrick simply wanted to extend Rivas's detention and delay the dismissal of his indictment as long as possible.

163.    On April 20, 2015, Onondaga County Court Judge Thomas J. Miller granted Rivas's motion and vacated the judgment of conviction against him.

## THE "RE-PROSECUTION" OF HECTOR RIVAS

164.    Judge Miller set Mr. Rivas's bail at $500,000.  Rivas's wife, son, and relatives were unable to come up with the funds necessary to secure Rivas's release, so Rivas remained incarcerated.

165.    Thereafter, the People took no steps whatsoever to retry Hector Rivas.

166.    Instead, for over a year and a half after Rivas's conviction was vacated, defendant Fitzpatrick and his office deliberately stalled and delayed Rivas's retrial.  They did so because they knew that the case against Rivas was unwinnable, and because they wanted to prolong Rivas's detention as long as possible.

### Disclosure of Previously Undisclosed Brady Material

167.    During this time period, the defendant Fitzpatrick and his office and/or the SPD turned over never before seen Brady material – including two marijuana pipes that were in the decedent Valerie Hill's living room (there was evidence that Rivas did not use marijuana, and that only one of the two pipes belonged to Hill), and previously-undisclosed police reports, including a police report by an informant who named someone else as a possible suspect in Hill's murder.

FIRST AMENDED COMPLAINT - 28

168.    On January 14, 2016, the D.A.'s Office and/or the SPD provided Rivas's counsel with copies of police reports and information regarding an individual named Richard Conte, another potential suspect in Ms. Hill's homicide. According to those reports, on Saturday, September 29, 2012, and Sunday, September 30, 2012, Angela Conte emailed the Syracuse Police Department after reading a media account regarding the legal proceedings in Rivas's habeas case.

169.    Angela Conte told Syracuse Police Investigators that her father, Mark Conte, always suspected that his brother Richard Conte had "killed a nurse in East Syracuse in the late 1980's."

170.    During a subsequent interview of Kelly Conte – Angela Conte's mother – she confirmed to Syracuse Police Investigators that Mark Conte had told her that he believed that his brother Richard had killed a nurse who lived near Shop City.  Valerie Hill's former apartment on Hickok Avenue was located approximately .08 miles from Shop City.

171.    Additionally, Richard Conte had been suspected by Syracuse Police Department Investigators of having killed another woman named Colleen Meadow in the mid-1980's.

172.    Up until this point, these materials had been withheld from Rivas by defendant Fitzpatrick and the SPD.

173.    Next, in late April 2016, Fitzpatrick's office and/or the SPD for the first time provided Rivas's counsel with eight CDs containing copies of cassette tapes that were recovered during the investigation of Valerie Hill's homicide.  One of those recordings was of a taped 911 call from April 11, 1987, wherein the male caller, who identified himself as a friend of David Hill – Valerie Hill's brother – stated, "I think the person that killed Valerie Hill was her brother, they were dealing drugs together."

FIRST AMENDED COMPLAINT - 29

174.    Defendant Fitzpatrick and his office and/or the SPD also deliberately interfered with DNA and other forensic testing (including of the aforementioned marijuana pipes and of 101 latent fingerprints from the crime scene that never been previously disclosed or tested) that they knew would have exculpated Rivas by directing the police laboratory to delay conducting the tests.  In fact, as it turned out, none of the 101 latent fingerprints belonged to Rivas – all of them remain unidentified.

175.    The prosecution knew it had no ability to prove any case against Hector Rivas after the habeas had been conditionally granted, and that it would have to move to dismiss the indictment against him.  Not only was the evidence relied on by the prosecution at Rivas's 1992 trial discredited, and not only had an abundance of additional exculpatory evidence that had originally been suppressed been revealed, but several essential prosecution witnesses also had died in the intervening decades.

**The Second Circuit Hearing on the People's Delay**

176.    Indeed, the People delayed so much that the Second Circuit directed the People to appear before it and show cause why Rivas should not be released from confinement pending his retrial on the basis that the People had failed to take concrete and substantial steps expeditiously to retry Rivas, as directed by the Second Circuit in its mandate.

