UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SIDNEY MANES, administrator of the estate
of HECTOR RIVAS,

                         Plaintiff,                5:19-cv-00844 (BKS/TWD)

v.

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
and JOHN DOES 1-10,

                         Defendants.
_____

**Appearances:**

*For Plaintiff:*
Ameer Benno
Block, O'Toole & Murphy, LLP
One Penn Plaza, Suite 5315
New York, NY 10119

*For Defendant City of Syracuse:*
Kristine E. Smith
Corporation Counsel of the City of Syracuse
Christina F. DeJoseph
Assistant Corporation Counsel
300 City Hall
233 E. Washington St.
Syracuse, New York 13202

**Hon. Brenda K. Sannes, United States District Judge:**

MEMORANDUM-DECISION AND ORDER

I.     INTRODUCTION

       Plaintiff Sidney Manes, as the administrator of Hector Rivas's estate, brings this action under 42 U.S.C. § 1983 against Defendants Onondaga County, City of Syracuse (the "City" or "Defendant"), Onondaga County District Attorney ("DA") William Fitzpatrick, Dr. Erik

Mitchell, and John Does #1–10. (Dkt. No. 16). This action arises from Plaintiff's allegations that the decedent, Hector Rivas, spent nearly 25 years incarcerated for a crime he did not commit. (*Id.*). Plaintiff brings the following claims against DA Fitzpatrick, Dr. Mitchell, and Does #1–10: (1) malicious prosecution (First Claim); (2) malicious abuse of process (Second Claim); (3) failure to intervene (Third Claim); (4) unreasonably prolonged detention (Fourth Claim); (5) denial of a fair trial/violations of procedural and substantive due process (Fifth Claim); (6) *Brady* violations (Sixth Claim); and (7) conspiracy (Eighth Claim). (*Id.*). He also brings a *Monell*[1] claim (Seventh Claim) against Onondaga County, the City, and DA Fitzpatrick. (*Id.*). Presently before the Court is the City's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 23). The parties have filed responsive papers. (Dkt. Nos. 25, 27, 30). The Court heard oral argument on the motion on July 1, 2020. For the reasons that follow, the City's motion is denied.

## II.    FACTS[2]

### A.    The Murder of Valerie Hill

Twenty-eight-year-old pediatric nurse Valerie Hill was murdered in her apartment on Hickok Avenue in Syracuse sometime during the weekend of March 27–29, 1987. (Dkt. No. 16, ¶¶ 31–33). Her body was discovered by her father, Randall Hill, the morning of Monday, March 30, 1987. (*Id.* ¶ 30). Her father told the police that his daughter "had recently broken up with [Hector] Rivas." (*Id.* ¶ 38). Officers went to Rivas's home and he agreed to accompany them to the police station. (*Id.* ¶¶ 38–39). Officers questioned Rivas for twelve hours at the police station. (*Id.* ¶ 40). While he was being questioned, "other police officers put together an application for a

---

[1] *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).

[2] The facts are drawn from the Amended Complaint. (Dkt. No. 16). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

warrant to search his residence." (*Id.* ¶ 44). The application stated that "Onondaga County Medical Examiner Dr. Erik Mitchell[] had estimated the time of Hill's death to be sometime between Saturday the 28th of March afternoon and Sunday morning the 29th of March 1987." (*Id.* ¶ 44).

Rivas told the police he "had last seen Hill four days earlier, on the evening of Thursday, March 26, 1987, when he had gone to her house and talked to her for half an hour." (*Id.* ¶ 41). He told them that "he had spent most of Friday evening with friends at various bars in Syracuse and Cazenovia"—specifically, "he was at Coleman's Bar in Syracuse from about 6:00 to 11:00 p.m." and then he "went to Albert's Bar in Cazenovia and stayed there until 2:00 a.m., before returning to Syracuse to get breakfast at an all-night diner." (*Id.* ¶ 42). On Saturday, "he awoke at 11:30 a.m." and "returned to Albert's to do some plumbing work," and then "went home to take care of some yard work." (*Id.* ¶ 43). "He then returned to Albert's to watch Syracuse compete in the 'Final Four'" and remained there "until approximately 8:30 p.m., whereupon he went to a party at a friend's house until 4 a.m. on Sunday, March 29." (*Id.*).

The police searched Rivas's home. "Despite a thorough investigation, neither Rivas nor anyone else was charged with, or even publicly identified as a suspect in, Hill's murder, which remained a 'cold case' for five years." (*Id.* ¶ 46).

