UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

                    *Plaintiff,*

    vs.

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
AND "JOHN DOES 1-10",

                    *Defendants.*

*AFFIRMATION OF*
*WILLIAM J. FITZPATRICK*

Civil Action No. 5:19-cv-844
(BKS/TWD)

---

Under the penalty of perjury, William J. Fitzpatrick, affirms the following to be true, upon

personal knowledge and/or upon information and belief, with respect to the matter entitled The

People of the State of New York versus Hector Rivas, Indictment No. 92-1114-1, as venued in

Onondaga County, New York:

1.      I am an attorney duly licensed to practice in the State of New York having been

admitted to the practice of law on January 17, 1977, upon graduation from Syracuse University

College of Law in 1976.

2.      Upon graduation from law school, I became an Assistant District Attorney in

Onondaga County, New York. I continued as an Assistant District Attorney until December 31,

1986. At that time, I became associated with the law firm of Tisdell, Moore and Walters which was

located in the City of Syracuse, New York. My practice primarily focused on criminal defense. I

was not employed by the Onondaga County District Attorney's office when Valerie Hill's

(sometimes referred to as decedent) body was found on 3/30/87.

1

3.      As District Attorney of Onondaga County, I assert my defense of absolute immunity for any liability in this lawsuit for my actions in preparing the prosecution of Hector Rivas, in presenting the case to the Grand Jury, in preparation for trial, in the conduct of the trial, and with regard to all post-trial matters.

4.      In 1991, I successfully ran for the office of District Attorney in Onondaga County and was sworn in with respect to such position on January 1, 1992. I have held this Office from that date to the present. In addition to a variety of matters which I undertook to address upon becoming District Attorney, I was of the belief that there were certain so-called cold cases that should be reviewed. The death of Valerie Hill was not specifically in mind, but it was a cold case. My Chief Investigator Peter Tynan was tasked to review cold cases and he brought the murder of Valerie Hill to my attention. Only then did I begin to actively review this file (Ex. F, pgs. 22-23). The Plaintiff, Mr. Manes is sarcastic and dismissive in the Complaint of my efforts to revive cold cases when I became District Attorney. In my opinion it was and is the standard of care for a District Attorney to review and revive cold cases where the facts and evidence support pursuit of a case against a likely perpetrator. It is not a matter of my seeking a "notch in my gun" as Mr. Manes asserts. The advance of technology and investigative techniques and the advantage of a second look are all strong factors that require a properly functioning District Attorney's Office to examine unsolved cold cases. Because I was not employed by the Onondaga County District Attorney's Office when Valerie Hill's strangled body was found in her home on March 30, 1987, I relied heavily upon the work of my Chief Investigator who was involved in the initial Valerie Hill investigation as a Sergeant of Detectives of the Syracuse Police Department. He told me that he believed there was enough evidence gathered by the Syracuse Police Department to prosecute Hector Rivas. When I reviewed the file, I agreed and we prepared the case for presentation to the

2

Grand Jury.

5.    In preparation for the Grand Jury, because five years had passed, we interviewed witnesses. I spoke with John Cassano, Susan Stonecipher, Joseph Fields, and Investigators John Brennan and Tom Stassi. I learned from my review of the file that the scene at which the body had been found had been reviewed by law enforcement and the Onondaga County Medical Examiner's Office and the opinion of the Medical Examiner was that she had died 2 to 3 days prior to the discovery of her body; that forensic evidence collection had been undertaken; that witnesses had been interviewed, including the defendant; that photographs had been taken, and; that an autopsy had been conducted of the victim of this homicide (Ex. F, pg. 25). As a result of my review, in conjunction with that of Investigator Tynan's, it was my judgement that the Valerie Hill homicide should be brought to the Grand Jury as there was a large body of circumstantial evidence for her death occurring late on March 27, 1987, Rivas had no alibi for that date and time frame, the date was within the range of time of death estimated by the medical examiner, and Rivas had motive as a jilted lover. We therefore commenced further investigative preparation for the purpose of taking the case to the Grand Jury. The decision was not based on any animus toward Hector Rivas, it was based on an honest view that the file warranted a re-investigation of the Syracuse Police efforts to reconfirm and that he was the likely perpetrator.

6.    While I supervised the preparation for presentation to the Grand Jury, Investigator Tynan managed the actual field preparation which included interviewing witnesses previously questioned by the Syracuse Police Department and collecting additional evidence. I, of course, also interviewed some of the witnesses in furtherance of preparation as an advocate for grand jury and trial proceedings (Ex. F, pg. 23-26). I should note that as District Attorney, I routinely try cases for my office. Usually, I try murder cases. I have, throughout my career, been asked to prepare

and sometimes try difficult murder cases for other district attorneys as well. I always interview witnesses if possible before their testimony to the Grand Jury or a jury.

7.      With respect to Dr Erik Mitchell, who was then the Onondaga County Medical Examiner, I was aware that he had conducted an on-the-scene investigation of the decedent and her apartment as well as the postmortem examination with regard to the death of Valerie Hill in March of 1987, and had recorded in his initial report a range for time of death of 2 to 3 days from discovery of the body. Dr. Mitchell was actually in the apartment and viewed decedent's body as it was found. My first contact with Dr. Mitchell regarding this matter would likely have been in October or November 1992, prior to Grand Jury presentation of this matter to prepare for his testimony. (Ex. F, pg. 26). It is likely that prior to the Grand Jury, Investigator Tynan confirmed with Dr. Mitchell that he still was of the opinion that the range of time of death was 2 to 3 days from discovery of the body. I am certain that I also spoke with him to review his testimony. This is our custom and practice. Dr. Mitchell testified in the Grand Jury as to the range of time of death consistent with his March 30, 1987 recorded finding in the Medical Examiner's official record that the range of time of death was two to three days from the body being found. I probably spent three to five minutes with Dr. Mitchell talking about time of death. My conversation was in anticipation of his testimony and occurred in October-November 1992.

