UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

*Plaintiff,*

vs.

Civil Action No. 5:19-cv-844
(BKS/TWD)

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
AND "JOHN DOES 1-10",

*Defendants.*

---

### *MEMORANDUM OF LAW ON BEHALF OF*
### *WILLIAM FITZPATRICK*
### *IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*


Robert F. Julian, Esq.
Bar Roll #601157
Robert F. Julian, P.C.
*Attorneys for Defendants William Fitzpatrick
and Erik Mitchell*
Office and Post Office Address
2037 Genesee Street
Utica, New York  13501
(315) 797-5610


Dated:  October 30, 2024

# TABLE OF CONTENTS

Page

Table of Authorities……………………………………………………………… iii

STATEMENT OF FACTS………………………………………………………... 1

    Valerie Hill…………………………………………………………….. 1

    Search Warrant………………………………………………………….. 2

    William Fitzpatrick……………………………………………………… 3

    Grand Jury……………………………………………………………….. 3

    Hector Rivas……………………………………………………………… 3

    Richard Calle, Esq……………………………………………………….. 4

    The Trial of Hector Rivas………………………………………………… 5

    The Appeal……………………………………………………………….. 6

    The 440 Motion…………………………………………………………. 6

    The Second Circuit……………………………………………………….. 7

    Rescheduling of the Trial………………………………………………… 7

    Sindey Manes, Esq………………………………………………………. 7

**ARGUMENT**……………………………………………………………. 10

**POINT I -**    **DISTRICT ATTORNEY FITZPATRICK HAS
ABSOLUTE PROSECUTORIAL IMMUNITY**………………………… 10

**POINT II -**    **PLAINTIFF FAILED TO SUPPORT THE CLAIMS
ALLEGED IN THE COMPLAINT**…………………………………….. 12

    **A.**    **THE CLAIMS IN THE COMPLAINT ARE
NOT SUPPORTED FACTUALLY**……………..…………………….. 12

    **B.**    **THE ADVOCACY ACTS OF THE DEFENDANTS
FITZPATRICK AND THE COUNTY ARE ENTITLED
TO ABSOLUTE IMMUNITY**…………………………….…………… 14

i

**POINT III**

    **PLAINTIFF MANES RECANTS OR CONTRADICTS
    KEY ALLEGATIONS IN THE COMPLAINT**……………………………..    18


**POINT IV**

    **FITZPATRICK COMPLIED WITH DISCOVERY
    STANDARDS**…………………………………………………………….    22

**POINT V**

    **THE PLAINTIFF HAS PRESENTED NO PROOF THAT
    THERE IS A MONELL CLAIM**…………………………………………..    24

**CONCLUSION**………………………………………………………………    24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Anilao v. Spota,* 27 F.4th 855, 864 (2d Cir. 2022)………………………………………..    17, 18

*Bernard v. County of Suffolk,* 356 F.3d 495……………………………………………    17

*Brady v. Maryland,* 373 US 83 (1963)……………………………………………………    22

*Buckley v. Fitzsimmons,*
509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993)……………………………………..    12, 15 18

*Buari v. City of New York,* 530 F.Supp 3d 356, 380 (S.D.N.Y. 2016)………………………    17

*Burns v. Reed,* 500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991)… … … … … … …..    10

*Connick v. Thompson,* 563 U.S.51 (2011)…………………………………………………    24

*Dory v. Ryan,* 25 F.3d 81 at 83), cert. denied, 143 S. Ct. 1781 (2023)………………………    17, 18

*Giglio v. United States,* 450 U.S. 150 (1972)……………………………………………..    22

*Giraldo v. Kessler,*
694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler,* 424 U.S. at 431 n.33)…………………    17

*Hill v. City of New York,* 45 F.3d 653……………………………………………………..    18

*Imbler v. Pachtman,* 424 U.S. 409, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)…………………    10, 17, 18

*Kalina v. Fletcher,* 522 U.S. 118, 118 S. Ct. 502, 139 L.Ed.2d 471 (1997)…………………    10, 12

*People v. Aulet,* 111AD 2d 822 (2nd Dept. 1985)…………………………………………    23

*People v. DiPippo,* 27 NY 3d 127 (2016)…………………………………………………    22

*People v. Ford,* 62 NY 2d 275 (1984)……………………………………………………    23

*People v. Iannone,* 45 NY 2d 589 (1978)…………………………………………………    23

*People v. Lancaster,* 69 NY 2d 20 (1986)………………………………………………..    23

*People v. Negron,* 26 NY 3d 262 (2015)……………………………………………… 23

*People v. Primo,* 96 NY 2d 351(2001)……………………………………………… 23

*People v. Rivas,*

*People v. Rong He,* 34 NY 3d 956 (2019)…………………………………………… 22

*People v. Soto,* 26 NY 3d 455 (2015)……………………………………………….. 23

*Rivas v. Fische,* 687 F.3d 514 (2012)……………………………………………….. 12

*Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013)……………………… 17

*Van de Kamp v. Goldstein,*
555 U.S. 335, 129 S. Ct. 855, 172 L.Ed.2d 706 (2009)……………………………… 10

*Warney v. Monroe County,* 857 F. 3d 113 (2nd Cir. 2009)………………………… 11

*Werkheiser v. County of Broome,* 655 F.Supp. 3d 88, 101 (N.D.N.Y.2023)……………… 18

**Statutes**

NY Constitution, Art. I, Sec. 6……………………………………………………….. 23

CPL Section190.30(1)………………………………………………………………… 23

CPL Sections 210.20(1)(a)(b) and (c)………………………………………………… 23

CPL Article 240………………………………………………………………………. 22

CPL Article 245………………………………………………………………………. 22

Section 1983 (42 U.S.C. § 1983)……………………………………………………… 10

## STATEMENT OF FACTS

Valerie Hill:

On March 30, 1987, the body of Valerie Hill was found by her father, brutally murdered in her apartment in Syracuse, New York.  She had not been seen or heard from since Friday evening, March 27, 1987, when she had dinner with her father.

