UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

        *Plaintiff,*

vs.

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
AND "JOHN DOES 1-10",

        *Defendants.*

Civil Action No. 5:19-cv-844
(BKS/TWD)

---

## STATEMENT OF UNDISPUTED FACTS ON BEHALF OF DR. ERIK MITCHELL IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

1. Dr. Erik Mitchell (hereinafter "Dr. Mitchell") was the duly licensed medical examiner of Onondaga County prior to and on March 27 through March 30, 1987.

2. Dr. Mitchell was called to the apartment of Valerie Hill, was present at the apartment, and observed her body in situ. (Ex. A, pg. 5).

3. Dr. Mitchell examined the body in situ and was present in the apartment and examined the apartment. (Ex. A, pg. 5).

4. Dr. Mitchell prepared a report of his examination of the body that was officially recorded in the medical examiner's record. (Ex. A, pg. 5).

5. Dr. Mitchell arrived at the scene of the murder at 3:05 p.m. (Ex. A, pg. 4).

6. Dr. Mitchell prepared a report of his scene investigation that he pronounced Valerie Hill dead at 3:30 p.m. (Ex. A, pg. 5).

1

7. Dr. Mitchell found the decedent laying face down on a rug in the living room area. (Ex. A, pg. 5).

8. Dr. Mitchell found that she was dressed in a bathrobe and knit upper garment of some type. (Ex. A, pg. 5).

9. The bathrobe was up above the level of the buttocks and fecal smearing was emanating from the area of the anus over the buttocks and upper thighs. (Ex. A, pg. 5).

10. Dr. Mitchell opined that the body was in full rigor with fixed anterior livor. (Ex. A, pg. 5).

11. Dr. Mitchell saw a small amount of bloody mucoid fluid came up from the mouth and nose when the body was turned over. (Ex. A, pg. 5).

12. A sash with material similar to the bathrobe was coiled about the neck and petechiae were evident above but not below the level of this sash. (Ex. A, pg. 5).

13. The apartment appeared to have been relatively cool as was the basement through ceiling from the floor upon which the decedent lay. (Ex. A, pg. 5)(Ex. C-1, pg. 905-906).

14. Dr. Mitchell testified that the apartment was 62 degrees. (Ex. C-1, pg. 906).

15. Dr. Mitchell opined that this appears to be a strangulation homicide. (Ex. A, pg. 5).

16. Dr. Mitchell performed an autopsy and generated an autopsy report that was dated March 30, 1987, indicating that the autopsy commenced at 5:30 p.m. (Ex. A, pgs. 6-11, 17).

17. Dr. Mitchell dictated a report that he signed on 3/30/87 at 7:45 p.m. under Narrative/Med Hist "Deced. was found prone in her residence by father and brother. Found prone with a piece of blue material around the neck. Last seen Friday by the father. Appears as though deced. was there appx. 2-3 days." (Ex. A, pg. 17).

18. Dr. Mitchell recorded an external examination. (Ex. A, pg. 6).

19. Dr. Mitchell in his report found evidence of injury based on the neck being "tightly wrapped in two and one half turns the sash from the bathrobe." (Ex. A, pg. 7).

20. Dr. Mitchell performed an internal examination in which he found as follows: "The 1530 gram brain is mildly softened secondary to autolytic changes. There is no evidence of acute contusion injury. There is an estimated ml. of liquid subdural and subarachnoid blood over the lateral convexities close to the midline." (Ex. A, pg. 8).

21. Dr. Mitchell listed as his autopsy findings:

1) Facial petechiae.
2) Fractures of hyoid and thyroid cartilage.
3) Dry, serous discoloration of neck soft tissues beneath ligature.
4) Epiglottal petechiae.
5) Streak hemorrhages into strap muscles.
6) Focal red discoloration of thyroid capsule. (Ex. A, pg. 11).

22. Dr. George Collins, M.D. examined the brain. He signed a note labeled Gross Description of Brain After Fixation. He found the brain to have "The deeper areas of the brain are riddled with cavities developed due to decomposition." His diagnosis was normal brain with postmortem decomposition. (Ex. A, pg. 12).

23. Photographs were taken of the brain by Kodachrome and two photographic slides of the brain are existent. (Ex. N).

24. Dr. Mitchell testified in his deposition there was decomposition of the brain demonstrated on the Kodachrome slides. (Ex. E, pg. 81).

25. Dr. Mitchell states in his affidavit "I see in the Kodachrome slides changes consistent with my time of death range of 2-3 days." (Ex. E, pg. 10).

26. Dr. Mitchell testified in his deposition that "Those slides are not in themselves the definition of decomposition. But I described in my autopsy report softening and autolytic changes

on gross exam, and what you've got here is a brain that is slumping slightly down in the brain cage and has slight flattening of the gyral definition. But handed this independently with no history, you're not going to derive - - it goes along with what I observed but it's not pathognomonic of it." (Ex. E, pg. 84).

