UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

                    *Plaintiff,*

vs.

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
AND "JOHN DOES 1-10",

                    *Defendants.*

***AFFIRMATION OF
ERIK K. MITCHELL***

Civil Action No. 5:19-cv-844
(BKS/TWD)

---

Under the penalty of perjury, Erik K. Mitchell, affirms the following to be true, upon personal knowledge and/or upon information and belief, with respect to the matter entitled The People of the State of New York versus Hector Rivas, Indictment No. 92-1114-1, as venued in Onondaga County, New York:

1.      I am a physician formerly licensed to practice in the State of New York. I am presently licensed in Georgia. I graduated from Cornell University in 1972 and obtained my M.D., in 1976 upon graduation from Upstate Medical Center. I thereafter undertook a four year training program in anatomic and clinical pathology. This was followed by subspecialty training as an assistant to the chief medical examiner in Chapel Hill, North Carolina, with further training in forensic pathology. As of the date of the Hector Rivas trial I had conducted over four thousand autopsies. I was the Medical Examiner of Onondaga County from September 1983 through November of 1993. I continued to work within the field of forensic pathology since my departure from Onondaga County in 1993 and presently function as in house forensic pathologist for cardiac

1

pathology for Artivion.

2.        With respect to the Valerie Hill homicide, which had occurred in March of 1987, I was then the Medical Examiner for Onondaga County. On March 30, 1987, I had been advised that a death had occurred at 248 Hickok Avenue in the City of Syracuse. I arrived at the scene between the hours of three and four o'clock in the afternoon. Upon arriving I had observed the body of a deceased female, subsequently identified as Valerie Hill, lying face down on a carpeted floor and wearing a nightshirt and bathrobe. About Ms. Hill's neck was wrapped what appeared to be the sash of the bathrobe. The body was in rigor and exhibited the presence of livor. There was some smearing of fecal matter around the anus and the lower extremities (T. 869). The apartment floor was above the basement and cold. The temperature of the apartment was 62 degrees.

3.        After the scene investigation, the body of Ms. Hill was transported to the Medical Examiner's Office for further examination. Upon external examination, petechiae, or small hemorrhages, were observed above the level of the sash (T. 872). There were no defensive wounds evidenced on the body. However, there was a small bruise to the right above the right eyebrow which would have occurred prior to the time that Ms. Hill had lost blood pressure (T. 873). There was further evidence of petechiae within the mucosa of the mouth and in the strap muscles of the neck.

4.        Upon further examination, hemorrhaging of one of the joints of the hyoid bone was present and the hyoid bone, itself, had been fractured on the left side (T. 874). Additionally, petechiae were present in the epiglottis (T. 874-5). It was evident that Ms. Hill had been strangled to death.

5.        With respect to the autopsy, I had removed the brain for the purpose of further examination by a neuropathologist, Dr. George Collins, who routinely examined bodies in

significant cases. Once removed, the brain was placed in formalin and fixed for the purpose

permitting the subsequent examination of the brain by Dr. George Collins. Upon initially removing

the brain I noticed that there were present autolytic changes to the brain tissue which indicated that

such was the result of the natural processes of the brain upon death. Dr. Collins, who subsequently

examined the brain, found that it was normal without any pathological abnormality. However, Dr.

Collins did note that the "deeper areas of the brain [were] riddled with cavities developed due to

decomposition." A component of my global assessment regarding the time of death included the

findings of Dr. Collins with respect to the decomposition of the brain. While it may not be possible

to determine how long it may take for such cavities to develop after death, cavities such as these

are seen more commonly in persons who have been dead for a longer period of time (Ex. P, pg.

72). It was my opinion, as a forensic pathologist, that such decomposition was consistent with the

parameters I had considered with respect to the time of death. The degree of decomposition as

found served to provide me with additional information which would be consistent with death

having occurred on Friday, the 27th of March, or early Saturday morning, the 28th of March.

6. With respect to the time of death, my recollection is that I had noted on the lab

document entitled "Specimen Description and Submit," that Ms. Hill had been dead for two to

three days as of March 30, 1987. (Ex. P, pg. . 39)(Ex. A, pg 17). In so doing, I believed that the

days referenced by this note would have consisted of March 29th, March 28th and March 27th (Dp.

