UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

*Plaintiff,*

vs.

Civil Action No. 5:19-cv-844
(BKS/TWD)

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
AND "JOHN DOES 1-10",

*Defendants.*

---

***MEMORANDUM OF LAW ON BEHALF OF***
***DR. ERIK MITCHELL***
***IN SUPPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT***

Robert F. Julian, Esq.
Robert F. Julian, P.C.
*Attorneys for Defendants William Fitzpatrick*
*and Erik Mitchell*
Office and Post Office Address
2037 Genesee Street
Utica, New York 13501
(315) 797-5610

Dated: October 31, 2024

1

# TABLE OF CONTENTS

Page

Table of Authorities…………………………………………………………………. iii

STATEMENT OF FACTS…………………………………………………………….. 1

    Valerie Hill………………………………………………………………….. 1

    Dr. Erik Mitchell/The Medical Examiner's Record……………………………. 1

    Time of Death Estimates on or About March 30, 1987…………………………. 3

    Peter Tynan…………………………………………………………………… 3

    Search Warrant……………………………………………………………….. 4

    Grand Jury…………………………………………………………………….. 4

    Hector Rivas………………………………………………………………….. 5

    The Trial of Hector Rivas……………………………………………………… 6

    The Appeal…………………………………………………………………….. 7

    The 440 Motion………………………………………………………………. 8

    The Second Circuit…………………………………………………………….. 8

    Rescheduling of the Trial……………………………………………………… 8

    Sindey Manes, Esq……………………………………………………………. 8

    Sidney Cominsky, Esq………………………………………………………….. 11

**ARGUMENT**…………………………………………………………………….. 11

    **POINT I - DR. MITCHELL HAS ABSOLUTE
IMMUNITY FOR HIS GRAND JURY AND TRIAL TESTIMONY**…..……… 11

    **POINT II**……………………………………………………………………. 14

      **A.     THE PLAINTIFFS FAILED TO PROVE THE
CLAIMS ALLEGED IN THE COMPLAINT**……………………………. 14

**B.     THE ALLEGED CONSPIRACY DID NOT EXIST
AND IS NOT PROVEN**……………………………………………     16

**POINT III**……………………………………………………………     18

**THE UNPROVEN CONSPIRACY CLAIM ALLEGED IN THE
EIGHTH CAUSE OF ACTION IS PROTECTED BY
ABSOLUTE IMMUNITY FOR
MITCHELL**……………………………………………………..     18

**POINT IV**

**PLAINTIFF MANES RECANTS OR CONTRADICTS
KEY ALLEGATIONS IN THE COMPLAINT**………………………..     21

**POINT V**

**THE PLAINTIFF HAS PRESENTED NO PROOF THAT
THERE IS A MONELL CLAIM**…………………………………………     25

**CONCLUSION**………………………………………………………     25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Barrett v. United States,* 798 F.2d 565 (2d Cir. 1986)…………………………………     18

*Briscoe v. LaHue*, 460 U.S. 325, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983)…………………     11, 12

*Buckley v. Fitzsimmons,*
509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993)…………………………………..     13, 18

*Burke v. Miller,* 580 F.2d 108 (4th Cir. 1978)…………………………………………     13

*Coggins v. Buonora*, 776 Fed. 3d 108, 113 (2d Cir. 2015)…………………………………     12

*Daloia v. Rose,* 849 F.2d 74 (2d Cir. 1988)……………………………………………     18

*Dory v. Ryan*, 25 F.3d 81 at 83), cert. denied, 143 S. Ct. 1781 (2023)………………………     18

*Mowbray v. Cameron County, Texas,*
274 F.3d 269, 277, 278, 51 Fed. R. Serv. 3rd 1031 (5th Cir. 2001)…………………………..     12

*People v. Rivas,* 214 AD2d 996, (4th Dept. 1995)…………………………………………     8

*Rehberg v. Paulk,* 566 U.S. 356, 132 S. Ct. 1497……………………………………………     11, 12

*Rivas v. Fisher,* 687 F.3d 514 (202)…………………………………………………     2


**Statutes**

Section 1983 (42 U.S.C. § 1983)……………………………………………………     11, 12
                                                                          13, 18, 19

**STATEMENT OF FACTS**

<u>Valerie Hill:</u>

On March 30, 1987, the body of Valerie Hill was found by her father, brutally murdered in her apartment in Syracuse, New York. She had not been seen or heard from since Friday evening, March 27, 1987, when she had dinner with her father.

She had been scheduled to visit a friend who lived out-of-town for the weekend, and was expected to arrive on Saturday, March 28, 1987. The friend did not hear from her, and she did not appear on Saturday or Sunday. The friend's many telephone calls to Valerie's telephone were unanswered. She had last been seen alive at her apartment by neighbors at noon on Friday. Her cat had been left outside on Friday night, a rare occurrence. Her car had not moved from Friday when she parked it.

Her father was accustomed to hearing from her daily and especially at that time because her step-mother was dying in the hospital. He did not hear from Valerie all weekend. Valerie was a registered nurse and fully aware of her step-mother's medical condition. Her step-mother died on March 30, 1987. William Fitzpatrick was not employed by the District Attorney's Office on the date of Valerie Hill's body being discovered, and did not participate in the immediate investigation in 1987. Dr. Erik Mitchell was the medical examiner and examined the body as it was found in the apartment on March 30, 1987. The Syracuse Police Department investigated Valeri's death. Investigators included Detective Sergeant Peter Tynen.

<u>Dr. Erik Mitchell/The Medical Examiner's Record:</u>

Dr. Mitchell was the Onondaga County Medical Examiner on the date of the discovery of Valerie Hill's body. He examined her body as it was found in her apartment at about 3:00 p.m. on March 30, 1987. His findings with regard to her body and crime scene were:

- The cause of death was strangulation;

1

- There had been anal penetration by an object;

- The body was found on the floor;

- Rigor was present;

- The floor was cold and her apartment was 62 degrees. (Ex. C-1, pg. 906);

- Dr. Mitchell noted "The apartment appeared to have been relatively cool as was the basement through ceiling from the floor upon which the decedent lay. (Ex. A, pg. 5).

