# EXHIBIT "B"

(Grand Jury Exhibits Numbers 18 through 21 was marked)

DR. ERIK MITCHELL, called as a witness, having been duly sworn, testified as follows:

EXAMINATION BY MR. FITZPATRICK:

Q    Sir, good morning.  Tell the grand jury your full name.

A    Eric Krag Mitchell.

Q    What do you do for a living, Eric Krag Mitchell?

A    Onondaga County Medical Examiner.

Q    And how long have you been medical examiner for this county?

A    Since September of 1983.

Q    What is your professional background in terms of your education and training?

A    I graduated from Cornell University in 1972, after which I went to Upstate Medical Center and got my M.D. in 1976.  This was followed by a training program in anatomic and clinical pathology.  That is respectively the study of the body's tissues, the body's fluids and excretions as they relate to an understanding of disease and injury. This was then followed after graduation in 1980 by a training program in forensic pathology, the legal aspect of an understanding of disease and injury and death as assistant to the State Chief Medical Examiner in Chapel

Hill, North Carolina.  I graduated from that program in 1981, after which I went to a staff position as Assistant Medical Examiner in Dade County, Florida, until I came here in September of 1983.

Q    Tell the grand jury what your duties are as medical examiner?

A    I'm responsible for the investigation of those deaths within my jurisdiction where there's a belief that a non-natural event may have played a role or where there is no physician available in good conscienced who can sign the death certificate.

Q    Can you tell the grand jury what an autopsy is?

A    An autopsy optimally has three parts, sometimes only the latter two.  The first part is examination of the deceased at the site of discovery of the body or the site of injury and then continues with the external examination in more controlled circumstances in my office, and finally an internal examination for examining the body's tissues for signs of disease and injury.  During these various stages of investigation and examination, a variety of types of documentation may be produced and a variety of types of materials collected for further analysis.

Q    And in your professional career approximately how many autopsies have you performed or assisted in performing?

121

A    Performed myself is somewhere over 4,000. I do not know the exact number. I do not keep count. I've been involved in a large amount of others.

Q    Did you have occasion to perform an autopsy on the body of Valerie Hill?

A    Yes, I did.

Q    Can you tell us where and when that took place?

A    This was done in my office and done on the 30th of March 1987.

Q    And tell us -- did you go to the scene of the murder, by the way?

A    I did.

Q    And the autopsy itself, how did the body appear when you examined her?

A    Well, at the original examination at the death scene, the body was partially dressed in a kind of a terrycloth bathrobe and there was what appeared to be the belt of that bathrobe around her neck. She was face down. The body was in rigor. Now, when you die, after a few hours your muscles start to set and become firm. That's called rigor mortis. After a period of a day or two, this stiffness will then go away. It's a chemical reaction within the musculature. She had gone into rigor. She also had livor, the settling of blood to the down side of the body. When the blood is no longer circulating, it settles

1  to the down side.  After the livor, the pigment starts to

2  leak out to the tissues, we have fixed livor.  If you shift

3  the body the stain will stay.  She was starting to do some

4  of that.  There was fecal staining or smear, fecal material

5  around the buttocks and the back of the thighs.

6      Q    I want to show you Exhibit 19 and Exhibit 18.

7  Have you seen these items before, sir?

8      A    Yes, sir.

9      Q    Exhibits 5 and 6, do you recognize the scene in 5

10 and 6, sir?

11     A    I do.

12     Q    And are 18 and 19 the items that were found on

13 Miss Hill's body?

14     A    Exhibits 18 and 19 are these two exhibits, yes,

15 sir.

16     Q    And I show you Exhibits 20 and 21, and ask if you

17 can tell us what those describe or what those are pictures

18 of?

19     A    Exhibit 20 is a picture of the face of the

20 decedent, Valerie Hill, taken at the scene -- no, that one

21 was taken at the morgue but still in the body bag now face

22 up still with the tie around her neck and with the robe on.

23 And Exhibit 21 is a picture taken from the right side

24 demonstrating the tie around her neck.

25     Q    Now, talking about the fecal staining that you saw

123

on her body which is shown in Exhibits 5 and 6, did you find any evidence that she had been violated in her anus to cause these smears?

A    I'm just going to refer to my notes. Unfortunately, I didn't have a chance to review them before I got over here today.  Let me just check.  I found no bruise.

