# EXHIBIT "C-1"

B. DORLAND                                                    865

1
2              (Witness excused.)

3              THE COURT:  Yes, sir.

4              MR. FITZPATRICK:  Your Honor, my final

5    witness is Dr. Erik Mitchell.

6              THE COURT:  Can I see you two at the bench,

7    please.

8              (Counsel approached the bench.  An off-the-

9    record discussion ensued.)

10         *                    *                    *

11

12

13

14

15

16

17   E R I K    K.    M I T C H E L L ,         called as a

18   witness on behalf of the People of the State of New York,

19   having been duly sworn, was examined and testified, under

20   oath, as follows:

21   DIRECT EXAMINATION BY MR. FITZPATRICK:

22        Q    Doctor, good afternoon.  Would you be so kind as

23   to tell us your full name and what you do for a living?

24        A    Erik Krag  Mitchell.  I'm medical examiner for

25   Onondaga County.



E. MITCHELL - DIRECT BY MR. FITZPATRICK                    866

1

2      Q      How long have you been medical examiner for

3 this county?

4      A      Since September of 1983.

5      Q      And as medical examiner, would you tell the

6 ladies and gentlemen of the jury, what your duties are?

7      A      I'm responsible for the investigation of

8 those deaths within this jurisdiction where there's a belief

9 that a nonnatural event may have played a role in that

10 death, or whether there's no physician available who can

11 sign the death certificate.

12          In accordance with this set of duties, I also

13 am engaged in other activities related to the investigation

14 of death-injury in both living and the dead.

15      Q      Do you, as a routine, respond to unnatural

16 death scenes within this county?

17      A      Yes.

18      Q      And could you tell the jury, please, a little

19 bit about your professional and educational background?

20      A      Yes, sir.  I graduated from Cornell in 1972,

21 after which I came to Upstate Medical Center and got my

22 M.D. in 1976.  This was followed by a four-year training

23 program in anatomic and clinical pathology.  That would be,

24 respectively, the study of the body's tissues and of the

25 body's fluids and excretions, as they relate to an

E. MITCHELL - DIRECT BY MR. FITZPATRICK                     867

understanding of disease and injury.

This was followed by a subspecialty training as an assistant to the chief medical examiner in Chapel Hill, North Carolina, with the further training being in forensic pathology or the legal aspects of pathology, understanding more of the mechanism by which someone is injured or dies.

Q     Would you tell the jury, please, what an autopsy is?

A     Well, an autopsy, for me, optimally has three phases:  It will begin with an examination of the body of the deceased at the site of discovery, or at the location of injury and death; then it will proceed to an external examination of the body under controlled circumstances in my office; and, finally, to an internal examination of the body.

Now, during these various stages of investigation, a variety of types of documentation may be produced, and a variety of types of materials checked for further analysis.

Q     Do you consider some of those materials in making any medical determinations in connection with your autopsy?

A     I do.

Q     And in the course of your professional career, Dr. Mitchell, approximately how many autopsies have you

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    868

performed or participated in in performing?

      A     I don't keep an account.  It's over four

thousand.  But I, I have not -- I've kind of run out of

fingers, so I don't know the number.

      Q     Now, sir, did you have occasion to respond to

248 Hickok Avenue sometime during the afternoon of March 30th,

1987?

      A     I did.

      Q     Do you remember what time it was that you got

there, sir?

      A     I was there in the midafternoon, sometime

between 3 and 4, to begin with.  Before that, some members

of my staff had been there preliminarily.

      Q     Did you observe the body of the deceased white

female?

      A     I did.

      Q     And you subsequently learned her name to be

Valerie Hill?

      A     Yes.

      Q     What observations at the scene did you make of

the deceased, Valerie Hill?

      A     Well, the decedant was lying on the floor, a

carpeted floor.  And had some sort of nightshirt, and then

over that nightshirt, a bathrobe.  And then around her neck

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    869

had a cord that, that was of the same type of material of

the bathrobe.  It appeared to be the sash from the bathrobe.

The body was face down.  It was in rigor, which means that

the musculature had stiffened and the -- it had begun to

turn purple on the down side, which is a process we call

livor or livor, depending on where you're trained.

There was some smearing of fecal material on

around the anus, and then around the lower extremities.

Q      Could you tell the jury what rigor, or rigor

mortis is?

A      The rigor, rigor mortis is the stiffening of

the muscles that occurs after you die.  Now, it has a very,

very variable onset.  And it has a somewhat variable pattern.

What happens is that the chemicals that normally allow you

to contract and utilize your muscles will, after you die,

be released within the cells, and the cells will use up

those chemicals.  And as they do, the muscles are very

stiff.

Rigor usually starts in the jaw and then it may

start in the lower extremities, or it may start in the

upper extremities.  Eventually the whole body will become

stiff.  After a while, the chemicals that are responsible

for this process are used up.  And when they are used up,

the body, once again, will become soft.

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    870

           So there is a process of rigor where you stiffen,
you go into rigor, you're in rigor for a while, and then you
loosen.  The factors that affect rigor would be primarily
temperature, but also factors of physical activity and
basic body condition.

           There are a number of factors, I'm sure, also,
that we do not understand and --

     Q     You also used the expression "livor."  Would you
tell the jury what livor, livor mortis is?

     A     Livor mortis, or livor mortis, depending on how
you want to pronounce it, is the settling of blood that
occurs after you die.  If you consider your body rather like
a sponge during life, fluid is being moved through that
sponge by the energy of the heart.

           Now, once you die, you are no longer pumping
that fluid, and some will go to the side that is down.  If
you are lying face down, it will tend to go towards your
face.  If you're laying face up, the blood will tend to go
to your back.  If you're standing up, it would go towards
your feet.

           And so we look for livor and we look for how
livor sets in to give us an indication of body position, or
whether the body has been moved.  And we also look at it to
give us some indication of how long a body may have been in a

E. MITCHELL - DIRECT BY MR. FITZPATRICK                871

given location.

Livor originally will move around if you move the
body, but after a while, the blood starts to seep out of
the blood vessels into the tissues, and then you end up
with something called fixed livor. In other words, livor
that doesn't move when you move the body, because the blood
is no longer able to move. It's no longer in the blood
vessels.

Q    Was livor fixed upon your observing Miss Hill's
body?

A    There was fixed and unfixed livor.

Q    Was the livor -- was the fixed livor
consistent with the position that you found her in in the
living room?

A    Yes, sir.

Q    Now, was her body removed to the medical
examiner's office?

A    Yes, sir.

Q    And that is located where?

A    That's 330 West Onondaga Street.

Q    Did you supervise the removal of the body?

A    Yes, sir.

Q    And upon returning to your offices at West
Onondaga Street, did you conduct an external examination

of Miss Hill's body?

