# EXHIBIT "C-4"

457

M A R K   J.   B R O S H ,                    called as a
witness on behalf of the People of the State of New York,
having been duly sworn, was examined and testified, under
oath, as follows:

<u>DIRECT EXAMINATION BY MR. FITZPATRICK:</u>

    Q    Mark, good morning.  Tell us your full name and
where you live, please.

    A    Mark J. Brosh, Liverpool, New York.

    Q    And what do you do for a living, Mark?

    A    Plumbing and heating business.

    Q    How old are you?

    A    Thirty-one.

    Q    Married?

    A    Yes.

    Q    Wife's name?

    A    Lori.

    Q    How long have you been married?

    A    Going on five years.

    Q    Good for you.  Any kids?

    A    Yeah, one.

    Q    All right.  And any on the way?

    A    Yes, one.

    Q    All right, sir.  And back in March of '87, Mark,
where were you living back then?

M. BROSH - DIRECT BY MR. FITZPATRICK                    458

    A     Liverpool.

    Q     And were you married back in March of '87?

    A     No.

    Q     Were you engaged?

    A     Yeah.

    Q     All right.  Did you know Hector Rivas, the defendant, here?

    A     Yes.

    Q     How long had you known Hector Rivas prior to March of '87?

    A     Probably seven years.

    Q     And what was your relationship with him?

    A     Friends.

    Q     Did you have a business relationship with him?

    A     Yeah.  We worked for a company together.

    Q     All right.  And you developed a friendship over the course of time?

    A     Yeah.

    Q     Now, did you know the deceased, Valerie Hill?

    A     No.  Knew of her, met her a few times, yeah.

    Q     And did you meet her in connection with Hector?

    A     Yeah.

    Q     And did you ever discuss with Hector his relationship with Ms. Hill?

M. BROSH - DIRECT BY MR. FITZPATRICK                        459

1

2    A    Not too much.

3    Q    All right, sir.  Did he ever express any

4  feelings that he had for her to you?

5    A    Yeah.  He was, you know, in love with her.

6    Q    Did he ever say he had any plans regarding Miss

7  Hill?

8    A    I assumed he was really in love with her and

9  wanted to get married someday.

10    Q    Are these thoughts that he expressed to you?

11    A    Yeah.  I guess so.  Thoughts that I took it that

12  way.

13    ·Q    And did he ever talk to you about Miss Hill's

14  plans regarding staying or leaving the area?

15    A    He said she was going to leave the area for

16  a while.

17    Q    And do you remember when he told you that?  Do you

18  remember when he told you, what time frame?

19    A    I don't recall.

20    Q    All right.  I want to ask you, Mark, if you do

21  recall Friday, March the 27th?  I have a calendar here in

22  front of me that may help you.

23        Do you recall that date, sir?

24    A    Yes.

25    Q    And did you work that day?

M. BROSH - DIRECT BY MR. FITZPATRICK                      460

1

2    A    Yes.

3    Q    And what time did you get off work?

4    A    Five, five-thirty.

5    Q    And what did you do that evening?

6    A    Well, we went up to Coleman's bar.

7    Q    Did you hear from Hector that evening prior to

8    going to Coleman's?

9    A    Yeah.  He called me, asked where we were going

10   to be.

11   Q    Where had he called you?

12   A    I think it was my office.

13   Q    And what was the conversation all about?

14   A    What's happening this weekend, what's going on.

15   I said, "We're going up to Coleman's," and, "Meet us up

16   there."

17   Q    When you say "we," who?

18   A    Normal people that we'd have job meetings on

19   Friday and everybody would go up there.

20   Q    Now, was this the regular thing where you would

21   meet Mr. Rivas at Coleman's?

22   A    We worked for A.B.O. Plumbing.  We'd meet up

23   there after job meetings, and he went into his own

24   business, and I went into my own business, and we really

25   didn't go out too much after that, but --

M. BROSH - DIRECT BY MR. FITZPATRICK                        461

1

2          Q      All right.  How long had it been prior to that

3   phone call on Friday, that you had heard from Hector?

4          A      Uh -- I don't know.  We really hadn't done

5   anything in about six months, I'd say.

6          Q      Now, did you tell him what time you were going

7   to be there?

