# EXHIBIT "C-7"

1067

THE COURT:  Okay.  All set?

MR. FITZPATRICK:  All set.

THE COURT:  David, would you -- Michael,
we're all set, please, Captain.

(Whereupon, the jurors then entered
the courtroom.)

THE COURT:  All right.  We're back
in session.  The record should reflect the
jury is present, counsel, the defendant.

At this time, ladies and gentlemen,
Mr. Fitzpatrick will deliver his summation.

Sir.


SUMMATION BY MR. FITZPATRICK


MR. FITZPATRICK:  Thank you, Judge.

Good morning everybody.

THE JURORS:  Good morning (in unison).

MR. FITZPATRICK:  Thank you very much
for having served on this jury.  No case
in a criminal trial can ever be brought
to conclusion without people like yourselves
that are willing to sacrifice their time
and energies and decide what happened in a

1068

criminal case. I appreciate that very

definitely, and I know your fellow citizens

in Onondaga County appreciate it as well.

And if there is nothing else that is true

in this trial, it is true that there is

justice in Onondaga County.

Ten days ago all of us, I think, were

a little bit different than we are right

now. I don't think anybody in this room

and certainly nobody on this jury had any

idea how inhuman one person could be to

another person, and how warped that person's

definition of love could be. I don't think

we knew the depth to which one person's

obsession, not love but obsession with another

human being could take him.

Those things I think have changed

all of us, but other things don't change.

They remain the same, because I'm willing

to bet that during the course of this trial,

and certainly after this trial, we are all

going to hug our kids a little bit harder,

we're all going to kiss our wives or husbands

a little bit longer, and we are all going to

1069

tell our moms and dads that we love them
just a little bit more.

And I will bet that days, weeks, months
from now all of you, like you have had all
of your lives, will have dreams about things
that you are going to do, and places you
are going to see, and people you are going
to meet, and exciting things, wonderous
things that are going to happen to you that
Valerie Hill no longer has.

But most importantly, just like ten
days ago, just like today, you all have
the same good common sense and intelligence
that caused the People of this State to
ask you to sit on this jury. And we know
something now that we didn't know ten days
ago. And what we know now beyond any reasonable
doubt is that Hector Rivas stalked this
woman two and a half months, and finally
strangled her and killed her in a jealous
rage on March the 27th of 1987.

Let me just say a few words about
Mr. Calle's summation, and then move on to
what I think the evidence has proven

1070

overwhelmingly.

I take an offense to the suggestion that this is a mission of hate.  It always kills me that when a defendant's friend testifies against him in a criminal trial, he's suddenly no longer a friend; he's now on a mission of hate.

Joe Fields is on a mission of hate. "Val, Val, I didn't mean to do it."  And he hates this man, the same man that he hugged, which he felt sorry because he felt he didn't do it, and now he's on a mission of hate.

And all the other people, the Broshs, friends of his, Peggy Burke, Liz Lewis, acquaintances and friends of his, now they're on a mission of hate.

When he asked you numerous times what's wrong with this picture, as if this was a cartoon, you take these photographs with you into this jury room and you look at the body of the 28-year-old woman who had everything in this world to live for, taken away by him because he is obsessive, and you

1071

look at that picture and you say what's

wrong with this picture. Because it didn't

have to happen. All he had to do was get

it through his head that the answer was

no.

The people in the audience tell

Mr. Calle that they don't think he shows

any emotion. And he explains that to you.

And then five minutes later he tells you

that he's not guilty because Saturday night

he didn't show any emotion. Which is it,

emotional or isn't he?

It's not what Bev Dorland said about

when he walked in the bar after having committed

his deed on 248 Hickok.

I don't know who Patsy Cicciarella

is, but he's going to be very upset when

he reads the paper in the morning he admitted

killing. Barricella, Patsy Barricella. God

help him. This is a poor mentally retarded

kid who lives two doors down from

a con artist. He had been stopped

by the police. Suddenly becomes the prime

suspect in the defense's mind.

1072

And it wasn't four times.  The officer's
testimony was that he drove by two or three
times.  And if you go away from someplace
and go back to someplace, that's two times.
The poor kid doesn't even have a license.

But Patsy Cicciarella, or Barricella,
or whatever his name was, was waiting in
the driveway and put a knife to Valerie Hill's
throat, or might have been waiting in the
vestibule and put a knife to her throat
as she came.

I guess her father failed to mention --
and, by the way, Randy, you came out okay.
You came out partially credible, I guess,
and partially incredible.  That's better
than most of the people did.

But I guess the partially incredible
part was where he forgot to tell us that
his daughter was dressed in a bathrobe when
she sat down in Candy's Restaurant to have dinner
before this knife was put to her throat.

And don't get smoke-screened by these
barriers in the area.  You've got to take
the whole answer. "Yeah, two years ago some

1073

kids broke into our house." Two years before this girl was murdered. A lot of other things, and that is why he emphasized what we say is not evidence. It is the people, what the people have to say that's evidence.

Crimi and Stonecipher absolutely said that Rivas's car was parked on the other side of the street. She even described the headlights exactly the same way. It is not my fault that Mr. Calle didn't use a photograph.

He wants to know why there's no sexual assault charge against his client. Because the thing happened six years ago. Statute of limitations is five years. That's with all sexual assault charges. The other reason is he violated this woman after she was dead.

You want to take 20, 30 minutes to explain to the jury that the cops screwed up, they didn't take a picture of the shrine. There it is. I'll do it in 20 seconds. They screwed up. They should have taken a

1074

picture of that shrine.  They didn't.  You

think they made it up?  You think they put

it in the reports and put in there about --

made up the story about the Madonna, a picture

of the victim, the candles, coins in a bowl?

I thought it was Oscar awards earlier.

We got a -- everyone got rated by the defense,

credible, incredible.  "Anybody that hurts

me is incredible."

Joe Fields, Joe Fields is incredible.

He's never cross-examined about a thing.  He

cross-examines his former girlfriend,

Kelly Williams.  If that wasn't absurd,

I don't know what was.  All these little

balloons that they float out there.  Kelly isn't

credible.

Joe Fields has a gambling problem.  What --

well, sitting down there now, the jury, you're

supposed to think that Joe Fields has a big

gambling problem.  What that has to do with

this trial I don't have any idea.

And remember when he started the trial,

it was police conspiracy.  The cops conspired,

they worked backwards to get at Hector.

1075

1    Only two cops got bad ratings:  Stassi

2    and Phinney.  Everybody else got superlative

3    ratings.  They were all credible, including

4    maybe the most important witness, and I

5    don't want to characterize him as such,

6    but maybe the most important witness in

7    this case, John Brennan.  Why?  Because

8    he told us what the defendant had to say.

9    And he was rated as credible.

10    So I think I'll take out the two pages

11    where I was going to argue why you should

12    believe Brennan.  There is no reason not

13    to believe him.  They -- he wants you to

14    believe him, too.

15    The issue about the cat, remember

16    that?  What Mrs. Stonecipher is saying about

17    the cat being outside, that is unusual.

