# EXHIBIT "D-1"

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    * * * * * * * * * * * * * * * * * * * * * * * * * *

4    SIDNEY MANES, Administrator of the Estate of HECTOR
     RIVAS,

5                        Plaintiff,

6                            No. 19-CV-844(BKS)(TWD)

7    - against -

8    ONONDAGA COUNTY, CITY OF SYRACUSE, WILLIAM
     FITZPATRICK, DR. ERIK MITCHELL, AND "JOHN DOES 1-10",

9                        Defendants.

10   * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13

14

15

16

17                **EXAMINATION BEFORE TRIAL** of

18           **SIDNEY MANES,** Plaintiff, taken pursuant

19           to Notice, via videoconference by Zoom,

20           held in New York State on May 31, 2022,

21           and taken by LISA M. SCHUSTER, Court

22           Reporter and Notary Public, in and for

23           the State of New York.

24

25

```
 1

 2

 3     APPEARANCES:

 4

       For the Plaintiff:
 5

           BOUSQUET HOLSTEIN, PLLC.
 6         360 S. Clinton Street
           Syracuse, New York  13202
 7         BY:  JAMES SONNEBORN, ESQ.

 8         THE LAW OFFICES OF JOSHUA MOSKOVITZ, P.C.
           392 Central Avenue, 7803
 9         Jersey City, New Jersey 07307
           BY JOSHUA MOSKOVITZ, ESQ.
10
           SCOTT A. KORENBAUM, ESQ.
11         14 Wall Street, Suite 1603
           New York, New York  10005
12         BY:  SCOTT KORENBAUM, ESQ.

13         RICKNER, PLLC.
           14 Wall Street, Suite 1603
14         New York, New York  10005
           BY:  ROB RICKNER, ESQ.
15

16     For the Defendants William Fitzpatrick and Erik Mitchell:

17         ROBERT F. JULIAN, PC.
           2037 Genesee Street
18         Utica, New York  13501
           BY:  ROBERT JULIAN, ESQ.
19

20     For the Defendant Onondaga County:

21         ONONDAGA COUNTY DEPARTMENT OF LAW
           421 Montgomery Street
22         Syracuse, New York  13202
           BY:  MARK VENTRONE, ESQ.
23

24     LITIGRAPHICS, LLC.
           Baldwinsville, New York
25         Mark Whalen, Videographer
```

INDEX OF EXHIBITS

DEPOSITION EXHIBITS:                                              ID

A    1st Amended Complaint - 45 pgs.                  7
B    Search warrant - 4 pgs.                          7
C    Gross description of brain after               7
     fixation - 1 pg.
D    Autopsy - 2 pgs.                                 7
E    United States Cour of Appeals for              7
     the 2nd circuit - judgment - 55 pgs.
F    Calendar proceedings - 16 pgs.                   7
G    Letter dated 3/26/15 - 2 pgs.                    7
H    Notice of Motion - 9 pgs.                        7
I    Letter dated 4/20/15 - 2 pgs.                    7
J    Letter and other documents - 6 pgs.             7
K    Letter dated 5/20/15 - 1 pg.                     7
L    Attachment 7 - 6 pgs.                            7
M    Court proceeding held 8/10/15 - 11             7
     pgs.
N    Report of laboratory analysis - 3             7
     pgs.
O    Letter dated 9/2/15 and other                 7
     documents - 23 pgs.
P    Letter brief - 10/29/15 - 26 pgs.                7
Q    Letter dated 9/8/11 - 2 pgs.                     7
R    Proceedings 1/5/16 - 19 pgs.                     7
S    Status update letter 1/22/16 - 4 pg             7
T    Document - 8 pgs.                                7
U    Order - 25 pgs.                                  7
V    Letter brief - 5 pgs.                            7
W    Order - 2 pgs.                                   7
X    Report of laboratory analysis - 7             7
     pgs.
Y    Show cause hearing - 15 pgs.                     7
Z    Letter dated 4/8/16 & other                   7
     documents - 15 pgs.
AA   Answering Affirmation - 17 pgs.                  7
BB   Order - 16 pgs.                                  7
CC   Plaintiff's objections and responses          7
     to defendant Fitzpatrick
     interrogatory demands - 12 pgs.
DD   Plaintiff's objections and responses          7
     to defendant Mitchell's
     interrogatory demands - 10 pgs.
EE   Defendant Fitzpatrick & Mitchell's            7
     request for production of documents
     - 6 pgs.
FF   Plaintiff's objections and responses          7

| 1 | | to defendant's City of Syracuse 1st set of request for production of documents and interrogatories - 12 pgs. | |
| 2 | | | |
| 3 | GG | Onondaga County's Response to Plaintiff's Rule 33 interrogatories - 5 pgs. | 7 |
| 4 | HH | Onondaga County's response to Plaintiff's Rule 36 request for admission - 8 pgs. | 7 |
| 5 | | | |
| 6 | II | Letters - 15 pgs. | 7 |
| | JJ | Erik Mitchell's testimony - 56 pgs. | 7 |
| 7 | KK | Grand jury transcript - 10 pgs. | 7 |
| | LL | Onondaga County Medical examiner's office documents - 36 pgs. | 7 |
| 8 | | | |

9

10                              -oOo-

11                      INDEX OF REQUESTS

12
   SIDNEY MANES (By Mr. Julian)                          PAGE
13
      1.   Request copy of document that Mr. Manes
14         is referring to that Sullivan, Rigle or
           Sawyer made by affidavit saying Mitchell
15         was prone to revise autopsy report.
           ( This reference is on page 41 of this
16         transcript )                                  41

17      2.   Asking counsel to ask witness to try to
           be more specific in terms of identifying
18         what Mr. Manes is referring to in terms
           of the reporter and casebooks.                45
19

20

21                              -oOo-

22

23

24

25

1

2

3

4

5

6                    S T I P U L A T I O N S

7

8

9          IT IS STIPULATED by and between the attorneys

10     for the respective parties that the testimony contained

11     herein may be used upon the trial of this action; that

12     the filing of the testimony is waived; that all

13     objections, except objections as to form, are reserved

14     until the time of trial, and that objections as to form

15     shall be noted on the record; that the examining party

16     will furnish the examined party a copy of the transcript

17     of testimony free of charge and that the testimony be

18     taken before **Lisa M. Schuster**, a Shorthand Reporter and

19     Notary Public in and for the State of New York, whose

20     oath is waived.

21

22

23                         -oOo-

24

25

1              VIDEOGRAPHER:  We are on the record.

2       Today is May 31st, 2022 and the time is

3       approximately 10:31 a.m.  This is a remote

4       video deposition being conducted via on-line

5       conferencing.  The zoom meeting number is

6       89564589907.  My name is Mark Whalen, certified

7       deposition video specialist with Litigraphics,

8       LLC, 26 Sunset Terrace, Baldwinsville, New York

9       13027 and I am the videographer.

10             This is case number 19CV844 filed in US

11      District Court, Northern District of New York.

12      Caption:  Sidney Manes, Administrator of the

13      Estate of Hector Rivas against Onondaga County,

14      William Fitzpatrick, Dr. Erik Mitchell and John

15      Does 1 through 10.  The deponent is Sidney

16      Manes and this testimony has been noticed by

17      defendant.  Would counsel and all present

18      please identify themselves for the record?

19             MR. KORENBAUM:  Scott Korenbaum for Mr.

20      Manes.

21             MR. SONNEBORN:  James Sonneborn from the

22      firm Bousquet Holstein.  We are of counsel to

23      the estate for Mr. Manes.

24             MR. MANES:  And I'm Sidney Manes being

25      deposed.

```
 1              MR. MOSKOVITZ:  Joshua Moskovitz, also for

 2         the Plaintiff.

 3              MR. JULIAN:  Robert Julian for the

 4         Defendants Mitchell and Fitzpatrick.

 5              MR. VENTRONE:  Mark Ventrone for the

 6         Defendant County of Onondaga.

 7              VIDEOGRAPHER:  Thank you.  Would the court

 8         reporter please administer the oath or

 9         affirmation at this time?

10  S I D N E Y   M A N E S, Having been called as a witness

11  and being first duly sworn, testified as follows:

12  EXAMINATION BY

13  MR. JULIAN:

14              ( It is agreed and stipulated by all

15         parties that the deposition will be conducted

16         via Zoom, that the witness will be sworn in

17         remotely and that the witness will read and

18         sign the transcript )

19              ( Deposition Exhibits A through LL,

20              inclusive, premarked for Identification )

21              VIDEOGRAPHER:  Please proceed.

22     Q.  Good morning, Mr. Manes.  How are you, sir?

23     A.  Fine.  Thank you, Mr. Julian.

24     Q.  We haven't seen each other for quite a while.

25  You're looking well.
```

SIDNEY MANES by JULIAN                    8

1          A.    Thank you.

2          Q.    So I'm going to ask you some questions.  Just a

3     couple of thoughts about this.  First, if I ask you a

4     question you don't understand, just tell me and I will

5     reframe the question.  If you answer the question, I'm

6     going to assume you understood it.  Second, you need to

7     answer with words even though we are videoing this, as

8     you know, the transcript controls, and so Uh-uh and that

9     type of nonverbal expression will require a verbal

10    response.  And third, by all means any time you need to

11    take a break, please so express that, and the only thing

12    I would ask is that you -- if there's a question pending,

13    that you answer the question.  Is that acceptable to you,

14    sir?

15         A.    Yes.

16         Q.    Okay.  So let me begin with the obvious.  And

17    could you identify yourself?  What is your name and what

18    is your business address?

19         A.    My name is Sidney Manes.  I work for -- I work

20    with Bousquet Holstein, the law firm of Bousquet

21    Holstein, Pllc.  I live in Syracuse.

22         Q.    All right.  And are you an attorney licensed to

23    practice law in the State of New York?

24         A.    Yes.

25         Q.    And what, Mr. Manes, is your role with regard

SIDNEY MANES by JULIAN                9

1    to the estate of Hector Rivas?

2        A.    I was appointed as the administrator of the

3    estate by the Surrogate's Court in Onondaga County.

4        Q.    All right.  And are you presently serving in

5    that capacity?

6        A.    Yes.

7        Q.    Now prior to that, had you represented

8    Mr. Rivas?

9        A.    Yes.  As a pro -- as pro bo counsel, again in

10   documents, primarily.

11       Q.    Okay.  Well, is it your testimony that you did

12   not represent him?

13              MR. KORENBAUM:  Object to the form of the

14              question.  Mr. Manes can answer.

15       A.    He had lawyers who represented him.  I was

16   asked by Mr. Rivas to obtain documents for him that he

17   couldn't get for some reason, and I agreed that I would

18   do FOIL requests on his behalf.

19       Q.    Okay.  So let's go back to the beginning.  When

20   did you first learn about Mr. Rivas?

21       A.    I received a letter from him, I believe it was

22   in August of '92.  If you have a document in that -- I'm

23   just not sure of the date.

