EXHIBIT "D-2"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
********************************************************
SIDNEY MANES, ADMINISTRATOR OF THE ESTATE
OF HECTOR RIVAS,

                                    Plaintiff,

vs.                          No.: 19-CV-844 (BKS) (TWD)

ONONDAGA COUNTY; CITY OF SYRACUSE;
WILLIAM FITZPATRICK; DR. ERIK MITCHELL;
AND "JOHN DOES 1-10",

                                    Defendants.
********************************************************


        Transcript of the Videotaped Examination

    Before Trial of SIDNEY MANES, a Witness called

    for the purpose of discovery, taken on August 22,

    2022, by Zoom Video Conference, taken before

    Angela S. Stangel, Court Reporter and Notary

    Public, pursuant to Notice.




                    **ANGELA S. STANGEL**
                      **Court Reporter**
                 **10455 Webster Hill Road**
                 **Boonville, New York 13309**
                      **(315) 827-4010**

```
 1                    A P P E A R A N C E S

 2    For Plaintiff:

 3         RICKNER, PLLC
      BY:  ROB RICKNER, ESQ.
 4         14 Wall Street, Suite 1603
           New York, New York  10005
 5
           BOUSQUET HOLSTEIN, PLLC
 6    BY:  JAMES SONNEBORN, ESQ.
           360 S. Clinton Street
 7         Syracuse, New York  13202

 8         THE LAW OFFICES OF JOSHUA MOSKOVITZ, P.C.
      BY:  JOSHUA MOSKOVITZ, ESQ.
 9         392 Central Avenue, 7803
           Jersey City, New Jersey  07303
10

11

12    For Defendants Fitzpatrick and Mitchell:

13         ROBERT F. JULIAN, PC
      BY:  ROBERT F. JULIAN, ESQ.
14         2037 Genesee Street
           Utica, New York  13501
15

16    For Defendant Onondaga County:

17         ONONDAGA COUNTY DEPARTMENT OF LAW
      BY:  MARK VENTRONE, ESQ.
18         421 Montgomery Street
           Syracuse, New York  13202
19

20    VIDEOGRAPHER:  TIM POTTER, PARROTTA STUDIO

21

22

23

24

25
```

3

```
 1                S T I P U L A T I O N S

 2

 3                     IT IS HEREBY STIPULATED AND AGREED

 4   that the transcript may be signed before any Notary

 5   Public with the same force and effect as if signed

 6   before a clerk or Judge of the Court; and it is

 7

 8                     FURTHER STIPULATED AND AGREED that

 9   this deposition may be utilized for all purposes as

10   provided by the Federal Rules of Civil Procedure; and

11   it is

12

13                     FURTHER STIPULATED AND AGREED that

14   all rights provided to all parties by the Federal Rules

15   of Civil Procedure shall not be deemed waived and the

16   appropriate sections of the Federal Rules of Civil

17   Procedure shall be controlling with respect thereto.

18

19      *************************************

20

21

22

23

24

25
```

