# EXHIBIT "D-3"

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    * * * * * * * * * * * * * * * * * * * * * * * * *

4    SIDNEY MANES, Administrator of the Estate of HECTOR
     RIVAS,

5
                        Plaintiff,

6
                             No. 19-CV-844(BKS)(TWD)

7    - against -

8    ONONDAGA COUNTY;CITY OF SYRACUSE; WILLIAM FITZPATRICK;
     DR. ERIK MITCHELL; AND "JOHN DOES 1-10",

9
                        Defendants.

10
     * * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13

14

15

16

17             **EXAMINATION BEFORE TRIAL** of

18         **SIDNEY MANES**, Plaintiff, taken pursuant

19         to Notice, via videoconference by Zoom,

20         held in New York State on October 18, 2022,

21         and taken by LISA M. SCHUSTER, Court

22         Reporter and Notary Public, in and for

23         the State of New York.

24

25

```
 1

 2

 3     APPEARANCES:

 4

       For the Plaintiff:
 5
            BOUSQUET HOLSTEIN, PLLC.
 6          360 S. Clinton Street
            Syracuse, New York  13202
 7          BY:  JAMES SONNEBORN, ESQ.

 8          THE LAW OFFICES OF JOSHUA MOSKOVITZ, P.C.
            392 Central Avenue, 7803
 9          Jersey City, New Jersey 07307
            BY JOSHUA MOSKOVITZ, ESQ.
10
            SCOTT A. KORENBAUM, ESQ.
11          14 Wall Street, Suite 1603
            New York, New York  10005
12          BY:  SCOTT KORENBAUM, ESQ.

13

14     For the Defendants William Fitzpatrick and Erik Mitchell:

15          ROBERT F. JULIAN, PC.
            2037 Genesee Street
16          Utica, New York  13501
            BY:  ROBERT JULIAN, ESQ.
17

18     For the Defendant Onondaga County:

19          ONONDAGA COUNTY DEPARTMENT OF LAW
            421 Montgomery Street
20          Syracuse, New York  13202
            BY:  MARK VENTRONE, ESQ.
21

22          PARROTTA STUDIOS
            Rochester, New York
23          David Parrotta, Videographer

24

25
```

1

2                              <u>INDEX OF REQUESTS</u>

3      <u>SIDNEY MANES</u> (By Mr. Julian)                          <u>PAGE</u>

4      1.     Any records pertaining to proceedings
              that were outstanding against Dr.
5             Mitchell                                            25

6      2.     Any records associated with Mr. Rivas'
              business                                            37
7
       3.     Address of Ms. Ortiz                                39
8
       4.     Economic loss documents                            41
9

10

11

12

13

14

15

16                              -oOo-

17

18

19

20

21

22

23

24

25

1

2

3                        S T I P U L A T I O N S

4

5

6        IT IS STIPULATED by and between the attorneys

7    for the respective parties that the testimony contained

8    herein may be used upon the trial of this action; that

9    the filing of the testimony is waived; that all

10   objections, except objections as to form, are reserved

11   until the time of trial, and that objections as to form

12   shall be noted on the record; that the examining party

13   will furnish the examined party a copy of the transcript

14   of testimony free of charge and that the testimony be

15   taken before **Lisa M. Schuster**, a Shorthand Reporter and

16   Notary Public in and for the State of New York, whose

17   oath is waived.

18

19

20                            -oOo-

21

22

23

24

25

1          VIDEOGRAPHER:  We are on the record at

2     10:09 a.m.  Today is Tuesday, October 18th,

3     2022.  I am David Parrotta of Parrotta Studio

4     located in Rochester, New York.  We are

5     conducting this deposition via videoconference.

6     We are about to begin the video-recorded

7     deposition of Sidney Manes, in the matter of

8     Sidney Manes, Administrator of the Estate of

9     Hector Rivas, Plaintiff, against Onondaga

10    County, City of Syracuse, William Fitzpatrick,

11    Dr. Erik Mitchell and John Does one through ten

12    Defendants.

13         In attendance is the court reporter, Lisa

14    M. Schuster, of Rome, New York.  At this time

15    the attorneys will identify themselves and the

16    parties they represent, after which our court

17    reporter will swear in the witness and we may

18    proceed.

19         MR. KORENBAUM:  Scott A. Korenbaum for

20    Mr. Manes.

21         MR. MOSKOVITZ:  Joshua Moskovitz also for

22    Sidney Manes.

23         MR. SONNEBORN:  Jim Sonneborn is Mr.

24    Manes' personal attorney.

25         MR. JULIAN:  Robert Julian for Fitzpatrick

SIDNEY MANES by JULIAN                6

1                      and Mitchell.

2                      MR. VENTRONE:  And Mark Ventrone for the

3          County of Onondaga.

4     **S I D N E Y   M A N E S**, Having been called as a witness

5     and being first duly sworn, testified as follows:

6     **EXAMINATION BY**

7     **MR. JULIAN:**

8          Q.   Good morning, Mr. Manes.  We've met before.

9     Bob Julian for the Defendants.  Again, if I cut you off,

10    just tell me, because of the nature of the communication

11    that may happen, it's not my intent.  All right?

12         A.   All right.  Thank you, Mr. Julian.

13         Q.   How are you today?

14         A.   Very well, thank you.

15         Q.   Good.  So what I'd like to do is if you recall

16    in your first deposition, you spoke about the Nanette

17    Gordon case, do you remember that?

18         A.   Yes.

19         Q.   And do you have any files or records with

20    regard to that case?

21         A.   Yes.

22         Q.   You do?  Is that case relevant to this case,

23    the case you brought on behalf of Mr. Rivas' estate, in

24    your opinion?

25         A.   No.

```
1                    MR. KORENBAUM:  Objection to the form of

2               the question, but you can answer.

3       A.   No, not relevant at all.

4       Q.   Okay.  Is there anything about that case that

5   in your opinion pertains to the relationship between

6   Fitzpatrick and Mitchell?

7                    MR. KORENBAUM:  Could you repeat the

8               question, please?

9                    MR. JULIAN:  Sure.  Actually, that's fine.

10              I'll move on.

11      Q.   Mr. Manes --

12                   MR. JULIAN:  Could we bring up Exhibit A,

13              the Complaint, please?

14      Q.   -- are you able to see that, sir?

15      A.   Yes.

16      Q.   Okay.  I'd like to go to the paragraph -- to

17  paragraph 101 through 103.  And would you take a look at

18  those paragraphs, please, and let me know when you're

19  done reading them?

20                   MR. KORENBAUM:  We need to go to the next

21              page, Mr. Julian.  103 continues onto the next

22              page.

23                   MR. JULIAN:  Yep.  Thanks. Sorry.

24                   THE WITNESS:  Back two.

25                   MR. KORENBAUM:  Back, please.  I'm sorry.
```

SIDNEY MANES by JULIAN                    8

1                    Mr. Manes said back two.

2                         MR. JULIAN:  It's all right.

3          Q.   Mr. Manes, tell us when you want us to scroll.

4          A.   Okay.

5          Q.   Does that mean you want us to scroll?

6          A.   No, not yet.

7          Q.   Okay.  Sorry.

8          A.   Okay.  You can go on.

9          Q.   Okay.  Thank you.  If I can direct your

10    attention --

11                        MR. KORENBAUM:  Hold on.  He has to finish

12               reading the end of the paragraph.

