# EXHIBIT "D-4"

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    * * * * * * * * * * * * * * * * * * * * * * * * *

4    SIDNEY MANES, Administrator of the Estate of HECTOR
     RIVAS,

5                        Plaintiff,

6                            No. 19-CV-844(BKS)(TWD)

7    - against -

8    ONONDAGA COUNTY; CITY OF SYRACUSE; WILLIAM
     FITZPATRICK; DR. ERIK MITCHELL; AND "JOHN DOES 1-10",

9                        Defendants.

10   * * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13

14

15

16

17                **EXAMINATION BEFORE TRIAL** of

18           **SIDNEY MANES**, Plaintiff, taken pursuant

19           to Notice, via videoconference by Zoom,

20           held in New York State on October 19, 2022,

21           and taken by LISA M. SCHUSTER, Court

22           Reporter and Notary Public, in and for

23           the State of New York.

24

25

```
 1

 2

 3     APPEARANCES:

 4

       For the Plaintiff:
 5

           BOUSQUET HOLSTEIN, PLLC.
 6         360 S. Clinton Street
           Syracuse, New York  13202
 7         BY:  JAMES SONNEBORN, ESQ.

 8         THE LAW OFFICES OF JOSHUA MOSKOVITZ, P.C.
           392 Central Avenue, 7803
 9         Jersey City, New Jersey 07307
           BY JOSHUA MOSKOVITZ, ESQ.
10
           SCOTT A. KORENBAUM, ESQ.
11         14 Wall Street, Suite 1603
           New York, New York  10005
12         BY:  SCOTT KORENBAUM, ESQ.

13

14     For the Defendants William Fitzpatrick and Erik Mitchell:

15         ROBERT F. JULIAN, PC.
           2037 Genesee Street
16         Utica, New York  13501
           BY:  ROBERT JULIAN, ESQ.
17

18     For the Defendant Onondaga County:

19         ONONDAGA COUNTY DEPARTMENT OF LAW
           421 Montgomery Street
20         Syracuse, New York  13202
           BY:  MARK VENTRONE, ESQ.
21

22         PARROTTA STUDIOS
           Rochester, New York
23         David Parrotta, Videographer

24

25
```

1                    INDEX TO WITNESSES

2                                              PAGE
     SIDNEY MANES
3
          By Mr. Julian                        7
4                                              48

5

6          By Mr. Ventrone                     25

7
                         -oOo-
8

9

                      INDEX OF EXHIBITS
10
     DEPOSITION EXHIBITS:                       ID
11

12      AAA    News article                     9

13

14

15

16

17

18

19

20

21

22

23

24                       -oOo-

25

1

2                          INDEX OF REQUESTS

3

4      SIDNEY MANES (By Mr. Ventrone and Mr. Julian)        PAGE

5       1.    Any documents in Mr. Manes' possession
              regarding appearance seeking approval by
6             surrogate court                                27

7       2.    Copies of FOIL requests by Mr. Manes
              that he says were not fully responded to       48
8

9

10

11

12

13

14

15

16

17                              -oOo-

18

19

20

21

22

23

24

25

1

2

3

4

5              S T I P U L A T I O N S

6

7

8          IT IS STIPULATED by and between the attorneys

9      for the respective parties that the testimony contained

10     herein may be used upon the trial of this action; that

11     the filing of the testimony is waived; that all

12     objections, except objections as to form, are reserved

13     until the time of trial, and that objections as to form

14     shall be noted on the record; that the examining party

15     will furnish the examined party a copy of the transcript

16     of testimony free of charge and that the testimony be

17     taken before **Lisa M. Schuster**, a Shorthand Reporter and

18     Notary Public in and for the State of New York, whose

19     oath is waived.

20

21

22                          -oOo-

23

24

25

6

```
 1              VIDEOGRAPHER: It's October 19th, 2022 and
 2         the time is 9:36 a.m. and we are back on the
 3         record.
 4              MR. KORENBAUM:  Mr. Julian, if I may just
 5         real briefly, two things.  One is Mr. Manes
 6         reserves his right -- I want to just put on the
 7         record that Mr. Manes reserves his right to
 8         review his testimony once we conclude and that
 9         will hopefully be by day's end.  The other
10         thing is when you have an opportunity, there's
11         a clarification of one of the answers that
12         Mr. Manes gave yesterday that he would like to
13         make whenever you'd like to do that.
14              MR. JULIAN:  Well, let's do it now.  This
15         is probably the right time.
16              MR. KORENBAUM:  So does Mr. Manes have to
17         be sworn first?
18              MR. JULIAN:  I waive it.  I mean, he was
19         sworn yesterday, so --
20              MR. KORENBAUM:  Why don't you just ask him
21         that he acknowledges that he's still under
22         oath.
23    S I D N E Y   M A N E S, having been called as a witness
24    and being previously duly sworn, testified as follows:
25    EXAMINATION BY
```

1      **MR. JULIAN:**

2           Q.   You acknowledge you're still under oath, right,

3      Mr. Manes?

4           A.   Yes.

5                     MR. JULIAN:  Okay.

6                     MR. KORENBAUM:  So yesterday, Mr. Julian,

7                you asked him questions about whether Mr. Rivas

8                had received any emotional counseling while

9                incarcerated, and I believe my notes reflect

10               that Mr. Manes said he didn't know, but he'd

11               like to clarify that with your permission.

12                    MR. JULIAN:  Yes, please.

13                    THE WITNESS:  During Mr. Rivas'

14               interrogation -- incarceration, a man visited

15               him on a number of occasions, his name was Joe

16               O'Brien.  Mr. O'Brien was a lawyer and he was

17               not practicing, he was a church priest or a

18               church counselor and he met with Rivas on a

19               number of occasions, primarily because he

20               believed in him, and number two, because he was

21               counseling with him.  I didn't realize that

22               that was the case, but that's what it turned

23               out to be.  He was counseling.  They not only

24               met at Sing Sing, but when Mr. Rivas was

25               transferred to Syracuse, Mr. O'Brien came to

SIDNEY MANES by JULIAN                    8

```
1              Syracuse and visited him in the justice's

2              center.  So I needed to tell you that, I didn't

3              realize.  Yes, that he was counseling with

4              Hector all during his incarceration.

5        Q.    Do you know if Mr. O'Brien is still alive?

6        A.    Yes.

7        Q.    Have you had contact --

8        A.    To the best of my knowledge.

9        Q.    I'm sorry?

10             MR. KORENBAUM:  He said to the best of his

11             knowledge.

12             THE WITNESS:  Yes.

13             MR. JULIAN:  Okay.  And when we have a

14             disconnect, Scott, feel free to jump in and

15             just --

16       Q.    Do you know where he's located approximately?

17       A.    To my knowledge, he's in Albany.

18       Q.    Have you ever seen any records generated by

19  Mr. O'Brien with regard to the counseling sessions?

20       A.    No.

21       Q.    All right.

22       A.    I had a number of conversations with him.

23       Q.    All right.  Can you summarize those

24  conversations, please?

25       A.    He very much believed in Hector's innocence.
```

1     They talked about a lot of things, and he was there for

2     Hector as a counselor I learned.  I never knew that other

3     than the fact that he was, and that's what he was doing

4     and that's what we discussed.

