# EXHIBIT "E"

1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK

2    —————————————————————————————————————

3    SIDNEY MANES, administrator of the
     estate of HECTOR RIVAS,

4

              Plaintiff,

5                          Case No.:
        -vs-                5:19-cv-00844

6    ONONDAGA COUNTY; et al.,

7

              Defendants.

8    —————————————————————————————————————

9                 DEPOSITION

10   —————————————————————————————————————

11   WITNESS:        ERIK MITCHELL

12   DATE:           Thursday, October 19, 2023

13   START TIME:      10:30 a.m.
     END TIME:       3:03 p.m.
14

     LOCATION:       Precision Reporters, LLC
15                  110 West Fayette Street, Suite 750
                   Syracuse, New York 13202
16

17   BEFORE:         Elyse M. Addabbo
                  Court Reporter and Notary Public
18

     JOB NUMBER:     20262
19

20

21

22

23

24

25

```
 1    APPEARANCES:

 2      For the Plaintiff:

 3          RICKNER PLLC
            Attorneys at Law
 4          14 Wall Street
            Suite 1603
 5          New York, New York 10005
            BY:  ROB RICKNER, ESQ.
 6              rob@ricknerpllc.com

 7
        For the Defendants:
 8
            LAW OFFICES OF ROBERT F. JULIAN
 9          Attorneys at Law
            2037 Genesee Street, Suite 2
10          Utica, New York 13501
            BY:  ROBERT F. JULIAN, ESQ.
11              robert@rfjulian.com

12              -and-

13          LAW OFFICE OF MARK A. VENTRONE
            Attorneys at Law
14          103 East Water Street
            Suite 304
15          Syracuse, New York 13202
            BY:  MARK A. VENTRONE, ESQ.
16              markventrone@ongov.net

17
        Also present:
18
            Sidney Manes
19

20

21

22

23

24

25
```

```
 1              I N D E X   O F   T E S T I M O N Y

 2

 3   EXAMINATION OF                              PAGE

 4     ERIK MITCHELL

 5        BY MR. RICKNER                           6

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              I N D E X   O F   E X H I B I T S

2                 (available for download)

3
     EXHIBIT      DESCRIPTION                         PAGE
4

5     25          report of toxicological screens      62

6     26          transcript of testimony              80

7     27          copy of brain slides                 81

8     28          letter, 5/22/00                      86

9     29          affidavit in support of court order  86

10    30          voluntary affidavit                  89

11    31          e-mail, 7/20/18                      146

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           FEDERAL STIPULATIONS

2

3          IT IS HEREBY STIPULATED AND AGREED, by and between
    the attorneys for the respective parties, that the
    presence of the Referee be waived;

4

5          IT IS FURTHER STIPULATED AND AGREED that the
    witness shall read and sign the minutes of the transcript
    within 30 days upon receipt, and that the filing of the

6   transcript be waived;

7          IT IS FURTHER STIPULATED AND AGREED that all
    objections, except as to form, are reserved until the

8   time of trial;

9          IT IS FURTHER STIPULATED AND AGREED that this
    Deposition may be utilized for all purposes as provided

10  by the Federal Rules of Civil Procedure;

11         AND FURTHER STIPULATED AND AGREED that all rights
    provided to all parties by the Federal Rules of Civil

12  Procedure shall not be deemed waived and the appropriate
    sections of the Federal Rules of Civil Procedure shall be

13  controlling with respect thereto.

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. JULIAN:  I just want to put on the

2         record that all objections are reserved except

3         as to form.

4              THE REPORTER:  Okay.  And then the

5         billing for the transcript, is that to you,

6         Mr. Rickner and provided to Mr. Julian, or

7         what did we do last week?

8              MR. RICKNER:  I think I just ordered one

9         for me.

10             THE REPORTER:  Okay.  And then do you

11        need a copy?

12             MR. JULIAN:  Yes.

13

14   E R I K   M I T C H E L L, having been called as a

15   witness, being duly sworn, testified as follows:

16   EXAMINATION

17   BY MR. RICKNER:

18        Q.   Good morning, Dr. Mitchell.

19        A.   Good morning.

20        Q.   Have you ever had your deposition taken

21   before?

22        A.   Yes.

23        Q.   Okay.  How many times?

24        A.   I have no idea.

25        Q.   Is it more than twenty?

```
1        A.    I presume so.

2        Q.    Just for clarity, you know the difference

3   between a deposition and, for example, trial or grand

4   jury testimony?

5        A.    Yes.

6        Q.    Okay.  This would be -- these would be civil

7   matters?

8        A.    Correct.  Well, I had a lot of depositions in

9   criminal matters.

10       Q.    Would that have been in Kansas or Wisconsin or

11  New York?

12       A.    Primarily in Dade County, Florida.

13       Q.    Okay.

14       A.    There, it was mandatory that we were deposed

15  before trial.

16       Q.    Right.  Okay.  Slightly different procedure.

17             With respect to civil cases, have you had your

18  deposition taken before?

19       A.    Yes.

20       Q.    Okay.  And about how many?

21       A.    I don't know.  It's not a huge number, but I

22  don't know.

23       Q.    Were any of those with respect to your work as

24  a medical examiner?

25       A.    They were -- let's see.  There was one where
```

```
 1    there was a civil case went before the criminal case in

 2    Kansas.  I wasn't medical examiner.  They don't really

 3    legally have medical examiners there, they got coroners.

 4    And I don't know if I was coroner for that county at that

 5    time.  I know I was later.

 6         Q.    Which county?

 7         A.    That would have been -- it was one of the

 8    northeastern counties.  It could have been Atchison.  I

 9    can't remember for sure.

10         Q.    And which other civil matters do you remember

11    testifying in a deposition in?

12         A.    That, I actually remember.  There was one

13    dealing with the identity of some material collected off

14    the floor in front of a meat counter at a Sam's Club, the

15    question being whether could it be meat or not.  Now,

16    that was done as a case submitted to Frontier Forensics,

17    the practice I worked for, in Kansas City, Kansas.  But

18    for civil matters --

19         Q.    Let me phrase it differently.

20               Were any of them civil rights cases or cases

21    brought under 42 USC 1983?

22         A.    I know nothing about the legal grounds, but I

23    don't remember any civil rights issues.

24         Q.    Okay.  Now, your attorneys have probably

25    explained this to you already, but there are a few ground
```

```
 1   rules just to make sure we get a nice clear transcript.
 2   The first is that even though I ask these long rambling
 3   questions, you may know exactly where I'm going, you do
 4   have to wait until there is a finished question before
 5   you jump in with the answer.  Can you do that for me?
 6        A.   I will do my best.
 7        Q.   Excellent.  And you can't gesticulate or nod
 8   your head.  You need to actually verbalize whatever
 9   you're saying on the record.  So if it's yes, you have to
10   say yes.  If it's eighteen inches, you can't put your
11   hands up like this.  You have to say 18 inches.  Can you
12   do that for me?
13        A.   I believe so.  That's pretty standard, also,
14   in criminal matters.
15        Q.   Yes, all to get a clear record.
16             You can take a break if you want to, you just
17   have to answer the pending question.  Do you understand?
18        A.   Yes.
19        Q.   Now, you're testifying here in a conference
20   room, but it's the same rules as though you were in
21   court, meaning you have to tell the truth, the whole
22   truth, and nothing but the truth.  Can you do that for
23   me?
24        A.   Yes.
25        Q.   Did you take any intoxicating substances in
```

```
 1   the last twenty-four hours?

 2       A.    No.

 3       Q.    Have you taken any medication or failed to

 4   take any medication at the result of which would be to

 5   impair your memory or your ability to think?

 6       A.    No.

 7       Q.    Is there any medical reason besides the

 8   ordinary passage of time that you wouldn't be able to

 9   give full and complete testimony today?

10       A.    No.

11       Q.    And have you ever been -- well, withdrawn.

12             I can assume you've testified in criminal

13   cases?

14       A.    Yes.

15       Q.    Okay.  Could you even ballpark how many?

16       A.    It's hundred.  I don't know how many.

17       Q.    Okay.  In those hundreds of criminal cases,

18   were you ever cross-examined with your prior grand jury

19   testimony or your prior deposition testimony in Florida?

20       A.    I'm sure I was in Florida.

21       Q.    Okay.

22       A.    But I don't know -- I would -- I'm -- it would

23   be speculative.  I presume that I -- that that would be

24   used, as a well-prepared attorney would have looked at

25   that.
```

```
 1        Q.     During your times testifying in criminal

 2   court, have you been cross-examined with prior sworn

 3   testimony?

 4        A.     Again, it's a presumpt -- I cannot remember

 5   specific questions related to it, but I would be

 6   surprised if it hasn't been, because I've had so much

 7   court experience.

 8        Q.     Okay.  So in all of the court experience that

 9   you have, you can't say definitively yes or no if you've

10   ever been cross-examined with your prior testimony?

11        A.     I would presume I have been.

12        Q.     But as you sit here today, you just can't

13   remember?

14        A.     But I can't remember a specific case to tell

15   you.

16        Q.     I'm not asking for a specific case.  I just

17   want to know if it happened?

18        A.     Well, if I can't remember a specific case --

19               MR. VENTRONE:  So I think he's answered

20          it.

21        A.     -- I can't say --

22        Q.     Is it fair to say that through your prior

23   experience testifying that you understand how important

24   it is to give clear and accurate answers when you're on

25   the record?
```

1      A.    Yes.

2      Q.    Now, did you prepare for this deposition?

3      A.    Yes.

4      Q.    Okay.  Now, without going into any

5    conversations you had with your attorney, just did you

6    meet with your attorney, and if so, for how long?

7           MR. JULIAN:  So I object to the question.

8           I believe that's -- the second part of the

9           question is attorney/client, and I'm asserting

10          that privilege, but I'm allowing the witness

11          to answer.  I recognize there may or may not

12          be a waiver issue, but in the interest of

13          advancing the deposition and getting it done,

14          that is my objection.

15          MR. RICKNER:  Okay.

16          MR. JULIAN:  You may answer.

17     A.    Are you asking about Facetime or conversation?

18     Q.    Anything that you did to prepare, if you were

19   communicating your attorney, I just want to know the

20   number of hours and the number of meetings?

21     A.    We've had conversation, and it's going to be a

22   generalized handful of times and I do not know how many.

23   It's not a -- it wouldn't be twenty.

24          MR. VENTRONE:  Talking about preparation

25          for the deposition, correct, Counsel?

```
 1                    MR. RICKNER:  Yeah, that's it.

 2                    MR. VENTRONE:  Okay.

 3        Q.    Just prep for this deposition.

 4        A.    I'm trying to remember what his -- let's see.

 5   We talked on the phone.  It's going to have to be an

 6   estimate, and I have not kept record of it.  I did not

 7   realize that was a question that I needed to be able to

 8   answer.  I'm estimating that there were probably five

 9   contacts, maybe six, something in that order, and the

10   total lapsed time is probably in the order of eight to

11   ten hours.

12        Q.    During your efforts to prepare for this

13   deposition, did you review any documents?

14        A.    Yes.

15        Q.    What documents did you review?

16        A.    I reviewed grand jury testimony, I reviewed

17   files from the medical examiner's office, I

18   reviewed -- and the contents thereof, and I reviewed

19   trial testimony.  I read through the series of three

20   depositions from Sidney Manes.  I read through a quick

21   reading of the -- what's it called?  Where

22   you -- interrogatories, I think it's called.  I read

23   through the trial summation by Fitzpatrick, some other

24   documents I can't remember the name of, but documents

25   that pertained to the case.
```

1          Q.     Did you listen to any audio?

2          A.     I did.

3          Q.     Were those interviews that you provided to the

4    county attorney in 1993?

5          A.     That's what I'm told they are.  I didn't

6    remember them at all, but yes.

7          Q.     Okay.  Did you recognize your voice in those

8    tapes?

9          A.     Most of the time you could recognize my voice.

10   Sometimes it was a bit garbled.

11         Q.     These are cassette tapes?

12         A.     Well, they've been transferred to CDs so that

13   they wouldn't tear.

14         Q.     Understood.  But it's your understanding that

15   these were originally cassette tapes and they sort of

16   sound like cassette tape --

17         A.     Correct.

18         Q.     -- recordings?

19                Now, I'm going to try to save us some time

20   here.  You testified at the trial of Hector Rivas

21   regarding your education and qualifications; is that

22   correct?

23         A.     Correct.

24         Q.     And you reviewed that testimony to prepare for

25   this deposition?

1      A.    Yes.

2      Q.    Just so we can skip over all of those

3   questions, will you confirm that the education and

4   background that you testified to at that trial was

5   accurate as of the time of that trial?

6      A.    Yes.

7      Q.    Okay.  Do you have any independent

8   recollection of the autopsy or your examination of the

9   body of Valerie Hill?  By which, I mean setting aside all

10   of the documents and audio and anything else that you

11   reviewed, you just happen to have a memory of it?

12      A.    No.

13      Q.    Okay.  How many -- so just to be clear, would

14   it be safe to say that your testimony that you're going

15   to be providing today will essentially be based on

16   refreshing your recollection of the records that were

17   available to you?

18      A.    It's from review of the records that are

19   available to me.

20      Q.    As part of your review, did you review any

21   photographs or slides?

22      A.    Yes.

23      Q.    Okay.  Were they in color?

24      A.    Yes.

25      Q.    And did they -- did the color photographs that

```
 1   you were able to review, were they of approximately the

 2   same quality as what would have been available to you in

 3   1993 or 1987 when the photos were taken?

 4        A.    No.

 5        Q.    Okay.  In what way did they differ?

 6        A.    They are reproductions.  They were taken

 7   originally on Kodachrome or Ektachrome, which is a very

 8   high definition film, and as far as I can tell, they were

 9   also in focus.  But the -- when you reproduce them,

10   there's always a degradation of quality.

11        Q.    Did you believe that degradation of quality

12   prevented you from being able to see things that you

13   would have been able to see otherwise?

14        A.    Hard to know, because if you haven't seen

15   something, you can't say that you -- but I don't think it

16   inhibits my ability to analyze things related to this

17   case.

18        Q.    As of 1980 -- withdrawn.

19              As of 1993 would it have been correct to say

20   that you've done about four thousand autopsies?

21        A.    I believe that's what I testified to at the

22   time.

23        Q.    Okay.  Can you say what percentage of those

24   are -- what percentage of those are homicides as opposed

25   to some other cause of death, at least based on your
```

1    findings?

2        A.    I know that in Dade County, we did about

3    twenty percent homicides, and I did a little over a

4    thousand autopsies there.  When I was in training in

5    forensics, I did something over two hundred and

6    fifty cases total, and they tried to weight it towards

7    homicides so we had more experience with them.  I don't

8    know the exact percentage, though.  It's not something I

9    kept record of.  And then here, I don't actually know the

10   autopsy percentage that we had that were homicides.  It's

11   definitely one of the minority numbers.  It's not the

12   majority of what we do.

13       Q.    Now, just for reference, did you work at Dade

14   County before or after you came to work in Onondaga

15   County?

16       A.    That was before.

17       Q.    Okay.  So when you speak of that percentage,

18   you're talking about as part of at least the four

19   thousand that you testified to?

20       A.    Yes.

21       Q.    Okay.  Now, I just want to have you pull out

22   for reference Exhibit 1, and you can grab it, Exhibit 3,

23   and Exhibit 2.

24            Now, Exhibit 1 is really just for reference.

25   Can you look at this and just confirm that it accurately

```
 1    states the days of the week that each specific date

 2    occurred on in March of 1987?

 3        A.    I am making the assumption that this is a

 4    correct --

 5        Q.    Okay.  Do you have any reason to believe it's

 6    not accurate?

 7        A.    No.

 8        Q.    Okay.

 9        A.    None that has been given to me thus far.

10        Q.    Now, when did you first examine the body of

11    Valerie Hill in 1987?

12        A.    When she was brought to the morgue -- well,

13    that's not true.  I first saw her at the scene of demise.

14        Q.    Okay.  And would it be correct to say that you

15    actually went to the apartment where her body was found?

16        A.    That's -- I do not have a direct memory of it,

17    but that's what I read in my -- in the reports.

18        Q.    Okay.  There were various photographs taken of

19    the body in the apartment.  Did you take those photos?

20        A.    It's quite likely that I took some, but I have

21    not reviewed any.  I can't tell you.

22        Q.    Okay.  And while she was actually in the

23    apartment, did you perform any examination of the body?

24        A.    According to the records, I did.

25        Q.    Okay.  What examination was that?
```

1        A.    It was to just see what was there, the

2    external surfaces, and to check the body.  One thing I'm

3    checking for is muscle stiffness.

4        Q.    Okay.  And also, you had confirmed she was

5    dead?

6        A.    Well, that was pretty much known before.  If

7    you wait to call the medical examiner to confirm death,

8    you're going to have a lot of problems along the way.

9        Q.    Now, I'd like you to look at Exhibit 3 and

10    turn to -- hold on -- I believe it's Page 19.  I'm just

11    going to show it to you so if you can look for that page,

12    please?

13        A.    I'm sorry.  I'm nearsighted.

14        Q.    Yeah, you can look.  I'm all sorts of sighted.

15        A.    Okay.  All right.

16        Q.    I believe Page 19 is titled Scene

17    Investigation?

18        A.    Yeah, I'm looking for it at the moment.  Yes,

19    I've got it.

20        Q.    Okay.  Now, just to confirm, this memorandum

21    titled Scene Investigation, that's something that you

22    authored?

23        A.    Yes.

24        Q.    This is -- relates to an investigation you did

25    on March 30th, 1987?

1       A.      That's correct.

2       Q.      Did you actually type this up on March 30th,

3    1987?

4       A.      I would not type it.  My secretary would type

5    it for me.

6       Q.      Okay.  When you were at the scene of the

7    Valerie Hill murder, would you have taken handwritten

8    notes?

9       A.      I've not seen any in review -- in the review

10   that I've done at this point, but I cannot guarantee you

11   that there were none.  The absence of evidence is not

12   evidence of absence.  In other words, I cannot tell you

13   that I didn't, but I normally would just put things in my

14   mind and then take care of it at the office.

15      Q.      Let's go back to 1987 and your general

16   practice.  Would it have been your general practice to

17   take notes at the scene of an incident?

18      A.      It would vary.  I mean, I could, I might not.

19   I do not actually remember our specific procedures at

20   that time.  It was common for me to take photographs.  In

21   fact, that was one of the first changes that occurred

22   when I came here.

23      Q.      You mean that in 1983 when you came, you

24   started the practice of taking photographs as part of

25   crime scene investigations?

```
 1        A.    Yes.

 2                     (SIDNEY MANES entered the proceedings

 3               at 10:51 a.m.)

 4    BY MR. RICKNER:

 5        Q.    When you would take notes at the scene of an

 6    investigation, was it your practice in 1987 to preserve

 7    those notes, meaning to keep them as part of the file?

