# EXHIBIT "F"

1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
2    _____

3    SIDNEY MANES, administrator of the
     estate of HECTOR RIVAS,
4
                Plaintiff,
5                              Case No.:
         -vs-                  5:19-cv-00844
6
     ONONDAGA COUNTY; et al.,
7
                Defendants.
8    _____

9                  DEPOSITION

10   _____

11   WITNESS:      WILLIAM FITZPATRICK

12   DATE:         Thursday, October 12, 2023

13   START TIME:   9:59 a.m.
     END TIME:     2:48 p.m.
14
     LOCATION:     Bousquet Holstein, PLLC
15               110 West Fayette Street
                 Syracuse, New York 13202
16

17   BEFORE:       Elyse M. Addabbo
                 Court Reporter and Notary Public
18
     JOB NUMBER:   20255
19

20

21

22

23

24

25

```
 1    APPEARANCES:

 2      For the Plaintiff:

 3          RICKNER PLLC
            Attorneys at Law
 4          14 Wall Street
            Suite 1603
 5          New York, New York 10005
            BY:  ROB RICKNER, ESQ.
 6               rob@ricknerpllc.com

 7
        For the Defendants:
 8
            LAW OFFICES OF ROBERT F. JULIAN
 9          Attorneys at Law
            2037 Genesee Street, Suite 2
10          Utica, New York 13501
            BY:  ROBERT F. JULIAN, ESQ.
11               robert@rfjulian.com

12               -and-

13          LAW OFFICE OF MARK A. VENTRONE
            Attorneys at Law
14          103 East Water Street
            Suite 304
15          Syracuse, New York 13202
            BY:  MARK A. VENTRONE, ESQ.
16               info@mventronelaw.com

17

18      Also present:

19          Sidney Manes

20

21

22

23

24

25
```

```
 1              I N D E X   O F   T E S T I M O N Y

 2

 3   EXAMINATION OF                              PAGE

 4     WILLIAM FITZPATRICK

 5        BY MR. RICKNER                          8

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19                                .

20

21

22

23

24

25
```

```
 1              I N D E X   O F   E X H I B I T S

 2                   (available for download)

 3
      EXHIBIT      DESCRIPTION                        PAGE
 4
```

```
 5      1         March 1987 calendar                  26

 6      2         grand jury testimony of Erik Mitchell  28
                  Bates P00534 - 542
 7
        3         FOIL response                        33
 8
        4         e-mail with photo attachments        55
 9
        5         memorandum, 11/16/93                 59
10
        6         memorandum, 11/19/93                 62
11
        7         press release, 11/19/93              63
12
        8         newspaper article                    82
13
        9         Erik Mitchell's response to allegations 83
14
       10         Onondaga County Department of Law     90
                  inter-office letter, 3/15/93
15
16     11         investigation notes                  91

17     12         audio recording                      93

18     13         Report of Committee on Medical Examiner 97

19     14         letter, 1/28/93                      101

20     15         letter, 11/19/93                     104

21     16         press release, 11/19/93              105

22     17         supplemental report                  110

23     18         voluntary affidavit                  114

24     19         Syracuse Police Department           115
                  inter-departmental memo, 4/18/87
25
```

| 1 | 20 | Syracuse Police Department inter-departmental memo, 5/27/87 | 115 |
| 2 | | | |
| | 21 | voluntary affidavit | 115 |
| 3 | | | |
| | 22 | Syracuse Police Department inter-departmental memo, 4/18/87 | 115 |
| 4 | | | |
| 5 | 23 | e-mail, 3/18/07 | 120 |
| 6 | 24 | laboratory analysis report | 125 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      FEDERAL STIPULATIONS

 2

 3          IT IS HEREBY STIPULATED AND AGREED, by and between
      the attorneys for the respective parties, that the
            presence of the Referee be waived;
 4

 5          IT IS FURTHER STIPULATED AND AGREED that the
      witness shall read and sign the minutes of the transcript
            within 30 days upon receipt, and that the filing of the
 6    transcript be waived;

 7          IT IS FURTHER STIPULATED AND AGREED that all
      objections, except as to form, are reserved until the
 8    time of trial;

 9          IT IS FURTHER STIPULATED AND AGREED that this
      Deposition may be utilized for all purposes as provided
10    by the Federal Rules of Civil Procedure;

11          AND FURTHER STIPULATED AND AGREED that all rights
      provided to all parties by the Federal Rules of Civil
12    Procedure shall not be deemed waived and the appropriate
      sections of the Federal Rules of Civil Procedure shall be
13    controlling with respect thereto.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    THE REPORTER:  For the transcript order,

2          is it --

3                    MR. RICKNER:  I'm ordering the copy.

4                    THE REPORTER:  The original?

5                    MR. RICKNER:  Yeah.  That will be 14 Wall

6          Street, Suite 1603, New York, New York 10005.

7          Rickner, PLLC.

8                    THE REPORTER:  And then for the copies,

9          is it provided or do they pay for their own?

10                   MR. RICKNER:  I don't know what -- if

11         we've have an agreement otherwise.  If we've

12         agreed to it in the past, we'll do it.  If we

13         haven't, we won't.

14                   MR. JULIAN:  The usual custom and

15         practice is to read and provide, but I'm not

16         going to have an argument.

17                   MR. RICKNER:  Whatever it is that we've

18         agreed on, I'll check in with Josh and stuff.

19         I just don't have it committed to memory

20         today.

21                   MR. JULIAN:  Yeah, that's fine.

22                   THE REPORTER:  So do you want to --

23                   MR. RICKNER:  Put a pin in it.  I'll take

24         the original, and if there's more to come,

25         we'll order more.
```

```
 1   W I L L I A M   F I T Z P A T R I C K, having been called

 2   as a witness, being duly sworn, testified as follows:

 3

 4                    MR. JULIAN:  I just want to, for the

 5              record, read and sign, and all objections

 6              except as to form are reserved.

 7                    MR. RICKNER:  Sure.

 8

 9   EXAMINATION

10   BY MR. RICKNER:

11      Q.    Mr. Fitzpatrick, nice to meet you.  My name is

12   Rob Rickner.  I'm going to be asking you a few questions

13   today.

14      A.    Sure.  Nice to meet you.

15      Q.    Nice to meet you.  Have you ever had your

16   deposition taken before.

17      A.    Yes.

18      Q.    Okay.  How many times?

19      A.    Oh, less than ten, more than five, somewhere

20   in the neighborhood.

21      Q.    Okay.  In the five to ten times that you've

22   had your deposition taken, did any of those involve cases

23   where either you were the prosecutor or whether you were

24   involved in the prosecution?

25      A.    I think they've all been.
```

1    Q.    All five or ten?

2    A.    Yeah.

3    Q.    Okay.  And about what years did that cover?

4    A.    Well --

5    Q.    The dates of the depositions, not the dates of

6    the prosecutions, to be clear.

7    A.    Oh.  The most recent one involved an

8    investigation by the County probably four years ago, and

9    the first one would have been mid '90s.

10    Q.    Were you represented by Mr. Julian in any of

11    those cases?

12    A.    No.

13    Q.    Do you have copies of the transcripts for any

14    of those depositions?

15    A.    Personally, no.

16    Q.    Okay.  Who represented you in those cases?

17    A.    The first one was Attorney Ed Menkin, and the

18    last one I appeared without counsel.

19    Q.    For the one that you appeared without counsel,

20    do you believe that you might have a copy of the

21    deposition in your e-mail or something?

22    A.    No.

23    Q.    Who was the -- for the most recent one, who

24    was the plaintiff and defense attorneys?

25    A.    It was a complaint from a former deputy chief

```
 1    of police, Sean Broton, who is now suing me, and he's

 2    represented by Gary Lavine, but I have not been deposed

 3    in that case as of yet.

 4        Q.    Oh, okay.  I'm just talking about the cases

 5    where you've been deposed.  You mentioned one in the '90s

 6    where you were represented by Ed Menkin?

 7        A.    Right.

 8        Q.    Who was the plaintiff's attorney in that case?

 9        A.    I couldn't remember.  I can picture her, but I

10    can't remember her name.

11        Q.    Okay.  Who was the plaintiff?

12        A.    Sig Menchel, former medical examiner.

13        Q.    Gotcha.  Okay.  And was the deposition in the

14    Menchel case the first time that you had your deposition

15    taken?

16        A.    I think so, Rob.  I mean, it was a long time

17    ago.  I think so.

18        Q.    I understand that.  What was the next time

19    after that?

20        A.    I honestly don't remember.

21        Q.    Well, between the one where you haven't had

22    your deposition taken yet and the one in the '90s, which

23    other ones do you remember?

24        A.    I don't know.  I've been sued a lot.  I don't

25    really remember them.  I shouldn't say a lot.  You know,
```

1    a dozen times.  There was a guy, a rape of a --

2    eventually pled guilty to sexual abuse of a child.  That

3    was not the second one.  And I testified in court, but I

4    know that's not a deposition, but --

5         Q.    We'll get to that.

6         A.    Yeah.  So I just don't remember.

7         Q.    In any of the five to ten depositions that you

8    mentioned, was the subject of the case something like a

9    wrongful or malicious prosecution?

10         A.    In the sex offender's case, yes.  Menchel was

11    not.  There was a guy who was a special prosecutor up

12    north, his name was Nick Hillary, that was several years

13    ago, I was deposed in that.  He alleged a civil rights

14    violation, malicious prosecution, et cetera.  The case

15    went to trial.  Who else?  Just not ringing a bell.

16         Q.    So I'm going to take it from your prior

17    experience with depositions that you're familiar with the

18    overall ground rules in a deposition, but I'm just going

19    to go over them for the record.

20         A.    Sure.

21         Q.    You understand that you have to answer

22    verbally.  Nods of the head aren't necessarily going to

23    be captured in the record, so you have to describe things

24    with words.  Will you do that?

25         A.    Yes.

1    Q.    Okay.  You're testifying in a conference room,

2    but it's the same rules as though you were in court.  I

3    mean, you have to tell the truth, the whole truth, and

4    nothing but the truth.  Can you do that for me?

5    A.    Yes.

6    Q.    Now, you may want to take a break, and that's

7    fine.  However, if there's a question pending, you have

8    to answer the question before you take a break.  Do you

9    understand?

10    A.    Sure.

11    Q.    I ask these long rambling questions, and you

12    may have exactly an idea of where I'm going to go and

13    when I'm going to stop asking the question, but can you

14    make sure and wait until I'm finished with the question

15    before jumping in with the answer?

16    A.    Yes.

17    Q.    Thanks very much.  And this is standard, I

18    have to ask it for everyone:  Do you have any physical or

19    medical reason you couldn't give full and complete

20    testimony today besides the ordinary passage of time?

21    A.    No.

22    Q.    Did you prepare for this deposition?

23    A.    Sure.

24    Q.    Okay.  Without going into the substance of the

25    conversations, did you talk to your lawyer?

```
 1      A.    Yes.

 2      Q.    And are you represented by Mr. Julian today?

 3      A.    I am.

 4      Q.    Are you represented by anybody else in this

 5   matter?

 6      A.    No.

 7      Q.    And how many times did you meet with

 8   Mr. Julian?

 9      A.    When was the lawsuit filed?

10      Q.    I'm just talking about with respect to

11   preparation for this deposition?

12      A.    Oh.  I think we met twice.

13               MR. JULIAN:  Isn't this attorney/client?

14            I object.  I'll allow him to answer, but --

15               MR. RICKNER:  The substance of the

16            conversation --

17               MR. JULIAN:  -- I'm not waiving the

18            attorney/client --

19               THE WITNESS:  I think --

20               MR. JULIAN:  Let me finish, Bill.

21               THE WITNESS:  Sorry.

22               MR. JULIAN:  I'm not waiving the

23            attorney/client privilege, but in the interest

24            of expedition, I'm allowing --

25               MR. RICKNER:  I don't want the subject.
```

14

```
 1              I just want to know how much time.
 2                   MR. JULIAN:  I don't think you're
 3              entitled to that, but I will object.  I will
 4              allow him to answer.
 5       A.     I think it was twice.
 6       Q.     Okay.  And how many hours total?
 7       A.     Total?
 8       Q.     Yeah.
 9       A.     Three to four.
10       Q.     Okay.  In the course of your preparation for
11  this deposition, did you review any documents?
12       A.     Yes.
13       Q.     Okay.  Did any of those documents help refresh
14  your recollection, meaning that there are things that you
15  just couldn't have remembered before that you remembered
16  after you read the document?
17       A.     Some.
18       Q.     Okay.  Which documents specifically refreshed
19  your recollection?
20       A.     There was a newspaper article about a press
21  conference that Dr. Mitchell held in early March of '93
22  that I did not remember, I actually still don't remember
23  it, but the newspaper article, I'm assuming, was accurate
24  and indicated I was there, didn't quote me as saying
25  anything.  That's about it.
```

```
 1        Q.    Did you listen to any recordings?

 2        A.    Yes.  There was a -- yes.

 3        Q.    Did you listen to a thirty-six-minute

 4   recording of statements you provided to the county

 5   attorney in April of 1993?

 6        A.    No.

 7              MR. RICKNER:  Is the time the issue

 8              you're having, Mr. Julian?

 9        Q.    You may not remember when you gave the

10   statement, but did you give a statement to the county

11   attorney that was recorded that you listened to?

12        A.    No.  It was to the county legislature.

13        Q.    To the county legislature?

14        A.    That's what I was told.  I could hear people

15   answering -- there were multiple people asking me

16   questions.

17        Q.    All right.  Do you know what year that

18   statement was provided?

19        A.    When I physically --

20        Q.    The recorded --

21        A.    -- gave the statement?

22        Q.    Yeah, the recorded statement.

23        A.    I was told it was '93.  I don't remember it.

24        Q.    Okay.

25        A.    But it was clearly my voice.
```

1      Q.    So it's about a half an hour long, and you

2   were discussing --

3      A.    I'm --

4      Q.    -- Dr. Mitchell?

5      A.    I'm sorry.  I broke your rule I interrupted

6   you.  I only listened to about five minutes of it.

7   That's what Mr. Julian played for me.

8      Q.    Okay.

9            MR. JULIAN:  For the record, we have a

10           problem with the tape in terms of rewinding

11           it, which -- so I didn't want to degrade it in

12           any way.

13           MR. RICKNER:  Oh.  Well, I have a

14           courtesy copy of the recording for you --

15           MR. JULIAN:  Thank you.

16           MR. RICKNER:  -- for the future.  We'll

17           get into that recording afterwards.

18   BY MR. RICKNER:

19      Q.    Besides the document you mentioned to refresh

20   your recollection, the other documents you reviewed in

21   the recording, was there anything else that you reviewed

22   to prepare for your deposition?

23      A.    Yes.

24      Q.    Okay.  What else did you review?

25      A.    There was a 440 hearing from a number of years

```
 1   ago in front of Judge Brunetti.  I read my testimony in

 2   that.  I looked at some grand jury testimony from

 3   Dr. Mitchell, part of my summation in the Rivas trial,

 4   medical examiner documents from the original case, and

 5   those are the things that stand out in my mind right now.

 6        Q.    Okay.  Now, just a bit of background.  We'll

 7   sort of jump ahead.  When did you graduate law school?

 8        A.    '76.

 9        Q.    Did you go straight to law school after

10   college?

11        A.    Yes.

12        Q.    Okay.  What's your college degree in?

13        A.    Political Science.

14        Q.    Did any of your formal studies involve

15   forensics?

16        A.    We had -- I took a course in law and

17   psychiatry, which is technically forensics.  There was a

18   standard evidence course, but I don't think they were

19   teaching, quote/unquote, forensics at SU in the mid '70s.

20        Q.    Fair enough.  And after you graduated law

21   school, that is, in 1976, where did you first practice?

22        A.    I practiced as an assistant DA right here in

23   Onondaga County.

24        Q.    Okay.  Did you pass the bar the first time?

25        A.    Yes.
```

```
1        Q.    And how long -- I understand there's been some

2    movement, but for that phase, how long were you an

3    assistant district attorney?

4        A.    Until December 31st, 1986.

5        Q.    Okay.  And after December 31st, 1986, did you

6    go into private practice?

7        A.    I did.

8        Q.    And did you practice at a specific firm?

9        A.    I shared space with Tisdell, Moore and Walter

10   and had a fee-split arrangement with them, but

11   essentially I was on my own.

12       Q.    Were you of counsel to the firm?

13       A.    No.

14       Q.    And what area did you practice in?

15       A.    Primarily criminal defense work.

16       Q.    Now, obviously at some point you became the

17   district attorney for Onondaga County?

18       A.    Correct.

19       Q.    Okay.  And I believe you started in January of

20   1992?

21       A.    That's correct.

22       Q.    Okay.  And would it be correct to say that you

23   would have been elected a couple of months earlier?

24       A.    November of '91.

25       Q.    Okay.  Now, between December 31st, 1986 and
```

```
 1    January of 1992, were you in private practice with

 2    yourself, essentially, for that entire period of time?

 3         A.    Yes.

 4         Q.    Okay.  And did you get elected the first time

 5    you ran for district attorney?

 6         A.    Yes.

 7         Q.    When you were campaigning to be district

 8    attorney for the first time, was one of your campaign

 9    issues cold cases?

10         A.    I really didn't have a lot of campaign issues.

11    I ran a host.

12         Q.    Okay.  So after you began as district

13    attorney, did you have an agenda where there were parts

14    of the office that you wanted to reform?

15         A.    Oh, sure.

16         Q.    Okay.  What was that agenda?

17         A.    That's a very difficult question to answer in

18    a short period of time.  The agenda -- the office wasn't

19    being run properly.  There was not vertical prosecution.

