# EXHIBIT "H"

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF NEW YORK

 3    _____

 4   SIDNEY MANES, administrator of the estate of

 5   HECTOR RIVAS,

 6           Plaintiff,

 7       v.                            Case No.:

 8   ONONDAGA COUNTY, CITY OF SYRACUSE, 5:19-cv-00844-BKS-TWD

 9   WILLIAM FITZPATRICK, DR. ERIK

10   MITCHELL, AND "JOHN DOES 1-10",

11           Defendants.

12    _____

13                    DEPOSITION

14    _____

15

16   WITNESS:           PETER TYNAN

17   DATE:              Wednesday, December 20, 2023

18   START TIME:        12:14 p.m., ET

19   END TIME:           1:21 p.m., ET

20   REMOTE LOCATION:   Remote Legal platform

21   REPORTER:          Zack Shoup, CER-15887

22   JOB NO.:           21976

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3         RICKNER PLLC

 4         14 Wall Street, Suite 1603

 5         New York, New York 10005

 6         By:  ROBERT RICKNER, ESQUIRE

 7              rob@ricknerpllc.com

 8         Appearing for Plaintiff

 9

10         LAW OFFICES OF ROBERT F. JULIAN

11         2037 Genesee Street, Suite 2

12         Utica, New York 13501

13         By:  ROBERT JULIAN, ESQUIRE

14         Appearing for Defendants Mitchell and Fitzpatrick

15

16         THE LAW OFFICE OF MARK A. VENTRONE

17         214 North State Street

18         Syracuse, New York 13203

19         By:  MARK VENTRONE, ESQUIRE

20              info@mventronelaw.com

21         Appearing for Defendant Onondaga County

22

23

24

25
```

```
 1              I N D E X   O F   T E S T I M O N Y

 2

 3   EXAMINATION OF PETER TYNAN:                      PAGE

 4        By Mr. Rickner                                 9

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                I N D E X   O F   E X H I B I T S

 2                   (available for download)

 3

 4    EXHIBIT   DESCRIPTION                           PAGE

 5    35        Mitchell Note                           26

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    FEDERAL STIPULATIONS

 2

 3           IT IS HEREBY STIPULATED AND AGREED by and

 4     between the attorneys for the respective parties that

 5     the presence of the Referee be waived;

 6           IT IS FURTHER STIPULATED AND AGREED that all

 7     objections, except as to form, are reserved until the

 8     time of trial;

 9           IT IS FURTHER STIPULATED AND AGREED that this

10     deposition may be utilized for all purposes as provided

11     by the Federal Rules of Civil Procedure;

12           AND FURTHER STIPULATED AND AGREED that all

13     rights provided to all parties by the Federal Rules of

14     Civil Procedure shall not be deemed waived and the

15     appropriate sections of the Federal Rules of Civil

16     Procedure shall be controlling with respect thereto.

17

18

19

20

21

22

23

24

25
```

```
 1                    FEDERAL REMOTE STIPULATIONS

 2

 3              IT IS HEREBY STIPULATED, by and between the

 4     attorneys of record for all parties to the above-

 5     entitled action, that:

 6              Pursuant to Rule 30(b)(4) of the Federal Rules

 7     of Civil Procedure, this deposition will be conducted by

 8     remote videoconference with the oath being administered

 9     remotely and a court reporter creating an accurate

10     written record; that, if necessary, the parties agree

11     that each witness can be identified with picture

12     identification;

13              No attorney, nor any party or witness, shall

14     capture any still photographs, nor record, by video or

15     audio, any part of these deposition proceedings;

16              Each attorney agrees to instruct their witness

17     that there is to be no communication with anyone outside

18     of the identified and participating group, by chat,

19     text, email, or other means during the deposition;

20              There shall be no other person in the room

21     with the witness during their deposition;

22              Any phone or electronic device in the room

23     with a witness shall be identified and not read,

24     referred to, or otherwise used during the witness'

25     deposition, unless agreed to by all counsel on record.
```

```
 1                    P R O C E E D I N G S

 2             THE REPORTER:  Good afternoon.  We are

 3   now on the record.  Today's date is Wednesday, December

 4   20th, 2023 and the time is approximately 12:14 p.m.,

 5   Eastern Time.

 6             My name is Zack Shoup and I'm the officer

 7   designated by Remote Legal, 11 Broadway, Suite 456, New

 8   York, New York, to take the record of this proceeding.

 9             This is the deposition of Peter Tynan

10   taken in the matter of Manes, versus Onondaga County,

11   Case Number 5:19-cv-00844-BKS-TWD, filed in the United

12   States District Court, Northern District of New York.

13             Would all Counsel please identify

14   themselves for the record starting with the noticing

15   attorney, and state who they represent?

16             MR. RICKNER:  Hello.  Rob Rickner,

17   Rickner, PLLC.  I represent the plaintiff.  Good

18   afternoon.

19             MR. JULIAN:  Robert Julian.  I represent

20   Defendants Fitzpatrick and Mitchell.

21             MR. VENTRONE:  Mark Ventrone for the

22   County of Onondaga.

23             THE REPORTER:  Thank you.

24             This deposition is being taken remotely

25   on behalf of the plaintiff and is being conducted
```

```
 1    pursuant to the procedural rules and laws of the state

 2    which governs this matter.

 3                    As such, all parties agree to this means

 4    of capturing the official record, which may include

 5    recording by audio and/or audiovisual means, and agree

 6    not to oppose admission of this proceeding on the basis

 7    of the personnel or method by which the testimony in

 8    this proceeding was captured.

 9                    Do all parties so stipulate?

10                    MR. RICKNER:  Plaintiff so stipulates.

11                    MR. JULIAN:  Yes.

12                    MR. VENTRONE:  Yes.  Defense does.

13                    THE REPORTER:  Thank you.

14                    And I will now swear in the witness.

15                    Mr. Tynan, could you please state and

16    spell your full name for the record?

17                    MR. TYNAN:  Sure.  Peter D. Tynan, T-Y-N-

18    A-N.

19                    THE REPORTER:  Sorry.  Hold on a moment.

20    Did you spell your name?

21                    MR. TYNAN:  Yes.  T-Y-N-A-N.

22                    THE REPORTER:  Thank you.  Could you

23    please raise your right hand?

24                    Do you swear or affirm that the testimony

25    you shall give today in this proceeding will be the
```

```
 1   truth, the whole truth, and nothing but the truth?

