# EXHIBIT "I"

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF NEW YORK

 3    _____

 4    SIDNEY MANES, administrator of

 5    the estate of HECTOR RIVAS,

 6          Plaintiff,

 7       v.                             Case No.:

 8    ONONDAGA COUNTY, CITY OF          5:19-cv-00844-BKS-TWD

 9    SYRACUSE, WILLIAM FITZPATRICK,

10    DR. ERIK MITCHELL, AND "JOHN

11    DOES 1-10",

12          Defendants.

13    _____

14                         DEPOSITION

15    _____

16

17    WITNESS:          Sidney Cominsky

18    DATE:             Wednesday, December 20, 2023

19    START TIME:       10:14 a.m. ET

20    END TIME:         10:59 a.m. ET

21    REMOTE LOCATION:  Remote Legal platform

22    REPORTER:         Zack Shoup, CER-15887

23    JOB NO.:          21976

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3        RICKNER PLLC

 4        14 Wall Street, Suite 1603

 5        New York, New York 10005

 6        By:  ROBERT RICKNER, ESQUIRE

 7             rob@ricknerpllc.com

 8        Appearing for Plaintiff

 9

10        LAW OFFICES OF ROBERT F. JULIAN

11        2037 Genesee Street, Suite 2

12        Utica, New York 13501

13        By:  ROBERT F. JULIAN, ESQUIRE

14        Appearing for Defendants Mitchell and Fitzpatrick

15

16        THE LAW OFFICE OF MARK A. VENTRONE, ESQ.

17        214 North State Street

18        Syracuse, New York 13203

19        By:  MARK VENTRONE, ESQUIRE

20             info@mventronelaw.com

21        Appearing for Defendant Onondaga County

22

23

24

25
```

```
1              I N D E X   O F   T E S T I M O N Y

2

3   EXAMINATION OF SIDNEY COMINSKY:                    PAGE

4        By Mr. Rickner                                  9

5        By Mr. Julian                                  25

6        By Mr. Rickner                                 29

7        By Mr. Julian                                  31

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X   O F   E X H I B I T S

 2                   (available for download)

 3

 4    EXHIBIT    DESCRIPTION                        PAGE

 5    32         Letter, February 5, 1988            11

 6    33         Article Page 3                      13

 7    34         Indemnification Letter              19

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    FEDERAL STIPULATIONS

 2

 3           IT IS HEREBY STIPULATED AND AGREED by and

 4   between the attorneys for the respective parties that

 5   the presence of the Referee be waived;

 6           IT IS FURTHER STIPULATED AND AGREED that all

 7   objections, except as to form, are reserved until the

 8   time of trial;

 9           IT IS FURTHER STIPULATED AND AGREED that this

10   deposition may be utilized for all purposes as provided

11   by the Federal Rules of Civil Procedure;

12           AND FURTHER STIPULATED AND AGREED that all

13   rights provided to all parties by the Federal Rules of

14   Civil Procedure shall not be deemed waived and the

15   appropriate sections of the Federal Rules of Civil

16   Procedure shall be controlling with respect thereto.

17

18

19

20

21

22

23

24

25
```

```
 1                FEDERAL REMOTE STIPULATIONS

 2

 3           IT IS HEREBY STIPULATED, by and between the

 4     attorneys of record for all parties to the above-

 5     entitled action, that:

 6           Pursuant to Rule 30(b)(4) of the Federal Rules

 7     of Civil Procedure, this deposition will be conducted by

 8     remote videoconference with the oath being administered

 9     remotely and a court reporter creating an accurate

10     written record; that, if necessary, the parties agree

11     that each witness can be identified with picture

12     identification;

13           No attorney, nor any party or witness, shall

14     capture any still photographs, nor record, by video or

15     audio, any part of these deposition proceedings;

16           Each attorney agrees to instruct their witness

17     that there is to be no communication with anyone outside

18     of the identified and participating group, by chat,

19     text, email, or other means during the deposition;

20           There shall be no other person in the room

21     with the witness during their deposition;

22           Any phone or electronic device in the room

23     with a witness shall be identified and not read,

24     referred to, or otherwise used during the witness'

25     deposition, unless agreed to by all counsel on record.
```

```
 1                     P R O C E E D I N G S

 2                     THE REPORTER:  Good morning.  We are now

 3   on the record.  Today's date is Wednesday, December

 4   20th, 2023, and the time is approximately 10:14 a.m.

