# EXHIBIT "L"





## MEMORANDUM

**TO:**      William J. Fitzpatrick
             District Attorney

**FROM:**    Peter D. Tynan
             Chief Investigator

**DATE:**    November 19, 1993

**SUBJECT:** Onondaga County
             Medical Examiner's Office

     On July 21, 1993, this Office conducted an investigation into the circumstances surrounding how convicted child pornographer Dennis Woodard managed to have a photo taken of himself at the Medical Examiner's Office (MEO) while apparently performing an autopsy. This quickly branched out into other areas of the MEO, including the conduct of Chief Medical Examiner Dr. Erik Mitchell. In summary, the main findings of the investigation to date are as follows with the bulk of the investigative work having been done by Inv. Dennis Griffin of the State Department of Health.


### I.  WOODARD PHOTO

     Dennis Woodard was photographed on January 5th, 1992, most probably by former morgue employee Joseph Contrera. At least one other unauthorized person was present, namely fifteen (15) year-old

County's Disclosure: Investigation of Dr. Erik Mitchell 0020

Jason Williams, Contrera's stepson.  Dr. David Rigle "supervised" this autopsy and authored the autopsy protocol.  Woodard held certain organs from the deceased and actually helped stitch his remains.

## II.  HOUSTON PHOTO

On March 25, 1987, Polaroid photos were taken of morgue assistant Alexis Houston by former assistant Medical Examiner Dr. Jean showing Ms. Houston in playful poses over the body of a female suicide victim.  The photos were done in jest, and while inappropriate, involved no illegal conduct.

## III.  DEC INVESTIGATION

The DEC through its agents has investigated allegations that certain toxic materials were illegally stored and certain body parts were illegally disposed of by MEO personnel.  Affidavits have indicated that body parts have been flushed for several years, the most recent time being in the Summer of 1992 when 600 gross jars of outdated tissue were flushed down the sink in an autopsy room. While these incidents clearly could be considered violations of the Environmental Conservation Law, the necessary standard of proof beyond a reasonable doubt is not currently present.  Further investigation of this area is necessary if a prosecution is to be pursued.

2

## IV.   TISSUE HARVESTING

Credible evidence suggests that early in his tenure as Medical Examiner, Dr. Erik Mitchell had visions of the Onondaga County MEO becoming a center in the Northeast for the preservation and collection of body parts, including skeletons.  It further is clear from the investigation that Dr. Mitchell felt it proper to harvest certain tissues from autopsy patients without consent from the deceased person's next of kin as appears required by law.

A.   Specifically, in June of 1985, by letter to Dr. Mitchell, Bristol Labs requested the harvesting and donations of human kidneys and livers, especially those of young adults or adolescents.  This practice went on for three (3) years and by one former employee's estimate, may have included up to a half-ton of human tissue.  It is impossible to determine the names of the donors, whether permission was ever given and the actual number of organs donated as neither the MEO nor Bristol Labs kept records of this practice.

B.  From 1986 through October 1989, one Larry Miller, a PhD working under the direction of Dr. Ahmad Elbadawi of the Dept. of Pathology at Upstate, was conducting a human bladder analysis, the specimens being supplied by the Onondaga County MEO.  The specimens harvested, which numbered approximately 150, were generally bladders and connective tissue which included the reproductive organs.  Investigation revealed that in roughly 95% of the cases there was no family consent to donate.  In fact, three (3) cases were uncovered where consent had been specifically withheld yet

3

tissues had been removed.  All three (3) autopsies were performed by Dr. Mitchell.   To date, there has been absolutely nothing published in connection with this "research".

c.  In 1988 and again in 1989, the Onondaga County MEO sponsored a "skeletal recovery" course for law enforcement personnel.  The cost per attendee was $500, that price being adjustable for local officers.  Numerous area law enforcement people attended the course and Dr. Mitchell claims not to have participated in the field exercises (money collected for the course was deposited in an account under the auspices of a Health Dept. Auxiliary and an audit of same has been conducted by the Comptroller's Office).  The 1988 course was held at Dr. Mitchell's farm and involved the examination of dead animals that had been buried specifically for the exercise. In 1989, the seminar was held at the farm of Joseph Contrera in Cayuga County.  No one associated, currently or formerly, with the MEO has been able to supply the identities of the human remains utilized on Contrera's farm.  Evidence indicated that six (6) full skeletons were used for this course, some of them with significant amounts of tissue still attached.  Dr. Mitchell professes no knowledge of the identities of these remains.

There is one former MEO employee who recalls loading three (3) frozen bodies in blue body bags into a vehicle directly from the morgue, and there is some photographic evidence to confirm this. Again, their identity is unknown.  It is known that the MEO was in possession of three (3) exhumed bodies, all "John Does", one from

4

Ulster County and two from Onondaga County. While the stated purpose of the exhumations was for facial reconstruction in an effort to determine identity, it is clear that the additional motivation was to provide remains for the seminar. Contrary to specific court order, the remains have not been reinterred and claims that the remains are being maintained for future study are absurd.

