# EXHIBIT "R"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

                *Plaintiff,*

vs.

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
AND "JOHN DOES 1-10",

                *Defendants.*

***EXPERT AFFIRMATION OF ROBERT MASTERS, ESQ.***

Civil Action No. 5:19-cv-844 (BKS/TWD)

---

    Under the penalty of perjury, Robert Masters, Esq., affirms the following to be true, upon personal knowledge and/or upon information and belief, with respect to the matter entitled The People of the State of New York versus Hector Rivas, Indictment No. 92-1114-1, as venued in Onondaga County, New York

    1.    I have been asked to review the professional conduct of William Fitzpatrick, Esq., District Attorney of Onondaga County, relevant to his prosecution of the murder case, *People v. Hector Rivas, Indictment #92-1114-1*, in which Mr. Rivas was accused of the March 27, 1987, strangulation murder of Valerie Hill.

    2.    At the outset, it should be noted that I have a personal, as well as a professional relationship with Mr. Fitzpatrick, resulting from the many years that I have served as a prosecutor in New York State. As with my prior service as an Executive Assistant District Attorney and Counsel to the late Queens County District Attorney, Richard A. Brown, and as his Chair of his Committee on Professional Standards, I have been called upon to objectively evaluate the

professional performance of attorneys, with whom I have worked and enjoyed long friendships. I have viewed this matter through the same lens I have utilized in those past endeavors.

3. As my attached *Curriculum Vitae* reveals, I have worked extensively in the field of criminal law since my graduation from St. John's University School of Law in 1980 and admission to the bar in 1981. Working initially as a Law Secretary to several justices of the Supreme Court in both Queens and Kings Counties, I became an Assistant District Attorney in Queens County in 1990, where I was continuously employed until my retirement on December 31, 2019. Since then, I have worked in a *pro bono* capacity as a Special Assistant District Attorney in Rockland County, as well as representing current and former prosecutors in various disciplinary matters before Grievance Committees around the State – also in a *pro bono* capacity.

**MATERIALS REVIEWED**

a) The Amended Complaint and answers on behalf of Defendants Mitchell and Fitzpatrick;
b) The deposition transcripts of the Plaintiff;
c) The deposition transcripts of Mr. Fitzpatrick and Dr. Mitchell;
d) The trial testimony and grand jury testimony of People v. Rivas;
e) The trial transcript of People v. Rivas;
f) The Onondaga County Medical Examiner's records regarding the death of Valerie Hill;
g) Various Court decisions in this case:
a. Appellate Division Fourth Department affirming conviction;
b. Decision of Hon. John Brunetti;
c. Decision of Magistrate David Peebles;
d. Several Decisions of Second Circuit Court of Appeals
h) Transcripts of conferences before Hon. Thomas Miller regarding the trial of People v. Rivas;

  i)   Affidavit and testimony of Dr. Cyril Wecht;

  j)   Various newspaper articles.

  4.   I must note that the inability of the Plaintiff to provide the file of trial counsel, Richard Calle, has compromised my ability to comment on his preparation, investigation, legal research and evaluation of various strategies available to him in handling Mr. Rivas' case. As a result, I evaluate his performance upon the trial's transcript and subsequent judicial opinions related thereto, as well as the reasonable inferences that may be drawn therefrom. Additionally, the absence of Calle's file forecloses an avenue of determining what Discovery materials, as well as the *Brady* and *Giglio* compliance and disclosure that was made by the People during his representation of Rivas.

  5.   I remain available to review any additional materials you may seek to provide.

## GENERAL OBSERVATIONS

  6.   Ms. Hill was murdered in 1987. The investigation of such crimes did not include evidence streams commonly utilized today. Digital evidence from cell phones, computers, tablets, license plate readers, as well as surveillance footage – so ubiquitous now – were not ever conceived of when Ms. Hill was murdered. Many other forensic techniques, whether through DNA technology, or other scientific means, were either in their infancy or not then available. Thus, the investigation of this crime does not resemble the methods utilized today.

