# EXHIBIT "W"

GRAND JURY PROCEEDINGS, NOVEMBER 9, 1992

INDEX TO TESTIMONY

| WITNESSES | PAGE |
|---|---|
| Randall Hill | 1 |
| David Hill | 21 |
| John Brennan | 29 |
| Frank Pieklik | 47 |
| Christopher Reynolds | 51 |
| Lori Broch | 57 |
| Peter Cooney | 62 |
| Mark Broch | 71 |
| Charles DeVaul | 79 |
| Cynthia Reiser | 83 |
| David Phinney | 90 |
| Thomas Stassi | 95 |
| Jill Boulter | 102 |
| John Cassano | 105 |

INDEX TO EXHIBITS

| GRAND JURY | | PAGE |
|---|---|---|
| 1 | Photograph | 19 |
| 2 | Photograph | 29 |
| 3 | Photograph | 29 |
| 4 | Photograph | 29 |
| 5 | Photograph | 29 |
| 6 | Photograph | 29 |
| 7 | Photograph | 29 |
| 8 | Photograph | 29 |
| 9 | Police Report | 29 |
| 10 | Photograph | 55 |
| 11 | Torn Note | 96 |
| 12 | Two Photographs | 96 |
| 13 | Photograph | 97 |
| 14 | Register Tapes | 102 |
| 15 | Photo Array | 109 |

O N O N D A G A   C O U N T Y   G R A N D   J U R Y

ONONDAGA COUNTY GRAND JURY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

GRAND JURY PROCEEDINGS, NOVEMBER 10, 1992

INDEX TO TESTIMONY

| WITNESSES | PAGE |
|---|---|
| Robert Lucas | 111 |
| Mark McArdle | 117 |
| Dr. Erik Mitchell | 119 |
| Joseph Fields | 130 |

INDEX TO EXHIBITS

| GRAND JURY | | PAGE |
|---|---|---|
| 16 | Letter to Robert Lucas | 114 |
| 17 | Video Tape | 117 |
| 18 | Bathrobe | 119 |
| 19 | Belt to Bathrobe | 119 |
| 20 | Photograph | 119 |
| 21 | Photograph | 119 |

GRAND JURY PROCEEDINGS, NOVEMBER 13, 1992

INDEX TO TESTIMONY

| WITNESS | PAGE |
|---|---|
| Elizabeth Lewis | 137 |

-iii-

GRAND JURY PROCEEDINGS, NOVEMBER 16, 1992

WITNESSES                                          PAGE

William Donohue                                    181
Randall Hill (Recalled)                            185
James Crimi                                        188
Susan Stonecypher                                  195
Gary Pratt                                         204
Donald Stonecypher                                 210
Karen Stonecypher                                  218

                        INDEX TO EXHIBITS

GRAND JURY                                         PAGE

    22        Photograph                           204
    23        Photograph                           204
    24        Photograph                           204
    25        Three Notes                          204
    26        Greeting Card & Notes                204
    27        Note                                 204
    28        Note                                 204
    29        Yellow Paper                         204
    30        Flower Card                          204

    LAW                                            225

1

GRAND JURY PROCEEDINGS, NOVEMBER 9, 1992

<u>RANDALL HILL</u>, called as a witness,

having been duly sworn, testified as follows:

EXAMINATION BY MR. FITZPATRICK:

    Q    Good morning, sir.  Tell us your full name, please.

    A    Randall Stanley Hill.

    Q    Where do you live, Mr. Hill?

    A    ████████████████████████████████████

    Q    How long have you lived there?

    A    Nine years.

    Q    Do you have any children?

    A    Well, I have one now.

    Q    And was Valerie Hill your daughter?

    A    Valerie was my daughter.

    Q    What was her birthday?

    A    ██████████████████████

    Q    And your other children?

    A    David.

    Q    David.  Are you married, sir?

    A    Yes, sir.

    Q    And could you tell us back in March of 1987 where were you living back then?

    A    Same place.

ONONDAGA COUNTY GRAND JURY

2

```
Q    Canastota?

A    Yes.

Q    And were you married back in March of '87?

A    I was.

Q    And your wife's name in March of '87?

A    That was Patricia.

Q    Patricia.  Is she still with us?

A    She died that day of cancer.

Q    What day did she die, sir?

A    March 30, '87.

Q    Where was she hospitalized?

A    St. Joseph's Hospital.

Q    Was that Valerie's mother?

A    No, stepmother.

Q    Valerie's mom, is she still alive?

A    She is.

Q    And she lives where?

A    Nashville, Tennesee.

Q    Now, back in March of '87, where was your daughter
living?

A    Eastwood.

Q    Do you know the address?

A    The name of the street escapes me.

Q    ██████████████████    does that sound right?

A    Yes.
```

3

Q     Do you know how long she had lived there prior to her death?

A     About a year.

Q     Was it a house she owned or was she renting?

A     She was renting.

Q     Could you tell us what Valerie did for a living?

A     She was a nurse at St. Joseph's.

Q     And your -- her step mom, was she also hospitalized at St. Joe's?

A     Same floor, same wing.

Q     Was Valerie also tending to her?

A     No.  Valerie worked in pediatric, which was just down the hall from where Pat was.

Q     Now, in '87 was Valerie married or single?

A     Single.

Q     Had she ever been married?

A     No.

Q     Was she dating anyone in '87 to your knowledge?

A     Yes.

Q     Who was that?

A     Hector Riveras (ph).

Q     Hector Rivas, R-I-V-A-S; is that right?

A     Correct.

Q     Now, to your knowledge was she dating anyone else in '87?

4

A    No.

Q    Do you know when she first started dating Mr. Rivas?

A    Maybe for about a year.

Q    Had you ever been out with your daughter and Mr. Rivas socially?

A    Yes, I had, um-hum.  He was --

Q    And you saw them interact?

A    He was at our house several times.

Q    Where was your -- in Canastota?

A    Yes.

Q    Do you know where he was from?

A    Cazenovia.  Originally, no.

Q    Do you know the last time you saw your daughter alive?

A    Friday night, which would be what, the 27th.

Q    I got a calender up here for --

A    Friday the 27th.

Q    The 27th of March.  And tell us the circumstances under which you saw her on that day?

A    I had dinner with her.  Well, I had dinner, she didn't.  She had met me at the restaurant.  I had been at the hospital visiting Pat and we talked during the day and she agreed to have dinner with me.  She was going to go out of town and I wasn't going to see her the rest of the

5

weekend.  She wanted to bring us up to date on Pat's

situation.  I ate dinner and she left.

Q    What time did you make plans to have dinner with

her?

A    The night before.

Q    So that would have been on the 26th?

A    The 26th.

Q    Was it a definite commitment on both your parts?

A    Yes.

Q    Was that in person or telephonically?

A    Telephone.

Q    What time did you meet her on the 27th?

A    I'm not sure about that.  It was after dark.  I'm

going to say 6:30, 7:00.

Q    Where did you meet her?

A    What's the name of the restaurant?  You tell me, I

don't remember.  It's on Burnet.

Q    Would it be in your affidavit?

A    Yes.

Q    I'll show you your affidavit.  I'll have it marked

later on if it's necessary.  If you refer to that, I think

it refers to it in the first two or three lines.

A    Candy's.

Q    And that's on Burnet Ave.?

A    Burnet Ave. and -- yeah, it's on corner.

6

ONONDAGA COUNTY GRAND JURY

1     Q    Now, tell us about the meal.  You indicated
2  already you ate, she did not?

3     A    She did not.

4     Q    You had a full dinner?

5     A    Yes.

6     Q    Did she have anything to eat?

7     A    She sampled some of what I had and didn't
8  particularly like it.

9     Q    Do you recall what that was?

10    A    That was a fish dinner.

11    Q    Do you recall if she had anything to drink?

12    A    Yes, she had a cocktail with me.

13    Q    Do you remember what kind of cocktail?

14    A    No.

15    Q    But it was some type of alcoholic beverage?

16    A    Yes.

17    Q    About how long did you stay in her company at
18  Candy's?

19    A    Maybe an hour.

20    Q    What did she do at the conclusion of that hour?

21    A    She went home.

22    Q    Do you know what type of transportation she used?

23    A    She had her car.

24    Q    Do you know how far her house is located from
25  Candy's?

7

A    Four miles, five miles.

Q    And your best estimation as to what time you separated would have been between --

A    7:00, 7:30, somewhere along in there, yes.

Q    You indicated you met her somewhere between 6:30 and 7, so she would have left you somewhere between 7:30 and 8?

A    Yes.

Q    Now, as far as you understood, she was to travel someplace on Saturday?

A    Schenectady.

Q    Did you therefore make any effort to contact her on Saturday?

A    No.

Q    Would you have normally on a weekend tried to contact your daughter under these circumstances?

A    Yes, I would have.

Q    How about on Sunday the 29th, did you make any effort to contact her?

A    None.

Q    I just want to refer you to your affidavit again, Mr. Hill, and direct your attention to the last -- last two lines, if you would, and I think the grand jury has an appreciation that these events occurred five years ago.

A    That's correct, yeah.

Q    Does that refresh your memory of whether or not you tried to contact her on Sunday?

A    8:00 p.m., okay.  It's five years ago, you know. Okay.

Q    So you did make a call to her on Sunday?

A    Apparently I did.

Q    And I take it you got no response?

A    No response, no.

Q    Now, take us, if you would, to your recollection of Monday, which would be the 30th.  Were you working back then?

A    Yes, I was working.

Q    What did you do for a living?

A    I am self-employed.

Q    As --

A    I build computers.

Q    And did you have a set work schedule back then?

A    No.

Q    Do you remember what your schedule was on the 30th, in terms of what time you got up?

A    I got to the hospital about 10:00.

Q    Had you made any effort to contact Valerie?

A    No.

Q    And --

A    Not that morning, no.

ONONDAGA COUNTY GRAND JURY

1    Q    What happened during --

2    A    Well, I went down the hall to find Valerie because

3    I knew what her work schedule was, she was supposed to be

4    at work, and I met one of her friend nurses as I was headed

5    towards the pediatrics section.  She said, if you're

6    looking for Valerie she isn't here.  And the first thing

7    came to my mind she had a car accident somewhere, so I

8    started making phone calls.

9    Q    To her apartment?

10   A    Well, to her friends.  I don't recollect now who,

11   but I made three or four phone calls to local friends, and

12   then I called the apartment and there was no answer, so I

13   called David.

14   Q    And David is?

15   A    My son.

16   Q    What did you do after you called David?

17   A    He got scared, so we went to -- I went to the

18   apartment, not knowing he was going to come, but I went to

19   Valerie's apartment.

20   Q    Do you know what time it was that you got there?

21   A    Noonish.

22   Q    And would you describe the apartment for us,

23   please.

24   A    In what respect?

25   Q    Is it a multi-family dwelling, is it a split

10

1   level?

2      A    It's two story.   Valerie had the bottom floor and

3   there's tenants that had the upper floor.

4      Q    Do you know what Valerie's normal method of exit

5   and entrance would have been?

6      A    It would have been through the rear door.

7      Q    Okay.   She had her own car?

8      A    She had her own car.

9      Q    Where did she generally park her car, if you know?

10     A    In the garage.

11     Q    When you got there -- you drove?

12     A    I drove.

13     Q    Tell us did you see her car when you got there?

14     A    It was in the driveway in front of the garage,

15  immediately in front of the garage.

16     Q    Where did you park?

17     A    Behind it.

18     Q    What did you do when you got out of the car?

19     A    Went into the house.

20     Q    Did you have a key?

21     A    No.

22     Q    How did you get in?

23     A    The door was unlocked, both doors were unlocked.

24     Q    When you say both doors, describe --

25     A    Outside -- it's a multiple dwelling, so there's

11

two doors.  I went in the hallway and to the immediate left
and that door was unlocked, that's her door.

Q    Had you ever been in her apartment before?

A    Yes.

Q    Had you ever been there without her?

A    No.

Q    Every time she went with you?

A    Or she was at home, yes.

Q    Do you know whether that outside door was normally
kept locked or unlocked?

A    The outside door, no, I don't.

Q    In any event, the outside door was unlocked?

A    Yes.

Q    Was it closed?

A    Yes.

Q    Now, do you know if normally the inside door, that
would be the door from the hallway to her apartment, do you
know if that was normally kept locked?

A    That was locked, that would have been locked.

Q    In this case it was unlocked?

A    It was unlocked.

Q    Do you know if it was closed?

A    It was closed.

Q    When you entered that door, what did you do, what
did you see?

12

ONONDAGA COUNTY GRAND JURY

1    A    Empty apartment. I saw her car there and couldn't
2    figure out where she was, so I went looking and calling.
3    Q    Tell us what you saw?
4    A    I walked into the living room and Valerie was
5    lying on the floor.
6    Q    Could you describe her condition for us as you saw
7    her?
8    A    She was laying on the living room floor with her
9    head up against the couch and she had on a robe, and the
10   robe was -- the only part of the body her robe covered was
11   the upper part.
12   Q    Were her buttocks exposed?
13   A    Yes.
14   Q    And she had no underwear on that you could see?
15   A    No, she did not.
16   Q    What else did you observe about her?
17   A    After that, nothing.
18   Q    Did you make any effort to check to see if she was
19   alive?
20   A    No. I touched her shoulder. There was no --
21   nothing.
22   Q    Clear to you that she was deceased?
23   A    Yep.
24   Q    What did you do at that point?
25   A    Called the police.

13

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1    Q    And did you -- did you touch anything other than
2    the phone, disturb anything, move anything?
3    A    No.
4    Q    Did anybody else arrive there?
5    A    While I was on the phone David came in.
6    Q    How long had you been there before David got
7    there?
8    A    Ten minutes.
9    Q    And did you observe him touch or disturb anything
10   while you were there?
11   A    No.
12   Q    How long did it take the police to get there?
13   A    Oh, gosh, within ten minutes.
14   Q    Almost the same time as David?
15   A    No, it was after David.  I was on the phone with
16   the police when he drove in, and it was within ten minutes
17   of that that the police were there.
18   Q    All right.  And I take it you gave an affidavit
19   back then -- the affidavit that I've already shown you?
20   A    Yes.  I left -- I left the scene.  I was there for
21   maybe half, three quarters of an hour.  Then I went back to
22   the hospital and an officer came up to the hospital and
23   took my statement.
24   Q    Okay.  Now, did you know the status of your
25   daughter's relationship with Hector Rivas as of March of

14

1987?

    A    Yes.

    Q    What was that?

    A    She wanted to break off their relationship.

    Q    Okay.  It may be a tough question, but did your daughter confide in you about details of her relationship with Mr. Rivas?

    A    Nothing specific.  He was -- he was bothering her.

    Q    Did you -- you indicated you socialized with your daughter and Hector on occasion?

    A    Yes.

    Q    Was that with any degree of frequency?

    A    No.

    Q    And was it -- regardless whether it was frequent or infrequent, was it of the same type in February and March of '87 as it had been in late '86?

    A    Well, I'm going to say in February she was trying to break off with him.  It had gone back that far that she didn't want anything more to do with Hector.

    Q    Now, when is your birthday, sir?

    A    My birthday is 3/17/32.

    Q    You didn't have to give us the 32, Randy, but that's okay.

    A    Okay.

    Q    Did you have occasion to see your daughter on

15

March the 17th of '87?

A    Yes.  We had dinner.

Q    How did that come about?

A    It was my birthday and she took me out.  Pat was in the hospital.

Q    I was just going to ask that.  Your wife was in the hospital as early as March 17th?

A    Yes.

Q    Now, where did you go to dinner?

A    Where did we go for dinner?  I went to her house.

Q    Hold on one second.  Does Bennigan's ring a bell with you?

A    Bennigan's rings a bell.  It was prior to that I was at her house.

Q    How did you arrange the dinner at Bennigan's?

A    By phone.

Q    Do you remember what time you had dinner with her?

A    No.

Q    Was it dark out when you had dinner with her?

A    Yes.

Q    Was there set hours that you could visit at St. Joe's?

A    No.  I was allowed in there anytime I wanted to come in.

Q    Do you remember anything unusual just about the

16

dinner itself?

 A    At Bennigan's, no.

 Q    Was it just you and Valerie?

 A    Yes.

 Q    Did you drive there?

 A    Yes.

 Q    Did she drive there?

 A    I believe so.

 Q    Okay.  Where did you go after Bennigan's?

 A    I don't remember.

        MR. FITZPATRICK:  Just let me have one
    second.  Let me see you for one second, Randy.

 (Mr. Fitzpatrick and the witness leave and re-enter the
grand jury room.)

        MR. FITZPATRICK:  Okay.  Just for the record,
    Mr. Hill and I left the room for about a minute,
    minute and a half, and we discussed a conversation
    that he and I had about five or six days ago.

BY MR. FITZPATRICK:

 Q    Do you recall now, sir, this dinner that you had
with your daughter on March 17th?

 A    Yes, now I do.

 Q    Asking you again, was she driving?

 A    I picked her up at the house.

 Q    And drove her to Bennigan's?

17

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1    A    Drove her, we drove to Bennigan's together.

2    Q    Now, getting to when you left Bennigan's, where

3    did you go from there?

4    A    Directly back to Valerie's house.

5    Q    On ██████████████

6    A    On ██████████████

7    Q    Could you tell us what happened when you got back

8    there?

9    A    We sat in the driveway in the car talking at the

10   back door.

11   Q    This would be the door that you just described to

12   us?

13   A    Yes, the rear entrance.

14   Q    And you were talking -- without going into the

15   specifics, just in general you were talking about what?

16   A    About Pat, her sickness.

17   Q    That's your wife?

18   A    Yes.  And her sickness and what was going to

19   happen.  And while we were sitting there in the dark, this

20   must have been 8:00 at night, Hector came out of the house,

21   out of the back door, the rear entrance door.

22   Q    Do you remember anything about him, how he

23   appeared, how he was dressed?

24   A    Just casual.

25   Q    Do you know if he had any outer clothing on?

18

A    He had a jacket on, short jacket.

Q    Okay.  What happened when he came out the back door?

A    He came over to the driver's window.  He didn't recognize the car.  He came over to the driver's side of the car.  I rolled the window down, and we had idle chitchat, hello, Mr. Hill, how are you.

Q    Were you in any way surprised to see him?

A    Yes.

Q    Did anything occur after he chitchatted with you?

A    I -- Valerie went in the house, I left.  We talked for a few more minutes and then they went in the house together.  But he had been sitting in the house with the lights off in the dark.

Q    Do you know if Valerie and he just talked about anything in your presence?

A    No, most of the conversation was with me, and it was just idle, whether --

Q    Did she react in any way to him coming out of the house?

A    Upset.  What's he doing there.

Q    You make the conclusion that she was upset by that comment and her appearance?

A    His appearance, what was he doing in my house with the lights off.

19

ONONDAGA COUNTY GRAND JURY

1          MR. FITZPATRICK:  I just want to have this

2     marked as Exhibit 1.  It's a photograph of your

3     daughter.

4          (Grand Jury Exhibit Number 1 was marked)

5     BY MR. FITZPATRICK:

6          Q     Is this your daughter Valerie?

7          A     That's my daughter.

8          Q     Does that show the way she appeared back in March

9     of '87?

10         A     She would be a little older than that, but

11    generally, yes.

12         Q     Generally the same appearance?

13         A     Yes.

14              MR. FITZPATRICK:  Anybody have any questions

15         for Mr. Hill?

16              JUROR:  Did he have a key to get into the

17         apartment?

18              MR. FITZPATRICK:  Well, we'll get into that.

19              JUROR:  He didn't break in?

20    BY MR. FITZPATRICK:

21         Q     You didn't see any evidence that the door had been

22    broken in?

23         A     No, sir.

24              MR. FITZPATRICK:  We'll hear a little bit

25         more about that later on.  That's a good point.

20

ONONDAGA COUNTY GRAND JURY

1    Keep in mind, if you want any witness recalled,
2    especially this witness, he'd be more than happy
3    to come back and talk to you.  All set, Mr. Hill.
4      (Whereupon the witness was excused)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

21

<u>DAVID HILL</u>, called as a witness,

having been duly sworn, testified as follows:

EXAMINATION BY MR. FITZPATRICK:

Q    Good morning, sir.  Tell us your full name,
please.

A    David Hill.

Q    Where do you live, David?

A    ██████████████████

Q    That's here in Syracuse?

A    Syracuse.

Q    And how old are you?

A    Thirty-six.  Just had a birthday so --

Q    And Valerie Hill was your sister; is that correct?

A    Yes, she was.

Q    And the gentleman that just left, Randall Hill,
that's your father?

A    Yes, he is.

Q    Are you married, David?

A    Yes.  Been married for almost thirteen years.

Q    Any kids?

A    One son, almost nine.

Q    And did your sister and you grow up together?

A    Yes, we did.

Q    Where did you grow up?

22

A    Cazenovia.

Q    And when did you leave the Cazenovia area?

A    1978.

Q    Same for Valerie?

A    Yes.  She was in college a year before that.

Q    Now, what was she doing -- how was she working prior to her death?

A    She worked for St. Joseph's Hospital as a -- I believe she was a nurse's aide.  I'm not exactly positive of her job title.

Q    Did you keep in close contact with your sister?

A    Once I had my son, Andy, my sister would call almost daily or stop by at least once a week or so just to see how he was doing.

Q    Where did you live back in March of '87?

A    ███████████████████████████

Q    That's in Syracuse?

A    Down in Syracuse, yes.

Q    And she lived --

A    On ████████████████████████

Q    Did you know in the 80's, let's say in the mid 80's, '84 '85, '86, was your sister seeing anyone seriously?

A    A fellow by the name of Bob Lucas in Cazenovia.

Q    How long had she been going out with Bob Lucas?

A    Probably five -- a little over five years.

Q    Did they ever get engaged as far as you know?

A    No, not that I know of.

Q    Do you know when she broke up with Mr. Lucas?

A    I think it might have been in the spring of '85 or '86.

Q    Did she start dating anyone else?

A    Not right away, not that I know of, not that I was aware of.

Q    Did there come a time when you became aware of another steady relationship she had?

A    Hector Rivas, yes, she started dating him in the early summer of -- I think it was '87.

Q    I got a calender up here, David, that might help you.  This is '87?

A    '86 then.

Q    So it was the early summer of '86 she started dating Hector?

A    Yes.

Q    When did you first meet him, if you remember?

A    I think it was late June or early July of '86.  I remember it was summertime and I had taken some time off from lunch at work.  I worked the night shift at Roth Brothers, and there was something that she wanted me to pick up at the house, and I stopped by her house at █████████

24

1    and I stopped there, and I think they were getting ready to

2    go to dinner or had had dinner, and that's the very first

3    time I had met Hector.

4        Q    As time went on did you socialize with Hector?

5        A    In Christmas of '86 we went to Nashville, Tennesee

6    to see my mother.  She went down there after separating

7    from my father, and we went three or four days in

8    Nashville.  Socially that was the only time I have ever

9    spent time with him.

10        Q    Who went to Nashville?

11        A    Myself, my wife and son drove down, and Hector and

12    Valerie flew down.

13        Q    And you stayed at your mother's house?

14        A    Yes.

15        Q    Did Valerie and Hector stay in the same room?

16        A    I believe they did, yes.

17        Q    As far as you know they were pretty serious about

18    each other?

19        A    I would say so.

20        Q    Did you notice anything about the relationship in

21    Nashville, everything appeared to be going okay that you

22    appeared to see?

23        A    Outward signs indicated everything was going well.

24        Q    Did there come a time, David, when you became

25    aware that the relationship was changing somewhat?

ONONDAGA COUNTY GRAND JURY

A    In the spring of '87 my sister decided that she
didn't like the way that Hector was -- I guess trying to
control her life and wanted to know where she had been,
where she was going, and my sister was the kind of person
that would just like to pack her bags and go visit friends.
I guess footloose would be probably the easiest way to
describe her.

Q    Could you give us a date rather than just
generally?

A    When I first noticed that they were having
trouble?

Q    Yes.  Not a day but maybe a time frame, January,
February, March.

A    I'd have to say probably toward the end of January
or maybe the middle of January of '87.

Q    Okay.  Now, earlier you said spring of '87.  Of
course, spring begins sometime in March around here.  Is it
clear in your mind that it was sometime in January that
they began to break up?

A    I'll go back and say probably closer to January,
middle part of January.

Q    Now, had you ever lived with your sister?

A    There was a period of about a year, maybe a little
longer, where we had lived together.  She had a roommate --
she went to a school with a gal, and once they graduated

from college, they moved to Mathers Street here in
Syracuse.  And about six months later her roommate moved in
with her boyfriend, my sister's roommate moved in with the
fellow that she was going out with, and my sister needed a
roommate and I was looking for a place to live, so we got
together and I spent I think another -- about a year, maybe
a year and a half living with her.  It wasn't a year and a
half.  It was about a year, I'm sorry.

Q    When was that?

A    Nineteen seventy -- 1979.

Q    Now, had you ever been visiting her at Hickok
Ave.?

A    I had stopped by a couple times a month probably.

Q    And she also in turn I think you indicated visited
you too?

A    Yes, would stop by on a much more regular basis.

Q    I want to ask you about some of her habits.  Do
you know if she smoked?

A    Very little.  She did smoke cigarettes maybe two
at a time.  That would be about all.

Q    Do you know what brand she smoked?

A    Green pack, Newports, I believe.

Q    Do you know if she drank at all?

A    She liked to -- mostly on the weekends though.
She wasn't a steady drinker.  More of a social drinker.

27

Q    What kind of liquor did she like to drink?

A    Rum and cokes, wines, the white Russians, black Russians, kind of exotic drinks.

Q    The times that you had encounters with Hector Rivas, do you know anything about his habits and smoking?

A    I believe he smoked, but how much I wouldn't be able to tell you.

Q    How about drinking, do you know if he drank?

A    I believe my sister met him in a bar, so I know he was a drinker.  But what kinds of drinks and how much, I couldn't tell you.

Q    I want to direct you to the 30th of March 1987 and ask what you were doing?

