UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

SIDNEY MANES, Administrator of the Estate of HECTOR RIVAS,

                 Plaintiff,

-against-

ONONDAGA COUNTY, CITY OF SYRACUSE, WILLIAM FITZPATRICK, DR. ERIK MITCHELL, and "JOHN DOES 1-10",

                 Defendants.

------------------------------------------------------------------------X

No. 19 Civ. 844 (BKS) (TWD)

**PLAINTIFF'S RESPONSE TO DEFENDANT MITCHELL'S STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1(b)**

Plaintiff SIDNEY MANES, Administrator of the Estate of HECTOR RIVAS, as and for his Response to Statement of Undisputed Facts on Behalf of Dr. Erik Mitchell in Support of His Motion for Summary Judgment (Dkt. 142-1), states as follows:

1.    Dr. Erik Mitchell (hereinafter "Dr. Mitchell") was the duly licensed medical examiner of Onondaga County prior to and on March 27 through March 30, 1987.

<u>Plaintiff's response</u>: Admitted.

2.    Dr. Mitchell was called to the apartment of Valerie Hill, was present at the apartment, and observed her body in situ. (Ex. A, pg. 5).

<u>Plaintiff's response</u>: Admitted that Dr. Mitchell prepared a report that states he was called to 248 Hickok Street in Eastwood on March 30, 1987, to examine a decedent identified later as Valerie Hill and states observations of a body at that location.

1

3.     Dr. Mitchell examined the body in situ and was present in the apartment and examined the apartment. (Ex. A, pg. 5).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report that states he was called to 248 Hickok Street in Eastwood on March 30, 1987 to examine a decedent identified later as Valerie Hill and states observations of a body and of the location.

4.     Dr. Mitchell prepared a report of his examination of the body that was officially recorded in the medical examiner's record. (Ex. A, pg. 5).

Plaintiff's response: Admitted.

5.     Dr. Mitchell arrived at the scene of the murder at 3:05 p.m. (Ex. A, pg. 4).

Plaintiff's response: Admitted that the cited document states "Dr. EKM & EFJ responded to the scene." However, the document does not state that Dr. Mitchell arrived at the scene at 3:05 p.m. Rather, the document states that "[a]t 3:05pm investigators at the scene requested the presence of MEO staff." There is no indication in the cited document what time Dr. Mitchell arrived.

6.     Dr. Mitchell prepared a report of his scene investigation that he pronounced Valerie Hill dead at 3:30 p.m. (Ex. A, pg. 5).

Plaintiff's response: Admitted insofar as the cited report indicates Dr. Mitchell examined a decedent "later identified as Valerie Hill" and that he "pronounced the decedent dead at 3:30 P.M."

7.      Dr. Mitchell found the decedent laying face down on a rug in the living room area. (Ex. A, pg. 5).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report that states, "[t]he decedent was laying face down on a rug in the living room area."

8.      Dr. Mitchell found that she was dressed in a bathrobe and knit upper garment of some type. (Ex. A, pg. 5).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report that states, "she was dressed in a bathrobe and knit upper garment of some type."

9.      The bathrobe was up above the level of the buttocks and fecal smearing was emanating from the area of the anus over the buttocks and upper thighs. (Ex. A, pg. 5).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report that states, "[t]he bathrobe was up above the level of the buttocks and fecal smearing was evident eminating [sic] from the area of the anus over the buttocks and upper thighs."

10.     Dr. Mitchell opined that the body was in full rigor with fixed anterior livor. (Ex. A, pg. 5).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report that states, "[t]he body was in full rigor with fixed anterior livor."

11.     Dr. Mitchell saw a small amount of bloody mucoid fluid came up from the mouth and nose when the body was turned over. (Ex. A, pg. 5).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report that states, "[a] small amount of bloddy mucoid fluid came from the mouth and nose when the body was turned over."

12.     A sash with material similar to the bathrobe was coiled about the neck and petechiae were evident above but not below the level of this sash. (Ex. A, pg. 5).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report that states, "[a] sash with material similar to the bathrobe was coiled about the neck and petechiae were evident above but not below the level of the sash."

13.     The apartment appeared to have been relatively cool as was the basement through ceiling from the floor upon which the decedent lay. (Ex. A, pg. 5)(Ex. C-1, pg. 905-906).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report and testified that the apartment appeared to have been relatively cool as was the basement through ceiling from the floor upon which the decedent lay.

