**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

                               Plaintiff,

                    -against-

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
and "JOHN DOES 1-10",

                            Defendants.

------------------------------------------------------------------------X

No. 19 Civ. 844 (BKS) (TWD)

**PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1(b)**

**PLAINTIFF'S RULE 56.1 COUNTERSTATEMENT OF FACTS**

Pursuant to Local Rule 56.1, Plaintiff Sidney Manes, as Administrator of the Estate of Hector Rivas, submits this Counterstatement of Facts in support of the combined opposition to the motions for summary judgment filed by Defendants Dr. Erik Mitchel and William Fitzpatrick, and the motion to dismiss under F.R.C.P. 12(b)6 by the County of Onondaga.

Plaintiff's Rule 56.1 Counterstatements are referenced as "P_". Exhibits to the "Affirmation" of Robert F. Julian, Esq. are cited by letter as "Ex. _". Exhibits to the Declaration of Rob Rickner, Esq. are cited by number as "Ex. _". The Affirmation of Erik K. Mitchell is cited as "Mitchell ¶_", and the Affirmation of William J. Fitzpatrick is cited as "Fitzpatrick ¶_".

      **I.**      **The Valerie Hill Murder and the Initial Investigation.**

P1. At approximately 11:45 a.m. on Monday, March 30, 1987, Randall Hill discovered his twenty-eight-year-old daughter, Valerie Hill, dead on the living-room floor of her apartment on Hickok Avenue in Syracuse, New York.

P2. Randall immediately called the police, who arrived at around 1:30 p.m. Ex. A at 4-5.

1

P3. Dr. Erik Mitchell was the Medical Examiner for Onondaga County, and had been since 1983. The Medical Examiner is a County policymaker and "the final policymaker of the Onondaga County Medical Examiner's Office for policies or procedures concerning making determinations about the time of death." Mitchell ¶1; Ex. 1.

P4. At Hill's apartment, Mitchell examined her body, limited to examining the external surfaces and checking for muscle stiffness. Ex. E at 18-19.

P5. In 1987, Mitchell often would not take notes at a crime scene. He waited until he was back at the office and provided the information to his secretary, who typed it up as a report. Ex. E at 19-20.

P6. The Scene Investigation report Mitchell wrote, dated March 30, 1987, noted that the body had full rigor. Full rigor is when all the muscle groups show at least some amount of rigor mortis – or, according to Mitchell, all the muscle groups he decided to test. Some muscle groups may have more rigor than other, and the amount of rigor changes over time, after death. It is possible to quantify how much rigor each muscle group has. But Mitchell admits that to do this one needs to write down those findings when first examining the body, and Mitchell did not record this information when he examined Hill. Ex. A at 6; Ex. E at 19-20, 22-26.

P7. Mitchell pronounced Hill dead at 3:30pm on March 30, 1987, but it was obvious she was dead before then, and he cannot remember how long he had been at her apartment beforehand. Mitchell 22.

P8. March 30, 1987, is the date of death on Hill's death certificate, which Mitchell signed. It says the date of injury is "UNK", meaning unknown. Ex. A at 21; Ex. E at 41-42.

P9. Mitchell also noted in the Scene Investigation that Hill's body had fixed livor, which means that when one presses on discoloration caused by "red cells" leaking out of the blood vessels into

the tissue, the color stays the same. Livor can also change over time, but Mitchell did not record that information because he considered it irrelevant. Ex. A at 6; Ex. E at 26-28.

P10.    Mitchell did not record the temperature of Hill's body because he personally thought (and still thinks) it was an unreliable way of determining the time of death, and he did not want other experts to use the body temperature to challenge his findings. Ex. E at 29-30.

P11.    P11.    Mitchell claims, however, that he measured the temperature in the "basement" below the kitchen where Hill's body was found at 62 degrees. Mitchell at p.4 n.1. In his affidavit. At trial he testified that he says the whole apartment was 62 degrees, although, this is not written in any of his reports, and Mitchell testified that he "can't remember if it came out on trial or whether it came out in one of the records itself." Mitchell acknowledged at his deposition that officers had been opening the door and walking in and out of the house, which could have let cold air in from outside, lowering the temperature. Ex. E at 31, 73-76; Mitchell ¶2.

P12.    It was between 55 and 60 degrees in Syracuse the afternoon of March 30, 1987. Ex 2.

