# DANIEL J. SPITZ, M.D.
## FORENSIC PATHOLOGY AND TOXICOLOGY

34051 South Gratiot Avenue, Suite 202
Clinton Township, Michigan 48035

****************************

Telephone: (586) 791-6700
Facsimile: (586) 791-6701
Direct: (313) 806-2002

Email: danspitz@aol.com

February 8, 2024

Mr. Joshua Moskovitz
Attorney at Law
Hamilton/Clark

Re: Sidney Manes v. Onondaga County, et al.

Dear Mr. Moskovitz,

My review of this case involved evaluation of the following materials:

- Autopsy Report (Valerie Hill)
- Toxicology Report (Valerie Hill)
- Death Investigation Report, Onondago County Medical Examiner's Office
- Scene Investigation Report
- Case Information Sheets
- Body Diagrams and Autopsy Worksheets
- Prescription Record
- Autopsy and Scene Photographs
- Death Certificate (Valerie Hill)
- Certificate of Identification
- Application for Search Warrant
- Handwritten Note (Exhibit 35)
- Affidavit, Dr. Cyril Wecht
- Trial Testimony – Dr. Erik Mitchell
- Deposition Testimony – Dr. Erik Mitchell (October 19, 2023)
- Deposition Testimony – Peter Tynan (December 20, 2023)

Subsequent to my review of these materials, it is my opinion that Valerie Hill died secondary to ligature strangulation. The manner of death is homicide. Furthermore, it is my opinion that Ms. Hill's death most likely occurred 36 hours and possibly up to 48 hours prior to when she was found dead on March 30, 1987 at approximately 1322 hours. Death was officially pronounced by the Onondaga County Medical Examiner on March 30, 1987 at 1530 hours.

Valerie Hill was a 28 year old female without significant past medical history. Ms. Hill was found dead in her apartment on March 30, 1987 at approximately 1322 hours. She was found by her father and brother who came to her home to do a well-fare check.

Upon finding Ms. Hill deceased a 911 call was made and officers from the Syracuse Police Department arrived on scene. Officer Bruce Kiggins observed Ms. Hill to be deceased and noted a ligature around her neck. Officer Kiggins notified the medical examiner's office at 1322 hours.

Crime scene investigators were contacted and arrived at the apartment to evaluate the scene and collect evidence. Medical examiner personnel were allowed access to the apartment at 1505 hours.

Dr. Erik Mitchell (Onondaga County Medical Examiner) responded to the scene and entered the apartment at approximately 1530 hours. Valerie Hill was officially pronounced deceased at this time.

According to Dr. Mitchell's scene investigation report, Valerie Hill was found face down on a rug in the living room. She was dressed in a bathrobe and a knit upper garment. The bathrobe was above the level of her buttocks. The body was described as being in full rigor with fixed anterior lividity. Fecal matter was around the anus with apparent smearing on her buttocks and upper thighs. A sash of material similar to the bathrobe was around her neck. The home was described as being "relatively cool as was the basement through ceiling from the floor upon which the decedent lay." There is no mention of the actual ambient temperature being taken while Dr. Mitchell was on scene and the apartment temperature is not recorded in his scene investigation report or any other document that I reviewed.

According to Investigator Gordie Lane, Valerie Hill was last seen alive on Friday, March 27, 1987 by her father who took her to dinner after she finished her shift as an emergency room nurse at St. Joseph's Hospital.

According to a case information sheet from the Onondaga Medical Examiner's Office (dated March 31, 1987 at 1300 hours) Sergeant Lynch indicated that Valerie Hill was last seen alive at 0830 hours on Saturday (March 28, 1987).

Valerie Hill's body was transported to the Onondaga County Medical Examiner's Office at 1655 hours for further investigation and autopsy.

An autopsy was conducted on March 30, 1987 at 1730 hours by Dr. Erik Mitchell

The autopsy report documented that Valerie Hill had fixed anterior lividity with flattening of the nose secondary to pressure and full rigor with cutis anserina. The rigor was described as easily broken.

