1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    * * * * * * * * * * * * * * * * * * * * * * * * *

4    SIDNEY MANES, Administrator of the Estate of HECTOR
     RIVAS,

5
                         Plaintiff,
6
                              Index No. 19-CV-844(BKS)(TWD)
7    against

8    ONONDAGA COUNTY, CITY OF SYRACUSE, WILLIAM
     FITZPATRICK, DR. ERIK MITCHELL, and "JOHN DOES 1-10",

9
                         Defendants.
10
     * * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13

14

15

16

17

18            **EXAMINATION BEFORE TRIAL** of

19            **DANIEL SPITZ, M.D.,** expert testimony taken

20            via videoconference by Zoom, held in New York

21            State on August 15, 2024.  This deposition

22            was taken by LISA M. SCHUSTER, Court Reporter

23            and Notary Public in and for the State of

24            New York.

25

```
 1

 2

 3

 4      APPEARANCES:

 5
        For the Plaintiff:
 6
            THE LAW OFFICES OF JOSHUA MOSKOVITZ, P.C.
 7          392 Central Avenue, 7803
            Jersey City, New Jersey  07307
 8          BY:  JOSHUA MOSKOVITZ, ESQ.

 9          Also Present:  Sara Wolkensdorfer

10

11
        For the Defendants:
12
            ROBERT F. JULIAN, P.C.
13          2037 Genesee Street
            Utica, New York  13501
14          BY:  ROBERT JULIAN, ESQ.

15          Also Present:  Mary Jumbelic, M.D.

16

17          PARROTTA STUDIO
            350 Merchants Road
18          Rochester, New York
            Ken Williamson, Videographer
19

20

21

22

23

24

25
```

DANIEL SPITZ, M.D., by JULIAN                    39

```
 1          A.   There are outliers, of course.

 2          Q.   Well, no.  Define outliers.

 3          A.    Well, I mean, medicine is not an exact

 4     situation.  Medicine there are always outliers and they

 5     don't always have, you know, a defined explanation.

 6               Following the scientific method and process of

 7     lividity and rigor mortis, we get some parameters upon

 8     which opinions are made on a day-to-day basis by forensic

 9     pathologists.  Are there situations where rigor mortis

10     lasts longer than 48 hours, well, sure.  Part of them are

11     related to extremes of temperature.  You know.  Are there

12     anecdotal reports?  Sure, there's anecdotal reports of

13     everything, that's not where opinions are based.  We're

14     not basing our opinions based on an anecdotal report that

15     really can't be scientifically analyzed because we don't

16     have a series of situations.

17               If you look at -- this is something that's been

18     going on for since the beginning of forensic medicine.

19     If you look at all the forensic textbooks, sure they say

20     that there are outliers, but when you look at the real

21     scientific reproducible data, you get more of a defined

22     sequence for lividity and rigor mortis and that's where

23     opinions are based.  It doesn't mean that it's a hundred

24     percent across the board, nothing really is in medicine.

25               MR. JULIAN:  Thank you.  Can we take
```

1    Saginaw County to do their medical examiner work.  That

2    was several years after some of the Macomb County

3    employee problems.

4              MR. JULIAN:  Can I have five minutes and I

5         think we're done?

6              THE WITNESS:  Sure.

7              VIDEOGRAPHER:  The time is 4:29.  We are

8         off the record.

9              ( Whereupon, a recess was taken )

10             VIDEOGRAPHER:  We are on the record.  The

11        time is 4:36 p.m.  Please continue.

12             MR. JULIAN:  Doctor, that completes my

13        questioning.  Thank you for your time.

14             THE WITNESS:  Great.  Thank you.

15   **EXAMINATION BY**

16   **MR. MOSKOVITZ:**

17        Q.  I have a couple questions, if I may.  Good

18   afternoon, Dr. Spitz.  Can you hear me okay?

19        A.  Yeah.

20        Q.  Great.  So Mr. Julian asked you a number of

21   questions about discretion and judgment that forensic

22   pathologists exercise in forming their opinions, you

23   recall those questions?

24        A.  Yes.

25        Q.  So you agree generally that there is some

DANIEL SPITZ, M.D., by MOSKOVITZ                68

1    amount of discretion or judgment that forensic

2    pathologists must utilize, right?

3        A.   Yes.

4        Q.   Do you believe that it is an exercise of

5    discretion or judgment for a forensic pathologist to

6    ignore known scientific data?

7        A.   No, you certainly shouldn't do that.

8        Q.   Do you think it's an exercise of discretion or

9    judgment for a forensic pathologist to ignore known

10   scientific assessment of common evidence like rigor

11   mortis, for instance?

12       A.   No.  You should analyze it in the context of

13   what is generally known and accepted.

14       Q.   So for instance, with rigor mortis we know from

15   scientific -- reproducible scientific studies that there

16   is a standard window for which rigor mortis sets in and

17   dissipates, right?

