# Forensic Consulting Specialists, Inc.

## 161 Cresline Drive ● Syracuse, New York 13206

## 315-432-1538

January 16, 2008

J. David Eldridge, Esquire
Eldridge & Langone, PLLC
185 Waterside Avenue
Northport, New York 11768

**Re: Walid Daniel Matter**

Dear Attorney Eldridge:

I have reviewed all the materials you provided to me concerning the death of Ivet Daniel. The materials reviewed include the items specified below. Further, I visited the death scene, which had not been structurally modified or substantially altered since the death of Ivet Daniel. During my scene visit, I made measurements of various coordinates in the bathroom and shower area and took digital color photographs. Additionally, I have reviewed the pertinent, case-specific abstracts generated from peer-reviewed medical research available through the national Library of Medicine databases. Finally, I have also examined the child protective lock purported to have caused the abraded contusion across the forehead of Ivet Daniel, identified by Erik K. Mitchell, M.D., in his gross autopsy report as Bruise A. This will be discussed in further detail.

1. Death investigative reports prepared by the Onondaga County Sheriff's Department.

2. Death Investigative reports prepared by the Onondaga County Medical Examiner's Office.

3. The autopsy report prepared by Erik K. Mitchell, including gross examination, microscopic tissue examination, body diagrams, specimen collection listing and toxicology report.

4. Prints of color photographs depicting the death scene and gross autopsy findings.

5. Re-cut H & E and Iron stains of the autopsy histology blocks prepared from the remains of Ivet Daniel, from tissue specimens collected by Dr. Mitchell at the time of autopsy.

6. A transcript of the grand jury testimony provided by Erik K. Mitchell, M.D. (Grand Jury transcript pages 59-78)

P08812

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 2 of 23**
**January 16, 2008**

7. A transcript of the trial testimony provided by Erik K. Mitchell, M.D. (trial transcript page 2267-2378).

8. Medical records from Saint Joseph's Hospital, Syracuse, New York, regarding care provided to Ivet Daniel on June 4, 1991, including the pre-hospital care report prepared by the Liverpool Fire Department Ambulance Staff.

9. Reports of experts; Walter Carlson, P.I., March 16, 2001; Gary W. Ross, M.D., Forensic Pathologist, April 19, 2001; and Arthur T. Davidson, M.D. Assistant Clinical Professor of Surgery, Albert Einstein College of Medicine, November 3, 1993.

10. A timeline of Mr. Walid Daniel's whereabouts on June 4, 1991, provided to me by Attorney J. David Eldridge, (TABLE B).

11. Photographs and measurements made during my visit to 125 Old Liverpool Road on June 22, 2007.

12. Letter from Ed Menkin, Esquire to Sal Piemonte, dated February 12, 1992, indicating that the plastic child safety lock that Erik K. Mitchell, M.D. causally links to an autopsy finding hereafter referred to as Bruise A, was tested by Steve Kaszubinski and no blood or tissue was detected. Further, this report substantiates that Walid Daniel's clothing recovered by Detective Conroy on June 4, 1991, was free of blood and hair.


You have asked that I review these materials to determine if the cause of death and the manner of death, as officially reported by Erik K. Mitchell, M.D. is accurate and validated by the case evidence made available to me. You have asked that I also comment specifically about Erik K. Mitchell, M.D., his mental state and his management of the Onondaga County Medical Examiners Office during the time interval surrounding the death of Ivet Daniel.

In this report, I will address these two issues separately. All opinions expressed in this report are based upon my training, education experience and background. All expert opinions expressed in this report I hold, at a minimum, to a confidence level of reasonable certainty. I will first provide you with a very brief history concerning my background, education, experience and training in forensics.

P08813

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 3 of 23**
**January 16, 2008**

After completing medical school with the distinction of Magna Cum Laude, I entered into a five-year combined internship and residency program in anatomical and clinical pathology at St. Paul Ramsey Medical Center, St. Paul, Minnesota. After completing my anatomical and clinical pathology residency, I practiced emergency medicine and family practice for approximately eight months at Forest Lake Hospital and Doctors' Clinic, Forest Lake, Minnesota, and then entered into a year of specialized training in forensics. After completing my fellowship training in forensic medicine and pathology at the Office of the Chief Medical Examiners for the State of Maryland, I accepted a position as an attending forensic pathologist at the Onondaga County Medical Examiners Office (OCMEO) as an Assistant Medical Examiner, under Erik K. Mitchell, M.D. I am board certified by the American Board of Forensic Medicine. My employment under Dr. Mitchell ran from May 1990 through January 1994. Since our OCMEO staff consisted of only three pathologists; myself, Dr. Mitchell and Assistant Medical Examiner, Humphrey D. Germaniuk, M.D. I had daily and extensive dealings with Dr. Mitchell.

***********

At 6:05 pm, on June 4, 1991, Helen Clifford, Administrator of the Onondaga County Medical Examiner's Office (OCMEO) received a call reporting the death of Ivet Daniel. OCMEO Forensic Investigator, Thomas Jensen, prepared a narrative report of the circumstances surrounding the death and Mr. Jensen, along with Onondaga County Medical Examiner, Erik Krag Mitchell, M.D., responded to the scene to investigate the death. By the time of their arrival, the death scene had been physically altered, as emergency response personnel moved the decedent from where she had been discovered and attempted cardiopulmonary resuscitation (CPR). When more space was needed to accommodate CPR personnel, the decedent was moved a second time before being prepared for transport to the hospital. Further, investigative reports indicate that Dr. Mitchell actually went to the scene on two separate occasions, the second instance in an attempt to identify an instrument potentially causative of an injury that was observed on the decedent's forehead. This purported injury will be further addressed later in this report. The records provided by the OCMEO show no documentation of Dr. Mitchell's scene investigation or activities he performed while at the scene of death.

On June 5, 1991, Erik K. Mitchell, M.D. certified the cause of death as drowning, occurring in concurrence with the decedent having been beaten about the head. Further, he certified the manner of death as homicide. Interestingly, only one day after the death, Dr. Mitchell certified Ivet Daniel's death as homicide, without the benefit of him having available any toxicology studies or tissue microscopics. This is not a conventional practice in forensic medicine for cases of this nature. Toxicology results most certainty represent critical physical evidence in establishing cause of death and manner of death in cases involving unwitnessed drowning and certification of a drowning death as homicide without first considering the toxicology evidence undoubtedly represents an unnecessary rush to judgment on the part of Eric Krag Mitchell, M.D.

P08814

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 4 of 23**
**January 16, 2008**


From the perspective of first responders, investigative reports indicate that the Liverpool Fire Department Ambulance received an emergency call at 5:32 pm, reporting a female found in the bathtub by her husband upon returning to the residence after work. The first responding individual appearing at the scene was Donald S. Imeson, Chief of the Liverpool Volunteer Fire Department.

In a sworn affidavit prepared for the Onondaga County Sheriff's Department, dated June 5, 1991, Mr. Imeson states that he was first contacted on June 4, 1991, at 5:25 pm, about a woman, possibly drowning in a bathtub, at 125 Old Liverpool Road.

Mr. Imeson, the first official to arrive at the death scene, reported that he encountered a white, clothed female lying face-up in a bathtub full of running water, after being directed to the bathroom by the decedent's husband, who was holding a baby. Mr. Imeson, who provided a well-detailed account of his observations, noted that the decedent's head was above the water, resting on the rim of the bathtub, which was overflowing with bloody water. He noted blood on the rim of the tub, the location of which is depicted in the scene investigation photographs.

Upon arrival at the scene, Imeson had been advised by Mr. Daniel that he had attempted to remove his wife from the bath but she was too heavy and too slippery. Noteworthy, Mr. Imeson likewise was unable to pull the 5'9", 220-pound woman from the bath without assistance.

Mr. Imeson noted that the decedent was without pulse and had white frothy fluid extruding from her mouth. He further noted that he did not observe any bruises on the face, arms or legs of the decedent.

Next to arrive on the scene was Liverpool Fire Department Medic, Marilyn Markham, who assisted Mr. Imeson with removing the decedent from the tub. The only injury noted upon removal of the decedent from the tub was a gash above and behind her right ear.

Soon after the arrival of Marilyn Markham on the scene, other rescue workers including Terry Wellenzohn, Doug Graham, David Putman, Peter Newlow, John Edwards, Chris Kaye and Mike Vassalo arrived and assisted with a rotation of vigorous CPR efforts, that remained essentially continuous, until Ms. Daniel's arrival at St. Joseph's Hospital at 6:01 pm, at which time continuous CPR was performed by emergency department staff, until the code was terminated at 6:18 pm and the decedent pronounced dead by Dr. Zick.

Additional significant facts and findings documented in the investigative reports and medical records from St. Joseph's Hospital include the following:

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 5 of 23**
**January 16, 2008**

- The temperature of the bath water taken at 8:10 pm was 80°.