177.    A hearing before the Second Circuit on this issue took place on April 6, 2016.

178.    During that hearing, the Second Circuit stated that the People had repeatedly disregarded court-imposed deadlines on retrying Rivas, and that the "the State was unable to detail ... what concrete and substantial steps [it] had taken in the 60 days following the issuance of our March 11, 2015 mandate, [to] expeditiously to retry Mr. Rivas," and that the court "serious[ly] question[ed]" whether the state had taken any such steps.

FIRST AMENDED COMPLAINT - 30

179.   Additionally, during the hearing, Onondaga County Assistant District Attorney Robert Moran effectively told the panel of Second Circuit judges that his office had no ability to effectively rebut the testimony of Rivas's forensic pathologist, and that they could not establish beyond a reasonable doubt that Hill had died on Friday, March 27, 1987.

180.   Upon information and belief, defendant Fitzpatrick and his office knew that they eventually would have to move to dismiss the indictment against Rivas because he was innocent, all of the available evidence exculpated him, and they had no way to prove his guilt of any offense whatsoever.

181.   These dilatory tactics by defendant Fitzpatrick and his office were performed with knowledge that Rivas was in poor health and suffering from advanced stage cancer.

182.   Fitzpatrick's plan was to put off trying the case against Rivas – which he and his office knew was unwinnable - as long as possible in hopes that Rivas would eventually succumb to his illness and die in jail.

183.   Were that to happen, the People (and defendant Fitzpatrick) knew that the criminal indictment against Rivas would have to be dismissed by virtue of Rivas's death, and that Fitzpatrick would avoid losing face in the community for sending an innocent man to prison for 25 years.

**THE DISMISSAL OF THE INDICTMENT AGAINST HECTOR RIVAS**

184.   On July 14, 2016, the indictment against Hector Rivas was dismissed and sealed by the Onondaga County Court.

**DAMAGES**

185.   This action seeks damages on behalf of plaintiff's decedent, Hector Rivas, for the extraordinary emotional pain and suffering, loss of liberty, loss of reputation, humiliation,

FIRST AMENDED COMPLAINT - 31

1    economic loss, and injuries to his person, that he was forced to endure as a consequence of

2    defendants' decidedly wrongful actions.

3         186.    Plaintiff's decedent, Hector Rivas, did not commit any offenses on or about

4    March 27, 1987.

5         187.    The conduct of defendants, who acted at all times under color of state law and

6    within the scope of their employment and authority, directly and proximately caused plaintiff's

7    decedent to suffer loss of liberty, serious physical and emotional injury, loss of familial

8    association, mental anguish, humiliation, embarrassment, and economic loss.

9         188.    Defendants acted with reckless and wanton disregard for the rights of Hector

10   Rivas.

11        189.    As a result of all of the acts alleged herein, Hector Rivas suffered physical and

12   mental pain and anguish, emotional distress, loss of liberty, loss of familial association, and

13   economic damages.

14                                         **CLAIMS**

15                                       **FIRST CLAIM**

16        **AGAINST DEFENDANTS FITZPATRICK, MITCHELL & DOES 1-10**

17               **(Malicious Prosecution Claim Under 42 U.S.C. § 1983)**

18        190.    Plaintiff repeats and realleges each and every allegation set forth above as though

19   fully set forth at length herein.

20        191.    Defendants, acting in concert and within the scope of their employment and

21   authority, caused plaintiff's decedent, Hector Rivas, to be prosecuted with malice and without

22   probable cause – a prosecution that terminated in Rivas's favor – in violation of Rivas's right to

23   be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United

24   States Constitution.

FIRST AMENDED COMPLAINT - 32

192.    These defendants are sued in their individual capacities.

**SECOND CLAIM**

**AGAINST DEFENDANTS FITZPATRICK, MITCHELL & DOES 1-10**

**(Malicious Abuse of Process Claim Under 42 U.S.C. § 1983)**

193.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

194.    Defendants, acting in concert and within the scope of their employment and authority, employed regularly issued process against plaintiff's decedent, Hector Rivas, compelling the performance or forbearance of prescribed acts.

195.    The purpose of activating the process was intent to harm Hector Rivas without economic or social excuse or justification.

196.    Defendants were seeking a collateral advantage or corresponding detriment to Hector Rivas which was outside the legitimate ends of the process.