### B.     The Indictment of Hector Rivas

In January 1992, William Fitzpatrick "was sworn in as District Attorney of Onondaga County." (*Id.* ¶ 60). He had "campaigned on a promise of re-opening and solving cold cases, including the Valerie Hill murder case." (*Id.* ¶ 61). "Shortly after becoming District Attorney, Fitzpatrick approached Mitchell, the medical examiner, and requested that he revise Hill's autopsy report to expand the time of death to include Friday, March 27, 1987, when Rivas's alibi was not as strong." (*Id.* ¶ 65). Specifically, Rivas's alibi was "uncorroborated and incomplete for

3

a three-and-a-half hour window" between "9:00 p.m. on Friday, March 27, 1987, and 12:30 a.m. on Saturday March 28, 1987." (*Id.* ¶ 63).

When this request was made, Mitchell "was under criminal investigation by Fitzpatrick's office, as well as by the Department of Health and Department of Environmental Conservation for varieties of misconduct, including improper disposal of waste and stealing and mishandling of body parts." (*Id.* ¶ 66). "Fitzpatrick promised Mitchell that if Mitchell revised and expanded Hill's time of death to include Friday, March 27, 1987," he would "make the investigation into Mitchell's conduct go away." (*Id.* ¶ 67). Additionally, "prior to 1992 and thereafter," Mitchell was the subject of several whistleblower complaints by his subordinates. (*Id.* ¶ 50). One subordinate, Dr. William R. Sawyer, stated under oath that "he had witnessed Mitchell 'slant the interpretation of evidence and/or exclude evidence to serve his predetermined objectives'" and he "routinely and as a matter of practice 'offered opinions without any scientific evidence to support his conclusion . . . [his] opinions and interpretations of evidence cannot be trusted as impartial or accurate.'" (*Id.* ¶ 52). Another subordinate, Dr. David A. Rigle, "stated that Mitchell had instructed him to fashion his autopsy reports in a way that would allow for manipulation of case findings" and that "reports had to be 'crafted' in such a manner that the wording would allow change to opinions, at any time, concerning cause and/or manner of death." (*Id.* ¶ 53). Mitchell also told Rigle that "the medical examiners worked for Onondaga County and were there solely to serve the needs of the District Attorney's Office" and that "he had never come across a suspect he couldn't convict." (*Id.* ¶¶ 55–56). "[N]either Rivas nor his attorney was aware of the investigation into Michell's conduct at the time of trial." (*Id.* ¶ 114).

At some point between January and November 1992, five years after Hill's death, Mitchell "complied with" Fitzpatrick's request and "revised his estimate of Hill's time of death

4

to include Friday, March 27, 1987." (*Id.* ¶¶ 68–69). DA Fitzpatrick then "took affirmative steps to have Rivas arrested and formally charged with Hill's murder and sexual assault" in November 1992 (*Id.* ¶¶ 72, 80). "The grand jury's indictment alleged that Rivas killed Hill on Friday, March 27, 1987." (*Id.* ¶ 81). Rivas "pleaded not guilty to all counts" and "declined any plea offers and consistently maintained his innocence." (*Id.* ¶¶ 84–85).

    **C.**    **The Trial of Hector Rivas**

Rivas's trial commenced in March 1993. (*Id.* ¶ 89). DA Fitzpatrick tried the case himself. (*Id.* ¶ 91). Fitzpatrick's theory of the case was that Rivas was "an obsessive, jilted lover who harassed Hill following their breakup and was pushed over the edge when he learned that Hill was planning to take a trip to the Bahamas alone." (*Id.* ¶ 91). The case was "almost entirely circumstantial"—"[w]hile several of Rivas's fingerprints had been found on items in Hill's house, the prosecution acknowledged that Rivas had been an invited guest in Hill's apartment many times before, including in the week prior to Hill's death." (*Id.* ¶ 90).

Regarding Rivas's alibi, "several witnesses testified regarding Rivas's whereabouts on Friday, March 27," and "taken together, the testimony of those witnesses suggested that there may have been a window of time during which Rivas could have gone to Hill's house and strangled her while en route from Coleman's in Syracuse to Albert's in Cazenovia, about thirty minutes away." (*Id.* ¶ 92). The prosecution needed to "prove that Hill died on Friday night," because Rivas's alibi was "complete" for Saturday night—a fact that DA Fitzpatrick himself acknowledged. (*Id.* ¶ 95).

"[T]he prosecution's case rested almost entirely on the testimony of Mitchell, the medical examiner, to persuade the jury that Hill died on Friday night and not on Saturday as Mitchell had initially determined." (*Id.* ¶ 96). Mitchell testified that "when he first observed Hill's body on the afternoon of Monday, March 30, it 'was in rigor,' and that by the time he performed an autopsy

5

later that day, '[s]he was coming out of rigor.'" (*Id.* ¶ 97). He acknowledged that "in most cases rigor mortis relaxes within twenty-four to forty-eight hours," which "would have put Hill's time of death somewhere between Saturday and Sunday afternoon." (*Id.* ¶ 98). However, "he suggested that the cool temperatures in Hill's apartment could have retarded the process." (*Id.*). He further testified that "he reviewed the autopsy sectional slides of Hill's brain before trial," and "he noticed in them 'some decompositions to the brain,'" which "'tends to push the [time] limits further out.'" (*Id.* ¶ 99). Mitchell testified that "it was his opinion, 'within a reasonable degree of medical certainty,' that Hill died as a result of being strangled, and that 'it's more likely that she died Friday night, to possible very early Saturday morning' than on Saturday night." (*Id.* ¶ 100).