8.      During the course of my review of the file in preparation for the Grand Jury, I became aware that the Syracuse Police Department investigation obtained details about Hector Rivas' relationship to Valerie Hill occurring prior to her death. The Syracuse Police Department learned Rivas had written to Ms. Hill and/or sent flowers to her every day in the several months after their break-up, and that this was unwanted contact. Mr. Rivas' recollection of the events of March 27, 1987, through March 29, 1987, had been reviewed by me and I found that his

4

whereabouts for the evening of March 27, 1987, were uncorroborated. In fact, Mr. Rivas had indicated, during his interview with the police, that he had left Coleman's bar on March 27, 1987, which was located in Syracuse, New York, and traveled to another establishment called Albert's, which was located in Cazenovia, New York. The Syracuse Police investigation revealed that there was a significant gap in Mr. Rivas' timeline suggesting that he lied about claiming he went straight from Colemans to Alberts, especially after having been seen by two witnesses parked in his vehicle outside the home of Valerie Hill in the late evening hours of March 27, 1987. (Ex. F, pg. 27).

9.     I made the determination to present the case to the Grand Jury because of the expectation of a significant amount of circumstantial evidence collected by the Syracuse Police Department which we confirmed Mr. Rivas had both the motive and the opportunity to kill Valerie Hill. It was further my opinion that this homicide had taken place during the evening of March 27, 1987, or the early morning hours of March 28, 1987, based upon the information from the file. (Ex. F, pg. 29). We were aware from the Syracuse Police Department investigation that Mr. Rivas had a history of stalking and violence toward women. This fortuitously came out at the trial when Rivas' friend, Mark Brosh, testified that Rivas had stalked a former girlfriend and had been criminally charged with beating her. These facts, though known to us, would have been inadmissible at the trial. However, Rivas' lawyer, Mr. Calle, attempted to make Brosh a character witness only to have Brosh disclose on cross-examination, Rivas's violent propensities toward his former girlfriend. This was obviously a failure by Mr. Calle to speak with the witness in advance. While I could not get Rivas' violent propensities into evidence in my direct case, Mr. Rivas's trial counsel, in attempting to get Mr. Brosh to provide character evidence for Mr. Rivas, learned for the first time standing before the jury, of Rivas' dangerous and inappropriate conduct. It was a devastating moment in the trial for the defense and a stunning blunder by Mr. Calle.  (Ex. C-4).

10.     Therefore, for the Grand Jury and trial preparation based on my many years as a homicide prosecutor, it was my opinion as an advocate that the overwhelming circumstantial evidence demonstrated that Mr. Rivas had caused the death of Valerie Hill most likely on March 27, 1987. That date of death was within the range opined and recorded by Dr. Mitchell on the day he saw the body in her apartment. The evidence presented to the Grand Jury and at trial, and witnesses who testified in the Grand Jury and at trial, is as summarized below.

Valerie Hill was a family-oriented, loving individual and medical professional who cared deeply for her family and friends. She was a registered nurse and a decent, conscientious person. On March 27, 1987, she had met her father at a restaurant in the evening hours. She had plans to travel to Saratoga Springs the next morning, a Saturday, to visit with her friend, Laura Adams. Ms. Adams told our investigators and ultimately testified that she repeatedly telephoned Ms. Hill on the evening of Friday, March 27, 1987, and during the day on Saturday, March 28, 1987, without any answer. Ms. Adams did not hear from Ms. Hill at all throughout that entire weekend. We knew that no one saw Ms. Hill on Saturday or Sunday and her car remained parked in her driveway in front of her garage as it had been parked on Friday evening. That was the testimony at trial (Ex. C-6, pgs. 216-220). Additionally, we learned that Ms. Hill's cat, which she loved and diligently tended to, was found roaming about the outside of her residence on Saturday morning, which was highly unusual (Ex. F, pg. 30). It wasn't until Monday, late morning, when Ms. Hill's body was discovered within her residence by her father and brother who were investigating why they had not heard from her since Friday night. Mr. Rivas, who, as noted above, had been in a failed romantic relationship with Ms. Hill, had been seen in his parked vehicle outside of her residence late in the evening of March 27, 1987, by two witnesses, Ms. Susan Stonecipher and Mr. James Crimi. Mr. Rivas acknowledged during his interview with the police that he had been at her

residence that day on two occasions in the hope of speaking with her even though they had separated, at her request, some months prior. Mr. Rivas did not telephone Ms. Hill nor attempt to stop at her residence on either Saturday or Sunday, or leave her a note, which was contrary to his practice up to that point, as he had been leaving flowers and/or notes every single day since the break-up. Prior to this weekend Mr. Rivas had provided to Ms. Hill a plethora of notes, flowers and cards, expressing his continued interest in her. Additionally, Mr. Rivas had also made a practice of stopping by Ms. Hill's residence uninvited throughout the day. The behavior of Mr. Rivas, on both Saturday and Sunday, and his speaking of Ms. Hill in the past tense on Saturday while at a party with others, clearly gave rise to the inference that Mr. Rivas knew that Ms. Hill had died on Friday night (Ex. F, pg. 28).

The body of Ms. Hill, on examination, did not exhibit any defensive wounds. Cigarettes of the Defendant and fingerprints of the Defendant were found in Ms. Hill's apartment, including on a bottle of rum which Mr. Rivas had purchased during the evening of Friday, March 27, 1987. According to the testimony of Mark Brosh, Rivas smoked Barclay's cigarettes which were found at the murder scene. A "shrine" was observed by police in the home of Hector Rivas which contained a picture of Ms. Hill along with burning candles and a statute of the Virgin Mary as seen by Officer Phinney. Rivas was seen at or around the scene of the murder on Friday evening between 11 p.m. and 12 a.m. by two witnesses, Ms. Stonecipher and Mr. Crimi. (Ex. C-2, pg. 937 and Ex. C-3, pg. 533). Rivas had a key to her apartment and there was no evidence of forced entry. In addition to the above, additional circumstantial evidence regarding the time of death and Rivas as a suspect in that death include: a torn note from the decedent's ex-boyfriend that was found in the defendant's trash but was suppressed at trial; the only item conclusively proven to be missing from the decedent's apartment was a single airline ticket she had purchased for a vacation. The ticket