She had been scheduled to visit a friend who lived out-of-town for the weekend, and was expected to arrive on Saturday, March 28, 1987.  The friend did not hear from her, and she did not appear on Saturday or Sunday.  The friend's many telephone calls to Valerie's telephone were unanswered.  She had last been seen alive at her apartment by neighbors at noon on Friday.  Her cat had been left outside on Friday night, a rare occurrence.  Her car had not moved from Friday when she parked it.

Her father was accustomed to hearing from her daily and especially at that time because her step-mother was dying in the hospital.  He did not hear from Valerie all weekend.  Valerie was a registered nurse and fully aware of her step-mother's medical condition.  Her step-mother died on March 30, 1987.  William Fitzpatrick was not employed by the District Attorney's Office on the date of Valerie Hill's body being discovered, and did not participate in the immediate investigation in 1987.  Dr. Erik Mitchell was the medical examiner and examined the body as it was found in the apartment on March 30, 1987.  The Syracuse Police Department investigated Valeri's death.  Investigators included Detective Sergeant Peter Tynan.

Peter Tynan:

Peter Tynan was a Syracuse police officer (Sergeant) who investigated Valerie Hill's death on March 30, 1987, and thereafter.  (Ex. H, pg. 18).  Sergeant Tynan spoke with Dr. Mitchell shortly after the body was found.  Dr. Mitchell opined to Tynan that Hill had been dead at least

1

two days before her body was found.  (Ex. H, pg. 21-22).  Sergeant Tynan believed there was enough evidence to prosecute Rivas in 1987.  (Ex. H, pg. 19-20).

Tynan, in 1992 while still a Syracuse Police Officer, was loaned to the newly elected District Attorney, William Fitzpatrick, and became his chief investigator.  He was tasked to evaluate cold cases existing in the office and recommended to Mr. Fitzpatrick the reopening of the investigation of the death of Valerie Hill and the prosecution of Rivas.  (Ex. H, pgs. 22-25).  He then led the preparation of the case for the Grand Jury presentation, identifying existing evidence and finding new evidence.  The investigation led to the presentation of Valerie Hill's death brought before the Onondaga County Grand Jury and the indictment of Hector Rivas.

There was a note in the District Attorney's file about an interaction with Dr. Mitchell that states, "Pushes the time of death events further out." (Ex. H).  It is not clear if that note refers to Dr. Mitchell's opinion in the Medical Examiner's records that death occurred within two to three days of discovery of the body or to a conversation with Dr. Mitchell, or both.  (Ex. H, pgs. 30-32).  Rivas was indicted by the Grand Jury on November 16, 1992.  He was tried and convicted by an Onondaga County Jury on March 25, 1993.

Based on complaints received in July of 1994 about Dr. Mitchell's office, at the direction of Mr. Fitzpatrick, Investigator Tynan conducted an investigation of Dr. Mitchell's office that ultimately led to Mitchell's resignation in November of 1994.  This was the first and only investigation of Dr. Mitchell by the District Attorney's Office.  (Ex. H, pgs. 40-47).

Search Warrant:

A search warrant was sought to search the apartment of Hector Rivas on March 30, 1987. (Ex. V).  Police Officer Timothy Phinney, presented an affidavit reciting that the Medical Examiner's Office, Dr. Mitchell, opined that Valerie Hill was killed on Saturday or Sunday.  The

warrant was issued (Ex. U), and Rivas' apartment was searched. The search of the apartment caused the police to observe a shrine dedicated to Valerie Hill. It was not photographed. Dr. Mitchell never advised Officer Phinney, as the warrant request was phrased, that Valerie was murdered on Saturday or Sunday. Dr. Mitchell did tell Sergeant Tynan that it was his opinion she had been dead more than two days. He recorded in his contemporaneous records his opinion that she had been dead two to three days. (Ex. H, pg. 21)(Ex. A, pg. 17).

William Fitzpatrick:

District Attorney Fitzpatrick became employed by the District Attorney's office out of law school in 1976 and ultimately became the Chief Felony Prosecutor. He left the D.A.'s office in 1986 and rejoined the office after his election as Onondaga County District Attorney in 1992.

Grand Jury:

The Onondaga County Grand Jury convened on November 9, 10, and 16, 1992. 25 witnesses were called over three days. District Attorney William Fitzpatrick presented the case. Among the witnesses were James Crimi and Susan Stonecipher, who testified that they saw Hector Rivas in front of Valerie Hill's house in his car smoking a cigarette at 11:00 p.m. to 12: a.m. on March 27, 1987. (Ex. W, Pgs. 193, 201-202).

Hector Rivas:

Mr. Rivas had been in a romantic relationship with Valerie Hill but she ended their relationship several months before her death to his dismay. He wrote to her virtually every day thereafter. He visited her frequently without her consent. He had a key to her apartment. He had a history of violence toward women. He did not have an alibi for 10:00 p.m. on March 27, 1987, to early morning on March 28, 1987. Rivas was seen outside of her residence from 11:00 p.m. to 12:00 a.m. on March 27, 1987, sitting in his parked car smoking a cigarette by Mr. Crimi and Ms.

3

Stonecipher. He had purchased rum the evening of the murder, the same brand of which was found in MS. Hill's apartment. Two weeks after the murder, he stated before a friend, "Valerie, Valerie, I didn't mean to do it." (Ex. C-5, pg. 817). Rivas retained Richard Calle, Esq. to represent him at his trial. Rivas did not testify at his trial.

<u>Richard Calle, Esq.</u>

Mr. Calle was an attorney at law who represented Mr. Rivas at his trial. He was disbarred after this trial. At the time of his representation of Rivas, Calle did not have an office. He apparently had a file regarding Mr. Rivas, but that file has not been produced. Calle did not meet with Dr. Mitchell prior to the trial. He did not engage a forensic pathologist to testify regarding the autopsy of the issue of time of death. Subsequent attorneys were critical of his preparation as well as several courts and the Second Circuit.