27. There were no microscopic tissue slides of the brain of Ms. Hill. There were two 35mm Kodachrome slides of her brain. There were microscopic tissue slides of the gland, lung, uterus and liver. (Ex. A).

28. The Plaintiff's expert Dr. Spitz testified that Dr. Mitchell did not deviate from the standard of care in the performance of his autopsy. His deposition testimony was as follows:

> "No, I don't think he deviated from what would be his autopsy examination. I think where the problem arose is that there were some opinions that were generated using scientific parameters that just fall outside of what is generally accepted." (Ex. G, pg. 57).

29. The Plaintiff's expert Dr. Spitz testified that Dr. Mitchell did not deviate from the standard of care in giving his estimates as to the time of death. A true copy of his testimony is attached cited below:

> Question: Doctor, in summary, are you saying that Dr. Mitchell fell below the standard of care and deviated from good, usual, customary and the accepted practice in offering the opinion that the window of death was somewhere between Friday night at 7 o'clock on the 27th and the time of Valerie Hill being found on Monday?
> Answer: I'm not really saying he fell below the standard of care, that's not really what I'm here for. What I'm doing is giving you my opinion based on the information associated with this case.
> I think my opinion is different than Dr. Mitchell's. The scientific information, in my opinion, clearly puts his death within a 48-hour period. You know. I mean, if Dr. Mitchell wasn't aware of some of these factors and therefore gave an opinion that I believe to be erroneous, so be it. If there were other factors involved in his conclusions, you know, so be it. I don't know all the information associated with it. (Ex. G, pg. 62).

30. Sidney Manes was not present and did not overhear any discussions between Dr. Mitchell, William Fitzpatrick or Sidney Cominsky, with regard to Dr. Mitchell's testimony in the Rivas case. (Ex. D-1, EBT I, pg. 69).

31. Sidney Manes did not obtain the file of Rivas' trial counsel Richard Calle. (Ex. D-1, EBT I, pgs. 21-23).

32. Sidney Manes never discussed the Rivas case with Dr. Mitchell or William Fitzpatrick. (Ex. D-1, EBT I, pg. 29).

33. Dr. Mitchell testified that the range of date of death of Valerie Hill included March 27, 1987, although less likely in Grand Jury testimony. (Ex. B, pg. 126-127). Dr. Mitchell was not asked a hypothetical to the time of death in Grand Jury testimony. (Ex. B).

34. At trial, Dr. Mitchell, when provided a hypothetical based on facts in evidence prior to his testimony, testified that March 27 to early March 28, 1987 was the more likely date of death. (Ex. C-1, pgs. 889-890).

35. Dr. Daniel Spitz opined that Dr. Mitchell did not deviate from good practice in performing the autopsy. (Ex. G, pg. 57).

36. Dr. Daniel Spitz opined that Dr. Mitchell did not deviate from good practice in his range of time of death opinion at trial. (Ex. G, pg. 62).

37. The application for a search warrant signed by Timothy Phinney in March of 1987 states "that the Onondaga County Medical Examiner's Office, Dr. Mitchell's preliminary estimate on the time of death of the victim Valerix (sic) Hill, was sometime Saturday the 28th of march afternoon, and Sunday morning of the 29th of March 1987," but does not contain a statement or affidavit signed by Dr. Mitchell. (Ex. W, pg. 2).

5

38. Syracuse Police Detective Sergeant Peter Tynan testified that Dr. Mitchell told him on or about March 30, 1987, that Ms. Hill had been dead not less than two days. (Ex. H, pgs. 20-21).

39. Syracuse Police Sergeant Peter Tynan, who became Mr. Fitzpatrick's Chief Investigator, testified that he was of the opinion that the Syracuse Police Department had accumulated sufficient evidence to prosecute Rivas in 1987. (Ex H, pg. 19-20)

40. Peter Tynan recommended to William Fitzpatrick the prosecution of Hector Rivas. (Ex. H, pg. 19-20).

41. The defense lawyer, Edward Klein, Esq., representing Mr. Rivas asked Judge Miller of the Onondaga County Court for an adjournment of the December 7, 2015, retrial. (Ex. S-3, pg. 4).

42. The defense lawyer, Edward Klein, Esq., representing Mr. Rivas asked Judge Miller of the Onondaga County Court for an adjournment of the February 2015 trial. (Ex. S-3, pgs. 5-7).

43. Mr. Langone never appeared as trial counsel for Mr. Rivas:

44. The defense lawyer representing Mr. Rivas on the Record before Judge Miller asserted, "The Assistant District Attorney handling the Rivas case was not at fault for the delay." (Ex. S-4, pg. 4).

45. Sidney Manes conceded to the Second Circuit that Dr. Mitchell was not under investigation by the District Attorney's Office at the time he testified in Rivas' trial. (Ex. D-2, Pg. 46, Ex. O, Bates No. 185419).

Dated: October 30, 2024

									_____
									Robert F. Julian, Esq.
									Bar Roll # 601157
									ROBERT F. JULIAN, P.C.
									Attorneys for Defendants
									2037 Genesee St.
									Utica, NY 13501
									315-797-5610