39). So, too, given the variability of ascertaining a specific time of death, I purposefully did not

identify a day of the month when I noted in the Death Certificate that death had occurred March

1987. I further noted that the day of death was unknown, and I noted on the certificate, "UNK,"

which reflected that the actual day of death was unknown. I wrote this I explained in my earlier

deposition, that I didn't know exactly what day she had died, but had an opinion as to the rough

time in which death occurred. (Dp. 41).

7.       I would note also that my autopsy protocol did not mention a time of death as well given the difficulty in ascertaining a precise time of death. I have historically not identified a time of death given the variables which impact upon such a determination. More precisely, variables such as the person's weight, location at time of discovery, temperature of the surroundings, and the like all impact upon such a determination.[1] The anatomical findings must necessarily be viewed in the light of other factors as well in attempting to determine when a person may have died. These other factors may consist of a variety of information obtained during the course of the investigation, such as when was the person last seen, when was the person last spoken to, had the individual's mail been picked up recently, had they made scheduled appointments, and the like. This is, at best, an impression as to when a person died, rather than an exact time, in most cases (T. 887). If a death is witnessed, obviously, determining a time of death is more precise. However, in the vast majority of cases, where death is not witnessed, one cannot narrow the time of death with any precision.

8.       With respect to the death of Valerie Hill, I had never made a determination as to a specific day Ms. Hill had died. (Dp. 42). I am aware that a search warrant deposition by Officer Phinney on March 30, 1987, referenced that that it was the preliminary estimate of the medical examiner's office on the time of death was sometime on Saturday afternoon of March 28th and Sunday morning, March 29th. That is not an accurate representation of my opinion. (Ex. A., pg. 17). The March 30, 1987, record I created on that date estimating the time of death to be two to three days from the discovery of the body. In giving that range, I was opining the time of death to

---

[1]The temperature of the home, when Ms. Hill was discovered, was cool as was the floor. The temperature of the basement, which was directly below Ms. Hill's apartment, was approximately sixty-two degrees at time of discovery. (Dp. 76). This factor, as well, played a role in determining the parameters of the time of death as the cooler temperature would a direct impact on those processes which occur after death. (T. 905-906).

4

be between March 27, 1987, and March 29, 1987. During the course of both grand jury and trial testimony, I proffered an opinion as to the range of when death may have occurred. My testimony was consistent with my original opinion. As I noted in my grand jury testimony as well as my trial testimony, the time of death could have been on Friday, March 27, 1987, or Saturday, March 28, 1987. During my grand jury testimony, upon inquiry, I acknowledged that the possibility that Ms. Hill's death occurred on the 27th of March was on the "outside edge of that possibility but it's possible" and that such a time frame was the "lesser likelihood" of the other days at issue. (Dp. 80). At trial, upon direct examination, taking into account the assumed facts to be true, I opined that "it's more likely that she died Friday night, to possible very early Saturday morning, would be the possibility that's given there - - I don't know when your overlaps are there with phone calls - - that to have been killed the following day." (T. 890). I sought, during the course of cross-examination, to make clear that a time of death determination is, in most cases, imprecise, at best. As I had noted to defendant's counsel, in the first instance, that I do not prepare a report that estimates the time of death in matters such as this (T. 893), but, rather "make observations that can be used to help interpret the time of death, but we do not create a report trying to establish a time of death. As I've explained previously, there's such a degree of variability that when this question is posed, we must, in fact, discuss the parameters." (T. 894). Therefore, when examined as to the time of death, I testified to what the parameters were given my impressions formed upon having examined the body and the other variables mentioned previously.[2]

9.      The parameters of which I speak, as it pertains to the time of death, were evidenced during the course of cross-examination by Attorney Calle. More specifically, when he inquired as to whether I had opined to the newspapers that Ms. Hill had been murdered on Saturday or Sunday,

_____

[2]As I had testified at trial, Friday, March 27, 1987, was "probably" on the "outside edge of possibility." (T. 907).