In the official Medical Examiner's Record which he authored on March 30, 1987, Dr. Mitchell opined that Valerie Hill's body "Appears as though Deceased was there approx.. 2-3 days." (Ex. A). [1] That meant the time of death could have been Friday, March 27, Saturday, March 28 or Sunday, March 29. Valerie's body was brought to the Medical Examiner's Office for autopsy on March 30, 1987. The autopsy commenced at 5:30 p.m. Dr. Mitchell signed the record at 7:45 p.m. (Ex. A, pg. 17). Kodachrome slides were taken of the brain. The brain was examined by Dr. George Collins, a neuropathologist in conjunction with Dr. Mitchell. The brain was sectioned. Dr. Collins reported the deeper sections of the brain are riddled with cavities developed due to decomposition. Dr. Mitchell, in his autopsy notes found the brain to be mildly softened due to autolytic changes. (Ex.A, pg. 8). In his trial testimony, he described the brain as having a fair amount of decompositional changes inside – in fact, her brain had sufficiently decomposed to have small holes in it. The tissues were flabby within. (Ex. C-1, pg. 905).

---

[1] The Second Circuit incorrectly determined that Mitchell changed his opinion regarding the range of time of death, "In any case, whether it was out of an eagerness to please the prosecutor" Appellant's Br. At 5, as Rivas suggests, or based upon an independent re-evaluation of the medical record, it does appear that sometime in 1992, Mitchell reconsidered his estimate of the time of death." *Rivas v. Fischer,* 687 F3d 514 (2012). The Second Circuit ignored Dr. Mitchell's March 30, 1987, opinion which he wrote in the medical examiner's record on that date after having seen the body in situ that Ms. Hill had been dead two to three days from the discovery of her body, Dr. Mitchell did not change his opinion at any time to the range of the time of death from the time the body was discovered to his trial testimony in March of 1993.

<u>Time of Death Estimates on or About March 30, 1987</u>

Dr. Mitchell, in his record, stated the time of death to be two to three days prior to the discovery of the body.  (Ex. A, pg. 17).

Detective Sergeant Peter Tynan, testified that Dr. Mitchell had told him on or about March 30, 1987, that Ms. Hill had died at least two days before.  (Ex. H, pgs. 20-21).

Timothy Phinney gave an affidavit requesting a Search Warrant stated on March 30, 1987:

> That the Onondaga County Medical Examiner's Office's, Dr. Mitchell's preliminary estimate on the time of death of the victim Valerix (sic) Hill was sometime Saturday the 28th of March afternoon and Sunday morning the 29th of March." (Ex. U).

The Tynan comment was made at the time the body was discovered.  The search warrant does not accurately state Dr. Mitchell's opinion as demonstrated by the Medical Examiner's Record.  Dr. Mitchell's contemporaneous Record clearly states his opinion that Ms. Hill had been dead two to three days.

<u>Peter Tynan:</u>

Peter Tynan was a Syracuse police officer (Sergeant) who investigated Valerie Hill's death on March 30, 1987, and thereafter.  (Ex. H, pg. 18).   Sergeant Tynan spoke with Dr. Mitchell shortly after the body was found.  Dr. Mitchell opined to Tynan that Hill had been dead at least two days before her body was found.  (Ex. H, pg. 21-22).   Sergeant Tynan believed there was enough evidence to prosecute Rivas in 1987.  (Ex. H, pg. 20)

 Tynan, in 1992 while still a Syracuse Police Officer, was loaned to the newly elected District Attorney, William Fitzpatrick, and became his chief investigator.  He was tasked to evaluate cold cases existing in the office and recommended to Mr. Fitzpatrick the reopening of the investigation of the death of Valerie Hill and the prosecution of Rivas.  He then led the preparation of the case for the Grand Jury presentation, identifying existing evidence and finding new

evidence.  The investigation led to the presentation of Valerie Hill's death brought before the Onondaga County Grand Jury and the indictment of Hector Rivas.  (Ex. H, pg. 19-20,).

There was a note in the District Attorney's file about an interaction with Dr. Mitchell that states, "Pushes the time of death events further out." (Ex. H).  It is not clear if that note refers to Dr. Mitchell's opinion in the Medical Examiner's records that death occurred within two to three days of discovery of the body or to a conversation with Dr. Mitchell, or both.  (Ex. H, pgs. 30-32). Rivas was indicted by the Grand Jury on November 16, 1992.  He was tried and convicted by an Onondaga County Jury on March 25, 1993.

Based on complaints received in July of 1994 about Dr. Mitchell's office, at the direction of Mr. Fitzpatrick, Investigator Tynan conducted an investigation of Dr. Mitchell's office that ultimately led to Mitchell's resignation in November of 1994.  This was the first and only investigation of Dr. Mitchell by the District Attorney's Office.  (Ex. H, pgs. 40-47, Line 6).

Search Warrant:

A search warrant was sought to search the apartment of Hector Rivas on March 30, 1987. A police officer, Timothy Phinney, presented an affidavit reciting that the Medical Examiner's Office opined that Valerie Hill was killed on Saturday or Sunday.  The warrant was issued, and Rivas' apartment was searched.  The search of the apartment caused the police to observe a shrine dedicated to Valerie Hill.  It was not photographed.  Dr. Mitchell never advised Officer Phinney that Valerie was murdered on Saturday or Sunday.  Dr. Mitchell did tell Sergeant Tynan that it was his opinion she had been dead more than two days and recorded in his contemporaneous records his opinion that she had been dead two to three days. (Ex. H, pg. 21)(Ex. A., pg. 17).

Grand Jury:

The Onondaga County Grand Jury convened on November 9, 10, and 16, 1992.  25

witnesses were called over three days. District Attorney William Fitzpatrick presented the case. Among the witnesses were James Crimi and Susan Stonecipher, who testified that they saw Hector Rivas in front of Valerie Hill's house in his car smoking a cigarette at 11:00 p.m. to 12: a.m. on March 27, 1987. (Ex. W, pgs. 193, 201-202).