Q    Now, do you have an opinion as to what caused this fecal smearing?

A    Yes.

Q    Tell us what that is.

A    Something was introduced into her anus and then wiped on the body.

Q    On her buttocks?

A    Yes, over the buttocks and thigh.

Q    Do you have any opinion as to whether or not this was a penis or some other type of object?

A    I doubt it was a penis.

Q    What makes you say that?

A    The ability to wipe the penis in the fashion as seen here would not fit with that structure.

Q    Any sign of ejaculation in her anus?

A    I could not see it, no.

Q    Was there any indication she was having her period?

124

ONONDAGA COUNTY GRAND JURY

1     A    Yes.  There is some -- the endometrium, the lining

2    of the uterus, was thin and red.  She could be at the

3    end -- there was some red fluid in the mucus, so it could

4    be the end of her period.

5     Q    And, in fact, was there also a Tampax recovered

6    from her body?

7     A    I believe so, yes.

8     Q    Now, did you find any sign of injury externally on

9    Miss Hill's body?

10    A    The primary findings were internal.

11    Q    Tell us about those then.

12    A    If you go inside the neck and look at the tissues

13   inside the neck, in the muscles that we call the strap

14   muscles, they're muscles that help us to bring our head

15   down, there were hemorrhages into these muscles close to an

16   area we call the hyoid.  This is a U-shaped point, with the

17   point of the U pointing towards the back of the neck.  Then

18   there was some discoloration about the hyoid where there

19   had been a fracture of it.  In other words, there was

20   sufficient pressure applied to the neck sufficient to break

21   the bone.  Also a fracture of the larynx with hemorrhage,

22   and the epiglottis is a flap of tissue, and there are small

23   petechiae, hemorrhages called petechiae.  This is something

24   we see when pressure is applied to the neck sufficient to

25   block the blood supply, outflow from the neck.

125

ONONDAGA COUNTY GRAND JURY

Q    Any other injuries to her head other than this injury to her neck?

A    The right temple had a bruise approximately two by three quarters of an inch.  It was lateral to the right eyebrow.  I'm pointing to it now about right here. Otherwise, it was free of injury.

Q    Now, this bruise to the temple, do you have an opinion as to whether or not that could have caused unconsciousness to Miss Hill?

A    It's possible.  You can't say for sure.  You can cause unconsciousness without causing much of a bruise.  It depends on the type of surface that strikes you, how rapidly it strikes you, and how the brain gets jiggled, if you will, in straight English.  So it's certainly possible.

Q    Do you have an opinion within a degree of medical certainty as to the cause of death of Miss Hill?

A    Yes.

Q    What is that?

A    She died as a cause of being strangled.

Q    Can you quantify the amount of force necessary to apply the belt around the neck to cause her death?

A    It has to be enough to at least block the blood outflow from the neck and from the head and may also have blocked the carotids because you're dealing with a broad surface of circumference of the loop of belt.  You have to

126

apply enough pressure to block the blood outflow.

Q    Would you expect a person with that amount of force being applied to the throat or neck to speak or cry out?

A    It's possible, but probably not.  If you reach enough pressure to break the hyoid and breaking the larynx, you're going to have compressed the airway.

MR. FITZPATRICK:  Any questions for Dr. Mitchell?

JUROR:  He said the body started going into rigor mortis?

BY MR. FITZPATRICK:

Q    Let me clear up one thing.  In terms of time of death, can you as medical examiner accurately pinpoint the time of death of a deceased person?

A    No.  Only Jack Klugman can do that.

Q    Can you offer guidelines or parameters as to when a person may have died?

A    Yes.

Q    Are your findings consistent with this death having occurred sometime during the evening hours of Friday, March the 27th?

A    The 27th and I have her on the 30th, it's possible.  It's on the outside edge of that possibility, but it's possible.  What we have is a body in full rigor,

127

and they usually start coming out.  But she was on the
floor, which is the cooler area of the house, compared to
the upper -- if you're higher up on a bed or something.  So
you tend to stay cooler, that tends to prolong the process
of rigor.  And you certainly can be in full rigor for 48
hours, it's not a problem.

       MR. FITZPATRICK:  Any questions?  Okay,
    Doctor, thanks very much.

    (Whereupon the witness was excused)