A     I did.

Q     And would you tell us what, if anything, you observed?

A     The -- we began -- had the processes that have been described. She was coming out of rigor; in other words, she had gone into rigor, and it was possible while we were still there, it was fairly easy to break the process.

When somebody is in full rigor, right in the middle of the process, the muscles tend to be very, very stiff, and it's difficult to manipulate the extremities because of their rigidity. With her, it was fairly easy to break the rigor. She had a very dense purple discoloration of part of the face, with small petechiae. These are small hemorrhages into the skin surfaces above the level of the sash that was around the neck.

Below the level of that sash there were none of these petechiae. Now, the reason that I break the petechiae pattern down into above versus below, is that if you have a blood pressure and a lack of oxygen at an elevated blood pressure, especially in the veins, then you will tend to get small hemorrhages in the various tissue surfaces.

So the petechiae are evidence of the pressure

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    873

applied around the neck from the sash during life.

Q    Could you tell the jury what a defensive wound is?

A    A defensive wound is a wound that is incurred when you try to put between yourself and some potential threat of harm, one of your extremities.  In other words, putting your hand or your arm or your leg up to ward off a blow or ward off other -- some other type of attack, and the types of wounds that we get under those circumstances we label as defensive wounds.

Q    Did you observe any defensive wounds to the body of Valerie Hill?

A    No, sir.

Q    Did you next conduct an internal examination of Miss Hill's body?

A    I did.

Q    And what, if anything, did you observe in the way of trauma?

A    There was a bruise that could not be well seen on the outside, because of the discoloration caused by livor, and the settling of blood.  But to the right above the right eyebrow, there was a bruise that was red and swollen, and was something that had happened prior to the time that she lost blood pressure.

Further down, if you go and look inside the mouth, there were prominent petechiae, prominent hemorrhages into the mucosa; that is the lining of the mouth.

Then you get down into the neck, and in the neck there were hemorrhages of what we call the strap muscles. The strap muscles are a series of muscles that connect the front of the neck to between the area of the collarbone and the area of the tongue. And there were many hemorrhages into these muscles.

And also, there were two areas where you have bony or firm tissue in the neck: one place called the hyoid; it's a U-shaped bone. It's kind of like this (Indicating). And that U-shaped bone is at the base of the tongue. This particular bone when you're young, as was she, actually has two joints in it. Later on in life these may fuse and become a perfect bony U. She had hemorrhage involving one of the joints, and then she had fracture of the left side of the hyoid, in other words, the bone had been broken.

When you go to Adam's apple, larynx, the larynx, the voice box, there was, again, fracture of part of the bone -- of the bones, the projections of the larynx. There were a number of petechiae, these little hemorrhages we talk

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    875

about in the epiglottis.  The epiglottis is the flap of

tissue at the base of the tongue.  It stands up something

like my hand (Demonstrating).  If you look into somebody's

mouth, you can see that -- you can see it.  And, again, if

you block the blood flow out of the head during life,

especially if there's a reduction in the amount of oxygen

to the tissues, you will tend to get little hemorrhages,

what we call petechiae, into the epiglottis.

Q    Now, Doctor, I want to direct your attention to

the bruise that you discovered upon your internal

examination.  First of all, can -- were you able to date

that bruise, in terms of when it occurred prior to her

death?

A    Well, it was relatively fresh.  I would expect

it to have happened within twenty-four hours.

Q    And would you, using your own head as an

example, would you point to the jury as to where exactly

the bruise was located?

A    This was located on the right side of the

head, right to the right of the right eyebrow (Indicating).

Q    Could you make any determination as to whether

or not such a bruise would have resulted in the victim

being unconscious?

A    It's not possible to say.  It's possible that

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    876

unconsciousness resulted from that blow.  It's also possible

that there were -- unconsciousness did not result from that

blow.  There was no direct bruising of the brain.

Q    So your opinion is that it's impossible to say?

A    That is correct.

Q    And would you tell us, in strangulation deaths,

are you able to estimate the amount of time necessary that

the oxygen has to be cut off from the brain for death to

result?

A    Well, there is a minimum time.  If you allow

some oxygen to get to the brain, you extend that time.  So

it can take quite a while for somebody to die in a

strangulation death.  But the minimum time would involve a

couple of minutes to -- well, you can actually, if you

block the carotids, you can probably knock somebody out

within seven to ten seconds.  But to have irreversible

brain death is going to be closer to something along the

lines of five minutes.

Q    I want to show you some items here, sir,

People's Exhibit 55.  Can you identify that, Dr. Mitchell?

A    Yes, sir.

Q    What is that?

A    This is the bathrobe removed from the body of

Valerie Hill.

E. MITCHELL - DIRECT BY MR. FITZPATRICK                877

Q    And Exhibit 56, can you identify that?

A    Yes, sir.

Q    What is Exhibit 56?

A    This is the sash that is -- that appears to have the same type of cloth as the bathrobe that was wrapped around the neck, and which I removed.  At the time I removed it, I cut it, but first I tied strings around the sash to preserve the wrappings around the neck, and then I cut between those two ties.

Q    And why was it necessary to cut it?

A    In order to get it off the neck.

Q    I show you People's Exhibit 57, a photograph. Can you identify that, Doctor?

A    Yes, sir.

Q    What is Exhibit 57?

A    Exhibit 57 is a picture of the deceased, taken to show the sash wrapped around the neck, and showing also some of the clothing around the upper chest, and showing a little bit of the right side of the head.

Q    Do you know where the photo was taken?

A    This photograph would have been taken -- well, I can't say for sure, somebody else -- it may have been a ruler of mine, but that is the ruler that is in there, is one that we have at the morgue, or is compatible to one

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    878

that we have in our morgue.

    Q    Does it show the shirt that she had on that you referred to?

    A    Yes, sir.

    Q    And was that the only clothing that she had on, the bathrobe and the shirt?

    A    Yes, sir.

    Q    And Exhibit 57, regardless of when it was taken, does it fairly and accurately portray the victim as she appeared at the time of your autopsy?

    A    Yes, sir.

            MR. FITZPATRICK:  I would offer 55, 56, and 57, your Honor.

            THE COURT:  Mr. Calle, any objection to 55, a plastic bag containing a blue bathrobe?

            MR. CALLE:  I'd like to see the photos, if I could, Judge, please.

            THE COURT:  Well, 55 is a plastic bag containing a bathrobe.

            MR. CALLE:  No, Judge.  I hear you now. No, no objection.

            THE COURT:  All right.  That's received.

            (People's Exhibit Number 55 was then received into evidence.)

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    879

THE COURT:  How about a plastic bag containing a sash or belt from that bathrobe?

MR. CALLE:  No, sir, no objection.