8          A      Yeah, 6:00.

9          Q      And did you, in fact, get there at 6:00?

10         A      Six, six-thirty, right in there.

11         Q      And did you meet your fiancee there?

12         A      Yeah.

13         Q      I'm sorry.  Were you engaged then?  I asked you

14  then --

15         A      I thought I was.  I thought I was.

16         Q      All right.  And did you see Mr. Rivas at

17  Coleman's?

18         A      Yes.

19         Q      Do you remember what time he got there?

20         A      It had to be 6:30, quarter of 7, right in that

21  area.

22         Q      All right, sir.  And describe for us any

23  conversation you had with him.

24         A      Well, there were several people there with us,

25  you know.  We were just talking informal stuff, "How's

M. BROSH - DIRECT BY MR. FITZPATRICK                      462

1    things going," you know.

2    Q    Okay.  Anything unusual happen while you were at

3    Coleman's?

4    A    No.

5    Q    Everybody having a good time?

6    A    Yeah.

7    Q    I want to show you a map here of a part of the

8    city, Mark.  I'll give you a second to orientate yourself

9    to that.

10   A    (Witness complied.)

11   Q    Are you familiar with some of the roads shown

12   here, 690?

13   A    Mm-hmm.

14   Q    Teall Avenue?  There's an indication of

15   Coleman's restaurant over here on the west side?

16   A    Mm-hmm.

17   Q    I believe it's on Tompkins Street.  Does that

18   coincide with your judgment as to where Coleman's is

19   located?

20   A    Yes.

21   Q    All right, sir.  And do you know what time

22   Hector Rivas, or -- strike that.

23   Did you see Mr. Rivas leave Coleman's?

24   A    Yeah.

M. BROSH - DIRECT BY MR. FITZPATRICK                          463

Q       And when did he leave Coleman's?  What time?

A       Between 9 and 9:30.

Q       And how were you aware of that time?

A       Well, he left fifteen, twenty minutes before my wife and I left -- or my fiancee then, and we went home. We would go home before 10:00.

Q       And you're certain you were home before 10?

A       Yeah, right in that area, yeah.

Q       All right, sir.  And do you know anything about the defendant's personal habits regarding smoking?  Do you know if he was a smoker?

A       Yeah, he was a smoker.

Q       And do you know what brand he smoked back in March?

A       I don't know what he smoked in March, because like I said -- but he used to smoke cigarettes.

Q       Do you know what brand he used to smoke?

A       I thought they were Barclays.

Q       Barclays, all right.  Mark, thanks very much. Why don't you stay right there.

               MR. CALLE:  Thank you, sir.


CROSS-EXAMINATION BY MR. CALLE:

Q       Good morning, Mr. Brosh.

M. BROSH - CROSS BY MR. CALLE                          464

A    How are you doing?

Q    Mr. Brosh, directing your attention to the
month of March 1987, can you recollect how long you had
known Hector at that time?

A    Seven years.

Q    And in the course of those seven years, did you
have occasion to go out with him?

A    Yes.

Q    On a friendly --

A    Yes.

Q    -- private life basis?

A    (No verbal response.)

Q    Did you have occasion to work with him?

A    Yes.

Q    Did you ever work with him out of town?

A    Yes.

Q    Would you say it was a number of occasions you
did both?

A    Mm-hmm.  Yeah.

Q    I'm not intimating --

A    I'd say so.  Yeah, we worked --

Q    More than one time each --

A    Yeah, right.

Q    Directing your attention to one month prior

M. BROSH - CROSS BY MR. CALLE                                465

to the telephone call setting up the evening meeting at

Coleman's, do you recall socializing with Hector Rivas at a

place called O'Toole's sometime  in February 1987?

        A        I don't recall right now, no.

        Q        Okay.  Is it possible that you did?

        A        Yeah, I could.  It would have been possible.

        Q        It's just that you don't recall?

        A        Yes, right.

        Q        Then you are not sure that you didn't see him for

six months on a social basis?

        A        Right.  Well, we used to every weekend, we used

to go out, you know, back when we worked together.  Like I

said, I went in business, he went in business, and we

parted our ways, and we didn't see each other that much

anymore.

        Q        But did you remain friendly with him?

        A        What's that?

        Q        Did you remain friendly with him?

        A        Yes.

        Q        Mr. Brosh, in the course of this friendship or

business relationship or both, did you ever have occasion to

see Mr. Rivas interact with females?

        A        Yes.

        Q        Okay.  Can you describe his behavior, demeanor,

M. BROSH - CROSS BY MR. CALLE                                466

with females, to this Court?

     A     He was a gentleman and polite.

     Q     Did you ever see Mr. Rivas strike any women?

     A     No.