18    What is different from her daughter is the

19    fact that the cat was unattended, not the

20    fact that the cat was outside.  The fact

21    that the cat was outside unattended, without

22    Valerie Hill there.

23    He made a rather incredible statement

24    that Mr. Brosh didn't think that Hector Rivas

1076

killed Valerie Hill. I don't recall that.
You can have his testimony read back if
you want. I know what he did say. He said
that Hector Rivas was a gentleman around
women, and we had a little different opinion
about that when he left the stand.

And this thing about Dr. Mitchell.
Why go back to analyze the brain? Maybe he
can't see the forest through the trees,
but why go back to look at notes and slides
and records? To prepare for trial. There
are different phases of the criminal process.
There's arrest. There's grand jury. There's
trial. Not every case arrested goes to
grand jury. Not every case in the grand jury
goes to trial. Dr. Mitchell does several
hundred autopsies a year; many of them are
of people who died as a result of violence.
He prepared himself for this trial. I don't
think he should be penalized for that.

When you go into the jury room --
enough of the defense's summation. When
you go into the jury room, one of the things
they don't do, aside from not providing coffee

1077

for you, is they don't give you a list and
say, "This is what you should do."

    Mrs. Madonna will be your foreperson.
She will be the person that speaks for you
when you come back into court and have a
question or want a readback, or whatever.
But as a suggestion, only as a suggestion,
let me suggest to you an analysis that you
can explore.

    First of all, go in there and get
comfortable, be civil with one another, listen
to what each other has to say.  And you can
retrieve any or all of these exhibits.  Look
at them yourself.  And I would ask you again
perhaps to say to yourself, "Look, we know
that the People have the burden of proof.
We knew that probably before we ever came into
court, but we certainly know it now because
Judge Mulroy has told us that.  We know that
Mr. Fitzpatrick, representing the People,
has the burden of proof."

    With that in mind, what is the defense
that Mr. Rivas has raised?  Is it this, that,
or whatever.  And I'll talk about that

1078

in a second.  And keep in mind that he has

retained his own attorney, Mr. Calle, who

has very, I think, aggressively fought for

his client's cause.  But maybe we should

say what is the cause, because I suggest

to you that the defense is not one of reasonable

doubt, but the defense is one of unreasonable

doubt.  There can't be a doubt which is

unreasonable.

It is the defense of alibi.  You will

hear the Judge charge you that the defense

has raised the defense of alibi, and he will

tell you what the law is in that regard.

The defense chose to present Sue Volz,

the young lady who testified just yesterday.

And saying, "I could not have killed

Valerie Hill because I was at Albert's tavern

at 7:00 on Friday, March 27th," this is

absurd.  This is ridiculous.  The defendant

himself has asserted through credible

Officer Brennan that he was at Coleman's

from 6:30 to 11:00.  And this is amply

corroborated, at least the 6:30 part of it,

by his own friends, Mark and Lori Brosh.

1079

Is there any question he was at Coleman's

at 6:30? I just don't understand it. I

would suggest that Ms. Volz has made an

honest mistake. And is not unlike the honest

mistake that Susan Stonecipher made when

she said that she saw Valerie Hill alive

on Saturday, and then in a little more calm

moment, not with having a medical examiner

downstairs removing the body of her neighbor,

she said, "No, I was mistaken, it was on

Friday morning."

And remember this: Sue -- I don't want

to harp on this too much, because Mr. Calle

didn't even mention her, but it is a defense

that's been raised and I don't want to leave

anything untouched. When her attention,

Sue Volz's attention was drawn to Friday,

the 27th, some 12 or 13 days later, she said,

"Oh, yes, I saw Hector Rivas, but, no, he

wasn't wearing those clothes," the clothes

that we know for a fact he was wearing that

night.

We now come to the second defense

or second prong of the same defense. "I'm not

1080

sure that Patsy Barricella is the killer."

Now, you have to, you have to appreciate this. Not only is Patsy Barricella -- and I'm really offended by people like Joe Morgan, who doesn't pick an identifiable person who can be brought in and interrogated and put under oath. No, he picks the weakest person maybe he knows, the two houses away neighbor, a young man who, unfortunately, is mentally retarded, but still I am sure is able to function in society, and he lays it on him.

Why? Because he knows that the poor kid got excited because he got stopped by the police because he drove by the homicide scene.

But Patsy Barricella has got to be the luckiest killer in the history of crime, because on his random psycho journey through the streets of Eastwood to find a victim to kill, he not only finds a victim who's home, who let's him in, who sits down, let's him smoke some Barclay cigarettes, let's him have some Bacardi rum, he finds a victim

1081

who just happens to have been stalked for
two and a half months by somebody else;
the same person that admitted to Joe Fields
that he did it.  You talk about luck, it
defies description.

They float out this theory to suggest
that this is a reasonable doubt.  I say
to you it is not only an unreasonable doubt,
it's not a doubt at all.  If this raises
a doubt in your mind about the guilt of
this defendant, don't even suggest that
anybody can be convicted of a crime
anywhere in the world, because all you need
is a Joe Morgan, who spent time in a
psychiatric hospital himself, an alcoholic
con artist, to say, hey, pick a name, I'll
pick a name, you know, then throw the smoke
screen out in front of the jury and let
the D.A. spend two weeks trying to defend
and six weeks trying to prove that the guy
I mentioned, who may not even exist, didn't
do it.

Joe Morgan, what a joke.  And I don't
want to spend any more time on that because,

1082

frankly, I already told you I thought you
were intelligent and I'm not going to spend
a lot of time on what should be obvious
anyway.

Then we have got the Saturday morning
and the third defense, if we count them
up, the Saturday night surprise.  Let's
be 100, 100 percent clear as to what
Dr. Mitchell said.  He said, "It is possible,"
repeat, possible, "that the victim was killed
on either Friday night or Saturday night,
based solely upon my initial external examination
of the body of Valerie Hill."  I don't think
it could be any clearer that that is
what he said.  And as he told the grand
jury, rigor mortis, the stiffening of the
body after death, normally begins to pass off
within 24 to 48 hours.

If we were looking at a calendar,
this would put the normal time of death or the
normal median time of death sometime Saturday
afternoon.  Could it have been 16, 17, 18 hours
earlier?  Absolutely.  Absolutely.

Heating conditions refer, first of all,

1083

to 75 degrees.  It wasn't the temperature
of the house.  The temperature of the house
was 62 degrees.  Valerie Hill kept the heat
down, as we now know.  That's why she had
plastic on the front door.  Basement
underneath her, cold floor.  And the nights,
as you might expect, in March of 1987 were
cold as well.

He had a chance to review autopsy
sectional slides of the brain.  He considered
the temperature factors.  And most importantly,
when he tells you what an autopsy is, it
is not just medical stuff on a slab in the
morgue.  It is a constellation of all the
other circumstantial factors that lead him
into an opinion as to what is most likely
the time of death.  Friday night.

Please, please, if someone in the
jury room says, geez, I have a reasonable
doubt, Dr. Mitchell says she could have
died Saturday, don't look for a conviction,
in any case, where the body isn't found
within 24 hours, because you're playing
right into this defendant's scheme.  Because

1084

Dr. Mitchell is going to say the same thing

in any case he ever testifies to, because --

well, because I think that's what he'll

do.  Namely, that "I am not Jack Klugman.