24       Q.    Sure.  And let's be clear.  I'm not going to

25   hold you to exact dates here.  What I'd like to do is get

1    your recollection, however.

2         A.    Correct.

3         Q.    Is that fair?

4         A.    Yeah, that's good.

5         Q.    Okay.  So sometime in the early 1990's, you

6    heard from by Mr. Rivas by letter, is that correct?

7         A.    Correct.

8         Q.    And is -- did you -- do you recall, I'm not

9    holding you to the exact contents of the letter, but do

10   you recall the sum and substance of the letter, what he

11   said to you in the letter?

12        A.    He said he was having difficulty, to the best

13   of my knowledge, with obtaining documents, and he was

14   being bent to one and, the county said no, then went to

15   the police, they didn't have it, went to the DA, they

16   didn't have it.  So he asked me as a lawyer to get him

17   FOIL requests.

18        Q.    Did you -- and what was your response to that?

19        A.    That I would.  I read his letter and I felt

20   that I would help him.

21                     ( Whereupon, Rob Rickner entered the Zoom

22            videoconference )

23        Q.    Okay.  Did you create a file on him?

24        A.    Yes, I created a file.

25        Q.    All right.  And at that time, again your best

SIDNEY MANES by JULIAN                    11

1    recollection, I'm not going to hold you exactly, were you

2    practicing law with this present law firm, Bousquet

3    Holstein, or were you with another law firm?

4         A.   No.  I was with, was it Green and Seifter?  It

5    was Green & Seifter at that time.

6         Q.   All right.  And did there come a time when that

7    firm merged with Bousquet?

8         A.   Well, Mr. Green, yes, he sold his interest in

9    the firm.  I don't know, I really wasn't party to any of

10   that.

11        Q.   Okay.  All right.  So you created a file.  And

12   as we go forward, fair to say you attempted to obtain

13   documents for him but you also appeared in court on his

14   behalf?

15             MR. KORENBAUM:  Object to the form of the

16             question.  Just from a temporal perspective,

17             but Mr. Manes can answer.

18        A.   I did not -- my first appearance in court was

19   on the 440 motion when I sat in the back of the court and

20   listened.

21        Q.   Okay.  So -- and my question was perhaps

22   confusing.  Did there come a time when you commenced

23   appearing in court as an attorney for Mr. Rivas?

24        A.   My answer would be yes, when I didn't get a

25   response to my FOIL letters, and on those occasions I

SIDNEY MANES by JULIAN                           12

1    sent them on to Mr. RIVAS who wrote me back and said he

2    didn't get everything that you asked for, and so I went

3    back to the law office or to whomever I had contacted,

4    and I was told that was it.  And so then I went to

5    William Burke, who was the county court judge, and I

6    asked him for a court order to obtain FOIL documents that

7    I felt Mr. Rivas was entitled to.

8           Q.   All right.  And is that contained in a file?

9           A.   I don't understand what you're said,

10   Mr. Julian.

11          Q.   Well, I apologize.  You said you obtained a

12   court order and had correspondence with Mr. Rivas, and

13   I'm asking you as you sit here today, do you know whether

14   that is in a file that you maintain with regard to

15   Mr. Rivas?

16          A.   I'm not -- I'm not sure --

17          Q.   All right.

18          A.   -- whether I kept that as a separate file or

19   not, I just don't remember.

20          Q.   All right.  Before testifying here today, have

21   you reviewed any file that you have with regard to

22   Mr. Rivas?

23          A.   Yes.

24          Q.   What -- can you tell me in a general sense who

25   maintains that file?

SIDNEY MANES by JULIAN                    13

1       A.   Well, what documents are you referring to?

2       Q.   I'm referring to the entirety of your file with

3   regard to Mr. Rivas.

4       A.   Yes, I think I have those, all the files in

5   regard to I think the FOIL request.  I'd have to -- I

6   don't know, Mr. Julian.

7       Q.   Okay.  Well, what can you tell me you reviewed

8   with regard to your file in preparation for your

9   testimony today?

10      A.   Well, why don't you tell me which files in

11  particular you're talking about.  There's -- I mean,

12  there's rather a large stack.

13      Q.   Well, and respectfully, sir, that's what I'm

14  trying to determine, what files you maintained and what

15  was the general contents are of that large stack and what

16  you reviewed.

17      A.   Well, I reviewed the first amended complaint

18  with all the Exhibits that were attached to it.  I

19  exhibited -- I read my testimony in the proceeding in

20  federal court before Judge Peebles.  I reviewed the

21  Interrogatories request that you had sent.  I reviewed,

22  you know, I sent all the Exhibits.  I guess that's what I

23  reviewed, primarily.

24      Q.   All right.  Have you turned your file over to

25  Plaintiff's counsel?

1         A.   To my knowledge, most of the files have been

2    turned over to counsel.

3         Q.   Well, the word -- you're a very experienced

4    lawyer.  The word "most" engenders a follow-up question.

5    Have you turned all of your files over to Plaintiff's

6    counsel, and if not, what files have you not turned over?

7         A.   That's impossible, Mr. Julian.

8         Q.   Okay.

9         A.   All of the files that were legal were turned

10   over to the counsel.

11        Q.   And did that include your notes with regard to

12   your conversations with Mr. Rivas?

13        A.   I don't understand your question.

14        Q.   Sure.  During the time that you represented

15   Mr. Rivas -- how many years did you represent him, sir,

16   let me ask you that?

17        A.   I would say I represented him from the 440

18   through the federal proceedings, that must have been

19   eighteen, twenty years.

20        Q.   Okay.

21        A.   That's in a pro bono capacity.  I was not

22   counsel.  He had lawyers.

23        Q.   Okay.  Probably a good time for you to tell me

24   what you mean by that distinction.  What does that mean?

25        A.   When I -- say it again, Mr. Julian.

SIDNEY MANES by JULIAN                    15

1        Q.   Sure, sure, sure.  And two things:  If you have

2   trouble understanding me, not only because of the

3   technology but because of me, tell me.  And second, I

4   don't ever mean to interrupt you or talk over you, so if

5   I'm doing that, tell me.  Okay?

6        A.   Okay.

7        Q.   All right.  So you have said several times you

8   were representing him, Mr. Rivas, in a pro bono capacity

9   and that he had other lawyers, and I'm just asking you to

10  explain that.  You're an experienced and accomplished

11  lawyer.  Tell me what that means to you.

12       A.   My first really interaction with any of the

13  other lawyers was when an attorney by the name of

14  Schumann brought on the 440 Motion before Judge Brunetti.

15  I just sat in the back of the court room and listened to

16  the presentation and the hearing that took place in front

17  of Judge Brunetti.

18       Q.   Okay.

19       A.   I did not participate in it, other than I sat

20  there and listened.

21       Q.   Do you remember if your appearance was noted?

22       A.   I don't know that.

23       Q.   All right.  So before the 440 Motion, did you

24  have the opportunity to speak with Mr. Rivas and take a

25  history from him?

SIDNEY MANES by JULIAN                          16

```
 1          A.   Not that I recall.

 2          Q.   Okay.  Let me try to move this along, and if

 3     this doesn't work, that's fine, I'm not suggesting it

 4     should or it shouldn't.  Did you ever sit down with

 5     Mr. Rivas and take a history of what happened to him,

 6     including, but not limited to, the events of his -- the

 7     events of Friday, the 29th, Saturday, Sunday and Monday?

 8               MR. KORENBAUM:  That calls for a yes or no

 9          answer.

10          A.   I'm not -- you'll forgive me, I'm not sure I

11     understand what you're talking about.

12          Q.   No, no, that's fine.  Let me try it a different

13     way.  Let's, if we could, go to Exhibit 1 - I'm sorry -

14     Exhibit A, and let's look at the first amended complaint.

15     That's a document that you indicated you've reviewed in

16     present for your testimony, correct?

17          A.   Yes.

18          Q.   And this complaint, the first amended

19     complaint, was brought by you as the administrator of the

20     estate of Mr. Rivas, correct?

21          A.   Would you say that again, please.

22          Q.   Sure.  You were the administrator of the estate

23     of Mr. Rivas, and you brought this lawsuit on behalf of

24     the estate, correct?

25          A.   Correct.
```

1          Q.   And you -- did you provide information with

2     regard to the allegations in the complaint?

3          A.   I would have to read to make -- I'd have to go

4     through it again.  I remember discussing a lot of the

5     items with Mr. Rivas.  I remember discussing a lot of the

6     items with Mr. Benno, his lawyer.

7          Q.   Okay.  Thank you.  Now, in terms of your

8     discussion with Mr. Rivas, did you make notes?  We

9     lawyers frequently of our vintage use yellow legal pads

10    and pens, now they use electronic things.  Did you make

11    notes with regard to your discussion with --

12         A.   Mr. Julian, I don't remember whether I did or

13    not.

14         Q.   Okay.

15         A.   It does not --

16         Q.   Mr. Manes, you trailed off.

17         A.   I don't remember doing that.

18         Q.   If you made notes, did you turn those over to

19    the Plaintiff's counsel in this case?

20              MR. KORENBAUM:  Object to the form of the

21              question.  Mr. Manes can answer.

22         A.   If I made notes, certainly I would have read

23    from those notes or sent copies to Mr. Benno.

24         Q.   Okay.  So let's just go back again.  You

25    started representing him at or around -- Mr. Rivas at or

SIDNEY MANES by JULIAN                                    18

1    around the time of the 440 motion.  What was your

2    representation of him after that, what did you do?

3         A.   After the 440?

4         Q.   Yes, sir.

5         A.   I wrote a letter to Judge Brunetti, I think

6    that's part of the Exhibit, I think, about the pictures

7    that were taken not by Mr. Mitchell, Dr. Mitchell, but by

8    Mr. Collins.  I finally obtained those on a FOIL request

9    from the county health department, and finally I was

10   given the two pictures or the pictures.  And after the

11   440 motion, on Judge Brunetti's decision, I wrote to

12   Judge Brunetti a letter, and I think that is also part of

13   the Exhibits, I don't know where it is now, but I wrote a

14   letter to Judge Brunetti about the slides - the slides -

15   the pictures that the slides represented, and he had

16   already contacted the district attorney's office and were

17   told there are no slides, they were pictures that was

18   done by Mr. Maxwell and supported by Dr. Jumbelic.  So he

19   had that and he conducted a hearing that I sort of

20   reviewed and felt that the pictures themselves was

21   grounds for a decision other than what he rendered, and

22   he wrote me back or called me on the phone, I can't

23   remember which, and he said, well, you got a gateway to

24   the habeas corpus, I'm not going to do anything further.

25   I said okay.

SIDNEY MANES by JULIAN                    19

1          Q.   So let me ask you some more sort of general

2     questions, if I may.  When you embarked upon representing

3     Mr. Rivas at or around the time of the 440 motion, did

4     you have the opportunity to review the file of the trial

5     counsel, Mr. Calle?

6          A.   You have to say that again, please.

7          Q.   Sure.  Can we agree that Mr. Calle was the

8     trial counsel?