4

1               **I N D E X   O F   W I T N E S S**

2

3          **WITNESS**                                    **PAGE**

4   SIDNEY MANES

5          By Mr. Julian                                    6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    VIDEOGRAPHER POTTER:  We are on the
 2              record at 2:06 p.m.  Today is Monday,
 3              August 22, 2022.  I am Tim Potter of
 4              Parrotta Studio located at 350 Merchants
 5              Road, Rochester, New York.  We
 6              conducting this deposition via video
 7              conference.  We are about to begin the
 8              video recorded deposition of Sidney L.
 9              Manes in the matter of Sidney Manes,
10              Administrator of the Estate of Hector
11              Rivas, plaintiff, v Onondaga County,
12              City of Syracuse, William Fitzpatrick,
13              Doctor Erik Mitchell, and John Does 1
14              through 10, defendants.  In attendance
15              is the court reporter Angela Stangel of
16              Boonville, New York.  At this time the
17              attorneys will identify themselves and
18              the parties they represent, after which
19              our court reporter will swear in the
20              witness and we may proceed.
21                    MR. RICKNER:  Rob Rickner, Rickner,
22              PLLC for plaintiff as administrator,
23              Sidney Manes.
24                    MR. MOSKOVITZ:  Josh Moskovitz,
25              also for the plaintiff.
```

1                    MR. SONNEBORN:  James Sonneborn of

2               the Law Firm Bousquet Holstein for

3               Mr. Manes, as I am of counsel to the

4               firm as general counsel to the estate,

5               not counsel for the litigation.

6                    MR. JULIAN:  Bob Julian for the

7               defendants Fitzpatrick and Mitchell.

8                    MR. VENTRONE:  Mark Ventrone for

9               the defendant  County of Onondaga.

10                   SIDNEY L. MANES, having been

11     called as a Witness, being first duly sworn, was

12     examined and testified as follows under oath:

13     SIDNEY L. MANES BY MR. JULIAN:

14         Q.    Good afternoon, Mr. Manes.  Before

15     commencing this deposition today, did you have an

16     opportunity to review your previous deposition?

17         A.    No.

18         Q.    You haven't read the deposition that you

19     gave on May 31, 2022?

20         A.    Yes, I think I do, yeah.

21         Q.    My question is have you read it before

22     coming here --

23         A.    No.

24         Q.    -- to testify today?

25         A.    No.  I am sorry to say, Mr. Julian, I

SIDNEY L. MANES BY MR. JULIAN

1   did not.

2       Q.   Okay.  At that deposition we left off

3   asking some questions about paragraph 75 of

4   Exhibit A.  Could you go now to page 13?

5               MR. RICKNER:  Can you identify

6               Exhibit A for the record.

7               MR. JULIAN:  Exhibit A is the First

8               Amended Complaint.

9       A.   I am reading it, yes.

10              MR. RICKNER:  I believe it's being

11              partially cut off by the video window,

12              so if you could move it over what on

13              your screen would be roughly an inch

14              because I think we might be losing words

15              on the right side.

16              (Whereupon, a discussion was held

17              off the record.)

18              MR. RICKNER:  Now we can see all

19              the words.

20  BY MR. JULIAN:

21      Q.   Mr. Manes, if you look at paragraph 74

22  it states "to the Grand Jury, Mitchell presented

23  fabricated and false testimony and suppressed and

24  concealed the truth in an effort to secure Hector

25  Rivas' prosecution, indictment, and conviction at

8

SIDNEY L. MANES BY MR. JULIAN

1   all costs."  Do you see that?

2        A.    Yes, I do.

3        Q.    What is your basis for making that

4   allegation?

5              MR. RICKNER:  Objection as to form.

6              You can answer.

7        A.    As I recall, I read some of the

8   testimony from the Grand Jury, and in that

9   testimony, there was a reference to by

10  Doctor Mitchell that he had read his notes and

11  slides.  And that those slides were subsequently,

12  as I recall, in the document, I think,

13  Fitzpatrick used those words the slides to

14  present to the Grand Jury, which indicted Hector

15  Rivas.  And there were subsequent documents, I

16  think it might be referenced in here, but I don't

17  see at all, that those slides never existed.

18              MR. JULIAN:  Tim, could you pull up

19          KK, please?

20              (Whereupon, a discussion was held

21              off the record.)

22              MR. RICKNER:  Can you please

23          identify KK for the record?

24              MR. JULIAN:  I will.

25

9

SIDNEY L. MANES BY MR. JULIAN

1    BY MR. JULIAN:

2        Q.    This, Mr. Manes, is a copy of

3    Doctor Mitchell's Grand Jury testimony.  I ask

4    you to look at it, review it, and direct me to

5    where Doctor Mitchell mentioned slides or

6    discussed slides or testified about slides to the

7    Grand Jury?

8        A.    I need to read the whole document,

9    please.

10        Q.    Sure.

11                    (Whereupon, a discussion was held

12                    off the record.)

13    BY MR. JULIAN:

14        Q.    Let me know when you completed your

15    reading?

16        A.    There is no more pages.  I have

17    completed my reading.

18        Q.    Doctor Mitchell testified before the

19    Grand Jury.  Did you see anywhere in his

20    testimony where he mentioned slides?

21        A.    No, did not.

22                    MR. JULIAN:  Can we go back to

23                    Exhibit A, Tim, page 13, please?

24                    (Whereupon, a discussion was held

25                    off the record.)

10

SIDNEY L. MANES BY MR. JULIAN

1    BY MR. JULIAN:

2        Q.    Mr. Manes, you said in paragraph 75 that

3    Fitzpatrick and Mitchell deliberately withheld

4    from the Grand Jury the fact that Mitchell had

5    previously determined that Hill's homicide had

6    occurred at the absolute earliest in the

7    afternoon of Saturday, March 28, 1987.  Do you

8    see that?

9        A.    Yeah, I see it.

10       Q.    In your deposition when we took a break

11   I asked you the following question, can you

12   direct me to any document written or signed by

13   Erik Mitchell that said that Hill's homicide had

14   occurred at the absolute earliest in the

15   afternoon of March 28, 1987.  Do you recall that?

16       A.    Would you say it again, please,

17   Mr. Julian?

18       Q.    Certainly.  The question that I asked

19   you when we broke up and you did not answer was

20   can you direct me to any document written or

21   signed by Doctor Erik Mitchell that said that

22   Hill's homicide had occurred at the absolute

23   earliest in the afternoon of Saturday, March 28,

24   1987?

25       A.    Mr. Julian, I don't understand your

11

SIDNEY L. MANES BY MR. JULIAN

1    question.

2        Q.    Okay.  Let me ask it this way.  To your

3    knowledge, did Doctor Mitchell ever put in

4    writing an opinion that Ms. Hill died either on

5    Saturday or Sunday?

6        A.    I read the warrant that was issued to

7    examine Mr. Hector Rivas' home and that affidavit

8    was by a police officer, Mr. Phinney, I think his

9    name was who testified.  In the affidavit

10   submitted to the judge that the time of death,

11   which came from the medical examiner, that she

12   had died Saturday night or Sunday morning.

13       Q.    My question of you is do you have

14   anything written or authored or signed by

15   Doctor Mitchell to that effect?

16       A.    His testimony that Mr. Fitzpatrick

17   brought out at the time of the trial said that he

18   renewed his review of the notes and slides.

19   That's what he testified to and he did that under

20   oath.

21       Q.    What I am asking you is can you tell me,

22   was there any opinion that you can direct me to

23   by Doctor Mitchell that was in writing prior to

24   his testimony that indicated that he believed the

25   cause of death to be Saturday or Sunday authored

SIDNEY L. MANES BY MR. JULIAN

1    by Doctor Mitchell?

2       A.    Well, he gave an interview to the

3    newspaper.  He also, as I said, he told the

4    police the time of death by an affidavit that

5    they signed.  And that he testified under oath

6    that there were notes and slides that he read

7    before he testified.

8       Q.    Mr. Manes, the interview to the

9    newspaper, did that interview -- is it your

10   testimony that that interview quoted

11   Doctor Mitchell?

12      A.    I'm sorry, I can't answer that unless I

13   see the Post Standard article.

14      Q.    Apart from a newspaper article, in all

15   the documents that you have reviewed, can we

16   agree that nowhere in those documents did

17   Doctor Mitchell put in writing an opinion that

18   Ms. Hill died on Saturday or Sunday?

19              MR. RICKNER:  Objection as to form,

20           those documents.

21              MR. JULIAN:  Yeah, that's fine.  He

22           can answer the question, I assume.

23              MR. RICKNER:  You can answer.

24      A.    No.  There is no signed statement that I

25   know that I reviewed about the time of death that

SIDNEY L. MANES BY MR. JULIAN

1    he had testified to or signed a document.  I

2    don't know about that.  Maybe he did.  I have no

3    idea.

4                    (Whereupon, a discussion was held

5                    off the record.)

6    BY MR. JULIAN:

7        Q.    If we go to 76, if we can scroll to 76.

8    76, you allege the following "Mitchell and