13                        MR. JULIAN:  Okay.  Sorry.  Sorry.

14         A.   Through 103?

15         Q.   Yes.

16         A.   Okay.  I've now read them.

17         Q.   Okay.  Thank you.  Now if we can go back to

18    102, please?  Paragraph 102 states that Fitzpatrick,

19    quote, deliberately withheld it, meaning the exculpatory

20    affidavit from the defense in violation of his obligation

21    under Brady and its progeny, do you see that?

22         A.   Yes, I see it.

23         Q.   What was your basis for making that allegation?

24         A.   I believe that came from the court records.

25         Q.   Okay.

SIDNEY MANES by JULIAN                                    9

1          A.    I was not at the trial.

2          Q.    Sure.  There are lots of courts in this case.

3     Can you tell me what specific court you're referencing?

4          A.    The trial court.

5          Q.    The trial court?  And can you tell me your

6     basis for alleging that this was deliberately withheld?

7          A.    The trial record, to the best of my knowledge.

8     I was not at the trial.

9          Q.    Okay.  Is there a particular part of the trial

10    record that you recollect that caused you to allege that

11    Fitzpatrick deliberately withheld this?

12         A.    I recall in reading the record, there was a

13    discussion between the judge, Mr. Fitzpatrick and

14    Mr. Calle, Mr. Rivas' attorney.

15         Q.    Okay.  And what do you remember about that

16    discussion that forms the basis for the allegation that

17    this was deliberately withheld?

18         A.    The record, as I recall, if I can remember,

19    that particular document, which was a reference through

20    possible other person who might have committed the crime,

21    that was only shown to -- according to the record, as I

22    recall, that was only shown to Mr. Calle at the time of

23    the trial and not before.

24         Q.    I understand that, but what is your basis for

25    saying it was deliberate rather than inadvertent?

1      A.   Well, there was no record of it by

2   Mr. Fitzpatrick in the record that he had provided that

3   for the indicating in the record.

4      Q.   When you say there was no record of it, could

5   you be more explanatory, please?

6      A.   Well, a document, when it's presented to the

7   other side, is usually recorded, this was not recorded.

8      Q.   Right.  And what I'm trying to determine in

9   terms of your knowledge is your basis for saying that was

10  not -- that that was deliberately not provided as opposed

11  to inadvertently not provided, what is your basis?

12     A.   Well, it didn't come out until they were

13  already in trial.  There was a not document which had

14  been provided prior to the trial.

15     Q.   Okay.  Has anyone told you that Fitzpatrick

16  acknowledged that he deliberately withheld this document?

17     A.   Not that I remember.

18     Q.   With regard to -- could you now read paragraphs

19  104 to 111, please?

20     A.   What was the last paragraph you wanted me to

21  read?

22     Q.   Yes.  111.

23     A.   Oh, okay.  Okay.  I've read them.

24     Q.   Thank you.  Are you claiming any misconduct on

25  Fitzpatrick's part with regard to paragraphs 104 to 111?

1          A.   I don't understand your question, please.

2          Q.   Are you claiming that Fitzpatrick did something

3     wrong with regard to paragraphs 104 to 111?

4               MR. KORENBAUM:   Object to the form of the

5               question.   Mr. Manes can answer it.

6          A.   I was not at the trial, but I have read the

7     documents maybe out of the trial, and this was an issue

8     that was made as I recall in the testimony about the

9     return of the book; further, there were -- yes, that all

10    came from the record.

11         Q.   Okay.   Are you claiming that Fitzpatrick did

12    anything inappropriate with regard to paragraphs 104 to

13    111?

14              MR. KORENBAUM:   Objection.   Mr. Manes can

15              answer.

16         A.   The only thing that I recall was that there

17    were fingerprints on the book that were never identified

18    as being Mr. Rivas'.   There were other people that were

19    never identified.

20         Q.   Is there anything about that that you're

21    claiming was inappropriate or misconduct on Fitzpatrick's

22    part?

23         A.   Well, it seemed in the record that he was

24    trying to show that Mr. Rivas had returned the book as a

25    ploy as to the time of death or that Valerie was alive at

1    that time, and it was a ploy according to the record.

2         Q.   Define "ploy."

3         A.   Well, that it was Rivas who tried to use this

4    book as being returned.

5         Q.   All right.

6         A.   Valerie on Saturday when allegedly she had been

7    killed on Friday.

8         Q.   And what do you say, if anything, Fitzpatrick

9    did that was inappropriate?

10        A.   He didn't identify anything to connect

11   Mr. Rivas to it, no fingerprints, nothing, but there were

12   two or three sets of fingerprints that were never

13   identified.

14        Q.   Okay.  Sir, do you agree that Mr. Rivas'

15   attorney was given the opportunity with regard to the

16   Barricella issue and the Affidavit from Morgan was given

17   the opportunity to adjourn and chose not to?

18             MR. KORENBAUM:  Objection.  Mr. Manes can

19             answer.

20        A.   That was in the record.

21        Q.   So you agree?

22        A.   As I recall the trial record.

23        Q.   Yes.  Okay.  Thank you.  Now, if we could go to

24   paragraphs 112 to 118, and would you be kind enough to

25   read those?

 1          A.    Yes.  Okay.  I've read them.

 2          Q.    All right.  What --

 3                MR. KORENBAUM:  Hold on, Mr. Julian.  You

 4          asked him to read through 118 and --

 5                THE WITNESS:  Oh, 118?

 6                MR. KORENBAUM:  You said 118, correct?

 7                MR. JULIAN:  Yes, I did.

 8                THE WITNESS:  Oh, I'm sorry.  I hadn't

 9          read that.

10                MR. KORENBAUM:  So he has to read 116, 117

11          and 118, the balance of 116, and then 117 and

12          118.

13                THE WITNESS:  Okay.

14                MR. JULIAN:  While he's reading, may I

15          just have one second?  I'll be right back.

16          Thank you.

17          Q.    Sir, have you read those paragraphs?

18          A.    I have, Mr. Julian.

19          Q.    Thank you.  Can you tell me, please, do you

20   claim that Mr. Fitzpatrick engaged in any misconduct as

21   set forth in those paragraphs?

22          A.    Will you repeat the question, please?

23          Q.    Of course.  Do you claim that Fitzpatrick

24   engaged in any misconduct as set forth in those

25   paragraphs?

1          A.   In my reading of the record, on the fact that

2     he identified the slides as being, I forget the

3     terminology he used, it's in those paragraphs.  Can you

4     scroll back a bit, please?

5          Q.   Sure.  Yes, by all means.

6          A.   Hold it.  Autopsy sectional slides of the

7     brain.  There were no such slides of the brain.

8          Q.   Did he use the word -- did he use the word

9     tissue as it pertains to those slides?