5           Q.   Anything specifically that you can tell me

6     about the detail of the counseling?

7           A.   Other than what I've already told you?

8           Q.   Correct.

9           A.   That's what I remember, Mr. Julian.

10               MR. JULIAN:  Okay.  Thank you.  This

11               morning I sent an article from the Central New

12               York News dated October 21st, 2012.  And Lisa,

13               could we mark it, please?  I'm not sure where

14               we left off, so if we could mark it as Exhibit

15               AAA for today's date, that won't confuse things

16               much.

17                    ( Deposition Exhibit AAA marked for

18                      Identification )

19               MR. JULIAN:  Could you put the article up,

20               please, Mr. Parrotta?

21           Q.   Mr. Manes, do you remember seeing this article

22     about you?

23           A.   Yes.

24           Q.   All right.  And did you see it when it first

25     came out?

1          A.   Yes.

2          Q.   All right.

3               MR. KORENBAUM:  Mr. Julian, just one

4          moment, please.  I'm just going to note my

5          objection to these, to the questions.  We

6          received this about 15 minutes -- approximately

7          about 9 a.m., 9:15.  And obviously I'm going to

8          allow you to ask questions about it, but just

9          note my objection as he hasn't had an

10         opportunity to review it today.

11              MR. JULIAN:  Sure.

12              MR. KORENBAUM:  But note my objection.

13         I'm not stopping you from questioning.

14              MR. JULIAN:  Yeah.  Thank you.  And he's

15         welcome to review it now.  My questions really

16         only involve one, two sentence paragraph of the

17         article; however, I think.  And if we could go

18         to page five of the article, please?  There we

19         go.

20         Q.   Now, if you see where the star is located,

21    Mr. Manes.  Right there.  I'm going to read to you the

22    two sentences I want to ask you about.

23         A.   Yes, I've read it.

24         Q.   All right.  And then could you read the

25    sentence below, also?

```
 1              MR. KORENBAUM:  I'm sorry.  Where are you
 2          asking him to read, Mr. Julian?
 3              MR. JULIAN:  Sure.  I apologize for the
 4          confusion.
 5      Q.   So first please read the following sentences:
 6  "Rivas' trial lawyer, Richard Calle, testified at a
 7  hearing in 1999 that he didn't recall ever seeing those
 8  reports before the murder trial.  If he had, he would
 9  have used them to support his argument that the murder
10  was on Saturday night and that someone other than Rivas
11  did it, Calle testified."  Next sentence, "A lawyer who
12  handled the Rivas appeal in the mid-1990's, Richard
13  Priest, said in an Affidavit that he'd reviewed Calle's
14  file and didn't recall seeing those police reports."  My
15  question is when you read this, did you ask Mr. Priest
16  for a copy of Calle's file?
17      A.   No.
18      Q.   Why not?
19      A.   I don't know why not.  I can't answer why not.
20  I read it.  I knew Mr. Priest, but I didn't think to ask
21  him for his file.
22      Q.   Did you ever ask Mr. Priest for his file?
23      A.   Not to my knowledge.
24      Q.   Did you ever file with Mr. Priest a
25  substitution of attorney?
```

SIDNEY MANES by JULIAN                12

1          A.   No.

2          Q.   Were you representing Mr. Rivas on

3     October 21st, 2012?

4          A.   I was never the attorney of record.  I was a

5     pro bono counsel trying to help Mr. Rivas recover

6     documents that occurred during his trial.  I

7     participated, not with Mr. Priest but certainly with

8     Mr. Schuman and with Mr. Langone.  I -- yes, so that was

9     the extent of my work.  I stayed involved but was never

10    -- I did not prepare other documents or lawsuits or

11    anything else.

12         Q.   Well, when you say you were never the attorney

13    of record, I don't want to go through all of the

14    appearance, but can we agree that you appeared on behalf

15    of Mr. Rivas in a number of courts?

16         A.   Yes, I participated and sat second chair.

17         Q.   But your appearance was noted as appearing on

18    behalf of Mr. Rivas in a number of courts, correct?

19         A.   Primarily in the Federal courts but not until

20    after the 440 and it went into the Federal courts, then I

21    was much more involved than I was in the state courts

22    other than making FOIL requests.

23         Q.   Who was representing Mr. Rivas, apart from

24    yourself, in 2012?

25              MR. KORENBAUM:  Objection to the form of

1              the question.  Mr. Manes can answer.

2         A.   2012.  That was Mr. Richard Langone primarily.

3    That was also Mr. Edward Klein, those were primarily the

4    two lawyers.

5         Q.   Did you ever ask them to obtain the Calle file

6    from Mr. Priest?

7         A.   Not that I recall.

8         Q.   When did Mr. Schuman represent Mr. Rivas, to

9    your recollection?

10        A.   In the 440 motion before Judge Brunetti.

11        Q.   Okay.  Did you ever ask -- you were present for

12   that, correct?

13        A.   Yes.

14        Q.   Did you ask Mr. Schuman to obtain a copy of

15   Mr. Calle's file from Mr. Priest?

16        A.   I never did that, no.

17        Q.   You're aware that his appeal was handled by yet

18   another attorney, is that correct?

19        A.   Yes.

20        Q.   Who handled his attorney -- the appeal with

21   Mr. Priest?

22        A.   I don't know.  I have no idea.

23        Q.   Okay.  Now, you've referenced --

24             MR. KORENBAUM:  One second.

25             MR. JULIAN:  What's that?

```
 1              MR. KORENBAUM:  Go ahead.
 2        Q.   You've referenced Langone and Klein as
 3   representing Mr. Rivas.  Were you satisfied with their
 4   representation?
 5              MR. KORENBAUM:  Objection to the form of
 6              the question.  You can answer.
 7        A.   Yes, I was satisfied with Mr. Langone's
 8   representation, yes.
 9        Q.   How about Mr. Klein's?
10        A.   Yes.
11              MR. KORENBAUM:  Objection to the form of
12              the question.
13              THE WITNESS:  Oh, excuse me.
14              MR. KORENBAUM:  You can answer.
15        A.   Yes.
16        Q.   Do you know if either of them ever asked for
17   adjournments of Judge Miller?
18              MR. KORENBAUM:  Objection.  You can
19              answer.
20        A.   Yes.
21        Q.   Yes what, do you know?
22        A.   Yes.
23        Q.   Did they?
24              MR. KORENBAUM:  I'm sorry, Mr. Julian.
25              What's the question?
```

1       Q.   Sure.  I apologize.  Did they ask for Judge

2   Miller to give adjournments in the retrial of Mr. Rivas?

3       A.   Yes.  The only one was that that was Mr. Klein

4   when we were sent back to Judge Miller's court to have a

5   retrial.