 8        A.    Yes.

 9        Q.    Okay.  And would that have been turned over to

10    the District Attorney's Office?

11        A.    Yes, if it was requested.  I don't know what's

12    requested.  Again, if it's requested, it's turned over.

13        Q.    Okay.  But if it's not requested, you wouldn't

14    necessarily turn it over?

15        A.    I do not know what our automatic protocols

16    were at the time.  I can't speak to that.  But in

17    general, what people ask for is what they get.

18        Q.    Now, this may sound a bit farfetched.  Do you

19    know if you in your own personal records have any

20    documents going back to 1987 or 1993?

21        A.    Not that I know of.

22        Q.    Okay.  Have you looked for any documents

23    relating to this case in your personal files?

24        A.    I have not kept any from this case, so I

25    wouldn't look for them.  Could I coincidentally have
```

1    something from another one that would be in some

2    paperwork I haven't thrown away, that's possible.

3         Q.    Okay.

4         A.    But I have not -- no case that I know of where

5    I've kept anything.

6         Q.    Okay.  Have you searched your own personal

7    files for any documents relating to the Valerie Hill

8    murder/autopsy?

9         A.    Well, I was asked to look for things -- I

10   expect I was asked.  I don't have a specific memory, but

11   I expect that I was asked to look for, so I would have.

12        Q.    But you don't remember one way or another as

13   you sit here?

14        A.    No.

15        Q.    Okay.  Now, going back to the scene

16   investigation, it says you pronounced the decedent dead

17   at 3:30 p.m.?

18        A.    Yes.

19        Q.    About how long do you think that was after you

20   arrived?

21        A.    I have no independent memory of that, so I

22   cannot tell you.

23        Q.    Okay.  And in your notes, it says that:  The

24   body was in full rigor with fixed anterior livor.  Do you

25   see that?

```
 1        A.     Livor, yes.

 2        Q.     Livor?

 3        A.     Right.  You can pronounce it "liver" or

 4   "livor", depending on whether you went to public or

 5   private school.  I don't know.

 6        Q.     I kind of did both, so I don't have one way or

 7   another.  But when you say the body was in full

 8   rigor -- actually, let me step back for a second.

 9               Would it be correct to say that rigor is a

10   range, meaning it goes to represent multiple different

11   types of stiffness that you would actually feel when you

12   examine the body?

13               MR. JULIAN:  Object to the form of the

14               question.  You can answer.

15        A.     Are there grades, if you will, where you can

16   estimate which muscle groups are involved, yes.

17        Q.     However you would put it best if somebody were

18   to say, well, is rigor one thing or are there different

19   grades of rigor, how would you answer?

20               MR. JULIAN:  Object to the form.

21               MR. VENTRONE:  Same objection.

22        A.     It can be done both ways.

23        Q.     What do you mean by that?

24        A.     Well, somebody may say body is in rigor, you

25   don't know what necessarily that means if you're trying
```

1   to break it down.  Does every muscle group have rigor?

2   Is there variability between them?

3       Q.    What about full rigor, what does that

4   represent when you would use the phrase in 1987?

5       A.    That means that all muscle groups have some

6   degree of rigor.

7       Q.    Okay.  And you say some degree of rigor --

8       A.    Or all muscle groups that I tested.

9       Q.    Okay.  Now, did you keep track of which muscle

10  groups you tested?

11      A.    I do not have a specific note of it, so I

12  cannot speak to that.

13      Q.    And is it possible that some muscle groups

14  might have had more rigor than others?

15      A.    Yes.

16      Q.    Okay.  Is there a way of quantifying which

17  muscle groups have rigor and how much rigor in note

18  taking or in the practice in 1987?

19      A.    You can do that, yes.

20      Q.    Okay.  So just to be clear, it would be

21  possible to go through the different muscle groups and

22  put in some statement quantifying how much rigor each

23  muscle group had?

24      A.    That's correct.

25      Q.    Okay.  Now, would it be correct to say that

1    rigor changes over time depending on how long the

2    body --

3        A.    You come into rigor and then you go out of

4    rigor.  Yes.

5        Q.    Right.  So around the time that the body is

6    found is really the only time that you would be able to

7    quantify the rigor, because if you test it three or four

8    days later, it's going to be gone; is that fair to say?

9        A.    It's going to be different.

10       Q.    Okay.  How is it going to be different?

11       A.    Because of passage of time.  If you read the

12   autopsy protocols from many offices, they assess rigor

13   well after the body has been brought in.  I don't know

14   why.  I don't find it useful in general, but they -- you

15   see that in frequent autopsy reports.

16       Q.    Right.  I guess what I'm saying is, is that

17   the time that you actually examine the body is the best

18   time to determine rigor in each muscle groups?

19       A.    It is the earliest time you can do it.

20       Q.    Okay.  And if you want to capture that

21   information, for example, which muscle groups have gone

22   into rigor and how much, the time to do it is to write it

23   down right at the time that you're doing the

24   examination --

25       A.    That's correct.

```
1        Q.     -- is that right?

2        A.     That's correct.

3        Q.     Now, you also mention fixed anterior livor,

4   L-I-V-O-R.  When you say anterior in this context, what

5   do you mean?

6        A.     This means the front of the body as being

7   normally perceived, the front of the body.

8        Q.     And fixed, what does fixed livor mean?

9        A.     That means that when you apply pressure to the

10  area of discoloration, it does not fade.

11       Q.     So put differently, after you roll the body

12  over and you pressed your finger into the skin, the

13  accumulated blood just stayed the same?

14       A.     That's a different issue.  If you're looking

15  at fixed livor, I can have fixed livor here and I can

16  have -- and then generate some unfixed livor afterwards,

17  but the front of the body here as fixed livor.

18       Q.     Okay.  And if I'm understanding you correctly,

19  it's possible that other parts of the body did not have

20  fixed livor?

21       A.     You can generate a new pattern, yes.

22       Q.     Okay.  What do you mean by generate a new

23  pattern?

24       A.     The livor is caused by the leak of red cells

25  out of blood vessels into tissues -- or actually, livor
```

1    is caused by the presence of red cells, and the fixation

2    of it is caused by the leak of the red cells out of the

3    vasculature into the non-vascular tissue where the red

4    cells then can escape when you apply pressure.  Where if

5    it's purely intravascular, when you apply pressure, it

6    can move away.  Now, if you've got fixed livor in one

7    place, it doesn't mean that you can't get some movement

8    when you -- additional livor when you move the body.

9        Q.    Okay.  If you had gotten additional livor when

10   you moved the body, would that have been something you

11   would have noted?

12       A.    No, because it's changed.  It's not relevant

13   to the factors that have been before here.

14       Q.    What do you mean by it's not relevant?

15       A.    What we're looking at is does the pattern in

16   which the body is found comport with the way the body is

17   found.  In other words, does the pattern of livor match

18   the position of the body and to see if there is

19   indication of fixed livor where it shouldn't be.

20       Q.    In other words, was the body moved after livor

21   had set in?

22       A.    After fixed livor had occurred, correct.

23       Q.    And how long does it typically take for fixed

24   livor to occur?

25       A.    Depends very much on environmental

1    circumstances, temperature being the most thing, and it

2    could be microtemperature, as well.  So for instance, a

3    clothed area will tend to retain heat better than a

4    non-clothed area.

5              And under average conditions of a household

6    environment when you find somebody, if you see fixed

7    livor, you start thinking about half a day or so, but it

8    may not be all fixed or there may be none at that stage.

9    It's just somewhere in that range, as I remember it,

10   for -- because I don't use it for timing.  I use it for

11   an estimate of whether the body's been moved or not.

12        Q.    Is there a point where fixed livor stops

13   developing?

14        A.    When there is no longer blood that can be

15   moved around or if the tissue is sufficiently damaged

16   that the fluids have -- well, that's probably got to do

17   with fluids leaving, but you will get situations where a

18   body is sufficiently far along and we can't get an idea

19   of livor.

20        Q.    Okay.  And about how long does that take?

21        A.    That, I don't know.

22        Q.    Okay.  The next sentence, you say:  A small

23   amount of bloody mucoid fluid came from the mouth and

24   nose when the body was turned over?

25        A.    Yes.

29

```
 1      Q.    What was the significance of that finding?

 2      A.    It's simply a note of a finding that's there

 3   that I cannot ascribe necessarily a distinct impression

 4   to -- anytime you got a body that's lying and draining in

 5   one direction, if you then move it, you may get some

 6   coming out.  You may make an observation of it, but that

 7   doesn't mean you can draw a conclusion from it.

 8      Q.    Okay.  Well, based on your review of the

 9   records at the time, did you draw any conclusion from

10   this?

11      A.    I don't remember any specific conclusion from

12   it.  It would be supportive, since she's a strangulation,

13   that you've got that, but it's not -- I cannot take that

14   finding and go backwards and say it had to be a

15   strangulation.

16      Q.    Okay.  Now, did you take the temperature of

17   the body?

18      A.    No.

19      Q.    Why not?

20      A.    It is highly unreliable as far as drawing

21   conclusions from it, and people who do so, do so with a

22   sense of scientific rigor that isn't there.  And so I

23   stopped -- well, I never really took -- hardly ever took

24   body temperatures.

25            Now, if I had somebody with a hypothermia
```

 1    episode and you had them immediately after they die, you

 2    do it not for timing, which is what most people try and

 3    use it for, but to get an impression of whether they had

 4    hypothermia.

 5         Q.    Regardless of whether or not you personally

 6    find it useful for timing, is there a reason why you just

 7    don't collect the information?

 8         A.    Because it is misused.

 9         Q.    Okay.  So to be clear, you don't

10    collect -- withdrawn.

11             To be clear, your practice was not to collect

12    body temperature because you believe that other medical

13    professionals would misuse that information if they had

14    it available?

15         A.    That's common, actually, yes.

16         Q.    Okay.  When you say that's common, what do you

17    mean by that?

18         A.    Well, if you look at high profile cases that

19    you occasionally come across, people will try to use body

20    temperature to establish time of death.  There's such a

21    tremendous variability.  For instance, you start out not

22    knowing what a person's intrinsic temperature is.  My

23    mother was by forensic calculations dead for something

24    like six hours all of her life.

25         Q.    You mean that your mother's natural body

```
 1    temperature was lower than --

 2        A.    Yes.

 3        Q.    -- what would be perceived as normal?

 4        A.    Yes.

 5        Q.    Okay.  Now, you said that the apartment

 6    appeared to be relatively cool?

 7        A.    Yes.

 8        Q.    As was the basement through the ceiling from

 9    the floor upon which the decedent lay?

10        A.    Correct.

11        Q.    Now, did you measure the temperature in the

12    apartment?

13        A.    According to the records that I reviewed, yes.

14    If I remember correctly, it was 62.

15        Q.    Where did you see that recorded?

16        A.    As I remember, there was a reference to it at

17    one point in one of the records.  I can't remember if it

18    came out on trial or whether it came out in one of the

19    records itself.

20        Q.    I'd like to -- let's go forward -- let's go,

21    actually, to the next page.  Is this your handwriting?

22        A.    Yes.

23        Q.    Okay.  Obviously, the parts that are not part

24    of the form?

25        A.    Well, yes.  Also, the top that has the case
```

```
 1   number and Valerie Hill, that top line is not mine.  In

 2   fact, everything noted there is not my handwriting.

 3        Q.   Okay.  Yeah, no, I can see the difference.

 4             In the Valerie Hill section, do you know whose

 5   handwriting that would be?

 6        A.   It would be somebody, technical staff helping

 7   me.

 8        Q.   Okay.  Do you recognize it?

 9        A.   No.

10        Q.   Okay.  Going below that, let's say below the

11   word hair, eyes, teeth and time, do you see handwriting?

12        A.   Yes.

13        Q.   Is that your handwriting?

14        A.   Yes.

15        Q.   Okay.  Is the timing part your handwriting?

16        A.   Is the timing of the 5:30?

17        Q.   Yes.

18        A.   No.  That's somebody else's.

19        Q.   Okay.  Can you read going to the top left, I

20   guess, to the left side of the head diagram --

21        A.   Mm-hmm.

22        Q.   -- what that says?

23        A.   Yes.

24        Q.   What does it say?

25        A.   It says:  Full rigor with anserina.
```

```
 1        Q.    What's -- could you spell that last word?

 2        A.    A-N-S-E-R-I-N-A.

 3        Q.    What's anserina?

 4        A.    That is when the hair follicles have rigor.

 5        Q.    The hair follicles have rigored?

 6        A.    Yes.

 7        Q.    What does that mean in layman's terms?

 8        A.    The hair stands up.  Cutis anserina.

 9        Q.    Now, going to the other side of the head, can

10   you read those two lines?

11        A.    Ant., which stands for anterior livor,

12   partial/fixed.  Nose flattened and -- nose flattened with

13   pressure.  The C with the line over it stands for with.

14        Q.    Now, what is partial fixed livor as you've

15   used that phrase here?

16        A.    I'm saying it's both partial and fixed.  I'm

17   using both.  So not all of the body has livor and part of

18   it is fixed.

19        Q.    Okay.  And going down to the left side of the

20   head, I guess, left of the ear on the diagram, can you

21   read that for me?

22        A.    Well, I think it's an R with parentheses and a

23   circle around it.  I don't know.  I cannot read the rest

24   of it.

25        Q.    Okay.  Can you -- given your experience with
```

1    your own work, can you make an educated guess as to what

2    that might be referring to?

3        A.    It's not very readable.  I don't know what's

4    written there.

5        Q.    What about the other side, I guess, to the

6    right of the ear on the diagram?

7        A.    Let's see.  That looks like I'm describing

8    some jewelry in the -- see the short horizontal line

9    there and it goes out there, and then the bottom line

10   says -- it looks like it says Heart, and I'm presuming it

11   says And Stud or Heart and Stud.  And then the other, the

12   top line, I think it says Round, and it might be Stud,

13   also.  It's a guess, but I think I'm describing jewelry.

14       Q.    Okay.  Now, going down to the hand that's on,

15   I guess it would be the right hand but it's the left side

16   of the page?

17       A.    Right.

18       Q.    It looks like Two White, and then something

19   else.  Can you tell me what that says?

20       A.    Metal.

21       Q.    Two white metal rings?

22       A.    Yes.

23       Q.    Okay.  That was referring to jewelry?

24       A.    Yes.

25       Q.    And going right below that, I see it looks

```
1     like a one-eighth, can you tell me what that is?

2         A.    One-eighth and then Abrasion.

3         Q.    Okay.  So that means there's just a

4     one-eighth-inch abrasion on the skin?

5         A.    Correct.

6         Q.    Okay.  And going over to the other hand, is

7     that another reference to a ring?

8         A.    It looks -- I believe it's saying White Metal

9     Spoon Ring.

10        Q.    Okay.  And looking at the other side, there's

11    a sort of almost circular.  Does this represent fecal

12    smear --

13        A.    Yes.

14        Q.    -- that was found on the body?

15        A.    Yes.

16        Q.    Okay.  Now, the -- Ms. Hill was strangled,

17    right?

18        A.    That's correct.

19        Q.    Okay.  You don't have any notations around the

20    neck.  Why not?

21        A.    That's correct.  I noted -- I removed the

22    implement of strangulation.  I can't remember whether I

23    removed it at the scene or whether I removed it at the

24    autopsy.

25        Q.    Okay.  You said dictated it.  While you were
```

```
1    doing an autopsy, was it your practice to have, for

2    example, a Dictaphone that you could speak into so you

3    could take notes while your hands were dirty?

4        A.    No.

5        Q.    Okay.  What did you mean by dictated it?

6        A.    You mean the previous exhibit --

7        Q.    You just used the phrased dictated it.  I'm

8    just wondering what you meant by in context?

9        A.    Oh, I would dictate the findings that I had.

10   I did not take a direct note of it there.

11       Q.    What do you mean by dictate the findings that

12   you had?

13       A.    Well, for my autopsy, I had to dictate that,

14   and that's where I would have document it.

15       Q.    Okay.  And when you say dictate, what do you

16   mean -- when you use that word in this context, what does

17   that practice mean?  Does that mean speaking into a

18   microphone, talking to somebody else, taking notes,

19   something else?

20       A.    It's dictating into a microphone.  I think we

21   were -- I can't remember which equipment we were using at

22   the time, either a cassette tape or I think we've gotten

23   away from the Dictaphone or Dictaphone sheets.  I don't

24   know.  I can't remember.  It's way too long.  I would

25   have dictated it into some sort of device.
```

```
1        Q.    Right.

2        A.    Which would provide something for the

3   secretary to transcribe.

4        Q.    Right.  And was it your practice to retain

5   whether it was the cassette or the sheet or the little

6   Dictaphone cassette, mini cassette, after your autopsy?

7        A.    Well, I'd give it to the secretary.

8        Q.    And then what happened to it?

9        A.    It would be transcribed and then reused.

10        Q.    Okay.  And would your secretary transcribe it

11   verbatim?

12        A.    Yes.

13        Q.    Moving on to the next page, is any of this

14   your handwriting?

15        A.    No.

16        Q.    Okay.  Moving on to the page afterwards, do

17   you see this, and in the center it says Specimen

18   Description and Submit?

19        A.    Yes.

20        Q.    All right.  Is any of this your handwriting?

21        A.    Yes.

22        Q.    Okay.  Which parts of it are your handwriting?

23        A.    My signature.

24        Q.    Where do you see your signature?

25        A.    Where it says Signature.
```

```
1        Q.    Is that at the bottom, right above the words

2   Tests Requested?

3        A.    Yes.

4        Q.    Okay.  And otherwise, did you fill out any

5   part of this?

6        A.    This is filled out for me and then I signed

7   it.

8        Q.    Okay.  Did you provide any of the information

9   contained in this document?

10       A.    Yes.

11       Q.    Okay.  What do you provide?

12       A.    Pretty much all of it.

13       Q.    Okay.  Now, this was generated, I believe, at

14  9:37 a.m. the following day after, being March 31st, the

15  day after the body was found?

16       A.    That is when it was delivered, when the form

17  with the specimens were delivered to the laboratory.  The

18  form would have been completed at the time the autopsy

19  was done, other than the Delivered By and Received By.