20    There was not specialized bureaus.  There was not

21    specialized training for those bureaus.  I didn't think

22    the staff was properly paid.  I went to the legislature

23    and asked for an increase in pay.  I attracted, I think,

24    some high-quality people to run the various bureaus,

25    including people from academia.  I just wanted the office
```

     1    to be run better in many, many more ways.  I could go on,

     2    or does that satisfy --

     3         Q.    No.  No.  That's very helpful.  But I'm sort

     4    of focusing on cold cases.

     5         A.    Sure.

     6         Q.    Going back to when you first started as

     7    district attorney, did you believe that there was a

     8    backup in cold cases, meaning either unsolved murders or

     9    murders that hadn't been properly prosecuted?

    10         A.    Well, that's a multifaceted question.  I

    11    wouldn't call it a backup.  I thought there were some

    12    cases that needed to be looked at more diligently, I

    13    think is the best way to answer that.

    14         Q.    Okay.  Was the Valerie Hill murder one of

    15    those cases?

    16         A.    No.

    17         Q.    Okay.

    18         A.    Not in my mind.  Obviously, it was brought to

    19    my attention.

    20         Q.    Okay.  I'm actually going to get into exactly

    21    that process.  So obviously, you remember the Valerie

    22    Hill murder and the prosecution of Hector Rivas, right?

    23         A.    Yes.

    24         Q.    Okay.  Now, prior to when you became district

    25    attorney in January of 1992, had you ever heard of the

21

1   Valerie Hill murder?

2        A.    I don't -- as I'm sitting here right now, I

3   don't remember.  Being a person that followed the news,

4   I'm quite certain that in 1987 I would have read the

5   paper and discovered that she had been murdered.

6        Q.    Okay.  Besides perhaps seeing it in the

7   news --

8        A.    Right.

9        Q.    -- did you have any information from your work

10  in law enforcement or something else regarding the murder

11  of Valerie Hill prior to becoming the DA?

12       A.    No.

13       Q.    How is it that -- now, between -- Valerie Hill

14  was murdered in 1987, correct?

15       A.    Right.

16       Q.    Between 1987 and 1992, do you know what steps

17  were taken to prosecute anyone for that murder?

18       A.    Do I know now --

19       Q.    Yeah.

20       A.    -- or did I know then?

21       Q.    Well, either way.

22       A.    Did I know then?  Absolutely not.  Do I know

23  now?  Yes.

24       Q.    Okay.  Well, what steps had been taken before

25  your involvement in this case to prosecute somebody for

1    the murder of Valerie Hill?

2        A.    The scene was examined, forensic evidence was

3    attempted to be collected, witnesses were interviewed,

4    including Mr. Rivas, photographs were taken, autopsy was

5    done.  And then I think essentially it went into the

6    status of a cold case.

7        Q.    Okay.  The steps you just described, would it

8    be fair to say that those were actions taken by the

9    police department and the medical examiners rather than

10   the prosecutor's office?

11       A.    Yes.

12       Q.    Okay.  Do you know why the prosecutor's office

13   didn't go forward with the prosecution either of Hector

14   Rivas or somebody else?

15       A.    I do not.

16       Q.    Okay.  At some point, the Valerie Hill murder

17   file came to your attention in 1992; is that fair?

18       A.    That's fair.

19       Q.    Okay.  How did that happen?

20       A.    The person who was serving as my chief

21   investigator was a former detective -- or he actually was

22   still a current detective.  He was on loan to me as my

23   chief investigator.  His name is Peter Tynan, T-Y-N-A-N,

24   and he brought the file to my attention as worthy of

25   being further investigated.

1    Q.    Okay.  When you say he brought the file to

2    your attention, did he actually bring you the

3    investigation file?

4    A.    At some point, yes.

5    Q.    Okay.  And after receiving the file, what did

6    you do?

7    A.    Well, I reviewed it, I felt that it clearly

8    warranted further investigation, and I took steps to

9    further investigate the murder of Valerie Hill.

10    Q.    Okay.  Now, when you say you took steps to

11    further investigate, was that actually performed by, I

12    guess, Officer or Detective Tynan, or were you personally

13    involved?

14    A.    Well, I was supervising it, but the physical

15    acts, witnesses, collection of photographs, were done

16    mostly by Investigator Tynan.

17    Q.    Okay.

18    A.    And I'm sure others were involved, as well.

19    Q.    Now, with respect to the -- this

20    reinvestigation, did Investigator Tynan speak to any

21    witnesses?

22    A.    Yes.

23    Q.    Okay.  Did you speak to any witnesses?

24    A.    Yes.

25    Q.    Was there anybody else in the office who was

24

```
 1    involved with talking to witnesses besides you and

 2    Investigator Tynan?

 3        A.    Not that I recall.

 4        Q.    Okay.  Just going for you, do you remember

 5    which witnesses you spoke to?

 6        A.    No.  I do remember a John Cassano, who was a

 7    store clerk at Liquor Square.  I remember a Susan

 8    Stonecipher.  I remember another woman, too, just by

 9    coincidence, I just leased my car from her, I can't

10    remember her name, but she worked for a car company back

11    in '87.  I remember speaking to Joseph Fields.  And I

12    remember speaking to Investigator John Brennan,

13    Investigator Tom Stassi, and anybody that testified at

14    trial I would have interviewed beforehand, prepared them

15    for trial or grand jury.  But those are the people that I

16    can picture in my mind.

17        Q.    During the course of these interviews, did you

18    take any notes?

19        A.    I normally don't take notes, but I certainly

20    may have.

21        Q.    Did you prepare any reports?

22        A.    No.

23        Q.    Do you know if Investigator Tynan took any

24    notes while he was interviewing witnesses?

25        A.    If he did, they would be in the file.  I
```

```
 1    don't, as I sit here today, recall him saying to me

 2    here's notes I took of so-and-so's interview.

 3         Q.    Did he create a report related to his

 4    reinvestigation?

 5         A.    You're now talking about a report in '87 in

 6    connection with the homicide.  I don't know if he was

 7    assigned to the case in '87 or not.

 8         Q.    I'm fairly sure he wasn't.  But no.  No.  I'm

 9    talking about in 1992 during what I'm calling the

10    reinvestigation--

11         A.    Why are you fairly sure he wasn't?  He was a

12    homicide detective in '87.  I don't know.

13         Q.    Well, I've looked at all the paperwork and his

14    name's not come up.

15         A.    Excuse me.  Okay.  Fair enough.

16         Q.    All of that aside --

17         A.    All of that aside, did he do a report

18    in -- no.  He would have verbally reported to me where we

19    stood on the investigation.  I don't recall him

20    generating a police report.

21         Q.    Okay.  In 1992 did you talk to Erik Mitchell

22    with respect to his autopsy and his investigation of the

23    body?

24         A.    Yes.

25         Q.    Okay.  About when was that?
```

26

```
 1         A.     It would have been before he testified in

 2    front of the grand jury, which would have been November

 3    of '92.

 4         Q.     So do you believe that he -- the first time

 5    that you spoke to him would have been in November of 1992

 6    or is it sometime before that?

 7         A.     It would have been November of '92 or October

 8    of '92.

 9         Q.     Do you know if Investigator Tynan spoke to him

10    before then?

11         A.     I do not know.

12         Q.     Okay.

13         A.     He may have been present when I spoke to him,

14    but I don't recall.

15         Q.     Understood.  Now, during the investigation,

16    did you learn that Hector Rivas claimed to have an alibi?

17         A.     Yes.

18         Q.     Okay.  I'm going to actually -- I guess we

19    should just mark this as Exhibit 1.  This is purely for

20    convenience, since I don't remember what day was what in

21    March of 19 --

22         A.     March 27th was a Friday.

23         Q.     Not bad.  Let's just pass one to your counsel.

24                    (Exhibit 1 marked for identification.)

25
```

```
 1    BY MR. RICKNER:

 2         Q.    Just Exhibit 1 for your reference, do you

 3    think this accurately represents which days fell on which

 4    days of the week in March of 1987?

 5         A.    Yes, it does.

 6         Q.    Okay.  Now, Mr. Rivas claimed to have an

 7    alibi.  What days did he claim to have an alibi for?

 8         A.    Well, when you say he claimed to have an

 9    alibi, those were not his words, obviously.  He was

10    interviewed about his whereabouts from the last time

11    Valerie was seen alive, which was Friday night, up until

12    the discovery of her body, and he gave a recitation of

13    where he was.  Friday he said that he on two occasions

14    during the day made efforts to contact Valerie, made no

15    effort to contact her that night.  He spent some time

16    with friends.  He wound up at Coleman's bar.  He --

17         Q.    When is this that he ended up at Coleman's

18    bar?

19         A.    The 27th, Friday.

20         Q.    Okay.

21         A.    He left Coleman's-- this is his version.  He

22    left Coleman's at 9:30 and went directly to Albert's bar

23    in Cazenovia.  And I would say parenthetically that's

24    completely false.  He went home to bed alone.  On

25    Saturday, he appeared at a party, spoke to a number of
```

28

```
 1    Valerie's friends at the party, related to them that she

 2    was not feeling well and that's why she wasn't at the

 3    party.  Witnesses also recall that he was talking about

 4    Valerie in the past tense.  Again, he went home that

 5    night and retired for the evening.  And then I do not

 6    recall his version of his activities on Sunday.  And

 7    Monday, he was at home when the police came and

 8    questioned him.

 9                    MR. RICKNER:  I'm just going to mark this

10              as Exhibit 2, please, one to be marked and one

11              for your counsel.

12                    (Exhibit 2 marked for identification.)

13    BY MR. RICKNER:

14        Q.    If you can just turn to Page 126.  And just

15    for the record, this is an excerpt of Erik Mitchell's

16    grand jury testimony -- well, it's all of his grand jury

17    testimony and excerpts of the total grand jury testimony.

18        A.    Got it.

19        Q.    And looking at Line 20, and the answer, which

20    goes to Line 6 on Page 127, you're asking Dr. Mitchell if

21    the death could have occurred on March the 27th?

22        A.    Correct.

23        Q.    That being the Friday, right?

24        A.    Correct.

25        Q.    Why did you ask him that?
```

```
 1       A.     Because the circumstantial evidence

 2   overwhelmingly pointed to Valerie being dead late Friday,

 3   early Saturday morning.

 4       Q.     Okay.  And would it have been correct to say

 5   that if she had died, let's say, late Saturday or into

 6   Sunday, that would have conflicted with the

 7   circumstantial evidence that you had?

 8       A.     It would have been inconsistent with my theory

 9   of the prosecution, but it would have been something that

10   I would have had have to overcome somehow and account for

11   his whereabouts.

12       Q.     Now, how did you come to the theory that he

13   was killed on the -- withdrawn.  It's usually he in my

14   cases.

15           How did you come to the theory that she was

16   killed either late in the evening on March 27th or in the

17   early hours of Saturday the 28th?

18       A.     I'll go through a couple things.  Number one,

19   this was a very, very -- a very, very good person, a very

20   loving person, a very professional person.  She was a

21   nurse.  She loved her family.  And she was very, very

22   conscientious.  So with that in mind, Saturday she was to

23   travel to Saratoga Springs to see a friend by the name of

24   Laura Adams.  She not only failed to appear, she never

25   once communicated to Laura that she wasn't coming.  Laura
```

```
 1    Adams made numerous efforts to contact Valerie during the

 2    weekend beginning Saturday and was unsuccessful.

 3           There were no phone calls made from her house

 4    Saturday or Sunday.  No one saw her Saturday or Sunday

 5    until her body was found on Monday.  Her car, which was

 6    in her driveway, had not been moved from Friday night

 7    onward.  She had a cat that she was very, very connected

 8    to.  A neighbor found the cat roaming around outside of

 9    Valerie's apartment on Saturday morning.

10           Those things, to me, indicate overwhelmingly

11    that she ceased to exist late Friday, early Saturday.

12    Q.    When you say early Saturday, do you mean,

13    like, before 6:00 a.m. or do you mean before noon?

14    A.    I would say more towards 6:00 a.m.  I'm

15    talking early morning hours, 12:00, 1 o'clock.

16    Q.    Okay.  And just for clarity, would it be

17    correct to say that if the medical examiner had

18    determined that she had died late in the evening on

19    Saturday or sometime on Sunday, that would have

20    conflicted with your theory of the case?

21    A.    Okay.  If I can -- with all due respect, the

22    question -- medical examiners do not determine a specific

23    time of death unless the death is witnessed or

24    videotaped.  I can tell you when John Kennedy died

25    because I've seen the Zapruder film.  No medical examiner
```

 1    is going to say with certainty that Valerie Hill died

 2    Saturday night.

 3        Q.    Right.

 4        A.    If Dr. Mitchell, during my interview with him,

 5    had said -- and answered my question differently and

 6    said, no, it's not possible that she was killed Friday

 7    night or Saturday morning, I would have had to have

 8    recalibrated it and reinvestigated the case to determine

 9    how it is that Hector Rivas killed her on Saturday or

10    Sunday or someone else had killed her on Saturday or

11    Sunday.

12        Q.    Okay.  And I think I understand your point.

13    If the medical examiner had told you that the physical

14    evidence was inconsistent with a death on Friday or the

15    early morning hours of Saturday, that would have

16    conflicted with your theory of the case?

17        A.    That's true.

18        Q.    Okay.  Now, when is the first time that you

19    learned that the medical evidence would have been

20    consistent with your theory of the case that she had died

21    on the 27th or early on the 28th?

22        A.    I don't remember specifically, but I'm sure it

23    would have been in a conversation with Erik Mitchell in

24    preparation for his grand jury testimony.

25        Q.    Okay.  Would you have gone forward with the

1    indictment without that information?

2        A.    If Dr. Mitchell had said it's not possible she

3    died Friday night?

4        Q.    Correct.

5        A.    Would I have gone -- I would not have gone

6    forward that day.  I would have continued to investigate

7    the case.

8        Q.    Okay.  And during your investigation, you

9    could have uncovered someone else excluded Hector Rivas

10   or any number of possibilities; is that right?

11              MR. JULIAN:  Object to the form of the

12              question.

13       A.    Anything is possible.

14       Q.    Okay.  Now, during your reinvestigation, at

15   any point did you learn that at least Dr. Mitchell's

16   initial impressions were that she had died later on the

17   28th or the 29th?

18       A.    No.

19       Q.    During your reinvestigation prior to this

20   discussion with Dr. Mitchell, did you have any

21   information with respect to what the medical evidence

22   suggested regarding her death?

23       A.    Sure.  Yeah.

24       Q.    At the time of her death?

25       A.    Yes.

33

```
 1      Q.    Okay.  What was that?

 2      A.    There was a handwritten note by Dr. Mitchell

 3   in his initial findings that indicated the death had

 4   occurred two to three days prior to her discovery.  So

 5   discovery being Monday at 1:00 p.m., that would have

 6   placed the time of death anywhere from Friday to Monday.

 7      Q.    You said it's a handwritten note?

 8      A.    Yes.  I -- yes, I believe so.

 9      Q.    Now, I'd like to mark this as Exhibit 3.  This

10   is a FOIL response from March 24th, 1998 from the

11   Onondaga County Health Department Office of the Medical

12   Examiner, enclosing an autopsy report, a final

13   toxicology, microscopic report, and several things listed

14   as other.

15              MR. RICKNER:  One copy to Mark, one copy

16         for your attorney.

17              (Exhibit 3 marked for identification.)

18   BY MR. RICKNER:

19      Q.    And I'd just like to walk you through.  This

20   is a collection of documents.  If you go to the first

21   document, which is six pages typed, and at the bottom

22   signed by Dr. Mitchell?

23      A.    Yes, I have that.

24      Q.    Okay.  Now, take your time if you need to, but

25   just going through these six pages, is there anything
```

```
 1    about the time of death?

 2        A.    No.  There are clues to the time of death, but

 3    there's nothing in there -- I've never seen an autopsy

 4    report from Dr. Mitchell that includes the time of death.

 5        Q.    Okay.  So just to be clear, it was not

 6    Dr. Mitchell's practice to include the time of death in

 7    his autopsy report?

 8        A.    None that I saw.

 9        Q.    Okay.  Now, going to the next page, which is

10    the report of toxicol -- toxicological screens.  Excuse

11    me.

12        A.    Easy for you to say.

13        Q.    No, not really.  They found alcohol in her

14    blood, and it looks like this was handled by a

15    toxicologist.  Now, can you read the signature at the

16    bottom?

17        A.    Chip Walls.

18        Q.    Could you spell that for the record, please?

19        A.    Common spelling, W-A-L-L-S.

20        Q.    Oh, okay.  Now, going to the next page, it

21    says:  Gross description of brain after fixation;

22    diagnosis, normal brain with postmortem decomposition,

23    signed by George Collins, MD --

24        A.    Yes.

25        Q.    -- do you see that?
```

```
 1        A.    Yes, I do.

 2        Q.    Who was George Collins, MD in 1992?

 3        A.    I don't believe I've ever met him, but I

 4   believe he worked at one of the local hospitals.

 5        Q.    Okay.  So just to be clear, you don't believe

 6   that he worked at the Office of the Medical Examiner for

 7   Onondaga County?

 8        A.    I can tell you he does not.

 9        Q.    Okay.

10        A.    I believe -- no, I do not know where he

11   worked, but I believe he was an expert in the brain.

12        Q.    Okay.  Now, as part of your reinvestigation,

13   did you ever speak to Dr. Collins?

14        A.    I don't recall speaking to Dr. Collins, but I

15   may have.

16        Q.    Okay.

17        A.    I just do not recall.  I apologize.

18        Q.    Do you know if anyone else did?

19        A.    Yes, Dr. Mitchell spoke to him.

20        Q.    Okay.  You believe that Dr. Mitchell spoke to

21   Dr. Collins?

22        A.    I believe he did.

23        Q.    And to be clear, do you believe that happened

24   in 1992 or back in '87?

25        A.    I do not know.
```

```
 1        Q.    Okay.  And what's the basis for your belief?