 2                   MR. TYNAN:  I do.

 3   WHEREUPON,

 4                   P E T E R   T Y N A N,

 5   having been called as a witness, being duly sworn by the

 6   notary public present, testified as follows:

 7                   THE REPORTER:  Thank you.  You may put

 8   your hand down.

 9                   The witness has been sworn and Counsel,

10   you may begin.

11                         EXAMINATION

12   BY MR. RICKNER:

13       Q    What is your current rank or what rank did you

14   retire on, Mr. Tynan?

15       A    Sergeant of detectives.

16       Q    Okay.  I guess I'll try to call you Sergeant

17   Tynan, but if I don't, my apologies.

18       A    Call me Peter or Tynan -- whatever.  That's

19   fine.

20       Q    Excellent.  I do try to be a bit formal, just

21   for the record, but -- have you ever had your deposition

22   taken before?

23       A    Yes.

24       Q    How many times?

25       A    Like, testify in court and depositions and
```

```
 1    everything, or?

 2         Q    No.  No.  I actually mean just a deposition,

 3    like a civil matter.  Effectively, what we're doing

 4    today.

 5         A    Just a few times.

 6         Q    Okay.  Were any of those with respect to your

 7    work as a law enforcement officer?

 8         A    I believe so.  Yes.

 9         Q    Okay.  And you may remember these ground rules

10    from your prior deposition, or you may have been

11    instructed by Mr. Julian.  But this is just to make sure

12    that we get the best transcript possible.

13              So the first, and you're doing a great job of

14    this -- I ask these long, rambling questions.  You may

15    know exactly where I'm going, but please wait until I

16    finish my question before jumping in with an answer.

17    Can you do that for me?

18         A    Sure.

19         Q    Great.  You're doing a good job of answering

20    verbally, but even though we're on camera, you can't do

21    nods of the head or hand gestures.  You need to actually

22    say verbally what your response is so the court reporter

23    can take it down.  Can you do that for me?

24         A    Yes, sir.

25         Q    If you ask a -- if -- withdrawn.
```

1            If you answer a question, I'm going to assume

2    you understood it.  So please, if anything I say

3    confuses you, tell me and I'll rephrase.  Can you do

4    that for me?

5        A    Yes, sir.

6        Q    You've taken an oath, and even though you're

7    sitting in a conference room, it's the same rules as

8    though you're in court, meaning you have to tell the

9    truth, the whole truth, and nothing but the truth.  Can

10   you do that for me?

11       A    Yes, sir.

12       Q    You may want to take a break, and that's

13   absolutely fine.  Just understand that if you take a

14   break, you have to answer the pending question first.

15   Do you understand?

16       A    Yes, sir.

17       Q    You will be given the chance, if you so

18   choose, to review the transcript and make any

19   corrections.  However, please note that if you do make

20   any changes to the transcript, I can comment on it at

21   trial.  Do you understand?

22       A    Sure.  Yes, sir.

23       Q    Don't be offended by this question.  We ask

24   everyone.  Do you have any medical reason why you

25   couldn't give full and complete testimony besides the

```
 1   ordinary passage of time?

 2        A    Do I have any reason -- what?  What'd you say?

 3        Q    Is there any medical reason why you couldn't

 4   give full and complete testimony today, like you hit

 5   your head?

 6        A    No.

 7        Q    Okay.  I had a client -- I had a witness once

 8   who hit his head, and he said, "You know what?  I don't

 9   remember anything at the end of the --" so I got to

10   check.

11             Are you represented today?

12        A    Yes, sir.

13        Q    Okay.  Who is your attorney?

14        A    Are you my attorney?  No.  I'm not

15   represented.  I'm just here because I was asked by Mr.

16   Julian to be here.  I'm not represented yet.

17        Q    Okay.  Yeah.  No.  Understood.  That's just

18   what I wanted to clear up.  Now, did you do anything to

19   prepare for this deposition?

20        A    Yes, sir.

21        Q    What did you do to prepare?

22        A    I met with Mr. Julian yesterday.

23        Q    Okay.  How long did you meet?

24        A    Half hour, hour, yesterday in his office.

25        Q    Okay.  Did you review any documents?
```

```
1      A      Yes, sir.

2      Q      What documents did you review?

3      A      Some exhibits from July and November in

4    regards to this matter.

5      Q      Okay.  And did you learn anything about the

6    case from Mr. Julian?

7      A      Just that apparently the -- some relatives of

8    Hector Rivas were bringing action against the county

9    for -- for something to do with the case or the

10   prosecution or something.

11     Q      And prior to that conversation with Mr.

12   Julian, did you know anything about this pending

13   lawsuit?

14     A      I think I heard about it.  I heard that --

15   that Rivas died in prison, and at some point, I think I

16   heard about this, but that's all -- that's about it.

17     Q      Did you hear that his conviction had been

18   overturned?

19     A      I think -- I think I heard that -- I may have,

20   because I know that when somebody gets convicted, I

21   think when they're in prison and if there's still a --

22   some kind of an appeal or something, a lot of times it

23   just gets dismissed or something.  That's all I know.

24     Q      Understood.  Now, I just want to go a little

25   bit through your background.  When did -- where did you
```

1   start your career in law enforcement?

2       A    Syracuse Police Department.

3       Q    And how many years were you with the Syracuse

4   Police Department?

5       A    20 years.

6       Q    And did you have any particular -- well,

7   withdrawn.

8            What year did you start?

9       A    1972.

10      Q    Would it be correct to say then that you

11  stopped in 1992?

12      A    Actually, I think it was January, February

13  1993, but yes.  Just a few months past that 20-year

14  mark.

15      Q    Okay.  When you were at the Syracuse Police

16  Department, I assume you started as a patrol officer or

17  something like that, but after that period as a patrol

18  officer, did you have any particular station or role?

19      A    Yes.  Most -- almost entirely of my career was

20  in criminal investigation division, or CID, as we call

21  it.

22      Q    Now, does the CID cover robberies, murders, or

23  is homicide separated?

24      A    It's not separated.  It's any major crime.

25  Yes.

1      Q    Okay.  And so that would include homicides?

2      A    Yes, sir.

3      Q    Okay.  During your time as a homicide -- well,

4    withdrawn.

5           During your time at the CID, did you have any

6    interactions with Erik Mitchell?

7      A    Yes, sir.

8      Q    How often do you think that you interacted

9    with Erik Mitchell?

10     A    While he was the medical examiner, at least

11   once a month, I would say, at least.

12     Q    Okay.  And what types of -- withdrawn.

13          As you sit here today, are you aware that

14   there have been, you know, certain allegations about

15   Erik Mitchell improperly disposing body parts,

16   mismanaging his office, and things of that nature?

17     A    Yes, sir.

18     Q    When do you think you first became aware of

19   those types of allegations?

20     A    Well, I think it was summer of '90 -- '92 or

21   '93.

22     Q    Would this have been when you were working at

23   the DA's office?

24     A    At that time, I was at the DA's office.  Yes,

25   sir.