 5   Eastern time.

 6                     My name is Zack Shoup and I'm the officer

 7   designated by Remote Legal, 11 Broadway, Suite 456, New

 8   York, New York to take the record of this proceeding.

 9                     This is the deposition of Sidney Cominsky

10   taken in the matter of Manes versus Onondaga County,

11   Case Number 5:19-cv-00844-BKS-TWD, filed in the United

12   States District Court, Northern District of New York.

13                     Would all Counsel please identify

14   themselves for the record starting with the noticing

15   attorney and state who they represent?

16                     MR. RICKNER:  Yes.  Thank you.  Rob

17   Rickner, Rickner PLLC.  I represent the plaintiff, the

18   estate of Hector Rivas.

19                     MR. JULIAN:  Robert Julian for Mitchell

20   and Fitzpatrick.

21                     MR. VENTRONE:  Mark Ventrone for the

22   County of Onondaga.

23                     THE REPORTER:  Thank you.  This

24   deposition is being taken remotely on behalf of the

25   plaintiff and is being conducted pursuant to the
```

```
 1    procedural rules and laws of the state which governs

 2    this matter.

 3                    As such, all parties agree to this means

 4    of capturing the official record which may include

 5    recording by audio and/or audiovisual means and agree

 6    not to oppose admission of this proceeding on the basis

 7    of the personnel or method by which the testimony in

 8    this proceeding was captured.

 9                    Do all parties so stipulate?

10                    MR. RICKNER:  So stipulated by Plaintiff.

11                    MR. VENTRONE:  Yes.

12                    THE REPORTER:  Do Defendants' attorneys

13    so stipulate?

14                    MR. JULIAN:  Yes.

15                    MR. VENTRONE:  Yes.

16                    THE REPORTER:  Thank you.  And I will now

17    swear in the witness.

18                    Sir, could you please state and spell

19    your full name for the record?

20                    MR. COMINSKY:  Sidney Cominsky, S-I-D-N-

21    E-Y C-O-M-I-N-S-K-Y.

22                    THE REPORTER:  Could you please raise

23    your right hand?

24                    MR. JULIAN:  I just want to make sure all

25    objections are reserved except as to form, correct?
```

1                    MR. RICKNER:  Yeah.  Standard federal

2    rules, obviously.  We don't -- we can't change them by

3    agreement.

4                    THE REPORTER:  All right.

5                    MR. RICKNER:  Anything else?

6                    THE REPORTER:  Sorry.  Okay.  Sorry.

7    I'll keep going.

8                    Mr. Cominsky, could you please raise your

9    right hand?

10                    Do you swear or affirm that the testimony

11    you shall give today in this proceeding will be the

12    truth, the whole truth and nothing but the truth?

13                    MR. COMINSKY:  I do.

14   WHEREUPON,

15                    S I D N E Y   C O M I N S K Y,

16   having been called as a witness, being duly sworn by the

17   notary public present, testified as follows:

18                    THE REPORTER:  Thank you.  You may lower

19   your hand.

20                    The witness is sworn and Counsel, you may

21   begin.

22                    MR. RICKNER:  Thank you.

23                    EXAMINATION

24   BY MR. RICKNER:

25        Q    Mr. Cominsky, may I presume you have taken a

```
 1   deposition during your career as an attorney?

 2        A    Literally thousands of them.

 3        Q    All right. I'm going to skip over some of the

 4   usual bits, then.

 5        A    Okay.

 6        Q    Just the stuff that matters.  You -- do you

 7   have any medication or any medical reason why you can't

 8   give full and complete testimony today?

 9        A    No.

10        Q    Okay.  Did you do anything to prepare for

11   today's deposition?

12        A    Put on a suit.

13        Q    Did you discuss the substance of today's

14   deposition with anyone prior to coming here?

15        A    A couple of months ago Bob Julian and I had a

16   brief conversation.  I told him basically that my file

17   had been disposed of years ago.  He suggested I look

18   over some materials.  I told him I probably wouldn't,

19   and I didn't.

20             He gave me the copy of Sidney Mane's

21   deposition.  I've not read it.  He sent me an old

22   newspaper article.  I don't think I read it, but I

23   haven't looked at anything for weeks and that's the

24   extent of -- of what it was.  I don't have a file.  And

25   so I haven't looked at anything.
```

```
 1        Q    Fair enough.  Now, would it be correct that

 2    you represented Erik Mitchell at some point in your

 3    life?

 4        A    Oh, absolutely.

 5        Q    Okay.  Great.  And when did you first

 6    represent Erik Mitchell?