D.   Beginning in 1985, Dr. John Wolf, Professor of Neurology at Upstate Medical Center, has been recovering human brains from the MEO for teaching purposes. Dr. Wolf visited the MEO every two to three months for the purpose of picking up the brains, usually two (2) or three (3) at a time. Dr. Wolf has provided some records of donors of these brains and usually wrote reports to the MEO if some disease was uncovered. A former MEO employee who only worked in late 1991 and early 1992 recalled seeing brains being removed from bodies without permission given by next of kin. The employee recalls seeing at one time approximately fifty (50) such brains in jars outside the MEO coolers. Some years ago, probably contemporaneous with the County Executive's edict on same, Dr. Mitchell informed Dr. Wolf that the "rules have changed" and Dr. Wolf would have to bring his students to the MEO to view and dissect the brains recovered by Mitchell.

E.   On August 2, 1992, seventy (70) year-old Victor Nycz was found dead at his home at 7:48pm. His eighty (80) year-old sister, contacted at night, gave permission to MEO to donate tissue for research if it "would help someone". On August 4, 1992 at 5:00pm,

5

County's Disclosure: Investigation of Dr. Erik Mitchell 0024

an autopsy was performed on the remains at the Onondaga County MEO. On August 4, 1992 at 11:47pm, the remains of Mr. Nycz were transported to a local funeral home. On August 5, 1992, in the morning, after closed casket services, "Mr. Nycz" was buried. During the investigation, it was learned that Mr. Nycz's entire skeleton was being stored at the MEO and that said storing was inconsistent with the family's wishes. There has been no evidence that Mr. Nycz's skeleton has performed any useful scientific purpose and has in fact sat stored in a cardboard box for over a year.

F. On June 16, 1987, the niece of Eva Ling signed a body donation form, as Ms. Ling was infirm and unable to sign. The body was to be donated to Upstate Medical Center at the time of Ms. Ling's death. On July 17, 1991, Ms. Ling passed away at Plaza Nursing Home at 1:25am. She was ninety (90) years-old. Inexplicably, her body was transported to MEO for autopsy (91-0435). Next of kin was notified and agreed to have Ms. Ling's brain donated to the Health Science Center (HSC) for the purposes of research into Alzheimer's Disease. By letter dated September 10, 1993, the HSC indicated it never received the remains of Ms. Ling. Actually, Ms. Ling's entire head was severed from her body and de-fleshed. The skeletal remains of her skull and top two vertebrae are now in storage at the MEO, again for purposes unknown.

G. On February 4, 1986, Mr. L.B. Chandler (MEO #86-0085) died and on February 11, 1986 his remains were supposedly transported to SUNY Upstate Medical School as a donation for research education.

6

County's Disclosure: Investigation of Dr. Erik Mitchell 0025

On March 19, 1986, SUNY Upstate supposedly delivered remains to a crematory and his ashes then were delivered to Bath National Cemetery for burial. However, investigation showed that Mr. Chandler's skeletal remains were actually stored at the MEO from 1986, until such time as they were picked up by SUNY Upstate Anatomy Dept. on February 16, 1990, probably in reaction to media inquiries. As of July, 1993, his skeletal remains are still in the teaching storage collection at Upstate. Mr. Chandler's family released his remains on February 16, 1986 to the Anatomy Dept. of SUNY at Upstate with the understanding that they would be used for medical education and research (Mr. Chandler was in a decomposed state and not suitable for teaching purposes). Instead, he was de-fleshed at the MEO and his bones were boiled clean for no identifiable purpose. It is unknown at this point whether Mr. Chandler's remains were part of either the 1988 or 1989 "skeletal recovery" seminars. It is also unknown what is buried in Bath National Cemetery and absent exhumation it is impossible to tell. He was then stored at the MEO for over four (4) years.

H.  Ms. Mary R. Knapp died on November 9, 1988, at sixty-eight (68) years of age. She was in a marked state of decomposition and was supposedly transported by funeral director for cremation on November 14, 1988. However, investigation has shown that her skeletal remains are actually being stored at the MEO, apparently in contradiction of her family's wishes. There is reasonable grounds to believe that Ms. Knapp's remains were utilized in the 1989 "skeletal recovery" seminar staged by the Onondaga County MEO.

7

County's Disclosure: Investigation of Dr. Erik Mitchell 0026

## V.   INVENTORY

On July 21, 1993, a graduate student employed during the summer at the MEO conducted an inventory of remains stored there. Among his findings were:

- 3 human spinal columns dating between 1989 to 1992

- 1 dog

- 1 cat

All of these were stored in the same cooler.

- 68 skulls dating between 1965 and 1992
- The skeletal remains of the Ulster County subject
- 4 skeletons dated 1991 to 1992
- 9 unmarked skeletal remains
- 5 unmarked skulls

The remains of those people found during the 1988 Eagle Village excavation, probably century old settlers in Manlius.

## VI.   PREVIOUS INVESTIGATIONS

In February of 1988, County Executive Pirro appointed an Advisory Committee to review the policies, practices and procedures of the Medical Examiner's Office.   At the conclusion of that committee's investigation, County Executive Pirro issued a directive that the Medical Examiner cease any and all cooperative protocols for research without express, informed consent from the next of kin.   It is clear from the recollection of at least one member to that committee that the extent of Dr. Mitchell's efforts

8

County's Disclosure: Investigation of Dr. Erik Mitchell 0027

to harvest human tissue was never fully disclosed.

An additional investigative committee was formed in late 1992 and its report was issued on May 5th, 1993. That report dealt with a number of allegations, only some of which concerned potential criminal conduct. That committee did not have subpoena power and the County Executive specifically noted that investigations were continuing.

9