  7.   The performance of counsel proved to be a significant factor in the Defendant's conviction. It is an adage among litigators that cases are rarely won or lost by the lawyer, but that results are determined by the nature and quality of the evidence. This case, however, is the rare matter where the disparity between the skills of the litigators played a significant, if not decisive,

role in Mr. Rivas' conviction. Mr. Fitzpatrick, even in 1993, was a skilled and experienced homicide litigator, who functioned as a far superior strategist and tactician then his opponent. Conversely, Mr. Calle's performance reveals no genuinely articulable theme or strategy that remained consistent throughout the trial. Part alibi, with minor hints of third-party culpability, Calle availed himself of a variation of the familiar "rush to judgment" attack upon the police, suggesting a lack of thoroughness in the investigation. Such criticism is often effective when a defendant is arrested soon after a crime, after a brief and incomplete investigation. But here, where Mr. Rivas was not charged until five years after the crime, the theme was a poor fit. Additionally, Mr. Calle, not a local practitioner, attempted to utilize that fact before the jury, but frequently did so in a way that was unflattering to not only the local legal community, but to the open-mindedness and fairness of the entire county in general, and perhaps the jurors, in particular. Fitzpatrick took full advantage of each of these rhetorical sins, and on every occasion defended the community thereby emphasizing the not very subtle insult suggested by an attorney embracing the fact that he was from out-of-town. A clear example of the disparity of skills between the attorneys was the testimony of Mark Brosh, a People's witness, who was a friend of Rivas, called to establish a portion of the timeline and that Rivas smoked Barclay's cigarettes – the Defendant's brand. On cross-examination, Calle attempted to extract evidence of Rivas' good character and being a gentleman, thus inviting the re-direct examination in which the witness revealed that Rivas had previously stalked a former girlfriend and that he had been charged with beating her. This self-inflicted wound was a Point on Rivas' direct appeal and the Appellate Division concluded that the "evidence was properly admitted to rebut evidence of defendant's good character."[1] Additionally, as noted by the CPL 440 court and the Second Circuit Court of Appeals, Calle was functioning as

---

[1] *People v. Rivas, 214 AD 2d 996 (4th Dept. 1995).*

4

an "office less" attorney. That this was becoming a challenging "road game" for Calle is difficult to dispute. Trying a case of this magnitude is a daunting experience under the best of circumstances. Doing so while living in a hotel, without an office or staff, compounds the difficulty and becomes a test of anyone's stamina. A review of the transcript surely poses a question regarding Calle's choices near the trial's conclusion, when he selected the quickest option offered to him by the Court in adducing hearsay testimony – which was easily impeached – as opposed to calling live witnesses – thereby delaying the proceedings – to support his claim that the crime had been committed by another. That Calle selected the least persuasive method of adducing this significant evidence is difficult to dispute. Whether that selection was motivated by the practical inconveniences the alternatives would invite was an unasked question that destroyed the Defendant's last best chance to effectively nominate an alternative suspect as the perpetrator of the murder.

8. An additional point regarding the significance of attorney performance is the suggestion by the Plaintiff that nothing changed from the time of Ms. Hill's murder in 1987 until Mr. Rivas' indictment in 1992, other than the incorrect allegation that the Medical Examiner's expansion of the time period for her demise. Plaintiff seeks to ignore that Mitchell wrote in the Toxicology Request Form his impression that Ms. Hill had been dead "2-3 days" at the time of her body's discovery. However, this ignores an important reality. This crime and its initial investigation occurred during the window when Mr. Fitzpatrick was not working in the District Attorney's Office. Having left the Office, as Chief of Homicide at the end of 1986, and not returning until his swearing in as District Attorney on January 1, 1992, Fitzpatrick was not available to guide the investigation, nor was he able to persuasively adduce the available evidence in the most compelling, probative way to support charges. It is difficult to conclude that Mr.