A    Worked the night shift at Roth Brothers, and if I'm not mistaken, Monday, the usual, I probably got up about 9:30 in the morning, and this particular day I got a call from my father because he hadn't been able to reach my sister, and at the time my stepmother was in the hospital at St. Joseph's, and when my father got to St. Joseph's to look in on his house, he found out my sister hadn't showed up for work.  Called her house, called me, wanted me to call her.  And about 1:00, quarter to one, I got in my car and went over to my sister's house and found that the door was open, both the doors.  There was an outside door and the door to her apartment.  Both of those doors were open

28

and I saw my father's car was parked in the driveway.  I
pretty much assumed -- I guess I expected the worse and
went into the house and found my sister on the living room
floor with a bathrobe around her lying face down.

Q    Obvious to you that she was dead?

A    Yes.

        MR. FITZPATRICK:  Any questions for David?
All right.  David, if we need to hear from you
again, we may call you back, but we want to thank
you for being here.

        THE WITNESS:  All right.  Thank you.

        (Whereupon the witness was excused)

ONONDAGA COUNTY GRAND JURY

1       <u>JOHN BRENNAN</u>, called as a witness,

2  having been duly sworn, testified as follows:

4  EXAMINATION BY MR. FITZPATRICK:

5   (Grand Jury Exhibits Numbers 2 through 9 were marked)

6     Q    Good morning, sir.  Tell us your full name,

7  please, and what you do for a living.

8     A    My name is John D. Brennan.  I'm a police sergeant

9  for the City of Syracuse.

10    Q    How long have you been with the Syracuse Police

11  Department?

12    A    Approximately twenty-three years.

13    Q    How long have you been a sergeant?

14    A    Approximately five years.

15    Q    And how were you employed back in March of 1987?

16    A    I was assigned as a police investigator in the

17  Criminal Investigation Division.

18    Q    Okay.  And Criminal Investigation Division, what

19  is that?

20    A    This is the plainclothes unit of the police

21  department.  We investigate all robberies, burglaries,

22  assaults and homicides that occur in the City of Syracuse.

23    Q    Were you working on Monday, March the 30th of

24  1987?

25    A    Yes, I was.

30

O    1        Q    And did you get a call regarding a suspicious

N    2    death sometime that afternoon?

O    3        A    Yes, I did.

N    4        Q    What did you do when you got that call?

D    5        A    I proceeded to ███████████ and met other

A    6    officers that were securing the scene.

G    7        Q    What was your job -- what was your role when you

A    8    got to the scene?

     9        A    When I arrived on the scene, I spoke with some

C   10    uniformed officers and I briefly scanned the crime scene,

O   11    observed the victim lying on her face down on what appeared

U   12    to be a living room floor.

N   13        Q    I'm going to show you a series of photos,

T   14    Sergeant.  Exhibit 2, do you recognize that?

Y   15        A    Yes, sir.  This is a photo of the victim's

    16    vehicle, which is a Ford Tempo.  It was parked in the rear

G   17    of 248 Hickok.

R   18        Q    Exhibit 3?

A   19        A    This is a photo of the two-family house, which is

N   20    248/250 Hickok Ave.  The victim resided downstairs, first

D   21    floor.

    22        Q    Now, Exhibit 3, is there a doorway to get into the

J   23    house even though it might not be shown there?

U   24        A    Right.  Our crime lab truck is blocking the view

R   25    of the doorway, but there's a side door here.

Y

31

Q    And Exhibit 4?

A    Again, this is another front view of 248/250 Hickok Ave.

Q    And the victim in the case, Valerie Hill, lived downstairs?

A    Downstairs at ███████

Q    Exhibit 5?

A    This is a picture of the victim, Valerie Hill, laying face down in the front room.

Q    And Exhibit 6?

A    Again, another photo of Valerie Hill laying face down with her robe pulled up.

Q    And Exhibits 7 and 8?

A    These are also photos of Valerie Hill.  This is what she appeared to look like when I arrived on the scene.

Q    Now, the difference in 7 and 8 and the other photos, there appears to be a blanket covering her buttocks?

A    That's true.

Q    Do you know how that blanket got on?

A    I was advised later on how it was.

Q    What were you told?

A    I was advised that a uniform member placed it over her because of family members at the scene.

Q    Besides placating the family, would it be fair to

32

say you were violating police procedure in doing that?

A    Yes, it is.

        MR. FITZPATRICK:  I'm going to distribute
        these photos to the grand jurors.  Make sure
        everybody has a chance to see them.

BY MR. FITZPATRICK:

Q    Now, were you assigned -- after your duties at the
scene, were you assigned to interview anyone?

A    Yes, sir, I was.

Q    Who was that?

A    That was one Hector Rivas.

Q    Do you know who gave you that assignment?

A    Yes, Sergeant Mike Lynch.

Q    And what efforts did you make to locate Mr. Rivas?

A    We learned that he lived on Nelson Heights Road in
Cazenovia, and myself and Investigator Jim Driscoll
proceeded to that location.

Q    Anyone assist you?

A    We had a uniformed state trooper with us to meet
us at the house.

Q    And this is in Cazenovia?

A    Yes, it is.

Q    That would be Madison County?

A    That's correct.

Q    And about what time did you get to Mr. Rivas'

33

ONONDAGA COUNTY GRAND JURY

1    house?

2        A    Approximately 2:40 p.m.

3        Q    And it was just the three of you, the trooper,

4    Mr. Driscoll, and yourself?

5        A    That's correct.

6        Q    How were you and Mr. Driscoll dressed?

7        A    At that time we were assigned for a burglary

8    squad, and we were dressed in jeans, sneaks, sweat shirts.

9        Q    How about the trooper?

10       A    The trooper was in his uniform, gray uniform.

11       Q    What type of house did Mr. Rivas live in?

12       A    This was a one-family ranch structure.

13       Q    Who knocked on the door?

14       A    I believe myself.

15       Q    Did you get a response?

16       A    Yes, I did.

17       Q    Tell the grand jury what happened after you got a

18    response?

19       A    After a few minutes, a male came to the door and

20    answered it.  We identified ourselves as police officers

21    and we asked for Mr. Rivas.  He stated that he was, in

22    fact, Hector Rivas.  We asked him if we could come in and

23    talk to him for a minute.  He allowed us entry.  It

24    appeared that we had just woken him up.  He was still

25    undressed and we advised him we wanted to talk to him about

his girlfriend, and at that time we asked him if he would accompany us to the Criminal Investigation Division in Syracuse, and he agreed.  He then got dressed and came out and got in the back seat of our police car.

Q    Did he ask you any -- did he say anything more to you?

A    At no time did he ever ask anything, never asked what it was about, made no inquiries at all.

Q    Did you advise him that his girlfriend was dead?

A    Not at that time, no, sir.

Q    You and Mr. Driscoll drove him to Syracuse?

A    That's correct.

Q    The trooper went his own way?

A    That's correct.

Q    How long did it take you to get to Syracuse?

A    I'd say approximately thirty, thirty-five minutes.

Q    And did you have any conversation with him on the way?

A    None at all.

Q    He remained absolutely silent?

A    Absolutely silent the entire time.  Never asked us anything, never made any attempt to have any conversation with us at all into Syracuse.

Q    What happened when you got into Syracuse?

A    Upon our arrival at the Public Safety Building, we

ONONDAGA COUNTY GRAND JURY

brought Mr. Rivas up to the third floor, and we placed him in the gold polygraph room of the Criminal Investigation Division offices.

Q    Then what happened?

A    At that time myself and Investigator Driscoll began to inquire about Mr. Rivas' relationship with the victim and to trace his steps over the past few days.

Q    Did you at any time take a written statement from him?

A    No, we did not.

Q    Did you memorialize though what he said in a police report?

A    Yes, we did.

Q    When did you make that police report?

A    That night after our interview with Mr. Rivas was concluded.

Q    Would you need to refer to that to refresh your recollection on occasion as to what he told you?

A    Yes, sir, if I could.

Q    I'm going to hand you Exhibit 9, allow you to refer to that to refresh your memory as needed.  Tell us about the conversations you had with Mr. Rivas, what did he tell you about the days in question?

A    Well, on the 26th of March, Mr. Rivas stated that was the last time he saw the victim.  He stated that he

36

went over to her house at approximately 7:00 p.m., stayed approximately a half hour and then left, then he returned to Cazenovia.

He stated that on Friday, the 27th, at approximately 2:00 p.m., he went over to her house and found that she was not at home. At that time he stated he left some type of note under the door, which was a habit of his when she was not at home. He stated he left, he went to a construction site, a job that he was working on, and then returned to Cazenovia.

Later on in the afternoon on Friday, he received a phone call from Mark Broch and made arrangements to meet him and other friends at Coleman's restaurant on the west end of the city. He stated at approximately 5:00 he went into the city, went to Coleman's, met his friends, stayed at Coleman's until approximately 11 p.m., then left Coleman's and returned to Cazenovia and went to Albert's bar. He stated he stayed at Albert's until approximately 2:00 a.m. At that time he and some other friends returned back to the city and went to Perkins restaurant to go to breakfast. They stayed there until about four, and at that time he returned back to Cazenovia and went home.

Q    If I could interrupt you just for a second. If you need to refer to that, please do so. Tell us how many times on Friday, the 27th, Mr. Rivas admitted stopping at

37

the victim's house?

    A    On Friday, sir?

    Q    Yes.

    A    He stated that on Friday that he went there at approximately 2 p.m., and then he went to a job site, and then he made arrangements to go to Coleman's Pub.  He said he drove by the victim's house again as he was going into the city to go to Coleman's and the victim was still not home.  At this --

    Q    I'm sorry, go ahead.

    A    At this time he leaves the note under the kitchen door.

    Q    At what time does he state that that is?

    A    This would have been sometime after 5:00, and then goes to Coleman's and stays there until about 11:00.

    Q    Now, did you discuss with him whether or not it was his habit to stop at the victim's house?

    A    Yes.  He stated that several times he would drive by the victim's house in attempt to find her home.  If she was not at home he would leave a note.  But he stated several times in the past he would always go to her house to see if she was there.

    Q    He stops by at 2:00 Friday, he stops by again before he goes to Coleman's, he goes to Coleman's and then tells you that he drives straight home?

38

A    That's correct.

Q    Do you know where ▓▓▓▓▓▓ is located in relation to 690?

A    Yes, I do.

Q    And you know where Coleman's is located?

A    That's correct.

Q    And you've already indicated that you've been to his house in Cazenovia?

A    That's correct.

Q    And are you familiar with Albert's restaurant in Cazenovia?

A    Yes, I am.

Q    What would be the most direct route from Coleman's to Albert's restaurant?

A    That would go directly out -- get on 690, go directly out, get off the Dewitt exit of 481 and then go out through Manlius to Cazenovia.

Q    How far is the victim's house from 690?

A    Just a few blocks from her house is the 690 exit and after you get off the 690 exit, you're only talking six, seven blocks to her house.

Q    Is that Teall Ave. or Midler?

A    Midler Ave. would be the closest exit.

Q    Go ahead, tell us what else you talked to Mr. Rivas about regarding Saturday and Sunday?

39

A   On the 28th, Saturday, Mr. Rivas says he gets up, supposed to do a plumbing job at Albert's. He gets down to Albert's and decides not to do the job but stay there and have lunch. He stayed at the bar until about 3:30 to watch the SU game and stayed there until about 8:00, then went to a party at a friend's house, Bob Giordano's house. He stayed at the house and got pretty drunk and slept on the sofa. He stated several of his friends were at the party.

On Sunday, the 29th, he stated he got up, did some laundry, went into town to get a newspaper, drove around town and goes home and washes the car. Then he goes back to Albert's bar in Cazenovia and stayed there until about 11:00 Sunday night, at which time he returned home.

Monday he gets up about nine, he decided not to do any work because of a sore throat. Approximately 2 p.m. he tries to call Valerie's place of employment and finds out she didn't come into work. About 2:40 p.m., is approximately when myself, Investigator Driscoll and a New York State Trooper showed up at his house.

Q   So the last time he tried to contact Miss Hill on Friday would have been approximately what time?

A   Approximately sometime around 5:00 on his way to Coleman's.

Q   Did he say anything about his effort to contact her on Saturday?

A    No, sir.

Q    Or Sunday?

A    Or Sunday.

Q    And the next time he tried to make contact was 2:00 on Monday?

A    That's correct.

Q    Did you ever question about that deviation from his routine?

A    When I asked why he didn't attempt to contact her throughout the weekend, he could not provide me with any answer.

Q    But you did make an effort to get an answer from him?

A    Yes, but he couldn't give an explanation under the circumstances.

JUROR:  Was there any proof that he called on the 30th, have they got any proof?

MR. FITZPATRICK:  We'll hear about that.

BY MR. FITZPATRICK:

Q    Do you know what kind of vehicle he drove?

A    He had a red Chevy van that he used for the plumbing business.  He also used another vehicle, a gray Olds Tornado.

Q    Do you know if he had any custom plates for the Tornado?

41

A    I don't recall the exact plates.

Q    Did you ask him about how his relationship with Miss Hill developed?

A    In May of '86 he met Valerie through a friend of his, Robert Lucas, who also used to date the victim.  And they started dating and they were dating steadily for about two months, and the victim wanted to break it off.  She no longer wanted to see Mr. Rivas.  He stated that he made several attempts to go back to her and stop by to see her and talk her into going back, but she still maintained that she didn't want that relationship with him.

Q    Did you ever ask him whether or not he had a key to her apartment?

A    Yes, I did.  He stated he did, in fact, have a key to her apartment, but approximately two months before the 30th she asked for it back and he returned it.  I asked him if he ever made any copies of the key.  He denied ever doing that.

        MR. FITZPATRICK:  Anybody have any questions for Sergeant Brennan?

        JUROR:  Yes.  How many notes did he leave? You said that he left a note at 2:00 p.m. and then went back at 5.

        THE WITNESS:  That was a mistake on my part. It was one note on Friday when he was en route to

42

Coleman's restaurant.

JUROR:  At 5:00?

THE WITNESS:  Approximately 5:00, yes, ma'am.

JUROR:  And you said that he tried to contact her about 2:00 p.m. on the 30th, the day she was discovered?

THE WITNESS:  On the 30th he tried to call her -- he did call her place of employment and learned she did not come into work.

JUROR:  At 9, around 9:00?

THE WITNESS:  He called at approximately 2:00 p.m. on Monday.

JUROR:  At work?

THE WITNESS:  Her place of employment, yes.

JUROR:  Yet you said when you got there to question him at his home in Cazenovia it was around 2:40 and it looked like he had just got up?

THE WITNESS:  That's correct.

JUROR:  Do you find it unusual that somebody you're bringing in to investigate would not make any comments at all on why that happened?

MR. FITZPATRICK:  That's really for you to decide.  You know, I'm sure the officer has an opinion on that, but I prefer you make that judgment.  If there's anything factually more that

you need to know, you can ask him.

JUROR:  Did anybody -- did the father find a note on the floor?

MR. FITZPATRICK:  You'll see notes that were recovered from the house.  Whether or not you can determine which was the Friday note, I'll have to warn you will be unlikely.

THE SECRETARY:  When he was -- when you arrived at his door, what time did you tell him exactly what had happened to Valerie?

MR. FITZPATRICK:  You bring up a good point.

BY MR. FITZPATRICK:

Q    Did you, Sergeant, at some point tell Mr. Rivas that Valerie hill was dead?

A    Yes, sir.  At approximately 5:30 p.m. on the 30th I advised Mr. Rivas that she was, in fact, dead.

Q    And that was after all this information that you just reported to us just came out?

A    That's correct.

Q    What was his reaction to that?

A    At that time he showed no emotion at all, no reaction.

THE SECRETARY:  Was it a state of shock type of motion where he just froze or --

THE WITNESS:  No, sir.  It appeared that he

44

didn't appear surprised or shocked or anything.

JUROR:  He never questioned at all why he was being taken --

THE WITNESS:  At no time from 2:40 a.m. -- p.m. I'm sorry, until the time I advised him she was dead at 5:30 did he ever make any inquiries as to her condition, whether she was alive or dead.

JUROR:  But you had told him that's why you were there, to talk about his girlfriend?

THE WITNESS:  That's correct.

JUROR:  When you were going over all these dates and why he didn't -- you asked specifically why he didn't try to get ahold of her over that period of time, he never said anything about her going away for the weekend or anything?

THE WITNESS:  Made no mention of it at all, no, sir.

JUROR:  When you told him that she was dead, how did you tell him?

THE WITNESS:  I was quite frank about it.  I said we found Valerie dead in her apartment.

JUROR:  Did he say what happened to her?

THE WITNESS:  He didn't inquire as to how she died or anything, just showed no emotion.

MR. FITZPATRICK:

Q    Now, he was not under arrest at this point?

A    That's correct, he was not.

Q    In fact, at some point he left CID later that morning?

A    That's correct.

        JUROR:  Counselor, at what point did they advise him of his rights, if ever?

MR. FITZPATRICK:

    Q    Sergeant, did you advise him of his constitutional rights?

A    No, we did not.

Q    What was the reason for that?

A    Well, he was a boyfriend, we were more interested in getting background information on Valerie or himself. At that time we had no concrete evidence to say he was definitely a suspect.

Q    Aside from the fact that you had some evidence that they had been dating, that she had tried to break the relationship up, any other information to indicate he was the killer?

A    No, sir, none at all.

Q    And you had no reason to believe he was a suspect?

A    That's correct.

        JUROR:  Who told you about him?

        THE WITNESS:  There was family members at the

46

scene when we arrived and they indicated she used
to have this relationship with Hector Rivas.

JUROR: Was that just a normal question and
answer period? Were they concerned that he might
have been the person to do it?

MR. FITZPATRICK: Could I interrupt this for
a second. Again, I want to protect Mr. Rivas here
and say that might be something that wouldn't be
fair. If they felt that there's -- there's no way
for this officer to testify if they felt that,
okay. I don't want to cut you off, but you
understand what I'm getting at?

JUROR: Yep.

MR. FITZPATRICK: All right. Sergeant, thank
you very much.

(Whereupon the witness was excused)

47

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

 1        **FRANK PIEKLIK**, called as a witness,

 2    having been duly sworn, testified as follows:

 3

 4    EXAMINATION BY MR. FITZPATRICK:

 5        Q    Good morning, sir.  Tell us your full name,

 6    please, and what you do for a living.

 7        A    My name is Frank John Pieklik.  I'm a sergeant

 8    with the Syracuse Police Department.

 9        Q    How long have you been with the Syracuse Police

10    Department?

11        A    Since September 24th, 1973.

12        Q    How long have you been a sergeant?

13        A    Since June of 1989.

14        Q    How were you employed back in March of 1987?

15        A    I was an investigator assigned to the Criminal

16    Investigations Division.

17        Q    And specifically on March 30th, 1987, a Monday,

18    did you receive an assignment to interview a Hector Rivas?

19        A    Yes, I did.

20        Q    Could you tell us when and where it was that you

21    first spoke to Mr. Rivas?

22        A    I met with him at about 8:00 p.m. in the CID

23    office.

24        Q    Anyone else with you?

25        A    No, sir.

48

Q    Anyone with him?

A    No.

Q    Could you tell us how he appeared physically?

A    I'm sorry, I don't recall how he appeared.

Q    It's been some period of time?

A    Several years, yes.

Q    Did you make a report memorializing your conversation with Mr. Rivas?

A    Yes, I did.

Q    Would you need to refer to that to refresh your recollection as to what he told you about certain dates?

A    Yes.

Q    I'm going to hand you your three-page report, Sergeant, and I want to direct your attention to Friday, March the 27th of '87, and ask if Mr. Rivas told you what he did on that date?

A    Yes, he did.

Q    Could you relate to the grand jury what he said?

A    On Friday, March 27th, he was sleeping at home, and awoke at approximately 8:00 in the morning.  He called a real estate agent by the name of Raymond, and then does paperwork.  At 1:00 he leaves home, goes to Merchants Bank in Cazenovia.  At 2:00 he arrives in the city at Louise Muserlian's house and talks about Frances Carroll Reality. Between 2:30 and 3:00 he arrives at Valerie Hill's.  She is

49

not at home, sees no car and just drives by.  Continues on
to Midler and Erie A-Plus Mini Mart.  Buys gas and a Coke.
Leaves there and proceeds to Liquor Square to buy a bottle
of Barcardi rum.  Leaves there and starts towards home and
stops by Sullivan and Seminary Streets where he owns
apartments.  Attempts to meet with Susan, I believe the
name is pronounced Rohn, R-O-H-N, in Apartment 5 to fix a
plugged sink.  Rohn is not home and he continues arriving
home at 4:00 p.m.  At 4:00 p.m. makes a series of calls to
Louise Muserlian, Attorney Raymond, Gillman Reality and
Frank Joseph attorney.  At 4:30 he calls Mark Broch,
B-R-O-C-H, at CYN Mechanical.  At 5:30 he leaves home en
route to Hill's house and arrives at 6:00 finding her not
at home and leaves a note on the side door.  At 6:30 he
arrives at Coleman's and meets with Mark Broch, Sean
Morgan, Gary Burghardt and Chuck Barron.  Burghardt leaves
at 9 o'clock.  At 10:00 he leaves in his car and drives
directly to Albert's arriving at 10:45 hours.  Mark
Costello and Bob Marion are tending bar.  He talked with
Pete Cooney and Charles DeVaul and a girl named Beth until
closing.  At 2:30 he leaves the bar with a girl of unknown
name.  She is short with blond hair.  He drives her to
Oran, dropped her off near a horse farm.  Then he drives
directly to the Eggplant restaurant to meet with Charles
DeVaul, Beth and a guy named Dick.  Arrives at Eggplant and

50

finds no one there.  Upon leaving he meets with Rema who owns Rema's Pizza.  Rema follows him to Perkins where he meets up with other friends.  At 5:00 he leaves Perkins and drives with Beth to Albert's where he dropped off Beth at her car.  Beth follows him until he gets home and she drives on.  At 5:30 he is at home and falls asleep on the couch.

Q    I want to refer back to the previous day, Thursday the 26th, and ask if he indicated whether or not he saw Valerie Hill on that date?

A    Yes, he did.

Q    What specifically did he say as to when he saw her, what she was doing, and so forth?

A    He said that he arrived at Valerie Hill's house at 5:00, talked with her about the relationship and how each other is doing.  Said he parked his van across the street. He said that he left at 5:30.  Valerie Hill walked him out and she was dressed in sweat pants to go jogging.

Q    Would this have been, as far as your conversation with him was concerned, the last time that he claims he saw her alive?

A    Yes.

MR. FITZPATRICK:  Any questions for Sergeant Pieklik?  Okay, Frank, thank you.

(Whereupon the witness was excused)

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

<u>CHRISTOPHER REYNOLDS</u>, called as a

witness, having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

Q     Good morning, sir.  Tell us your full name.

A     Christopher Scott Reynolds.

Q     Christopher, how old are you?

A     Twenty-four.

Q     What do you do for a living?

A     I'm a student at OCC.

Q     What are you studying up there?

A     Graphic design.

Q     How long have you been at OCC?

A     This is my second semester.

Q     And are you married or single?

A     I'm single.

Q     Do you know -- tell us where you live?

A     ███████████████████

Q     How long have you lived there?

A     Almost two years.

Q     Where did you live back in March of 1987?

A     ██████████████ on the second floor.

Q     What did you do back in March of '87?

A     I was a paperboy and a student at Henninger High
School.

52

Q    What paper did you deliver?

A    The evening paper, the Herald-American or Herald Journal, whatever it is.

Q    What hours did you deliver the paper back in March of '87?

A    I usually started at 3:45 after taking care of business, getting home from school, eating and change my clothes, about 3:45 I'd start delivering.

Q    How long did it take you to deliver your whole route?

A    Usually about a half an hour or so, except on collection days.

Q    Did you walk or drive a bike?

A    I walked.

Q    When was collection day?

A    Thursdays, Fridays and if I didn't have everybody done, sometimes on Saturday mornings.

Q    Now, I want to take you back to a particular day, Friday, March the 27th of 1987, do you remember that day?

A    Yeah, it was collection day for the route. I had about half my people done.

Q    Now, did you deliver to a family by the name of Stonecypher?

A    Yeah.

Q    And they lived at ██████████

53

A    Um-hum.

Q    Do you remember coming into -- let me ask, first
of all, Chris, if you remember this house here shown in
Exhibit 4?

A    Yeah.

Q    Did you -- were you delivering a paper to that
house on March the 27th?

A    Yeah, and collecting.

Q    And collecting?

A    Um-hum.

Q    Okay.  Tell us what happened as you approached the
house?

A    I was coming from the house -- I believe it was
242/244, I think it was, the house next door, and I was
coming south on Hickok towards the Stonecypher's house, and
I observed a gentleman standing on the porch, the front
porch, and as I drew closer, he walked down the stairs and
was standing on the sidewalk.  And as I got closer to him,
he gave me this look like, you know, like I had insulted
his mother or something.

Q    How about if I paraphrase that and say he gave you
an unusual look?

A    An unusual look.

Q    You recall that, do you?

A    Yes.

54

ONONDAGA COUNTY GRAND JURY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Q    Did you have any conversation with him?

A    No.

Q    What did you do?

A    I just blew him off and kept right on walking, went over -- forgot about walking up 248 side of the porch and walking across. I walked over to the sidewalk to the Stonecypher's door and went up that way instead.

Q    Now, did you collect from the Stonecypher's?

A    Yeah.

Q    Did you see that person again?

A    When I turned around he was nowhere to be seen.

Q    Did you see any vehicles on ████████

A    I remember seeing a -- it was either brand new or newly cleaned red van with a chrome or a white ladder rack sitting on top of it, and it was sitting across the street from the house next door.

Q    When you were walking up to the Stonecypher's house, did you notice that red van?

A    Yeah, it was sitting over there. It wasn't on.

Q    When you came back from the Stonecypher's after you had seen this person, did you see the red van?

A    It was still sitting there, but it was running now.

Q    What, if anything, did you notice about the red van?

55

ONONDAGA COUNTY GRAND JURY

1    A    I couldn't see anybody sitting in it, but it was

2    running and it was just sort of sitting there.

3    Q    Did you then proceed further south on Hickok?

4    A    Yeah.  I went to the next house down to deliver

5    their paper and try to collect from them, too.