14.     Dr. Mitchell testified that the apartment was 62 degrees. (Ex. C-1, pg. 906).
Plaintiff's response: Admitted.

15.     Dr. Mitchell opined that this appears to be a strangulation homicide. (Ex. A, pg. 5).
Plaintiff's response: Admitted that Dr. Mitchell prepared a report that states, "[t]his appears a strangulation homicide.

4

16.    Dr. Mitchell performed an autopsy and generated an autopsy report that was dated March 30, 1987, indicating that the autopsy commenced at 5:30 p.m. (Ex. A, pgs. 6-11, 17).

Plaintiff's response: Admitted that Dr. Mitchell prepared an autopsy report dated March 30, 1987.

17.    Dr. Mitchell dictated a report that he signed on 3/30/87 at 7:45 p.m. under Narrative/Med Hist "Deced. was found prone in her residence by father and brother. Found prone with a piece of blue material around the neck. Last seen Friday by the father. Appears as though deced. was there appx. 2-3 days." (Ex. A, pg. 17).

Plaintiff's response: Admitted.

18.    Dr. Mitchell recorded an external examination. (Ex. A, pg. 6).

Plaintiff's response: Admitted.

19.    Dr. Mitchell in his report found evidence of injury based on the neck being "tightly wrapped in two and one half turns the sash from the bathrobe." (Ex. A, pg. 7).

Plaintiff's response: Admitted that Dr. Mitchell prepared a report with a section labeled, "EVIDENCE OF INJURY," which states, "tightly wrapped in two and one half turns the sash from the bathrobe."

20. Dr. Mitchell performed an internal examination in which he found as follows: "The 1530 gram brain is mildly softened secondary to autolytic changes. There is no evidence of acute contusion injury. There is an estimated ml. of liquid subdural and subarachnoid blood over the lateral convexities close to the midline." (Ex. A, pg. 8).

<u>Plaintiff's response</u>: Admitted that Dr. Mitchell prepared a report with a section labeled, "INTERNAL EXAMINATION," which states: "The 1530 gram brain is mildly softened secondary to autolytic changes. There is no evidence of acute contusion injury. There is an estimated ml. of liquid subdural and subarachnoid blood over the lateral convexities close to the midline."

21. Dr. Mitchell listed as his autopsy findings:

    1) Facial petechiae.

    2) Fractures of hyoid and thyroid cartilage.

    3) Dry, serous discoloration of neck soft tissues beneath ligature.

    4) Epiglottal petechiae.

    5) Streak hemorrhages into strap muscles.

    6) Focal red discoloration of thyroid capsule. (Ex. A, pg. 11).

<u>Plaintiff's response</u>: Admitted that Dr. Mitchell prepared a report with a section labeled, "AUTOPSY FINDINGS," which states:

    1. Facial petechiae.

    2. Fractures of hyoid and thyroid cartilage.

    3. Dry, serous discoloration of neck soft tissues beneath ligature.

    4. Epiglottal petechiae.

      5.    Streak hemorrhages into strap muscles.

      6.    Focal red discoloration of thyroid capsule.

22.    Dr. George Collins, M.D. examined the brain. He signed a note labeled Gross Description of Brain After Fixation. He found the brain to have "The deeper areas of the brain are riddled with cavities developed due to decomposition." His diagnosis was normal brain with postmortem decomposition. (Ex. A, pg. 12).

<u>Plaintiff's response</u>: Admitted that Defendant Mitchell has cited a report that purports to be signed by George Collins, M.D. and that report has a section labeled, "GROSS DESCRIPTION OF BRAIN AFTER FIXATION," and states: "The deeper areas of the brain are riddled with cavities developed due to decomposition." However, Defendant Mitchell has not disclosed admissible evidence or testimony to authenticate the truth of the matters asserted within the report. Dr. Collins did not testify at trial or in a deposition in this case, and there is no sworn statement in the record from Dr. Collins that confirms this report accurately reflects his observations. Dr. Collins passed away in 2013.[1] Therefore, there is no admissible evidence that Defendants can offer to render "undisputed" the truth of the matters asserted in this report.

23.    Photographs were taken of the brain by Kodachrome and two photographic slides of the brain are existent. (Ex. N).

<u>Plaintiff's response</u>: Admitted that the cited exhibit includes the two known photographs of Valerie Hill's brain.