P13.    At trial, Mitchell admitted that the temperature of the body as well as the temperature of the apartment can be used to determine how fast rigor mortis would dissipate after it set in, which helps determine the time of death. Ex. C-1 at 916-17.

## II.    Dr. Erik Mitchell's Scientifically Worthless Opinion on the Time of Death.

P14.    Hill's body was taken to Mitchell's office using a truck. The truck was not refrigerated. Ex. E at 44.

P15.    Hill's body was stored in a room, which was as cold as it could be without freezing the body, for two hours while he waited to do the autopsy. Ex. E at 45.

P16.    During the autopsy, Mitchell removed Hill's brain, weighed it, and examined it. It showed autolytic changes, which means that the brain was beginning to soften a small amount, and

3

could not maintain the same integrity as it would have been when fresh. Mitchell admitted that he did not know how long these changes take to develop. Ex. E at 46-48.

P17. After Mitchell examined the brain, he preserved it with formalin, until it could be examined by a neuropathologist from Upstate Medical Center, which can take two to eight weeks or even longer. Mitchell cannot remember if he was part of that examination. The report, generated by Dr. George Collins, does not note any decomposition on the outside of the brain. The report does note decompensation inside the brain, but Mitchell admitted at his deposition that this could be found a day and a half after death, and he could not tell how long based on the decomposition noted in Dr. Collins' report. Ex. E at 46-47, 49-51, 70-73.

P18. The heart also showed mild autolytic changes, but Mitchell could not say how long those changes took to develop, and admitted in his deposition that it could be as little as six hours. Ex. E. at 51-54.

P19. Mitchell admitted at his deposition that he could not say anything meaningful about the time of death based on the gassy crepitus in the liver, meaning gas from decomposition. Ex. E at 55.

P20. Mitchell admitted at his deposition that he could not say how recently Hill had eaten based on the stomach contents, and acknowledged he did not see any undigested food in the stomach. Ex. E at 55-58.

P21. Mitchell also noted that the mucosa in the stomach had lost some of its rugal folds, meaning the internal lining was losing some of its structure, but his notes did not reflect if this was from decomposition or not. Ex. E at 58.

P22. The pancreas also showed mild autolytic changes, but Mitchell testified at his deposition that he could not use these finding to determine time of death. Ex. E at 59-60.

P23.     Mitchill found nothing worth commenting on after examining the kidneys, or Hill's genitalia, except to note that there were signs of recent menstruation. Ex. E at 60-61.

P24.     The toxicology report showed gastric ethanol at 0.16 grams per deciliter, the blood had .03 grams of ethanol per deciliter, and the vitreous humor had .02 grams of ethanol per deciliter. At his deposition, Mitchill testified at his deposition that these ethanol findings did not say how much Hill drank or when. Ex. E at 64-68.

P25.     At the deposition, when asked if Hill had consumed three standard drinks at dinner (with her father) on March 27, 1987, Mitchell admitted that the ethanol levels would have reached the levels found in her body only an hour or two later. Ex. A at 5; Ex. E at 68-69.

P26.     When Mitchell did autopsies, he would dictate his findings into a device, like a cassette tape or a Dictaphone. After his secretary wrote up the report, he would tape over the recording, instead of saving it. Ex. E at 36-37.

P27.     In a diagram Mitchell made during the autopsy, he wrote that there was partial fixed livor, but he did not write down what parts of the body had fixed livor and what parts did not. He did not include this information in the autopsy report because he decided this information was not useful. Ex. A at 14; Ex. E at 33, 42-43.

P28.     In the same diagram Mitchell made during the autopsy, he made no notes about Hill's neck, even though she had been strangled. Ex. A at 14; Ex. E at 35.

P29.     The findings at the end of the Autopsy Report contain no opinion on the time of death, or even a range of dates or times when Hill could have died. Ex. A 7-12.

P30.     Shortly after the autopsy, in a form from the Onondaga Medical Examiner's Officer dated March 31, 1987, there is a narrative that says that "Appears as though deced. was there appx. 2-3 days." Ex. A at 18.

P31.    Dr. Mitchell testified that this narrative is his conclusion, at the time, that Hill could have been murdered as early as March 27, 1987, and he provided this conclusion on or before the form was delivered on March 31, 1987 at 9:37 a.m. Ex. E at 38-40; Mitchell ¶ 6.