No decompositional changes were noted upon external examination of Ms. Hill's body.

Anal and perianal fecal soiling was noted and fecal matter appeared to be smeared on her buttocks and thighs.

A large number of fibers were noted on the body surface. The fibers were collected and transferred to the police. There was no mention of a sexual assault/rape kit being performed.

Injuries consisted of multiple petechiae above the level of a ligature which was around Ms. Hill's neck. The eyes showed sclera hemorrhages and the oral mucosa showed large red petechial hemorrhages. The anterior neck muscles had streak hemorrhages and the left side of the hyoid bone and left greater horn of the thyroid cartilage were fractured. The epiglottis had multiple petechiae. A contusion involved the right temporal subscalp.

The vagina and rectum were without bruises or acute injury. A tampon was noted in the vagina and examination of the uterus showed evidence of menstruation.

Dr. Mitchell reported that the gross examination showed the brain to be mildly softened secondary to autolytic changes. The brain was not dissected at the time of the autopsy and was fixed in formalin for later examination by a neuropathologist (Dr. George Collins).

The heart was described as being mildly softened secondary to autolysis and the liver and spleen were described as having gassy crepitus. The pancreas was reported to show autolytic changes.

Examination of the stomach showed that it contained an estimated 250 cc of cloudy liquid with a fragment of what appears to be congealed grease.

Postmortem toxicology testing was positive for a blood alcohol level of 0.03 g/dL and a vitreous alcohol level of 0.02 g/dL.

It was not indicated in the neuropathology report as to the day and time of the brain examination and there was no mention of who was present when the brain was cut. When asked how long it was that the brain was in formalin, Dr. Mitchell responded: "That varies depending upon Dr. Collins' availability and scheduling and the needs of a particular case. It could be two weeks. It could be eight weeks. It could be longer." When asked if he was present when Dr. Collins cut the brain, Dr. Mitchell stated "That would be my standard practice, but I cannot guarantee you in a given case that we did not take it

up and examine it." Dr. Mitchell stated that if he had been part of the examination his involvement would not have been noted.

The report prepared by Dr. Collins indicated that the brain showed cavities in the deep areas related to decomposition. This finding is essentially of no forensic value with respect to time of death determination since decompositional cavities often occur during the process of fixation due to poor penetration of the formalin into the deep tissues of the brain. Using such a finding to determine or estimate the time of death would be inappropriate and without scientific basis.

When evaluating the time of the death, several factors should be taken into account. Scientific means such as rigor mortis, livor mortis, algor mortis and decompositional changes are important as is circumstantial information such as when the decedent was last known to be alive.

When evaluating scientific factors the environment should be considered as part of the evaluation. In average, comfortable room temperature conditions, the progression of postmortem rigor mortis and lividity is fairly standard. However, environmental extremes make using such findings difficult. In a very warm environment, the time frame for these factors is increased and in a cold environment, the timing is decreased.

In this case, Valerie Hill was inside her residence which was likely a comfortable ambient temperature. With an environment between 60-70 degrees Fahrenheit, I would expect rigor mortis and lividity to follow a fairly standard progression and be consistent with known parameters which allow for a reproducible estimate of the time of death. No body temperature was taken and thus algor mortis cannot be used in the time of death estimation.

Commonly referenced forensic literature with respect to postmortem changes such as rigor mortis and livor mortis offers the following:

**Medicolegal Investigation of Death, Spitz, 4th Edition, Spitz, WU, Spitz, DJ, 2006**

In temperate climates, under average conditions, rigor becomes apparent within half an hour to an hour, increases progressively to a maximum within twelve hours, remains for about ten or twelve hours and then progressively disappears within the following twelve hours.

Postmortem lividity may be evident as early as twenty minutes after death or may become apparent after several hours. The development of lividity is a gradual process which progressively becomes more pronounced.

In the early stages, livor can be blanched by compression and may shift if the position of the body is changed. Depending on temperature, but usually after eight to twelve hours, the blood congeals in the capillaries or diffuses into the extravascular tissues and does not usually permit blanching or displacement.