18       A.   Yes.

19       Q.   We'll get to this in a second.  There might be

20   some outliers to that, but scientifically we can say this

21   is the normal course that there is this window of time

22   for rigor mortis to fully set and then for it to fully

23   dissipate, correct?

24       A.   Correct.

25       Q.   Now, do you think a forensic pathologist is

DANIEL SPITZ, M.D., by MOSKOVITZ                69

1    exercising discretion or judgment if they -- in reaching

2    an opinion about the likely window of time of death

3    ignore the widely accepted scientific knowledge about the

4    time it takes for rigor mortis to set in and dissipate?

5         A.   No.  I think you need to not only document the

6    findings, but then interpret those findings in the

7    context of what is known.  And there is an understanding

8    that you need to build in some degree of window, which

9    I've done in this case, to indicate that 48 hours is the

10   outer time frame does include a window of time to account

11   for the fact that not everybody is identical and that not

12   every environment is, you know, perfect, you know, to

13   account for something that is very specific, but even

14   when you put in that window, you're at that 48-hour time

15   frame.

16        And so I think at a minimum Dr. Mitchell should

17   have recognized that the scientific parameters indicate

18   that the death was in a 48-hour time frame.  Of course if

19   he wants to discuss circumstances, you know, that's not

20   really him to analyze, those are just -- those should be

21   facts that he can take into consideration, but those

22   aren't really -- and if there's a discrepancy, then I

23   suppose you can indicate there's a discrepancy, but, you

24   know, Dr. Mitchell should be focussed on the science and

25   those are his findings, and so therefore he should be

DANIEL SPITZ, M.D., by MOSKOVITZ                    70

1    rendering opinions that are reproducible and known and

2    understood with respect to those parameters.

3        Q.   I want to focus on the scientific aspect of the

4    forensic pathologist's work.  Based on your experience

5    and to a reasonable degree of certainty from that

6    experience and training, is there any basis in science

7    within the field of forensic pathology that supports an

8    opinion that Valerie Hill's death could have occurred

9    more than 48 hours before she was discovered?

10       A.   No, I don't think the scientific data would

11   support a longer time frame than 48 hours.

12       Q.   So we talked or you spoke a bit with Mr. Julian

13   about outliers.  Now, is it fair to say that in human

14   experience, there's always outliers?

15       A.   Of course.  There's outliers in virtually

16   everything that goes on.

17       Q.   Right.  And so science is aware of outliers and

18   takes that into account and that's not unusual, right?

19       A.   Right.  You know.  You're not saying that a

20   hundred percent of people follow the exact same process.

21   What you're saying is that we have known reproducible --

22   known reproducible process to analyze these kinds of

23   things, and while there's a bell curve, the overwhelming

24   majority, you know, follow that process, and there are

25   outliers.  And usually there's reasons for those

DANIEL SPITZ, M.D., by MOSKOVITZ                    71

```
 1    outliers, but sometimes there's not or the reasons that

 2    exist might not be known.

 3         Q.   So when giving a scientific opinion or medical

 4    opinion in your report, you talk about a reasonable

 5    degree of medical certainty.  That's the type of opinion

 6    that's based on reproducible data acknowledging that

 7    there might be some extreme outliers, right?

 8         A.   Correct.

 9         Q.   And so would you say that in your experience in

10    providing an opinion on a window of the most likely time

11    of death, you would use outliers in expressing that

12    opinion?

13         A.   I would not.  I would not, because again,

14    you're looking at the overwhelming majority of cases, and

15    I suppose if you wanted to mention that outliers can

16    exist, but outliers are rare, you know, that would be a

17    truthful and accurate statement.  But as far as giving

18    opinions to a reasonable degree of medical certainty,

19    that encompasses what is known and reproducible and

20    doesn't really need to incorporate outliers, because

21    outliers exist in everything we do.

22         Q.   Are you aware of any scientific literature that

23    supports the conclusion that a room ambient temperature

24    of 62 degrees can prolong rigor mortis?

25         A.   Not to any significant measurable degree.  No,
```

DANIEL SPITZ, M.D., by MOSKOVITZ                    72

1    I'm not aware of anything like that.

2        Q.   Are you aware of scientific literature that

3    supports the conclusion that an ambient room temperature

4    of 62 degrees can prolong lividity?

5        A.   Not to any significant or measurable degree.

6        Q.   Are you aware of any scientific literature that

7    supports, taking into account anything that's visible in

8    the photographs of Miss Hill's brain, in determining the

9    likely time of death?

10       A.   No.

11               MR. MOSKOVITZ:  Thank you.  Those are all

12            the questions I have for Dr. Spitz.

13               MR. JULIAN:  Nothing further.

14               VIDEOGRAPHER:  Okay.  This will conclude

15            today's testimony.  The time is 4:44 p.m.  We

16            are off the record.

17            ( Whereupon, the examination concluded )

18                         -oOo-

19

20

21

22

23

24

25