- Upon arrival on-scene, Fire Chief Imeson reported that the bath water was cold. This is further stated in the St. Joseph's Hospital medical records.

- Marilyn Markham states in her affidavit that the bath tub water was very cold.

- The St. Joseph's Hospital Emergency Room record notes the decedent to have a body temperature of 98.3° F.

- Appropriately, the decedent had been handled aggressively at the death scene during vigorous CPR, with investigative reports further indicating that she had been dragged to different positions on two occasions, extricated from the tub onto a hard surfaced floor and had sustained chest compressions during protracted CPR attempts sufficiently energetic to cause multiple rib fractures, (per autopsy report).

- When frothy fluid was cleared from the mouth during resuscitation efforts at the death scene, additional fluid from the lungs exuded into the mouth, continuously.

- Emergency care providers removed the deceased from the scene on a backboard equipped with a neck support.

- It is noted in multiple investigative reports that multiple attempts at intubation were unsuccessful at the scene.

- In his deposition, Michael J. Vassalo states that when he questioned Mr. Walid Daniel at the scene, Mr. Daniel, "was very distraught and was crying."

- Except for the scalp laceration above and behind the right ear, there is no mention of other injuries on the body of the decedent by emergency personnel at the scene or by the emergency medical staff at St. Joseph's Hospital. Further, it is noted in multiple documents and affidavit statements, that no other injuries were observed beyond the single scalp laceration, above and behind the right ear.

*Forensic Consulting Specialists, Inc.*
J. David Eldridge, Esquire
Walid Daniel Matter
Page 6 of 23
January 16, 2008

- There is no mention of scratches, abrasions, contusions or other injuries to the arms or hands of Mr. Daniel. Given that the decedent was face-up when discovered in the tub, one would expect Mr. Daniel to have 'defense injuries' particularly scratch type abrasions on the forearms and on the dorsal aspects of his hands, had he forcefully submerged his wife against her will.

- There is no mention of blood spatter patterns on the walls, ceiling or clothing of Walid Daniel that would inevitably be present if the decedent had been struck multiple times, to cause the scalp laceration.

I will now focus on Dr. Mitchell's autopsy report, for without having first-hand knowledge of how he conducted his medical examiner activities, much of this is likely to make little sense to anyone who has not worked with him directly. Once the autopsy report of Dr. Mitchell has been reviewed and consideration given to his interpretation of the purported injuries, I will review his grand jury and trial testimony and then further discuss my personal dealings with him in detail.

Dr. Mitchell's autopsy protocol of Ivet Daniel is dated June 4, 1991, 11:00 pm. However, this represents the time he performed the gross dissection rather than the time he dictated his autopsy report. The report itself consists of eight pages of text and a cover page noting cause of death and manner of death. Of the eight pages of text, approximately five full pages are dedicated to the description of what he classifies as acute injury. Dr Mitchell describes seventeen bruises which he labels A through Q, consecutively. For most of the bruises he describes grossly, there is a corresponding microscopic examination of the tissue taken from these purported bruises, labeled N through Z, consecutively. Unfortunately, the letter depicting the bruises grossly does not correspond in any way to the letter depicting the microscopic characteristics of each particular bruise. Accordingly, to minimize confusion in this regard, I have created a table depicting Dr. Mitchell's localization and characterization of each bruise grossly, the corresponding features of each bruise depicted in his microscopic examination along with his interpretation of the bruise provided in his testimony, where available, alongside my interpretation of the 'bruise' based upon review of the gross autopsy photos and examination of re-cut H&E tissue sections and also tissue sections stained with iron stain. The microscopics I reviewed are essentially identical to those evaluated by Dr. Mitchell. Please refer to TABLE A annexed to this report.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 7 of 23**
**January 16, 2008**

The gross autopsy report on Ivet Daniel, prepared by Dr. Mitchell is not dated at the signature line, which was a standard procedure at the OCMEO under Dr. Mitchell, while the microscopic exam review is dated August 22, 1991. Therefore we have no idea as to when Dr. Mitchell dictated and signed-off on his gross autopsy findings. In court testimony transcripts he confirms this, as he testified that he does not dictate his autopsy findings at the time of the examination. Accordingly, there could have been a significant time lapse between the autopsy and the time he prepared his report, resulting in time delay diminished accuracy. Regardless, the manner in which he dictated the Ivet Daniel report causes one reading the report to have the impression that Ivet Daniel was covered with injuries, which is not the case.

In general, I am very skeptical of the autopsy report accuracy of Ivet Daniel as prepared by Dr. Mitchell, since his gross examination report demonstrate glaring omissions. For example, the report fails to mention examination of the back of the torso, the chest, the abdomen and the breasts. It is standard for the pathologist to examine and note any findings on these body surfaces, even if they are completely unremarkable. In these instances, it should be stated that they are unremarkable, so to document that they in fact have been examined. To not do so, as in this case, indicates substandard work on the part of the examiner. Also, it deviates from the strict policy concerning autopsy report preparation as imposed by Dr. Mitchell, himself. This raises other questions of reporting accuracy and methodology, specifically regarding the manner by which relatively minor bruises were documented with full paragraph descriptions and headers, a method which tends to exaggerate the overall picture of bodily injury as sustained by Ivet Daniel.

Since it is a well-established principle in forensics, that the location of a contusion on a body surface does not predictably correspond with the site of an impacting force causing the bruise, much of the pages of text Erik K. Mitchell, M.D. used to describe bruises to the left arm could be reasonably documented by simply recording:

*'There are multiple contusions on the skin of the left upper extremity extending from 1 inch below the top of the shoulder to the elbow ranging from 0.1 inches to 2.0 inches in greatest dimension. This is further documented photographically.'*

Following is an accurate representation of the rather insignificant, minor bruises, that Dr. Mitchell goes on to describe in great detail, lending the impression of great severity and great bodily harm sustained by Ivet Daniel at the time of her death.

**Bruise A -** Clearly represents therapeutic intervention artifact, that I will discuss in detail below. This artifact offers no interpretive evidence of homicide.

**Bruise B -** Is an abraded laceration above and behind the right ear. This is the only significant injury that Ivet Daniel sustained. This will be discussed in further detail below.

P08818

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 8 of 23**
**January 16, 2008**

**Bruise C -** Is a faint artifact over the bridge of the nose caused by therapeutic intervention during aggressive CPR. It was caused by firm application of the ventilator mask. This artifact offers no interpretive evidence of homicide.

**Bruises D, E, F, G, H, I, J and K -** represent a group of bruises clustered about the left elbow and left upper arm most probably resulting from extrication of Ivet Daniel from the bathtub, moving her around during CPR in the bathroom and subsequent transfer of her to an ambulance gurney for transport to the hospital and then transfer of her from the ambulance gurney to the hospital gurney in the emergency room. None of these injuries are life-threatening. They offer no interpretive evidence of homicide.

**Bruise L -** is located about the right elbow and most likely represents an artifact resulting from moving Ivet Daniel as described above. Again, this is a very minor injury and if it did not occur perimortem, occurred postmortem, as did the marks observed on the left upper extremity described above. Bruise L offers no interpretive evidence of homicide.

**Bruise M -** describes areas of discoloration involving the knuckles of the left hand. The absence of any overlying abrasion indicates that these discolorations most probably represent cold water artifact. This is substantiated by absence of hemorrhage in the microscopic skin sections that I examined. They offer no interpretive evidence of homicide.

**Bruises N, O, P and Q -** represent small contusions overlying the right knee, right shin and right ankle. These marks are also consistent with extrication from the tub and subsequent transport of Ivet Daniel described above. They offer no interpretive evidence of homicide. They are very minor injuries.


Pointedly, the autopsy reporting style and methodology utilized by Erik K. Mitchell in this case, demonstrates a clear attempt by him to manipulate the case findings to suit a conclusion of homicidal drowning. All in the same report, there are critical omissions, along with unwarranted, lengthy dissertations regarding insignificant bruises: 'bruises' with no true forensic interpretative value; along with the reporting of marks on the body claimed to represent antemortem homicidally inflicted injuries, that instead represent artifacts unequivocally caused by therapeutic intervention. This will be further discussed in Part II of this report, concerning my personal knowledge of Erik K. Mitchell, M.D. and his attempt to have me fashion my autopsy reports in a way that would allow for manipulation of the case findings.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 9 of 23**
**January 16, 2008**


### 'Bruise A'

In both the grand jury testimony and trial testimony, a great deal of attention is focused on the band-like, abraded contusion, running laterally across the decedent's forehead. This is described as being composed of two lateral-running almost parallel, thin bands of abrasion, connected by vertical, thin abrasions having a 3/16" periodicity.