197.    Such collateral objective included, but was not limited to, pinning the Valerie Hill murder and related crimes on Hector Rivas in order to close out an open and unsolved felony crime, the closing out of which inured to benefit of the Onondaga District Attorney's Office's stature and statistics, and to give defendant Fitzpatrick another "notch on the belt."

198.    Such collateral objective also included, but was not limited to, pinning the Valerie Hill murder and related crimes on Hector Rivas in order for defendant Mitchell to please the District Attorney and, in a quid pro quo, escape criminal liability for his own misconduct.

199.    The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Hector Rivas and that by virtue of the aforementioned acts, Rivas was deprived of his rights, privileges and immunities secured by the Constitution of the United States, including his rights under the Fourth and Fourteenth Amendments to the U.S.

FIRST AMENDED COMPLAINT - 33

1    Constitution to be free from unreasonable or unlawful searches and seizures and to due process

2    of law.

3        200.    These defendants are sued in their individual capacities.

4                                **THIRD CLAIM**

5              **AGAINST DEFENDANTS FITZPATRICK, MITCHELL & DOES 1-10**

6                  (**Failure to Intervene Claim Under 42 U.S.C. § 1983**)

7        201.    Plaintiff repeats and realleges each and every allegation set forth above as though

8    fully set forth at length herein.

9        202.    Each individual defendant had an affirmative duty to intervene on behalf of

10   Hector Rivas, whose constitutional rights were being violated in that defendant's presence by

11   other governmental officials, but failed to intervene to prevent the unlawful conduct, despite

12   having had a realistic opportunity to do so, in violation of Hector Rivas's right under the Fourth

13   and Fourteenth Amendments to the United States Constitution.

14       203.    These defendants are sued in their individual capacities.

15                               **FOURTH CLAIM**

16             **AGAINST DEFENDANTS FITZPATRICK, MITCHELL & DOES 1-10**

17             (**Unreasonably Prolonged Detention Claim under 42 U.S.C. § 1983**)

18       204.    Plaintiff repeats and realleges each and every allegation set forth above as though

19   fully set forth at length herein.

20       205.    Upon information and belief, defendants' above-described conduct, including but

21   not limited to defendants' mishandling of exculpatory and/or impeaching evidence and their

22   concealment, suppression, and/or failure to disclose evidence to the defense, their subornation

23   of perjury, their own perjurious testimony, and their deceit, engaged in under color of state law,

24   violated rights, privileges and immunities secured to plaintiff's decedent, Hector Rivas, by the

FIRST AMENDED COMPLAINT - 34

Constitution of the United States of America including, <u>inter alia</u>, his Fourth and Fourteenth Amendment right to be free from continued detention after it was or should have been known that plaintiff was entitled to release, as articulated in <u>Russo v. City of Bridgeport</u>, 479 F.3d 196 (2d Cir. 2007).

206.     Hector Rivas had a right to be free from continued detention stemming from defendants' mishandling, concealment, and/or suppression of exculpatory and/or impeaching material, and defendants violated that right.

207.     That said Constitutional right arises both from Hector Rivas's Fourth Amendment right to be free of unreasonable searches and seizures and his Fourteenth Amendment right to substantive due process.

208.     Defendants' conduct in this regard was so egregious and outrageous as to shock the conscience.

209.     These defendants are sued in their individual capacities.

### FIFTH CLAIM

### AGAINST DEFENDANTS FITZPATRICK, MITCHELL & DOES 1-10

**(Denial of Fair Trial / Procedural and Substantive Due Process Under 42 U.S.C. § 1983)**

210.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

211.     By the conduct and actions described above, defendants, under color of state law, conspired to interfere with and violate rights secured to Hector Rivas by the Constitution of the United States in violation of 42 U.S.C. § 1983, including, but not limited to, his Fourth and Fourteenth Amendment rights.

212.     Defendants, through the actions alleged above, consciously disregarded known and excessive risks to Hector Rivas's liberty and welfare and engaged in a deliberate and

FIRST AMENDED COMPLAINT - 35

1    unjustified effort to manufacture guilt against him in furtherance of a plan to secure and sustain

2    a conviction against him at all costs.