"At the close of the People's case, Fitzpatrick for the first time disclosed the existence of an August 1988 affidavit from one Joe Morgan, in which Morgan attested that an individual named Patsy Barricella had admitted to Morgan that he (Barricella) murdered Hill." (*Id.* ¶ 101). Fitzpatrick had "deliberately withheld [the affidavit] from the defense in violation of his obligations under *Brady* and its progeny." (*Id.* ¶ 102). Rivas's attorney had to "decide whether to adjourn and attempt to call Morgan or Barricella as witnesses, or instead to bring out the information contained in the affidavit by examining the Syracuse police officer who had interviewed Morgan," Officer Michael Ostuni. (*Id.* ¶ 103). Rivas's attorney "opted to draw the information out of" Officer Ostuni. (*Id.*). Officer Ostuni testified that Morgan had claimed that in March 1988, "he had a conversation with his friend and neighbor Barricella . . . at which time Barricella confessed to killing 'the girl on Hickok Avenue.'" (*Id.* ¶ 104). Morgan told Officer Otsuni that Barricella had "driven by the crime scene several times as police were investigating Hill's murder and was stopped by police as a result." (*Id.* ¶ 105). "A contemporaneous police

report corroborated Barricella's account, and revealed that Barricella had, in fact, been stopped by police after driving by the crime scene repeatedly." (*Id.* ¶ 106). Officer Ostuni also testified that "Morgan was a career criminal who had contacted the police from a county jail cell and demanded release as a quid pro quo for cooperation." (*Id.* ¶ 107).

During the defense's case, "evidence was also adduced that, on Friday afternoon a witness had seen a Stephen King novel that Hill had checked out from the Cazenovia Public Library in the back seat of Hill's car." (*Id.* ¶ 108). "[T]his book was returned to the library's drop box sometime between Saturday afternoon and Sunday morning, suggesting that Hill (the most likely person to have returned it) was alive at least as late as Saturday afternoon." (*Id.* ¶ 109). Additionally, a witness "who claimed to have seen Rivas at Albert's in Cazenovia as early as 7:30 p.m. on Friday" testified. (*Id.* ¶ 110).

After eight hours of deliberation, the jury found Rivas guilty of second-degree murder. (*Id.* ¶ 119). On May 12, 1993, he was "sentenced to an indeterminate term of imprisonment" from "twenty-five years to life." (*Id.* ¶ 121). "After Hector Rivas was convicted, Dr. Mitchell resigned from his position as Onondaga Medical Examiner, and defendant Fitzpatrick dropped his office's criminal investigation into Mitchell." (*Id.* ¶ 122).

### D.     Subsequent Litigation

#### 1.     New York State Court

Rivas "appealed his conviction, but it was affirmed by the Appellate Division of the New York Supreme Court," and his "application for leave to appeal to the New York Court of Appeals was thereafter denied." (*Id.* ¶¶ 123–24). He then "filed a motion to vacate the judgment of conviction pursuant to N.Y. Criminal Procedure Law § 440.10, which provides the means of collateral attack on a criminal judgment in New York state courts." (*Id.* ¶ 125). He alleged that Mitchell "altered his original estimate of the time of Hill's death in order to satisfy the District

7

Attorney in hopes of avoiding prosecution for alleged criminal misconduct." (*Id.* ¶ 127). He had discovered after trial that "despite Mitchell's testimony that he had examined 'slides' in coming to the conclusion that Hill most likely died on the night of Friday, March 27, 1987," and "despite Fitzpatrick's characterization of these slides in his summation as 'autopsy sectional slides,' there were, in fact, no section slides of Hill's brain in the medical examiner's file." (*Id.* ¶ 129).

As part of the motion, Rivas submitted an affidavit by Dr. Cyril H. Wecht, "an expert in forensic pathology, who attested that Mitchell's calculations of the cause of death were 'misguided,' and that, in his expert opinion, 'based upon a reasonable degree of medical certainty, the length of time between the death of Valerie J. Hill and the time she was found was less than 48 hours, and more likely less than 36 hours.'" (*Id.* ¶ 131). This means that, according to Dr. Wecht, "Hill died between 3:30 p.m. on Saturday, March 28, and 3:30 a.m. on Sunday, March 29 – during a time when Rivas's alibi was airtight." (*Id.* ¶ 132).