was never found nor used; A library book that the decedent had borrowed was returned sometime on Saturday. I suggested at trial that this was an effort by Rivas to establish an alibi. The Second Circuit ridiculed this theory. In re-examining the evidence in preparation for a second trial, Rivas' fingerprints were found on the book proving that my theory wasn't so far-fetched after all; and finally, also discovered in re-examination of the physical evidence was Rivas' DNA on the marijuana pipe on decedent's kitchen table (though not sufficient in amount to allow testimony at trial) and Rivas' DNA was found on the Barclays cigarettes found in decedent's kitchen ashtray. All gave rise to my belief and were the basis of this prosecution that he had killed Ms. Hill late Friday evening or during the early morning hours of Saturday. As noted above, the circumstantial evidence was supported by the opinion of Dr. Erik Mitchell who opined on March 30, 1987, in writing after examination of the body and the scene of the crime that Hill had been dead for two to three days. His opinion regarding the range of time of death was consistent with the above circumstantial evidence. Joseph Fields, an acquaintance of Rivas with whom Rivas bowled and played softball, heard Rivas while drunk at a bar two weeks after the murder, tearfully exclaim "Valerie, Valerie I didn't mean to do it". (Ex. C-5, pg. 817). This admission strongly buttressed the case against Rivas. My trial preparation as set forth herein is subject to absolute immunity, which I am asserting as a defense in this case and as a bar to all causes of action. Mr. Fields testified about this admission both in the Grand Jury proceeding and in the trial.

11. The Plaintiff's claims (claims one through eight) regarding my actions in preparing this case to be presented to an Onondaga County Grand Jury for its consideration are barred by absolute prosecutorial immunity. That Ms. Hill's death had occurred on Friday evening or early Saturday morning, March 27-28, was consistent with the evidence then in the possession of the People based on the investigation that was conducted by the Syracuse Police and my office. My

conduct at every stage of the pre-trial process is absolutely immune from liability in this lawsuit. I was acting as an advocate utilizing the investigation of the Syracuse Police Department to prepare this case for presentation to the Grand Jury and for trial.

12.     It is well known that time of death, absent an observed death, is not the product of exact science. Rather, the time of death can vary greatly due to a variety of factors. However, Dr. Mitchell's typed note that death had occurred two to three days before her body was discovered lead me to conclude that the possibility of her having been murdered on Friday was consistent with both the circumstantial facts and his opinion (Ex. F., pgs. 33, 43). It was also evident that the time of death was not precisely known as the Death Certificate, signed by Dr. Mitchell, identified the month and year of death but not the day of death (Ex. F, pg. 50)(Ex. A, pg. 20). However, in speaking with Dr. Mitchell in routine preparation for the Grand Jury in November of 1987 and reviewing the evidence then known, the time of death, in the evening hours of March 27, 1987 or early hours of March 28, 1987, was consistent with his findings. Therefore, based upon the circumstantial evidence, and in good faith, I proceeded to present to the Grand Jury the facts and they concluded that Ms. Hill had been killed on or about Friday, March 27, 1987, by Hector Rivas. I did not urge Dr. Mitchell to change his opinions for the purpose of his testimony to the Grand Jury. He already held the opinion that the time of death was two to three days prior to the discovery of the body. There was no investigation pending of Dr. Mitchell by my office or any other agency to my knowledge at the time of the Grand Jury testimony. He certainly was not under investigation by my office. I made no deal not to prosecute Dr. Mitchell prior to his Grand Jury testimony in return for his testimony. This claim is offensive, unsupported and rendered absurd by the fact that Dr. Mitchell had already opined as to the range of time of death as a matter of judgment totally consistent with the People's theory of the case.

13.    I did not provide Dr. Mitchell with the hypothetical in the Grand Jury that I gave him at trial. I am careful in Grand Jury presentation to avoid hearsay and thus generally do not give experts hypotheticals that I would use at trial after proven testimony is given to form the facts. This conduct is entitled to absolute immunity from liability in this lawsuit and I assert that defense.

14.    I had no further conversations with Dr. Mitchell regarding the Valerie Hill homicide until prior to the trial of this matter. (Ex. F, pg. 53). Prior to Dr. Mitchell's trial testimony, I did routinely review with him what I anticipated questioning him about regarding his medical findings. That was and is my custom and practice. While I do not remember the specific details of the preparation, I am certain nothing addressed during my routine pretrial preparation of Dr. Mitchell for trial testimony caused me to question my theory of the case. He had opined on March 30, 1987, as well as in November of 1992 that the range of time of death was 2 to 3 days from discovery of the body. I did not ask Dr. Mitchell to alter his opinions, I did not offer him non-prosecution as alleged by Mr. Manes (without any factual basis) in preparing him for trial in return for this testimony in the Rivas case. There was no prosecution or investigation by my office pending regarding Dr. Mitchell when he testified. I had received no complaints about Dr. Mitchell. I was aware that certain of his employees had complained to the County and State officials and those complaints were the subject of administrative review. I discuss this in more detail below. Moreover, such an improper deal was unnecessary because Dr. Mitchell was already of the opinion that the range of time of death was 2 to 3 days prior to the discovery of the body, including Friday, March 27th, as noted above. My preparation of Dr. Mitchell for trial was in good faith, privileged, and is subject to the defense of absolute immunity which I assert.

15.    Dr. Mitchell testified at trial. There was no variation in Dr. Mitchell's opinion between the time of his Grand Jury testimony and his testimony at trial. When he testified before

the Grand Jury, I did not provide him with the hypothetical that I presented to him at trial. As the Court knows, prosecutors are not to offer hearsay evidence at trial. The Grand Jury testimony occurred over three days. Dr. Mitchell testified at the beginning of the second day. More fact witnesses were to follow. Consequently, I did not offer him a fact-based hypothetical in the Grand Jury because certain assumptions were not yet in evidence. The fact-based hypothetical offered at trial caused Dr. Mitchell to opine based on the facts presented that death more likely occurred on March 27, 1987 to the early hours of March 28, 1987. At the time of Dr. Mitchell's Grand Jury testimony, witnesses had yet to testify, including Elizabeth Lewis, a fact witness prepared by Assistant District Attorney Glenn Suddaby who testified for 43 pages, James Crimi, Susan Stonecipher, and Donald Stonecipher. I did not want to risk placing an assumption that would not be allowed into evidence at trial before the Grand Jury. Every trial lawyer knows that asking an expert a hypothetical question must be based on facts that are in evidence. Hypotheticals are subject generally to extensive objections. I saved the hypothetical for trial as a judgment call. I did not discuss a hypothetical with Dr. Mitchell prior to his testimony at the Grand Jury.