During the trial Mr. Calle committed several noteworthy errors:

- Asked Mark Brosh, a prosecution witness called to establish the brand of cigarettes smoked by Rivas was the Barclay brand which were found smoked at the crime scene. Calle asked Brosh character related questions on cross examination about Rivas only to be told by Brosh that Rivas had previously stalked a girlfriend and had been criminally charged with beating her. (Ex. C-4, pg. 476-482).

- Was offered the opportunity to provide live witnesses rather than hearsay and opted to use less effective hearsay as compared to more effective live witnesses regarding possible other perpetrators. (Ex. R, pg. 9).

- On March 18, 2016, he was described in Onondaga County Court by Mr. Rivas' then attorney, Edward Klein, Esq., as an attorney who lacked the skills to try

4

any kind of criminal case, let alone a homicide. "We are relying upon a case that is so screwed up…" (Ex. S-4, pgs. 5-8).

<u>The Trial of Hector Rivas:</u>

Several weeks before the trial of Hector Rivas, Dr. Erik Mitchell held a press conference in response to an investigation by the New York State Health Department. William Fitzpatrick attended that press conference. He does not recall this event but there is a photograph of Fitzpatrick standing with Dr. Mitchell at the press conference. The investigation did not involve issues regarding Dr. Mitchell's autopsy or time of death opinion. No referral or complaint had been made to Mr. Fitzpatrick's office.

Fitzpatrick did not advise Mr. Calle of this event, however, he believes Calle was aware of it as he had newspapers obviously to be used for testimony on his counsel table during the trial. A total of 26 witnesses were called during the trial.

In summary, the evidence leading to Rivas' conviction was:

1.    The absence of any contact with Valerie Hill after she left her father on Friday, March 27, 1987. Valerie Hill's father testified he had dinner with her and did not hear from her again after 7 p.m. on Friday.

2.    That her car, which had been serviced that day, had not been moved from the time it was parked in the driveway on March 27, 1987. Testimony by a representative of the garage that serviced her car provided mileage at the time of the service. Mileage on the odometer was added for her drive home on Friday.

3.    That the friend who she was to travel to visit on March 28, 1987, did not hear from her and was unable to reach her by telephone starting on the evening of Friday, March 27th.

4.      That her father did not hear from her after she left having dinner with him even though her step-mother was in the hospital and dying, and that was entirely out of character.

5.      That her cat was found outside on Saturday morning, which was uncommon.

6.      That Susan Stonecipher and her boyfriend Jim Crimi saw Hector Rivas present outside of Hill's apartment between 11:00 p.m. and 12:00 a.m. on March 27th, parked in his car smoking a cigarette.

7.      Most important, Rivas made an admission in front of his friend at a bar stating, "Valerie, I didn't mean to do it," just two weeks after the murder.

8.      Barclay cigarettes were found smoked in Ms. Hill's apartment. This was Rivas' favored brand of cigarette.

9.      Rivas had a key to Hill's apartment and there was no evidence of forced entry.

10.     A library book borrowed by Hill was returned on Saturday, 3/28/87, suggesting Rivas had returned the book to evidence his alibi. (His fingerprints were found on the book in preparation for the re-trial).

The jury deliberated for eight hours before convicting Rivas.


The Appeal:

The Appellate Division, Fourth Department affirmed Rivas' conviction. *People v. Rivas,* 214 AD2d 996 (4th Dept. 1995).


The 440 MOTION: The motion was brought before Hon. John J. Brunetti after a hearing in which testimony was taken. The Court denied the motion in a written Decision.

<u>The Second Circuit:</u>   The Second Circuit inexplicably ignored Dr. Mitchell's written opinion of March 30, 1987, that the decedent had been dead 2 to 3 days from the date of discovery. Their finding that Dr. Mitchell changed his opinion as to time of death is wrong and inconsistent with the facts.

<u>THE RESCHEDULING OF THE TRIAL:</u>   The transcripts of four proceedings before Judge Thomas Miller dated March 25, 2015, April 20, 2015, March 18, 2016 and June 5, 2016. Judge Miller scheduled specific return dates for motions which were not met by Rivas' counsel. A trial date was set for December 7, 2015, which the defense counsel adjourned.  At no time did the prosecution request adjournments.

<u>SIDNEY MANES, ESQ.</u>

Attorney Sidney Manes, the Plaintiff Administrator of the Estate is an attorney licensed to practice law in the State of New York.

In this case, in paragraph 29 of the Complaint, he would allege factual statements unless he represented that it was upon information and belief.  He alleged a cascade of factual allegations for which he acknowledged he has no proof.

Every claim set forth in the Complaint is predicated on Mr. Manes' unproven and inaccurate belief that there was a conspiracy between William Fitzpatrick and Erik Mitchell, M.D. and his lawyer, Sidney Cominsky, Esq., to obtain the conviction of Hector Rivas. The Complaint alleges as facts that Mr. Fitzpatrick through Mr. Cominsky extorted the revised testimony of Dr. Mitchell to expand the time of death of Valerie Hill in return for not prosecuting him.  Mr. Cominsky testified emphatically that this did not happen and that when Mr. Fitzpatrick agreed not to prosecute Dr. Mitchell months after the Rivas trial, it was shortly before his resignation. (Ex. I, pg. 28-31).  The Complaint also alleges facts that they:

1) Misrepresented facts in the Grand Jury and at trial;

2) Withheld exculpatory evidence.

Mr. Manes conceded to the Second Circuit prior to the preparation of his Complaint that the District Attorney's Office was not investigating Dr. Mitchell at the time of the trial of the Rivas case in March of 1993. (See, Bates number 185419, which is the page of the transcript and Mr. Manes' testimony) (Ex. D-2, EBT II, pg. 46). Even though he conceded this important fact in Court before the Second Circuit, he alleged the contrary in the Complaint.