5

I informed him that I had not spoken with the newspaper reporters and was unaware of that which

he had referenced, suggesting that he should ask such a question of the reporter who wrote the

story. The following trial testimony sets forth the substance of this discussion:

> Q: Sir, it is your testimony today that you never estimated Valerie Hill's time of death to be late Saturday or early Sunday morning, that is the 28th or the 29th of March of 1987?
> A: I have never tied myself to such a time.
> Q: Sir, did you ever state that it could have been the time of death, that is, late Saturday or early Sunday morning?
> A: It, it could have been, yes.
> Q: Did you ever state that it could have been previously?
> A: Quite possibly. (T. 895-896).

10.     Shortly thereafter, during the course of a colloquy between the Court and Attorney

Calle, Attorney Calle stated to the Court: "Did he ever give him the opinion that the time of death

was either Saturday or Sunday." The Court, noting this to be a "fair question," then inquired of

me: "Have you, sir?" My response to the court was as follows: "I have not given the opinion of a

specific time of death, because that's not the way I function. I would - - I will have told people to

consider those times as possible." (T. 897-898). This particular expression, set forth above,

adequately encapsulates that which had occurred pertaining to whether I had expressed a precise

time of death.

11.     I was vigorously questioned by Mr. Calle with regard to rigor from page 903 of the

trial transcript through page 906. I testified that rigor may disappear at 24 hours. It may take 48

hours. (T. 903)  So on average, I agree that rigor disappears between 24 and 48 hours. (T. 904) I

also testified that when I examined the body it was in full rigor. I observed full rigor at the scene.

(T. 904) I agreed that on average the time of death using the 24 – 48 hour analysis that the time of

death would have been sometime between Sunday and Saturday at 3:30. However, I also pointed

6

out that there is variability. I stated to Mr. Calle the following:

> "What you're trying to do is disregard the variability to which I have previously testified. You're also disregarding some other findings that are present in the autopsy protocol. She had a fair amount of decompositional changes inside - - in fact, her brain had sufficiently decomposed to have small holes in it. The tissues were flabby within.
>
> In addition to that, there are other things from the scene. She was laying on a cool floor, which retards all of these processes. And I specifically checked, the basement was cool, so that there's - - that there would be colling of the body, all of which would retard these processes. The night temperatures were cool. And the house, itself, was cool, as I believe - - I, I believe it's about sixty-two degrees, if I remember correctly, in the house when that was measured. So that all of these processes would remarkably slow the - - have the potential, at least, for remarkably slowing both the onset and the relaxation of rigor.
>
> In strict chemical reactions, we speak about something called the Q-ten. For every ten degree drop in temperature, we expect to have a reduction of the speed of a reaction by about the factor of two."

I was then asked:

> "Question: Dr. Mitchell, would you say that forty-eight hours is the outside time frame in which full rigor would start to disappear?
> Answer: It depends upon the conditions of the storage of the body.
> Question: Sir, is it possible that Miss Valerie Hill's time of death was Sunday, March 29th?
> Answer: It's possible.
> Question: Sir, is it possible that Miss Valerie Hill's time of death was Saturday, March 28th?
> Answer: It's possible." (Ex. C-1, pgs. 905-906).

I was then asked several questions about the 27th being on the outside edge of

possibility.

> "Question: Well, is it fair to say that the time of death of Valerie Hill, being attributed to March 27th, 1987, is on the outside edge of a possibility? Would that be fair to say that?
> Answer: Probably.
> Question: Isn't it a fact that you did say those very words inside the grand jury when you testified in November of '92?

Answer: It's possible. I would have to review that." (Ex. C-1, pg. 907)

That was my testimony at the Grand Jury.

As the Court can see I made no secret of the fact that based on a pure understanding of rigor, that the Friday, March 27th estimation as to the possible time of death was at the outer limits of likelihood. However, I also pointed out that the temperature of the house was cold, 62 degrees, which would alter the process of rigor and make it more likely that the decedent, if killed at somewhere between 10 p.m. on March 27th and the early morning hours of March 28th, that would have retarded and effected the rigor process. I reached these opinions in good faith and independently commencing on March 30, 1987.

12. I have read the testimony of Dr. Spitz who opines that the estimate of the rigor that I made was an "outlier." He also acknowledged that my testimony regarding time of death was consistent with the standard of care. (Ex. G, pg. 70-71). Dr. Spitz also admitted that such an analysis of rigor would be based on a bell-shaped curve. As we know bell shaped curves contain within a degree of probability, a higher likelihood in the middle of the curve and lower likelihood at each end of the curve. The March 27 date of death was at the lower end of the curve but, as Dr. Spitz acknowledges, within the curve. In the case of ascertaining rigor, I had factors which I considered with regard to both temperature of the household and the changes in the brain that were significant to me as well as the circumstantial evidence to place the time of death as more likely late on Friday the 27th to early morning hours of the 28th.