Dr. Mitchell testified about the autopsy. He opined the cause of death was strangulation. (Ex. B, pg. 125)

He was asked the following and gave the following answer after advising the Grand Jury in a case like this that it was not possible to give an exact time of death, just guidelines or parameters.

> Q. Are your findings consistent with this death having occurred sometime during the evening hours of Friday, March the 27th?
>
> A. The 27th, and I have her on the 30th, it's possible. It's on the outside edge of that possibility, but it's possible. What we have is a body in full rigor, and they usually start coming out. But she was on the floor, which is the cooler area of the house, compared to the upper – if you're higher up on a bed or something. So you stay cooler, that tends to prolong the process of rigor and you certainly can be in full rigor for 48 hours, it's not a problem. (Ex. B, pgs. 126-127).

Hector Rivas was indicted by the Grand Jury.

<u>Hector Rivas:</u>

As set forth in the affidavit of William Fitzpatrick, Dr. Mitchell testified at the trial based on a hypothetical question from Mr. Fitzpatrick that March 27th was the more likely time of death to early on March 28th. Mr. Rivas had been in a romantic relationship with Valerie Hill but she ended their relationship several months before her death to his dismay. He wrote to her virtually

every day thereafter. He visited her frequently without her consent. He had a key to her apartment. He had a history of violence toward women. He did not have an alibi for 10:00 p.m. on March 27, 1987, to early morning on March 28, 1987. Rivas was seen outside of her residence from 11:00 p.m. to 12:00 a.m. on March 27, 1987, sitting in his parked car smoking a cigarette by Mr. Crimi and Ms. Stonecipher. He had purchased rum the evening of the murder, the same brand of which was found in MS. Hill's apartment. Two weeks after the murder, he stated before a friend, Joseph Fields, "Valerie, Valerie, I didn't mean to do it." (Ex. C-5, pg. 817). Rivas retained Richard Calle, Esq. to represent him at his trial. Rivas did not testify at his trial.

     <u>The Trial of Hector Rivas:</u>

     Several weeks before the trial of Hector Rivas, Dr. Erik Mitchell held a press conference in response to an investigation by the New York State Health Department. William Fitzpatrick attended that press conference. He does not recall this event but there is a photograph of Fitzpatrick standing with Dr. Mitchell at the press conference. The investigation did not involve issues regarding Dr. Mitchell's autopsy or time of death opinion. No referral or complaint had been made to Mr. Fitzpatrick's office.

     Fitzpatrick did not advise Mr. Calle of this event, however, he believes Calle was aware of it as he had newspapers obviously to be used for testimony on his counsel table during the trial. A total of 26 witnesses were called during the trial.

     In summary, the evidence from the trial of Hector Rivas leading to Rivas' conviction was:

     1.     The absence of any contact with Valerie Hill after she left her father on Friday, March 27, 1987. Valerie Hill's father testified he had dinner with her and did not hear from her again after 7 p.m. on Friday.

2.      That her car, which had been serviced that day, had not been moved from the time it was parked in the driveway on March 27, 1987.  Testimony by a representative of the garage that serviced her car provided mileage at the time of the service.  Mileage on the odometer was added for her drive home on Friday.

3.      That the friend who Valerie was to visit on March 28, 1987, did not hear from her and was unable to reach her by telephone starting on the evening of Friday, March 27th.

4.      That her father did not hear from her after she left having dinner with him even though her step-mother was in the hospital and dying, and that was entirely out of character.

5.      That her cat was found outside on Saturday morning, which was uncommon.

6.      That Susan Stonecipher and her boyfriend Jim Crimi saw Hector Rivas present outside of Hill's apartment between 11:00 p.m. and 12:00 a.m. on March 27th, parked in his car smoking a cigarette.

7.      Most important, Rivas made an admission in front of his friend at a bar stating, "Valerie, I didn't mean to do it," just two weeks after the murder.

8.      Barclay cigarettes were found smoked in Ms. Hill's apartment.  This was Rivas' favored brand of cigarette.

9.      Rivas had a key to Hill's apartment and there was no evidence of forced entry.

10.     A library book borrowed by Hill was returned on Saturday, 3/28/87, suggesting Rivas had returned the book to evidence his alibi.  (His fingerprints were found on the book in preparation for the re-trial).  (Ex. V).

The jury deliberated for eight hours before convicting Rivas.

The Appeal:

The Appellate Division, Fourth Department affirmed Rivas' conviction. *People v. Rivas,*

214 AD2d 996 (4th Dept. 1995).

The 440 MOTION:  The motion was brought before Hon. John J. Brunetti after a hearing in which testimony was taken.  The Court denied the motion in a written Decision.

The Second Circuit:  The Second Circuit inexplicably ignored Dr. Mitchell's written opinion of March 30, 1987, that the decedent had been dead 2 to 3 days from the date of discovery. Their finding that Dr. Mitchell changed his opinion as to time of death is wrong and inconsistent with the facts.

THE RESCHEDULING OF THE TRIAL:  The transcripts of four proceedings before Judge Thomas Miller dated March 25, 2015, April 20, 2015, March 18, 2016 and June 5, 2016. Judge Miller scheduled specific return dates for motions which were not met by Rivas' counsel. Dates were set for December 7, 2015, and March 2016 which the defense counsel adjourned. Sidney Manes was a counsel of record and present for each adjournment request.  At no time did the prosecution request adjournments.

SIDNEY MANES, ESQ.

Attorney Sidney Manes, the Plaintiff Administrator of the Estate is an attorney licensed to practice law in the State of New York.

In this case, in paragraph 29 of the Complaint, he would allege factual statements unless he represented that it was upon information and belief.  He alleged a cascade of factual allegations for which he acknowledged he has no proof.