THE COURT:  All right.  That's received.

(People's Exhibit Number 56 was then received into evidence.)

THE COURT:  Now we're at Photo 57, or Exhibit 57, the photo depicting the victim with this object.

MR. CALLE:  Yes, sir.  I respectfully object, based upon the prior stated grounds.

THE COURT:  I haven't seen it, so I'll reserve on it for now and we'll have a discussion at the end of the witness' testimony.

BY MR. FITZPATRICK:

Q     Dr. Mitchell, in your opinion, would you expect someone to have suffered the type of death that Miss Hill suffered, to be able to speak during the strangulation period?

A     This would depend upon the rapidity and the strength of force applied, you might be able to get some sound, but in this instance, we have fracture of the hyoid, a fracture of the larynx, so the likelihood is that the air was at least partially collapsed, inhibiting speech.

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    880

Q    So your opinion is, speech would be unlikely?

A    That is correct.

Q    And did you see any evidence indicating that
at the time of her death, the victim was menstruate?

A    Yes, sir.

Q    And what evidence did you see of that?

A    There was a Tampax, and the endometrium was thin
and red, that's the lining of the uterus, the endometrium.

Q    You referred to some fecal matter being smeared
on the victim's buttocks that you observed at the scene.
Do you have that in mind, sir?

A    Yes, sir.

Q    Did you conduct an internal examination to see
if there were any bruising or damage to the anus, itself?

A    Yes, sir.

Q    What, if anything, did you find?

A    I found no evidence of any bruise.

          MR. CALLE:  I didn't hear that.  I'm
     sorry.

A    There was no evidence of any bruise.

BY MR. FITZPATRICK:

Q    Did you find any evidence of semen or ejaculant?

A    Not that I could see with the eye.

Q    Did you have an opinion, Doctor, as to the

E. MITCHELL - DIRECT BY MR. FITZPATRICK                881

1    object -- or, strike that.

2            Do you have an opinion as to whether or not

3    Miss Hill's anus was penetrated with something?

4    A    Yes, sir.

5    Q    And do you have an opinion as to what that

6    something was?

7    A    No, I can't say specifically what it was, no.

8    Q    Can you say that it was or was not a male

9    penis?

10   A    It would be very unlikely to be a male penis.

11   Q    Would you tell us why you find that, sir?

12   A    The object that was inserted into the anus was

13   then wiped,  a wipe pattern of fecal material on the lower

14   extremities.  And to be able to do that with a male penis,

15   would not fit the anatomy.

16   Q    Does the body at death have a tendency to

17   expel fluids and fecal material?

18   A    Yes.

19   Q    Do you have an opinion, Doctor, considering the

20   following factors:  considering that you found no evidence

21   of semen or ejaculant, that you found no evidence of

22   bruising or trauma to the inside of Miss Hill's anus, do

23   you have an opinion as to whether or not this violation was

24   ante-mortem or post-mortem?

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    882

         A    I can't state with any absolute certainty.  I

think it's more likely to be post-mortem  than ante-mortem.

                    THE COURT:  Would you explain what those

            two terms mean?

                    THE WITNESS:  Okay.  Ante-morten would

            be before death; post-mortem would be after

            death.

BY MR. FITZPATRICK:

         Q    Do you have any medical opinion, Dr. Mitchell,

as to the significance of this type of violation to a

person who's dead?

                    MR. CALLE:  Objection.  What does that

            mean, medical opinion or significance?

                    THE COURT:  Yes.

                    MR. FITZPATRICK:  I'll rephrase it.

                    THE COURT:  I'll sustain the objection.

                    MR. FITZPATRICK:  I'll rephrase the

            question.

BY MR. FITZPATRICK:

         Q    Have you encountered in your some four-thousand-

plus autopsies, instances of anal violation of deceased

people, particularly women?

         A    Yes.

         Q    Have you also read on the subject?

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    883

A    Yes, sir.

Q    And do you have an opinion as to the significance
in conjunction with your autopsy of an anal violation of a
woman, such as this?

A    Yes, sir.

        MR. CALLE:  Objection.

        THE COURT:  Well, he's got an opinion.

All right.  So the next question is, what is the

opinion?

BY MR. FITZPATRICK:

Q    Could you tell us what that opinion is?

        MR. CALLE:  Objection.

        THE COURT:  All right.  Wait a second.

Could I see the attorneys, please.

        (Counsel approached the bench.  An off-

the-record discussion ensued.)

        THE COURT:  As to the last question, the

objection is sustained.

BY MR. FITZPATRICK:

Q    Dr. Mitchell, did you make an examination of
the stomach contents of Miss Hill?

A    Yes, sir.

Q    To educate the jury, would you tell us, is there
a time that is consistent with all people as to the

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    884

digestive process being completed?

    A    There's a tremendous amount of variety between

people as to how long it can take to empty the stomach.

The largest number of people, though, eat at regular

intervals, and by the time they eat, they've emptied their

stomach.

    So we're talking a number -- a few hours is

the usual emptying time.

    Q    From the time of ingestion, until the time it's

in the bowels?

    A    That is correct, but it does vary upon your

physical condition, whether you've been injured or not,

what you're eating, how much you're eating.

    Q    Miss Hill have anything in her stomach?

    A    Yes, sir.

    Q    What was that?

    A    She had about 250 milliliters, which would be

about a cup of fluid, and then some chunky material that

looked to be congealed grease.  In other words, fatty

material, that because of the drop in body temperature

had turned to solid.

    Q    Were you able to make a determination as to

what phase in the digestive process this material was in?

    A    It was not completely absorbed.  And I cannot

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    885

identify what the substance -- or I cannot, just by eye,

identify what the substance is.

    Q    Was there any alcohol in Miss Hill's stomach?

    A    Yes.

    Q    And were you able to get a reading as to the

alcohol level?

    A    Yes, sir.

    Q    What was that?

    A    That was .16 grams percentum.

    Q    Now, if Miss Hill were to be alive and have

.16 millimeters alcohol in her blood, would that be what

you would expect on a Breathalyzer?  Do you understand my

question, Doctor?

    A    If she had .16 in her blood, you'd expect to

get approximately that reading on the Breathalyzer.

    Q    All right.  I'm talking about her stomach

contents.

    A    Oh, on her stomach contents, no.  If it's in

the stomach, and not yet in the blood, you're not going to

get it in the Breathalyzer.

    Q    All right.  Were you able to determine what the

alcholic content of her blood was?

    A    Yes, sir.

    Q    What was that?

1

2          A      That was .03 percent.

3          Q      Now, I want you to understand that this -- I'm

4    asking you to make an assumption here.  I want you to assume

5    that the time of death was on any given day, but was

6    sometime between 10:00 and midnight.  Would that finding of

7    .03 percent of alcohol in the blood be consistent with her

8    having had a mixed drink or perhaps two mixed drinks at

9    approximately 7 p.m. that evening?