     Q     Did you ever see Mr. Rivas harass sexually any women?

     A     No.  I -- no.

     Q     Were you privy to any weird sexual habits that he might have possessed?

     A     No.

     Q     Now, when you said you went on jobs out of town, does that mean that you stayed in some place other than your respective homes?

     A     Right.

     Q     Would that be a motel --

     A     Right.

     Q     -- or hotel?

     A     Motel.

     Q     Did you share a room?

     A     Uh -- I can't recall.  There were several people working on job sites.

     Q     And did you ever see Mr. Rivas cause any problems with anyone during --

     A     No.

M. BROSH - CROSS BY MR. CALLE                          467

1

2    Q      -- during the course of either your business or

3  private relationship with him?

4    A      No.

5    Q      Did you ever know Mr. Rivas to have a girl-

6  friend?

7    A      Yes.

8    Q      Did you ever see Mr. Rivas interact with his

9  girlfriend or girlfriends?

10   A      Occasionally, yeah.

11   Q      Did you ever see him strike any of his girl-

12 friends?

13   ·A     No.

14   Q      Did you ever see Mr. Rivas get stricken by any

15 female?

16   A      No.

17   Q      Did you ever hear any complaints by females about

18 Mr. Rivas' sexual attitude?

19   A      I don't recall anything like that.

20   Q      Now, did you know where Mr. Rivas lived in 1987?

21   A      Cazenovia.

22   Q      Did you know where?

23   A      I don't know the road, but I knew where the

24 house was, yeah.

25   Q      And so he had been a resident of this particular

M. BROSH - CROSS BY MR. CALLE                                    468

part of New York State for about seven years, you say you

knew him?

         A       Mm-hmm.

         Q       So he was a local, was he not, at that time?

         A       Uh -- I, I guess so.  I don't know what you

define a local as.

         Q       Well, he was living up here for at least seven

years, that you knew?

         A       Yeah, but he was living in North Syracuse.  I

think he only lived in Cazenovia a year or two at the time.

         Q       But the general vicinity of this area, would you

not say that he was a resident here?

         A       Well, he's from Buffalo.

         Q       I beg your pardon?

         A       He came from Buffalo.  I worked with him --

         Q       He came from Buffalo?

         A       Yeah.

         Q       And in 1987, you knew him for seven years,

correct?

         A       Could be eight, could be six; approximately

seven, that's right.

         Q       Approximately.  So he was at least a local

resident for about seven years --

         A       Yes.

M. BROSH - CROSS BY MR. CALLE                              469

Q     -- that you know of?

A     Yes.

Q     Is your testimony here today, Mr. Brosh, that Hector Rivas got into Coleman's about 6:30, 6:45?

A     Yeah.  Could have been 6:15, right in that area.

Q     Could have been 6:00?

A     Mm-hmm, could have been.

Q     So you are not sure?

A     No.

Q     It was around 6 to 6:45 --

A     Right.

Q     -- something like that?

And is it fair to say that this meeting was tentatively set up earlier in the day?

A     It wasn't a meeting-type deal.

Q     Well, a get-together?

A     Everybody goes there -- everybody, you know, everybody that I know, goes to Coleman's for happy hour.

Q     But you had a conversation with Mr. Rivas earlier --

A     Right.

Q     -- earlier on the 27th?

A     Yes.

M. BROSH - CROSS BY MR. CALLE                              470

Q       Do you know approximately what time that was?

A       I don't recall.

Q       Well, was it lunchtime?

A       Probably midafternoon, I'd say.

Q       What's midafternoon?

A       Two o'clock, one-thirty, two o'clock.

Q       So based upon that conversation, Mr. Rivas at
least was aware that you and a bunch of other guys were
going to be in Coleman's at that evening, and he knew this
about 1:30, 2:00, approximately, correct?

A       Yes.

Q       You weren't surprised that he showed up at
Coleman's --

A       No.

Q       -- were you?

A       No.

Q       You had spoken to him about it earlier that
day?

A       Right.

Q       Now, there came a time that Mr. Rivas left
Coleman's that evening, is that correct?

A       Yes.

Q       Do you recall what time he left?

A       Between 9 and 9:30.

M. BROSH - CROSS BY MR. CALLE                           471

1

2      Q      So it could have been 9:00, it could have been

3      9:30?