I cannot tell you she died at 6:30 on Tuesday,

the 4th of July."  That's not the way it

works in the real world.

He wants you to think, Hector Rivas

wants you to think that she died Saturday

night because even though he hasn't really

presented an alibi for that night either,

he has presented some witnesses that have

been with him.  And he's just, he's just

Mr. Social Butterfly on Saturday night.

He rushes up to Liz Lewis, gives her a big

hug.  Ed Marion remembers him dancing up

a storm.

And the library book.  You know, when

I took this case six months ago and began

to look into it, I said, you know, the library

book, it's going to be important.  I'm going

to look for a jury that knows not to be

fooled by a defendant.  The cunning of it

all, the library book.  And the beautiful irony

1085

of it is I think it will help you convict.

How do we know for sure that
Valerie Hill didn't return it?  Defense
attorney suggests that she did.  See, what
Hector didn't know, and what he couldn't
have known, was that at Nye Ford they took
the odometer reading.  And we know, don't
we, for a fact that she left Nye Ford; that
she drove down Route 5; she went into the
Village of Fayetteville; she picked up her
airline ticket; she went home to the eastside
of the City of Syracuse; she went to Candy's
Restaurant; she drove back and parked her
car.

What was the odometer reading at Nye Ford
and what was the odometer reading in her
driveway?  That indicated a travel of
approximately 32 and a half miles.  And
when Investigator Stassi retraced those
routes to testify to you, it was 33 miles.
So we know that she didn't drive to Cazenovia
to return that book.  Nice try.

Is it likely that she threw her cat
out on Saturday morning?  Is it likely that this

1086

woman, who every single person that knows her,
whether they loved her or just knew her,
says was a thoroughly decent, caring,
conscientious human being, pediatric nurse,
one of most demanding nursing jobs you can
have, caring for sick young children, is
it likely or even remotely possible that
she just said the hell with Laura and Doug Adams,
I ain't calling her, and then she hides
in her apartment all day, even though she's
looking forward to the trip to get away
from Hector, and to not answer the phone,
knowing that her stepmother is dying at
St. Joseph's Hospital, to not be seen by
anyone?  It is inconceivable.  She died
Friday night and we know it.  The defense
is attempting to assert that she didn't.

Reminds me of a story.  And I don't
mean to get sarcastic, and I apologize for
that if it's offensive.  It is just my nature.
But, you know, let me just tell you.  There
is an old case.  This private investigator,
he's testifying.  And he's hired by a husband
who wants to know if his wife is cheating on him.

1087

And he says, "Yeah, I saw her.  You know,
I followed her.  She left the house and
she was supposed to go bowling, but she
did not go bowling.  She went to a hotel
room and she met a guy, pretty good looking
guy, in the lobby of the hotel.  Had a
couple drinks and sat and talked for a while.
And they were kissing and hugging and everything.
Then they got in an elevator, they got off
on the sixth floor and went to a room.  I
rushed into the parking lot and I looked
on the sixth floor and I saw her through
the drapes.  And she was now dressed, you
know, rather comfortably, bottle of
champagne chilling, and they were embracing
and kissing."

        And the husband says, "Well,
was she sleeping with him or not?"
He says, "Well, I don't know.  At that moment
they pulled the drapes."

        I say, damn, another reasonable doubt.
And that's what this defense is all about,
an unreasonable doubt.

        There's no reasonable doubt that

1088

Hector Rivas killed Valerie Hill on Friday
night.  Perhaps he should have stuck with
the defense that he himself offered six
years ago, before he hired Mr. Calle.  "Val,
Val, I didn't mean to do it."

        The Judge will talk to you about the
defense theories, prosecution theories.
Theories are not to be based on surmise
and speculation.

        I want to talk to you about what the
People have proved to you beyond any shadow
of a doubt.  And I want you to keep in mind
some basic concepts which I think are important.

        Number one, we are never going to
know exactly what happened the night of
March 27th.  That's a fact.  We are never
going to know minute by minute, step by
step what this defendant did and what
Valerie Hill did.  We have a remarkable,
I must say, array of witnesses that are
able to piece this together for us fairly
closely.  But what happened when Valerie
let him into that apartment, I can point
to you what the physical evidence indicates,

1089

but I can't tell you for certain. I certainly

can't tell you what the dialogue was. I

can't tell you who sat where.

And, you know, witnesses remember

a garage door open, garage door closed;

lights on, lights off. I told you, this

thing happened six years ago. And when

you think about it, you say is that unusual?

Well, think about this: Remember I gave

you the example of the Kennedy assassination

on voir dire. The President of the United States

was assassinated 30 years ago, and it was

on videotape. We actually had a film of

it. You know how many books have been written

about what happened that day? Over 700

and counting.

So when you talk about the criminal

trial involving Valerie Hill, don't have

someone walk into the jury room and say,

"So, gee, I don't know exactly what happened.

I just can't vote to convict." Say, "Hey,

time out here."

Another thing, and this is important,

Hector Rivas didn't wake up Friday morning and

1090

say, "I'm going to kill Valerie Hill today."
And I don't even think he went to her apartment
that night intending to kill her.  In fact,
I seriously doubt that he did.  I think he
went there for the same reason he had been
stalking her for the last two and a half
months.  "Please, Val, take me back.  Please,
Val."

We'll talk about a few notes that
Mr. Calle wants to suggest to you aren't
that important in a minute.

Third concept, this doesn't take a
rocket scientist to figure this out.  Killers
are stupid.  They don't always act smart.
Sometimes in addition to killing people,
they do other stupid things as well, like
get drunk and admit that you killed a girl
to a friend at a bar.

Because the fourth thing I want you to
remember, remember I asked you about alcohol.
You probably were thinking, you know, maybe the
District Attorney's going to prove this guy was
drunk when he killed Valerie Hill.
I don't know if he was or he wasn't.

1091

If he says that he was, fine.  He certainly
had had something to drink that night.  But
I'm talking about alcohol lowering your
defense mechanism, saying things -- you've
all heard someone say something under the
influence of alcohol that they'd kind of
like to grab back.

It's almost like being a kid.  You
know, your sister comes to the door or something
and your three-year-old kid, you know, yells
out, "Hey, Dad, fat Aunt Mary's here."

Well, unfortunately, Aunt Mary is fat,
and the kid is honest.  That is the way
people under the influence can be.  "Val,
Val, I didn't mean to do it.  Liz, I
loved her so much.  She meant so much to
me."  And then they want to tell you that's
because he realizes the relationship is
over.

He leaves, he leaves 53 notes in
54 days and doesn't realize until Saturday
night the relationship is over.

Let's look at the People's case.  And
I want to talk about it not -- I'll talk about

1092

it individually, but keep this in mind:
You know, you can take one piece from a
building and say, "What is this?  This is
nothing.  It's nothing."  You put all the
pieces of the building together and all
of a sudden you have a pyramid.