9          A.   Yes.

10         Q.   Okay.  And did you ever see his file?

11         A.   No.

12         Q.   Did you ever ask to see his file?

13         A.   No.

14         Q.   Did you ever have any discussions with any

15    lawyers who said they saw his file?

16         A.   No.

17         Q.   Do you know Richard Priest?

18         A.   Yes.

19         Q.   Did he represent Mr. Rivas at some point?

20         A.   I was first -- I knew, at least I was informed,

21    that he took the appeal, I think, on a -- I'm not sure.

22    If you'll forgive me, I'm not sure.

23         Q.   No, that's fine.  And I'm not asking you for

24    the detail of his representation.  Do you remember yes or

25    no or I can't remember if Mr. Priest at some point

SIDNEY MANES by JULIAN                    20

1      represented Mr. Rivas?

2          A.   I remember reading that someplace or being

3      told.

4          Q.   Do you recall that there was an article about

5      you in Central New York News about you and this case in

6      which Mr. Priest said he had reviewed Mr. Calle's file?

7          A.   No, don't recall that at all unless you -- no.

8          Q.   Have you talked with anyone, either in your

9      capacity as an attorney for Mr. Rivas or in your capacity

10     as administrator of the estate, about the whereabouts of

11     Mr. Calle's file?

12         A.   No.

13         Q.   And I want to make sure we understand each

14     other.  I'm not -- in the totality of your representation

15     of Mr. Rivas, have you ever asked either Mr. Rivas or any

16     of his lawyers where Mr. Calle's file is?

17         A.   No.

18         Q.   Why not?

19         A.   I was asked to obtain documents for him under

20     FOIL request because he was not capable of getting those

21     documents himself.  That was the extent.  I did not

22     contact Mr. Calle, I did not see his file --

23         Q.   Okay.

24         A.   -- nor did I know anyone else that did.  Now,

25     you say it was in the paper.  I don't even recall seeing

1    that in the paper.

2         Q.   So what I am asking you, I want to make sure we

3    understand.  I'm not looking to get anything but your

4    completely accurate answer here.  During all of the time

5    that you represented Mr. Rivas, are you saying the nature

6    of your representation was limited to obtaining FOIL

7    documents?

8         A.   After -- no.  There was more after the 440.

9         Q.   Okay.  What do you remember about that?  What

10   did you do after the 440 in terms of the representation

11   of Mr. Rivas?

12        A.   I was -- I talked to a lawyer in the law firm

13   whose name is Kim Zimmer, and she is a -- did a lot of

14   criminal work in federal court, to my knowledge.  And

15   after I was suggested by Judge Brunetti to do a habeas

16   corpus, I was not a criminal lawyer, I went to Kim Zimmer

17   in the office and she explained what that was.  And I

18   asked whether or not she would take on Mr. Rivas and

19   follow through with the habeas corpus because I had no

20   idea what the hell to do, and she said yes.

21        Q.   Okay.  At that point did you speak with Ms.

22   Zimmer about the status of Mr. Calle's file?

23        A.   No.

24        Q.   Okay.  And so that we're clear, to your

25   recollection, you have never talked with any lawyer or

SIDNEY MANES by JULIAN                    22

1    any other person about where Mr. Calle's file is?

2         A.   No -- or yes.  I guess the answer is yes, I

3    didn't speak to anyone.

4         Q.   And it goes without saying; therefore, that you

5    have never seen anything that purports to be Mr. Calle's

6    file?

7         A.   Yes.  How do you answer that, yes or no?

8         Q.   Okay.

9         A.   I did not see Mr. Calle's file at any time that

10   I can recall in all of the years that I have been

11   involved with Mr. Rivas.

12        Q.   Okay.  And has any lawyer told you that they

13   have seen Mr. Calle's file?

14        A.   Not to my knowledge.

15        Q.   So Mr. Calle testified, didn't he, before Judge

16   Brunetti, or was it --

17        A.   Yes.

18        Q.   And did anyone ask him for his file at that

19   time?

20        A.   Not that I remember.

21        Q.   And when I talk about his file, we understand

22   that this would be all of the records, notes and

23   documents that he would have with regard to his

24   preparation for the trial and the trial of Mr. Rivas,

25   correct?

SIDNEY MANES by JULIAN                23

1        A.    Correct.

2                MR. JULIAN:  Okay.

3                MR. KORENBAUM:  Mr. Julian, you're

4        referring to Mr. Calle's notes, files,

5        etcetera, correct?

6                MR. JULIAN:  Yes.  Did I say something

7        else?

8                MR. KORENBAUM:  I just wanted to be clear.

9        Thank you.

10                MR. JULIAN:  Yes.  Thank you.

11        Q.    So how many times would you say you personally

12    met with Mr. Rivas?

13        A.    I would say twenty times.

14        Q.    Okay.  And do you remember writing things down

15    when you met with him?

16        A.    Could you repeat that, please?

17        Q.    Sure.  Did you write anything down when you met

18    with him as to what he said to you and what you said to

19    him?

20        A.    I don't remember doing that, Mr. Julian.

21        Q.    Okay.  Did you speak with Mr. Rivas about the

22    facts in this case?

23        A.    I believe that was part of our discussion, but

24    I can only tell you from my recollection.

25        Q.    Okay.  Did you ask Mr. Rivas about the events

1    of Friday, March 27th, 1987?

2        A.    That was discussed, Mr. Julian, I assume.

3        Q.    Okay.  Did you ask Mr. Rivas what his movements

4    were, where he was on the evening of that date?

5        A.    I don't recall that.

6        Q.    Did you ask Mr. Rivas during any of your

7    meetings if he had an explanation for where he was

8    between 11 o'clock p.m. that evening and 2:30 the

9    following morning?

10        A.    I recall our discussing it, but I didn't make

11    any notes that I recall.  He felt that he had, at least

12    this my remembrance, he had an alibi and he was

13    absolutely was not -- he had an alibi for the time.

14        Q.    Do you know what it was?

15        A.    He talked about Coleman's Restaurant, he talked

16    about the liquor store, just in general, you know.

17        Q.    Did he say he was at the liquor store?

18        A.    No, just that -- he was not at the liquor store

19    that was reflected in the trial.

20        Q.    Okay.  You're familiar with the testimony at

21    the trial that there was testimony that he was seen

22    parked in front of Ms. Hill's apartment at or around 11

23    p.m. on that date, the 27th.  Did you ask him about that,

24    did you ask him if he was there in front of her

25    apartment?

SIDNEY MANES by JULIAN                    25

```
 1         A.   I was not --
 2              MR. KORENBAUM:  Hold on.  I'm going to
 3         object to  the form of the question, but
 4         Mr. Manes can answer.
 5         A.   I was not a party to the trial in any, way,
 6    shape or form.
 7         Q.   Okay.
 8         A.   And I didn't testify as to it that I recall.
 9    My information about Mr. Rivas was that he had been, that
10    -- that he had an alibi, and that he discussed Saturday
11    night and how often he stopped, but I was not at the
12    trial, I did not hear his testimony.
13         Q.   Well, you did read the trial transcript, didn't
14    you?
15         A.   Oh, sure.  Absolutely.
16         Q.   Okay.  So --
17         A.   That I remember.
18         Q.   And in the trial transcript, was there
19    testimony from witnesses saying they saw him in front of
20    Ms. Hill's apartment at 11 o'clock at night --
21              MR. KORENBAUM:  Object to the form of the
22         question.  Mr. Manes can answer.
23         Q.   -- on March 27th?
24         A.   Mr. Julian, I remember reading the testimony,
25    but if you're asking me to pinpoint whether I heard that
```

1       or not, I can't answer that.

2            Q.   Would you be kind enough to assume that.  Did

3       you ask Mr. Rivas was he sitting in front of her

4       apartment smoking a cigarette at or around 11 p.m. on

5       March 27th, 1987?

6            A.   I never asked that question.

7            Q.   Did you ask Mr. Rivas if he retained a key to

8       her apartment?

9            A.   I never asked that question, though I remember

10      that he had the key and that in the search warrant, which

11      said when the murder occurred, they found the key in

12      Hector's apartment, that's what I remember.

13           Q.   Okay.  Did you ask -- I don't mean to speak

14      over you.  I apologize.  Please keep speaking.

15           A.   All right.

16           Q.   There's a little bit of a delay.  So, again,

17      just tell me to shut up if I'm speaking over you.  Okay?

18      I do not intent to interrupt you.

19                Did you ask him, Mr. Rivas, to describe to you

20      the nature of his relationship with Ms. Hill?

21           A.   His relationship with whom?

22           Q.   The -- Valerie Hill.

23           A.   I don't recall asking him that question.

24           Q.   Did you ask him if he was asked by her to cease

25      contact with him?

SIDNEY MANES by JULIAN                    27

1        A.   I don't remember asking that question.

2        Q.   Did you ask him if he told one of his friends

3   that Valerie Hill was not well enough to come to a party

4   on March 29th?

5        A.   I didn't ask him that question.

6        Q.   Okay.  Did you ask him if he ever said in the

7   company of another person, "Valerie, Valerie, I didn't

8   mean to do it"?

9        A.   No.

10       Q.   So did you ask him if he had erected a shrine

11  to her in his house?

12       A.   I'm sorry.  Would you repeat that?

13       Q.   Absolutely.

14            MR. KORENBAUM:  Mr. Julian, your voice is

15            trailing off a little bit.

16            MR. JULIAN:  Okay.  I apologize.  I'll try

17            -- thank you.  Just tell me --

18            MR. KORENBAUM:  That's better.

19            MR. JULIAN:  Good.

20       Q.   Okay.  Did you ask him if he had erected a

21  shrine of some type to Valerie Hill in his house?

22       A.   I'm sorry.  You'll have to forgive me.  I

23  didn't understand your question.

24       Q.   You're totally forgiven and let me try again.

25  Did you ask Mr. Rivas if he had a photo of Valerie Hill,

SIDNEY MANES by JULIAN                    28

1   a photograph, in his house?

2       A.    No.

3       Q.    So have you told me all you remember about his

4   alibi for the Friday, March 27th, 1987?

5               MR. KORENBAUM:  I'm going to object to the

6               form of the question.

7       Q.    Do you remember anything else about it that you

8   haven't told us?

9               MR. KORENBAUM:  Objection.  Mr. Manes can

10              answer.

11      A.    Mr. Julian, I am going to be 96 years of age

12  and this has been -- you know, we talked a lot, but what

13  you're asking me specific questions, I do not recall.

14      Q.    All right.

15      A.    We talked a lot.

16      Q.    As you sit here, you understand that a factual

17  claim in the case is that Mr. Rivas could not account for

18  a period of time from approximately 11 o'clock on

19  March 27th, 1987 through 2 o'clock and that that is the

20  window in which the prosecution alleges the murder

21  occurred, you understand that?

22      A.    Yes.

23              MR. KORENBAUM:  I object to the form of

24              the question.  Mr. Manes can answer.