9    Fitzpatrick and Does 1 through 10 also

10   deliberately withheld from the Grand Jury that

11   Mitchell was under investigation for multiple

12   wrongdoings and that he had brokered a deal with

13   Fitzpatrick in 1987 in exchange for expanding

14   Hill's time of death to include Friday, March 26,

15   1987, Mitchell would receive favorable treatment

16   from Fitzpatrick and the other agencies

17   investigating Mitchell's illegal conduct."  Do

18   you see that?

19       A.    Yep.

20       Q.    What is your basis for that allegation?

21              MR. RICKNER:  Objection as to form.

22              You can answer.

23       A.    As I remember, we were in court and

24   Doctor Mitchell had with him his attorney Sidney

25   Cominsky, and I was standing next to, I believe

SIDNEY L. MANES BY MR. JULIAN

1    Mr. Fitzpatrick as I recall, and they had a

2    discussion about the misconduct of

3    Doctor Mitchell and the investigation that was

4    ongoing and that -- that is my best recollection.

5    I didn't hear him say you can go free if you

6    change your testimony.  I didn't hear any of

7    that.  But I know he had a lawyer with him and

8    they had a conversation in court.

9        Q.    What court, when?

10       A.    It was in Supreme Court.  We were in

11   front of -- I don't remember the name of the

12   judge.  It was in the -- well, I think it was the

13   Nanette Gordon case I was involved in and they

14   were there.  It was a question of whether or

15   not -- well, that doesn't matter.  But I was

16   there and Doctor Mitchell was there and

17   Fitzpatrick was there and Sidney Cominsky was

18   there.

19       Q.    Tell me everything you remember about

20   that?  First of all, why were you in court?

21       A.    Doctor Mitchell --

22              THE WITNESS:  Is it relevant?

23              MR. RICKNER:  You can answer his

24          question.

25              THE WITNESS:  I can answer his

15

SIDNEY L. MANES BY MR. JULIAN

1          question.  Okay.

2                    MR. RICKNER:  Go for it.

3      A.    Doctor Mitchell had issued an autopsy

4      report and he had indicated that --

5                    THE WITNESS:  Should I keep

6          talking?

7                    MR. JULIAN:  I apologize.  My dogs

8          like to bark.

9      A.    -- Doctor Mitchell's death certificate

10     was undetermined how she died.  I was trying to

11     prove to the Court that everything about the

12     death to me seemed to be murder and that he

13     refused to change the death certificate.  I took

14     him to court.  The Court ordered an autopsy of

15     the body and an examination by three independent

16     medical examiners.  And two decided of the three

17     that it was a homicide.  And we were in court at

18     that time talking about the changing of the death

19     certificate.  There was some discussion, I think,

20     of Doctor Mitchell being one of the people who

21     were interested -- we thought he might be

22     interested in her death.  So we were all in

23     court, including his lawyer.  We were standing at

24     the railing.  They were talking.  Subsequently

25     Doctor Mitchell also testified and became the

SIDNEY L. MANES BY MR. JULIAN

1    medical examiner in Hector's case and that was

2    how I got involved with Hector.

3        Q.    So what you are describing, being

4    present in court with regard to -- I'm sorry if I

5    say her name wrong -- Nanette Gordon.

6        A.    Nanette Gordon.  She was a doctor.

7        Q.    This preceded the death of Ms. Hill,

8    correct?

9        A.    Correct.

10        Q.    So what you are describing is a

11    discussion between District Attorney Fitzpatrick,

12    Doctor Mitchell, and Sidney Cominsky that

13    occurred before the death of Ms. Hill, correct?

14        A.    You are absolutely correct.  But do you

15    want an explanation of why?

16        Q.    Sure.

17        A.    There were misdemeanors outstanding

18    against Doctor Mitchell for his operation as a

19    medical examiner.  He was burying body parts.  He

20    was selling body parts.  He was pouring blood

21    down the drain.  This was all documented by

22    people who worked for him.  At that point in time

23    I think there were over a hundred misdemeanors.

24    There might have even been a couple of felonies,

25    as I remember.  He was being examined, Doctor

SIDNEY L. MANES BY MR. JULIAN

1    Mitchell was, by the Health Department as to the

2    operation of his department.  So there was a lot

3    going on with Doctor Mitchell at that point.  And

4    he was, in my opinion, also considered because

5    Doctor Gordon had worked as an intern at the

6    pathologists at his medical examination.  He was

7    very much involved and attracted to her.  So

8    there was a lot going on at the time.

9        Q.   What year was this?

10       A.   Well, I would have to look at some

11   documents to remember that, but it was prior to

12   Hector.  I can't remember when Nanette Gordon was

13   murdered.  No, I can't at this point.

14       Q.   Sure.  So it's your testimony that at

15   the time you were in court with Sidney Cominsky

16   and William Fitzpatrick and Erik Mitchell, Erik

17   Mitchell had a hundred misdemeanors pending

18   against him?

19       A.   I think there were -- yeah.  I think

20   that was what the case was.  That was being

21   brought up.  I was being explained to the Court.

22   He had a couple of felonies, as I recall.  And he

23   was considered involved in the Nanette Gordon's

24   death.

25       Q.   This is before the death of Ms. Hill,

SIDNEY L. MANES BY MR. JULIAN

1    correct?

2        A.    Yes.  I don't know whether it was or

3    not.  I can't remember that.

4        Q.    Tell me everything you remember you

5    heard said between Mr. Fitzpatrick, Mr. Cominsky,

6    and Doctor Mitchell?

7        A.    I think I told you.  I didn't hear them

8    discussing doing away with the charges, but they

9    had talked about it.  Now, there is also another,

10   I think it was Doctor Mengle or one of the

11   doctors who were working in his office gave an

12   affidavit in a lawsuit that Fitzpatrick came to

13   Mitchell and they had a conversation in

14   Mitchell's office and this was after Hector had

15   died -- not died, but had been convicted.  I

16   don't know what that was about, but they

17   identified the fact that Fitzpatrick and Mitchell

18   had a private conversation.

19       Q.    What else do you have that supports your

20   allegation that Mitchell was under

21   investigation -- I am looking at paragraph 76 --

22   for multiple wrongdoings and that he had brokered

23   a deal with Fitzpatrick in 1987 in exchange for

24   expanding Hill's time of death to include Friday,

25   March 26, 1987?

SIDNEY L. MANES BY MR. JULIAN

1     A.    The fact that Doctor Mitchell left our

2 community and resigned. And that this was after

3 he had testified. And he left Onondaga County

4 with a clean bill of health and everything else

5 evaporated. Now, that is an assumption, maybe,

6 that I gave it without question, but something

7 had taken place between Doctor Mitchell and

8 Fitzpatrick. He was under a mentor provided by

9 the Mental Health Department because of the

10 operation. There were lots of things. He just

11 walked away from Onondaga County with a clean

12 bill of health.

13     Q.    So if I understand this allegation, this

14 allegation states that a deal had been brokered

15 with Fitzpatrick in 1987. Isn't that what the

16 allegation says?

17            MR. RICKNER: Objection. I don't

18            believe that is clear from the sentence.

19 BY MR. JULIAN:

20     Q.    Let me ask it different. Does

21 paragraph 76 say that Mitchell had brokered a

22 deal with Fitzpatrick in 1987 in exchange for

23 expanding Hill's time of death?

24            MR. RICKNER: Same objection.

25

SIDNEY L. MANES BY MR. JULIAN

1  BY MR. JULIAN:

2      Q.    Doesn't it say that?  Do you agree that

3  this allegation identifies 1987 as the date that

4  this deal was made with Fitzpatrick?

5              MR. RICKNER:  Same objection.

6  BY MR. JULIAN:

7      Q.    Are you able to answer it sir?

8              THE WITNESS:  Should I answer it?

9              MR. RICKNER:  Oh, no, no, you can

10             absolutely answer.

11     A.    I am sorry.  The question was?  Just a

12  second, let me read it again.  Your question to

13  me, Mr. Julian?

14  BY MR. JULIAN:

15     Q.    My question to you was and is do you

16  allege in paragraph 76 that in 1987 Mitchell

17  brokered a deal with Fitzpatrick in exchange for

18  expanding Hill's time of death to include

19  March 26, 1987, Mitchell would receive favorable

20  treatment from Fitzpatrick and other agencies

21  investigating Mitchell's illegal conduct?

22             MR. RICKNER:  Objection to the

23             form.  You can answer.

24     A.    He didn't, to my knowledge.  And when I

25  read the Grand Jury minutes, that was not where

SIDNEY L. MANES BY MR. JULIAN

1    the deal was made or that he said he had slides,

2    but when the jury heard from Fitzpatrick's

3    questioning of Doctor Mitchell on the stand that

4    there were slides and notes and that was how

5    Doctor Mitchell was able to expand his

6    justification for changing the time of death.

7    Now, you know, with all due respect, he had

8    substantiated with the affidavit given to

9    Phinney.  It was in the newspapers.  He told the

10   newspapers "I have never met a defendant I

11   couldn't convict on the evidence."  There were

12   too many things going on with Doctor Mitchell.

13   And yet, to have him come forward and talk about

14   the notes and the slides, they made the

15   impression without question that there had been a

16   deal made for him to expand the time of death.