10              MR. KORENBAUM:  Objection.  Mr. Manes can

11          answer.

12         A.   I don't remember that, but in reading the

13    record, he totally changed the reference to the slides.

14         Q.   Is there a difference between photographic or

15    Kodachrome slides and tissue slides, to your

16    understanding?

17         A.   Yes, absolutely.

18              MR. KORENBAUM:  Objection.  Mr. Manes can

19          answer.

20         A.   Yes, absolutely.

21         Q.   What's the difference?

22         A.   Well, there's slides of the brain and not

23    tissues samples which would tell you some of the results

24    that they found in the brain, alcohol or drugs and

25    pictures of the brain, which was a picture that was taken

1    of the brain in formaldehyde, that wouldn't tell you

2    anything scientific about the brain as Dr. Wecht

3    testified.

4              MR. KORENBAUM:  That's W-e-c-h-t.

5         Q.   Do you know if the pictures of the brain were

6    pictures of the brain as sectioned or divided?

7         A.   Repeat the question, please, Mr. Julian.

8         Q.   Of course.  Were the photographs of the brain

9    that you're describing, were they photographs of the

10   brain having been sectioned or divided?

11        A.   The pictures of the brain did not show it, it

12   was in a jar filled with formaldehyde.  That would be

13   Dr. Collins who examined the brain, wrote a report that

14   said there was nothing abnormal in the brain, and that's

15   all part of the record.

16        Q.   Who is Dr. Collins?

17        A.   Dr. Collins was a professor at the University

18   Hospital, to the best of my knowledge, and he was given

19   the brain to examine in a jar, and he filled it with --

20   and he said there is nothing wrong with the brain as I

21   examined it, that's in the record.

22        Q.   He's a neuropathologist?

23        A.   To my knowledge, yes.

24        Q.   And he issued a report?

25        A.   Yes.

1          Q.    Was that a part of the autopsy report?

2          A.    I don't know whether if that's what they

3    considered it or not, but it was certainly part of the

4    record.  And if I can add one other thing, if I may.  It

5    was part of the record Dr. Wecht reviewed.

6                MR. JULIAN:  Can we go to Exhibit C,

7          please?

8                THE WITNESS:  Is that a question?

9                MR. KORENBAUM:  No.  No.

10               MR. JULIAN:  I'm sorry.  Not for you, for

11         the videographer.

12         Q.    All right.  Sir, I show you Exhibit C and ask

13   you to examine the same.  Would you be kind enough to

14   read it, and then I'll ask you some questions about it?

15         A.    Sure.  I've read it.

16         Q.    All right.  Is this what you're referring to in

17   terms of Dr. Collins' report?

18         A.    Yep.

19         Q.    Can we agree that he says, "Coronal sections of

20   the cerebral hemispheres reveal essentially normal

21   development of the brain without evidence of pathologic

22   abnormality," can we agree he says that?

23         A.    That's in his report, yes.

24         Q.    All right.  Can we agree that he says, "The

25   deeper areas of the brain are riddled with cavities

SIDNEY MANES by JULIAN                    17

1    developed due to decomposition," do you agree that he

2    said that?

3         A.   Yep, it's in the report.

4         Q.   And can we agree that his diagnosis was,

5    "Normal brain with postmortem decomposition," can we

6    agree that he said that?

7         A.   Yes.  And Dr. Wecht --

8              MR. KORENBAUM:  There's no question.

9              THE WITNESS:  There's no question?  Okay.

10        Q.   Do you have an understanding as to what he

11   meant by coronal sections of the cerebral hemispheres?

12             MR. KORENBAUM:  Objection.  Mr. Manes can

13        answer.

14        A.   According to Dr. Wecht, when you put the brain

15   into formaldehyde, there is a decomposition that starts

16   approximately ten days after it's submerged, and

17   Dr. Wecht was very clear that there were no brain slides

18   other than the two pictures that he saw and that there is

19   not any justification for extending the time of death

20   based upon the decomposition of the brain in

21   formaldehyde, no scientific reason.

22        Q.   So are you saying that your understanding as to

23   the words "coronal sections" are based on what you just

24   told me?

25        A.   Yes.

```
 1              MR. JULIAN:  Okay.  Can we go back to

 2              Exhibit A, please, and can we go to number one,

 3              paragraph number 118?

 4         Q.   Sir, you state in paragraph 118, "By doing the

 5    aforementioned, thr defendants perjured themselves."  How

 6    did they perjure themselves?

 7              MR. KORENBAUM:  Objection.  Mr. Manes can

 8              answer.

 9         A.   When I read the record, the time of death was

10    determined to be Saturday night or Sunday morning from

11    which the district attorney acknowledged that Mr. Rivas

12    had a perfect alibi for Saturday night and Sunday morning

13    in regard to her death.  There was an opening Friday

14    night, according to the record, of three hours when there

15    was the possible no basis of an alibi and it was

16    necessary to stretch the time of death according to the

17    record.

18              Now, there was documentation to substantiate

19    the time of death initially found by Dr. Mitchell and

20    there's information to the police who did, in fact,

21    obtain a warrant identifying those times when Mr. Rivas

22    might have killed Valerie and they had to find a

23    different time of death.  From the record, it seemed to

24    me that without question, they used the brain and the

25    slides and notes to justify the moving of the time of
```

1    death.

2                    MR. JULIAN:  Can we go to Exhibit D,

3            please?

4                    VIDEOGRAPHER:  Did you say D, sir?

5                    MR. JULIAN:  D as in dog, yes.

6                    VIDEOGRAPHER:  All right.  Thank you.

7        Q.   Sir, can we look at the narrative medical

8    history, please, in the lower left-hand corner?

9                    MR. KORENBAUM:  It needs to be rotated.

10       Q.   Do you see the narrative medical history?

11       A.   I didn't understand that.

12       Q.   Okay.  Simple question.  Do you see Exhibit D

13   where it says, narrative slash medical history?

14                   MR. KORENBAUM:  It's very small,

15           Mr. Julian.  Can you enlarge it?  Thank you.

16           Too much.

17                   MR. JULIAN:  Yep.

18       A.   The deceased was found prone in her residence.

19   Yep, I see that.

20       Q.   All right.  Does this record -- withdrawn.

21           Can we agree that this is a -- I'm sorry.  I

22   apologize.

23       A.   That's all right.

24       Q.   Can we agree that this is a record that was

25   generated by the medical examiner's office?

1       A.   I'm sorry.  Would you tell me the question

2   again?

3       Q.   Of course.  Can we agree that this was a record

4   generated by the medical examiners's office?

5       A.   I'm sorry.  I would assume so, but I can't tell

6   that.

7       Q.   Are you taking this record into consideration

8   when you allege that Mitchell and Fitzpatrick perjured

9   themselves in paragraph 118 of the Complaint?

10                  MR. KORENBAUM:  Objection to the form of

11              the question.  Mr. Manes can answer it.

12      A.   I have no idea when it was written, I have no

13  idea who wrote it.  I can't answer that.