6       Q.   Did you object to Mr. Klein requesting

7   adjournments?

8                   MR. KORENBAUM:  Objection.  He can answer.

9       A.   We discussed it and he was -- he was in charge

10  and he had justification for saying that once he had all

11  of the information from the district attorney's office,

12  he'd be ready for trial.  They were waiting for a report

13  in regard to DNA samples of the pipes, DNA samples of a

14  number of things, and Mr. Moran kept saying they were not

15  available yet and so he was not ready for trial so he

16  kept saying, Mr. Moran kept saying, "he was ready," and

17  Mr. Klein said, "well, I don't have the documents."  And

18  so it was adjourned again and again and again, because

19  the district attorney was not able to get the analysis of

20  the DNA and other things that were necessary.

21      Q.   Was a trial date established and existent at

22  the time of Mr. Rivas' death?

23      A.   It was to be done immediately.

24      Q.   Was a trial date --

25      A.   Immediately.

SIDNEY MANES by JULIAN                    16

1          Q.    Was a trial date existent as of the date of

2     Mr. Rivas' death?

3          A.    Yes.

4          Q.    And did Mr. Rivas pass away before that date?

5          A.    One week before the trial date.

6          Q.    Was a Miss Kim Zimmer also representing

7     Mr. Rivas at that time?

8                         MR. KORENBAUM:  Objection.  What time?

9                         MR. JULIAN:  Up to the point of trial from

10                   the time the last second circuit decision up to

11                   the time of trial.

12         A.    I'm sorry.  The second circuit decision?  I

13    don't know what --

14                        MR. KORENBAUM:  His question is was Kim

15                   Zimmer representing Mr. Rivas at any point from

16                   the time of the final second circuit decision

17                   requiring the new trial or granting the writ of

18                   habeas corpus to the trial date, to the retrial

19                   date when Hector died.

20         A.    I believe that Ms. Zimmer came onboard with

21    Mr. Klein's request to Judge Miller after the case was

22    sent back to Judge Miller for a retrial.  I don't believe

23    she participated -- well, I beg your pardon.  She also

24    participated in a Federal court hearing before Judge

25    Peoples in regard to expanding on the justification for

SIDNEY MANES by JULIAN                17

```
 1   his -- for Hector's being having a gateway past the

 2   ADPPA.

 3               MR. KORENBAUM:  That's not his question.

 4               His question is from the second circuit grant

 5               to the writ of habeas corpus his trial date,

 6               was Ms. Zimmer his counsel?  It would have been

 7               in the state court action.

 8        A.   No.

 9               MR. JULIAN:  Can we go now to Exhibit A,

10               please?  And can we go to page 37 of the First

11               Amended Complaint, paragraph 224?

12        Q.   Mr. Manes, in this Complaint, there's a Cause

13   of Action alleged against the county, the city and

14   Fitzpatrick, it's called a Monell claim, do you see that?

15        A.   First let me read it.

16        Q.   Sure.  Take as much time as you need.

17        A.   What was the question, please?

18               MR. KORENBAUM:  He hasn't asked it yet.

19        A.   Oh, all right.  Okay.  I've read it.

20        Q.   Thank you.  When you commenced this lawsuit,

21   what was your factual basis for suing the City of

22   Syracuse?

23               MR. KORENBAUM:  Object to the form of the

24               question.  Mr. Manes can answer it.

25        A.   I believe the police department was under the
```

SIDNEY MANES by JULIAN                    18

1    control of the county.

2        Q.   And what did the police department --

3        A.   The city.  Excuse me.

4        Q.   I have no idea what -- if something was said, I

5    couldn't hear it, so --

6        A.   Oh, I'm sorry.  The police, I believe, were

7    under the control of the city, they were part of the city

8    administration.

9        Q.   All right.  And what was your criticism or

10   criticisms of the police?

11       A.   To the best of my recollection, there were

12   other people that were available to be talked to and

13   examined and reports filed that were never shown to me or

14   I don't know whether they were ever shown to Mr. Klein

15   during the trial period that we were getting ready.  The

16   district attorney kept handing out partial reports but

17   never what we asked for in total, and so I felt the

18   police department had a responsibility to make sure that

19   they did everything to find the correct person to charge

20   for murder.

21       Q.   Any other -- in your opinion, any other

22   failures or complaints about the conduct of the police in

23   this case?

24       A.   Well, an issue that was -- no, I guess -- they

25   went to Hector's apartment and examined the apartment

SIDNEY MANES by JULIAN                    19

1    under the auspices of a warrant that were signed by

2    justice -- by Judge McKinney, and in a review of his

3    apartment, they took a number of pictures, but then they

4    testified that Mr. Rivas had a statue, a religious statue

5    and a candle that was burning but never took a picture of

6    it, but that's what one of the policemen testified to.

7    Mr. Rivas totally denied that.  So there was those little

8    things.

9         Q.   All right.  Anything else?

10        A.   I'm not sure what kind of an interrogation they

11   did to the Patsy Barric -- I can't think of her last

12   name, his last name.

13             MR. KORENBAUM:  Barricella.

14        A.   Barricella who said he committed the murder or

15   the stalker who was known in the neighborhood of where

16   she lived.  These were people who were certainly suspect,

17   and I thought they didn't do a great job in interviewing

18   them and present that as a defense.

19        Q.   All right.  Were you aware of anything about

20   their conduct as to whether or not the police conduct was

21   conduct they had behaved -- that they had engaged in in

22   other cases prior to this?

23             MR. KORENBAUM:  Object to the form of the

24             question.  You can answer it if you can.

25        A.   I can't answer that.

SIDNEY MANES by JULIAN                    20

1          MR. JULIAN:  All right.  You can take down

2          the Complaint.

3      Q.   You testified about Dr. Cyril Wecht and his

4  opinions, do you recall that?

5          MR. KORENBAUM:  Object to the form of the

6          question, but if you recall that, you can

7          answer.

8      A.   At this time or at any other time?

9      Q.   Good point.  Let me ask the question in a

10  different way.  During the course of your depositions

11  over the several days that we've done them, you've made

12  several references to Dr. Wecht, Dr. Cyril Wecht, am I

13  correct?

14     A.   Yes.

15     Q.   And have you -- and you've relied upon his

16  opinions, in part, in terms of bringing this lawsuit,

17  correct?

18          MR. KORENBAUM:  Object to the form of the

19          question, but Mr. Manes can answer it.

20     A.   To the best of my knowledge, yes.

21     Q.   Now, have you -- what is your awareness of

22  Dr. Wecht's background?

23          MR. KORENBAUM:  Object to the form of the

24          question, but Mr. Manes can answer it.

25     A.   He provided a vitae of his background and the

SIDNEY MANES by JULIAN                           21

1    books that he had published on the talks he had given,

2    the reports he had filed and the number of examinations

3    he had done, and he was a foremost authority.