20       Q.    Okay.  Now, at the bottom right, under

21  narrative/medical history, is this information that you

22  provided --

23       A.    To me that's the bottom left.

24       Q.    You're right, it is.  It's the bottom left.

25  Narrative history, or Narrative/Med History, do you see
```

1    that?

2       A.    Yes.

3       Q.    Did you provide that information --

4       A.    That would be at my direction.

5       Q.    Okay.  To be clear, when it says:  Appears as

6    though deceased was there approximately two or three

7    days --

8       A.    Yes.

9       Q.    -- was that your conclusion?

10      A.    Yes.

11      Q.    Okay.  Now, when you say two or three days,

12   measuring from March 30th, what do you mean by that?

13      A.    That means from the time of discovery.

14      Q.    Okay.  So what would two or three days be,

15   would that be the 28th, the 29th, and the 30th?

16      A.    That would be from the day of discovery, which

17   was, what, the 30th?

18      Q.    Mm-hmm.

19      A.    Okay.  And then the 29th, 28th, 27th.

20      Q.    Okay.  So by putting down two or three days,

21   you were pushing it all the way to 27th?

22                 MR. JULIAN:  Object to the form.

23                 MR. VENTRONE:  Yeah.

24      A.    That includes it.

25      Q.    You were including the 27th as part of this

```
 1   conclusion?

 2       A.    Yes.

 3       Q.    Okay.  I'd like to go to -- actually, skip the

 4   next page, which isn't that interesting.  Go to the

 5   Certificate of Death.  Now, I'd like you to look at the

 6   To Be Completed by Coroner or Medical Examiner Only, do

 7   you see that?

 8       A.    Let's see.

 9       Q.    We're looking -- this is the bottom right

10   quadrant.

11       A.    I'm just looking for where it says To Be

12   Completed By.  That's what it was.

13       Q.    No.  No.  Right underneath that, is that your

14   signature?

15       A.    Oh, yes.  Yes.

16       Q.    Okay.

17       A.    I was looking down at the actual certification

18   part.  Okay.

19       Q.    And there's an X that says Medical Examiner

20   because at the time you were medical examiner?

21       A.    Yes.

22       Q.    Okay.  Now, it says pronounced dead

23   March 30th, 1987 at 3:30?

24       A.    Yes.

25       Q.    Okay.  And that would be information that you
```

1     would have typed into the Certificate of Death or would

2     that have been something you directed somebody to do?

3          A.    I would have directed it.

4          Q.    Okay.  Is that true for all of the typed

5     portions on the Certificate of Death, meaning that you

6     directed this to be provided?

7          A.    That's correct, and then I looked at it before

8     signing it.

9          Q.    Okay.  Of course.  Now, if you look towards

10    the section Cause, right at the bottom, towards the

11    middle -- well, first, it says Homicide.  Do you see

12    that?

13         A.    Yes.

14         Q.    And to the immediate right, it says Date of

15    Injury?

16         A.    Yes.

17         Q.    And it says March of 1987, and then UNK?

18         A.    Correct.

19         Q.    That says unknown; is that correct?

20         A.    That's correct.

21         Q.    Why did you put unknown?

22         A.    Because it's unknown.

23         Q.    Okay.  What do you mean by unknown?

24         A.    Because I don't know it.

25         Q.    Okay.  So just to be clear, when you put down

1    unknown, did that mean that you did not have any opinion

2    as to what day that Ms. Hill died?

3        A.    That's correct.

4                MR. VENTRONE:  Object to the form.

5        Q.    If that opinion had changed, meaning that if

6    you had some opinion as to what day she had died, would

7    the Certificate of Death have been updated?

8        A.    Could be if there was a request for it.

9        Q.    Okay.  Well, based on -- did you ever come to

10   a determination as to what day Valerie Hill died,

11   according to your review?

12       A.    No.

13       Q.    Okay.  Go back to the beginning.  Now, I'd

14   like to go to page -- well, it's page one of the external

15   examination.  That's the page, exactly.  It's the second

16   page of Exhibit 3.  And it says here:  The body has fixed

17   anterior livor with flattening of the nose secondary to

18   pressure?

19       A.    Correct.

20       Q.    Okay.  And we've discussed fixed anterior

21   livor.  Would it be correct to say that this doesn't note

22   the partial anterior livor?

23       A.    Correct.

24       Q.    Okay.  Why would you have left that out of the

25   report?

1      A.      Because that's a potential artifact of moving

2    the body like we have done.  It does not add to

3    information that's useful to understanding about movement

4    of the body prior to the time of discovery.

5      Q.      Okay.  So you left it out because the partial

6    anterior livor could have been caused by the body being

7    moved to the medical examiner's office?

8      A.      Any change from the fixed could have been

9    caused by a transfer and manipulation.

10     Q.      Okay.  Could it have been caused by something

11   else?

12     A.      Well, I could have not seen some livor before.

13   That's possible.

14     Q.      You mean some partial livor?

15     A.      I could have not known -- yeah.  I could have

16   not known.  That's a possibility.

17     Q.      Okay.  Would it have been useful information

18   to record as part of your memorandum?

19     A.      I do not believe so.

20     Q.      Okay.  Why would you have left it out?

21     A.      Because it wasn't useful.  It wasn't -- what

22   I'm trying to do is describe the things that can be

23   interpreted.

24     Q.      Okay.  So you didn't believe it was useful for

25   interpretation so you left it out?

```
 1      A.      Correct.

 2      Q.      Okay.  Now, going down to the next, I guess

 3  it's really paragraph:  There is full rigor with cutis

 4  anserina?

 5      A.      Anserina.

 6      Q.      Cutis, C-U-T-I-S.  What is cutis anserina in

 7  this section?

 8      A.      The same as before, which is the rigor of

 9  muscle associated with hair follicles.

10      Q.      Okay.  And:  The rigor is easily broken as the

11  body is coming out of rigor.  What does that mean?

12      A.      This means that the tissues were relaxing.

13  They're not stiff.

14      Q.      Okay.  The -- when the corpse of Valerie Hill

15  was moved from the apartment to the medical examiner's

16  office, how did that occur?

17      A.      That would -- I don't have an independent

18  memory, but our practice was we would package the body

19  and then move it in our rig to the office.

20      Q.      And is the -- when you say the rig, that's a

21  vehicle?

22      A.      Yes.

23      Q.      Okay.  Is that vehicle kept at any particular

24  temperature?

25      A.      No.
```

```
 1        Q.    Was the medical examiner's office where you

 2   would have stored the body for the two hours before the

 3   autopsy was performed kept at any particular temperature?

 4        A.    It would be in the cooler, and the cooler was

 5   kept as cold as it could be without causing freezing or

 6   other factors, but I don't know specifically the

 7   temperature it was kept at.  I haven't kept a record of

 8   it.

 9        Q.    So just to be correct, you would have kept it

10   in the cooler for about two hours while you waited to do

11   the autopsy?

12        A.    Right.

13        Q.    Okay.  Now, going to internal examination,

14   which would be page three.

15             MR. RICKNER:  Just for convenience sake,

16             do you guys mind leaving the room since

17             getting him up and around --

18             MR. JULIAN:  Not at all.  Absolutely.

19             Absolutely.

20             MR. RICKNER:  We're taking five.

21                 (Off record:  11:24 a.m. to 11:33 a.m.)

22   BY MR. RICKNER:

23        Q.    Going back to the internal examination, it

24   says here the 1,530 gram brain?

25        A.    Yes.
```

```
1        Q.     Safe to say that to make that determination,

2   the brain would have been removed from the body --

3        A.     And weighed, yes.

4        Q.     Okay.  Now, after the brain was removed from

5   the body and weighed, what happened to it?

6        A.     It was fixed in formalin and then examined by

7   Dr. Collins, a neuropathologist from Upstate Medical

8   Center.

9        Q.     Okay.

10        A.     In concord with us.

11        Q.     And how long between the brain being removed

12   is it fixed in formalin?

13        A.     That varies depending upon Dr. Collins

14   availability and scheduling and the needs of a particular

15   case.  It could be two weeks.  It could be eight weeks.

16        Q.     Okay.

17        A.     It could be longer.

18        Q.     What steps are taken to ensure that the brain

19   doesn't degrade in between removal and being fixed

20   informally?

21        A.     Placing it in formalin immediately.

22        Q.     Okay.  Then I've missed what you said.

23               Would it be correct to say that after you

24   removed the brain, you placed it in formalin immediately?

25        A.     After it was removed, it was weighed.  I
```

1   examined it externally, or the external parts of the

2   brain, it's still internal body, and then put it into

3   formalin.

4        Q.    Okay.  In general, your practice between

5   removal and putting it in formalin, what would that

6   interval typically be?

7        A.    Minutes to an hour maybe.

8        Q.    Okay.  And what is formalin, just for the

9   record?

10       A.    Formalin is formaldehyde that has been

11   diluted.  And I'm trying to remember the nomenclature.

12   When you have a certain percentage of what can be

13   intrinsically gaseous formaldehyde dissolved in water, it

14   is usually sold as a -- it's a saturated formaldehyde

15   solution.  And then when you dilute that, it's considered

16   formalin.

17       Q.    Got it.  Now, what is -- you used the phrase

18   "autolytic changes" here.  What does that mean?

19       A.    This means that it is beginning to soften, not

20   maintain the same structural integrity that it would if

21   it were fresh.

22       Q.    Okay.  And is there a way to quantify this or

23   is just mild softening the term that you chose?

24       A.    Mild means it's definitely detectible.  It's

25   there.  It's not severe where you would have kind of a

1    run-through-your-fingers brain.

2        Q.    Okay.  And how long does it take for this mild

3    softening to develop?

4        A.    That is a variable I can't answer.

5        Q.    Okay.  Do you have a range?

6        A.    No, because under -- well, it depends on what

7    parameters you put in place.  For instance, if you were

8    to find one of the people from the Franklin Northeastern

9    Expedition frozen, who have been frozen for a hundred

10   years, if there had been any insufficient temperature

11   variations to cause crystal formation and a variety of

12   things, you could have a brain that did not have

13   significant autolytic change.  But that's extreme.

14       Q.    Okay.

15       A.    In the average situation, I've never timed it.

16       Q.    It's fair to say, though, you've examined

17   thousands of brains?

18       A.    Yes.

19       Q.    Okay.  For somebody who's found in an

20   apartment between 60 and 70 degrees, about how long would

21   these mild softening take to develop?

22       A.    I do not know.

23       Q.    And:  There's an estimated milliliter of

24   liquid subdural and subarachnoid blood over the lateral

25   convexities close to the midline.  Do you see that?

1        A.     And here we have an oversight in my

2    proofreading of this particular one, because I'm sure I

3    put a number in front of milliliter, but I don't know

4    what it was.

5        Q.     Okay.  Just one milliliter would be --

6        A.     Milliliter would be --

7        Q.     -- very unlikely?

8        A.     Unlikely, yes.

9        Q.     Okay.  But there's some number of

10   milliliters --

11       A.     Right.

12       Q.     -- of liquid subdural and subarachnoid blood?

13       A.     Right.

14       Q.     Okay.  What is the significance of that?

15       A.     This is potentially related to the injury of

16   the brain.  I didn't know at this point whether further

17   sectioning, when we created sections of the brain with

18   Dr. Collins, whether we were going to see contusion or

19   not.  I could not see any of the misspelled acute

20   contusion.  I did not see any acute contusion, but that

21   did not mean I wasn't going to see something later.

22       Q.     Okay.  And to be clear, if you had seen

23   something later, would it have been included in this

24   section?

25       A.     No.

```
 1        Q.    Where would it have been included?

 2        A.    In Dr. Collins's report.

 3        Q.    So you mean if Dr. Collins had come up with

 4   further evidence of contusion after his examination of

 5   the brain --

 6        A.    At the time of his examination, if either of

 7   us had seen anything, it would have been noted.

 8        Q.    Did you examine the brain with Dr. Collins?

 9        A.    That would be my standard practice, but I

10   cannot guarantee you in a given case that we did not take

11   it up and examine it.

12        Q.    Just let's skip ahead and go to one, two,

13   three, four, Gross Description -- keep going four more,

14   four pages.  Not that one, the next one.  Yes.

15              It says Gross Description of Brain After

16   Fixation, do you see that top part?

17        A.    Yes, I do.

18        Q.    If you had been part of this examination,

19   would your participation have been noted in the report?

20        A.    No.

21        Q.    Okay.  So as you sit here today, you don't

22   know whether you were part of this examination or not?

23        A.    I cannot -- I do not have an independent

24   memory of it.

25        Q.    Okay.
```

1      A.    We had a policy, a practice, if you will,

2    actually not so much a policy, he would come down, I

3    can't remember whether his was once a month or something

4    approximately, and examine brains with us usually, but I

5    cannot say that some did not go back to Upstate Medical

6    Center.

7      Q.    Okay.  To be clear, you don't know as you sit

8    here today?

9      A.    Correct.

10     Q.    And have you seen any notation or anything in

11   your testimony that indicates whether or not you were

12   part of it?

13     A.    No.

14     Q.    Okay.  Going -- go back to page four of your

15   sort of overall memorandum?

16     A.    You mean the autopsy report?

17     Q.    Yes.  That is actually -- it doesn't have the

18   title Autopsy Report, but that's what it is?

19     A.    Yes.

20     Q.    Okay.  And you see in the top left, it says:

21   The 280-gram heart?

22     A.    Yes.

23     Q.    Okay.  And it says:  This tissue is diffusely

24   mildly softened secondary to autolysis.  Do you see that?

25     A.    Correct.

1      Q.    What does that mean?

2      A.    That means the tissue is beginning to

3   breakdown from its own degradative processes.

4      Q.    Okay.  And typically about how long does that

5   take in an average situation, apartment 60 to 70 degrees?

6      A.    It varies considerably.  I can't actually put

7   a time on it.  The more you have of it, the more you tend

8   to think of longer time passing, but I can't make a

9   direct correlation.  There are too many factors that

10  affect it.

11     Q.    Okay.  It says here mildly softened?

12     A.    Right.

13     Q.    Would that be consistent with somebody who was

14  dead for seventy-two hours?

15     A.    Yes.

16     Q.    Would it be consistent with somebody who was

17  dead for six hours?

18     A.    It could be, yes.

19     Q.    Okay.  Is there any way to make a closer

20  determination as to time of death with respect to how

21  much the heart has softened?

22     A.    All you can say is that the more you notice

23  and then actually go through the trouble of noticing

24  this, the more it indicates that there's been some

25  passage of time, but there's so many variables, I can't

1    tie it down to a time.

2        Q.    Okay.  And when you say there's so many

3    variables, that also includes in the Valerie Hill case,

4    you can't tie it down to a time?

5        A.    That's correct.

6        Q.    Okay.  And the same is true for the brain?

7        A.    Yes.

8        Q.    Okay.  Can you tie it down to an outside

9    range, like bookend it?

10        A.    Looking simply at likelihoods, I cannot give

11    you a specific range and say not beyond that, no.

12        Q.    Okay.  At what point does it become unlikely

13    if you were bookending it?

14        A.    I mean, to have no softening -- let me

15    understand the question.  You're asking how long can you

16    go having no softening?

17        Q.    Yeah.  To start out.

18        A.    I don't know the answer to that.

19        Q.    Okay.  How about to the point where you stop

20    describing it as mildly softened and describe it with

21    another word?

22        A.    Then if it is falling apart, then it's

23    severely autolytic.

24        Q.    Is there something between mildly and severe?

25        A.    I'm sure I can use moderately sometimes.

1      Q.    Okay.

2      A.    But I don't have any specific borders for any

3    of those.

4      Q.    Okay.  Now, going down to the

5    lungs -- actually, back up for a second.

6           Was there anything out of the ordinary

7    regarding the weight of the brain, the heart, the lungs,

8    the liver, or the spleen?

9      A.    No.

10     Q.    Okay.  Now, looking at the lungs, do you note

11   any softening or other degradation?

12     A.    There is some distribution of blood in the

13   airway, which is the red distribution, and then some

14   edema foam in the airways, which indicates accumulation

15   of fluid in the lungs.

16     Q.    Right.  And for a strangulation death, that

17   would be typical, right?

18     A.    You can get it in a lot of different things,

19   but it's one of the things that goes along with that

20   diagnosis.

21     Q.    Okay.  Is that correlated with degradation of

22   the lungs due to some sort of decomposition?

23     A.    You can get it with decomposition.

24     Q.    Okay.  Is that what you believe happened here?

25     A.    I make no specific note, so I can't speak to

```
 1   that.

 2        Q.     Now, moving on to the liver, this one I know

 3   how to pronounce, is there any notation in this paragraph

 4   about the liver regarding degradation?

 5        A.     Yes.

 6        Q.     Okay.  What is that?

 7        A.     It says that there's gassy crepitus.  In other

 8   words, it's decomposing.  There is a gas-producing

 9   organism in the tissue.

10        Q.     And it says mildly apparent?

11        A.     Yes.

12        Q.     In a case like Valerie Hill's, is there any

13   indication of how long that takes to develop?

14        A.     It is highly variable.

15        Q.     So again, six hours or six days, you couldn't

16   say one way or another?

17        A.     I cannot.  By six days, you have an increased

18   chance to have it, but it doesn't tell you -- I can have

19   somebody who is six days who doesn't have it.

20        Q.     And moving to the stomach contents?

21        A.     Yes.

22        Q.     It says:  There appears to be congealed grease

23   in one solid chunk?

24        A.     Yes.

25        Q.     Is there any indication of anything else in
```

1    the stomach?

2         A.    Well, there's liquid.

3         Q.    Okay.  Was there any indication of how

4    recently the person had eaten prior to death?

5         A.    I can't answer that.

6         Q.    Okay.

7         A.    I mean, I don't have anything that is visibly

8    undigested.

9         Q.    Okay.  So you have -- let's just say somebody

10   had eaten a sandwich six hours before they died, would

11   you expect to see congealed grease in one solid chunk or

12   would you expect to see more or less or something else?

13        A.    It depends on what they ate and their

14   digestive system and whether they -- people digest things

15   at different time frames.  Now, for most of us, under

16   average conditions, you get hungry every few hours.  It

17   doesn't mean you've necessarily emptied your stomach, but

18   you've -- you start to want to eat again.  I don't

19   actually know where you're going.

20        Q.    I'm not going anywhere.

21        A.    Okay.

22        Q.    I just want to know what you want to know.

23              I would say this:  The presence of the

24   congealed grease in one solid chunk, does that indicate

25   anything about how long it had been since this person had

1    eaten?

2        A.    Very broad terms, if somebody came out

3    of Bergen-Belson and died before being fed, you wouldn't

4    expect to find it, because they haven't been fed there,

5    they were starving to death.  But I do not know exactly

6    how long you can retain some grease from a -- let's say

7    if you had a heavy grease-filled meal, especially if you

8    got GI problems.  It depends on the person.

9        Q.    Okay.  But there's no indication that Valerie

10   Hill had GI problems, correct?

11       A.    No, not that I know of.

12       Q.    Just an ordinary, you know, relatively healthy

13   woman the age of Valerie Hill, if she had eaten a

14   sandwich and died six hours later, would you expect to

15   find remnants of the sandwich in the stomach?

16       A.    It depends on what the sandwich was made of.

17   It depends on a variety of factors.  I cannot say that I

18   expect it.  I don't have an expectation of it.

19       Q.    What about if she had just eaten some garlic

20   bread?

21       A.    Okay.

22       Q.    If she had died six hours later, would you

23   expect to find the remnants of garlic bread in her

24   stomach?

25       A.    No, not gross visible remnants.