 2   I mean, did Dr. Mitchell tell you this?

 3        A.    No.  Just his trial testimony.

 4        Q.    Okay.

 5        A.    Dr. Mitchell's trial testimony.

 6        Q.    Understood.  Now, can you please move to the

 7   next page?  It doesn't really have a title except for

 8   maybe Report of Death/Investigation and it bears the

 9   numbers in the top right-hand corner 870208?

10        A.    Yes.

11        Q.    Do you recognize the handwriting?

12        A.    No, I do not.

13        Q.    Okay.  Moving to the next page, which seems to

14   be the same document.  At the top right, it says:  Found

15   dead by, and then handwritten father and brother.  At the

16   bottom is an M. Birchmeyer.  Do you see that?

17        A.    Yes.

18        Q.    Okay.  Do you know who M. Birchmeyer is?

19        A.    Yes.

20        Q.    Who is he?

21        A.    Michael Birchmeyer.

22        Q.    Okay.  And what was Michael's Birchmeyer's

23   role in 1992?

24        A.    I believe he was a medical examiner's

25   investigator.
```

```
 1        Q.     Who did he work for?

 2        A.     Medical -- Dr. Mitchell.

 3        Q.     Okay.  And moving to the next page, it says

 4   Notification of Death, and there's a signature at the

 5   bottom right.  Do you know whose signature that is?

 6        A.     It doesn't ring a bell.

 7        Q.     Okay.

 8        A.     I can't read it.

 9        Q.     Okay.  Moving to the next page is a Case

10   Information Sheet with the time 8:53 a.m. on March 31st,

11   1987 handwritten.  Do you recognize the signature, the

12   two signatures, at the bottom?

13        A.     You mean these scribbled initials here, is

14   that what you're referring to?

15        Q.     It looks like a signature.  It looks like

16   scribbled initials.  I'm wondering if you know who they

17   belong to?

18        A.     It doesn't ring a bell, no.

19        Q.     That's fine.  Now, moving to the next page,

20   it's another case information sheet.  This appears to be

21   from 3:29 p.m. on March 31st, 1987.  It says:  Per

22   Dr. EKM, and then there's a signature?

23        A.     Yes.

24        Q.     Do you know whose signature that is?

25        A.     No.
```

```
 1        Q.    It's fair to say this isn't Dr. -- EKM is

 2   Dr. Mitchell's initials, right?

 3        A.    That's correct.

 4        Q.    Now, moving to the next page, another case

 5   information sheet, this is for 1:00 p.m. on March 31st,

 6   1987, and it has the signature for UBS or WBS?

 7        A.    Yes.

 8        Q.    Do you know who that might be?

 9        A.    William Sullivan.

10        Q.    Okay.  Who is William Sullivan?

11        A.    He was an investigator for Dr. Mitchell.

12        Q.    Okay.  And his note says that Sergeant Lynch

13   states that subject last seen at 8:30 a.m. on Saturday?

14        A.    Correct.

15        Q.    Okay.  Do you know Sergeant Lynch's first

16   name?

17        A.    No.

18        Q.    Okay.  Could we agree that if the subject

19   Valerie Hill was seen at 8:30 a.m. on Saturday, that

20   means she died sometime after?

21        A.    That is a mistake in that report.  That came

22   from a Ms. Stonecipher who confused her dates.  She

23   thought it was Saturday morning.

24        Q.    Okay.

25        A.    It turned out it was Friday morning.
```

```
 1        Q.    Okay.  So we'll get to that in a second.  But

 2   it's your understanding that Sergeant Lynch received

 3   inaccurate information from Ms. Stonecipher?

 4        A.    Correct.

 5        Q.    Okay.  And that's what resulted in this

 6   report?

 7        A.    Correct.

 8        Q.    Okay.  The next one, it's 4:55 p.m. on, it

 9   looks like, April 1st, 1987.  That's the same Sullivan's

10   signature; is that right?

11        A.    Yes, sir.

12        Q.    And moving to the next case information sheet,

13   9:30 a.m. on April 2nd, that's also Investigator

14   Sullivan?

15        A.    Correct.

16        Q.    Can you read the name right below Decedent,

17   Valerie Hill?

18        A.    That's Larry Bonanni.

19        Q.    Who is Larry Bonanni?

20        A.    He was a Syracuse cop.

21        Q.    Okay.  And do you know what role he had in the

22   investigation?

23        A.    I do not.

24        Q.    Do you know what the two Brandy Alexanders,

25   one piece of garlic bread information came from?
```

```
 1        A.    I don't recall.

 2        Q.    It's fair to say Brandy Alexander is an

 3   alcoholic drink?

 4        A.    Yes.

 5        Q.    Okay.

 6              MR. JULIAN:  So stipulated.

 7        Q.    Do you have a recipe?  Hold on.  I think it's

 8   on the next page.  Going on to the next case information

 9   sheet, this is 11:10 a.m. on April 2nd, 1987, and it

10   appears to have information about a Brandy Alexander

11   recipe.  Do you know whose handwriting this is?

12        A.    No, I don't.

13        Q.    Okay.  Moving on to the next one, this is

14   April 30th, 1987.  It appears to have at least a partial

15   signature at the bottom.  Do you know who that might be?

16        A.    No.

17              (Brief interruption.)

18              MR. RICKNER:  Sidney is here.  I need to

19              talk to my client.

20   BY MR. RICKNER:

21        Q.    I'm sorry.  I didn't --

22        A.    I apologize, Counselor.  I do not know who

23   that scribble mark was written by.

24        Q.    Okay.  Tim Finney, do you see that at the top

25   left?
```

```
 1        A.    I do.

 2        Q.    Who is that?

 3        A.    He's a Syracuse cop.

 4        Q.    Okay.  And spoke to, it says -- is that

 5   Randall Finney?

 6        A.    I think there's a comma missing.  Spoke to

 7   Randall would have been Randall Hill, Valerie's father,

 8   and then I don't know what he's trying to say there.  It

 9   says V. Hill had only -- my recollection of this is this

10   is a recitation of what Randall Hill believed she had

11   consumed at the Friday night dinner.

12        Q.    And just to be clear, based on your

13   investigation, the last time that you believe she was

14   seen alive was a Friday night dinner with her family?

15        A.    With her father, just her father.  Her

16   mother -- her stepmother, excuse me, was dying at Upstate

17   Medical Center.

18              And when I answered your question earlier, you

19   just refreshed my memory that in addition to the facts

20   which I outlined regarding why circumstantially she died

21   Friday night, she had been in constant contact with her

22   father regarding her stepmother's status, and obviously,

23   Saturday and Sunday she made no effort to check on her

24   status.

25        Q.    Got it.  Now, moving on to this next case
```

1    information file, at this point we have no dates or

2    signature.  I can read brother David Hill called him.  Do

3    you know whose handwriting this is?

4        A.    I do not.

5        Q.    Okay.  And the next page, it says Scene

6    Investigation.  Just for the record, this is the type-up

7    of the investigation Erik Mitchell performed at the scene

8    itself?

9        A.    Yes.

10        Q.    Okay.  Now, going on to the next page, which

11    is sort of a standard autopsy diagram of the front and

12    back of a generic human --

13        A.    Right.

14        Q.    -- with some notes on it.  Do you know whose

15    handwriting any of this is?

16        A.    I don't recognize the handwriting.

17        Q.    Just looking at, for example, the lines that

18    go to the fingers?

19        A.    Right.

20        Q.    In sort of the middle part of the page, do you

21    recognize that handwriting?

22        A.    I don't.

23        Q.    Going to the next page, this seems to be a

24    partially filled out document, it's dated 5:30 p.m.  Do

25    you recognize any of the handwriting on this page?

```
 1        A.      No.

 2        Q.      Going to the next page, do you recognize any

 3   of the handwriting on this one?  It doesn't have a title.

 4   It appears to have been cutoff, but I see, for example,

 5   Specimen Description and Submit, and a case number

 6   87-0208, name Valerie Hill.

 7        A.      Right.

 8        Q.      Do you recognize any of the handwriting on

 9   this?

10        A.      I do not.

11        Q.      Okay.

12        A.      It refreshes my memory, though, that I was

13   incorrect earlier when I said two to three days was

14   handwritten.  It was not.  It was typed.

15        Q.      Okay.  And it says Delivered By, do you see

16   this person?

17        A.      Yeah.  William Welch.  The name rings a bell,

18   and I just can't remember who he is.

19        Q.      Okay.  So going back for a moment, would it be

20   correct to say that this statement, "was there approx.

21   two to three days," prior to talking to Dr. Mitchell in

22   preparation -- withdrawn.

23               Would it be correct to say that this

24   statement, "was there approximately two to three days,"

25   was the only information you had regarding the medical
```

```
 1    evidence of when Valerie Hill died prior to the first

 2    time you spoke to Dr. Mitchell about it?

 3                    MR. JULIAN:  Object to the form of the

 4            question.

 5                    MR. VENTRONE:  Yeah, object to the form.

 6    A.    Strictly anatomical, correct, medical --

 7    Q.    Yes.

 8    A.    Yeah.  I don't remember.  I don't remember

 9    anything coming to my attention.  This was not a time of

10    death case to me.  I know that that's the thrust of your

11    lawsuit, but this case to me was always going to be

12    defended by reasonable doubt, he didn't do it, somebody

13    else did it.  And I probably spent three to five minutes

14    with Erik Mitchell talking about time of death.

15    Q.    Okay.  So I'm just going to break this apart a

16    little bit, since we did have an objection from counsel.

17    So it's your -- withdrawn.

18                    In 1992, when you were doing your

19    reinvestigation, would it be correct to say you didn't

20    consider this a time of death case, right?

21    A.    I did not consider -- let me back up.  In any

22    case as a prosecutor, you want to anticipate a defense.

23    My assessment of the case in anticipating the defense,

24    the defense was going to be:  I didn't do it, and you

25    can't prove that I did it.
```

1          If the time of death became an issue, for

2     example, if Mr. Calle had hired a tox -- excuse me -- a

3     pathologist and began to focus on time of death, I would

4     have paid more attention to it with Dr. Mitchell, but he

5     didn't so I didn't.

6          It's obvious to me she was killed Friday

7     night.  Why in the name of God would a woman in her

8     position, her status, her background, why would she not

9     pick up a phone and call her father and ask how her

10    stepmother was doing?  Why she would not call this friend

11    in Saratoga Springs and say I'm not coming.  Why would

12    she leave her cat outside?  How did her car not move?

13    What did she do all weekend?

14    Q.    Now, with respect to the medical evidence

15    regarding time of death, excluding the circumstantial

16    evidence that you just discussed --

17    A.    Right.

18    Q.    -- as you sit here today, does the statement,

19    was there approximately two to three days before she was

20    found that she died that's in this document, in

21    Exhibit 3, is that the only medical information you had

22    prior to talking to Dr. Mitchell?

23    A.    Well, I've got the autopsy report.  There are

24    clues in the autopsy report as to her time of death.

25    Time of death is a multifaceted investigation, as I'm

```
 1    sure you very well know.  There are -- I have seen cases
 2    where two people died at the exact same time, and we can
 3    prove that, and they look completely different because of
 4    where they were stored in a particular house, because of
 5    the temperature, because of their own chemistry.
 6            The human body reacts differently in
 7    everybody, the weight, the stress, the temperature in the
 8    room, so forth and so on.  So there are clues, rigor
 9    mortis, livor mortis, aquafication of the eyes,
10    putrefaction, in this case the deterioration of the
11    brain.  All of those things that I read I was aware of,
12    and to me, not being a pathologist, they were consistent
13    with me for her having been dead several days.
14        Q.    Okay.  Let's go back to page one of Exhibit 3.
15    Now, the second paragraph, it says:  The body has --
16        A.    I think you're talking about page two.
17        Q.    Oh.  Page one of the autopsy report.
18        A.    Autopsy report.  Okay.  Second paragraph.
19        Q.    Yeah.  It says:  The body has fixed anterior
20    livor with flattening of the nose secondary to pressure.
21    There's a small amount of bloody fluid coming from the
22    mouth and nose.  Do you see that?
23        A.    Yes.
24        Q.    What does that tell you about the time of
25    death?
```

```
 1      A.    Livor mortis, only that it had to have -- that

 2   she had to have been dead for a period of time for livor

 3   to have been fixed.

 4      Q.    Which takes how long?

 5      A.    You're asking -- I'm not answering medical

 6   questions, with all due respect.

 7      Q.    Okay.  Well, just --

 8      A.    I mean, it can take hours.

 9      Q.    Well, we have hours.

10      A.    The only thing of relevance to me about the

11   livor was that it was consistent with her position when

12   she was found, i.e., she wasn't killed and then moved.

13      Q.    All right.  Let's ask this a different way.

14   Going through the six pages of this report from

15   Dr. Mitchell, you read this report before you ever talked

16   to Dr. Mitchell about this case; is that right?

17      A.    That's right.

18      Q.    Okay.  Please list the parts in this report

19   that you read and caused you to believe that she had died

20   on Friday, the 27th?

21      A.    There's nothing in this report -- there's

22   nothing anywhere that would convince me that she didn't

23   die Friday night based on what I've already told you.

24      Q.    That wasn't my question.  I just --

25      A.    Well, your question is what in this report.
```

48

```
1    Nothing.

2        Q.    Okay.

3        A.    Nothing in this report indicates to me that

4    she died Friday night, Saturday night, or Sunday night.

5        Q.    Thank you.  Going back to the, sort of,

6    untitled page where it says Specimen Description and

7    Submit, and it has the two to three days statement on it?

8        A.    Yes.

9        Q.    Do you know who wrote this "was there

10   approximately two to three days" statement?

11       A.    I do not know who typed that.

12       Q.    Do you know --

13       A.    If I asked Dr. Mitchell if he typed it, I

14   don't recall.

15       Q.    Okay.  I'm just saying the prior -- and just

16   to be clear, had you ever discussed this document with

17   Dr. Mitchell prior to the October/November conversation

18   with him in 1992?

19       A.    I don't recall discussing this document with

20   Dr. Mitchell.  It's possible that I did, but I don't

21   recall that.

22       Q.    Is it possible that you talked to Dr. Mitchell

23   about his autopsy and findings with respect to the

24   Valerie Hill murder before the October/November 1992

25   conversation?
```

49

```
 1        A.    Is it possible that I talked to him?

 2   Certainly.  But I don't remember talking to him before

 3   then.

 4        Q.    Okay.  And as you sit here today, do you know

 5   whether the person who wrote "there was approximately two

 6   to three days" was qualified to make that determination?

 7                   MR. JULIAN:  I'll object to the form of

 8              the question.

 9        A.    I don't know who the author is, so

10   obviously -- I mean, I can make some assumptions, but

11   we're lawyers, we don't make assumptions, so not knowing

12   who the person is, I don't think it was somebody that was

13   an intern, but I will give the devil his due, I don't

14   know who wrote it, I don't know the person's

15   qualifications to offer that opinion.

16        Q.    Okay.  Now, moving to the next page, this is

17   the prescription record, do you see that?

18        A.    I do.

19        Q.    Do you recognize any of the handwriting on

20   this page?

21        A.    I don't.

22        Q.    Now, moving to the next page, this is the

23   certificate of death, do you see that?

24        A.    Death certificate, yes.

25        Q.    Normally called the death certificate?
```

```
 1        A.    Yes.

 2        Q.    A portion of this has not been filled out, but

 3   at the bottom, do you see the name Erik Mitchell?

 4        A.    Are you talking about the -- yes.  Are you

 5   talking about --

 6        Q.    The certifier?

 7        A.    -- 26, name and address of certifier?

 8        Q.    Yeah.

 9        A.    Okay.

10        Q.    Going to, I guess it's entry 25, is that Erik

11   Mitchell's signature?

12        A.    Those are his initials, yes.  That's the way

13   he usually signs things, EKM.

14        Q.    Okay.  And if you go to the bottom, it says

15   Homicide, that's in the Cause, 30(A)?

16        A.    Yes.

17        Q.    And it says the date and hour of injury are

18   unknown; is that right?

19        A.    It says -- under date of injury, it says

20   March, under day it says UNK, standing for unknown, year

21   '87.

22        Q.    Right.  And hour is also unknown?

23        A.    Hour of injury, unknown.

24        Q.    Did you review this certificate of death

25   during your reinvestigation?
```

```
 1       A.    I'm sure I read it.

 2       Q.    Do you know if there's a more complete

 3  certificate of death with all of the rest of the pieces

 4  filled out possibly at a later date?

 5       A.    I do not know that.

 6       Q.    Moving on to the next page, the certificate of

 7  identification, do you recognize any of the handwriting

 8  on this page?

 9       A.    Looking at the bottom there, I don't know if

10  that's EKM or not, so I would have to say I don't -- I

11  can't say that.

12       Q.    The next page is Release of Deceased, which

13  isn't really relevant.  And the last one is a document

14  that says Onondaga County Medical Examiner's Office.  Do

15  you see that?

16       A.    Yes.

17       Q.    And it says:  I received the body of Valerie

18  Hill, April 1st, 1987 at 9:52 a.m.  Do you see that?

19       A.    I do.

20       Q.    And it says that -- is that William Walls'

21  signature?

22       A.    I think that's the same guy, William Welch.

23       Q.    I thought you said Walls before?

24       A.    Did I?

25              MR. VENTRONE:  Two different.
```

52

```
1       A.      I thought Walls was somebody else.

2       Q.      Well, just going back to the other similar

3  signature on the --

4       A.      Chip Walls is the toxicologist.  This is

5  William Welch.  If you remember, that's the guy whose

6  name I said sounded familiar but I just can't place him.

7       Q.      Okay.  Does looking at this document refresh

8  your recollection as to who he is?

9       A.      No.

10              MR. RICKNER:  Is this a good time to take

11              five?

12              MR. JULIAN:  Sure.

13              (Off record:  11:02 a.m. to 11:12 a.m.)