```
 1        Q    Okay.  And did you move smoothly between the

 2   Syracuse Police Department and the DA's office?

 3        A    I didn't understand you.

 4        Q    That wasn't a very good question.  Thank you.

 5   What I'm asking is that -- did you go straight from the

 6   Syracuse Police Department to the DA's office?

 7        A    I did.

 8        Q    And was there a particular reason that you

 9   went to the DA's office?

10        A    Yes, sir.

11        Q    What was that reason?

12        A    I was -- I was offered the position of chief

13   investigator.

14        Q    Were you offered that position by William

15   Fitzpatrick, the DA?

16        A    Yes, sir.

17        Q    Had you known him prior to that?

18        A    Yes, sir.

19        Q    And did you work on investigations together?

20        A    Yes, sir.

21        Q    Now, going back to your time working at CID,

22   did you have any particular impressions of Erik Mitchell

23   during that time period?

24        A    Yes, sir.

25        Q    And what was your impression of Erik Mitchell?
```

1      A    Well, I thought he was brilliant.  He was a

2  very likable guy.  He is -- he had a good sense of

3  humor.  He was a little quirky, but as far as his -- I

4  consider his expertise in his position, and he was very

5  helpful, and he would always help you out no matter --

6  no matter what.  Yes.

7      Q    Understood.  When you say "help you out," what

8  do you mean?

9      A    Well, I was a -- I used to be an instructor at

10  the police academy.  I used to teach death

11  investigations, and I would discuss that with him.  And

12  you know, he would -- sometimes he would give me a

13  couple of slides to show in class and discuss some of

14  the death investigations with me, like a lot of -- any

15  unattended death.  That's why.

16      Q    And an unattended death means that you weren't

17  aware of somebody being present at the time that they

18  died?

19      A    Right.  And we were unsure of -- anything

20  other than a natural death, you know, could it be

21  accidental, suicide, homicide, so forth.

22      Q    Did you have any role in investigating the

23  Nanette Gordon case?

24      A    No, sir.  But I'm aware of it.  Yes.

25      Q    Okay.  And did you have any role in

1    investigating the death of Valerie Hill?

2        A    Yes, sir.

3        Q    Okay.  And I want to talk about the first

4    investigation.  That would have been in, what, 1986,

5    1987?

6        A    Yeah.  I think it was 1987, but I'm not sure.

7        Q    And what was your role in the investigation of

8    the death of Valerie Hill in 1987?

9        A    Not completely sure, but I remember that I was

10   at the -- at the actual scene the day her body was

11   discovered.  I believe at that time also, I was sergeant

12   of detectives, and I may have -- I think I might have

13   directed some of the investigators in their roles that

14   day.  After that, you know, we -- lengthy follow up

15   following wherever the investigation would take us.

16       Q    Understood.  And at any point while you were

17   at the scene where Valerie Hill died, did Erik Mitchell

18   show up?

19       A    I -- I -- somebody from the medical examiner's

20   office would have shown up.  Whether it was him or not,

21   I'm not certain.

22       Q    Okay.  Do you know how long that was after the

23   body was found?

24       A    No, sir.

25       Q    During the course of the investigation of the

```
1    Valerie Hill murder, were there any suspects?

2         A    Certainly anytime a woman is killed in this

3    manner, certainly statistically and intuitively, you

4    have to consider that it was a boyfriend or an ex-

5    boyfriend.  Yes.  So I would say Hector Rivas was

6    certainly somebody that we were -- we were looking at.

7    Yes.

8         Q    Okay.

9         A    I know that --

10        Q    Now --

11        A    -- he is a suspect.

12        Q    Right.  Were there any other suspects?

13        A    No, sir.

14        Q    You remember that Hector Rivas was not

15   prosecuted until sometime after 1987; is that fair to

16   say?

17        A    Yes, sir.

18        Q    Okay.  Do you know why Hector Rivas was not

19   prosecuted in 1987 or 1988?

20        A    My opinion?

21        Q    Yes.

22        A    In my opinion, there was enough to arrest him

23   based on our police investigation.  The district

24   attorney's office at the time did not want him arrested

25   and forced prosecution because they felt that there
```

```
 1   might not be -- at that time, there might not be enough

 2   evidence, or you know, totality of the evidence to

 3   convict him.  And that was the -- that was the main

 4   point that -- not that there wasn't enough to arrest

 5   him.  There wasn't enough to convict him.

 6        Q    Right.  Now, did Hector Rivas have, I guess

 7   what you would call an alibi?

 8        A    At some point, I remember that he presented to

 9   us that he was drinking at a bar on the west end, and I

10   also remember that he had a Polaroid photo of him with

11   some other people at this bar.

12        Q    Okay.  At any point during the investigation,

13   did Dr. Mitchell make a determination as to when he

14   thought Valerie Hill died with respect to the day that

15   her body was found?

16        A    It's -- I -- could you -- could you repeat

17   that?

18        Q    Yeah.  Absolutely.  Obviously, Valerie Hill

19   died before you found the body, right?

20        A    I'd say that's accurate.

21        Q    And there is some question as to how long

22   before her body was found she died, right?