 7        A    I think in the 1980s.

 8        Q    I'm going to put -- we're going to do this as

 9    Exhibit 32 because previously we marked up to 31.  And I

10    believe that this is shared for everyone.  In the

11    printouts it's a letter from the Onondaga County

12    Department of Law -- February 5, 1988, directed to you.

13        A    I see it.  Okay.

14        (Exhibit 32 marked for identification.)

15    BY MR. RICKNER:

16        Q    Okay.  Now --

17        A    Give me one minute to look it over.

18        Q    Please do.

19        A    All right.

20        Q    Okay.  Now, does this refresh your

21    recollection reading what's been marked as Exhibit 32?

22    That you were -- represented Erik Mitchell with respect

23    to an investigation by the County attorney in 1988?

24        A    As I said, it was in the '80s that I

25    represented him.  I just don't know when it began, so to
```

```
 1    speak.  I don't know how far along in '88 this was.

 2         Q    Okay.  But at least in 1988 you represented

 3    him with respect to an investigation by the county

 4    attorney?  Do you remember that?

 5         A    Correct.

 6         Q    Okay.  Do you remember the substance of that

 7    investigation?

 8         A    There were Department of Health concerns and

 9     and some complaints about Dr. Mitchell's professional

10    behavior.  And Dr. Mitchell had called me, asked me if I

11    would represent him, and I said I would.

12         Q    And do you know if Dr. Mitchell was

13    interviewed during this investigation in 1988?

14         A    I know we met at one time with Nick Pirro, Ed

15    Kochian and Bill Fitzpatrick at the County office

16    building, but that was at the latter part of all of

17    this.  I don't recall.  This is over 30 years -- this is

18    a long time.  I just don't remember.

19         Q    You know, Counselor, I'm sure you've said this

20    to witnesses many times in your own career, but it's not

21    a memory test.  I understand it's 30 years ago.  I've

22    just got to cover the territory, see what you do

23    remember.

24         A    It's not a problem.  Go ahead.

25         Q    All right.  I fully accept that you may not
```

1    remember.  Okay.  I'm going to take this exhibit down.

2            Now, at least in 1988, were you being paid by

3    Dr. Mitchell?  Dr. Mitchell's insurance company?  Was he

4    indemnified by the County or something else?

5        A    I was not paid.  All of this was pro bono.

6        Q    Out of curiosity, why did you take on this

7    case pro bono?

8        A    Because I saw it as an opportunity to get free

9    advertising, so to speak.  It was something of public

10   concern.  I was a young attorney.  I was just at this

11   time -- let's see, '88, I was a kid and it was an

12   opportunity to represent someone who was in the public

13   eye and a way for me to establish a reputation, and

14   that's why I did it.

15       Q    Understood.  Now -- shoot.

16            All right, I'd like to mark this as Exhibit

17   33.  And this is a newspaper article from the Post-

18   Standard dated March 3rd of 1993.

19       A    Okay.  Give me a minute.

20       (Exhibit 33 marked for identification.)

21       Q    Yes, please do.  And if you can --

22       A    The doctor's review.  Okay.  I got it.

23       Q    Yes.  It's three pages.  Please, you know,

24   read it over and familiarize yourself with the document

25   a little bit, and hopefully it refreshes your

1    recollection.

2        A    Okay.  I've kind of reviewed it.

3        Q    Okay.  I appreciate that.  Now, having

4    reviewed this newspaper article, does that refresh your

5    recollection as the types of allegations that were being

6    made about Dr. Mitchell in the early part of 1993?

7        A    I guess so, yeah.

8        Q    Okay.

9        A    But, I mean, it's only whatever I read.  I

10   don't remember much about this, other than what you've

11   just shown me.

12       Q    Okay.  Well, based on what I've just shown

13   you, in March of 1993, there was a series of allegations

14   about misconduct directed towards Erik Mitchell, both in

15   the media and, I believe, in the County Attorney's

16   office.  Do you remember that?

17       A    Yes.  John O'Brien, the reporter, was very

18   persistent and he felt that there was wrongdoing going

19   on, and these employees made certain complaints.  And as

20   far as I can recall from this article, much of it was

21   never proven, and some of it was unresolved.

22       Q    Okay.  Now during this -- when this first came

23   to light, did you discuss the allegations against Erik

24   Mitchell with D.A. Fitzpatrick?

25       A    The D.A.'s attacker?  I -- I'm not sure if I

```
 1   know what you're --

 2       Q    Did -- in the beginning part of 1993, did you

 3   ever discuss the allegations made against Erik Mitchell

 4   with D.A. William Fitzpatrick?