5

Fitzpatrick's absence did not strongly contribute to the matter's being left in a state of suspended animation. A telling example of Fitzpatrick's absence impacting the investigation and wounding the prosecution is the manner in which the search warrant of the Defendant's home was executed. Occurring on the day of the discovery of Ms. Hill's body, whether because of the lack of film, or a functioning camera, no effort was made to photographically memorialize the "shrine" to Ms. Hill found in Rivas' closet – thereby providing proof that he was aware of her death prior to the discovery of her body – knowledge of which could compellingly be argued would only be had by the killer. Surely, as experienced a homicide litigator as Fitzpatrick was at that time would have instructed the police to return to the venue with a camera, or video equipment to effectively depict and memorialize such probative evidence, or well would have advised the "shrine" to be seized for the court's consideration during subsequent litigation. Fitzpatrick's efforts to sharply and unquestionably prove various small, yet critical circumstantial points were what raised the evidence supporting Mr. Rivas' suspicion as the killer, to being sufficient to reach the legally required standard of probable cause. Whether it was establishing that Ms. Hill's vehicle had not moved since Friday, March 27, 1987 through the mathematical assessment of the car's odometer readings and the places that she had visited earlier in the day, to the presence of a particular brand of cigarette butt smoked by Rivas, as well as his preferred liquor – recently purchased by him at a local liquor store – at a time, not long before he was observed parked in front of Ms. Hill's home by neighbors familiar with him, Fitzpatrick harvested the best possible proof of the puzzle pieces necessary to powerfully support his theory of the case.

    9.    Perhaps most critical however, remains the reality that the entirety of the pleadings, as well as the Second Circuit's Opinion, give insufficient weight to the significance of Mr. Rivas' admission to the crime. The testimony of Joseph Fields, an acquaintance of Rivas', with whom he

6

bowled and played softball and who had never met Ms. Hill, that while drunk at a local bar, a week or two after the crime, Rivas tearfully exclaimed, "Valerie, Valerie, I didn't mean to do it." Fields testified that prior to hearing the admission, he believed Rivas to be innocent, but thereafter, out of fear, he did not share this evidence with authorities until a post-indictment meeting in January 1993. Mr. Calle's cross-examination of Fields was ineffective. Unable to show any bias, Calle resorted to suggesting that Fields was too drunk to accurately perceive events, which only led to a devastating rejoinder that Rivas was far more intoxicated by comparison, thereby enhancing the likelihood that Rivas – consumed by guilt and alcohol – made the damning admission. This evidence completely changed the complexion of the case against Rivas. Rather than a nuanced, circumstantial case founded on subtle proof of Rivas' motive, means and opportunity, the case was primarily driven by his own damning statement, powerfully corroborated by all the other evidence adduced. The admission strengthened the People's case tremendously, which made the defense of the charges far more complicated and difficult. That Calle proved inadequate to this challenge is apparent and the poor strategic and tactical choices that he made are more glaring, therefore.

## COMPLIANCE WITH ETHICAL RULES AND STANDARDS

10. A review of the pleadings herein reveal that they contain many dramatic claims of the District Attorney's Office, and Mr. Fitzpatrick in particular, violating standards for the ethical conduct of a prosecutor. Based upon my examination of the materials that I have been provided, I find these claims to be largely unsupported.

11. Just as the methods of investigating crimes have greatly changed since Ms. Hill's murder, so too has the law pertaining to her prosecution, both statutorily and through the common law. Appreciating that this case was investigated and tried more than 30 years ago is critical in

evaluating the claims herein. Additionally, reliance on the propriety of decisions made by the trial judge, Hon. Kevin Mulroy, is entirely appropriate, for his rulings are supported by the law, facts and the sound exercise of discretion and it is clear that he monitored the behavior of the litigants and provided all parties with a "clean" and fair trial.

12. Prior to its repeal in 2020, CPL Article 240 controlled Discovery in criminal cases. The current CPL Article 245 is far more generous to defendants than its predecessor and where the Discovery provided herein did not satisfy today's standard, all evidence suggests it did comport with the demands of CPL 240 and the Judge so held during the trial – declining to provide sanctions for various claims of statutory violation.

13. *Brady v. Maryland, 373 US 83 (1963)* has for more than 60 years mandated that prosecutors must share evidence that tends to exculpate the defendant. *Giglio v. United States, 450 US 150 (1972)* has for half-a-century obliged prosecutors to make available to the defendant, at a time it can be utilized, materials that would impeach the prosecution's witnesses or their theory of the case, even if standing alone the information does not exculpate the defendant, but merely weakens the prosecution case. Over the years – particularly during this millennium –what information falls into these categories has greatly expanded, as has the prosecution's obligation to provide it.[2] Moreover, the admissibility of evidence of third-party culpability has been significantly relaxed by the common law – the requirement for the predicate of a "clear link" being established as a foundational requirement for such evidence – has been abandoned since Mr. Rivas' trial.[3]