6              MR. FITZPATRICK:  I'd like to have this

7         photograph marked as Exhibit 10.

8         (Grand Jury Exhibit Number 10 was marked)

9    BY MR. FITZPATRICK:

10   Q    Chris, did the police show you a photograph and

11   ask if you could identify any person in the photo?

12   A    Yes.

13   Q    I'm going to show you Exhibit 10, have you seen

14   that photo before?

15   A    Yeah.  It was shown to me by Detective Unger on

16   the night that they took me down to the station to ask me

17   questions about what I had seen.

18   Q    And do you see the person that you saw coming off

19   the porch at █████████ in that photo?

20   A    Yes, this gentleman right here (indicating).

21   Q    On the far right?

22   A    Yes.

23   Q    Now, you see the jacket that he's wearing in that

24   photo?

25   A    Um-hum.

Q    Can you say if that's what he was wearing on the afternoon of the 27th?

A    It looks -- from what I can remember, it looks similar to the coat he had on.

Q    But you can't be sure if it's the same coat?

A    No, I can't.

Q    Can you tell us your best recollection as to the time it was that you saw this person coming off the steps?

A    It was approximately 4:20 -- somewhere between 4:20 and 4:30.

Q    And how is it, Chris, that you can remember that time?

A    Because the lady that lives next door to five -- 250/248 got home, I guess -- that day she had gotten home at 4:15, because I was down at my friend's house, which is further up the street, and we were talking, and he told me -- I asked him what time it was because I had to hurry up and get moving, and I noticed her pull in her driveway.

Q    So that's your best recollection that it was between 4:20 and 4:30?

A    Yeah.

            MR. FITZPATRICK:  Any questions for Chris, former paperboy and now student and always Atlanta fan?  Okay, Chris, thank you.

            (Whereupon the witness was excused)

ONONDAGA COUNTY GRAND JURY

<u>LORI BROCH</u>, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

    Q    Ma'am, good morning.  Tell the grand jury, please, your full name?

    A    Lori Broch.

    Q    Where do you live?

    A    Liverpool.

    Q    Are you married or single?

    A    Married.

    Q    Any children?

    A    One.

    Q    How old is your child?

    A    Three.

    Q    Your maiden name?

    A    Fleming, Lori Fleming.

    Q    When did you get married?

    A    1988.

    Q    Do you know a person by the name of Hector Rivas?

    A    Yes.

    Q    How did you know Mr. Rivas?

    A    A friend of my husband.

    Q    Okay.  And did you know Valerie Hill?

    A    Met her once.

ONONDAGA COUNTY GRAND JURY

1   Q    Very casual acquaintanceship then?

2   A    Yes.

3   Q    Did you know that Hector Rivas and Valerie Hill

4   had been dating at some point?

5   A    Yes.

6   Q    Did you ever socialize with the two of them?

7   A    The one night that I met her.

8   Q    Do you know where that was?

9   A    I know it was at the Sugar Mill.  It was by a

10  fluke that we met up with them.

11  Q    Lori, if I may take you back to Friday, March 27th

12  of 1987 and ask if you recall being out that evening?

13  A    Yes, I do.

14  Q    Where did you go that evening?

15  A    Coleman's.

16  Q    And you were single then?

17  A    Yes.

18  Q    Were you engaged?

19  A    To the best of my knowledge -- yes.  That was in

20  '87.

21  Q    It must have been quite an event.  Did you mention

22  your husband's name, his first name?

23  A    Mark.

24  Q    We're going to hear from Mark hopefully in a

25  couple of minutes.  Do you remember what time you got to

59

Coleman's that night?

A    I would say approximately 7:30.

Q    And did you see anyone there that you knew?

A    I went there with my girlfriend and was meeting my husband and his friends, which was a Friday night occurrence.

Q    At some point during the evening did you see Hector Rivas?

A    Yes.

Q    Did you have a camera with you?

A    Yes.

Q    Did you take some pictures?

A    Yes.

Q    I'm going to show you Exhibit 10 and ask if that's a picture you took?

A    Yes, it is.

Q    Could you identify the people in the picture?

A    Chuck Barron, Hector Rivas and Gary Burghardt.

Q    And you're going from left to right?

A    Yes.

Q    Do you remember what time you left Coleman's that night?

A    Yes.

Q    What time did you leave?

A    Somewhere between 9 and 10:00.

60

ONONDAGA COUNTY GRAND JURY

1    Q    Did you leave with Mark?

2    A    Yes.

3    Q    Did you know if Mr. Rivas was there when you left?

4    A    No, he was not there.

5    Q    Do you remember having a conversation earlier in

6    the week, this would have been the 5th of March 1987?

7    A    Yes.

8    Q    Do you remember where that conversation took

9    place?

10    A    R.J. O'Toole's, North Syracuse.

11    Q    Do you remember what time of day it was?

12    A    7, 8:00, happy hour.

13    Q    Were you with anyone?

14    A    My husband.

15    Q    Was he with anyone?

16    A    There was some guys there.

17    Q    Was it a private conversation, just the two of you

18    involved?

19    A    Yes.

20    Q    What was the subject of the conversation?

21    A    His girlfriend.

22    Q    Tell us as best you recall what he said and what

23    you said?

24    A    He was all bummed out and I asked where his

25    girlfriend was, and he was crying the blues about his

61

girlfriend and just said that she wanted to break up with him, and I asked him why she wanted to break up, and he didn't know.

Q    Was it a long conversation or --

A    We probably talked a little while about it.

Q    Anything else that you recall about that conversation?

A    No.  Just that he was confused about the break up, why she wanted to break up.

MR. FITZPATRICK:  Okay.  Any questions for Lori?  Thank you very much, Lori.  Come out with me, please.

(Whereupon the witness was excused)

62

O N O N D A G A   C O U N T Y   G R A N D   J U R Y

1     PETER COONEY, called as a witness,

2  having been duly sworn, testified as follows:

3

4  EXAMINATION BY MR. FITZPATRICK:

5     Q    Good morning, sir.  Tell us your full name,

6  please.

7     A    Peter Frederick Cooney.

8     Q    Peter, where do you live?

9     A    ████████████████████████

10    Q    How old are you?

11    A    Twenty-eight.

12    Q    What do you do for a living?

13    A    Inside sales at Burns Brothers.

14    Q    And are you married or single?

15    A    Single.

16    Q    How long have you lived in Cazenovia?

17    A    All my life.

18    Q    And were you living at that address back in March

19  of 1987?

20    A    No, I wasn't.

21    Q    Where were you living back then?

22    A    ████████████████████████

23    Q    And do you have some recollection, Peter, of

24  Friday, March the 27th of 1987?

25    A    Yes.

63

Q    Were you working that day?

A    Yes, I was.

Q    What hours would you have been working that day?

A    7:30 to 5.

Q    7:30 a.m. to 5:00 p.m.?

A    Right.

Q    Where were you working back then?

A    J.C. Smith.

Q    What did you do for them?

A    Inside sales.

Q    What kind of a company is that?

A    It's a contracting supply house.

Q    Did you do a lot of driving back then?

A    Yes.

Q    Did you have a company car?

A    Yes, I did.

Q    What kind of car was it?

A    It was a truck, a pickup truck.

Q    Anything on the truck to indicate it was a company car?

A    Yes.

Q    What was it?

A    J.C. Smith emblems on it.

Q    Now, do you know an individual by the name of Hector Rivas?

64

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1    A    Yes.

2    Q    And how do you know Mr. Rivas?

3    A    I used to work with him.

4    Q    Where did you work with him?

5    A    He owned his own plumbing business in Cazenovia.

6    Q    Were you an employee of his?

7    A    Yes, part time.

8    Q    How long had you worked for them?

9    A    Three months.

10   Q    Do you know when that was?

11   A    August of '86 to December of '86.

12   Q    Now, on that date, Friday the 27th of March '87,
     did you see Mr. Rivas?

13   A    Yes, I did.

14   Q    How many times during the day did you see him?

15   A    I saw him twice during that day and once at night.

16   Q    Tell us about the first time you saw him?

17   A    He was driving on Burnet Street in Syracuse, and I

18   was driving -- we passed each other on Burnet Street.

19   Q    About what time was that?

20   A    It was in the afternoon, two o'clockish.

21   Q    Okay.  Did you give a statement back then, Peter,

22   an affidavit about what you saw?

23   A    Yes.

24   Q    And what direction were you traveling and what

65

direction was he traveling?

    A    I think I was going -- I was heading west.  I think he was heading east.

    Q    And so for a point of reference, do you remember the side street or any stores that you were near on Burnet Ave.?

    A    It was maybe like a half mile down from J.C. Smith.

    Q    Okay.  Your affidavit indicated that you were near DeJulio's Army/Navy store, does that sound familiar?

    A    Yeah.  I was down in that area.

    Q    Did you acknowledge him in any way?

    A    I waived to him.

    Q    Do you know if he acknowledged you in any way?

    A    I don't think he did wave back to me.  I don't think he did.

    Q    What vehicle was he in?

    A    He was in his van.

    Q    Were you familiar with that van prior to the 27th of March?

    A    Yes.  I've driven that van.

    Q    What kind of van was it?

    A    Chevy van.

    Q    Color?

    A    Red.

66

Q    Did you notice anything unusual about it, any markings on the side?

A    No.  It didn't have any markings.  It was a new van.

Q    And he would have been heading towards Cazenovia and you would have been heading towards the city?

A    Right.

Q    When did you next see Mr. Rivas?

A    After I got out of work.  I get out of work around 5:00, so it was just around five.

Q    Where did you see him?

A    I saw him in Manlius.  He was on 92 heading in towards the city.  I was heading home.

Q    Was he driving the red van again?

A    No, he had his car.

Q    Do you know what kind of car that was?

A    Cornato (sic).  It was a Cadillac, Coranto (sic).

Q    Did you acknowledge him at all?

A    Yeah.  I waved to him again.  He didn't wave back to me at all.

Q    Now, did you see Mr. Rivas later that evening?

A    Yes, I did.

Q    Let me go back to your own schedule later that evening.  Did you go out that night?

A    Yeah, I did.

67

ONONDAGA COUNTY GRAND JURY

1   Q   Do you remember what time you went out?

2   A   Oh, I'd say around eight or nine.

3   Q   Now, did there come a time during the evening when

you went to Albert's bar or tavern in Cazenovia?

4   A   Yes.

5   Q   Do you remember what time it was that you got

there?

6   A   I got there I'd say around eight or nine at night,

and then I had left that bar.

7   Q   All right.  And your affidavit indicates, Peter,

if I can refer to it, that you were there sometime around

10:30?

8   A   Yeah.

9   Q   Does that sound correct?

10  A   Yeah.

11  Q   So did you stay there for a period of time?

12  A   Yeah.  Well, I was there, and then I went to

another bar and then I came back.

13  Q   What time did you come back to Albert's?

14  A   It was sometime, I'd say, after midnight.

15  Q   Okay.  I want to hand you your two-page affidavit,

so there's no confusion here, and I'm just going to direct

your attention to these two lines.  I'd like you to read

those silently to yourself.

16  A   (Reviews document).

68

O N O N D A G A   C O U N T Y   G R A N D   J U R Y

1    Q    And you've done that?

2    A    Yeah.

3    Q    Does that refresh your memory, Peter, as to what
4    time you were at Albert's the first time?

5    A    Yes.

6    Q    What time was that?

7    A    10:30.

8    Q    Okay.  This statement --

9    A    The first time.

10    Q    Okay.  When you were there at 10:30 the first
11    time, did you see Mr. Rivas at the bar?

12    A    No, I didn't.

13    Q    Where did you go from Albert's?

14    A    The Cazenovia Tavern.

15    Q    Do you remember who you were with?

16    A    No, I don't.  I don't remember who I was with that
17    night.

18    Q    And you went back to Albert's that night?

19    A    Yeah.  It was sometime after midnight.

20    Q    When you went back to Albert's, did you see anyone
21    you knew?

22    A    I saw Hector in there.

23    Q    Do you know whether he was already there when you
24    got there?

25    A    I think he was already there, but I'm not sure.

69

ONONDAGA COUNTY GRAND JURY

Q    Did you see anyone else that you knew?

A    Yeah.  I know a lot of people in that bar.

Q    You had some conversation with Hector, did you?

A    Yeah, I did.  I asked him if he had seen me.

Q    What did he say?

A    He said he saw me in the morning -- or in the early morning but he didn't say he saw me the second time.

Q    Did you discuss that second time with him at all?

A    Yeah.  I said -- I told him I passed him twice that day, you know, in the car.

Q    Did he also indicate that he had seen you twice?

A    He said he saw me the first time when I was in the J.C. Smith truck.

Q    That would have been at 2:00?

A    Right.

Q    And he did not see you between 5 and 5:30?

A    He says he didn't.

Q    Did you talk to him about that occasion as to where he was going?

A    I did tell him I saw him as he was heading, you know, back towards into Syracuse.

Q    Did he say anything?

A    He mentioned something about Valerie, and I don't remember what it was.

Q    How much time did you spend with him at Albert's

70

after midnight?

     A    Not very long, two minutes.

         MR. FITZPATRICK:  Okay.  Any questions for Peter?  All right, Peter, thanks very much.

        (Whereupon the witness was excused)

71

<u>MARK BROCH</u>, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

    Q    Good morning, sir.  Tell us your full name,

please.

    A    Mark J. Broch.

    Q    Where do you live, Mark?

    A    ████████████████████████████

    Q    Are you married?

    A    Yep.

    Q    Your wife's name?

    A    Lori Broch.

    Q    And she was just in here a few moments ago?

    A    (Nods head).

    Q    How old are you, Mark?

    A    Thirty-one years old.

    Q    And are you working?

    A    Yep.

    Q    What do you do for a living?

    A    Self employed heating and plumbing business.

    Q    Do you know an individual by the name of Hector

Rivas?

    A    Yep.

    Q    How long have you known Mr. Rivas?

72

A    We were good friends for at least five or six years.

Q    About what time period did that cover?

A    I'd have to say '83, '84.

Q    Did you ever work together?

A    Yeah.  Worked at ABL Plumbing and Heating, that's where we met.

Q    Did you ever know Valerie Hill?

A    Not that well.  I've known of her.  I've seen them out to dinner, went to a bar and had a few drinks with them.

Q    Now, I want to take you back to late '86, early '87, first of all, you were single back then?

A    Yeah.

Q    And you knew Hector back then as well?

A    Yeah.

Q    Did you become aware that Valerie Hill and Hector Rivas had gone on a weekend trip to visit some relatives?

A    Yep.

Q    After they came back from that trip -- first of all, do you remember when that trip was?

A    Not really, to be honest with you.

Q    Regardless of that fact, when they came back, did Hector begin to tell you some things about his relationship with Valerie?

73

A    Yeah.  I guess the parent -- her mother or father, I'm not sure, things weren't going so well with the parents.  He went down there, and he was pretty bummed out from the response from her mother or father, I'm not sure who it was.

Q    Did he say anything in particular with respect to Val's relationship with him?

A    Not really.

Q    Did you become aware of any plans that Valerie had through Hector, specifically about her moving somewhere?

A    Yeah.  She was going to move out to California, he was saying, she wanted a change.

Q    This is something that you learned from Hector as opposed to from Valerie?

A    Yeah.

Q    Now, how would you describe Hector's feelings for Valerie based on what he told you and what you observed?

A    He was in love with her.  He wanted to marry her.

Q    Did express these thoughts to you?

A    Yeah.

Q    Mark, I'd like to take you to Friday, March the 27th of 1987, and ask if you remember that day?

A    Yeah.

Q    Did you receive a call from Hector sometime that evening?

74

A    Yes.

Q    Tell us about that call.

A    Well, we all worked for ABL Plumbing and Heating, and normally on a Friday night we all meet at Coleman's because everybody worked out of town, different areas. Hector wasn't working at that time. He called and said, where you going tonight. I said, same place we go every Friday, Coleman's. He said, maybe I'll show up, and he did.

Q    How long had it been since you had seen him?

A    Six months.

Q    In a social setting?

A    Six months.

Q    Do you remember what time you got to Coleman's?

A    Five thirty, quarter of six, right after work. We usually have our Friday night meetings, and we all head over and have a few beers.

Q    Do you remember what time he got there?

A    Six, six fifteen.

Q    And did you put that in your affidavit back in April 1st of '87?

A    I'm not sure.

Q    But you did give an affidavit back then?

A    Yeah.

Q    About these times?

75

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1    A    Yeah.

2    Q    And how long did you stay at Coleman's?

3    A    We stayed till 10:00.

4    Q    Who did you leave with?

5    A    My wife.

6    Q    At that point she was your fiancee?

7    A    Right.

8    Q    Do you know what time Hector left Coleman's?

9    A    Half an hour earlier before we did, about 9:30.

10   Q    Your affidavit indicates 9:15.  Your present

11   recollection is between 9:15 and 9:30?

12   A    Yeah.

13   Q    Did he leave with anyone?

14   A    No.

15   Q    Did you discuss Valerie with him during the

16   evening at Coleman's?

17   A    Not a lot, to be honest with you, not too much.

18   Q    Do you remember anything he said to you?

19   A    I guess I probably -- I guess he said not too

20   good.  I guess they were going to break up.  They were

21   going to break up.

22   Q    Would it help if you refer to your affidavit to

23   recall exactly what he said?

24   A    (Nods head).

25   Q    I'm going to refer you to this paragraph of your

76

April 1st affidavit here.  Take a moment, read that to
yourself.

    A    Yeah.

    Q    Does that help refresh your memory as to something
specific he said?

    A    Yeah.  He was bummed out, why she was breaking up
with him, he was wondering why.

    Q    Tell us specifically what he said.

    A    Why is she doing this to me, breaking up.

    Q    Had he been drinking Friday?

    A    He had a few beers, yeah.

    Q    How did he appear in terms of sobriety?

    A    Normal, okay.

    Q    Did he tell you where he was going when he left?

    A    (Shakes head).

    Q    You're indicating no?

    A    No.

    Q    Did you make any plans to see him?

    A    He wanted us to come over and see the house, spend
the weekend and watch football games together.

    Q    And did you, in fact, do that?

    A    No.

    Q    Now, did there come a time on Tuesday, March 31st,
when Hector called you at home?

    A    Yeah, I believe.

77

Q     Do you remember what he told you on that occasion?

A     Yeah.   That they brought him in and questioned him about the murder.

Q     When he talked to you on Tuesday, the 31st, did he tell you when the last time he had seen Valerie was?

A     Thursday.

Q     That would have been the 26th?

A     Um-hum.

Q     Did he give you any details as to what had happened when he saw her on Thursday?

A     No.

MR. FITZPATRICK:  Any questions for Mark?

THE SECRETARY:  He said he invited him over to watch football games.  They don't play football in March, do they?

MR. FITZPATRICK:  In defense of the witness, Saturday, March 28th is rather memoriable in Syracuse history.  That's the night Syracuse played Providence in New Orleans for the Final Four.

BY MR. FITZPATRICK:

Q     Mark, might you have misspoken and meant basketball?

A     Yeah.  Let me put it this way, he was going out of his way to make sure we had gone over that weekend.

78

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Q    Was that something unusual?

A    Yeah.  We hadn't seen him in six months.

          MR. FITZPATRICK:  Anybody else?  Okay, Mark,

thank you.

     (Whereupon the witness was excused)

Case 5:19-cv-00844-BKS-TWD    Document 142-41    Filed 10/31/24    Page 83 of 236

ONONDAGA COUNTY GRAND JURY

1
2    <u>CHARLES DEVAUL</u>, called as a witness,

3    having been duly sworn, testified as follows:

4    EXAMINATION BY MR. FITZPATRICK:

5        Q    Sir, good afternoon.  Tell the grand jury your

6    full name.

7        A    Charles Lee DeVaul.

8        Q    Mr. DeVaul, where do you live?

9        A    ██████████████████████████

10       Q    How long have you lived there?

11       A    We bought the house twelve years ago.

12       Q    Who lives there with you?

13       A    My wife and daughter.

14       Q    And what do you do for a living?

15       A    Self-employed auctioneer and antique dealer.

16       Q    Were you living at that address back in March of

17   1987?

18       A    Yes, I was.

19       Q    And are you familiar with an establishment known

20   as Albert's tavern or restaurant?

21       A    Yes.

22       Q    Where is that located?

23       A    Right on Albany Street, which is right in the

24   center of town.

25       Q    In Cazenovia?

80

1    A    Yeah.

2    Q    Back in March, and, Charlie, there's a calender up

3  here, specifically on March 27th, Friday, did you have

4  occasion to visit Albert's restaurant?

5    A    Sure, yes.

6    Q    Do you remember what time you first got there?

7    A    It was sometime around 10:00.

8    Q    In the evening?

9    A    Yes.

10    Q    Do you remember anybody that was with you?

11    A    Just some people that I was talking to at the

12  time, which would have been Bobby Marion, which would have

13  been tending bar, and John Fowler.

14    Q    Do you know Hector Rivas?

15    A    Yes, I do.

16    Q    How long had you known Hector Rivas prior to March

   of '87?

17    A    I didn't really know him, I just knew of him.

18    Q    You knew him by sight though?

19    A    Yes.

20    Q    Did you ever converse with him?

21    A    At the bowling alley.

22    Q    Just to say hi?

23    A    Just to say hi.

24    Q    Did you see him there at 10:00 around Friday?

81

A    It was right around that time, yes.

Q    Did you give a statement back at that time?

A    Yes.

Q    Would you like to take a look at that, would that help you remember?

A    Yes, it would.  That was a long time ago.

Q    Sure was.

A    Friday night, the 27th.  Okay.

Q    Does that help you remember if you saw Hector there that night?

A    On Friday night at Albert's, yes.

Q    What time did you see Hector Rivas that night?

A    Around midnight.

Q    Is that what it says in your affidavit?

A    Yes.

Q    Okay.  And that was -- Charlie, that was true when you gave it back then?

A    Yes, it was.

Q    That was five years ago?

A    Yes, it was.

Q    It was fresh in your mind?

A    Yes, it was.

Q    And you indicate that you remember seeing Hector Rivas arrive at Albert's sometime after midnight?

A    After midnight, yes.

82

Q    Do you remember somebody else that arrived about the same time?

A    Some friends of mine, Dick Cargill, C-A-R-G-I-L-L, and Bev Dorlin, and Dee Dee.

Q    Did Dick Cargill, Dee Dee and Hector arrive together?

A    No.  They came about the same time.  I can't remember which one came in first.  I want to say that Dick came in first.

Q    But in any event, Hector arrived sometime after midnight?

A    Just shortly after midnight, yes.

Q    Did you spend any time with him later on that evening?

A    We went and had breakfast together.  He joined us for breakfast.

Q    Where did you have breakfast?

A    A place called Perkins.  We went to a place called Eggplant but they were busy.

Q    Was this after Albert's had closed?

A    Yeah.  Yes.

        MR. FITZPATRICK:  Anybody have any questions
        for Mr. DeVaul?  Okay, Charlie, thank you very
        much.

        (Whereupon the witness was excused)

83

ONONDAGA COUNTY GRAND JURY

1            <u>CINDY REISER</u>, called as a witness,

2  having been duly sworn, testified as follows:

3

4  EXAMINATION BY MR. FITZPATRICK:

5      Q    Good afternoon, ma'am.  Would you tell us your

6  full name, please.

7      A    Cynthia L. Reiser.

8      Q    Are you married or single?

9      A    Married.

10     Q    And where do you live?

11     A    Morrisville.

12     Q    Where do you work?

13     A    Jim Brown Travel in Dewitt.

14     Q    And how long have you worked at Jim Brown Travel?

15     A    Five years.

16     Q    Where did you work before that?

17     A    All Seasons Travel.

18     Q    What did you do at All Seasons?

19     A    I was a manager.

20     Q    What kind of place is All Seasons?

21     A    It's a travel agency, a full-service travel

22  agency.

23     Q    Where is it located?

24     A    At that time it was Fayetteville Square,

25  Fayetteville.

84

ONONDAGA COUNTY

GRAND JURY

Q    Is that right in the village, the town?

A    Yeah, yeah.

Q    Do you recognize the woman shown here in Exhibit 1, Valerie Hill?

A    Yes.

Q    How did you know Miss Hill?

A    I did reservations for her and her family.

Q    Do you recall any particular reservations that you made for her in late '86?

A    I made reservations for her and Hector Rivas to go and see her natural mother in Nashville, and then I made reservations in the spring for her.

Q    Now, did you -- do you remember when the trip was in '86?

A    When she traveled?

Q    Right.

A    It was right around Christmas time.

Q    Did you know Hector Rivas?

A    No.

Q    Did you ever lay eyes on him?

A    Not that I remember.

Q    But you knew him by name as her boyfriend or whatever?

A    Right, that's correct.

Q    Okay.  Now, did you become aware of the fact that

85

ONONDAGA COUNTY GRAND JURY

Miss Hill had traveled to Acapulco?

A    She told me that she had.

Q    When did she tell you that?

A    When we were placing reservations for the Bahamas.

Q    The trip to Acapulco, did you have anything to do with that?

A    No.

Q    Tell us about the trip to the Bahamas, when did you become aware that Miss Hill wanted to travel there?

A    It was in March of '87.

Q    How did you become aware of it?

A    She called me on the telephone to request information on the Bahamas.

Q    And what, if any, information did you give her?

A    I gave her information on air fares, hotels, places to stay, things to do.

Q    Did she indicate whether or not she would be traveling with anyone?

A    No, she indicated that she wanted to go alone.

Q    Did you make any -- did you have any discussion about that?

A    I did because it's -- they charge a single supplement if you travel by yourself.  It costs more to go by yourself as opposed to two people.

Q    So it would have been cheaper per person to go

86

with another person?

    A    That's correct.

    Q    And she declined that and still wanted to go alone?

    A    That's correct.

    Q    Did you make a reservation for her?

    A    Yes, I did.

    Q    Do you happen to recall when the reservation was for?

    A    It was mid March.  For travel you mean --

    Q    In other words, when she was supposed to travel.

    A    Oh, in April.

    Q    And you made the reservations sometime in mid March?

    A    Yes.

    Q    Did she pay you?

    A    Yes, she did.