---

[1] *See* https://obits.syracuse.com/us/obituaries/syracuse/name/george-collins-obituary?id=46340856.

24.    Dr. Mitchell testified in his deposition there was decomposition of the brain demonstrated on the Kodachrome slides. (Ex. E, pg. 81).

Plaintiff's response: Disputed. The cited deposition testimony states that at the criminal trial of Hector Rivas, Dr. Mitchell testified he saw decomposition of the brain in the slides that he reviewed in preparation for his trial testimony.

25.    Dr. Mitchell states in his affidavit "I see in the Kodachrome slides changes consistent with my time of death range of 2-3 days." (Ex. E, pg. 10).

Plaintiff's response: Admitted that this quote appears at page 9 of Dr. Mitchell's affirmation filed at Dkt. 142-2.

26.    Dr. Mitchell testified in his deposition that "Those slides are not in themselves the definition of decomposition. But I described in my autopsy report softening and autolytic changes on gross exam, and what you've got here is a brain that is slumping slightly down in the brain cage and has slight flattening of the gyral definition. But handed this independently with no history, you're not going to derive - - it goes along with what I observed but it's not pathognomonic of it." (Ex. E, pg. 84).

Plaintiff's response: Admitted that Dr. Mitchell so testified in his deposition.

27.    There were no microscopic tissue slides of the brain of Ms. Hill. There were two 35mm Kodachrome slides of her brain. There were microscopic tissue slides of the gland, lung, uterus and liver. (Ex. A).

Plaintiff's response: Admitted.

8

28.     The Plaintiff's expert Dr. Spitz testified that Dr. Mitchell did not deviate from the standard of care in the performance of his autopsy. His deposition testimony was as follows: "No, I don't think he deviated from what would be his autopsy examination. I think where the problem arose is that there were some opinions that were generated using scientific parameters that just fall outside of what is generally accepted." (Ex. G, pg. 57).

<u>Plaintiff's response</u>: Objection. Defendants' "Exhibit G" does not include page 57 of Dr. Spitz's deposition's transcript.

29.     The Plaintiff's expert Dr. Spitz testified that Dr. Mitchell did not deviate from the standard of care in giving his estimates as to the time of death. A true copy of his testimony is attached cited below:

> Question: Doctor, in summary, are you saying that Dr. Mitchell fell below the standard of care and deviated from good, usual, customary and the accepted practice in offering the opinion that the window of death was somewhere between Friday night at 7 o'clock on the 27th and the time of Valerie Hill being found on Monday?
>
> Answer: I'm not really saying he fell below the standard of care, that's not really what I'm here for. What I'm doing is giving you my opinion based on the information associated with this case.
> I think my opinion is different than Dr. Mitchell's. The scientific information, in my opinion, clearly puts his death within a 48-hour period. You know. I mean, if Dr. Mitchell wasn't aware of some of these factors and therefore gave an opinion that I believe to be erroneous, so be it. If there were other factors involved in his conclusions, you know, so be it. I don't know all the information associated with it. (Ex. G, pg. 62).

<u>Plaintiff's response</u>: Disputed. While Defendants' "Exhibit G" does not include page 62 of Dr. Spitz's deposition transcript, in the quoted testimony, Dr. Spitz makes clear that he is "not really saying he fell below the standard of care" because "that's not really what I'm here for." At

page 70 of Dr. Spitz's deposition transcript, which Defendants included in "Exhibit G," Dr. Spitz testified:

> Q. . . . [T]o a reasonable degree of certainty from that experience and training, is there any basis in science within the field of forensic pathology that supports an opinion that Valerie Hill's death could have occurred more than 48 hours before she was discovered?
>
> A. No, I don't think the scientific data would support a longer time frame than 48 hours.

Ex. G at 70. This testimony directly and unequivocally contradicts the assertion Defendants make about Dr. Spitz's opinion and testimony.

30.     Sidney Manes was not present and did not overhear any discussions between Dr. Mitchell, William Fitzpatrick or Sidney Cominsky, with regard to Dr. Mitchell's testimony in the Rivas case. (Ex. D-1, EBT I, pg. 69).

Plaintiff's response: Admitted.

31.     Sidney Manes did not obtain the file of Rivas' trial counsel Richard Calle. (Ex. D-1, EBT I, pgs. 21-23).

Plaintiff's response: Disputed. In the testimony of Mr. Manes that is cited in support of this statement, he does not testify that he "did not obtain the file of Rivas' trial counsel Richard Calle," but rather that he did not see Mr. Calle's file.