P32.    During Rivas' extensive attempts to free himself from prison, his attorneys hired esteemed pathologist Dr. Cyril Wecht, who concluded in 1999, that Mitchell's opinion that the time of death was 72 hours, 3 days, before Hill's body was discovered was not scientifically supportable. Ex. 3.

P33.    Dr. Wecht's conclusion led the Second Circuit to have "serious doubt" about the validity of Mitchell's time-of-death evidence. *Rivas v. Fischer*, 687 F.3d 514, 552 (2d Cir. 2012).

P34.    Dr. Daniel Spitz, who was retained by Plaintiff to provide expert testimony, and had the benefit of Dr. Mitchell's recent deposition testimony reached a similar conclusion: "Valerie Hill's death most likely occurred 36 hours but not later than 48 hours prior to when she was found dead. Ex. 4 at 2.

P35.    Dr. Spitz also concluded that: "[t]here is no valid or reliable medical or scientific support for Dr. Mitchell's opinion that Ms. Hill's death could have occurred more than 48 hours before she was found dead." Ex. 4 at 6.

P36.    Dr. Spitz testified "[t]o a reasonable degree of certainty" there was no "basis in science within the field of forensic pathology that supports an opinion that Valerie Hill's death could have occurred more than 48 hours before she was discovered." Ex. 5 at 70.

P37.    Dr. Spitz concluded that: "There is no observable decomposition of Valerie Hill's brain." Ex. 4 at 6.

P38.    Dr. Spitz concluded that: "There is no reliable medical or scientific support for Dr. Mitchell's opinion that the timing of Ms. Hill's death could be determined based on the condition of Ms. Hill's brain." Ex. 4 at 6.

P39.    Dr. Spitz also testified that there is no scientific support for the assertion that the photographs of Hill's brain show anything meaningful for determining the time of death. *See* Ex. 5 at 72.

P40.    Dr. Spitz concluded that: "Mitchell did not rely upon any objective evidence to support his conclusion that the ambient temperature in Valerie Hill's apartment impacted the time of her death." Ex. 4 at 6.

P41.    Dr. Spitz testified that there was no scientific support for Mitchell's conclusion that the ambient temperature in the room where Hill's body was discovered was low enough to slow the rate of decomposition. Ex. 5 at 71-72

P42.    Dr. Spitz testified that the existence of anecdotal reports of outliers does not form the basis for a scientifically sound forensic opinion. Ex. 5 at 39.

P43.    Dr. Spitz testified that he would not use outliers to provide an opinion on a window of the most likely time of death. Ex. 5 at 71.

P44.    Defendants' forensic expert, Dr. Mary Jumbelic, did not provide an opinion about the forensic value, if any, of the photographs of Hill's brain. She also failed to account for the fact that police had been going in and out of her apartment for as much as 2 hours before Mitchell pronounced Hill dead, and it was below 60 that day. Ex. Q.

P45.    Rivas was not charged with Hill's murder in 1987, because there was not enough evidence to convict him, and the Hill murder became a "cold case." Ex. F at 21-22; Ex. H at 19-20.

### III.    William Fitzpatrick is Elected District Attorney for the County of Onondaga County, and Reinvestigates Cold Cases, Including the Valerie Hill Murder.

P46.    Fitzpatrick was elected district attorney for the County of Onondaga in November 1991, and he took office in January 1992. Ex. F at 18-19.

P47.    Fitzpatrick believed that there were some cold cases that needed to be looked at more diligently. Ex. F at 20.

P48.   Fitzpatrick recruited an investigator, Peter Tynan, from the Syracuse Police Department to work at his office. Ex. H at 16.

P49.   Tynan brought the Hill murder to Fitzpatrick's attention. Ex. F at 22-23.

P50.   Tynan handled the reinvestigation, with Fitzpatrick's supervision, and they both spoke to witnesses and reviewed evidence. Ex. F at 23-24.

P51.   Tynan's investigation was not memorialized in a report. Ex. F at 25.

P52.   During the investigation, Fitzpatrick learned that Rivas had an alibi, but the alibi did not cover March 27, 1987. Ex. F at 26-28; Fitzpatrick ¶5.

P53.   In reviewing the file to prepare the prosecution, Fitzpatrick saw Mitchell's opinion in the records about Hill's death occurring 2 or 3 days before her body was found. Fitzpatrick ¶¶7, 12.