**Forensic Pathology, Principals and Practice, Dolinak, D, Matshes, E, Lew, E, 2005**

Rigor mortis is the stiffening of the muscles postmortem due to chemical changes in the myoplasm. It begins after death but is usually not readily detected until hours later. The stiffness progresses with time and becomes maximal between 8-12 hours postmortem at room temperature. Once rigor mortis is fully developed and decomposition continues in the muscles, the rigor will begin to pass off, again at a rate that is dependent on the same factors as those that affected the development of rigor. Discoloration of the skin, including early marbling, slippage of the skin, early bloating of the face and distinctive odor may accompany the passing of rigor mortis.

Livor mortis begins to develop after the heart stops beating and becomes more intense with time, so that if livor is perceptible after 3-4 hours, it will be even more readily seen at 6-8 hours. Livor becomes fully developed around 10-12 hours. Once livor is fully developed, it becomes fixed and will no longer blanche with pressure.

Following my forensic evaluation of this case, it is my opinion that Valerie Hill's death most likely occurred around 36 hours up to possibly 48 hours prior to her being found dead on March 30, 1987. While the death could have occurred even a few hours early than 36 hours, 48 hours would be the outside range of the postmortem interval.

The presence of full rigor mortis as described by Dr. Mitchell in his scene investigation report strongly supports a postmortem interval at or around 36 hours starting at the time that Ms. Hill was found deceased. Such a finding would not be expected if Ms. Hill's death had occurred more than 48 hours previously.

Furthermore, in Valerie Hill's autopsy report, Dr. Mitchell described full rigor with cutis anserina (goose flesh) and noted that the rigor was easily broken. He also described fixed anterior lividity and did not mention that any lividity had moved posteriorly after the body was put in a supine position. These findings are recorded approximately 3 hours after he conducted his initial examination at the scene. The autopsy findings regarding rigor mortis and lividity are also consistent with an approximately 36 hour time frame from when Ms. Hill was found deceased.

Dr. Mitchell testified in his deposition that he used the brain slides to help determine the time of death. There is one photograph of the brain taken at the time of the autopsy. The brain has a small amount of blood over the cerebral hemispheres. The photograph does not show any decompositional changes involving the brain. The brain was fixed in formalin and cut at an unknown later date. Brains placed in formalin will often show decompositional changes in the deep structures because the formalin does not readily penetrate into these areas. Any time of death estimate using this finding would be inaccurate and forensically unreliable.

There were no microscopic slides taken of the brain.

Although fecal matter was noted on and around the anus and on the buttocks and thighs, this is not sufficient to render a conclusion of sexual assault. No genital injuries were

noted and no positive reports regarding biologic specimens from a rape kit appear to exist. Although the scene investigation raises the suspicion of a sexually motive crime, there is insufficient evidence upon which to base this opinion.

In Summary:

1.) Valerie Hill's death most likely occurred 36 hours but not later than 48 hours prior to when she was found dead.
2.) There is no valid or reliable medical or scientific support for Dr. Mitchell's opinion that Ms. Hill's death could have occurred more than 48 hours before she was found dead.
3.) In offering the opinion that Ms. Hill's death could have occurred more than 48 hours before she was found dead, Dr. Mitchell failed to adhere to and neglected standard accepted practices in the field of forensic pathology.
4.) There is no observable decomposition of Valerie Hill's brain.
5.) There is no evidence to indicate that Valerie Hill had been sexually assaulted.
6.) There is no reliable medical or scientific support for Dr. Mitchell's opinion that the timing of Ms. Hill's death could be determined based on the condition of Ms. Hill's brain.
7.) Dr. Mitchell did not rely upon any objective evidence to support his conclusion that the ambient temperature in Valerie Hill's apartment impacted the time of her death.

The above opinions are made to a reasonable degree of medical and scientific certainty and are based on the materials that I have reviewed. I reserve the right to amend my opinions should new or additional information become available.

I would testify to the above if called as a witness at trial and I hereby affirm the foregoing under penalty of perjury.

Very truly yours,

Daniel J. Spitz, M.D.