Without any comparative forensic testing or reasonable explanation as to how this can possibly occur, Erik K. Mitchell, M.D. opines that this "injury" is the result of trauma. He even goes so far as to claim that a plastic child protective device was responsible for these forehead markings. I have personally examined the suspect child lock and the bathroom cabinet where it had been positioned when Dr. Mitchell claims the injury to have occurred. It is my opinion that this notion is **absurdly** erroneous. Had Erik K. Mitchell, M.D. followed-up by communicating with emergency first responders, he would have discovered that, with reasonable medical certainty, this forehead marking was indeed iatrogenic and caused by the head stabilizing strap on the backboard, by which the decedent was emergently transported to the hospital. My opinion regarding this 'injury' is consistent with the interpretation offered by Dr. Gary Ross in his expert report dated April 19, 2001.

Technically, when a patient is fastened to a backboard by emergency response personnel, a fabric band, like a seat belt, (with the texture characteristics described by Erik K. Mitchell, M.D. to be incorporated in the pattern of the purported injury), is secured tightly across the upper forehead to firmly secure the neck to the neck-brace portion of the backboard. Because the decedent was very large, substantial tension was necessary to hold the head securely in place during transport. Friction and compression of the skin of the forehead, against the fabric of the restraint, created this patterned abraded contusion. There was bleeding into the forehead skin as a result of artificially created blood pressure, that was sustained by effective CPR. These markings on the decedent's forehead should never have been misconstrued as 'real injury' as it most assuredly represents artifact as a consequence of medical intervention. Further, Dr. Mitchell did not wait for tissue processing to determine the microscopic characteristics of this forehead marking and therefore ruled this death a homicide prematurely, with far less than adequate information available to him.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 10 of 23**
**January 16, 2008**

## 'Bruise B'

The only externally bleeding injury suffered by the decedent was a laceration, behind and above the right ear, with increased marginal abrasion on the inferior aspect. Of all the injuries described by Erik K. Mitchell, M.D. in his report and testimony, this is the only one capable of causing unconsciousness leading to drowning or incapacitation of a victim during homicidal drowning. This injury is the result of the decedent's head striking a water fixture on the bathtub, namely one of the water flow control valve handles. Erik K. Mitchell, M.D. admits to this possibility in his trial testimony (Erik K. Mitchell, M.D. trial testimony p 2300). However, by then the damage had been done, as he misleadingly remained steadfast in his opinion that the death of Ivet Daniel represented a homicide.

In actuality, what can be learned from the bleeding scalp wound is that it is consistent with a face-up, backward descent into the bathtub, with the decedent striking her head on the metallic fixture during the fall, knocking herself unconscious and drowning as a consequence of her airway being submerged below the waterline. There is no other reasonable explanation.

The wider margin of abrasion along the inferior aspect of the laceration is not the result of someone hitting their head on the faucet while attempting to battle with an offender trying to hold the victim submerged below the water line. This homicidal scenario would require the wider margin of abrasion to lie along the superior and frontal edge of the laceration. That is not depicted at all in the photographs, which demonstrate the characteristics of this wound very well.

Accordingly, this wound is consistent with accidental drowning and is not consistent with homicidal drowning, whatsoever.

The tissue blocks submitted for H& E and iron stain preparations for microscopic evaluation of injuries are lettered N through Y, consecutively. These microscopic slides were prepared to characterize the skin markings described as bumps, scratches, abrasions and contusions on the body surface of the decedent although no singular injury of this nature nor all of them collectively can cause death, as they are essentially very minor. However, the age of these injuries can be important in assessing whether or not the decedent had been beaten and drowned, as certified by Dr. Mitchell at the time of autopsy.

Using the tissue block legend provided by Dr. Mitchell on a supplemental case information sheet (bates stamp 00033), the body diagram he prepared at the time of autopsy, the description of the injuries as depicted by Erik K. Mitchell, M.D. in his testimony and the microscopic findings portion of the autopsy report on Ivet Daniel, signed by Erik K. Mitchell, M.D. on August 22, 1991, 79 days after certifying the death as a homicide; I provide a comparative analysis to determine if they assist in further characterizing this death, (TABLE A).

P08821

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 11 of 23**
**January 16, 2008**

## Narrative of Tissue Microscopics  'Bruises'

**Sections N, O and P** - Microscopic examination of tissue taken from the back of the left hand and knuckles demonstrates organizing hemorrhage with pigment in tissue macrophages. This indicates that these bruises occurred at least 24 hours before death and therefore are not related to the drowning. They most likely indicate mild trauma related to daily activities.

**Section R -** "Upper outer left arm bruise" This has the microscopic features of postmortem artifact. There is no vital response.

**Section S** – Demonstrates subcutaneous hemorrhage extending into superficial fat lobules. Positive for pigment laden macrophages. This injury is at least 24 hours old. It most likely indicates mild trauma related to daily activities.

**Section T** – Left elbow skin demonstrates hemorrhage and acute thrombosis of subcutaneous blood vessel. Organized clotting injury of greater than 24 hours duration. This injury most likely indicates mild trauma related to daily activities that occurred at least one day before death.

**Section U** – "Large bruise inside left upper arm." The microscopic features of this section are consistent with postmortem artifact.

**Section V** – "Bruise A" from forehead. Skin lined by a thin layer of keratin demonstrating no evidence of injury.

**Section W** – Skin Identified by EKM as "Left Temporal Bruise" Sections demonstrate skin with no evidence of acute injury.

**Section X** – Labeled by EKM as skin from right elbow. This section labeled elbow is a skin fragment lined by a thin layer of keratin. The tissue is void of injury and remarkable only to the extent that the keratin layer is too thin to have come from the elbow. The origin of this normal tissue was most likely misidentified.

**Section Y** – Microscopic examination demonstrates non-keratinizing, thin epidermis lining loose connective tissue with glandular elements. There is no evidence of injury in this section.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 12 of 23**
**January 16, 2008**


In summary, tissue sections obtained at the time of autopsy from areas of the body where bruises were described grossly do not support a theory of homicidal drowning with associated blunt force injury to the head. The findings are consistent with minor injuries and small bruises associated with the events of everyday living. Areas of actual bruising demonstrate histologic features indicating that they occurred at least 24 hours before death and thus represent incidental findings. These findings support a death due to accidental drowning associated with a backwards fall into the tub filling with water, unconsciousness and accidental drowning. (TABLE A)


## Narrative of Tissue Microscopics  Internal Organs


Review of the tissue blocks taken from internal organs reveals the following findings:

**Heart** – There is a slightly increased infiltrate of polymorphonuclear leukocytes seen focally at the origin of a papillary muscle.  Small intramuscular vascular channels show margination in this area.  The coronary artery section present in the block is not remarkable.

**Lungs** – The lungs are severely congested and edema fills the air spaces in most areas.

**Liver** – Chronic passive congestion.

**Spleen** – Acute congestion.

**Tongue** – Normal tissue without any evidence of trauma.

**Gastrointestinal** – Within normal limits.

**Genitourinary** – Within normal limits.


## Toxicology Findings


Review of the toxicology specimens taken at autopsy shows that samples of blood, vitreous, urine, bile, gastric contents and liver were obtained.  Test for drugs and alcohol were negative.  Given the fact that time of death determination in this case was critical, it is alarming that Dr. Mitchell did not submit the vitreous for electrolyte testing.  However, my overview of his autopsy report reveals deficiencies that may have  been intended.  My basis for this is explained in the latter section of this report.

P08823

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 13 of 23**
**January 16, 2008**


## Time of Death Determination


The most valuable information available for the determination of time of death is the temperature of the water in the bathtub at the time Ivet Daniel was discovered and her body temperature taken soon after her arrival at St. Joseph's Hospital Emergency Department.

Although we do not know the exact temperature of the water in the bath when Ivet Daniel was discovered, we do know from sworn statements of first responders that the water was described as cold or very cold. The body temperature of Ivet Daniel taken at the hospital was 98.3° F. Had the body been in cold or very cold bath water for more than approximately one hour, the temperature of the body would have dropped below 89.0° F. It is reported to me that both the hot and cold water faucets were turned on fully. Allowing time of approximately 30 minutes for the hot water to run out of the hot water heater, it can be estimated that Ivet Daniel fell into the tub filling with water, sustaining a head injury during her backward fall, being rendered unconscious and drowning due to submersion of her head at approximately 4:00 pm, on June 4, 1991.

Evidence to support this time of death determination was available to Dr. Mitchell at the time of autopsy, however, he omitted to submit vitreous fluid for electrolyte analysis. Studies performed by John Coe, M.D., resulted in the generation of tables demonstrating electrolyte changes in vitreous fluid based upon time differences between moment of death and time of vitreous fluid collection. Although vitreous electrolyte measurements are not exact, the information provided by the results of vitreous electrolyte testing would have been useful in assisting with time of death determination.