3        213.    This included a course of conduct and pattern of behavior whereby, upon

4    information and belief, defendants, inter alia, created and fabricated evidence to create the

5    appearance of probable cause, and maliciously concealed and suppressed material exculpatory

6    evidence, suborned perjurious testimony, developed and cultivated witnesses to testify falsely,

7    and unduly and improperly influenced the statements and testimony of witnesses through deceit

8    and other means.

9        214.    In furtherance of this course of conduct and pattern of behavior, defendants

10    engaged in a pattern of deceit whereby they failed to disclose material exculpatory and/or

11    impeaching evidence before, during, and after Hector Rivas's trial, fabricated evidence,

12    developed and cultivated witnesses to testify falsely.

13        215.    That such conduct by defendants deprived Hector Rivas of liberty and property

14    and constituted both a substantive and procedural due process violation under the Fourteenth

15    Amendment.

16        216.    Defendants' conduct precipitated and caused the sequence of events that

17    ultimately resulted in Hector Rivas's prosecution, conviction, detention, deprivation of liberty,

18    and all attendant damages suffered by him.

19        217.    Defendants' conduct in this regard was so egregious and outrageous as to shock

20    the conscience.

21        218.    These defendants are sued in their individual capacities.

22

23

FIRST AMENDED COMPLAINT - 36

1

2

3

<center>**SIXTH CLAIM**</center>

<center>**AGAINST DEFENDANTS FITZPATRICK, MITCHELL & DOES 1-10**</center>

<center>(**Brady Violations Under 42 U.S.C. § 1983**)</center>

4    219.    Plaintiff repeats and re-alleges each and every allegation set forth above as

5  though fully set forth at length herein.

6    220.    The conduct and actions of defendants, acting under color of law, suppressed and

7  failed to disclose material evidence that was favorable to plaintiff's decedent, Hector Rivas,

8  either because of its exculpatory or its impeachment value, in violation of Rivas's substantive

9  and procedural due process rights and Brady v. Maryland, 373 U.S. 83 (1963) and its progeny.

10    221.    Said concealment, suppression, and failure to disclose was done intentionally,

11  maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and

12  probable consequences of their acts, and was done without lawful justification or reason, and

13  was designed to and did cause specific and serious pain and suffering in violation of Hector

14  Rivas's Constitutional rights and guaranteed under 42 U.S.C. § 1983, and the Fourth and

15  Fourteenth Amendments to the United States Constitution.

16    222.    These defendants are sued in their individual capacities.

17    <center>**SEVENTH CLAIM**</center>

18    <center>**AGAINST DEFENDANTS COUNTY, CITY &  FITZPATRICK**</center>

19    <center>(**Municipal Liability Monell Claim under 42 U.S.C. § 1983**)</center>

20    223.    Plaintiff repeats and realleges each and every allegation set forth above as though

21  fully set forth at length herein.

22    224.    All of the acts by the defendants described above were carried out pursuant to

23  policies and practices of the County of Onondaga, the Onondaga County Medical Examiner's

24  Office ("OCMEO"), the Office of the Onondaga District Attorney ("OCDAO"), the Syracuse

1    Police Department ("SPD"), and the City of Syracuse which were in existence at the time of the

2    conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation

3    and under the supervisory authority of defendants County, OCMEO, OCDAO, and City.

4         225.    Defendants County, OCMEO, OCDAO, City, and SPD, by their policy-making

5    agents, servants and employees, authorized, sanctioned and/or ratified the defendants' wrongful

6    acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to

7    continue.

8         226.    The actions of the defendants resulted from and were taken pursuant to de facto

9    policies and/or well-settled and widespread customs and practices of defendants County,

10   OCMEO, OCDAO, City, and SPD to arrest, prosecute and convict persons through fabricated

11   and manipulated allegations without adequate basis in fact and/or despite exculpatory evidence

12   known to them and withheld from accused persons, including plaintiff's decedent herein, in

13   furtherance of a plan to deprive such persons of their right to a fair trial and to secure and

14   sustain criminal convictions at all costs.

15        227.    The existence of such unlawful de facto policies and/or well-settled and

16   widespread customs and practices were known to – and in this case created and promulgated by

17   – supervisory and policy-making officers and officials of defendants County, OCMEO,

18   OCDAO, City, and SPD, such as defendants Mitchell and Fitzpatrick, for a substantial period of

19   time.