Rivas also argued that "a significant amount of exculpatory material had [been] withheld from the defense at trial," including: (1) an affidavit from one of Hill's neighbors, Mary Lazarski, in which she attested that "in the evening of Saturday, March 28 or early in the morning of Sunday, March 29 . . . she heard through her open window 'a loud shriek or scream [that] seemed to cut off'"; (2) "[a]n affidavit from Lazarski's husband in which he confirmed that his wife woke him up and told him about the incident that night"; (3) "a police report memorializing an interview with another unnamed neighbor . . . [who] told the police that he heard a dog barking and a car speed away from the vicinity of Hill's house at around 11:00 Saturday night"; (4) "a police report regarding an interview with a neighbor who had seen Hill intimately embracing a man other than Rivas a few days prior to her murder"; (5) "[a] police report of another interview stating that Hill had been involved in an intimate relationship with a

8

man other than Rivas at the time of her death"; (6) "[i]nformation that one of Hill's neighbors had previously been arrested for burglary and was known to peer through windows in the neighborhood"; (7) "[i]nformation that an employee at the hospital where Hill worked had been disciplined after Hill made a complaint against him"; (8) "[i]nformation regarding a purported 'sexual deviant' who was residing in Hill's neighborhood"; (9) "[t]he fact that one of the prosecution witnesses had a prior conviction"; (10) Hill's diary; and (11) "[t]he affidavit stating that Patsy Barricella, not Rivas, had committed the crime." (*Id.* ¶ 133(a)–(k)).

"On April 7, 2000, Acting Onondaga County Supreme Court Justice John J. Brunetti conducted an evidentiary hearing in connection with Rivas's § 440.10 motion. At the close of the hearing, Rivas's motion was denied." (*Id.* ¶ 137).

### 2. Federal Court

In 2002, "Rivas filed a petition for a writ of habeas corpus." (*Id.* ¶ 138). "[H]e raised substantially the same claims that he had advanced before the state court," claiming that "he was entitled to a new trial in light of newly discovered evidence of misconduct and false testimony by the medical examiner." (*Id.* ¶ 139). "The district court dismissed Rivas's claim as time-barred." (*Id.* ¶ 140 (citing *Rivas v. Fischer ("Rivas I")*, No. 01-cv-1891, 2005 WL 8165617, 2005 U.S. Dist. LEXIS 49473 (N.D.N.Y. Jan. 28, 2005), *vacated and remanded*, 294 F. App'x 677 (2d Cir. 2008))). Rivas appealed this decision to the Second Circuit, which "vacated and remanded the judgment of the district court, holding that additional fact-finding on the issues of timeliness and actual innocence was required." (*Id.* ¶ 142 (citing *Rivas v. Fischer ("Rivas II")*, 294 F. App'x 677 (2d Cir. 2008))).

"After a hearing, the magistrate judge issued a Report and Recommendation recommending that Rivas's petition be dismissed as untimely." (*Id.* ¶ 145 (citing *Rivas v. Fischer ("Rivas III")*, No. 01-cv-1891, 2010 WL 1257938, 2010 U.S. Dist. LEXIS 29695 (N.D.N.Y. Jan.

9

8, 2010), *report and recommendation adopted*, No. 01-cv-1891, 2010 WL 1257935, 2010 U.S. Dist. LEXIS 29689 (N.D.N.Y. Mar. 26, 2010), *rev'd and remanded*, 687 F.3d 514 (2d Cir. 2012))). "Rivas filed timely objections to the Report and Recommendation" and "[a]fter further briefing from both sides, U.S. District Judge Gary L. Sharpe, upon de novo review, adopted the magistrate judge's Report and Recommendation and dismissed the petition without reaching the merits." (*Id.* ¶ 146 (citing *Rivas v. Fischer ("Rivas IV")*, No. 01-cv-1891, 2010 WL 1257935, 2010 U.S. Dist. LEXIS 29689 (N.D.N.Y. Mar. 26, 2010), *rev'd and remanded*, 687 F.3d 514 (2d Cir. 2012))).

"On appeal, the Second Circuit again reversed, holding as a matter of first impression in this Circuit that a 'credible' and 'compelling' showing of actual innocence warrants an equitable exception to the AEDPA's limitation period, allowing a petitioner to have his otherwise time-barred claims heard by a federal court." (*Id.* ¶ 147 (citing *Rivas v. Fischer ("Rivas V")*, 687 F.3d 514 (2d Cir. 2012))). The Second Circuit "concluded that Rivas had made such a showing, having produced essentially unchallenged expert testimony 'which call[ed] into serious doubt the central forensic evidence linking him to the crime,' and as a result, 'a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit.'" (*Id.* ¶ 148). The case was therefore remanded so the petition could be heard on the merits. (*Id.* ¶ 149).