16. With respect to the autopsy findings pertaining to the brain of Ms. Hill, it was during the course of cross-examination at trial that topic was first addressed. Specifically, in response to Mr. Calle's question regarding the time of Ms. Hill's death, Dr. Mitchell testified to the "variability" of factors impacting a determination of the time of death in homicide cases and that one rarely knows when another has died due to these variabilities (Ex. C-1, pg. 905). More specifically, Dr. Mitchell, when testifying about his various autopsy findings, stated that, "She had a fair amount of decompositional change inside - - in fact, her brain had sufficiently decomposed to have small holes in it. The tissues were flabby within." (Ex. C-1, pg. 905). Observation of brain decomposition was one of a variety of matters Dr. Mitchell addressed which influenced his testimony regarding

11

the time of death. (Ex. C-1, pgs. 905-906). Though the specific term "slide" had not been used by Mr. Calle nor Dr. Mitchell when referring to the brain, I had, during the course of redirect examination, inquired of Dr. Mitchell whether he had reviewed his "slides and notes" in preparation for trial, to which he acknowledged that he had. (Ex. C-1, pg. 915). There were autopsy Kodachrome slides of the brain. (Ex. N), and there were tissue slides, but not of the brain. I further inquired of Dr. Mitchell as to whether he had noted the decomposition of the brain as a result of having reviewed his slides, to which he also answered that he had (Ex. C-1, pg. 915). The appearance of the brain, in conjunction with the other significant findings including the presence of rigor in a 62 degree apartment, provided Dr. Mitchell with the facts upon which he determined that the time of death could have been on Saturday, March 28, 1987; Friday, March 27, 1987, or, for that matter, Thursday, March 26, 1987, though the latter date was "less likely, but it's possible," according to Dr. Mitchell. (Ex. C-1, pg. 916). Although I am not a pathologist, I work on a regular ongoing basis with pathologists and I agree with the Plaintiff's expert, Dr. Spitz, and Defendants' expert forensic pathologist agrees that Dr. Mitchell's testimony regarding the range of time of death was within the standard of care. My conduct during the trial, and that of Dr. Mitchell as a witness, is protected by absolute immunity and I assert the same as a defense to this lawsuit.

17. There is a great deal made after trial about the use of the word "slides" of the brain of Ms. Hill. It is a fact that there were Kodachrome photographic slides of the brain taken as a part of the autopsy, as noted by Dr. Mary Jumbelic and Robert Masters, our experts in this case. That was routine and common practice. There were no microscopic slides containing brain tissue of Ms. Hill maintained by the Medical Examiner's Office. Rather, the slides referred to were Kodachrome 35-millimeter photographs taken of the brain and which had been encased in a cardboard frame. These frames, measuring approximately one inch by one inch, were commonly used during the

'80's and '90's under like circumstances for subsequent viewing on a projector. While it is true in summation that I used the phrase "autopsy sectional slides of the brain," I was mistaken as that was not the exact testimony of Dr. Mitchell because he did not use the word "sectional." (Ex. C-7, pg. 1083). However, neither Dr. Mitchell, nor Mr. Calle, nor I referred to tissue slides, which would be the proper descriptive term for tissue samples contained with a slide to be viewed under a microscope. However, this single sentence used by me in my summation which referenced such slides was a minor component of my recitation of the global factors which served to assist Dr. Mitchell in forming his opinion as to the range of time of death of Ms. Hill. The only erroneous representation was that the slides seen by Dr. Mitchell on the Kodachrome were not photos of sections. While I do not specifically remember, I believe I was aware that Neuropathologist Dr. George Collins sectioned and viewed the brain to view its inner portions but he did not place any brain tissue on microscopic slides according to his report. I offer the Court the foregoing by explanation to prove my right to absolute immunity regarding these issues action as I was acting as an advocate as a bar to the alleged relevant causes of action. I am not waiving my immunity defense, but I believe the truth regarding this matter is important. I am asserting absolute immunity as a defense in this case, and particularly as to my advocacy.

18.    I further affirm that I, at no time prior to the sentencing of Mr. Rivas, engaged in any conversation nor in any other fashion communicated to Dr. Mitchell that if he were to change his opinion as to the time of death of Valerie Hill to comport with my theory of prosecution that I would discontinue any and all investigations pertaining to or involving him in his capacity as the Onondaga County Medical Examiner. At no time prior to the sentencing of Mr. Rivas was there a representation made by me to Dr. Mitchell that such investigations would be discontinued or that prospective charges would either be declined or dismissed. Such a purported *quid pro quo* was

never, under any circumstance, considered, discussed or engaged in by me with Dr. Mitchell at any time prior to the sentence of Hector Rivas. This claim by Mr. Manes is unsupported by any evidence. He alleges in the Complaint a conspiracy with Mitchell and his attorney to not prosecute Mitchell in the Nanette Gordon case which was years before the murder of Valerie Hill. There was no conspiracy, Dr. Mitchell was not a suspect by me, and we identified a likely suspect who expired before we could further investigate him. Mr. Manes asserts he was present when this alleged conspiracy commenced but admits in his deposition testimony he did not hear any such discussion. (Ex. D-1, EBT I, pg. 43). In fact, in his deposition testimony he did not recite anything that approximated actual knowledge of a conspiracy or quid pro quo of non-prosecution in exchange for favorable testimony in the Rivas case. I would not engage in such a criminal and unethical act which is the suborning of perjury. This conspiracy theory is further refuted and rendered absurd because it was unnecessary as noted above. Dr. Mitchell, on the day Ms. Hill's body was discovered, opined in writing a range of time of death from that date of two to three days placing the time of death possibilities of Friday 3/27, Saturday 3/28 or Sunday 3/29. His opinion as to the range of time of death in testimony to the Grand Jury and at trial was reached at in writing five years before the Grand Jury and the trial were convened. I assert absolute prosecutorial immunity as a defense to the baseless and inaccurate charges set forth in claims one through eight of the Complaint.