Mr. Manes was Mr. Rivas' attorney for years before bringing this lawsuit. He represented Rivas at the 440 hearing in the Court of Claims, State Supreme Court and the Second Circuit. He acknowledges that:

1) He never obtained Rivas' trial counsel Calle's trial file from Calle or from appellate counsel Richard Priest (Ex. D-1, EBT I, pg. 19-20). He never asked Rivas' other lawyers if they have any of the Rivas trial files. This is despite the fact that Mr. Calle was in Syracuse and testified in a 440 hearing before Justice Brunetti, and Mr. Leone and Mr. Manes were present in the Courtroom with Calle. There is no evidence even then that Mr. Calle was asked for his trial file. (Ex. D-1, EBT I, pg. 23). Mr. Calle's trial file, properly demanded in the case at bar, was not produced by Plaintiffs.

2) Although Mr. Manes met with Rivas 20 times, he did not make any notes of these meetings. (Ex. D-1, EBT I, pg. 23).

3) Mr. Manes did not ask Rivas if he was at Hill's apartment at 11:00 p.m. on March 27, 1987, given that he was seen parked in front of the apartment at 11:00 p.m. (Ex. D-1, EBT I, pg. 26)

4) Mr. Manes did not ask Rivas if he ever stated in the company of another person, "Valerie, Valerie, I didn't mean to do it." (Ex. D-1, EBT I, pg. 27) or if he erected a shrine to Valerie Hill in his house. (Ex. D-1, EBT I, pgs. 27-28).

5) Mr. Manes never discussed Rivas' case with Mr. Fitzpatrick, Dr. Mitchell, Dr. David Rigle, Dr. William Sawyer, or call any of the witnesses that testified at trial. (Ex. D-1, EBT I, pgs. 29-31).

The admissions are contrary to the facts pled in the Complaint given that Mr. Manes pled as fact in Paragraph 64 of the Complaint that the Defendants had no reasonable or probable cause to believe that Rivas had anything to do with the murder and sexual assault of Valerie Hill – and therefore no case against him for those crimes – unless it could prove that Hill died on Friday night, March 37, 1987.

The facts supportive of Rivas' guilt were extensive as collected by the Syracuse Police Department and presentation to the Grand Jury, to wit: upon the commencement of Mr. Tynan's investigation that Rivas was seen at the scene of the crime at 11:00 p.m. on 3/27/1987 by two witnesses; that Dr. Mitchell had opined in his notes on March 30, 1987, that Ms. Hill had been dead two to three days; that Dr. Mitchell told Tynan on or about March 30 that it was his opinion that Hill had been dead for more than two days; that Hill had not been heard from by anyone after the evening of March 27, 1987; that her cat was outside overnight; that she was not in touch with her friend who she was travelling to see on Saturday; and that she was not in touch with her father even though her step-mother was dying in the hospital. Mr. Rivas had motive, his despair over the relationship, opportunity, and he had no alibi for late March 27 to early morning of March 28.

## ARGUMENT

## POINT I

### I.    DISTRICT ATTORNEY FITZPATRICK HAS ABSOLUTE PROSECUTORIAL IMMUNITY

District Attorney Fitzpatrick has the defense of absolute immunity for all of the alleged acts and claims in this case which bar all of the causes of action (which he denies) pled by Plaintiff. To the extent that Fitzpatrick is alleged to have made false claims to the Grand Jury and presented false evidence to the jury at trial, he enjoys absolute immunity. *Imbler v. Pachtman*, 424 U.S. 409, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976). *Burns v. Reed*, 500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991). *Imbler v Patchman,* 424 U.S. 409, prosecutors entitled to absolute immunity from suit for damages under Section 2983 for "indicating a prosecution and ... presenting the State's case." 424 U.S. at 431. *Burns v Reed*, 500 US 478, 111 S. Ct. 1934, 114 L.Ed2d 547 (1991) The Prosecutor had absolute immunity from a claim of false and misleading evidence at a probable cause hearing. *Kalina v. Fletcher,* 522 U.S. 118, 118 S. Ct. 502, 139 L.Ed.2d 471 (1997).  The Prosecutor's actions in preparing and filing charging documents was shielded by absolute immunity (pg. 129) but not swearing out false statements of fact in affidavits supporting charging documents.  "...the preparation and filing of two of the three charging documents -- the information and the motion for an arrest warrant -- are protected by absolute immunity." *Kalina v. Fletcher* (*Supra*)

Fitzpatrick's alleged non-disclosure of impeachment material is privileged and cannot be subject to a Section 1983 claim. *Van de Kamp v. Goldstein,* 555 U.S. 335, 129 S. Ct. 855, 172 L.Ed.2d 706 (2009).  Likewise, his judgment in putting forward Dr. Mitchell as a witness is tied to advocacy rather than administrative and consequently subject to absolute immunity.

Fitzpatrick's absolute immunity extends to his actions with regard to the post conviction collateral attacks as he continued to act as an advocate . *Warney v. Monroe County,* 587 F.3d 113, 122-25 (2nd Cir. 2009).