13. It is gratifying that Dr. Spitz admitted that my opinion as to the time of death was consistent with the standard of care and that my autopsy was performed consistent with the standard of care. I would point out that at trial when asked the opinion as to the likelihood that the time of death was within a certain time frame, Mr. Fitzpatrick asked me to consider the following:

- Ms. Hill's cat was outside on Saturday morning and was described by a neighbor as very unusual.

- No one saw Ms. Hill after Friday, March 27th at approximately 7-8 p.m. that evening.

- No one had any in person or telephone contact with Ms. Hill after Friday, March 27, 1987.

- Assume that she had plans to visit a friend in Schenectady and made no contact with that friend either on Friday night or Saturday morning. That friend attempted numerous times on Friday and Saturday to contact Ms. Hill and received no answer.

- Her car was found in the driveway with no additional mileage after Friday evening, the 27th.

- Her step-mother was gravely ill at St. Joseph Hospital and she had been in almost daily contact with her father regarding that fact.

Coupled with my opinions as set forth with regard to the appearance of the brain and rigor, I offered the opinion based on the hypothetical that it was more likely she died Friday night to possibly very early Saturday morning. It is the standard of care for a medical examiner to consider all of the facts in arriving at a range of time of death. That was my testimony, there was a range with Friday more likely based on the facts presented. My understanding is my testimony at trial is subject to absolute immunity from lawsuit which I invoke.

I testified in my deposition there was decomposition of the brain on the Kodachrome slides. (Ex. P, pg. 81)(Ex. N). I see in the Kodachrome slides changes consistent with my time of death range of 2 to 3 days. I also stated in my deposition:

"Question. Okay. And what did you see in - - and please, look at them now. What did you see in those slides that indicated decomposition?

Answer. That is consistent with it. I mean, those slides are not in themselves the definition of decomposition. But I described in my autopsy report softening and autolytic change on gross exam, and what you've got here is a brain that is slumping slightly down in the brain cage and has slight flattening of the gyral definition,. But handed this independently with no history, you're not going to derive - - it goes along with what I observed but it's not pathognomonic of it."

I was also asked at the trial if I saw some decomposition as to the brain as I reviewed my slides in preparation for the trial testimony and I indicated that it tends to push the limits further out. I was referring to my review of the Kodachrome slides. Those slides reflect gross changes to brain as I described in my deposition: "She had a fair amount of decompositional changes inside - - in fact, her brain had sufficiently decomposed to have small holes in it. The tissues were flabby within." (T. 905). That reflects the appearance of the brain on the above-referenced slides and as it appeared when sectioned and observed with the consulting neuropathologist, Dr. George Collins.

14.     With respect to the matter of whether there were microscopic tissue slides of the brain of Ms. Hill, my recollection was that there were no such microscopic slides but, rather, 35 millimeter Kodachrome slides of her brain. There were, in fact, microscopic slides of the gland, lung, uterus and liver (Ex. P, pg. 82). To insure that it is clear, I did not look at tissue slides of the brain, as there were none. Rather, the slides I had referenced were the Kodachrome slides as previously noted (Ex. P, pg. 83). I further wish to make it clear that my review of the Kodachrome slides of the brain did not serve to change my impression that the time of death was two to three days prior to discovery of the body (Ex. P, . 84-85). My testimony at trial with regard to slides and all other issues is entitled to absolute immunity which I invoke.