Every claim set forth in the Complaint is predicated on Mr. Manes' unproven and inaccurate belief that there was a conspiracy between William Fitzpatrick and Erik Mitchell, M.D. and his lawyer, Sidney Cominsky, Esq., to obtain the conviction of Hector Rivas. The Complaint alleges as facts that Mr. Fitzpatrick through Mr. Cominsky extorted the revised testimony of Dr.

Mitchell to expand the time of death of Valerie Hill in return for not prosecuting him.  Mr. Cominsky testified emphatically that this did not happen and that when Mr. Fitzpatrick agreed not to prosecute Dr. Mitchell months after the Rivas trial, it was shortly before his resignation.  (Ex. I, pg. 28-31).  The Complaint also alleges facts that they:

1) Misrepresented facts in the Grand Jury and at trial;

2) Withheld exculpatory evidence.

Mr. Manes conceded to the Second Circuit prior to the preparation of his Complaint that the District Attorney's Office was not investigating Dr. Mitchell at the time of the trial of the Rivas case in March of 1993.  (See, Ex. O, Bates number 185419, which is the page of the transcript and Mr. Manes' testimony)(Ex. D-2, EBT II, pg. 46).  Even though he conceded this important fact in Court before the Second Circuit, he alleged the contrary in the Complaint.

Mr. Manes was Mr. Rivas' attorney for years before bringing this lawsuit. He represented Rivas at the 440 hearing in the Court of Claims, State Supreme Court and the Second Circuit.  He acknowledges that:

1) He never obtained Rivas' trial counsel Calle's trial file from Calle or from appellate counsel Richard Priest (Ex. D-1, EBT I, pg. 19-20).  He never asked Rivas' other lawyers if they have any of the Rivas trial files.  This is despite the fact that Mr. Calle was in Syracuse and testified in a 440 hearing before Justice Brunetti, and Mr. Leone and Mr. Manes were present in the Courtroom with Calle. There is no evidence even then that Mr. Calle was asked for his trial file.  (Ex. D-1, EBT I, pg. 23). Mr. Calle's trial file, properly demanded in the case at bar, was not produced by Plaintiffs.

2) Although Mr. Manes met with Rivas 20 times, he did not make any notes of these meetings. (Ex. D-1, EBT I, pg. 23).

3) Mr. Manes did not ask Rivas if he was at Hill's apartment at 11:00 p.m. on March 27, 1987, given that he was seen parked in front of the apartment at 11:00 p.m. (Ex. D-1, EBT I, pg. 26).

4) Mr. Manes did not ask Rivas if he ever stated in the company of another person, "Valerie, Valerie, I didn't mean to do it." (Ex. D-1, EBT I, pg. 27) or if he erected a shrine to Valerie Hill in his house. (Ex. D-1, EBT I, pgs. 27-28).

5) Mr. Manes never discussed Rivas' case with Mr. Fitzpatrick, Dr. Mitchell, Dr. David Rigle, Dr. William Sawyer, or call any of the witnesses that testified at trial. (Ex. D-1, EBT I, pg. 29-31).

The admissions are contrary to the facts pled in the Complaint given that Mr. Manes pled as fact in Paragraph 64 of the Complaint that the Defendants had no reasonable or probable cause to believe that Rivas had anything to do with the murder and sexual assault of Valerie Hill – and therefore no case against him for those crimes – unless it could prove that Hill died on Friday night, March 37, 1987.

The facts supportive of Rivas' guilt were extensive as collected in the 1987 investigation by the Syracuse Police Department and presentation to the Grand Jury, to wit: upon the commencement of Mr. Tynan's investigation that Rivas was seen at the scene of the crime at 11:00 p.m. on 3/27/1987 by two witnesses; that Dr. Mitchell had opined in his notes on March 30, 1987, that Ms. Hill had been dead two to three days; that Dr. Mitchell told Tynan on or about March 30 that it was his opinion that Hill had been dead for more than two days; that Hill had not been heard from by anyone after the evening of March 27, 1987; that her cat was outside overnight; that she was not in touch with her friend who she was travelling to see on Saturday; and that she was not in touch with her father even though her step-mother was dying in the hospital.  Mr. Rivas had

motive, his despair over the relationship, opportunity, and he had no alibi for late March 27 to early morning of March 28.

Sidney Cominsky, Esq.

Sidney Cominsky is a Syracuse lawyer who represented Dr. Mitchell in 1993. Mr. Manes, in the Complaint and in his testimony, has Mr. Cominsky at the epicenter of the plot by Mr. Fitzpatrick to have Dr. Mitchell expand the range of possible time of death in return for his testimony and non-prosecution. Mr. Cominsky testified emphatically that no such deal was made, that he understood it to be the suborning of perjury, and he would never participate in such an agreement. (Ex. I, pgs. 28-32).

Months after Rivas' conviction, Mr. Cominsky did participate in a meeting in November of 1993 shortly before Dr. Mitchell resigned with Mr. Fitzpatrick, Nicholas Pirro, and Deputy County Executive Kochian, in which Dr. Mitchell agreed to resign and Mr. Fitzpatrick stated he would further pursue any investigation. (Ex. I, pg. 29-32).

He also refuted Mr. Manes' utterly unsupported allegation that Mitchell was charged with 100 misdemeanors and several felonies. (Ex. I, pg. 27).