10                     MR. CALLE:  Objection.

11                     THE COURT:  No.  I'll allow the answer.

12         A      It would not be consistent with that.

13   BY MR. FITZPATRICK:

14         Q      Would the .03 percent of alcohol in her blood

15   be consistent, assuming that she died sometime on any given

16   day between 10:00 and midnight, with having had one or

17   perhaps two mixed drinks at approximately 7 p.m., and then

18   having had some wine to drink shortly before her death?

19         A      Yes, sir.

20         Q      Doctor, are you, as a medical examiner, or for

21   that matter, any medical examiner, able to pinpoint with

22   certainty the time of a person's death?

23         A      No, sir.

24         Q      Would you tell us, and tell the jury, most

25   importantly, what factors affect the determination as to

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    887

determining, or an effort to determine the time of a

person's death?

A       Well, there are a variety of things that we use

to try to establish when somebody died.  We can break them

down into factors that are from examining the body and then

factors from examining other evidence.

If we look at the changes in the body, there

are certain averages that we expect under average

conditions.  But there's still a great deal of variability

between people.

If we look at other evidence that is often the

strongest evidence, for instance, instead:  Is the mail

in; when does someone normally walk their dog; were

people unable to get them by phone; was there a place they

were expected to be; had an appointment and were not there;

was the newspaper brought in.  These are common things

that we look for to try to establish whether somebody was

alive or dead at a given time.

And we have to combine the anatomic factors

from examining the body, and the other evidence, to get an

impression of when somebody died, but we cannot narrow it

to an exact time, except with very rare exceptions.

There are things like the Challenger explosion

we can place the astronauts' deaths within a few minutes,

E. MITCHELL - DIRECT BY MR. FITZPATRICK                     888

from reconstruction of the events.  There was an explosion

of a propane tank in Buffalo a number of years ago, and at

the time of the explosion, somebody was blown against a

wall, and at the same time, looked at his watch, and so

that tells us when the people in the explosion were killed.

But from the examination purely of the body, there

is too much variability to give any time in the absolute

sense.

        Q    Okay.  Doctor, I want to direct your attention

to a calendar of March of 1987 and indicate to you that I

think I can say with some fair degree of safety, that

there's some dispute during the course of this trial as to

when it was exactly that Miss Hill died.

        Taking strictly your observation of her body,

is there anything inconsistent with her having died on the

night of Saturday, March the 28th, 1987?

        A    No.

        Q    Again, taking strictly your observations,

physical observation of her body, is there anything

inconsistent with her having died during the evening hours

of Friday, March the 27th, 1987?

        A    No.

        Q    Now, you indicated that in your efforts to

offer an opinion as to the time of death, you take into

E. MITCHELL - DIRECT BY MR. FITZPATRICK                889

account other factors?

     A     Yes, sir.

     Q     All right.  I want you to take into account the

following factors in offering an opinion.  I want you to

take into account the fact that the victim, Miss Hill's

cat, was seen outside on Saturday morning; and that was

described by a neighbor as being very unusual.  I want you

to assume that no one saw Miss Hill after Friday, March the

27th, 1987 at approximately 7 p.m. to 8 p.m. that evening.

I want you to assume further that no one had any physical

-- in person or telephone contact with her after Friday,

March the 27th, 1987.

          I want you to assume that she had plans to visit

a friend in the Schenectady area and made no contact

whatsoever with that friend on either Friday night or

Saturday morning.  I want you to consider further that

that friend attempted numerous times, both on Friday

night and Saturday morning, to contact Valerie Hill by

phone, and received no answer.

          I want you to assume further that her car was

found in a driveway with no additional mileage on it after

Friday evening, the 27th.  And, lastly, I want you to

consider that her stepmother was gravely ill at St. Joseph's

Hospital, and that she had been in almost daily contact

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    890

with her father regarding that fact.

Assuming all those factors, do you have an opinion as to whether it's more likely or less likely that Miss Hill died on the evening of Friday, March the 27th, 1987, as opposed to Saturday, the 28th?

MR. CALLE: Judge, I must object. Unspecified ground, unspecified grounds.

THE COURT: What -- Doctor, is this going to be a medical opinion, or is it going to be an opinion rendered like anybody else would render an opinion, based on those factors as described by Mr. Fitzpatrick?

THE WITNESS: It's going to include the medical aspects of the body, and the investigational aspects that we normally include in our medical evaluation.

THE COURT: Your objection is overruled.

BY MR. FITZPATRICK:

Q     You may answer, Doctor.

A     I would consider that it's more likely that she died Friday night, to possibly very early Saturday morning, would be the possibility that's given there -- I don't know when your overlaps are there with phone calls -- than to have been killed the following day.

E. MITCHELL - DIRECT BY MR. FITZPATRICK                    891

    Q    Do you have an opinion, Dr. Mitchell, within a

reasonable degree of medical certainty as to the cause of

death of Valerie Hill?

    A    I do.

    Q    Would you tell the jury what that opinion is?

    A    Valerie Hill died as a result of being strangled.

    Q    Thank you very much, Doctor.  You can stay right

there.  Mr. Calle will have some questions.

            MR. CALLE:  Judge, would it be out of

    the ordinary to request an afternoon adjournment

    now and give me a couple --

            THE COURT:  Sure.  We'll take a fifteen-

    minute break.  Don't talk about it or form any

    opinions.

            (Proceedings stand in recess.)

            (Court, counsel, and the defendant are

    present.  Proceedings resumed at this time.)

            THE COURT:  Okay.  Would you get the jury,

    please.

            MR. FITZPATRICK:  Judge, before resting,

    I just want to offer some exhibits.

            THE COURT:  Sure.

            (The jurors entered the courtroom and were

    seated in the jury box.)

E. MITCHELL                                                    892

            THE COURT:  We're all set, Yolanda,

    thanks.

            Okay.  Put us back in session.  The jury

    is present, counsel, the defendant.

            Mr. Calle, if -- I think he's rested.

    We're in cross-examination.

            MR. CALLE:  I had the impression he was

    going to introduce some exhibits.  I beg your

    pardon.


CROSS-EXAMINATION BY MR. CALLE:

        Q    Good afternoon, Dr. Mitchell.

        A    Sir.

        Q    Dr. Mitchell, I understand that based upon your

position as medical examiner for the county, you performed

an autopsy on the deceased in question, correct?

        A    That's correct.

        Q    Okay.  Did you make out the reports based upon

your -- this autopsy, and publish its findings?

        A    Yes, sir.

        Q    Did you bring them with you here today?

        A    I brought some copies, yes, sir.