4      A      Yes.

5      Q      Could it have been 8:30?

6      A      No.

7      Q      Could it have been 10:00?

8      A      I don't think so, no.

9      Q      Do you recall if Mr. Rivas was drinking?

10     A      Yes, he was.

11     Q      Do you recall what he was drinking?

12     A      Uh -- I, I don't recall.  Beer.

13            THE COURT:  Are you guessing, or are you --

14            THE WITNESS:  He was drinking beer with

15     me.  I don't know what flavor of beer, or -- you

16     know, we were drinking beer.

17     BY MR. CALLE:

18     Q      How did he appear, in terms of sobriety?

19     A      Fine.

20     Q      Did you see him anytime after he left Coleman's

21     that evening?

22     A      No.

23            MR. CALLE:  One moment.

24            (Proceedings paused.)

25     BY MR. CALLE:

M. BROSH - CROSS BY MR. CALLE                              472

1

2        Q       I just have two further questions for you,

3    Mr. Brosh.  Do you recall how much you were drinking that

4    evening?

5        A       We were drinking pretty good, probably ten

6    beers, at least.

7        Q       Okay.  So you were fairly intoxicated, would you

8    say?

9        A       No, no.  I don't think fairly intoxicated.  Under

10   control.

11       Q       But you had ten beers in the course of how long?

12       A       Four, five hours.  Four hours.

13       Q       From 6 to 10?

14       A       Six to nine, nine-thirty.  I won't reveal how

15   much I drink in front of a court of law, you know what I'm

16   saying?

17       Q       I understand.  Mr. Fitzpatrick is taking down

18   notes here.

19               MR. FITZPATRICK:  It's six years ago.  The

20               statute of limitations has run out.

21   BY MR. CALLE:

22       Q       Mr. Brosh, between 6 and 9:30 -- is that the time

23   you were there, three and a half hours?  You just said you

24   had about ten beers during the course of 6 p.m. and 9:30?

25       A       Right.

M. BROSH - CROSS BY MR. CALLE                          473

Q    Okay.  Would that be correct?

A    That's --

Q    Fair, accurate?

A    Yeah, fair.

Q    Okay.  And would it be fair to say, Mr. Rivas
left a half-hour before you did?

A    No.  He left around 9:15, 9:30.  I left about
quarter to 10.  He left before I did.

Q    By the way, are you wearing a watch today?

A    No, I'm not.

Q    Did you have a watch on?

A    No, I didn't.

Q    Did you look at a clock that evening?

A    No, I didn't.

Q    So these are guesses, would you say, fair
guesses?

A    Yes, yes.

Q    As to the time frame, and it could be a little
earlier, could be a little later?

A    I don't think it would have been much later.

Q    But they're all guesses?

A    Yeah.

Q    Thank you.

        THE COURT:  Any redirect, Mr. Fitzpatrick?

M. BROSH - CROSS BY MR. CALLE                                    474

MR. FITZPATRICK:  Yes, your Honor.


REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q    Mr. Brosh, you testified in response to a
question by Mr. Calle that Mr. Rivas was polite and
gentlemanly around women.  Do you recall that?

A    Yeah.

Q    Do you know Sarah Hamlin?

A    No.  I know of her, yeah.

Q    And do you know of her relationship with the
defendant, Hector Rivas?

A    Yeah.  They went out for a few years.

Q    And was he polite and gentlemanly around Sarah
Hamlin, as far as you know?

A    In front of me, yes, he was.

Q    Are you aware that Sarah Hamlin has moved out
of the Central New York area?

A    Yes.

Q    Are you aware that is a result of her
relationship with Mr. Rivas?

MR. CALLE:  I would object.  I don't

believe there is any --

THE COURT:  Sustained.

MR. CALLE:  -- testimony pertaining to

M. BROSH - REDIRECT BY MR. FITZPATRICK                    475

this.

MR. FITZPATRICK:  Well --

THE COURT:  Sustained.

MR. FITZPATRICK:  Well, Judge, I would

like to be heard outside the presence of the

jury.

THE COURT:  Okay.  Would you like this

witness on the stand when you make that offer,

sir?

MR. FITZPATRICK:  I have no more questions

of this witness.

THE COURT:  Okay.  Wait a second.  Do you

want to be heard now outside the presence of the

jury, sir, to put this issue to rest?

MR. FITZPATRICK:  At the Court's

convenience.  I can call another witness or --

THE COURT:  Okay.  We'll move on then and

I'll give you the opportunity -- you're telling

me you don't want this person held, or on call,

or anything?

MR. FITZPATRICK:  I'd like him, if your

Honor changes his ruling, I'd like him held.