So I'm going to talk about it piece
by piece.  And I want to talk first about
what this case is all about, obsession.
It isn't about love.  It's about obsession.

Let me read some of these notes to
you.  They're in evidence.  You can take
them all in and look at them.

This is Exhibit 39.  You haven't had
a chance to see any of these yet.  Thank God
she was a saver of these.  Maybe she knew
what was coming.

Valentine's Day, Christmas.  There
is one Christmas card here.

"For my dear Valerie.  Dear Valerie,
Merry Christmas.  For the special person
in my life."

Look at them all.  Look at them all.
It's ridiculous.

1093

"Dear Val, I hope that you can start giving with the love that you like to get back.  I truly wish the best.  No more joking. Thank you for what you let me give you.  I was just starting."

"I'm sorry so much for the times that I've given you."  This is a new note.  "I never knew that I was just passing time.  Bless you in your moments with whoever.  Happy Valentine's Day, Hector."  As if she had the audacity to see someone else.

"You mean so much to me.  I'll work with you and stand beside you until the end, so then we can have the world with the sunshine and everything in it."

The guy ought to work for Hallmark if he gets another job.

"I know you have been thinking things out.  Tell me if you need my help.  I know what you need in this life and I could do it all with you.  I'm not like anyone you've ever had before."  That was the understatement of the year.  "It's a special love that can grow."

1094

1    "Hi Babe, I'm just sitting here feeling
2    hurt over all this mess that I've cause in
3    us."
4    "Hi Val, I stopped by to talk to you,
5    but I guess I'm late again.  I really understand
6    this joke now.  I guess you're having fun
7    now.  Enjoy yourself.  Thank you for a good
8    laugh."
9    "Val, I'm very sorry, very sorry.  Try
10   to understand my pain."
11   "Dear Val, I want to say thank you
12   for your company tonight.  I so much want to
13   be held in your arms.  Thinking of the warm
14   evenings with you beside me."
15   "I need you."
16   "Dearest Val, Thank you for letting
17   me use the phone.  I miss you today and every
18   day.  I give to you my heart with the sunshine.
19   Love, Hector."
20   "Valerie, I'm sorry, very sorry for
21   my own pain.  Sorry I didn't get here sooner.
22   I shouldn't surprise you like this any more.
23   Have fun now."
24   "A flower for Val."

1095

"Hi Baby, I want to tell you how much I love you today. I hope you have a nice time. I miss you. I hope we can see each other soon."

"Val, please give us a chance. Remember us and love us."

You get the picture. What is this? You know, you listen to Mr. Calle, you get the impression the guy left a couple of notes. "I got a flat tire. I've got to go to the garage" or something. "I had a flat tire" or something.

Take a look at the videotape. You see it as recently as that day or a couple days before she died. He sends her roses. Look at the notes on the table.

Exhibit 46, you remember these. These are sitting on the kitchen table. Burns Brothers stationery. I don't know. You can make your own judgment. Appear to be written with the same pen.

"Hi Baby, I'm just wanting to share things with you. I need to talk. It's a hard thing to say sometimes, but I really

1096

need you.  Please, Babe, it's from inside."

    "Hi Babe, Well, another crazy day has
gone by.  I'm hoping that you're feeling better,
along with your" -- "along with everything else
that's going on in your life.  Hope to be
with you or sit and talk with you.  So very
much to say.  I hope your night went well at
work.  I miss you, Val.  Love you, Hector."

    "Dear Val, I'm hoping that your day
is going well for you.  And I sure hope your
cold is better."  Take a look at the picture.
You see a little bottle of cold medicine
by the sink.  "I guess when someone loves like
we do, they should be at peace.  I never knew
that my trying to please you for the feelings
your heart was giving would cause all of this.
I'm doing the best I can, and I know you
are, too.  Thank you, Babe.  Take care.
Love, H.R."

        And these are some, some other exhibits:
        "Don't ever go away, Hector."
        Get that piece of paper.
        "Please call me today, H.R."
        Flower card, probably with his roses:

1097

"Life is sure nice with you in it.
Don't ever leave."

There, don't ever go to the Bahamas
without me.  I'll -- let me suggest -- that was
not on the note.  I'm paraphrasing what
I think the proof has said.  This is obsession.
This is not love.

Now, we get to convict him because
he's obsessed with her, because he left
her a lot of notes?  No.  But don't take
that out of the mosaic.

The word that Mr. Calle was right
in knowing I would use, "stalking" her,
stalking this poor girl.

Liz Lewis says letters/notes virtually
every day.  He tells John Brennan and he
tells Liz Lewis, "Yeah, I was following
her.  She wouldn't talk to me."

Peggy Burke sees him show up unannounced
with flowers on the 18th or 19th of February.
They went to the kitchen and she can hear
him pleading with her, "Please, Val."

Coco's, March 4th.  Here is something
as simple as wanting to go out with your friends

1098

for a drink after work and you have -- and,

again, it's demonic. And she does the only

reaction she could, because of the decent

person she was. She rolls her eyes and

says, "Oh, God." She doesn't want to go

over, and finally she goes over, she talks

with him. "I want to buy everybody some

drinks."

March 17th. You'd think she'd get a

moment's peace on her father's birthday,

with his wife dying. Pulls into the driveway.

Guess who pops out of the driveway, rushes

up to the car? Probably thinks she had

dinner with another guy.

Don't convict him for obsession and

stalking. Don't convict him just for stalking

her.

What about his alibi? I'll call it

a false alibi, because that's just what

it is. Now, I agree it's difficult for

someone to say where they were six years

ago, but it's not that difficult to recall

where you were three days ago. And I want

you to remember what the defendant said to

1099

John Brennan.

And I've offered these here facts to you as a chart, an alibi chart. You can use it. You can't take this with you into the jury room because it's something I'm using for demonstrative purposes.

You want to sit down when you deliberate, Mrs. Madonna, if you want to have everybody do it, that is up to you. You may not need to if you recall this.

This is what Brennan says the defendant says: "Right around 2:00 I'm at 248 Hickok Avenue. I don't stay. I just make a judgment that Valerie's not home. I leave. I do some errands. I go home."

And he gets home, Cazenovia, sometime in that area. What does he do? Leaves Cazenovia at 5:00 and goes to, where else, 248 Hickok. Get's there about 5:30, 6:00. Not home. Left a note under her kitchen door. I don't know which one of the 53 notes that was, but I assume it was one of them.

Goes to Coleman's. Stays at Coleman's to 11 p.m., you know, drinks. No dispute. That's what

1100

he said to Brennan.

Brennan, remember he is credible by the defense's standards.

Stays at Coleman's to 11:00. "I leave and I go to Albert's." And he arrives in Albert's. I don't know if Brennan tells us when he gets to Albert's, but we know from Officer Stassi it's about a 40-minute drive from Coleman's. So figure he got there shortly before midnight.

There's a big hole in that story. It is huge. I'll talk to you about it right now.

Karen and Donald Stonecipher, no ax to grind with anybody. The defendant, Karen says she sees him sometime around here, 248 Hickok. Donald says he sees him 3:30, 248 Hickok. Looks out of his window about 20 minutes later, sees him at 248 Hickok.