25      A.    Yes, I understand that.

SIDNEY MANES by JULIAN                              29

```
 1          Q.    And so in your conversations with Mr. Rivas,

 2     did you discuss with him what he was doing during that

 3     time period?

 4          A.    Yes, it was discussed between me and Mr. Rivas.

 5          Q.    What did you --

 6          A.    He said it just wasn't true, absolutely was not

 7     true, he did not kill Valerie Hill.

 8          Q.    Did he tell you what he was doing during that

 9     time period?

10          A.    The best that I remember, he was having

11     breakfast at Coleman's and/or Albert's in Cazenovia.

12     That was about the extent of it.  I'm not -- it was

13     fabricated.

14          Q.    In terms of the information that you gathered

15     for the preparation of the complaint, I'd just like to

16     ask you questions about certain individuals to see if

17     you've ever talked with them about this case.  May I do

18     that?

19          A.    Certainly.  It's your right.

20          Q.    Okay.  Did you ever speak with William

21     Fitzpatrick about this case?

22          A.    No.

23          Q.    Did you ever speak with Erik Mitchell about

24     this case?

25          A.    No.
```

SIDNEY MANES by JULIAN                    30

```
 1        Q.    Did you ever speak with David A. Rigle about

 2   this case?

 3        A.    Not that I remember.

 4        Q.    And I don't mean this the way it sounds.  Do

 5   you remember who Dr. Rigle is?

 6        A.    Yeah.  Yes.

 7        Q.    He worked for the medical examiners office, you

 8   remember that?

 9        A.    Yes.

10        Q.    Okay.

11        A.    Yes.

12        Q.    Did you ever speak with a Dr. Sawyer about this

13   case?

14        A.    I don't recall talking to Mr. Sawyer,

15   Dr. Sawyer.

16        Q.    Did you ever speak with Mr. Calle about this

17   case?

18        A.    No.

19        Q.    Did you ever speak with any of the witnesses

20   who testified at the trial about this case?

21                   MR. KORENBAUM:  Objection to the form of

22             the question.  Mr. Manes can answer.

23        A.    What's the question, did I ever talk to

24   witnesses?

25        Q.    Yes.
```

SIDNEY MANES by JULIAN                                31

1      A.   No.

2      Q.   Did you ever speak with Rob Moran about this

3   cases, he's an assistant district attorney?

4      A.   Yes.

5      Q.   You did speak with him?

6      A.   I was in the court room with Mr. Klein on a

7   number of occasions when we were before the court, and I

8   stood there with him and Hector was there and I talked to

9   Moran, said good morning or good afternoon, whatever it

10  was, but that's about the extent of it.  He was

11  represented by Mr. Klein, and Mr. Klein asked him the

12  questions, not me.

13     Q.   Okay.  Did you ever speak with anyone from the

14  New York State Attorney General's Office about this case?

15     A.   I talked to the attorney from the attorney

16  general's office who was handling the habeas corpus

17  proceeding.  I answered her questions, I testified in

18  that case, but that was the extent of it.  We didn't go

19  off in the corner and talk.

20     Q.   Okay.  Was that Patricia Stuart?  I spoke over

21  you, I apologize.

22     A.   Yes, Patricia Stuart.

23     Q.   Thank you.  Have you brought other lawsuits on

24  behalf -- civil lawsuits on behalf of Mr. Rivas or his

25  estate other than this lawsuit?

SIDNEY MANES by JULIAN                    32

1          A.   Yes.

2          Q.   Tell me, please, what lawsuits you have

3    brought.

4          A.   Just one in regard to his treatment at Upstate.

5          Q.   Was that a medical malpractice case?

6          A.   You'd have to tell me.  I'm not sure whether it

7    was or whether it was negligence or malpractice, I just

8    am not sure.

9          Q.   Okay.  Was money collected?

10         A.   Yes.

11         Q.   Do you recall how much?

12         A.   I believe it was $25,000.

13         Q.   All right.  Did you bring any proceeding

14    against the state on behalf of Mr. Rivas in the court of

15    claims other than that case?

16         A.   I don't understand your question.

17         Q.   Sure.  Do you remember a decision by a Judge

18    Sise, a court of claims judge?

19         A.   I'm sorry, I don't remember that.

20         Q.   Okay.  Do you remember bringing in a proceeding

21    pursuant to Section 8 of court of claims act on behalf of

22    Mr. Rivas on the theory that he had a claim because he

23    was actually innocent?

24         A.   Sorry, I don't recall that.  That wasn't --

25              MR. KORENBAUM:  Mr. Julian, we've been

SIDNEY MANES by JULIAN                33

```
 1              going almost an hour.  Why don't you get into a
 2              good stopping point and then we'll take a short
 3              break, if that's okay with you.
 4                   MR. JULIAN:  Any point is a good stopping
 5              point.  I'm mindful of the situation and I'll
 6              do whatever you need.
 7                   MR. KORENBAUM:  Why don't you go for
 8              another five minutes and then we'll see.
 9                   MR. JULIAN:  Sure.  Okay.  All right,
10              Judge, you got it.
11         Q.   So you just don't remember that case?
12         A.   Well, it was handled by Michelle Rudderow.  I
13    did not handle it, it was not handled by my office.
14         Q.   Okay.
15         A.   So I do remember talking with her, but that's,
16    you know, she handled this case.
17         Q.   All right.  Do you remember a court of claims
18    case that you participated in with perhaps Mr. Benno or
19    Benno or however you - and I don't say this
20    disrespectfully - I'm not sure how to pronounce his name,
21    do you remember that at all, sir?
22         A.   No.
23         Q.   Okay.  Not a problem.
24         A.   No, I don't, Mr. Julian.
25         Q.   What I'd like to do now is start to review the
```

SIDNEY MANES by JULIAN                          34

1    complaint, the first amended complaint, and this is a

2    document that was prepared at your request?

3         A.   Yes.

4         Q.   And did you provide information with regard to

5    the complaint?

6         A.   Yes.

7         Q.   And let's take a look at paragraph 29 of the

8    complaint, if we could, please.  And please take a moment

9    to read it, take all the time you need, and tell me when

10   you're ready.

11              MR. KORENBAUM:  You just want him to

12              review paragraph 29?

13              MR. JULIAN:  At the moment, yes.

14        A.   I've reviewed it.

15        Q.   All right.  And we're going to look at parts of

16   this complaint, so the pattern will be I'll ask you to

17   read it, and then you'll tell me when you're ready to

18   talk about it?  Okay?

19              So this paragraph provides that the facts in

20   the case are either based on your personal knowledge or

21   upon information and belief, correct?

22        A.   That's what it says.

23        Q.   And information and belief, what does that mean

24   to you?

25        A.   Well, it's what I remember and what we have

```
 1    been able to surmise from the information that has been

 2    provided over the course of time.

 3          Q.  All right.  Does information and belief, as

 4    it's used in a pleading of this type, mean that you don't

 5    have actual knowledge but you are inferring it?

 6                MR. KORENBAUM:  Objection to the form of

 7                the question.  Mr. Manes can answer.

 8    A.    Yes.

 9                MR. JULIAN:  Okay.  And do you want to

10                take a break now before we get into the

11                complaint?

12                MR. KORENBAUM:  That's a good idea.  Five

13                minutes?

14                MR. JULIAN:  Five minutes.  Whenever

15                you're ready.

16                VIDEOGRAPHER:  We're off the record at

17                approximately 11:30 a.m.

18                ( Whereupon, a recess was taken )

19                VIDEOGRAPHER:  We're back on record at

20                approximately 11:44 a.m.

21          Q.  So Mr. Manes, we were in the process of looking

22    at the complaint, and what I'd like to do is look at

23    certain paragraphs of the complaint and ask you the basis

24    -- the factual basis for the claims made.  All right?

25          A.  Yep.
```

1          Q.   So if we could go to page 11 of the complaint

2    entitled, "reviving the cold case"?

3          A.   I have it.

4          Q.   You have it?

5          A.   Yes.

6          Q.   And I would like to go to paragraph 63.  And

7    feel free when I say I'm going to a paragraph, if you

8    want to read anything above it, around it or anything

9    else, by all means tell me and you can do so.  All right?

10         A.   Yes.

11         Q.   Paragraph 63 states, "Rivas' alibi was

12   uncorroborated and incomplete for a three and a half hour

13   window between approximately 9 p.m. on Friday,

14   March 27th, 1987 and 12:30 a.m. on Saturday, March 28th,

15   1987," is that your factual understanding?

16         A.   No.

17         Q.   What is your factual understanding with regard

18   to Rivas' alibi?

19         A.   As I remember, he himself corroborated where he

20   was.  He was at Albert's -- he was at Albert's and then

21   he went to Coleman's, and then he went back to Albert's

22   and he -- that's my best recollection.

23         Q.   Did he give you the names of any people who

24   could corroborate where he was between 9 p.m. on Friday,

25   March 27th, 1987 and 12:30 a.m. on Saturday, March 28th?

SIDNEY MANES by JULIAN                37

```
 1        A.    I'm sorry.  Would you just say the beginning
 2   again?
 3        Q.    Sure.  Did he give you the names of any people
 4   who could corroborate where he was between 9 p.m. and
 5   12:30 a.m. on March 27th, 1987 and March 28th, 1987?
 6        A.    Only the facts of where he went and where he
 7   was on Friday evening.
 8        Q.    So apart from what Mr. Rivas told you, is
 9   paragraph 63 correct that there was no corroboration of
10   what he told you?
11               MR. KORENBAUM:  Objection to the form of
12               the question.  Mr. Manes can answer.
13        A.    I didn't investigate this.  I hired counsel,
14   that's the best I can tell you.  I don't know of any
15   corroboration, I have no idea.
16        Q.    When you say you hired counsel, who did you
17   hire?
18        A.    I hired Benno.
19        Q.    Okay.  But you read this complaint before it
20   was filed, correct?
21        A.    I did, yeah.
22        Q.    And did you suggest any changes, additions or
23   corrections to the complaint?
24        A.    Not that I recall.
25        Q.    Are you saying that paragraph 63 is inaccurate?
```

SIDNEY MANES by JULIAN                    38

1        A.   No.

2        Q.   I'm sorry?

3        A.   No, I don't think it's inaccurate.

4        Q.   All right.

5        A.   I don't know what it is.  It's just a

6    statement.

7        Q.   Okay.  Paragraph 64, The prosecution -- "The

8    prosecution had no reasonable or probable cause to

9    believe that Rivas had anything to do with the murder and

10   sexual assault of Hill - and therefore, no case against

11   him for those crimes - unless it could prove that Hill

12   died on Friday night, March 27th, 1987," is that

13   paragraph accurate?

14            MR. KORENBAUM:  Objection to the form of

15            the question, but Mr. Manes can answer it.

16       A.   Yes.

17       Q.   Is it factually correct?

18       A.   Say it again.

19       Q.   Is it factually correct?

20            MR. KORENBAUM:  Object to the form of the

21            question.  You're asking for his belief as to

22            whether that's correct or not?