17              MR. JULIAN:  So I am going to

18              reserve the right to move to strike the

19              unresponsive answers.

20   BY MR. JULIAN:

21      Q.    More specifically, what I am trying to

22   glean from you, sir, is are you claiming that

23   Fitzpatrick and Mitchell made a deal in 1987

24   prior to his Grand Jury testimony that Mitchell

25   would receive favorable treatment from

SIDNEY L. MANES BY MR. JULIAN

1      Fitzpatrick in return for expanding Hill's time

2      of death?

3                    MR. RICKNER:  Objection to form.

4                You can answer.

5          A.    Mr. Julian, you are going to have to

6      read the affidavit and the testimony of

7      Doctor Cheryl Wachtler as to how you determine

8      the time of death.  I can only assume that he

9      walked away from Onondaga County over his head in

10     concerns and did not take one bad thought with

11     him.  Now, he testified to the slides.  There

12     weren't any slides, none.  There were two

13     pictures is all there was.  It had to be

14     something to give him the benefit of the doubt

15     that he moved forward on behalf of District

16     Attorney Fitzpatrick.

17     BY MR. JULIAN:

18         Q.    So let me repeat the question again.

19     Are you saying that a deal was brokered to expand

20     the time of death with Fitzpatrick and Mitchell

21     before Mitchell's Grand Jury testimony, yes or

22     no?

23         A.    I can only assume.

24         Q.    Okay.  Paragraph 77 you state upon

25     information and belief, Mitchell repeated to the

SIDNEY L. MANES BY MR. JULIAN

1    Grand Jury the false and fabricated allegations

2    he had forwarded to the District Attorney and

3    which formed the basis of Hector Rivas'

4    prosecution.  Why did you make this allegation

5    upon information and belief?

6                   MR. RICKNER:  Objection to form.

7         A.    Because I subsequently found out of the

8    testimony on the affidavit from Doctor Wachtler

9    and looking at the slides which we subsequently

10   found and found that there weren't slides, there

11   were pictures.  Now, he performed the autopsy and

12   he testified as to rigor mortis and all of that.

13   And yet subsequently it turned out that he was

14   not testifying with medical accuracy.  He was

15   falsifying information as to what he found.  Now,

16   that is what I read.  I read most of all the

17   testimonies, if I can remember.  I just assumed

18   that there was a deal.

19   BY MR. JULIAN:

20        Q.    Okay.  When you say I just assumed that

21   there was a deal --

22        A.    Upon information and belief.

23        Q.    -- you assumed there was a deal -- if I

24   could just finish -- between Fitzpatrick and

25   Mitchell to obtain false testimony from Mitchell,

24

SIDNEY L. MANES BY MR. JULIAN

1    is that what you are saying?

2                MR. RICKNER:  Object to the form.

3        A.    No.  I don't think it was false.

4    Whether it was false testimony or not, it

5    subsequently came out, yeah.  His testimony that

6    he gave to the Grand Jury.

7    BY MR. JULIAN:

8        Q.    My problem is paragraph 77 says Mitchell

9    repeated to the Grand Jury the false and

10   fabricated allegations.  What false and

11   fabricated allegations are you talking about?

12       A.    You should have heard the summation.

13   You should have heard the closing by

14   Mr. Fitzpatrick who said clearly that there were

15   slides and what kind of slides that there were.

16   That wasn't true.  There were no slides prepared

17   by Doctor Mitchell.  He didn't even have the

18   brain.  It was done by Doctor Collins at, I think

19   one of the Universities at Upstate.  He got a

20   report from Doctor Collins that said clearly

21   there was no abnormalities in the brain.  Yet he

22   used that to extend the time of death.

23               MR. JULIAN:  I am going to move to

24           strike as nonresponsive.

25

25

SIDNEY L. MANES BY MR. JULIAN

1    BY MR. JULIAN:

2        Q.    Let me ask you this question.  You keep

3    referring to slides.  Were the slides that you

4    saw Kodachrome slides?

5        A.    What were they?

6        Q.    Kodachrome, photographic Kodachrome-s?

7              MR. RICKNER:  Are you asking if

8              they were old school white slides with

9              film inside?

10             MR. JULIAN:  Yes.

11       A.    It was just a picture of the brain in

12   formaldehyde in a jar.

13   BY MR. JULIAN:

14       Q.    Do you know if the original photographs

15   were Kodachrome slides?

16       A.    I don't know what that means, Julian,

17   Mr. Julian.  They were slides.  Somebody took a

18   picture.  They were two slides and they were of

19   the brain.  That's all there were.  There was no

20   dissecting of the brain.  There were no slides as

21   we know them when you do a frog in botany.

22       Q.    So Mr. Manes, we have gone through the

23   Grand Jury testimony.  There was no mention of

24   slides by Doctor Mitchell to the Grand Jury,

25   correct?

26

SIDNEY L. MANES BY MR. JULIAN

1      A.    Correct.  As I read, there was no slides

2    mentioned.  If that was the total testimony, then

3    there were no slides mentioned.

4      Q.    Do you have any reason to believe it

5    wasn't the total testimony?

6      A.    I am sorry, say that again.

7      Q.    Do you have any reason to believe that

8    you weren't provided with the total testimony

9    here?

10     A.    I can't answer that.  I have no idea.

11     Q.    Well, you have seen the Grand Jury

12   testimony before many times, correct?

13     A.    No, not many times, no.  But I remember

14   the Grand Jury.  I remember him saying, he was

15   asked, how did he extended time.  And he said

16   that he examined his notes and the slides and

17   that was how he determined to extend the time of

18   the murder from Saturday night, Sunday to Friday

19   night.

20     Q.    Mr. Manes, are you talking about the

21   Grand Jury testimony or the trial testimony?

22     A.    I think the trial.  You showed me

23   the testimony, that it was the trial.

24     Q.    I have been repeatedly asking you

25   questions at this point about the Grand Jury.

SIDNEY L. MANES BY MR. JULIAN

1    You know that, correct?

2        A.    You showed it to me, I think.  I hope

3    that was the Grand Jury.

4                MR. RICKNER:  Mr. Julian, Mr. Manes

5                is here to talk about his personal

6                knowledge.  Asking him what he remembers

7                about documents that he didn't author,

8                didn't personally litigate is not really

9                that helpful.  It's essentially hearsay

10               testimony.  If you want the theory of

11               the case, I will pick up the phone and

12               run you through it.  But asking my

13               client whether or not he can identify

14               every piece of the theory of the case

15               from his own personal memory is

16               essentially a waste of time legally.  He

17               is 96 years old.  If you want to spend

18               hours and hours doing it, fine.

19               Eventually we are going to move the

20               Judge and say look, no useful questions

21               are being asked here.  You can ask him

22               about Hector.  You can ask him what he

23               knows.

24                MR. JULIAN:  You know, Mr. Rickner,

25                I have done this for a long time.  I

SIDNEY L. MANES BY MR. JULIAN

1          really do not need instruction from you,

2          with all due respect.

3              MR. RICKNER:  You may not need

4          instruction, but I am putting my

5          position on the record.

6              MR. JULIAN:  That's fine.  You put

7          your position on the record.

8              MR. RICKNER:  Asking him about

9          documents he didn't author, he didn't

10         litigate, he didn't even see until years

11         after the conviction and trying to

12         ask --

13             MR. JULIAN:  He is the plaintiff.

14         He made these allegations.  Not only

15         that, he was the attorney for this

16         decedent for years.

17             MR. RICKNER:  Years later.  You can

18         ask him about those.  But his opinion on

19         the documents is not relevant.

20             MR. JULIAN:  We will have a long

21         discussion about that, Mr. Rickner.  But

22         I think the rules allow me to inquire.

23             MR. RICKNER:  You can ask whatever

24         you want.

25             MR. JULIAN:  Quite frankly, I

SIDNEY L. MANES BY MR. JULIAN

1            object to your speech.  I don't think

2            under the rules you are entitled to give

3            that speech.  But if you would like to

4            consult with the Magistrate and you

5            would like to do it now, I am happy to

6            do it.

7                 MR. RICKNER:  I am happy to let you

8            finish your testimony because we only

9            have a few hours today.  But we should

10           discuss the continued progress.

11           Mr. Manes is 96 years old.  If you want

12           to make productive use of the

13           questioning, you can.  But if you don't,

14           I think there is a time that we are

15           going to ask to put a stop to it.

16                MR. JULIAN:  Look, I am done being

17           insulted by you.  I have questions to

18           ask of this man.

19                MR. RICKNER:  I am not trying to

20           insult you, sir.

21                MR. JULIAN:  Well, you are.  I have

22           been nothing but polite and nothing but

23           solicitous of this gentleman.