14      Q.   Okay.  In terms of the fabrication of evidence

15  against Rivas, can you tell me when that occurred in

16  terms of the timeframe as you allege it in paragraph 118?

17      A.   I'm sorry, Mr. Julian.  I don't understand the

18  question.

19      Q.   Sure.  You allege that there was fabricated

20  evidence against Rivas, correct?

21      A.   Yes, pursuant to the record.

22      Q.   And when did the fabrication occur, when did

23  that happen?

24      A.   To the best of my -- from the record, as best

25  as I can understand, that fabrication started with the

1   grand jury and Dr. Mitchell testifying that that new

2   review of his notes and slides.

3           MR. JULIAN:  Okay.  Now, can we go back to

4           Exhibit A, please?

5   Q.   And would you be kind enough to read paragraph

6   122, sir, and then let us know when you've read it?

7   A.   Yes, I've read it.

8   Q.   Okay.  What are you claiming in this paragraph?

9           MR. KORENBAUM:  Objection to the form of

10          the question.  Mr. Manes can answer if he

11          understands it.

12  A.   Well, as I read it, after Hector was convicted,

13  Dr. Mitchell resigned from his position.  Now pursuant to

14  the records, there were a number of outstanding

15  proceedings that were still in effect as concerns

16  Dr. Mitchell and those were all dropped and the office

17  criminal investigation into Mitchell and the New York

18  State Department of Health investigation into Mitchell

19  all dropped and Dr. Mitchell resigned and went to another

20  location.

21  Q.   All right.  Have you ever discussed with

22  Mr. Fitzpatrick your claim that he dropped his office's

23  criminal investigation into Mitchell?

24  A.   I've never discussed that with Mr. Fitzpatrick.

25  Q.   Have you ever discussed that with anyone?

1          A.   Was that the question?

2          Q.   Yes.

3               MR. KORENBAUM:   Other than his lawyers?

4               MR. JULIAN:   Other than his lawyers, of

5          course.   Thank you, Scott.

6          A.   I don't know.   What's the question?

7          Q.   Have you ever discussed the allegation in

8     paragraph 122 that defendant Fitzpatrick dropped his

9     office's criminal investigation into Mitchell with anyone

10    other than your lawyers?

11              MR. KORENBAUM:   So I should broaden the

12         objection as well to any cocounsel with respect

13         to postconviction proceedings.   I assume you

14         agree to that, as well, Mr. Julian?

15              MR. JULIAN:   You're serious that would be

16         attorney-client communication?

17              MR. KORENBAUM:   Or work product.

18              MR. JULIAN:   Okay.   For the purpose of

19         getting through this, sure, but reserving my

20         right to further have a determination.

21         Q.   Want me to do it one more time, Sidney?

22         A.   Yes, please.

23         Q.   Okay.   Have you discussed with anyone, other

24    than lawyers in this case or lawyers who were

25    representing Mr. Rivas and/or his estate in any

SIDNEY MANES by JULIAN                    23

1    proceeding, the allegation that Fitzpatrick dropped his

2    office's criminal investigation into Mitchell?

3         A.   I'm sorry.  I can't remember whether I did or

4    not.

5         Q.   Okay.  Did anyone outside of your lawyers ever

6    tell you in words or substance that Fitzpatrick dropped

7    his office's criminal investigation into Mitchell, and if

8    so, who?

9         A.   From my best -- no.  I guess my best

10   recollection was that Dr. Mitchell had a lawyer, Sidney

11   Cominski, and Sidney Cominski and Mr. Fitzpatrick and

12   Dr. Mitchell had a conversation in which I was close by

13   but did not participate in the discussion between

14   Dr. Mitchell, Fitzpatrick and Sidney Cominski.

15        Q.   Did you overhear the discussion?

16        A.   I just knew of the discussion because I was

17   there, but I was not part of the discussion.

18        Q.   No.  But did you hear what was said?

19        A.   Well, it had to do with some of the proceedings

20   that were outstanding against Dr. Mitchell by both the

21   DEC, the department of health, but I didn't hear any of

22   the negotiations or what actually transpired.

23        Q.   When did this occur?

24        A.   Sometime after -- well, I'm sorry.  I just

25   don't remember.

```
 1         Q.   Where did this occur?

 2         A.   Where?

 3         Q.   Where.

 4         A.   Oh, it took place in the court room.

 5         Q.   Okay.  Why were you in the court room?

 6         A.   I was there with Dr. Mitchell in regard to the

 7   Nanette Gordon case in which Dr. Mitchell was a suspect.

 8         Q.   And can we agree that this was long before the

 9   Rivas trial?

10         A.   No, we can't agree to that.

11         Q.   We can't agree to that?

12         A.   No.

13         Q.   Well, can we agree it was before the Rivas

14   trial?

15         A.   Yes, I believe it was.

16         Q.   Can you tell me why you were all in the court

17   room, what was the reason for being there?

18         A.   I can't remember at this point.

19         Q.   Can you tell me what courthouse it was?

20         A.   It was supreme Court Onondaga County.

21         Q.   Can you tell me who the judge was?

22         A.   I believe it was Judge Donald Miller, as I

23   recall.

24         Q.   Donald Miller, M-i-l-l-e-r?

25         A.   I'm sorry.  Say it again, please.
```

1        Q.   Yeah.  Donald Miller, M-i-l-l-e-r?

2        A.   That's correct.

3        Q.   Okay.

4        A.   I think that's who it was.

5        Q.   Do you have any documents pertaining to that

6   proceeding?

7        A.   There's a record, a full record.

8        Q.   Do you have it?

9        A.   I don't know whether I do or not at this point.

10        Q.   Will you look to see if you do?

11        A.   I'll look, certainly.

12        Q.   Okay.  In a general sense, can you explain the

13   purpose of your being in the court room with Judge Miller

14   and Mr. Fitzpatrick and Mr. Cominski and Dr. Mitchell?

15        A.   Is this relevant?

16             MR. KORENBAUM:  Note my objection.  You

17        can answer the question.

18        A.   Okay.  Dr. Miller -- no, not Dr. Miller.

19   Dr. Mitchell had issued a death certificate, this

20   concerns Nanette Gordon being undetermined how she died,

21   and everything in the record that I reviewed indicated

22   clearly that she had been murdered.  We -- I applied to

23   Judge Miller, I think there was a Petition I filed to

24   compel Dr. Mitchell to issue a new death certificate, and

25   I outlined to the judge what was referenced in the

SIDNEY MANES by JULIAN                          26

1          autopsy report that it seemed to be a murder.  The judge

2          agreed to designate three other medical examiners to

3          examine the documents and to make a determination to the

4          court in regard to whether or not she had been murdered.

5          Two out of the three decided that, yes, it was a murder,

6          and at that point the judge directed Dr. Mitchell to

7          issue a new autopsy report and that cause of death as

8          being murder, and there was a series of appearances in

9          court, and it was at one of those appearances where

10         Mr. Fitzpatrick, Mr. Cominski, Dr. Mitchell discussed

11         whatever they discussed, and I was there, as well, but

12         did not overhear it.