4         Q.   Are you aware that he was the coroner of

5    Allegany County?

6         A.   Yes.

7         Q.   Are you aware that Allegany County sued him and

8    took a judgment against him for $172,410 for doing his

9    private work on county time with county facilities?

10             MR. KORENBAUM:  Objection.  Mr. Manes can

11             answer.

12        A.   No.

13        Q.   Were you aware that he ultimately reached a

14   settlement with the county and repaid the county $200,000

15   in or around 1992?

16             MR. KORENBAUM:  Objection.  Mr. Manes can

17             answer.

18        A.   No

19        Q.   Are you aware that he was indicted twice?

20             MR. KORENBAUM:  Objection.  Mr. Manes can

21             answer.

22        A.   No.

23        Q.   You're not aware of any of the details of those

24   indictments?

25        A.   No.

SIDNEY MANES by JULIAN                          22

1          Q.   Mr. Manes, are you aware of any disciplinary

2     action taken against Dr. Mitchell by any state agency or

3     entity against him personally?

4          A.   To my knowledge, the Department of

5     Environmental Conservation had a number of citations that

6     were issued against Dr. Mitchell and his operation as

7     medical examiner of the County of Onondaga.  If I recall,

8     there was over a hundred charges, citations in regard to

9     blood being poured down the sink, body parts being

10    boiled, body parts being destroyed, body parts being

11    boiled and buried, those were charges from the Department

12    of Environmental Conservation.

13         Q.   Are you aware of any finding made personally

14    against Dr. Mitchell by DEC?

15         A.   I don't understand the question.  Repeat it,

16    please.

17         Q.   Well, the question -- you've told me about the

18    charges.  I'm asking you are you aware as to whether or

19    not the DEC leveled any fines or disciplinary action

20    against Dr. Mitchell personally with regard to those

21    charges?

22         A.   No, I don't know that.

23         Q.   Are you aware of any finding or penalty or fine

24    ever leveled against Dr. Mitchell personally by the state

25    health department?

1       A.   I know they admonished him for how he ran the

2    department as medical examiner, and that they assigned a

3    monitor to oversee his actions, and that they made a

4    number of suggestions of correction, and that was as a

5    result of hearings that took place with the Department of

6    Health in which the district attorney was an attendant.

7    As far as the DEC is concerned --

8               MR. KORENBAUM:  He's asking about DOH.

9       A.   Oh, the DOH.  Okay.

10      Q.   So my question again is was there any finding

11   or fine leveled personally against Dr. Mitchell, to your

12   knowledge, by the state health department?

13      A.   I don't know that, no.

14      Q.   Have you ever learned of any disciplinary

15   action taken by the New York State Health Department

16   Professional Conduct Department?

17              MR. KORENBAUM:  Objection to the form of

18              the question.  That was -- it didn't come out

19              right, Mr. Julian.  Can you rephrase it?

20              MR. JULIAN:  I agree.  Yeah.  You got it.

21      Q.   Are you aware of any action taken by the State

22   of New York and its commission on professional conduct

23   against Dr. Mitchell finding him in violation either

24   ethically or in terms of practice?

25      A.   Well, they appointed a monitor over his

SIDNEY MANES by JULIAN                                    24

1    administration of the medical examiner's office.

2         Q.   Are you aware of any finding by the state

3    health department that Dr. Mitchell violated either

4    ethically or in terms of his practice any specific -- let

5    me reframe the question.

6              Has Mr. Mitchell had any license -- strike

7    that.

8              Has Dr. Mitchell received any disciplinary

9    determinations by the New York State Health Department

10   with regard to his license?

11        A.   Not to my knowledge, other than appointing the

12   monitor.

13        Q.   Have you ever been told by anyone that

14   Dr. Mitchell was not a suspect in the Nanette Gordon

15   case?

16        A.   Would you repeat the question, please?

17              MR. JULIAN:  Sure.  Actually, Lisa, could

18              you just read it back, please?

19                   ( The requested material was read )

20        A.   No.

21        Q.   Have you ever been told by anyone that the

22   district attorney's office identified a suspect in the

23   Nanette Gordon case?

24        A.   Yes.

25        Q.   Who told you that?

SIDNEY MANES by VENTRONE                    25

1          A.   I believe it was the sheriff's department.

2          Q.   And who did they say the suspect was?

3          A.   A young man whose mother or father were

4    involved in maintaining the apartments in which Miss

5    Gordon lived, and he was a son, and he was a suspect.

6          Q.   Do you know why he wasn't indicted or charged?

7          A.   No, I do not know.

8          Q.   Did he pass away before he could be indicted or

9    charged?

10         A.   Not to my knowledge.

11         Q.   Who told you from the sheriff's department of

12   this?

13         A.   Sorry.  I can't remember that.

14              MR. JULIAN:  Okay.  I'm going to pass the

15              witness to Mr. Ventrone.

16   **EXAMINATION BY**

17   **MR. VENTRONE:**

18         Q.   Good morning, Mr. Manes.

19         A.   Good morning.

20         Q.   Hi.  Mark Ventrone.  I represent the County of

21   Onondaga in this action.

22              You just testified about the Nanette Gordon

23   homicide, Mr. Julian asked you a few questions about that

24   suspect, the suspect in that case.  Was he a maintenance

25   worker in Nanette Gordon's building?

SIDNEY MANES by VENTRONE                                    26

1           A.   I'm not sure I remember anything being told to

2      me that he was a -- I know he was involved in the

3      building, but I don't know what his job was.

4           Q.   Do you remember or recall the last name

5      Stackhouse?

6           A.   I'm sorry.  Would you repeat that, please?

7           Q.   Do you recall hearing at or about that time

8      that his last name was Stackhouse?

9           A.   No, I'm sorry.  I can't remember that.

10          Q.   Okay.  Yesterday Mr. Julian asked you about a

11     case that was commenced, I believe you said you referred

12     a medical malpractice case to Attorney Michelle Rudderow,

13     do you recall that?

14          A.   Yes.

15          Q.   And I believe you testified that the case

16     settled.  It was a medical malpractice case and it

17     settled for $25,000?

18          A.   Yes.

19          Q.   Wasn't that case in the court of claims against

20     Upstate Medical Center for medical malpractice?

21          A.   I believe that was the case, but I'm not sure

22     it was settled on the malpractice or it was settled

23     against the county for the treatment that Mr. Rivas had

24     in the justice department or in the jail.  I think the

25     better person to answer that would be Miss Rudderow.