```
 1       Q.    But would you expect to find something that

 2   perhaps could be related to garlic bread or food or

 3   something else in the stomach?

 4       A.    If you had greasy garlic bread, could this

 5   chunk be from that, yes.

 6       Q.    Okay.  And about how long between eating and

 7   death would be this sort of one solid chunk?

 8       A.    Don't know.

 9       Q.    Next, you note that:  The mucosa has lost some

10   of the usual rugal folds?

11       A.    Yes.

12       Q.    That's R-U-G-A-L.  What does that mean?

13       A.    That means that the internal lining of the

14   stomach is losing some of its structure.

15       Q.    Okay.  And is that part of a disease process

16   or is that part of the decomposition of the body or

17   something else?

18       A.    It could be both.

19       Q.    Here what do you think it was?

20       A.    I have to -- I make no specific note, so I

21   cannot speak to that.

22       Q.    Okay.  Is it an indication that the

23   body -- well, withdrawn.  You already answered.

24             Then you go:  There is a very light coating of

25   mucoid, tan-brown material over the small bowel without a
```

```
 1    distinct C-H-Y-M-E column?

 2         A.    Correct.

 3         Q.    What does that mean?

 4         A.    This means that there is something on the

 5    surface of the lining and I cannot tell what it is.

 6         Q.    Okay.  Is there any testing or something else

 7    that you could use to tell what it is?

 8         A.    I don't know what it is, so I can't answer

 9    that question.

10         Q.    Okay.  Would there have been tests that you

11    would have performed to answer that question in 1987?

12         A.    No.

13         Q.    Now, moving down to the pancreas, it says:

14    Softened somewhat by autolytic change?

15         A.    Yes.

16         Q.    Is that the same mild changes that we've

17    discussed in the other organs?

18         A.    The pancreas can autodigest very easily

19    because it's full of digestive enzymes, and when you

20    remove oxygen, it will autodigest.  I can't use it for

21    timing.  Now, if you get somebody with no autolysis of

22    the pancreas, that's good preservation and you have a

23    higher chance of that if it's a short period of -- since

24    he died.

25         Q.    What do you mean by short period in that
```

1    context?

2        A.    Okay.  If you die within -- if you're

3    dead -- found within a few hours and the autopsy is

4    performed within just a few hours of death, you've got a

5    fair chance you may not notice anything that you notice

6    as far as autolysis.  If somebody is a day out, you have

7    a greater chance of finding it.  If you're several days

8    out, there's a very good chance that they're going to

9    have it.

10        Q.    Okay.  And this sort of digesting itself is

11    something that happens after death --

12        A.    Yes.

13        Q.    -- obviously?

14        A.    Well, alcoholics do it, and that's one of the

15    reasons they got pancreatic problems.

16        Q.    Okay.  Any normal healthy person, though, this

17    doesn't occur to, just talking about the process that

18    occurs after death?

19        A.    If you're healthy, it's not taking place.  If

20    it's taking place, you're not healthy.

21        Q.    Now, moving on to the two kidneys.  Is there

22    anything notable about either the degradation,

23    decomposition, or something else in this paragraph?

24        A.    No.

25        Q.    Okay.  Which would be to say that you don't

1   notice any decomposition in the kidneys?

2       A.    There's nothing that I note that I consider

3   sufficient to comment on.

4       Q.    Okay.

5       A.    There's always some change.

6       Q.    It hadn't reached to the point where you would

7   have written it down?

8       A.    Obviously, yes.

9       Q.    Okay.  And just to be clear, if you had

10  noticed some of those changes, you would have written it

11  down?

12      A.    I expect I would, yes.

13      Q.    Okay.  And same question with the internal

14  genitalia.  Any notation about degradation or

15  decomposition or something similar?

16      A.    The -- what I noted here was the degradation

17  of the endometrium.

18      Q.    Okay.  And can you just -- is that:  The

19  endometrium is thin and dark red with a reddish fluid

20  present?

21      A.    Yes.

22      Q.    Okay.  And what does that mean with respect to

23  degradation of the organ?

24      A.    This has more to do with it looks like she had

25  recent menstruation.

1      Q.    Okay.  So to be clear, it has nothing to do

2  with what happened to the body after death?

3      A.    Nothing I can relate.  The information I'm

4  trying to relate is that it looks like she's recently

5  menstruated.

6      Q.    Now, when you're writing up an autopsy report

7  like this, would it be your practice to note anything

8  that you considered significant?

9      A.    Yes.

10      Q.    Okay.  Going to the Report of Toxicological

11  Screens, that's going to be the next page.  I'm actually

12  going to mark Exhibit 25.

13      A.    So within this exhibit, this will become

14  Exhibit 25?

15      Q.    Nope.

16      A.    Okay.

17      Q.    I'm just going to show you some other related

18  documents.

19      A.    Yes, sir.

20                    (Exhibit 25 marked for identification.)

21  BY MR. RICKNER:

22      Q.    All right.  I'd like you to look -- obviously,

23  there's a page in Exhibit 3 that seems to be roughly the

24  same or really just a different copy of the same document

25  as the first page of Exhibit 25.  Do you see that?

1      A.    Yes.

2      Q.    Okay.  Let's move to the second page of

3  Exhibit 25.  Now, they crossed out the month and changed

4  it from a 4 to a 5, and if you compare, it added a third

5  line that says:  Acidic drugs not detected in the

6  blood --

7      A.    Correct.

8      Q.    -- do you see that?

9      A.    Correct.

10      Q.    And then at the bottom, it says:  7/13/87, WS?

11      A.    Yes.

12      Q.    Okay.  Would the 7/13/87, WS, would that be

13  Sawyer, Dr. Sawyer's notation?

14      A.    I do not know who.  It could also be Bill

15  Sullivan.

16      Q.    Okay.  And that was another doctor that

17  worked --

18      A.    No, he was my investigator, or an

19  investigator, but I can't remember if he was in the

20  office at that time or not.

21      Q.    Okay.  Do you know why this tox screen would

22  have been supplemented a month later, it appears?

23      A.    Somebody must have asked a question.

24      Q.    Like what?

25      A.    That pertained to toxicology and knew this was

```
 1    run.

 2        Q.    Okay.  And just going through the process,

 3    somebody asked a question, and as a result, somebody did

 4    a test that determined acidic drugs not detected in the

 5    system?

 6        A.    Somebody asked the question, I can't tell you

 7    who.  I have no memory of this.

 8        Q.    Okay.

 9        A.    And then Chip Walls would have arranged to

10    have that tested.

11        Q.    Okay.  Now, it says:  Basic drugs were not

12    detected in the blood, liver, or gastric contents?

13        A.    That's correct.

14        Q.    What are basic drugs in this context?

15        A.    You should ask the toxicologist.

16        Q.    Okay.  And it says:  Gastric ethanol at

17    0.16 grams per deciliter?

18        A.    That's correct.

19        Q.    Okay.  What does that mean?

20        A.    That means that alcohol was detected in the

21    gastric contents at that concentration.

22        Q.    Okay.  And could you say what that

23    concentration would equate to as far as how many drinks

24    somebody had?

25        A.    No.
```

1    Q.    Okay.  The blood had .03 grams per deciliter

2   of ethanol?

3    A.    Yes.  Correct.

4    Q.    And the vitreous humor had .02 grams per

5   deciliter --

6    A.    That's correct.

7    Q.    -- of ethanol.

8          Do either of those numbers say anything about

9   how recently it had been since the person had taken a

10  drink or drinks?

11   A.    They don't tell you how recently.  They tell

12  you that that's as much as you've got.  You then look

13  hypothetically, okay, let's say somebody got completely

14  hammered, had a liver that didn't metabolize worth a darn

15  and got to, let's say, a .4, which would kill me, then it

16  would take a long time before you get to a .03.

17   Q.    Right.  Days even?

18   A.    I'd have to -- I'm not good at math in my

19  head.  But alternatively, if you've got somebody who has

20  had half a drink and you get this, then it's closer in

21  time.

22   Q.    Okay.  What about somebody who had two

23  cocktails?

24   A.    If we look at two standard servings of

25  alcohol, two glasses of wine versus two glasses of hard

1    liquor -- well, not same size glass -- two shots of hard

2    liquor versus two beers, we consider them approximately

3    equivalent, then it takes -- you will clear those -- the

4    average person is going to clear something on the order

5    of a drink an hour, but it's quite variable depending on

6    your experience with alcohol.

7        Q.    Okay.  And when you say clear on the order of

8    a drink an hour, does that mean that you would not be

9    able to detect, for example, any ethanol in the blood?

10       A.    It would be below reporting limits, at least,

11   for most people.  Let's say if you chug a beer right now,

12   an hour from now there's a good chance it's over

13   reporting limits, then you test your blood.

14       Q.    But I'm saying, if somebody has the ethanol

15   concentration that you're seeing here in the blood --

16       A.    Right.

17       Q.    -- how long would it take an average woman to

18   clear, let's call it three standard beers, down to this

19   ethanol level?

20       A.    Three drinks.  We would generally think of

21   clearing about anywhere from 0.015 to 0.02 for the novice

22   drinker per hour.

23       Q.    Which equates to?

24       A.    So if you had just three drinks, then you

25   expect that person to get -- and a standard size weight,

1    I can't remember what her weight was -- and it's just

2    drunk down, you're going to expect something on the order

3    of, let's see, .015 times three, so .45, something like

4    that -- .045, something like that, to .6 maybe, 0.06.

5        Q.    Okay.  And then to go from .45 to -- it's

6    .045 to .06?

7        A.    Right.

8        Q.    To go down to .03 from that level,

9    approximately how long does it take, one, two hours?

10       A.    Yeah, something like that.

11       Q.    Okay.  So just to be clear, this ethanol

12   concentration means that she had a drink quite recently

13   before she died?

14       A.    What supports that more is the vitreous,

15   because you still have the issues of decomposition.

16       Q.    But with respect to the vitreous humor, how is

17   that different?

18       A.    You don't put alcohol directly in your eye.

19       Q.    Good.

20       A.    It gets there from the blood.  So it's got a

21   lag phase.

22       Q.    Okay.  And what is that -- so these two

23   numbers, what do they say about how long Ms. Hill had

24   consumed some alcohol before she died?

25       A.    It doesn't really tell me, because I can't

1    tell you how high she was before.

2        Q.    And if somebody told you that she had three

3    standard drinks before she died, about how long would you

4    expect -- what would these numbers say about her having,

5    let's say, the assumption of three standard drinks

6    before?

7                    MR. JULIAN:  Object to the form of the

8                    question.

9        A.    Okay.  If she had three standard drinks, had

10    average or anticipated absorption, had average

11    metabolism, as I said, we expect you to metabolize about

12    a drink an hour, and she's got 0.02.  She's got two

13    drinks, an indication of a couple drinks here.

14        Q.    Okay.  But how long before she died, is what

15    I'm trying to figure out?

16        A.    I guess I kind of lost track of the question.

17                    MR. VENTRONE:  Me, too.

18        Q.    What I'm saying is:  If you assume that she,

19    let's say, sat down at dinner and had an alcoholic

20    beverage, two or three drinks -- or withdrawn.  Let's be

21    more specific.

22                    Let's assume she sat down in the course of a

23    normal dinner, an hour long, she consumed three standard

24    units of alcohol, how long would you expect it to be

25    after that moment for her to get to the ethanol in the

```
 1    blood and ethanol in the vitreous humor you see here?

 2                    MR. JULIAN:  Object to the form.

 3                    MR. VENTRONE:  Object to the form.

 4    A.    An hour or two, something like that.

 5    Q.    Okay.  Moving to the next page of Exhibit 25,

 6    please.

 7    A.    Okay.

 8    Q.    It says here:  One vial of an amber liquid.

 9    Do you see that?  That's items for exam.

10    A.    The next page is this.

11    Q.    Oh.  Continue going to the page after that,

12    then.

13    A.    Okay.

14    Q.    It's labeled 11094 on the bottom right.

15    A.    Okay.

16    Q.    And it says Laboratory Report, Syracuse Police

17    Department.

18    A.    Right.

19    Q.    And halfway down, Items for Exam:  One vial of

20    an amber liquid.  Do you see that?

21    A.    Yes.

22    Q.    What does that say -- what does that mean?

23    A.    It's an amber liquid.

24    Q.    Do you know which amber liquid it is?

25    A.    No.
```

1      Q.    Okay.  And please, leaf through the rest of

2   the exhibit and tell me if you see any indication as to

3   what that amber liquid might have been?

4      A.    It says amber liquid, and I do not see

5   anything that tells me what it was sampled from or

6   where -- and I don't see a chain of custody for transfer

7   to the lab, so I don't know where it came from.

8      Q.    Go back to the Exhibit 3, which is your

9   autopsy and the other related -- nope -- yep, and back to

10  the Gross Description of Brain After Fixation.

11     A.    Yes, sir.

12     Q.    I'd like -- the process of this analysis, do

13  you take the brain out of the formalin and then dissect

14  it?

15     A.    Yes.

16     Q.    Okay.  And that was, at least from our

17  records, done by George Collins?

18     A.    He was -- he would be directing it.  I cannot

19  tell you that he didn't have somebody else with him.  I'm

20  sure he had residents he'd train and they would come,

21  too.

22     Q.    The person we know who did this is George

23  Collins, right?

24     A.    The person who created the report is George

25  Collins.

1      Q.    And based on that, the information we have

2    suggests that he is the one who actually did the

3    examination?

4      A.    He's the primary observer and it is his

5    responsibility, yes.

6      Q.    Okay.  As you said, the absence of information

7    is not proof of something, so it doesn't say anything

8    about who else might have been there, right?

9      A.    Right.  Correct.

10     Q.    Okay.  Now, does this note any decomposition

11   on the outside of the brain?

12     A.    He did not make any specific note of it.

13     Q.    Okay.  He does note decomposition in the

14   cavities in the deeper areas of the brain; is that right?

15     A.    That's correct.

16     Q.    Okay.  So just to be clear, that means if you

17   slice the brain up and you look inside of it rather on

18   the surface, you'd see the decomposition?

19     A.    You see the bubbles, yes.

20     Q.    Okay.  What are those bubbles?

21     A.    They're gas.

22     Q.    Okay.  So is this similar to the pancreas,

23   meaning that some sort of microorganism starts digesting

24   parts of the brain or something else?

25     A.    The pancreas is not from typically

72

```
1    microorganisms.  It's from autolytic --

2        Q.    I used a bad example.  Why don't I just ask

3    this the right way.

4              What causes those cavities in the brain during

5    decomposition?

6        A.    Release of gas by microorganisms.

7        Q.    Okay.  I was pretty close, then.

8              And how long does that typically take to

9    develop?

10        A.    I never timed it, never been able to do an

11    experimental series where we kill people and then look at

12    their brains to study that process.

13        Q.    Okay.  Is it fair to say that there just isn't

14    any way to determine how long it takes for those cavities

15    to develop due to decomposition?

16        A.    That is correct.  We know that we see them

17    more commonly in bodies that are further along from the

18    time of death, but we don't have any specific way we can

19    see them early on.  There's a high degree of variability.

20        Q.    What does further on mean in that sentence?

21        A.    In other words, that has been dead longer.  So

22    if I have a body that is three, four, five days dead and

23    then take the brain out, I have a higher chance of seeing

24    something like this than a brain that comes out of

25    somebody who has just died.
```

```
1        Q.    Okay.  Is it inconsistent with somebody who

2   has been dead for, let's say, a day and a half?

3        A.    No.

4        Q.    Okay.  Is there any way to determine, to your

5   knowledge, between a day and a half and three or four

6   days?

7        A.    From the gas bubbles, no.

8        Q.    And from the decomposition that you see noted

9   here?

10       A.    I cannot make a decision there, no.

11       Q.    Okay.  I'd like you to go to the next page.

12  This is a summary that's by Mr. M. Birchmeyer.  It says

13  father and brother, found dead, in the top left?

14       A.    Yes.  Hold on.  Is this the one we're looking

15  at?

16       Q.    No.  This one.

17       A.    Okay.  Let me see if I can find it.

18       Q.    Bingo.

19       A.    Okay.

20       Q.    The -- have you reviewed this document before?

21       A.    I've seen it.

22       Q.    Okay.  Would you have reviewed it around the

23  time that you did the autopsy?

24       A.    It would be generated after that.

25       Q.    Okay.  Would it have been something that you
```

1   would have reviewed before testimony or do you think you

2   just reviewed it recently?

3       A.   I know I reviewed it recently.  I anticipate,

4   but I do not have a specific memory, so I cannot answer

5   the question.

6       Q.   Understood.  Prior to your arrival at the

7   scene, do you know how long investigators had been at the

8   apartment where Valerie Hill died?

9       A.   That may be in records that I reviewed, but I

10  did not record that.  I have no memory of it.

11      Q.   Okay.  About how many people were on the

12  scene, do you think?

13      A.   I have no memory of it.

14      Q.   Would you agree with me that if people had

15  been coming and going outside of the house, that could

16  have decreased the temperature inside the apartment?

17      A.   I don't know enough about the environment

18  during the time they were there, the opening and closing

19  of doors, typically they wouldn't leave things open, but

20  I don't know.

21      Q.   If multiple investigators had been coming in

22  and out and they left the door open, could that have

23  dropped the temperature in the apartment?

24      A.   I don't know what the relative temperature is

25  outside.  I can't answer that question.

1      Q.    Well, just as a general matter, if the

2  temperature outside was cooler than the temperature in

3  the apartment, would keeping the door open drop the

4  temperature in the apartment?

5      A.    If you give the hypothetical that there's

6  lower temperature outdoors, then opening would obviously

7  introduce cooler air.

8      Q.    Okay.  When making determinations about the

9  temperature in the apartment while Valerie Hill's body

10  was there, did you take into account the fact that the

11  apartment could have dropped in temperature?

12      A.    All I noted was the temperature that was

13  there, and I believe it was the basement that we looked

14  at for temperature.

15      Q.    Okay.  And did you actually have a thermometer

16  with you?

17      A.    If I remember correctly, somewhere there's a

18  note of 62 degrees.

19      Q.    It's in your testimony.  Do you -- would you

20  have noted it anywhere else?

21      A.    I would presume that it's noted somewhere,

22  because I would -- but I do not have an independent

23  memory of that.

24      Q.    Okay.  Is it possible when you said 62 degrees

25  when you were testifying it was an estimate?

1      A.    No.

2      Q.    Is it possible that you testified based on

3   some notes rather than the autopsy report and what we

4   have in Exhibit 3?

5      A.    It's possible that it came from observations

6   made at the scene either by the police department or by

7   us.

8      Q.    Okay.  Do you remember if the 62 degrees was

9   the room she was in or the basement?

10     A.    I think, but I'm not -- but this is partially

11  speculative, because I do not have an independent memory

12  of it, that it was basement.

13     Q.    Okay.

14     A.    Because we were interested in what the

15  temperature of the floor might be.

16     Q.    Okay.  And is it possible that the temperature

17  in the apartment was warmer than that?

18     A.    Anything is possible.

19     Q.    Okay.  Did you take any steps to exclude that

20  possibility in your determination or address it?

21     A.    After it -- now it comes into presumption,

22  because I do not have an independent memory of how I did

23  that.

24     Q.    What is algor mortis, meaning A-L-G-O-R

25  mortis?

1      A.     Cooling of the body.

2      Q.     Okay.  So that's the body temperature

3    calculations we've discussed before?

4      A.     Yes.

5      Q.     Okay.  Now, I'd like you to go to Exhibit 2,

6    and I'd like you to go to Page 122 as noted by the top

7    right.  Obviously, this exhibit is not a hundred and

8    twenty-two pages.

9            MR. JULIAN:  Can you just identify what

10           the exhibit is, please?

11           MR. RICKNER:  Exhibit 2 is his grand jury

12           testimony.

13           MR. JULIAN:  Thank you.

14   BY MR. RICKNER:

15     Q.     Now, we're actually -- I'm just going to read

16   the question and answer to you, starting on Line 25 of

17   122.  Question:  Now, talking about the fecal staining

18   that you saw on her body which is shown in Exhibits 5 and

19   6, did you find any evidence that she had been violated

20   in her anus to cause these smears?

21           Answer:  I'm just going to refer to my notes.

22   Unfortunately, I didn't have a chance to review them

23   before I got here today.  Let me just check.  I found no

24   bruise.

25           Do you see that?