14  BY MR. RICKNER:

15       Q.      Now, following the grand jury indictment, did

16  you have any conversations with Dr. Miller about the

17  murder of Valerie Hill and his work on the autopsy?

18              MR. VENTRONE:  Dr. Mitchell?

19       A.      Dr. Mitchell.

20       Q.      Thank you.

21       A.      None that I recall.  Forgive me, it's a period

22  of time ago, but my normal practice would be prep a

23  witness for grand jury to a lesser extent than I would

24  prep them for trial.  I don't remember having any

25  conversation with Erik Mitchell at all regarding this
```

```
 1   case, but I know that I spoke to him before grand jury,

 2   and I know that I spoke to him before trial, more

 3   extensively before trial.

 4        Q.    And about how much before trial do you believe

 5   that you spoke to him?

 6        A.    It would have been somewhere around a week, a

 7   couple of days, somewhere in that vicinity.

 8        Q.    Okay.  Now, do you remember during trial some

 9   slides of the brain coming up?

10        A.    Here's my recollection:  During the trial,

11   Calle, defense counsel, was cross-examining Dr. Mitchell

12   regarding the time of death and suggesting that it wasn't

13   Friday night, giving reasons why.  Dr. Mitchell was

14   responding to those, and then really for the first time

15   mentioned slides of the brain having cavities as a result

16   of putrefaction, and he mentioned Dr. Collins.  And then

17   I think I mentioned it briefly on redirect.  Prior to

18   that, I don't recall any mention of slides.

19        Q.    I guess that's not exactly my question.

20        A.    Sorry.

21        Q.    But just to be clear, you do remember him

22   mentioning slides of the brain?

23        A.    Yes.

24        Q.    Okay.  Now, what did you understand that to

25   mean, the slides themselves?
```

```
 1        A.    A little old fashion, but back in the '90s,

 2   '80s and '90s, you take Kodachrome slides, little things

 3   that are a little bigger than a postage stamp, and I

 4   would usually review those with the medical examiner

 5   before grand jury and before trial.

 6        Q.    Okay.  And just to be clear, the slides you're

 7   talking about are essentially 35-millimeter film that's

 8   been mounted in a square or cardboard case --

 9        A.    Yes.

10        Q.    -- that can be put on a projector?

11        A.    Yes.

12        Q.    I'm older than you think I am.

13              Now, these were slides of photographs that

14   were taken during the autopsy?

15        A.    That's my understanding.  As I said, it was

16   not something that I used in my trial preparation.   I

17   didn't really make reference to them until it came up

18   during the cross.

19        Q.    Just to be clear, would it have been your

20   practice to go through the photographs of the autopsy as

21   part of your trial preparation with the medical examiner?

22        A.    Yes.

23        Q.    Okay.  And the slides are not -- they're just

24   a different way of showing a photo, they're not, like, a

25   microscopic slide?
```

55

```
 1      A.      Correct.

 2      Q.      Okay.  Why would you refer to them as slides

 3   instead of photos?

 4      A.      Because they were slides.

 5      Q.      Okay.  Did you ever -- withdrawn.

 6              To your knowledge, did Dr. Mitchell ever look

 7   at any microscopic slides, meaning material that's

 8   mounted under two very thin pieces of glass?

 9      A.      I'm certain he did, only because -- and my

10   certainty is based on having done dozens and dozens of

11   cases with him.  I do not recall if he discussed that

12   with me in this particular case, so I do not actually

13   know if he looked at microscopic slides.  I'd be shocked

14   if he did not.

15      Q.      Okay.  For clarity, as you sit here today, you

16   don't know whether or not Dr. Mitchell looked at any

17   microscopic slides, meaning material held between two

18   pieces of glass, as part of his preparation for trial in

19   the Hector Rivas matter?

20      A.      That's correct, I do not know.

21      Q.      Okay.

22              MR. RICKNER:  I guess we're up to

23              Exhibit 4.

24              (Exhibit 4 marked for identification.)

25
```

```
 1    BY MR. RICKNER:

 2         Q.    Do you have the marked copy?

 3               MR. JULIAN:   He does.

 4         Q.    Okay.   This is an e-mail with two attachments.

 5    Do you know if these are the slides that Dr. Mitchell was

 6    referring to?

 7         A.    I do not, know.

 8         Q.    Okay.   That's okay.   And was it your

 9    understanding of Dr. Mitchell's testimony that reviewing

10    these slides of the brain is what caused him to push the

11    date of death out into March 27th?

12         A.    No, absolutely not.   It just solidified his

13    position that she could have died Friday, Saturday, or on

14    the outside early Sunday.

15         Q.    And did you -- prior to trial, did you discuss

16    with Mr. Mitchell how his -- the evidence he reviewed

17    influenced the time of death and his determination

18    thereof?

19         A.    I'm sure I did.

20         Q.    Do you remember his description of how the

21    evidence he reviewed influenced his time of death, his

22    estimation of the time of death?

23         A.    Do I remember what he said to me?

24         Q.    Yeah.

25         A.    No.
```

57

1      Q.    Okay.  About how long would you have spent

2  preparing him for trial?

3      A.    Probably less than an hour.  Somewhere between

4  forty-five minutes and an hour.

5      Q.    Okay.  Now, did you seek any alternate

6  opinions or information from other medical experts to

7  determine whether or not what Dr. Mitchell was telling

8  you was credible?

9      A.    No.

10     Q.    Just one second.  I'm moving to a new section.

11           Now, at some point in 1993, your office,

12  meaning the District Attorney's Office for Onondaga

13  County -- actually, let's clean this up a bit.

14           How do you refer to your own office?

15     A.    The office.

16     Q.    Seriously, how do you call it?

17     A.    I call it my family.  I don't know what you

18  mean by that.

19     Q.    I mean, do you call it the Onondaga County

20  District Attorney's Office, the Office of the District

21  Attorney?

22     A.    I call it the DA's office.

23     Q.    Okay.

24     A.    I don't care what you call it.

25               MR. VENTRONE:  I think we all do.

58

```
 1        Q.    Now, your office, the DA's office,

 2    investigated Dr. Erik Mitchell in mid 1993; is that

 3    correct?

 4        A.    Yes.

 5        Q.    Okay.  What initially caused you to start that

 6    investigation?

 7        A.    You know, I've been asking myself that

 8    question in anticipation of you asking, and as best I

 9    recall, it was a complaint from a family member who felt

10    that their relative might not have been buried with quite

11    everything that he should have been buried with.

12        Q.    Okay.  And when did you get this complaint?

13        A.    I want to say July, August, approximately.

14    I've looked for records of that.  If I had them, I turned

15    them over to Counsel who would have turned them over to

16    you.  So just from memory, I know it was July or August.

17        Q.    Okay.  And is Peter Tynan still alive?

18        A.    Yes.

19        Q.    Does he still work for you?

20        A.    No.

21        Q.    Okay.

22        A.    He retired a number of years ago.

23        Q.    Do you know where he lives?

24        A.    Yeah.

25        Q.    Okay.  Is it this state?
```

```
 1      A.    Yes.

 2                  MR. JULIAN:  I think we gave it to you.

 3      A.    I got his cell phone number.  I'll give it to

 4    you.

 5      Q.    Yeah.  We can leave it open on the record for

 6    that.

 7                  MR. JULIAN:  It's in the 26 --

 8                  MR. RICKNER:  Okay.

 9                  MR. JULIAN:  -- whatever it is,

10            amended --

11                  MR. RICKNER:  All right.

12                  MR. VENTRONE:  I saw it.  You did.

13                  MR. RICKNER:  Mark this as Exhibit 4.

14                  THE REPORTER:  5.

15                  MR. RICKNER:  5.  Thank you.

16                  (Exhibit 5 marked for identification.)

17    BY MR. RICKNER:

18      Q.    Do you recognize what's marked as Exhibit 5?

19      A.    Yes.

20      Q.    What is it?

21      A.    It's a memorandum from Chief Investigator

22    Peter Tynan to me, dated November 16th, '93, regarding an

23    investigation of an incident that occurred at the medical

24    examiner's office.

25      Q.    Okay.  Now, the first section is the Woodard
```

```
 1    Photo.  Do you see that?

 2         A.    Yes.

 3         Q.    Now, do you recall how your office discovered

 4    that this photograph had been taken of Dennis Woodard?

 5         A.    I don't specifically know.  There were news

 6    articles.  It might have been from -- I don't remember.

 7         Q.    Okay.  And going to Section B, which is on

 8    page five, there is the Houston Photo?

 9         A.    Houston.  Okay.

10         Q.    Now, do you know how the Houston Photo first

11    came to light?  This is the photograph, I guess, of

12    horseplay by Alexis Houston involving a corpse, a dead

13    body?

14         A.    I'm reading this.  It's not ringing a bell.  I

15    don't remember how it came to our attention.

16         Q.    The DEC investigation --

17         A.    Yes.

18         Q.    -- and this is -- involved illegally-stored

19    mercury, flushing of body parts, and the disposal of

20    water used to boil bodies.  Do you see that?

21         A.    Yes.

22         Q.    When did you first learn that there was

23    concerns about the medical examiner's office illegally

24    storing mercury, flushing body parts, or improperly

25    disposing its water?
```

1          A.     I that there were news reports about this

2     prior to my taking office, but I can't be sure.

3          Q.     Okay.  And there's also a New York State

4     Health Department investigation, page seven?

5          A.     Yes.

6          Q.     Regarding the improper collection of skeletal

7     remains/body parts, donation of body parts to a facility

8     that is not a licensed research center, donation of body

9     parts to Upstate Medical, and apparently et al, even

10    more.  Do you see that?

11         A.     Right.  Page seven, right.

12         Q.     When did you become aware of these allegations

13    that were being investigated by the New York State

14    Department of Health?

15         A.     I remember speaking to Dennis Griffin, who is

16    referenced, and I don't remember -- again, I don't

17    remember when I first spoke to Mr. Griffin.

18         Q.     Could you sort of ballpark the time?

19         A.     No.

20         Q.     Do you think it would be before you took

21    office, right after you took office, before your

22    investigation, or something else?

23         A.     Best of my memory, it would have been

24    contemporaneous with this memo, sometime in -- well, not

25    contemporaneous with memo, but sometime in July.

```
 1       Q.    Now, set this aside for a second.

 2                   MR. RICKNER:  Mark this as Exhibit 6.

 3                   (Exhibit 6 marked for identification.)

 4    BY MR. RICKNER:

 5       Q.    Now, do you recognize Exhibit 6?  Oh, you know

 6    what?  I went too fast.

 7       A.    I recognize it as a memo to me from Chief

 8    Investigator Pete Tynan, dated November 19th, 1993,

 9    referencing as the subject the Onondaga County Medical

10    Examiner's Office.

11       Q.    Now, besides Chief Investigator Peter Tynan,

12    did anybody else work on the investigation from your

13    office?

14       A.    Not that I recall.

15       Q.    Okay.  Did you perform any of the

16    investigation or interviews with respect to this

17    investigation?

18       A.    No.

19       Q.    Besides Exhibit 5 that was provided earlier

20    and this Exhibit 6, did you get any other information

21    regarding this investigation, to your knowledge?

22       A.    I may have been verbally apprised of certain

23    things.  If there was a written document, it would have

24    been provided.

25       Q.    Okay.
```

```
 1                    MR. RICKNER:  I'll move on to Exhibit 7.

 2                    (Exhibit 7 marked for identification.)

 3    BY MR. RICKNER:

 4         Q.    Do you recognize Exhibit 7?

 5         A.    I do.

 6         Q.    Okay.  What is Exhibit 7?

 7         A.    A press release regarding, I believe, the

 8    investigation and eventual resignation of Dr. Mitchell.

 9         Q.    Now, did you author this press release?

10         A.    I usually write my own.  It certainly -- as

11    I'm reading it, it's consistent with my style of writing.

12         Q.    Okay.  So to be clear, when you read this, it

13    reads like your own writing?

14         A.    Yeah.  Just in the maybe thirty seconds that

15    I've had to look at it, it certainly does appear to be

16    written by me.

17         Q.    Okay.  Take a minute and read the whole thing,

18    because I do want to make sure that this is your

19    statement and that you're familiar with it?

20         A.    If it went out, it's my statement.

21         Q.    Okay.  So even if somebody else may have

22    provided edits, you adopt this as your own statement?

23         A.    Yes.

24         Q.    Okay.  Now, in Section 1, it says:  This probe

25    was conducted as fairly and as professionally as I know
```

1   how.  Dr. Mitchell was completely cooperative and

2   answered all questions put to him by me in the presence

3   of his attorney.  Do you see that?

4       A.   Yes.

5       Q.   Did you personally interview Dr. Mitchell with

6   respect to this investigation?

7       A.   Yes.

8       Q.   And how did you record the fruits of that

9   interview?

10      A.   I don't recall.

11      Q.   Would it have been your practice to take

12  notes?

13      A.   I can't answer that question, because this

14  was, you know, a year into my administration or it's

15  almost two years into my administration.  It's kind of a

16  unique situation.  So I don't know if I had developed a

17  practice at that point.  I would have memorialized it

18  somehow.

19      Q.   When you say memorialized it, you mean you

20  would have written up a memorandum or something else?

21      A.   Yeah, taken an affidavit, tape recorded it,

22  videotaped it, taken notes.  I just don't remember how I

23  did that.

24      Q.   Okay.  Do you have any reason to believe that

25  that memorialization would not still be available to you

1    somewhere?

2        A.    If I did take notes, if I did take an

3    affidavit, I have no reason not to provide that to you.

4        Q.    I'm not saying that you've done anything wrong

5    here.  I'm just wondering --

6        A.    Yes, you certainly are saying I did something

7    wrong.

8        Q.    I just want to know if you know whether or not

9    there's any reason why it wouldn't still be available?

10       A.    I do not know.

11       Q.    Okay.  And do you know what efforts were taken

12    to try to collect that information?

13       A.    My executive assistant spent hours and hours

14    looking for documents that have been provided to

15    Mr. Julian and you.

16       Q.    Now, from July of 1993 -- withdrawn.

17             Just to be clear, what date did Dr. Mitchell

18    actually resign?

19       A.    Well, I don't know.  It had to be sometime

20    close to November the 19th or --

21       Q.    Okay.

22       A.    -- shortly before.  You got to have that

23    information somewhere, right?

24             MR. JULIAN:  Yeah.

25       Q.    I do.  Between July of 1993 and November 1993,

1    do you know if Dr. Mitchell ever testified as a witness

2    for the prosecution?

3        A.    I do not, no.

4        Q.    Do you know if you ever disclosed the fact

5    that this investigation was ongoing to a defense

6    attorney?

7        A.    I don't know if he testified.  If he had

8    testified, the defense attorney would have to live in

9    Siberia not to know that something was happening with

10   Dr. Mitchell.  Did we specifically advise him?  I don't

11   recall.

12       Q.    Would it have been your practice to advise the

13   district attorney of an ongoing investigation regarding

14   Dr. Mitchell if he was one of your witnesses at trial?

15       A.    You mean defense counsel?

16       Q.    Yeah.

17       A.    Sure.

18       Q.    And just to be clear, you just don't remember

19   whether or not you had to do it here?

20       A.    Correct.

21       Q.    Okay.  I'd like you to turn to page three?

22       A.    Got it.

23       Q.    This is at the bottom, it starts on Thursday,

24   November 18th.  Do you see that?

25       A.    I'm just reading it.  Yes, I see it.

```
 1        Q.    Okay.  Now, there's a statement from you.  It

 2   says, about your concern, quote, that trial juries in

 3   this county could very well begin to focus on the issues

 4   surrounding Erik Mitchell and by distracted from their

 5   task of deciding guilt or innocence.  Do you see that?

 6        A.    Yes.

 7        Q.    What did you mean by that?

 8        A.    Well, at this point, prior to the previous

 9   news reports about Dr. Mitchell, the investigation was

10   beginning to intrude into possible criminal prosecution.

11   Illegally harvesting body parts, that would have been a

12   violation of Public Health Law.  If the investigation

13   continued and we discovered that and we discovered

14   sufficient evidence with which to charge Dr. Mitchell,

15   obviously that would follow him for the rest of his

16   career, and he would be cross-examined, isn't it a fact

17   that you're a convicted criminal, or something like that.

18        Q.    Did your investigation into, you know, the

19   criminal charges that you just mentioned continue after

20   his resignation?

21        A.    No.  It was satisfied by his resignation.

22        Q.    Okay.  And so if I'm understanding this

23   correctly, the investigation into criminally harvesting

24   body parts stopped because he quit?

25        A.    Correct.
```

```
 1        Q.     Okay.  Was that an agreement between you,

 2    Mr. Mitchell, and/or his attorney, I believe

 3    Mr. Cominsky?

 4        A.     Yes.

 5        Q.     Okay.  When did you reach that agreement?

 6        A.     It would have been the day of his resignation.

 7        Q.     Did you have --

 8        A.     Can I back up for a second?  I'm sorry.

 9        Q.     Please do.

10        A.     I just want to be clear in my mind, because

11    the meeting that we had with County Executive Pirro,

12    Mr. Cominsky, Dr. Mitchell, and I believe Pete Tynan was

13    there, there may have been some other staff members for

14    the county exec there, I don't recall it being my walking

15    in and saying I demand your resignation.  It was I

16    confirmed where my office was going to be going with the

17    county executive in front of Mr. Mitchell, Dr. Mitchell,

18    and his attorney.  And at that point, Dr. Mitchell said

19    that he would resign.  And then I confirmed with

20    Mr. Cominsky that, okay, this is the end of it.

21        Q.     Okay.

22        A.     I don't want to split hairs with you, but I

23    think that -- that's my best recollection of how it

24    happened.

25        Q.     So to be clear, your recollection is that
```

```
 1   Dr. Mitchell offered to resign, and you said okay, in

 2   response, I will drop the investigation?