23        A    Yes, sir.

24        Q    Okay.  In the initial investigation in 1987,

25   did Erik Mitchell ever express to you any conclusions
```

1    about when she may have died with respect to when her

2    body was found?

3        A    As I recall, he said that she died at least

4    two days before her body was found.

5        Q    Now, was the fact that Hector Rivas had a

6    potential alibi for some of the days prior to when her

7    body was found a factor in determining that he couldn't

8    be prosecuted successfully for that murder?

9        A    No.  Not in -- not in my opinion.  No.

10       Q    Now, at any point -- withdrawn.

11            So, after you were recruited to the district

12   attorney's office by DA Fitzpatrick, were you instructed

13   to look through cold cases to try to get convictions?

14       A    Yes.  We -- we discussed cold cases.  Yes,

15   sir.

16       Q    I'm asking a slightly different question.  Did

17   DA Fitzpatrick ask you to go look at some cold cases to

18   see if they could possibly be prosecuted?

19       A    Well, he didn't have to tell me to look.  I'm

20   the one that worked on the cold cases, so yes.  I was

21   very aware of them.

22       Q    Okay, I guess, then, I should reframe my

23   question.  When you say you worked on cold cases, was

24   that a particular assignment that you were provided at

25   the district attorney's office?

1       A       No.  Cold cases become cold cases when

2    somebody -- the investigation kind of stops or is

3    suspended because it -- and then it becomes cold.  But I

4    worked on the homicides from the day they happened, and

5    so anytime after that, some period of time after that, I

6    guess you could call it a cold case.  But for almost 20

7    years, I worked almost every single homicide that

8    happened in Syracuse.

9       Q       Understood.  So when you say when you were

10   working on cold cases, you mean these were your own

11   cases and they had gone cold?

12      A       Yes, sir.

13      Q       That is said --

14      A       And not only my cases, but if I didn't work on

15   the case and I was aware of the case.  Yes.

16      Q       Okay.  So when you went to the district

17   attorney's office, would it be correct to say that you,

18   at least in your mind, had a list of cold cases that

19   you're interested in reinvestigating?

20      A       Yes, sir.

21      Q       Did you discuss that with DA Fitzpatrick?

22      A       Yes.

23      Q       Okay.  As a result of that discussion, did you

24   bring DA Fitzpatrick some cold cases that you thought

25   maybe could be prosecuted?

1      A    We discussed them.  Yes, sir.

2      Q    Okay.  But what I'm asking is that did you

3  literally show up to DA Fitzpatrick's office with one or

4  more cases and say, "These are cold cases that I think

5  we need to reinvestigate and look into"?

6      A    Well, that's not exactly how it happened.  We

7  would discuss the case.  We -- we would discuss cases,

8  then whatever -- whatever case that we might have

9  settled on, he said, "Well, why don't you start putting

10 some of the reports together?"  And that's how it would

11 start.

12     Q    Okay.  Well, I'm going to represent to you

13 that DA Fitzpatrick testified that you brought the

14 Hector Rivas case to him as a case that needed to be

15 reinvestigated.  Is that comport with your memory?

16     A    Yes.  It's just what we just discussed.  We

17 discussed cold cases, and this was one of them, and once

18 he agreed to take a look at it, then I started getting

19 the reports together, and then after the reports, maybe

20 any affidavits were around or maybe go to the evidence

21 room to make sure all the evidence was there and

22 available, you know, et cetera.

23     Q    Understood.  Did DA Fitzpatrick work on the

24 Valerie Hill case at the district attorney's office when

25 the crime first occurred?

```
 1       A    I'm pretty sure Bill Fitzpatrick wasn't even

 2   in the DA's office at the time.  He --

 3       Q    So prior to -- I'm sorry.  Please continue.

 4       A    He might have been there from, I think, '88 to

 5   '92, at least.  Yeah.

 6       Q    With respect to the Valerie Hill murder, do

 7   you remember who first brought that case up in

 8   discussing reinvesting it?

 9       A    Yeah.  It would have been me.  Yes.

10       Q    What about the Valerie Hill case made you

11   think, "You know, this is one we need to reinvestigate"?

12       A    I -- could you repeat the question?  Because

13   I'm trying to understand it.

14       Q    Fair enough.  Was there a particular reason

15   that the Valerie Hill murder came to your mind as a cold

16   case that needed to be looked into further?

17       A    Yes.

18       Q    What was it?

19       A    Well, it was a case where, you know, a woman

20   was murdered savagely and he was a suspect and our

21   investigation showed that, you know, in all probability

22   he did it and there was probably enough for an arrest.

23   And sometimes the, you know, the prior district attorney

24   didn't feel there was enough for conviction.  That's why

25   we wanted Bill Fitzpatrick to look at it, because he's a
```

1    different kind of prosecutor.

2        Q    What do you mean by, "he's a different kind of

3    prosecutor"?

4        A    Well, he -- he prosecuted several cases that

5    I'm aware of, that -- and I was with him -- that

6    previous district attorneys did not feel there was

7    enough to prosecute, and he took the reins on the cases

8    and he followed them through.

9        Q    Was there any additional evidence that you

10   felt needed to be developed in order to successfully

11   prosecute Hector Rivas as part of this reinvestigation?

12       A    Not that I -- not that I can pinpoint right

13   now.  No.

14       Q    During your reinvestigation, did you ever have

15   any discussions with Erik Mitchell?

16       A    All right.  Can you ask that again then,

17   please?

18       Q    Okay.  I want to make sure I get this correct.

19   So at some point you begin reinvestigating the Valerie

20   Hill murder and Hector Rivas as a suspect, right?

21       A    Yes, sir.

22       Q    About when was that?

23       A    I'd say 1992, probably.

24       Q    As part of that reinvestigation, did you talk

25   to Erik Mitchell?

1        A    I don't believe so.  No.

2        Q    As part of that reinvestigation, do you know

3    if William Fitzpatrick spoke with Erik Mitchell?

4        A    I don't know.  I think Erik Mitchell at some

5    point was gone from the -- from the ME's office.  That

6    might -- I think that was '93, though, so.  I'm sure

7    that -- I'm sure that somebody must have talked to Erik

8    Mitchell.  Yes.

9        Q    I'm going to share an exhibit.

10              THE REPORTER:  Mr. Rickner, would you

11    like this one marked?

12              MR. RICKNER:  Yes.  Absolutely.  What is

13    it?  35?

14              THE REPORTER:  Believe we're on to 35.

15        (Exhibit 35 marked for identification.)

16    BY MR. RICKNER:

17        Q    All right.  Now, this is a note.  It's Bates-

18    stamped, I guess, 008955 in red on the bottom left.

19    First, Sergeant, is this your handwriting?

20        A    We can't see the exhibit.

21        Q    Really?

22              MR. JULIAN:  We can see the top part of

23    it.

24              MR. RICKNER:  Okay.  Let's see if this

25    works.

```
1                    MR. JULIAN:  Yep.

2   BY MR. RICKNER:

3        Q    Can you see the whole note now?

4        A    Yes, sir.

5        Q    Is this your handwriting?

6        A    It looks like it is.

7        Q    Okay.  Is that your sort of first name

8   signature, "Peter," at the bottom?