 5       A    I don't recall.  As I told you, I recall one

 6   meeting with Nick Pirro, the County Executive, Ed

 7   Kochian, which is K-O-C-H-I-A-N, who was Nick Pirro's, I

 8   guess, executive officer or something, William

 9   Fitzpatrick, Erik and myself.  And I recall getting into

10   a fight with Bill Fitzpatrick in the office.  And I

11   basically told him to stick it in his ear, and if he was

12   prepared to go to court, we'd go to court.

13       Q    Understood. When do you think this meeting

14   was?

15       A    No idea.  I -- I'm -- I would say it was

16   somewhere within a year of Erik resigning --

17       Q    Okay.

18       A    -- because that's what the discussion was

19   about, was that they wanted him to resign.

20       Q    Okay.  Was this around the time that the

21   county attorney was doing its investigation?

22       A    I don't know.

23       Q    So this conversation with Fitzpatrick, you

24   said you were fighting with him.  What were you fighting

25   about?
```

```
 1        A    He made certain statements about Erik that I

 2   found offensive, and I don't even recall what he was

 3   saying.  And I told him that if that's how he felt,

 4   let's go to the courthouse and fight it out.  And

 5   basically, Nick Pirro and Ed Kochian told us to quiet

 6   down and calm down.  And Erik and I -- I kind of recall

 7   getting up and leaving, and that's about it.  At that

 8   time, I was doing criminal defense work, and -- and Bill

 9   Fitzpatrick and I were not what I would call close

10   friends.

11        Q    So you knew him as the District Attorney at

12   this time -- as well as in his role as investigating

13   Erik Mitchell?

14        A    I don't think there was ever a time I didn't

15   know Bill Fitzpatrick as being in the D.A.'s office.  He

16   was either an assistant A.D.A. -- you know, an A.D.A.

17   rather, or the District Attorney, and at this time when

18   we had the argument, he was the District Attorney.

19        Q    Okay.  So at the time you had the argument he

20   was the District Attorney?  Did I get that right?

21        A    Correct.

22        Q    Okay.  Now, at the -- during that

23   conversation, did he call for Erik Mitchell to resign?

24        A    I don't -- I was going to say I don't recall,

25   but since you're saying call -- I think the conversation
```

```
 1    was Nick Pirro, Ed Kochian, and Bill Fitzpatrick trying

 2    to figure out a way to let Erik leave instead of being

 3    fired because they felt that the -- the newspaper, the

 4    public pressure was too much, and they were trying to

 5    resolve this.  And that's what I recall.

 6         Q    Was there ever a discussion where William

 7    Fitzpatrick said that he would avoid bringing criminal

 8    charges if Mitchell resigned?

 9         A    I don't recall it specifically, but that's

10    kind of the gist.  And I think that's where Bill and I

11    got into an argument, and I basically said, you know, go

12    ahead and do it.  And of course, everybody else was

13    like, let's slow down, you know.

14         Q    After, you know, after that argument, at some

15    point, did Erik Mitchell agree to resign to avoid

16    criminal charges?

17         A    That's two questions you're asking.  Did he

18    agree to resign?  The answer is yes.

19         Q    Okay.

20         A    Did he agree to do it because he wanted to

21    avoid criminal charges?  I don't know.

22         Q    Okay.

23         A    I don't remember.  I don't even know if we

24    discussed that aspect of it.

25         Q    Okay.  Was your understanding with William
```

1    Fitzpatrick that if he resigned, that Fitzpatrick would

2    stop pursuing criminal charges?

3        A    I think that was.  I don't recall anything

4    specific, but that would make sense.

5        Q    And.  I'm trying to -- prior to this

6    conversation, was there a time when you felt that

7    William Fitzpatrick was trying to protect Erik Mitchell

8    from the allegations in the media?

9        A    I don't know.  I mean I think probably Bill

10   Fitzpatrick had certain cases that relied on Erik

11   Mitchell's testimony, so he might have been in a spot,

12   but he never said anything to me.  That's just my guess.

13       Q    Okay.  Do you believe that William Fitzpatrick

14   started pursuing criminal charges when he ran out of

15   cases that he was relying on Erik Mitchell?

16       A    No.  I -- I don't have any way of knowing why

17   or what.

18       Q    With respect to Erik Mitchell resigning, was

19   there ever some sort of written agreement or contract?

20       A    I don't recall.

21       Q    Hold on.  I'm going to close out this exhibit,

22   although -- all right.

23            All right.  I'm going to share, this is --

24   should be in your pile.  It's a November 19th, 1993

25   letter.