---

[2] See, for example, *People v. Rong He, 34 NY 3d 956 (2019); People v. DiPippo, 27 NY 3d 127 (2016): People v. Negron, 26 NY 3d 262 (2015): People v. Soto, 26 NY 3d 455 (2015).*
[3] See *People v. Primo, 96 NY 2d 351(2001)* and *People v. Aulet, 111AD 2d 822 (2nd Dept. 1985).*

8

14.     New York is unique requiring not only grand jury indictment for all felony prosecutions,[4] but prohibits hearsay's admission during such a presentation.[5] Prosecutors are not obliged to present *Brady*-type information to a grand jury.[6] After an indictment is secured, a court reviews the proceedings to ensure the sufficiency of the evidence adduced, as well as the propriety of the presentation.[7] It is apparent that such motions were made by the Defendant and decided in the People's favor, thereby setting the stage for Mr. Rivas' trial. Accordingly, no infirmity in the process by which Mr. Rivas' indictment was secured can be found.

15.     The record at trial, however, reveals that material tending to exculpate Rivas was not turned over to Mr. Calle until just before the prosecution rested its direct case.[8] Mr. Fitzpatrick averred that he made the material available immediately upon his receipt of it and that he was "dismayed" by the delay in the production of the materials – reports that a Joe Morgan heard an admission from Patsy Barricella, claiming his responsibility for Ms. Hill's murder and other evidence corroborating Barricella's presence near the crime scene the day after the discovery of Ms. Hill's body. The Court denied Calle's motion for a mistrial, instead offering him the alternatives of an adjournment to call the relevant witnesses or, what Calle selected – admitting the evidence through hearsay. It should be noted that on appeal, the Appellate Division, Fourth Department found the disclosure's delay to have been unintentional and that it did not deprive Rivas of a fair trial owing to the choice afforded Calle in how to proceed.[9] This record informs my conclusion that although a delay in *Brady* compliance occurred, this imperfection did not interfere in Rivas' receipt of a fair trial.

---

[4] NY Constitution, Art. I, Sec. 6; *People v. Ford, 62 NY 2d 275 (1984); People v. Iannone, 45 NY 2d 589 (1978)*.
[5] CPL Section 190.30(1)
[6] See *People v. Lancaster, 69 NY 2d 20 (1986)*.
[7] CPL Sections 210.20(1)(a)(b) and (c).
[8] Trial transcript, March 24, 1993, p. 949.
[9] *People v. Rivas, supra*.

9

## MEDICAL EXAMINER

16. Perhaps the most contested issue in the instant action is the findings and subsequent testimony of Dr. Erik Mitchell regarding Ms. Hill's time of death. Additionally, apart from Mitchell's findings and testimony herein are the significant areas of impeachment regarding his professional behavior and failings as administrator – all of which may have possibly been utilized to impeach Mitchell as a witness.

17. Initially, it should be noted that Mitchell's findings with regard to Ms. Hill's cause of death appear to be entirely uncontested. Moreover, Mitchell did not merely rely on the observations of medical investigators, he apparently spent significant time at the scene and examined the remains *in situ* – considered a "best practice" in this field. On the day he was there, he opined that Ms. Hill had been dead 2 to 3 days. He never varied from that impression/opinion.

## TIME OF DEATH

18. It is not infrequent that the time of the deceased's death is an issue contested by the defense. In this trial, the time of Ms. Hill's death was prominent and quite contested. Because Mr. Rivas was indisputably alibied for almost the entire time period between Ms. Hill's dining with her father on Friday evening, March 27, 1987, until her body's discovery in the early afternoon of Monday, March 30, 1987 – save for a window between approximately 8:00 p.m. and about midnight on Friday -- it was incumbent upon the prosecution to establish the crime was committed then, and as important for the defense to preclude that possibility.

19. Experience shows that it is common for defense counsel during trial to attempt to concretize the time of death – particularly through a medical examiner during cross-examination.

Just as commonly occurring is a pathologist's resolute resistance to provide more than broad estimates for the homicidal event, because of the well-known variables that prevent precision in making such approximations for the time of the crime. Transcripts for murder trials are rife with defense counsel's determined efforts to narrow these estimates, only to be met by the pathologist's nimble refusal to provide more than a broad window – owing to the presence of many accepted variables that prevent the certainty sought by the defense.