    Q    Do you know when she paid you and her method of payment?

    A    She paid by check.  As to exact dates I'm not positive.  It would have been maybe like the 20th to the 23rd, sometime there in March.  I don't know exactly when.

    Q    Did she pay you the full amount by check?

    A    No.  She came back in and paid the balance later.

    Q    Did you give her anything prior to her paying the

final balance?  Did you give her a ticket or anything at all?

A    I gave her an itinerary, which stipulates the flights she's going to take.  I gave her information on the hotels and brochures.

Q    Do you know if those would have been stamped with All Seasons?

A    Yes, they would have been.

Q    And do you know when it was that you gave her a brochure?

A    It probably would have been when she made the deposit, the beginning payment on her trip, someplace around the 17th, 18th, 19th.  I'm not exactly sure when that would have been.

Q    Did there come a time when she came in and paid the balance?

A    Yes.

Q    As you sit there now, do you remember the amount of the balance?

A    It was less than thirty dollars.  I mean, it wasn't anything substantial.

Q    How did she pay that?

A    I think she paid cash for that.

Q    And do you remember the day she paid it?  We have a calender up here that may --

88

A    No, I can't say for certain.

Q    Cindy, there's a report back from five years ago indicating that she paid the balance on Friday.

A    Okay.  I thought it was Thursday, but it's possible it was Friday.

Q    Is it consistent with your memory that she paid it on Friday?

A    Um-hum.

Q    You have to say yes or no.

A    Yes.

Q    Do you remember what time of day she may have paid it?

A    It was late morning.

Q    Can you tell us when she paid you if you gave anything to her?

A    I gave her airline tickets and documents.

Q    Was that in your presence that she received them?

A    Yes.

Q    What, if anything, did she do with them?

A    She put them in her purse.

Q    What documents did you give her in addition to the airline ticket?

A    The documents that would have stated where she was going to stay, that they had been paid in full, transfers if she had them at the time and any sightseeing.

89

Q    How were these things packaged, the tickets, the documents, the itinerary?  Were they all loose, was it several pieces of paper, were they packaged in any way?

A    They would have been in a ticket jacket.  They would probably have been separate pieces of paper, but probably all enclosed in a ticket jacket with an itinerary wrap around them.

Q    So I could pick them all up at the same time if I picked up the jacket?

A    Yes.

Q    What did she do with that jacket?

A    Put it in her purse.

Q    Then did she leave?

A    Yes, shortly thereafter.

        MR. FITZPATRICK:  Any questions for

    Mrs. Reiser?  Thank you, Cindy, all set.

    (Whereupon the witness was excused)

90

**DAVID PHINNEY**, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

    Q    Sir, good afternoon.  Tell the grand jury, please,

your full name and what you do for a living.

    A    David A. Phinney, and I'm a Syracuse Police

Officer.

    Q    How long have you been a Syracuse Police Officer?

    A    Since August 1st of 1977.

    Q    Where are you currently assigned?

    A    Special Investigations Division as a narcotics

investigator.

    Q    How long have you been there?

    A    Approximately three years.

    Q    Where were you assigned back in March and April of

1987?

    A    To the Criminal Investigations Division.

    Q    Did you become involved in investigating the death

of Valerie Hill?

    A    Yes, sir.

    Q    In connection with that investigation, did you

execute a search warrant at the residence of a Hector

Rivas?

    A    Yes, sir.

91

Q    And could you tell us when and where that search warrant execution took place?

A    It was in Cazenovia, Nelson Heights Road, and it was in March of 1987.

Q    Specifically on March 30th, Monday, 1987?

A    Yes.

Q    Do you remember what time you got to Mr. Rivas' house that evening?

A    Approximately 9 or 10:00 p.m.

Q    Could you tell us who -- which judge signed the search warrant?

A    Judge Mulroy.

Q    And what specifically were you searching for when you went to the house?

A    We were searching for keys to fit the residence of Valerie Hill, articles of women's clothing or any correspondence or mail that belonged to Valerie Hill or between Valerie Hill and Hector Rivas.

Q    Did you personally recover anything from the house?

A    No, sir.

Q    Did you make any observations of the house?

A    Yes, sir.

Q    What kind of a house was it?

A    A ranch style.

92

Q     Anyone home when you got there?

A     No, sir.

Q     How did you effect entry?

A     We used Hector Rivas' keys.

Q     We heard previous testimony at this time that he was at the Public Safety Building, and he provided the key?

A     That's correct.

Q     I want to show you what's been marked into evidence as Exhibit 10 and ask if you recognize the gentleman on the far right?

A     This is Hector Rivas.

Q     Do you happen to see the jacket he's wearing in that photo?

A     Yes, sir.

Q     At any time on the night of March 30th did you see that jacket or a similar appearing jacket?

A     Yes, sir, I did.

Q     Could you tell the grand jury where it was that you saw that jacket?

A     It was in the basement of Hector Rivas' residence on a clothesline in the cellar.

Q     Did you make any other physical observations about the jacket?

A     The jacket appeared to have been freshly washed and was still damp to the touch.

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

Q    Now, did you examine Mr. Rivas' bedroom?

A    Yes, sir.

Q    More particularly a closet in his bedroom?

A    Yes, sir.

Q    Any observation or anything unusual in the closet of the bedroom?

A    In a shelf in the closet, directly over the closet rod there was a large statue of the Virgin Mary, approximately 18 to 20 inches high, a couple candles were burning.  There was a plate with some change in it, and there was a photograph, a snapshot torn in half across with a picture of Valerie Hill on it.

Q    And you recognized the photo that you saw on the night of March 30th as being of this woman in Exhibit 1?

A    Yes, sir.

Q    Did you know it was Valerie Hill when you saw it that evening?

A    Yes, sir.

Q    How long, Investigator Phinney, would you say that you spent at Mr. Rivas' house?

A    Approximately two to three hours.

MR. FITZPATRICK:  Any questions for Investigator Phinney?

JUROR:  He mentioned there was a clothesline and the jacket was hanging.  I was wondering if

94

there was any other articles of clothing?

THE WITNESS:  No, just the jacket.

JUROR:  Does he know the significance of the candles burning with the statue?

MR. FITZPATRICK:  I don't know if he's qualified to answer that.

BY MR. FITZPATRICK:

Q    Do you have any personal knowledge of the significance of the statute and photo and candles?

A    No, sir, I don't know what it means.

JUROR:  Was the jacket taken for examination?

THE WITNESS:  No, it wasn't.

BY MR. FITZPATRICK:

Q    Was the jacket covered in the search warrant application?

A    No, sir, it was not.

Q    Are you limited by law to only recovering or seizing those items that are in the search warrant application?

A    Yes, sir.

MR. FITZPATRICK:  Okay.  David, thank you.

(Whereupon the witness was excused)

95

THOMAS STASSI, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

    Q    Good afternoon, sir.  Your name, please.

    A    Thomas John Stassi.

    Q    What do you do for a living, Mr. Stassi?

    A    I'm currently employed by the Onondaga County

District Attorney's Office as an investigator.

    Q    How long have you been working for the DA's

Office, sir?

    A    Since January of this year, sir.

    Q    Prior to that how were you employed?

    A    Previous to that I was employed for twenty years

by the City of Syracuse, the Syracuse Police Department as

a police officer.

    Q    Now, were you so employed as a Syracuse Police

Officer back in March and April of 1987?

    A    Yes, I was, sir.

    Q    What were your duties back then?

    A    Back around that time, sir, I was assigned to the

Criminal Investigations Division.

    Q    Did you become involved in investigating the death

of Valerie Hill?

    A    Yes, sir.

Q    Did you along with some of your brother officers proceed to search Hector Rivas' house on the evening of Monday, March the 30th of 1987?

A    Yes, I did, sir.

Q    Do you remember when and where that was?

A    I remember that it was the late evening, approximately 9:30, 10:00 that evening, and it was on Nelson Heights Road out in Cazenovia, and I was with Sergeant Michael Lynch, Investigator David Phinney, and Investigator Timothy Phinney.

Q    And you had a search warrant with you?

A    Yes, sir.

Q    What were you searching for?

A    I had been advised that there had been a search warrant signed by a judge, and that we were looking for house keys, letters and possibly women's clothing.

Q    Did you seize any items of evidence during the course of the search?

A    Yes, I did, sir.

        MR. FITZPATRICK:   Now, I'd like to have this
        item marked as Exhibit 11 and Exhibit 12.

(Grand Jury Exhibits Numbers 11 and 12 were marked)

BY MR. FITZPATRICK:

Q    I hand you Exhibit 11, Investigator Stassi, could you tell the grand jury what that is, please.

97

A    This is a plastic bag sealed by myself.  It has my first initial, my last name, a number which was then my IBM number.  And the bag contains an evidence card which indicates on the 30th day of March, 1987, at 2300 hours, which would be 11:00 p.m., I recovered a torn note, which according to my description was apparently written by Valerie Hill, and it also contains a police report of the description of that note, and I turned it into the -- I turned it in as evidence on the 31st day of March at 0200 hours, which would be 2:00 a.m.

Q    And Exhibit 12, could you identify that for us, two photos?

A    Yes, sir.  These are photos of that note, which I pieced together in the CID office prior to my turning it in.

            MR. FITZPATRICK:  And I'd like to have this
            Polaroid marked as Exhibit 13.

(Grand Jury Exhibit Number 13 was marked)

BY MR. FITZPATRICK:

Q    And can you tell us what is Exhibit 13?

A    Exhibit 13 is the garbage bag in which I found the note.  The note was torn in numerous pieces and then crumpled up in some old newspaper and tossed into the bottom of this garbage bag.

Q    That's at Mr. Rivas' residence?

98

A    Yes, sir.

Q    Describe it more particularly, is it in a garbage bag or bin?

A    It's a green garbage bag that I located or that I searched and I believe this is the kitchen area of where I found the bag.

Q    Where was the torn piece of the note exactly?

A    The note was wrapped in some newspaper and the newspaper and the note were on the bottom of the bag.

Q    Okay.

A    Inside the bag.

        MR. FITZPATRICK:    Ladies and gentlemen, what
        I'll do is I'll read the note to you at such point
        as the handwriting is identified.    I won't read it
        to you right now.    You can pass the pieces of the
        note around.

BY MR. FITZPATRICK:

Q    Now, Investigator Stassi, during the course of your investigation did you become aware, either yourself or through other police investigation, that the victim, Valerie Hill, had purchased an airline ticket from Syracuse to the Bahamas and had, in fact, received that on Friday, March the 27th?

A    Yes, sir.

Q    Did you make any effort to locate that airline

99

ticket?

     A     Yes, sir.

     Q     Tell us about that.

     A     I was advised that Miss Hill had apparently purchased a ticket, airline ticket through Pan Am on Friday the 27th or had picked up a ticket Friday the 27th day of March, and I contacted the travel agency, and I'd have to go back over my police report to find out which travel agency that was, but I did talk to a young lady in the travel agency and she was able to give me the ticket number, the exact date of departure, and with that information, I went back to Miss Hill's residence at 248 Hickok Avenue in an attempt to locate that ticket.  To the best of my knowledge -- I know that I was never able to find that ticket, and to the best of my knowledge that ticket was never located.

     Q     When an item of evidence is secured from a homicide scene, is it standard procedure to document that fact and record it on the police report?

     A     Absolutely.

     Q     Did you ever -- in addition to that, did you make any effort to determine whether or not anyone used that ticket?

     A     Yes, sir.  I contacted the regional office, and again I'm not sure of the gentleman I spoke to but I know

100

he was someone high up in the Pan Am organization.    I had

explained to him the type of investigation we were

conducting and requested that they put a stop on the

ticket, and he indicated to me that they were going to

black list that ticket so if that ticket was ever used the

Syracuse Police Department would be notified.

      MR. FITZPATRICK:  Any questions for

Investigator Stassi?

      JUROR:  Where was the trash bag found, was it

in a cupboard?

      THE WITNESS:  I believe the trash bag was

found in the kitchen area.

      JUROR:  You don't know if it was inside a

cupboard?

      THE WITNESS:  I believe it was hanging right

where it was found.  I believe that is where I

found it.

      MR. FITZPATRICK:  I believe from the photo,

like you use the friction of a drawer, it appears

to be that.  I don't want to put words in your

mouth, Investigator.

      JUROR:  Was the ticket ever used?

      THE WITNESS:  To the best of my knowledge,

no, ma'am.

      MR. FITZPATRICK:  All right, Investigator,

101

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1        thank you very much.

2            (Whereupon the witness was excused)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JILL BOULTER, called as a witness,
having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

Q    Good afternoon, ma'am.  Tell us your full name, please.

A    Jill Boulter.

Q    What do you do for a living, ma'am?

A    I'm a bookkeeper at Liquor Square.

Q    Tell us where Liquor Square is located?

A    At the corner of Erie Boulevard, 320 Erie Boulevard East.

Q    Is it near 690?

A    Yes, it is.

Q    How long have you worked there?

A    Sixteen years.

Q    Were you working there back in March and April of 1987?

A    Yes, I was.

Q    Did you have an employee back then by the name of John Cassano?

A    Yes, I did.

MR. FITZPATRICK:  I want to have this marked as 14.  It's a series of register tapes.

(Grand Jury Exhibit Number 14 was marked)

103

BY MR. FITZPATRICK:

    Q    Ma'am, I'm holding in my hand Exhibit 14, what appear to be some register tapes.  Now, have you seen these before?

    A    Yes, I have.

    Q    Do they relate to March 27th, Friday, of 1987?

    A    Yes, they do.

    Q    And have you reviewed these tapes?

    A    Yes, I have.

    Q    And at my request did I ask you to attempt to locate when and if any bottles of Bacardi rum were sold from Liquor Square on that date?

    A    Yes.

    Q    Were there any bottles of Barcardi sold on that date?

    A    There were two bottles sold.

    Q    What were the times the bottles were sold?

    A    One was at 2:08 in the afternoon, and one was at 9:50 in the evening.

    Q    How late are you open?

    A    We're open until 10.

    Q    And that includes on Friday?

    A    Yes.

    Q    One at 2:08 in the afternoon and one at 9:50 in the afternoon?

104

ONONDAGA COUNTY GRAND JURY

A    9:50 in the evening.

        MR. FITZPATRICK:  Any questions?  Thank you.

(Whereupon the witness was excused)

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

<u>JOHN CASSANO</u>, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

    Q    Sir, good afternoon.  Tell us your full name,

please.

    A    John M. Cassano, Jr.

    Q    John, how old are you?

    A    Twenty-nine.

    Q    And are you married or single?

    A    Married.

    Q    Any kids?

    A    Yep, five.

    Q    Good for you.  Where do you live?

    A    Canastota.

    Q    How long have you lived at Canastota?

    A    Let's see here, about three and a half years.

    Q    And where did you live back in March of 1987?

    A    In Solvay.

    Q    How long have you lived -- how long had you lived

in Solvay?

    A    That was a good two years, two, three years.

    Q    What do you do for a living today?

    A    I manage a Pizza Hut restaurant.

    Q    Where is that located?

106

A    Western Lights Plaza.

Q    How were you employed back in March --
specifically on Friday, March the 27th of 1987?

A    I was the front-end manager at Liquor Square.

Q    Liquor Square is where?

A    Corner of Thompson and Erie Boulevard.

Q    Were you working on Friday, March 27th?

A    Yes, I was.

Q    I want to direct your attention towards the
evening hours.  First of all, what hours did you work that
day?

A    I worked like 10 -- I'm sorry, 10 to 10.

Q    10:00 a.m. to 10:00 p.m.

A    Yeah.

Q    Were you questioned back in April of 1987 about
something that occurred on that evening?

A    Yes, I was.

Q    Do you have that date, Friday, March 27th, in
mind?

A    Most certainly do.

Q    Do you remember something that you saw, a person
that you saw that evening?

A    Yeah.

Q    Tell the grand jury about that.

A    It was Friday night, and I had sent two cashiers

1    to do some cleaning up the aisles, so I was on the

2    register, and it was, you know, the last half hour of

3    business before close, and this gentleman came in and he

4    you know, just from the visual look when he came to the

5    register, he looked like a Hispanic person of nature, was

6    in a hurry, purchased three bottles.  The one I remember

7    the most was a Bacardi dark rum, and the other two were

8    wine bottles, but I couldn't remember the exact types of

9    wine they were.  And just normal conversation, like cashing

10   out, how you doing, and I didn't get a single response out

11   of this person, cold stare, he seemed to be in a hurry.  So

12   I cashed him out and he went out.  The reason I remember

13   him, when he walked in the door, there was the mechanical

14   doors and I heard them slide open, and the first thing that

15   popped in my mind, because I was alone up there, I'm going

16   to be robbed.  And that's the first --

17              MR. FITZPATRICK:  We're not going to offer

18         this testimony to suggest this person was a

19         robber, but to explain why Mr. Cassano might have

20         a vivid memory of this.

21   BY MR. FITZPATRICK:

22        Q    Where did he park?

23        A    There's an alcove, he parked in the first or

24   second spot in the alcove.  And the car was parked quickly

25   so he could get out of there quickly.  He was the only car

108

there, in and out.  He could jump from there to the door, and it was an in-and-out stop.

Q    Did you, John, review register tapes from that evening?

A    Yes.

Q    Keeping that out of your mind, what was your best recollection of the time that this individual came in the store?

A    My best recollection was between 9:30 and 10:00.

Q    And you close you said at 10:00?

A    We close at 10:00.

Q    How long did you have an opportunity to look at this fellow?

A    Oh, I'd say maybe three minutes tops.

Q    Were you paying attention to him?

A    Yeah, the whole time.  I watched him from the time he walked in, as he walked across the front of the store, to the farthest aisle to get the rum, and I watched him go through the back of the store because I don't recall any other store management being down on the floor at that time, and I didn't know where the girls were, so I kept my eye on him in case I had to do something.

Q    What do you remember about his face?

A    He had a scar on his face and he just had a very, very cold stare.  I mean, it was not an inviting face to

look at.  That was the thing that stuck out most.

Q    I want to take you back to several days ago,
specifically October the 28th of this year, and did some
members of my office, specifically Mike Martinez and
Sergeant Peter Tynan, ask you to look at some photos?

A    Yes, they did.

Q    Did you select a person as the photo you saw back
on March 27th?

A    Yes, I did.

Q    Of 1987?

A    Yes.

MR. FITZPATRICK:  I would like to have that
photo array marked as Exhibit 15.

(Grand Jury Exhibit Number 15 was marked)

BY MR. FITZPATRICK:

Q    John, I'll show you Exhibit 15.  Is that the photo
array that you were shown?

A    Yes, it is.  Number two.

Q    And you selected which person?

A    Number two.

MR. FITZPATRICK:  I'll pass that around.
Anybody have any questions for Mr. Cassano?

JUROR:  I was wondering if you recognized
what kind of a car he was driving?

THE WITNESS:  The best I could tell you was a

110

light colored car.  It was really hard to see

because there was a pretty bad lighting unit in

the foyer because it didn't shed a lot of light

out, but it looked like a lighter colored car.

JUROR:  Was it a big car?

THE WITNESS:  Yeah, it was a bigger car.  It

wasn't a small thing.

JUROR:  Do you remember what the individual

was wearing?

THE WITNESS:  That's a tough one.  I paid

more attention to his face than anything else.

That's the most thing I had my eyes on at the

time.

BY MR. FITZPATRICK:

Q    How about the lighting inside the store?

A    The lighting inside the store was fine.  But as

far as being able to see outside -- in the store was great,

but seeing outside was pretty hard.

MR. FITZPATRICK:  John, thanks very much.

Come on out here with me, please.

(Whereupon the witness was excused)

111

GRAND JURY PROCEEDINGS, NOVEMBER 10, 1992

ROBERT LUCAS, called as a witness,

having been duly sworn, testified as follows:

EXAMINATION BY MR. FITZPATRICK:

Q    Good morning, sir.  Tell the grand jury, please,
your full name.

A    Robert Claude Lucas.

MR. FITZPATRICK:  Can everybody hear him?

THE WITNESS:  Robert Claude Lucas.

BY MR. FITZPATRICK:

Q    Where do you live?

A    Cazenovia.

Q    What do you do for a living?

A    Resell farm machinery.

Q    Is that a family business?

A    Yes, it is.

Q    Married or single?

A    Married.

Q    Your wife's name?

A    Suzanne.

Q    How long have you been married?

A    Four years.

Q    Any kids?

A    One child.

112

Q    Do you know Valerie Hill?

A    Yes, I did.

Q    How long had you known her?

A    I had known her for approximately six years total.

Q    Did you date her at some point?

A    Yes, we did.

Q    When did you start dating her?

A    It would have been six years prior to her murder.

Q    So she was murdered in March of '87, so you would have started dating early '81?

A    Somewhere around there, yes.

Q    Did you ever live together at any point?

A    Yes, we did.

Q    So it was a very serious relationship you had with her?

A    Yes, it was.

Q    When did you break up with her?

A    A year before her murder.

Q    What was the reason for the break-up as far as you could tell?

A    Well, we drifted apart in some aspects. Her idea of a relationship and mine had gone different ways, and that's just the main reason.

Q    Did you ever meet Hector Rivas?

A    Yes, I did.

113

ONONDAGA COUNTY GRAND JURY

1    Q    When did you first meet him?

2    A    About a month before we broke up, I met him

3    uptown.

4    Q    Where did you meet him?

5    A    In a bar uptown, Albert's.

6    Q    That's in Cazenovia?

7    A    Yes, it is.

8    Q    Did you become aware that Valerie was seeing

9    Mr. Rivas?

10    A    Oh, approximately a month later, yes.

11    Q    Was that the reason for your break-up?

12    A    That was the final straw, yeah.  We had lived

13    together for probably three and a half years or so and then

14    because of her work in Syracuse, she had moved to Syracuse,

15    got an apartment out here.  We had stayed, well, going out

16    but not living together for probably a year before that I'm

17    going to say or six months, something to that effect.

18    Q    Do you remember the last time you saw Valerie

19    alive?

20    A    It was probably -- it was in Cazenovia at some

21    time probably at a bar somewheres out on -- but I don't

22    know exactly when, no.

23    Q    Even though you had broken up, did there come a

24    time when you started having telephone communications with

25    her?

114

A    Yeah.  We had always kept in touch even after we broke up, quite a bit at first and then towards the end a little less, but we had still kept in touch quite a bit.

Q    So there was still some feelings between the two of you?

A    Oh, yeah.  We had a lot in common.  Like I said, we went out together four or five years, lived together two or three years, had a lot to do with each others families and got together a lot and talked about how each other families doing.

MR. FITZPATRICK:  I'd like this marked as Exhibit 16.

(Grand Jury Exhibit Number 16 was marked)

BY MR. FITZPATRICK:

Q    Bob, I'm going to hand you Exhibit 16.  First of all, do you recognize that?

A    Yes, I do.

Q    What is that?

A    This is a letter that she wrote me.

Q    When is that postmarked?

A    February 26th, 1987.

Q    And do you remember how soon after that postmark you received it?

A    Not exactly, but within a few days I'm presuming.

Q    Did you ever discuss the letter with her?

A    Yes.  Like I say, we still were talking on the phone every now and then.  Yes, we had.

Q    And this was -- the discussion you had concerning this letter, was it in person or on the phone?

A    It would have been on the phone.

Q    Did you ever get another letter from her?

A    No, I did not.

Q    I want to show you, Bob, what is marked Exhibit 12 and ask have you ever seen that letter?

A    Not this letter, no.

Q    Do you recognize the handwriting?

A    This is Val's handwriting, yes.

Q    In fact, if we can compare the -- I should clarify that on Exhibit 16, Bob, this is a two-page handwritten letter on lined paper, and there's also a smaller handwritten letter on regular paper, unlined.  Were they together when you received them?

A    Yes, they were.

Q    And, if you would, read the first two lines of Exhibit 16.

A    I was so glad to hear from you yesterday.  You must have been reading my mind.

Q    How does that compare with the first two lines of Exhibit 12?

A    I was so glad to hear from you yesterday.  You

116

must have been reading my mind.

     Q    And once again, you've never seen Exhibit 12?

     A    No.

         MR. FITZPATRICK:  Anybody have any questions for Mr. Lucas?  Okay, Bob, thanks very much for coming in.

      (Whereupon the witness was excused)

117

(Grand Jury Exhibit Number 17 was marked)

MARK McARDLE, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

Q    Sir, state your full name for the record, please.

A    My name is Mark McArdle.

Q    What do you do for a living?

A    I'm a police officer with the City of Syracuse.

Q    How long have you been a police officer?

A    Twenty years next -- on the 21st of this month.

Q    Now, back in April, late March and April of 1987,
did you have occasion to become involved in investigating
the death of Valerie Hill?

A    Yes, sir, I did.

Q    Did you in connection with that investigation have
occasion to interview a Hector Rivas?

A    Yes, sir, I did.

Q    Was that tape recorded?

A    Yes, sir, it was.

Q    And is the date of the interview on the body of
the tape itself?

A    Yes, sir, it is.

Q    Is that -- can you tell us if you had a chance to
look at Exhibit 17?

118

O   1        A    Yes, I did.

N   2        Q    Does that fairly and accurately show the extent of

O   3   the interview you had with Mr. Rivas?

N   4        A    Yes, it does.

D   5             MR. FITZPATRICK:  I'll recall Officer McArdle

A   6             at a later point if we need to, but I'm going to

G   7             excuse him for now.

A   8        (Whereupon the witness was excused)

    9

C   10

O   11

U   12

N   13

T   14

Y   15

    16

G   17

R   18

A   19

N   20

D   21

    22

J   23

U   24

R   25

Y

(Grand Jury Exhibits Numbers 18 through 21 was marked)

      DR. ERIK MITCHELL, called as a

witness, having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

Q    Sir, good morning.  Tell the grand jury your full
name.

A    Eric Krag Mitchell.

Q    What do you do for a living, Eric Krag Mitchell?

A    Onondaga County Medical Examiner.

Q    And how long have you been medical examiner for
this county?

A    Since September of 1983.

Q    What is your professional background in terms of
your education and training?