32.     Sidney Manes never discussed the Rivas case with Dr. Mitchell or William Fitzpatrick. (Ex. D-1, EBT I, pg. 29).

Plaintiff's response: Admitted.

33.     Dr. Mitchell testified that the range of date of death of Valerie Hill included March 27, 1987, although less likely in Grand Jury testimony. (Ex. B, pg. 126-127). Dr. Mitchell was not asked a hypothetical to the time of death in Grand Jury testimony. (Ex. B).

Plaintiff's response: As to the assertion that "Dr. Mitchell testified that the range of date of death of Valerie Hill included March 27, 1987, although less likely in Grand Jury testimony," it is admitted that Dr. Mitchell testified, "it's possible. It's on the outside edge of that possibility, but it's possible." Ex. B 126:23-25. Plaintiff admits that "Dr. Mitchell was not asked a hypothetical to the time of death in Grand Jury testimony."

34.     At trial, Dr. Mitchell, when provided a hypothetical based on facts in evidence prior to his testimony, testified that March 27 to early March 28, 1987 was the more likely date of death. (Ex. C-1, pgs. 889-890).

Plaintiff's response: Plaintiff admits that Dr. Mitchell's answer to the lengthy hypothetical question posed to him at pages 889 to 890 of the trial transcript is: "I would consider that it's more likely that she died Friday night, to possibly very early Saturday morning, would be the possibility that's given there - - I don't know when your overlaps are there with phone calls - - than to have been killed the following day." As to the assertion that Dr. Mitchell was "provided a hypothetical based on facts in evidence prior to his testimony," Plaintiff objects that the pages of evidence Defendants cite do not support this assertion.

11

35. Dr. Daniel Spitz opined that Dr. Mitchell did not deviate from good practice in performing the autopsy. (Ex. G, pg. 57).

Plaintiff's response: Disputed. Defendants' "Exhibit G" does not include page 57 of the transcript of Dr. Spitz's deposition.

36. Dr. Daniel Spitz opined that Dr. Mitchell did not deviate from good practice in his range of time of death opinion at trial. (Ex. G, pg. 62).

Plaintiff's response: Disputed. While Defendants' "Exhibit G" does not include page 62 of Dr. Spitz's deposition transcript, Dr. Spitz's testimony at that page of deposition makes clear that he is "not really saying he fell below the standard of care" because "that's not really what I'm here for." At page 70 of Dr. Spitz's deposition transcript, which Defendants included in "Exhibit G," Dr. Spitz testified:

> Q. . . . [T]o a reasonable degree of certainty from that experience and training, is there any basis in science within the field of forensic pathology that supports an opinion that Valerie Hill's death could have occurred more than 48 hours before she was discovered?
>
> A. No, I don't think the scientific data would support a longer time frame than 48 hours.

Ex. G at 70. This testimony directly and unequivocally contradicts the assertion Defendants make about Dr. Spitz's opinion and testimony.

37. The application for a search warrant signed by Timothy Phinney in March of 1987 states "that the Onondaga County Medical Examiner's Office, Dr. Mitchell's preliminary estimate on the time of death of the victim Valerix (sic) Hill, was sometime Saturday the 28th of march

afternoon, and Sunday morning of the 29th of March 1987," but does not contain a statement or affidavit signed by Dr. Mitchell. (Ex. W, pg. 2).

<u>Plaintiff's response</u>: Admitted that the search warrant states "Dr. Mitchell's preliminary estimate on the time of death of the victim Valerix (sic) Hill, was sometime Saturday the 28th of march afternoon, and Sunday morning of the 29th of March 1987" and admitted that the search warrant "does not contain a statement or affidavit signed by Dr. Mitchell." The search warrant, however, includes an unsigned statement by Dr. Mitchell that his "preliminary estimate on the time of death of the victim Valerix (sic) Hill, was sometime Saturday the 28th of march afternoon, and Sunday morning of the 29th of March 1987."

38.     Syracuse Police Detective Sergeant Peter Tynan testified that Dr. Mitchell told him on or about March 30, 1987, that Ms. Hill had been dead not less than two days. (Ex. H, pgs. 20-21).

<u>Plaintiff's response</u>: Admitted.