P54.   Fitzpatrick's entire theory of the case was based on Hill dying late Friday night, March 27, 1978, or early Saturday morning, and if she died later on Saturday or on Sunday, he would have had to contend with Rivas' alibi. Ex. F at 28-29; Fitzpatrick ¶5.

P55.   In October 1992, a month before the grand jury, Fitzpatrick met with Mitchell to discuss his testimony and confirmed that it was his opinion that Hill could have died on March 27, 1987. Fitzpatrick ¶7.

P56.   If Mitchell had told Fitzpatrick that Hill could not have died Friday night or Saturday morning, he would have had to come up with more evidence and a new theory of the case. Ex. F at 30-31.

P57.   If Mitchell had told Fitzpatrick that Hill could not have died Friday night or Saturday morning, he would not have gone forward with the grand jury indictment. Ex. F at 31-32.

    **IV.   Dr. Erik Mitchell Fabricates a Story About Brain Slides to Bolster His Time of Death Opinion.**

P58.    On November 9, 1992, in his grand jury testimony, Mitchell testified that it was "on the outside edge of that possibility, but it's possible" that Hill died on March 27, 1987. Ex. B at 126.

P59.    During the autopsy, Mitchell did not make any tissue slides of the brain, the type of slides you look at under a microscope. Ex. E at 83.

P60.    There were Kodachrome slides showing Hill's whole intact brain inside of her skull. After the grand jury, but before trial, Mitchell reviewed these Kodachrome slides. Ex. E at 82-84; Ex. N.

P61.    Mitchell also discussed his autopsy findings with investigator Tynan. Ex. E at 94, Ex. H at 15.

P62.    Tynan wrote a note that says " RE: DR. MITCHELL … #2 BODY HAS DECMOP, INCLUDING BRAIN (SWISS CHEESE). PUSHES T.O.D. LIMITS FURTHER OUT. (GOOD!!!)." Ex. 6; Ex. H at 28.

P63.    The note is not dated, but Tynan was only at the district attorney's office from shortly after Fitzpatrick was elected district attorney in January of 1992 until January or February of 1993. During that time, he was the investigator who brought the Hill murder to Fitzpatrick for reinvestigation. Ex. H at 14-16; Fitzpatrick ¶4.

P64.    Mitchell did not, however, prepare the report showing the decomposition of the brain, and did not view the inside of the brain himself, because that part of the autopsy was performed by Dr. Collins. There is no evidence that Mitchell ever told Fitzpatrick that he had no personal knowledge of the condition of the brain from the autopsy, and was working solely off the report of Dr. Collins, who was not a witness at trial. Ex. A at 13; Ex. E at 46, 50.

P65.    Fitzpatrick knew that Mitchell had reviewed Kodachrome slides, but he assumed that Mitchell had also reviewed microscopic slides. Ex. F at 53-55.

9

P66.    Fitzpatrick spoke to Mitchell again before the trial, and during these conversations Mitchell against stated that Hill could have died on March 27, 1987. Fitzpatrick ¶14.

P67.    Rivas' defense attorney cross-examined Mitchell with the grand jury testimony where he admitted it was only an outside possibility that Hill died on March 27, 1987. Ex. C-1 at 906.

P68.    Fitzpatrick knew about Mitchell's new claim about the brain slides from his conversations with Mitchell, and was ready to rehabilitate Mitchell using the "slides" he had reviewed, asking leading questions based on the information Mitchell had previously provided to him: "Q Have you also testified in front of the grand jury, Doctor, that prior to that particular testimony, you had not reviewed some of your notes and slides in connection with this case? A That is correct. Q And naturally when you prepare for trial, you did review your slides and your notes, is that true? A That is correct. Q And did you see some, as I think you indicated on cross-examination, some decomposition to the brain as you reviewed your slides in preparation for this trial testimony? A Yes, sir. Does that assist you in any way estimating the parameters of time of death? A *It tends to push the limits further out*." Ex. C-1 at 915 (emphasis added); Fitzpatrick ¶16.

P69.    At his deposition, Mitchell admitted that the Kodachrome slides do not show decomposition on their own. And Mitchell admitted that the report by neuropathologist Dr. Collins showed no decomposition on the outside of the brain (*i.e.*, the parts of the brain you can see on the slides). In fact, the report stated specifically that: "External examination of the brain over the convexities and at the base reveals normal structure without evident abnormality." Ex. A at 13; Ex. E at 46, 50, 84.