I am certain from my personal communications with Dr. Mitchell that he was aware of the value of vitreous electrolyte testing to estimate time of death in cases similar to that of Ivet Daniel. Accordingly, I must conclude that he did not order vitreous electrolyte analysis so that he could have great latitude in his personal assessment of this case, allowing him to better manipulate the evidence to his liking. This will be supported by evidence I include in part II of the report.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 14 of 23**
**January 16, 2008**


## Fact Based Expert Opinions


Based on all the evidence made available to me, I opine that on June 4, 1991 at approximately 4:00 pm, Mrs. Ivet Daniel fell into a bathtub at her residence while tending to household cleaning at or above her head. Most likely, she was straddling the tub with one foot on each side the tub, close to and facing the wall farthest from the drain. The water was running and the stopper was in place, causing the tub to fill. Mrs. Daniel fell backward, striking the right side of her head on the water control knob farthest from the wall side of the tub. The impact of her head with the fixed object caused her to lose consciousness. She remained unconscious in the tub, face up, sufficiently long to result in submersion of her face, resulting in her accidentally drowning.

Because her body temperature recorded at St. Joseph's Hospital was 98.3° F and the bath water recorded by investigators at 8:10 pm was 80° F. her lividity remained unfixed and the temperature change of the bath water resulted in minor bruises appearing more vibrant. Despite all the findings to the contrary, Dr. Mitchell ruled the death a homicide. I am most confident this represents an egregious error and the information provided in part II of this report will lend understanding as to why I believe Dr. Mitchell erroneously ruled this death a homicide by intent and why I believe his intentions and motives were malice driven.

In conclusion, after having carefully reviewed all of the analytical data made available, as detailed throughout the text of this report, I opine with the confidence of reasonable certainty, that Ivet Daniel died as a result of accidental drowning.

Further, I opine with the confidence of reasonable medical and scientific certainty that Ivet Daniel's death was incorrectly ruled a homicide. Accordingly, Walid Daniel had been wrongfully convicted for the murder of his wife. This represents a tragic failure of the American justice system and Erik Krag Mitchell is largely responsible for having falsely ruled the death of Ivet Daniel a homicide.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 15 of 23**
**January 16, 2008**

### Part II – The Eric Krag Mitchell, M.D. Experience

*"I've never come across a suspect I couldn't convict."*
**Eric Krag Mitchell, M.D.  1990**

In addition my review of the medical and scientific evidence surrounding the death of Ivet Daniel, you have requested that I provide you details of my experience as an Assistant Medical Examiner practicing with Erik K. Mitchell, M.D. as Chief Medical Examiner. Based on my knowledge and recollection, I here provide you details of particular events and issues I've experienced working under Dr. Mitchell as well as his policies, procedures and general practices that may have allowed him to erroneously classify the death of Ivet Daniel as a homicidal drowning, resulting in the conviction of Mr. Walid Daniel on April 15, 1992.

In addition to interviewing with Dr. Mitchell for multiple days in March and May 1, 1990 I served Onondaga County as an Assistant Medical Examiner from June 1, 1990 until January 15, 1994 and worked with Dr. Mitchell almost daily. He and I engaged in conversations both on a professional basis and on a personal basis. On average, I spent a significant amount of time with him directly just about every work day and occasionally on weekends. I'd estimate conservatively, that I spent at least 1.5 hours with him daily on average. This is exclusive of meetings where other members of the Onondaga County Medical Examiner's Office would be in attendance, such as during medical examiner functions and meetings that were held at least 3 times per week. Further, Dr. Mitchell sought to establish a friendship with me soon after I arrived in Syracuse and we would commonly spend an hour or two discussing both personal and professional matters at the end of the day's business in my office. The listing that follows provides a specific point of concern and whenever possible a brief narrative explaining the basis of that point. I believe that this will sufficiently expose the mental state, moral character and personal beliefs of Erik K. Mitchell, M.D. (EKM) that compelled him to wrongly and hurriedly misclassify Ivet's death as a homicide.

### EKM's Direction on the Preparation of Autopsy Protocols

I had performed my Forensic Fellowship training in Baltimore, Maryland, prior to taking the position at Onondaga County as Assistant Medical Examiner under Erik. K. Mitchell, M.D. This training period of one year at the Office of The Chief Medical Examiner for the State of Maryland is well recognized as one of the finest forensic medicine training programs in the United States and the listing of graduates of the program I attended reads like a Who's Who in Forensic Medicine now and for many years past. Despite this high level of training and education, Dr. Mitchell advised me that my autopsy reports, also known as protocols, were not to his liking and needed to be dramatically overhauled for work I was to perform at his Medical Examiner's Office.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 16 of 23**
**January 16, 2008**

Specifically, Dr. Mitchell insisted that I be much less specific in the description of my autopsy findings. When he further instructed me in this regard, alluding to some of his own autopsy reports as examples, he advised me that the reports I would write working under him had to be "crafted" in such a manner that the wording would allow me to change my case-specific, medical opinions concerning cause of death and manner of death determination at any time. He advised me that he had become very adept at this and could change the basis of his expert medical opinions at any time as the case progressed, to suit the needs of the case as circumstances may develop over time.

As time passed, Dr. Mitchell became less fixed on this issue of autopsy report documentation and I was able to return to the exacting and detailed method of preparing autopsy reports as I had been trained to provide during my forensic medicine fellowship.

**EKM's Direction on Providing Expert Testimony**

Presentation of testimony on cases I handled as an Assistant Medical Examiner was not required of me until after I had been working at the Onondaga County Medical Examiner's Office (OCMEO) for a number of months. As time approached for my first testimony appearance, Dr. Mitchell came to my office and without solicitation advised me that I must always be aware of the fact that medical examiners working for the OCMEO are there to serve the needs of the District Attorney's Office. He advised me that I should promote a pre-testimony meeting with the attorney handling a specific case of the DA's office and that if a pre-testimony conference was requested by the attorney representing a defendant, that I must first consult with him and that he must be in attendance for any meeting I may have with defense counsel. This is not in keeping with my background, education and training in forensic medicine, where I was informed that the medical examiner is to provide testimony and pre-trial conferences with a completely neutral disposition. Accordingly, it was clear to me that Erik Mitchell, M.D. routinely favored the prosecution and was proactive in attempting to have me follow that methodology.

**EKM Exerted Undue Influence on Cause of Death and Manner of Death Certification**

On several occasions, Dr. Mitchell changed the official manner of death on cases that I had previously certified via death certificate. This was done after I had completed the autopsy, toxicology analysis and microscopic evaluation. This was done behind my back and I had no knowledge that he would overrule on my cases until it came to my attention months later, for one reason or another. I discovered that on a number of cases that I had handled from beginning to end, he would later submit an amended death certificate to the Department of Health and change my cause of death and manner of death determinations. He did this without being active in the case evaluation at any level and without the benefit of consulting with me regarding my findings and rationale for ruling as I did on the manner of death in the first place.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 17 of 23**
**January 16, 2008**

## EKM Exerted Influence on Autopsy Tissue Retention that was Not Medically Based

Prior to working at the OCMEO, I had worked at a number of medical examiner offices and each had a specific office policy regarding retention of human organs and tissues, procured at the time of autopsy. Under Dr. Mitchell at the OCMEO there were no set policy and Dr. Mitchell would often enter the autopsy room while I was performing a case and demand that certain organs and tissues be retained, even when they were of no value in solving the case. In particular, Dr. Mitchell had a propensity to save the entire brain on cases in which brain pathology played no role in the determination of cause and manner of death. He additionally made demands to save tissue from other organs when there was no intrinsic forensic need.

## EKM Diverts and Keeps Human Organs and Body Parts without Consent

At one point, when the OCMEO came under investigation, because it became known to the public that Dr. Mitchell would divert human organs and tissues to Bristol Myers Labs for research purposes through Upstate Medical Center, I was personally ordered by the OCMEO Administrator, Helen Clifford, to categorize and moderate the disposal of human organs and body parts that Dr. Mitchell had accumulated over a number of years. In short, I was ordered to deal with a large freezer full of human body parts that I discovered had been commingled with animal remains Dr. Mitchell had taken possession of, from the Onondaga County Animal Control operation, with which the OCMEO share a building.

I found the observation of large portions of humans, including whole torsos and intact extremities, frozen en-mass along with dog remains, bat remains and cattle parts, frozen solid into bizarre configurations disrespectful of the decedents. When I refused to "deal with Dr. Mitchell's saved tissue" my employment was threatened and I hence reported my findings to members of the television and print news media, so that in the future such disrespect for human remains could be limited via public awareness of what was happening at the OCMEO. I was reprimanded for this public disclosure.