20        228.    Despite knowledge of such unlawful de facto policies and practices, these

21   supervisory and policy-making officers and officials of defendants County, OCMEO, OCDAO,

22   City, and SPD, and their predecessors in interest did not take steps to terminate these policies

23   and practices, did not discipline individuals who engaged in such practices, or otherwise

FIRST AMENDED COMPLAINT - 38

properly train their officials, agents, representatives, and subordinates with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs, and practices through their deliberate indifference to or reckless disregard of the effect of said policies, customs and practices upon the constitutional rights of persons subject to their jurisdiction.

229.     The failure of defendants County, OCMEO, OCDAO, City, and SPD  to properly train and supervise and discipline their officials, agents, representatives, and subordinates, including defendants herein, constituted a policy, custom and/or practice, and included, but was not limited to, the failure to instruct them in applicable provisions of the Penal Law and Criminal Procedure Law of the State of New York, the failure to instruct them in generally acceptable medical, investigative, forensic, and prosecutorial standards and techniques, and the failure to instruct them in state and federal constitutional limitations.

230.     The actions detailed herein were and are consistent with institutionalized practices of the OCMEO, OCDAO, and SPD which was known to and ratified by defendants County, City, Fitzpatrick, and Mitchell.

231.     Despite knowledge of these institutionalized practices, defendants County, City, Fitzpatrick, and Mitchell at no time  took any effective action to prevent OCMEO, OCDAO, or SPD personnel from continuing to engage in this type of misconduct.

232.     Defendants County, OCMEO, OCDAO, City and SPD had prior notice of the vicious and unlawful propensities of defendants Fitzpatrick and Mitchell and other subordinates, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority.

FIRST AMENDED COMPLAINT - 39

233.    Defendants County, OCMEO, OCDAO, SPD, and City's policies and practices in existence at the time of the conduct complained of herein, which caused injuries to plaintiff's decedent, Hector Rivas, include, inter alia, the following:

a.    Failing to adequately investigate, monitor, audit, and respond to complaints and other claims of misconduct and evidence of unlawful acts committed by County, OCMEO, OCDAO, SPD, and City personnel, including specifically defendants herein named, such that defendants County, OCMEO, OCDAO, SPD, and City knew about and acquiesced in a custom of tolerating constitutional, statutory, and common law violations;

b.    Affirmatively creating or acquiescing in the manufacturing of evidence against individuals;

c.    Affirmatively suppressing, or acquiescing in the concealment, of exculpatory evidence;

d.    The failure to properly supervise, train, instruct, and discipline County, OCMEO, OCDAO, SPD, and City personnel, including specifically defendants herein named;

e.    The failure to properly supervise, train, instruct, and discipline County, OCMEO, OCDAO, SPD, and City personnel, including specifically defendants herein named, with regard to the preparation of truthful paperwork, or to correctly and accurately document and preserve evidence or to memorialize investigative steps taken, or circumstances surrounding the obtaining of evidence, that could be relevant to the investigation and/or prosecution, and/or discoverable in any litigation;

FIRST AMENDED COMPLAINT - 40

f.   The failure to properly supervise, train, instruct, and discipline County, OCMEO, OCDAO, SPD, and City personnel, including specifically defendants herein named, with regard to the New York State Penal Law and the state and federal Constitutions, and with regard to adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

g.   The failure to properly supervise, train, instruct, and discipline County, OCMEO, OCDAO, SPD, and City personnel, including specifically defendants herein named, with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory and/or impeaching evidence;

h.   The failure to disclose to the defense material evidence that is favorable to the accused person(s), either because of its exculpatory or impeachment value, in violation of an accused person's substantive and procedural due process rights and Brady v. Maryland, 373 U.S. 83 (1963) and its progeny;

i.   The failure to properly supervise, train, instruct, and discipline County, OCMEO, OCDAO, SPD, and City personnel, including specifically defendants herein named, known to be irresponsible in their dealings with citizens of the community, known to violate state and federal law and state and federal constitutional limitations in their investigative and law enforcement conduct, known to fabricate and falsify evidence, known to manipulate evidence, known to deprive criminal defendants of their right to a fair trial, and known to initiate/continue prosecution in the absence of probable cause;