On remand, the district court "denied Rivas's petition in its entirety." (*Id.* ¶ 150 (citing *Rivas v. Fischer ("Rivas VI")*, No. 01-cv-1891, 2013 WL 4026844, 2013 U.S. Dist. LEXIS 110014 (N.D.N.Y. Aug. 6, 2013), *rev'd and remanded*, 780 F.3d 529 (2d Cir. 2015))). "Upon further appeal, the Second Circuit again unanimously reversed." (*Id.* ¶ 151 (citing *Rivas v. Fischer ("Rivas VII")*, 780 F.3d 529, 532 (2d Cir. 2015))). The Second Circuit stated that the case "turned on rebutting the prosecution's theory as to the time of death," but

"[i]nexplicably . . . [Rivas's trial attorney] relied on a strategy that was completely divorced from this central issue." *Rivas VII*, 780 F.3d at 549. Thus, "it was an unreasonable application of *Strickland*[3] for the state collateral review court to deny Rivas's claim of ineffective assistance of counsel." *Id.* at 552. The Circuit thus "reversed the judgment of the district court, denying habeas relief and remanded the case, holding that on remand, the district court 'shall issue a writ of habeas corpus to Rivas by the sixtieth calendar day after the issuance of our mandate unless the state has, by that time, taken concrete and substantial steps expeditiously to retry Rivas.'" (*Id.* ¶ 156 (quoting *Rivas VII*, 780 F.3d at 552)). This mandate was issued on March 11, 2015. (*Id.* ¶ 157).

      **E.**     **Rivas's Re-Prosecution**

"After the [Second Circuit] mandate was issued, the prosecution – led by defendant Fitzpatrick – took no steps to vacate Rivas's judgment of conviction, a necessary prerequisite to retrying him." (*Id.* ¶ 158). Rivas's attorney "ultimately brought the motion to vacate the conviction." (*Id.* ¶ 160). The Onondaga District Attorney's Office did not consent, join, or oppose the motion. (*Id.* ¶ 161). "On April 20, 2015, Onondaga County Court Judge Thomas J. Miller granted Rivas's motion and vacated the judgment of conviction against him." (*Id.* ¶ 163). Judge Miller set bail at $500,000, which Rivas's "wife, son, and relatives were unable to come up with." (*Id.* ¶ 164).

For the next year and a half, while Rivas was incarcerated, "Fitzpatrick and his office deliberately stalled and delayed Rivas's retrial." (*Id.* ¶ 166). During this period, "Fitzpatrick and his office and/or the [Syracuse Police Department ("SPD")] turned over never before seen *Brady* material," including "two marijuana pipes" that were in Hill's living room and "a police report

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

11

by an informant who named someone else as a possible suspect in Hill's murder." (*Id.* ¶ 167). The *Brady* material disclosed included "copies of police reports and information regarding an individual named Richard Conte." (*Id.* ¶ 168). In September 2012—four years earlier—"Angela Conte emailed the Syracuse Police Department after reading a media account regarding the legal proceedings in Rivas's habeas case," and told them "that her father, Mark Conte, always suspected that his brother Richard Conte had 'killed a nurse in East Syracuse in the late 1980's.'" (*Id.* ¶¶ 168–69). SPD interviewed Kelly Conte, Angela's mother, who told investigators "that Mark Conte had told her that he believed that his brother Richard had killed a nurse who lived near Shop City." (*Id.* ¶ 170). Hill's apartment was "located approximately .08 miles from Shop City." (*Id.*).

On April 6, 2016—over a year after the Second Circuit issued its decision in *Rivas VII*—"[t]he Second Circuit directed the People to appear before it and show cause why Rivas should not be released from confinement pending his retrial on the basis that the People had failed to take concrete and substantial steps expeditiously to retry Rivas." (*Id.* ¶¶ 176–77). At the hearing, the Second Circuit "stated that the People had repeatedly disregarded court-imposed deadlines on retrying Rivas," and "serious[ly] question[ed]" whether "the state had taken" any concrete and substantial steps to retry him. (*Id.* ¶ 178). Onondaga County Assistant District Attorney Robert Moran "effectively told the panel of the Second Circuit judges that his office had no ability to effectively rebut the testimony of Rivas's forensic pathologist, and that they could not establish beyond a reasonable doubt that Hill died on Friday, March 27, 1987." (*Id.* ¶ 179).

"Fitzpatrick and his office" knew "that Rivas was in poor health and suffering from advanced stage cancer." (*Id.* ¶ 181). Rivas passed away "on or about July 10, 2016." (*Id.* ¶ 3). "On July 14, 2016, the indictment against Hector Rivas was dismissed and sealed by the

Onondaga County Court." (*Id.* ¶ 184). On July 13, 2019, Plaintiff filed the instant action. (Dkt. No. 1).

### III. STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court accepts as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)."Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided" on a motion to dismiss "if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (quoting *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014)).