19. There is no showing by the defense that we violated any of the requirements set forth in *Monell* (claim 7). I can state unequivocally that the investigation and prosecution of Hector Rivas by myself and the members of the Onondaga County District Attorney's Office was undertaken in good faith and consistent with my oath of office. It was based on the investigation by the Syracuse Police Department in 1987 and prepared for Grand Jury for trial under my

14

direction as the District Attorney who presented the case to the Grand Jury and jury. The investigation in this case was previously conducted by the Syracuse Police Department. My office utilized that investigation for prosecution to the Grand Jury and trial jury. Had Dr. Mitchell's opinion been inconsistent with the theory of prosecution ascribed by me I would not have undertaken to present this matter to the grand jury when I had and under the circumstances then present. If such had taken place, I would have, consistent with my oath of office and my moral and ethical obligations, reviewed this matter further given this information. That Peter Tynan, the chief investigator of the District Attorney's Office, as he conducted the Syracuse Police Department investigation for the Grand Jury and trial, communicated with Dr. Mitchell or reviewed his records to confirm with Dr. Mitchell's original opinion regarding the range of the time of death of two to three days prior to March 30, reflects routine Grand Jury/Trial preparation. All of these acts are subject to absolute immunity for both myself and the County, not in violation of the requirements of *Monell.*

20. There are allegations in the Complaint that investigations being conducted by the Onondaga County Attorney, the Onondaga Health Department as well as the New York State Conservation Department, were pending against Dr. Mitchell that impacted the integrity of his testimony. At the time of his Grand Jury testimony, I was not aware of any investigations of Dr. Mitchell. I believe the facts support that there were no investigations pending on the date of the Grand Jury testimony of November 10,1992. No referral for prosecution had been made by any agency or complaint by any citizen to my office about Dr. Mitchell until July of 1993. That complaint was made by a citizen. I did then also speak with a representative of the New York State Health Department. The investigations commenced by the Onondaga County District Attorney's Office of Dr. Mitchell and his office commenced after that complaint.

21.    I did attend a press conference called by Dr. Mitchell on March 3, 1993 regarding the State Health Department investigating his department. I do not remember being present but there is a photo of me at the press conference that demonstrates my presence. (Ex. J). I do not recall speaking at the press conference. From a review of Dr. Mitchell's statement, an investigation had commenced by the State Health Department. From my retrospective review, no charges had been filed by the Health Department and no complaints or referrals about Dr. Mitchell of any type had been made to my office prior to or after the press conference on March 3, and the trial commencing. Consequently, when I prepared Dr. Mitchell for testimony at trial, we likely discussed his Grand Jury testimony, the autopsy report and the time of death hypothetical I intended to ask and ultimately did ask at trial. I do not specifically remember the detail of this meeting, but that is my custom and practice in the many trials I have prosecuted.

22.    I did not in any way attempt to influence Dr. Mitchell's opinion. I did not offer him that I would not prosecute him in return for his testimony in the Rivas case. At the time of the trial, he had opined twice, in writing and sworn testimony, once on March 30, 1987 and again under oath in the Grand Jury that the range of time of death included Friday, March 27, 1987. That claim is repugnant, a figment of Mr. Manes' animus toward me, a product of his imagination and without any factual support. I have never engaged in such conduct and certainly not in the Rivas case. I am advised that even if there was such a conspiracy, and there was not, that conduct bars this claim as I have absolute immunity.

23.    Several months after the Rivas trial, a complaint was made to my office regarding Dr. Mitchell's conduct relating to autopsy and body parts. The investigation by the Onondaga County District Attorney's Office into allegations of impropriety by the Onondaga Medical Examiner's Office and Dr. Mitchell commenced in mid July 1993. The defendant Rivas was

convicted by a jury on March 25, 1993, and was sentenced on May 12, 1993, at least two months prior to any investigation being conducted by my office. From my review of certain documents brought to my attention as it pertains to this case. I will summarize what appear to be investigative events surrounding Dr. Mitchell:

1) In 1988, there was a Medical Examiner Oversight Committee appointed by the County. I was not employed by the County at that time and was unaware of this until reviewing documents for this case.

2) On March 3, 1993, I attended a press conference called by Dr. Mitchell. I do not recall being present. The press clipping indicate he was responding to certain allegations by his employees and that there were investigators present in his office from State agencies.

3) The trial of Rivas was held from March 17, 1993 to March 25, 1993.

4) On April 13, 1993, I attended a hearing/investigatory session conducted by the County Attorney and the County Legislature relating to the management of the Medical Examiner's Office. I have listened to parts of the tape of that session which explored the management of the Medical Examiner's Office. I do not recall this session.

5) In or about July of 1993 my office received a complaint about Dr. Mitchell's handling of a corpse by a family member.

6) Around that time, I also spoke with an investigator from the State Department of Health who advised me of certain investigatory details about Dr. Mitchell and his office. I don't recall the specifics.

7) However, based on that discussion and the complaint by the citizens, I

decided that rather than wait for a Health Department report, I assigned my chief investigator Peter Tynan to investigate the Dr. Mitchell matter.

8) It is important to note the Medical Examiner's Office is a separate branch of County government managed by the County Executive through his appointed Commissioner of Health. (*See,* the Onondaga County Charter). The District Attorney's Office is a separate branch of government and has no civil management or oversight of the Medical Examiner's Office. Dr. Mitchell and every medical examiner I have worked with will speak with defense counsel and provide defense counsel with their insights and opinions prior to trial. Mr. Calle did not avail himself of this important opportunity. In this case, when we received a complaint in July of 1993, we investigated promptly – even though we had investigations pending relevant to our office in which Dr. Mitchell would be a likely witness.

9) Mr. Tynan prepared a memorandum dated November 16, 1993, and then a report regarding Dr. Mitchell dated November 19, 1993. Based on that report I immediately advised then Onondaga County Executive Nicholas Pirro of Investigator Tynan's findings. My probe was of photos that were inappropriately taken at three autopsies, inappropriate tissue harvesting, and inappropriate management of bodies and body parts. The very day I received Mr. Tynan's further report, I called for Dr. Mitchell's resignation. I made it clear that there was no finding of guilt or innocence at that point, and that the probe was not completed but that if he resigned, the probe would go no further.

10)	I spoke with Dr. Mitchell and his attorney Sidney Cominsky in the fall of 1993, likely after Mr. Tynan reported to me.

11)	A meeting thereafter was convened by County Executive Nicholas Pirro in which Dr. Mitchell voluntarily offered to resign and satisfied with that outcome, I did not proceed with any further action or investigation. That was an agreement with Dr. Mitchell's attorney Sidney Cominsky. Dr. Mitchell resigned but remained in the Medical Examiner's office to complete his pending case load.