Pursuant to *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993), it is likely the Plaintiff will argue the so-called conspiracy between Fitzpatrick and Mitchell to extend the time of death to the extent it is preceded the presentation to the Grand Jury was at a preliminary state of investigation and not subject to immunity. Investigator Tynan believed there was sufficient evidence to prosecute Rivas in 1987. (Ex. H, pg. 19). Once Mr. Fitzpatrick reviewed the file, they made the decision to prepare the case for the Grand Jury based on the Syracuse Police Department investigation. There is no evidentiary support for Plaintiff's fraud theory:

1) Dr. Mitchell had determined the range of time of death already as 2-3 days in writing over five years before his Grand Jury testimony. (Ex. A, pg. 17)

2) Manes admitted that he did not have actual knowledge of, or proof of the conspiracy;

3) Plaintiff's Forensic Pathologist expert, Dr. Daniel Spitz, acknowledged that Dr. Mitchell's conduct in performing the autopsy and in his testimony was within the standard of care;

4) There was a tremendous amount of circumstantial evidence that Ms. Hill died on 3/27 or early on 3/28/87;

5) There was no investigation of Dr. Mitchell pending on November 10, 1992, when Dr. Mitchell testified before the Grand Jury that the death could have occurred on March 27, 1987. Mitchell's testimony at Grand Jury and trial and Fitzpatrick's conduct at the Grand Jury proceeding and trial were absolutely privileged.

11

Mr. Fitzpatrick's actions including the process of preparing the case for the Grand Jury are absolutely immune.  Pursuant to *Kalina v. Fletcher,* supra, to the extent he has qualified immunity, the Plaintiff's claims of fraud in the investigation of the case fail.  There are no facts to support the claim.

## POINT II

### PLAINTIFF FAILED TO SUPPORT CLAIMS IN THE COMPLAINT.

**A.    THE CLAIMS IN THE COMPLAINT ARE NOT SUPPORTED FACTUALLY**

Notwithstanding that these claims are barred by absolute immunity, Defendants argue that all claims by the Plaintiff Manes of the Complaint are not supported factually.  As set forth above, all of the referenced claims are predicated on the notion that there were not adequate facts to support the indictment, trial and conviction of Hector Rivas.  All of these claims are primarily dependent upon an allegation/assumption that Erik Mitchell gave false and inaccurate testimony motivated by a deal between Defendants Fitzpatrick and Mitchell that required Mitchell to alter his testimony and opinion that the time of death in this case fell within a period of time in which Rivas did not have an alibi for the purpose of achieving a conviction.  There is no evidentiary support for this allegation.  Dr. Mitchell did not alter his opinion at any time.  His opinion was consistently that the time of death occurred within 2 to 3 days of discovery of Ms. Hill's body from the time he evaluated the crime scene until his testimony.  Reliance upon the Second Circuit's preliminary fact finding is a posture that ignores the actual facts in the case regarding time of death opinions.[1]

---

[1]   The Second Circuit incorrectly determined that Mitchell changed his opinion regarding the range of time of death, "In any case, whether it was out of an eagerness to please the prosecutor" Appellant's Br. At 5, as Rivas suggests, or based upon an independent re-evaluation of the medical record, it does appear that sometime in 1992, Mitchell reconsidered his estimate of the time of death." *Rivas v. Fischer,* 687 F3d 514 (2012).  The Second Circuit ignored Dr. Mitchell's March 30, 1987, opinion which he wrote in the medical examiner's record on that date after having

Dr. Mitchell opined in writing on the day Ms. Hill's body was found, March 30, 1987, the time of death was within two to three days of the afternoon of March 30th. (Ex. A, pg. 17). This was before Dr. Mitchell knew of or had any idea of Hector Rivas, his whereabouts, and/or the status of his alibi for Friday, March 27th. Dr. Mitchell's opinion on that day placed the time of death therefore within a time frame from Friday afternoon March 27th through Monday afternoon, March 30th. The Plaintiff's Forensic Pathology expert, Dr. Daniel Spitz, testified that Mitchell did not deviate from the standard of care either in his performance of the autopsy nor in his testimony as to the time of death. (Ex. G, p. 57, 62). Dr. Spitz specifically testified that Dr. Mitchell did not fall below the standard of care in offering his opinion that the window of death was sometime between Friday night at 7:00 on the 27th and the time Valerie Hill was found on Monday. (Spitz p. 62). Plaintiff's own expert concedes that Dr. Mitchell's actions were within the standard of care, thereby undercutting the theory that a conspiracy resulted in false testimony. Contrary to the claims made in the Complaint, there was ample evidence for the indictment and conviction as presented to the Grand Jury and the jury. In summary, the evidence was:

- The absence of any contact with Valerie Hill after she left her father on Friday, March 27, 1987. Valerie Hill's father testified he had dinner with her and did not hear from her again after 7 p.m. on Friday.

- That her car, which had been serviced that day, had not been moved from the time it was parked in the driveway on March 27, 1987. Testimony by a representative of the garage that serviced her car provided mileage at the time of the service. Mileage on the odometer was added for her drive home on Friday.

---

[1]  seen the body in situ that Ms. Hill had been dead two to three days from the discovery of her body, Dr. Mitchell did not change his opinion at any time to the range of the time of death from the time the body was discovered to his trial testimony in March of 1993.

- That the friend who she was to travel to visit on March 28, 1987, did not hear from her and was unable to reach her by telephone starting on the evening of Friday, March 27th.

- That her father did not hear from her after she left having dinner with him even though her step-mother was in the hospital and dying, and that was entirely out of character.

- That her cat was found outside on Saturday morning, which was uncommon.

- That Susan Stonecipher and her boyfriend Jim Crimi saw Hector Rivas present outside of Hill's apartment between 11:00 p.m. and 12:00 a.m. on March 27th, parked in his car smoking a cigarette.

- Most important, Rivas made an admission in front of his friend at a bar stating, "Valerie, I didn't mean to do it," just two weeks after the murder.

- Barclay cigarettes were found smoked in Ms. Hill's apartment. This was Rivas' favored brand of cigarette.

- Rivas had a key to Hill's apartment and there was no evidence of forced entry.

**B.     THE ADVOCACY ACTS OF THE DEFENDANTS FITZPATRICK AND THE COUNTY ARE ENTITLED TO ABSOLUTE IMMUNITY**

The facts support that there was a thorough investigation by the Syracuse Police Department with no jading of the proof either during or resulting from the investigation or the trial. There is no claim against the Police Department. Based on the Police Department investigation, and in his role as advocate, Mr. Fitzpatrick prepared the case against Rivas for the Grand Jury and then for trial.