15.     Finally, I state unequivocally that I had not spoken with District Attorney Fitzpatrick regarding any investigation of me or the Medical Examiner's Office prior to or during

the Rivas trial or prior to his sentencing. I was aware of various investigations being conducted by the County Attorney's Office and the Department of Health, but I never discussed any of those matters with Mr. Fitzpatrick. At no time was a proffer made by Mr. Fitzpatrick, if I were to change my impression as to the time of Ms. Hill's death to comport with his theory of prosecution, that the investigations would be concluded and no formal charges would be filed. If such a proffer were made, I would have refused and reported such inappropriate deal to my supervisor and the County Attorney's Office. Such a proffer was unnecessary. I formed the preliminary opinion that the range of time of death was 2 to 3 days on March 30, 1987, at 7:45, after I performed the autopsy. That was supported by the autopsy findings (See Medical Examiner's file, Ex. A, pg. 17). As a matter of fact, I did not know that Mr. Fitzpatrick or his office were actively investigating me until November of 1993. (Ex. P, pg. 110). What I do know, however, is that upon having considered the breadth of media coverage and the accusations which were made regarding myself and the operation of the Medical Examiner's Office, I chose to accept County Executive Nicholas Pirro's request that I resign (Ex. P, pg. 112). My further recollection is that my resignation was not dependent upon the District Attorney's Office discontinuation of any investigation then pending. Such was not a condition of my resignation in November of 1993, as far as I knew. (Ex. P, pg. 113). I was represented by Attorney Sidney Cominsky and am unable to remember details about my interaction with him.

16.     Even after I had resigned, I remained at the medical examiner's office and was used as a forensic pathologist for approximately two months thereafter. (Ex. P, pgs. 113, 114).

17.     In conclusion, I state unequivocally that at no time did I enter into any type of agreement or understanding, nor was such a proffer made to me, that if I were to change my impression as to the time of death of Valerie Hill to comport with the prosecution's theory that she

11

was murdered on Friday, March 27, 1987, that any charges, prospective charges or allegations of professional misconduct would be discontinued by the District Attorney's Office. My offer to resign my position as Medical Examiner came as a result of a discussion I had with County Executive Nicholas Pirro and was precipitated by what I then believed to be adverse publicity regarding the operations of the Medical Examiner's Office and my interest in insuring that the public's perception of the Medical Examiner's Office was not adversely affected. I continued to testify in cases, called as a witness by the District Attorney's Office from July 1993 to my departure from the office in January of 1994. (Ex. P, pg. 114).

18.    I am accused of malicious prosecution in the First Claim. I did not make the determination to prosecute Mr. Rivas and believe that claim to be unfair, unsupported by the evidence and inappropriate. I believe I am entitled to absolute immunity from this claim. Likewise, as to the Second claim, I played no role in issuance of process, and I believe I am entitled to absolute immunity from this claim. The Third cause of action accuses me of a failure to intervene. I do not believe I had a duty in that regard as I was unaware of the pre- or post-trial events regarding Mr. Rivas. I believe I am entitled to absolute immunity from this claim. The same would be true of the Fourth claim for unreasonably prolonged detention. I believe I am entitled to absolute immunity from this claim. The denial of a fair trial claim regarding the Fifth claim is also not applicable to me. I am not a lawyer and would not play a role regarding due process and I believe I have absolute immunity for my testimony in the Grand Jury and in the trial. As to the Sixth claim, I believe it is not applicable to me. I disclosed all evidence asked of me. Mr. Calle, the Defendant's attorney, never spoke with me prior to the trial to my recollection or subpoenaed any information from my office. He never engaged a fellow pathologist to review the autopsy and various forms of slides. He did not call a forensic pathologist to refute my opinion as to time of death. It was my

custom and practice to speak with all attorneys prior to trial and to collaborate with fellow medical professionals. I believe I am entitled to absolute immunity from this claim. The Seventh claim, a Monell claim, is not applicable to me or my actions which are entitled to absolute immunity. The Eighth cause of action alleges conspiracy. As set forth above, there was no conspiracy, just my routine participation in a murder trial testifying regarding my investigation, autopsy and opinions related thereto.

19.     Given the foregoing, I respectfully request that the First Amended Complaint of the Plaintiff be dismissed as against me as it is not based on facts supported in the record before this court. The allegations and assertions of plaintiff's counsel, Attorney Manes, are without merit nor factual support and are, rather, the product of speculation, innuendo and subterfuge. Moreover, I believe my Grand Jury testimony and trial testimony are accorded absolute immunity.

WHEREFORE, I pray that the Court dismiss the Complaint and the causes of action against me with prejudice as I am entitled to absolute immunity and there is no factual basis for the claims.

I affirm this 23rd day of October, 2024, under penalties of perjury under the laws of the State of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

 

 

_____
Erik K. Mitchell