## ARGUMENT

### POINT I

### DR. MITCHELL HAS ABSOLUTE IMMUNITY FOR HIS GRAND JURY AND TRIAL TESTIMONY.

Dr. Mitchell asserts the defense of absolute immunity which bars the claims against him for his testimony at trial and at the Grand Jury. Witnesses testifying in Section 1983 actions have absolute immunity as articulated the United States Supreme Court's decision in *Rehberg v. Paulk*, 566 U.S. 356, 132 S. Ct. 1497, 182 L .Ed. 593, 2012 and *Briscoe v Lahue*, [1983]. The Supreme Court in *Rehberg v. Paulk* explained its holding in *Briscoe v Lahue*,:

11

"At common law, trial witnesses enjoyed a limited form of absolute immunity for statements made in the course of a judicial proceeding…

In *Briscoe,* however, this Court held that the immunity of a trial witness under Section 1983 is broader. In such a case, a trial witness has absolute immunity with respect to any claim based on the witness' testimony. When a witness is sued because of his testimony, the Court wrote "the claims of the individual must yield to the dictates of public policy." 460 U.S. at 332-333…

The factors that justify absolute immunity for trial witnesses apply with equal force to Grand Jury witnesses." See, *Rehberg v Paulk*, 566 US 356 [2012] at 367,

The Defendant acknowledges that the Second Circuit has held that a claim could go forward for malicious prosecution where the facts that support the claim parallel information given to the Grand Jury. *Coggins v. Buonora*, 776 Fed. 3d 108, 113 (2d Cir. 2015). The question is whether there is an independent claim existent with regard to Dr. Mitchell's testimony. There is no claim against Dr. Mitchell independent of his Grand Jury and trial testimony. The alleged conspiracy cited in Claims 1, 2, 3, 4 and 8 of the Complaint have no independent status as they are dependent upon the alleged fraudulent testimony of Dr. Mitchell. That testimony is immune and thus the claims are barred.

While *Rehberg v. Paulk* involves testimony of a law enforcement officer, it's applicable as well to Mitchell's circumstance. The Court held that a law enforcement officer has "absolute immunity from any Section 1983 claim based on the witness's testimony". *Rehberg*, 132 S. Ct. 1506. In fact, prior to *Rehberg*, most circuit courts held that absolute immunity extended to claims of conspiracy to commit perjury. *Mowbray v. Cameron County, Texas*, 274 F.3d 269, 277, 278, 51 Fed. R. Serv. 3rd 1031 (5th Cir. 2001) surveying the Circuit's finding majority position persuasive and concluding "that absolute witness immunity bars Section 1983 suits for conspiracy to commit perjury." It is also the state of the law that Dr. Mitchell's trial testimony is absolutely immune. See *Briscoe v. LaHue*, 460 U.S. 325, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983).

12

In a pre-*Briscoe* and *Rehberg* decision, the Fourth Circuit held that any witness in a state judicial proceeding enjoys absolute immunity. *Burke v. Miller,* 580 F.2d 108 (4th Cir. 1978). The Court in *Burke v. Miller* specifically held that a medical examiner Defendant in a Section 1983 action had absolute immunity.

*Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993) is not applicable. Fitzpatrick and Mitchell did not engage in any agreement to extend the time of death. Based on the facts, there is no evidentiary support for such a fraud.   However:

1) Dr. Mitchell had determined the range of time of death already as 2-3 days in writing years before this alleged conspiracy occurred.

2) Manes admitted that he did not have actual knowledge of, or proof of the conspiracy;

3) Plaintiff's Forensic Pathologist expert Dr. Daniel Spitz acknowledged that Dr. Mitchell's conduct in the autopsy and in his testimony regarding time of death was within the standard of care;

4) There was a tremendous amount of circumstantial evidence that Ms. Hill died on 3/27 or early on 3/28;

5) Factually, there was no investigation of Dr. Mitchell pending on November 10, 1992, when Dr. Mitchell testified before the Grand Jury that the death could have occurred on March 27, 1987.  His testimony, which was consistent with his March 30, 1987 opinion, and Fitzpatrick's conduct at the Grand Jury proceeding was absolutely privileged.

POINT II

## A. PLAINTIFF FAILED TO PROVE THE CLAIMS ALLEGED IN THE COMPLAINT

Notwithstanding that these claims are barred by absolute immunity, Mitchell argues that the claims by the Plaintiff Manes as set forth in the Complaint are unsupported. As set forth above, all of the referenced claims are predicated on the notion that there were not adequate facts to support the indictment, trial and conviction of Hector Rivas. All of these claims are primarily dependent upon an allegation/assumption that Erik Mitchell gave false and inaccurate testimony motivated by a conspiracy between Defendants Fitzpatrick and Mitchell that required Mitchell to alter his testimony and opinion that the time of death in this case fell within a period of time in which Rivas did not have an alibi for the purpose of achieving a conviction. There is no evidentiary support for this allegation. Dr. Mitchell did not alter his opinion at any time. His opinion was consistently that the time of death occurred within 2 to 3 days of discovery of Ms. Hill's body from the time he evaluated the crime scene until his testimony. Reliance upon the Second Circuit's preliminary fact finding defies the actual facts in the case regarding Dr. Mitchell's range of time of death impression.

Dr. Mitchell opined in writing on the day Ms. Hill's body was found, March 30, 1987, after the autopsy that it appears she "was there two to three days." (Ex. A, pg. 17). This was before Dr. Mitchell knew of or had any idea of Hector Rivas, his whereabouts, and/or the status of his alibi for Friday, March 27th. Dr. Mitchell's opinion on that day placed the time of death therefore within a time frame from Friday afternoon March 27th through Monday afternoon, March 30th. The Plaintiff's Forensic Pathology expert, Dr. Daniel Spitz, testified that Mitchell did not deviate from the standard of care either in his performance of the autopsy nor in his testimony as to the time of death. (Ex. G, p. 57, 62). Dr. Spitz specifically testified that Dr. Mitchell did not fall below the

14

standard of care in offering his opinion that the window of death was sometime between Friday night at 7:00 on the 27th and the time Valerie Hill was found on Monday. (Ex. G, p. 62). Plaintiff's own expert concedes that Dr. Mitchell's actions were within the standard of care, thereby undercutting the theory that a conspiracy resulted in false testimony. Contrary to the claims made in the Complaint, there was ample evidence for the indictment and conviction as presented to the Grand Jury and the jury. In summary, the evidence was:

- The absence of any contact with Valerie Hill after she left her father on Friday, March 27, 1987. Valerie Hill's father testified he had dinner with her and did not hear from her again after 7 p.m. on Friday.

- That her car, which had been serviced that day, had not been moved from the time it was parked in the driveway on March 27, 1987. Testimony by a representative of the garage that serviced her car provided mileage at the time of the service. Mileage on the odometer was added for her drive home on Friday.