        Q    May I see what you have?

        A    Certainly.

E. MITCHELL - CROSS BY MR. CALLE                    893

MR. CALLE:  If you'd allow me, Judge.

A     Do you wish to see my complete file, or is it just specific reports?

Q     Well, sir, what is in your complete file?

A     That would be all paperwork that I have relating to this particular case, including our photographs and some photographs from the police.

Q     Well, I don't believe that will be necessary. I just want the results of your findings on your medical examination.

THE COURT:  You want the autopsy report, sir?

MR. CALLE:  Yes, sir.

THE COURT:  Hasn't that been furnished to you?

MR. FITZPATRICK:  Yes, Judge.

MR. CALLE:  Yes, sir, it has, but specifically what I'm looking for, Dr. Mitchell, is the report estimating the time of death.

THE WITNESS:  There would be no such thing.

BY MR. CALLE:

Q     Sir, is it not your normal course of business practice to estimate time of death when you perform an autopsy on a suspicious murder?

E. MITCHELL - CROSS BY MR. CALLE                        894

        A       It is my practice to make observations that

can be used to help interpret the time of death, but we do

not create a report trying to establish a time of death.

As I've explained previously, there's such a degree of

variability that when this question is posed, we must, in

fact, discuss the parameters.

        Q       Well, Dr. Mitchell, if I were to tell you that

the Syracuse Herald-Journal published March 31st, 1987 --

                MR. FITZPATRICK:  Well, Judge, I would

        object.

                THE COURT:  Let's hear what the question

        is.

                MR. FITZPATRICK:  Well, it doesn't do too

        much good if it's something with absolutely

        nothing to do with the witness, and the jury

        hears it.  I mean, is it something he said to

        the Herald-Journal?

                THE COURT:  I don't know, that's why I

        have to hear the question.  And if it's an

        improper question, this jury is going to be

        instructed to disregard it -- the question.

                Go ahead, Mr. Calle, ask your question.

                MR. CALLE:  Yes, sir.

BY MR. CALLE:

E. MITCHELL - CROSS BY MR. CALLE                    895

Q       In regards to the Herald-Journal published

March 31st, 1987, there is an indication by a writer by

the name of John Doherty that, in fact, your report

indicated that she died -- that is Valerie Hill -- sometime

Saturday or early Sunday morning.  Can you explain that?

A       I do not speak to the newspapers.  You can, in

fact, talk to the newspaper personnel and they will

describe their great frustration in getting information

from me concerning case material.

Q       Yes, sir.  But my question was:  Could you

explain the fact that they're saying the report indicated

that she, Valerie Hill, died sometime Saturday or early

Sunday morning; could you explain that?

A       As I had no communication with them and

generated no such report, I think you're going to have to

turn to the person who wrote that article and ask him that

question.

Q       Sir, is it your testimony today that you never

estimated Valerie Hill's time of death to be late Saturday

or early Sunday morning, that is the 28th or the 29th of

March of 1987?

A       I have never tied myself to such a time.

Q       Sir, did you ever state that it could have been

the time of death, that is, late Saturday or early Sunday

1    E. MITCHELL - CROSS BY MR. CALLE                        896

2    morning?

3         A     It, it could have been, yes.

4         Q     Did you ever state that it could have been

5    previously?

6         A     Quite possibly.

7         Q     Is that -- would that mean you don't recall if

8    you did or you didn't?

9         A     That is correct.

10        Q     But you might have stated that she died late

11   Saturday or early Sunday?

12                  MR. FITZPATRICK:  Excuse me, Doctor.  I

13                  object to the question, "stated" when, to whom,

14                  under what circumstances?

15                  THE COURT:  Well --

16        Q     At any time, sir.

17                  THE COURT:  Stated to anybody?

18                  MR. FITZPATRICK:  Well, he's stated,

19                  Judge, to this jury a few moments ago, that it

20                  could -- it was consistent with Saturday, so I

21                  would ask if he's trying to impeach him, that

22                  he identify the document or the recording that

23                  he's referring to.

24                  THE COURT:  Well, I don't think the

25                  doctor denied that, that he stated that.

E. MITCHELL - CROSS BY MR. CALLE                        897

1

2          MR. FITZPATRICK:  No.  I'm not suggesting

3     that he did, but he's impeaching the witness

4     about a statement.  I'd like to have some

5     foundation of the statement, so I can know

6     whether or not Mr. Calle is recording it

7     accurately, and perhaps I could have a chance

8     to rehabilitate the doctor, if necessary.

9          MR. CALLE:  Judge, if I may respond

10    briefly.  I'm not debating that this particular

11    gentleman stated the possibilities of time of

12    death; I'm just inquiring as to whether he ever

13    stated this particular time of death at any

14    time before.

15          THE COURT:  Any other, other type of

16    proceeding, or any other type of report, or to

17    any other person --

18          MR. CALLE:  Did he ever give him the

19    opinion that the time of death was either

20    Saturday or Sunday.

21          THE COURT:  Okay.  Fair question.

22    Have you, sir?

23          THE WITNESS:  I have not given the opinion

24    of a specific time of death, because that's not

25    the way I function.  I would -- I will have told

E. MITCHELL - CROSS BY MR. CALLE                    898

                people to consider those times as possible.

BY MR. CALLE:

    Q    Do you know what an inference is, Dr. Mitchell?

    A    Yes, sir.

    Q    What is it, can you tell me?

                MR. FITZPATRICK:  Objection, your Honor.

                THE COURT:  Sustained.

BY MR. CALLE:

    Q    Dr. Mitchell, if I were to tell you that based

upon the factors which the District Attorney Fitzpatrick

had given you in your determination of Valerie Hill's time

of death, if I were to give you different factors,

investigatory factors, is there a possibility that that

would change the estimated time of death?

    A    Yes, sir.

    Q    So if I were to tell you that, in fact, there

was a busy signal at Miss Hill's residence on Saturday, the

28th, would that exclude her being killed on the 27th?

                MR. FITZPATRICK:  Judge, I object to the

                form of the question.  Unlike Mr. Calle's

                example, my examples were based on the testimony

                and evidence that has been received in this

                trial.  His example, there's absolutely no

                evidence before this jury of a busy signal on

Saturday morning.

THE COURT:  But he's asking it with good

faith.

MR. FITZPATRICK:  Well, Judge, a

hypothetical has to be based on facts that

are in some manner, shape, or form, in evidence

before a jury.

THE COURT:  Or --

MR. FITZPATRICK:  There's no evidence

before this jury, nor is there any evidence --

THE COURT:  Or factors that the witness

is asked to assume.

MR. CALLE:  Judge, that's my point.  I

believe this witness was asked to assume -- make

certain assumptions.