THE COURT:  Let's put it to bed now.  I'm

going to ask you to step out a minute, folks.

M. BROSH - REDIRECT BY MR. FITZPATRICK                          476

Don't discuss the case.

COURT ATTENDANT:  Right this way, please.

(The jurors were excused.)

THE COURT:  This is what we'll do.  The record should reflect the jury has been excused. Mr. Fitzpatrick, I will give you an offer of proof at this time with this witness, and then we'll review the objection.

MR. FITZPATRICK:  Yes, your Honor.

THE COURT:  Strategy.

MR. FITZPATRICK:  Judge, outside the scope of my direct examination, because I never asked Mark Brosh any questions about how the defendant interacted with women --

THE COURT:  Correct.

MR. FITZPATRICK:  -- the defense made him his own witness and asked him, in fact, a character question, "How does he act around women?"  "He is gentlemanly and polite."  I would like to impeach this witness on that point because I have sworn statements from Sarah Hamlin that she was stalked by this defendant; that she had him arrested several times; that he tried to strangle her on occasion; that he threatened to kill her and

M. BROSH - REDIRECT BY MR. FITZPATRICK

477

threatened to kill her children; and that as a

result of all of this conduct, she finally moved

out of the Central New York area to get away

from him.  In other words, exactly the same --

THE COURT:  Okay.

MR. FITZPATRICK:  -- as Valerie Hill,

except she -- Valerie Hill didn't get a chance

to move out --

THE COURT:  I think the key is you've

asked this witness what he knew about this

man's behavior and he said, in his experience, he

saw him act a certain way.  Now you want him to

testify about someone else's state of mind.

MR. FITZPATRICK:  I want to be able to

impeach him on that point.

THE COURT:  Well, take your shot now

outside the presence of the jury, because I want

to know what questions you're going to ask him

and what knowledge he may or may not have about

that issue.

BY MR. FITZPATRICK:

Q     Mark, are you aware that Sarah Hamlin had the

defendant arrested?

A     Yes.

M. BROSH - REDIRECT BY MR. FITZPATRICK                    478

Q    Are you aware that these were for acts of
violence against her?

A    Yes.

THE COURT:  Okay.  Fair enough.  Then I'm
going to -- how did you come to be aware of this,
sir?

THE WITNESS:  I picked up Hector Rivas at
the courthouse in Madison.

THE COURT:  And he related why he was at
the courthouse in Madison?

THE WITNESS:  Yeah.  He beat up Sarah
Hamlin and was arrested for that.

THE COURT:  Based on that testimony, and it
comes from personal knowledge, I intend to allow
the examination of this witness on this particular
point, Mr. Calle.

MR. CALLE:  I didn't hear that, I'm sorry,
your Honor.

THE COURT:  That's okay.  Do you want a
minute to confer with your client?

MR. CALLE:  No, sir.

THE COURT:  Based on this witness' personal
knowledge from the defendant, of this relationship
with this woman and the acts of violence, or the

M. BROSH - REDIRECT BY MR. FITZPATRICK                479

acts of his arrest surrounding that relationship,
based on your testimony, or your questions, I'm
going to allow the district attorney to delve
into this on redirect, sir.

MR. CALLE:  I would just object to the
arrest coming in.  We weren't talking about his
reputation, just as to his knowledge -- not to
bring in his arrest, that's a rebuttal, that this
man gave reputation -- I don't believe this man
gave reputation testimony to which is to be
impeached.

THE COURT:  Well --

MR. CALLE:  He just gave his personal
observations.  So I would object if a prior
arrest of violence were to be entered into the
jury's knowledge at this time.

If you want to say what the relationship is
with Sarah Hamlin, that's fine.  I could ask him
other quest ons that will maybe perhaps cover it.
But to get into his arrest, I find that's too
prejudicial, at this point.

THE COURT:  I appreciate that.  However,
normally I wouldn't allow it, on a simple arrest
to be

M. BROSH - REDIRECT BY MR. FITZPATRICK                    480

1

2          brought before a jury, since they are certain

3          presumptions attached and final dispositions may

4          be different than what the charges were.  However,

5          given the nature of the questions, the fact that

6          these alleged acts of violence arose to a level

7          of the police intervening, causing an arrest to

8          be made, I think that's significant and I think

9          that the degree of violence is fair game for the

10          prosecutor on redirect, and if that level

11          reached the point where the police were called

12          to intervene, an arrest was, in fact, made, I

13          think that's significant, and I'm going to allow

14          it.