Chris Reynolds delivered the paper. There's no -- there is not a single contradiction between Christopher Reynolds and Peter Cooney, by the way. Reynolds says around 4:30 sees him at 248 Hickok.

1101

Let me tell you what Cooney adds

to this.  Take this.  This you can take

with you into the jury room.  Please do.

Cooney says that he passes the defendant

at about 2:00.  Cooney heading west into

the city; the defendant heading east, in

the neighborhood of DeJulio's Army & Navy Store,

less than what, half a mile at most from

the victim's house.

I submit to you, by his own admission,

he is on his way to the victim's house.

Cooney sees him at DeJulio's.  DeJulio's.

And what do we, what do we get from

this?  Do you, do you think that he was

here and then he left, and then he came back

and then he left, and he came back and

then he left and he came back?  Nonsense.

I submit to you that a reasonable

person can conclude that from 2:00 to

almost 4:30 or 5:00 he is doing what

he does best, stalking Valerie Hill, just

sitting there.

He wants me to prove that he's a sexual

1102

psychopathic deviant. I wish that the rules

of evidence would allow anything remotely

close to that to come into a criminal trial.

They don't. So -- but if that doesn't prove

something significant, I don't know what

does. 2:00 to 4:30 sitting there, waiting

and waiting and waiting. And then what

does he do? He's upset about something.

Reynolds remembers that, remembers that

look in his face. So he leaves there. Cooney

at 5:30 sees him in Manlius. Only now he

is not driving his van. He's driving his

"One Rivas," whatever the car was, two-door,

silver-colored car or gray-looking colored

car. Where? Heading back into the city.

Do we know where he's going? Why,

yes, we know where he's going. Why do we

know where he is going? Because he told

us where he was going. He stopped on his

way to Coleman's to see if Val was home.

So here he is back at 248, by his

own admission. Wait a minute. Wait a minute.

Something is wrong here. He says Val wasn't

home. We know she was home. We know that at

1103

5:30 or 5:45 Valerie Hill was at 248 Hickok.
She's on the phone talking to Liz Lewis.
And Laura Adams, calling from Schnectady,
is getting a busy signal sometime that
evening.  And we know that at 6:30 she's
supposed to meet her dad at Candy's, but
she doesn't get there till almost 7.

Why?  Why is she a half hour late?
Why is the defendant not being candid with
us about her being home?

She is up at Candy's half an hour
late.  The defendant we know was, was at
her house and we know she was home.

What do Mark and Lori Brosh say?  They
say -- and I don't think you could find
two nicer people.  They -- I don't know,
I forgot how they rated on Mr. Calle's
scale.

But they say that from 6:30, thereabouts,
to no later than 9:30 the defendant is at
Coleman's.  This is not rocket science.
They remember they were home before 10.
They remember it takes about 15 minutes
to get home.  They remembered the defendant

1104

left about a half hour before they did.

Where is the reasonable doubt about the accuracy of that report? They say the defendant is at Coleman's. Do we see a rather large gap developing here?

John Cassano, folks. Again, I forgot where he came on the scale. But everybody should be so lucky, if they were ever involved in a serious incident where a loved one was hurt, to have a fine and observant young man as John Cassano near the scene of the crime, because there isn't any shred of doubt in his mind that at 9:40 p.m. the defendant is in Liquor Square buying a bottle of Bacardi rum and some other liquor. And he confirms it by looking at a computer-generated register tape.

That man was in Liquor Square. And he must have forgotten to tell John Brennan about that, because John Brennan, who talked to him from 3 to 5:30, made no mention of the defendant being at Liquor Square.

Jim Crimi and Susan Stonecipher, they say 11:00 to 1:00. Where else? 248 Hickok Avenue.

1105

Take a look at this map.  Concentrate
for a second.  You're not in the jury box,
you're home in your -- where you feel
comfortable, either in the family room,
kitchen, living room, whatever.  Let me
tell you a story.  Remember now, you are
not the jury.  You're just listening to
me and I am a salesman.  I'm trying to convince
you of something.

Here is what I convince you of:  I
want to convince you that a person had a
relationship with a woman and they broke
up about 60 days before she died.  And during
that 60-day period this person called her,
saw her, phoned her, left her notes, sent
her flowers, popped up on the job, popped
up in her driveway, popped up at her workplace,
popped up in the restaurants where she went
out, every single day, every single day.
And on Friday, March the 27th, that person,
coming from the east -- or, excuse me, coming --
heading east, stopped by at her house and left.
Then he went home this way (indicating)
to Cazenovia.  And then he came back this

1106

way (indicating), stopped by her house again.

And then he went to Coleman's restaurant,

and he stayed there and he had something

to drink.  And then he drove home, all the

way home, and never stopped at her house.

On a scale of one to ten, the

believability of that is zero.  Zero.

"Thank you, Mr. Fitzpatrick.  I don't think

I'm going to be purchasing anything today.

And I don't think I'm going to purchase

that."

He stopped at the house, he stopped

at the house every solitary chance he got.

I don't even -- I have sat through eight

days of trial.  I don't even know what the

guy did for a living.  I had heard some

reference about plumbing.  When the hell has

the guy got time to be a plumber?

What do plumbers do?  Did he plumb?

And then the final piece to this mosaic,

Bev Dorland.  Credible.  So I don't have --

you know, I don't have to get into a lot

of argument why I believe her.  12:30 a.m.

the defendant walks into Albert's and

1107

Bev Dorland says to herself, "My, God, Hector, what did you do?" Seems he's not so nice. Everyone says he's always the same or so seldom Hector didn't look different. But then we get a witness who says he didn't look like himself. "I wanted to say to him what happened, what did you do?"

Don't convict, though, because his alibi is completely false. Don't convict him because he's obsessed with her. Don't convict because he was stalking her. Don't convict him because his alibi is a total fabrication.

(Whereupon, there was then a brief pause in the proceedings.)

THE COURT:  Thanks, Patti.

MR. FITZPATRICK:  The defendant's reaction to cops, John Brennan.  John Brennan says around 2:30 he's assigned to drive to Hector Rivas's house.  Unbeknownst to Brennan, Rivas has, coincidentally, stayed home during the day because, as he told Peggy Burke, he's got a sore throat.

Brennan says to him, very simply --

1108

and Brennan is credible, right -- Brennan
says to him, "Would you be willing to
come with me and talk to me about Valerie Hill?"
And I'm not -- Mr. Calle suggested I'm
trying to use the defendant's silence.
I'm not trying to use the silence at all.
What did he -- he didn't stay silent.
What did he say?  He said, "Sure.  Can I
get dressed?"

Excuse me.  And then during the
questioning Brennan says, "You know" -- and
I'm paraphrasing Brennan -- "You know,
Mr. Rivas, I'm a little confused."  He
got the chance to ask the question.  "I'm
a little confused.  You leave a note every
day.  You stop by every day.  You're there
at 2, at 6.  And you drive home from
Coleman's, you don't stop.  You don't try
to get ahold of her Saturday.  You don't
leave a note on Saturday.  You don't call
her on Saturday.  You don't try to see
her on Sunday.  You don't call her on
Sunday.  You don't leave a note on Sunday."