23            MR. JULIAN:  I'm -- he has -- this

24            complaint provides that he has knowledge,

25            unless there is the allegation of information

SIDNEY MANES by JULIAN                    39

1              and belief, this is not on information and

2              belief.

3                   MR. KORENBAUM:  Object to the form of the

4              question, but Mr. Manes can answer.

5         A.   I think it says what it says very clearly.

6         Q.   So given this allegation, when you interviewed

7    Mr. Rivas, may I ask why you didn't ask him if he was

8    sitting out in front of her apartment at or around 11

9    p.m. on that evening?

10                  MR. KORENBAUM:  Object to the form of the

11             question, but Mr. Manes can answer it.

12        A.   I didn't ask him.

13        Q.   Why didn't you?

14        A.   I believed Mr. Rivas when he told me that he

15   did not kill Valerie Hill.

16        Q.   All right.

17        A.   And that he had a perfect alibi for Saturday

18   night, which is when the medical examiner allegedly said

19   she died on Saturday night or Sunday morning.

20        Q.   Okay.  We'll get to that, but you also knew

21   that there were witnesses who saw -- who claim they saw

22   him at or around 11 o'clock at night in front of her

23   house, correct, on Friday night?

24                  MR. KORENBAUM:  Objection to the form of

25             the question, but Mr. Manes can answer it.

1        A.    I don't know how he got those witnesses.

2        Q.    Thank you.  But my question, Mr. Manes, is

3    simply why didn't you ask Mr. Rivas about that?

4        A.    I believed him.  I believed he was innocent.

5        Q.    Okay.  Now paragraph 65, "Shortly after

6    becoming district attorney" -- I'm reading a quote.

7    "Shortly after becoming district attorney, Fitzpatrick

8    approached Mitchell, the medical examiner, and requested

9    that he revise Hill's autopsy report to expand the time

10   of death" -- I'm sorry.  I need to begin again.  I

11   apologize, a technical glitch.

12            "Shortly after becoming district attorney,

13   Fitzpatrick approached Mitchell, the medical examiner,

14   and requested that he revise Hill's autopsy report to

15   expand the time of death to include Friday, March 27th,

16   1987 when Rivas' alibi was not as strong."  Do you see

17   that paragraph?

18       A.    Yes, I remember the paragraph.

19       Q.    And what is your basis for this paragraph?

20       A.    Newspaper articles by Sawyer, by Rigle, by

21   Sullivan all reflecting his cooperation and his

22   commitment to the district attorney's office.  I remember

23   reading in one of those statements that Mr. Mitchell

24   never met or it was in a newspaper article he never met a

25   criminal he couldn't convict on the evidence, it was in

SIDNEY MANES by JULIAN                41

1    one of the newspaper articles.

2         Q.   So are you saying that there are newspaper

3    articles that say what is in paragraph 65, "That shortly

4    after becoming district attorney, Fitzpatrick approached

5    Mitchell, the medical examiner and requested he revise

6    Hill's autopsy report to expand the time of death to

7    include Friday, March 27th, 1987," are you saying that's

8    in a newspaper article?

9         A.   I remember it was either a statement that

10   either Sullivan, Rigle or Sawyer made, and they did it by

11   an Affidavit, which I'm sure you have access to, where he

12   says very clearly that, at least as I remember, that

13   Mr. Mitchell was prone to do that, if necessary.

14             MR. JULIAN:  Well first of all, I would

15             ask that this document be identified, not now,

16             but I make a demand for a copy of it.  And

17             second, I'd like to reframe my question.

18             MR. KORENBAUM:  Mr. Julian, just with

19             respect to your first statement, we'll take it

20             under advisement.  I believe you have it, but

21             we'll check.

22             MR. JULIAN:  Sure.  Well, I have about

23             18,000 pages of documents and so do you.  So if

24             you can just direct me to what he's

25             referencing, I would appreciate it, and I will

Lisa M. Schuster, CR      (315) 571-5838      lschuster@twcny.rr.com

SIDNEY MANES by JULIAN                    42

```
1              provide the same courtesy to you.  Okay?

2              MR. KORENBAUM:  Sure.  We'll take it under

3              advisement.

4        Q.   Okay.  All right.  So Mr. Manes, do you have

5   any information that William Fitzpatrick went to

6   Dr. Mitchell and said, I want you to change the Hill

7   autopsy report, do you have anything that supports that

8   specific conversation?

9              MR. KORENBAUM:  Object to the form of the

10             question, but Mr. Manes can answer it.

11       A.   I will repeat, I read the documentation of

12   Sawyer, Sullivan and Bengle - Rigle, excuse me - and it

13   was -- plus -- well, there's also the case history that

14   was recorded, it sets an outline of the case, and I read

15   it there, as well.  So if you'll forgive me, Mr. Julian,

16   the documentation is all there.  You show me the document

17   and I'll try to pick it out for you.

18       Q.   So it's your testimony that you learned that

19   Fitzpatrick approached Mitchell and asked him to revise

20   specifically the Hill report from a document?

21             MR. KORENBAUM:  Object to the form of the

22             question, but Mr. Manes can answer it.

23       A.   Can you repeat that, please?

24             MR. JULIAN:  I'm going to ask the court

25             reporter to read back.
```

```
 1                    THE WITNESS:  Okay.

 2                    ( The requested material was read )

 3                    MR. KORENBAUM:  You noted my objection.

 4                    COURT REPORTER:  I did.

 5          A.   Yes.

 6          Q.   And --

 7          A.   Yes.

 8          Q.   You answered yes.  What document?

 9          A.   The Affidavits by Sawyer, Sullivan and Mengle,

10     they all gave Affidavits.  And then there is also the

11     case history that -- I don't know how you describe -- I'm

12     trying to think how you describe it, but it's where the

13     court reporter reports everything in the case and it's

14     available for everyone to see, and it was a full

15     explanation on where all that information came from, and

16     that's where I read and it's where I thought I saw it.

17          Q.   You were not present for any discussion between

18     Mitchell and Fitzpatrick, correct?

19          A.   Not to my knowledge, no.

20          Q.   Do you know of anyone else who was present for

21     this discussion that you can identify?

22          A.   No.

23          Q.   And you're not saying that either Sullivan or

24     Rigle or --

25          A.   Sawyer.
```

SIDNEY MANES by JULIAN                    44

1          Q.   -- Sawyer were present for such a discussion

2     between Fitzpatrick and Mitchell, are you?

3          A.   All I can tell you is they all gave Affidavits.

4          Q.   Okay.  And is it your recollection that their

5     Affidavits said that Fitzpatrick -- "Fitzpatrick

6     approached Mitchell, the medical examiner, and requested

7     he revise Hill's autopsy report to expand the time of

8     death," are you saying that that's in their Affidavits?

9          A.   I don't recall that specifically.  I do recall

10    that it being discussed that Fitzpatrick came and met

11    with Mitchell.

12         Q.   Okay.

13         A.   You're gonna -- that's the best I can do for

14    you, Mr. Julian.

15         Q.   Well, if that was not said specifically in

16    their affidavits, what is your basis for this allegation

17    against the district attorney and the medical examiner?

18         A.   If those affidavits don't do it, newspaper

19    articles did it, the case history that is recorded in the

20    reporter did it.  But I read all of those things and

21    remember that they were able to quote and there were

22    quotes in the reports.

23         Q.   They were able to quote a conversation between

24    Fitzpatrick and Mitchell, is that your testimony?

25         A.   As I recall, they were able to do that, plus

1   the reporter that was recorded in our case books, that

2   was a full explanation.

3       Q.   So --

4       A.   And I think there were quotes in that.

5       Q.   I apologize.  You dropped off, sir.

6       A.   All right.  I'm sorry.  There were quotes in

7   the reporter.

8       Q.   And I say this with -- I'm not sure what you're

9   referring to in terms of the reporter and casebooks, I'm

10  just not sure what you're referring to.

11          MR. JULIAN:  Could you -- at some point I

12          would ask counsel to ask the witness to try to

13          be more specific in terms of identifying it so

14          that we know what he's referring to.

15      A.   Okay.

16          MR. KORENBAUM:  We'll take it under

17          advisement.

18      Q.   Paragraph 66, "At this time this request was

19  made, Mitchell was under criminal investigation by

20  Fitzpatrick's office, as well as by the department of

21  health and the department of environmental conservation

22  for varieties of misconduct, including improper disposal

23  of waste and stealing and mishandling of body parts," do

24  you see that?

25      A.   Yep.

SIDNEY MANES by JULIAN                    46

1        Q.   Now, it starts with the words "at this time, at

2    the time this request was made," do you see that?

3        A.   Yes.

4        Q.   Can you tell me in terms of paragraph 65, at

5    what time this request was made, can you give me a date?

6              MR. KORENBAUM:  Object to the form of the

7              question, but Mr. Manes can answer.

8        A.   This came out of the hearing with the

9    department of health, to my knowledge, that was reflected

10   in the newspapers, as well as in other documents.

11   Mr. Fitzpatrick participated in that.  The department of

12   environmental conservation had issued a number of

13   citations, that came out of the newspapers and other

14   documents.

15             The fact that the department of health was also

16   involved and was -- had been informed by members of the

17   medical examiner's group of what was going on in regard

18   to the medical examiner's office and the administration

19   of it, and to my knowledge, listening and hearing

20   conversation of there was a mentor who was appointed to

21   oversee the medical examiner.

22       Q.   What I'm trying to --

23       A.   All of that --

24       Q.   I'm sorry.  Please go on.

25       A.   Well, that's it.

SIDNEY MANES by JULIAN                    47

1          Q.   What I'm trying to discern from you is the time

2     in which Fitzpatrick approached Mitchell to change his

3     report so that I can understand the claim in number 66.

4     Can you give me a time in which Fitzpatrick approached

5     Mitchell pursuant to paragraph 65 of the complaint, yes

6     or no?

7          A.   I can't be specific with the time.

8          Q.   Paragraph 67, "Fitzpatrick promised Mitchell

9     that if Mitchell revised and expanded Hill's time of

10    death to include Friday, March 27th, 1987, that

11    Fitzpatrick would make the investigations into Mitchell's

12    conduct go away."  What is your basis for that?

13         A.   Sidney Cominsky's statement in the newspapers.

14         Q.   What did Sidney Cominsky say?

15         A.   Or another source, don't remember where.  I

16    read it in one of the documents or the newspapers or the

17    Affidavits, on Mr. Cominsky met, according to the

18    document, met with Fitzpatrick, that's my best

19    recollection and judgment.

20         Q.   Well, are you saying that Mr. Cominsky met with

21    Fitzpatrick and they had a discussion about revising

22    Hill's time of death, and that if they did so, then the

23    investigation into Mitchell's conduct would go away, is

24    that what you're saying?

25         A.   My best recollection is that was a discussion

1    between Sidney Cominsky and Fitzpatrick that appeared

2    either in the newspaper, which is where I think it did

3    appear, and it's reflected in the newspaper and it

4    certainly is reflected in the court reporter that was --

5    yeah.