24           Continuing to repeat his age is

25           inferring that I am being anything but.

SIDNEY L. MANES BY MR. JULIAN

1              MR. RICKNER:  I'm just stating the

2        facts.

3              MR. JULIAN:  I don't appreciate it.

4        I am ready to call the magistrate right

5        now if you want.

6              MR. RICKNER:  I am saying you can

7        continue the deposition.  I have placed

8        our position on the record.

9              MR. JULIAN:  Thank you.

10   BY MR. JULIAN:

11        Q.   In any event, Mr. Manes, you, as the

12   plaintiff in this case, have made allegations

13   with regard to the Grand Jury testimony, correct?

14        A.   Yes.  Upon information and belief.

15        Q.   Not all.  Let me ask you this.

16        A.   I read them, Mr. Julian, I did.  I just

17   read them.

18        Q.   So now I would like to turn -- in terms

19   of your knowledge, tell me this.  When was the

20   deal made in terms of a date, a time and place

21   between Fitzpatrick and Mitchell, when was the

22   deal that you are alleging in paragraphs up

23   through 83, when was that deal made?

24        A.   You would have to read the testimony and

25   the affidavit and the complaint that was filed by

SIDNEY L. MANES BY MR. JULIAN

1    Doctor Mangle and Doctor Rigle and Sawyer.  These

2    were men who worked in the Medical Examiner's

3    Office at the time of Gordon's death.  And I

4    believe they were still there when Hector was

5    incarcerated and found guilty.  I think they were

6    there at that time as well.  You have to read

7    those and they mention the meetings between

8    Fitzpatrick and Mangle -- Doctor Mitchell.

9       Q.    So it's your testimony that these three

10   doctors Mangle, Rigle, and Sawyer all referenced

11   a deal made between William Fitzpatrick and

12   Doctor Mitchell with regard to Doctor Mitchell's

13   testimony in the Rivas case?

14              MR. RICKNER:  Objection.  You can

15          answer.

16      A.    I don't know whether it was the Rivas

17   case per se, but they met with -- Fitzpatrick met

18   with Mitchell.  All I can assume is when all of

19   these claims that were made by the DEC, by the

20   Mental Health Department appointing a mentor over

21   Doctor Mitchell's operation as the medical

22   examiner, the hearing that was held by the

23   Department of Mental Health, the appointment of

24   the mentor, and then his subsequently leaving

25   here after he testified in the Hill case and

SIDNEY L. MANES BY MR. JULIAN

1    the -- I don't want to get in to that case.  He

2    left here with a clean bill of health.

3        Q.    You may have said that before.

4        A.    I am assuming that there had to be some

5    sort of meeting between Doctor Mitchell and

6    Fitzpatrick to have worked out some sort of

7    arrangement.  It certainly seems to me to be the

8    case.

9        Q.    As a practicing lawyer, was it your

10   custom and practice to meet with witnesses before

11   they testified in a trial?

12       A.    Oh, absolutely.

13       Q.    Would you agree that that is good legal

14   practice?

15       A.    Yes.  I would agree that that is good

16   legal practice.

17       Q.    Do you know whether William Fitzpatrick

18   ever in any of his meetings with Doctor Mitchell

19   was meeting with him to prepare him for trial?

20       A.    I don't know.  I have no idea what that

21   meeting was about other than the fact that he

22   left here with a clean bill of health after his

23   testimony.

24       Q.    Now, I would like to ask you some

25   questions, if we could scroll to paragraph 99,

SIDNEY L. MANES BY MR. JULIAN

1    please.  Do you need -- I am going to ask you

2    some questions about this paragraph.  Would

3    you like -- if you want to read any of the

4    language before it or afterward, just tell me.

5    Okay?

6        A.    I want to do what?

7              MR. RICKNER:  If you want to read

8              the rest of the Complaint, he will let

9              you or you can listen to his question

10             and then decide if you want to.

11       A.    Let me hear the question.

12   BY MR. JULIAN:

13       Q.    You got it.  So paragraph 99 you state

14   "Mitchell further testified that when he reviewed

15   autopsy sectional slides of Hill's brain before

16   trial, he noticed in them "some decompensation to

17   the brain".  This, he states "tends to push the

18   (time) limits further out."  Do you see that?

19       A.    Yes, I see it.

20       Q.    I would like to ask you to turn --

21             MR. JULIAN:  Tim, can we pull up

22             JJ, please?

23             (Whereupon, a discussion was held

24             off the record.)

25

SIDNEY L. MANES BY MR. JULIAN

1  BY MR. JULIAN:

2      Q.   Let the record show that Exhibit JJ is

3  the trial testimony of Erik Mitchell, both his

4  direct, cross, and redirect.  Now, have you

5  reviewed this testimony recently?

6      A.   No.  And I -- no.  And I was not at

7  trial.

8      Q.   Well, you have referenced the testimony

9  frequently during -- the trial testimony

10  frequently during your testimony here, haven't

11  you?

12      A.   Did I what?

13          MR. RICKNER:  Objection.  He is

14          saying have you referenced Erik

15          Mitchell's testimony during your

16          testimony here today?

17      A.   Okay.

18  BY MR. JULIAN:

19      Q.   Okay means yes?

20      A.   I still don't understand your question.

21      Q.   I will try to do better.  You have made

22  reference in your testimony here today to

23  statements that Doctor Mitchell made before the

24  jury at the Rivas trial, correct?

25      A.   I am sorry.  I still don't understand.

SIDNEY L. MANES BY MR. JULIAN

1      Q.    By all means.  In your testimony earlier

2   this afternoon, you have talked about your

3   recollection of what Doctor Mitchell said at

4   Hector's trial, correct?

5      A.    Only through my lawyer.  I wasn't at the

6   trial.

7      Q.    You have read the transcript before

8   coming here today, correct?

9           MR. RICKNER:  Objection to form.

10          Have you ever read Erik Mitchell's trial

11          testimony ever?

12     A.    Yes.

13  BY MR. JULIAN:

14     Q.    How many times have you read it?

15     A.    I don't know.  Maybe once, maybe twice.

16  I read it afterward.  I wasn't at the trial

17  certainly.

18     Q.    I understand you weren't at the trial.

19  So it's your testimony that you have only read

20  Doctor Mitchell's trial testimony once or twice

21  in all the time that you represented Hector Rivas

22  and in all the time of this lawsuit?

23     A.    Yes.  Yeah.

24     Q.    Okay.  Is it your testimony that

25  Doctor Mitchell referred to sectional slides in

SIDNEY L. MANES BY MR. JULIAN

1    his testimony at the trial?

2        A.    No.  I don't believe that was my

3    testimony because I didn't hear him say that.

4    The only time I heard of sectional slides,

5    autopsy slides was by Fitzpatrick.  That's what

6    he told the jury.  That's what I read.

7        Q.    So let's go back to paragraph 99 of

8    Exhibit A.  Did you allege in paragraph 99 of

9    Exhibit A "Mitchell further testified when he

10    reviewed autopsy sectional slides of Hill's brain

11    before trial, he noticed in them some

12    decomposition to the brain.  This he stated

13    tenders to push the time limits further out."

14    Did you make that allegation?

15                    MR. RICKNER:  Form.  You can

16            answer.

17        A.    I do not recall my saying that he

18    reviewed autopsy sectional slides.  His

19    testimony, as I recall, was he reviewed his notes

20    and the slides.  The autopsy sectional slides

21    came from Fitzpatrick as he pounded the table on

22    summation.

23    BY MR. JULIAN:

24        Q.    How do you know that if you weren't at

25    the trial?

SIDNEY L. MANES BY MR. JULIAN

1      A.    Do what?

2      Q.    How do you know he pounded the table?

3      A.    Well, that's what I just thought that

4    that is what he did and he did it well.

5      Q.    You were not there?

6      A.    No, I was not there.  Absolutely.

7              MR. RICKNER:  Is this a metaphor?

8              THE WITNESS:  Yes, exactly.

9    BY MR. JULIAN:

10     Q.    Do you know if either Fitzpatrick or

11   Mitchell referred to the slides as sectional

12   tissue slides at any time?

13             MR. RICKNER:  Objection.  You can

14             answer.

15     A.    I am sorry.  I don't remember.  I don't

16   remember that, whether that came from Fitzpatrick

17   or that came from Doctor Mitchell or from the

18   summation.

19   BY MR. JULIAN:

20     Q.    Well, may I ask the question in a

21   different way.  What I am trying to determine is

22   if you remember either Mitchell or Fitzpatrick

23   ever referring to the slides as sectional tissue

24   slides?

25     A.    Only reading the testimony and the

38

SIDNEY L. MANES BY MR. JULIAN

1    summation by Fitzpatrick do I recall Fitzpatrick
2    saying that.  He expanded on the slides, you see.
3        Q.    Is it your memory that he referred to
4    the slides as tissue slides?
5        A.    I am sorry.  I don't remember whether it
6    was tissue slides or sectional slides to give the
7    impression that they were slides of the brain.
8    That's how he learned of the decompensation and
9    was able to extend the time of death.
10       Q.    Do you recall appearing before the
11   Second Circuit Court of Appeals in this case --
12               MR. JULIAN:  Strike that.
13   BY MR. JULIAN:
14       Q.    Do you recall appearing before the
15   Second Circuit Court of Appeals on April 6, 2016?
16       A.    Can you show me -- I mean, why were we
17   there at the Second Circuit because we were there