13              Q.   Okay.  And can you explain to me, please, what

14         that has to do with your allegation in paragraph 122 that

15         defendant Fitzpatrick dropped his office's criminal

16         investigation into Mitchell, if anything?

17              A.   He testified in the Rivas case --

18                   MR. KORENBAUM:  Hold on.  The court

19                   reporter can't -- there's background noise I

20                   believe on Mr. Julian's perspective and he's

21                   trying to address that.

22                   THE WITNESS:  All right.

23                   MR. KORENBAUM:  And the court reporter is

24                   having difficulty hearing, is that right?

25                   MR. JULIAN:  Let me -- if we can just take

```
1              five minutes, let me see if I can end the

2              background noise.

3                   VIDEOGRAPHER:  It is 11:03 a.m.  We're

4              going off the record.

5                   ( Whereupon, a recess was taken )

6                   VIDEOGRAPHER:  It's 11:12 a.m. and we're

7              back on the record.

8                   ( The requested material was read )

9    Q.    Are you able to answer that, Mr. Manes?

10                  MR. KORENBAUM:  Object to the form of the

11             question.

12   A.    The only thing I can tell you -- no.  He

13   subsequently left Syracuse without any further criminal

14   proceedings against him, Dr. Mitchell, and he left and

15   got another job in another community.

16   Q.    What relationship, if any, is there in terms of

17   what you've just said to the Nanette Gordon case?

18   A.    Well, he was a suspect in the Nanette Gordon

19   case.

20   Q.    Okay.

21   A.    There was a number of charges by the department

22   of environmental conservation.  There was a mentor

23   assigned to Dr. Mitchell by the department of health, and

24   as I recall the record, Dr. Mitchell was admonished for

25   the operation of his department and all of those things
```

SIDNEY MANES by JULIAN                           28

1    were outstanding, he left with a good bill of health.

2        Q.   So what you just described all occurred with

3    regard to the Nanette Gordon case?

4                MR. KORENBAUM:  Objection.  You can

5                answer, Mr. Manes.

6        A.   It was all part of it, I guess, in the sense of

7    he being a suspect in her murder.  In the record,

8    Dr. Mitchell disappeared for six hours on the night that

9    she was murdered and nobody knew where he was, he said he

10   fell asleep.  So there was lots of little things hanging

11   out there.

12       Q.   Okay.  And can you explain to me what this has

13   to do with your claim that Fitzpatrick dropped his

14   office's criminal investigation into Mitchell in

15   paragraph 122?

16               MR. KORENBAUM:  Objection.  You can answer

17               it.

18       A.   He walked away without one charge being -- I

19   mean, without any further proceedings against him by the

20   district attorney's office.

21               MR. JULIAN:  Could we go to paragraph 191,

22               please?

23       Q.   Mr. Manes, could you take a moment and read

24   paragraph 191, please?

25       A.   I've reviewed it.

1       Q.   Thank you.  With regard to that paragraph, it

2   is stated in the Complaint that the defendants,

3   Fitzpatrick and Mitchell, caused Plaintiff's decedent

4   Hector Rivas to be prosecuted with malice, do you see

5   that?

6       A.   Yes.

7       Q.   Could you please give me, in terms of your

8   understanding and basis, each and every factual

9   circumstance which causes you to allege this?

10              MR. KORENBAUM:   Objection.  Mr. Manes can

11          answer.

12      A.   When the death occurred of Valerie Hill, in the

13  interrogation of Mr. Rivas for twelve hours by the police

14  department, he was told that although he had been

15  considered a suspect, to the best of my knowledge as I

16  remember the record, and that he was free to go.

17          He stayed in Syracuse for another two years or

18  so and subsequently went back to the Bronx, which was his

19  home, and six years later, almost six years later without

20  any definitive determination or other evidence produced,

21  Mr. Rivas was presented to the grand jury and he was

22  indicted for murder one and murder two.

23          Now after six years without any further

24  evidence, it seems to me and in the review of the record,

25  that he was profiled and subsequently wound up to be

1    found guilty of murder in the second degree.

2        Q.    Is there anything else that you would like to

3    provide that supports your claim of malice on the part of

4    Fitzpatrick and Mitchell?

5                    MR. KORENBAUM:  Objection.  You can

6            answer.

7        A.    Well, after the trial and 22 years or so of

8    being incarcerated, and the second circuit court of

9    appeals found him actually innocent and mandated that he

10   be released and that the guilty plea be disposed of,

11   which is exactly what happened with great difficulty and

12   objections and so forth that he was, in fact, found to be

13   actually innocent, and that's where we are.

14       Q.    Anything else?

15       A.    The record, I guess, speaks for itself at this

16   point, that's all I can tell you.

17       Q.    I'm sorry, Sidney.  We missed the first part of

18   your answer.

19                   MR. JULIAN:  Scott, if you want to tell us

20           what he said.

21                   MR. KORENBAUM:  Why don't you just repeat

22           what you said, Sidney.  I think what he said,

23           I'm not sure we're on the same page, the last

24           thing Mr. Manes said well, the record speaks

25           for itself.

SIDNEY MANES by JULIAN                    31

1              THE WITNESS:  Yeah.

2        Q.   Okay.  What are you referring to in terms of a

3   court decision that references your representation that

4   Mr. Rivas was found to be actually innocent?

5        A.   The court of appeals back in the circuit found

6   that there was questions in regard to the Brady material

7   which was not supplied and it was exculpatory, the fact

8   that the brain slides didn't exist and were used by

9   Mr. Fitzpatrick to obtain a conviction that the time of

10  death was subsequently changed and extended because of

11  the brain slides' composition or decomposition, all of

12  those things they took into account and as the activities

13  of Mr. Fitzpatrick with regard to documentation that was

14  not supplied to Calle, his lawyer, who was also found to

15  be ineffectual in his handling of Mr. Rivas' case.  All

16  of those things were taken into account by the second

17  circuit.  I appeared before them on three separate

18  occasions where the district court was overruled three

19  separate times and the court finally said give him a new

20  trial.

21       Q.   And a new trial was scheduled prior to his

22  death, correct?

23       A.   A new trial was -- say it again, Mr. Julian.

24       Q.   Scheduled prior to his death.

25       A.   Yes.  He was to be retried on July 18th.  He

SIDNEY MANES by JULIAN                    32

1    died on July 10th, a week before the trial.

2        Q.   Didn't you bring a proceeding in the court of

3    claims to attempt to have him declared actually innocent?

4        A.   I'm sorry.  Would you say that again, please?

5        Q.   Did you bring a proceeding in the court of

6    claims to have Mr. Rivas declared actually innocent?

7                    MR. KORENBAUM:  Objection.  You can

8                answer.

9        A.   I'm sorry.  I don't remember.

10                   MR. JULIAN:  Okay.  As to -- can we now go

11               to paragraph 194?

12       Q.   And I would ask you, sir, to read paragraphs

13   194 through 200.

14                   MR. KORENBAUM:  I'm sorry.  194 through?

15                   MR. JULIAN:  200.

16                   MR. KORENBAUM:  Thank you.

17                   MR. JULIAN:  You're welcome.

18       A.   Can you go up a bit, please?  Thank you.  Was

19   it through 199?