SIDNEY MANES by VENTRONE                    27

```
 1          Q.   Do you recall that there was an action

 2     commenced against the county in supreme court and a

 3     separate action against Upstate in the court of claims?

 4          A.   Yes, I believe that was the case.

 5          Q.   And do you recall that the action against the

 6     county was voluntarily discontinued?

 7          A.   I don't know that.

 8          Q.   Did you represent the Rivas estate in surrogate

 9     court in order to get their approval of the $25,000

10     settlement?

11          A.   Yes.

12          Q.   Would you have documents in that regard?

13               MR. KORENBAUM:  Objection to the form of

14               the question, but Mr. Manes can answer it if he

15               understands it.

16          A.   Would you repeat the question, please?

17          Q.   Would you have any documents, your Petition,

18     any pleadings in regards to your appearance seeking

19     approval by the surrogate court?

20          A.   Yes, there are documents by legal requirement.

21          Q.   And would you have those documents in your

22     possession in your file?

23          A.   They would probably be in the file at the

24     office.

25               MR. VENTRONE:  I would make a request for
```

1                any such documents that they be produced.

2                We'll join the same pattern that Mr. Julian is

3                following in regards to the requests for any

4                documents, we'll put it in writing.

5                     MR. KORENBAUM:  Meaning you'll commit that

6                to writing?  I believe that was the --

7                     MR. VENTRONE:  I will, yes.

8        Q.   Mr. Manes, you testified a few minutes ago that

9    you were in court before Judge Miller with Ed Klein and

10   ADA Robert Moran, I believe that was back in 2016,

11   correct?

12       A.   Yes, to the best that I remember.

13       Q.   Do you recall Judge Miller indicating he was

14   going to adjourn the trial date at that time because

15   Mr. Langone had indicated he was going to withdraw?

16       A.   Yes.

17       Q.   Do you also recall at that time that Mr. Klein

18   indicated to the court that this was a complex case and

19   he too would need more time?

20       A.   I don't remember the exact conversation or the

21   -- between the judge and Mr. Klein --

22       Q.   Okay.

23       A.   -- it's on the record.

24                     MR. VENTRONE:  Okay.  I'm going to refer

25                to, if we can call up Exhibit A, the Complaint,

SIDNEY MANES by VENTRONE                29

1              page 38.

2          Q.   Mr. Manes, I'm going to ask you to look at

3     these paragraphs 225 through 228, your allegations on

4     page 38 for a few minutes, just please take a look at

5     that page.

6          A.   Could you scroll up a bit, please?  Thank you.

7     Okay.  I've read it.

8          Q.   So going back to paragraph 225, do you see

9     where it says, "Defendants County," and then I'm going to

10    jump, "by their policymaking agents, servants and

11    employees authorized sanctioned and/or ratified the

12    defendant's wrongful acts"?

13         A.   Yep, I see that.

14         Q.   Who are you alleging at the county did that?

15         A.   The defendant's county, Onondaga County by one

16    of their -- by the district attorney of the County of

17    Onondaga who testified before Judge Brunetti that certain

18    documents that were shown to Mr. Calle and that were

19    discussed by Mr. Schuman, that there were documents that

20    were not listed as being shown to the defendant's counsel

21    which might have made a difference in the outcome of the

22    trial.  And the district attorney acknowledged, but he

23    also said at that time, that I remember, that he was sure

24    they were listed and yet they were not, and Judge

25    Brunetti accepted that because Mr. Fitzpatrick said very

SIDNEY MANES by VENTRONE                    30

1    clearly, "I always do that, John, or Judge Brunetti," and

2    that was the end of that.  There were instances of that

3    nature in regard to the trial of Mr. Rivas.

4        Q.   Okay.  I'm going to move to reserve to move to

5    strike that as nonresponsive.  But be that as it may, 225

6    still, Mr. Manes, what are the defendant's wrongful acts

7    that you are claiming or alleging in that paragraph that

8    were ratified?

9        A.   The fact that there were exculpatory material

10   that was not provided to Mr. Calle.

11       Q.   Is this the same material that Mr. Julian asked

12   you about yesterday and you indicated Mr. Calle decided

13   not to ask for an adjournment?

14            MR. KORENBAUM:  Objection to the form of

15            the question.  Mr. Manes can answer.

16       A.   I was not at the trial.  I don't know that.

17       Q.   Okay.  I'm sorry.  I thought I heard you

18   indicate that Mr. Calle was given the opportunity to seek

19   an adjournment and he chose not to.

20       A.   That's in the record.

21       Q.   Did you read that in the record?

22       A.   Did I what?

23       Q.   Did you see that in the record?

24       A.   Yes, I think I did.

25            MR. VENTRONE:  Okay.  Paragraph 226 of the

1              Complaint, if we could call up the Complaint

2              again, Exhibit A.

3        Q.   The first line of 226, Mr. Manes, "The actions

4    of the defendants resulted from and were taken pursuant

5    to de facto policies and/or well-settled and widespread

6    customs and practices."  What were those or what are

7    those de facto policies and well-settled and widespread

8    customs and practices of the county that you are

9    alleging?

10             MR. KORENBAUM:  Object to the form of the

11             question, but Mr. Manes can answer it.

12       A.   To my knowledge, there were a number of Brady

13   material to exculpate -- that were exculpatory and that

14   why not presented, those were the documents that might

15   have helped Mr. Rivas' defense in obtaining an acquittal.

16       Q.   Okay.  So that's in the Rivas case.

17       A.   Yes.

18       Q.   Are you familiar with any practices -- are you

19   familiar with any such practices prior to or other than

20   the Rivas case?

21             MR. KORENBAUM:  Object to the form of the

22             question, but Mr. Manes can answer it.

23       A.   Well, I'm familiar with the Nanette Gordon

24   case, yes.  I'm also -- yes.  Okay.

25       Q.   But there was no indictment in the Nanette

SIDNEY MANES by VENTRONE                    32

1    Gordon case, was there?

2        A.    Not to my knowledge, no.

3        Q.    Do you base the allegations in paragraph 226 on

4    anything else?

5            MR. KORENBAUM:  Object to the form of the

6            question, but Mr. Manes can answer it.

7        A.    The Walid Daniel case I was involved in that

8    was prosecuted by Edward Menkin on behalf of the district

9    attorney of the County of Onondaga.

10       Q.    Mr. Manes, wasn't Mr. Walid -- hello.

11           MR. KORENBAUM:  Hi, Mr. Ventrone.  We've

12           been going almost an hour.  I'm not saying stop

13           right now, but if you can get to a good

14           stopping point and then we can take a short

15           break.

16           MR. VENTRONE:  Okay.  Sure.

17           MR. KORENBAUM:  I'm not saying now, just

18           get to a good point.

19           MR. VENTRONE:  Okay.  That's fine.

20       Q.    Mr. Manes, you just mentioned a Walid Daniel

21    case?

22       A.    Yes.

23       Q.    And that's the basis of your allegations in

24    paragraph 226?

25       A.    You asked me if there was anything else that

SIDNEY MANES by VENTRONE                    33

1    resulted in my -- in 226.  That's another case that I

2    remember that I was involved in, and that was also

3    questionable in regard to the result of the trial.

4         Q.   Did you represent Walid Daniel?

5         A.   I was just asked to participate by Mr. Langone

6    who was arguing to vacate the judgment of conviction.