```
 1        A.    Yes.

 2        Q.    What are the notes that you're referring to

 3   here?

 4        A.    Probably the protocol and then my file.

 5        Q.    Okay.  What's the protocol?

 6        A.    The autopsy report.

 7        Q.    Okay.  And you say your file, what would be

 8   your file in this context?

 9        A.    Whatever we had collected, the information

10   that had been collected, and whatever had been created at

11   the medical examiner's office.

12        Q.    Okay.  Would that include, for example, any

13   handwritten notes that you may have on type -- or on

14   lined paper, rather?

15        A.    I don't remember that I used lined paper

16   there, but I should include whatever -- the file is

17   supposed to include every note made at the office.

18        Q.    Okay.  But as you sit here today, when you

19   said I'm going to refer to my notes, you don't know what

20   that meant?

21        A.    I'm presuming it's the autopsy report.

22        Q.    Okay.

23        A.    But that is a presumption.

24        Q.    Who is Jack Klugman?

25        A.    He was an actor on television who portrayed
```

```
 1    rather inaccurately forensic medicine.

 2         Q.    Okay.  Can you move to Page 126?  And

 3    Mr. Fitzpatrick says:  Let me clear up one thing.  In

 4    terms of time of death, can you as medical examiner

 5    accurately pinpoint the time of death of a deceased

 6    person?

 7              No.  Only Jack Klugman can do that?

 8         A.    Yes.

 9         Q.    Okay.  What TV show was that?

10         A.    Excuse me?

11         Q.    What was the TV show he was on?

12         A.    I don't actually know.

13              MR. JULIAN:  Can I volunteer?  Quincy.

14              MR. RICKNER:  Okay.  Thank you.

15              MR. VENTRONE:  That's right.

16              MR. RICKNER:  I'm old enough, but I'm

17              not -- I don't remember this one.

18         A.    I can't remember.

19         Q.    The purpose of this comment is to say

20    essentially that a medical examiner can't really pinpoint

21    the time of death?

22         A.    That's correct.

23         Q.    Okay.  And then afterwards, you testified that

24    there are guidelines and parameters?

25         A.    He -- well, yes.  Okay.
```

```
 1        Q.    And just to say, just to be clear, your

 2   testimony in the grand jury with respect to whether or

 3   not she had died on the 27th, you said it's on the

 4   outside edge of that possibility but it's possible?

 5        A.    Right.

 6        Q.    Okay.  So when you're talking about

 7   likelihoods, you were putting the 27th on a lesser

 8   likelihood than the other days --

 9        A.    Correct.

10        Q.    -- before she was discovered?

11        A.    Correct.

12              MR. JULIAN:  Object to the form.

13              MR. VENTRONE:  Object to the form.

14        Q.    Was the heat on in her apartment when you --

15        A.    I do not know, only that it was cool when I

16   was there.

17        Q.    Okay.  Now, we're going to mark this as

18   Exhibit 26, and this is your trial testimony from -- it's

19   Pages 865 of the transcript through Page 919, bearing

20   Bates stamp P01536 to P01590.

21              (Exhibit 26 marked for identification.)

22   BY MR. RICKNER:

23        Q.    Okay.  Could you do me a favor and go to

24   Page 915?

25        A.    By the top right?
```

1    Q.    That's correct.  And it says here, just

2  starting at Line 9:

3          Question:  Have you also testified in front of

4  the grand jury, Doctor, that prior to that particular

5  testimony, you had not reviewed some of your notes and

6  slides in connection with this case?

7          Anser:  That's correct.

8          Question:  And naturally, when you prepared

9  for trial, you did review your slides and notes; is that

10  true?

11          That is correct.

12          And did you see some, as I think you indicated

13  on cross-examination, some decomposition to the brain as

14  you reviewed your slides in preparation for this trial

15  testimony?

16          Yes, sir.

17          I read that correctly?

18    A.    Yes.

19    Q.    Okay.  Now, with respect to -- I'm just going

20  to mark this as Exhibit 27.

21               (Exhibit 27 marked for identification.)

22  BY MR. RICKNER:

23    Q.    Now, on Exhibit 27, I'd just like you to look

24  at pages four and five, which are the blowups in

25  color --

1      A.    Yes, sir.

2      Q.    -- two photos, perhaps, of the brain.

3            Now, when you used the phrase "slides" in your

4  testimony, were you referring to the slides where a piece

5  of cardboard or plastic is placed around 35-millimeter

6  films, it's sort of two-inch-by-two-inch square that you

7  can then put into a projector?

8      A.    I -- that would be included.  I make no

9  specific denotation here which ones were involved.  And I

10 looked at tissue slides.

11     Q.    Okay.

12     A.    And Kodachrome slides.

13     Q.    Well, the tissue slides --

14     A.    The tissue slides were not brain.

15     Q.    Okay.  Can you move to page three of that

16 exhibit?

17     A.    Page three of which exhibit?

18     Q.    Oh.  Page three of Exhibit 27, the photographs

19 and et cetera.

20     A.    Okay.

21     Q.    When you say tissue slides, we have here,

22 according to the records, gland, lung, uterus, and liver.

23 Do you see that?

24     A.    Okay.

25     Q.    Are these the type of tissue slides you're

1    talking about?

2        A.    Yeah.

3        Q.    Now, with respect to the decomposition you

4    were talking about, were you looking at slides like this,

5    meaning placed on glass for use with a microscope?

6        A.    I would look at both of them.

7        Q.    Were the brain slides the ones that you're

8    talking about with respect to decomposition of the brain?

9        A.    I did not look at tissue slides of the brain.

10   They didn't exist.

11       Q.    Okay.  My next question is:  Are pages four

12   and five the slides that you did look at?

13       A.    They're the Kodachrome slides, yes.

14       Q.    Okay.  So just to be clear --

15       A.    But the question that I was asked was a

16   compounded question.

17       Q.    Okay.

18       A.    So I'm looking at the aggregate of the -- the

19   import I get from that question is did I look at the

20   aggregate of what I had available to me.  Yes.

21       Q.    Well, let's be very clear here.  If we go back

22   to 915, it says, question:  Did you see some, as I think

23   you indicated on cross-examination, some decomposition to

24   the brain as you reviewed your slides in preparation for

25   this trial testimony?

1      A.      Yes.

2      Q.      Okay.  Did you understand that question

3  meaning slides of the brain?

4      A.      No, the only slides we have, the Kodachrome

5  slides.

6      Q.      Okay.  And were the slides of the brain you

7  were talking about pages four and five of Exhibit 27?

8      A.      That would be the only ones that I would have,

9  yes.

10      Q.      Okay.  And what did you see in -- and please,

11  look at them now.  What did you see in those slides that

12  indicated decomposition?

13      A.      That is consistent with it.  I mean, those

14  slides are not in themselves the definition of

15  decomposition.  But I described in my autopsy report

16  softening and autolytic change on gross exam, and what

17  you've got here is a brain that is slumping slightly down

18  in the brain cage and has slight flattening of the gyral

19  definition.  But handed this independently with no

20  history, you're not going to derive -- it goes along with

21  what I observed but it's not pathognomonic of it.

22      Q.      Okay.  Now, did reviewing those slides in

23  preparation for trial change your opinion with regard to

24  the likelihood of the date of death or the range of the

25  date of death?

1      A.     No.

2      Q.     So just to be clear, when you reviewed those

3  slides, it did nothing to change your opinion that you

4  originally gave in the grand jury that the 27th was on

5  the outside edge of that possibility?

6                MR. VENTRONE:   Object to the form.

7      A.     Correct.

8      Q.     So just to be clear, examining the slides in

9  preparation for trial didn't really do anything with

10  respect to the time of death testimony?

11                MR. JULIAN:   Object to the form.

12      Q.     Is that correct?

13      A.      It did not change my opinion that it could be

14  two to three days.

15      Q.     Okay.  Did anything that you reviewed prior to

16  trial testimony as distinguished from prior to your grand

17  jury testimony do anything to change your opinion with

18  respect to the range of the date of death and the

19  likelihood of each date in that range?

20      A.      The aggregate of information with the

21  decompositional changes that are there slants it towards

22  the longer period, longer than the earlier period, but it

23  does not -- and I think I make it very clear in my

24  testimony, it does not define the time of death.

25      Q.     Okay.  But what I'm asking is:  When you say

1    slants, you used outside possibility in grand jury.

2         A.    Mm-hmm.

3         Q.    Was your opinion at trial any different from

4    that?

5         A.    No.

6         Q.    All right.

7              MR. RICKNER:  It is noon-thirty.  That's

8              not a real word.  But we're kind of at a sort

9              of good break point if people wanted to take

10             five or ten.

11             MR. JULIAN:  Okay.

12             (Off record:  12:28 p.m. to 12:43 p.m.)

13             MR. RICKNER:  This is 28.

14             (Exhibit 28 marked for identification.)

15   BY MR. RICKNER:

16        Q.    So have you ever seen Exhibit 28?

17        A.    Excuse me?  Have I seen this one?

18        Q.    Yeah.

19        A.    I can't remember.

20        Q.    Do you remember in the year 2000 anybody ever

21   calling you and asking you any of the questions posed one

22   through seven in Exhibit 28?

23        A.    I do not remember.

24             MR. RICKNER:  Let's go to Exhibit 29.

25             (Exhibit 29 marked for identification.)

1    BY MR. RICKNER:

2        Q.    I'm actually most interested in page three.

3    Now, do you recognize the name Timothy Phinney?

4        A.    Yes.

5        Q.    Who is Timothy Phinney?

6        A.    He was a Syracuse Police Officer who ran a

7    fish store.

8        Q.    Who what?

9        A.    Ran a fish store, believe it or not.

10       Q.    At the same time as being a police officer,

11   he --

12       A.    Yes.

13       Q.    -- just ran a fish store?

14             And when you say a fish store, do you mean

15   selling fish or selling ways --

16       A.    Selling fish.

17       Q.    -- to catch fish?

18       A.    Pet fish.  Pet fish.

19       Q.    Pet fish?

20       A.    Yeah.

21       Q.    Okay.  Do you remember talking to Officer

22   Phinney with respect to the Valerie Hill murder?

23       A.    Nope.

24       Q.    That's all for Exhibit 29.

25             Now, did you ever speak to the police about

1    your estimation with respect to the time of death for

2    Valerie Hill?

3        A.    I'm sure there was discussion, but I have no

4    independent recollection of discussing time of death with

5    anybody.  I don't do that.  I don't establish times of

6    death.  I can't.

7        Q.    Do you have any reason to believe that you

8    would have given them an estimate or a range as to when

9    you believe she had died?

10       A.    I do not have any recollection of doing such.

11       Q.    Would it have been your practice to do so if

12   they had asked?

13       A.    I would discuss with them the parameters of

14   what was there, but I would not come down and say -- and

15   sometimes get misunderstood when you discuss things.  I

16   don't give a time of death.  I just -- it's -- I've never

17   done that.

18       Q.    Would you give a preliminary estimate of the

19   time of death?

20       A.    I might tell somebody when I would start my

21   investigation and work away from.

22       Q.    Okay.  You mean so when you're talking about

23   likelihood, sort of where you put the center of the bell

24   curve as a likely time of death and then moving further

25   out, either before or after that point as being less

```
 1   likely?

 2                   MR. JULIAN:  Object to the form of the

 3               question.  You may answer.

 4       A.    I would -- since I don't have a memory of

 5   doing it in this case, what I would do is discuss what

 6   the possibilities are as far as effects on the case.  It

 7   would always be wide open.

 8       Q.    It would always be wide open, but if asked,

 9   you would say which days you thought were more likely or

10   less likely?

11       A.    Or where I would start.  And this is the

12   problem that I've got, is that people misinterpret what

13   you're trying -- somebody would say, you said such and

14   such time of death, or something, if you give -- it's

15   like saying maybe to a child.  They take it as a yes.  So

16   I do not give -- I say, okay, start here and then work

17   from there.

18       Q.    Okay.

19                   MR. RICKNER:  Exhibit 30.

20                   (Exhibit 30 marked for identification.)

21   BY MR. RICKNER:

22       Q.    It bears at the bottom left the Bates number

23   010309 to 010310.

24       A.    Right.

25       Q.    Application for Search Warrant.  Going to
```

1    page two, it's partially redacted in the version I have,

2    but it says in the third to bottom paragraph on page two,

3    Voluntary Affidavit, above the swearing portion of it:

4    That the Onondaga County Medical Examiner's Office,

5    redacted, preliminary estimate on the time of death of

6    the victim, redacted, was sometime Saturday, the 28th of

7    March afternoon and Sunday morning the 29th of March,

8    1987.

9        A.    Okay.

10       Q.    Do you see that?

11       A.    Yeah.

12       Q.    Now, with respect to the more likely or less

13   likely that you just determined, would this have been the

14   period of time where you would have told them to start in

15   the way that you had described in the prior question?

16              MR. JULIAN:  Object to the form of the

17              question.

18       A.    As I said, I don't have an independent memory

19   of it, so I can't speak to it directly, but that would be

20   a reasonable thing to do.

21       Q.    Would that be consistent with all of the

22   records that you've reviewed in preparing for this

23   deposition?

24       A.    Yes.

25       Q.    All right.  Now, who is William Sullivan?

```
 1        A.     He was my chief investigator for several

 2   years.

 3        Q.     And as chief investigator, did he have any

 4   medical training or was he just, like, a retired police

 5   officer or somebody else?

 6        A.     He was a funeral director who had been coroner

 7   and death investigator in Illinois, I think DeKalb

 8   County, Illinois, if I remember correctly.

 9        Q.     Was he a doctor?

10        A.     No.

11        Q.     Did he have a degree in some sort of

12   coroner-related specialty, whatever that might be?

13        A.     I think funeral directing degree.

14        Q.     Was he there when Valerie Hill's body was

15   first examined?

16        A.     I can't remember.  If there's documentation

17   that he was there, then he would have been there.

18        Q.     Were there any instances where Mr. Sullivan

19   would ask you to take the temperature of the body?

20        A.     I don't remember any.

21        Q.     Do you have any reason to believe he wouldn't

22   have asked that about Valerie Hill?

23        A.     We did not do it, so I would not expect him

24   to.

25                    MR. JULIAN:  Object to the form.
```

1      Q.    Would -- did he ever, to your memory, object,

2  saying I think you should do this?

3      A.    I don't remember any such event.

4      Q.    Okay.  Do you remember discussing the time of

5  death of Valerie Hill or the date of death with

6  Mr. Sullivan?

7      A.    No.

8      Q.    If he said that you had told him that you

9  believe the date of death was the 28th or the 29th, would

10  you have any reason to believe that you had never said

11  that?

12           MR. JULIAN:   Object to the form of the

13           question.

14           MR. VENTRONE:   Object to the form.

15      A.    He has -- he's entitled to say whatever he

16  believes.  I don't quite know how to answer that one.

17      Q.    Okay.  Now, obviously Valerie Hill died in

18  1987, and the grand jury was in 1992; is that right?

19      A.    That's my -- yes.

20      Q.    Okay.  So there's a fairly significant period

21  of time between the two events; is that right?

22      A.    That's correct.

23      Q.    And prior to your grand jury testimony in

24  1992, did you ever have any discussions with anybody from

25  the DA's Office about your findings and opinions with

1    respect to Valerie Hill?

2        A.    I have no recollection.  It's such a passage

3    of time.  We often discussed, so I don't -- but I can't

4    tell you what we did or did not do.

5        Q.    Okay.  Would it be correct to say that you had

6    worked with District Attorney Fitzpatrick earlier in the

7    '80s, before he was elected?

8        A.    While he was assistant, yes.

9        Q.    Right, when he was an assistant district

10   attorney?

11       A.    Yes.

12       Q.    Okay.  And he was a homicide prosecutor,

13   right?

14       A.    Well, he was a prosecutor.  I don't know how

15   they designate him.

16       Q.    Okay.  Did you testify in homicide cases when

17   he was an assistant district attorney acting as lead

18   counsel?

19       A.    I presume so, yes.

20       Q.    Okay.  And then he got elected as district

21   attorney in late 1991.  Does that sound right?

22       A.    I'll take your word for it.

23       Q.    Okay.  There came a time when he started

24   opening cold cases, do you remember that?

25       A.    I don't remember that specifically, no.

1    Q.    Okay.  Do you remember somebody named Peter

2  Tynan?

3    A.    Peter Tynan was, I believe, Fitzpatrick's

4  chief in-house investigator.

5    Q.    Okay.  Would you discuss your findings with

6  Peter Tynan?

7             MR. JULIAN:  Object to the form of the

8             question.

9    A.    If he came over and asked questions, I'm sure

10  I would.

11    Q.    Okay.  Just in general, do you remember in

12  1992 having conversations with Peter Tynan regarding the

13  findings in autopsies, in any autopsy?

14    A.    No.

15    Q.    Okay.  Do you have any recollection of talking

16  to him in respect to this case?

17    A.    No.

18    Q.    Okay.  In the '90s, could you explain the sort

19  of process by which you would find out that you had to

20  testify to grand jury or that a case was being reopened?

21    A.    Somebody would let me know.  I don't know how.

22    Q.    Okay.  Would you get a phone call, a memo,

23  something else?

24    A.    I do not know.  I can't tell you that.

25    Q.    Would there be times when a case was being

1    investigated when somebody from the district attorney's

2    office, whoever that might be, would call you up and ask

3    you to discuss the findings of the case?

4        A.    Yes.

5        Q.    Okay.

6        A.    I'm sure there were.  I can't remember any

7    specific ones, but we were open.  All you had to do was

8    call.

9        Q.    And did you sometimes have those discussions

10   with District Attorney Fitzpatrick?

11       A.    I would be open -- he prepared, so in general

12   with cases going to court, I would expect I would have

13   some discussion with him.

14       Q.    Okay.  Would it be your practice to, you know,

15   for example, prepare your testimony in the '90s with

16   District Attorney Fitzpatrick prior to testifying?

17       A.    He wouldn't so much prepare your testimony.

18   He would want to know what I could say and couldn't say.

19       Q.    Okay.  And so prior to whenever you would have

20   testified, you would have had a discussion about what you

21   could or couldn't say based on your findings?

22       A.    Yes, very frequently.

23       Q.    And would this happen sort of well advance of

24   your grand jury or trial testimony?

25       A.    I can't remember timing.

1        Q.      Okay.

2        A.      I would expect it to be before, not after.

3        Q.      That would make sense.  Was it typically, for

4    example, a period of time before so you could review your

5    notes and get acquainted with the file?

6        A.      I cannot remember specifically timing

7    sequences.

8        Q.      With respect to a case like this that's five

9    years old, so perhaps it's not as fresh in your mind,

10   would you have gotten some sort of advanced warning so

11   you could pull out the file, review it, and sort of

12   prepare your opinions for testimony?

13                     MR. JULIAN:  Object to the form.

14       A.      I can't answer that.  I do not know what

15   scheduling went on, whether it was just come on over or

16   can I come over or discuss on the phone.  I can't tell

17   you.

18       Q.      Okay.  Now, would it be correct to say that at

19   some point you were investigated by the county attorney?

20       A.      That's my understanding from reviewing the

21   folder.

22       Q.      Well, do you remember that investigation?

23       A.      I don't remember them.  I remember the

24   New York State Health Department.

25       Q.      Okay.  That's separate.  But let's start with

```
 1    the State Health Department since you seem to remember

 2    that.  Do you remember when you started being

 3    investigated by the State Health Department?