 3       A.    Yeah.  I probably said that privately to

 4   Mr. Cominsky.  I would have confirmed it with him

 5   somehow.

 6       Q.    Okay.  And was this agreement ever reduced to

 7   writing?

 8       A.    If it wasn't, it should have been, but I don't

 9   remember.  Sid and I have a good relationship.  He

10   probably took my word for it.

11       Q.    Now, going back for a moment, when did you

12   first start working with Dr. Mitchell?

13       A.    Let's see.  Do you have a notation as to when

14   he was hired or when he took office?

15       Q.    No.  I don't get to take his deposition until

16   next week.

17       A.    Oh.  I just thought you might have had it on

18   some other document --

19       Q.    I don't think I actually have his personnel

20   file, to be clear.

21       A.    I don't remember the first case I worked with

22   him on, but there were many, many cases when I

23   was -- when I left the office, I was the chief homicide

24   prosecutor, so from '83 -- actually, a little before '83,

25   but '83 to '86 all I did was homicide cases.  And
```

```
 1    whenever he started, I would have been working with him

 2    extensively, had about twenty murders a year in Onondaga

 3    County back then.  And then I actually consulted with him

 4    when I was a defense lawyer on one rather high profile

 5    case that I remember, may have been more.

 6         Q.    Now, going back, so at a certain point, you

 7    became chief of homicides or some other similar title?

 8         A.    Chief of the homicide bureau, yes.

 9         Q.    Okay.  You became chief of the homicide

10    bureau.  And that was in 1983?

11         A.    Correct.

12         Q.    Is that about the time that Dr. Mitchell

13    started working for Onondaga County as the chief medical

14    examiner?

15         A.    It sounds about right.  I mean, Dr. Martin

16    Hilfinger was before him.  I worked a lot of cases with

17    Dr. Hilfinger.  It sounds right.  Could have been '82,

18    could have been '84, but it sounds about right.

19         Q.    And you said there were about twenty homicides

20    a year in Onondaga County back then?

21         A.    Yes.

22         Q.    About how many would result in criminal

23    prosecutions?

24         A.    We had a pretty good solve rate, so, you know,

25    fifteen.
```

```
 1       Q.    That is a good solve rate.

 2             And out of those fifteen cases, when you were

 3   the head of the homicide bureau, how many would you

 4   actually have worked on yourself, like as part of the

 5   trial team?

 6       A.    Just an estimate, about half.

 7       Q.    Okay.  So putting it together, you know,

 8   between '83 and '86, you probably worked on somewhere

 9   between twenty and twenty-five homicide cases in

10   Onondaga?

11       A.    Well, I would work on all of them, but your

12   question, I think, is me personally prosecuting a case.

13   In other words, if I delegated it to an assistant DA, I

14   would be hands-on and say what are you doing, you know,

15   but that person would be responsible for grand jury and

16   trial.

17       Q.    Right.

18       A.    But you're asking me exclusive jurisdiction

19   over the case, your numbers sound about right.

20       Q.    Okay.  And in those cases, how often was

21   Dr. Mitchell one of the expert witnesses?

22       A.    At least two-thirds of the time.  I mean, I

23   know he had assistants, but he did most of the homicides

24   himself.

25       Q.    Okay.  So just in your time in the homicide
```

1    bureau, would it be fair to say you put Dr. Mitchell on

2    the stand fifteen or eighteen times for his expertise?

3        A.    Sure.   That -- at least that number, yeah.

4        Q.    Okay.   Is the medical examiner's office in

5    Onondaga County an independent body, meaning that they're

6    supposed to make their own independent choices free of

7    influence from any other group in the county?

8        A.    No, they're responsible to the County

9    Executive.

10       Q.    Okay.   And when you say that the medical

11   examiner's office is responsible to the county executive,

12   what does that mean?

13       A.    Budgetary purposes, hiring and firing, I mean,

14   the individual service at the pleasure of the county

15   executive.

16       Q.    That's actually not what I'm talking about.   I

17   mean with respect to the decision-making power.   Is the

18   medical examiner expected to exercise

19   independent -- that's a poor way of phrasing that one.

20   Let me start over.

21            Would it be correct to say that the medical

22   examiner in Onondaga County was expected to exercise

23   their independent judgment with respect to their

24   determinations free of any influence from any other

25   political body in the county?

```
 1        A.      I think that's fair to say.  The DA's office

 2   has certain statutory authority over the medical

 3   examiner, such as we can order an exhumation or an

 4   autopsy, and by statute we are entitled to review any

 5   records without subpoena at the medical examiner's

 6   office.  But in terms of independence, yes --

 7        Q.      Right.

 8        A.      -- a competent professional, a board certified

 9   forensic pathologist should come to his or her own

10   conclusions regarding cause and manner of death.

11        Q.      Okay.  And would it be correct to say that the

12   chief medical examiner for Onondaga County would be sort

13   of the final determination with respect to things like

14   autopsies, time of death, and investigations into

15   homicides?

16        A.      No.  The final buck stops right here.  The DA

17   has the final determination.  I've had a number of cases

18   that have been ruled accident and people are serving life

19   sentences.

20        Q.      So if I'm understanding you correctly, that

21   your office would override the determinations of the

22   medical examiner's office when they deemed it fit?

23              MR. JULIAN:  Object to the form of the

24              question.  You can answer it.

25        A.      I mean, I can give you an example that might
```

```
 1    help clarify.  Steven Vandersluys, V-A-N-D-E-R-S-L-U-Y-S,

 2    first name Steven with a V, killed three of his children

 3    over the course of many years, and each child's death

 4    certificate listed the cause of death as Sudden Infant

 5    Death Syndrome.  That did not deter me from prosecuting

 6    Steven Vandersluys, who is still in state prison.  That's

 7    just one example.

 8         Q.    Okay.  And when you would perform -- let's say

 9    the prosecution of Steven Vandersluys, you needed to

10    establish that it wasn't an accident, right?

11         A.    That it wasn't SIDS.

12         Q.    Yes.

13         A.    Right.

14         Q.    Okay.  Did you hire your own expert to do

15    that?

16         A.    In that case, I did.  First of all, the

17    autopsies were not done by Dr. Mitchell, so I had

18    Dr. Mitchell, and I reached out to someone who had a

19    national reputation in pediatric pathology.

20         Q.    Right.  But let me phrase this a little

21    differently.

22               Was there ever an instance when, for example,

23    the medical examiner, whether Dr. Mitchell or someone

24    else, made a determination that it was an accident, and

25    your office called them and said this isn't an accident,
```

```
 1   we need this marked as a homicide?

 2                  MR. VENTRONE:  Object to the form.

 3       A.    I wouldn't put it that way.  I think you're

 4   probably referring to Dr. Neulander, that was originally

 5   determined to be an accident by Dr. Stoppacher.  With all

 6   due respect to Dr. Stoppacher, who in my opinion is a

 7   very, very competent forensic pathologist, his

 8   investigation was minimal.  He did not take into account

 9   a number of other forensic factors aside from the wound

10   to the victim, and after many, many months of

11   investigation, Dr. Stoppacher changed his opinion that

12   the victim in that case was -- the death was as a result

13   of a homicide, a blow to the head.

14                  MR. JULIAN:  I objected to the form of

15              that question but I couldn't get it out.  I

16              apologize.

17                  MR. RICKNER:  That's fine.  So noted.

18       Q.    I'm going to talk about that process, though.

19   Would it be correct to say that the medical examiner may

20   reexamine the evidence and come to a different conclusion

21   in certain cases?

22       A.    It happens all the time.

23       Q.    Okay.  But would you agree with me that that's

24   different from your office telling the medical examiner

25   that they have to change their opinion?
```

```
 1        A.    I would never do that.  I have never done

 2   that.

 3        Q.    I didn't think you did.  I'm just trying to

 4   establish sort of the lines of control here.

 5              So to understand the relationship between the

 6   DA and the medical examiner's office, would it be correct

 7   to say that the medical examiner's office exercises

 8   independent judgment, but sometimes the district

 9   attorney's office would request that they do further

10   examination or make a different determination?

11        A.    What you just said is very fair.

12        Q.    Okay.  Thank you.

13              MR. RICKNER:  This actually may be a good

14              time for -- can we go off the record for a

15              second?

16              MR. JULIAN:  Yes.  Sure.

17              (Off record:  11:50 a.m. to 12:11 p.m.)

18   BY MR. RICKNER:

19        Q.    Now, would it be correct to say that at some

20   point, there started to emerge a series of newspaper

21   articles criticizing Dr. Mitchell for various practices

22   in his office?

23        A.    Yes.

24        Q.    Okay.  When do you first remember seeing

25   newspaper articles criticizing Dr. Mitchell?
```

1      A.     It would have been sometime before I took

2    office and after I had left the DA's office.

3      Q.     So maybe 1992?

4      A.     No.  It would have been before I took office.

5      Q.     Oh, you mean so 1991?

6      A.     '90, '91, somewhere around there.  It had

7    to -- yeah.

8      Q.     And did you make it your practice to follow

9    newspaper articles regarding Dr. Mitchell particularly

10   after you took office?

11     A.     Yeah.  If there was an article concerning

12   Dr. Mitchell, I would make myself aware of it.

13     Q.     Let's just say from when you took office

14   through May, were there any trials where you used

15   Dr. Mitchell as a witness for his expertise?

16     A.     I don't recall.  I did not.

17     Q.     You did not?

18     A.     Right.

19     Q.     Okay.  Do you know if anybody else in your

20   office did?

21     A.     I don't know.  The homicide prosecutors at

22   that time were Glenn Suddaby and Steve Dougherty, but if

23   they tried a case that soon in my administration, I don't

24   recall.

25     Q.     Okay.  And why was it that you were keeping

1    track of the newspaper articles regarding Dr. Mitchell?

2        A.    Well, for obvious reasons.  They wanted to

3    know if he was doing his job, if any of the articles had

4    anything to do with his credibility or his competence or

5    his expertise.

6        Q.    Okay.  After you took office, let's say in the

7    first four or five months, was there any time that you

8    were worried that the newspaper articles might influence

9    a jury or result in cross-examination?

10       A.    No.

11       Q.    Was there a time, let's say between when you

12   took office and the first couple of months afterwards,

13   where you ever disclosed newspaper articles as part of

14   either your Brady/Giglio or Rosario obligations?

15       A.    No.

16       Q.    Why not?

17       A.    I don't believe they constituted Giglio or

18   Brady material.

19       Q.    Okay.  Why do you say that?

20       A.    As I recall, the allegations was people, not

21   necessarily Dr. Mitchell himself, but people under his

22   employ that were illegally -- allegedly illegally

23   disposing of human tissue samples, and there were

24   articles that I recall about a -- the best way to

25   describe it would be a forensic examination setup that he

```
 1    had where bones were buried, and investigators were to

 2    come out to the scene in an attempt to exhume the body

 3    and examine the scene and make determinations.  None of

 4    that has, in my judgment -- it might be salacious, it

 5    might be bad management, but it doesn't have anything to

 6    do with his credibility.

 7        Q.    Okay.  And would you agree with me when a

 8    medical examiner testifies, that there's a certain

 9    impression to the jury they have an organized medical

10    office that's doing competent work?

11        A.    No.  I wouldn't -- I mean, we would hope, but

12    I don't make assumptions that juries think everybody who

13    testifies is competent.

14        Q.    At any point did you ever worry that if

15    Dr. -- withdrawn.

16              At any point did you ever worry that if

17    allegations came out that Dr. Mitchell was improperly

18    storing body parts or improperly disposing of them, that

19    that would lead a jury to believe that he may not have

20    been performing other parts of his job adequately?

21        A.    I think --

22              MR. JULIAN:  Object to the form of the

23              question.  You may answer.

24              THE WITNESS:  Thank you.

25        A.    I think that would describe my mindset in
```

80

```
 1    November of '93.

 2        Q.    Okay.  So let's go -- so in November of '93,

 3    it was your worry that if a jury found out, for example,

 4    that Dr. Mitchell was improperly disposing of body parts,

 5    that would lead them to conclude that he may have been

 6    performing other parts of his job inadequately?

 7        A.    I don't know that I would be that specific.

 8    My concern was that if Dr. Mitchell was charged with a

 9    crime, it would affect a jury's impression of him.

10        Q.    Okay.  Taking the crime out of it, were you

11    ever concerned that the fact that Dr. Mitchell was

12    accused of improperly storing body parts would lead a

13    jury to conclude that he wasn't doing other parts of his

14    job correctly?

15        A.    No.

16              MR. JULIAN:  Object to the form of the

17              question.

18              MR. VENTRONE:  Object to the form.

19        Q.    Did you have any concerns that Defense Counsel

20    would take the various newspaper articles and

21    cross-examine Dr. Mitchell with them at trial?

22              MR. JULIAN:  Form.

23        A.    No.  No.  You asked me about his -- was that a

24    concern of mine?  No.

25        Q.    Okay.
```

```
 1       A.    No.

 2       Q.    Did any Defense Counsel ever try to

 3  cross-examine Dr. Mitchell using newspaper articles or

 4  the allegations?

 5       A.    I do not know.  Not in cases I had.

 6       Q.    Okay.  Did you ever consider going to a judge

 7  in advance and making a motion in limine trying to

 8  exclude that line of questioning?

 9       A.    I did not.

10             MR. JULIAN:  Form.

11       A.    I did not.  I don't know of whether assistants

12  did.

13       Q.    Okay.  Did you ever see any defense counsel

14  appear in court with a stack of newspaper articles

15  regarding Dr. Mitchell?

16       A.    I don't recall.

17       Q.    Okay.  If you had seen defense counsel

18  employing that strategy, let's say around March of 1993,

19  what would you have done have?

20             MR. JULIAN:  Form.

21       A.    Purely hypothetically, depending on my

22  relationship with the defense counsel, I may have said

23  what's that.  And if it was something I thought was

24  improper, I would object at the appropriate time.

25             MR. RICKNER:  This is Exhibit 8.
```

```
 1                    (Exhibit 8 marked for identification.)

 2     BY MR. RICKNER:

 3          Q.    Have you had a chance to review Exhibit 8?

 4          A.    Yes.  I'm sorry.  I didn't know you wanted me

 5     to read this.

 6          Q.    I thought you sort of were.  You looked like

 7     you were --

 8          A.    Yeah, I was.

 9          Q.    Just to go to the front page of Exhibit 8 in

10     the top right, it's a photocopy of a photograph --

11          A.    Yes.

12          Q.    -- from a newspaper article?

13          A.    Yes.

14          Q.    And on the right, meaning the right side of

15     the photograph, that's Dr. Mitchell in glasses?

16          A.    That certainly is, yes.

17          Q.    Okay.  And skipping over the person whose face

18     is partially covered with a hand, on the left side of the

19     photograph is that you?

20          A.    Yes.

21          Q.    Okay.  And I believe you mentioned earlier

22     this refreshed your recollection that you attended a

23     press conference with Dr. Mitchell?

24          A.    Actually, it doesn't refresh my memory.  I

25     don't remember this at all.  But obviously, I'm there.
```

 1    I'm reading it.  I don't think I'm quoted here.  I don't

 2    think I spoke at this thing, but obviously, I'm there.

 3    So I'll answer whatever I can.

 4         Q.    Okay.  Do you have any reason to believe that

 5    you weren't at a press conference in March of 1993?

 6         A.    Come on.  I was there.  I'm standing next to

 7    the guy.

 8         Q.    Okay.

 9         A.    I just don't remember it.

10         Q.    Okay.

11         A.    I -- honestly.

12         Q.    Now, based on the article, this press

13    conference was called by Dr. Mitchell following a series

14    of allegations that had been made against him?

15         A.    Yes.

16         Q.    Okay.

17               MR. RICKNER:  Now, I'd like to mark this

18               as Exhibit 9.

19                    (Exhibit 9 marked for identification.)

20         A.    Did you want me to read it --

21         Q.    Yeah, read it over.

22         A.    (Witness complies.)  Good.

23         Q.    Okay.  So first question for Exhibit 9:  Do

24    you recall ever seeing this document before?

25         A.    No.

```
 1        Q.    Okay.  In the initial months, let's say

 2   between the beginning of 1993 and March 3rd, 1993, did

 3   you ever discuss the allegations in Exhibit 9 with

 4   Dr. Mitchell?

 5        A.    I don't remember speaking to him about them.

 6        Q.    Okay.  Were you aware of the allegations in

 7   Exhibit 9 regarding Dr. Mitchell from things like

 8   newspaper articles?

 9        A.    Exactly from newspaper articles and from

10   William Sullivan, who was an investigator in the ME's

11   office, who was then and still is a close friend of mine.

12        Q.    Okay.  What did William Sullivan tell you?

13        A.    He was -- I won't use the language he used.

14   We spoke colloquially.  But it was essentially that

15   Mitchell was a bad manager and wasn't running the office

16   properly.

17        Q.    Okay.  And did Mr. Sullivan, did he provide

18   any writings to anybody that you know of regarding his

19   allegations?

20        A.    He did not to me.  If he did to someone else,

21   I don't have any knowledge of it.

22        Q.    Okay.  Now, with respect to the allegations in

23   Exhibit 9 and the conversation that you had with

24   Mr. Sullivan, did you ever disclose that to Defense

25   Counsel for any reason?
```

```
 1        A.    No.   That he was allegedly a bad manager, I

 2   did not.

 3        Q.    Okay.  And why not?

 4        A.    Why would I?  I don't mean to be flippant.

 5   Why would I?  I disclose things that are -- that have to

 6   do with a person's credibility.  Somebody's opinion that

 7   he's a bad manager -- I have opinions about Dr. Rigle, I

 8   don't disclose those to Defense Counsel if he testified.

 9   It never occurred to me that somebody's opinion that

10   Mitchell is a bad manager is Brady material.

11        Q.    Okay.

12        A.    Erik Mitchell was a brilliant medical

13   examiner, fantastic witness, and a decent guy, and he

14   obviously took umbrage with some of the things that were

15   being said about him.