9        A    I can't see it.

10                   MR. JULIAN:  Yeah.  We still don't have

11  the whole exhibit.

12                   MR. RICKNER:  How's this?

13                   MR. JULIAN:  We've got a parenthesis of

14  "(Good)" but we still don't have any -- if there's

15  anything below that.

16                   MR. RICKNER:  There is.  You know what?

17  I'm going to close this down and just have -- I was

18  hoping that just because it was such a big exhibit, we

19  might be able to do this on the screen.  Let me have Ms.

20  Herb (phonetic) handle this one, if we can get you a

21  hard copy.  Okay?

22                   THE WITNESS:  Okay.

23                   MR. RICKNER:  I'm also going to -- I'm

24  just going to go off the record for two seconds and

25  actually call her just to make sure --
```

```
 1                    THE REPORTER:  I was going to ask, if

 2    we're trying to work out an exhibit thing, should we go

 3    off the record?  I'll take us off.

 4                    MR. RICKNER:  Yes, please.  Thank you.

 5                    THE REPORTER:  12:43 p.m., Eastern Time.

 6    We're going off the record.

 7        (Off the record.)

 8                    THE REPORTER:  12:47 p.m., Eastern Time.

 9    We are back on the record.

10                    MR. RICKNER:  Thank you.

11    BY MR. RICKNER:

12        Q    Now, looking at this Exhibit 35, a copy of

13    which you now have in hard copy in front of you, at the

14    bottom, do you see the word "Peter"?

15        A    Yes.

16        Q    Is that your handwriting?

17        A    I would say yes.

18        Q    Okay.  And just going up a little bit, there's

19    an acronym "TOD."  Does that mean time of death?

20        A    I would say yes.

21        Q    Okay.  And does seeing this note refresh your

22    recollection as to whether or not you spoke with Dr.

23    Mitchell as part of the reinvestigation?

24        A    I don't know how I -- where this information

25    come from.  I don't remember talking to him, but I may
```

1    have.  I'm not saying I didn't, I mean.

2        Q    Understood.  I would say this.  Based on your

3    own practices as an investigator, does this note

4    represent the kind of note that you would make following

5    a conversation with a witness?

6        A    No.  Actually, I'd write a report on it, some

7    kind of a memo or report so it can go in the file.

8        Q    Well, looking at this note, do you believe

9    that the information reflected in it came from a

10   conversation with Dr. Mitchell?

11       (Pause.)

12           I'm sorry.  Did I get a -- maybe the answer

13   was clipped.

14       A    Maybe the way you -- I don't know.  Can you

15   answer -- ask it again, please?

16       Q    Yeah.  Absolutely.  I'm just saying is, do you

17   believe that the information on this note came from Dr.

18   Mitchell?

19       A    I'm not certain.  I could -- it could have.

20   It says -- it says, "Regarding Dr. Mitchell."  Does that

21   mean -- it's about Dr. Mitchell, but I -- it could have

22   come from Dr. Mitchell, could have come from somebody

23   else in the ME's office, or -- I mean it says -- you

24   know, the information sounds like it did come right from

25   the medical examiner's office.  And I didn't -- I

```
 1   don't -- there's no date on the note either.  I have no

 2   idea when this was.

 3       Q    Understood.  Now, do you remember the time of

 4   death being an issue with respect to prosecuting Hector

 5   Rivas?

 6       A    The -- the issue of the time of death came up.

 7   Yes, sir.

 8       Q    Okay.  And would it be correct to say that to

 9   successfully prosecute him, the time of death had to be

10   before the period of time where Hector Rivas claimed to

11   have an alibi?

12       A    No.  The -- as I recall, our investigation

13   showed that she had talked to somebody on the phone on

14   Friday and that she wasn't heard from since.  So in my

15   mind, the time of death could have been anytime after

16   she wasn't heard from or -- seen or heard from.

17       Q    Right.  Would it be correct to say that Hector

18   Rivas claimed to have an alibi for Saturday and Sunday?

19       A    I don't remember about Sunday, but I do

20   remember him saying -- it was something about being at

21   the Coleman's bar up on the west end, and he had a

22   picture of him with some of his friends.  That, I do

23   remember.

24       Q    The note, "Pushes time of death limits further

25   out," parentheses, "(Good.)"  What do you understand
```

1    that to mean?

2        A    Okay.  Repeat the question.  I just looked at

3    the note again.  Repeat the question, please.

4        Q    The line, "Pushes time of death limits further

5    out," parentheses, "(Good!!!)" exclamation points, what

6    does that mean?

7        A    It means whatever the limits of time of death

8    would be further out, which could -- in my mind, it

9    means that any time to when she last talked to somebody.

10   It pushes that time of death limit out.

11       Q    Right.  And by "Good," that means that is

12   stronger evidence against Hector Rivas, right?

13       A    I would -- I would interpret it that way, too.

14       Q    So by Erik Mitchell pushing the time of death

15   further out, it makes the case against Hector Rivas

16   stronger; is that right?

17                 MR. JULIAN:  Form.

18                 MR. VENTRONE:  Yeah.  I'll object to the

19   form.

20                 MR. RICKNER:  You can answer.

21                 THE WITNESS:  I can answer -- what?  What

22   Dr. Mitchell said?  Can you repeat the -- I don't

23   understand the question how you're asking it, sir.  I'm

24   sorry.

25                 MR. RICKNER:  No.  That's fine.  I want

1   you to -- if you're confused, I want you to tell me.

2   What I'm saying is --

3               THE WITNESS:  Well, I'm not -- I just

4   don't understand the question.

5   BY MR. RICKNER:

6       Q    Would it be correct to say that if Dr.

7   Mitchell was able to push the time of death out, it

8   would make the case against Hector Rivas stronger?

9               MR. JULIAN:  Objection.

10              THE WITNESS:  Dr. Mitchell could only

11  push the time of death out to the time that we knew she

12  was alive.

13  BY MR. RICKNER:

14      Q    Right.  Yes.  And by pushing it closer to

15  Friday, the time she had last spoken to somebody, did

16  that make the case against Hector Rivas stronger?

17              MR. JULIAN:  Object to the form.

18              THE WITNESS:  (Whispering.)

19              MR. RICKNER:  You can answer, by the way,

20  even if there's an objection.

21              THE WITNESS:  Okay.  I didn't know that.

22  Well, you keep saying if he pushed it out, and I keep

23  saying that he can only push it out to the time that we

24  knew she was alive.  And that's as far as you can push

25  it.  If there was a -- if there was an issue of the time

```
1    of death -- and I know there was controversy about

2    something that -- was it -- was it two days or three

3    days?  But it was at least -- he said it was at least

4    two days, that I recall.