```
1        A    Hold on.  November?

2        Q    19th of 1993.

3        A    From the Department of Law?

4        Q    Yes.

5        A    Okay.  Hold on.

6             THE REPORTER:  Mr. Rickner, would you

7    like this marked Exhibit 34?

8             MR. RICKNER:  Yes, please.

9        (Exhibit 34 marked for identification.)

10            THE WITNESS:  Okay.  This is a letter

11   from Diane E. Tucker?

12            MR. RICKNER:  Correct.

13            THE WITNESS:  Okay.

14   BY MR. RICKNER:

15       Q    Now, does this Exhibit 34, does this refresh

16   your recollection that you attempted to have

17   indemnification provided by the County of Onondaga for

18   Erik Mitchell?

19       A    Well, that's a different question than you

20   asked me before.  First of all, I still didn't get paid

21   any fees.  Second of all, there obviously was some

22   question as to whether or not Erik Mitchell would be

23   indemnified, and I don't know what it was regarding.

24       Q    Right.  Well, that's what I was asking.  Do

25   you remember seeking indemnification for something
```

```
 1   related to Erik Mitchell?

 2        A    Well, I must have been seeking clarification,

 3   providing defense and indemnification.  That's what it

 4   says, but I don't recall what the circumstances were.

 5        Q    Okay.  Do you recall whether or not the County

 6   of Onondaga ever denied indemnification to Erik Mitchell

 7   for anything?

 8        A    I don't remember them giving him

 9   indemnification or denying.  I don't remember.

10        Q    About when do you believe you stopped

11   representing Erik Mitchell?

12        A    Right around this time of '93, '94.  I don't

13   think much longer, but again, I don't recall.  I don't

14   have any -- I don't have a file.  I did have a bunch of

15   newspaper articles, but I moved about three years ago

16   from my home, and I don't have any idea of where those

17   articles are.  And like I said, I got rid of my file

18   years ago.  So I don't know.  I really don't know.

19        Q    Now, when do you think the last time you spoke

20   with Erik Mitchell was?

21        A    Four or five years ago, maybe, six.

22        Q    Okay.  What was the content of that

23   conversation?

24        A    Well, I don't know if I can answer that.

25        Q    Well, I guess that's a different question.
```

1   But did you -- what -- the last time you spoke with Erik

2   Mitchell, were you -- was he seeking representation from

3   you?

4        A    I don't know if I can answer that.

5        Q    Well, to establish whether -- I understand

6   that you are worried that it's privileged.  However, if

7   you aren't acting in his capacity as an attorney and he

8   isn't seeking to retain you as an attorney, I don't

9   think that privilege applies.

10            MR. JULIAN:  No, I don't agree with --

11            THE WITNESS:  And I -- I appreciate what

12  you think.  You're going to have to get a ruling from a

13  court on that.  Okay?  I -- I don't know if you're right

14  or wrong, but without a judge telling me to say it, I'm

15  not talking.

16  BY MR. RICKNER:

17       Q    Okay.  Just to avoid the potential unnecessary

18  motion practice, will you say whether as a general

19  matter, it was with respect to the allegations in this

20  case or something entirely separate?

21       A    No.  I will not say anything -- you're asking

22  -- I mean, I appreciate your creativeness, but I ain't

23  talking.

24       Q    Well, I don't -- I don't want to march into

25  court only to find out that you guys were talking about

```
 1   some case totally unrelated to this one.

 2        A    So --

 3        Q    So I'm just giving you the opportunity to

 4   potentially avoid that.  I don't know what I'm doing in

 5   the future.

 6        A    I -- I can't answer.  I don't think it's

 7   appropriate.  Or let's put it --

 8        Q    Well --

 9        A    I don't -- I do not know if it's appropriate

10   or inappropriate, and I'm going to have to err on the

11   side of caution.

12        Q    Okay.  Then, one last question.

13        A    I get -- one way or another, but I -- you got

14   to get a court to make a ruling on it.

15             MR. RICKNER:  Well, one other option.  I

16   just ask Mr. Julian again, to avoid possible unnecessary

17   motion practice, would you allow your client -- you

18   know, you represent Dr. Mitchell.  Would you allow him

19   to answer this one question?  Was this conversation on

20   topic or effectively off topic with respect to this

21   case.