20. Consistent with this experience is an estimate of time of death is rarely included in an autopsy report and is not included as a "finding" by a medical examiner. Rather, as what occurred in this case, a "ballpark" estimate will be shared with the police at an early stage to assist a nascent investigation.

21. An examination of Dr. Mitchell's testimony herein reveals it to be almost routine. After describing his qualifications and examination of Ms. Hill and her autopsy, his conclusions regarding her cause of death are clearly stated. Thereafter, Mitchell addresses the time of death issue, detailing the variables that are observed, but which prevent certainty, while conceding that extrinsic evidence – mail recovery, phone and vehicle use – may be the strongest proof to help interpret anatomic findings. Fitzpatrick's questioning fairly asks if anything from the physical observation of Ms. Hill's remains was inconsistent with her death occurring on Saturday night, March 28, 1987? Or Friday night, March 27, 1987? To each question, Mitchell simply answers "no." Thereafter Fitzpatrick recites a litany of investigative facts – lack of phone activity, car use, of any observation of Ms. Hill, her abortive travel plans without notice to her friend, no contact with her father, despite the imminent death of his wife (indeed, Ms. Hill's step-mother succumbed to cancer later on March 30, 1987) – and asked Mitchell what conclusion he draws; to which the reply is that it is "more likely" that she died in the Friday night to Saturday morning window, as

11

opposed to the following day.[10] The totality of investigative facts before the jury include the above, as well as the statement made by Rivas to his friend, Ms. Hill's cat being left outside the premises on Friday, Ms. Hill's statement to her father that Rivas was following her on that day, and Rivas having been observed in the neighborhood on Friday, March 27th.

22.  Calle's cross-examination is fairly standard in his attempt to narrow the timeline and succeeds in gaining Mitchell's concession that Ms. Hill's demise on Friday night is on the "outside edge" of the possible time of death.[11] On re-direct examination, Fitzpatrick asks about Ms. Hill's brain decomposition and "slides" (addressed separately; *infra*), but punctuates Mitchell's testimony by adducing the opinion that it was "possible" Ms. Hill was murdered on Saturday and Friday, and "less possible" on Thursday.[12]

23.  Despite the attack on Mitchell's testimony years later – in large part based upon subsequent professional issues – his actual testimony is quite sober and modest, without resort to any extremes. He points out the limits of certainty regarding this issue and essentially concludes his examination and autopsy did not preclude the possibility that Ms. Hill was murdered during the critical window for which Rivas had no alibi and was actually observed outside her home.

24.  I must emphasize that I am not a pathologist, only that I have worked with many of them on a variety of cases that presented different issues. My review of this case suggested to me that a topic that may have not been sufficiently explored was the contents of Ms. Hill's stomach and how that may have suggested when she had last eaten and thereby inform the issue of her time of death.

---

[10] Trial transcript, March 24, 1993, p.887-890.
[11] Trial transcript, March 24, 1992, p. 907.
[12] Trial transcript, March 24, 1993, p. 915-6.

12

## SLIDES

25.     A point of contention in the instant litigation appears to be the use of the term "slides" during testimony and oral advocacy and to what that term referred. During the era in which this case was litigated, digital photography was not available. Rather, pathologists photographed their observations during autopsy and the photographs were ultimately mounted on Kodachrome slides—subsequently placed in a carousel and displayed on a projector. The vernacular employed by prosecutors referred to these photographs as "slides." During that time period, I engaged in many conversations to arrange for preparation or testimony with a medical examiner that mentioned "the slides" – either for the witness to bring them, or for arrangements to be made at the morgue for a projector to be available to use "the slides" during the preparation session. During my career, I never saw a medical examiner bring tissue samples, on a slide brought to court. I have rarely seen such tissue samples through a microscope at a morgue, but the rarity of those occasions never impacted either myself, or others from employing the term "slides" to refer to photographs.