A    I graduated from Cornell University in 1972, after
which I went to Upstate Medical Center and got my M.D. in
1976.  This was followed by a training program in anatomic
and clinical pathology.  That is respectively the study of
the body's tissues, the body's fluids and excretions as
they relate to an understanding of disease and injury.
This was then followed after graduation in 1980 by a
training program in forensic pathology, the legal aspect of
an understanding of disease and injury and death as
assistant to the State Chief Medical Examiner in Chapel

Hill, North Carolina.  I graduated from that program in 1981, after which I went to a staff position as Assistant Medical Examiner in Dade County, Florida, until I came here in September of 1983.

Q    Tell the grand jury what your duties are as medical examiner?

A    I'm responsible for the investigation of those deaths within my jurisdiction where there's a belief that a non-natural event may have played a role or where there is no physician available in good conscienced who can sign the death certificate.

Q    Can you tell the grand jury what an autopsy is?

A    An autopsy optimally has three parts, sometimes only the latter two.  The first part is examination of the deceased at the site of discovery of the body or the site of injury and then continues with the external examination in more controlled circumstances in my office, and finally an internal examination for examining the body's tissues for signs of disease and injury.  During these various stages of investigation and examination, a variety of types of documentation may be produced and a variety of types of materials collected for further analysis.

Q    And in your professional career approximately how many autopsies have you performed or assisted in performing?

ONONDAGA COUNTY GRAND JURY

1    A    Performed myself is somewhere over 4,000. I do

2  not know the exact number. I do not keep count. I've been

3  involved in a large amount of others.

4    Q    Did you have occasion to perform an autopsy on the

5  body of Valerie Hill?

6    A    Yes, I did.

7    Q    Can you tell us where and when that took place?

8    A    This was done in my office and done on the 30th of

9  March 1987.

10    Q    And tell us -- did you go to the scene of the

11  murder, by the way?

12    A    I did.

13    Q    And the autopsy itself, how did the body appear

14  when you examined her?

15    A    Well, at the original examination at the death

16  scene, the body was partially dressed in a kind of a

17  terrycloth bathrobe and there was what appeared to be the

18  belt of that bathrobe around her neck. She was face down.

19  The body was in rigor. Now, when you die, after a few

20  hours your muscles start to set and become firm. That's

21  called rigor mortis. After a period of a day or two, this

22  stiffness will then go away. It's a chemical reaction

23  within the musculature. She had gone into rigor. She also

24  had livor, the settling of blood to the down side of the

25  body. When the blood is no longer circulating, it settles

to the down side.  After the livor, the pigment starts to leak out to the tissues, we have fixed livor.  If you shift the body the stain will stay.  She was starting to do some of that.  There was fecal staining or smear, fecal material around the buttocks and the back of the thighs.

Q    I want to show you Exhibit 19 and Exhibit 18. Have you seen these items before, sir?

A    Yes, sir.

Q    Exhibits 5 and 6, do you recognize the scene in 5 and 6, sir?

A    I do.

Q    And are 18 and 19 the items that were found on Miss Hill's body?

A    Exhibits 18 and 19 are these two exhibits, yes, sir.

Q    And I show you Exhibits 20 and 21, and ask if you can tell us what those describe or what those are pictures of?

A    Exhibit 20 is a picture of the face of the decedent, Valerie Hill, taken at the scene -- no, that one was taken at the morgue but still in the body bag now face up still with the tie around her neck and with the robe on. And Exhibit 21 is a picture taken from the right side demonstrating the tie around her neck.

Q    Now, talking about the fecal staining that you saw

123

on her body which is shown in Exhibits 5 and 6, did you find any evidence that she had been violated in her anus to cause these smears?

A    I'm just going to refer to my notes. Unfortunately, I didn't have a chance to review them before I got over here today.  Let me just check.  I found no bruise.

Q    Now, do you have an opinion as to what caused this fecal smearing?

A    Yes.

Q    Tell us what that is.

A    Something was introduced into her anus and then wiped on the body.

Q    On her buttocks?

A    Yes, over the buttocks and thigh.

Q    Do you have any opinion as to whether or not this was a penis or some other type of object?

A    I doubt it was a penis.

Q    What makes you say that?

A    The ability to wipe the penis in the fashion as seen here would not fit with that structure.

Q    Any sign of ejaculation in her anus?

A    I could not see it, no.

Q    Was there any indication she was having her period?

124

A    Yes.  There is some -- the endometrium, the lining of the uterus, was thin and red.  She could be at the end -- there was some red fluid in the mucus, so it could be the end of her period.

Q    And, in fact, was there also a Tampax recovered from her body?

A    I believe so, yes.

Q    Now, did you find any sign of injury externally on Miss Hill's body?

A    The primary findings were internal.

Q    Tell us about those then.

A    If you go inside the neck and look at the tissues inside the neck, in the muscles that we call the strap muscles, they're muscles that help us to bring our head down, there were hemorrhages into these muscles close to an area we call the hyoid.  This is a U-shaped point, with the point of the U pointing towards the back of the neck.  Then there was some discoloration about the hyoid where there had been a fracture of it.  In other words, there was sufficient pressure applied to the neck sufficient to break the bone.  Also a fracture of the larynx with hemorrhage, and the epiglottis is a flap of tissue, and there are small petechiae, hemorrhages called petechiae.  This is something we see when pressure is applied to the neck sufficient to block the blood supply, outflow from the neck.

125

O N O N D A G A    C O U N T Y    G R A N D    J U R Y

1    Q    Any other injuries to her head other than this

2    injury to her neck?

3    A    The right temple had a bruise approximately two by

4    three quarters of an inch.  It was lateral to the right

5    eyebrow.  I'm pointing to it now about right here.

6    Otherwise, it was free of injury.

7    Q    Now, this bruise to the temple, do you have an

8    opinion as to whether or not that could have caused

9    unconsciousness to Miss Hill?

10    A    It's possible.  You can't say for sure.  You can

11    cause unconsciousness without causing much of a bruise.  It

12    depends on the type of surface that strikes you, how

13    rapidly it strikes you, and how the brain gets jiggled, if

14    you will, in straight English.  So it's certainly possible.

15    Q    Do you have an opinion within a degree of medical

16    certainty as to the cause of death of Miss Hill?

17    A    Yes.

18    Q    What is that?

19    A    She died as a cause of being strangled.

20    Q    Can you quantify the amount of force necessary to

21    apply the belt around the neck to cause her death?

22    A    It has to be enough to at least block the blood

23    outflow from the neck and from the head and may also have

24    blocked the carotids because you're dealing with a broad

25    surface of circumference of the loop of belt.  You have to

126

apply enough pressure to block the blood outflow.

Q    Would you expect a person with that amount of force being applied to the throat or neck to speak or cry out?

A    It's possible, but probably not.  If you reach enough pressure to break the hyoid and breaking the larynx, you're going to have compressed the airway.

MR. FITZPATRICK:  Any questions for Dr. Mitchell?

JUROR:  He said the body started going into rigor mortis?

BY MR. FITZPATRICK:

Q    Let me clear up one thing.  In terms of time of death, can you as medical examiner accurately pinpoint the time of death of a deceased person?

A    No.  Only Jack Klugman can do that.

Q    Can you offer guidelines or parameters as to when a person may have died?

A    Yes.

Q    Are your findings consistent with this death having occurred sometime during the evening hours of Friday, March the 27th?

A    The 27th and I have her on the 30th, it's possible.  It's on the outside edge of that possibility, but it's possible.  What we have is a body in full rigor,

127

and they usually start coming out.  But she was on the floor, which is the cooler area of the house, compared to the upper -- if you're higher up on a bed or something.  So you tend to stay cooler, that tends to prolong the process of rigor.  And you certainly can be in full rigor for 48 hours, it's not a problem.

      MR. FITZPATRICK:  Any questions?  Okay, Doctor, thanks very much.

      (Whereupon the witness was excused)

128

MR. FITZPATRICK:  You can indicate that the grand jury is looking at Exhibit 17.

(Grand Jury Exhibit 17 was played)

MR. FITZPATRICK:  Let the record reflect that we stopped the tape at 8:03 40 seconds, and the grand jury can have any part of that tape played back that they want.  And with that we'll let you go for the morning.

First I'm going to read Exhibit 12 to the grand jurors.  The date is Thursday.  Hi, Bob.  I was so glad to hear from you yesterday.  You must have been reading my mind.  This letter is going to be a bit different than the first one only because I had the chance to say a few of the things I was going to write.  I'm very glad you understand how I feel and that you sort of share the same feelings.  I was afraid you wouldn't understand or have any idea of what or how I was feeling.  I think we really need to talk, Bob, just for our own piece of mind and to be able to get on with our lives with a clear conscious and that I miss talking with you.  It's hard not to miss it after five plus years.  Anyway, the real reason for this letter is that I just want to thank you from the heart and sole that's in me for

the things we shared, places we went and the stuff we did.  I've been wanting to write since the summer to say that but never had the nerve, parenthesis, didn't think you'd want to hear it, close parenthesis.  I very much appreciate the opportunity you gave me to go back to school.  I was able to get a skill that I'll always be able to use, parenthesis, and it will come in pretty handy, close parenthesis.  For that I am especially grateful and always will be.  And it's not signed.

        JUROR:  Is it dated?

        MR. FITZPATRICK:  Just Thursday.

130

<u>JOSEPH FIELDS</u>, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

    Q    Sir, good afternoon.  Tell the grand jury your

full name, please.

    A    Joseph Francis Fields.

    Q    Mr. Fields, where do you live?

    A    ██████████████████████████

    Q    What do you do for a living?

    A    I work at the Baldwinsville Sports Bowl.

    Q    Married or single?

    A    Single.

    Q    What do you do at the Sports Bowl?

    A    I do the lanes, bartend, everything.

    Q    How old are you?

    A    Forty.

    Q    How long have you lived in Onondaga County?

    A    Two years.

    Q    And how about Central New York?

    A    Central New York seven years.

    Q    Okay.  Where did you live back in March and April

of '87?

    A    Cazenovia.

    Q    What did you do back then for a living?

ONONDAGA COUNTY GRAND JURY

1       A    I was a painter and also worked at a bowling alley

2   there.

3       Q    Did you know Hector Rivas?

4       A    Yes, I did.

5       Q    How did you know him?

6       A    Through bowling, softball, you know, patron of the

7   bar, et cetera.

8       Q    How would you describe your relationship with him

9   back in '87?

10      A    Fine.  I mean, you know, we were friends, but we

11  weren't close friends.

12      Q    Did you ever have any problem with him?

13      A    No, sir.

14      Q    Nobody has any debts with each other?

15      A    No, sir.

16      Q    No bones to pick with him?

17      A    No.

18      Q    Did you ever meet Valerie Hill?

19      A    No.

20      Q    Did you know that she was Hector's girlfriend?

21      A    Yes.

22      Q    Other than that you had no real contact with her?

23      A    No.

24      Q    I want to take you to a time -- I want to tell you

25  on Monday, March the 30th, 1987, is the day the police

132

found the body of Valerie Hill; do you remember that day?

A    I remember seeing it in the papers, yes.

Q    Okay.  Did you ever hear Hector Rivas say anything about that event?

A    On that -- you lost me here.

Q    Okay.  Did there come a time when you heard Hector Rivas say something about Valerie Hill?

A    Yes.

Q    To the best of your recollection, when was that?

A    I would say two to three weeks after they had picked him up for suspicions of that crime.

Q    Now, do you know what day of the week it was?

A    It was a Friday.

Q    Did you know what time of day it was?

A    It was late at night, I would say 11:00, 12:00.

Q    Is there anything else that happened that day that you remember?

A    We were -- we were having a drink at the bar.

Q    Who's we?

A    My girlfriend and myself.  We had just come in and Hector was there.

Q    What bar was it?

A    Albert's restaurant.

Q    And your girlfriend's name?

A    Kelly Gray.

Q    Was Albert's crowded?

A    Yeah.  It was a Friday.  It was fairly crowded, yes.

Q    Where did you go when you went in?

A    We went right to the bar and Hector was there.

Q    And did you sit anywhere near Hector?

A    We joined him at the bar, yes.

Q    What was his appearance when you first saw him?

A    He was, I would say, fairly ilebriated (sic).

Q    Inebriated?

A    Inebriated, ilebriated.

Q    He had been drinking?

A    Yes.

Q    Anything else you noticed about his condition?

A    He was crying, you know, like I say, you know, he was going through some tough times because of the fact that he had been pulled in, and a lot of the people in Cazenovia were like looking down on him, et cetera, and you know, I was consoling him, you know.

Q    Did you have any physical contact with him to console him?

A    Yeah.  You know, I hugged him, et cetera, and he was crying, and one thing led to another, you know.

Q    Did you have anything to drink?

A    Yeah, I had a couple of drinks, yeah.

134

Q    Did there come a time when your girlfriend got up to go to the bathroom?

A    Um-hum.

Q    Tell the grand jury about what happened?

A    My girlfriend went to the -- we were sitting there and my girlfriend got up to go to the bathroom, and when she did, Hector was like between us, and she got up to walk around to go to the bathroom, and I had like made a move to like let her go through while Hector by this time was still crying quite a bit and he had his head on the bar like this, and I really believe that he had got to a point where he thought I went with her, and he was crying and then he turned around and he says -- he made the statement, Valerie, Valerie, I'm sorry, I didn't mean to do it.

Q    What did you do when he said that?

A    Well, I didn't know what to do.  I just kind of stood there, and all of a sudden he looked up at me and stopped crying instantly and got a very, very sobering look on his face.  And then, you know, he just never said a word.  I never said anything, he didn't say anything.  My girlfriend came back, and I would say fifteen, twenty minutes went by and he like just left.

Q    You never confronted him with what you heard him say?

A    No.

135

Q    Is there any doubt in your mind that's what you heard him say?

A    That's an absolute -- what I heard is what he said, yes.

Q    Don't misunderstand this, but I'm sure we're curious, did you ever tell the police about this?

A    No, I did not.

Q    And tell us why, in your own words, why you didn't tell anybody and the police?

A    Well, basically I really thought because he got pulled in and the general consensus in Cazenovia was that half the people thought he did it, half the town thought he didn't, and I gotta say, you know, at that time I was one of them.  And then after he said that, then I thought to myself, geez, if he did do it, I don't want him coming after me.  If he went to trial and he got let off, I could be next.  I just didn't want to get involved, I guess.

                MR. FITZPATRICK:  Any questions for Joe?

                JUROR:  Why now?

                MR. FITZPATRICK:  He's been ordered to be here in terms of why now.

                JUROR:  Was there any loud music?

                THE WITNESS:  Yes.  I was this far away from him, sir.

                MR. FITZPATRICK:  You're holding your hands

136

about a foot, foot and a half apart?

THE WITNESS:  Yes.  I was shoulder to shoulder, I should say.

JUROR:  When did you come forward and I assume made this statement to the police?

THE WITNESS:  I didn't.  They called me today.

JUROR:  First contact you ever had?

THE WITNESS:  Yes.

MR. FITZPATRICK:  Thanks, Tom, come on out.

(Whereupon the witness was excused)

(Proceedings were adjourned)

GRAND JURY PROCEEDINGS, NOVEMBER 13, 1992

ELIZABETH LEWIS, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. SUDDABY:

Q    Would you please tell the ladies and gentlemen of the grand jury your full name and spell your last name.

A    Elizabeth G. Lewis, L-E-W-I-S.

Q    Where do you live --

A    I live in --

Q    Do you go by Liz or Elizabeth?

A    Liz.

Q    Where do you live, Liz?

A    Merrimack, New Hampshire.

Q    Who do you live with?

A    My husband and two children.

Q    How long have you lived in Merrimack?

A    Almost five years.  It will five years in February.

Q    Prior to moving to Merrimack where did you live?

A    Cazenovia.

Q    How long did you live in Cazenovia?

A    I went to college there for two years and lived there from 1980 until we moved in early 1988.

Q    And when you say two years of college, did you

138

start college in '78?

A    Eighty.  I'm sorry, '78, went two years and graduated in '80.

Q    During the time you were in Cazenovia did you come to know a person by the name of Valerie Hill?

A    Yes, I did.

Q    How did you come to know her?

A    My husband now, boyfriend at the time, was best friends with a man named Bob Lucas, who Valerie started seeing.  I was seeing Brian, and Bob was seeing Valerie, and we ended up all seeing each.

Q    Would you describe the relationship to the ladies and gentlemen of the grand jury that you had with Valerie?

A    Bob and Val started seeing each other early in 1981, very -- like January or February, and I did not know her very well at first.  I would say that starting that summer we started to become very close.

Q    During that time period what were you doing?

A    I worked for the Addis Company downtown for the summer and then I went to work for Cazenovia College as an admissions counselor.

Q    What was Valerie doing during that time period?

A    At that time she had graduated from Cazenovia College in 1979 and she was a medical office assistant at that time.

Q    How close did you get as far as friends go?

A    We became very close.  Valerie was a -- probably the most private person I had ever met, valued her privacy. I would not say she was an easy person to get to know. Once I did, we became very close.  Kind of a person that once you broke through, I guess you want to say, would do anything for you.  Very, very good friend.

Q    And would you describe to the ladies and gentlemen of the grand jury over the time period that you knew her how often would you see her?

A    Well, starting that summer that we really became friends we saw each other all the time.  She was living at her parents' house in Cazenovia at the time.  Her parents still owned a home in Cazenovia and I was renting an apartment in Cazenovia.  The year after that, 1982, she was living in the house that Bob Lucas owned, that Brian lived in.  She moved in there, and in 1982 I also moved in there, so the four of us shared that house, so I saw her every day.

Q    So you got to know her very well?

A    Very well.

Q    Did you become familiar with her personal habits as far as smoking, drinking, housekeeping, that sort of thing?

A    Yes.

140

Q    Would you please tell the ladies and gentlemen of the grand jury with regard to her housekeeping, what were her particular personal quirks with regard to that?

A    She was very neat, which I loved because I am kind of a neat freak, and the two of us were like that and we spent a lot of time picking up after the two others.  But very, very neat and very, very organized, and not just in her housekeeping but her entire life was very organized.

Q    And how about -- well, during this time period, I take it you had an opportunity to socialize with her?

A    Um-hum.

Q    Would you tell the ladies and gentlemen of the grand jury about that and in particular her drinking and smoking habits if you're aware?

A    At that time the four of us spent obviously a lot of time together.  We all had different jobs and would usually meet on Friday night after work.  Valerie and I did go out by ourselves a lot also.  She was very familiar with I think it's the university area in Syracuse.  We would come in here sometimes, probably both drank too much at the time, and when we did, that was the only time that either one of us ever smoked cigarettes.  We would insist that we didn't smoke.  I would say social smokers, but that's the only time that she smoked.

Q    Okay.  You've described a time period when she was

141

dating a gentleman by the name of Bob Lucas; is that right?

A    Um-hum.

Q    Okay.  And do you know how long that relationship lasted?

A    From 1981 until -- Brian and I were married in 1984, so obviously we weren't living there anymore.  I would say late 1984, I'm not absolutely certain of that, but she moved out of Bob's house.  She was still seeing him but things were not going as well as she hoped.  She had gone back to Cazenovia College to become a nurse.  Had done very well at Cazenovia and gotten a job right away at St. Joe's in Syracuse.  So she moved into Syracuse mainly to be closer to work but also because she was not happy with the way things were going between she and Bob, and in -- I'm sorry, that would have been in 1985.  Early 1986 was when they stopped seeing each, May of 1986.

Q    And during this time period, did you continue to see Valerie?

A    Yes.

Q    Even after she moved to Syracuse?

A    Yes.  I mean, we weren't living together anymore so obviously I didn't see her on a day-to-day basis, but we would get together on the phone.

Q    Could you describe your relationship at that time?

A    We would still socialize, the two of us.  We

talked on the phone a lot. That would be until -- let's see, in August of 1985 I had my first son, so for nine months prior to that, I probably wasn't -- I'm sure I wasn't socializing as much. She would come into my house more, and then after I had the baby we also spent a lot of time at her first apartment in Syracuse or again she would be coming into Cazenovia.

Q    And during this time period did you ever visit her at her apartment in Syracuse?

A    At both. The first one she lived in for a short period of time, and then she moved I think it was just two streets up to Hickok Avenue in Syracuse.

Q    And would you describe that apartment and the condition of that apartment, as you recall?

A    The second apartment on Hicock?

Q    Yes.

A    It was very nice or she wouldn't have taken it. It was newly redone. It was a two-family. There was a family that lived upstairs and she had the entire downstairs, except they shared the washer/dryer area. I believe it had three bedrooms, maybe just two, but a nice living room, a good size kitchen, bathroom, very comfortable. It had a porch on the front.

Q    Would you, to the best of your recollection, describe for the ladies and gentlemen of the grand jury how

143

she kept that particular apartment?

A    Very neat, very neat.  Very nicely decorated and she was very neat.

Q    Okay.  Now, during this time period after she had broken up with Bob Lucas, are you aware or did she introduce you to any other gentlemen that she would have been dating?

A    Yes.  We were at a party together in Cazenovia in the middle of May.

Q    What year is this now?

A    1986.

Q    Okay.

A    That would be 1986.  She and I were standing in the kitchen of this person's home, and at the time things between she and Bob were pretty much not completely over but close to it, and a man named Hector Rivas came into the kitchen.  I did not know him.  I had seen him around for quite some time before that.  I had been in Cazenovia for a while.

Q    When you had seen him around, describe where would you see him in Cazenovia and how often?

A    I remember seeing -- again, I probably -- you know, this is going to before I had Patrick, which was in August of 1985.  I remember seeing him with another woman from Cazenovia.  She was a hairdresser, who was not from

144

ONONDAGA COUNTY GRAND JURY

1  Cazenovia, had just moved into the area recently.  And the

2  two of them would be out in the local restaurants and the

3  bars in Cazenovia.

4      Q    And if we could return now to when you met him in

5  the kitchen with Valerie, would you describe that

6  particular occasion to the ladies and gentlemen of the

7  grand jury?

8      A    He was very nice.  It was very obvious that he was

9  flirting with Valerie, and then she was probably -- she was

10  flirting back, paying a lot of attention to her, made a

11  point of -- Valerie did not drink beer and I think that at

12  this party that was the only thing they were serving, and

13  there was a few bottles of wine, so he went to find a

14  bottle of wine to get us a glass of wine.  But Bob was at

15  this party also.  Valerie and I were there with Bob and

16  Brian.  But that was about the extent of it that night.

17     Q    Do you know if she continued to see this

18  individual?

19     A    I would say within two weeks after that evening,

20  she saw him again -- maybe within one week, and then the

21  week after that went on a very informal date with him and

22  Bob found out -- at the end of that weekend, it was on a

23  Sunday, she told him that things were over.  And I don't

24  know if it at that time -- I don't know if she told him

25  about Hector.  This wasn't something she had planned on

turning into much of anything.  But I do remember it was on a Sunday that she told Bob things were over.

Q    And do you know if she started dating this Hector Rivas on a regular basis?

A    This would have been still May.  I would say for the first couple of weeks after this Sunday that she told Bob this, a couple of times.  I wouldn't say it was every night or even every weekend.  By June they were seeing each other on a regular basis.

Q    Okay.  And would you describe the relationship for the ladies and gentlemen of the grand jury from June on as you recall it?

A    I would say for that summer, which would have been the summer of 1986, it was very exciting to her.  Things with Bob had become kind of ho-hum.  There wasn't too much left there.  And Hector was very charming, I guess you would say, wined and dined her, threw his money around definitely, what money he had, took her a lot of places. It was very exciting to her.  It was something new again. She had absolutely no intention of getting involved at that point with anyone but kind of swept her off her feet, I would say.

Q    And how long did this go on for?

A    Through that summer she was enjoying this relationship and into the fall.

146

O N O N D A G A

C O U N T Y

G R A N D

J U R Y

1    Q    Of what year are we talking about now?

2    A    '86.

3    Q    1986, okay.

4    A    I would say by early to mid fall I could tell that

things were not as exciting to her.  She was beginning to

think that maybe she had made a mistake.  She regretted her

and Bob were still in contact with one another.  She

regretted that she never really resolved things the way she

probably -- in hindsight should have done.  So by November

I know they were making plans to spend Christmas with her

mother.  Her mother had moved to Tennesee, and she was kind

of hoping that he would not be able to go.  She had invited

him earlier in the year.  The mother had invited them and

her brother and his wife and Andy.

    Q    When you say they?

    A    Hector and Valerie.  And they invited her brother

and wife and son Andy down for Christmas.

    Q    What observations did you make about Valerie which

you said indicated to you there were problems or it wasn't

going as well?

    A    She would indicate that she didn't really like the

way -- not necessarily the way he conducted himself -- I

shouldn't say that.  At times she talked about how in

public he was very flashy, showy, always had to be the one

to pay for everything, a real talker, but yet with her was

ONONDAGA COUNTY GRAND JURY

1  very indecisive, confusing, say one day he felt one way,

2  the next day another, he would get depressed.  She was very

3  interested in the fact that he had a son, who he didn't

4  tell her too much about.  She didn't know too much about

5  his marriage.  He explained that the son that lived with

6  what he called the ex-wife's mother, the reason being he

7  couldn't take the boy when they divorced and his wife was

8  too messed up to do so.  She encouraged him to invite his

9  son to come stay with him, I believe it was for

10  Thanksgiving, and I do remember her commenting that after

11  she had seen the two of them together, within the first

12  hour, it was very obvious to her that this boy didn't know

13  Hector at all, you know, that he was not comfortable with

14  him, and that bothered her.

15      Q    Now, during this time period, how often are you

16  speaking with or seeing Valerie?

17      A    We would talk at least every other day.  At this

18  time I was pregnant again with my second son, so again I

19  wasn't out too much.  I had a very young baby at home, so

20  she would come over, usually come over to my house if we

21  were getting together.  Well, the four of us did socialize

22  on occasion a couple of times.

23      Q    Did Valerie -- are you aware if Valerie and Hector

24  ever traveled together during this time period?

25      A    Very early on.  Again, that was one of the things

148

that was so exciting. He would just say let's go to
New York, which is where he was from. His sister was
there, so they would go down to New York City, stay in a
very nice hotel, get together with his sister. He would
always talk about his mother but yet when they'd go down he
wouldn't -- they really wouldn't take the time to go see
her, but his sister did come to them. Valerie did not go
to his mother's home.