39.     Syracuse Police Sergeant Peter Tynan, who became Mr. Fitzpatrick's Chief Investigator, testified that he was of the opinion that the Syracuse Police Department had accumulated sufficient evidence to prosecute Rivas in 1987. (Ex H, pg. 19-20).

<u>Plaintiff's response</u>: Disputed. Mr. Tynan's cited deposition testimony does not support the assertion "that he was of the opinion that the Syracuse Police Department had accumulated sufficient evidence ***to prosecute*** Rivas in 1987." Rather, Mr. Tynan testified that in his opinion, "there was enough to arrest him." Ex. H at 19:22. Mr. Tynan went on to testify that the District

Attorney's Office "did not want him arrested and forced prosecution" because "they felt" the evidence "wasn't enough to convict him." Ex. H 19:23-20:5.

40.     Peter Tynan recommended to William Fitzpatrick the prosecution of Hector Rivas. (Ex. H, pg. 19-20).

Plaintiff's response: Objection. The cited testimony does not support this assertion.

41.     The defense lawyer, Edward Klein, Esq., representing Mr. Rivas asked Judge Miller of the Onondaga County Court for an adjournment of the December 7, 2015, retrial. (Ex. S-3, pg. 4).

Plaintiff's response: Admitted.

42.     The defense lawyer, Edward Klein, Esq., representing Mr. Rivas asked Judge Miller of the Onondaga County Court for an adjournment of the February 2015 trial. (Ex. S-3, pgs. 5-7).

Plaintiff's response: Disputed. The cited transcript pages do not support the assertion that Edward Klein asked Judge Miller for an adjournment of a February 2015 trial date. The colloquy makes clear that Mr. Klein did not believe the case could be tried in January 2015 and part of the reason he thought March 2015 was a better time to start the trial was that the People had not tested evidence that he believed needed to be tested for the retrial. *See* Ex. S-3 at 8-10.

43. Mr. Langone never appeared as trial counsel for Mr. Rivas:

Plaintiff's response: Objection. Defendants have not cited evidence to support this statement, and it is inconsistent with the undisputed fact that Mr. Langone appeared before the trial court on Mr. Rivas's behalf. *See* Ex. S-3 at 3.

44. The defense lawyer representing Mr. Rivas on the Record before Judge Miller asserted, "The Assistant District Attorney handling the Rivas case was not at fault for the delay." (Ex. S-4, pg. 4).

Plaintiff's response: Objection. The phrase "The Assistant District Attorney handling the Rivas case was not at fault for the delay" appears nowhere in Defendants' Exhibit "S-4." Mr. Klein's reference at page 5 of the transcript to "tests that we're requesting be done" is referring to testing by the County Medical Examiner's Office that was repeatedly delayed.

45. Sidney Manes conceded to the Second Circuit that Dr. Mitchell was not under investigation by the District Attorney's Office at the time he testified in Rivas' trial. (Ex. D-2, Pg. 46, Ex. 0, Bates No. 185419).

Plaintiff's response: Disputed. At page 185419 of Defendants' Exhibit O, Manes does not "acknowledge[] that the DA wasn't investigating until the trial was over." Instead, Manes' statement makes clear that he was saying the DA would have prosecuted, not investigated, these particular allegations because the investigation would be done by the Department of Environmental Conservation. Ex. O at 185419. Manes' deposition testimony was to the same effect: "[i]t wasn't [the District Attorney's] job [to investigate Mitchell for environmental issues]. That was the DEC's job to investigate environmental concerns. He [the District Attorney] would

15

have prosecuted Mitchell for the misdemeanors, absolutely. So he wasn't investigating. It was the DEC that did the investigating." Ex. "D-2" at 46:23-47:3. Also, in the cited transcript from the Second Circuit, the New York State Assistant Attorney General represented that the allegations about Mitchell's integrity were circulating "in 1992/1993." Ex. O at 185419. Rivas' trial took place in March 1993.

Dated:  January 13, 2025

                                        **THE LAW OFFICE OF JOSHUA MOSKOVITZ, P.C.**

                                        /s/
                                        Joshua S. Moskovitz

                                        **RICKNER PLLC**

                                        /s/
                                        Rob Rickner
                                        Stephanie J. Panousieris

                                        **SCOTT A. KORENBAUM, ESQ.**

                                        /s/
                                        Scott A. Korenbaum