P70.    At his deposition, Mitchell admitted that reviewing these slides did not change his opinion regarding the time of death, or his opinion as to whether Hill dying on March 27, 1987 was only an outside possibility. Ex. E at 84-85.

10

V. **William Fitzpatrick Fails to Disclose the Evidence of Dr. Mitchell's Wrongdoing.**

P71. Fitzpatrick had worked with Mitchell on at least 15 to 18 homicide cases when he ran the homicide bureau at the district attorney's office from 1983 to 1986. Ex. F at 69-72.

P72. Before Fitzpatrick returned to the district attorney's office Fitzpatrick had read newspaper articles about Mitchell's misconduct, and after he was elected, he made it his practice to follow any stories regarding Mitchell because he wanted to know whether the articles called into question Mitchell's competence or expertise. Ex. F at 76-78.

P73. The newspapers during this time reported numerous incidents of misconduct by Mitchell, including, among others: October 31, 1987, the Syracuse Post-Standard reported on "turmoil" in Mitchell's office, including his failure to complete death certificates and provide a cause of death, the resignation of several physicians who disagreed with Mitchell, and that Mitchell was overworked. Ex. 7.

P74. On December 1, 1988, the Syracuse Herald reported that there were allegations that Mitchell had testified falsely at a homicide trial and that case he labelled as a homicide turned out not to be. Ex. 8.

P75. On April 24, 1992, the Syracuse Herald Journal reported that a morgue worker had been burying human remains in his yard and using them to teach seminars at his house and at Mitchell's house. Ex. 9.

P76. The Onondaga County Executive Nicholas Pirro started an investigation into Mitchell's misconduct in early March 1993, following complaints made by two pathologists who worked with Mitchell. Ex. 10.

P77. [redacted]

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████ Ex. 11 at 16-17.

P78.    ████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████ Ex. 11 at 9-10.

P79.    Dr. David Rigle, who worked with Mitchell, said that in 1990 Mitchell claims that "I've never come across a suspect I couldn't convict." And detailed how Mitchell urged him to memorialize his findings in a way that would make it easier to change them later at trial: "Dr. Mitchell insisted that I be much less specific in the description of my autopsy findings. When he further instructed me in this regard, alluding to some of his own autopsy reports as examples, he advised me that the reports I would write working under him had to be 'crafted' in such a manner that the wording would allow me to change my case-specific, medical opinions concerning cause of

12

death and manner of death determination at any time. He advised me that he had become very adept at this and could change the basis of his expert medical opinions at any time as the case progressed, to suit the needs of the case as circumstances may develop over time." Ex 12 at 28-29.

P80.    Toxicologist William Sawyer, who worked with Mitchell from 1988 to 1993, made similar accusations: "Throughout my five years with Dr. Mitchell, I witnessed him on several occasions slanting the interpretation of evidence and/or excluding evidence to serve his predetermined objectives." And he further explained how Mitchell had illegally handled body parts, and dangerous chemicals. Ex 13 at ¶12.

P81.    On March 3, 1993, the Syracuse Post-Standard published an article detailing these and other accusations by Dr. Rigle, Dr. Humphrey Germaniuk, and toxicologist Sawyer, who stated that:

   a. "Mitchell may not have the mental stability to run the office. They cite bizarre behavior dating back to 1987."

   b. "Mitchell used to have his workers dice up brains and other organs and flush them down the toilet or a flush sink, rather than following a more environmentally and ethically sound practice of having them incinerated."

   c. "Mitchell illegally allowed up to 100 pounds of highly volatile mercury to be stored in improper containers in the county lab for the past year, endangering thousands of workers in the County Office Building and Civic Center."

   d. He ordered Sawyer to illegally dispose of other toxic chemicals at the lab by mixing them with medical waste."

   e. Mitchell tried to "trade 25 gallons of alcohol at the lab to a private lab for a fax machine."

13

   f. "Mitchell retaliated repeatedly against Rigle and Germaniuk for complaining to the medical examiner's advisory board about a contract that requires them to handle AIDS cases from Oneida County."

███████████████████████████████████████████████

███████████████████. Ex. 11; Ex. 14 at 1-15.

P82. That same day, March 3rd, Fitzpatrick defended Mitchell in the press. Fitzpatrick supported Mitchell at a press conference where Mitchell was defending himself against allegations that he was flushing organs, including brain matter, down the toilet, that he was endangering people with improperly stored mercury, and that he was under investigation by the Health Department's Office of Professional Medical Conduct. Ex. 15; Ex. E at 104; Ex. F at 82-83, 133.