## EKM Demands that Families Be Pressured Into Consent for Autopsy Examination

My forensic training regarding dealing with families and next-of-kin who were opposed to autopsy examination was uniform. I was advised, in all offices in which I worked prior to the OCMEO, to respect the wishes of the family and next-of-kin, as best as possible, without being negligent of the responsibilities of the medial examiner's office. Generally, if the family was opposed to autopsy and cause of death and manner of death could be determined, with reasonable medical certainty, no gross dissection of the body was to be performed and instead body fluids would be collected for toxicology analysis and an external examination performed to rule-out the presence of suspicious injuries. This was not the case under the leadership of Dr. Mitchell.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 18 of 23**
**January 16, 2008**

Dr. Mitchell insisted that just about every case brought into the office, including deaths due to natural causes, be autopsied. He advised me that if the family could not be convinced to permit an autopsy via reasoning, that I should not release the body to the funeral home and pressure them into permission for an autopsy.

One of the very first cases I brought into the office was a suicidal hanging of an individual with metastatic cancer of the throat. There were no suspicious markings on the body, the scene was typical and the decedent had left a suicide note. The family wished that no autopsy be performed and requested that I release the body to the funeral home of their choice after I brought back the decedent to the OCMEO, performed an external examination and collected blood for toxicology. The family had no objection to the collection of body fluids or external examination, but did not want the decedent subjected to dissection. I agreed to their wishes and brought the body to the OCMEO for external exam and blood collection.

When Dr. Mitchell discovered that I had accepted the family wishes of no autopsy he became exceptionally irate and insisted I was not doing my job. He wanted the decedent to be autopsied and would have it no other way. He demanded I call the family and tell them an autopsy was mandatory or else no death certificate would be issued and therefore the body could not be buried. When I refused to acquiesce to his demands, he called the family right in front of me and demanded that permission for an autopsy be granted or else there would be no funeral as he would obtain a court order for the postmortem and that could take several days. He essentially lied directly to the grieving family in my presence and then told them that since they did not sign a permit for the autopsy at the time of the body removal that the next-of-kin would have to come to the OCMEO to sign the autopsy permit. I was ordered to wait at the office until the elderly, grieving wife, shocked by her husband's suicide, could get a ride to the OCMEO to sign the permit. Mitchell, upon completing his call, coercing the family into an unnecessary autopsy advised me with a grin that he never met a family he couldn't force into permission for an autopsy. It was then that he also made a comment, the significance of which I could not have fully understood at that time. As he was leaving and I waited in the front office of the OCMEO for the widow to appear to sign her husband's autopsy permit, Dr. Mitchell turned back to me, smirked and said, "I've never come across a suspect I couldn't convict, either." As I write this report, the significance of that off-handed comment never made more sense to me.

I was subsequently advised by Dr. Mitchell that my continued employment was contingent upon maintaining 100% autopsy compliance on all cases brought into the OCMEO. If tension over autopsy permission grew to the point that the threat of a court order would not result in compliance, I was to refer the situation to him and he would then handle the family directly.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 19 of 23**
**January 16, 2008**


## EKM Dismisses Employee Concerns Over Infection Control

Dr. Mitchell showed no concern over placing his employees at risk of serious infection. This carefree demeanor regarding infection control is exemplified by him having exposed the majority of his staff to antibiotic resistant Mycobacteria *tuberculosis*. He did this by importing autopsy cases from Oneida County, on a fee for service basis, fully aware that the morgue facility was not equipped to handle these high risk infectious cases. He caused a number of staff members to turn Tine Test positive and even when he became aware of the poor air exchange in the morgue and direct communication of the morgue ventilation with the office space ventilation, he continued to bring in antibiotic resistant Mycobacteria tuberculosis cases from out of county. It was only after an investigation by the Center for Disease Control (CDC) that he made modification to the morgue ventilation system. He then installed ultraviolet lighting in the morgue area himself. I am aware of this because one week night I was called into the office for a scene investigation around 11:00 pm. When I reported to the OCMEO I found Dr. Mitchell on a step ladder installing the UV light fixtures. I was not so much startled by the fact that he was doing the work of an electrician at close to midnight, but by the fact that he was clothed in a pair of pajamas and also wearing an ill-fitting pair of clogs that belonged to a previous female employee of the OCMEO who had been murdered. Dr. Mitchell was questioned as a suspect in this murder. When I offhandedly asked him about his attire, he advised me that he left his home in a rush and forgot to change into his day clothing. He made no comment about the decedent's clogs and I did not inquire any further.


## EKM Displays Bizarre Behavior and Unethical Conduct

It is my opinion that the above detailed experiences I encountered through working with Dr. Mitchell sufficiently expose a persona capable of being dishonest, scheming, unreasonably judgmental and purposefully misleading, in their handling medical examiner duties relating to evidence interpretation for cause of death determination and manner of death determination. Further I find that he would unquestionably provide biased, untruthful and misleading testimony to jurors on a whim. Without further embellishment, I will now list specific events I had experienced working as an Assistant Medical Examiner under Dr. Mitchell that I believe constitute bizarre behavior and unethical conduct. It should be noted that although Dr. Mitchell did at times have a motive behind his actions, he also would be misleading and untruthful at times just to demonstrate how clever he thought he could be. I came to learn through many hours of dealing with Dr. Mitchell that he was better, smarter, more cleaver and had more ambition than everyone else, in his own mind.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 20 of 23**
**January 16, 2008**

It should be mentioned that since his ouster from the OCMEO by current Onondaga County District Attorney William Fitzpatrick under the threat of grand jury indictment, he relocated to Topeka, Kansas. Since then, I have received calls from the Kansas Death Penalty Defense Unit to assist them with overcoming expert opinions proffered by Dr. Mitchell that wrongfully had their clients placed on death row. Dr. Mitchell had rendered opinions that were completely without any medical or scientific basis. In one instance, when I offered to go to Topeka to testify against Dr. Mitchell on behalf of a convicted murderer facing a death penalty, Dr. Mitchell, for the first time and without any notice to the court, took a long vacation so that I would not have to testify against his wildly misleading expert opinions and expose him. The prosecutor dropped the death penalty charges as a result.

Following is a listing of facts and observations concerning my experiences with Dr. Mitchell. I could go into great detail on each of these points, but I believe the information set forth sufficiently substantiates how and why Dr. Mitchell was misleading in the case of Mr. Walid Daniel.

I have experienced on many occasions Erik K. Mitchell, M.D., greeting myself and others with a Nazi salute and clicking his heels while coming to military like attention.

I have observed Dr. Mitchell disposing of vast quantities of commingled human remains via a flush sink located in the autopsy room.

I have observed Dr. Mitchell making anti-Semitic remarks.

I have observed Dr. Mitchell attempting to trade 100% ethanol for office equipment, including a fax machine. I reported this to the AFT enforcement branch of the federal government.

I witnessed Dr. Mitchell throwing a loaded, contaminated scalpel at a morgue worker.

I witnessed Dr. Mitchell being sexually inappropriate with OCMEO staff members.

I witnessed Dr. Mitchell stuffing animal remains into a Ziegler casket liner along with human remains, the disposition of which was a closed casket funeral.

I witnessed Dr. Mitchell illegally disposing of toxic, hazardous chemicals by flushing them down a flush sink located in the OCMEO autopsy room.

I witnessed Dr. Mitchell bragging on multiple occasions about having been exposed to HIV infected blood, by having sustained a scalpel cut through his glove and into his skin and by having sustained a needle puncture wound while performing an autopsy on HIV cases.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 21 of 23**
**January 16, 2008**

## Conclusion and Summary of Expert Opinions

After having reviewed all the case evidence, it is my opinion that Dr. Erik K. Mitchell misleadingly certified the death of Ivet Daniel as a homicidal drowning. It would be presumptive of me to claim any particular single motive behind Dr. Mitchell having falsely ruled this death as a homicide, however, I believe that personal attributes of Dr. Mitchell discussed in part two of this report, provide a sufficient basis for understanding his high aptitude to be intentionally misleading, when he so chooses.

Nevertheless, despite Dr. Mitchell's unprofessional conduct in handling this case, the wrongful conviction of Mr. Walid Daniel for the death of his wife, Ivet Daniel cannot be blamed solely on Mitchell. In fact, at the time of trial, Dr. Mitchell admitted that a key injury sustained by Ivet Daniel, the only blunt force injury that could have caused unconsciousness, may have been caused by contact of her head with a water control valve of the bathtub faucet assembly.

In his trial testimony, when questioned about the bleeding scalp laceration above and behind Ivet Daniel's right ear, Dr. Mitchell admits:

> A. The faucet handle has a surface, namely, the end
> of one of the wings, that I cannot eliminate as being
> able to cause that injury.

> Erik K. Mitchell, M.D. *(trial testimony transcript, page 2300, lines 9 – 11)*

This represents a major disclosure by Dr. Mitchell, because given the other key points of evidence I summarize below, a scalp laceration above and behind the right ear, being the only injury noted on Ivet Daniel that could have caused unconsciousness, makes the most likely manner of her death accidental. This is because the characteristics of the abrasion rim around the laceration are consistent with her having fallen backward while standing along the edge of the bathtub away from the faucet.