FIRST AMENDED COMPLAINT - 41

j.  Failing to establish or assure the functioning of a bona fide and meaningful departmental system for dealing with complaints of misconduct County, OCMEO, OCDAO, SPD, and City personnel, but instead responding to these types of complaints with bureaucratic power and official denials calculated to mislead the public;

k.  Failing to adequately investigate, monitor, audit, and respond to citizen complaints and other claims of misconduct with the County, OCMEO, OCDAO, SPD, and City, such that defendants County, OCMEO, OCDAO, SPD, and City knew about and acquiesced in a custom of tolerating constitutional, statutory, and common law violations;

l.  The tacit acceptance of and encouragement of a code of silence whereby County, OCMEO, OCDAO, SPD, and City personnel, including specifically defendants herein named, regularly cover up misconduct by refusing to report misconduct or by telling false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the Civilian Review Board ("CRB") and the Internal Affairs Bureau, and in public statements designed to cover for and/or falsely exonerate the accused;

m.  Encouraging the arresting, prosecution, and conviction of innocent persons in order to meet "performance/productivity goals" (i.e., quotas), and thereafter concocting stories, fabricating evidence, and suppressing the truth to conceal the fact that they made arrests to meet performance/productivity goals;

n.  Encouraging and/or failing to discipline County, OCMEO, OCDAO, SPD, and City personnel, including specifically defendants herein named, for "testilying"

FIRST AMENDED COMPLAINT - 42

and/or fabricating false evidence to bring about preconceived perceptions or determinations of guilt;

o. Directing and encouraging the arrest and prosecution of innocent persons and taking steps to ensure their criminal convictions in order to "close out" open investigations, especially of otherwise unsolved felony matters, in order to create the appearance effective policing and to improve statistical performance.

234. The aforementioned policies, practices and customs of failing to supervise, train, instruct and discipline County, OCMEO, OCDAO, SPD, and City personnel and encouraging their misconduct are evidenced by the broad sweeping misconduct detailed herein, where the individually-named defendants endeavored to procure the prosecution and conviction of plaintiff's decedent on charges of which he was in fact innocent by, inter alia, creating and fabricating evidence to create the appearance of probable cause that he had committed the homicide and related offenses, intentionally and maliciously concealing material exculpatory evidence, suborning perjurious testimony, and unduly manipulating evidence by means of deceit.

235. The foregoing customs, policies, practices, procedures, rules, and usages constituted deliberate indifference to plaintiff's decedent's safety, well-being, and constitutional rights.

236. The foregoing customs, policies, practices, procedures, rules, or usages were the direct and proximate cause of the constitutional violations suffered by plaintiff's decedent, Hector Rivas.

237. The foregoing customs, policies, practices, procedures, rules, or usages were the moving force behind the constitutional violations suffered by plaintiff's decedent, Hector Rivas.

FIRST AMENDED COMPLAINT - 43

238.    For this claim, defendant Fitzpatrick is sued in his official capacity.

## EIGHTH CLAIM

## AGAINST DEFENDANTS FITZPATRICK, MITCHELL & DOES 1-10

### (Conspiracy Under 42 U.S.C. § 1983)

239.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth at length herein.

240.    Defendants agreed, cooperated, participated, and conspired to assist in and effectuate the suppression of evidence, the fabrication of evidence, the unlawful detention, arrest, imprisonment, and malicious prosecution of Hector Rivas for crimes he did not commit, and in so doing deprived plaintiff's decedent of his rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures and to due process of law.

241.    These defendants are sued in their individual capacities.

*        *        *

<div align="center"><b><u>PRAYER FOR RELIEF</u></b></div>

**WHEREFORE**, plaintiff demands the following relief jointly and severally against all the

defendants:

    a.   Compensatory damages in an amount to be determined at trial;

    b.   Punitive damages in an amount to be determined at trial;

    c.   Attorneys' fees pursuant to 42 U.S.C. § 1988;

    d.   An award of plaintiff's costs of suit;

    e.   Pre-judgment and post-judgment interest;

    f.   Such other relief as this Court deems just and proper.


Dated this 27th day of August, 2019


Ameer Benno, Esq.

BLOCK, O'TOOLE & MURPHY, LLP
One Penn Plaza
Suite 5315
New York, NY 10119
Tel.: (212) 736-5300
abenno@blockotoole.com

FIRST AMENDED COMPLAINT - 45