IV.    **DISCUSSION**

    A.    **Scope of Defendant's Motion**

The Amended Complaint alleges one cause of action against the City—municipal liability arising under *Monell*.[4] (Dkt. No. 16, ¶¶ 223–38). In its motion to dismiss, Defendant moves to "dismiss[] the amended complaint against it in its entirety" because all of Plaintiff's other claims are either time-barred or fail to state a claim, and thus "[b]ecause no independent constitutional violation . . . survive[s], there is no underlying constitutional violation to support his *Monell* claim." (Dkt. No. 23-5, at 20). Plaintiff contends that because the City "has neither appeared nor moved on behalf of any of the non-municipal or Doe defendants, it lacks standing to ask this Court to dismiss claims brought only against those defendants." (Dkt. No. 25, at 5). In its reply, Defendant clarified that it "is not seeking dismissal of any individual constitutional claims," but rather "is seeking dismissal of the complaint against it" because all of the "individual constitutional claims fail." (Dkt. No. 27, at 3–4). Accordingly, the Court's analysis is limited to determining whether the *Monell* claim against the City should be dismissed.[5]

    B.    **Malicious Prosecution**

Defendant argues that Plaintiff's malicious prosecution *Monell* claim should be dismissed because the Amended Complaint "fails to plausibly allege that the underlying criminal proceeding terminated in a manner that affirmatively indicates [Rivas's] innocence." (Dkt. No. 23-5, at 11). Plaintiff contends that "the record of the criminal proceedings contains affirmative

---

[4] In a letter to the Court, Plaintiff clarified that he is alleging that "the City of Syracuse is liable, under *Monell*, for all of the claims pleaded in the First Amended Complaint." (Dkt. No. 30).

[5] Though Defendant argues that "it is . . . well-settled that the courts possess an[] 'inherent authority to dismiss meritless claims *sua sponte*,'" and so the Court has the power to dismiss the claims against other Defendants here, (Dkt. No. 27, at 3 n.1 (quoting *Baker v. Spinner*, No. 18-cv-0950, 2019 WL 3430918, at *6 n.6, 2019 U.S. Dist. LEXIS 126541, at *18 n.6 (N.D.N.Y. July 30, 2019))), the Court does not find any basis for exercising that power here. *See infra* § IV.C n.7.

14

indications of [Rivas's] innocence," and so the termination of criminal proceedings should be deemed "favorable." (Dkt. No. 25, at 9).

In *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018), "the Second Circuit clarified that federal law, rather than state tort law, defines the elements of a § 1983 malicious prosecution claim." *Blount v. City of New York*, No. 15-cv-5599, 2019 WL 1050994, at *2, 2019 U.S. Dist. LEXIS 34969, at *4 (E.D.N.Y. Mar. 5, 2019) (citing *Lanning*, 908 F.3d at 25). "In doing so, the Circuit reaffirmed that the 'favorable termination' element of a federal malicious prosecution claim requires 'affirmative indications of innocence,' regardless of developments in state tort law." *Id.* Specifically, "a plaintiff asserting a malicious prosecution claim under § 1983" must show "that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence"—when a termination "'leaves the question of guilt or innocence unanswered[,] . . . it cannot provide the favorable required as the basis for [that] claim.'" *Lanning*, 908 F.3d at 22, 29 (quoting *Hygh v. Jacobs*, 961 F.2d 359, 367–68 (2d Cir. 1992)). The termination must be on the "'merits' rather than 'on any number of procedural or jurisdictional grounds.'" *Rosario v. City of New York*, No. 18-cv-4023, 2019 WL 4450685, at *4, 2019 U.S. Dist. LEXIS 159771, at *11 (S.D.N.Y. Sept. 16, 2019) (quoting *Lanning*, 908 F.3d at 28). While "[n]o single type of disposition is necessary or sufficient . . . the termination must be 'measured in objective terms by examining the totality of the circumstances.'" *Id.* (quoting *Lanning*, 908 F.3d at 28). "Under this standard, the Second Circuit found the *Lanning* plaintiff's 'vague allegations' of favorable termination insufficient" because his charges "were dismissed posttrial 'without [him] specifying how or on what grounds;' the plaintiff agreed the dismissals were based at least in part on lack of jurisdiction; and a state court had explicitly stated that there

15

was no 'determination of the merits' upon dismissal." *Rosario*, 2019 WL 4450685, at *4, 2019 U.S. Dist. LEXIS 159771, at *12 (quoting *Lanning*, 908 F.3d at 28)