12)	During the time of this probe, I had cases pending in which Dr. Mitchell was the medical examiner.

24.	This decision was based upon my assessment of the evidence obtained during the course of this investigation, my concern that Dr. Mitchell would not be an effective witness if he continued in his present capacity, the need to bring closure to the families of those affected and in the interests of justice.

25.	The attached **Exhibit M** reflects my full statement of November 19, 1993, with regard to our investigation of Dr. Mitchell. It notes that "Since mid-July of this year, this office has conducted an investigation into the practice of Onondaga County Medical Examiner Erik Mitchell. This probe has as its genesis, published reports about a convicted child pornographer being photographed at the Medical Examiner's Office, MEO, during an autopsy." The statement also mentions Investigator Dennis Griffin who was employed by the New York State Health Department with whom I spoke in the summer of 1993 about Dr. Mitchell and the operation of his office.

26.	The statement emphasizes that there were a series of other events found in our

investigation including inappropriate photographs, the disposition of body parts and tissue harvesting, all raising questions about the legality of such actions. I was careful to state that I was not forming any conclusions, that Dr. Mitchell was entitled to the presumption of innocence, I formed no conclusions about what his actual knowledge was about any of these events, and that I was anticipating that Dr. Mitchell would be resigning. Furthermore, I in a public way indicated that with a resignation there would be no further prosecution. There was no private corrupt deal. I am entitled to absolute immunity regarding this matter which was a lawful exercise of my prosecutorial discretion. To the extent that the complaint in this case alleges these acts, I assert prosecutorial immunity as a bar to any claim.

27.    As to the Appellate issues and delay as alleged in Plaintiff's complaint at paragraphs 164, 165, 166, 175, 176, 177, 178, 179, 180, 181, 182 and 183:

- Mr. Rivas appealed his conviction to the Appellate Division, Fourth Department. The jury verdict of conviction was affirmed.

- A CPR 440 Motion and hearing was conducted before the Hon. John Brunetti. In a written Decision on September 8, 2000, Justice Brunetti upheld the conviction and dismissed Mr. Rivas' motion to set aside the verdict.

- Proceedings were brought in Federal Court. One magistrate and two federal court judges upheld the conviction. (*Rivas v. Fischer,* Civ. Action No. 9:01-cv-1891 (GLS/DEP) United States District Court for the Northern District of New York.)

- The Federal Second Circuit Court of Appeals overturned the conviction and ordered a new trial. (*Rivas v Fischer*, 687 F3d 514 [2d Cir 2012])

- My office diligently proceeded to offer Mr. Rivas a new trial. I was not aware Mr. Rivas was in poor health as alleged in paragraph 181 of the Complaint.

- The case was assigned to County Court Judge Miller who attempted to schedule new trials on four different occasions, only to be confronted by requests for adjournments by Mr. Rivas' counsel. The transcripts of those proceedings are attached as exhibits. It is noteworthy that Mr. Manes was one of the attorneys of record for Mr. Rivas during each appearance.

28. On March 25, 2015, Judge Miller held an "on the record" conference with Mr. Rivas present. Assistant District Attorney Rob Moran appeared for the People. Richard M. Langone, Esq. and Sidney Manes, Esq. appeared for the Defendant. The Court noted that the conference was the result of the Decision by the United States Court of Appeals for the Second Circuit Decision dated March 11, 2015. (*Rivas v. Fischer*, 780 F.3d 529.)

Reciting the Decision, Justice Miller, by virtue of the conference, was attempting to take concrete and substantial steps to retry Mr. Rivas.

Mr. Langone and Mr. Manes were asked as to whether or not they would be the attorneys to try the case, Mr. Langone stated he needed thirty days to figure out the logistics. Mr. Manes stated he would remain as pro bono counsel. (Ex. S-1, pgs. 3-5, P011359-P011361).

The Court at this proceeding gave the parties a motion schedule of May 8th for filing, the People's response by May 15, and oral argument on May 23. The Court stated that a trial date would be scheduled on April 20, 2015. My office announced we were ready for trial.

A 440.10(1)(h) motion was made and granted based upon a finding that the Defendant was deprived of the effective assistance of counsel at his prior trial. My office did not oppose the motion. No other motions were made by the defense even though the schedule called for all motions to be made by that date.

On April 20, 2015, Mr. Langone would not commit to being trial counsel, but asked

to stay "on board" for motion purposes. Judge Miller appointed Attorney Edward Klein also as counsel for Mr. Rivas. The Court heard argument regarding bail and set the case down for trial on December 7, 2015. Defense counsel asked that Defendant's time to make motions be extended to on or before August 10, 2015, with argument on September 21, 2015. (Ex. S-2, pgs. 3-17, P011431-P011445). No motions were made by the defense. The December 7, 2015, trial was again adjourned at the request of the Defendant.

When the Court convened on January 5, 2016, in this matter, it addressed the Second Circuit's December 23, 2015, Order that a retrial commence on or before February 1, 2016, with the expectation that Mr. Langone proceed as trial counsel.

Mr. Langone had not filed an appearance as trial counsel in County Court. In response to the Second Circuit's opinion, he advised the Court he could not try the case on that date. He previously advised Judge Miller he would not be participating in a retrial and told the Second Circuit he could not try the case until the end of March at the earliest.

Judge Miller offered to try the case in February of 2016, and the People announced they were ready. Mr. Klein had previously indicated that he could not accommodate the December 7, 2015, trial date as his expert was not available. (Ex. S-3, pg. 4, P12428). Mr. Klein, according to the Court, still had not filed motions that were due in August of 2015. (Ex. S-3, pg. 6, P012430). A new trial at Mr. Klein's request was scheduled for March 21, 2016. (Ex S-3, pgs. 4-5, P012428-P012429). Judge Miller noted he was confused by the Second Circuit's Order as Mr. Langone had advised Judge Miller he would not be participating in the trial, as Mr. Klein noted in seeking more time:

> "It's a complex case because of how badly Mr. Rivas was represented in 1993 from his arrest in November of '92 to a trial in March of '93, and the passage of time. It's a complex situation and can't be done quickly."
> (Ex. S-3, pg. 13, P012437).