In his Grand Jury testimony, Dr. Mitchell opined that the range of time of death was two to three days. In his direct testimony at trial, Dr. Mitchell was presented by Fitzpatrick with facts in a hypothetical that were all proven at the trial prior to Mitchell's testimony. The opinions provided by Dr. Mitchell as to the time of death took into consideration those facts further

14

supporting his opinion which was in existence from the date of his first observing the body of Ms. Hill that the range of time of death was two to three days from the discovery of her body. Defendant's expert, Dr. Mary Jumbelic, opines that such a hypothetical sets forth facts a medical examiner must consider in offering time of death opinions.  (Ex. Q, para. 3, 4, 5, and 7). Consequently, there is no showing by the Plaintiff in the component of this case that there was any bias, maliciousness or conduct which violated Rivas' rights.  Therefore, the findings of the United States Supreme Court in *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993), is not implicated.  To the extent that the District Attorney's Office engaged in a preparatory process for the Grand Jury and trial, the investigatory process was factual and the witness testimony at trial was supportive of the investigative work that was performed.  That testimony included:

1.    The absence of any contact with Valerie Hill after she left her father on Friday, March 27, 1987.  Valerie Hill's father testified he had dinner with her and did not hear from her again after 7 p.m. on Friday.

2.    That her car, which had been serviced that day, had not been moved from the time it was parked in the driveway on March 27, 1987.  Testimony by a representative of the garage that serviced her car provided mileage at the time of the service.  Mileage on the odometer was added for her drive home.

3.    That the friend who she was to travel to visit on March 28, 1987, did not hear from her and was unable to reach her by telephone starting on the evening of Friday, March 27th.

4.    That her father did not hear from her after she left having dinner with him even though her step-mother was in the hospital and dying, and that was entirely out of character.

5.    That her cat was found outside on Saturday morning, which was uncommon.

15

6.      That Susan Stonecipher and her boyfriend Jim Crimi saw Hector Rivas present outside of Hill's apartment between 11:00 p.m. and 12:00 a.m. on March 27th, parked in his car smoking a cigarette.

7.      Most important, Rivas made an admission in front of his friend at the bar stating, "Valerie I didn't mean to do it," just two weeks after the murder.

The Plaintiff has not presented any proof that any of these facts as presented were inaccurate, much less inappropriate, fraudulent or wrongfully obtained. These are investigative findings that were before the jury. Many of these findings were given to Dr. Mitchell based on a hypothetical question where he was questioned regarding the time of death. Plaintiff's expert, Daniel Spitz, M.D., acknowledged that Mitchell's testimony and opinion as it pertained to time of death, which weighed the findings in a hypothetical, was within the standard of care.

It is important to note that witness Susan Stonecipher at page 936 saw Rivas on Friday night, March 27, 1987, anywhere between 11:00 p.m. and 1:00 a.m. She was with her then-boyfriend Jim Crimi. She saw Rivas sitting in his car parked with his parking lights on smoking a cigarette. Ms. Stonecipher was called by Mr. Calle apparently to obtain testimony that she had seen the victim on Saturday morning. She had erroneously told the police that and had corrected her statement that several days after being interviewed by the police and amended it to having seen Valerie alive on Friday morning. Apparently, Mr. Calle did not bother to interview Ms. Stonecipher prior to calling her to the stand.

Likewise, James Crimi, who was the then-boyfriend of Susan Stonecipher, dropped her off on Friday evening prior to the murder after 11:00 o'clock in the neighborhood of 11 or 12 p.m. He saw Rivas' car parked in front of the house. Rivas was in the car smoking a cigarette. The car had a license plate that read 1-Rivas or Rivas-1. (Ex. C-3, pgs. 532 -534).    Consequently, the

16

prosecution had testimony that placed Rivas at the scene of the crime, and the prosecution also had

Rivas' admission, "Valerie, I didn't mean to do it." (Ex. C-5, pg. 817). Finally, through the

ineptitude of the Defense, testimony was given to the jury that Rivas had a violent history toward

women. (Ex. C-4, pgs. 476-482).

It was an unrefuted fact that Rivas was at the crime scene within the time frame of Ms.

Hill's time of death and had a key to her apartment.

"A prosecutor acting in the role of an advocate in connection with a judicial proceeding is

entitled to absolute immunity for all acts 'intimately associated with the judicial phase of the

criminal process.'" *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Imbler*,

424 U.S. at 430). "The Supreme Court has explained that a prosecutor's functions preliminary to

the initiation of proceedings include 'whether to present a case to a grand jury, whether to file an

information, whether and when to prosecute, whether to dismiss an indictment against particular

defendants, which witnesses to call, and what other evidence to present.'" *Giraldo v. Kessler*, 694

F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler*, 424 U.S. at 431 n.33). "[A]bsolute immunity extends

even to a prosecutor who 'conspir[es] to present false evidence at a criminal trial,'" see *Anilao v.

Spota,* 27 F.4th 855, 864 (2d Cir. 2022) (second alteration in original) (quoting *Dory v. Ryan*, 25

F.3d 81 at 83), cert. denied, 143 S. Ct. 1781 (2023), or to a grand jury, provided there is no

"prosecutorial involvement in its earlier inducement," *see Bernard v. County of Suffolk*, 356 F.3d

495 at 503, 506.

Assuming arguendo there was falsification of evidence and the coercion of witnesses, they

are prosecutorial acts for which absolute immunity applies. (Dkt. No. 37-1 at 10 (quoting *Buari v.