- That the friend who she was to travel to visit on March 28, 1987, did not hear from her and was unable to reach her by telephone starting on the evening of Friday, March 27th.

- That her father did not hear from her after she left having dinner with him even though her step-mother was in the hospital and dying, and that was entirely out of character.

- That her cat was found outside on Saturday morning, which was uncommon.

- That Susan Stonecipher and her boyfriend Jim Crimi saw Hector Rivas present outside of Hill's apartment between 11:00 p.m. and 12:00 a.m. on March 27th, parked in his car smoking a cigarette.

- Most important, Rivas made an admission in front of his friend at a bar stating, "Valerie, I didn't mean to do it," just two weeks after the murder.

15

- Barclay cigarettes were found smoked in Ms. Hill's apartment. This was Rivas' favored brand of cigarette.

Rivas had a key to Hill's apartment and there was no evidence of forced entry.

## B. THE ALLEGED CONSPIRACY DID NOT EXIST AND IS NOT PROVEN

One of the most outrageous claims made in the Complaint, alleged as facts known to Plaintiff Manes, alleges in paragraph 76 that Mitchell had brokered a deal with Fitzpatrick not to be prosecuted in exchange for expanding Hill's time of death. This allegation is central to Plaintiff's theory of this case. It is not true and without factual basis. When probed in his deposition as to the basis of the facts set forth in this allegation, Plaintiff Manes points to the fact that Mitchell left the community and resigned with a clean bill of health and everything else evaporated. Manes testified "Now, that is an assumption, maybe, that I gave it without question, but something had taken place between Doctor Mitchell and Fitzpatrick." (EBT II p. 19). Manes further was asked "Are you saying that a deal was brokered to expand the time of death with Fitzpatrick and Mitchell before Mitchell's Grand Jury testimony, yes or no? Answer: I can only assume." (Ex. D-2, EBT II p. 22). At page 23 he testified, "I just assumed that there was a deal." (Ex. D-2, EBT II p. 23). The facts are:

1) Dr. Mitchell opined in his Record of March 30, 1987, years before his 1992 Grand Jury testimony and his 1993 trial testimony, that Hill had been dead 2-3 days. He stated, "appeared dec's was there approximately 2-3 days." (Ex. A, pg. 17). This typewritten note was part of the Onondaga County Medical Examiner's Office signed by Dr. Mitchell at 7:45 p.m. on March 30, 1987, after he performed the autopsy which commenced at 5:30 p.m. on that date. (Ex. A, pg. 17).

16

2) Dr. Mitchell was not under investigation by Fitzpatrick or anyone else when he testified before the Grand Jury that Hill's time of death could have been Friday, March 27, 1987.

3) Mitchell was not under investigation by Fitzpatrick when he testified at Rivas' trial on March 23, 1993.  Manes conceded this fact when he appeared before the Second Circuit.  (Ex. O, Bates No 185419)( Ex. D-2, EBT II, pg. 46).

To the extent that Mr. Manes' testimony supporting his claims is decipherable, and it is asserted that there was some investigative component to the conduct of Fitzpatrick and Mitchell, there is absolutely no evidence supporting that there was a conspiracy or that there was a conspiracy to inappropriately present testimony to the Grand Jury.  The issues raised about the trial testimony are not applicable at the Grand Jury, to wit, the confusion about slides and the condition of the decedent's brain at the time it was examined at autopsy.  That is because Mitchell, Despite Manes' incorrect allegations in the Complaint, did not discuss slides or the condition of the Decedent's brain at the Grand Jury.  There is no proof of any agreement by Mitchell and Fitzpatrick to misrepresent to the jury the existence of slides pre-trial.  During the trial, the discussion of slides was accurate.  There were Kodachrome slides of the brain.  At no time did Mitchell of Fitzpatrick represent there were tissue slides prepared for microscopic review. (See, Affirmation of Dr. Mary Jumbelic, Ex. Q, pg. 4, paragraph 9).

Furthermore, there is no showing that the testimony by Mitchell, pursuant to the questioning by Fitzpatrick during Mitchell's trial testimony, was the result of any investigative function by either Fitzpatrick or Mitchell.  Indeed, Mitchell's testimony is found to be within the standard of care both as to the autopsy performed and his testimony at trial by Plaintiff's expert witness.  Mitchell's courtroom testimony as set forth to above and Fitzpatrick's questioning of him are all contained within the context of absolute witness immunity.

17

## POINT III

## THE UNPROVEN CONSPIRACY CLAIM ALLEGED IN THE EIGHTH CAUSE OF ACTION IS PROTECTED BY ABSOLUTE IMMUNITY FOR BOTH FITZPATRICK AND MITCHELL.

The United States Supreme Court in *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993), made it clear "That the proper analysis for determining whether particular actions of an official are absolutely immune from Section 1983 Liability is the 'functional approach', which looks solely to the nature of the function performed." (See *Buckley*, 509 U.S. 259, 113 S. Ct. at 2613). Absolute Immunity will apply to a prosecutor's conduct that is "intimately associated with the judicial phase of the criminal process" but not to a prosecutor's acts of investigation or administration. *Id.* at 509 U.S. 259 at 269, 113 Supreme Court at 2614. The application of immunity is not limited to duties a prosecutor performs in a courtroom. *Id.* at 113 S. Ct. at 2615. *Dory v. Ryan*, 25 F.3rd 81 at 83. To further quote the Second Circuit, "The Court in Buckley stated:

> We have not retreated . . . from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which *occur in the course of his role as an advocate from the State*, are entitled to the protection of absolute immunity. Those acts must include the professional evaluation of evidence assembled by the police and appropriate preparation for presentation at trial or before a Grand Jury after a decision to seek an indictment has been made."