THE COURT:  Look it, I'm not, look it --

MR. CALLE:  Yes, sir.

THE COURT:  I've had this argument once

just a minute ago.

MR. CALLE:  I'm sorry.

THE COURT:  You can ask your question,

sir, and base it upon that, what you've stated.

MR. CALLE:  I require a readback at this

point, if I may.

E. MITCHELL - CROSS BY MR. CALLE

900

                THE COURT:  Ask his question.

                (The requested portion of the record was
read back by the court reporter.)

    A    As long as no one else was responsible for
having the phone busy, yes.

BY MR. CALLE:

    Q    Okay.  Now, sir, if I were to tell you -- and
I'm repeating Mr. Fitzpatrick's assumption -- that Valerie
Hill's cat was outside her apartment on Saturday morning,
stop for a minute and consider, if you would, do you have
any basis to determine whether that cat was not outside
her apartment on Friday night?

    A    I personally do not.

    Q    So you don't know when that cat got outside the
apartment of Valerie Hill on the weekend in question, do
you?

    A    I do not.

    Q    Therefore, sir, would it be fair to say without
that information, your analysis is flawed as to the estimated
time of death being more likely to be Friday night than
Saturday?

    A    I was given a hypothetical with certain
assumptions.  I have to take those assumptions in that
hypothetical.

E. MITCHELL - CROSS BY MR. CALLE                      901

Q    Sir --

A    If you give me another hypothetical, you will

get another answer.

Q    Dr. Mitchell, I'd like to direct your attention

to rigor mortis.  Actually, I do not like to direct your

attention, but I must.

Would you be so kind, instead of me asking the

question about rigor mortis, which is probably incorrect,

would you again, for me, speak about rigor mortis and what

happens after a body dies, in relation to rigor mortis,

briefly, if you would?

A    Rigor mortis is a process that occurs post

mortem, in other words, after death, where there is release

and use of certain chemicals within the muscles, that cause

the same types of chemical activity that normally allow for

muscle contraction.  But instead of allowing the muscles to

contract, the muscles become firm.  They cannot extend and

they cannot contract.  They're -- as they're using this

energy up.

When the energy has been used up, the muscles

can once again become loose and flexible.  Rigor mortis

will begin typically in the jaw and then may go into the

lower extremities or arms.  There's some dispute between

experience in some authorities as to exactly which is the

E. MITCHELL - CROSS BY MR. CALLE                                    902

most likely.  There is a time progression during rigor mortis,

but it's quite variable from person to person, and it depends

upon a variety of factors, including temperature, because

temperature has tremendous influence on the speed of chemical

reactions.  Do you wish more?

Q     Oh, no.  I didn't know you were done.  Now, you

mentioned that averages of each body is different, sir.  In

particular, rigor mortis sets in, I believe you mentioned,

and then it goes away, is that correct?

A     That's correct.

Q     What is the average time in which rigor mortis

sets in and then goes away?

A     We expect onset, usually, of rigor in the jaw

within a few hours, and this is under the assumption of an

average body temperature, of an average temperature around the

body, an average level of activity.  No such thing as seizure

or something of this sort, and nor -- none -- nor the other --

some unknown factors impacting this.

Q     Let me get this straight.  You're saying that

rigor sets in in the jaw within a few hours, or it leaves --

A     Correct.

Q     -- or it leaves?

A     It begins in the jaw within a few hours.

Q     Okay.  When you --

A      We --

Q      I'm sorry.

A      I don't know what you want from me now.

Q      When you examined Miss Hill the first time you examined her, was at the scene?

A      That was at the scene, yes, sir.

Q      Was there rigor in the jaw?

A      She had -- she was in full rigor.  All or parts of the body were affected by rigor.

Q      And, again, sir, what's the average time in which rigor sets in and then leaves?

A      (No verbal response.)

Q      Average, sir, based upon average conditions, is it not a fact that it's -- well, I'll let you answer the question.

A      Well, with somebody at least, say, 75 degrees, of average body weight, with no other factors influencing rigor, you may get -- you may start to see rigor disappear at twenty-four hours.  It may take forty-eight hours.

Q      So it would be fair to say that between twenty-four and forty-eight hours that full rigor disappears, on the average?

A      Well, if you take all the ones that are on average, you're taking all the people who do it much more

E. MITCHELL - CROSS BY MR. CALLE                              904

rapidly, plus all the ones that do it much more slowly on

average, I guess would be something on there.

     Q      So, on average, full rigor disappears between

twenty-four and forty-eight hours, is that correct?

     A      Or it's disappearing at least in that time

frame.

     Q      However, on March 30th, when you examined the

body for the first time, the body was in full rigor,

correct?

     A      It had --

     Q      Wasn't that your testimony?

     A      It had rigor affecting all muscle groups, yes.

     Q      Would that be classified as full rigor?

     A      Yes.

     Q      And what time would you -- did you first

observe this full rigor?

     A      I would have observed rigor at the scene, and

then I observed it --

     Q      What time, sir?

     A      That would be sometime after -- somewhere

around 3:30, or a little bit later.

     Q      3:30 on a Monday?

     A      Mm-hmm.

     Q      So between twenty-four hours on average, would

E. MITCHELL - CROSS BY MR. CALLE                    905

be 3:30 Sunday, correct?

     A     That is correct.

     Q     The day before?

     A     That is correct.

     Q     And forty-eight hours would be 3:30 on Saturday, correct?

     A     Yes, sir.

     Q     So on average, your findings indicate, or at least one can assume that they indicate that Miss Hill's time of death was approximately 3:30 on Sunday, or 3:30 on Saturday, would be the twenty-four or forty-eight hour average time span for full rigor to start disappearing, is that valid?

     A     No.  You -- what you're trying to do is disregard the variability to which I have previously testified.  You're also disregarding some other findings that are present in the autopsy protocol.  She had a fair amount of decompositional change inside -- in fact, her brain had sufficiently decomposed to have small holes in it.  The tissues were flabby within.

          In addition to that, there are other things from the scene.  She was laying on a cool floor, which retards all of these processes.  And I specifically checked, the basement was cool, so that there's -- that there would

E. MITCHELL - CROSS BY MR. CALLE                              906

be cooling of the body, all of which would retard these

processes.  The night temperatures were cool.  And the

house, itself, was cool, as I believe -- I, I believe it's

about sixty-two degrees, if I remember correctly, in the

house when that was measured.  So that all of these

processes would remarkably slow the -- have the potential,

at least, for remarkably slowing both the onset and the

relaxation of rigor.

     In strict chemical reactions, we speak about something

called the Q-ten.  For every ten degree drop in temperature,

we expect to have a reduction of the speed of a reaction by

about the factor of two.

     Q    Dr. Mitchell, would you say that forty-eight

hours is the outside time frame in which full rigor would

start to disappear?