15              Would you bring the jury back, please.

16              And based on that offer of proof, it's quite

17          obvious I'm going to allow -- change my ruling

18          on the objection.

19              (The jurors entered the courtroom and were

20          seated in the jury box.)

21              THE COURT:  Will the record reflect the

22          jury is present and has returned to the

23          courtroom.

24              Go ahead, Mr. Fitzpatrick.

25  BY MR. FITZPATRICK:

M. BROSH - REDIRECT BY MR. FITZPATRICK                    481

Q     Mr. Brosh, you were aware of who Sarah Hamlin is?

A     Yes.

Q     And you're aware that she, in the past, made several complaints against this defendant for beating her?

A     Well, I don't know of the complaints that were made.

Q     You know the defendant was arrested on more than one occasion for assaulting her?

A     I know of one occasion.

Q     And do you know which occasion that was?

A     Uh -- I guess he beat Sarah Hamlin up, and I picked him up from the police department.

Q     Do you know what time?  In '84 and '85, or in '86?

A     I don't really recall, to be honest with you.

Q     Do you know if that was the time when he attempted to strangle her?

A     I don't really -- didn't know the details.  I just know there was a problem.

Q     Do you know that was the time when he threatened to kill her?

                    MR. CALLE:  I object to the line of

                    questioning.  There's no evidence that Mr. Rivas

M. BROSH - REDIRECT BY MR. FITZPATRICK                    482

1

2          attempted to strangle Miss Hamlin --

3                    THE COURT:  I'll sustain --

4                    MR. CALLE:  -- nor evidence that he

5          attempted to kill her.

6                    THE COURT:  I'll sustain the objection.

7                    Do you know, personally, any circumstances

8          surrounding that incident where you picked him

9          up at the courthouse, sir?

10                   THE WITNESS:  The only thing I know, she

11         was beat up by Hector Rivas, and I picked up

12         Hector Rivas from the courthouse.  That's all I

13         know.

14    BY MR. FITZPATRICK:

15         Q    Do you know, Mark, that she has since moved out

16    of the Central New York area?

17         A    Yes.

18         Q    Do you know why she's moved out of the Central --

19                   MR. CALLE:  Objection.

20                   THE COURT:  Overruled.

21         Q    Just if you know why.

22         A    I guess she wanted to get away from Hector Rivas.

23                   MR. CALLE:  Objection.

24                   THE COURT:  Overruled, sir.

25                   MR. CALLE:  He says he guesses.

M. BROSH - REDIRECT BY MR. FITZPATRICK                    483

1

                    THE COURT:  Overruled, sir.

2

                    MR. FITZPATRICK:  Thank you, Mark.

3

4

RECROSS-EXAMINATION BY MR. CALLE:

5

      Q     Mark, did you know the relationship of Sarah

6

and Hector?

7

      A     Yes.

8

      Q     What type of relationship was it?

9

      A     They were lovers.

10

      Q     Did they live together?

11

      A     Um -- at one point, I think they did, yeah.

12

      Q     Did you know that Sarah Hamlin used to batter

13

Mr. Rivas?

14

      A     I knew they had some problems.  I didn't know who

15

was battering who.  I really didn't care, to be honest with

16

you.

17

      Q     Did you know that Sarah Hamlin, the next day,

18

withdrew the charges that were the cause of Mr. Rivas'

19

arrest?

20

      A     No, I didn't.

21

      Q     That, in fact, she admitted to the police that

22

she lied?

23

      A     No, I didn't.

24

      Q     Nothing further.

25

1 ‖ M. BROSH - RECROSS BY MR. CALLE                         484

2        THE COURT:  Okay.  Anything else?

3        MR. FITZPATRICK:  No, your Honor.

4        THE COURT:  Thank you, sir.  You may step

5   down.  Watch your step there.

6        (Witness excused.)

7        MR. FITZPATRICK:  Lori Brosh.

8        THE COURT:  Hang on just a minute, please.

9        (Photographs were marked for identification

10  as People's Exhibit Numbers 25 and 26, this

11  date.)

12        THE COURT:  Hi, how do you do?

13        MS. BROSH:  Good.

14        THE COURT:  Keep your voice up nice and

15  loud.  If you don't understand any question, ask

16  him to repeat it.  You can't answer by saying

17  mm-hmm.  You have to say yes or no.

18        MS. BROSH:  Okay.

19        THE COURT:  Thanks.

20        *                    *                    *

21

22

23

24

25