What do you think the defendant knows,

1109

that he had no way of knowing unless he
was there?

        And then at 5:30, 5:30, hours before
anybody executed a search warrant in Cazenovia,
"Mr. Rivas, Valerie Hill is dead." Okay.
Maybe that was the reaction he had as he's
sitting there now. I don't know.

        I suggest to you, ladies and gentlemen,
that he knew, he knew better than anyone,
he knew better than Dr. Mitchell did, that
Friday night he killed that woman.

        Don't convict him for that alone,
though, because I want you to look at the
crime scene. What do I mean by that? Did
I put these pictures in to horrify you?
No. What do we know is missing from the
apartment? An airline ticket.

        Mr. Calle suggests to you, with his
New York City experience, that this would
be an important thing for a burglar to steal,
an airline ticket. He may have forgotten
that I grew up in a place called Brooklyn,
New York. And in Brooklyn, New York we
don't steal airline tickets, because I don't

1110

think the burglar is going to show up at

American Airlines and say, "I'm Valerie Hill.

I'd like a window seat, please." He's not

going to leave the house Friday night with

a sweatshirt that says "I Killed Valerie Hill."

But think about it. Use your

intelligence. That's why I've asked you

to be here. What's important about the

airline ticket? "Val, don't ever go away.

Don't ever leave me, Val. Can't live without

you, Val." What do you think his reaction

was to her going, committing the horrible,

horrible sin of wanting to get away for

a couple of days by herself? What do you

think his reaction was?

And what else is missing? The

Stephen King book. And we know, and I've

already told you -- Mr. Calle never mentioned

it, and I don't even know if he heard during

the course of the trial -- we know that

she did not go to the Cazenovia Library

on Saturday, but somebody knew that book

was overdue. Perhaps when she got the call

on Tuesday, was so upset because she thought

1111

it had to be returned, she might have mentioned
it to this defendant.

What else do we know about the, about
the nature of the crime scene?  Did the
ticket get burnt up in the fireplace?  I
don't know.  I don't know.  The killer can
answer that.  I do not know.

Fingerprints.  Fingerprints.  Juries
love fingerprints.  I can tell you this
from experience, that I've been in front
of a hundred or so and I know the jurors
love fingerprint evidence.  And I prepared
in this case -- and I'm telling you folks,
I make a comfortable living with my, with
my wife, but I'm telling you I wish I had
a nickle for every time I walked into a
courtroom and heard a defense lawyer say
to a jury, "Where are the fingerprints?
My client's fingerprints aren't there."

And here am I, getting ready for this trial,
salivating.  I've got my nice charts all set out,
got my fingerprints all ready for you.  And what
does he do?  He says, "Forget about the
fingerprints.  They don't matter."  No fair.

1112

There's only two, the entire

apartment, the entire apartment, there's

two fingerprints the police can't identify.

Where are they?  On the phone.  On the phone.

Inconceivable, along with a million other

things, that the unknown stalker, burglar,

Cicciarella, Barricella, whatever his name

was, went to make a phone call as well.

Remember, medical personnel, police

officers are there.  Police officers sometimes

don't like to talk on the radio, no, because

the press sometimes have scanners.  They

don't like to talk about it, attract a lot

of attention.  Sometimes they're a little

careless and they use the phone.

What about the prints of the defendant?

There are his prints on the Blue Nun bottle.

And more importantly, there are seven of

them.

Give the defense his due.  Prints

can last for years.  They can last certainly

for times when the defendant may have been

an invitee into that apartment.  But this

is a bottle of wine that has no other prints

1113

on it except those of, those of the defendant,
and not one or two, that have lasted through
repeated touching.

Remember how Officer Donohue told
us if we touch something, sometimes prints
overlap, they become useless.  There are
seven identifiable prints of the defendant
on the bottle of Blue Nun wine.

Valerie's prints are on the drinking
glass found on the counter and the bottle
of Bacardi rum.

I do not know if the defendant was
wearing gloves that night.  I do not know
if his prints on the Bacardi rum bottle
were smeared.  I do not know if he put it
in a paper bag and handed it to Val, and
she took it out of the bag and poured him
a drink and put it in her cupboard.  But
I know that at 9:40 that night Hector Rivas
bought a bottle of Bacardi rum from
Liquor Square, which is less than a half
a mile from the victim's house, and I know
that he failed to tell Officer Brennan about
that.

1114

Five of the defendant's brand of
cigarettes are in the ashtray. I do not
smoke, but I watch TV -- well, they don't
have cigarette ads on TV, no, but I read
magazines and I drive around. And I have
never up until this trial heard of Barclay
cigarettes. And this defendant had 50 or
so crushed packs of Barclay cigarettes at
his house. And I know there are five Barclay
cigarettes in that ashtray. And I know
that's not something that should be dismissed,
because I'm suggesting to you he was
chain-smoking there that night. And I know
that he touched that ashtray. And I know
that Valerie Hill was neat. And I know
that by habit Valerie Hill would clean out
the ashtray, unless, of course, she was
lying dead in another part of the apartment.

And I know that three of the defendant's --
I won't call them love letters, I'll call
them obsession letters were sitting on that
kitchen table. And I know when -- and you
know that there was no forced entry. The
killer was let in, just like she let him in

1115

earlier in the week.  Wasn't February 23rd

or 4th.  It was March 23rd or 4th.  Banging

on the door four or five minutes, "Please,

Val, let me in.  Please, Val, let me in."

Finally she let's him in, which is probably

telling us as to why she let him in this

night.

This is not a reckless woman that

opens the door for Patsy Barricella.

"Who is it?

"It's me.

"Who's me?

"Patsy Barricella.

"What are you doing here?

"God told me to come here.  I want

to steal your airline ticket.

"Oh, come on in.  Come on in.  Help

yourself."

Can't say what I was about to say.

Common sense?  Absolutely nonsense.

Nature of the crime scene.  Take a

look at pictures of the poor woman's body.

Not -- take a look at them.  What kind of

rage has to be in a person to wrap that belt

1116

around her neck so tight that the only way
the medical examiner can get it off is by
cutting it off?

Is this what -- this is a burglar
that gets caught and says I'm going to stay
for three, four minutes -- and I apologize
to the Hill family, but this has got to
be said -- I'm going to stay here for four
minutes while I crush the life out of you?
And there's not going to be a struggle?

This woman was in good health.  She
was in good shape.  Most of -- if every one
of you women on this jury is in good physical
health, what would you do if you were confronted
with an intruder?  What would you do?  Would
your nails be intact?  Would a lamp in your
house be knocked over?  Would magazines
be strewn about, table knocked down, glass
broken?

Not a single defense wound on her
body.  Why?  Because she not only let the
killer in, she trusted him.  And perhaps
most significantly when you look at that
body, the anal violation postmortem, does

1117

that make any sense at all?