6        Q.   When you say the court reporter, can -- you're

7    welcome to -- do you want to take a break and talk to the

8    lawyers and see if we can just identify what you're

9    talking about?

10               MR. KORENBAUM:  Sure.  Why don't we do

11               that.

12               MR. JULIAN:  Okay.  Thank you.

13               VIDEOGRAPHER:  This is the end of media

14               one.  We're off the record at approximately

15               12:11 p.m.

16               ( Whereupon, a recess was taken )

17               VIDEOGRAPHER:  This marks the beginning of

18               media unit number two, the testimony of Sidney

19               Manes.  We're back on record at approximately

20               12:19 p.m.  Please proceed.

21               MR. KORENBAUM:  Mr. Julian, we had an off

22               the record discussion where I offered to

23               elaborate on what Mr. Manes meant when he used

24               the term case reporter, correct?

25               MR. JULIAN:  Yes.

SIDNEY MANES by JULIAN                49

1          MR. KORENBAUM:  And it's okay for me to

2      inform you what he meant?

3          MR. JULIAN:  Yes.

4          MR. KORENBAUM:  He was referring to either

5      the second or third of the second circuit

6      decision addressing the grant of habeas corpus

7      relief or the request for, the petition and the

8      ultimate grant of the request.  You can ask,

9      I'm representing he doesn't remember if it was

10     the second or third decision, but you can ask.

11     Mr. Manes would also like to supplement one of

12     his answers in response to questions that you

13     asked.

14         MR. JULIAN:  Yes.  If he could identify

15     generically what question it is he's

16     supplementing, that would be helpful, but

17     that's fine.

18         MR. KORENBAUM:  Well, Mr. Manes, with

19     respect to the questions regarding the

20     expansion of the time of death, Mr. Julian

21     asked you to identify documents, and I

22     understand you want to supplement your answer.

23         THE WITNESS:  Yes.  One of the documents

24     was the Affidavit of the police who obtained a

25     warrant, and it spells out clearly that the

1           time of death was Saturday night or Sunday

2           morning, and that was the basis upon which they

3           obtained the warrant.  It was very clear.  So I

4           really, when I spent time talking with Hector,

5           we had that warrant and that helped me clearly

6           identify the time of death.

7                MR. JULIAN:  Okay.  Thank you.

8                MR. KORENBAUM:  Thank you, Mr. Julian.

9                MR. JULIAN:  Yes.  How, just in terms of

10          the timetable, how, counsel, would you like to

11          organize this going forward?  I'm mindful of

12          Mr. Mane's health and well-being and everyone

13          else's.  Do we want to take a break?  Do we

14          anticipate going all day?  What is our

15          pleasure?

16                MR. KORENBAUM:  I don't think we can go

17          all day, I don't think that's realistic to ask

18          of Mr. Manes.

19                MR. JULIAN:  Well, I agree.  And I'm not

20          -- please understand I'm asking -- this is not

21          adversarial from this perspective.  I will do

22          whatever you want to do.

23                MR. KORENBAUM:  So let's see the hour,

24          which brings us to about 12:44, and let's see

25          -- I was thinking somewhere between three and

SIDNEY MANES by JULIAN                          51

1              four hours, but let's see how Mr. Manes is

2              doing.  So why don't we go to about -- when I

3              say the hour, we started after our first break

4              at 11:44, we've had breaks otherwise, but when

5              you get to a good stopping point around quarter

6              to one, we'll reassess.

7              MR. JULIAN:  You and your client our in

8              charge of that and you'll tell me.  Okay?

9              MR. KORENBAUM:  Thank you.

10             MR. JULIAN:  You're welcome.

11      Q.   Mr. Manes, we were looking at paragraph 67.

12   And do you have the name of any person or persons other

13   than Mitchell and Fitzpatrick who were present and heard

14   Fitzpatrick promise Mitchell that if Mitchell expanded

15   the time, Fitzpatrick would make the investigations into

16   Mitchell's conduct go away, do you have any person or

17   persons who were there and heard that?

18             MR. KORENBAUM:  Object to the form of the

19             question, but Mr. Manes can answer.  I believe

20             that was asked and answered, but he can answer.

21      A.   I was not there, but I read in the newspaper

22   and in the court's decision that Sidney Cominsky was

23   Mitchell's lawyer and made the arrangements with

24   Fitzpatrick.

25      Q.   Did you ever discuss this with Sidney Cominsky?

SIDNEY MANES by JULIAN                    52

1     A.   No.

2     Q.   Do you know of any one who has?

3     A.   No idea.

4     Q.   So you believe that Sidney Cominsky was present

5  when Fitzpatrick promised Mitchell that if he had revised

6  and expanded Hill's time of death, that Fitzpatrick would

7  make the investigations go away?

8     A.   Yes.

9          MR. KORENBAUM:  Objection to the form of

10         the question, but Mr. Manes can and has

11         answered it.

12    A.   Yes, and it did go away.

13    Q.   Anyone else apart from Mr. Cominsky?

14    A.   Not to my knowledge.

15    Q.   All right.  Paragraph 69.  Before we get to

16 that, I'd like you, if you would, to look at Exhibit B

17 and Exhibit D, and when you're ready to discuss them,

18 just let me know.

19         MR. KORENBAUM:  Mr. Julian, can you just

20         describe Exhibit D, how many pages it is?

21         MR. JULIAN:  Of course.  Of course, yes.

22         So Exhibit B, as I understand it, is page 8885,

23         Plaintiff's 8885 to page 8888.

24         MR. KORENBAUM:  Okay.  Thank you.

25         MR. JULIAN:  And Exhibit D, we might as

```
 1                    well do both, is Plaintiff's 8910.  Tell me

 2                    when you're ready, please.

 3                         THE WITNESS:  B is the warrant, yep.

 4                         MR. JULIAN:  So we can hear you.  And if

 5                    you want to be off the record, that's fine.

 6                         THE WITNESS:  Oh, no.  And the other one

 7                    is --

 8                         MR. KORENBAUM:  We're going to go off the

 9                    record for just a few minutes.

10                         MR. JULIAN:  Yeah, that's fine.

11                         ( Discussion off the record )

12           Q.   Mr. Manes, you've now looked at Exhibit B and

13     Exhibit D, correct?

14           A.   Yes.

15           Q.   Now, do you have an understanding as to what

16     Exhibit B is?

17                         MR. KORENBAUM:  B or D?

18                         MR. JULIAN:  I'm sorry.  B, as in boy.

19                         MR. KORENBAUM:  B.

20           A.   Yes.

21           Q.   What is it?

22           A.   It's an application for a search warrant.

23           Q.   Fine.  And is this -- did you reference this

24     previously in your testimony as a basis for your belief

25     that Ms. Hill died on either Saturday or Sunday?
```

```
 1        A.   I'm sorry.  Start that again, please, Mr.

 2   Julian.

 3        Q.   No problem.  No problem.  Did you in your

 4   earlier testimony reference this Exhibit as a basis for

 5   your belief that Ms. Hill died on either Saturday or

 6   Sunday?

 7        A.   Yes.

 8        Q.   And is this Exhibit a basis for your belief

 9   that Dr. Mitchell changed his estimation as to the time

10   of death?

11             MR. KORENBAUM:  Objection to the form of

12             the question, but Mr. Manes can answer.

13        A.   Yes.

14        Q.   And specifically does page P8888, the last page

15   say, "That the Onondaga County Medical Examiners Office,

16   Dr. Mitchell's preliminary estimate on the time of death

17   of the victim, Valerie Hill, was sometime Saturday, the

18   28th of March afternoon, and Sunday morning, the 29th of

19   March 198," and the year is obscured, do you see that?

20        A.   Yes.

21        Q.   Okay.

22        A.   Yes.

23        Q.   And this is an Affidavit signed by Timothy H.

24   Phinney, P-h-i-n-n-e-y, is that correct?

25        A.   Yes.
```

SIDNEY MANES by JULIAN                    55

1        Q.   This is not an Affidavit that was signed by

2   Dr. Mitchell, agreed?

3        A.   Yes, this is not signed by Dr. Mitchell.

4        Q.   And do you have any knowledge as to whether or

5   not this Affidavit was shown to Dr. Mitchell before it

6   was utilized to be presented to a county court judge?

7        A.   No.

8        Q.   I would like now to refer you to Exhibit D, as

9   in dog, page 8910.  This is a page from the medical

10  examiner's autopsy report, correct?

11       A.   Correct.

12       Q.   And I'd like to direct you to the top of the

13  page where it says, exam slash date.  Does it state

14  3/30/87?

15       A.   Yes.

16       Q.   And then below under, in the left-hand corner,

17  narrative medical history, is a typewritten, "Decedent

18  was found prone in her residence by father and brother.

19  Found prone with a piece of blue material around the

20  neck.  Last seen Friday by the father.  Appears as though

21  decedent was there approximately two to three days," do

22  you see that?

23       A.   Yep.

24       Q.   And do you have an understanding as to who

25  dictated or typed that?

SIDNEY MANES by JULIAN                    56

```
 1          A.   I see where somebody with the name of EKM

 2     prosect, that's got to be Erik K. Mitchell, and he was

 3     assisted -- it was assisted by NSB slash TJ.

 4          Q.   Okay.

 5          A.   So I'm assuming that this was a document that

 6     was performed or utilized or made by Erik Mitchell.

 7          Q.   So if Erik Mitchell wrote or caused it to be

 8     written the words "appear as though decedent was there

 9     two to three days," that is inconsistent with what

10     Mr. Phinney said, correct?

11          A.   No, I don't think so.

12          Q.   And if Dr. Mitchell said, decedent -- "appears

13     as though decedent was there approximately two to

14     three days," the third day would be Friday, correct?

15          A.   No.

16          Q.   No?

17          A.   Three days would be, I believe, Monday, Sunday

18     and Saturday.

19          Q.   Okay.  If she was found on Monday, 24 hours to

20     Sunday, 24 hours to Saturday, 24 hours to Friday, isn't

21     that three days?

22          A.   It doesn't say that.

23          Q.   It says approximately two to three days,

24     correct?

25          A.   That's correct.
```

1      Q.   And so if Dr. Mitchell were to testify that the

2   two to three days constituted her being present as

3   deceased from Friday to Saturday, Saturday to Sunday, and

4   Sunday to Monday, would you accept that?

5      A.   No.

6      Q.   Why not?

7      A.   Because I think he makes it clear on that his

8   autopsy was based upon full rigor, and full rigor starts

9   to dissipate after 24 to 36 hours or 42 hours, I don't

10  believe that was the case.  He made it clear that the far

11  exception was Friday night to make sure that he included

12  time when Rivas was not available or that he didn't have

13  an alibi.

14     Q.   I'm sorry.  I didn't mean to speak over you.

15  He was including Friday night in this report.

16     A.   In what report?

17     Q.   The Exhibit D.

18     A.   I don't believe -- well, that's your

19  interpretation, Mr. Julian.  I don't believe that's what

20  he -- I don't think it's --

21     Q.   If she died on Friday --

22     A.   If she what?

23     Q.   If she died Friday night, let's say at

24  11 o'clock.  11 o'clock Friday to 11 o'clock Saturday

25  night, one day; 11 o'clock Saturday night to 11 o'clock

SIDNEY MANES by JULIAN                    58

1      Sunday night, two days; 11 o'clock Sunday night to

2      11 o'clock Monday night, three days, fair?