18   frequently.
19       Q.    Let me give you a document, Mr. Manes.
20       A.    All right.
21       Q.    That's fine.
22               MR. JULIAN:  Tim, could you bring
23               up Exhibit Y, please, which I am
24               identifying as a document entitled Show
25               Cause Hearing in the matter of Hector

39

SIDNEY L. MANES BY MR. JULIAN

1           Rivas against Fischer April 6, 2016.

2                    (Whereupon, a discussion was held

3                    off the record.)

4    BY MR. JULIAN:

5           Q.    Does it show you being present?

6           A.    Yes.

7           Q.    Do you remember this?

8           A.    I remember.  If you show me the

9    documents, it will refresh my recollection.

10          Q.    Sure.

11                   MR. JULIAN:  Tim, let's go to Bates

12                   number 185373.

13                   (Whereupon, a discussion was held

14                   off the record.)

15   BY MR. JULIAN:

16          Q.    You see where it says may we have the

17   appearance of counsel stated for the record?

18          A.    Yep.

19          Q.    Do you see there is an attribution to

20   you, Mr. Manes, it says Sidney Manes?

21          A.    Yes.  I was there, absolutely.

22          Q.    You were appearing as counsel for Hector

23   Rivas?

24                   MR. RICKNER:  Objection.

25          A.    I was his pro bono counsel.  Mr. Langone

40

SIDNEY L. MANES BY MR. JULIAN

1    was his counsel and so was Mr. Klein, but that

2    the Supreme Court case.  And so was Kim Zimmer.

3                MR. RICKNER:  Can we actually take

4                a break?  We have gone going about an

5                hour and twenty minutes.

6                MR. JULIAN:  Sure.  The rule is.

7                MR. RICKNER:  I wait until a

8                question is finished and then I ask.

9                MR. JULIAN:  Thank you.

10               VIDEOGRAPHER POTTER:  The time is

11               3:18 p.m.  We are off the record.

12               (Whereupon, a brief recess was

13               taken.)

14               VIDEOGRAPHER POTTER:  The time is

15               3:24 p.m.  We are on the record.

16               MR. RICKNER:  Mr. Manes, you just

17               had a clarification regarding the

18               representation.  Would you like to

19               explain that to, Mr. Julian.

20    A.    Mr. Julian, I was never the real

21    attorney of record.  I was merely a pro bono

22    counsel to whom Hector wrote a letter asking me

23    to help him.  I was impressed with Hector and

24    what he wrote me.  And as a result of that, I

25    started to get FOIL requests on his behalf.  But

SIDNEY L. MANES BY MR. JULIAN

1    I was never his attorney of record, though, I

2    went to all the hearings on the Second Circuit

3    and I subsequently wrote some documents on

4    Hector's behalf.  But Langone was his lawyer,

5    Klein was his lawyer, Schumann was his lawyer,

6    Fahey was his lawyers.  Those were the lawyers

7    that handled the legal aspect.

8         Q.    How about Priest?

9         A.    I was pro bono counsel.

10        Q.    Was Priest his lawyer also?

11        A.    Yeah, Priest was his lawyer too, I

12   think.

13        Q.    So thank you for that.  So we are at the

14   Second Circuit, correct?

15        A.    Yeah, we are at the Second Circuit, yes.

16   This was a very important meeting, as I remember.

17        Q.    Why was it important?

18        A.    I beg your pardon?

19        Q.    I apologize.  I will try to speak

20   louder.  Why was it important?

21        A.    Well, he wanted all counsel there, the

22   judges there, the three panel.  They wanted all

23   the lawyers there to talk about how to get Hector

24   out of jail.  They had determined that he was

25   actually innocent and they sent it back for him

42

SIDNEY L. MANES BY MR. JULIAN

1   to be released until the trial.  They ordered a

2   new trial on his behalf.  Judge Miller, who was

3   then the judge because Kilroy had died, he set

4   bail at the request of the District Attorney, he

5   asked for a million and the judge gave him

6   500,000.  I got it -- we when to the Appellate

7   Division and they reduced it to 200,000.  He had

8   no money.  He had no way of getting out.  He had

9   no place to run.  Judge Miller wouldn't let him

10  out.  So he wanted everybody there because the

11  Court then was going to review and then make a

12  decision and send it to Judge Miller.  That's

13  what it was all about.

14      Q.   So just if we could take a quick trip

15  through this transcript, sir.

16      A.   It was rather long.

17      Q.   That's why I said a quick trip.

18      A.   All right.

19              MR. JULIAN:  If we could go to

20              page 185391.

21              (Whereupon, a discussion was held

22              off the record.)

23  BY MR. JULIAN:

24      Q.   At this point of the transcript do you

25  remember discussing with the Second Circuit what

SIDNEY L. MANES BY MR. JULIAN

1  documents had been received and were available at

2  this stage of the case, received through FOIL and

3  other means, do you recall discussing that with

4  the Second Circuit?

5      A.    No, I don't recall that.  I did the

6  FOILing of requests.  I remember them asking me a

7  question.  There were documents I FOILed.

8      Q.    Okay.  If we could go to the bottom of

9  the page here, do you see your name where you

10  address the Court?

11      A.    Yeah, I see that.

12      Q.    If you would like to look at what you

13  have to say on pages 391 through 393, if you

14  would just like to read through it for a minute,

15  I have a couple questions for you.  Okay?

16      A.    Yeah.

17      Q.    Thank you.

18              (Whereupon, a discussion was held

19              off the record.)

20      A.    Do you want me to read the whole page?

21  BY MR. JULIAN:

22      Q.    I will leave it up to you.  You can read

23  any and all of that.  I am respectfully

24  suggesting we start with what you had to say at

25  the bottom of the page.  Then go to the next page

44

SIDNEY L. MANES BY MR. JULIAN

1    of transcript, which is page 393.  We have a

2    series of blank pages in this transcript, that's

3    how I received it.

4        A.    Okay.  I finished that page.

5        Q.    Do you remember the context in which you

6    were discussing the documents that you had

7    obtained with the Second Circuit?

8        A.    Yeah, I recall that.  That was

9    Mr. Langone, though, not me.  I was there on a

10   440 Motion, yes.

11       Q.    Were you telling the Second Circuit that

12   there were a number of documents that you had

13   obtained and that there were not any new

14   documents provided?

15       A.    I think I was saying that, that we had

16   those documents and I had forwarded them on to

17   Mr. Klein.  He had them.  There was a particular

18   reason why the Court wanted some information

19   about that.  Because at that time they were

20   supposed to have proceeded with some alacrity and

21   to try Mr. Rivas, either that or let him go until

22   the trial.  The Court wanted to know if those

23   were records that the District Attorney provided.

24   But they had been provided before.  That was not

25   the issue.  They had them.  We had them.  The

SIDNEY L. MANES BY MR. JULIAN

1    difficulty was Mr. Moran, that he was not ready

2    for trial, though he kept saying he was.

3              MR. JULIAN:  Would you kind enough

4         to go to page 185417, please.  Actually,

5         Tim, I misspoke, please, 415.

6              (Whereupon, a discussion was held

7         off the record.)

8    BY MR. JULIAN:

9    Q.    Again, you are entitled to read whatever

10    you need to read, sir.  I would like to direct

11    your attention to the Assistant Attorney General

12    Ms. Steward's comments on this page.  What she

13    says "Actually, my recollection is the People had

14    represented that the investigation did not begin

15    until after the trial was over."  I believe she

16    is referencing the investigation by the DA's

17    Office of Doctor Mitchell.  And the trial that

18    she was referring to is Hector's trial.  Do you

19    remember this, does this refresh your

20    recollection?

21    A.    Can I see the rest of that, please?  Can

22    I see the rest of that?

23    Q.    Go to page 419.

24    A.    I don't know what she is referring to.

25    144 misdemeanors for disposing of body parts, for

SIDNEY L. MANES BY MR. JULIAN

1    pouring material, blood, yeah.

2        Q.    May I ask you a couple questions?

3        A.    That's exactly what I said.  I am trying

4    to tell the truth here.

5        Q.    Okay.  Did you say -- is the transcript

6    correct on page Bates number 185419 at line 7 did

7    you say "if you will forgive me, Your Honor, she

8    indicates the DA wasn't investigating, that may

9    be true."  Did you see that?

10       A.    Let me read the rest of it.

11       Q.    Sure.

12       A.    Okay.

13       Q.    Are you finished reading it?

14       A.    Yep, I have read it.

15       Q.    So to go back to my question.  Did you

16   say "if you will forgive me, Your Honor, she

17   indicates that the DA wasn't investigating, that

18   may be true."  Did you say that?

19       A.    It's possible, yes.  I don't remember.

20   It was so long ago, but it's possible.

21       Q.    Were you conceding in that sentence that

22   the District Attorney was not investigating?

23       A.    It wasn't his job.  That was the DEC's

24   job to investigate environmental concerns.  He

25   would have prosecuted Mitchell for the

SIDNEY L. MANES BY MR. JULIAN

1    misdemeanors, absolutely.  So he wasn't

2    investigating.  It was the DEC that did the

3    investigating.