20                   MR. KORENBAUM:  200.

21       A.   Oh, 200.  Okay.  I think I've read it.

22       Q.   If we can go back now and look at paragraph

23   195.  This paragraph says that Fitzpatrick and Mitchell

24   utilized process with the intent to harm Hector Rivas

25   without economic or social excuse or justification, do

SIDNEY MANES by JULIAN                33

1    you see that?

2         A.   Yep, I see it.

3         Q.   To your knowledge, did Mitchell issue any

4    process?

5                   MR. KORENBAUM:  Objection to the form of

6              the question.  Mr. Manes can answer.

7         A.   I don't understand the question.

8         Q.   Right.  Well, my question is:  Mitchell, as

9    medical examiner, did he ever summons Mr. Rivas?

10        A.   I don't understand that at all, Mr. Julian.

11   Forgive me.

12        Q.   No.  What I'm trying to figure, I mean you

13   claim in this second claim that Mitchell regularly issued

14   process against Rivas.  What process did he issue?

15                  MR. KORENBAUM:  Objection.  You can

16             answer.

17        A.   The process was, I think, is his conversation

18   and testimony at the trial.

19        Q.   Okay.  But to your knowledge, did he issue any

20   specific documents that caused Rivas to be subject to

21   process?

22                  MR. KORENBAUM:  Objection.  You can

23             answer.

24        A.   The records said when he testified in the grand

25   jury, that there were notes and there were brain slides

1    or slides - excuse me - and the notes were never examined

2    by Mr. Calle, the brain slides were never examined by

3    Mr. Calle, and Mr. Calle was not prepared for this trial.

4    He did a very ineffective defense for Mr. Rivas.  Now,

5    that's what the record says.

6                    MR. KORENBAUM:  Mr. Manes, I'm not sure

7                    that was responsive to Mr. Julian's question.

8                    Mr. Julian, why don't you repeat the question,

9                    if that's okay.

10                    MR. JULIAN:  That's fine, if it's all

11                    right with you, Scott.  Lisa, could you just

12                    read the question back, please?

13                    ( The requested material was read )

14                    MR. KORENBAUM:  Referring to Dr. Mitchell,

15                    correct?

16                    MR. JULIAN:  Yes, correct.  Thank you.

17                    MR. KORENBAUM:  Object to the form of the

18                    question now, but Mr. Manes can answer it.

19    A.    The only response I can give you is that the

20    process was the testimony that he gave.

21    Q.    Now, as it pertains to Fitzpatrick, what

22    regularly issued process against Rivas are you claiming

23    he issued?

24                    MR. KORENBAUM:  Object to the form of the

25                    question.  Mr. Manes can answer it if he

SIDNEY MANES by JULIAN                    35

1                understands it.
2          A.    He prosecuted after six years after the death
3     of Valerie Hill and there was nothing presented to change
4     that except the testimony by Dr. Mitchell.
5          Q.    You state in paragraph 196, "Defendants were
6     seeking a collateral advantage or corresponding detriment
7     to Hector Rivas which was outside the legitimate ends of
8     the process."  Can you explain that?
9                MR. KORENBAUM:  Object to the form of the
10               question.  Mr. Manes can answer it.
11         A.    That was how I read the record.
12         Q.    Okay.  Can you tell me what collateral
13    advantage either Fitzpatrick or Mitchell was seeking?
14               MR. KORENBAUM:  Object to the question.
15               Mr. Manes can answer it.
16         A.    Just that he had -- that Mr. Fitzpatrick had
17    just been elected as the new district attorney in
18    Onondaga County and he was opening up cold cases, and
19    Hector Rivas was one of those cold cases that he opened,
20    and he decided that Mr. Rivas was the murderer, and with
21    Dr. Mitchell's help, he proved it.
22         Q.    Is it, in your opinion, appropriate for a
23    district attorney to open closed cases, in a general
24    sense?
25         A.    I'm sorry.  I have no idea of that.

1      Q.   Can we look at paragraph 197?  You state, "The

2  closing out of which inured to the benefit of the

3  Onondaga District Attorney's office's stature and

4  statistics and to give defendant Fitzpatrick another,

5  'notch on the belt,'" do you see that?

6      A.   Yep.

7      Q.   Who were you quoting?

8      A.   Who am I quoting?

9      Q.   I'm sorry.  I didn't hear you.

10          MR. KORENBAUM:  He was asking you.

11     Q.   Well, the quote notch on the belt is in

12  quotation marks, and I'm asking who you were quoting.

13     A.   Well, I don't -- I can't answer that question.

14  I have no idea.

15     Q.   In a general sense, you claim in paragraph 199

16  that Mr. Rivas enured damages, you also make that claim

17  in paragraph 187, and it occurs throughout the Complaint.

18  So if I could just ask you several general questions

19  about Mr. Rivas.  Can you tell me, please, if you know,

20  what his background and training was?

21     A.   Yes.

22     Q.   Would you, please?

23     A.   Yes.  Mr. Rivas was a certified plumber in the

24  County of Onondaga, in the County of Madison.  He had a

25  business going, he was quite successful at it, and that

SIDNEY MANES by JULIAN                     37

```
1    he owned property in Cazenovia, an apartment complex he

2    owned, collected rents.  He was successful a businessman

3    and did a lot of work as a plumber, he got paid

4    accordingly.

5         Q.   Do you have any records associated with his

6    business?

7         A.   I don't.  I don't believe I do, no.

8         Q.   Will you search your records to see if you do,

9    and if so, would you provide them to your lawyer?

10        A.   Okay.

11              MR. KORENBAUM:  Mr. Julian, just with

12              respect to any requests for documents that

13              you're making today, tomorrow, previously, just

14              would you follow them up in writing, we'd

15              appreciate it.

16        Q.   Okay.  Do you have any of his tax returns?

17        A.   Do I have what?  Excuse me.

18        Q.   Any of his tax returns.

19              MR. KORENBAUM:  Tax returns.

20        A.   No, I don't.  No, I don't.

21        Q.   Do you know if he was employed between the time

22   of Valerie Hill's death and his indictment?

23        A.   Yes.

24        Q.   Where was he employed?

25        A.   He was a super in the Bronx of a large
```

SIDNEY MANES by JULIAN                    38

1      apartment complex where he was in charge of the

2      maintenance of that apartment complex and had an

3      apartment there.  He was the super, superintendent.

4           Q.   Superintendent, yes.  Do you know what he was

5      earning in that capacity?

6           A.   I don't know.

7           Q.   Do you know who, if anyone, he was supporting?

8           A.   Well, he was married, had a child and himself.

9      He had two children, a child by his first marriage and a

10     child by a second.

11          Q.   Do you know the age of his child at the time he

12     was indicted?

13          A.   Yes.  His age, yes.

14               MR. KORENBAUM:  Children's age.  He said

15               children's age, right?