7         Q.   Walid Daniel was convicted, was he not?

8         A.   Yes.

9         Q.   I think of murdering his wife, correct?

10        A.   Say it again, please.

11        Q.   Of murdering his wife, is that correct?

12        A.   Yes, that's correct.

13        Q.   Was Attorney Sal Piemonte the defense counsel,

14   trial counsel?

15        A.   I don't know.  I don't remember at this point.

16        Q.   Okay.  And what are you alleging in regards to

17   paragraph 226 was done in this regard in the Walid Daniel

18   case?

19        A.   I think it had to do primarily with the

20   evidence that was presented by Dr. Mitchell and pursued

21   by Mr. Menkin.

22        Q.   Okay.  Let's look at paragraph 227.  And what

23   were the widespread customs and practices that you are

24   alleging in line two?

25        A.   The utilization, I think, of Dr. Mitchell again

1    being involved in a case that was suspect and resulting

2    in a conviction.

3            Q.    And what case was that in reference to 227?

4            A.    The Walid Daniel case.

5            Q.    Okay.  And who are the supervisory and

6    policymaking officers and officials of Onondaga County

7    that you allege in line 3?

8            A.    The district attorney, the medical examiner.

9            Q.    Anybody else?

10           A.    Not that I can recall.

11                    MR. VENTRONE:  Okay.  We're at the bottom

12                of page 38.  This is probably a good time if

13                you want to take that break before we continue.

14                    MR. KORENBAUM:  Perfect.  All right.

15                Thank you.

16                    VIDEOGRAPHER:  It's 10:36 a.m. and we're

17                going off the record.

18                    ( Whereupon, a recess was taken )

19                    VIDEOGRAPHER:  It's 10:52 a.m.  We're back

20                on the record.

21           Q.    Mr. Manes, I'm going to ask you to look at page

22    39 of the Complaint, Exhibit A, paragraphs 229 through

23    232.

24           A.    Okay.  I've read it.

25           Q.    Okay.  Paragraph 229, and I direct your

SIDNEY MANES by VENTRONE                    35

```
1    attention to line 4, starting with the failure to

2    instruct them in applicable provisions, what is your

3    basis for those allegations?

4                   MR. KORENBAUM:  Object to the form of the

5                   question, but Mr. Manes can answer it.

6         A.   Well, it seems to me that in the three cases

7    that I was involved in, that there seemed to be a close

8    connection between the district attorney's office and the

9    medical examiner, and in all three cases, Brady material

10   was not provided, people were not interviewed,

11   documentation was not provided under the Brady rules, and

12   this seemed to be somewhat of, you know, thank God I was

13   only involved in three cases, which was Nanette Gordon,

14   Walid Daniel and Hector Rivas.  Two were found guilty and

15   one was no investigation completed.  It just led me to

16   believe that there was a lack of proper training or some

17   sort of tandem relationship between the sheriff - not the

18   sheriff - well, yes, the law enforcement group, the

19   district attorney and the medical examiner's office.

20        Q.   But, Mr. Manes, on the Nanette Gordon matter

21   there was no indictment, correct?

22        A.   Ha.   There was no finding of a criminal who did

23   the act.  They abandoned their investigation.  To my

24   knowledge, they never interviewed or spent any time with

25   the possible subject of Dr. Mitchell, he disappeared for
```

SIDNEY MANES by VENTRONE                        36

1    six hours.  He wrote a 28-page letter for his wife.  None

2    of that was provided or discussed.

3         Q.   But we also talked this morning about a suspect

4    in this matter, correct, the lone suspect?

5         A.   Yes.

6         Q.   Do you remember me asking you that question?

7         A.   About the suspect?

8         Q.   Yes.

9         A.   Yeah.  There was a young man you stated he was

10   in the maintenance department or something, yes.  Yes,

11   but so was Dr. Mitchell.

12        Q.   There was no trial on that matter, correct?

13        A.   No.  It's still a closed case.

14        Q.   Okay.  Mitchell was never charged, was he?

15        A.   No, he was not.

16        Q.   Okay.  Looking at paragraph 230, The actions

17   detailed herein were and are consistent with

18   institutionalized practices of the county and others.

19   What are you making reference to, what are these

20   institutionalized practices that you allege in paragraph

21   230 of the Complaint?

22              MR. KORENBAUM:  I object to the form of

23              the question, but Mr. Manes can answer it.

24        A.   I don't know what you mean.  Can you define

25   "institutional practices" for me?

1        Q.    I'm asking you the same thing.

2        A.    Oh, that's true.  Okay.  Well, I can't answer

3    that at the moment other than the fact that there are

4    penal codes that to me did not seem to be followed in

5    regard to the Brady material, the failure to mark

6    documents in the record, I guess that's the best I can

7    tell you.

8        Q.    Was there Brady material that was withheld from

9    any defendants in the Nanette Gordon matter?

10       A.    Not to my knowledge, other than the fact there

11   were documents that we never were privy to like the 28-

12   page letter that Dr. Mitchell wrote to his wife after

13   they found him asleep in the car six hours later after

14   her death, that's the Nanette Gordon case.  We never knew

15   about the interview of the defendant's wife and asked her

16   to respond to the letter, we never saw that investigated.

17   To my knowledge, he was never interrogated.  That's what

18   I can tell you.  These are policies that I --

19       Q.    Okay.  I'll reserve my right to move to strike

20   again as nonresponsive.

21       A.    Okay.

22       Q.    And in paragraph 232, that first line, who are

23   you alleging at the county had prior notice of the

24   vicious and unlawful propensities of the defendants

25   Fitzpatrick and Mitchell and other subordinates?

SIDNEY MANES by VENTRONE                            38

1          A.   Well, the murder of Valerie Hill occurred six

2    years approximately before they decided to reinvestigate

3    and rebring on the -- open the cold case of Valerie Hill

4    and charge Hector Rivas with her murder when he had gone

5    through an interrogation for 12 hours at the time of

6    death, after the time of death by the police and they

7    said they could find no relationship between him and

8    Valerie that he had caused her death, and yet six years

9    later they had indicted him without any new testimony or

10   any new evidence that was found.  This was a cold case

11   that was totally reexamined by the medical examiner who

12   now found a way to enlarge the time of death struck me as

13   a little unusual.

14         Q.   And so that is your basis for the allegations

15   in paragraph 232, correct?

16         A.   That's part of it, certainly.

17         Q.   Okay.  Can we look at page 40, paragraph 233,

18   subparagraphs A through E?

19         A.   How far did you want me to look?

20         Q.   Right through subparagraph E, A through E.

21         A.   Okay.  I've read them.

22         Q.   So going to let's say subparagraph A, line 2,

23   other claims of misconduct and evidence of unlawful acts

24   committed by the county, what were those, what are those,

25   what are you alleging there?

1          A.    In the retrial of Mr. Rivas, it took almost a

2    year of requesting documents which were never provided in

3    one fell swoop.  Every time there was an adjournment,

4    there seemed to be more documents that were found deeply

5    buried in boxes that were provided to Mr. Klein.  There

6    was also documentation that we haven't found to this day.