 4         A.    There were multiple investigations over the

 5    years.

 6         Q.    Okay.  Which ones do you remember as you sit

 7    here today?

 8         A.    I don't have much specific memory of any of

 9    them.  One was a woman complaining about a death being

10    called a suicide, I know that.  And then eventually, they

11    had placed one of their investigators in my office and he

12    was given free run of everything.

13         Q.    Okay.  Would that have been in 1992?

14         A.    I cannot remember the date.

15         Q.    Okay.  When did you become the medical

16    examiner for Onondaga County?

17         A.    That would be '83.

18         Q.    Okay.  And you held that position until '93?

19         A.    Yes.

20         Q.    All right.  When the investigator from the

21    Department of Health was placed, I guess, stationed in

22    your office, do you know why they were stationed in your

23    office?

24         A.    I think because they were investigating me.

25         Q.    Into what?
```

```
 1        A.      That's up to them.  I'm not -- I have no

 2    influence of the investigation.  It's completely their

 3    choice.

 4        Q.      Do you have any memory of what they were

 5    investigating?

 6        A.      They were investigating me and my practices.

 7        Q.      What parts of you and your practices?

 8        A.      Everything, as far as I'm concerned.

 9        Q.      Give me some examples.

10        A.      They were doing the investigation.  You're

11    going to have to ask them.

12        Q.      Were they investigating you with respect to

13    improperly disposing of human remains?

14        A.      That was one of the issues.  I can't remember

15    if they were primarily involved with that or it was -- I

16    think the environmental -- I think

17    Environmental -- there's a department that's got to do

18    with environmental something or other, I think they were

19    involved at one point.  I can't remember.

20        Q.      Was the investigation with respect to improper

21    disposal or storage of certain toxic chemicals?

22        A.      Yes.

23        Q.      Was part of their investigation involving

24    providing human remains for scientific inquiry to

25    Bristol, I believe is the company?
```

1      A.    Yes.

2      Q.    Okay.

3      A.    Bristol-Myers Squibb, I believe is the full

4    name of the company.

5      Q.    Was part of the investigation having to do

6    with running a skeletal remains clinic at your farm?

7      A.    Yes.

8      Q.    With respect to the areas of investigation

9    that we just spoke about, did you ever talk to William

10   Fitzpatrick about them?

11     A.    Yes.  He ran the skeletal investigation.

12     Q.    That would have been in July of 1993?

13     A.    He did it two years.

14     Q.    He investigated you for two years?

15     A.    I don't -- I said -- well, you're talking

16   about investigation.  You're talking about -- first, you

17   mentioned Fitzpatrick.  I presume you're talking about

18   the skeletal investigation.  We had a skeletal course,

19   and Bill Fitzpatrick, we ran that course two years.

20     Q.    Okay.  To be clear, you and

21   William Fitzpatrick ran the skeletal investigation?

22     A.    Well, he ran the course.  I was highly

23   supportive of it.  He brought a range for speakers to

24   come in.

25     Q.    Was this while he was the district attorney or

1     while he was in private practice?

2         A.    Wait a minute.  I thought you were talking

3     about William Rodriguez.  That's the guy running the

4     course.

5         Q.    I was talking about Fitzpatrick.

6         A.    Oh, sorry.  Fitzpatrick had absolutely nothing

7     to do with this.

8         Q.    Okay.  Who was running the course with you?

9         A.    William Rodriguez.

10        Q.    Okay.  Who is William Rodriguez?

11        A.    He's a forensic anthropologist.

12        Q.    And where was he employed in the '80s and

13    '90s?

14        A.    He was employed in my office as a forensic

15    anthropologist and as a -- eventually became the chief

16    investigator.

17        Q.    I was talking about with respect to William

18    Fitzpatrick.

19        A.    Sorry.  Because you were talking

20    anthropology and I just --

21        Q.    I'm not trying to confuse you.

22        A.    I just met Rodriguez again at the May meeting,

23    so I --

24        Q.    You just ran into him again recently?

25        A.    Right.  Right.

```
1        Q.    Okay.  Gotcha.  With respect to the

2   investigations into the improper disposal of chemicals,

3   human remains, donating body parts --

4        A.    Right.

5        Q.    -- did you ever discuss that with William

6   Fitzpatrick prior to when he started his investigation?

7                    MR. JULIAN:  Object to the form.

8                    MR. VENTRONE:  Object to the form.

9        A.    No.  I have no memory of that.  I didn't -- in

10  fact, I was not, that I know of, aware of any

11  investigation by him until late, when there was a report

12  that he's been investigating me.  I was aware of the

13  New York State.

14       Q.    Right.  No, I'm talking about the

15  investigation by, let's say, the County of Onondaga --

16       A.    Okay.

17       Q.    -- the County Attorney's Office, did you ever

18  discuss that with Mr. Fitzpatrick.

19       A.    No.

20       Q.    Did you ever make him aware of the fact that

21  you were being investigated by the county?

22       A.    It was so public, I don't think it was

23  necessary for me to get ahold of him.

24       Q.    What about the investigation by the Department

25  of Health, did you ever make Mr. Fitzpatrick aware of
```

1    that?

2        A.    That's what I'm saying, it's so public that I

3    never had anything -- I didn't feel I had the need to

4    note that.  I'm pretty sure I would have probably let the

5    Health Department know.  They were my bosses.  I mean, my

6    boss was Jim Miller, the health commissioner, my direct

7    boss, and then after that it would be the County

8    Attorney's Office and the County Executive.  Now, what

9    conversations I had there, I can't remember.

10       Q.    I'd like you to pull out the stack of

11   previously marked exhibits, Exhibit 9.

12       A.    Exhibit 9, got it.

13       Q.    Now, did you author Exhibit 9?

14       A.    It certainly looks like my type of thought

15   processes.

16       Q.    Okay.

17       A.    And it looks like language that I would write.

18       Q.    So just to be clear, you recognize your own

19   writing in Exhibit 9?

20       A.    I believe.  It may have -- I do not know who

21   else might have been involved, but it looks I would have

22   to be at least the major contributor.

23       Q.    Okay.  Do you remember writing this on or

24   about March 5th, 1993?

25       A.    No.

```
 1        Q.    Okay.  And please, go through it.  Do you

 2   remember the various accusations against you in March of

 3   1993?

 4        A.    There were all kinds of accusations, so yes.

 5        Q.    Does this appear to be a complete

 6   documentation of your response to those various

 7   accusations?

 8        A.    It looks like a response to a variety of

 9   accusations, and that got apparently sent to the Post

10   Standard.  I don't remember it.

11        Q.    Did you send it anywhere else?

12        A.    I have no knowledge if I did or not.

13        Q.    Following the accusations printed in the Post

14   Standard, did you hold a press conference?

15        A.    I believe there was at least one.

16        Q.    Was that called by you or somebody else?

17        A.    I do not know.

18        Q.    I'd like you to pull out Exhibit 8, please.

19        A.    Sure.  Here we go.

20        Q.    Do you recognize this article in Exhibit 8?

21        A.    I have seen it.  Yes.

22        Q.    Is that a photograph of you being on the right

23   of the rectangle?

24        A.    Yes.

25        Q.    And on the left is a photograph of William
```

1    Fitzpatrick?

2        A.    That's correct.

3        Q.    And was this photograph taken at a press

4    conference where you responded to your critics?

5        A.    That's what it -- yes.

6        Q.    At the time did you believe that William

7    Fitzpatrick was trying to protect you from this

8    criticism?

9                        MR. JULIAN:  Objection to form.

10                       MR. VENTRONE:  Object to the form.

11       Q.    You can answer.

12       A.    He was willing to step forward and give his

13   impression, which surprised me, because it left him open

14   to insult from the paper.

15       Q.    Okay.  And to be clear, his impression was at

16   the time favorable?

17                       MR. JULIAN:  Object to the form.

18                       MR. VENTRONE:  Object.

19       A.    I would have to ask him, but he did support

20   me.

21       Q.    Okay.  And that would be in March of 1993?

22       A.    That would be whenever this was.  Yeah, March

23   of '93.

24       Q.    Do you recognize the name Sidney

25   Cominsky --

1       A.    Yes.

2       Q.    -- that's spelled with a C-O-M-I-N-S-K-Y?

3       A.    Yes.

4       Q.    Okay.  When did you hire him first?

5       A.    I can't remember when I first was involved

6    with him.

7       Q.    Do you remember if it was before or after the

8    March press conference in 1993?

9       A.    I think it was before.

10      Q.    And without going into your conversations with

11   Mr. Cominsky, just in general was he hired by you to help

12   defend against the various allegations that were being

13   made against you?

14      A.    He was -- I approached him for advice and

15   countenance, because it was very disturbing to me.

16      Q.    I'm sorry.  Could you repeat that?  I did not

17   here that phrase.

18      A.    Okay.  I approached him for advice and

19   countenance, because everything was very disturbing to

20   me.  It was extremely distressing to be attacked the way

21   I was being attacked.

22      Q.    Okay.  Now, at the time, did you have any

23   understanding of who was making those attacks?

24      A.    Well, I can't remember exactly what -- when it

25   all started and when Cominsky got involved.  It's all

1    been lost in --

2        Q.    I mean, who was attacking you besides the

3    press?

4        A.    Well, the press was the major attacker.  Then

5    eventually people inside the office were identified.

6        Q.    Okay.  How many people were inside the medical

7    examiner's office in 1992?

8        A.    I don't have an exact number.  I'm guessing

9    that there were about fifteen, and the public health lab

10   separate.

11       Q.    What do you mean by the public health lab

12   being separate?

13       A.    I wore two hats.  I was the medical examiner

14   and I was the public laboratory director.

15       Q.    Gotcha.  Now, with respect to the public

16   health, how many employees did you have in that section

17   for your other half?

18       A.    That varied.

19       Q.    Roughly?

20       A.    Well, that varied over a period of time.  I

21   can't tell you exactly when it switched, because I

22   haven't kept track of that.  When I got there, we had

23   something like seventy positions, not all of them filled,

24   at the public health laboratory, and I believe -- let's

25   see.  At the medical examiner's office when I got there,

1    a supervisor, two for each shift, that's six, eight -- it

2    might have been ten or twelve, I think.  I don't remember

3    exactly the number.

4        Q.    Okay.  So just to be clear,

5    approximately -- in 1992, 1993, approximately thirty

6    people worked for you?

7        A.    That was '83.

8        Q.    Oh.  I'm talking about '92, '93.

9        A.    '92, '93, there had been changes.  The County

10   had cut back on the lab.  In fact, there was one day

11   where a huge number of people had to be dismissed just

12   because the County cut the positions.  So by that time, I

13   think it was something on the -- it's an estimate.

14   Probably around thirty employees in the lab is my guess,

15   and maybe fifteen at the medical examiner's office,

16   something like that.

17       Q.    And how many of those people do you believe

18   were providing critical statements about you in 1992,

19   1993?

20       A.    I don't know.

21       Q.    I'd like you to pull out Exhibit 13.

22       A.    Okay.

23       Q.    Now, just go through and tell me, have you

24   ever seen this before?

25       A.    Yes.  I saw it yesterday.

1      Q.    And would you have been provided a copy of

2  that around the time that it came out?

3      A.    I do not know.

4      Q.    Did you provide any sort of official response

5  to it?

6      A.    I also do not know that answer.

7      Q.    Following the release of this report, did you

8  hold a press conference, for example, to respond to it?

9      A.    That, I don't remember.

10     Q.    Do you believe that this report made you doing

11 your job more difficult?

12                  MR. JULIAN:  Form.

13     A.    I mean, it was a difficult job.  I

14 don't -- and with controversy, you've always

15 got difficulty, so it was part and parcel of everything

16 going on.

17     Q.    Were you worried that because of the newspaper

18 articles about you, that jurors might be less likely to

19 accept your opinion?

20                  MR. JULIAN:  Form.

21                  MR. VENTRONE:  Object to the form.

22     Q.    In 1992, 1993?

23     A.    That actually was not on my radar.

24     Q.    Meaning you didn't consider it?

25     A.    That, I can't tell you, because I can't

1      remember what I thought or did.  But the concern for me

2      was the function of the medical examiner's office and the

3      function of the public health lab.

4          Q.     What do you mean by function?

5          A.     That they could do their work and produce

6      quality work.

7          Q.     And you were worried that the investigation

8      impinged on that?

9          A.     Well, it's difficult to hire people when

10     you're under controversy.

11         Q.     Were there any other issues that the

12     investigation controversy created in your office?

13         A.     It's never -- it always takes time, and it

14     places requirements on you when there are active

15     investigations going on and active questions being asked.

16         Q.     Now, at some point did you learn that you were

17     being investigated by William Fitzpatrick's office?

18         A.     Well, I know it now.  Back then, I didn't

19     think of him so much as investigating my office.

20         Q.     When did you -- when do you believe you first

21     would have learned about his investigation?

22         A.     I know that he gave a news conference, and I

23     don't remember any formal approaching of anything you're

24     being investigated.

25         Q.     Do you mean that you would have learned about

1    his investigation closer to when it was completed?

2        A.    Yeah.

3        Q.    Okay.  Did he ever interview you as part of

4    his investigation?

5        A.    I don't remember any, but he may have, because

6    I didn't understand, I had no understanding that he was

7    actively investigating me.

8        Q.    Okay.  Did you ever have an interview with a

9    Peter Tynan?

10        A.    I talked to Tynan many times, so I don't know

11    what I discussed.  I do not have a memory of that.

12        Q.    Okay.  Let's be more specific.  Can you pull

13    out Exhibit 7?

14        A.    Okay.

15            MR. RICKNER:  Can we actually take five?

16            I've got something I want to make sure that my

17            associate didn't just miss something.  I think

18            that's what just happened.

19            MR. JULIAN:  No problem.

20            MR. RICKNER:  Thank you.

21            (Off record:  1:16 p.m. to 1:25 p.m.)

22    BY MR. RICKNER:

23        Q.    Okay.  Moving on to Exhibit 7.  Were you

24    surprised to find out that William Fitzpatrick was

25    investigating you?

```
1                    MR. JULIAN:  Object to the form.

2         A.    I don't remember any specific response.  I was

3    being investigated.  So what's another investigation.

4         Q.    Did you have any reaction to William

5    Fitzpatrick's investigation when you learned about it?

6         A.    Not that I know of, that I remember, anyway.

7    Just okay, it's out there, it's -- there's this, and

8    okay.

9         Q.    Following William Fitzpatrick's investigation,

10   did anybody ask you to resign as medical examiner?

11        A.    Well, I was asked to resign by Nick Pirro at a

12   meeting, I can't remember the exact date, but I believe

13   it predeceased this Exhibit 7 --

14        Q.    So you believe that you were asked --

15        A.    Precede.  Sorry.

16        Q.    I get you.  Just for clarity, prior to the

17   date of Exhibit 7, you were asked to resign --

18        A.    Yes.

19        Q.    -- by County Attorney Nicholas Pirro?

20                    MR. VENTRONE:  Object to the form.  It's

21               county ex.

22                    MR. RICKNER:  Okay.  Excuse me.  County

23               Executive Nicholas Pirro.

24                    MR. JULIAN:  And I further object,

25               because we have the date, which is
```

```
 1              November 19th, 1993.

 2                   THE WITNESS:  That's when this was

 3         released.

 4                   MR. RICKNER:  Right.

 5   BY MR. RICKNER:

 6         Q.    And it happened beforehand, right?

 7         A.    I believe so, yeah.

 8         Q.    Okay.  And what was your understanding of why

 9   you were being asked to resign?

10         A.    That I was too much trouble to keep around.

11         Q.    Okay.  In the sense that you had been

12   investigated too much?

13         A.    Well, there was constant news noise, which is

14   negative.  It doesn't help anybody.  It's disruptive, and

15   so it was time for me to move on.

16         Q.    Okay.  Was it your understanding that if you

17   resigned, that the criminal investigation against you

18   would end?

19                   MR. VENTRONE:  Object to the form.

20         A.    That was something that came up afterwards.  I

21   was asked to resign -- there was a meeting, I remember

22   that meeting that they want and Pirro was there,

23   and -- Pirro is my assigning -- is the person who assigns

24   whether I'm employed or not, so do you want me to resign?