16        Q.    Going back to 1993, I want to talk about your

17   office's practices regarding these types of disclosures.

18   You are drawing a line between where something impacts

19   somebody's credibility versus something that you wouldn't

20   disclose.  Where do you draw that line?

21               MR. JULIAN:  Object to form.

22               MR. VENTRONE:  Object to the form.

23        A.    That's a tough question to answer.  First of

24   all, the process is different today.

25        Q.    I'm talking about 1993.
```

1      A.    I understand that.  That's why I said the

2  process is different today.  Back then, the disclosures

3  to Defense Counsel regarding Brady would have to do with

4  credibility, misconduct.  If I knew that an expert

5  witness had an affair, I would not disclose that to

6  Defense Counsel even though it may be salacious and

7  fertile grounds for cross-examination in somebody's

8  twisted mind.  But I did not think in 1993 or today that

9  being accused of being a bad manager is Brady material.

10      Q.    Okay.  You said misconduct.  Let me step back

11  for a second, actually.

12           So I think you were drawing the line between

13  allegations of misconduct and findings of misconduct; is

14  that correct?

15                MR. JULIAN:  Form.

16      A.    I don't recall that.

17      Q.    All right.  Well, is an allegation that

18  somebody is dicing up brains and flushing them down the

19  toilet the kind of misconduct you would have disclosed as

20  Brady material?

21                MR. JULIAN:  Form.

22                MR. VENTRONE:  Object to the form.

23      A.    No.

24      Q.    Okay.  And how do you distinguish that from

25  other types of misconduct?

1      A.    Did he lie, did he conceal, did he manipulate

2    evidence, did he change something, did he -- was

3    he -- did he change the time of death to please the

4    district attorney, has he done something that would

5    reflect on his competence, did he lie about his pedigree,

6    his education, his training.

7      Q.    Okay.  And it was your practice in 1993 that

8    if it didn't arise to the level of what you just

9    described, that it wouldn't have been Brady material that

10    is disclosed?

11      A.    Not on cases that I handled, correct.

12      Q.    Okay.  And was that the policy of the office

13    that you set?

14      A.    I did not have initially a specific policy

15    regarding Brady material other than the clear obvious

16    education of assistant DAs, what their obligations were

17    under Brady.  That would be training that at that point

18    would have been done by the now Professor Gary Kelder.

19      Q.    I guess I missed something in there.  Are you

20    saying that you instituted training after 1993 in your

21    office regarding Brady?

22      A.    No.  I don't remember specifically when.

23    Every DA hired today gets a booklet regarding his or her

24    obligations under many, many things, including Brady,

25    something that I instituted statewide.  In addition, they

1    get an office manual.  I did not have those in 1993.

2    When I instituted those, I don't remember.

3        Q.    Okay.  Was it your understanding that what you

4    did was the policy of the office and that other attorneys

5    would follow suit?

6                    MR. JULIAN:  In 1993?

7        Q.    In 1993, of course.

8        A.    No.  I mean, if I did something or did not do

9    something, is that policy of the office?  You know, each

10   lawyer has his or her own procedure, style, manner of

11   dealing with things.  I don't think that I would say that

12   if I did something, that's office policy.  I would expect

13   people to say, well, if he does it, that's the boss,

14   let's try and copy him.

15       Q.    Understood.  Now, at some point there was an

16   investigation into misconduct by Dr. Mitchell in around

17   maybe March of 1993 instituted by the county attorney?

18       A.    If you're asking -- I don't know.  I don't

19   know.

20       Q.    Okay.  Who is Nicholas Pirro?

21       A.    He is the former county executive of Onondaga

22   County.

23       Q.    Okay.  And what years was he in office, to

24   your knowledge?

25       A.    Let's see.  I think -- I know we ran together

 1    in '91, and I think he was an incumbent, so that would

 2    have meant that he would have been in office in '87.

 3         Q.    Okay.  And when did he leave office?

 4         A.    Let's see.  When did Nick retire?  I don't

 5    recall.  '91, '95, '99.  Maybe 2003.  '99 or 2003, one of

 6    those.

 7         Q.    Okay.  And do you know where he is now?

 8         A.    At 11:30, he's probably having lunch.  He

 9    lives in Syracuse.  I saw him the other day.

10         Q.    Okay.  So that's what I'm asking.  You're

11    still in contact with Mr. Pirro?

12         A.    Yeah.

13         Q.    Okay.  And with respect to Dr. Mitchell,

14    when's the last time you spoke to Dr. Mitchell?

15         A.    Wow.

16         Q.    Outside the presence of counsel in the event

17    that happened.

18         A.    It's been years.  I don't remember.

19         Q.    Okay.  Since 2016 have you spoken to

20    Dr. Mitchell?

21         A.    I don't remember.

22         Q.    There was a period of time between reversal of

23    the conviction by the second circuit and Mr. Rivas'

24    death.  In that time period did you ever talk to

25    Dr. Mitchell?

```
 1      A.    No.

 2      Q.    Do you know if anybody at your office did?

 3      A.    I do not know.  It would have been Rob Moran

 4  who was assigned to do the routine on the case until it

 5  came to trial.

 6      Q.    What do you mean by the routine?

 7      A.    You know, bail applications, court

 8  appearances, additional discovery, additional testing of

 9  evidence, which, as you know, was conducted.

10      Q.    Understood.  All right.

11            MR. RICKNER:  We're going to mark this as

12            Exhibit 10.

13            (Exhibit 10 marked for identification.)

14      A.    I've read it.

15      Q.    Okay.  Do you recognize Exhibit 10?

16      A.    No.

17      Q.    Okay.

18      A.    I mean, I know what it is.  Do you want me to

19  put on the record what it is?

20      Q.    Sure.

21      A.    It's a memo to Nick Pirro, the county

22  executive, from Diane Tucker, who I knew to be in the

23  county attorney's office, and it's titled Cooperation

24  with Medical Examiner Investigation.

25      Q.    Okay.  At some point did you become aware of
```

```
 1    the medical examiner investigation by County Executive

 2    Pirro?

 3         A.    I don't have a specific recollection today,

 4    but I'm sure I did.

 5         Q.    Okay.  Do you know if it would have been

 6    before or after the Rivas trial?

 7         A.    I do not know.

 8         Q.    Okay.

 9                   MR. RICKNER:  I'm going to mark this as

10                Exhibit 11.

11                   (Exhibit 11 marked for identification.)

12         A.    Okay.

13         Q.    Looking at this, does this refresh your

14    recollection that you may have been provided an interview

15    in April of 1993 as part of this investigation?

16         A.    No.

17         Q.    Do you know what date Hector Rivas was

18    convicted?

19         A.    No.

20         Q.    Now, just being more general, do you remember

21    providing an interview as part of that investigation by

22    County Attorney -- or County Executive Pirro?

23         A.    No.  I see that I'm listed on Exhibit 11 as

24    being scheduled for an interview on Tuesday, April 13th,

25    1993 at 1:30, but I just don't have any recollection of
```

1    that whatsoever.

2         Q.    Okay.  With respect to Erik Mitchell, did you

3    ever testify in front of the New York State legislature?

4         A.    New York State legislature about him?

5         Q.    Yes.

6         A.    I don't think so.  Do you have evidence to the

7    contrary?  I don't remember.

8         Q.    I'm just checking boxes.

9         A.    Oh.  I can't imagine why I would --

10        Q.    Besides the county executive, do you know if

11   you provided an interview or testimony to any other

12   government group or organization regarding Erik Mitchell?

13        A.    Just the interview we referenced earlier that

14   you -- you had, I think, described it as in front of the

15   county attorney.  It was actually in front of the county

16   leg.

17        Q.    Okay.  So the interviews, you believe that was

18   in front of the county legislature?

19        A.    I thought it was.

20              THE WITNESS:  Wasn't it?

21              MR. JULIAN:  Well --

22        Q.    I'm just going with your memory --

23              MR. JULIAN:  On the record, I told you

24        that I was unsure as to the source, and at

25        some point it was represented that those tapes

```
 1              that you gave me -- that the county gave you

 2              that you gave me were from that -- from the

 3              county legislature.  That may be my mistake.

 4                   MR. RICKNER:  Okay.

 5         A.   So was it the county attorney?  Because I

 6    don't remember.  I listened -- I told you, I listened to

 7    five minutes of it.  I just don't remember it.

 8         Q.   Okay.  I'm just going from your memory.  But

 9    you gave an interview about Erik Mitchell?

10         A.   Yes.

11         Q.   Okay.  And I am going to mark this as

12    Exhibit 12.  Keep one for -- obviously you're not going

13    to be reading this --

14         A.   Right.

15         Q.   -- that wouldn't be possible.  I'm going to

16    represent that the only file on this is titled Tape

17    Six-Fitzpatrick Unknown Date Side A.wav.  That's the

18    file.

19                   MR. JULIAN:  That's the file.

20                   (Exhibit 12 marked for identification.)

21                   MR. RICKNER:  Hopefully everyone can hear

22              this.  I don't know how loud it's going to be.

23                   (Recording played.)

24    BY MR. RICKNER:

25         Q.   Is that your voice?
```

```
 1        A.    Yes.

 2        Q.    Okay.  And did you ever describe Erik Mitchell

 3   as being invaluable in the courtroom?

 4        A.    Is --

 5        Q.    I mean, I'll play it for you.

 6        A.    If it's on the tape, obviously I said it.

 7        Q.    Let's just go back to that.

 8                   (Recording played.)

 9        A.    That refreshes -- well, it doesn't refresh my

10   memory because I don't remember this conversation, but

11   clearly that's my voice and I called him invaluable, and

12   that was true when I said it.

13        Q.    Okay.  All right.  We can move forward a bit.

14   Actually, can you do me a favor?  Go back to Exhibit 11,

15   and unfortunately, it's only first names.  Do you

16   recognize Sam and Jack as being two people involved with

17   the county perhaps?

18        A.    Where are you?

19        Q.    If you look at, like, April 13th, it says Sam

20   available after 3:30?

21        A.    Oh, Sam available.

22        Q.    Like Sam and Jack, do those refresh your

23   recollection as to who those might be?

24        A.    Sam could be Sam Laguzza.  He was a county

25   legislature.  Jack's not ringing a bell.
```

```
 1        Q.     All right.  So I'm going to go to another

 2   portion, it starts at thirteen minutes, exactly

 3   thirteen minutes into the file.  We're going to actually

 4   play this.  It's a little back and forth that goes about

 5   two minutes, but I want you to hear the whole thing.

 6        A.     Okay.

 7                    (Recording played.)

 8                    THE WITNESS:  Can you hear that?

 9   BY MR. RICKNER:

10        Q.     Let's back up a little.  I've heard this a

11   million times, so I don't need to hear it again.  Let's

12   back up, actually, to maybe more like -- so this is

13   starting at 12:29.  I'm going to stick it closer to you

14   so maybe you have a better chance of hearing the speaker,

15   and then we'll move to headphones next.

16                    (Recording played.)

17        Q.     Could you hear what I just played from the

18   recording of your interview?

19        A.     Yeah.  I couldn't hear all the questions

20   perfectly, but I got the gist by my answers of what the

21   question was.

22        Q.     Okay.  So I just want to go back.  Does

23   hearing that refresh your recollection about a time that

24   a defense attorney did show up in court with a bunch of

25   newspaper articles to potentially cross-examine
```

1   Dr. Mitchell?

2       A.    That was in reference to Calle.

3       Q.    So you think that this interview was directly

4   related to Calle's cross-examination of Dr. Mitchell in

5   the Rivas trial?

6       A.    No.  Calle chose not -- as I said on that tape

7   that we just listened to, Calle chose for whatever reason

8   not to go into that.

9       Q.    Okay.  I just -- listening to this

10  recording --

11      A.    Right.

12      Q.    -- you're saying that Calle, during the Rivas

13  trial, showed up with these newspaper articles and chose

14  not to use them, and the reason that you remember that is

15  because of this recording?

16      A.    Yes.

17      Q.    Okay.  Now, of course --

18            MR. JULIAN:  May I object to the form of

19            that?  I apologize.

20            MR. RICKNER:  Well, then, let's ask that

21            again.

22      Q.    You're saying, if I understand this correctly,

23  that listening to this portion of your prior interview

24  sparked a memory that Calle, the defense attorney in

25  Rivas, had shown up to court with newspaper articles

```
 1   about Dr. Mitchell to use in the Rivas trial?

 2        A.    Yes.

 3        Q.    Okay.

 4        A.    No question that I'm referring to Calle.

 5        Q.    Okay.  And do you know when that investigation

 6   ended?

 7        A.    I'm sorry.  Which investigation?

 8        Q.    The county attorney's investigation, do you

 9   know when it was completed?

10        A.    I do not know when it ended.

11        Q.    Okay.

12              MR. RICKNER:  Let's just mark this as

13              Exhibit 13.

14                 (Exhibit 13 marked for identification.)

15        A.    Rob?

16        Q.    Yeah.

17        A.    Looking at this, remember you asked me

18   about --

19        Q.    Yes.  Let's do this the formal way, because I

20   think you're about to say something helpful, but I want

21   to make sure it's clear on the record.  Do you recognize

22   Exhibit 13 as being the Report of the Committee on the

23   Medical Examiner following the County's investigation?

24        A.    Yes.

25        Q.    And you're looking at the signature page?
```

```
1        A.     Yes.

2        Q.     And would it be correct to say that the

3    signature page helped refresh your recollection regarding

4    some of the names that you had seen earlier?

5        A.     Yes.  On Exhibit 11, you asked me about Sam

6    and Jack.  Sam now I feel comfortable saying was Sam

7    Laguzza.  John Mitchell signed this report.  He was

8    commonly addressed as Jack.

9        Q.     Got it.  Gotcha.  Who are these -- let's

10   actually go through.  Diane Tucker, Chief Deputy County

11   Attorney.

12       A.     Right.

13       Q.     What's the chief deputy county attorney?

14       A.     That would be the number one assistant to the

15   county attorney.  I think it was Jon Gerber, J-O-N,

16   Gerber, G-E-R-B-E-R, I believe was the county attorney at

17   this time, but I'm not a hundred percent sure.  Joanna

18   Gozzi is Senior Deputy County Attorney.  I remember

19   Joanna very well.  And Zach Karmen, Chief Welfare

20   Attorney, I didn't know him as well as I know the other

21   two people, but I remember Zach.

22       Q.     Okay.  And John C. Mitchell and Sam Laguzza,

23   that's the Sam and Jack?

24       A.     Yes.  They were both county legislators back

25   then.
```

1      Q.    Okay.  Does this refresh your recollection as

2  to who interviewed you?

3      A.    No.  Am I quoted in the report?  Direct me to

4  that if I can look at it.

5      Q.    Actually, I can.  If you go back, there's a

6  list -- yes, there it is.  If you go to page three, which

7  is partially obscured by the Bates stamp, there's

8  something that says:  The following constitutes the list

9  of interviewees.

10     A.    Right.  And I see I'm mentioned on page five

11  as having been interviewed.

12     Q.    Okay.  And I'm just wondering, in putting this

13  all together, does this refresh your recollection that

14  the interview you provided was part of this

15  investigation?

16     A.    No.  Is there any quotes in here you want to

17  direct me to, or I don't know.

18     Q.    There are no quotes in there whatsoever.

19     A.    I meant references, I should have said.  I

20  just don't remember this, and I apologize.

21     Q.    Okay.

22     A.    I know it exists.  It -- I know it is what it

23  is.  They appear to have interviewed a lot of people,

24  made some conclusions.

25     Q.    Right.  I guess what I'm asking is, put it the

1    other way, do you have any reason to believe that the

2    interview that I played audio of was for anything else

3    but this investigation by the county attorney?

4        A.    I'm sorry.  You're suggesting that that audio

5    is my interview for this.  I -- if I could -- I wish I

6    could hear the voices better, but that could be.  I don't

7    remember.

8        Q.    Well, you know what?  Let's go back to it and

9    play you some -- there's actually in the very beginning

10   more voices.

11       A.    Do I reference anybody, like, do I say like if

12   I'm speaking to you, I would say Rob, or do I say Diane

13   or --

14       Q.    There's sort of some joking parts in the

15   beginning that I'm going to see if maybe that refreshes

16   your recollection.

17       A.    Maybe those help.

18       Q.    No, I think that actually you might be able to

19   hear the voices better than just about anybody else that

20   we had spoken about.  Hold on.  Let me play -- this is

21   actually from the very beginning.

22                    (Recording played.)

23       A.    That sounded very much like Joanna Gozzi.  You

24   know, I think you're right.  I think I would accept that

25   that's my interview by this committee.  I definitely

1    recognize Joanna Gozzi's voice.  She has a very

2    distinctive voice.

3         Q.    Okay.

4         A.    And the other people could easily be Sam,

5    Jack, and Diane.

6                    MR. RICKNER:  I'm going to mark this as

7              Exhibit 14.

8                    (Exhibit 14 marked for identification.)

9         A.    I have Exhibit 14.

10        Q.    Now, leaf through Exhibit 14.  I don't know

11   that you need to read the whole thing, it doesn't seem

12   productive.  And this is a letter from David Rigle to the

13   county executive; is that fair to say?

14        A.    Yes.

15        Q.    All right.  Now, would it be correct to say

16   that, you know, January of 1993 and beforehand, Dr. Rigle

17   had some criticisms of Dr. Mitchell?

18        A.    Sure.

19        Q.    Okay.  And there were multiple different

20   letters, I'll represent to you, that were written to the

21   county executive regarding Erik Mitchell.  Do you recall

22   ever seeing Exhibit 14 before?

23        A.    I do not recall seeing it before.  I may have,

24   but I just don't recall it.

25        Q.    Okay.  Do you recall seeing any other of the

```
 1    letters criticizing Dr. Mitchell that were sent by

 2    various people in his office?