5    BY MR. RICKNER:

6        Q    Right.  And by pushing it back three days to

7    Friday or the morning of Saturday, that makes the case

8    against Hector Rivas stronger; is that right?

9                   MR. VENTRONE:  Object to the form.

10                  MR. JULIAN:  Objection.

11                  THE WITNESS:  That -- it -- it made it --

12   it made it more probable in my mind, based on what --

13   nobody heard from or saw this woman again, after Friday.

14   BY MR. RICKNER:

15       Q    And it also pushed the time of death to a

16   point where Hector Rivas did not have this alibi in the

17   bar; is that right?

18                  MR. JULIAN:  Object as to form.

19                  THE WITNESS:  I don't -- the -- the alibi

20   that he presented, I think, was for Saturday night.  I

21   don't know if -- I don't recall right now what his alibi

22   for Friday was or -- or Sunday.

23   BY MR. RICKNER:

24       Q    Well, I don't believe he had an alibi for

25   Friday.  So if he didn't have an alibi for Friday,
```

```
 1   putting the time of death to Friday makes the case

 2   against him stronger, right?

 3        A    I would say so.

 4             MR. JULIAN:  Objection.

 5             MR. VENTRONE:  Object to the form.

 6   BY MR. RICKNER:

 7        Q    Now -- I'm going to take this down.  I'm going

 8   to try to take -- oh.  Sorry.  I didn't realize it's

 9   only on my screen for reference.

10             Do you recognize the name Susan Stonecipher?

11        A    I know the name Stonecipher.  I don't remember

12   Susan Stonecipher.  Can you expand on --

13        Q    Sure.  I -- yeah.  Susan Stonecipher initially

14   stated, I'm just going to represent this to you, that

15   she saw Ms. Hill on Saturday.  Does that refresh your

16   recollection?

17        A    No.

18        Q    With respect to the reinvestigation, did you

19   do -- well, I skipped over a step.  My apologies.

20             As part of the reinvestigation, did you re-

21   interview witnesses?

22        A    I'm sure we did.

23        Q    And did you conduct those interviews yourself

24   or were you assisted by other officers or detectives?

25        A    Either -- could have been either or both.
```

1      Q    Okay.  As you sit here today, do you remember?

2      A    Do I remember talking to witnesses or talking

3  to -- I -- I -- once again, I don't understand your

4  question.

5      Q    What I'm asking is do you remember if you were

6  the one who handled the investigation entirely yourself

7  or if you were -- reinvestigation -- or if you were

8  assisted by other people?

9      A    I'm sure I was assisted by other people.

10     Q    Now, prior to the indictment, did you discuss

11  the results of your reinvestigation with DA Fitzpatrick?

12     A    Of course.  Yes.

13     Q    Did you have a meeting at one point where you,

14  DA Fitzpatrick, and possibly others sat down and

15  discussed the evidence that you had against Hector

16  Rivas?

17     A    Sure.  Yes, sir.

18     Q    And do you remember what DA Fitzpatrick said

19  with respect to the evidence against Hector Rivas when

20  you sat down to review it?

21     A    No.  We -- we -- as I recall, and we -- well,

22  what our normal procedure on something like this is we

23  set up a little bit of a war room, like we call it, and

24  it's maybe a designated spot at the DA's office where we

25  could more control our files and paperwork.  And if we

```
 1    had evidence from the police department there, it had to

 2    be in a secure location, and so on and so forth.

 3              So -- and I don't know.  I can't remember

 4    if -- and it's another, again, I don't know if it

 5    happened in this case, but it's normal for the police

 6    department to then assign a detective to the DA's office

 7    to assist with the investigation.  Also, it was normal

 8    for the DA's office to assign a prosecutor to the case

 9    too, which might not just have been Bill Fitzpatrick.

10    Could have been another prosecutor.

11         Q    As part of this re investigation, do you

12    remember Erik Mitchell reviewing some slides?

13         A    I don't remember, but it's -- once again, it's

14    possible.

15         Q    Do you remember Erik Mitchell coming to any

16    new conclusions with respect to Valerie Hill's murder

17    during the reinvestigation phase?

18         A    Could you -- could you ask the question again

19    so --

20         Q    Sure.  During the reinvestigation phase, 1992,

21    do you remember Erik Mitchell coming to any new

22    conclusions?

23         A    No.  I remember that -- that -- like I said

24    before, that he said that she was dead at least two days

25    and we knew that -- that she was -- she was -- she
```

1    wasn't seen after Friday.  That would make it three

2    days.  So, do I remember Erik Mitchell saying change of

3    something?  Not particularly.  No.

4         Q    Do you remember Erik Mitchell saying that he

5    now had more evidence that it was more likely to be

6    three days rather than two days?

7         A    No.

8                   MR. VENTRONE:  Object to the form.

9                   MR. RICKNER:  You can answer.

10                  THE WITNESS:  I did.  I said no, sir.  I

11   don't.

12   BY MR. RICKNER:

13        Q    How long do you think this reinvestigation

14   took overall?

15        A    How long did it last?  It's -- it's hard to

16   hear you.

17        Q    Oh.  I'm sorry.  And you may be able to turn

18   up the volume on the TV, by the way.  I don't know if

19   you have a remote or something.  I mean, I can shout

20   louder.

21        A    I'm just saying that -- I think that the

22   volume is good.  I think when you turn away from your

23   mic or something, it's muffled.  That was muffled or

24   something.

25        Q    Oh.  I'm sorry.  Thank you.  It's okay.  Now I

```
 1   can't remember.

 2           How long did the reinvestigation into the

 3   Valerie Hill murder take?

 4       A   I don't remember.  But I can tell you that

 5   from the time we started looking into it would have

 6   ended probably the time he was indicted.

 7       Q   So it could have been several months?

 8       A   I'm sure -- I'm pretty sure it was several

 9   months.  Yes.