22             MR. JULIAN:  Would I allow -- Dr.

23   Mitchell is not here to consult with him.  I do not know

24   about this issue one way or the other, and so I have to

25   respect the witness's position at this point.
```

```
 1                    MR. RICKNER:  That's fine.  As I said,
 2    I'm just trying to avoid, you know, potentially fighting
 3    about nothing.  But I'll move on.
 4    BY MR. RICKNER:
 5         Q    Between 1993 and today, have you had any
 6    discussions with William Fitzpatrick about Erik Mitchell
 7    or the subject of this case?
 8         A    I don't know if I did or didn't.  I -- I
 9    simply don't -- I can tell you this much.  In the last
10    20 years or so, I can say absolutely not, but I -- I
11    don't know.  I mean, I may have seen him in 1993 or '5
12    or whatever, and I don't know.  I mean I did not have
13    much of a relationship with Bill Fitzpatrick.  I've
14    probably seen Bill a half a dozen times in the last 30
15    years at some event.  We are not socially ever together.
16         Q    The same question with Nicholas Pirro.  Have
17    you discussed Erik Mitchell or the subject of this case
18    at any time besides for the one conversation that you do
19    remember.
20         A    I don't recall.  Can you tell me when Erik did
21    resign?
22         Q    Probably.  It's in 1994.  Well, he resigned,
23    and then he kept -- stayed on for a little bit, but if
24    you're wondering about the timeline, it's -- that's the
25    area.
```

```
1        A    It's possible that I saw Nick Pirro and had

2   some kind of a conversation with him after the meet.  He

3   may have -- he may have said, you know, have you made up

4   your mind?  Are you, whatever?  Where's Erik going?  But

5   I don't recall anything.  And I had a nice relationship

6   with Nick Pirro, so.  His office was next door to the

7   County courthouse.  I may have run into him, but I don't

8   recall.

9        Q    Are you familiar at all with the case, the --

10  Hector Rivas's criminal case?

11       A    No.

12       Q    Great.  Just to close the loop, if I

13  understand correctly, the only conversation you remember

14  between Erik Mitchell, Nick -- what's -- Nicholas Pirro

15  and William Fitzpatrick, or in any combination of them,

16  is the one that we've discussed, right?

17       A    That's the only one I recall, yeah.

18       Q    Okay.  And --

19       A    I mean, because we were so hot headed at the

20  time.  Bill and I, not on good terms.

21       Q    Did you go into the meeting not on good terms,

22  or did you become not on good terms because of the

23  meeting?

24       A    He was a D.A.  I was a criminal defense

25  attorney.  There were no such thing as good terms.
```

```
 1      Q    Just so to answer my question, you already

 2   weren't on good terms before the meeting started?

 3      A    Right.  Or let's put it this way, we were on

 4   the opposite sides of each other and we had very little

 5   contact outside of a courtroom.

 6      Q    All right.  I don't know if anybody else has

 7   any questions.

 8                          EXAMINATION

 9   BY MR. JULIAN:

10      Q    I do.  Mr. Cominsky, as you know, I represent

11   both Dr. Mitchell and William Fitzpatrick.

12                MR. RICKNER:  You're going to have to get

13   real close to a microphone because I'm going to guess

14   the court reporter is about to jump in and say, "I can

15   barely hear you," so.

16                MR. JULIAN:  Okay.  Well, I have no idea.

17   Is this any better?

18                THE REPORTER:  Yes.  Speaking up --

19                MR. RICKNER:  Much better.

20                THE REPORTER:  Speaking up works.

21                MR. VENTRONE:  We don't know where the

22   microphone is.  We're guessing it's built in.

23                MR. JULIAN:  I'll try to keep my voice

24   up.  Just, I mumble.

25                MR. RICKNER:  Once you started projecting
```

```
 1    your voice.  It worked great.

 2                    THE WITNESS:  Excuse me.  Would it help

 3    if I moved down so that he's facing?

 4                    THE REPORTER:  This is great.

 5                    MR. JULIAN:  I don't know what they said.

 6                    THE WITNESS:  I -- I didn't understand

 7    what you folks said.

 8                    THE REPORTER:  The speaking up and you

 9    sitting where you are is working fine.

10                    THE WITNESS:  Oh, okay.

11                    MR. JULIAN:  Okay.  Good.

12    BY MR. JULIAN:

13         Q    So, Mr. Cominsky, you understand I represent

14    both Dr. Mitchell and District Attorney Fitzpatrick.  I

15    have some questions for you based upon the Complaint

16    that was filed in this case and the allegations that

17    were made by Sidney Manes.