## NEWSPAPER ARTICLES

26.     A review of the depositions in the instant litigation reveals that newspaper articles relevant to Dr. Mitchell were a topic.[13] Moreover, during Mr. Calle's cross-examination of Dr. Mitchell, he employed newspaper articles from the time of the murder in a failed attempt to impeach the witness regarding her time of death.[14] Because of the unavailability of Mr. Calle's files, it renders the task of determining what articles he had and to what topic they pertained an impossibility, and at best, an exercise in speculation.

---

[13] Transcript of Deposition of William Fitzpatrick, October 12, 2023; p.82; p.95-6.
[14] Trial transcript, March 24, 1993; p.895.

27. I want to address the *Giglio* obligation of the prosecution to provide impeachment material relevant to Dr. Mitchell. The obligations extant in 1993 were far less demanding and not then controlled by statute. Today's standards would likely compel the prosecution to notify the defense of any unresolved investigations into a professional witness' competence or integrity.[15] Circa 1993, common law did not require the prosecution to notify Calle of pending and unresolved investigations and complaints regarding the Doctor. Indeed, whether the existence of such matters, without conclusion would have provided sufficient "good faith" basis to question Mitchell, would have been a discretionary ruling by the Judge and because such matters would be considered of a collateral nature, Calle would have been bound by the answer of the witness. Calle's being a less than nimble cross-examiner may explain his deferral from attempting pursuit of a line of questioning that he saw little chance of successfully executing.

## CONCLUSIONS

28. My impression remains that Mr. Rivas is likely guilty of the murder for which he was convicted. That the trial was subsequently deemed sufficiently flawed to undo his conviction is attributable to counsel's performance and not the professional behavior of either the prosecutor or the trial judge, conclusions that are amply supported by the conclusion of the Appellate Division in its decision when it conducted a "weight of the evidence" review.[16] To conclude that despite Rivas' persistent pursuit of Ms. Hill over a period of months, characterized by daily notes, cards and letters, constant uninvited visits and phone calls, his presence at the crime scene earlier in the day of the crime and then being observed outside her home later that evening and the presence of significant physical evidence – cigarette butts of his brand, found in an ashtray with his

---

[15] See, *People v. Garrett*, 23 NY 3d 878 (2014); CPL Article 245.
[16] See *People v. Rivas, sura.*

14

fingerprints, liquor he preferred and purchased immediately before his evening visit and that a shrine to Ms. Hill was erected at his home prior to being advised of her death or the discovery of her body, and that soon after the crime, while intoxicated, made a weeping admission – another – unidentified perpetrator had the motive, means and opportunity to commit the crime strains logic and credulity. Additionally, to believe that the crime occurred outside the temporal window alleged by the prosecution would mean that Ms. Hill rudely deserted a friend, without notice, by abandoning her plans to visit, that despite the knowledge that her stepmother was a patient, *in extremis*, at the same hospital where she worked and although she had daily conversations with her father regarding this crisis, made no effort to contact him for three days and had no telephone activity, car use, nor was she observed anywhere, at all. The jury's rejection of this notion surely comported with reason.

29. Moreover, I see no evidence of any conspiracy between Fitzpatrick and Mitchell against Rivas in this matter. The facts demonstrate a routine "cold case" prosecution brought by Fitzpatrick without malice, but rather based upon compelling evidence. No malice can be attributed to the manner in which the powerful evidence of Rivas' commission of the murder was gathered and presented. Fitzpatrick's conduct throughout the prosecution is consistent with the ethical standards provided for by the Rules of Professional Conduct and simply compels the conclusion that he appropriately gathered the relevant facts and fairly applied them to the relevant law. Mitchell's testimony and participation in this case was routine, and the opinions he offered appeared to be consistent with the facts that were presented and his knowledge of medicine.

30. Finally, Mr. Fitzpatrick's decision to defend the conviction against collateral attacks, as well as on direct appeal, was not only appropriate, but consistent with a District Attorney's oath to seek justice. To abandon such a serious matter after an appellate court held that

15

it was amply supported by sufficient evidence, in the face of information provided by the Defendant would be virtually unprecedented. Notably, the record reveals that upon remand to the County Court after Mr. Rivas was granted relief, the delays in scheduling a retrial were occasioned by the appropriate and necessary request for the engagement of new defense trial counsel and renewed preparation, which resulted in the defense seeking multiple adjournments for these necessary purposes.

I affirm, this 23rd day of October 2024 under penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
Robert J. Masters, Esq.