Q    When you say very early on, give us a time
reference?

A    I would say July and August.

Q    Of?

A    1986.

Q    Okay. And afterwards, through the relationship
did they continue to travel at all or go anywhere together?

A    One time they went to Canada, but that was no
later -- that is also within that same summer.

Q    Okay. So now later on when you indicated that she
started to feel differently about this relationship, were
they traveling anywhere together at that time?

A    No.

Q    And what time period are we talking about, what's
the time reference there?

A    When I started noticing this?

Q    Yes.

A    I would say again November into December, because I can remember the comments about, you know, probably it would have been October that her mother had invited them all down and she kind of regretted that and kind of wished he wasn't going.  There was also an occasion where the four of us went to dinner, was not something my husband was interested in doing because he and Bob had been best friends, and it was important to me that Valerie was still our friend even though Hector really wasn't.  It was obvious to me when we went out to dinner one night somewhere on Erie Boulevard that everything he said irritated her.  She didn't embarrass him, she didn't speak out, but at one point I saw her roll her eyes.

Another time he started talking about his father, the fact that he just found out that his father had fathered a set of twins with someone in New York City and he kind of went off on a tangent.  I don't know if she was embarrassed, but she was irritated by what he was saying, most everything that came out of his mouth.

Q    What other problems, if there were any, did you observe during this time period?  Explain the course of the relationship from this point on.  I think we're in December you said of '86?

A    Yeah, almost December.

Q    Explain the course of the relationship from that

point forward as you recall it, your observations of it?

A    Again, she was kind of sad over the decisions that she had made.  She was second guessing herself.  She was not -- Valerie was very independent, and when she saw that things with Bob were not going the way she thought they should be, she was not one to sit around and let things be the way they were if she was unhappy with them.  After looking back on it, was really just beginning to regret that she had started to -- that she had gotten so involved with this person so soon after breaking things off with Bob and that it was getting too serious.

Q    Did that eventually lead to anything, any sort of a break-up?

A    They went to her mother's for Christmas, her mother's in Tennessee, Christmas of 1986, and when they came back, they were still seeing one another, but by January -- I had my second son January 22nd.  She came over to see me -- I had him on a Thursday, she came over on Monday to see us.  She told us that previous Saturday night they had gone out to dinner and they were not arguing but they weren't really talking, and he had suggested that they not see one another anymore, that things were not going the way they should be.  She didn't seem very happy and she didn't argue with him.  You know, she was almost -- not almost, she was relieved.

Q    How do you know she was relieved?

A    It was a good way out.  I remember that she didn't have to -- by this time, I should have added in, he had become very dependent, always wondering where she was.  She worked nights, would go home during the day and a lot of times take her phone -- she would take the phone and unplugged the phone.  It would still ring.  She would be there but wouldn't answer it.  He was becoming possessive, didn't believe the things she was telling him.  So I was not going to say she was getting worried because she never worried, but she just was very relieved and was hoping that was that, which lasted about three days.

Q    After this time did you observe further problems between Valerie and Hector?

A    It started that week.  This would have been on a Saturday, this would have been a Monday.  And by the end of the week he was calling her telling her that he had changed his mind, that he thought they should still see one another.  She at this point had to speak up and say no, you know, I think it's best if we don't.  But she was not extremely persistent at that point.  He would call her every day.  He would appear at her apartment most every day.  He told her that he was working at some -- he told her that he was a master plumber and he was working at some -- I think it was a new development in some area in East

152

Syracuse, so he had an excuse for being around.

Q    How often were you seeing Valerie at this time?

A    Seeing her I would say twice a week, talking to her probably every day.  Mat, the baby was sick at that time, not with anything serious but with a lot of things I wasn't very sure about.  And she was a pediatric nurse, so she was like my lifeline, you know, giving me advice, so we would talk a lot.

Q    Were you able to observe Hector's reaction to this break-up first hand?

A    Yes.

Q    And when was that and what was it?

A    That would have been going into -- I mean, I -- there were things that I knew that she told me had been going on.  He then started calling my house if he couldn't find her.  There was one time that she was at my house.  We lived in an apartment in Cazenovia where ours was towards the back, so you could drive up around the back of the house and your car couldn't be seen from the road.  He was following her by this point.  One time he called and she was there, and I told him that she wasn't, that I didn't know where she was.  Another time he called, I would say this was within three, three and a half weeks, these phone calls of one another, and said to me, well, we're having a few problems and I really need to talk to her.  I think

153

more or less trying to get something out of me.

Q    This is Hector?

A    This is Hector.

Q    Okay.

A    I said I don't know where she is, and that was that.  Another time he called when she was there, it would have been on a Friday night.  She came out, not necessarily every Friday, but at least every other she would come out and have dinner with us, and he called again.  There was another time -- I'm going way ahead to March, which by the time this phone call took place he had been pulling a lot of what Valerie called tricks on her, doing a lot of things.

Q    What tricks were you aware of?

A    On March 6th, which was a Friday night, she came over.  I remember that we were watching -- she loved scary movies, loved scary books.  Stephen King was her favorite.  It was always a joke that Bob and I would watch Disney and Brian and Val loved the scary things.  I think the new Twilight Zone was on at that time, and I was very surprised it got to be 11, 11:30, and she got up to go home.  And I said why don't you spend the night, but she wanted to go home.  The next day she called me and told me when she went home that night, she opened her kitchen door, which was almost to the back of the apartment, and she knew right

154

away that Hector was there. He wore a cologne, probably
put a half of bottle on every time he went out, and you
always smelled that cigarette smoke.

Q    You observed this yourself as far as his cologne?

A    Oh, yeah, oh, yeah. I mean, you know, he left a
trail. It was always a very, very strong trail.

He didn't approach her at the door. She went into
the living room and turned the light on and he was in the
dark smoking cigarettes.

Q    Would you please describe what was going on in
March of 1987 that you observed? Again, not what she told
you but what you observed between Hector and Valerie.

A    That would have been on March 6th, I would say
that I'm sure one of those phone calls where he called me
happened after that, within that -- before the 27th. On
March 20th, which was another Friday night -- she hadn't
come out on the 13th, I remember that, because that was my
husband's birthday. She was going somewhere with a friend
from work. I hate to bake. She loved to bake. She
brought Brian an apple pie, and that was the first time we
were going out together. Brian was staying home with the
kids and Valerie and I were going to go out. We had
dinner, had pie. But before that, she and I had spoken
earlier in the day. She said she was definitely coming and
for some reason after we talked again, I would say it was

155

around -- right around -- just before dinner time, I called her apartment to ask her to stop and get milk on her way, and I dialed her phone number, which I dialed all the time, and a man answered and I hung up. I thought that it sounded like Hector, and then I thought I was, you know, my imagination was getting to me, you know. So I said to Brian, that's strange, I just dialed Valerie's phone number and a man answered. And I said I bet it sounded like Hector. He had a very distinctive voice. It was very deep but soft if that makes sense. He always spoke -- you couldn't hear him well. He muttered almost, but yet in a deep -- that doesn't make sense. It was very easy to tell his voice.

I waited about five minutes and it bothered me, and I said I'm going to call back again. I thought if she was there there wouldn't be any reason she wouldn't answer the phone. I dialed her number again and he answered again. And he said hello, and I didn't say anything. And he said hello again, and I was certain it was him. And ten minutes later Valerie was at my door.

Q    Did you mention this to Valerie at this point?

A    Right away.

Q    What did she say?

A    I said to her hoping -- I knew it was him. I said to her, your father's not at your apartment, is he. His

156

wife was in St. Joseph's Hospital at the time.  So he lived

a ways away from Syracuse, and he spent a lot of time with

Val.  She looked at me like why would my father be at my

apartment.  And I said well, then it's Hector.  And I knew

on the phone it was him.  Her father speaks very loudly,

has a bit of an accent and it was not her father's voice.

She said, I could tell you right now, I'm sure that's

Hector.  She knew he had a key.

    Q    During this time period did you ever discuss with

her her apartment secured?

    A    Yes.

    Q    What did you tell her?

    A    And that especially.  It was really beginning to

worry me.  I wish I had worried a little bit more.  She

didn't.  She was not the kind of person that worried about

anything.  I'm very much the opposite.  Brian and I

discussed with her that night on the 20th, Brian said, Val,

why don't I come change your locks.  And she said, you

know, it was obvious he had given her back the key, but she

knew he had it.  He wasn't forcing his way in there.  He

was coming through the door with a key.  And she knew he

had a copy.  She had never given him more than one key

because she only had two.  She felt she had to check, since

she was renting, with the landlord, was going to do so, and

she appeared to be growing a little more concerned, not

156

wife was in St. Joseph's Hospital at the time.  So he lived
a ways away from Syracuse, and he spent a lot of time with
Val.  She looked at me like why would my father be at my
apartment.  And I said well, then it's Hector.  And I knew
on the phone it was him.  Her father speaks very loudly,
has a bit of an accent and it was not her father's voice.
She said, I could tell you right now, I'm sure that's
Hector.  She knew he had a key.

     Q     During this time period did you ever discuss with
her her apartment secured?

     A     Yes.

     Q     What did you tell her?

     A     And that especially.  It was really beginning to
worry me.  I wish I had worried a little bit more.  She
didn't.  She was not the kind of person that worried about
anything.  I'm very much the opposite.  Brian and I
discussed with her that night on the 20th, Brian said, Val,
why don't I come change your locks.  And she said, you
know, it was obvious he had given her back the key, but she
knew he had it.  He wasn't forcing his way in there.  He
was coming through the door with a key.  And she knew he
had a copy.  She had never given him more than one key
because she only had two.  She felt she had to check, since
she was renting, with the landlord, was going to do so, and
she appeared to be growing a little more concerned, not

as -- again, not as worried. I said to her later that week, it would have been after the 20th, why don't you just call the police, just see what they do say, see if they can give you any advice. And she very ironically said, they're not going to do anything until he does. And I even, you know, thought about calling myself, but you know, figured they wouldn't, you know, couldn't do that.

Q    With regard to apartment security and the keys, did you ever discuss with Valerie when she got the key back from Hector? Do you know when that happened?

A    I would say early February. I mean, it was that Saturday night I told you about he had said he didn't think he should see each other anymore. By the middle of that next week he was calling her, coming by, and there were a couple of occasions where she knew he had come in, things would be missing. One thing that was missing -- you want me to get to that later? I would say within -- it was before the middle of February and now we're to March 20th.

Q    And during that time period between the middle of February and March 20th, did you see Valerie on a regular basis?

A    Most every Friday night, yeah, and she would also -- if she was working a weekend, she would have a day off during the week, and she would come out a lot of times for lunch. She never really -- when she was working at

158

night, she would go home in the morning.  I know if I wanted to catch her before she went to sleep, I would call her around 9:30.  She would sleep for a little while, not all day, get up, go around and do her errands and things and then go to work.  So she would come out for lunch.

Q    Between that time period when she got her key back and between March 20th when you said you called her apartment and Hector answered the phone, describe for the grand jury what was going on between Hector and Valerie?

A    He again was calling her at least twice a day. She mentioned to me at one point, we were talking on the phone -- this was not on the 20th, this was probably the week before that -- and I heard clicking, and I said to her, we must have a bad connection, and she said, no, that's been happening a lot.  And within a couple of days after that -- I mean, that happened more than once when I was talking with her on the phone.  She called someone at the phone company, somehow found out that -- after she would be on the phone with somebody, the phone would immediately ring and it would be Hector, and she found out from someone at the phone company -- I think she called to report this.  Many times if the operator is checking the line, you will hear clicking, and she was wondering if he was having them check the line to see if she left the phone off the hook because she did leave the phone off the hook,

too.  She felt it was him to see if the phone was off the hook or if she was on the phone with someone.  She knew he was following her.  She found a couple of different ways like to make her way to Cazenovia, although she knew many different ways, moreso than he did, I imagine.

There was a time back in November she and I had gone shopping.  We had gone shopping in Norwich, Emily Lawrence, and she saw a coat she liked, and this is when they were still seeing each other.  She and Hector went back down to Emily Lawrence to get the coat for her birthday.  In February she came home one day from work, and I wouldn't say she realized it within the first two minutes she was there, but she was certain she left the coat on one of the kitchen chairs, and it was gone.  And this was after his birthday must have been in February, and she hadn't given him anything, and he was very offended about that.  And I did ask him about that at a later time, and he had acknowledged about having done that.

Q    I want to move forward to the point of March 20th when you called Valerie's apartment and Hector answers the phone.  You indicated that Valerie came to your apartment in Cazenovia that night and that you went out?

A    Um-hum.

Q    Now, after that particular night, when is the next time you talked to Valerie?  Why don't you describe what

160

happened that next week for the ladies and gentlemen of the grand jury.

A    That was on the 20th.  I am not absolutely certain if it was Monday through Thursday before the 20th or the beginning of the following week she related a time that her father had brought her home -- she had again been spending a lot of time with him, his wife was dying in the hospital, and they were spending a lot of time together.  She went out to dinner with him in his car.  Her car was at the apartment.  As they drove up, Hector walked out of the apartment.  So again she knew he was in there.

There also were times -- one of these would have been before the 20th, where she would come home and find -- she liked to drink Blue Nun wine, was not a beer drinker but would have a bottle of wine in the refrigerator and would come home and find a bottle she knew she had left with a lot in it empty.  That happened on more than one occasion.

Wednesday night of that week, very late Wednesday night, I would say into Thursday morning, the phone rang to me what is the middle of the night.  It was 1:00 or 1:30 or something, and it startled me, immediately thinking someone's hurt, something's wrong.  I got up and answered the phone and I heard Hector's voice.  He was crying, identified himself, and then it was very obvious that he

was very, very intoxicated.  He would be speaking English
and then he would go right into Spanish.  He was in and
out.  I could not make sense of anything he was saying.  So
I hung up on him, and I left the phone off the hook.  That
would have been Wednesday, early Thursday morning.

Thursday morning Valerie and I spoke on the
telephone.  I told her about this.  She was -- she was very
angry, and that wasn't really the way I wanted her to take
it.  I wasn't complaining to her.  But she took it here he
is not just bothering her, but her friends.  She told me he
asked her two weeks before that, but she never told me, if
she thought I would mind if he would come by and visit me
and see the new baby.  She told him, yes, I think she would
mind, don't bother doing that.  She was very irritated,
very irritated.  And that was probably the extent of the
Thursday conversation, Thursday morning.

Q    With regard to Friday, March 20th, 1987, did you
see or speak to Valerie on that day?

A    Yes, I did.  I should mention also that later on
Thursday, my husband and I drove -- we were going to
Syracuse and we drove -- we were sitting at the light at
Lyndon Corners where Peter Harris Clothing is, and he
passed us heading east.

Q    When you say he --

A    Hector passed us heading east.  We were at the

light and I saw him coming as if heading back to Cazenovia.
That would have probably been 5:30 in the evening. And I
commented to Brian, there he is again, what you want to bet
I know where he's coming from. So that was that. I didn't
talk to her again Thursday.

The next day, Valerie and -- Valerie and I on
Thursday morning made plans for Friday. She was -- she was
going out of town. She was going to come over on Friday.

Q    When you say going out of town, do you know where
she was going?

A    She was going to visit a college friend. Her
maiden name is Laura Welden, Laura Welden Adams, north of
Albany, Glens Falls, New York. Was looking very, very
forward to it. He knew nothing about it. I wasn't about
to tell him, and she was very excited about this trip.

Q    Did you see or talk to her on Friday, March 20th?

A    Yes.

Q    When was that?

A    She called -- it was before dinner because she
knew that we were expecting her for dinner and stated she'd
had a very busy day. She sounded very tired. She was
upset. She had gone to get her car fixed. She bought her
car at a car dealer out in Oneida, and -- Nye Ford, Nye
Ford. She was going to have something done to her car.
Hector had followed her. She also was going to pick up

some plane tickets for a trip that she was planning that he did not know about, that she was taking to the Bahamas. She was tired and her father called and wanted to see her. She knew that Pat, his wife, was not doing well, and she also was extremely -- I guess excited is the word, not excited in a good way. She related to me that that Thursday, the day before, she had come home from work --

Q    This is during the phone conversation?

A    During this phone conversation.

Q    When you say excited, what do you mean?  Was she upset?

A    She was upset.  And it took a lot to get her going.  I mean, she would put up with a lot before, but when she got mad, she got mad.  She was not crying, but she was irritated and excited, anxious, and told me that you will not believe Hector's latest trick.  This is after -- it got to the point I was asking her on a daily basis, what did he do today, so she related the bit about following her to Nye Ford.  And she said you wouldn't believe what he did yesterday.  And I had spoken with her Thursday.  This is after I knew to call her early before she went to bed.  She had gone to bed and the phone rang, it was Hector.  He was talking about wanting to see her.  She said no, and she hung up the phone.  He called back again.  She told him, you know, I just got home from work, I'm tired, I'm trying

to go to sleep, don't call me.  Hung up the phone again.
It rang again, so while it was ringing, she unplugged it,
so to the person on the other end it continues to ring, and
she let it go for a good ten minutes, and plugged the phone
back in and it's still ringing, and she picked it up and
she heard traffic.  It was obvious it was a pay phone that
was off the hook because she could hear traffic going by.
Within five minutes he appeared at her door.  This is -- to
the best of my knowledge, this is the first time that she
really showed him that she was mad, she was upset.  She
yelled at him, which I don't believe that she had done
before.  She screamed at him she said about having called
us in the middle of night.  She let him know she knew he
had been following her, that -- just everything that he had
been doing she was recanting.  She was sick and tired of
coming home and he had been in her apartment, he had taken
things on more than one occasion, and she slammed the door
in his face, which she had never done before.  There was
times before I know in the middle of night if he'd come
knocking at the door, instead of being concerned for her
own safety, she was worried that he would wake the people
upstairs up.  And there were times if she let him in and
let him talk for ten minutes, he would go away.  But this
time she didn't let him in.  She really let him have it.
So in relating this story to me, she was extremely upset,

ONONDAGA COUNTY GRAND JURY

1    moreso than she had been probably -- one of the -- I would

2    say the most upset I'd ever heard her, or mad, I should say

3    mad.

4        Q    This was Friday between around dinner time between

5    five and six?

6        A    Around dinner time, yes.  She was going to have

7    dinner with her dad instead.

8        Q    Did you see Valerie or talk to her after that

9    time?

10        A    No.

11        Q    What happened on Saturday, March 28th, 1987?

12        A    I was home during the day.  My husband and I had

13    made plans to go out, which I was excited about because

14    this was the second time I would have been going out since

15    the new baby, and we were going out with Bob Lucas and his

16    new wife now, Sue, so we made plans to go uptown in

17    Cazenovia to eat and then going to a party.  Someone named

18    Bob Giordano was having a party in Cazenovia.  I had to get

19    the baby settled with the kids and Bob was always late, so

20    we probably didn't get off until 8 or 8:30.

21        Q    Where did you go?

22        A    We went to Albert's restaurant in Cazenovia.

23        Q    Approximately what time was this?

24        A    I would say that was around 9:00.  It was not

25    early.

166

Q      Okay.

A      I mean, it wasn't late either, but it was not 7:00.

Q      Tell the ladies and gentlemen of the grand jury what happened at Albert's on Saturday, March 28th?

A      We walked in, the four of us.  There's an entrance to the bar side, there's an entrance to the side of the restaurant.  We walked into the bar entrance.  I was the first one in.  I walked in, there were a lot of people there, and it seemed like he almost made a path to me and all of a sudden was in my face.  I didn't laugh, but I was very taken back by the way he was dressed.  He was never -- in all of the times I had seen him, he made a point of dressing very, very well, which didn't really fit -- I'm not saying people in Albert's didn't dress well.  Most of the time you would see people on Friday and Saturday night casually dressed.  He just never went out to socialize in his work clothes.  He was in a pair of jeans, he had on a rugby shirt that Valerie had given him for Christmas.  He was in the rugby shirt with the collar turned up.  The way he was dressed I thought this was strange, and he walked up and he threw his arms around me, and I was, you know, taken back because, as I said, it was almost as if he made a B line, little mama, how are you, can I come see you and the baby, I'm so excited.  I did not say a word to him.  I went

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1  past him.  The four of us are in a line coming in.  He

2  approaches my husband and says congratulations, which my

3  husband didn't say anything.  Then he approached Bob, this

4  was strange.  There were very, very bad feelings.  Bob

5  would have never spoken to him.  He said, Bob, I hear

6  you're building a new house, I'll be happy to do your

7  plumbing.  And at this time the four of us are looking at

8  him, he's off the wall, and we walked right past him.

9      And within the first fifteen, twenty minutes we

10  were there, and there were a lot of people I had not seen

11  in a very long time because I had not been out, someone

12  named Sue, I do not remember her last name, my husband

13  would remember, related to me that Hector had told her --

14  she was asking me about Valerie.  Hector had told her that

15  he called Valerie but she was home sick and wasn't coming

16  out that night.  And I'm thinking he's unbelievable, she's

17  out of town.  And I'm thinking he's telling everybody that

18  they're still seeing each other.  And the girl, Lori

19  Rydell, related the same story to me, he says he's making

20  his way to the phone booth to call Valerie, making a point

21  of having people see him do this.  And I said to her, Lori,

22  Valerie is out of town, she's not home in her apartment

23  sick, she's out of town.  And, you know, we both thought,

24  you know, this is strange.  And it didn't occur to me until

25  that point in time how few people knew they were not seeing

168

each other anymore. According to him, apparently from what these people said, he was always saying these things, you know.

Q     Did you have any further direct conversation with Hector at Albert's?

A     Not at Albert's, no.

Q     How about after any time on that evening, did you have any further direct conversation with -- not what other people told you, but direct conversation with Hector?

A     With him, yes. We went to the party at Bob Giordano's house, the four of us, Bob, Sue, Brian and myself, and I would say we had been there maybe an hour when Hector came in. I believe he was by himself. He again approached me, almost immediately, and was asking me about Valerie, and I said to him, Hector, this is ridiculous. I did not mention she was out of town. I said, why are you saying these things. I was not yelling at him, I was not screaming. It was not a heated conversation. I said why can't you leave her alone, things are very tough for her right now, she's very involved with her father, you know, that Pat is very, very sick, and why can't you just get on with your life, and he would not -- this conversation went on and on and he would not acknowledge that is what I was saying to him. He would respond back to me, oh, you two have been such good

169

friends, you have been such a good friend to her, she really needed you, just things that we were not discussing, you know.

Q    What other things were you saying to him?

A    I was talking to him about saying why are you doing these childish things that you're doing, you know, I know that you took her coat.  In that same sentence I referred to golf clubs.  He gave her golf clubs for Christmas.  He wanted her to start golfing with him, and after they broke up, he had told her she couldn't have those, which she didn't care about.  And the coat, he said she didn't give anything to me for my birthday and I gave it to her for her birthday.

Q    So he acknowledged he did take the coat from her apartment?

A    Absolutely, yes.

Q    What else did you say?

A    I mentioned to him that I did not appreciate his having called us in the middle of the night, that I knew Valerie didn't appreciate it, and I knew what he had done on Thursday.  I said you don't understand that while she's at work she's very, very busy, she's tired, and she has to put up with you pulling the tricks like you do.  And his response was something -- again, he would not acknowledge that they were not seeing each other anymore.  He said, I

170

O N O N D A G A   C O U N T Y   G R A N D   J U R Y

1    wanted to know what she was doing and needed to see her.

2    And I would go on with -- I said to him -- he was talking

3    about how much he loved her, not I love her so much, but I

4    loved her so much.  I said, I really find this hard to

5    believe when I know, because I had heard directly from

6    other people, that he had been trying to date while he was

7    seeing Valerie.  Valerie knew this.  And I said, you look

8    me in the eye and you tell me that you haven't been

9    attempting to see numerous other women.  How can you tell

10   me that she means so much to you when you're out doing

11   this.  And he looked me in the eye, and I probably never

12   felt -- again, I'm easily scared, so unnerved.  He looked

13   at me with cold dark eyes and said, oh, no, I would never

14   do that, I love -- and then went back into the I love

15   Valerie so much or I loved her because of this.  And he had

16   me very, very upset, enough so that a friend of mine,

17   Denise Robella, approached us and was very helpful in

18   getting me out of that conversation.  She said to me, are

19   you all right, out of his earshot, and she and I started a

20   conversation, and he walked away.  And she said, you looked

21   very scared talking to him.

22        Q    With regard to his specific language and referring

23   to you and Valerie, would you please tell the ladies and

24   gentlemen of the grand jury how he was doing that?

25        A    Everything -- and I'm not going to say within that

171

first five minutes it occurred to me, but when I replayed that conversation, everything he said to me was in past tense, everything.

Q    Describe what you mean?

A    Not you are such good friends and she needs you so much, but you two had such a nice friendship, you were such a good friend to her.  And his bit, I loved her so much.  Again, I'm not saying within the first five minutes that came to me.  As I laid in bed that night recalling that conversation, the whole thing was very, very bizarre and very, very unsettling.  And I said the next day, I spoke with a good friend of my mine, Colleen, she had an idea, she didn't know Val that well, but she knew Val.  I said, I did not have a true reading, and I said I did not know what she was up against.  When she comes back she is moving in with us.  I was so upset about the conversation I was expecting to do something.

Q    Did you ever speak again to Hector Rivas after that conversation?

A    On Monday, the 30th, I was home with the kids, it was early in the day, and Val's sister-in-law called me to ask me if I knew where Val was and that, of course, she had not shown up for work, which was not like her at all.  Very, very responsible person, never late, never called in sick.  Her father, who was with Pat at the time, went down

ONONDAGA COUNTY GRAND JURY

to see her and they told him that she had never shown up, so they were calling to see if I knew. They knew she was going to Laura Adams. She called me back within an hour and a half, told me that David, her husband, and father had gone to Valerie's apartment and found her there, so then obviously we knew what happened.