P83. Fitzpatrick admitted in his deposition that, as early as January 1993, he was aware of Dr. Rigle's accusations that Mitchell admitted he was a manic depressive and would use his mania to get more work done, that Mitchell ignored staff safety and put lives at risk, and that other forensic pathologists refused to work with Mitchell. Ex. F at 101.

P84. Fitzpatrick spoke to an investigator in the Medical Examiner's Officer about the allegations being made about Mitchell's misconduct. Ex. F at 84, 102.

P85. Fitzpatrick admitted in his deposition that Mitchell was "very, very valuable" in obtaining homicide convictions and when the allegations about Mitchell's misconduct came out, he was worried that he would lose Mitchell as a witness. Ex. F at 132-133.

P86. Rivas' trial for the Hill murder started on March 17, 1993 and finished on March 25, 1993. Fitzpatrick ¶23.

P87. Fitzpatrick admitted at this deposition that if Mitchell was convicted of illegally taking body parts from corpses without the family's permission, it would be a serious problem for Mitchell's career. Ex. F at 67, 108.

P88.  Fitzpatrick did not disclose the allegations about Mitchell's misconduct to defense counsel in 1993. This decision was consistent with the policy in Fitzpatrick's office, dictated by Fitzpatrick. And at trial Mitchell was not cross-examined regarding his misconduct, so it is reasonable to infer that defense counsel did not have this information Ex. C-1; Ex. F at 86-88, 107.

### VI. Hector Rivas is Wrongfully Convicted of the Valerie Hill Murder.

P89.  In his summation, Fitzpatrick relied on Mitchell's testimony to undermine Rivas' alibi, and to undermine his defense attorney's cross-examination, telling the jury that "He had a chance to review autopsy sectional slides of the brain. He considered the temperature factors. And most importantly, when he tells you what an autopsy is, it is not just medical stuff on a slab in the morgue. It is a constellation of all the other circumstantial factors that lead him into an opinion as to what is most likely the time of death. Friday night." Ex. 16.

P90.  Rivas was convicted of murder on March 25, 1993. *Rivas v. Fischer*, 687 F.3d 514, 527 (2d Cir. 2012).

### VII. William Fitzpatrick Stops Defending Dr. Erik Mitchell, and Dr. Mitchell is Forced to Resign to Avoid Criminal Charges.

P91.  In July 1993, Tynan started to investigate several of the accusations against Mitchell. He found credible evidence that Mitchell was illegally disposing of human remains by flushing them down the toilet, as recently as 1992, that Michell had been donating body parts to researchers without the family's consent – even when consent was specifically withheld – and that an employee of the Medical Examiner's Office had been burying skeletal remains on his property in 1988 and 1989 to use in a forensics courses, again without permission from the families. In his deposition, Mitchell admitted to being part of these courses and admitted bodies were buried on his farm, although he denied it in 1993. Ex. 5; Mitchell 99-101.

P92.  On November 13, 1993, Fitzpatrick issued a press release detailing what he discovered during Tynan's investigation. Ex. M.

15

P93. Fitzpatrick reached an agreement with Mitchell's attorney that he would stop the investigation, avoiding any criminal charges, if Mitchell resigned, which he did, and Fitzpatrick was satisfied by the resignation. Ex. F at 67-68.

P94. ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 11 at 21-34.

### VIII. The Second Circuit Orders a New Trial, Hector Rivas Gets Cancer, Retrial is Delayed, and Rivas Dies Waiting for it.

P95. After years of litigation, Rivas won his habeas case on appeal to the Second Circuit Court of Appeals, overturning his conviction and ruling that Rivas must be released within 60 days unless the State takes steps to expeditiously retry him. *Rivas v. Fischer*, 780 F.3d 529, 552 (2d Cir. 2015).

P96. The district attorney did not retry the case for well over a year, despite severe criticism from the Second Circuit, who had ordered an expeditious retrial. Ex. 17.

P97. Rivas was diagnosed with cancer and died on July 10, 2016. Fitzpatrick ¶29.

P98. The indictment was dismissed after Rivas' death.

Dated: New York, New York
      January 13, 2025

Rickner PLLC

By:  /s/
Rob Rickner

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 965-9370
Fax: (888) 390-5401
*Attorney for Plaintiff*