As unfortunate as was Dr. Mitchell's involvement in this case, the scene investigation was inadequate toward either substantiating or disproving this theory. However, given all possible scenarios, it is most likely that Ivet Daniel was cleaning the bathroom tile at or above the level of her head from where she was standing on the narrow edge of the tub away from the faucet when she lost her balance or slipped and fell into the tub, striking her head on the right faucet handle (perspective of facing it) during her descent, causing the laceration to the right side of her head and becoming unconscious. She remained face up in the tub with the water running which resulted in submersion of her airway and drowning.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 22 of 23**
**January 16, 2008**

In summary, I hold to the confidence level of reasonable medical and scientific certainty, that Ivet Daniel died as a result of accidental drowning rather than as a result of a homicidal drowning at the hands of Walid Daniel. In support of my expert opinion, I put forward for consideration the following points of physical and circumstantial evidence.

The timeline of concerning the whereabouts of Walid Daniel on the date of Ivet Daniel's death do not provide Mr. Daniel a window of opportunity to murder his wife, given the time of death determination based upon available physical evidence, particularly references made to the body temperature of Ivet Daniel at St. Joseph's Hospital and observations made by first responders and scene investigators concerning the temperature of the bath water from which Ivet Daniel's body was recovered.

Walid Daniel was observed to be crying and further he displayed an appropriate emotional response, as recorded by first responders and death investigators, for him having unexpectedly discovered the death of a loved one.

The clothing worn by Walid Daniel, collected by Detective Conroy, revealed no evidence of Ivet Daniel's blood or hair.

Walid Daniel is not documented to have any scratches, abrasions or contusions to his hands or forearms which would be expected to be present had he forcefully drowned his wife.

The only significant injury sustained by Ivet Daniel is most consistent with a backward fall into the bathtub.

The abraded contusion to the forehead of Ivet Daniel is most assuredly the result of her having been secured to a backboard during resuscitative efforts. It is absurd that Dr. Mitchell claimed that this was an injury resulting from her having been struck or otherwise injured during a struggle with Walid Daniel, by a plastic child protective device. The device was forensically tested for the presence of blood and none was found.

The minor contusions documented by Dr. Mitchell is great detail in his autopsy report on Ivet Daniel are most likely perimortem or postmortem and the result of aggressive resuscitation efforts. Postmortem bruising of this nature is well documented in the peer-reviewed forensic medical literature.

*Forensic Consulting Specialists, Inc.*
**J. David Eldridge, Esquire**
**Walid Daniel Matter**
**Page 23 of 23**
**January 16, 2008**

Areas of discoloration reported in the neck musculature of Ivet Daniel are most likely the result of aggressive resuscitation efforts including intubation. There is no evidence to support the notion of any antemortem neck injury that could have occurred homicidally. There are no documented abrasions or contusions on the skin overlying the neck organs.

Negative toxicology studies show that Ivet Daniel was not in any way incapacitated or unable to defend herself from someone attempting to drown her. Hence, again had this been the case, skin abrasions, fingernail marks and contusions would have been expected to be found on the hands and forearms of the offender.

Given the evidence available and the conduct and behavior displayed by Dr. Mitchell in this case and in others, it is clear to me that Mr. Walid Daniel was wrongfully accused and convicted of murdering his wife, Ivet Daniel.

Thank you for consulting with me on this very interesting yet most unfortunate case. Please do not hesitate to advise me if I may be of any further assistance to you in seeking justice for Mr. Walid Daniel.

Sincerely,

David A. Rigle, M.D., B.C.F.M.
Medical Director
Chief Forensic Consultant

*Notarized 1-16-08*
*for David A. Rigle*
*Betty A. Goff*
Notary Public State of New York
No. 4625238
Qualified in Onon County
My Commission Expires Oct. 31, 2010

DAR/cr

Attachments:

**TABLE A** – Summary of body surface injuries as documented in the autopsy report of Ivet Daniel by Erik K. Mitchell, M.D., along with my review and interpretation.
**TABLE B** – Timeline of Mr. Walid Daniel for June 4, 1991. As provided to me by Attorney David Eldridge.

Walid Daniel

Report of David Rigle, M.D. – TABLE A

| Slide/Block | EKM – Location Gross Characterization/ Trial Testimony | EKM Micro Report | David Rigle, M.D. Interpretation |
|---|---|---|---|
| N, O & P | Back of Left hand & knuckles | Dermal & subdermal – acute hemorrhage; no Inflammation (Relatively fresh bruise) p 2345 | Organizing hemorrhage with inflammation and pigment laden macrophages. |
| Q | Upper outer left arm bruise (from autopsy) | Dermal & subdermal Acute hemorrhage | No vital response to red cells in deep dermis- appears post-mortem |
| R | Lower outer left arm bruise | Dermal & subdermal – acute hemorrhage; Macrophage with granules, (NOS) "up to one day old" p 2347-8 | No vital response to red cells in deep dermis- appears post-mortem |
| S | Left little finger | Skin with dermal and subdermal acute hemorrhage; no inflammation, no macrophages with pigment. | Subcutaneous hemorrhage extending into superficial fat lobules. Positive for pigment laden macrophages. Injury 24 hours or older. |
| T | Left elbow | Skin with acute hemorrhage; no inflammation; no macrophages with pigment. | Skin with hemorrhage and acute thrombosis of subcutaneous blood vessel. Organized clotting injury >24 hours. |
| U | Large bruise inside left upper arm | Skin with extensive acute hemorrhage; no inflammation; no macrophages with pigment. | Thin, keratinizing stratified squamous epithelium lining densely staining, deeply eosinophilic dermis collagen and degenerating subcutaneous fat. This is consistent with postmortem artifact. |
| V | Patterned forehead abrasion | Acute hemorrhage – single focus in dermis adipose tissue. No iron; no inflammation p.2351 | Skin lined by a thin layer of keratin demonstrating no evidence of injury. Normal forehead skin. |
| W | Left temporal bruise | Subdural - acute hematoma; no inflammation; no macrophages with pigment. | Skin with no evidence of injury. In the deep dermis there are haphazardly clustered clumps of an unidentified pigment. |
| X | Right elbow | Subdermal - acute hemorrhage; no inflammation; no macrophages with pigment. | This section labeled elbow is a skin fragment lined by a thin layer of keratin. The tissue is void of injury and remarkable only to the extent that the keratin layer is too thin to have come from the elbow. The origin of this normal tissue was likely misidentified. |
| Y | Left lower lip | Dermal -acute hemorrhage, no inflammation, no macrophages with pigment. 4 blue cytoplasmic granules. | Non-keratinizing, thin epidermis lining soft tissue with glandular elements. There is no evidence of injury in this section. |
| Q,X,Y | Not discussed in trial testimony. | No vital reaction | Most likely postmortem artifact; No real injury |

P08835

Report or David Rigle, MD – TABLE B
(Document Provided by Attorney David Eldridge)

WALID DANIEL
TIME LINE / JUNE 4TH 1991

7:30        Time DANIEL says he left the house to drop Christine off at school and go to Just
            Desserts [but also said he didn't leave work until 5:15 p.m. - and never left in
            between] (1205)
8:30        DANIEL seen arriving at Just Desserts (2613)
10:00       DANIEL seen at work (2466)
10:30-10:45 DANIEL leaves work (2470)
11:00       DANIEL seen working out at gym (450-451)
12:00-12:15 DANIEL returns to work
12:23       DANIEL at Wegman's grocery (785)
1:00-1:15   DANIEL seen leaving Just Desserts (2472)
1:30-2:30   DANIEL at Albert's Jewelry (2432)
1:50-2:30   DANIEL at Scaravillo Insurance (736, 742-743)
2:00        Tenant (Jennifer McAvoy) hears Ivet talking to baby (545-549)

LAST POINT IN TIME IVET CONFIRMED ALIVE - DEATH HAD TO OCCUR AFTER 2:00
2:00-2:15   DANIEL leaves work to pick up Christine (622-626)
2:05        DANIEL seen at school picking up Christine
2:15        McAvoy leaves house - no mention of DANIEL - no cars in driveway (545, 556)
2:30-3:00   DANIEL drops Christine off at cousin's house (2553) - but school doesn't even let
            out until 2:30 - so it had to be some time after that (2508)