In this case, Plaintiff alleges that the Rivas's prosecution terminated in his favor because the District Attorney knew the case was unwinnable; engaged in dilatory tactics to try to delay trying the case as long as possible, knowing that Rivas had advanced stage cancer, and hoping that he would die in jail; and that in fact, following Rivas's death, "the indictment against [him] was dismissed and sealed by the Onondaga County Court." (Dkt. No. 16, ¶¶ 162, 166, 181–184). Defendant argues that the Amended Complaint does not allege that "the criminal proceedings against Rivas were terminated in a manner that affirmatively indicates his innocence," because the indictment was dismissed as a result of Rivas's death. (Dkt. No. 23-5, at 12–13).[6]

Here, construing all reasonable inferences in favor of Plaintiff, the Court finds that—at this stage—Plaintiff has alleged enough facts to suggest that "the prosecution terminated in some manner indicating that [Rivas] was not guilty of the offense charged." *Lanning*, 908 F.3d at 28. Plaintiff alleges facts that suggest that DA Fitzpatrick effectively abandoned the prosecution. After the Second Circuit found that Rivas had "raised a credible and compelling claim of actual innocence," because he offered "essentially unchallenged [expert] testimony that the victim was almost certainly killed at a time when Rivas had an uncontested alibi," *Rivas V*, 687 F.3d at 517–18, Plaintiff alleges that DA Fitzpatrick "deliberately stalled and delayed Rivas's retrial" for over a year after the conviction was vacated, knowing that prosecutors "had no way to prove his guilt," knowing that Rivas had "advanced stage cancer," and hoping that Rivas "would succumb to his illness" so that "the indictment "would have to be dismissed by virtue of Rivas's death."

---

[6] While the Amended Complaint does not state the reason for the dismissal it alleges that the prosecutors "knew that the criminal indictment against Rivas would have to be dismissed by virtue of Rivas's death," and that it was dismissed after Rivas's death. (Dkt. No. 16, ¶¶ 3, 183, 184).

16

(Dkt. No. 16, ¶¶ 166, 179–183). Plaintiff has alleged additional specific facts, asserting that during this period of delay, "the Second Circuit directed the People to appear before it and show cause why Rivas should not be released from confinement pending his retrial on the basis that the People had failed to take concrete and substantial steps expeditiously to retry Rivas." (*Id.* ¶ 176). Plaintiff further alleges that at this hearing Onondaga County Assistant District Attorney Robert Moran "effectively told the panel of the Second Circuit judges that his office had no ability to effectively rebut the testimony of Rivas's forensic pathologist, and that they could not establish beyond a reasonable doubt that Hill had died on Friday, March 27, 1987." (*Id.* ¶ 179). Plaintiff also alleges that he has "consistently maintained his innocence." (Dkt. No. 16, ¶ 85).

"[E]xamining the totality of the[se] circumstances"— the Court cannot say as a matter of law that Plaintiff could not prove that Rivas's prosecution terminated in a manner that indicated his innocence. *Lanning*, 908 F.3d at 28. *See Virgil v. City of New York*, No. 17-cv-5100, 2019 WL 4736982, at *7, 2019 U.S. Dist. LEXIS 167081, at *21 (E.D.N.Y. Sept. 27, 2019) ("[T]he Court finds that post-Lanning, a dismissal based on the state's express inability to prove its case beyond a reasonable doubt is sufficient to show a favorable termination for a § 1983 malicious prosecution claim."); *Rosario*, 2019 WL 4450685, at *3–4, 2019 U.S. Dist. LEXIS 159771, at *11–12 (declining to dismiss a § 1983 malicious prosecution claim where the plaintiff's "conviction was vacated . . . , after he was imprisoned for nearly twenty years, following the DA's reinvestigation concluding that he had not received a fair trial, and the indictment was dismissed because the DA "did not believe it could prove the case"); *Heidelberg v. Manias*, No. 118-cv-01161, 2019 WL 4862069, at *22, 2019 U.S. Dist. LEXIS 173695, at *67 (C.D. Ill. Mar. 26, 2019) (stating that, where the § 1983 plaintiff's conviction was vacated and then the plaintiff died awaiting retrial, "the Court is not persuaded that [the plaintiff] cannot, as a matter of law"

sustain a malicious prosecution claim); *Blount*, 2019 WL 1050994, at *3, 2019 U.S. Dist. LEXIS 34969, at *10–11 (declining to dismiss a malicious prosecution claim where the dismissal followed an order suppressing evidence; finding affirmative indications of innocence surrounding the dismissal "[b]ased on the reasons given by the state court in its suppression order, coupled with the fact" that the plaintiff "ha[d] maintained his innocence of all charges throughout the prosecution and subsequent civil proceedings"). Accordingly, considering this case's unique set of facts and its early stage, the Court declines to dismiss Plaintiff's malicious prosecution claim.