There was a further appearance before Judge Miller on March 18, 2016, in which

Mr. Rivas, Mr. Klein, and new attorneys Kimberly M. Zimmer and Casey Johnson appeared. In

the conference, Mr. Klein indicated that he was satisfied with the extent and pace of discovery

toward the trial date (Ex. S-4, pgs. 4-7, P012447-P012450). He explicitly stated neither the DA's

Office nor I were the problem in terms of the delay. He acknowledged that the delay was based on

the age of the case and the incompetence of Mr. Calle. Here is the relevant portion of the transcript:

> MR. KLEIN: The only obstacle -- Mr. Moran has been cooperative throughout. As we have needed things, I let him know. He's checked for them. They either exist or don't exist. He informs me of that. The obstacle is the nature of the case. The obstacle is the history of the case and the material that has to have been gone through. I want to note that Mr. Fitzpatrick, during the trial when there was the Brady problem that became an issue on appeal and the 440, the late provision of material at the time of trial, Mr. Fitzpatrick on the record said that he was frustrated because every time a police officer came over, they came over with new reports that he had never seen. That has continued. There are reports that Mr. Moran hasn't seen. There are reports that we know are out there that haven't been provided to Mr. Moran. We keep coming across things and partly because the files are paper files. I don't know what manner they kept records in those days, but it wasn't computerized, and so we continue to learn things and get things. Also complicated by the fact that we now have modern technology. We have DNA. We have better laboratory procedures. So there are tests that have been done. There are tests that we're requesting be done. That all takes time. And against that is the background of the case. **It was indicted in late November of 1992 and tried in March of 1993 by an attorney from out of the area who lacked skills to try any criminal case, let alone a homicide case, and who had asked for an adjournment of that trial and Judge Mulroy denied it. Even though at that point he had asked for an adjournment, he had not had his investigator come to Syracuse. His investigator spent two days here in early March with a trial of two weeks and saw maybe five people and went back to New York City. That's what -- you know, we're retrying a case that was so screwed up in the beginning that it's taking longer now to get it in shape to be tried.**
>
> Mr. Moran is not part of that and he's not being an obstacle. The obstacle is the history of the case, and I really think the Second Circuit is taking another look at that because I don't think they were aware of that when they issued a mandate last spring. So maybe they're re-thinking it, but it has nothing to do with you or the court. You offered trial dates that were speedy and would have allowed the case to be tried, but it couldn't have been tried by any competent defense team before now and we're trying, as we talked about that, to have it ready for June. And that

is going to be difficult, but we're committed to do that. But any competent defense counsel team would be in the same position where we are given the history of the case and what has to be done. (Emphasis added)

Judge Miller outlined the problems he had scheduling the trial, pointing out it was on the defense and that Mr. Klien was requesting adjournments from him, and Mr. Manes was pressing the Second Circuit for an immediate trial:

> But having reviewed the submission of the Second Circuit and now looking at their order this morning, it's ironic, I would say, if not disingenuous, to be complaining in correspondence about the scheduling of this case for trial when no motions have been filed by the defense. Discovery issues, if they exist, don't prevent filing some of these motions. I have none at this point. I've attempted from the first appearance date to give you a trial date, and each time I've been told the defense isn't ready, for whatever reason. The March trial date been moved yet again at the defense request now to June. Initially you were given a December trial date. I was told that was too soon. The Second Circuit is free to do whatever they see is justice, but I am at a complete loss as to what I'm to do or what they would do if they were in my shoes to move this case along. This trial is scheduled now for June. If I have to be here by myself with twelve jurors, then I'll be here by myself. Don't come to me looking for any further adjournments. I will not grant them. **It is intellectually inconsistent that on the one hand the defendant, through Mr. Manes, is saying to the Second Circuit I want my trial now, and on the other hand Mr. Klein is telling me he's not ready to go to trial and I need more time for motions.**

> June 13th is our trial date. That's a date certain whether this defendant is in or out of custody. I will be here with a jury. I hope you'll all join me. There are too many people involved in this case, and, frankly, there are too many courts involved in this case.

> Mr. Langone told me he was not involved in this case. However, the Second Circuit has indicated their expectation he should be here ready to try this case back on February 1st. Frankly, as I indicated to you all at the Bench, I don't get it. (Emphasis added). (Ex. S-4, pgs. 7-9, P012450-P012452).

29.    Hector Rivas died on July 10, 2016. A trial date had been established for June 13, 2016. (Ex. S-4, pg. 8, P012451). Any delay in scheduling the trial was attributable to his attorneys, and the logistical issues presented by this trial and not by any intentional and/or malicious acts of my office as the record clearly indicates.

## THE UNITED STATES COURT OF APPEALS,
## SECOND CIRCUIT JULY 9, 2012, DECISION

30.     The Plaintiff obviously views this Decision as a springboard for his claim.  This

Decision ignored Dr. Mitchell's opinion recorded on the date of the discovery of Ms. Hill's body,

March 30, 1987, that she had been dead 2 to 3 days.  (Ex. A, pg. 17).  The Court relies on hearsay

– a search warrant authored by a police officer – that does not quote Dr. Mitchell directly that the

time of death was between Saturday and Sunday and a newspaper article apparently predicated

thereon.

31.     As noted multiple times before, it was Dr. Mitchell's opinion therefore, before I

was District Attorney and before he would have known anything about Rivas' alibi that the range

of her time of death was two to three days prior to the discovery which included Friday, March 27,

1987.

32.     Peter Tynan, the Syracuse Police Sergeant of Detectives who participated in the Hill

murder investigation at the time of the discovery of her body, recalled that Dr. Mitchell told him

at that time that Hill had been dead at least two days.

33.     The Second Circuit in terms of expert proof had before it only the affidavit of Dr.

Cyril Wecht, who is now deceased.  Dr. Wecht had a long history of lack of credibility regarding

financial matters, had been tried criminally and ultimately repaid hundreds of thousands of dollars

to his former employer.

34.     We present to this Court the opinion of former Onondaga County Medical Examiner

Mary Jumbelic, who opines that the two-to-three day range for the time of death is consistent with

good medical practice and that with the addition of circumstantial evidence pointing to Rivas'

guilt, Dr. Mitchell's trial testimony was appropriate and that she agrees with Dr. Mitchell that the

likely time of death was late Friday, March 27 to early morning on March 28, 1987.