City of New York,* 530 F.Supp 3d 356, 380 (S.D.N.Y. 2016)).) However, the Court must determine

the function in which a prosecutor is engaged when the alleged evidence is falsified or witnesses

are coerced. "[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Werkheiser v. County of Broome,* 655 F. Supp. 3d 88, 101 (N.D.N.Y.2023)(quoting *Buckley v. Fitzsimmons*, 509 U.S. 259 at 273). Accordingly, "in presenting the State's case, the prosecutor is immune from a civil suit for damages." *Imbler*, 424 U.S. at 431. So too is a prosecutor who, "function[ing] as an advocate," conspires to present- and, indeed, presents-falsified evidence or coerced testimony to a grand jury or at trial. *See Hill v. City of New York*, 45 F.3d 653 at 661; *Anilao*, 27 F.4th 855 at 864; *Dory*, 25 F.3d 81 at 83.

## POINT III

### PLAINTIFF MANES RECANTS OR CONTRADICTS KEY ALLEGATIONS IN THE COMPLAINT.

Moreover, there was ample evidence for the indictment and the conviction. In summary, the evidence was:

1.     The absence of any contact with Valerie Hill after she left her father on Friday, March 27, 1987. Valerie Hill's father testified he had dinner with her and did not hear from her again after 7 p.m. on Friday.

2.     That her car, which had been serviced that day, had not been moved from the time it was parked in the driveway on March 27, 1987. Testimony by a representative of the garage that serviced her car provided mileage at the time of the service. Mileage on the odometer was added for her drive home.

3.     That the friend who she was to travel to visit on March 28, 1987, did not hear from her and was unable to reach her by telephone starting on the evening of Friday, March 27th.

4.     That her father did not hear from her after she left having dinner with him even though her step-mother was in the hospital and dying, and that was entirely out of character.

5.    That her cat was found outside on Saturday morning, which was uncommon.

6.    That Susan Stonecipher and her boyfriend Jim Crimi saw Hector Rivas present outside of Hill's apartment between 11:00 p.m. and 12:00 a.m. on March 27th, parked in his car smoking a cigarette.

7.    Most important, Rivas made an admission in front of his friend at the bar stating, "Valerie I didn't mean to do it," just two weeks after the murder

The cold case was revived based on the work of Chief Investigator Peter Tynan who was assigned by Fitzpatrick to review cold cases.  Tynan recommended to the Defendant District Attorney that this case be further investigated.  The evidence set forth above was revisited by Investigator Tynan, deemed to be sufficient to prove Rivas' guilt beyond a reasonable doubt, and the case went forward to the Grand Jury.

District Attorney Fitzpatrick met with Dr. Mitchell prior to his Grand Jury testimony in November of 1992.  Mitchell testified that Ms. Hill could have been killed on the evening of March 27, 1987, but that was at the outer limit of probability, testimony consultant with his written opinion of March 30, 1987.

In paragraph 74 of the Complaint, Mr. Manes alleges that at the Grand Jury, Dr. Mitchell presented false testimony to the Grand Jury.  When asked again what Grand Jury testimony by Dr. Mitchell false and fabricated testimony, stated, "I really can't answer it, but you know, they say a District Attorney can indict a corned beef sandwich."  (Ex. D-1, EBT I, pgs. 71-72).

Manes conceded that Mitchell did not put forward any signed document that Ms. Hill's time of death was Saturday or Sunday.  (Ex. D-2, EBT II, pgs. 12-13).

In an appearance before the Second Circuit, Manes conceded that Mitchell was not being investigated by the Onondaga County District Attorney's Office at the time of the March 1993

murder trial of Rivas. When the New York Attorney General's Office asserted that, "The People had represented that the investigation (of Mitchell) did not begin until the trial was over." Manes interjects to the Second Circuit, "Your Honor will forgive me that may be true." (Ex. O, Bates No 185419). Manes conceded the District Attorney was not investigating Mitchell at the time of the Rivas trial, Manes answered, "It wasn't his job." (Ex. O, Bates ND 185419, Ex. D-2, EBT II, pgs. 45-46).

Therefore, by Manes' own admission and testimony, there is no factual basis that:

1. Mitchell altered his time of death opinion;

2. That the DA's office was investigating Mitchell in November of 1992 when he testified before the Grand Jury and then at the Rivas trial;

3. That Mitchell and Fitzpatrick were in a conspiracy to indict and convict Rivas. (See, paragraph 76 of the Complaint, "That is an assumption, maybe, that I gave, it's without question but something had taken place between Fitzpatrick and Mitchell." (Ex. D-2, EBT II, pg. 19)

Consequently, causes of action in the Complaint should be dismissed as they are without a factual basis.

The claim of a so-called conspiracy is the figment of Sidney Manes' imagination and conjecture. The Complaint accuses District Attorney William Fitzpatrick, a fellow officer of the Court, of criminal activity with no factual basis and denigrates the good faith efforts of Dr. Mitchell. When placed under oath in his deposition, Mr. Manes:

1) Contrary to the allegations set forth in paragraphs 65, 66, 67, 68, 69, 70 and 71, Manes admitted he was not present to overhear any agreement between Fitzpatrick and

Mitchell to alter the time of death. (Ex. D-3, EBT III, pg. 23, Ex. D-1, EBT I, pgs. 68-70, Ex. D-2, EBT II pg. 14).

2) Admitted there were no witnesses to this alleged conspiracy and Mitchell did not sign any statement or document that the time of death was Saturday or Sunday. (Ex. D-2, EBT II, pgs. 12-13)

3) In paragraph 74 of the Complaint, Manes accuses Mitchell of presenting fabricated testimony falsely to the Grand Jury. In his deposition, he wrongly accuses Mitchell of testifying in the Grand Jury about slides (Ex. D-2, EBT II, pg. 8). He recants when asked to read the Grand Jury testimony. Once read, he acknowledged there was no testimony by Mitchell at the Grand Jury about slides. (Ex. D-2, EBT II, pg. 10). In a chilling glib response to the question, "What testimony was fabricated to the Grand Jury," he testified, "I really can't answer it, but you know they say a District Attorney can indict a corned beef sandwich." (Ex. D-1, EBT I, pg. 71).