The Second Circuit goes on to further state in *Dory v. Ryan,*

> "This language indicates that absolute immunity protects a prosecutor from Section 1983 Liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include, for the purpose of this case, allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because "[t]he immunity attaches to his function, not to the matter in which he performed it." *Barrett v. United States*, 798 F.2d 565, 573 (2d Cir. 1986); also see *Daloia v. Rose*, 849 F.2d 74, 75 (2d Cir. 1988) (per curiam) (Holding without discussing San Filippo that prosecutor

was immune from 1983 Liability for knowingly presenting false testimony). *Id.* at 83.

In the case at bar, Fitzpatrick did not present the false testimony of any witness. Dr. Mitchell opined as early as the date that Valerie Hill's body was found on March 30, 1987, that the time of death was between two to three days from the discovery. Dr. Mitchell made it clear in the Grand Jury in November of 1992 and thereafter in his courtroom testimony that there was a range and a variety of factors that would occasion and cause the determination of time of death. The discussion of slides and Mr. Fitzpatrick's use of the words sectional slides as it pertains to Dr. Mitchell's testimony is grounded in the fact that there are indeed photographic slides of the decedent's brain. (Ex. N). Neither the prosecution nor the defense utilized the appropriate term of art which is sectional tissue slides for the purpose of description.

Based on the foregoing, it is also clear that Dr. Mitchell has absolute immunity for the preparation and testimony he provided at this trial. His testimony as a witness falls within the ambit of an expert.

That Dr. Mitchell's testimony was not based on any proven conspiracy as alleged in the Complaint is clearly set forth in the Manes depositions, wherein he acknowledged that:

1. Manes did not ever overhear any discussion between Fitzpatrick, Mitchell and between Fitzpatrick, Mitchell and Cominsky. (Ex. D-3, EBT III, pg. 23, Ex. D-1, EBT I, pgs. 68-70, Ex. D-2, EBT II pg. 14).

2. Mr. Manes claimed that there existed a document saying that Mitchell was asked to revise his testimony by Fitzpatrick although he could not identify that document. (Ex. D-1, EBT I, p. 41). No document exists. Manes further testified that there statements by Dr. Sawyer, Dr. Sullivan and Dr. Rigle and that they gave affidavits with regard to the Rivas conspiracy. (Ex. D-1, EBT I, p. 41). They did not. Manes acknowledged he

was not present for any discussion between Mitchell and Fitzpatrick and he did not know of anyone else who was present for those discussions that he could identify. (Ex. D-1, EBT I, p. 43). He could not say that Rigle, Sawyer or Sullivan were present, he simply stated all he could say is they gave affidavits. Their affidavits do not mention the Rivas case in any way. (Ex. D-1, EBT I, p. 43-44). He testified that he did not recall specifically that Fitzpatrick approached Mitchell, and requested that he revised Hill's autopsy report to expand the time of death. (Ex. D-1, EBT I, p. 44). Consequently, Manes has no basis for his allegations in paragraph 65, 66, 67 or the Complaint.

Apart from the conjecture and speculative testimony of Manes, there is no evidence of a conspiracy between Mitchell and Fitzpatrick. At the time Mitchell testified at the Grand Jury there were no known investigations pending against him, much less any evidence that Fitzpatrick was aware of them. The Grand Jury testimony occurred in November 1992. Dr. Mitchell testified that the possible time of death on Friday, March 27th, was within the confines of possible although less likely than Saturday or Sunday. He testified at trial based on the circumstantial evidence hypothetical presented by the prosecutor that Friday was the most likely date of death. That hypothetical was not given to him at the Grand Jury.

The Plaintiff's expert witness, Dr. Spitz, testified that Mitchell did not deviate from the standard of care either in the performance of his autopsy or in his testimony with regard to the time of death. Consequently, Mitchell, in his actual in-court testimony, is accorded absolute immunity as set forth above as well as his out of court preparation. Moreover, even if his immunity is not absolute, there is no evidence that he and Fitzpatrick or anyone from Fitzpatrick's office entered into any type of conspiracy with regard to his testimony as to the time of death or that the testimony was wrong or fraudulent. The police officer who was present at the scene engaged in the actual

20

murder investigation, Peter Tynan who later became Fitzpatrick's chief investigator in 1992, recalled that Mitchell had said the time of death was at least two days or more.  Mr. Tynan, in conducting preparation for the trial, likely interviewed Mitchell as well as Fitzpatrick having prepared Mitchell for trial.  Tynan did not testify that there was any conspiracy or attempt to extend the time of death opinion of Mitchell.  The alleged conspiracy was not necessary, Mitchell did not change his opinion as his testimony was consistent from March 30, 1987, to his Grand Jury testimony in November of 1992, and to his trial testimony in March of 1993.

The Plaintiffs have not factually alleged a basis for conspiracy in this case and moreover, the Defendants are entitled to absolute immunity with regard to their work and testimony and in court actions in this case.

## POINT IV

### PLAINTIFF MANES RECANTS OR CONTRADICTS KEY ALLEGATIONS IN THE COMPLAINT.

Moreover, there was ample evidence for the indictment and the conviction.  In summary, the evidence was:

1.    The absence of any contact with Valerie Hill after she left her father on Friday, March 27, 1987.  Valerie Hill's father testified he had dinner with her and did not hear from her again after 7 p.m. on Friday.

2.    That her car, which had been serviced that day, had not been moved from the time it was parked in the driveway on March 27, 1987.  Testimony by a representative of the garage that serviced her car provided mileage at the time of the service.  Mileage on the odometer was added for her drive home.

3.      That the friend who she was to travel to visit on March 28, 1987, did not hear from her and was unable to reach her by telephone starting on the evening of Friday, March 27th.

4.      That her father did not hear from her after she left having dinner with him even though her step-mother was in the hospital and dying, and that was entirely out of character.

5.      That her cat was found outside on Saturday morning, which was uncommon.

6.      That Susan Stonecipher and her boyfriend Jim Crimi saw Hector Rivas present outside of Hill's apartment between 11:00 p.m. and 12:00 a.m. on March 27th, parked in his car smoking a cigarette.