     A    It depends upon the conditions of storage of

the body.

     Q    Sir, is it possible that Miss Valerie Hill's

time of death was Sunday, March 29th?

     A    It's possible.

     Q    Sir, is it possible that Miss Valerie Hill's

time of death was Saturday, March 28th?

     A    It's possible.

     Q    Sir, would you say that the estimated time of

E. MITCHELL - CROSS BY MR. CALLE                                907

death for Miss Hill, being the 27th of March, 1987, was on

the outside edge of the possibility?  Yes or no, sir.

    A      It -- I don't think that is a yes or no question.

    Q      I'm asking you if you could say that the death

of Valerie Hill being attributed to Friday, March 27th, was

on the outside edge of the possibility we've just

discussed; yes or no?

    A      I don't believe that's a yes or no question.  I

don't think it can be answered and give a correct impression.

In other words, the inference from what the response is,

yes or no would be improper.

    Q      Well, is it fair to say that the time of

death of Valerie Hill, being attributed to March 27th, 1987,

is on the outside edge of a possibility?  Would that be fair

to say that?

    A      Probably.

    Q      Isn't it a fact that you did say those very

words inside the grand jury when you testified in

November of '92?

    A      It's possible.  I would have to review that.

    Q      You did, sir.  I direct your attention,

Dr. Mitchell, to the bruise that Miss Hill suffered, I

believe, on the right side of her head, and which you

observed, I believe, in an internal exam; do you recall?

E. MITCHELL - CROSS BY MR. CALLE                          908

A    Yes, sir.

Q    I see.  Were you able to estimate, Dr. Mitchell, when she received that bruise, based upon your observations at the time in 1987?

A    I can't give an exact time, but it appeared to be a fresh bruise, something that probably happened within twenty-four hours of the time of the demise.

Q    Oh, that's what I'm looking at, at the time of demise.  I understand now.  So you're saying that the bruise occurred either twenty-four hours before Miss Hill was killed, or twenty-four -- twenty-five (sic) **hours after** she was killed?

A    No.

Q    I don't know what you're saying.

A    It occurred within twenty-four hours of the time of demise, but during life, so it's within the day before she died, or up to the time of demise.

Q    Oh, I understand now.  So this bruise that you observed on the right side of Miss Hill's head, that could have been on her head for twenty-four hours before she died?

A    It's possible.

Q    And your testimony was -- is you weren't able to determine if that bruise caused unconsciousness or not, is that correct?

E. MITCHELL - CROSS BY MR. CALLE                                909

A       That is correct.

Q       Dr. Mitchell, did you examine the body in its
entirety, the outside area?

A       Yes, sir.

Q       Did you find any defensive wounds?

A       No.

Q       What about her fingernails, did you look into
her fingernails at all?

A       I did.

Q       Did you find any evidence of other blood
inside her nails, as to perhaps speculating that she was
clawing or scratching in her defense at all?

A       No.

Q       What was the condition of those fingernails?

A       They were unbroken.

Q       And I just ask for clarification for my own
mind, Dr. Mitchell, you said on direct examination by
Mr. Fitzpatrick that the amount of alcohol that you found
in the victim, either in her stomach or her blood, or both,
if she had drunk adult beverage at approximately 7 p.m., the
amount of alcohol or findings -- your findings of such
were not consistent with her imbibing at 12 p.m. death, is
that what I understood on direct examination?

A       With the hypothetical presented by

E. MITCHELL - CROSS BY MR. CALLE                              910

Mr. Fitzpatrick, you would not have a .03 blood alcohol

present at 10 or thereafter,  if she had ingested the

one to two drinks at 7.

    Q    So, therefore, it's your expert opinion that

Miss Hill had imbibed in alcoholic beverages subsequent to

7:00 at night?

    A    Or she imbibed a larger amount orally.

    Q    And I just would like to establish something

We're not talking about 7 p.m., we're talking between

three and five hours before the demise, is that correct?

    A    Correct.

    Q    Now, Dr. Mitchell, when you arrived at the

murder scene on the day in question, March 30th, 1987, that

was about 3:30 in the afternoon?

    A    Somewhere about there.  I haven't kept an

exact record, or if I have it, I don't remember.

    Q    Was the victim on her front or her back side on

the ground?

    A    She was lying face down.

    Q    Were you present when the body was turned over?

    A    Yes, sir.

    Q    And was that on your direction?

    A    I would certainly have been part of that

decision.

E. MITCHELL - CROSS BY MR. CALLE                    911

Q       When you say you would have -- you believed you

were --

A       Yes, sir.

Q       -- in on that decision?

A       Yes, sir.

Q       You just can't recall?

A       Well, this is something -- you're asking, was it

at my direction.  I would work in conjunction with the

evidence technicians at the scene, and so it would be a

mutual decision.  I would not want to move the body before

adequate evidence collection had taken place.

Q       Were you -- were you involved with the investi-

gation regarding blood samples or semen samples, if any were

taken?

A       I would retrieve those and they would be

transferred to the police.

Q       Did you retrieve those?

A       Yes, sir.

Q       What did you retrieve?

A       Okay.  A vaginal, oral, rectal, and cervical

swabs all transferred to the Syracuse Police Department.

Q       Oh, so you didn't perform any analysis of blood

or semen or any samples of -- at the scene recovered?

A       No.  My office would be responsible for the

E. MITCHELL - CROSS BY MR. CALLE                              912

toxicology.

Q     Well, do you have the results of the toxicology?

A     I do.

Q     And do any of those results link Mr. Rivas at
all with the murder?

A     I don't see how I can confere a blood alcohol
or -- from any presence or absence of the drug, link a
specific person.  Drugs and alcohol don't have any names on
them.  I can't even tell you whether she drank Stolichnaya
or wine.

Q     My question, sir, has to do with, was there any
blood samples taken which perhaps matched up with Mr. Rivas,
if you know?

A     You'd have to ask the Syracuse Police
Department.

Q     That was my question:  Do I ask you or not.
That's all.  Thank you.

You mentioned something, livor or livor, sir,
which is the settling of blood after death.  Was the livor
or livor consistent with the position in which you found the
body?

A     Yes, sir.

Q     And if the body had been on the back side, these
results would be inconsistent, based upon your

E. MITCHELL - CROSS BY MR. CALLE                                    913

determination?

    A    I don't quite know for sure what you're after,
but if you're trying to say that had she been moved post
mortem, would the livor pattern have shown it?

    Q    Yes, sir.

    A    That would -- that would depend on how soon
after demise she was moved. If you are moved before livor
becomes so fixed, before it leaks out of the blood vessels
into the tissues, and then becomes nonmoveable. If it's
done while it's still moveable, you cannot tell from the
livor pattern, unless you happen to observe the body before
the blood has once again moved.