Give the defense his due.  This maniacal
burglar strangles her.  Now he says I'm
going to send a message to this woman, this
bitch.  I'm going to do something to her.
I'm going to leave my calling card here.
What kind of disgusting rage has to be in
a human being?  How much time does it take
to build up where he would do that to a
dead woman?

I told you I would do two things.
I would convince you beyond a reasonable
doubt that this defendant did it, and I
will convince you that no one else could
have done it.  And if you're not convinced
by that crime scene that no one else could
have done this, I don't know what else I
could do.

The Judge is going to tell you that
if the total evidence points to both innocence
and guilt, then you must go with innocence.
That's not a surprise to anybody.  If there's
a theory that fits innocence in this case,
find the defendant not guilty.  But it's a

1118

theory that has to be based on evidence
or lack of evidence, not a guess.  You are
not here to do Mr. Calle's job.  He's done
it very well for this defendant.  The defendant
picked him.  He's done the best he could
with what he had to work with.  His investigator
and he worked very hard on this case.  But
let me just tell you that there is no room
for guessing and speculation and surmising.

The evidence supports one theory,
and one theory only, that this defendant
is guilty.  If someone says in that jury
room, "Gee, there is no eyewitness.  There
is no signed confession," number one, remind
them of the promise they made a week ago;
and, number two, look the person in the
eye and say, "You don't have to give me
a name, but give me a theory.  Give me a
theory."

Was it a burglar?  A burglar that
is let in, that steals an airline ticket
and a library book, and gets out -- commits
a horrible crime, with not a sign of a struggle,
leaves not a fingerprint, a hair, a fiber?

1119

A boyfriend that no one knows about, as Mr. Calle suggested on his opening statement, a mystery boyfriend? Everybody, every friend, every relative said she dated two men in six years: Bob Lucas and Hector Rivas.

A random psycho killer that just happened to pick her apartment? She doesn't struggle with him? She let's him in? She looks through her peephole and says come on in? And he so hates this girl that he does that to her?

But don't convict him because of his obsession, the stalking, his false alibi, his reaction to the police, his -- the nature of the crime scene. Don't convict just because of that. Take a look at his house.

We seem to have adopted the word "shrine" for this thing in his house. Look at the things in his house.

And I apologize. I've gone over my intended time, but I'll be done in about ten minutes. And I mean it.

Look at his house. He's smoking Barclay cigarettes. The shrine, I already told you we

1120

should have taken a picture of the shrine.
Okay.  It is what it is.  Well, what is
it?  Well, it's got religious significance.
The Virgin Mary is there; candles; there
is a bowl of coins; there is a photo of
Valerie Hill.

          Is there an innocent explanation for
this and a guilty explanation for this?
Well, I gave you the guilty explanation
for it.  It is a memorial.  It is what it
is.  It is a memorial to Valerie Hill.  She
is dead.  I know she's dead and here is
a shrine in my closet.

          What is the innocent explanation?
I don't know.  My wife will tell you that,
you know, I -- when I was courting her,
I would do a lot of strange things to get
her to go out with me, but I never remember
putting a picture in the closet, lighting
some candles and making an offering to it.

          His jacket is downstairs, laundered.
And there's a note in the trash.  You get
a little sense of what Valerie Hill is like.
There is a note in the trash.  And look at,

1121

look at the type of paper, which is Exhibit 30,

which is recovered from her house.  You know,

because I'm thinking to myself, well, what if

Mr. Calle makes the argument, hey, she wrote

the note to Bob Lucas while she is at the

house and that's how it winds up out in

his trash.  Kind of strange.  Well, he didn't

even make that argument, and I hope I didn't

make it for him.

But here is -- compare this type of

paper, if you can put it together, and this

type of paper from her house.  It's exactly

the same.  You get fingerprint dust on it.

And these markings here, they attempted

to lift what was written there and they

couldn't do it.  It's the exact same, exact

same kind of paper.  It is from her apartment

and it is addressed to Bob, "Hi, Bob."  And

it is exactly the same as the letter he

got sometime in late February.

Did she write them at the same time?

Probably.  Did he take it from her house

Friday night?  Absolutely not.  He took

it sometime, I suggest, earlier in that week.

1122

And look at the rage.  You know, we
talk about motive and means and opportunity.
The person that did this had to have a motive.
And his motive is she's going to the Bahamas;
she won't answer me; she's ignoring me.
This is, this is maniacal rage.  And he
tears the letter up into 16 pieces and throws
it in his trash earlier in the week and
forgets about it.  Puts it in a newspaper,
wraps it up, forgets about it.  Never thinks
the cops are going to be there with a search
warrant, or he would have blown out the
candles.

But don't convict him on that alone.
And then the -- and I apologize because
she is here, but the -- she got a bad rating
from the defense, Liz Lewis.  Why is Liz Lewis
important?  Because she knows, Liz Lewis
knows better than anybody what's inside
Valerie Hill and what Valerie Hill and
Hector Rivas are all about.  Look at what
she told us that we know.  She knew she
kept the house neat, as did Peggy Burke.
She knew that Val and Hector were done, in

snippet

1123

in Val's mind, by the end of January of '87.
She knew that Hector Rivas tortured -- no,
"tortured" is an overstatement -- harassed,
stalked this woman every day from the time
of their breakup until the time of her death.
She knew that on March 20th Hector was at
Val's house without Val's permission.

Remember the phone calls, Hector answers
the phone. Val shows up. Her reaction?
Anger.

She knew that she, Liz Lewis, wanted
Val to go to the police and to change her
locks. Knew that Hector called her, Liz Lewis,
drunk at 1:30 a.m. the day before he killed
Valerie, and that when Liz told Valerie,
Valerie was angry.

And remember what he says to Mr. Brennan
about their relationship on Thursday, the
day before the murder. "Oh, I stopped by,
spent a half hour with her. It was great."
Just, hey, we are just kind of two ships
passing in the night, having a great time
playing the game of life. What a bunch
of crap.

1124

This woman is furious at this stalker
because he now is involving her best friend
at 1:30 in the morning, who's got kids.
Calls her up drunk, babbling, blatting
on the phone.  You don't think she mentioned
that to him on Thursday?

Knew that Hector was unaware that
Valerie was visiting Laura Adams, and that's
confirmed by Laura Adams and Peggy Burke.

Knew that Hector was acting
inappropriately Saturday night.  Gave a
totally false impression that he had
spoken to her that night; that she was home
sick.

Knew that Hector spoke of her in the
past tense Saturday night.  "I loved her
so much.  She meant so much to me."  And
the defense tells you, well, he knew the
relationship was over.  Yeah, finally, the
only way he would know the relationship
was over, he killed her.

But don't convict him because of that
alone.  Convict him because he admitted it.
When all is said and done, he tells Joe Fields.

1125

Why don't you believe Joe Fields?
Go in the jury room, let somebody stick
up their hand and put their two cents in
and say, "I don't believe Joe Fields."  Well,
somebody please look at that person and
say, "Why?  He didn't think he did it."