3              A.    Let's do it my way.  The first day was Monday,

4      the second day was Saturday, the third day was Saturday.

5              Q.    Well, isn't the question of time of death and

6      the approximate time of death the appropriate time to

7      start counting the days?

8              A.    He made it very clear that she was in full

9      vigor -- full rigor.

10             Q.    I understand you have pathological differences

11     in terms of his interpretation, but isn't your case based

12     on the fact that you think he changed his opinion with

13     regard to the number of days she could have been dead?

14                     MR. KORENBAUM:  Can you repeat your

15                     question, which I'm going to object to?

16             A.    I'm sorry.  I beg your pardon, Mr. Julian.

17             Q.    No, no.  That's okay.  Well, aren't you

18     claiming that Mitchell changed his opinion as to the

19     period of time that she was dead?

20                     MR. KORENBAUM:  Object to the form of the

21                     question.  Mr. Manes can answer it.

22             A.    Yes.

23             Q.    And doesn't this record indicate that he

24     believed she had been dead for two to three days from

25     Friday evening?

 1                    MR. KORENBAUM:  Objection to the form of

 2               the question.  Asked and answered repeatedly.

 3          A.    You're missing out on Cyril Wecht,

 4     pathologist --

 5          Q.    Okay.

 6          A.    -- to couple with what he said.

 7          Q.    Yes.  Cryil Wecht is a pathologist, and he and

 8     Dr. Mitchell disagree in terms of their opinions,

 9     correct?

10          A.    It's not a matter of disagreement.  It's a

11     matter of pathologists.

12          Q.    I see.  So if she was deceased as of Friday

13     evening as referenced in this Exhibit D, then

14     Dr. Mitchell would not have to change his opinion as to

15     the duration of her time of death to time of discovery,

16     correct?

17                    MR. KORENBAUM:  Objection to the form of

18               the question.

19                    THE WITNESS:  I can answer it?

20                    MR. KORENBAUM:  Yes.

21          A.    I hear you, Mr. Julian, but I take into account

22     Erik Mitchell's findings based his decision or Mitchell

23     did on a couple of things, not just what you're saying.

24     There was also the rigor, full rigor.  There was also the

25     decomposition of the pictures of the brain, which were

1    impossible, that is very clear.  You can only stretch

2    this so far, and you'll forgive me, but I disagree with

3    you and so did the courts.

4              MR. KORENBAUM:  Mr. Julian, finish up this

5              line of questioning and let's take that break.

6              MR. JULIAN:  You had your hand over your

7              mouth.  I couldn't hear you.

8              MR. KORENBAUM:  I'm sorry.  Why don't you

9              finish up your line of questioning and let's

10             take that break we discussed earlier.

11             MR. JULIAN:  Let's take that break.

12             MR. KORENBAUM:  Okay.

13             VIDEOGRAPHER:  We're off record at

14             approximately 12:47 p.m.

15             ( Whereupon, a recess was taken )

16             VIDEOGRAPHER:  We're back on the record at

17             approximately 1:52 p.m.  Please proceed.

18             MR. KORENBAUM:  This is Scott Korenbaum.

19             Mr. Julian and I had a brief discussion just

20             moments before.  We're going to go for an

21             additional hour today, that's about all that

22             Mr. Manes -- that's good for Mr. Manes.  It's

23             getting late in the day.  Also, we reserve the

24             right for Mr. Manes or Mr. Manes reserves the

25             right to review the transcript of his

```
 1                  deposition testimony.
 2                       MR. SONNEBORN:  We agreed it's going to be
 3                  read and sign.
 4                       MR. KORENBAUM:  Right.
 5                       MR. JULIAN:  I didn't -- I think I know
 6                  what you said, but I didn't pick it up.  What
 7                  did you just say?
 8                       MR. KORENBAUM:  Just that he reserves the
 9                  right to review his testimony and make any
10                  changes if he wanted to due to Rule 30.
11                       MR. JULIAN:  Yep.  All right.
12        Q.    Mr. Manes, good afternoon.
13        A.    Good afternoon, Mr. Julian.
14        Q.    I'd like to ask you to go back to paragraph 65,
15   please, of the Exhibit A, the complaint, and once you've
16   reread that, let me know.
17        A.    I've read it.
18        Q.    All right.  Did this conversation, to your
19   knowledge, occur before the presentation to the grand
20   juror or after?
21        A.    I think before.
22        Q.    Okay.  And what's your basis for that?
23        A.    My basis for -- I read his testimony,
24   Mitchell's testimony at the grand jury, and he said
25   specifically that he had changed on put the time of death
```

SIDNEY MANES by JULIAN                    62

1    farther out because of his notes and because of slides.

2        Q.   Okay.  I sent this morning, and we have it in

3    various places, Exhibit KK, which is Mitchell's grand

4    jury testimony.

5                MR. JULIAN:  Could you put it up, because

6                they may not have it on paper?

7        A.   KK?

8        Q.   KK.  Do you have it?  Okay.

9        A.   I got it.

10       Q.   Where - can you direct me to where it says that

11   he based his - Mitchell based his testimony on slides?

12       A.   I don't see it in this testimony.

13       Q.   Okay.

14       A.   But it is in the testimony of the trial.

15       Q.   All right.

16       A.   That's where I think it was.

17       Q.   Well, what I'm asking you, though, is was this

18   discussion -- I asked you if this discussion in terms of

19   extending out the time of the death to Friday, as you

20   claim in paragraph 65, if that occurred before the grand

21   jury testimony, did it?

22       A.   That was my best recollection, but it might not

23   have been.  You got to show me the testimony of the

24   trial.

25       Q.   Well, first I want to -- I want -- I need to

SIDNEY MANES by JULIAN                           63

1     know what is the basis of your recollection that the

2     discussion to extend out the time of death between

3     Fitzpatrick and Mitchell occurred before the grand jury?

4                     MR. KORENBAUM:  Objection to the form of

5                the question.  Mr. Manes can answer.

6          A.   My only recollection is that he said it and

7     that it was part of the testimony.  I assumed, maybe

8     wrongly, that it was in the -- but it was at the grand

9     jury, but it may -- I read it, there's no question, in

10    the testimony that he made, I think that was probably at

11    the trial.

12         Q.   So his testimony at the grand jury was not;

13    therefore, based upon Fitzpatrick approaching Mitchell

14    and offering him a deal?

15         A.   I don't know that.

16         Q.   Okay.  So you don't know one way or the other?

17                    MR. KORENBAUM:  Objection to the form of

18               the question.

19         A.   Yeah.  Okay.

20         Q.   Then do you have, looking at paragraph 66, are

21    you alleging that Mitchell was under investigation by the

22    department of health and the department of environmental

23    conservation, as well as Fitzpatrick, at the time of his

24    grand jury testimony?

25         A.   I don't know.

SIDNEY MANES by JULIAN                    64

1          Q.   Mitchell -- excuse me just one second.

2                    MR. KORENBAYM:  List to the question.

3                    THE WITNESS:  What question?

4                    MR. KORENBAUM:  Listen to the questions

5               that are being asked of you.

6          Q.   You state that, going now to number 75 --

7     strike that.

8                    Paragraph 73, will you look at it, please?

9     Tell me when you're ready.

10         A.   Yep.

11         Q.   This paragraph states, "At Fitzpatrick's

12    direction, Mitchell perpetuated the lie Hill's time of

13    death included Friday, March 27th, 1987, and falsely

14    testified to that in the grand jury in or about November

15    of 1992," do you see that?

16         A.   Yep.

17         Q.   What is your basis for saying that Fitzpatrick

18    directed Mitchell to testify falsely in November of 1992?

19                    MR. KORENBAUM:  Object to the form of the

20               question.  You can answer.

21                    THE WITNESS:  Oh, I can answer it?

22                    MR. KORENBAUM:  Yes.

23         A.   I certainly remember reading someplace in one

24    of the testimony that was given by Mitchell that he said

25    under oath, I believe now it was the jury trial, that he

```
 1    was able to extent the time based upon his notes and

 2    slides.

 3         Q.   Okay.  But this is a complaint that was

 4    prepared at your direction as the administrator of the

 5    estate, correct?

 6         A.   Correct.

 7         Q.   And you, as the administrator of the estate,

 8    said that you were alleging making allegations based on

 9    fact except where it was upon information and belief,

10    correct?

11         A.   I said that somewhere?

12         Q.   Well, didn't we go over it, isn't it in

13    paragraph 29?

14         A.   Yeah.  That was a long way back.

15         Q.   Say that again.  Paragraph 29, isn't that what

16    paragraph 29 of the complaint says?

17                   MR. KORENBAUM:  Objection to the form of

18              the question.  You can answer it.

19         Q.   Well, does paragraph 29 say that the facts

20    stated in this complaint are based on the personal

21    knowledge of you, the Plaintiff?

22         A.   And upon information and belief.

23         Q.   Yes.  But the paragraph we're looking at,

24    paragraph 73, does not say upon information and belief,

25    does it?
```

SIDNEY MANES by JULIAN                    66

1          A.   Well, that one doesn't, but the factual
2     background does.
3          Q.   Could you explain?  I apologize.  Could you
4     explain what you mean by the factual background does?
5          A.   That's what's stated -- the facts that are
6     stated in this complaint are based on the personal
7     knowledge of the Plaintiff and upon information and
8     belief.
9          Q.   Well, there are specific paragraphs where upon
10    information and belief is alleged, such as paragraph 77,
11    correct?
12              MR. KORENBAUM:  Objection to the form of
13              the question.  Mr. Manes can answer.
14         A.   77?
15         Q.   Paragraph 77, yes, sir.
16         A.   Yeah.  Well, that was my belief until I found
17    out otherwise.
18         Q.   But my point is some paragraphs say upon
19    information and belief.
20              MR. KORENBAUM:  Mr. Julian, question,
21              don't editorialize, please.
22              MR. JULIAN:  Well, I think I'm allowed to
23              ask the question before you interrupt.
24         Q.   Upon information and belief is a term of art,
25    correct?

SIDNEY MANES by JULIAN                    67

1          A.   Yes.

2          Q.   And that term of art reflects uncertainty as to

3    the facts, correct?

4          A.   I'm sorry.  Rephrase that.  Will you say it

5    again, please?

6          Q.   No.  Rather, let me do it this way.  You define

7    upon information and belief as you understand it.

8          A.   On information I've read or I've obtained or

9    I've seen, that's information.  And it's my belief that

10   these were statements that were made by Dr. Mitchell.  If

11   they weren't made at the grand jury, they were made

12   certainly in his testimony in the trial.