4        Q.    This would have been at the time of the

5    Rivas trial, correct?

6        A.    This was the time of when, Mr. Justin --

7    Mr. Julian, excuse me.

8        Q.    You can call me whatever you want, sir.

9    Believe me, I have been called worse.  What you

10   are conceding here is that the District Attorney

11   was not the investigating Mitchell for the

12   environmental conservation issues at the time of

13   the Rivas trial, correct?

14       A.    Yeah.  That was the DEC.

15       Q.    Okay.

16       A.    The Department of Environmental

17   Conservation, not the District Attorney.  They

18   were to turn the claims over to the DA to

19   prosecute.

20       Q.    Thank you.

21       A.    Judge Pooler said he knew about the DEC

22   to the best of our knowledge.  That was Judge

23   Pooler who said that.

24       Q.    I am not sure -- what are you referring

25   to, sir?

SIDNEY L. MANES BY MR. JULIAN

1              MR. RICKNER:  The next line.

2      A.    The next line.

3  BY MR. JULIAN:

4      Q.    Well, that's a question, isn't it?

5      A.    Yeah.  There is no evidence that the DEC

6  was investigating.

7      Q.    She asked the question.  The next line,

8  line 14 says Judge Pooler "he knew about the DEC,

9  to the best of our knowledge."

10     A.    Yeah.

11     Q.    The Assistant Attorney General,

12  Ms. Steward, said "we have no evidence of that".

13     A.    Well, she is in Albany.

14     Q.    Okay.  Was any evidence given to the

15  Second Circuit on this day that the District

16  Attorney --

17     A.    I have no idea.

18     Q.    -- knew of this investigation at the

19  time of the Rivas trial?

20     A.    He is the District Attorney for the

21  County who is going to prosecute Doctor Mitchell

22  for the misdemeanors.  I don't know, Mr. Julian,

23  whether or not the DEC told the DA or the DA knew

24  it or they sent them over to him to prosecute, I

25  don't know that, if he was aware.

SIDNEY L. MANES BY MR. JULIAN

1    Q.    Did you say you don't know that, but he

2    was aware or you don't know if he was aware?

3    A.    I don't know if the DA was aware, but I

4    must assume as the County District Attorney that

5    he would have known of the misdemeanors.

6    Q.    Well, the question is whether he would

7    have known of DEC's investigation before they

8    proffered any charges, do you know that one way

9    or the other?

10    A.    No, I don't know that.

11    Q.    At this same hearing you were again

12    heard at page 185451.

13                MR. JULIAN:  Timothy, would you

14                take us there, please?

15                (Whereupon, a discussion was held

16                off the record.)

17    BY MR. JULIAN:

18    Q.    Now, Mr. Manes, just to give you some

19    context and you are welcome to read whatever you

20    need to.  There is a discussion --

21                MR. RICKNER:  Please scroll up and

22                let him see the question he is being

23                asked before he talks about the

24                response.

25                MR. JULIAN:  I'm sorry.

SIDNEY L. MANES BY MR. JULIAN

1              MR. RICKNER:  I said please scroll

2          up so he can see the Judge's question

3          before he considers his response.  Let's

4          see the preamble for this.

5              MR. JULIAN:  I thought you might

6          want to know the question, but that's

7          fine.

8              MR. RICKNER:  Well, it looks like

9          the question isn't really -- the

10         immediately proceeding question doesn't

11         get in to the topic.

12             MR. JULIAN:  No, no.  I mean, I

13         thought you wanted to hear my question

14         so he could read the document in that

15         context.  That's up to you.  I will do

16         it either way.  It doesn't matter.

17             MR. RICKNER:  Can you go up to the

18         top of the page.  It's not clear who is

19         speaking.

20    A.    It's not.  It's Moran.  He is the

21    Assistant District Attorney.  Would you scroll

22    up, please?

23             (Whereupon, a discussion was held

24              off the record.)

25    A.    I don't think that's true.

SIDNEY L. MANES BY MR. JULIAN

1          MR. RICKNER:  Let him ask the
2          question.  I also don't think it's true.
3          But take a look at the document and see
4          what Mr. Julian wants to ask about it.
5     A.    Okay.  I have read that.
6  BY MR. JULIAN:
7     Q.    Have you read page 451?  Please read
8  that also.
9     A.    Yeah, okay.  What is the question?
10    Q.    Were you ever provided with a report
11 with regard to the presence of fingerprints on
12 the book and specifically those of Hector Rivas?
13    A.    To the best of my knowledge, Mr. Julian,
14 we had information that there were three prints
15 on the book and none of them were Hector's.
16    Q.    Okay.  I am not going to hold you to the
17 exact date --
18          MR. RICKNER:  Mr. Julian, don't cut
19          off the witness.  Continue, Mr. Manes.
20          MR. JULIAN:  I'm sorry.
21    A.    That was part of the FOIL request that I
22 made.  All that material was given to us, that
23 was thirty years ago.  I don't know how long ago,
24 but it was a long time ago.  We were advised and
25 we had a report that showed there were three

SIDNEY L. MANES BY MR. JULIAN

1    prints and they were not Hector's and they didn't

2    know whose they were.  So that was brand new for

3    us without question.

4    BY MR. JULIAN:

5         Q.    Are you finished?

6         A.    Yes, I am.

7         Q.    I never intend to cut you off.  So if I

8    am cutting you of off, tell me.

9         A.    That's all right.

10        Q.    After this, after the appearance on

11   April 6, 2016, were you given a further report by

12   the District Attorney's office with regard to the

13   presence of Hector Rivas' prints on this library

14   book?

15             MR. RICKNER:  Form.  You can

16             answer.

17        A.    Not that I remember.

18   BY MR. JULIAN:

19        Q.    If that information were going to be

20   provided, would it have been provided to you or

21   someone else?

22             MR. RICKNER:  Form.  You can

23             answer.

24        A.    It would have gone to Mr. Klein who was

25   his lawyer at that time.  I do not recall it

SIDNEY L. MANES BY MR. JULIAN

1    coming to me.  It may have, but I don't recall

2    that.  Forgive me.  I know there was never -- if

3    you will forgive me, there was never a reference

4    to Valerie Hill's fingerprints were on the book.

5    There were fingerprints they never identified,

6    that I recall, but not Hector's.

7        Q.    I apologize again.  Are you finished?

8        A.    Okay.  Yes, I am.

9        Q.    I mean, it's very hard on this --

10       A.    I agree.

11       Q.    -- format.

12             MR. JULIAN:  How are we doing, Rob?

13       I am going to move in to a new area.

14             MR. RICKNER:  My clock was 3:53.

15             MR. JULIAN:  Do you want to do

16       another seven minutes?

17             MR. RICKNER:  The question is do

18       you want to do another seven minutes?

19             MR. JULIAN:  I am fine.  I can do

20       another seventy.

21             MR. RICKNER:  We would object to

22       that, but you have the rest of the hour.

23             MR. JULIAN:  Thanks.

24  BY MR. JULIAN:

25       Q.    Mr. Manes, I would now like to ask you

SIDNEY L. MANES BY MR. JULIAN

1   about Exhibit U.

2            MR. JULIAN:  Tim, could you pull it

3            up for us?  Could you go to the bottom,

4            please?  Could you scroll downward,

5            please?  Can you just scroll that,

6            please.  Go to page 185046, please.

7   BY MR. JULIAN:

8       Q.    So Mr. Manes, let the record show that

9   as part of Exhibit U is a transcript of an

10  appearance on March 18, 2016 before Onondaga

11  County Judge Thomas J. Miller.  Are you shown as

12  appearing on that day with Mr. Klein, Ms. Zimmer,

13  and Casey Johnson, yes, no, maybe?

14            MR. RICKNER:  He wants to know if

15            you appeared.

16      A.    Oh, I appeared, absolutely, to the best

17  of my knowledge.

18  BY MR. JULIAN:

19      Q.    Can we go to page 185049.  Toward the

20  bottom of the page do you see where Mr. Klein

21  speaks.  I would ask you if you would be kind

22  enough to read what he says at page 185049, 050,

23  051.  My question is a simple one.  Do you agree

24  with what he says?

25            MR. RICKNER:  Objection.  You can

SIDNEY L. MANES BY MR. JULIAN

1          answer.

2    BY MR. JULIAN:

3          Q.    I guess did you agree with what he said?

4                MR. RICKNER:  Objection.  Different

5                question.

6          A.    It wasn't my job to agree or disagree.

7    I wasn't asked.  Mr. Klein was the attorney of

8    record.  There were many obstacles, I can tell

9    you that.  We couldn't get the DNA, the dairy and

10   the second type.  There were so many things they

11   hadn't provided.  Yes, he was cooperative, but

12   Mr. Klein had to go over and dig for them.  You

13   got to ask Mr. Klein whether he was satisfied.

14   It certainly was objectionable.

15                MR. JULIAN:  Are we at

16                4:00 o'clock?

17                MR. RICKNER:  We are.  While we are

18                still on the record, I would just ask

19                that -- well, plaintiff's obviously will

20                do this, but if the defense counsel

21                could please provide as many dates as he

22                can in the next three weeks, we would

23                really like to just get this done.  I

24                understand that we all have crowded

25                schedules, but time is of the essence as

SIDNEY L. MANES BY MR. JULIAN