16               MR. JULIAN:  Thank you, yes.  Children's,

17               I apologize.  Children's.

18          A.   He had a boy who was 20, went into the Army,

19     and then he subsequently had another child when he was

20     while in prison, and that child by the time he got out

21     was ten-years old.  Those were the two children that he

22     had, two boys.

23          Q.   Do you know the name of his first wife?

24          A.   No, I do not, sir.

25          Q.   Do you know the name of his second wife?

```
 1        A.   Yes.  Marilyn Ortiz.

 2        Q.   Do you know, were they married before he went

 3   to prison or after?

 4        A.   After.

 5             MR. KORENBAUM:  Referring to Ms. Ortiz?

 6             MR. JULIAN:  Yes.  Thank you very much,

 7        yes.  Thank you.

 8        A.   To my knowledge, it was after he was in prison.

 9        Q.   All right.  At the time he was tried, to your

10   knowledge, was he single?

11        A.   Was he single?

12        Q.   Yes, was he single?

13        A.   Yes.

14        Q.   And so the younger child was conceived after

15   his trial, correct?

16        A.   Yeah.  Yes.

17        Q.   Okay.  Do you know the status of his wife,

18   where is she living?

19        A.   Yeah.

20        Q.   Where is she living?

21        A.   Well, I don't know the address right offhand,

22   but I believe I can get you her address.

23        Q.   All right.  Is she living in New York City?

24        A.   Yeah.  Yes.

25        Q.   And do you know the status, the present status
```

```
 1    of his younger child?

 2         A.   Yes.  He's a -- the status?

 3         Q.   Yes.

 4         A.   Living well, is that what you mean?

 5         Q.   Yes.  Is he in school, what does he do?

 6         A.   Well, he's married, I think he has a child of

 7    his own, yeah.

 8         Q.   In terms of damages, can you identify what the

 9    claim is, if any, for economic damages, economic loss in

10    this case?

11              MR. KORENBAUM:  Objection to the form of

12              the question.  If you understand it, you can

13              answer it.

14         A.   I'm not sure I -- you mean -- would you say it

15    again?

16         Q.   Sure.  I'm just trying to understand if there

17    is a claim for economic damages in this case.

18              MR. KORENBAUM:  Objection.  We can

19              represent that there is.

20              MR. JULIAN:  Okay.

21              MR. KORENBAUM:  Generally, yes, there is.

22              MR. JULIAN:  All right.  Is -- I'm not

23              looking to engage in a feudal exercise.  Is

24              there some way we can have that identified for

25              us before trial?
```

```
 1              MR. KORENBAUM:  I don't think that's -- we
 2         will confer, and yes, that will be something
 3         that will be shared.
 4              MR. JULIAN:  Okay.  And can we agree that
 5         if there are tax returns or other indices of
 6         loss, that those will be provided to us?
 7              MR. KORENBAUM:  We will provide you with
 8         relevant documentation relating to that
 9         economic loss.
10    Q.   Okay.  Do you know if Mr. Rivas had engaged in
11    counseling?  And when I say counseling, did he receive
12    emotional counseling during his incarceration, to your
13    knowledge?
14    A.   I don't know.  I have no idea of emotional
15    counseling.
16    Q.   Is there a claim that there is emotional
17    injury, and if so, are there supporting documents
18    associated therewith?
19              MR. JULIAN:  Scott, you can answer.  I'm
20         not looking --
21              MR. KORENBAUM:  Yes, there is a claim for
22         spending as many years in custody we claim
23         wrongfully that were taken an emotional toll
24         on.  Yes, there is a claim for emotional
25         distress for however many years Mr. Rivas had
```

SIDNEY MANES by JULIAN                    42

1                been in custody we claim wrongfully, and so --

2                and there are specific documents relating to,

3                just to use your example, that he was receiving

4                counseling while incarcerated.  When we get

5                them, we will produce them.

6                    MR. JULIAN:  Great.  Thank you.

7        Q.  With regard to Mr. Rivas' demise, which I

8   understand was secondary to and caused by cancer, is

9   there any claim with regard to that?

10                   MR. KORENBAUM:  Mr. Julian, why don't you

11               direct the questions to Mr. Manes.  We can have

12               this conversation outside of the context of the

13               deposition.

14                   MR. JULIAN:  Okay.  Well, I'm asking him.

15                   MR. KORENBAUM:  Okay.

16       A.  Forgive me.  Mr. Julian, would you repeat it?

17       Q.  Absolutely.  Sure.  Is there any claim that the

18  defendants in this case caused or contributed to his

19  demise secondary to cancer?

20       A.  I can't answer that, other than that the fact

21  that being incarcerated for 24 years, he had a -- the

22  medical care that he had at the Onondaga County Justice

23  Center was not justice, it was very, very poor and that

24  may have contributed.  I don't know whether -- I'm not a

25  physician, so I can't answer that any further.

SIDNEY MANES by JULIAN                    43

```
1        Q.   There was a lawsuit with regard to the medical

2   care that he received, correct?

3        A.   What was the question?

4        Q.   Sure.  Did you bring a lawsuit on behalf of

5   either Mr. Rivas or his estate that sounded in medical

6   malpractice or the care that he received for his cancer?

7        A.   Yes.  There was a local odd challenge to the

8   treatment that he received and he had -- he had some

9   medical problems for which he was not really treated

10  well, and then subsequent to that he had the cancer, so

11  there was a pairing separation between the two.  And he

12  suffered terribly in the first one, and by time the

13  second one came around, which was the cancer, it had

14  gotten out of hand and so --

15            MR. KORENBAUM:  Could you repeat the

16            question, Mr. Julian?

17            MR. JULIAN:  Lisa, could you read it back,

18            please?

19                ( The requested material was read )

20            MR. KORENBAUM:  That calls for a yes or no

21            answer.

22       A.   Yes.

23       Q.   Can you tell me the basis of the lawsuit?

24            MR. KORENBAUM:  Objection.  You can

25            answer.
```

SIDNEY MANES by JULIAN                    44

1          A.   As I recall, it was -- I believe it was

2    malpractice in regard to the medical personnel, that's

3    about the best I can tell you.

4          Q.   Sure.  Did you refer the case to counsel?

5          A.   Yes.

6          Q.   Do you recall who you referred it to?

7          A.   Michelle Rudderow.  R-u-d-d-e-r-m-a-n, I

8    believe that's how it's spelled.

9          Q.   I think it's R-u-d-d-e-r-o-w.

10         A.   Oh, there you -- thank you.

11         Q.   You're welcome.  Do you recall the underlying

12   claim, was it for misdiagnosed cancer or some other

13   condition or both?

14              MR. KORENBAUM:  Objection.  Mr. Manes can

15         answer.

16         A.   I'm sorry.  I just don't remember.

17         Q.   Okay.  Do you remember how much money the case

18   was settled for?

19         A.   Yes.  It was for $25,000.

20         Q.   Do you recall who the paying defendant or

21   defendants were?

22              MR. KORENBAUM:  Objection.  You can

23         answer.

24         A.   The county or the county insurance company, I

25   should say.

1          Q.   Was the case, if you can remember, was the case

2     settled while Mr. Rivas was alive or was it settled after

3     his demise?