7    Dr. Wasserman did an analysis on I think it was DNA

8    information of certain things that Dr. Wasserman did.

9    Nobody ever heard of Dr. Wasserman except me because it

10   was all in the record that I reviewed.  And

11   Dr. Wasserman, who I talked to, said without question he

12   sent those documents to the district attorney's office.

13   Now, you know, you just can't keep finding more and more

14   things when you're asked to prepare for trial and the

15   district attorney doesn't give privy to you until

16   whenever there's an adjournment, again he goes to the

17   bottom of the list, he says, because that's what the lab

18   does.  He never came up with the DNA on the pipe, never.

19   I mean -- and Dr. Wasserman's review of documentation of

20   examination, the Brady material that was buried, the

21   information in regard to any number of things that they

22   kept prolonging.  It took a year when the circuit court

23   said you shall trial this case in 60 days.  It never

24   happened.  Judge Miller said he won't do it.  Now, that's

25   all part of the county problem.  You know.  The district

SIDNEY MANES by VENTRONE                    40

1    attorney, the county, the medical examiner, these are all

2    under county auspices.  I don't know why they don't

3    review what the DA is doing and what the medical examiner

4    is doing.  They render --

5         Q.   Okay.  Other than the Rivas case, your

6    allegations in these paragraphs consistently refer to

7    other claims, prior claims.  I want to know what the

8    other claims of misconduct in evidence of unlawful acts

9    committed by the county were.

10        A.   Through its district attorney and through its

11   laboratories and through its department of the district

12   attorney, documents were withheld, they were not

13   provided, even on my FOIL requests, you don't know how

14   many I made.  I was never given what I was asked to

15   receive.  I mean, it took a long time to get whatever

16   documents I was lucky to get.  I had to get a court order

17   once from Judge Burke.  These were things that I should

18   have gotten by law.  All of this to prevent, if you'll

19   forgive me, proving that Hector was an actual innocent

20   person in jail.

21        Q.   So, again, you're talking about the Rivas

22   matter, correct?

23        A.   Yes.

24        Q.   Okay.

25        A.   I'm also talking about Nanette Gordon.

SIDNEY MANES by VENTRONE                    41

1          Q.    But nobody was actually charged in that matter,

2    correct?

3          A.    Yes, but it was a poor job of investigation on

4    the police department and sheriff's department.

5    Sheriff's department is under the control of the county.

6          Q.    Nobody was tried in that matter, correct?

7          A.    You're correct, no one was tried.

8          Q.    Okay.  Can we go to page 41?

9          A.    You forget who I --

10                MR. KORENBAUM:  Sidney, there's no

11                question.

12                THE WITNESS:  Okay.  No question.  Sorry.

13         Q.    Page 41, please, look at subparagraphs F

14   through I.

15         A.    Did you say I, as well?

16         Q.    Yes, the bottom of page 41.

17         A.    Okay.

18         Q.    If we look at paragraph I, lines two and three.

19         A.    Okay.

20         Q.    "Known to be irresponsible in their dealings

21   with citizens of the community," what's the basis for

22   that, what do you mean by that?

23         A.    You know the district attorney has the

24   obligation to prosecute those that are suspects in

25   different crimes.  He has at his disposal the sheriff's

SIDNEY MANES by VENTRONE                42

```
1    department, city police department, the medical

2    examiner's office.  All of these people work towards

3    providing the district attorney with information

4    substantiating a crime.

5         In the Hector Rivas case, the second circuit in

6    just reviewing documents that we provided to the second

7    circuit found that Hector was actual innocent, actual

8    innocent, and yet we have a district attorney who is in

9    control of the file and he works with the medical

10   examiner continued to believe and prosecute Hector when,

11   in fact, there was documentation that he could have given

12   to Mr. Calle, the ineffective counsel of Hector's, which

13   might have affected the decision by the jury.  His job is

14   to, you know, provide safety for their citizens, not in

15   this case.  In Hector's case he did everything he could

16   to convict him, including the testimony by Dr. Mitchell

17   changing the time of death which eliminated Hector's

18   alibi.  Those are jobs that --

19       Q.   Okay.  So basically I'm going to reserve the

20   right to move to strike again as nonresponsive,

21   repetitious.  So essentially that's your basis for the

22   allegations in subparagraph I?

23            MR. KORENBAUM:  Object to the form of the

24            question, but Mr. Manes can answer it.

25       A.   Well, I don't know what the question is.  Do
```

1    you want more examples?

2        Q.   Not if they're nonresponsive and repetitious.

3        A.   Well --

4        Q.   I'm fine.  We can move on.  Let's move on to

5    page 42, J through N.

6        A.   I've read them.

7            MR. KORENBAUM:  You've only read through

8            L.

9            THE WITNESS:  Oh, L.  Oh, there's more.

10           Okay.

11       Q.   That's fine.  Let's just look at J, K and L for

12   not, that's fine.  In paragraph -- J, K, L, right there.

13   In paragraph K, line 1 and 2 -- lines 1 and 2, how did

14   the county -- how is it alleged that the county failed to

15   investigate or respond to citizen complaints, what are

16   those citizen complaints that you're alleging?

17       A.   Well, as I remember, without family's approval,

18   the medical examiner buried body parts, sold body parts,

19   gave away body parts, buried body parts, poured blood

20   down the sink without the families knowing that their

21   loved ones were being buried without parts.  Nobody

22   oversaw what the medical examiner was doing.  So there

23   were complaints, as I understand it, in listening to some

24   of the people who worked there, like Dr. Sawyer, like

25   Dr. Menchel, like Dr. - I don't know - there were more

1    doctors after Mitchell.  The case -- the medical examiner

2    was a disaster and the district attorney utilized

3    Dr. Mitchell.

4              You know, the district attorney when Hector was

5    granted a new trial, the district attorney is quoted in

6    the newspaper as saying, "I hope he rots in jail."  You

7    know, you don't say things like that in public.  This was

8    a criminal who was subsequently found actually innocent.

9        Q.    So that is your basis for the allegations --

10   that is your basis for the allegations in paragraph K?

11       A.    Yes, that's the best I can remember.

12       Q.    Okay.

13       A.    There were other complaints, no question, that

14   were subsequently discovered by the department of health

15   and the department of environmental conservation against

16   the medical examiner's office and the district attorney's

17   office.

18       Q.    And do you know, as you sit here today, as to

19   whether the county responded or investigated any such

20   complaints?

21       A.    Absolutely.  Yeah.  They had a hearing.  Yeah,

22   the district attorney sat in on that hearing, he was

23   perfectly aware of what they were charging the medical

24   examiner.  This all came out at the hearing.

25       Q.    This was prior to Rivas, was it not?

SIDNEY MANES by VENTRONE                45

1      A.   No, I don't believe so, whether it was prior to

2   -- I can't remember the timing.