25   Yes.  Okay.  Then I resigned.
```

1    Q.    And as a result of your resignation, it's your

2  understanding that the criminal investigation stopped?

3    A.    That's what it says.

4    Q.    Okay.  Was that your understanding at the time

5  when you resigned?

6              MR. JULIAN:  When you say it says, I

7              don't mean to interrupt.

8              MR. RICKNER:  He can answer how he wants.

9    A.    It says here, if I remember correctly --

10    Q.    It's on page three at the bottom.

11    A.    If said resignation is forthcoming, I have

12  informed Dr. Mitchell's attorney that in the interests of

13  justice, my Office's probe is at an end.  That was not a

14  condition of my resignation.

15    Q.    At least as far as you know?

16    A.    Yeah.

17              MR. VENTRONE:  He can only testify as to

18              what he knows.

19              MR. RICKNER:  Shut up.  We don't do that

20              here.  No speaking objections.

21    Q.    Now, following your resignation, did you

22  continue on at the medical examiner's office in any

23  capacity?

24    A.    I was used as a forensic pathologist for a

25  little over two months, I believe.  I can't remember

1    exactly what date.

2        Q.    If I told you it was roughly January that you

3    actually fully left the office, would that sound right to

4    you?

5        A.    Yes.

6        Q.    Okay.  Now, in the time between let's say July

7    of 1993 and January of 1994, did you continue testifying

8    in criminal cases?

9        A.    Yes.

10       Q.    Okay.  Were you ever cross-examined about the

11   investigations in criminal cases?

12       A.    I can't remember what the cross-examinations

13   were.  I've been cross-examined so many times.

14       Q.    Okay.  Were you ever told by William

15   Fitzpatrick or anybody else at the DA's office that they

16   couldn't use you as a witness because of the ongoing

17   investigations?

18       A.    Since they used me, I had a feeling that

19   didn't happen.

20       Q.    Well, I'm wondering if you -- if there came a

21   time when they said, no, they weren't going to use you

22   anymore?

23       A.    They never told me that directly.

24       Q.    Okay.  Now, where did you go after

25   Onondaga -- your employment at Onondaga County?

1      A.    Skaneateles, where my wife lived, and I was

2  unemployed for two or three months.

3      Q.    Okay.  And I'm not going to pronounce that

4  correctly, but you just mean you went to live in the

5  place where your wife was from for two or three months?

6      A.    Well, that's where our house was.  That's

7  where I lived.

8      Q.    Okay.  When I say where did you go next, I

9  mean as far as employment?

10      A.    Employment, I ended up in Topeka, Kansas.

11      Q.    Okay.  Now, how long were you in Topeka,

12  Kansas?

13      A.    I lived in Topeka for, let's see, a little

14  over ten years.

15      Q.    Now, when you first moved to Topeka, Kansas,

16  were you employed as a medical examiner or some similar

17  title?

18      A.    My first employment was with George and

19  Jill -- George Thomas and Jill at that time I think her

20  last name was Gould, who were and still are a husband and

21  wife forensic team, and then he had me appointed as a

22  deputy coroner after -- I can't remember exactly when

23  that happened, if that happened immediately when I

24  started working with him or if it had a little bit of

25  delay.

1    Q.    So a little explanation, when you say husband

2    and wife forensic team, did they have their own office,

3    did they work for the state, something else?

4    A.    Well, they are a husband and wife who both are

5    board certified forensic pathologists.  They moved to

6    Topeka.  He was appointed Shawnee County District

7    Coroner.  I presume that she had a deputy coronership

8    with him.  I don't know if when they moved there they

9    were -- how immediate appointments were or not.  She

10   was -- became district coroner for Douglas County, I

11   know, and maybe some other counties.  I can't remember.

12   Q.    I guess I'm trying to understand the structure

13   here.  The husband and wife, did they have, for example,

14   their own company and then they were employed by the

15   state or did they just happen to be a husband and wife

16   who were both forensic investigators and they had

17   different positions in Kansas?

18   A.    They're not forensic investigators.  They're

19   forensic pathologists.

20   Q.    Okay.

21   A.    They were forensic pathologists who moved to

22   Kansas.  They were husband and wife before they moved to

23   Kansas.  And he took on the position of Shawnee County

24   District Coroner.  She and he worked together.  She

25   handled primarily the cases that came from outside the

```
1    county, which meant usually traveling out to typically a

2    funeral home to do autopsies, and then of course testify

3    if that was required.  And he did primarily the cases

4    that were in Shawnee County or came to Shawnee County.

5         Q.    Got it.  And so with respect to working in

6    Kansas, did you have to get licensed as a medical doctor

7    to work as a, I think you said, forensic pathologist?

8         A.    Yes.

9         Q.    Did you get licensed in Kansas?

10        A.    Yes.

11        Q.    Was that before or after you left New York?

12        A.    Well, I applied for the license, and when I

13   got down there, I can't remember if it had come in yet or

14   it came in after that, shortly after I got there.

15        Q.    Did you apply for the license before you had

16   put in your resignation or afterwards?

17        A.    After.

18        Q.    Okay.  And this may have already been covered,

19   but you were also licensed in Florida for a time; is that

20   correct?

21        A.    Yes.

22        Q.    And that's as a medical doctor in Florida?

23        A.    That's correct.

24        Q.    Okay.  And I know that there's been some

25   states after Kansas, but just up and to the point where
```

1      we are in the conversation, it was Florida, New York, and

2      Kansas?

3          A.    Also North Carolina.

4          Q.    You worked in North Carolina prior --

5          A.    I was in training in North Carolina and had to

6      be licensed there.

7          Q.    Okay.  Now, in order to be a forensic

8      pathologist in New York, besides being a medical doctor,

9      did you need any additional licensure with the state?

10         A.    No.

11         Q.    Okay.  And what about Florida, North Carolina,

12     and Kansas, was the medical doctor license enough or was

13     there additional?

14         A.    Forensic pathologist is not a license.  It's

15     training.

16         Q.    Right.  In order to work as a forensic

17     pathologist in New York, did you need a specific license

18     with the state?

19         A.    If you want to call yourself a board certified

20     forensic pathologist, you have to have the forensic

21     boards.

22         Q.    But also --

23         A.    There are people who call themselves and don't

24     have them.

25         Q.    Okay.  But do you also have to be licensed

1    with the state as a medical doctor?

2        A.    You have to be licensed as an MD, yeah, or a

3    DO.

4        Q.    Okay.  And that's true in New York, Florida,

5    North Carolina, and Kansas?

6        A.    Yes.

7        Q.    And what I'm saying is besides that license,

8    were there any others in those states that you were

9    required?

10       A.    No.

11       Q.    Okay.  Going back for a second with respect to

12   the medical examiner, you were the county medical

13   examiner, meaning you were essentially -- for the medical

14   examiner's office, you were at the top of the food chain?

15       A.    Yes.

16       Q.    Okay.  With respect to performing autopsies

17   while you had that title, were you the final decision

18   maker?

19       A.    Well, once other pathologists came in, no.

20       Q.    What does that mean?

21       A.    Well, when another forensic pathologist does a

22   case, they make the decisions on their case.  I may or

23   may not agree with them.  I might advise them if I think

24   what they are doing is incorrect, but their decision is

25   their decision.

```
1        Q.    Right.  What I'm saying is when you make a

2   decision with respect to an autopsy, is that the decision

3   of the medical examiner's office?

4        A.    If it's my case, yes.

5        Q.    Okay.  And so in 1987 or 1993, if you were

6   making a decision with respect to an autopsy and the

7   findings, that was the decision of the medical examiner's

8   office?

9        A.    That's correct.

10        Q.    Okay.  And there were other people who had

11   authority over you with respect to employment, like

12   Nicholas Pirro; is that right?

13        A.    Well, at that time, it was Mulroy.

14        Q.    Later on Nicholas Pirro?

15        A.    Later on Nicholas Pirro.

16        Q.    But would it be correct to say that when it

17   comes to the autopsy and the opinions therein, they don't

18   have any authority over that, only your overall

19   employment?

20        A.    That's correct.

21        Q.    Okay.  The buck stops with you?

22        A.    Yes.

23        Q.    Okay.

24              MR. RICKNER:  I think

25              actually -- everybody has problems.  Is this a
```

```
 1            good time for lunch?  I'm sort of moving on to

 2            a new section.

 3                    MR. JULIAN:  Okay.

 4                    (Off record:  1:37 p.m. to 2:16 p.m.)

 5   BY MR. RICKNER:

 6        Q.    Can we go back to Exhibit 26?  I want you to

 7   go to Page 890.

 8        A.    26.

 9        Q.    It's the big thick one.

10        A.    820, you said?

11        Q.    90.

12        A.    890.

13        Q.    Actually, you know what?  I'm going

14   to -- let's go to 891.

15        A.    Okay.

16        Q.    It's only going to be one extra page, so it

17   should be all right.

18        A.    891.  Here we are.

19        Q.    It says, starting at Line 2:

20              Question:  Do you have an opinion,

21   Dr. Mitchell, within a reasonable degree of medical

22   certainty as to the cause of death of Valerie Hill?

23        A.    Yes.

24        Q.    I do, right?

25        A.    Correct.
```

```
 1        Q.    Okay.  Now, let me go back to the prior page.

 2   And actually, you know what, there's a big long

 3   objection, and you have to go back to start -- I'm not

 4   going to read it all into the record.  Read 889 all the

 5   way through to where you start answering on Line 21, just

 6   to refresh your recollection.

 7        A.    So you want me to read 889, 890, and 891, is

 8   that it?

 9        Q.    No.  You can stop at the bottom of 890.

10   You'll see.  That's where your answer goes.

11        A.    So the bottom of 890.  Okay.

12        Q.    That is, in fact, just one question and one

13   answer, it just -- with a colloquy in the beginning -- in

14   the middle, rather.

15              MR. JULIAN:  I'm not looking to -- do you

16         get what he's asking you?

17              THE WITNESS:  Yeah.

18              MR. JULIAN:  Okay.

19        Q.    I'm just avoiding reading the whole thing into

20   the record, so if you want to read it yourself, 889, the

21   question, onto 890.

22        A.    I'm at, I think, Line 21 on 890 is what you

23   want me to look at?

24        Q.    No.  No.  That's where I want you to stop.

25   The question before it, unfortunately, stretches quite a
```

```
 1    long time --

 2          A.    Okay.

 3          Q.    -- from Line 4 on 889 really to Line 6 on 890.

 4          A.    Okay.

 5          Q.    Just review that quickly, if you don't mind.

 6          A.    Okay.

 7          Q.    So your answer to that long question that I

 8    just had you review is:

 9                Answer:  I would consider that it's more

10    likely that she died Friday night to possibly very early

11    Saturday morning would be the possibility that's given

12    there -- I don't know when your overlaps are with the

13    phone calls -- than to have been killed the following

14    day.

15          A.    Right.

16          Q.    That's your answer, right?

17          A.    Right.

18          Q.    Did you provide that testimony within a

19    reasonable degree of medical certainty, that specific

20    opinion?

21                MR. JULIAN:  Object to the form.

22          A.    I don't -- non-medical, so I don't know how

23    you put a medical certainty into it.

24          Q.    Okay.  So just for clarity, that answer was

25    not made within a reasonable degree of medical certainty?
```

```
 1                    MR. JULIAN:  Object to the form.

 2                    MR. VENTRONE:  Same objection.

 3        Q.    Was that a correct statement that I provided?

 4        A.    I'm trying to figure out how this applies

 5   here.  I'm not trying to be cute.  I'm just trying to

 6   understand it.  With that hypothetical and my background

 7   information, accepting the hypothetical is accurate,

 8   which I don't know if it is, then it would be a

 9   reasonable degree of medical certainty.

10        Q.    Okay.  Is there a reason that you didn't

11   testify to that specifically?

12        A.    What do you mean?

13        Q.    To say that it's within a reasonable degree of

14   medical certainty?

15        A.    Nobody asked the question that way.

16        Q.    Now, you discussed earlier slides with respect

17   to Kodachrome?

18        A.    Right.

19        Q.    Was it your general practice to refer to

20   Kodachrome slides as just slides or was it your practice

21   to differentiate them specifically from medical slides

22   like the ones in the prior exhibit?

23        A.    It would depend --

24                    MR. JULIAN:  Form.

25                    THE WITNESS:  I'm sorry.
```

125

```
1                  MR. JULIAN:  Go ahead.

2        A.    It would depend upon the context of the

3   conversation.

4        Q.    Okay.  What depends?

5        A.    Well, if I realize that it could be confusion

6   and that it was important, then I would expect to

7   differentiate.  If it did not appear to me an area of

8   confusion even though it may have been, I would not.

9        Q.    Okay.  It would be fair to say that sometimes

10  you would testify and make clear that you made Kodachrome

11  slides versus microscopic slides and sometimes you

12  wouldn't?

13       A.    Well, I don't ever remember having run into

14  that, but that's what I would expect.  I have no memory

15  of ever having had to make that distinction in that way.

16       Q.    Was re-reviewing Kodachrome slides something

17  that you did typically in, let's say, 1992, 1993 when

18  preparing for testimony?

19       A.    If I'm reviewing my case and I have

20  photographs and histology, that would be reviewed.

21       Q.    Okay.  But I meant slides specifically,

22  Kodachrome slides?

23       A.    That's part of it.  We took Kodachrome slides

24  as our photo media, so I would review photographs, and

25  the photographs that I took were the Kodachrome slides,
```

1    so I would review those.

2       Q.    Okay.  When was the last time you spoke to

3    William Fitzpatrick?

4       A.    The last time I can remember, I was back in

5    town for some other reason with my wife, and we went to

6    lunch with Carol Williams and I think maybe one of the

7    other ex-employees or current employees, I don't know, of

8    the medical examiner's office when I was there as medical

9    examiner, to a restaurant, I think it was East Genesee

10   Street or out in Dewitt area, I can't remember, and

11   during lunch, he happened to walk by and said hello.

12      Q.    Okay.  What year was this?

13      A.    I don't know.

14      Q.    Was it more than a decade ago?

15      A.    Yes.

16      Q.    Okay.  Were you ever contacted either by

17   Mr. Fitzpatrick or somebody at his office during the time

18   that the Hector Rivas' habeas petition was pending in the

19   district court?

20      A.    I don't know.

21      Q.    What about when it was pending on appeal?

22      A.    Don't know.  I was never called to come and do

23   anything.  I don't know if there was ever any contact.

24      Q.    Do you recall if anybody ever called you about

25   the Valerie Hill case, anyone for any reason following

```
 1    the conviction?

 2         A.    There was a TV station that called me when I

 3    was in Topeka as district coroner and wanted to discuss

 4    the case without any opportunity to see anything or

 5    review anything, so I didn't.

 6         Q.    And when was that?

 7         A.    While I was district coroner in Topeka.  I

 8    cannot tell you the date.

 9         Q.    Somewhere in the '93 to 2003 range?

10         A.    Yes.

11         Q.    Okay.  Or '94 to 2004?

12         A.    Well, 2010, rather.

13         Q.    Okay.  Now, you were the Topeka, Kansas

14    coroner, you said, in --

15         A.    Shawnee County Coroner.

16         Q.    Shawnee?

17         A.    Shawnee County Coroner.

18         Q.    Okay.  What years was that?

19         A.    Let's see.  George left in '97, I believe, so

20    I think it was '97, and then I resigned it in 20 -- I

21    think 2010 or 2011, when I moved the practice to Kansas

22    City.

23         Q.    Okay.  And you said you moved your practice to

24    Kansas City.  Is that a -- withdrawn.

25               When you say -- so you resigned as the Shawnee
```

1    County Coroner?

2         A.    Yes.

3         Q.    Okay.  Why did you resign?

4         A.    Shawnee County was making unreasonable

5    demands.  We had a private practice that provided service

6    and they were producing unreasonable demands, and the

7    practice was not going to be able to operate properly.

8         Q.    When you say --

9         A.    Among other things with having to provide more

10   financial support to the county.  Because we already paid

11   their staff at overtime rates for using them if they were

12   working beyond time -- beyond their county time.  We had

13   a contract to use them more and to use the staff that

14   were there, plus with the staff we added to it.  Because

15   both our private office and the county office were in the

16   same facility, but we provided private staff and also

17   supplemented the full-time staff at the coroner, the

18   county coroner's office, so it was a conjoined event.

19              With what they wanted to do, this was not

20   going to work out.  It was going to be too expensive, and

21   it was not going to work out.  So I resigned the position

22   right there at the county exec -- well, it was the county

23   manager.  I can't remember.  It's a

24   three-person-controlling board from the county, and -- or

25   gave notice.  I gave them three months to find somebody.

1    And then I moved the practice to a morgue that was being

2    built in Kansas City.

3        Q.    Okay.  And when you say unreasonable demands,

4    do you mean just the sheer number of, for example,

5    autopsies that you were being asked to perform?

6        A.    No.  In fact, it was going to reduce the

7    number that we could perform which would not provide the

8    income that was necessary to pay the staff.

9        Q.    Oh, I see.

10        A.    And it was going to -- we were not going to be

11    able to provide services to some of the other counties,

12    plus it was going to cost us more to do it, so we -- so I

13    moved us to Kansas City.

14        Q.    So for that coroner's office, how was it

15    funded?

16        A.    Well, Shawnee County?

17        Q.    Mm-hmm.

18        A.    That's through the taxpayers' dollars.

19        Q.    So what's the relationship with the private, I

20    guess, practice that you had just described?

21        A.    Okay.  They couldn't find anybody, so they had

22    to hire people who were in private practice, and that's

23    what they did with George, whom I succeeded, came in and

24    they had to pay him, I can't remember exactly what it

25    was, but it was a lot more than they paid me in effect.

```
1    Then I supplemented my income by doing cases to other

2    counties and that also allowed me to hire staff and to

3    get equipment and things of the sort.

4        Q.    But in some manner or fashion, were you being

5    paid by the autopsy?

6        A.    We were piecework, if you will, for the

7    autopsy performance, yes.

8        Q.    And that was even though you were the county

9    coroner rather than in private practice?

10       A.    Right.  Well, there was a base salary that

11   they paid only to the district coroner, not to any other

12   pathologist that was there, until I got another

13   pathologist, which I did very shortly after he left, and

14   we split that base salary, so we each had a lower base

15   salary.  That got us county health benefits, which were

16   important.  Then we -- our primary income was what we

17   brought in from other counties and then also the

18   piecework part for that county.  I can't remember the

19   exact financial details of all this.

20       Q.    But the upshot was that if you didn't have

21   enough time to do these autopsies from other counties

22   where you were being paid directly, you simply couldn't

23   afford to keep the operation running?