 3         A.    No.

 4         Q.    Okay.  Did you ever discuss Dr. Rigle with

 5    Dr. Mitchell?

 6         A.    Did I discuss?  In the back of my mind, I have

 7    a recollection of -- I don't want to slander the guy, but

 8    I have a recollection of Mitchell telling me that Rigle

 9    showed up at a crime scene drunk, and that it

10    just -- that's about it or something along those lines,

11    and Mitchell got him out of there or something and drove

12    him home.

13         Q.    And we've already discussed Investigator

14    Sullivan, and you were friends at the time, and he

15    expressed some criticism at the way Dr. Mitchell

16    organized his office?

17         A.    Yes.

18         Q.    Did you ever see any writing from Investigator

19    Sullivan to the county attorney or anyone else about

20    that?

21         A.    Not that I recall.

22         Q.    Now, were there any other medical examiners or

23    professionals that you know of that were providing

24    criticism of Dr. Mitchell around this time, early 1993?

25         A.    Other than Rigle and Germaniuk, and who is the
```

 1    other guy, Sawyer -- Sawyer's the toxicologist, right?

 2         Q.    I believe so.

 3         A.    Yeah.  No, I don't remember anybody other than

 4    those three.

 5         Q.    Did you ever -- do you remember talking to

 6    Erik Mitchell regarding Dr. -- how do you pronounce it,

 7    Germaniuk?

 8         A.    Germaniuk.

 9         Q.    Can you spell that for the record?

10         A.    German, G-E-R-M-A-N-I-U-K.

11         Q.    Okay.

12              THE WITNESS:  I believe, Elyse.

13         A.    No, I don't recall talking to Dr. Mitchell

14    about Dr. Germaniuk.

15         Q.    And do you remember talking to Dr. Mitchell

16    about a Dr. or Mr. Sawyer.

17         A.    Very vaguely.  They had negative opinions of

18    each other.

19              THE WITNESS:  Sid, want some water?

20              MR. MANES:  Oh, thank you, Bill.

21         Q.    Now, just going back to Exhibit 13, and

22    looking at the pages with all the signatures, it's dated

23    May 5th, 1993.  Do you see that?

24         A.    Yes.

25         Q.    Does that refresh your recollection as to when

1    the investigation by the county attorney was finished?

2        A.    No.    But it, to state the obvious, it appears

3    to be a final report dated then, so I would accept that.

4        Q.    Fair enough.    Now, moving on to the next page,

5    it's actually not clear as to whether or not this was

6    part -- actually, it's probably part of the

7    separate -- yeah.    I'm going to peel off -- let's keep it

8    the way it is.    It's already marked as an exhibit.    It

9    wasn't clear to me whether or not this was one document

10   or multiple.    But going two pages afterwards, there's a

11   November 19th, 1993 letter from --

12       A.    Rob, what are you on, Exhibit 14?

13       Q.    This, this page as part of Exhibit 13.

14       A.    Okay.

15             MR. JULIAN:    Respectfully, I don't see

16             that.

17       A.    Here is the 13 that was marked.

18       Q.    You know what?    I may have peeled this off.

19   Yeah, no, I recognized earlier when I was preparing.    Let

20   me pull this off, because I just want to mark this as

21   Exhibit 15.    It's a little unclear why there is a 30 at

22   the bottom, but let's mark this as -- what are we up to,

23   15?

24             (Exhibit 15 marked for identification.)

25

1    BY MR. RICKNER:

2        Q.    Is that the resignation letter that Erik

3    Mitchell provided following the investigation that your

4    office performed?

5        A.    Yes, it certainly appears to be.

6        Q.    Okay.

7                MR. RICKNER:  We're going to mark this as

8                Exhibit 16.

9                        (Exhibit 16 marked for identification.)

10       Q.    Again, I don't have -- we'll run a staple

11   through it.  Here's a paper clip if you want to put it

12   together.  Now, looking at that document, does

13   that -- this is Exhibit 16.

14       A.    Yes.

15       Q.    And looking at that document, does that

16   refresh your recollection as to whether or not Erik

17   Mitchell continued working for the county in any capacity

18   up until January of 1994?

19                MR. JULIAN:  I don't want to get overly

20                technical.  Could we ask him to identify it

21                first?

22                MR. RICKNER:  Sure.

23       Q.    Identify Exhibit 16, if you can.

24                MR. JULIAN:  Thank you.

25       A.    Sure.  It's a -- it looks like a press release

1    dated November 19th, 1993.  It's got Marty Farrell's name

2    on it.  I remember Marty very well.  He was the public

3    information officer for County Executive Pirro.  And

4    according to the press release, it appears that he would

5    immediately -- there's a little inconsistency here.

6    Anyway, it says -- I'll quote it.  It says:  Pirro said

7    Mitchell will immediately step down as chief medical

8    examiner and resign from all staff pathologist duties

9    effective January 15th, 1994.

10           I say inconsistency because if he immediately

11    steps down, he's no longer the chief medical examiner,

12    but he apparently was doing --

13       Q.    Right.

14       A.    -- some material work up until January 15th,

15    or I don't know if that was for paid purposes or

16    whatever.

17       Q.    Okay.  Did he ever testify in any capacity in

18    any prosecution between November 19th and January when he

19    finally stepped down?

20       A.    I do not recall.  I can certainly make an

21    effort to check for you if you give me an opportunity to

22    provide that to you at a later date.

23       Q.    Yeah, absolutely.  We'll leave a blank in the

24    record.  Thank you.

25           Did you ever disclose the portions of your

1    investigation as Brady material in any cases?

2         A.    Obviously subsequent to his resignation.

3    Honest answer is:  I don't remember.

4         Q.    Okay.

5         A.    Would I have?  Yes.  You have to understand,

6    every defense lawyer in town knew about this, so Calle

7    being from Queens coming up and trying the case, who was

8    aware of it as we just determined, would have been an

9    exception, and I don't remember any specific instance

10    where Mitchell testified in a homicide case after his

11    resignation where somebody from outside of Syracuse was

12    the defense lawyer.

13          I do remember getting a call from an attorney

14    in Kansas wanting to know about Mitchell, and I sent

15    him -- I don't remember what I sent him, but I sent him

16    some stuff, and I think I contacted -- as a courtesy, I

17    think I contacted the local DA out there to discuss

18    Mitchell with him.

19         Q.    And about when was that?

20         A.    Oh, God.  I couldn't tell you.

21         Q.    Do you know if that's in any relation to the

22    Kansas Supreme Court case involving Erik Mitchell?

23         A.    No.

24         Q.    You don't know or it's not?

25         A.    I do not know.

```
 1        Q.     Okay.

 2        A.     I didn't know there was a Kansas case

 3   involving Erik Mitchell.

 4        Q.     Earlier on, you testified that there was

 5   potential criminal activity, and that if he was

 6   ultimately convicted, it would have been an issue for his

 7   career.  Do you remember that?

 8        A.     Yes.

 9        Q.     Which specific acts constituted the crime that

10   you were referring to?

11        A.     Taking body parts from cadavers or corpses

12   without permission.

13        Q.     Okay.  When you say without permission, do you

14   mean from the family?

15        A.     From the next of -- whoever had Power of

16   Attorney or executor or executrix, whoever had the

17   authority to consent.

18        Q.     Okay.  And based on your investigation,

19   although you didn't ultimately prosecute that, that could

20   have been a crime?

21        A.     No, that would have been a crime if I could

22   prove it beyond a reasonable doubt.

23        Q.     Okay.

24               MR. RICKNER:  So this is actually kind of

25               a good place to break for lunch if everybody's
```

```
1                interested.

2                          (Off record:  1:09 p.m. to 1:55 p.m.)

3    BY MR. RICKNER:

4         Q.    Earlier on, you mentioned somebody named

5    Patricia Stonecipher?

6         A.    Susan Stonecipher.

7         Q.    Thank you.  Susan Stonecipher?

8         A.    Right.

9         Q.    And that's just spelled Stonecipher?

10        A.    Correct, common spelling.

11        Q.    Both words put together into one last name?

12        A.    Correct.

13        Q.    Okay.  Had she provided a statement to the

14   police initially?

15        A.    She did.

16        Q.    And what was that statement?

17        A.    From memory, it was essentially her

18   observations of the victim, her relationship with -- I

19   think she was a tenant in the same building, and she

20   indicated that the last time she saw the victim was

21   Saturday morning because they were doing laundry.

22              She later returned to the police department

23   and said I want to correct that, it was Friday morning

24   because I don't work on Saturdays, and I was laundering

25   my work outfit and I confused the two days.  And the rest
```

1    of her affidavit, I don't recall as I sit here.

2        Q.    Okay.  Now, when you say that she went back to

3    the police to correct her statement, when was that?

4        A.    I believe it was May 7th.

5        Q.    Okay.  So back initially she corrected her

6    statement?

7        A.    That's my understanding.

8        Q.    Okay.  Now, as part of the -- got it.

9            MR. RICKNER:  Actually, you know what?

10           Let's just mark this.

11               (Exhibit 17 marked for identification.)

12   BY MR. RICKNER:

13       Q.    Now, do you recognize Exhibit 17?

14       A.    I do.

15       Q.    And is this -- the Susan referred to herein is

16   Susan Stonecipher?

17       A.    Yes.

18       Q.    Okay.  And in 1987, she actually returned to

19   the police station and said, you know what, I got the

20   time wrong or the date wrong, it was actually the day

21   before?

22       A.    That's not reflected in Exhibit 17, but that's

23   my recollection.

24       Q.    Okay.  And did you actually speak to

25   Ms. Stonecipher prior to -- as part of the

1    reinvestigation we discussed in 1992?

2         A.    I don't recall.  I would feel more comfortable

3    saying that I did, but I just don't recall.

4         Q.    Okay.  And Stonecipher is

5    S-T-O-N-E-C-I-P-H-E-R?

6         A.    Correct.

7         Q.    And is it your understanding that an

8    additional police report was prepared reflecting the

9    change in her statement?

10        A.    Either a report or an additional affidavit.

11        Q.    Okay.

12        A.    Again, that's from memory.  She testified at

13   trial, so she would have explained it at trial.  That

14   would be the best evidence rather than my memory.

15        Q.    Whose witness was she at trial?

16        A.    Calle called her.

17        Q.    Okay.  It's your recollection that Calle was

18   somewhat surprised to discover that she testified to a

19   different date than what was on the report?

20        A.    Well, I can't speak for him.

21        Q.    You were in the courtroom, you saw what he was

22   doing.

23        A.    Not necessarily.  I mean, in other words, did

24   he manifest, like -- and for the record, I'm widening my

25   eyes, did he manifest some surprise?  Not that I

1    remember.  He seemed to argue with her, as I recall, but

2    again, the trial record speaks for itself.

3        Q.    Okay.  Do you remember what color hair Valerie

4    Hill had?

5        A.    My recollection is saying brown, but there's

6    photos available of her.

7        Q.    That's correct.  One moment.  Just let me

8    check something.

9              Now, at some point, somebody named Joe Morgan

10   surfaced as part of the investigation; is that right?

11       A.    Yes.

12       Q.    To the best of your recollection, can you

13   explain who Joe Morgan was and what his testimony was?

14       A.    He never testified.

15       Q.    Or what his statement was?

16       A.    His statement, as I recall, was that a Patsy

17   Barricella had made admissions to him that he killed some

18   girl over on Hickok, which would have been the same

19   street that Valerie Hill lived on.

20       Q.    And when did this first surface?

21       A.    It would be reflected more accurately in the

22   trial transcripts, but it was during the trial a Syracuse

23   police officer brought it to my attention and then I

24   immediately brought it to the court and Mr. Calle's

25   attention.

```
1        Q.    And was that actually during the trial?

2        A.    Yes.

3        Q.    Had you heard of this statement

4   regarding -- or this statement by Mr. Morgan beforehand?

5        A.    No.

6        Q.    Just I want to be very clear.  Had you heard

7   of anything regarding Mr. Morgan before this time during

8   the trial when the disclosure was made?

9        A.    There was something about Joe Morgan, but it

10  had nothing to do with this.  It had nothing to do with

11  Patsy Barricella and somebody admitting.  It was

12  something unrelated to it and I can't remember what that

13  was.

14       Q.    When you say something unrelated, do you mean

15  just not related to Patsy Barricella or not related to

16  this case at all?

17       A.    Well, I wouldn't have mentioned it.  It had to

18  have something to do with the case, but nothing of

19  any -- let me take that back.  It had -- somehow I

20  remember the name Morgan coming up, but it had nothing to

21  do with anything of substance to the case or certainly

22  not Patsy Barricella.  I may be totally wrong about that.

23  It's just my memory as I'm sitting here.

24       Q.    Do you know why in your opening you might have

25  said that the defense attorney was going to bring up
```

1    Morgan?

2        A.    That would confirm what I just said, but no, I

3    don't know why I would have said that.  I don't remember.

4    Do you have the transcript or --

5        Q.    I do.  I'm happy to -- I got it.  Let me see

6    if I can pull this out.  I have too many exhibits here.

7    Actually, right here.  That's summation.  I was wrong.

8    You know what?  We'll come back to it after a break.

9        A.    Okay.

10       Q.    I don't want to waste your time on the record.

11                MR. RICKNER:  Let's mark this as 18, I

12            believe.

13                (Exhibit 18 marked for identification.)

14    BY MR. RICKNER:

15       Q.    Now, looking at that affidavit, can you tell

16    me who signed it, the name?

17       A.    MC Lazarski, L-A-Z-A-R-S-K-I, I believe.

18       Q.    And who is MC Lazarski?

19       A.    He was a neighbor that was interviewed in

20    connection with a canvas that was done back in 1987 by

21    SP -- Syracuse Police Department.

22       Q.    And did you interview him as part of the

23    reinvestigation?

24       A.    I do not recall.

25       Q.    Do you know if anyone else did?

1      A.      I do not know.  You're talking about from my

2   office?

3      Q.      Yeah.

4      A.      I do not know.

5      Q.      Yeah.  Only within your knowledge.  Now, I'm

6   going to hand you a series -- actually, I want to kind of

7   do these all at once to make this move a little faster.

8                      MR. RICKNER:  This is 19.

9                          (Exhibit 19 marked for identification.)

10                     MR. RICKNER:  This is 20.

11                         (Exhibit 20 marked for identification.)

12                     MR. RICKNER:  This is 21.

13                         (Exhibit 21 marked for identification.)

14                     MR. RICKNER:  And this is Exhibit 22.

15                         (Exhibit 22 marked for identification.)

16   BY MR. RICKNER:

17      Q.      Can you identify Exhibit 19 for the record?

18      A.      19 is a Syracuse Police Department

19   inter-departmental memo, dated April 18th, 1987.  It is

20   to Lieutenant Dick Walsh from Sergeant John Kerwin, and

21   the subject listed is Joseph Morgan.

22      Q.      Okay.  And can you identify Exhibit 20 for the

23   record?

24      A.      20 is also a Syracuse Police Department

25   inter-departmental memo, dated May 27th, '87 to Sergeant

1    Pete Tynan from Investigator Jack Hayes, again the

2    subject being Joseph Morgan, and then it's a space and it

3    says Hill Homicide.

4        Q.    And can you identify Exhibit 21 for the

5    record, please?

6        A.    21 is an affidavit, dated August 2nd, 1988,

7    from Joseph Morgan.

8        Q.    And can you identify Exhibit 22 for the

9    record?

10        A.    Exhibit 22 is again a Syracuse Police

11    Department inter-departmental memo, page two, dated

12    April 18th, 1987, To and From are both blank, the subject

13    Joseph Morgan, and it appears to be signed by Sergeant

14    Kerwin.  And Kerwin is K-E-R-W-I-N.

15        Q.    Now, I think that given that it was marked as

16    an exhibit at trial, can we agree that Exhibit 21 was

17    probably turned over to the defense?

18        A.    Yes.

19        Q.    Okay.  Do you know if what's currently marked

20    as Exhibit 21 was turned over to the defense before trial

21    or during the incident during trial?

22        A.    Best of my recollection, this is what was

23    turned over to me and I turned over to Mr. Calle during

24    trial.

25        Q.    Okay.  Now, turning back to Exhibit 19, do you

1    know if this was something that was turned over during

2    trial or before trial or something else?

3        A.    Best of my recollection, this would have been

4    turned over before trial.  By the way, Exhibit 19 and

5    Exhibit 22 are the same memo.  19 is page one, and 22 is

6    page two.

7        Q.    Okay.  And so I guess Exhibits 19 and 22, you

8    believe this was turned over before trial?

9        A.    Yes.

10        Q.    Okay.  And Exhibit 20, was this turned over

11    before trial or during trial?

12        A.    I'm just reading it, if I may.  I do not

13    recall.  My best recollection is that it was turned over

14    before trial.

15        Q.    Now, when you made Brady disclosures in 1993,

16    would you include a cover letter that listed all of the

17    documents that were being disclosed?

18        A.    No, not necessarily.

19        Q.    What would you do to protect yourself against

20    allegations that something hadn't been turned over that,

21    in fact, you had turned over?

22        A.    I should have had a better procedure.  I

23    testified before that the discovery in this particular

24    case was a little unusual because of Mr. Calle's style.

25    For example, he served the demand to produce and forgot

```
 1    to attach the demand to produce, but I responded to it as

 2    if he had attached it.  So there would be discovery that

 3    would be documented, and then we would argue discovery in

 4    front of the trial judge.  There would be a stenographer

 5    there.  There would be a record of what was turned over,

 6    what was being argued about and so forth and so on.

 7    There were things that were turned over during the trial

 8    that include this referenced to Patsy Barricella, and the

 9    record, I think, talks about that.

10         Q.    Okay.  Going back to before trial.

11         A.    Right.

12         Q.    Things that you turned over before trial

13    through this discovery procedure you just described.