10       Q   Now, are you still with the DA's office?

11       A   I am not.  I'm retired.

12       Q   Congratulations.  When did you retire?

13       A   From the DA's office?

14       Q   Yes.

15       A   From the DA's office?

16       Q   Yes.

17       A   You're nodding.  You got to say --

18       Q   I said yes.

19       A   Okay.  I retired from the DA's office.  I

20   believe it was 1999, November.

21       Q   Now, you may know from the news or somewhere

22   else that, you know, Hector Rivas's conviction was

23   overturned and they started investigating it a third

24   time.  Did you have any part of that third

25   investigation?
```

1       A    No, sir.

2       Q    Between, let's say, 1999 and today, did

3   anybody ever come and talk to you about the Valerie Hill

4   murder or the Hector Rivas criminal case and conviction?

5       A    Not that I remember.  No.

6       Q    When was the last time you spoke with William

7   Fitzpatrick?

8       A    I think -- I think it was about two weeks ago

9   from today.

10      Q    What'd you discuss?

11      A    He asked me to give Bob Julian a call

12  regarding this case.

13      Q    Did you discuss the case?

14      A    No.

15      Q    Prior to that conversation, had you ever had

16  any conversations with -- well, withdrawn.

17           From, let's say, the time that Hector Rivas

18  was convicted until the present day, is that the only

19  conversation you've had with DA Fitzpatrick that relates

20  to Hector Rivas or this case or the Valerie Hill murder?

21      A    So, we're talking how many years?  No.  I have

22  no idea at all.  Nothing that I recall, so.

23      Q    Okay.  Do you have any reason to believe that

24  you would have, at any time after your retirement,

25  discussed this case, the Valerie Hill murder or the

```
 1   Hector Rivas prosecution and conviction with William

 2   Fitzpatrick?

 3        A    Not that I recall.  No.

 4        Q    When was the last time you spoke with Erik

 5   Mitchell, if you remember?

 6        A    Erik Mitchell?  I can't remember.  It was a

 7   long time ago, probably, you know, like 15, 20 years

 8   ago.

 9        Q    Okay.  Now, at some point, the DA's office and

10   William Fitzpatrick started investigating Erik Mitchell;

11   is that right?

12        A    Yes, sir.

13        Q    Were you part of that investigation?

14        A    I was.

15        Q    Okay.  When did you first begin that

16   investigation?

17        A    I think it was the summer of '93.

18        Q    And what sparked that investigation?

19        A    I think that somebody made a complaint to the

20   DA's office about an autopsy, an improper autopsy or

21   something.

22        Q    Do you know when that complaint was made?

23        A    Do I know when the complaint was made?  No.  I

24   don't.

25        Q    As of the result of that investigation, did
```

1    you uncover any conduct that could be illegal with

2    respect to Dr. Mitchell?

3        A    Yes, sir.

4                MR. JULIAN:  Object to the form.

5    BY MR. RICKNER:

6        Q    What was that?

7                MR. JULIAN:  Form.

8                THE WITNESS:  What was -- what was the

9    illegal activity?

10               MR. RICKNER:  Yes.

11               THE WITNESS:  Well, I can describe some

12   things, and whether they're illegally -- illegal by the

13   penal law or improper or not procedural, I'll just

14   describe them that way.  Okay?

15   BY MR. RICKNER:

16       Q    Yeah.  Please.  During your investigation,

17   what did you uncover about Dr. Mitchell?

18       A    Well, there was a complaint that -- we found

19   that -- we heard -- I guess I heard from some people

20   working there that they had flushed some body parts down

21   the drain in the -- the ME's office, and I think the

22   Department of Environmental Conservation was called in.

23               We heard that he had maybe seized some body

24   parts, for research or whatever, without the express

25   permission of family.

1          We heard that he sponsored or conducted

2    some -- some -- they were like a teaching exercise where

3    animals were bought and then buried, you know, for

4    research.  And then his office also either sponsored or

5    had something to do with another exercise on a farm, not

6    in this county, but that maybe some body parts from the

7    ME's office were used in that exercise.

8          We -- we had a complaint that a female member

9    of the ME's office was staging some photos over dead

10   bodies and had a complaint about that.

11         We had a complaint about somebody who was not

12   a member of the ME's office actually partaking in actual

13   parts of a -- of a legitimate autopsy, that somebody --

14   that some body parts, particularly like a skull or a

15   spine, were -- were used by the ME's office for display

16   or research or teaching or whatever, but these

17   particular body parts were not supposed to be there.

18   They were supposed to be returned to a grave or returned

19   to a funeral home or return to a whatever, but -- or he

20   didn't have permission to have them at all.

21         Yes.  I think that that about does it.

22     Q    And based on your investigation, did you find

23   that these allegations were credible?

24     A    In my opinion, yes.

25     Q    Now, did DA Fitzpatrick ever attempt to

```
 1    prosecute Erik Mitchell based on these allegations?

 2         A    Did he attempt to prosecute him?  I -- you

 3    mean -- I -- no.

 4         Q    Do you know why Erik Mitchell wasn't

 5    prosecuted as a result of this investigation?

 6         A    I believe so.  Yes.

 7         Q    Do you know why he wasn't prosecuted?

 8         A    Do I know why?

 9         Q    Yes.

10         A    I think -- I -- I believe so.

11         Q    And what's the reason?

12         A    Well, I was present at the office of the

13    county executive when Erik Mitchell offered his

14    resignation.

15         Q    And tell me what happened at that meeting.

16         A    Well, as I recall, we were having a meeting at

17    the executive -- county executive's office, Nick Pirro.