18         A    Okay.  I did not know you were representing

19    Bill Fitzpatrick up until 3.4 seconds ago.  Okay?  But,

20    fine.  I don't know anything about the Complaint.  I've

21    never seen it.

22         Q    Not my question.

23         A    Okay.

24         Q    Do you know Sidney Manes very well?

25         A    Yes.
```

```
 1        Q     Have you ever spoken with him about this case?

 2        A     I don't remember.

 3        Q     Did you ever speak with Sidney Manes on behalf

 4   of Dr. Mitchell about the Nanette Gordon case?

 5        A     I don't remember.

 6        Q     Did you ever enter into any sort of agreement

 7   with District Attorney Fitzpatrick that provided that --

 8   withdrawn.

 9              Let me ask you this.  To your knowledge, did

10   Dr. Mitchell ever have a hundred misdemeanors

11   outstanding against him during the time that you

12   represented him?

13        A     Absolutely not.

14        Q     To your knowledge, did Dr. Mitchell have

15   several felonies pending against him during the time

16   that you represented him?

17        A     Not that I know of.

18        Q     Did you ever participate in a discussion with

19   Mr. Fitzpatrick in which Mr. Fitzpatrick advised you

20   that he would not prosecute Dr. Mitchell if Dr. Mitchell

21   testified before the grand jury that it was his opinion

22   that Valerie Hill could have died on March 27th, 1987?

23        A     Did you say Valerie Hill?

24        Q     Yes.

25        A     I don't know.  I'm not familiar with the name
```

 1   Valerie Hill.

 2       Q    Did you ever participate in a conversation

 3   with District Attorney Fitzpatrick in which he advised

 4   you that he would not prosecute Dr. Mitchell if Dr.

 5   Mitchell testified that it was his opinion that a

 6   defendant would have a different date of death than he

 7   had previously opined?

 8       A    I'm sure I did not participate in any

 9   conversation where anyone asked Erik Mitchell to perjure

10   himself.

11       Q    And that would be true in terms of Dr.

12   Mitchell's testimony either before a grand jury or a

13   trial court, correct?

14       A    Absolutely.  I would not have participated in

15   that conversation.  That's a felony, I believe, and if

16   it -- if it had occurred, I would have been obligated to

17   report it to someone.  Or at least if it occurred in my

18   presence.

19       Q    And just to close the loop, did you ever offer

20   District Attorney Fitzpatrick anything about Dr.

21   Mitchell's testimony in any pending case or future

22   criminal case in return for Dr. Mitchell not being

23   prosecuted in the Nanette Gordon case?

24       A    No.

25       Q    Did you ever make such an offer to him about

```
1    anything?

2         A    Absolutely not.

3         Q    Dr. Mitchell resigned on November 19th, 20 --

4    1994.  Did you participate in the preparation of his

5    letter of resignation?

6         A    I don't recall.

7         Q    To your recollection, was the meeting that you

8    had, the one meeting that you had with County Executive

9    Pirro, Deputy County Executive Kochian, Dr. Mitchell and

10   yourself, was that meeting shortly before Dr. Mitchell

11   resigned?

12        A    I tend to think so, but I don't recall the

13   time.

14             MR. JULIAN:  Thank you.

15             MR. VENTRONE:  I have nothing.

16             MR. RICKNER:  I just have a very brief

17   follow up, unless the County has some questions.

18             THE WITNESS:  You got to speak up a

19   little bit.  I heard you got something brief.

20             MR. RICKNER:  I have a few questions,

21   unless the county has questions first.

22             MR. VENTRONE:  I don't.

23             FURTHER EXAMINATION

24   BY MR. RICKNER:

25        Q    Okay.  Prior to his resignation, Erik Mitchell
```

```
 1   periodically testified in criminal cases; is that right?

 2       A    I guess so.  I mean, I don't recall.  I would

 3   suspect he would.

 4       Q    Let's phrase this differently.  Were there

 5   times where Erik Mitchell would have spoken with the

 6   prosecutor's office and William Fitzpatrick when you

 7   weren't around?

 8       A    I -- again, he's a -- a County medical

 9   examiner.  It would be part of his job normally to -- if

10   -- if something occurred that would go to court, I'm

11   sure somebody from the D.A.'s office would talk to him.