Tuesday morning I was home with my children, the phone rang, and I picked it up, and it was Hector, and I was thinking why are they letting him call me. He said, hi, this is Hector, how are you doing. I said I can't believe this, why are you calling me, don't call me again. And I hung up on him. I called the police and I said why are you letting him call me, and they said he was not there. They let him go home. And that was the last time I have talked to him. I saw him many, many times but never talked to him.

MR. SUDDABY: Thank you. Does the grand jury have any questions?

THE SECRETARY: Regarding Val's personality, one of the witnesses made reference she's like footloose and does things on a wing and a prayer kind of deal. You had knowledge she was going to Glens Falls. This Laura Adams, did she know she was coming?

BY MR. SUDDABY:

173

O N O N D A G A

C O U N T Y

G R A N D

J U R Y

1    Q    First of all, did you know Laura Adams?

2    A    Only through Val. She had come to visit when we

3    lived together.

4    Q    So you had met her?

5    A    Right, did not know her phone number.

6    Q    What did you know personally about this trip to

7    Glens Falls?

8    A    She had planned it, it was not just a day before.

9    She was excited about that trip, getting away. She had

10   gotten that weekend off to go, and it was -- these were

11   definite plans, so much so that she was going shopping at a

12   store in Albany she and I had been to before, and I had

13   given her a list of things I wanted.

14            THE SECRETARY:  But this girl in Glens Falls

15       knew she was coming as well?

16            THE WITNESS:  She did.

17            THE SECRETARY:  Was there any mention made of

18       this girl not calling to see where Val was or --

19            MR. SUDDABY:  I don't know that this witness

20       would have any knowledge of that. We're going

21       into things that she doesn't know about, things

22       that she couldn't testify to.

23            Anybody else have any questions?

24            JUROR:  What was this man like in his worst

25       moments?

174

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1          THE WITNESS:  That I witnessed?

2          JUROR:  Yeah, or that you heard Valerie say.

3    Could he be an angry person at times?

4          MR. SUDDABY:  We got to stick with what this

5    witness observed.  I guess you're --

6          JUROR:  Because she knows more about his

7    personality than everyone we probably will ever

8    talk to.

9    BY MR. SUDDABY:

10        Q    With regard to your observations of Hector's

11   personality and mood swings, during the time that you knew

12   him was over what period of time?

13        A    May of '86 until March -- when this happened,

14   March of '87.

15        Q    Would you please describe to the best of your

16   ability what you observed about Hector Rivas' personality?

17        A    He would jump from one mood to another.  Like I

18   say, when we go out together, he was very showy and talking

19   up -- before the time he mentioned the fact that his father

20   just had twins with somebody, he forgot apparently two

21   weeks before that he told us about what a wonderful

22   marriage his mother and father had.  Very childish.  When

23   he called me on the phone and spoke to me on the phone, he

24   would not speak in grown up terms.  I observed him being

25   very much a show-off, and then at other times very, very

childish.

Q     Those are your opinions, but what specific
incidents or things that you observed without -- you know,
give us a basis for what you're telling us.

A     Can I go back to even before Valerie knew him?

Q     Sure.

A     The first time I ever saw him would have been in
the early spring of 1985.  We were again living in this
apartment in the back of this house downstairs.  Somebody
was knocking at the door, and again it was the middle of
the night.  I got up and I turned on the porch light and it
was very dark in the back of the house.  I turned on the
porch light on, and there was this man standing in the
pouring rain.  And I opened just one of the doors, there
was a screen door and regular door.  And this man smelled
like the inside of a whiskey bottle.  He was out in the
pouring rain, but he was obviously very, very drunk, and he
asked me where Deanne lived, who was a girl that lived
upstairs, and I very stupidly said, she's not here, she's
up around the back.  I thought, why am I telling this
person this.  But I was half asleep.  That was Hector.  He
went up the stairs.  I heard him pounding on the door.  The
back stairs went up alongside the bedroom.  I was pregnant
at the time and wasn't sleeping very well.  So I heard him
go up, heard him knocking at the door.  Drifted off to

sleep. But when somebody would go out the door, it would slam. At 6:00 in the morning, I heard the door slam. And I said to the girl that lived there, if you're going to have someone over at that time of night, I'd appreciate it if you let them know where you live. She said I didn't want him here. He was my girlfriend's boyfriend.

That was my first impression of him. I saw him extremely intoxicated, very incoherent, and he, as it turns out, was sitting on the stairs for four and a half hours. I related the story to Valerie later on, and he knew I related the story to her, and he had a very good excuse for doing that. He came across as being very charming and very, again, as I say, very flashy, very showy, and the next time I saw him, he could directly contradict himself, obviously had trouble with the truth, and would at times --

JUROR: Were there certain things that made him angry?

MR. SUDDABY: Again, that you observed, not your opinion, but things that you observed.

JUROR: Something that Valerie might have told you.

THE WITNESS: I can't.

JUROR: I see the resentment, more than towards Valerie but resentment possibly in his marriage that failed and more importantly the

177

resentment towards his father, and that's why he

couldn't deal with the rejection.

MR. SUDDABY:  We can't have this witness

speculate things that were going on his in head.

The only things she can testify about are things

she observed.

Anybody else have any questions?

JUROR:  Did Valerie ever indicate that she

was fearful of him or for her safety?

THE WITNESS:  No.  She -- it was obvious to

me that she was becoming that way, but again, you

have to understand that nothing unnerved her,

nothing -- you know, she knew I was worried, and

she would worry about taking care of how worried I

was.  But she was mad, she was definitely mad.

She had had enough, and she definitely, you know,

conveyed that to me.

BY MR. SUDDABY:

Q   When did she convey that to you?

A   That phone call on the 20th.

Q   March 20th, 1987, that's the phone call you

described where she was so excited and upset?

A   Yeah.  Before that we discussed about calling the

police.  She may have been worried enough that she thought

about doing that but didn't feel they would do anything

about it.

JUROR:  Counselor, would the witness have any directed knowledge about possible financial aid that Valerie ever gave to Mr. -- whatever his last name is?

BY MR. SUDDABY:

Q    Do you have firsthand knowledge about any sort of money or funds that were given by Valerie to Hector Rivas?

A    She was a very, very frugal person, very good with her money, and always saved a great deal of money.  And I know like the Christmas trip to Tennessee, she had paid for him and he was supposedly going to pay her back, never had done so, that bothered her.  She was -- those first trips that they took that I told you about, he had paid for all of that.  But she at one point mentioned, but this would have been even before the 22nd, that she had to lend him some money, never went into it, but that would -- she would not have been too happy about doing that.  Because all the time I knew anybody, I never saw anybody save money like that at that age.  I was terrible and she was good.  Other than that, she would not have been too willing to admit that, no.  That was kind of a source of pride to her that she had been so responsible.

JUROR:  Does she have any knowledge about how Valerie's family felt about Hector?

O N O N D A G A

C O U N T Y

G R A N D

J U R Y

1       MR. SUDDABY:  I think we better avoid that.

2  We're asking her to interpret somebody else's

3  feelings with regard to another witness, and you

4  should really hear that testimony from them.

5       JUROR:  I remember some of the other

6  testimony about clothing.  I'd like to know the

7  clothing he happened to have on when he met you in

8  Cazenovia?

9       THE WITNESS:  In Albert's?

10      JUROR:  Yeah.

11      THE WITNESS:  He would always make a point of

12  being extremely well dressed, and I don't know if

13  you're familiar with Cazenovia and Albert's, but

14  you didn't walk in there in a suit and tie or even

15  black shoes.  It was -- you know, that was just

16  where you went, it was a very casual place.  I had

17  always seen him -- when we saw him socializing, he

18  was dressed to the T.  That evening it hit me

19  immediately, and it was a Saturday so he hadn't

20  been working, why was he dressed the way that he

21  was.

22  BY MR. SUDDABY:

23      Q   And how was that?

24      A   In a pair of jeans, a pair of sneakers and the

25  shirt that I had told you she had given to him for

180

Christmas, more or less she wanted him to wear, but he wasn't too excited about it. A rugby shirt was not his style and there he was sitting with his collar up, looking like anybody else in Albert's.

           THE SECRETARY: She mentioned on that Friday evening that she had passed Hector at Lyndon Corners --

           THE WITNESS: Thursday.

BY MR. SUDDABY:

    Q   Just to clear it up. Would you please tell us the date and time that you and your husband, I believe you testified, were coming into Syracuse and you passed Hector?

    A   That would have been Thursday, March 26th. Brian didn't get home until about 4:30. We had to get a baby sitter. So it would have been between 5:30 and 6.

    Q   Where was it?

    A   Lyndon Corners, that's Dewitt. I'm not sure.

           MR. SUDDABY: Any other questions? Okay, Liz, thank you very much.

           (Proceedings were adjourned)

GRAND JURY PROCEEDINGS, NOVEMBER 16, 1992

WILLIAM DONOHUE, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

Q    Good afternoon, Officer.  Tell us your full name
and what you do for a living.

A    William Gregory Donohue.  I'm a police officer for
the City of Syracuse.

Q    How long have you been a Syracuse Police Officer?

A    Nineteen years.

Q    What is your current assignment?

A    I'm assigned to the identification section.

Q    What do you do there?

A    My basic duty is to compare fingerprints.

Q    How long have you been doing that?

A    For almost ten years.

Q    And have you been trained in that particular
expertise?

A    I have.

Q    Have you testified in court before?

A    I have.

Q    Has your testimony been accepted as expert
testimony by courts and juries in this county?

A    It has.

O
N
O
N
D
A
G
A

C
O
U
N
T
Y

G
R
A
N
D

J
U
R
Y

1    Q    I'd like to ask you, sir, if you were so employed

2 back in March and April of 1987?

3    A    I was.

4    Q    Were you asked to make some comparisons of unknown

5 fingerprint samples that were recovered from the Valerie

6 Hill homicide scene?

7    A    I was.

8    Q    And whose fingerprints were you asked to compare

9 these unknown prints to?

10    A    There was a number of names, first the victim,

11 Valerie Hill.  Hector Riveras (ph).

12    Q    Rivas, R-I-V-A-S?

13    A    Rivas.  May I refer to my notes?

14    Q    You may.

15    A    The parent of the victim, Randall Hill, the

16 brother of the victim, David, Donald Stonecypher, David

17 Stonecypher, and a John Cassano.

18    Q    Now, were you asked to examine a bottle of Bacardi

19 rum recovered from the kitchen area of Valerie Hill's

20 apartment?

21    A    I was.

22    Q    Did you find any identifiable prints on that

23 bottle?

24    A    Yes, I did.

25    Q    Whose prints were those?

183

A    They were the victim's.

Q    Valerie Hill's?

A    Valerie Hill's.

Q    Did you find any other prints that you were not able to identify?

A    On the bottle?

Q    On the bottle of Bacardi rum.

A    No, I didn't.

Q    Did you also identify some recovered prints from a bottle of Blue Nun wine taken from the refrigerator of Valerie Hill's apartment?

A    I did.

Q    Were you able to identify those prints?

A    Yes.

Q    Who did they belong to?

A    They belonged to Hector Riveras -- Rivas.

Q    Any other identifiable prints on that bottle?

A    No, they were just Hector's.

Q    Did you also examine an ashtray or some prints recovered from an ashtray recovered from the kitchen table of Miss Hill's apartment?

A    I did.

Q    You did not recover these prints; isn't that correct?

A    That's correct.

184

Q    And were you able to identify any of the prints recovered from this ashtray?

A    I did.

Q    And whose prints were those?

A    They were Hector Rivas' also.

Q    How many prints were there on this particular ashtray that you could identify?

A    There were two prints.

Q    Did they belong to Mr. Rivas?

A    They were both Hector Rivas'.

            MR. FITZPATRICK:  Any questions?

            JUROR:  I think it was mentioned before, how much wine was in the bottle?

            THE WITNESS:  I received a photograph of the bottle of wine.  I don't receive the actual bottle itself.  The crime lab processes the bottle and forwards me the photos of the latents.

            MR. FITZPATRICK:  I'll answer that question for you as we go on.  Thank you very much, Bill.

            (Whereupon the witness was excused)

185

MR. FITZPATRICK:  This is Randall Hill, the father of Valerie Hill.  He's previously testified.  So there's no question about it, why don't we place him under oath again.

RANDALL HILL, recalled as a witness, having been duly sworn, testified as follows:

EXAMINATION BY MR. FITZPATRICK:

Q    Mr. Hill, good afternoon, and thanks for returning here.

A    Yes, sir.

Q    You recall during the course of your previous testimony you mentioned to the grand jury the fact that you and your daughter on the evening of March the 27th, 1987, a Friday, had met for dinner at Candy's restaurant?

A    Yes, sir.

Q    And would you tell us, did you have a conversation with your daughter immediately upon her arrival at Candy's restaurant?

A    Valerie was a half hour late -- excuse me.  We had set up a time, and she was a half hour late.  She got there, she was excited and nervous, agitated.  And she explained to me that when she had come home from running her errands that Hector was parked across the street, and

186

when she drove out, he followed her and she drove through the back streets of Eastwood trying to lose him so he didn't follow her to the restaurant.

Q   Did you ever see him at the restaurant?

A   No, sir, I did not.

Q   And this was --

A   It's my understanding that she lost him.

MR. FITZPATRICK:  Okay.  Any questions for Mr. Hill about that point?  Okay, thank you, Randall.

(Whereupon the witness was excused)

187

ONONDAGA

COUNTY

GRAND

JURY

1   MR. FITZPATRICK:  I want to explain to you,

2   ladies and gentlemen of the grand jury, that this

3   is technically hearsay in that it is something

4   that someone said to someone else, but as in many

5   instances there is an exception, and I as your

6   legal advisor will tell you one exception is

7   called an excited utterance.  It explains an event

8   that took place, namely her being late.  It also

9   explains why she was excited, and you may consider

10  it or reject it as you would any other piece of

11  evidence in this particular proceeding.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

188

O N O N D A G A

C O U N T Y

G R A N D

J U R Y

<u>JAMES CRIMI</u>, called as a witness,

having been duly sworn, testified as follows:


EXAMINATION BY MR. FITZPATRICK:

Q    Good afternoon, sir.  Tell the grand jury your full name and where you live.

A    My full name is James Crimi.  I live in the Village of Eastwood in Syracuse, New York.

Q    How old are you, sir?

A    Twenty-eight years old.

Q    Married or single?

A    Single.

Q    Are you working now?

A    Yes, I am.

Q    Where do you work?

A    I work for Empire Vision Centers.

Q    And that's located --

A    Fairmount, New York.

Q    All right.  And do you know a Susan Stonecypher?

A    Yes, I do.

Q    And her family?

A    Very well.

Q    How do you know Miss Stonecypher?

A    I developed a six-year relationship with her as a boyfriend.

O    1    Q    When did you start going out with her?

N    2    A    Teen-age years, sixteen, seventeen.

O    3    Q    And when did you stop going out with her?

N    4    A    At the age of about twenty-six.

D    5    Q    So a couple years ago?

A    6    A    Twenty-five, twenty-six, yes.

G    7    Q    Did you know her when she lived at 250 Hickok

A    8    Avenue in the City of Syracuse?

     9    A    Yes, I did.

C    10    Q    And had you visited her at that address?

O    11    A    Of course, several times.

U    12    Q    Did you know the woman that lived downstairs,

N    13    Valerie Hill?

T    14    A    Yes, I did.

Y    15    Q    And how did you know her?

     16    A    Well, being a downstairs neighbor, I knew of her

G    17    just as a neighbor, as a friend.

R    18    Q    Would you do anything or say anything more than hi

A    19    to her?

N    20    A    Not really, just friends, pass her in the hallway.

D    21    Q    You never saw her outside of your relationship

     22    with Susan?

J    23    A    Correct, never did.

U    24    Q    Were you aware of an individual by the name of

R    25    Hector Rivas?

Y

190

A    Yes, I was.

Q    How did you know Mr. Rivas?

A    I knew of him because, of course, he was her boyfriend, and I knew of him because I used to work in Cazenovia where he was originally from.

Q    So you knew him independently of Valerie Hill?

A    Correct.

Q    And you also knew him as an acquaintance of Valerie's Hill's?

A    Correct.

Q    You wouldn't have any problem identifying him?

A    Absolutely not.

Q    I want to take you back to March 27th, a Friday, and ask if you recall that day?

A    Yes, I do.

Q    Do you also recall Monday, March the 30th, 1987, when the body of Valerie Hill was found?

A    Yes, I do.

Q    And did that cause some excitement in your own life, that particular event?

A    Absolutely.

Q    And do you recall when you found out about it and what you did as a result of finding out about it?

A    Well, I found out about Valerie Hill's murder when I was at work.  I heard it over the radio.  I immediately

191

left work because they said it happened in Eastwood on
Hickok Ave.  So I immediately left work and went to Susan's
house.

    Q    Okay.  Now, I want to take you back to that
Friday, the 27th of March '87, and ask do you recall if you
worked that day?

    A    Yes, I did.

    Q    And where were you working back then?

    A    At the time I was working for a company called
O.M. Edwards in Syracuse.

    Q    Did you see Susan Stonecypher that evening?

    A    Yes, I did.

    Q    Where did you see her?

    A    I picked her up at work as a regular kind of --

    Q    What was her work place?

    A    She worked for Nikki's restaurant in downtown.

    Q    And she worked that Friday, did she?

    A    Yes, she did.

    Q    Was it your normal routine to pick her up after
work?

    A    Pretty much so, yes, sir.

    Q    Did she not have a vehicle?

    A    She did not -- at that day I picked her up she did
not have a vehicle.

    Q    Do you recall what time you picked her up from

192

work?

A    I picked her up late in the evening, returning back to Hickok Ave. somewhere around 11, 12:00, late.

Q    It was late at night?

A    Yes, it was.

Q    And when you got back to Hickok Ave., what, if anything, did you observe?

A    Well, when we got back to Hickok Ave., I pulled my car up in front of her house, and we both noticed another vehicle parked across the street, which would have been in front of her house, actually one house over. A vehicle sitting there with the parking lights on, and that was Hector's vehicle with Hector sitting in the vehicle.

Q    What was he doing, were you able to see?

A    Yes. He was just sitting there smoking a cigarette, had his parking lights on, and was just kind of hanging -- hanging out, so to speak.

Q    Did you have any conversation with him?

A    No. We just noticed and I, you know, said good night and told her to get in the house, so she went in the front door.

Q    Did you stay any longer than that?

A    No, just, of course, until she was in the house.

Q    And then you drove away?

A    Then I drove away.

ONONDAGA COUNTY GRAND JURY

1  MR. FITZPATRICK: Any questions for Jim?

2  JUROR: What time did he say this was?

3  BY MR. FITZPATRICK:

4  Q  Jim, would it be fair to say you have difficulty

5  pinpointing the exact time?

6  A  I'm not -- it was late in the evening.  He had his

7  parking lights on and it was dark.  Although when I did

8  pull up, his vehicle was facing mine, so as I pulled up,

9  there was no doubt that it was him with his personalized

10  license plate on his vehicle, which I had seen several

11  times before.

12  Q  And your best estimation of time is somewhere

13  around 11:00, is what you said earlier?

14  A  Yeah, eleven, maybe twelve.

15  JUROR: What time did you pick her up from

16  work?

17  THE WITNESS: I picked Susan up from work in

18  the evening time.

19  JUROR: You again don't know what time?

20  THE WITNESS: No, late evening.

21  JUROR: Could you identify the vehicle?

22  BY MR. FITZPATRICK:

23  Q  Do you remember what kind of car it was?

24  A  Oh, yeah, it was a Riviera, gray, maybe tan,

25  personalized license plates, said RIVAS 1 or whatever.

194

Q    His name?

A    Oh, yeah.  I seen the vehicle several times when I worked in Cazenovia.

THE SECRETARY:  When he picked her up from work, did he take her directly to Hickok Ave. or did you stop somewhere in between?

THE WITNESS:  I'm not real clear on that.  It was a Friday evening.  I think we kind of cruised around a little.

MR. FITZPATRICK:  Okay, Jimmy, thank you very much.  Come on out here.

(Whereupon the witness was excused)

195

O  1              SUSAN STONECYPHER, called as a

N  2    witness, having been duly sworn, testified as follows:

O  3

N  4    EXAMINATION BY MR. FITZPATRICK:

D  5         Q    Ma'am, good afternoon.  Tell us your full name and

A  6    where you live.

G  7         A    Susan Marie Stonecypher.  I live at ████████████

A  8    Ave.

   9         Q    How old are you?

C  10        A    Twenty-six.

O  11        Q    Married or single?

U  12        A    Single.

N  13        Q    Are you working right now?

T  14        A    Not at the moment.

Y  15        Q    Anybody live there with you?

   16        A    My fiancee.

G  17        Q    Back in 1987, March and April of '87, where did

R  18    you live back then?

A  19        A    ████████████████

N  20        Q    And who lived there with you?

D  21        A    My whole family.  My mother, my father, one of my

   22    brothers, and a sister.

J  23        Q    Were you working back then?

U  24        A    Yes, I was.

R  25        Q    Where were you working?

Y

196

A    Nikki's Downtown.

Q    And what hours did you work at Nikki's, what days of the week, what hours did you work?

A    I basically did lunches and then a couple parties at night, always on a Friday night, happy hour, Party in the Plaza, Wednesday night happy hour.

Q    When you say happy hour, was that strictly on a Friday or was that everyday?

A    No.  Fridays happy hour.  When Party in the Plaza was going on Wednesday night I would do that.  Only during Party in the Plaza hours.

Q    Was there a set time that you would leave work on a Friday?

A    It varied, whenever the people left.  I would get there at 4:30, started cocktailing.  I could sometimes leave at 8:00, sometimes 9:00, but no later than 10, whenever they started weeding out.

Q    Were you dating someone back in March of 1987?

A    Yes, I was.

Q    Who was that?

A    Jim Crimi.

Q    And he was the gentleman that just left here, if you happened to see him?

A    Yes.

Q    Do you recall March 30th, 1987, a Monday, the day

197

ONONDAGA COUNTY GRAND JURY

1    Valerie Hill's body was discovered?

2        A    Yes.

3        Q    Did that cause some excitement in your house?

4        A    Yes.

5        Q    Where did she live in relation to you and your

6    family?

7        A    Right below us.

8        Q    Did you know her?

9        A    I talked to her a few times.  Run into her, you

10   know, how you doing, stuff like that.

11       Q    Do you know if she was dating anyone herself?

12       A    Yes.

13       Q    Who was that?

14       A    His name was Hector.

15       Q    Did you ever meet Hector?

16       A    A few times.

17       Q    Did you know his last name to be Rivas?

18       A    I've never known his last name.

19       Q    You knew him as Hector, that's how you know him

20   today?

21       A    Right.

22       Q    Did you ever see Hector at her apartment?

23       A    Many occasions.

24       Q    Okay.  Do you recall any of those where anything

25   unusual happened?

198

A     There was one incident where he was banging on her door to get in.

Q     Do you remember when that was in relation to when she was killed?

A     It was probably like within a month because everything all happened within a month when she was found.

Q     So sometime say late February to late March of '87 is when this incident happened?

A     When he was banging on her door?

Q     Yeah.

A     Yeah.

Q     Describe what did you see, what did you hear?

A     I was upstairs and I heard banging on the door, and naturally, I mean, you know, you see what's gone on.  I open up our back door, which was upstairs, and then you knew someone was banging on her door, and he said let me in.  She wouldn't let him in.  So he went back out the back door.  You heard the back door slam.  He went around the house to her bedroom window, and my bedroom was right above it.  He was saying, let me in.

Q     How did you know this was him?

A     I know his voice.

Q     You heard his voice?

A     I heard his voice.  He was he screaming, let me in, and she wouldn't let him in.  He was there a good five,

ten minutes.  And you heard him go around the corner and you heard her downstairs door slam.  So she let him in.

Q    Did you hear any conversation?

A    No.

Q    Were you able to hear any conversation?

A    No.

Q    Were you able to hear any conversation when you were upstairs on any occasions?

A    Not when I was upstairs, no.  There was one incident when I was out hanging out clothes in the back yard, and he was kneeling down to her when she was sunbathing outside reading a book, and they were talking. I didn't really quite understand what they were saying, but whatever was said, he got mad and he took off in his car and sped off in the driveway.

Q    Now, you know that you gave an affidavit back in March of 1987?

A    (Nods head).

Q    You have to say yes or no.

A    Yes, I did.

Q    And you know it would be logical to assume that you would remember events much better back then than you would five years later?

A    Right.

Q    In the affidavit, Susan, you and I talked about

O N O N D A G A

C O U N T Y

G R A N D

J U R Y

1    it, you indicated that on Thursday night, the 26th of

2    March, your boyfriend, who would be Jim Crimi, dropped you

3    off from work at about 9:00.

4        A    I did say that, but it wasn't Thursday night, it

5    was Friday night, because I never worked Thursday night.

6        Q    You've had time to think about it since then?

7        A    Yes.

8        Q    And there was another incident you described with

9    seeing Valerie Hill; isn't that right?

10       A    Right.

11       Q    And you corrected yourself back then?

12       A    It was on a Friday.

13       Q    And where was that that you saw her on Friday?

14       A    I seen her as I was going downstairs -- because I

15   had to wear a tuxedo everyday to work, and I would go

16   downstairs, I wash my shirts or whatever, like every other

17   night or every night.  It depended on how trashed they got,

18   and I got them in the basement.  So I usually always see

19   her in the morning getting my uniform out of the dryer and

20   going back up the stairs.

21       Q    Has anybody from my office or any police officers

22   attempted to make you change your recollection from one day

23   to another?

24       A    No.

25       Q    I want to go back then to that Friday, March the

ONONDAGA COUNTY GRAND JURY

1  27th of '87, and ask if you saw -- the person you refer to

2  as Hector, if you saw him that day?

3      A    That day, no.

4      Q    Or how about that night?

5      A    That night I did.

6      Q    Tell the grand jury about that.

7      A    Okay, I was getting out of work.  It was on a

8  Friday night because a lot of times I brought different

9  clothes with me to wear if we ever went out, especially on

10  a Friday, my boyfriend and I.  And he dropped me off, it

11  had to be anywhere between eleven and one, I know it was

12  late.  As we were pulling up, I seen Hector sitting in his

13  car, I mean, we looked face to face to each other.