2:40-2:45   Mounayer says he saw DANIEL's car pull out of driveway (424)
2:30-4:00   Mirizio hears garage door open                          CONFLICT
3:00-3:15   Jamie Bova sees DANIEL's car at the house (379-380)
    (a)     how could Jamie see DANIEL's car at 3:00-3:15 when Mounayer saw him leaving
            at 2:40-2:45?
    (b)     If DANIEL was dropping Christine off at cousin's house between 2:40-2:45 or so
            and 3:00 (giving extra time for school to let out and him to pick her up)- AT
            MOST - only possible window was between that time and time he is next seen at
            Chase Pikin (3:05-3:21); a total of about 5-25 minutes
THAT GIVES DANIEL ABOUT 15-20 MINUTES TO COMMIT THE CRIME, CHANGE HIS
CLOTHES, DRY HIS HAIR, AND DRIVE TO CHASE-PITKIN FROM THE HOUSE
3:05 to 3:13- 3:21    DANIEL at Chase-Pitkin Hardware - receipt shows 3:17 p.m. (774)
3:30-4:00   DANIEL returns to Just Desserts (2472, 2493, 2545, 2798)
3:30        DANIEL calls Fahed's house
3:30-4:00   DANIEL seen leaving parking garage (2790, 2792)
3:30-3:40   Tenant (Nancy Allen) returns home - no DANIEL, no mention of his car (573)
4:00-5:00   DANIEL seen in Just Desserts (2477, 2818, 2469, 2482)
5:00        DANIEL calls Fahed to say he's not picking up Christine - going straight home
5:00-5:15   DANIEL seen leaving parking garage (2801)
5:20-5:25   DANIEL seen in his car near Montgomery and Adams (2598)

# CURRICULUM VITAE

## DAVID ANTHONY RIGLE, M.D.

**Work Address:**
David A. Rigle, M.D.
Medical Director and Chief Forensic Consultant
Forensic Consulting Specialists, Inc.
161 Cresline Drive
Syracuse, New York 13206

**Communications:**
Telephone:      315-432-1538
Fax :               315-432-1216
E-mail:            ForensicMedical @yahoo.com
URL:               ForensicMedPro.com

**Personal:**
Date of Birth :        10/02/55
Marital Status:       Married
Children:               Four ( 22, 20, 16, and 7 years of age)

**High School Education:**
Wyoming Seminary College Prep.
Kingston, Pennsylvania
1969-1973

**College Education:**
Wilkes College
Wilkes-Barre, Pennsylvania
1973 - 1974
Major: Biology
Member of Chemistry Society

King's College
Wilkes-Barre, Pennsylvania
1974 – 1977
Major: Biology
Senior Honors: Cum Laude/Magna Cum Laude
Graduation: May 1977, Bachelor of Science, (B.S.)

**Medical School Education:**
Faculte Libre de Medicine
Lille, France
Diplomate of the Committee for International Medical Exchange
September 1977- May 1984
Degree: Medical Doctor – M.D.

**Curriculum Vitae**
**David Anthony Rigle, M.D.**
**Page 2 of 10**

**Medical School Distinction:**
Graduated Magna Cum Laude, (with high honors)

**Clinical Experience/Clerkships – France**
General and Vascular Surgery
Saint Philibert Hospital, Lomme, France

Cardiology and Cardiac Intensive Care Medicine
Saint Philibert Hospital, Lomme, France

**Clinical Experience/Clerkships – United States**
Internal Medicine
Medical College of Pennsylvania, Philadelphia, Pa.

Gastroenterology
Medical College of Pennsylvania, Philadelphia, Pa.

Emergency Medicine
Medical College of Pennsylvania, Philadelphia, Pa.

General Surgery and Vascular Surgery
Thomas Jefferson University Hospital, Philadelphia, Pa.

Orthopedic Surgery and Hand Surgery
Thomas Jefferson University Hospital, Philadelphia, Pa.

Anesthesia and Postoperative Care
Thomas Jefferson University Hospital, Philadelphia, Pa.

Neurosurgery and Spine Surgery
Thomas Jefferson University Hospital, Philadelphia, Pa.

Neurology
Medical College of Pennsylvania, Philadelphia, Pa.

Obstetrics and Gynecology
Medical College of Pennsylvania, Philadelphia, Pa.

Clinical Pediatrics and Pediatric Surgery
Long Island Jewish – Hillside Medical Center, Long Island, New York

Psychiatry
Eastern Pennsylvania Psychiatric Institute, Philadelphia, Pa.

**Curriculum Vitae**
**David Anthony Rigle, M.D.**
**Page 3 of 10**

Physical Medicine & Rehabilitation
Medical College of Pennsylvania, Philadelphia, Pa.

Radiology
Medical College of Pennsylvania, Philadelphia, Pa.

Infectious Disease
Medical College of Pennsylvania, Philadelphia, Pa.

Pathology
Chestnut Hill Hospital, Philadelphia, Pa.

**National Medical License Qualification Examination:**

ECFMG: July 1983; Passed first attempt: 0568B, Philadelphia, Pennsylvania
FLEX: June 1985 Passed first attempt, : Minneapolis, Minnesota

**Medical Licenses:**

State of Minnesota: august 8, 1985; # 029455-7
State of Maryland; Institutional, 1989
State of New York; July 24, 1990; # 183181

**Doctoral Thesis:**

Abdominal Aortic Aneurysms – A Review.
Presented to the Medical Faculty and successfully defended.
Ratified by the Medical Faculty with special distinction of High Honors,
(Magna Cum Laude).
May 30, 1984; Lille, France

**Internship:**

St. Paul Ramsey Medical Center, St. Paul, Minnesota.
July 1984 – June 1985

**Residency Training: Anatomic and Clinical Pathology**

St. Paul Ramsey Medical Center, St. Paul, Minnesota.
July 1985 – December 1988

**Curriculum Vitae**
**David Anthony Rigle, M.D.**
**Page 4 of 10**

**Specialized Training: Forensic Pathology , (Fellowship):**

Office of the Chief Medical Examiner for the State of Maryland
Baltimore, Maryland
May 1989 – April 1990

**Board Certifications:**

Board Certified: Board Certified Diplomate of the A.B.F.E.
Primary division: Forensic
Specialties: Medicine, Pathology and Toxicology, (as of 1994)

American Board of Forensic Medicine, (as of 1996).
Board Certified Diplomate of The American Board of Forensic Medicine

**Executive Advisory Board Positions:**
Executive Advisory Board of the American Board of Forensic Medicine, ( 1997-2002)

**Medical Publication and Editorial Positions:**

Chief Medical Editor:
Practical Reviews in Forensic Medicine and Sciences, (1997-99)
Continuing medical education (CME) accredited and peer-reviewed jointly by
Albert Einstein College of Medicine and Montefiore Medical Center

Contributing Editor and Peer-reviewer for Publication Submissions:
Forensic Examiner: (1995-2004)

Author; Forensic Medicine Column of the Forensic Examiner, (1995-1997)

Co-author, Forensic Medicine Column of the Forensic Examiner (2001-2002)

**Clinical Appointments Held:**

Emergency Medicine
District Memorial Hospital, Forest Lake, Minnesota
February 1986 – April 1989

Family Practice Medicine
District Memorial Hospital, Forest Lake, Minnesota

Emergency Medicine
St. Paul Ramsey Medical Center, St. Paul, Minnesota
August 1985 – February 1986

**Curriculum Vitae**
**David Anthony Rigle, M.D.**
**Page 5 of 10**

Neonatal Intensive Care
St. Paul Ramsey Medical Center, St. Paul, Minnesota
July 1985 – January 1986

Respiratory Intensive Care
Good Samaritan Hospital, St. Paul, Minnesota
July 1986 – May 1987

Forensic Appointments Held:

Anatomic and Clinical Pathology, Consulting Pathologist
United Hospitals, St. Paul, Minnesota
October 1985- April 1989

Deputy Medical Examiner
Ramsey County Medical Examiner's Office
St. Paul, Minnesota
October 1984 – April 1989

Forensic Pathology Consultant  - Wisconsin
October 1984 – April 1989

Forensic Resident, (Fellowship)
Office of the Chief Medical Examiner for the State of Maryland
May 1989 – April 1990

Assistant Medical Examiner
Onondaga County Medical Examiner's Office
Syracuse, New York
May 1990 – January 1994

**Forensic Experience:**

Forensic cases reviewed/Consulted on: Approximately 8,500
Forensic autopsy Experience: Approximately 3,500

**Special Certifications:**

Forensic Anthropology
Smithsonian Institute of Natural History
Washington, D.C., 1990

**Curriculum Vitae**
**David Anthony Rigle, M.D.**
**Page 6 of 10**

Child Abuse – Detection and Recognition
Department of Health for the State of New York
Syracuse, New York, 1992

**Current Professional Association Memberships:**

American College of Forensic Examiners
Active Member

American Association for the Advancement of Science
Active Member

American Chemical Society
Active Member

**National and International Professional Conference Presentations:**

(1995) Fourth Annual Expert Witness and Litigation Seminar, (SEAK)
Hyannis, Massachusetts; June 22 and 23, 1995.