      **C.**    **Timeliness**

Defendant argues that Plaintiff's fair trial, *Brady*, abuse of process, and unreasonably prolonged detention claims are time-barred, and thus the *Monell* claims against it should be dismissed because there is an "absence of an independent constitutional violation." (Dkt. No. 23-5, at 13–20). Plaintiff argues that even assuming the underlying constitutional violations are time-barred, Defendant's "motion to dismiss the *Monell* claim against it nevertheless fails on the ground that, in the Second Circuit, a cause of action against a municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a municipal 'policy or custom.'" (Dkt. No. 25, at 7 (quoting *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995)). According to Plaintiff, "[b]ecause the statute of limitations is an affirmative defense, defendant bears the burden of establishing that the limitations period has expired since the [*Monell*] claims accrued." (*Id.* (quoting *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995))). Defendant does not respond to this argument, other than a general assertion that "a person's civil rights can only be violated while he or she is alive." (Dkt. No. 27, at 5).

18

The Court agrees with Plaintiff. "When a defendant raises the statute of limitations as an affirmative defense in a motion to dismiss, the defendant bears the burden of demonstrating, based on the allegations in the complaint, that the claim is untimely." *Laboy v. Ontario Cty.*, 318 F. Supp. 3d 582, 589 (W.D.N.Y. 2018) (quoting *Egan v. Kennedy*, No. 04-cv-6626, 2008 WL 4647740, at *3, 2008 U.S. Dist. LEXIS 83034, at *7–8 (W.D.N.Y. Oct. 17, 2008)). In *Pinaud*, the Second Circuit stated that "a cause of action against [a] municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a [municipality] 'policy or custom.'" 52 F.3d at 1157. In this case, the Amended Complaint contains "no allegations regarding when plaintiff learned that the City of Syracuse's harmful acts were the consequence" of SPD policy, (Dkt. No. 25, at 7–8), nor has Defendant offered any argument as to how it has met its burden in demonstrating that the "complaint clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999); *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) ("[P]leading requirements in the Federal Rules of Civil Procedure . . . do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses.").

Defendant offers no caselaw to support its argument that Plaintiff's *Monell* claims accrued no later than the date of Rivas's death, regardless of whether it was clear then that the constitutional violations allegedly suffered by Rivas were caused by municipal policies or customs. Contrary to this position, in *Barrett v. United States*, 689 F.2d 324, 333 (2d Cir. 1982), the Second Circuit held that the estate of a man who suffered a constitutional injury could sue long after the man died, because he did not know or have reason to know of his injury.

Accordingly, the Court cannot conclude that Plaintiff's *Monell* claims are time-barred, and therefore, "at the motion to dismiss stage, the statute of limitations does not operate as a bar" to Plaintiff's claim. *Laboy*, 318 F. Supp. 3d at 589 (declining to dismiss a *Monell* claim on a motion to dismiss because the defendant had failed to meet its "burden of demonstrating, based on the allegations in the complaint, that the claim is untimely").[7]

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) (Dkt. No. 23) is **DENIED.**

**IT IS SO ORDERED.**

Dated:  July 10, 2020
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[7] In order to provide some guidance to the parties, should any of these issues resurface, the Court notes as follows. Even if the Court were to reach the question of whether Plaintiff's underlying constitutional claims are time-barred, it appears that Plaintiff's fair trial and *Brady* claims were timely. *See McDonough v. Smith*, 139 S. Ct. 2149 (2019). In *McDonough*, the Supreme Court held that the statute of limitations for a fair trial claim does not begin to run until "the criminal proceedings against the defendant [*i.e.*, the § 1983 plaintiff] have terminated in his favor." *Id.* at 2155. In this case, the indictment against Rivas was dismissed on July 14, 2016, (Dkt. No. 16, ¶ 184), within three years of when the case was filed. On the other hand, *McDonough* would not appear to control when the statute of limitations runs on an abuse of process claim because § 1983 abuse of process can be "remedied without disputing the validity of [a plaintiff's] conviction," *Hadid v. City of New York*, No. 15-cv-19, 2015 WL 7734098, at *4, 2015 U.S. Dist. LEXIS 160537, at *13 (E.D.N.Y. Nov. 30, 2015), *aff'd*, 730 F. App'x 68 (2d Cir. 2018).With respect to Plaintiff's unreasonably prolonged detention claim, the threshold question is what "specific constitutional right" is at issue. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017); *see* Dkt. No. 16, ¶ 205 (alleging Plaintiff's continued detention violated his rights under the Fourth and Fourteenth Amendment); *Manuel*, 137 S. Ct. at n.8 (noting that "once a trial has occurred . . . [a] person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment"). The parties must then identify the most analogous tort, and consider whether the claim accrued when Plaintiff's detention ended, *see Manuel v. City of Joliet, Ill.*, 903 F.3d 667, 670 (7th Cir. 2018), or whether the claim accrued when the criminal proceedings terminated, like the claim at issue in *McDonough*. *See Manuel*, 137 S. Ct. at 921–22.