35.    Plaintiff's own expert agrees that Dr. Mitchell's autopsy and testimony was consistent with the standard of care as noted above

36.    The Second Circuit consequently in this Decision omitted key facts and based their opinion as to Dr. Mitchell's conduct without the benefit of those facts which are now fully presented to this Court.

## MONELL CLAIMS

37.    While there is a claim based on Monell, I assert that such a claim has no factual or legal basis. I am the elected District Attorney of Onondaga County. No one in County government supervises me. All of the allegations raised factually are directed to me alone, thus there are no supervisory failures. If there are claims with regard to the District Attorney's Office, I believe the Supreme Court decision in *Connick v. Thompson* provides I cannot be sued in my official capacity for failure to train and supervise. 563 US 51 (2011).

## BRADY CAUSES OF ACTION

38.    I disclosed *Brady* deficits during the trial. The Court offered Mr. Calle a remedy which he accepted. In any event, I am entitled to absolute immunity with regard to this issue which is a bar to that claim.

## NEW EVIDENCE AT RETRIAL

39.    Finally, if there were a retrial of Rivas in 2016, within a reasonable probability, Rivas would have been convicted. The same witnesses that testified at trial would likely have been called to provide the same testimony. I would likely have called Dr. Mitchell to testify as to his investigative and autopsy finding and corroborate his opinion that Ms. Hill's death was within two to three days of her body being discovered. I would likely have called Dr. Jumbelic who would have testified consistent with her affirmation. I would also have called our fingerprint and DNA

26

experts who found the following: I would likely have called Ashley Tate who found Rivas' fingerprints on a bottle of Blue Nun and a blue flower canister found in Ms. Hill's apartment. Rivas' fingerprints were found on the library book returned on Saturday, confirming my theory that Rivas delivered the library book on Saturday to buttress his alibi. (Ex. V, pgs. 19-26). Fingerprints were not found of Pasquale Barracella, a possible suspect. Likewise, the report excludes Conte from a fingerprint perspective. Rivas' DNA was found on a marijuana pipe and on the cigarettes. (Ex. V, pgs. 6, 27).

### THERE IS NO PROOF AS TO MATERIAL ALLEGATIONS
### IN THE COMPLAINT

40.     I ask the Court to look at Mr. Manes' deposition testimony regarding the complaint he signed regarding the basis of his allegations. He could not support his allegations in:

- As to the allegation at Paragraph 26 of the Complaint, I would point out that I am not an employee of the County per se, I am an elected Constitutional officer.

- Paragraph 44 of the Complaint is incorrect. The request for a warrant did not quote Dr. Mitchell as to the estimate of time of death, it only referenced the medical examiner's office.

- As to the allegation at Paragraph 44 of the Complaint, that is inaccurate. Dr. Mitchell never signed any affidavit or other document establishing the time of death as Saturday or Sunday. He, in fact, opined in the medical examiner's record, Ms. Hill had been dead for two to three days.

- Paragraph 57 of the Complaint implies I manage the Medical Examiner's Office. I do not.

- As to the allegation in Paragraph 57 of the Complaint of a pattern of misconduct, there is no evidence of any pattern associated with this outrageous charge.

27

- Paragraph 58 of the Complaint is an outrageous allegation for which there is no proof and I deny.

- Paragraph 59 of the Complaint is also an outrageous allegation for which there is no proof and I deny.

- As to paragraphs 58 and 59, again, these are outrageous allegations that are unproven and that I deny.

- Paragraph 65 of the Complaint. This paragraph alleges that Dr. Mitchell revised his autopsy report. He did not. Manes admits there was no signed statement by Dr. Mitchell contrary to his original time of death estimate of 2 to 3 days prior to the discovery of the body. (EBT II, pgs. 12-13).

- Paragraph 66 of the Complaint. This paragraph claims Mitchell was under criminal investigation by my office at the time of his testimony. Manes cannot give a date or time. (EBT I, pg. 47).

- Paragraph 67 of the Complaint. Manes is unable to offer any actual knowledge of his claim (EBT I, pg. 67).

- Paragraph 69 of the Complaint. Manes alleges Mitchell changed his opinion regarding time of death. He admits Mitchell never put in writing his time of death opinion except in the medical examiner's record. (EBT I, pgs. 54-56)

- Paragraphs 69, 70 and 71 of the Complaint. Manes acknowledges in his deposition that he has no actual knowledge of facts that support these allegations (EBT I, pgs. 68-70). He admits he does not know if the so-called deal was cut before Mitchell's Grand Jury testimony. (EBT I, pg. 70).

- Paragraph 74 of the Complaint which accuses Dr. Mitchell and myself of presenting

fabricated and false testimony to the Grand Jury, Manes acknowledges he can't answer what specific testimony was fabricated, but states "A district attorney can indict a corned beef sandwich." (EBT I, pg. 71). He ultimately acknowledges he did not know what part of the testimony was fabricated or false. (EBT I, pg. 71-72). He attempts to say Dr. Mitchell testified about slides at the Grand Jury. Dr. Mitchell did not, which Manes acknowledged in his deposition. (EBT II, pg. 10). Manes acknowledges no discussion of slides occurred before the Grand Jury. (EBT II, pg. 26).

- Paragraph 76 of the Complaint alleges I withheld existence of an investigation of Dr. Mitchell from the Grand Jury. Mr. Manes had no proof of this. I commend to the Court his disjointed and non-factual testimony in his deposition regarding the claim which he acknowledges is an "assumption." (EBT II, pgs. 13-19).

- As to each claim made against me in the Complaint, I deny and I assert absolute immunity as a bar.

41.    The facts as alleged in the Complaint are utterly unsupported, inflammatory and without basis.

42.    I ask this Court to dismiss the Complaint in its entirety with costs as to all defendants based upon my affidavit and other supporting documents herein.


WHEREFORE, I ask that this motion be granted for summary judgment as I have absolute prosecutorial immunity as to every claim, I have proven entitlement to that bar as to all causes of action. There is no factual basis to support any of the claims as set forth in this case.

I affirm this _30_ day of October, 2024, under penalties of perjury under the laws of the State of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

William J. Fitzpatrick