4) At paragraph 76 of the Complaint, Manes alleges that Mitchell and Fitzpatrick deliberately withheld from the Grand Jury that Mitchell was under investigation. Manes testified that the basis of this claim was based on the Nanette Gordon case in which there was no investigation of Dr. Mitchell but a divided panel of pathologists disagreed with his opinion regarding the cause of death. (Ex. D-2, EBT II, pgs. 15-16). He then buttresses his claim falsely asserting that Mitchell had 100 misdemeanors and several felonies pending against Dr. Mitchell as well as a State Health Department investigation. (Ex. D-2, EBT II, pgs. 16-17). Dr. Mitchell has never had a misdemeanor or felony charge lodged against him at any time. An investigation by the New York State Health Department commenced in early 1993 of the Medical

21

Examiner's office.   There was no investigation of Dr. Mitchell pending when he

initially opined that the time of death was two or three days before March 30, 1987, or

when he told Investigator Tynan the time of death was likely greater than two days, or

when he testified before the Grand Jury in November of 1992 that March 27, 1987 was

at the outer limits of a possible time of death.

5) Manes admitted to the Second Circuit that Mitchell was not being investigated at the

time he testified in March of 1993.

## POINT IV

### FITZPATRICK COMPLIED WITH 1987 DISCOVERY STANDARDS

As Defendants' Expert Robert Masters, Esq. states, prior to its repeal in 2020, CPL Article

240 controlled Discovery in criminal cases. The current CPL Article 245 is far more generous to

defendants than its predecessor and where the Discovery provided herein did not satisfy today's

standard, all evidence suggests it did comport with the demands of CPL 240 and the Judge so held

during the trial – declining to provide sanctions for various claims of statutory violation.   The

Plaintiff's allegation in claim 6 of the Complaint is consequently contrary to the requirements of

the law and facts in this case.

*Brady v. Maryland,* 373 US 83 (1963) has for more than 60 years mandated that prosecutors

must share evidence that prosecutors that tends to exculpate the defendant. *Giglio v. United States,*

450 U.S. 150 (1972) has for half-a-century obliged prosecutors to make available to the defendant,

at a time it can be utilized, materials that would impeach the prosecution's witnesses or their theory

of the case, even if standing alone the information does not exculpate the defendant, but merely

weakens the prosecution case. Over the years – particularly during this millennium –what

information falls into these categories has greatly expanded, as has the prosecution's obligation to

22

provide it. See, for example, *People v. Rong He,* 34 NY 3d 956 (2019); *People v. DiPippo,* 27 NY

3d 127 (2016): *People v. Negron*, 26 NY 3d 262 (2015): *People v. Soto,* 26 NY 3d 455 (2015).

Moreover, the admissibility of evidence of third-party culpability has been significantly relaxed

by the common law – the requirement for the predicate of a "clear link" being established as a

foundational requirement for such evidence – has been abandoned since Mr. Rivas' trial.  See

*People v. Primo,* 96 NY 2d 351(2001) and *People v. Aulet,* 111AD 2d 822 (2nd Dept. 1985).

New York is unique requiring not only grand jury indictment for all felony prosecutions,

NY Constitution, Art. I, Sec. 6; *People v. Ford, 62 NY 2d 275 (1984); People v. Iannone,* 45 NY

2d 589 (1978) but prohibits hearsay's admission during such a presentation. (CPL

Section190.30(1)). Prosecutors are not obliged to present *Brady*-type information to a grand

jury.(See *People v. Lancaster*, 69 NY 2d 20 (1986).After an indictment is secured, a court reviews

the proceedings to ensure the sufficiency of the evidence adduced, as well as the propriety of the

presentation.(CPL Sections 210.20(1)(a)(b) and (c)) It is apparent that such motions were made by

the Defendant and decided in the People's favor, thereby setting the stage for Mr. Rivas' trial.

Accordingly, no infirmity in the process by which Mr. Rivas' indictment was secured can be found.

The record at trial, however, reveals that material tending to exculpate Rivas was not turned

over to Mr. Calle until just before the prosecution rested its direct case.(*See,* Trial transcript, March

24, 1993, p. 949).  Mr. Fitzpatrick averred that he made the material immediately upon his receipt

of it and that he was "dismayed" by the delay in the production of the materials – reports that a Joe

Morgan heard an admission from Patsy Barricella was responsible for Ms. Hill's murder and other

evidence corroborating Barricella's presence near the crime scene the day after the discovery of

Ms. Hill's body. The Court denied Calle's motion for a mistrial, instead offering him the

alternatives of an adjournment to call the relevant witnesses or, what Calle selected – admitting

the evidence through hearsay. It should be noted that on appeal, the Appellate Division, Fourth Department found the disclosure's delay to have been unintentional and that it did not deprive Rivas of a fair trial owing to the choice afforded Calle in how to proceed. (*People v. Rivas, supra*) This record informs my conclusion that although a delay in *Brady* compliance occurred, this imperfection did not interfere in Rivas' receipt of a fair trial.

**POINT V**

**THE PLAINTIFF HAS PRESENTED NO PROOF TO SUPPORT
THE MONELL CLAIM ALLEGED IN THE COMPLAINT**

There are no facts or allegations that support the Monell claim in this case. If arguendo there are, Mr. Fitzpatrick is entitled to a bar based on absolute immunity. *Connick v. Thompson*, 563 U.S 51 (2011)

**CONCLUSION**

The Complaint in this matter should be dismissed with prejudice. Both Mr. Fitzpatrick and Dr. Mitchell are entitled to absolute immunity for their actions and Plaintiff's causes of actions are barred. The allegations of conspiracy to alter the testimony and evidence in this case are not based on facts. There was no conspiracy or malign effort to delay Rivas' retrial. Each adjournment of his trial was sought by his own lawyers.

Oct 31, 2024

Robert F. Julian, Esq.