7.      Most important, Rivas made an admission in front of his friend at the bar stating, "Valerie I didn't mean to do it," just two weeks after the murder

The cold case was revived based on the work of Chief Investigator Peter Tynan who was assigned by Fitzpatrick to review cold cases.  Tynan recommended to the Defendant District Attorney that this case be further investigated.  The evidence set forth above was revisited by Investigator Tynan, deemed to be sufficient to prove Rivas' guilt beyond a reasonable doubt, and the case went forward to the Grand Jury.

District Attorney Fitzpatrick met with Dr. Mitchell prior to his Grand Jury testimony in November of 1992. Mitchell testified that Ms. Hill could have been killed on the evening of March 27, 1987, but that was at the outer limit of probability, testimony consultant with his written opinion of March 30, 1987.

In paragraph 74 of the Complaint, Mr. Manes alleges that at the Grand Jury, Dr. Mitchell presented false testimony to the Grand Jury.  When asked again what Grand Jury testimony by Dr. Mitchell false and fabricated testimony, stated, "I really can't answer it, but you know, they say a District Attorney can indict a corned beef sandwich."  (Ex. D-1, EBT I, pgs. 71-72).

Manes conceded that Mitchell did not put forward any signed document that Ms. Hill's time of death was Saturday or Sunday. (Ex. D-2, EBT II, pgs. 12-13).

In an appearance before the Second Circuit, Manes conceded that Mitchell was not being investigated by the Onondaga County District Attorney's Office at the time of the March 1993 murder trial of Rivas. When the New York Attorney General's Office asserted that, "The People had represented that the investigation (of Mitchell) did not begin until the trial was over." Manes interjects to the Second Circuit, "Your Honor will forgive me that may be true." (Ex. O, Bates No 185419). Manes conceded the District Attorney was not investigating Mitchell at the time of the Rivas trial, Manes answered, "It wasn't his job." (Ex. O, Bates No 185419)(Ex. D-2, EBT II, pgs. 45-46).

Therefore, by Manes' own admission and testimony, there is no factual basis that:

1. Mitchell altered his time of death opinion;

2. That the DA's office was investigating Mitchell in November of 1992 when he testified before the Grand Jury and then at the Rivas trial;

3. That Mitchell and Fitzpatrick were in a conspiracy to indict and convict Rivas. (See, paragraph 76 of the Complaint, "That is an assumption, maybe, that I gave, it's without question but something had taken place between Fitzpatrick and Mitchell." (Ex. D-2, EBT II, pg. 19)

Consequently, causes of action One through Four and Eight of the Complaint should be dismissed as well as the conspiracy claim set forth in the Eighth cause of action as without a factual basis.

The claim of a so-called conspiracy is the figment of Sidney Manes' imagination and conjecture. The Complaint accuses District Attorney William Fitzpatrick, a fellow officer of the

Court, of criminal activity with no factual basis and demeans the good faith efforts of Dr. Mitchell. When placed under oath in his deposition, Mr. Manes:

1) Admitted he was not present to overhear any agreement between Fitzpatrick and Mitchell to alter the time of death. (Ex. D-3, EBT III, pg. 23, EBT I, pgs. 68-70, EBT II pg. 14).

2) Admitted there were no witnesses to this conspiracy and Mitchell did not sign any statement or document that the time of death was Saturday or Sunday. (Ex. D-2, EBT II, pgs. 12-13)

3) In paragraph 74 of the Complaint, Manes accuses Mitchell of presenting fabricated testimony falsely to the Grand Jury. In his deposition, he wrongly accuses Mitchell of testifying in the Grand Jury about slides (Ex. D-2, EBT II, pg. 8) when asked to read the Grand Jury testimony. Once read, he acknowledged there was no testimony by Mitchell at the Grand Jury about slides. (Ex. D-2, EBT II, pg. 10). In a chilling and glib response to the question, "What testimony was fabricated to the Grand Jury," he testified, "I really can't answer it, but you know they say a District Attorney can indict a corn sandwich." (Ex. D-1, EBT I, pg. 71).

4) At paragraph 76 of the Complaint, Manes alleges that Mitchell and Fitzpatrick deliberately withheld from the Grand Jury that Mitchell was under investigation. Manes testified that the basis of this claim was based on the Nanette Gordon case in which there was no investigation of Dr. Mitchell but a divided panel of pathologists disagreed with his opinion regarding the cause of death. (Ex. D-2, EBT II, pgs. 15-16). He then buttresses his claim, falsely asserting that Mitchell had 100 misdemeanors and several felonies pending against Dr. Mitchell as well as a State Health Department

24

investigation.  (Ex. D-2, EBT II, pgs. 16-17).  Dr. Mitchell has never had a misdemeanor or felony charge lodged against him at any time.  An investigation by the New York State Health Department commenced in early 1993 of the Medical Examiner's office.  There was no investigation of Dr. Mitchell pending when he initially opined that the time of death was two or three days before March 30, 1987, or when he told Investigator Tynan the time of death was likely greater than two days, or when he testified before the Grand Jury in November of 1992 that March 27, 1987 was at the outer limits of a possible time of death.

5)  Manes admitted to the Second Circuit that Mitchell was not being investigated at the time he testified in March of 1993.

## POINT V

### THE PLAINTIFF HAS PRESENTED NO PROOF TO SUPPORT A *MONELL* CLAIM AS ALLEGED IN THE COMPLAINT

Plaintiffs' expert, Dr. Spitz, testified that Dr. Mitchell performed both the autopsy and his testimony consistent with the standard of care for a pathologist.  Consequently, Dr. Mitchell is absolved from any breach of the requirements of *Monell*.

### CONCLUSION

The Complaint in this matter should be dismissed with prejudice.  Dr. Mitchell is entitled to absolute immunity for their actions and Plaintiff's causes of actions are barred.  The allegations of conspiracy to alter the testimony and evidence in this case are not based on facts.  There was no conspiracy or malign effort to delay Rivas' retrial.  Each adjournment of his trial was sought by his own lawyers.

Robert F. Julian, Esq.

BAR ROLL NO 601157

25