    If you move a body after the livor has fixed,
it then becomes apparent as long as the body is not placed
back in a position consistent with the livor pattern.

    Q    Thank you, sir.

            MR. CALLE: One moment, your Honor.

            (Proceedings paused.)

BY MR. CALLE:

    Q    You mentioned that the victim was wearing, I
believe you said she was wearing a nightshirt and a robe
over the nightshirt, is that correct?

    A    Yes, sir.

    Q    And nothing else?

E. MITCHELL - CROSS BY MR. CALLE                         914

A    Well, she had the sash around her neck.

Q    I understand.  But I'm talking --

A    She had some jewelry.  I'm talking items of clothing.

Q    Yes, sir.  Did you ever find or observe any -- anyone find a pair of panties?

A    I don't remember them.  I can review my photographs and see if I have something there.

Q    Would you?

        MR. FITZPATRICK:  Dr. Mitchell, if it will save time, your Honor, I would stipulate there were no panties found within the immediate area of the body.

        MR. CALLE:  All right.  Thank you.

        I'll -- I just have a couple brief questions.

BY MR. CALLE:

Q    Did you ever testify in the grand jury that full rigor mortis goes away after a period of one or two days?

A    Probably.

Q    Does that mean yes?

A    Yes.

        MR. CALLE:  One moment, your Honor.

1    E. MITCHELL - CROSS BY MR. CALLE                    915

2                    (Proceedings paused.)

3                    MR. CALLE:  Nothing further.  Thank you.

4                    THE COURT:  Any redirect,

5              Mr. Fitzpatrick?

6                    MR. FITZPATRICK:  Very briefly.

7

8    REDIRECT EXAMINATION BY MR. FITZPATRICK:

9         Q    Have you also testified in front of the grand

10   jury, Doctor, that prior to that particular testimony, you

11   had not reviewed some of your notes and slides in connection

12   with this case?

13        A    That is correct.

14        Q    And naturally when you prepare for trial, you

15   did review your slides and your notes, is that true?

16        A    That is correct.

17        Q    And did you see some, as I think you indicated

18   on cross-examination, some decomposition to the brain as you

19   reviewed your slides in preparation for this trial

20   testimony?

21        A    Yes, sir.

22        Q    Does that assist you in any way estimating the

23   parameters of time of death?

24        A    It tends to push the limits further out.

25        Q    All right.  I want to make sure the jury is clear

on this.  What you're saying, if I may paraphrase, is

that there are certain parameters within which it's

possible that Valerie Hill died?

A       Yes, sir.

Q       And that to make a more accurate determination

as to the accuracy of when exactly she died, you would take

into account factors other than a mere observation of the

body?

A       Yes, sir.

Q       And, again, you're saying that it's possible

that she died on Saturday evening?

A       Yes, sir.

Q       And you're also saying that it's possible that

she died and was killed on Friday evening?

A       That is correct.

Q       Would it have been possible that she had been

killed on Thursday evening, March the 26th, during the late

evening hours of March the 26th?

A       It's less likely, but it's possible.

Q       Okay.  And when you make a determination as to

average time, and when you testified in front of the grand

jury as to rigor disappearing within twenty-four to forty-

eight hours, you were speaking of the average, is that

correct?

E. MITCHELL - REDIRECT BY MR. FITZPATRICK                    917

A       That is correct.

Q       And that would include the determination of average being 75 degree temperature?

A       Average body weight, 75 degree temperature, average circumstances.

Q       All right.  Doctor, I hope we're clear on that. Thank you very much.

THE COURT:  Anything else?

MR. CALLE:  Nothing, sir.

THE COURT:  I have a question -- a couple, if you don't mind.  The bruise over the right -- I wasn't able to see -- your right eyebrow, I guess?

THE WITNESS:  Yes, sir.  It's over here (Indicating) towards the right temple.

THE COURT:  You indicated because of the livor, you were unable to really observe it from your exterior examination, correct?

THE WITNESS:  That is correct.

THE COURT:  When you did your interior examination of the body, did -- you were able to conduct an interior examination of that area to better understand the extent of that injury?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  With that injury,
were there any lacerations around the eyebrow?

THE WITNESS:  No.

THE COURT:  All right.  The extent of the
injury that you observed internally, were you
able to tell, would that have raised a bruise,
a visible bruise on the outside, if the person
remained alive?

THE WITNESS:  I would expect that if this
person remained alive, you'd have a very high
probability of bruise, but you can't guarantee
it, a visible bruise on the outside.

THE COURT:  How about swelling of the
tissue area around that?

THE WITNESS:  Again, with, with this size
bruise, you usually end up with some swelling.

THE COURT:  That would have been visible
to someone if they had seen it?

THE WITNESS:  Yes, sir.

THE COURT:  How rapidly after this injury
would have been caused would that have been
visible to the naked eye?

THE WITNESS:  Well, that does vary from
person to person.

E. MITCHELL                                              919

THE COURT:  Okay.

THE WITNESS:  But usually within a few
hours.

THE COURT:  Okay.  All right, Doctor,
thanks very much for your time, sir.  Appreciate
it.  You may step down.

THE WITNESS:  Thank you.

(Witness excused.)

MR. FITZPATRICK:  May I, Judge?

THE COURT:  Are these questions or --

MR. FITZPATRICK:  No.  Judge, I would like
to offer People's Exhibit 7, which is the
Stephen King library book.

THE COURT:  Okay.  Mr. Calle, the People
are offering People's Exhibit 10 (sic), a
library book, Stephen King.

COURT CLERK:  7, your Honor.

THE COURT:  7?

COURT CLERK:  7.

THE COURT:  Any objection to that?

MR. CALLE:  No, sir.

THE COURT:  That's received.

(People's Exhibit Number 7 was then
received into evidence.)

920

MR. FITZPATRICK:  Your Honor, I'd offer Exhibit 28.  It's a bottle of Bacardi rum recovered from the victim's apartment.

THE COURT:  Mr. Calle, Exhibit 28, a plastic bag containing a bottle of rum, Bacardi brand.

MR. CALLE:  No objection.

THE COURT:  That's received.

(People's Exhibit Number 28 was then received into evidence.)

MR. FITZPATRICK:  I'd offer Exhibit 30, your Honor, several pieces of stationery recovered from the victim's apartment by Officer Kimak.

THE COURT:  Mr. Calle.

MR. CALLE:  No objection.

THE COURT:  That's received.

(People's Exhibit Number 30 was then received into evidence.)

MR. FITZPATRICK:  I'd offer Exhibit 34, your Honor, a bottle of Blue Nun wine recovered from the refrigerator of the victim, Valerie Hill.

THE COURT:  Any objection to that?