He's there having a drink with the
guy.  He gives him a hug.  He's slobbering
in his beer.  The guy is crying, blatting,
talking about Valerie.  Knows he had been
picked up by the police.  And right at the
time that they're talking about Valerie
and Joe gets up, and I would suggest to
you Hector thinks he's not within earshot,
"Val, Val, I didn't mean to do it."

Convict him because of all of those
things.  Not one, not two, but all of them,
because within those eight things there
are a couple dozen reasons why Hector Rivas
is guilty.

It's the night of Friday, March 27th,
1987.  Valerie Hill, with everything to look
forward to, has just come home.  She is
going to get away for the weekend, get away

1126

from the harassment, the flowers, the phone
calls and the notes, just for the weekend.
She's excited.

She goes through her brochures and
she's looking about the Bahamas. Boy, I'm
going to have fun. Maybe I'll meet somebody.

Straightens up and, I suggest to you,
she gets ready for bed. She turns on the electric
blanket. She is in her bed clothing. She's
got a heating pad out. Perhaps, perhaps
because she's having discomfort from her
period. She is on the budget. She keeps
the heat down low. And that's why she has
that electric blanket. And she's preparing
or is actually in bed. And it's after 9:00
at night.

And the defendant, while she is doing
those things, has left Coleman's and is
now on his way, not to kill Valerie, but
to do what he has done, there's no mystery
about it, what he's done for the 60 days
before March 27th. And he's got to have
a bottle of booze to go with him. So he
buys a bottle of Bacardi and gets something

1127

else.

And while Valerie is looking forward
to tomorrow, Hector is looking forward to
one more chance.  And he knocks and he comes
in and they talk, perhaps at the kitchen
table.  I suggest to you that Valerie pours --
or Hector pours a bottle of Blue Nun wine
for her, which is a bottle of some type
of alcohol, or there is a glass of some
type of alcoholic beverage still on the
kitchen counter.  Hector has his usual.
Valerie pours.  Her prints are on the bottle.

Does he notice the brochure on the
kitchen table?  He's chain-smoking.  Would
you expect the dialogue to be any different
than it had been for the previous two months?
"Val, Val, I can't live without you.  Val,
don't ever leave me.  Val, don't ever go
away.  Life is sure nice with you in it."

But now, now she commits the horrible
crime.  She stands firm.  She stands firm.
It's over.  Leave me alone.  I mean
I'm going away without you.  I'm going
to the Bahamas.  And that sets off this jealous

1128

rage in this defendant.

There's a blow struck to her head.
Maybe she was knocked out.  She's certainly
stunned by it.  There's no struggle.  She
never expected this.

She's now in the living room, or
she's dragged to the living room.  There
is a phone book propped up under her pelvis
for leverage.  He grabs the belt off
her robe and he ties it tight enough to
choke the life out of her.  And we know
the rest.

But it isn't enough.  No one leaves
Hector Rivas.  He violates her, so that
forever more that will be the last image
of Valerie Hill.

And the rage subsides and he collects
himself.  He hasn't been thinking right.
Now he's got to do a lot of things.  He
needs to get his act together.  Prints,
now there is no time to wipe them all away.
What did I touch; what didn't I touch.  Wait
a minute.  I have been here before.  That's --
I'm not worried about prints.

1129

The airline ticket, did he burn it
in the ashtray or in the fireplace because
it had -- ripped it up because it had his
prints, or did he throw it out the car window?
I don't know.  But I've got to get rid
of that airline ticket.

The book, I'll take the book.  These things
that will come in handy.  Hector doesn't
know about Laura Adams.  So I'll mention
Valerie being sick Saturday night, and the
book and the library.  I'll be out.  I'll
be seen by every human being in Cazenovia
Saturday night.

He was outside.  The coast is clear.
No one sees him leave the house.  Gets
in his car and begins to calm down.  Has
a cigarette.

Something bad happens.  Susan Stonecipher
and Jim Crimi come home.  It's a little,
it's a little after 11.  They see him.
Does he see them?  I would imagine so.  Do
they recognize -- does he know that he
was recognized?  I don't know.

Now he's got a problem.  Maybe they

1130

won't recognize me.  Maybe a jury six years

from now won't believe them.  I've got

to drive around.  I have got to be seen.

I'll go to Albert's.  Good place to go.

Saturday I will return the book, be all

over the place.Saturday night.

Sunday all is quiet.  Not going to

try to contact her.  Wait, wait, waiting.

When are they going to find the body?  Can't

go to work Monday.  I know, I have got a

sore throat.  I can't take it anymore.  I've

got to call her.  I'll ask for Peggy Burke.

"Is Peggy Burke there?

"Yeah.  Hold on."

Peggy Burke gets on the phone.

"Hi, Peg.  Where's Val?

"She's gone away for the weekend.

"Is she late?  Everything okay?

"Yeah, yeah, yeah.  Yup.

"Well, I've got a sore throat.  I've

got to go."

And the cops come.  And you know the

rest.

Folks, six years is a long time.  There's

1131

a lady up there holding a scale of justice.
Look real close at her.  She doesn't have
a calendar on her.  There ain't no time
of justice.

        As you look at the last six years,
this defendant has done whatever he's done
in that six years.  I've done a lot in that
six years.  I had three children that I
didn't have six years ago.  The Berlin Wall
has come down.  Who would have believed
that six years ago?  We have four million more
new Americans than we did six years ago.
New lives, new births, new immigrants.
People dreaming about this and that.

        The man who said "Time heals all wounds"
never met Randy or Icie Hill, because it
doesn't.

        The time -- this case is about time.
The time has come.  This woman had rights.
No one is going to argue that.  She had
the right to vote.  She had the right to
remain silent if somebody wanted to question
her.  And she had the right to be left alone,
be left alone.  She had the right to be left

1132

alone.  She had the right to live.

And if he couldn't get it through
his head, after the times that she told
him, and the notes, and the calls, why?
He didn't have to do what he did that night.

Folks, I went to law school for three
years.  And we had professors and teachers
and people that came and lectured to us.
And they tried to tell us about one thing,
something Mr. Calle doesn't think we have
in Onondaga County, and it's called justice.
It's called justice.  You can define it
any way you want.  I went through three
years of law school.  I have heard 60 different
versions of it.

Today is justice.  You are justice
in this case.  Six years is over.  The deceit
is done.

You are the killer and you're going
to pay for it.

THE COURT:  Ladies and gentlemen,
we are going to break right now and I'm
going to give you about 40 minutes to eat
your lunch.  It should be in the jury room.

1133

1    I ask you not to form any opinions

2    or to discuss the case.  I'll bring you

3    back and give you the final charge at about

4    1:30.

5         You're excused.

6         (Whereupon, a luncheon recess was

7    then taken.)

8         *                    *                    *

9    (AFTERNOON SESSION - March 25, 1993)

10        MR. CALLE:  Sorry I'm late, Judge.

11        THE COURT:  That's okay.

12        Hi, fellas.  Take your hats off.  Okay.

13        Let's do it.

14        (Whereupon, the jurors then entered

15   the courtroom.)

16        THE COURT:  Rich, can I see you a

17   minute.

18        (Whereupon, an off-the-record discussion

19   then ensued between the Court and counsel