13         Q.   But in paragraph 73, you state not on

14   information and belief, but as a -- the complaint states

15   as a flat out fact that:  "At Fitzpatrick's direction,

16   Mitchell perpetuated the lie Hill's time of death

17   included Friday, March 27th, 1987 and that he falsely

18   testified to that in the grand jury in or about November

19   of 1992."  How did you know that?

20                    MR. KORENBAUM:  Objection to the form of

21              the question.

22         A.   Well, when you read -- I guess section 72 gave

23   me some authority to presume that that's what happened.

24         Q.   You said paragraph 72?

25         A.   Yes.

SIDNEY MANES by JULIAN                          68

1        Q.   So paragraph 72 is your basis for what you said

2   in the complaint in paragraph 73?

3        A.   Yes.

4             MR. KORENBAUM:  Objection to the form of

5             the question.  Mr. Manes can answer.

6        A.   It says, "According to the plan, once Mitchell

7   provided Fitzpatrick with the revised time of death,

8   Fitzpatrick took affirmative steps to have Rivas arrested

9   and formally charged with Hill's murder and assault."  So

10  I can only assume that that took place at the grand jury,

11  but it wasn't, I don't think, unless I don't have all the

12  minutes.

13       Q.   So what I'm trying to understand, and let me

14  ask it this way, you are alleging that Mitchell and

15  Fitzpatrick had a conversation in which they cut a deal,

16  correct?

17       A.   Correct.

18       Q.   When did that happen?

19             MR. KORENBAUM:  Objection to the form of

20             the question.  Mr. Manes can answer.

21       A.   I don't know the exact date, but I do know it

22  happened.

23       Q.   The exact date escapes you because --

24             MR. KORENBAUM:  Objection to the form of

25             the question.

Lisa M. Schuster, CR       (315) 571-5838      lschuster@twcny.rr.com

1      Q.    Why don't you know the exact date?

2      A.    Why don't I know?

3            MR. KORENBAUM:  Sidney, wait for me to

4      object.

5            THE WITNESS:  Oh, I did.

6            MR. KORENBAUM:  Objection to the form of

7      the question.

8            THE WITNESS:  I did.

9            MR. KORENBAUM:  You can answer it now.

10     Q.    Would you like me to ask the question again?

11     A.    Ask your question again.

12     Q.    Sure.  You got it.  Can you explain why you are

13     unaware of the exact date given the specificity of the

14     allegation?

15           MR. KORENBAUM:  Objection to the form of

16     the question.

17     A.    I was not present when the statement was made

18     by and the relationship that was made between Mitchell,

19     Fitzpatrick and Sidney Cominsky.

20     Q.    So it's you testimony that Sidney Cominsky

21     participated in this discussion before the grand jury

22     testimony in 1992?

23           MR. KORENBAUM:  Objection to the form of

24     the question.  I believe, Mr. Julian, he may

25     have confused your question, but --

SIDNEY MANES by JULIAN                    70

```
 1                   MR. JULIAN:  I do that a lot, but let me

 2             try it again.

 3        Q.   Are you saying that Sidney Cominsky,

 4   Dr. Mitchell and district attorney Fitzpatrick made this

 5   deal, cut this deal before Mitchell testified to the

 6   grand jury in November of 1992?

 7                   MR. KORENBAUM:  Objection to the form of

 8             the question.

 9        A.   I don't know.

10        Q.   So paragraph 74 -- you have Exhibit KK in front

11   of you.  Can you direct me, please, to the testimony in

12   Exhibit KK that you are referencing when the complaint

13   states, "Mitchell presented fabricated and false

14   testimony and suppressed and concealed the truth in an

15   effort to secure Hector Rivas' prosecution indictment and

16   conviction at all costs," can you direct me to that part

17   of the Exhibit?

18        A.   "Question:  Tell the grand jury what your

19   duties are as medical examiner.  Answer:  I'm responsible

20   for the investigation of those deaths within my

21   jurisdiction where there's a belief that a non-natural

22   event may have played a role or where there is no

23   physician available in good conscience who can sign the

24   death certificate."  Dr. Mitchell has control, he's the

25   one who does the autopsy, he's the one who determines the
```

1    time of death.

2         Q.   So my question is what part of this testimony

3    to the grand jury is fabricated and false, can you direct

4    me to those questions and answers that are fabricated and

5    false?

6              MR. KORENBAUM:  Objection to the form of

7              the question.  Mr. Manes can answer.

8         A.   Well, I really can't answer it, but you know,

9    they say a district attorney can indict a corned beef

10   sandwich.

11        Q.   I actually think it was ham sandwich, and it

12   was --

13        A.   Oh, a ham sandwich.

14        Q.   -- Judge Wachtler who said that, but that's

15   really -- my question to you is can you direct me to

16   those parts of the Exhibit KK that are fabricated and

17   false testimony, please?

18             MR. KORENBAUM:  Sidney, do you understand

19             the question?

20        A.   I understand the question, but it says clearly

21   that she had gone into rigor, that she had gone into

22   livor.  It was starting -- there was fecal -- yeah, I

23   think there's enough information here for the district

24   attorney to have created a scene for the grand jury,

25   that's how they do it, to indict Mr. Rivas and not

SIDNEY MANES by JULIAN                          72

1    necessarily tell us when the death occurred, just that it

2    did.

3        Q.   Well, what I -- I'm trying to understand the

4    factual basis for the allegation that Mitchell presented

5    fabricated and false testimony to the grand jury, can you

6    direct me to any questions and answers that support that

7    allegation?

8        A.   The testimony of Dr. Mitchell.

9        Q.   What part of it?

10       A.   There's enough information there for a district

11   attorney to use to convince the grand jury to indict.

12       Q.   What answers were fabricated and false?

13       A.   I don't know.  I have no idea.  I was not

14   there.  I have no idea.  It says it clearly, upon

15   examination at the death.

16       Q.   Paragraph 75 says, "Fitzpatrick and Mitchell"

17   deliberate -- and Does 1 through 10 deliberately withheld

18   from the grand jury the fact that Mitchell had previously

19   determined that Hill's homicide had occurred at the

20   absolute earliest in the afternoon of Saturday,

21   March 28th, 1987," do you see that?

22       A.   Yes.

23       Q.   Can you direct me to any document, written or

24   signed by Dr. Erik Mitchell, that said that Hill's

25   homicide had occurred at the absolute earliest in the

SIDNEY MANES by JULIAN                73

1       afternoon of Saturday, March 28th, 1987?

2                   MR. KORENBAUM:  Signed by Dr. Mitchell, is

3               that the question?

4                   MR. JULIAN:  Yes.

5       A.   I had no idea what documents were submitted to

6       the medical examiner by Mr. Fitzpatrick.

7                   MR. KORENBAUM:  That's not the question.

8               That's not the question.  The question is --

9               well, repeat the question, Mr. Julian.

10                  MR. JULIAN:  Go ahead.  You're welcome --

11                  MR. SONNEBORN:  Before you do that, Bob,

12              can we take about a three-minute break for me?

13                  MR. JULIAN:  Yeah, sure.  Absolutely.

14              Whatever you need.

15                  VIDEOGRAPHER:  We're off the record at

16              2:23 p.m.

17                  ( Whereupon, a recess was taken )

18                  VIDEOGRAPHER:  We're back on record at

19              approximately 2:30 p.m.  Please proceed.

20                  MR. KORENBAUM:  I just informed -- this is

21              Scott Korenbaum.  I just informed Mr. Julian

22              that -- no one who's not in this conference

23              room has the benefit of seeing what we're

24              seeing, which is that Mr. Manes is exhausted

25              and given his advanced age, we believe it

SIDNEY MANES by JULIAN                                            74

1           prudent for everybody involved to end the

2           deposition now.  I suggested to Mr. Julian, and

3           I think he was most gracious enough to agree

4           that moving forward, we should continue -- when

5           we continue Mr. Manes' deposition, it should be

6           in two-hour bites starting in the morning.  I

7           just think that's wisest for everybody

8           involved, and in particular from a selfish

9           perspective, Mr. Manes himself.

10              MR. JULIAN:  I agree.  No problem.

11          Whatever -- whatever it takes to complete the

12          deposition and accord Mr. Manes the appropriate

13          courtesies.

14              MR. VENTRONE:  I agree to that.  Mark

15          Ventrone.

16              MR. JULIAN:  Do we want to try to

17          reschedule it now or do you want to --

18              MR. VENTRONE:  I might need a little time.

19          I'm between here and a private practice, so I

20          probably need to go, Bob, back to my office.

21              MR. JULIAN:  Okay.

22              MR. VENTRONE:  And I'll be able to see my

23          schedule over the next week or so.

24              MR. KORENBAUM:  May I suggest that,

25          Mr. Ventrone, you provide either all of us at

SIDNEY MANES by JULIAN                      75

1              the same time or you provide Bob with your

2              availability and then we can work around that.

3                   MR. JULIAN:  Yes.  I have a -- I don't how

4              soon you plan on doing it.  I do start a jury

5              trial two weeks from today that will go a

6              theoretical two weeks, so --

7                   VIDEOGRAPHER:  I was going to say,

8              counsel, may we go off the record, please?

9                   MR. JULIAN:  Yeah, off the record.

10                   VIDEOGRAPHER:  After hearing approval,

11              this concludes the testimony of Mr. Manes.

12              We're off the record May 31st, 2020 at

13              approximately 2:32 p.m.

14                   ( Whereupon, the examination concluded )

15                              -oOo-

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    CERTIFICATE OF WITNESS
 3
 4          I, SIDNEY MANES, hereby certify that I have
 5     read the foregoing transcript of my deposition taken on
 6     May 31, 2022, at approximately 10:30 a.m., in New York
 7     State pursuant to the applicable Rules of Civil Procedure
 8     and that the foregoing 73 pages of the transcript are in
 9     conformity with my testimony given by me, under oath, and
10     at the time and place indicated herein, (with the
11     exception of any corrections made by me on the errata
12     sheet).
13
14                    _____
15                         SIDNEY MANES
16
17          SUBSCRIBED AND SWORN to before me, the undersigned
18     authority on this the _____ day of _____, 2022.
19
20
21     _____
22          NOTARY PUBLIC
23
24     My commission expires _____ day of
25     _____, 20_____.
```

```
 1
 2                        REPORTER'S CERTIFICATE
 3
 4           I, LISA M. SCHUSTER, a Shorthand Reporter and
 5   Notary Public in and for the State of New York, DO HEREBY
 6   CERTIFY;
 7           that the foregoing proceedings were taken via
 8   videoconference at the time and place therein set forth,
 9   at which time the witness was put under oath by me;
10           that the testimony of the witness and all
11   objections made at the time of the examination were
12   recorded stenographically by me and were thereafter
13   transcribed;
14           that the foregoing is a true and accurate
15   transcript of my stenographic notes in the above-entitled
16   matter.
17           I further certify that I am not a relative or
18   employee of any attorney or of any of the parties, nor
19   financially interested in the action.
20
21   Dated:  June 24, 2022
22
23                    _____
24                         Lisa M. Schuster
25
```