```
1          well.  If you could just spit out three,
2          four weeks worth of possible dates, half
3          dates since we are doing this in two
4          hour blocks, that would be very helpful.
5               MR. JULIAN:  Sure.
6               MR. VENTRONE:  The County has no
7          objection.
8               MR. JULIAN:  Where do you stand,
9          Rob, with the information, tapes and
10         whatever that the County sent to you?
11              MR. RICKNER:  It's voluminous.
12         It's immense.  And going through it has
13         been extraordinarily time consuming.  We
14         have probably sixty hours worth of
15         audio.
16              MR. JULIAN:  Okay.
17              MR. RICKNER:  But I am happy to
18         discuss that with you tomorrow.  I am
19         free all afternoon.
20              MR. JULIAN:  Okay.  I am not
21         available tomorrow.  I apologize.
22              MR. RICKNER:  Email me your
23         availability.  I will pick up the phone
24         and we will talk.
25              MR. JULIAN:  I will give you a
```

SIDNEY L. MANES BY MR. JULIAN

1          call.  I am not putting you on the spot,

2          it's just while we are here, I was

3          wondering.

4              MR. RICKNER:  It's a fair question,

5          I just don't have a better answer today.

6              MR. JULIAN:  That's a good answer

7          for the moment.

8              VIDEOGRAPHER POTTER:  The time is

9          4:02 p.m.  We are off record.

10             (Whereupon, the Witness is

11             excused.)

12             THE PROCEEDINGS WERE ENDED.

13                  --**0**--

14

15

16

17

18

19

20

21

22

23

24

25

1              **S I G N A T U R E   P A G E**

2

3    STATE OF NEW YORK    )

4                        )          <u>**CERTIFICATE OF WITNESS**</u>

5    COUNTY OF           )

6

7        I, SIDNEY L. MANES, hereby certify that I have

8        read the transcript of my testimony taken under

9        oath on August 22, 2022; that the transcript is a

10       true, complete, and correct record of what was

11       asked, answered, and said on the record as given

12       by me are true and correct.

13

14                              _____

15                                    SIDNEY L. MANES

16

17       SUBSCRIBED AND SWORN to before me, the

18       undersigned authority, on this _____ day of

19       _____, 2022.

20

21                              _____

22                                    NOTARY PUBLIC

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3              I, ANGELA S. STANGEL, Court

 4     Reporter and Notary Public in and for the State

 5     of New York, do hereby certify that I recorded

 6     stenographically the foregoing at the time and

 7     place mentioned and that the preceding is a true

 8     and correct transcript thereof to the best of my

 9     knowledge, ability, and belief.

10

11              I further certify that I am not an

12     attorney or counsel of any parties, not a

13     relative or employee of any attorney or counsel

14     connected with the action, nor financially

15     interested in the action.

16

17              WITNESS, my hand and seal in the

18     County of Oneida, State of New York.

19

20

21     _____

22              ANGELA S. STANGEL
                 Court Reporter

23

24

25
```