4          A.   After his demise.

5               MR. JULIAN:  Can we turn to paragraph 202,

6          please, of Exhibit A?

7               MR. KORENBAUM:  Do you want to take a

8          five-minute break and then we'll finish up?

9               MR. JULIAN:  How are we doing?  Do you --

10              MR. KORENBAUM:  Why don't we do this, why

11         don't we take another five-minute break, and

12         then we'll go to about 12:15?

13              MR. JULIAN:  That's fine.

14              VIDEOGRAPHER:  11:56 a.m.  We're going off

15         the record.

16              ( Whereupon, a recess was taken )

17              VIDEOGRAPHER:  It's 12:05 p.m.  We're back

18         on the record.

19         Q.   Paragraph 202 of Exhibit A, have you read it,

20    or would you read it?  I can't remember if you'd read it

21    or not, so would you read it, please?

22         A.   I have read it.

23         Q.   The claim against Fitzpatrick and Mitchell is

24    that they failed to intervene on behalf of Mr. Rivas

25    whose constitutional rights were being violated.  Can you

1    explain your claim against them in terms of what ever

2    facts or detail you have?

3                    MR. KORENBAUM:  Object to the form of the

4              question.  Mr. Manes can answer if he's

5              capable.

6         A.   I don't think I'm capable of answering that

7    question.

8         Q.   Okay.  Let's go to paragraph 205.  Would you

9    read it, please, Mr. Manes?

10        A.   Yep.  Okay.  I've read it.

11        Q.   All right.  With regard to this claim, can you

12   describe for me in terms of facts the defendants'

13   mishandling of exculpatory and/or impeaching evidence

14   both as to Fitzpatrick and Mitchell?

15                   MR. KORENBAUM:  Object to the form of the

16             question.  Mr. Manes can answer it.

17        A.   As you read the record, especially the record

18   and the decisions by the second circuit, it seemed

19   evident to me that on both Mitchell and Fitzpatrick were

20   involved somehow in the presentation of their case and

21   the evidence that was presented engaged in the violation

22   of Mr. Rivas' constitutional rights handed to the jury

23   and he was convicted by the jury based upon the

24   activities and the presentation of facts by

25   Mr. Fitzpatrick which was in effect supported by the

SIDNEY MANES by JULIAN                47

1    testimony of Dr. Mitchell, it all came from the record in

2    my determination.

3        Q.   Specifically you state in paragraph 205 that

4    there was subornation of perjury.  Can you explain that

5    allegation, please?

6              MR. KORENBAUM:  Object to the form of the

7              question.  Mr. Manes can answer it.

8        A.   From my reading of the record and the facts of

9    the district attorney's office which kept indicating that

10   they had produced all the documents and they hadn't and

11   that there was a change in Mr. Mitchell's feelings about

12   the time of the death based upon the slides which didn't

13   exist, it struck me Mr. Rivas' constitutional rights were

14   denied.

15       Q.   Then next you state, "Their own perjurious

16   testimony and their deceit."  Can you explain the factual

17   basis for that claim?

18       A.   I'm sorry.  Would you say that again, please?

19       Q.   Sure.  I apologize.

20       A.   Which one is that?  Are we in 205?

21       Q.   We're in 205.  I'll redo it.  I was coughing.

22   I apologize.

23             Can you explain the and provide the factual

24   basis for the allegation that there was perjurious

25   testimony and deceit by Fitzpatrick and Mitchell?

1              MR. KORENBAUM:  Object to the form of the

2         question.  Mr. Manes can answer it.

3         A.    In the indictment and reading other documents

4    in the record, it seems to me that Dr. Mitchell changed

5    his testimony and as a concern that Mitchell had that

6    there were claims outstanding against him, which were in

7    the hands of the district attorney, and that he actually

8    said to someone that we work for the district attorney

9    and I've never met a defendant that I wasn't able to

10   convict on the evidence.  These were all in the newspaper

11   and led me to believe that they had violated Hector's

12   constitutional rights.

13        Q.    Was that statement that your quoting, was that

14   specifically directed toward the Rivas case, to your

15   knowledge?

16        A.    I'm sorry.  Say that again, please.

17        Q.    Sure.  You're quoting something that Mitchell

18   told another person, correct?

19        A.    Yeah.  Yes.

20        Q.    Was that discussion about the Rivas case?

21        A.    That's where I read it, in the record.

22        Q.    Do you know if the discussion that Mitchell was

23   having -- withdrawn.

24              With whom did Mitchell have this alleged

25   discussion?

```
 1        A.   As I remember the record, it was to an

 2   assistant medical examiner or a new medical examiner who

 3   replaced Mitchell.

 4        Q.   Okay.

 5        A.   I'm inclined to believe it was one or two now.

 6   Sawyer, I think was there, and -- it's part of the

 7   record, it's all there.

 8        Q.   Do you recall if they were talking generally?

 9        A.   I can't answer that.

10        Q.   Do you recall if they were talking specifically

11   about the Rivas case?

12        A.   I can't answer that.

13             MR. JULIAN:  Scott, if it's okay with you,

14             this might be a good time to bag it and we'll

15             start at 9:30.

16             MR. KORENBAUM:  Okay.  Thank you very

17             much.

18             VIDEOGRAPHER:  It's 12:14 p.m.  We're

19             going off the record.

20             ( Whereupon, the examination concluded )

21                      -oOo-

22

23

24

25
```

1

2                    <u>CERTIFICATE OF WITNESS</u>

3

4          I, SIDNEY MANES, hereby certify that I have

5    read the foregoing transcript of my deposition taken on

6    October 18, 2022, at approximately 10:00 a.m. in New York

7    State pursuant to the applicable Rules of Civil Procedure

8    and that the foregoing 49 pages of the transcript are in

9    conformity with my testimony given by me, under oath, and

10   at the time and place indicated herein, (with the

11   exception of any corrections made by me on the errata

12   sheet).

13

14                _____

15                        SIDNEY MANES

16

17        SUBSCRIBED AND SWORN to before me, the undersigned

18   authority on this the _____ day of _____, 2022.

19

20

21   _____

22        NOTARY PUBLIC

23

24   My commission expires _____ day of

25   _____, 20_____.

```
 1

 2                    REPORTER'S CERTIFICATE

 3

 4        I, LISA M. SCHUSTER, a Shorthand Reporter and

 5   Notary Public in and for the State of New York, DO HEREBY

 6   CERTIFY;

 7           that the foregoing proceedings were taken via

 8   videoconference at the time and place therein set forth,

 9   at which time the witness was put under oath by me;

10           that the testimony of the witness and all

11   objections made at the time of the examination were

12   recorded stenographically by me and were thereafter

13   transcribed;

14           that the foregoing is a true and accurate

15   transcript of my stenographic notes in the above-entitled

16   matter.

17           I further certify that I am not a relative or

18   employee of any attorney or of any of the parties, nor

19   financially interested in the action.

20

21   Dated:  November 28, 2022

22

23          _____

24                    Lisa M. Schuster

25
```