3      Q.   Okay.  Let's look at page 43.  Actually, I'm

4   sorry.  Let's go back to the bottom of 42, M and N.

5      A.   You said N.

6      Q.   Looking at line one of M.

7      A.   Okay.

8      Q.   Other than Rivas, the Rivas matter that you're

9   involved with, how was the county, County of Onondaga,

10  encouraging the arresting prosecution and conviction of

11  innocent persons?  Who are those other innocent persons?

12     A.   In what case?

13          MR. KORENBAUM:  He's asking you.

14     Q.   I'm asking you that.

15     A.   Oh.  Well, I would say Hector Rivas, I would

16  say Walid Daniel, and both cases seemed to have had

17  similar stories that didn't -- it's just --

18          MR. KORENBAUM:  Just answer the question.

19          THE WITNESS:  Yeah, I'm trying to.  I

20          don't know how.  I guess that's -- I can't.

21     A.   I know the activities of Dr. Mitchell.

22          MR. KORENBAUM:  What's the question?

23     A.   Yeah.  What's the question?

24     Q.   Any other cases?

25     A.   That's the only three I was involved in.

SIDNEY MANES by VENTRONE                    46

1          Q.   And really that's two, correct?  Nanette Gordon

2    was not really a trial, correct, nobody was charged,

3    correct?

4          A.   That's correct, nobody was charged in the

5    Nanette Gordon case so they had suspects.

6          Q.   Okay.  At any time over the years, did you ever

7    submit any letters to the new local newspapers

8    complaining about our district attorney Fitzpatrick?

9          A.   I wrote an eight-page letter to Judge Brunetti

10   in regard to the 440 motion that he heard and I urged him

11   to reconsider, and he said take the case to the Federal

12   court on a habeas corpus.

13                  MR. KORENBAUM:  Can we have one second,

14           please?

15                  MR. VENTRONE:  Okay.  Sure.

16         A.   What's the question, please?

17                  MR. KORENBAUM:  Can we hear the last

18           question back, please?

19                  ( The requested material was read )

20         A.   To the best of my knowledge, I was interviewed

21   by the newspapers and that's where the information that

22   they used came from.  I don't remember mailing any

23   evidence or any documents that I was utilizing through

24   the newspapers.

25                  MR. VENTRONE:  Okay.  I think that's all I

1          have.  I'm going to pass the ball back to

2          Mr. Julian if he has anything further.

3               MR. JULIAN:  Mr. Manes, is it --

4               MR. KORENBAUM:  Hold on.  Wait a minute.

5          One second.  I mean, if you have one or two

6          questions, Mr. Julian, that's fine.

7               MR. JULIAN:  I do.

8               MR. KORENBAUM:  But you asked.  I

9          reasonably believe that you were done answering

10         questions.  If you have a question or two, I'm

11         okay with that, but I'm not okay with you

12         reopening your examination.

13              MR. JULIAN:  Well, I'm not sure under what

14         rule that occurs, but I only have a couple

15         questions.  But as you know when lawyers say

16         that, they're not believable, so let's see.

17         Okay?

18              MR. KORENBAUM:  You ended your

19         questioning.  You're done.  You said I have no

20         further questions.

21              MR. JULIAN:  No, no.  What I said is I

22         pass the witness.

23              MR. VENTONRE:  I think that's right.

24              MR. KORENBAUM:  I'll allow a couple of

25         questions.

```
 1                    MR. JULIAN:  That's very nice of you.

 2          Thank you.

 3   EXAMINATION BY

 4   MR. JULIAN:

 5          Q.   Was Robert Wildridge the district attorney

 6   during the Nanette Gordon case when you sued the county

 7   and district attorney and others?

 8          A.   I'm sorry.  I don't remember.

 9          Q.   All right.  And then my only other question,

10   two others questions.  Do you have copies of your many

11   FOIL requests that you say were not fully responded to?

12          A.   Would you repeat the question, please?

13          Q.   Sure.  Do you have copies of your FOIL requests

14   that you've referenced in your testimony?

15          A.   The best that I remember was when --

16                    MR. KORENBAUM:  The question is do you

17              have copies of the FOIL requests.

18          A.   I don't know.

19          Q.   I'll make a request for them and follow the

20   same protocol.

21                And finally, do you have any knowledge as to

22   what Brady material or other materials provided by the

23   district attorney was in Mr. Calle's file?

24          A.   No, I have no idea.

25                    MR. KORENBAUM:  I object to the form of
```

SIDNEY MANES by JULIAN                49

```
1              the question.  Can you repeat that, please?
2              I'm sorry.
3                   MR. JULIAN:  Why don't you read it back,
4              it will be faster.
5                   ( The requested material was read )
6                   MR. KORENBAUM:  Object to the form of the
7              question, but Mr. Manes can answer.
8         A.   I was not at the trial, but I -- I don't know.
9         Q.   And just for completeness, fair to say you
10   never requested a copy of Mr. Calle's file from him or
11   anybody else?
12        A.   I'm sorry.  I don't remember that.
13                  MR. JULIAN:  Okay.  Thank you.  All set.
14                  MR. KORENBAUM:  Thank you very much.  And
15             again, thank you accommodating my schedule.
16                  MR. JULIA:  You're welcome.
17                  VIDEOGRAPHER:  It is 11:27 a.m.  We're
18             going off the record.
19                  ( Whereupon, the examination concluded )
20                            -oOo-
21
22
23
24
25
```

1

2                    <u>CERTIFICATE OF WITNESS</u>

3

4          I, SIDNEY MANES, hereby certify that I have

5    read the foregoing transcript of my deposition taken on

6    October 19, 2022, at approximately 10:30 a.m., in New

7    York State pursuant to the applicable Rules of Civil

8    Procedure and that the foregoing 49 pages of the

9    transcript are in conformity with my testimony given by

10   me, under oath, and at the time and place indicated

11   herein, (with the exception of any corrections made by me

12   on the errata sheet).

13

14              _____

15                    SIDNEY MANES

16

17       SUBSCRIBED AND SWORN to before me, the undersigned

18   authority on this the _____ day of _____, 2022.

19

20

21   _____

22          NOTARY PUBLIC

23

24   My commission expires _____ day of

25   _____, 20_____.

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4        I, LISA M. SCHUSTER, a Shorthand Reporter and
 5   Notary Public in and for the State of New York, DO HEREBY
 6   CERTIFY;
 7        that the foregoing proceedings were taken via
 8   videoconference at the time and place therein set forth,
 9   at which time the witness was put under oath by me;
10        that the testimony of the witness and all
11   objections made at the time of the examination were
12   recorded stenographically by me and were thereafter
13   transcribed;
14        that the foregoing is a true and accurate
15   transcript of my stenographic notes in the above-entitled
16   matter.
17        I further certify that I am not a relative or
18   employee of any attorney or of any of the parties, nor
19   financially interested in the action.
20
21   Dated:  November 28, 2022
22
23              _____
24                    Lisa M. Schuster
25
```