24       A.    It wasn't a matter of time.  It was a matter

25   of whether you could bring them in or not.
```

1      Q.    Okay.  So they told you you weren't allowed to

2  do that anymore?

3      A.    They were going to change -- I can't remember

4  all the details of this, but it ended up economically, as

5  far as I saw, was not viable and they were not interested

6  in doing what I was interested in doing, which was being

7  a regional service.  Because we've provided service to

8  counties throughout Kansas, not every county in Kansas,

9  but we provided to a large number of counties in Kansas,

10  and this was going to be impractical.

11          There were disadvantages in moving to Kansas

12  City, because the travel distance is so -- there's some

13  counties that only one of them could use us.  But the

14  advantage is to be able to be a regional service and try

15  to bring forensic quality up, which was always the idea

16  with the service, was more easily accomplished by going

17  to Kansas City.

18      Q.    Okay.  So backing up to when you were in

19  New York.

20      A.    Yes.

21      Q.    Now, as medical examiner, you were being paid

22  by the County; is that fair to say?

23      A.    That's correct.

24      Q.    Did you also have any type of private practice

25  while you were in New York?

132

```
1        A.     No.

2        Q.     Now, at some point you were providing

3   specimens from corpses to Bristol for scientific

4   examination?

5        A.     That's correct.

6        Q.     And about what years was that?

7        A.     I can't remember.

8        Q.     The '80s, basically, the '90s?

9        A.     Yeah, until they told me I couldn't.

10       Q.     Okay.  That would have been maybe in the late

11  '80s?

12       A.     I cannot remember.

13       Q.     Okay.  Besides Bristol, were specimens being

14  provided anywhere else?

15       A.     The Environmental Protection Agency wanted

16  adipose tissue samples to look for pesticide residues and

17  we would provide some samples that they then would test.

18       Q.     What about Langone, do you provide any samples

19  to them?

20       A.     Who is Langone?

21       Q.     I don't know.  I just came up with the name.

22       A.     I have no idea who you're talking about.

23       Q.     Fair enough.  So the materials that were being

24  provided to Bristol, were they paying for them?

25       A.     No.
```

```
 1        Q.    Okay.  Was there any instance where you were

 2   providing specimens to anyone in exchange for money?

 3        A.    Absolutely not.  It was to the point,

 4   actually, when the Environmental Protection Agency sent

 5   us a hack, I had Tom Jensen Burrough (ph).

 6        Q.    Why?

 7        A.    Because that was an emolument.  I accepted

 8   absolutely no money.  That was a -- that's a problem in

 9   lots of places.

10        Q.    And by emolument, you mean payment for

11   services, right, that you weren't necessarily expecting?

12        A.    Any gain, any financial or material gain, it

13   should be done purely altruistically.

14        Q.    Okay.  Now, you had a farm in Onondaga County?

15        A.    Yeah.  My wife and I bought a farm.  Yes.

16        Q.    Okay.  And about how big was that?

17        A.    Fifty-five acres.

18        Q.    And this is where you ran the skeletal remains

19   clinic --

20        A.    Yes.

21        Q.    -- in part?

22        A.    Yes.

23        Q.    Okay.  And did that involve burying bodies?

24        A.    On that farm, we buried sheep and I think some

25   calves.  I think we may have put some skeletal -- I can't
```

```
1    remember if we used skeletal there or that was later.

2    There was one year we used the farm, and one year we used

3    a place, I can't remember exactly where it was,

4    Dr. Rodriguez found it through one of our employees.

5         Q.    And in either of these locations, did you ever

6    use human remains?

7         A.    Yes.

8         Q.    Okay.

9         A.    Not a complete body, but bones.

10        Q.    Okay.  So you would effectively bury bones for

11   a period of time, then people could dig them up and learn

12   something about how long they've been there?

13        A.    For not very long.  Learning how to excavate.

14   What we were trying to do is teach them the mechanisms of

15   how to retrieve material, and then with the animal

16   materials to learn something about the entomology of

17   this.

18        Q.    Okay.  And for the human remains, did you

19   obtain permissions from families before using them?

20        A.    No.

21        Q.    What years was this?

22        A.    It was in the '80s.  I can't remember exactly

23   when.

24        Q.    Did it continue into the '90s?

25        A.    I believe it's the '80s.  I don't remember
```

1     the -- there were two years, two consecutive years, and I

2     can't tell you the years.

3         Q.    And did people pay to take this class?

4         A.    Didn't pay me.  I don't know -- we offered it

5     two years.  I'm presuming there was some sort of tuition

6     because of the cost of running it.  I don't know what it

7     was, and I did not handle the money myself.

8         Q.    Okay.  Did you have a program where you were

9     donating material to the Red Cross Donor Program?

10        A.    That was with -- the Red Cross had a donor

11    program, and we worked with them if they had -- one of

12    our cases was a donor, we cooperated with them.

13        Q.    Understood.  At some point during your

14    practice as medical examiner at Onondaga County, were you

15    taking body parts and providing them to local

16    laboratories for research purposes besides Bristol that

17    we discussed earlier?

18        A.    I remember Bristol, and then the Upstate

19    Medical Center was doing a study on bladders and

20    prostates and needed the -- also a sample of

21    endocrine-producing tissue which would be tested over it.

22        Q.    And for these donations, did you have

23    permission of the families?

24        A.    No.

25        Q.    At any point prior to leaving Onondaga County,

```
1    did anybody tell you that that could be a crime?

2         A.    Later, when they were chastising me, yes.

3         Q.    Okay.  Now, you started, I believe, your

4    practice in North Carolina?

5         A.    I was in forensic training.

6         Q.    Okay.  That's --

7         A.    Completed my forensic training in North

8    Carolina, and then after I graduated that program, went

9    to Dade County.

10        Q.    Okay.  When you were at North Carolina, were

11   you subject to any investigation by any state agency?

12        A.    Not that I'm aware of.  I mean, there's the

13   standard supplying of information in order to get a

14   license, but nothing nonstandard.

15        Q.    Okay.  And were you disciplined by any state

16   regulatory agency?

17        A.    No.

18        Q.    In North Carolina, that is?

19        A.    No.

20        Q.    Moving on to Florida, were you ever

21   investigated by any state agency in Florida?

22        A.    Not of which I'm aware.

23        Q.    Okay.  Were you ever disciplined by any agency

24   in Florida?

25        A.    No.
```

```
1       Q.    I think we've covered New York.

2             In Kansas, when you were in Kansas, were you

3    ever investigated by any state agency?

4       A.    Not that I'm aware of.

5       Q.    Okay.  Were you ever disciplined?

6       A.    No.

7       Q.    And that, again, being Kansas.

8             So you got to -- you moved to Kansas City?

9       A.    Yes.

10      Q.    What did you do in Kansas City, did you have a

11   specific role, something else?

12      A.    I did forensic pathology.

13      Q.    Okay.  With who, yourself, somebody else?

14      A.    There were other pathologists that also worked

15   there.  I started out with Dr. -- I'm blocking on his

16   name.  I'm having a Rick Perry moment.  A Bangladeshi

17   pathologist that we hired into the practice, and I moved

18   to Kansas City where Dr. Glenn stayed behind in Shawnee

19   County.

20      Q.    Were you in private practice in Kansas City or

21   did you eventually get hired by the state as sort of the

22   state coroner or something like that?

23      A.    There is no state coroner.  That's always a

24   county-based.

25      Q.    Okay.
```

1       A.     I was a deputy coroner for Wyandotte County.

2   I got health insurance that way.

3       Q.     Is Kansas City in that county or a different

4   one?

5       A.     That's Kansas City, Kansas.

6       Q.     Okay.  Forgive me.  I know very little about

7   Kansas.

8              After that position, did you get another

9   position with the state or something else -- or with the

10  county?

11      A.     I had no state positions at all.

12      Q.     Okay.

13      A.     Other than boards.  There were some boards I

14  was on, like the child death review board.  It's a pro

15  bono non -- a board that reviews child deaths, and I had

16  that type of interaction with the state, but I was never

17  hired by the state.

18      Q.     Okay.  Stick to the counties then.  Besides

19  the county where Kansas City is located, did you work for

20  any other county following leaving Shawnee?

21      A.     I was already coroner for several counties

22  before I left Shawnee County.  So I resigned the Shawnee

23  County one.  I maintained most if not all of the other

24  coronerships that I had, and in fact, added to them while

25  I was in Kansas City.

```
 1        Q.    Okay.  And during the time that you were

 2   in -- actually, let me be more thorough with the

 3   timeline.

 4              How long were you in Kansas City for?

 5        A.    We moved there I think it was 2011, if I

 6   remember correctly, and then I left Kansas City in 2018.

 7        Q.    Now, during that time, you were in Kansas

 8   starting from I think it's 1994 going to 2018, did you

 9   ever do autopsies from out of state?

10        A.    I did some cases where the person had died in

11   Oklahoma.  I did cases from Missouri.  I believe I may

12   have done a case or two at least from Nebraska, but I'm

13   not -- well, for sure some that died in Nebraska, yes.

14   In fact, we ended up providing all forensic autopsy

15   services for some counties in Missouri, not me

16   specifically but the practice.  There may have been some

17   from Nebraska.

18        Q.    And after 2018, where did you go?

19        A.    I went to Fond du Lac County in Wisconsin.

20        Q.    Okay.  And why did you leave Kansas City

21   for -- did you say Fronterlock?

22        A.    Fond du Loc, F-O-N-D, D-U, L-A-C.

23        Q.    Okay.  Why did you leave Kansas City for that

24   county in Wisconsin?

25        A.    The practice was sold to a group out of
```

1    Nashville, Tennessee with promises of certain

2    improvements made to the practice, like daily case review

3    and more professional review of cases, which was not

4    happening to my satisfaction, and they promptly did not

5    do anything, and I simply ceased talking to them and

6    started looking for other doctors.

7         Q.    Okay.  So when you were in Kansas City, did

8    you have a business incorporated that you then worked as

9    a coroner for other things?

10        A.    It's a convoluted story.  It seems like one

11   business but in fact I think there would be at least

12   three.  When I was in Shawnee County, it was Frontier

13   Forensics.  Moved it to Kansas City, gave it to Chris

14   Bearing (ph), who was running the morgue, because I'm not

15   the world's best administrator, so I just gave him the

16   business.  That I think was Frontier Forensics, LLC, and

17   then it passed on to the people in Nashville.  I don't

18   know exactly what they --

19        Q.    But there was a legal entity that you had

20   partial ownership that you could sell?

21        A.    When I first moved there, it would have been

22   saleable.

23        Q.    Okay.

24        A.    But I didn't.  I gave it away.

25        Q.    Okay.  So you gave it away to your friend

```
 1    because you didn't want to be the administrator, and that

 2    friend then sold it to Nashville?

 3         A.    Well, he was my -- he became my employer.  We

 4    were friendly, but it wasn't a matter of just giving it

 5    to a friend.  He was running it.  We seemed to have the

 6    same ideals as far as trying to improve quality of

 7    service, and so he was good at administration, great

 8    investigator, I gave it to him.

 9         Q.    Okay.  So you gave him the legal entity that

10    was doing this work?

11         A.    Right.  That was around 2013, if I remember

12    correctly.

13         Q.    Okay.  And then sometime afterwards, he sold

14    to this organization to Nashville?

15         A.    Correct.

16         Q.    Okay.  And following your dissatisfaction with

17    that, you moved to Wisconsin?

18         A.    Yes.

19         Q.    Okay.  And how long were you in Wisconsin?

20         A.    About six months.

21         Q.    Okay.  Why were you only in Wisconsin for six

22    months?

23         A.    That was a practice that, again, was supposed

24    to feed itself, if you will, through cases, and one of

25    the coroners there took an extreme dislike to me and
```

1    informed the county manager or executive, I can't

2    remember exactly what his title is, that he would not

3    submit cases there as long as I was there.  So at that

4    point, I said there's no sense in me being here, I

5    resigned.

6        Q.    And where did you go afterwards?

7        A.    Then I went to Upstate New York to my house in

8    Cato.  I worked for a short time for my son who runs a

9    business constructing dairy forms.

10       Q.    Okay.  Not in a forensic capacity?

11       A.    No.

12       Q.    Okay.  So since you left Wisconsin, have you

13   worked as a forensic pathologist?

14       A.    Yes.

15       Q.    In what capacity?

16       A.    As a forensic pathologist.

17       Q.    No.  No.  Are you working for a county, are

18   you for private hire, something else?

19       A.    No.  Right now I'm hired as a forensic

20   pathologist doing quality control examinations,

21   basically, in cardiovascular transplant.

22       Q.    Where?

23       A.    That's in Georgia.

24       Q.    Georgia as in the State of Georgia?

25       A.    That's correct.

```
 1        Q.    Okay.  And do you do that work here or are you

 2   traveling back and forth to Georgia?

 3        A.    I don't travel back and forth much unless I

 4   have something like this deposition.  I live down there.

 5        Q.    You live in Georgia?

 6        A.    Yes.

 7        Q.    Okay.  Understood.  And how long have you had

 8   that job?

 9        A.    Since April of 1919 -- not 1919.  2019.  I'm a

10   century, I'm a vampire.

11        Q.    Nobody's accusing you of being a vampire.

12        A.    I'm just senile.

13        Q.    Neither that.  I apologize if I already

14   covered this.  While you were in Kansas, were you ever

15   subject to any investigation by any state agency or

16   county agency?

17        A.    Not of which I am aware.

18        Q.    Okay.  And were you ever subject to any

19   discipline?

20        A.    No.

21        Q.    Okay.  And same for Wisconsin, you were only

22   there for six months?

23        A.    Correct.

24        Q.    Okay.  Now, has any court ever found your

25   professional opinion to be unreliable?
```

```
 1                    MR. JULIAN:  Form.

 2                    MR. VENTRONE:  Object to the form.

 3         Q.    You can answer.

 4         A.    There was a case of a juvenile who hanged

 5   himself that -- where the judge said he did not feel that

 6   my testimony would be useful for the jury.

 7         Q.    And what state was that in?

 8         A.    That was in Kansas.

 9         Q.    Okay.  Do you remember the name of the case?

10         A.    No.

11         Q.    Besides that one instance, has any court ever

12   found your testimony to be unreliable?

13         A.    I don't know if the Daubert -- okay.  There's

14   a Daubert hearing in Kansas which said that -- found for

15   the defendants that I -- that my testimony was not

16   scientifically based.

17         Q.    Was this in federal court?

18         A.    No.  That would have been state court.

19         Q.    Okay.  Do you remember the name of the case?

20         A.    No.

21         Q.    How many years ago was this?

22         A.    That was not -- that would have been about

23   2018, 2019, somewhere in there.

24         Q.    Besides the --

25         A.    I can't remember whether the first one went to
```

```
 1    trial.

 2         Q.     Besides the juvenile case you mentioned and

 3    this Daubert case, has there been any other instances

 4    where a court has found your testimony unreliable?

 5         A.     No.  I testified against myself.

 6         Q.     All right.  You win.  I want to know.  How did

 7    you testify against yourself, sir?

 8         A.     Well, it's an Innocent Project case, and when

 9    they came to me with the case, we re-examined it, and I

10    said it was wrong, and I testified on behalf of the

11    person who had been convicted.

12         Q.     Okay.  What was the name of that person?

13         A.     Coones.

14         Q.     How do you spell that?

15         A.     C-O-O-N, I believe, E-S.

16         Q.     Was that in the south?

17         A.     No.  That was in Kansas.

18         Q.     Okay.  There's somebody by -- a wrongful

19    conviction person with a similar name that just got shot

20    by a sheriff in the south, actually.

21              Okay.  So this is a case where you had

22    originally testified as part of the criminal case, and

23    then during the reinvestigation you changed your opinion

24    and testified for the defendant?

25         A.     Yes.
```

1  Q. Okay.  Has any district attorney ever refused

2 to use you as an expert because they didn't believe they

3 could rely on your opinion?

4  A. When I refused to call a case a homicide in

5 Dodge County, Kansas, that would have been early in my

6 tenure there, the Dodge County DA stopped using our

7 services.  I do not know anything else.

8  Q. Okay.  In New York, was there ever a time when

9 a district attorney said that they're not going to rely

10 on your opinion and decided to hire somebody else or

11 simply go on without you?

12  A. I'm presuming that's what Fitzpatrick has done

13 by saying that I needed to leave.

14  Q. Okay.  But besides that, is there any other

15 instance from beforehand?

16  A. Not that I'm aware of.

17  Q. Okay.

18    MR. RICKNER:  Give me one second.  I may

19    be wrapping up here.  Do you want to take

20    five?

21    MR. JULIAN:  Sure.

22    (Off record:  2:51 p.m. to 3:01 p.m.)

23    (Exhibit 31 marked for identification.)

24 BY MR. RICKNER:

25  Q. So just looking at the top of the e-mail

1    chain, it says "cjrieg@douglascountyks.org"?

2         A.    Okay.

3         Q.    Who is that?

4         A.    I don't know.

5         Q.    Do you know who knagsted@aol.com is?

6         A.    Oh, that's me.  That's my e-mail.

7         Q.    So do you remember who you -- let's turn to

8    the second page.  C.J. Rieg, Senior Assistant District

9    Attorney, Douglas County, Kansas?

10        A.    Okay.

11        Q.    Do you remember what this e-mail was about?

12        A.    No -- well, it sounds like it's about the case

13   that I discussed, is my guess.  Let's see.  Yeah, that's

14   what it sounds like.

15        Q.    Okay.  And was this part of the trial

16   preparation?

17        A.    I assume that.

18        Q.    I'd like you to go to the bottom of the second

19   page.  It says the Rivas case.  Do you see that?

20        A.    Yes.

21        Q.    What did you discuss about the Rivas case with

22   this district attorney?

23        A.    I don't know if we did even discuss it.  I

24   don't remember.  It would be something available to him

25   if you're looking for issues that might come up.

1      Q.    Did the Rivas case come up as part of the

2   Daubert hearing?

3      A.    It might have.  I don't know.  I wasn't there.

4      Q.    Did you testify at the Daubert hearing?

5      A.    No.

6      Q.    Okay.  All right.

7            MR. RICKNER:  Then I have no further

8         questions.

9              (Brief discussion off record.)

10           THE REPORTER:  Mr. Ventrone, will you

11        need a copy of today's transcript and then

12        last week of Mr. Fitzpatrick's?

13           MR. VENTRONE:  Yeah.  Thank you.

14           THE REPORTER:  Okay.

15             (Proceedings concluded at 3:07 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                      REPORTER'S CERTIFICATE

 2

 3           I, ELYSE M. ADDABBO, Court Reporter and

 4     Notary Public, certify:

 5           That the foregoing proceedings were taken before me

 6     at the time and place therein set forth, at which time

 7     the witness was put under oath by me;

 8           That the testimony of the witness and all

 9     objections made at the time of the examination were

10     recorded stenographically by me and were thereafter

11     transcribed;

12           That the foregoing is a true and correct transcript

13     of my shorthand notes so taken;

14           I further certify that I am not a relative or

15     employee of any attorney or of any of the parties nor

16     financially interested in the action.

17

18

19          Elyse M Addabbo

20
            ELYSE M. ADDABBO, Court Reporter
21          Notary Public

22

23

24

25
```