14         A.    Right.

15         Q.    How would you document which specific document

16    that you had turned over?

17         A.    We would respond by way of affidavit to a

18    demand to produce and any motions, Bill of Particulars,

19    discovery, police reports, Rosario material, and that

20    would be in -- it would be documented in my responding

21    affidavit.

22         Q.    Would your responding affidavit go document by

23    document or would it simply say we turned over Rosario,

24    we turned over police reports?

25         A.    I don't recall in this case.
```

```
1        Q.    Okay.  But there should be in the file

2   something with your signature on it that details

3   whichever that disclosure is?

4        A.    Yes, something with either my signature or I

5   might have had an assistant DA handling discovery.

6        Q.    And would that also be filed with the court?

7        A.    Yes.

8        Q.    Now, at some point -- withdrawn.

9              You're aware that Mr. Rivas filed a habeas

10  petition following a 440 motion, you testified at least

11  at one point --

12       A.    Correct.

13       Q.    -- you're familiar with this, right?

14       A.    Correct.

15       Q.    Okay.  Now, around the time of the 440 and the

16  habeas, did your office engage in any reinvestigation?

17       A.    No.

18       Q.    Did you perform any -- withdrawn.

19             Did anybody from your office perform any

20  additional forensic testing?  This is during -- not

21  during the second circuit part, but during the 440 and

22  habeas?

23       A.    No.

24       Q.    Who handled the 440 and habeas, to the best of

25  your knowledge?
```

1       A.      The gentleman's name was James Maxwell.

2       Q.      And is that somebody from the Attorney

3   General's Office or your office?

4       A.      My office.  He's retired.  He's no longer with

5   me.

6                   MR. RICKNER:  Hold on.  I passed it over

7               and I just need to find it.  There it is.

8               This is 23, I believe.

9                       (Exhibit 23 marked for identification.)

10  BY MR. RICKNER:

11      Q.      Now, just to set this up, you recognize the

12  name Nanette Gordon?

13      A.      Yes.

14      Q.      And Nanette Gordon died under a homicide in

15  1985?

16      A.      Yes.  There ' some disagreement about the

17  cause of death, as you probably know.  In my opinion, she

18  was murdered.

19      Q.      In your opinion she was murdered?

20      A.      Yes, and several other pathologists, but not

21  unanimously.

22      Q.      Okay.  Meaning that Erik Mitchell did not find

23  that she was murdered?

24      A.      There was a three -- three forensic

25  pathologists were hired by the county to reexamine the

1   case, and they voted two to one that she was murdered.

2       Q.   Okay.

3       A.   And none of them were Erik Mitchell.

4       Q.   Yeah, I'm aware.  Did you engage in any

5   investigation into the Nanette Gordon murder?

6       A.   Very much so.

7       Q.   Okay.  And did you have any suspects?

8       A.   Yes.

9       Q.   And who were they?

10      A.   Well, I'm not going to reveal the name, but

11  he's deceased.

12      Q.   All right.  I'd like you to look at

13  Exhibit 23.

14      A.   Yes.

15      Q.   Do you know who Tamara Danner is?

16      A.   Yes.  I remember Tamara.  She was a forensic

17  chemist at the Wallie Howard Center for Forensic

18  Sciences.

19      Q.   Okay.  Now, do you know why Nanette Gordon's

20  forensic material would have been submitted for analysis

21  alongside Hector Rivas'?

22      A.   Well, I'm not sure that happened, but -- and I

23  got the e-mail in front of me.  Are you saying that they

24  were in one container or --

25      Q.   The e-mail, I think, it appears to be what she

1    said.

2       A.    Well, let's see.  When opening the evidence

3    that was to contain only the head hairs, pubic hairs, and

4    pubic lifts from NG, I found mounted pubic hairs labeled

5    H. Rivas.

6             I don't know how they were intermingled.

7    Obviously, some level of incompetence had to be involved,

8    but I don't know how they got in the same package.

9       Q.    Was Hector Rivas a suspect in the Nanette

10   Gordon murder?

11      A.    No.

12      Q.    When you say somebody deceased, you're talking

13   about someone else?

14      A.    Yes.

15      Q.    All right.  Following the 440 and the habeas,

16   there was the appeal to the second circuit where the

17   conviction of Hector Rivas was overturned; fair to say?

18      A.    Correct.

19      Q.    Okay.  And that was in, roughly, 2015?

20      A.    Correct.

21      Q.    Now, following over -- the overturning of the

22   conviction, was the investigation reopened?

23      A.    No.  I mean, we had the right guy.  There was

24   certain evidence that because of developments in forensic

25   science that were not available to us in '92 -- or, yeah,

1    '92 and '93 that were tested.  For example, the cigarette

2    butts, I think there were six of them, five or six of

3    them on Valerie's kitchen table in the ashtray.

4          The fingerprint evidence was reexamined

5    because we had, in my judgment, a very, very

6    highly-skilled individual by the name of Mark Mills who

7    had been working for several years but was not employed

8    back in the '90s at the Forensic Science Center.  The

9    Forensic Science Center didn't exist in the early '90s.

10         The marijuana pipe was tested.  We also tested

11   the clothing, the swabbing from the deceased, the belt

12   that had been used to strangle her, and I think that's

13   about it.

14     Q.    All right.  And besides the forensic testing,

15   were witnesses from the original prosecution contacted

16   and interviewed?

17     A.    Not by me.  I was involved in an extremely

18   high-profile murder case at the time, and I relied on Rob

19   Moran to handle the nuts and bolts.  I don't recall Rob

20   Moran or an investigator under his command interviewing

21   or re-interviewing any witnesses.  I think he probably

22   would have told me about that.

23     Q.    Okay.  To your knowledge, there was no

24   interviews of witnesses or anything like that?

25     A.    To my knowledge, that's correct.

```
 1        Q.    Okay.  And as part of the forensic testing,

 2   was there any testing done against Joe Morgan's DNA or

 3   anything else available regarding him?

 4        A.    Well, the testing that was done was to

 5   determine if DNA could be identified, so it wasn't as if

 6   anyone went in with a preconceived conclusion.  Once a

 7   profile was developed, it was then either compared to

 8   known samples or run through CODIS.  I'm pretty sure

 9   you're aware of the results.

10        Q.    It's Patsy Barricella?

11        A.    Cella, with a C.

12        Q.    B-A-R-I-C-E-L-L-A?

13        A.    Yeah.  And I'm sorry to interrupt you.  Best

14   of my recollection, B-A-R-R-I-C-E-L-L-A.  There could be

15   one too many Rs in there, but that's my recollection.

16        Q.    The one unredacted copy I have, it's just

17   difficult to read.  But Patsy --

18        A.    Yes.

19        Q.    -- did you have DNA profiles of him available

20   for testing?

21        A.    I don't know if he's in CODIS or not.

22        Q.    Okay.  Do you know if Rob Moran made any

23   efforts to try to get DNA profiles from him?

24        A.    I'm sure he would have told me of that, and he

25   made no mention of that to me.  I don't even know if
```

```
 1    Patsy Barricella is still alive.

 2         Q.    Okay.  Did you do any investigation --

 3    withdrawn.

 4              Did you or your office or Rob Moran do any

 5    investigation into any alternate suspects following the

 6    reversal of Mr. Rivas' conviction?

 7         A.    Absolutely not.

 8                   MR. RICKNER:  Mark this as Exhibit 24.

 9                   (Exhibit 24 marked for identification.)

10    BY MR. RICKNER:

11         Q.    Can you identify Exhibit 24 for the record?

12         A.    Exhibit 24 is a lab report from the Wallie

13    Howard Forensic Science Center.

14         Q.    Now --

15         A.    I'm just trying to get the date.  Dated

16    December 10th, 2019.

17         Q.    Now, is it fair to say that Hector Rivas died

18    in 2016?

19         A.    I'll take your representation on that.  I know

20    he's dead.

21         Q.    Do you know why forensic testing was being

22    performed three years after?

23         A.    After his death?

24         Q.    Yes.

25         A.    I know that testing was done -- or I know
```

1    these items were submitted in 2015 in preparation for the

2    trial, and I -- they may have ended -- they may have

3    stopped what they were doing.  For example, there's

4    swabbings from the pipe.  I don't see that reflected

5    here, but I know that results did come from the pipe and

6    the cigarettes, and that's not reflected in this exhibit.

7    So I may have asked the lab to conclude these

8    investigations in anticipation of this litigation.

9        Q.    Okay.  So you're saying that it's possible

10   that you continued to do forensic testing knowing that

11   there were civil suits coming?

12       A.    That's -- that would make sense to me, and I

13   believe that's true.

14       Q.    Okay.  Besides these DNA tests, were there any

15   other forensic tests done in preparation for civil

16   litigation?

17       A.    Not that I'm aware of.  The fingerprint

18   evidence on the library book came back, I'm fairly

19   certain, in 2015, and the cigarette DNA belonging to

20   Mr. Rivas, again, I'm fairly certain came back in 2015.

21   I don't recall, unless there's a report to contradict me,

22   I don't recall any other items.  I know -- well, this

23   reflects that we were looking at the clothing that she

24   was wearing.  I don't see anything relative to the rape

25   kit, so I would just leave open the possibility that that

1    may have been examined, as well.

2        Q.    Do you know somebody by the name of Josh

3    Marquis, M-A-R-Q-U-I-S?

4        A.    Yes.

5        Q.    Who is he?

6        A.    He's the former district attorney of Clatsop,

7    C-L-A-T-S-O-P, County, Oregon, and a very, very good

8    friend of mine, and a superior legal mind.

9        Q.    Okay.  And where does he -- excuse me if I

10   don't know the geography.  What state does he live in?

11       A.    Oregon.

12       Q.    Okay.  And is he still the DA there?

13       A.    No.  He's retired.

14       Q.    When did he retire?

15       A.    Oh, four, five years ago.

16       Q.    Did you ever discuss this matter with him?

17       A.    I was going to say, I don't remember, but you

18   got his name from somewhere, so maybe I did.

19       Q.    Okay.  Now, do you know somebody named

20   Jack M. Ryan?

21       A.    Yes.

22       Q.    Who is that?

23       A.    Jack is the former chief assistant DA in

24   Queens County.  He is currently working in Rockland

25   County.  He's had a very, very long and distinguished

 1    legal career.  He was the special prosecutor in the

 2    Tawana Brawley case for Bob Abrams, among the more

 3    high-profiled cases that he's handled.  And when Judge

 4    Brown passed away and Melinda Katz took office, Jack

 5    retired from Queens and was picked up by the DA in

 6    Rockland to essentially run the office.  And in addition

 7    to that, he's a very close friend of mine.

 8        Q.    Now, do you know somebody named RJ Masters?

 9        A.    Yes, Bob Masters, very similar career to Jack.

10    He was also a chief under Judge Brown, retired when

11    DA Katz took over, and he's also, as far as I know, in

12    Rockland County.

13        Q.    Okay.  And do you know somebody named ED

14    Saslaw?

15        A.    Ed Saslaw.

16        Q.    Ed Saslaw?

17        A.    Yes.

18        Q.    And who is that?

19        A.    Ed worked under Judge Brown.  He was kind of

20    the law guy.  He's been an advisor to the New York State

21    DA's Association, and I'm fairly certain he currently

22    works for Dave Hoovler, the Orange County DA.

23        Q.    And do you know who Rick Trunfio is?

24        A.    Yes.  Trunfio, T-R-U-N-F-I-O.  Rick was for

25    many years my chief assistant DA, but he retired, oh, I

1    think two years ago.

2        Q.    Okay.  So he's somebody who worked for you?

3        A.    Correct.

4        Q.    Now, in the last, let's say -- since the

5    reversal of Mr. Rivas' conviction, have you spoken to

6    William Sullivan about this case?

7        A.    Let's see.  That would have been '15, right?

8    I'm certain I've spoken to Bill Sullivan since 2015,

9    because he was a witness for me in a case that was

10   retried.  But have I spoken to him since then about -- I

11   do not recall.  If I did, it wasn't of any great

12   substance.

13              MR. RICKNER:  Can we -- we've been going

14              about not quite an hour, but I actually might

15              be wrapping up, so I'd just like to look over

16              my notes and the exhibits.

17              MR. JULIAN:  All right.

18              (Off record:  2:39 p.m. to 2:42 p.m.)

19   BY MR. RICKNER:

20       Q.    During your work with Erik Mitchell, was there

21   ever a time where he expressed an opinion that you

22   personally found unreliable and you didn't want to use as

23   part of the prosecution?

24       A.    Talking about an opinion regarding cause of

25   death, the manner of death?

```
 1        Q.    Within his expertise.

 2        A.    Yeah.

 3        Q.    Not --

 4        A.    Not an opinion on the Yankees or something.  I

 5   don't recall one, sir.

 6        Q.    Okay.  Do you recall anyone in your office

 7   expressing concern about a professional opinion within

 8   Dr. Mitchell's expertise that they didn't feel was

 9   reliable that they could otherwise use as part of the

10   prosecution?

11        A.    I don't recall, no.

12        Q.    Okay.  Do you recall any instance during your

13   work with Erik Mitchell or during your office's work with

14   Erik Mitchell when a judge excluded his opinion for any

15   reason?

16        A.    No.

17        Q.    During your work with him or your office's

18   work with him, did you ever observe Dr. Mitchell being

19   erratic or otherwise acting in a manner that concerned

20   you?

21        A.    I remember being at his house once and a goat

22   came in through the kitchen, which I found odd, and I

23   explained that to him, and he just said, hey, I live on a

24   farm.  I mean, let's be candid, lawyer to lawyer, you got

25   to be a little unusual to want to cut up dead bodies for
```

1    your profession.  And my answer is no, I had no

2    reservations about his mental competency, his expertise,

3    and his dedication to his work.

4         Q.    So Dr. Mitchell lived on a farm?

5         A.    Well, I'm from Brooklyn, so my definition of a

6    farm might not be the same as everybody else's, but he

7    lived in a country house in Skaneateles.  I forget why I

8    was there.

9         Q.    How many times do you think you went to his

10   house there?

11        A.    Oh, just that one time.

12        Q.    Okay.  And he raised animals or just had goats

13   as a pet?

14        A.    I don't know.  I don't think the goat was a

15   pet.  So I don't know.

16        Q.    Would you describe Dr. Mitchell as eccentric?

17        A.    Yes.

18        Q.    Was there ever an instance where Dr. Mitchell

19   was willing to provide an opinion that no other

20   pathologist was willing to provide?

21        A.    Not to my knowledge.  I never encountered

22   that.  In other words, where I -- like, I medical

23   examiner shopped, no.  No, it never happened.

24        Q.    Were there cases that you believe you could

25   not have gotten a conviction on without Dr. Mitchell's

1    testimony?

2        A.    Every one he testified to.  I'm a homicide

3    prosecutor.  You can't convict somebody in a homicide

4    case without a cause of death by a -- certified by a

5    competent forensic pathologist.

6        Q.    Beyond cause of death, were there other

7    details that he would provide as part of his expertise

8    that were invaluable to securing prosecutions?

9        A.    I wouldn't say invaluable.  If I was choosing

10   the words, it would be very, very helpful.  As you know

11   as an experienced lawyer, expert witnesses fall into

12   different categories, this guy is great, this person

13   stinks, you know.  It's just communicative skills, it's

14   expressions, it's explaining the complex in a simple

15   manner so the least educated juror understands it as well

16   as the person who's got a PhD.

17       Q.    And when allegations of misconduct started

18   coming out 1991, '92, '93 about Dr. Mitchell, were you

19   worried about losing him?

20       A.    Yes.  I think -- yeah, I think I expressed

21   that, I don't want to see the guy, you know, I don't need

22   this crap, I'm leaving.

23       Q.    Prior to when your office's investigation

24   started, do you believe you took steps to try to protect

25   Dr. Mitchell from scrutiny?

```
1       A.    Did I take steps?

2       Q.    Yes.

3       A.    No.  I mean, I might have given him -- I might

4    have sat down with him and talked to him about his

5    management style, but if I did, I don't recall.

6       Q.    Did you ever defend him in the press?

7       A.    Yes.

8       Q.    And was the reason -- did you ever defend him

9    from scrutiny against other public officials maybe not

10   necessarily in public?

11      A.    No.

12      Q.    After you took office -- sorry.  Did you want

13   to finish?

14      A.    No.  I was just coughing.

15      Q.    Gotcha.  After you took office, besides the

16   medical examiners that we've talked about, did anybody

17   else come to you and say, you know, look, I'm concerned

18   about Dr. Mitchell, besides the people we've discussed

19   already?

20            MR. JULIAN:  I guess I'm going to object

21            to the form of the question.  I'm not looking

22            to -- after he took office ever at any time?

23            MR. RICKNER:  After he took office until

24            the following year.

25      A.    I understand your question to be did somebody
```

1    come up to me and say, hey, this guy is crazy or he

2    stinks --

3        Q.    Sure, or anything else in a similar vein?

4        A.    Other than the people we've discussed, none

5    that come to mind, no.

6                    MR. RICKNER:  I don't think I have any

7            further questions.  You guys got any?

8                MR. JULIAN:  Nope.

9                MR. VENTRONE:  I think we're good.

10               MR. JULIAN:  We decline.

11                   (Proceedings concluded at 2:48 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, ELYSE M. ADDABBO, Court Reporter and

 4   Notary Public, certify:

 5          That the foregoing proceedings were taken before me

 6   at the time and place therein set forth, at which time

 7   the witness was put under oath by me;

 8          That the testimony of the witness and all

 9   objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12          That the foregoing is a true and correct transcript

13   of my shorthand notes so taken;

14          I further certify that I am not a relative or

15   employee of any attorney or of any of the parties nor

16   financially interested in the action.

17

18

19

20
             ELYSE M. ADDABBO, Court Reporter
21           Notary Public

22

23

24

25
```