18    And Erik Mitchell was going to be there, and Erik

19    Mitchell's attorney was going to be there, and Mr.

20    Fitzpatrick was going to be there, and I was there.

21              And I think Mr. Pirro discussed some of the --

22    I wouldn't say the allegations, but the fallout from any

23    adverse publicity that might become the medical

24    examiner's office due to the facts, you know, uncovered

25    during our investigation.  What would it do for public
```

1    confidence in that office?

2            And Erik Mitchell, I believe, as I recall,

3    said, "Well, then, would you feel better if I offered my

4    resignation?"  I think Mr. Pirro said yes, he would

5    accept it.

6        Q    Do you remember Erik Mitchell's attorney and

7    DA Fitzpatrick arguing?

8        A    Their -- yes.  They had some words.  Yes.

9        Q    What were they arguing?

10       A    I don't remember.  I don't remember what they

11   were arguing about, but I remember that Mr. Cominsky, he

12   got a little loud -- or -- with Mr. Fitzpatrick, and

13   then Mr. Fitzpatrick said something to Mr. Cominsky, and

14   that's the part I remember.

15       Q    Do you remember these allegations coming out

16   earlier in 1993 as part of an investigation by the

17   county?

18            MR. VENTRONE:  Object to the form.  Go

19   ahead.

20            THE WITNESS:  I -- I don't, but I

21   remember that -- I mean, I remember something about

22   that.  Yes.  But I don't remember anything specific.  I

23   remember that the county was looking into some other

24   complaints about the ME's office.  And it was in the

25   newspaper, I believe, so.

1    BY MR. RICKNER:

2        Q    Do you remember DA Fitzpatrick ever saying

3    that he wanted to try to protect Erik Mitchell?

4        A    No, sir.

5        Q    During the investigation, was Erik Mitchell

6    still testifying as a witness in criminal prosecutions?

7        A    I don't remember, but I'm certain that he was.

8    I mean, he was the -- he was the ME.

9        Q    At any time, did DA Fitzpatrick ever tell you

10   in sum and substance that his opinion of Erik Mitchell

11   had changed and that he couldn't rely on him anymore as

12   a medical examiner?

13               MR. JULIAN:  Object to the form.

14               MR. VENTRONE:  Yeah.  Object to the --

15               MR. RICKNER:  You can answer.

16               THE WITNESS:  Well, I can -- I can say in

17   my opinion is I think Mr. Fitzpatrick had the same

18   opinion of Erik Mitchell that we liked Erik Mitchell.

19   We thought he was doing a good job.

20               On the other hand, when I presented to

21   Mr. Fitzpatrick everything that we uncovered at the ME's

22   office, I think was -- she shared my opinion that

23   something had to be done because some of the allegations

24   were so outrageous that -- I go by the old adage that if

25   it's in the front page of the newspaper the next day,

1    you want to live with that, so.

2    BY MR. RICKNER:

3        Q    Would it be correct to say that as a result of

4    everything that had been uncovered during your

5    investigation, DA Fitzpatrick was worried know juries,

6    if they heard it, might not believe Mitchell and he

7    couldn't get convictions?

8                MR. JULIAN:  Object to the form.

9                THE WITNESS:  In my opinion, no.  That

10   was -- it was more about the public confidence in the

11   ME's office and also to -- I mean, to -- to make the

12   injured people, the relatives or whoever, of -- of the

13   folks were involved, we wanted to make them feel better

14   too.  We had to make -- make them feel that there was

15   some consequences for what they went through.

16   BY MR. RICKNER:

17       Q    And during this meeting that you described, do

18   you remember DA Fitzpatrick making any accusations to

19   Erik Mitchell?

20       A    No, sir.

21       Q    Do you remember him accusing anything --

22   withdrawn.

23            Do you remember DA Fitzpatrick accusing Erik

24   Mitchell of something that ultimately then made his

25   lawyer angry?

```
 1        A     No.  I don't -- I don't recall what made the

 2   lawyer uncomfortable.  No.

 3        Q     Prior to that meeting with the county

 4   executive, had you had any meetings with DA Fitzpatrick

 5   about your investigation into Erik Mitchell?

 6        A     I'm sure I did.

 7        Q     During your investigation of Erik Mitchell,

 8   did you keep DA Fitzpatrick informed of everything that

 9   was relevant?

10        A     I'm sure I did.

11              MR. RICKNER:  And -- you know --

12   withdrawn.

13              I don't think I have any further

14   questions actually.  Counselor?

15              MR. JULIAN:  No.

16              MR. VENTRONE:  Nothing by me.  We're all

17   set.  Thank you.

18              MR. RICKNER:  Do we know if we have the

19   county attorney yet?

20              MR. JULIAN:  County executive?

21              MR. VENTRONE:  County exec?

22              MR. RICKNER:  Exec.

23              THE REPORTER:  Sorry.  Before we go off

24   record, real briefly, same questions as the first one.

25   Mr. Tynan, would you like to read and sign the
```

1    transcript?  I think that was brought up at the

2    beginning.

3                    MR. VENTRONE:  Let's wait for --

4                    MR. RICKNER:  Can we wait -- can we wait

5    until Bob comes back?

6                    THE WITNESS:  We -- Mr. Rickner, are you

7    all set with me?

8                    MR. VENTRONE:  Peter, just have a seat

9    for a minute.

10                   MR. RICKNER:  One second.  Can you just

11   go nab Bob for me quickly so we can wrap this up?  I

12   don't want to hold the witness any further.

13                   MR. VENTRONE:  He's checking to see if

14   Pirro's here.

15                   MR. RICKNER:  Okay.

16                   THE REPORTER:  Want me to take us off

17   record for a moment?

18                   MR. RICKNER:  Yeah.  One second.  Let's

19   just wait until everybody comes.

20                   THE REPORTER:  Is that a yes?  We're

21   taking off record?  Sorry -- he's back.

22                   MR. JULIAN:  Not yet.  No.

23                   MR. VENTRONE:  Do we need him to sign?

24                   MR. JULIAN:  I don't really care.

25                   MR. VENTRONE:  No.  We're good with that,

```
 1    Rob.

 2                THE REPORTER:  Okay.  Mr. Rickner, would

 3    you like to order the original transcript?

 4                MR. RICKNER:  I am.  Yeah.  Of course.

 5                THE REPORTER:  Same question for Mr.

 6    Julian.  Would you like to purchase the original -- the

 7    copy of the transcript?

 8                MR. JULIAN:  Same deal.

 9                MR. VENTRONE:  Same deal.

10                THE REPORTER:  Same deal as before?  All

11    right.

12                MR. VENTRONE:  Nothing for me.

13         (Off the record - counsel confer.)

14                THE REPORTER:  1:20 p.m., Eastern Time.

15    We're going off the record.

16            (Proceedings concluded at 1:20 p.m.)

17                (Read and Sign waived.)

18                       * * * * *

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3           I, Zack Shoup, hereby certify:

 4           That the foregoing proceedings were taken

 5   before me at the time and place therein set forth;

 6           That the proceedings were recorded by me and

 7   thereafter formatted into a full, true, and correct

 8   transcript of same;

 9           I further certify that I am neither counsel

10   for nor related to any parties to said action, nor in

11   any way interested in the outcome thereof.

12

13           DATED, this 9th day of January 2024.

14

15

16           _____

17                    Zack Shoup, CER-15887

18                    Digital Reporter

19

20

21

22

23

24

25
```