12       Q    But just to be clear, when you were

13   representing Erik Mitchell, you were not present with

14   every single conversation he had with D.A.'s office or

15   William Fitzpatrick, right?

16       A    Correct.

17       Q    Okay.  Now, there was one of the allegations

18   against Erik Mitchell was with respect to him taking

19   body parts and burying them in his farm; is that right?

20       A    I would -- now that you bring it up, what I

21   remember was he was doing some kind of a, like a course

22   for investigators and prosecutors, and he had taken body

23   parts -- I don't know, I don't recall what parts --

24   burying them, putting them in certain areas, and then

25   trying to instruct people about, you know, if you're
```

1    looking for this, this is what you want to do.  You want

2    to make sure you -- you preserve this or that.  And I do

3    recall something about that.

4        Q    Do you recall William Fitzpatrick stating in

5    sum and substance, you know, if that was occurring

6    without the family's permission, that could be a crime?

7        A    I don't recall any -- I don't -- I know it

8    caused people to question whether or not it was

9    appropriate.  I do not know if anybody from the D.A.'s

10   office said that could be a crime.  I don't recall.

11       Q    All right.  That's fine.  I actually have no

12   further questions, then.

13                 MR. JULIAN:  I have one other.

14                 MR. RICKNER:  Okay.

15                 MR. JULIAN:  The prototypical lawyer's

16   one other question.

17                 MR. VENTRONE:  I'm leaving tomorrow

18   morning.

19                 FURTHER EXAMINATION

20   BY MR. JULIAN:

21       Q    Did you speak with District Attorney

22   Fitzpatrick on behalf of Dr. Mitchell at any time with

23   regard to Dr. Mitchell's testimony in the case of Hector

24   Rivas?

25       A    I don't know anything about the Hector Rivas

```
 1   case.

 2        Q    Did you ever, in a discussion with Doctor --

 3   with District Attorney Fitzpatrick, offer that Dr.

 4   Mitchell would change his opinion with regard to the

 5   time of death in return for his not being prosecuted as

 6   it pertains to the Hector Rivas case?

 7        A    Again, I would not suborn perjury.

 8        Q    So the answer is no?

 9        A    Answer is absolutely, unequivocally.

10        Q    Fair to say if that conversation that --

11        A    If that conversation occurred, I would have

12   had Bill Fitzpatrick where I wanted him.  I would have

13   reported that so quickly, it would have made everybody's

14   head turn.  There is no way in the world that I would

15   get involved in committing a felony in order to protect

16   the District Attorney's office.

17                  MR. JULIAN:  Nothing further.

18                  MR. RICKNER:  Nothing further for me.

19                  MR. JULIAN:  Mark?

20                  MR. VENTRONE:  I'm good.

21                  THE REPORTER:  As long as we're still on

22   record, just a few brief questions on the court reporter

23   side of things.  Sorry, I'll speak up.  First, Mr.

24   Cominsky, would you like to read and sign the transcript

25   for the purpose of producing an errata sheet?
```

33

```
 1                    THE WITNESS:  I don't think it's

 2   necessary.

 3                    THE REPORTER:  Okay.  Mr. Rickner, as the

 4   questioning attorney, would you like to purchase the

 5   original transcript?

 6                    MR. RICKNER:  Yep.  I'll buy a copy for

 7   myself, absolutely.

 8                    THE REPORTER:  And to both opposing

 9   counsel, Mr. Julian, would you like to purchase a copy

10   of the transcript?

11                    MR. JULIAN:  I'll buy a copy, yes.

12                    THE REPORTER:  And Mr. Ventrone?

13                    MR. VENTRONE:  No, I'm good.  I don't

14   need one.

15                    THE REPORTER:  If you could stay on for

16   spelling clarifications, I'd appreciate it, but 10:59

17   a.m. Eastern time, we are going off the record.

18            (Proceedings concluded at 10:59 a.m.)

19                 (Read and Sign waived.)

20                    *  *  *  *  *

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3              I, Zack Shoup, hereby certify:

 4              That the foregoing proceedings were taken

 5     before me at the time and place therein set forth;

 6              That the proceedings were recorded by me and

 7     thereafter formatted into a full, true, and correct

 8     transcript of same;

 9              I further certify that I am neither counsel

10     for nor related to any parties to said action, nor in

11     any way interested in the outcome thereof.

12

13              DATED, this 9th day of January 2024.

14

15

16              _____

17                    Zack Shoup, CER-15887

18                    Court Reporter

19

20

21

22

23

24

25
```

**Remote Legal Court Reporting**
**646.461.3400   info@remotelegal.com**