14      Q    You and Hector?

15      A    Hector and I.  He had his window cracked down,

16  just smoking, relaxing, in his chair like lounged and I

17  looked at my boyfriend at the time and said now that's

18  strange, why is he sitting there.  Our next door neighbor's

19  house, he was parked out there and having a cigarette.  I

20  could see him pulling in the driveway --

21      Q    Don't get too speculative.

22      A    Yeah.  It was --

23      Q    That's what you said to Jim?

24      A    Yeah.  It was weird.

25      Q    From the position he was parked could you see

202

ONONDAGA COUNTY GRAND JURY

1    Valerie Hill's apartment?

2        A    He could see the whole side of the house.

3        Q    Her side, the driveway is on one --

4        A    And the whole side of her flat, the front and

5    back.

6        Q    When you made eye contact, did you speak to him?

7        A    No.

8        Q    Did he speak to you?

9        A    No.

10       Q    Did you notice anything about the car?

11       A    It was like a blueish gray.  I know nothing about

12   cars.

13       Q    Was the engine running?

14       A    No.

15       Q    Were the lights on?

16       A    He had his parking lights on.

17       Q    And that's it?

18       A    That's it.

19       Q    What did you do after you made this comment to

20   Jim?

21       A    I made him sit right there until I got in the

22   house.  He parked his car in front of my house and I flew

23   up the stairs.

24       Q    Later that evening did you hear anything unusual?

25       A    No.  As a matter of fact, I was hoping that

203

someone was home, but when I got in, there was no lights on, nobody up, no nothing. And when I got up there, I looked out the window and he was still sitting there.

Q    And you went to bed?

A    I went to bed.

Q    Did you see Valerie Hill that whole weekend?

A    No.

Q    Were you home that Saturday and Sunday?

A    In and out, yes.

Q    And you never saw her?

A    No.

Q    When you got home when your boyfriend dropped you off, do you remember if you saw Valerie Hill's car in the driveway or not?

A    I don't remember if I did or not. It could have been there, it could not have been there. I don't remember at all.

        MR. FITZPATRICK: All right, Susan, thanks very much. Anybody have any questions? Susan, come on out with me. Thank you.

        (Whereupon the witness was excused)

204

(Grand Jury Exhibits Numbers 22 through 30 were marked)

GARY PRATT, called as a witness,

having been duly sworn, testified as follows:

EXAMINATION BY MR. FITZPATRICK:

Q    Sir, good afternoon.  Would you tell us your full name, please.

A    Gary Pratt, P-R-A-T-T.

Q    What do you do for a living, sir?

A    For the past fifteen years I've been employed by the City of Syracuse at the police department.

Q    What is your current assignment there?

A    For the past eight years I've been assigned to the crime laboratory.

Q    And your area of expertise as we sit here today is what?

A    My area of expertise for the last eight years is firearms examination.

Q    How were you employed back in March and April of 1987?

A    I was assigned to the crime laboratory.

Q    Were you the ballistics expert back then?

A    I was.

Q    Did you become involved in investigating the death of Valerie Hill?

A    I was.

Q    Even though there was no firearm used in the particular case?

A    Yes.  I also get involved in the photography, collecting of evidence, sketching or any other facet that the lab may become involved in.  But my expertise is firearms.

Q    I'm going to show you a series of photographs, I'll start with Exhibit 22, can you describe that for the ladies and gentlemen of the grand jury?

A    Yes.  Exhibit 22 portrays a refrigerator with the door open, and there's various items inside the refrigerator on the different shelves.

Q    And that was taken at the apartment of Valerie Hill?

A    Yes, on the 30th of March.

Q    Does there appear to be a Blue Nun bottle of wine shown in the photo?

A    Yes.  On the top shelf on the left-hand side there is a bottle of Blue Nun wine.  Its cork has been replaced.

Q    Is there any way to tell how much wine is left in the bottle?

A    From the photograph it appears it's probably -- two-thirds of it's been removed, the liquid's been removed.

Q    I'm going to show you Exhibit 23 and ask if you

206

can identify that, directing your attention to the contents of the cupboard?

A    Yes.  This was a cupboard over a ducting van over an oven in the kitchen area.  Both doors of that cupboard area are opened.  Inside is a Bacardi rum bottle and sugar and some crackers.

Q    Okay.  And Exhibit 24, can you identify that, please.

A    Exhibit 24 is a table which was found just off the kitchen area, and on that table is numerous magazines, a Key Bank passbook and some other personal items.

Q    I'm going to show you Exhibit 25, could you tell us what's in there?

A    Exhibit 25 are three notes on yellow paper which I collected on the 30th.

Q    Incidentally, are those notes also shown here on the kitchen table in Exhibit 24?

A    Yes.  They're portrayed on the kitchen table towards the wall.  You can actually see them in the photograph.

Q    I'm going to show you, Investigator, Exhibit 26 and can you tell us what that is?

A    Exhibit 26 is a greeting card and notes that were recovered from the scene on the 30th of March.

Q    And although you didn't recover them, did you see

any records that indicate where these items were recovered from?

A    Yes.  We keep a log of everything we remove from a house, it's an evidence log, and on this log it would tell me exactly where it was recovered.  If I could refresh my memory.

Q    Yes, please do.

A    The greeting card and notes were found in a desk drawer in a spare bedroom at about 7:15 on the night of the 30th of March.

Q    I'll show you Exhibit 27, can you identify that for us, please.

A    Yes.  Exhibit 27 is a note on white paper.  It was recovered at about 1:20 on the 31st.  It has the 31st of March.

Q    1:20 in the morning then?

A    1:20 in the morning.

Q    And where was that recovered from?

A    If I could refresh my memory.

Q    Sure.

A    The white note paper with writing was in the spare bedroom on the floor.

Q    And Exhibit 28, can you identify that for us, please.

A    Yes.  Exhibit 28 is a white note paper with

208

writing on it.  That was recovered on an end table in a
drawer at about 4:40 in the afternoon on the 30th of March.

Q     And Exhibit 29, a yellow piece of paper?

A     Exhibit 29 is a yellow piece of paper.  It was
recovered at about 4:40 in the afternoon on the 30th, and
that was recovered also in that end table.

Q     And lastly, Exhibit 30, it's a flower card or tell
us what that is?

A     Exhibit 30 is a note found in a flower
arrangement.  This was found in a jewelry box at about 5:30
on the 30th of March.

        MR. FITZPATRICK:  Any questions for

    Mr. Pratt?  Okay, Gary, thank you very much.

    (Whereupon the witness was excused)

209

ONONDAGA COUNTY GRAND JURY

1    MR. FITZPATRICK: Ladies and gentlemen, what
2    I'd like you to do is at your leisure go through
3    these notes, if you'd like, and keep in mind this:
4    We do not have any handwriting samples from
5    Mr. Rivas and you haven't had anyone identify this
6    handwriting as his. However, you'll see some of
7    the notes are signed in various ways, some of them
8    are signed Hector and some of them are signed H.R.
9    Then you compare them together and see if they're
10   similar and you can make a determination. They're
11   not offered as to what is said is true, but
12   they're offered to give some background as to what
13   we've been saying as to the type of relationship
14   that existed between Hector Rivas and Valerie
15   Hill. So you can do that at your leisure and
16   we'll break for lunch now.

210

<u>DONALD STONECYPHER</u>, called as a
witness, having been duly sworn, testified as follows:

EXAMINATION BY MR. FITZPATRICK:

    Q    Sir, good afternoon.  Tell the grand your full
name, please.

    A    Donald Stonecypher.

    Q    Where do you live, Donald?

    A    █████████████████

    Q    And that's here in the City of Syracuse?

    A    Syracuse, New York.

    Q    What do you do for a living?

    A    Well, I'm presently laid off.  I got called back
to work.  I work for Crouse-Hinds.

    Q    Married or single?

    A    Married.

    Q    Wife's name?

    A    Karen.

    Q    How long have you been married?

    A    Twenty-nine years.

    Q    Where did you live back in March and April of
1987?

    A    ███████████████

    Q    And what kind of a house is that?

    A    It's a two-family.

ONONDAGA COUNTY GRAND JURY

211

Q   Where did you live, upstairs or downstairs?

A   Lived upstairs.

Q   Did you know your downstairs neighbor, Valerie Hill?

A   Yes, I did.

Q   Did you know her boyfriend, Hector Rivas?

A   Yes, I did.

Q   Now, did you ever see Mr. Rivas in her apartment? I shouldn't say in her apartment.  Did you ever see him go into her apartment?

A   Yes.

Q   Any occasion that stands out in your mind that you can recall, was it a number of times?

A   Yeah.  I would say a number of times, yeah.

Q   Did you ever recall an occasion when he was attempting to gain admittance to her apartment?

A   Only through my daughter.

Q   You don't have any direct knowledge of that?

A   Only through my daughter.  I was at work when this happened when he was banging on the door to try to get in.

Q   Well, disregard that.  It's not something you personally saw or heard?

A   No, I didn't.

Q   Now, I want to take you to -- Don, I want to take you to Friday, March the 27th of 1987 and ask, first of

all, where were you working back then?

A    Crouse-Hinds.

Q    And do you remember if you got off work that day --
do you remember if you worked that day, that Friday?

A    Yes, I did.

Q    And do you remember what time you got home?

A    Yes.  I got out at 3:30.

Q    When you got home did you see anyone at the house?

A    Yes.  I seen Hector parked out in front of the
house.  When I went in the house, he was out there sitting
in the car for at least twenty minutes to a half hour.

Q    What was he doing?

A    Just sitting in the car.

Q    Do you remember what type of vehicle he was in?

A    I'm not quite sure of that.

Q    If your affidavit indicates that it was his red
van, does that refresh your memory?

A    Yes.  He did have a red van.

Q    You saw that and he was just sitting in it
sometime around 3:30?

A    Yep.  I would say, yep.

Q    Did you have any conversation with him?

A    No.

Q    Do you know how long he was there?

A    I would say twenty minutes to a half an hour.

213

O    1  Q Did you see him pull away?

N    2  A No, I didn't.  I was in the house, but I happened

O    3 to look out to see if he was still out there and, you know,

N    4 like I said, twenty minutes to a half hour he was still

D    5 there then.

A    6  Q He was still there?

G    7  A Yeah.

A    8  Q And he was there for at least that period of time?

  9  A Yes.

C    10  Q And you don't know when he left?

O    11  A No.

U    12  Q Did you ever leave the house?

N    13  A No.

T    14  Q Later on that evening did you leave?

Y    15  A Yes, I did.

  16  Q Where did you go?

G    17  A My wife and I went out for dinner.

R    18  Q Do you remember what time that was?

A    19  A I think it was about 8:00 maybe.

N    20  Q And do you remember where you went to dinner?

D    21  A Lyncourt Grille.  I'm pretty sure it was Lyncourt

  22 Grille.

J    23  Q When you left was Mr. Rivas' van still there?

U    24  A I don't recall that, no.

R    25  Q Do you know if your downstairs neighbor was home

Y

ONONDAGA COUNTY GRAND JURY

1  when you left?

2      A    I can't remember that either, no.  If her car was

3  there, I can't remember.

4      Q    If your affidavit indicates that her car was not

5  there, does that refresh your memory?

6      A    Was not there?

7      Q    If that's what your affidavit says.

8      A    If that's what my affidavit says, yeah.

9      Q    You went to dinner.  Did you leave dinner at any

10 time?

11     A    Yes, I did.

12     Q    Where did you go?

13     A    I went to pick my son up at Friendly's Ice Cream

14 Parlor on James Street.

15     Q    What time was that?

16     A    I believe around 9:00.

17     Q    What's your son's name?

18     A    David.

19     Q    Where did you take your son?

20     A    I picked him up, took him home, and then went back

21 to join my wife and other couple for dinner.

22     Q    What time would you have dropped him off if you

23 picked him up?

24     A    Probably twenty after nine.

25     Q    Do you remember now if Valerie Hill's car was in

215

the driveway?

A    No, because I dropped him off in front of the house.

Q    So you don't have any recollection whether it was or it wasn't?

A    No.

Q    Do you know if her lights were on?

A    Yes.  As a matter of fact, I noticed that.  It's not like Valerie to leave her lights on.  All of the lights in the house were on.  I didn't think nothing of it, you know.

Q    I understand.  Then you went back to get your wife?

A    Yeah, join them for dinner, yeah.

Q    And when did you leave the Lyncourt Grille?

A    It had to be probably about 11, around 10:30, 11:00.

Q    That's your best recollection from five years ago, right?

A    Yeah.

Q    And when you got home, do you know if you saw Valerie Hill's car then?

A    Yes.  Her car was in the driveway because we pulled our car right up alongside hers when we got home.

Q    Did you happen to know if her lights were still

216

on?

A    The living room light was on.  No other lights were on.

Q    So it wasn't as bright as it had been before?

A    No, no way.

Q    Did you ever hear her or have any sign that she was at home other than seeing her car in the driveway and a light on in the living room?

A    No, that's it.

Q    How did you get in the house that night, do you remember?

A    We went in the front way.  My wife and I went in the front way.

Q    So you would have walked up the driveway and went on the porch?

A    Yes.

Q    And you walked in the door?

A    Yes.

Q    At any time when you went in did you see Mr. Rivas?

A    No, I did not.

Q    And do you remember about what time -- your best recollection is sometime around 10:30, 11 that you got home?

A    Yeah, I would say approximately around there.

217

ONONDAGA

COUNTY

GRAND

JURY

1    MR. FITZPATRICK:  Any questions for Donald
2  Stonecypher?
3    JUROR:  At 9:00 p.m. when you dropped your
4  son off, did you notice if Hector's car was around
5  at that point?
6    THE WITNESS:  No, I didn't.  Like I said, I
7  just dropped my son off, and I didn't even think
8  about anything else.
9    JUROR:  Did you notice any cars parked in the
10  street?
11    THE WITNESS:  No, I did not.  I did not pay
12  any attention.
13  BY MR. FITZPATRICK:
14    Q   You're not saying there were no cars.  You're just
15  saying you didn't pay any attention to them?
16    A   No, I didn't pay any attention to them.
17    JUROR:  Did you know that she was going away
18    for the weekend?
19  BY MR. FITZPATRICK:
20    Q   Did she ever mention anything to you about
21  watching her apartment for the weekend?
22    A   No.
23    MR. FITZPATRICK:  Okay, Don, thank you very
24    much.
25    (Whereupon the witness was excused)

218

ONONDAGA COUNTY GRAND JURY

1    <u>KAREN STONECYPHER</u>, called as a

2    witness, having been duly sworn, testified as follows:

3

4    EXAMINATION BY MR. FITZPATRICK:

5        Q    Good afternoon, ma'am.  Would you tell the grand

6    jury your full name, please.

7        A    Karen Ann Stonecypher.

8        Q    And where do you live, Mrs. Stonecypher?

9        A    ████████████████████

10       Q    Your husband is Donald who just left here?

11       A    Right.

12       Q    Are you working, ma'am?

13       A    Yes, I am.

14       Q    What do you do?

15       A    I'm a cashier at P&C.

16       Q    And how long have you been doing that?

17       A    Well, about fourteen years.

18       Q    Back in March of 1987 where were you living?

19       A    ████████████████████

20       Q    And did you know your downstairs neighbor, Valerie

21   Hill?

22       A    Yes, I did.

23       Q    Did you know her boyfriend, Hector Rivas?

24       A    Briefly, yes.

25       Q    And how did you know Mr. Rivas, how did you meet

219

him, if you remember?

    A    Just the two of them dating, that's about it. Meetings in the hall back and forth.

    Q    Did you ever have any conversation with him?

    A    No.

    Q    Other than just say hello?

    A    Just hello and that's it.

    Q    Did you ever see him gain admittance to her apartment himself?

    A    Yes.

    Q    How did you see that, tell us about that?  Do you remember when this was, first of all?

    A    Well, he had a key, I guess.

    Q    Well, you say I guess --

    A    Yes.

    Q    You say he had a key?

    A    Right.  Because I seen him going with the key.

    Q    You saw that happen?

    A    Right.

    Q    Do you remember how many occasions you saw that happen?

    A    Maybe about four or five times.

    Q    When you saw -- when you would see him gain entrance to the apartment, do you know if Miss Hill was home or not on those occasions?

A    Sometimes she wasn't but sometimes she was.

Q    Okay.  Did you ever see her or hear her deny him access to the apartment?

A    All I know is what she told me.  I never seen them -- her not let him in or anything.

Q    Okay.  Was there occasion -- an occasion on a Tuesday prior to her death when you heard some knocking on her doors?

A    Yes.

Q    Tell us about that.

A    I would just hear him keep knocking at her back door, and she wouldn't answer the door.

Q    When you say him, you're referring to Hector?

A    Right.

Q    How did you know it was him knocking on the door?

A    Because our back entrance is right at the top and I could tell by his voice and his car.

Q    What car?

A    He had a silver Riviera or something like that.

Q    Did you also know him to drive a red van?

A    Yes.

Q    Karen, do you recall Friday night, March the 27th?

A    Yes.

Q    And do you remember going to dinner that night?

A    Yes.

Q    When you left the house, did you at any time see Mr. Rivas?

A    Earlier --

Q    Did you see him any time that day?

A    Yes, I did.

Q    When did you see him on Friday?

A    Probably early afternoon.  I really have no idea what time it was.

Q    Your best estimation was it was early afternoon?

A    Yeah, right.

Q    Where was he, what was he doing?

A    I just seen him sitting out in the car, that's all.

Q    And was your husband home when you saw this?

A    I can't remember.

Q    Okay.  He was just sitting there?

A    Right.

Q    You didn't have any conversation with him?

A    No.  Never did.

Q    And you say car, I think your husband indicated he did see him in a van, do you actually recall whether he was in his car or his van?

A    No.

Q    But he was in some type of a vehicle sitting outside?

222

ONONDAGA COUNTY GRAND JURY

1    A    Right.

2    Q    When you went out to dinner that evening, what

3    time did you return home?

4    A    All I know is it was before midnight, but I have

5    no idea what time it was.

6    Q    Do you remember whether or not Valerie Hill's car

7    was at the house when you returned home?

8    A    Yes, it was.

9    Q    And did you see it?

10   A    Yes, I did.

11   Q    Did you ever see Mr. Rivas when you returned home?

12   A    No.

13   Q    And did you know whether or not the lights were on

14   in Valerie Hill's apartment when you got home?

15   A    Yes.

16   Q    Do you know what kind of light --

17   A    Her living room.  I remember her living room light

18   on because that's our entrance.

19   Q    Did you see her or hear her at any time that

20   weekend?

21   A    No.

22   Q    Did you ever see her or did you have knowledge

23   that she had some cats as pets?

24   A    Two cats.

25   Q    Did you ever see those cats that weekend?

223

A    One.

Q    When?

A    Out in the hall.

Q    What day?

A    I didn't notice it till Saturday.

Q    Saturday?

A    Right.

Q    Was that something out of the ordinary?

A    Very ordinary -- I mean out of the ordinary.  She never let them cats out.

MR. FITZPATRICK:  Okay, Karen.  Any questions for Karen Stonecypher?

JUROR:  Did you notice any time throughout the weekend whether the lights remained on throughout the weekend at night or not?

THE WITNESS:  No.  Believe it or not, I did not go out at all that weekend.  I was sick.

JUROR:  I'm sorry?

THE WITNESS:  That weekend I was ill and I did not go out Saturday or Sunday.

JUROR:  Was your daughter home when you came home?

THE WITNESS:  My youngest --

JUROR:  Susan.

THE WITNESS:  No.  That's my oldest.

224

BY MR. FITZPATRICK:

Q    When you got home --

A    I don't remember her being home.  I really don't.

Q    Do you remember anyone being home when you got home?

A    I remember my youngest daughter being home.

Q    That's Sandy?

A    Yes.

Q    And did you physically see her or was there something that led you to believe she was home?

A    Oh, I had physically seen her.

Q    And do you have a recollection of Susan coming home?

A    No, I don't.

MR. FITZPATRICK:  Thank you, Karen.  Thanks very much.  All set.

(Whereupon the witness was excused)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

<u>LAW</u>

MR. FITZPATRICK: Now, ladies and gentlemen, I'd like you to consider the following charges that relate to March the 27th of 1987, and I'll tell you right away, as you can plainly see, that's more than five years ago, so for that reason we are not concerning ourselves with anything other than murder in the second degree.

I'd like to charge you that under Section 125.25, Subdivision 1, a person is guilty of murder in the second degree when, with intent to cause the death of another person, he causes the death of such person.

It's rather simple. A person's state of mind has to be that they intended the result to occur. I'll give you a real quick example. I'm driving down the street. A child darts out in front of my car. The child dies. I intentionally drove down that street, but my intent was certainly not to cause the death of the child. It would be very, very difficult to in some way conclude that I have committed the crime of murder.

Another example, if I take a knife and I cut someone's stomach, have I committed the crime of assault? Most people jump and say yes, I did. If

I add something to the scenario, and I say I was a doctor and the reason I cut the stomach was to remove the appendix, then I have not committed assault obviously.

It's what's in the person's state of mind which is governing or determining whether or not Hector Rivas should be indicted for the crime of murder in the second degree. And I think you recall the testimony what was around Miss Hill's neck, and I'm sure those pictures of her body are fresh in your mind.

Now, I'd also like you to consider a second count, and that is murder in the second degree under Section 125.25, Subdivision 3. And this says that a person is guilty of murder in the second degree when, acting either alone or with one or more other persons, he commits or attempts to commit aggravated sexual abuse, and in the course of and in furtherance of such crime or of immediate flight therefrom, he or another participant causes the death of a person other than one of the participants.

Now, what does that mean? We refer to that as felony murder, and an example of that would be if I go into the bank with a gun and in the bank

to rob money, and I point the gun at a teller and
I say give me your money, she gives me the money.
In my zeal to flee the scene, the gun goes off
accidentally and kills the teller.  Well, the law
tells us that that is just the same as intentional
murder, that should be considered murder in the
second degree.  There has to be though an
underlying felony.

In this case, I'm charging you to consider
aggravated sexual abuse.  Now, you need not indict
Mr. Rivas or consider against Mr. Rivas the charge
of aggravated sexual abuse, because as I say, it's
been more than five years.  And I'll read those
two sections to you.  You don't have to write down
the section number, Mr. Secretary.

130.67 is aggravated sexual abuse in the
second degree, and a person is guilty of
aggravated sexual abuse in the second degree when
he inserts a finger in the rectum of another
person, causing physical injury to such person by
forcible compulsion or when the other person is
incapable of consent by reason of being physically
helpless.

Physically helpless means that a person is
unconscious or for any other reason is physically

unable to communicate unwillingness to an act.

Forcible compulsion means to compel either by use of physical force or a threat, express or implied, which places a person in fear of immediate death or physical injury to herself.

130.70 is aggravated sexual abuse in the first degree. A person is guilty of aggravated sexual abuse in the first degree when he inserts a foreign object in the rectum of another person, causing physical injury to such person by forcible compulsion, or when the other person is incapable of consent by reason of being physically helpless.

Foreign object is defined, essentially what you would think, any instrument or article when inserted in the rectum is capable of causing physical injury.

What are the differences between those two subdivisions and the two subdivisions underneath both of them? Well, one, aggravated sex abuse in the second degree involves use of a finger. The second, aggravated sexual abuse in the first degree, involves use of a foreign object.

Now, I would suspect that you would say to yourself in this case, if you were to find that Mr. Rivas was the actor here, how do we know was

it a finger or a foreign object.  You recall the medical examiner's testimony, it was his judgment that it was not a penis, but that it might have been something else.  Well, all you have to do is find that it could have been one or the other, and then you have the underlying felony, should you choose to indict Mr. Rivas for felony murder.  And what are the two subdivisions of those, forcible compulsion, that's pretty much what it sounds like, and I just read you the definition of that.  And the other would be when the other person is physically helpless, either because they're unconscious or they can't speak or they can't communicate with you.

So those are the two charges.  You do not have to vote four times on the second count.  You only have to vote one time on the first count, one time on the second count.

There are two types of evidence that we've heard in this case.  One is direct evidence.  I saw something, I heard something.  That's fairly basic.

The other type, and certainly the type you've heard more of in this case, is circumstantial evidence.  Now, one is not better than the other.

ONONDAGA COUNTY GRAND JURY

1  You should not say that circumstantial evidence is
2  less reliable than direct evidence.  In many cases
3  just the opposite is true.  Circumstantial
4  evidence can be much more compelling.  People can
5  make eyewitness identifications, they can be
6  wrong, they can pick out the wrong person.  That's
7  direct evidence.
8      Circumstantial evidence, if there were no
9  windows in here, if we were in a totally wall
10  enclosed room and we were on the first floor of
11  the Civic Center and you were to see me walk into
12  the room and I had an umbrella, I shook the
13  umbrella, I put it in the corner.  I took a rain
14  coat that was sopping wet and put it on the coat
15  rack.  Does anyone know it's raining?  No, no
16  one's seen the rain fall, no one's felt the rain
17  drops fall, but you could infer circumstantially
18  that it was raining out.  If you went to bed at
19  10:00 and the ground was clear, and you woke up at
20  9:00 the next morning and it had snowed during the
21  night and you saw a set of footprints coming up
22  the steps and going down the steps back on the
23  street, you could infer if they appeared to be
24  human footprints that someone had been on your
25  porch during the evening.

231

ONONDAGA COUNTY GRAND JURY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

That's what we call circumstantial evidence, and that's a lot of what you heard in here.

You know what your burden of proof is, that's been explained to you many times before you got to me. It's not beyond a reasonable doubt or to a moral certainty at this point because we're in grand jury. But you know what your standard of proof, I should say, is as to whether or not you're going to return an indictment.

Does anybody have any questions on the law? All right. If anybody wants to see any exhibits, you let me know and I'll have them right out here for you.

(Whereupon the grand jury voted)

MR. FITZPATRICK: Mr. Foreman, I see that the grand jury has voted unamimously to indict Mr. Rivas for two counts of murder in the second degree, the first one being intentional murder and the second count being felony murder; is that correct?

THE FOREMAN: That's correct.

MR. FITZPATRICK: Thank you very much.

(Proceedings were concluded)