*Keynote Speaker*
Presenting Expert Testimony: Preparation, Delivery and Admissibility.
Participant of the Expert Panel of Medical and Scientific Advisors.

*Co-Speaker*
Evaluating Toxic Exposures After Daubert.
The Role of the Medical Expert in Toxic Exposure Assessments.

(1996) Annual Scientific Meeting of The American College of Forensic Examiners
San Diego, Ca.; December 12-14, 1996.
Providing Testimony as an Expert Witness.

(1998) Annual Scientific Meeting of The American College of Forensic Examiners
San Diego, Ca.; December 12-14, 1998.
The Medical Aspects of Toxic Exposure Assessments.

(1999) Annual Scientific Meeting of The American College of Forensic Examiners
New York, New York: October 29 – November 1, 1999.
Forensic Medicine, Toxicology and Pathology
Reactive Airways Dysfunction Syndrome (RADS) and Occupational Asthma.
(A 3.75 hour CME certified medical and scientific professional workshop)

P08842

Curriculum Vitae
David Anthony Rigle, M.D.
Page 7 of 10

(2000) Annual Scientific Meeting of The American College of Forensic Examiners
American Board of Forensic Medicine
Las Vegas, Nevada: October 24 – October 27, 2000
Forensic Medicine Toxicology
Chemical Exposures and Toxic Effects on Humans, a Comprehensive Review
(5.50 hr CME certified medical and scientific professional workshop, also CLE approved)

(2000) Annual Scientific Meeting of The American College of Forensic Examiners
American Board of Forensic Medicine
Las Vegas, Nevada: October 24 – October 27, 2000
Expert Evidence Admissibility in Toxic Exposure Assessments
(A 2.0 hour CME certified medical and scientific professional presentation)

(2002) Annual National Expert Witness and Litigation Seminar, (SEAK)
Hyannis, Massachuetts; June 2002
Causation and Reasonable Certainty
(1.5 hrs CME certified, CLE approved)

Expert Opinions: Formulating, Presenting and Defending
(1.5 hrs CME certified, CLE approved)


CME Accreditation Monitor Appointments:

(1999) New York State Medical Society Continuing Medical Education (CME) Monitor
Annual Scientific Meeting of The American College of Forensic Examiners,
(joint ACFE/APA national conference)
New York, New York: October 29 – November 1, 1999.

Special Interests:

Population based Toxic Exposures Evaluations
Pharmaceutical Toxicity and Causation Toxicology
Complications of Medical Treatment, resulting from mixed drug interactions
Forensic aspects of Medical Microbiology
Reducing Patient Exposure to Preventable, Negligent Healthcare Causing Severe Injury

Curriculum Vitae
David Anthony Rigle, M.D.
Page 8 of 10

**Publications: Original Contributions, Abstracts, Reviews, Treatises and Editorials**

Rigle, D.A., Dexter, R.D., McGee, M.B., Cardiac Rhabdomyomas Presenting as Sudden Infant Death Syndrome, Journal of Forensic Sciences, Vol. 34 (3), May 1989.

Sawyer, W.R. and Rigle, D.A., Toxic Etiology of Multiple Chemical Sensitivity: Review of Case Histories with Documented Toxic Exposure. Society of Toxicology, The Toxicologist, 15 (1), 1995, 228-229.

Rigle, D.A., The Effects of Maternal Cocaine Use on the Human Fetus, abstract presented to the FBI Academy, 1992.

Rigle, D.A., Homicide by Oral Drug Dosing – A report of Two Cases and a Review of the Literature, in preparation.

Rigle, D.A. Presenting Expert Testimony; Preparation and Delivery, Expert Witness Handbook, S.E.A.K., 1995 edition

Rigle, D.A. and Sawyer, W.R., Evaluation of Toxic Exposures After Daubert, Expert Witness Handbook, S.E.A.K., 1995 edition.

Rigle, D.A., The American Board of Forensic Medicine – On The Cutting Edge, Forensic Examiner, Vol. 11-12, 1995.

Rigle, D.A. The O.J. Simpson Trial – A Total Eclipse of Forensic Procedure, Forensic Examiner, Vol. 1-2, 1996.

Rigle, D.A. Expert Evidence Admissibility in the Court. Practical Reviews in Forensic Medicine and Sciences, Vol. 1, September 1998, Educational Reviews, Inc.

Rigle, D.A. Death Investigation in Canada. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol. 1, September 1998, Educational Reviews, Inc. from Avis, SP.J Forensic Sciences 43 (2): 377-379.

Rigle, D.A. Can Tampon Use Cause Hymen Changes in Girls Who Have Not Had Sexual Intercourse. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol,1, September 1998, Educational Reviews, Inc. from Goodyear-Smith FA and Laidlaw TM., Forensic Science International Vol. 94, June, 1998, 147-153.

Rigle, D.A. Legal Implications of Birth Videos.  (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, October 1998, Educational Reviews, Inc .from Eitel DR, et al., Journal of Family Practice. Vol.46, March, 1998, 251-256.

Rigle, D.A. Carbon Monoxide Poisoning: Forensic Aspects.  Practical Reviews in Forensic Medicine and Sciences, Vol.1, October 1998, Educational Reviews, Inc.

Rigle, D.A. Psychological Aspects of Child Abuse for Primary Care Pediatricians.  (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, October 1998, Educational Reviews, Inc. from Freitag R., et al., Pediatric Clinics of North America. Vol. 45, April 1998, 391-402.

Rigle, D.A. and Sawyer, WR Carbon Monoxide Toxicity versus Carbon Dioxide Toxicity and their relationship in Attempted Suicide, (interactive editorial) Practical Reviews in Forensic Medicine and Sciences, Vol. 1, November 1998, Educational Reviews, Inc.

Rigle, D.A. Findings in Gunshot Wounds From Tandem Projectiles.  (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol. 1, November 1998, Educational Reviews, Inc. from Simmons GT, Journal of Forensic Sciences. Vol. 42, July, 1997, 678-681.

Rigle, D.A. Docking Doctors? AMA Eyes Discipline for Doctors Giving 'False' Testimony. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, December 1998, Educational Reviews Inc. from Higgins, M., American Bar Association Journal, Vol. 82, September, 1998, p20.

Rigle, D.A. Medical Misconduct. (Special Article Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, December 1998, Educational Reviews, Inc. from The New York State Office of Professional Medical Conduct, November, 1998, 1-3.

Rigle, D.A., Immersion Technique for Brain Removal in Perinatal Autopsies. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, January 1999, Oakstone Medical Publishing, Inc. from Prahlow, AJ. Et al, Journal of Forensic Sciences, (43)5, 1998, 1056-1060.

Clark A.D. and Rigle D.A. The Almost Perfect Crime. Practical Reviews in Forensic Medicine and Sciences, Vol.1, January 1999, Oakstone Medical Publishing, Inc.

Sawyer W.R. and Rigle, D.A. Toxicology of Aromatic Hydrocarbons  Practical Reviews in Forensic Medicine and Sciences, Vol.1, January 1999, Oakstone Medical Publishing, Inc.

P08845

**Curriculum Vitae**
**David Anthony Rigle, M.D.**
**Page 10 of 10**

Rigle, D.A. The Medical Aspects of Toxic Exposure Assessment. <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol.1 January 1999, Oakstone Medical Publishing, Inc.

Rigle, D.A. Pellet Embolization to the Right Atrium Following Double Shotgun Injury. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol 1, April 1999, Oakstone Medical Publishing, Inc from Pollak S. et al., Forensic Science International, (99) 1.

Rigle, D.A. Death Over-the-Counter: The Dangers of Ephedrine. ( Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol, April 1999, Oakstone Medical Publishing, Inc. from Aaron, JL. Trial. Dec. 10, 1997, 61-75.

Rigle, D.A. Mechanisms of aortic Injury in Fatalities Occurring in Motor Vehicle Collisions. (Special Keynote Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences.</u> Vol. 1, May 1999, Oakstone Medical Publishing, Inc. from Shkrum MJ, et al. Journal of Forensic Sciences. Vol. 44 (January), 1999, 44-56.

Rigle, D.A. Fifth Circuit Extends Daubert to Physicians' Causation Testimony. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol 1, June 1999, Oakstone Medical Publishing, Inc. from McMurry K. Trial 34 (November), 1998, 108-109.

Rigle, D.A. Untrue Confessions. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol. 1, August1999, Oakstone Medical Publishing, Inc. from Hansen, M. Journal of the American Bar Association. Vol. 85 (July), 1999, 50-53.

Rigle, D.A. Minimizing Mistakes in Clinical Diagnosis. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol2, September 1999, Oakstone Medical Publishing, Inc. from Ermenc B. Journal of Forensic Sciences. Vol. 44(4), 19999, 810-813.


**Professional References:**
Available Upon Request

Revised: December 2007