1

G46VRIVA

```
 1   UNITED STATES COURT OF APPEALS
     FOR THE SECOND CIRCUIT
 2   ------------------------------------x

 3   HECTOR RIVAS,

 4                    Petitioner-Appellant,

 5             v.                          13-2974-pr

 6   BRIAN FISCHER, Superintendent,
     Sing Sing Correctional Facility,
 7
                      Respondent-Appellee,     SHOW-CAUSE HEARING
 8   ------------------------------------x

 9

10
                                    New York, N.Y.
11                                  April 6, 2016
                                    3:05 p.m.
12

13
     Before:
14
                     HON. JOSÉ A. CABRANES, Presiding,
15                      HON. ROSEMARY S. POOLER,
                          HON. ROBERT D. SACK,
16
                                       Circuit Judges
17

18                         APPEARANCES

19   LANGONE & ASSOCIATES
          Attorneys for Petitioner-Appellant
20   BY:  RICHARD M. LANGONE

21   NEW YORK STATE ATTORNEY GENERAL
          Attorneys for Respondent-Appellee
22   BY:  PRISCILLA I. STEWARD, AAG

23   ALSO PRESENT:  SIDNEY L. MANES, ESQ.
                    EDWARD W. KLEIN, ESQ.
24                  CASEY JOHNSON, ESQ.
                    KIMBERLY M. ZIMMER, ESQ.
25                  ROBERT E. MORAN, ADA, Onondaga County
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2

G46VRIVA

1              JUDGE CABRANES:  This is Rivas v. Brian Fischer,

2    Superintendent, Sing Sing Correctional Facility, No.

3    13-2974-pr.

4              May we have the appearances of counsel stated for the

5    record.  I know that each of you has signed in with the clerk,

6    but I'd like to have the appearances stated for the benefit of

7    the panel so we know exactly who's who, beginning on my left.

8              MR. MORAN:  Robert Moran, assistant district attorney.

9              MS. STEWARD:  Priscilla Steward from the New York

10   State Attorney General's office.

11             MR. LANGONE:  Richard Langone.

12             MR. MANES:  Sidney Manes.

13             MR. JOHNSON:  Casey Johnson.

14             MR. KLEIN:  Edward Klein.

15             MR. LANGONE:  Your Honor, that's Kim Zimmer, who

16   assisted earlier on, and she's here.

17             JUDGE CABRANES:  She's your assistant?

18             MR. LANGONE:  She's assisting Mr. Klein.  She was

19   recently appointed by the state court to do the motion practice

20   in the retrial.

21             JUDGE CABRANES:  I see.

22             MR. LANGONE:  She was involved in the remand on the

23   district court, the previous remand before this Court.  She's

24   admitted before this Court.

25             JUDGE CABRANES:  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02461

G46VRIVA

1        The appearances having been stated, I ask you to bear

2   with me while I make a brief introductory statement to provide

3   an overview of the relevant procedural history which will

4   substantially inform our discussion today.

5        As the parties are well aware, the most recent round

6   of proceedings in this complicated case relate to the opinion

7   and order that we issued on March 11, 2015, in which we

8   reversed the judgment of the district court and remanded the

9   cause.

10        We held, and I quote, that on remand, the district

11   court should issue a writ of habeas corpus to Mr. Rivas on the

12   60th calendar day after the issuance of our mandate, that is,

13   May 10, 2015, "unless New York State had by that time taken

14   concrete and substantial steps expeditiously to retry

15   Mr. Rivas."

16        We also held that:  "If further proceedings arising

17   from Mr. Rivas's habeas petition were required in this Court,

18   jurisdiction would be automatically restored without need for a

19   new notice of appeal.  After jurisdiction was restored, the

20   matter would be heard by this panel on letter briefs."

21        Approximately six months after our mandate issued, on

22   September 8, 2015, Mr. Langone filed a motion to be relieved as

23   counsel for Mr. Rivas and to permit Mr. Rivas to proceed pro

24   se.  That day or the next day, on September 9, 2015, Mr. Manes

25   submitted a pro se letter brief addressed to us that Mr. Rivas

(212) 805-0300

P02463

4

G46VRIVA

1    had sent to him.  In that letter brief, among other arguments,

2    Mr. Rivas claimed that the state trial court had not taken

3    concrete and substantial steps expeditiously to retry him.

4    Mr. Rivas requested that we recall our mandate and issue an

5    unconditional writ of habeas corpus.

6           On September 11, 2015, we issued an order in which we

7    stated that, quote, before ruling on Mr. Langone's motion, we

8    would hold a conference on September 24, 2015, at which the

9    status of this case would be discussed.  We also requested that

10   Ms. Steward file in advance of that conference "a letter brief

11   detailing the concrete and substantial steps that New York

12   State had taken expeditiously to retry Mr. Rivas."

13          We held the conference as scheduled on September 24,

14   2015.  Mr. Langone, Ms. Steward, and Mr. Manes appeared.

15   Approximately two weeks later, on October 5, 2015, we issued an

16   order requesting further briefing on issues, including what

17   concrete and substantial steps New York State had taken

18   expeditiously to retry Mr. Rivas in accordance with our March

19   11, 2015, mandate, whether we have the power to modify

20   Mr. Rivas's bail and, if so, whether we should.

21          Following the parties' submission of their responsive

22   briefing, on December 23, 2015, we ordered that, and I quote,

23   Unless the State of New York had commenced retrial of Mr. Rivas

24   on or before February 1, 2016, Mr. Fisher would be required --

25   that is, the respondent would be required to show cause why

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02465

G46VRIVA

1    this Court should not enter an order -- should not order

2    Mr. Rivas's release from custody pending resolution of state

3    proceedings.  Unquote.

4              On January 4, 2016, we received a letter from

5    Mr. Langone who stated that he did not, quote, know if the

6    state was actually ready to retry Mr. Rivas, but Mr. Klein was

7    not ready, and he still had not filed motions, and had another

8    trial scheduled to begin the end of January 2016.  Mr. Klein

9    told Mr. Langone that Mr. Rivas's case was on the trial

10   calendar for the end of March 2016.  Unquote.

11             We received another letter brief from Mr. Langone on

12   January 8, 2016.  He informed us that:  "As a result of this

13   Court's order to show cause, a hearing was held on January 5,

14   2016, in county court, Onondaga County, to determine the

15   parties' readiness to retry Mr. Rivas by February 1, 2016.

16             "To begin with, Mr. Rivas indicated that he wants

17   Mr. Klein to remain on the case.  Mr. Klein stated on the

18   record that he would not be ready to try the case until the end

19   of May 2016."

20             Mr. Langone also argued in his letter brief that,

21   quote, we should recall the mandate and order Mr. Rivas

22   released from confinement pending the retrial.

23             The saga continues.

24             On January 22, 2016, Mr. Langone filed yet another

25   letter brief in which he stated that:  "The district attorney

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02467

6

G46VRIVA

1    just last week turned over to the defense potential Brady

2    material concerning a possible other suspect in the murder of

3    Valerie Hill."  In light of this disclosure, he, quote, once

4    again asked this Court to recall the mandate and order

5    Mr. Rivas released pending the retrial.  Unquote.

6           On March 8, 2016, about a month ago, we received a

7    letter brief from Mr. Manes.  Mr. Manes pointed out that the

8    date we had specified in our December 23, 2015 order to show

9    cause, that is, February 1, 2016, had come and gone, but

10   Mr. Rivas had still not been retried.

11          On March 16, 2016, we, quote, ordered that Mr. Fischer

12   show cause why the Court should not, one, order Mr. Rivas's

13   release from custody pending resolution of state proceedings;

14   or, two, order Mr. Rivas's release from custody and bar his

15   retrial.  Unquote.

16          We also scheduled a show-cause hearing for today,

17   which is, of course, why we are all here.  We requested the

18   presence of Ms. Steward, Mr. Moran, Mr. Langone, Mr. Manes, and

19   Mr. Klein at the hearing and briefing from the parties in

20   advance thereof.

21          Finally, we come to the last order that we issued to

22   date:  On March 31, 2016, we notified all counsel who would be

23   appearing at the April 6 hearing that they should consider in

24   advance thereof what conditions an order releasing Mr. Rivas

25   from custody pending resolution of state proceedings should

(212) 805-0300

P02469

7

G46VRIVA

1    impose, including housing and/or geographical limitations, and

2    how Mr. Rivas's compliance with such conditions would be

3    monitored and enforced.  Unquote.

4           We also noted that:  "All counsel should be prepared

5    to answer questions regarding these issues during the hearing."

6           So I thank all of you for hearing me out on this, but

7    I think context is crucial and the record should be entirely

8    clear.

9           Moving on to our discussion, I'd like to begin by

10   asking Mr. Moran a few questions.  I know that my colleagues

11   will also have questions for Mr. Moran, as well as for the

12   other counsel who have appeared today.  I don't wish to suggest

13   that my questions in any way preclude questions that they will

14   ask as soon as I'm finished.

15          So Mr. Moran --

16          MR. MORAN:  That's me.

17          JUDGE CABRANES:  That's you.

18          Let's start with the questions that our most recent

19   order portended.

20          If we were to order Mr. Rivas's release from custody

21   pending resolution of the state proceedings, what is your view

22   with respect to the conditions that we should impose and how

23   those conditions would be monitored and enforced?

24          MR. MORAN:  Judge, I don't know who you intend to have

25   monitor him, I don't know how that's going to be accomplished

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02471

8

G46VRIVA

```
 1    locally in Onondaga County.  When people are released through
 2    what we call pretrial release --
 3            JUDGE CABRANES:  Why don't you move up to the
 4    microphone.
 5            MR. MORAN:  -- the probation department would monitor
 6    someone and set up conditions that the county court judge might
 7    impose on him or her.  But I simply don't know how this Court
 8    is going to force Onondaga County Probation to do that.  They
 9    do it in other cases locally.  I've never seen it done in our
10    case, but it can be done.
11            JUDGE CABRANES:  Tell me what the problem is in having
12    this done in the state court.
13            MR. MORAN:  I'm at a loss --
14            JUDGE CABRANES:  To put it another way, which comes to
15    another question in a way, why exactly is a $200,000 bond
16    required in a case like this?  Originally, the state court,
17    after our initial decision, began with a $1 million bond.  And
18    we know that there is a constitutional right in this country to
19    bond or to bail in appropriate circumstances.  Was there a
20    finding made that he was a danger to the community?
21            MR. MORAN:  Danger to the community isn't relevant for
22    bail considerations in state court.
23            JUDGE CABRANES:  Really?
24            MR. MORAN:  It's only flight risk and --
25            JUDGE CABRANES:  What is the risk of flight, was there
```

P02472

(212) 805-0300

P02473

9

G46VRIVA

1    a finding on that?

2         MR. MORAN:  There was no hearing.  I made a

3    representation to the court about the strength of our case; the

4    court considered that argument, along with the --

5         JUDGE CABRANES:  Did you make an argument on the basis

6    that there was little or no risk of flight?

7         MR. MORAN:  I did not make an argument about risk of

8    flight, that there was little or none.  I said there was a risk

9    of flight based on the proof in the case.

10        JUDGE CABRANES:  That there was no risk of flight?

11        MR. MORAN:  No, I said there was a risk of flight on a

12   level of proof, on the fact that if he's --

13        JUDGE CABRANES:  Who were you representing?

14        MR. MORAN:  People of the State of New York.

15        JUDGE CABRANES:  Okay.  Tell me more.

16        MR. MORAN:  About the risk of flight?

17        JUDGE CABRANES:  Yes.

18        MR. MORAN:  Representations I made to Judge Miller

19   were about the strength of the case; and that based on the

20   strength of the case, I said Mr. Rivas was a flight risk based

21   on the strength of the case.  I laid out the entire case for

22   Judge Miller in making my bail application.

23        Another factor the judge considers usually is ties to

24   the local community, of which Mr. Rivas has none.  And then

25   based on that, Judge Miller makes a decision.  He sets the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02475

G46VRIVA

1    bail, not me.

2         JUDGE CABRANES:  Now, at one of our previous hearings

3    Ms. Steward was unable to detail with as much specificity as we

4    might have liked what concrete and substantial steps the state

5    had taken in the 60 days following the issuance of our March

6    11, 2015 mandate, quote, expeditiously to retry Mr. Rivas.

7         Would you walk us through those steps, being as

8    specific as possible.  What is it that you've done to take

9    concrete and substantial steps to retry Rivas other than to

10   announce that you're "ready for trial"?

11        MR. MORAN:  I've done everything I can to

12   expeditiously retry Mr. Rivas.  Every adjournment has been at

13   his request.  We brought him back to Onondaga County; his

14   conviction was vacated; a motion schedule was set; an attorney

15   was assigned; and a trial date was set.  Since that time, that

16   date keeps getting moved not by me, by them.

17        JUDGE CABRANES:  So you are, in fact, ready to go to

18   trial?

19        MR. MORAN:  I have been since Day One.

20        JUDGE CABRANES:  So we'll have to speak to Mr. Rivas's

21   counsel, appointed counsel.

22        What do you say to that?

23        MR. KLEIN:  Well, first of all, in the first 60 days,

24   other than their announcement of readiness, nothing took place.

25        JUDGE CABRANES:  Why is that?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02477

G46VRIVA

```
 1            MR. KLEIN:  Other than at the first appearance -- I
 2   think I was assigned a month later; I think I was assigned in
 3   May, first of all.
 4            We were handed 370-something pages of police reports.
 5   No criminal defense attorney who was competent had ever looked
 6   through those.  They were not part of the record on appeal, so
 7   it's not a slight of the appeals attorneys or the courts that
 8   reviewed those matters, but it was clear from that there was a
 9   lot of work that had to be done.
10            JUDGE POOLER:  Were these police reports, records that
11   had been turned over to the trial counsel below?
12            MR. KLEIN:  They would have been.
13            JUDGE POOLER:  What does that mean?  They would have
14   been, but they weren't?
15            MR. KLEIN:  They should have been, let's put it that
16   way.  We don't know what was turned over.
17            JUDGE SACK:  You're not saying it wasn't; you're just
18   saying you don't know -- it should have been, but you don't
19   know.
20            MR. KLEIN:  He's unavailable and his records are
21   unavailable.
22            JUDGE CABRANES:  Mr. Manes has a view on this, I
23   think.
24            MR. MANES:  I'm available.  I can tell you, those
25   documents were foiled by me and we had them for quite a period
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

G46VRIVA

1    of time.  There was nothing new, Judge Cabranes, in those

2    documents.  I just merely took them and gave them to Mr. Klein.

3    We had seen them before.  This was nothing new; this was

4    nothing concrete or substantial, I can assure this Court.

5              JUDGE POOLER:  Were they part of the record below?

6              MR. MANES:  Absolutely.  Absolutely, Judge Pooler,

7    without question we had been through these documents.

8              JUDGE CABRANES:  These documents are part of the state

9    court proceedings?

10             MR. MANES:  Yes, in the original.

11             JUDGE CABRANES:  Were they also before the district

12   court?

13             MR. MANES:  They were all part of the record, that I'm

14   sure.

15             JUDGE CABRANES:  They were part of the record.

16             MR. MANES:  Yes.

17             MR. KLEIN:  They were all part of the 440 motion.

18             MR. MANES:  They were part of the 440 motion as well.

19             MR. LANGONE:  I think what really goes on here is what

20   happens is as the case goes forward, Mr. Klein -- he can speak

21   to this better than I -- was receiving additional information.

22   When he went through this material that was previously

23   available to Mr. Calle, who was the trial attorney at the time,

24   there was information there that was never worked up.  For

25   instance, there was supposedly a marijuana pipe or two that

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02481

G46VRIVA

1    were found at the scene that were never turned over to the

2    defense; or if they were, they were never inspected or

3    investigated or examined by the defense counsel.

4             JUDGE POOLER:  Now they're gone?

5             MR. LANGONE:  I'm not going to speak to that, your

6    Honor.

7             MR. MORAN:  They are not, Judge.  If I may interject,

8    I apologize if that's out of order, but they're at the lab --

9             JUDGE CABRANES:  That's all right.

10            JUDGE SACK:  They are at the lab and being tested

11    right now?

12            MR. MORAN:  Yes.

13            MR. LANGONE:  These were not tested initially.

14            JUDGE SACK:  I understand.

15            MR. LANGONE:  There's some evidence in the record that

16    Mr. Rivas never smoked marijuana or wasn't a marijuana smoker.

17    So, in fact, that these pipes were at the crime scene is

18    somewhat --

19            JUDGE POOLER:  They were never tested?

20            MR. MORAN:  Mr. Rivas's fingerprints are on the film

21    canister that had marijuana in it.  These two marijuana pipes

22    and two film canisters, the type that 35-millimeter film would

23    have been in back in the day, one of which had marijuana in it,

24    were found about five feet or so from the body on a side table

25    next to the couch.  Mr. Rivas's fingerprints are on them.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02483

14

G46VRIVA

1              JUDGE SACK:  Are you permitted to say what they are

2      being tested for?

3              MR. MORAN:  Latent prints have been done.  I think

4      they are also looking for some DNA on the marijuana pipes

5      themselves.

6              JUDGE POOLER:  Were they introduced in the trial

7      below?

8              MR. MORAN:  I don't believe that they were.

9              MR. LANGONE:  I never heard of this before.  This is

10     not in the record anywhere.

11             MR. MORAN:  Because he's not the trial counsel in

12     Onondaga County Court.

13             MR. KLEIN:  Well, I am, and I first learned of this

14     fingerprint on the film canister two weeks ago.

15             Pardon?

16             JUDGE CABRANES:  Hold on a second.  Let him finish.

17             MR. KLEIN:  From Mr. Moran.  And last Saturday I

18     learned that -- this past Saturday, three days ago, learned

19     that they have identified 100 -- through new technologies and

20     different technicians doing it, 100 unidentified latent prints

21     from the scene.  This is this past Saturday, which is past the

22     December trial date, the February trial date; we're now into

23     April.

24             And the context of that --

25             JUDGE CABRANES:  Hold on one moment right there,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02485

15

G46VRIVA

1    Mr. Klein.  Can I turn to Mr. Moran.

2            How can you possibly claim that you were ready from

3    Day One to go to trial when this stuff is surfacing now?

4            MR. MORAN:  Because I was ready to call witnesses; I

5    was ready to pick a jury; I was ready to stand up and make my

6    case.  That the forensic testing wasn't 100 percent complete

7    doesn't mean I wasn't ready for trial.

8            JUDGE POOLER:  What does that mean?  You were going to

9    go to trial without any forensic evidence?

10           MR. MORAN:  If I had to, I would.

11           JUDGE POOLER:  Because you didn't care if you won or

12   lost?

13           MR. MORAN:  That's not true at all, no.

14           JUDGE POOLER:  Then tell me how you could be prepared

15   if you were still testing evidence.

16           MR. MORAN:  This case comes back in March.  We have

17   the first appearance; we have a December trial date.  I meet

18   with the people from the lab, I think it was in May, when I

19   sort of scheduled things and start talking about what's going

20   to get tested.  I bring the evidence up there and we review it

21   and say, This is worth looking at; this is not worth looking

22   at.  Those decisions are made.  They then start their work

23   looking at those things.

24           JUDGE SACK:  If you know, why does it take so long

25   to --

SOUTHERN DISTRICT REPORTERS, P.C.

P02486

(212) 805-0300

P02487

16

G46VRIVA

1          MR. MORAN:  Part of it, your Honor, is that the trial

2     date keeps getting pushed back.

3          JUDGE SACK:  No, no, no.  Why is it so hard to

4     accomplish the testing that's required for this case?

5          MR. MORAN:  I'm not sure I understand the question,

6     but maybe I can answer --

7          JUDGE SACK:  What I'm saying is we're now in April.

8     The pipes have been around for -- I can't subtract that well.

9          MR. MORAN:  I understand.

10          JUDGE SACK:  The question is why is it still being

11     worked on now and why did it take so long?

12          MR. MORAN:  Because, if I may, every time the trial

13     date gets moved out, other things get put in line in front of

14     it.  They are extremely busy and overlooked; they have a lot of

15     cases to look at.

16          JUDGE CABRANES:  So other cases jump the queue?  I

17     don't quite understand.  I mean they get it; they should be

18     working on it pretty soon after they get it, right?

19          MR. MORAN:  Indeed they are, yes.

20          JUDGE CABRANES:  So what's the relevance of other

21     cases?

22          MR. MORAN:  The relevance is once the case moves from

23     December to March and March to June, other things get in front

24     of it.

25          JUDGE CABRANES:  They just decide to put it aside

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

G46VRIVA

1     because we don't have to do it right now.

2            MR. MORAN:  Because other trial cases have to get

3     done.

4            JUDGE CABRANES:  Even though you've claimed much

5     earlier and continue to claim that you're ready to go to trial.

6            MR. MORAN:  Which I am.

7            JUDGE CABRANES:  This is some sort of theoretical

8     concept, I gather, going to trial.

9            MR. MORAN:  If we had had this trial in December, the

10    latents would have been done in December.  But every time it

11    gets moved out, they have other work they have to get done,

12    there's three months worth of work they have to do between

13    December and March.

14           JUDGE POOLER:  And none of this was done because it's

15    new testing for the first trial?  None of this was done before

16    the first trial?

17           MR. MORAN:  DNA technology wasn't available, I don't

18    believe, Judge.

19           JUDGE POOLER:  What about fingerprint technology?

20           MR. MORAN:  -- they did look at.  There was a

21    different system then.  The Syracuse Police Department took

22    more control over what testing was done and how it was done and

23    whom it was done by.  We now have a different county

24    department, the Center for Forensic Sciences.  Those are the

25    folks that are looking at it now, not people from the Syracuse

(212) 805-0300

P02491

18

G46VRIVA

1    Police Department.

2          JUDGE CABRANES:  We interrupted Mr. Klein.

3          MR. KLEIN:  It was a good interruption.

4          There are over 100 -- I learned this this past

5    Saturday.  There are 100 or more unidentified latent prints.

6    To a defense attorney in a case where you're pursuing alternate

7    suspects, those have to be pursued; those have to be -- you

8    have, as a defense attorney, to not just leave them hanging.

9          Also this I learned from Mr. Moran on the same phone

10   call on Saturday, that they had misplaced, lost, somehow over

11   the intervening years Ms. Hill's postmortem latents, which are

12   the only fingerprints they have.  They don't have her latent

13   prints, so they can't -- of these 100 unidentified latent

14   prints from the scene, they can't use hers as elimination.

15         If we go to trial -- it's interesting that Mr. Moran

16   talks about when the trial is pushed out.  It's pushed out at

17   my request because we can't be ready from a defense standpoint

18   with questions unresolved, with forensic issues hanging.

19         JUDGE CABRANES:  That is until Mr. Moran's colleagues

20   have finished their work.

21         MR. KLEIN:  Right.

22         JUDGE CABRANES:  Work which continues to be postponed.

23         MR. KLEIN:  It's a catch-22, which I learned today in

24   talking with Mr. Moran, that every time the trial is put out,

25   they put those aside only to return to them when there's a

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02493

G46VRIVA

```
 1    trial date, and then I don't have enough time to get done what
 2    I need to get done.
 3              JUDGE SACK:  I think that's the perfect catch-22.
 4              MR. KLEIN:  It is.  Thank you.
 5              JUDGE CABRANES:  Mr. Manes, do you have a view on
 6    that?
 7              MR. MANES:  Well, your Honor --
 8              JUDGE CABRANES:  Take the microphone.
 9              MR. MANES:  It's so difficult to listen to Mr. Moran,
10    with all due respect.  In the meantime, Hector Rivas sits in
11    jail on a 30-year-old case.  He has served 24 years, your
12    Honor, 24 years of a 25-year minimum sentence.
13              Three years ago or so, Judge Cabranes, your decision
14    was spectacular, indicated and gave him a breadth of absolute
15    innocence -- or actual innocence, excuse me.  Yet he still sits
16    in jail.  He's terribly ill; he has no place to run; he'll go
17    home to his family, while Mr. Moran and Mr. Klein fight it out.
18              JUDGE CABRANES:  Where is his family?
19              MR. MANES:  In the Bronx, your Honor.  His wife is
20    here; they have a home in the Bronx, easily for him to go home.
21    He's ill.  He can't hide, your Honor.  There's no place to run.
22              JUDGE CABRANES:  Let me ask Mr. Klein first, have you
23    done anything to secure a modification of bail conditions so
24    that he can be released pending trial?
25              MR. KLEIN:  Judge Miller has made it very clear he's
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

G46VRIVA

1    not -- first of all, the people, the district attorney, asked

2    for a million dollars bail.

3            JUDGE CABRANES:  Yes, I know.

4            MR. KLEIN:  Judge Miller set it at 500,000.  I was not

5    involved that day; I was assigned at the end of that or during

6    that court appearance, but I didn't argue the bail.  I

7    immediately went to an appellate division judge in Syracuse

8    who, after discussions, reduced it to 200,000 cash or bond and

9    that's where we've been.  He's unable to make that bail.

10           Judge Miller has made it clear that his response to

11   our wanting Hector out is to say we have a trial date.  You

12   have a trial date; I've given you an early trial date.  That

13   doesn't serve my purposes as his counsel to try to do an

14   effective job in this incredibly factually complex case and it

15   also doesn't get him out.  And that's, I think, why we're here.

16           JUDGE POOLER:  Mr. Moran, you're ready for trial now

17   as you sit there?

18           MR. MORAN:  Yes.

19           JUDGE POOLER:  Can you tell me without revealing any

20   trial strategy how you plan to establish Ms. Hill's time of

21   death?

22           MR. MORAN:  I plan to call the medical examiner,

23   Dr. Robert Stoppacher, from Onondaga County.

24           JUDGE POOLER:  The present medical examiner --

25           MR. MORAN:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02497

21

G46VRIVA

1           JUDGE POOLER:  -- who was not there at the time.

2           MR. MORAN:  Correct.

3           JUDGE CABRANES:  How do you spell his name for the

4     record?

5           MR. MORAN:  S-T-O-P-P-A-C-H-E-R.

6           JUDGE POOLER:  He's going to do that based on the

7     records of the medical examiner at the time, Dr. Eric Mitchell?

8           MR. MORAN:  Yes.

9           JUDGE POOLER:  Of course, we know -- because we've

10    discussed it before -- that the alleged slides didn't exist;

11    correct?

12          MR. MORAN:  We do know that, yes.

13          JUDGE POOLER:  We do know that?

14          MR. MORAN:  Yes.

15          JUDGE POOLER:  So it's going to be the medical

16    examiner interpreting the notes of the previous medical

17    examiner --

18          MR. MORAN:  Yes.

19          JUDGE POOLER:  -- whose integrity was called into

20    question in our decision?

21          MR. MORAN:  I suppose.

22          JUDGE POOLER:  Well, we thought that the fact that he

23    was being investigated by the district attorney at the very

24    time that he changed his testimony was at least interesting and

25    perhaps a badge of fraud.

SOUTHERN DISTRICT REPORTERS, P.C.

```
(212) 805-0300
```

G46VRIVA

```
 1              MR. MORAN:  He didn't change his testimony.

 2              JUDGE POOLER:  He never changed his testimony?

 3              MR. MORAN:  He never changed his testimony.

 4              JUDGE POOLER:  I think you're wrong about that, but

 5    elaborate on that.

 6              MR. MORAN:  He never said that she died on Saturday.

 7    That was reported in the newspaper.  It was part of an

 8    affidavit that was submitted as part of a search warrant, that

 9    affidavit came from a police officer.  I think it was just

10    misconstrued, frankly, and I think that happens --

11              JUDGE CABRANES:  Misconstrued by whom?

12              MR. MORAN:  By the police officer.

13              JUDGE CABRANES:  What about our opinion?  Was there

14    anything factually inaccurate about what we described?

15              MR. MORAN:  I thought your opinion said that you never

16    really called into question Dr. Stoppacher -- or, excuse me,

17    Dr. Mitchell's integrity about opinions and autopsies that he

18    had performed; but that the questions were about handling of

19    body parts and those kinds of things.  It wasn't really about

20    his job, but how he handled other things.

21              JUDGE POOLER:  Although he was being investigated by

22    the district attorney who was trying this case at the same time

23    as he was testifying; isn't that correct?  Weren't they

24    contemporaneous events?

25              MR. MORAN:  I honestly don't know, but I've heard it.
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

G46VRIVA

```
1              JUDGE CABRANES:  You've heard it and you've read it.
2              MR. MORAN:  Yeah, and I've read it.
3              JUDGE CABRANES:  Do you have any reason to doubt the
4    accuracy of that?  I don't think Ms. Steward --
5              MR. MORAN:  I don't know the time --
6              MS. STEWARD:  Actually, my recollection is that the
7    people had represented that that investigation did not begin
8    until after the trial was over.  And actually there was a
9    report that Dr. Mitchell had prepared the day that the body was
10   found.  In the report it stated that it appeared the body had
11   been there for two to three days.  And given that the body was
12   found on Monday, three days before that is Friday.
13             We had always maintained in our papers and in our oral
14   argument that from the time that the body was found, that
15   Dr. Mitchell discovered the body, that he had always said that
16   the body had been there at least -- well, at most since Friday.
17   That does not appear in your opinion, but it is in the record.
18             MR. LANGONE:  Judge --
19             JUDGE POOLER:  Can we hear anything in response?
20             MR. LANGONE:  Absolutely.
21             First of all, let's keep in mind that Mr. Rivas is not
22   indicted until almost five years after this death, this murder,
23   okay.  He was a suspect early on because he was the boyfriend.
24   We know the investigation began way before Hector was ever
25   arrested in this case.  In fact, it was two weeks after he was
```

P02502

```
(212) 805-0300
```

P02503

G46VRIVA

1    convicted, Mitchell was let off the hook.  He was allowed to

2    plead out and avoid the --

3              JUDGE POOLER:  He left his job.

4              MR. LANGONE:  And he left his job.

5              JUDGE POOLER:  So was it going on contemporaneously?

6              MR. LANGONE:  Contemporaneously.

7         There was an investigation with the DEC.

8              JUDGE POOLER:  This is a factual issue.

9              MS. STEWARD:  He was not being investigated by the

10   DA's office.  That investigation with the DA's office did not

11   begin until four months after the trial was over.

12             JUDGE CABRANES:  Let's just state the obvious:  In our

13   opinion we set forth with as much care as possible what we

14   thought to be the facts.  And I'm not aware -- maybe my

15   colleagues are aware, I'm not aware of any effort by anyone in

16   the state to correct any misapprehension by us.  I recall no

17   such -- it may be that Ms. Steward had a different view of the

18   facts, but whatever that view may be was never conveyed to us

19   in the aftermath of the decision.

20             JUDGE POOLER:  And before the DA started

21   investigating -- I know this because I live in Onondaga

22   County -- there were stories in the newspaper about his

23   integrity as a coroner.  And that was going on for a while

24   before the DA began his investigation.  He was under attack by

25   his former employees in the office.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02505

G46VRIVA

```
 1          MS. STEWARD:  That's right.  That was, I believe, in
 2     1992/1993.  But they were not related to his -- the way he did
 3     his job, and they weren't related to the way he did his job in
 4     this case.
 5          JUDGE POOLER:  Allegedly.
 6          MR. MORAN:  If I may, Judge.
 7          MR. MANES:  If you'll forgive me, your Honor, she
 8     indicates that the DA wasn't investigating, that may be true.
 9     The Department of Environmental Conservation has investigated
10     Dr. Mitchell for 144 misdemeanors:  For disposing of body
11     parts, for pouring material blood down the sink.  So the people
12     who would have prosecuted Dr. Mitchell was not the DEC, it
13     would have been the district attorney.
14          JUDGE POOLER:  He knew about the DEC to the best of
15     our knowledge?
16          MS. STEWARD:  We have no evidence of that.
17          JUDGE POOLER:  There's no evidence that he knew the
18     DEC was investigating?
19          MR. LANGONE:  He said to the press, He was my friend
20     for 20 years and he's resigning and he's leaving.  That's
21     exactly why he wasn't prosecuted, because he agreed to resign.
22          MS. STEWARD:  That's not evidence that he knew about
23     the DEC investigation.
24          JUDGE CABRANES:  Hold on.
25          We understand that there are differences of
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

26

G46VRIVA

1   perspective here, but given this colloquy, Mr. Moran, do you

2   have anything to add?

3          MR. MORAN:  I'm not calling Dr. Mitchell; I'm calling

4   Dr. Stoppacher.  Stoppacher reviewed the --

5          JUDGE POOLER:  But it's based on Dr. Mitchell's notes.

6          MR. MORAN:  Yes.  It's not that unusual.

7          JUDGE CABRANES:  His testimony will consist of an

8   evaluation of the notes 20-plus years ago?

9          MR. MORAN:  Yes.  And the temperature that was at the

10  house, and the condition that the body was in, and then he'll

11  estimate the time of death.

12         JUDGE POOLER:  Will we also consider Dr. Wecht's

13  testimony?

14         MR. MORAN:  I haven't.  I plan on calling

15  Dr. Stoppacher.  Dr. Stoppacher has looked at --

16         JUDGE POOLER:  I understand.  But Dr. Wecht testified

17  at a hearing later and he contradicted Dr. Mitchell.  I'm

18  wondering if the medical examiner would be able to respond to

19  that testimony as well.

20         MR. MORAN:  I'm sure that he will.  I look forward to

21  crossing Dr. Wecht.

22         JUDGE CABRANES:  Mr. Langone, you had something to say

23  on this?

24         MR. LANGONE:  It just slipped my mind, Judge.  It will

25  come back to me.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

G46VRIVA

1          JUDGE CABRANES:  It's all right.

2          MR. MORAN:  If I may.

3          JUDGE CABRANES:  Please.

4          MR. MORAN:  What I was going to continue with is so

5     I'm meeting with Dr. Stoppacher at the medical examiner's

6     office.  He has had the opportunity to review the autopsy

7     performed by Dr. Mitchell and review the file that the medical

8     examiner has.  So I'm meeting with him to talk about time of

9     death.  He and I go through this discussion.  We talk about the

10    onset of livor mortis and then how it comes out of livor

11    mortis.  And he says to me based on her size, based on the

12    temperature, based on Dr. Mitchell's notes about coming out of

13    rigor mortis, he would estimate the time of death to be between

14    24 and 72 hours.

15         JUDGE POOLER:  I don't think there's any evidence in

16    the record about the temperature of the room.

17         MR. MORAN:  There is evidence in the record.  I don't

18    know if it's in your record, but I have paperwork from the

19    evidence technician at the time documented the temperature at

20    the apartment was between 62 and 64 degrees.

21         JUDGE CABRANES:  We're not here to adjudicate or

22    consider any of those matters.  But since you've been ready for

23    trial forever, according to what you said, how long will it

24    take you to complete the -- assuming for the argument that

25    Mr. Klein is also ready for trial under the same theory that

(212) 805-0300

P02511

28

G46VRIVA

1    you're ready for trial, how long will it take you to complete

2    all of that, all of those matters that you keep putting aside?

3            MR. MORAN:  I don't put them aside.  The lab doesn't

4    work for me.

5            JUDGE CABRANES:  That they are put aside, as in

6    mistakes are made, they are put aside.  How long will it take

7    to get it done?

8            MR. MORAN:  I don't know how to answer that, Judge.

9    I'd like to be as honest as I can.  If they said the trial is

10   in a month, it will be done when the trial goes.  If I call

11   them tomorrow and say, We're moving the trial date up, it's got

12   to get done, it will get done.

13           JUDGE POOLER:  You heard Mr. Klein say he can't

14   prepare for the trial until he gets the results of your

15   forensic tests.

16           MR. MORAN:  There are 100 unidentified prints because

17   we don't have her postmortem prints.  I don't expect that to

18   change very much.  If we don't find her prints, there's going

19   to be a number of unidentified --

20           JUDGE CABRANES:  Doesn't it seem to you from this

21   colloquy that you are the key person here, your office; that

22   you can ask the other functionaries in the medical examiner's

23   office or wherever to get this done by a date certain?  Can you

24   do that?

25           MR. MORAN:  I have, every time there's been a trial

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02513

29

G46VRIVA

1    date.  And every time it moves, that changes.

2            JUDGE CABRANES:  Mr. Moran, I hope you'll excuse me

3    for saying this is like some sort of joke.

4            MR. MORAN:  It's not.

5            JUDGE CABRANES:  This is a catch-22 is a pleasant way

6    of putting it.

7            MR. MORAN:  I too have experienced that.  Because

8    every time I'm in court in Onondaga County, I hear, We're not

9    ready; we can't rush; it's too soon.

10           JUDGE CABRANES:  Well, they're waiting for you,

11   Mr. Moran --

12           MR. MORAN:  They are not.

13           JUDGE CABRANES:  -- and the people who are reporting

14   to you.

15           How are you going to get those materials?  You're not

16   going to do anything.  You're going to sit there and, What, me

17   worry, Alfred E. Neuman style.

18           MR. MORAN:  No.  I'll call them today, Judge, if you

19   want; tell them it's got to be done.

20           JUDGE SACK:  I think there's something -- there's a

21   hitch there that's missing.  Because you say it has to be done

22   by trial; your adversaries are saying, No, no, it has to be

23   done before trial because we're entitled to look at it and be

24   prepared to respond to it.

25           Are they right, are you right, or I'm just simply

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02515

30

G46VRIVA

1    wrong?

2         MR. MORAN:  They are entitled to look at it before

3    trial.

4         JUDGE SACK:  In that case it has to be ready before

5    trial.

6         MR. MORAN:  It does.

7         JUDGE SACK:  Saying it's going to be ready by trial

8    isn't helpful.  It has to be ready enough before trial so they

9    can do what they do and then everybody is ready for trial.

10        JUDGE CABRANES:  It's really circular, Mr. Moran.

11        Are we helpful to you in this respect?

12        MR. MORAN:  Sure.

13        JUDGE CABRANES:  How long will it take, Mr. Moran?

14        MR. MORAN:  Judge, I'd have to talk to them, but I

15   don't know --

16        JUDGE CABRANES:  You didn't think to do that or to

17   check before you made the trip to New York?

18        MR. MORAN:  I didn't.

19        MR. LANGONE:  Your Honor, may I also say that from the

20   first appearance we made in March, immediately after this

21   Court's order, they announced ready.  Clearly a year later they

22   are still doing things.  So those representations are hard to

23   grasp.

24        But I'm going to go right to what I think is really

25   the critical point.  At this point, from what I'm hearing right

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02517

G46VRIVA

1    now, your Honor, with respect to preventing or precluding the

2    state from retrying Mr. Rivas, let me tell you what's going on

3    here, Judge.

4        The 25 years -- it's a 30-year-old case now.  It's

5    almost impossible to recreate these events.  We know that this

6    case -- the trial was predicated upon ineffective assistance of

7    counsel and really, really inappropriate behavior by a medical

8    examiner, to be kind.  Okay?  This was state-action driven.  I

9    would say it was an outrageous governmental misconduct

10   situation.

11       They're saying that there's 100 some-odd latent

12   fingerprints -- critical in a murder case of circumstantial

13   evidence -- that now cannot be compared because the evidence is

14   lost.  Her fingerprints, the known print, is not available to

15   compare these latents to, okay.

16       The medical examiner Mitchell's report was so flawed,

17   as Judge Pooler is intimating, was so suspect, that there's an

18   implicit Crawford issue with respect to allowing someone to

19   come and interpret now some findings that this medical examiner

20   made that are inherently untrustworthy.  And the rules of

21   evidence and even the exceptions -- the business record

22   exception and all that, there's the exception for the lack of

23   indicia of reliability.

24       So the bases upon which the present medical examiner

25   is going to posit an opinion with respect to time of death is

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02519

32

G46VRIVA

1    going to be built on quicksand.  The totality of all that's

2    gone on has prevented Mr. Rivas from obtaining a fair trial at

3    this point.  The witnesses who are going to be unavailable,

4    whose testimony they would like to perpetuate based upon the

5    prior testimony, we would argue that because their testimony --

6    Mr. Rivas had globally ineffective assistance of counsel, that

7    it would be unfair, because even though he had a similar

8    opportunity and interest to cross-examine these people, the

9    constitutional right to effective representation was denied.

10   So to allow testimony of people that may not be available to

11   come in under prior sworn testimony is problematic.

12          JUDGE CABRANES:  I don't mean to cut you off in any

13   way, but we're not here to review the merits of any of these

14   situations.

15          JUDGE POOLER:  We granted habeas.

16          MR. LANGONE:  Yes, I know.

17          JUDGE CABRANES:  What really concerns us, I think, is

18   whether there are conditions that can be and should be

19   established to permit Mr. Rivas as a pretrial detainee, whose

20   prior conviction has been voided, to be free pending trial.

21          MR. LANGONE:  With that statement then it's really

22   quite simple.  This Court knows far better than I do he's been

23   in jail for 24 years on a 25-to-life sentence; he's an older

24   man; he just had five inches of his colon cut out.  I've got

25   medical records here.  I served a copy on Ms. Steward and I'd

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02521

G46VRIVA

1    like to serve a copy on the Court, if I might.

2          JUDGE CABRANES:  If you could just give it to

3    Mr. Conde.

4          MR. LANGONE:  Thank you.

5          Just indicating his dire condition -- didn't Patty

6    Duke just die yesterday of the same thing?

7          MR. MANES:  Last week.

8          MR. LANGONE:  Last week.

9          JUDGE CABRANES:  Probably not.

10         JUDGE SACK:  It was a peculiar -- it's not worth --

11         MR. LANGONE:  Okay.  You always have one on me, Judge.

12         But the point is that he's been very, very ill.  He

13   was a model prisoner.  He was out on bail previously.  He's got

14   no reason to run.  He'd be eligible for parole release

15   consideration in one year.  We know that the case -- the

16   evidence against him is paper thin.

17         Let me tell you something else here, Judge.  It's

18   really troubling to me, as an appellate practitioner, I see

19   this case as having a slew of important pretrial constitutional

20   issues that have to be decided.

21         So the trial court judge, the state court judge at

22   this point is saying, Yeah, well, get ready, we're trying it

23   next month.

24         Well, guess what?  I think the pretrial motions in

25   this case for correct disposition of this matter is going to

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02523

34

G46VRIVA

1   take several months.  I think that if they're both prepared,

2   the judge can't be ready to try this case.  I don't know what

3   he's thinking, that he's going to try this case, he says, with

4   or without a jury -- I mean with or without counsel -- of

5   course he's playing -- in 30 days.  It's an impossibility.

6          Going back to Hector's release.  He's lived in the

7   Bronx his whole life; he lived upstate for some period of time;

8   his family is in the Bronx; he's married; they're all here;

9   they're great people.

10          JUDGE CABRANES:  Where in the Bronx?

11          MR. LANGONE:  Where in the Bronx?  I don't know.

12          St. Ann's Avenue in the Bronx.  That's his wife.

13          He's going to go home to his wife and his son.  Where

14   is he going?  He's got nowhere to run.  He doesn't even have

15   money to run.

16          JUDGE CABRANES:  Let me ask Mr. Klein what he would

17   recommend to break through this Gordian Knot.

18          MR. KLEIN:  Concerning release, I think if this Court

19   were to direct Judge Miller to release Hector to the pretrial

20   release program in Onondaga County, to supervise him at his

21   home residence with his wife in the Bronx, that Judge Miller

22   would do that and that the Onondaga County Probation Department

23   would honor that.

24          JUDGE SACK:  As somebody who is unfamiliar with this

25   sort of practice, what is supervision in that case?  Those of

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02525

35

G46VRIVA

1   us who get most of our knowledge of criminal law by reading the

2   daily newspapers think of a Bernie Madoff who was confined to

3   his home and had people watching over him.

4           What do you mean when you say "home" and

5   "supervision"?

6           MR. KLEIN:  I think the supervision from the pretrial

7   release program can be as simple as a weekly phone call where

8   he checks in and says, I'm still living at the same address;

9   I'm still doing the same thing.

10          JUDGE SACK:  And if he doesn't make that call, we're

11  all in trouble.

12          MR. KLEIN:  Pardon?

13          JUDGE SACK:  If he doesn't make that call, we're all

14  in trouble.

15          MR. KLEIN:  Right.

16          I don't want to commit them to electronic home

17  confinement because that has to be between counties and they'd

18  have to have an agreement.  I'm sure the home and the setting

19  are --

20          JUDGE SACK:  Are you all right?

21          MR. MANES:  Yes, I'm fine, your Honor.

22          JUDGE POOLER:  Counsel, what power do we have to order

23  Judge Miller to release him?  Where would it come from?

24          MR. KLEIN:  I don't know what statutory power you have

25  under the federal habeas rules.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02527

36

G46VRIVA

1           MR. LANGONE:  Your Honor, I would submit that first

2   recalling the mandate would give you that power.  I believe the

3   All Writs Act under 28 U.S.C. 1651 gives you the power to take

4   any steps necessary to effectuate the writ.  I don't trust

5   anything about Onondaga County's judicial system at this point,

6   forgive me, Judge Pooler.  But I think that the only way

7   Mr. Rivas is going to get any kind of pretrial protection is if

8   we have him under federal probation.  Under the Writs Act I

9   think you can have him under federal probation supervision;

10  pretrial services could monitor him, keep him within the

11  Eastern District, Southern District, and Northern District.

12          JUDGE POOLER:  So the first step is we recall the

13  mandate.

14          MR. LANGONE:  I think that would be required.

15          JUDGE POOLER:  Which gives us jurisdiction to

16  effectuate our earlier decision.

17          MR. LANGONE:  Correct.

18          JUDGE POOLER:  And then if he was released, the county

19  could try him whenever.

20          MR. LANGONE:  Yes.  And I think that takes the

21  pressure off the state court judge.

22          I'm really worried about that.  I really think he's

23  feeling like he's being pressured now and he's going to try to

24  run this case through.  There is some really serious motion

25  practice that needs to be made here because I don't think

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02529

37

G46VRIVA

1    Mr. Rivas can get a fair trial anymore.

2         JUDGE POOLER:  Mr. Klein, you haven't even done motion

3    practice yet, have you?

4         MR. KLEIN:  I've had cooperation to the extent --

5         JUDGE POOLER:  So you got all the discovery --

6    although you just got Brady material.

7         MR. KLEIN:  There was already a motion to suppress

8    that was granted of statements and physical evidence, which is

9    law of the case as far as I'm concerned; that may be an issue

10   for Mr. Moran.  There is a significant motion to dismiss based

11   on constitutional and speedy trial grounds that Ms. Zimmer and

12   I are working on now.

13        JUDGE POOLER:  So that's pending a motion to dismiss

14   is pending now before --

15        MR. KLEIN:  We are drawing it up.  But, again, it's

16   been a moving target in terms of what evidence is there and

17   what evidence isn't there.

18        JUDGE POOLER:  What did you suppress?  What did the

19   judge suppress?

20        MR. KLEIN:  There's a videotaped statement that

21   followed Mr. Rivas on video saying, I was told I should have a

22   lawyer here.  Is it okay if I have a lawyer here?  And they

23   went ahead for another five or six hours.

24        JUDGE SACK:  When was this?  This was immediately

25   after his arrest?

                    SOUTHERN DISTRICT REPORTERS, P.C.

P02530

(212) 805-0300

P02531

38

G46VRIVA

1              MR. KLEIN:  It was a week later.  The one immediately
2     after was allowed.
3              JUDGE SACK:  Okay.  But I want to get general time.
4              JUDGE POOLER:  That was not suppressed in the first
5     trial?
6              MR. KLEIN:  That was suppressed at the first trial.
7              JUDGE POOLER:  It was.
8              MR. KLEIN:  And the torn note in the wastebasket,
9     which we factually contest the legitimacy of that, was also
10    ordered suppressed as beyond the scope of the search warrant.
11             JUDGE POOLER:  So you're trying to be in exactly the
12    position that the first lawyer was in terms of what's allowed
13    as evidence?
14             MR. KLEIN:  I'm okay with those rulings in terms of
15    the evidence; but in terms of trying the case, it's a
16    nightmare.
17             JUDGE CABRANES:  Mr. Klein, I get the impression --
18    perhaps my colleagues also have the impression -- that you
19    really can't undertake this important motion practice until
20    certain things are done by the state.  Is that -- by the DA's
21    office.
22             MR. KLEIN:  We're almost there, and we committed to a
23    motion date with Judge Miller.
24             JUDGE CABRANES:  What's between "there" and "almost
25    there"?

                    SOUTHERN DISTRICT REPORTERS, P.C.

P02532

(212) 805-0300

P02533

39

G46VRIVA

1              MR. KLEIN:  The ground shifting under my feet when I

2       get a call from Mr. Moran on a Saturday afternoon telling me

3       there are over 100 unknown latent prints; and that they lost

4       the victim's postmortem prints.  I'd asked him about print

5       lifts and print photographs a couple of months ago because we

6       hadn't seen them; and he told me they can't find them.

7              JUDGE SACK:  You don't know because you don't know

8       what's going to happen tomorrow.

9              MR. KLEIN:  No, I don't.

10             JUDGE CABRANES:  Mr. Moran, can you tell us when you

11      can get everything over to Mr. Klein?

12             MR. MORAN:  Mr. Klein has everything I have.  I don't

13      hold out any hope that I'm going to find her postmortem prints.

14             JUDGE CABRANES:  Do you have any hope of ever getting

15      any reports from any other state or local agency which will be

16      relevant to Mr. Klein?

17             MR. MORAN:  You mean the testing?

18             JUDGE CABRANES:  Yes.

19             MR. MORAN:  Yes, there was one report that was

20      finished yesterday that I'll give Mr. Klein.  I told him about

21      it this morning.  I'll give it to him tomorrow.

22             JUDGE CABRANES:  What else?

23             MR. MORAN:  I think there's some more latent print

24      testing still ongoing.  The DNA reports haven't been --

25             JUDGE CABRANES:  When can you get that finished?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02535

40

G46VRIVA

```
 1              MR. MORAN:  Judge, I got to talk to the lab.  I don't
 2    want to commit them to that, but I would think a month.
 3              JUDGE SACK:  Is there anything other than -- I mean
 4    we're talking about latent prints.  DNA came up, that's also --
 5    we're waiting on that too?
 6              MR. MORAN:  Yes.
 7              JUDGE SACK:  Anything else?
 8              MR. MORAN:  No.
 9              And, Judge, if I may, all of this testing, every time
10    we find new results, all comes back to Hector Rivas.  And I
11    know I've said this once, that we have the prints on the
12    marijuana canisters that are a few feet from the body.  I know
13    the Court will recall that at the original trial there was this
14    issue of this library book that was returned.  His fingerprints
15    are on the book.
16              We're making progress.  We're doing the best we can.
17    I will call the lab tomorrow and expedite everything and tell
18    them it has to be done ASAP.
19              One of the ironies of this case is that they have more
20    than I do.  It is 20 years of foiled requests.  And we're on
21    the hook for this, because so many hands have been in these
22    boxes and moved things around, they didn't get back to the
23    right place.
24              JUDGE SACK:  Mr. Manes, I'm dying to know what's
25    upsetting you at the moment.
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02537

41

G46VRIVA

1          MR. MANES:  As I remember, your Honor, this library

2     book 30 years ago had no -- did not have a print.  This is new.

3          MR. LANGONE:  They found the book.

4          MR. MANES:  This is absolutely new.

5          JUDGE POOLER:  Speak into the microphone.

6          MR. MANES:  I beg your pardon, Judge Pooler.

7          I do not know of any such print on a library book.

8     And I know about the library book, it was in the back of her

9     car and it went back to the library.  And they never found a

10    print on it.  This is, to me, totally new.

11         JUDGE POOLER:  Was that part of the record below, to

12    the best of your knowledge, counsel?

13         MR. MORAN:  Judge, this is brand-new.

14         MR. MANES:  Brand-new.

15         JUDGE POOLER:  How can it be brand-new?  Could you

16    explain that to us?

17         MR. MORAN:  It's not actually that unusual, when the

18    new lab goes back and looks at old evidence with better

19    technology and better techniques.

20         JUDGE POOLER:  You kept the book?

21         MR. MORAN:  Yes, we still have the book.

22         JUDGE POOLER:  But what you don't have is Valerie

23    Hill's fingerprints, so you can't get her resolved there, can

24    you?

25         MR. MORAN:  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02539

G46VRIVA

```
 1                JUDGE CABRANES:  What about the chain of evidence with
 2     respect to this book?
 3                MR. MORAN:  That will be an issue, but it's been in
 4     our custody since the trial.
 5                MR. MANES:  Like the diary?
 6                JUDGE POOLER:  This is the first time you're telling
 7     the defense team that Hector Rivas's prints were on that book?
 8                MR. MORAN:  The defense team doesn't include
 9     Mr. Manes; it includes Mr. Klein and --
10                JUDGE POOLER:  Is this the first time --
11                MR. MORAN:  No, it's not.
12                JUDGE POOLER:  -- Mr. Klein heard?
13                MR. MORAN:  Yes, he heard as soon as I did.  I don't
14     want to mischaracterize it, but two or three weeks ago, I
15     think.
16                MR. KLEIN:  Less than that.
17                JUDGE CABRANES:  Mr. Klein, let me come at this
18     another way:  If, as represented, Mr. Moran is able to get
19     everything that you need -- I guess we should actually know
20     what it is you need.
21                JUDGE SACK:  I guess you don't know what it is because
22     you don't know what's out there is part of the problem.
23                MR. KLEIN:  I asked for things and he tells me they
24     exist or we can't find them.
25                The issue with the marijuana pipes is an example.  I
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02541

G46VRIVA

1    first learned the significance of the marijuana pipes and the

2    film canisters, so I'm probably responsible for having them

3    continuing to be tested for sure.  But I first learned of their

4    significance when I saw a video of the scene which was provided

5    to me in September.

6            You laid out the procedural history.  I was assigned

7    in May.  I immediately asked Mr. Moran for the scene video,

8    scene photographs, autopsy photographs, everything.  I was told

9    they were digitalizing the scene video.  It was the old VCR, on

10   the old VCR/VHS type format.  And they were putting on digital.

11   And I continued to ask him for it as I ran into him or I would

12   call him or text him, however, asking, you know, When are you

13   going to have that?

14           Finally in September it was provided to us, at the

15   same time that all the physical evidence was provided to us.

16   And that was in seven or eight boxes at the DA's office.

17           And we went through that; we noted things that were

18   missing; and said, Where are these things?  Among those were

19   the marijuana pipes.  They were not in the physical evidence

20   that was at the DA's office.  He told me at that point some of

21   the things are at the lab.  So we waited for a lab report,

22   which I think came within a month.  And it only referred to one

23   marijuana pipe.

24           In the meantime, I had looked at the scene video.  Two

25   marijuana pipes were on the end table by the sofa in the living

P02542

(212) 805-0300

P02543

G46VRIVA

1    room.  Her body was prone in the living room by a sofa with an
2    end table.  The two marijuana pipes and the film canisters were
3    in the video, and also you can see them in photographs.  It
4    appeared to me to be two marijuana pipes.
5         When I asked Mr. Moran about I looked at the lab
6    report, it only referred to one marijuana pipe, he spent
7    several weeks asking me, Are you sure that you see two
8    marijuana pipes in the video?  I only see one or we only have
9    one.  And that's where the thing with the missing marijuana
10   pipe came into play.  As it turns out, it was at the lab all
11   along.  I didn't learn that until informed by Mr. Moran in
12   December.  December.
13        So both of them needed to be tested for DNA, because
14   there's an affidavit from Val's best friend in that 370 pages I
15   told you about that Hector didn't smoke marijuana.  She
16   identified one of the pipes as Val's and said, I don't know
17   whose that one was, the other one, whichever one it was.  And
18   Hector didn't smoke marijuana.  She's the one who said, Hector
19   did not smoke marijuana; you'll have to -- and they asked her
20   about where she got her marijuana and said, I'm not sure;
21   you'll have to ask her brother David.
22        So I had to have those tested and asked that at that
23   point.  I asked in November or December, whenever I was aware
24   that the lab had the marijuana pipes.  And I guess I learned
25   today that every time I've had to adjourn the trial because I

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

G46VRIVA

 1   haven't been ready because I don't have all the evidence I
 2   need, that those aren't getting tested; they are getting put on
 3   a lower shelf so that I will never be -- I can't answer your
 4   question until I have the things.  I don't have the fingerprint
 5   reports he's told me verbally about.  I'm not going to commit
 6   to something without having seen it.
 7        MR. MORAN:  I don't understand why the absence of lab
 8   reports prevents a constitutional speedy trial argument.  He's
 9   got all the discovery, he's got all the affidavits, they've got
10   all the information and had it through Mr. Manes for 20 years.
11   Now, the lab reports are important; I'll get them done.  They
12   will be done for trial.  How does that prevent a constitutional
13   speedy trial argument or a motion that we've been waiting for
14   for a year?
15        JUDGE CABRANES:  Mr. Klein?
16        MR. KLEIN:  Well, the constitutional speedy trial
17   motion is based on loss of evidence and loss of witnesses,
18   either through death or unavailability, because they're out of
19   state.  Dr. Mitchell will be a prime example of being out of
20   state.  My understanding is that he's now practicing in Kansas
21   somewhere.
22        There are Sixth Amendment confrontation issues.  This
23   is the first I've had it confirmed that Dr. Stoppacher will be
24   the one testifying, although I assume that will be the case;
25   and there's a significant confrontation issue and him relying

(212) 805-0300

P02547

46
G46VRIVA

1   on the opinion of someone who is potentially available to the

2   state and they are not calling.

3            JUDGE CABRANES:  Are you unable to file any of these

4   motions?

5            MR. KLEIN:  No.

6            JUDGE CABRANES:  So why haven't you filed them?

7            MR. KLEIN:  They would have been incomplete if I had

8   filed them any sooner.  We are at the stage we're at now and I

9   said we're pretty much there.  I'm not going to wait any

10  longer; I'm committed to keeping to the motion schedule we have

11  now.

12           JUDGE CABRANES:  I recognize that.

13           MR. KLEIN:  I bet you though there will be things that

14  I'll learn are missing, because that's just been the nature of

15  this case.

16           JUDGE CABRANES:  I'm mindful that you're Mr. Rivas's

17  counsel in the state proceedings and Mr. Langone is his counsel

18  in the federal proceedings.

19           Do you have any reason to believe that Mr. Rivas

20  cannot be released pending trial for any reason?  That is, is

21  he a risk of flight or a danger to the community?

22           MR. KLEIN:  No, I don't think so.  He was released

23  pending the first trial and made his appearances until the end

24  when Mr. Calle pulled a stunt, resulting in him being taken

25  into custody.  But otherwise he was released by Judge Mulroy on

SOUTHERN DISTRICT REPORTERS, P.C.

```
(212) 805-0300
```

P02549

G46VRIVA

1     a five-year-old case on a bail that could be made at that point

2     and he made his court appearances.

3          JUDGE CABRANES:  Do you know anything about his record

4     during the period of imprisonment?  Does he have any record of

5     infractions or difficulties with the authorities within the

6     prison system?

7          MR. KLEIN:  Mr. Langone just made a representation

8     that his prison history has been exemplary.  I don't have

9     personal knowledge.

10         MR. LANGONE:  Your Honor, there's an attorney in this

11    audience, his name is Mr. O'Brien.  I don't know if he's

12    admitted before this Court, but he's admitted in the State of

13    New York.

14         JUDGE CABRANES:  Is he here?

15         MR. LANGONE:  Yes.

16         Mr. O'Brien, could you stand up?

17         He's also a counsellor, a chaplain.  He's known Hector

18    at Sing Sing for many, many years.

19         JUDGE CABRANES:  Can we find him a seat?  Microphone.

20         Mr. O'Brien, would you state your appearance for the

21    record; your full name, address, and other particulars.

22         MR. O'BRIEN:  Yes, your Honor.

23         Name is Joseph J. O'Brien, Jr., 316 North Highland

24    Avenue in Upper Nyack, New York is my residence.  I'm admitted

25    to practice in the courts of the State of New York.  I'm also

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02551

48

G46VRIVA

1   admitted to practice in the federal court for New Jersey,

2   federal district court for New Jersey, your Honor.  I practice

3   law as an arbitrator at present.

4          JUDGE CABRANES:  What is your connection to Mr. Rivas

5   or his confinement?

6          MR. O'BRIEN:  Your Honor, I have known Hector Rivas

7   for at least 12 years as a volunteer in the Catholic chapel at

8   Sing Sing Correctional Facility.  I go there every Wednesday

9   evening and have seen him many, many, many times over the

10  course of 12 years.

11         We have had numerous discussions about his religious

12  faith, about his personal life, and about his conduct in

13  prison.  I have never heard of any instance where he was in

14  trouble at Sing Sing during the time I've known him.  I know

15  that he has been a blessing to the men with whom he works in

16  the chapel.

17         He is simply a man of great worth.

18         He is a licensed plumber.  And as part of my interest

19  in what he might do, were he to be released, I spoke with a

20  representative of the plumbers' union in the City of New York

21  last week regarding training that would update his skills so he

22  could get employment.  And they informed me that they would

23  want to interview him and have training available for him were

24  he to be released.  In that regard, he would need access to a

25  union facility in Queens County.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

49

G46VRIVA

1           Additionally -- and this is strictly word-of-mouth --
2     I know that he worked with plumbers who would come into the
3     facility, he would work as a helper for them.  And on
4     information and belief, one of the plumbers who was under
5     contract to the state to do work at Sing Sing told him that
6     when he gets out, he would have a job for him.  That, of
7     course, is prospective and nothing more than the words I just
8     spoke.
9           But that's my experience with him.
10           JUDGE POOLER:  Ms. Steward, do you know of any
11     infractions or other problems that Mr. Rivas has had during his
12     incarceration?
13           MS. STEWARD:  In Sing Sing?
14           I'm not aware of that, your Honor.
15           JUDGE CABRANES:  Well, perhaps we can do this:
16     Ms. Steward, if you could provide the Court with a report from
17     the relevant state authorities reporting on Mr. Rivas's
18     disciplinary or related records during his time of confinement,
19     and they can add whatever characterizations they think
20     appropriate, but we obviously would like it in the form of
21     facts and in the form of a sworn statement, an affidavit.  We
22     would ask you to submit that by next week.
23           Is next Wednesday all right, you think?
24           MS. STEWARD:  Can I get Friday?
25           JUDGE CABRANES:  Fine.  Until Friday, April 15, 2016,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02555

50

G46VRIVA

1    at 12 noon.

2            JUDGE POOLER:  Copies to all parties.

3            JUDGE CABRANES:  Copies to all of the persons here.

4    It is so-ordered.

5            Hold on one second.

6            Judge Sack has suggested to me at sidebar -- and I

7    think he's quite right -- that when we conclude here we're

8    going to ask the official court reporter to prepare a

9    transcript of these proceedings and make them available to the

10   state court trial judge for his information and to all of the

11   parties here.  Now, that seems like a very good idea and that

12   is also so-ordered.

13           And I don't know how long it would take to prepare

14   such a transcript.

15           The court reporter indicates that it's possible within

16   a week.

17           But we have some more questions that may be helpful to

18   us in this regard.

19           What we're looking for from Ms. Steward and anybody

20   else who's here is some indication of whether Mr. Rivas -- were

21   he to be released -- would be a danger to the community or --

22   go ahead.

23           JUDGE SACK:  I'm just trying to figure out whether

24   we're applying the federal or the state bar.  And I take it the

25   state is only flight risk, right?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02557

51

G46VRIVA

```
 1              MR. MORAN:  The state does not include danger to the
 2     community.
 3              JUDGE SACK:  Is there anything else other than flight
 4     risk that you know of?
 5              MR. MORAN:  Everything speaks to flight risk, meaning
 6     ties to community, criminal history, that kind of stuff,
 7     strength of the case.
 8              JUDGE SACK:  And strength of the case.
 9              JUDGE CABRANES:  Is there anything else that any of
10     you think is appropriate under the circumstances while we wait
11     for these filings?
12              MS. STEWARD:  Your Honor, I understand at the outset
13     of this you were giving a rundown of all the things that
14     happened.  I just wanted to note that maybe it was an
15     oversight, but I just want to make clear on the record that I
16     did respond.  And I want to make sure that you actually have
17     received the papers that we have submitted.
18              JUDGE CABRANES:  Yes.  Absolutely.  You're referring
19     to your March 23, 2016 letter?
20              MS. STEWARD:  March 23, October 29th, and November
21     5th.
22              JUDGE CABRANES:  Yes, I'm sure we've got it.
23              MS. STEWARD:  And there was another one on January
24     28th.
25              JUDGE CABRANES:  We'll check that.  And if there's any
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02559

G46VRIVA

1    reason to doubt that we've got it -- of course, we can all

2    check the electronic records of the Court, and you would have a

3    quick answer to your question.  If you find that any one of

4    them is not reflected in the electronic record, we hope you'll

5    be in touch with us by a letter, with copies to all other

6    counsel.

7            JUDGE POOLER:  There's a docket sheet that can be

8    checked.

9            JUDGE CABRANES:  Sure.  You check the docket sheet.

10           JUDGE SACK:  There's absolutely no question that we

11   had received, each of us, copies of what you had supplied to us

12   previous.

13           JUDGE CABRANES:  So do we have a date by which

14   Mr. Moran believes he is able to place Mr. Klein in a position

15   to evaluate what motions to bring or not bring?

16           I think we are agreed that the first chess move, the

17   first move on the chessboard has to be that of Mr. Moran.  So

18   we want to know when you're going to make that move.

19           JUDGE SACK:  May I -- just a little addition to it.

20           I gather your answer is going to be, I can't tell

21   until I talk to the people at the laboratory.  And maybe the

22   question is when will you talk to the people in the laboratory

23   and let everybody know what the answer is?

24           MR. MORAN:  I will talk to the lab tomorrow and I'll

25   send a letter to everyone letting them know.  And I will

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02561

53

G46VRIVA

1   expedite it.

2          JUDGE CABRANES:  Can you send us a letter immediately

3   after you speak to them --

4          MR. MORAN:  I will do that.

5          JUDGE CABRANES:  -- fixing a firm date by which time

6   you will be giving Mr. Klein everything in your possession

7   which you believe to be relevant?  You can identify things that

8   you will not turn over to him as well.

9          MR. MORAN:  Just I can maybe clarify right now, Judge.

10         I don't have anything that he doesn't have.  I have

11  given him a copy of every scrap of paper, every report, every

12  affidavit, every transcript, every police report, every lab

13  report.  The only things that aren't done are the modern lab

14  reports, the ones that are still pending at the lab.  I have

15  given him the ones that are done; there's nothing that I have

16  that he doesn't have.

17         JUDGE CABRANES:  All right.

18         Today is Wednesday.  By Friday, April 8th at 12 noon,

19  you will get to us electronically and otherwise copies to

20  everybody here, a letter telling us what you were able to tell

21  us as a result of your inquiries with these various expert

22  persons.

23         MR. MORAN:  One of my concerns is am I going to be

24  precluded from continuing to work or continuing to look at

25  things?  Because, generally speaking, I'm -- well, I may decide

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02563

54

G46VRIVA

1      I want something else tested.  I may decide that something else

2      is going to go to the lab next week.  I don't think I'm going

3      to do that, but, again, this goes back to my question --

4                JUDGE CABRANES:  Why would you think -- if you said

5      you've given them everything and you are "ready for trial," why

6      would something else be surfacing 30 years later?

7                MR. MORAN:  I'm continuing to prepare for trial all

8      the time.

9                JUDGE CABRANES:  That's fine.

10               MR. MORAN:  I'm not going to stop.

11               JUDGE CABRANES:  For the trial that you're ready for.

12               MR. MORAN:  Yes.

13               JUDGE CABRANES:  You continue to prepare for the trial

14      for which you are ready.

15               MR. MORAN:  Yes.

16               MR. LANGONE:  Your Honor, if Mr. Rivas is released,

17      I'm getting a sense of compression that this is going to be a

18      kind of rush to judgment.  If Hector's released, I think this

19      kind of obviates some of that.

20               JUDGE SACK:  I thought it was exactly the opposite.  I

21      thought that the notion was that if there was some way to

22      achieve a release that's consistent with everybody's interest,

23      that that would relieve the pressure.

24               MR. LANGONE:  Yes, that's what I mean.

25               JUDGE SACK:  I think you made that point already.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

P02565

G46VRIVA

```
 1              MR. LANGONE:  I'm sorry.

 2              JUDGE SACK:  Or somebody did.

 3              JUDGE CABRANES:  Is Mr. O'Brien available as part of

 4     some arrangement for release to help Mr. Rivas in consultation

 5     perhaps with probation authorities?

 6              Mr. O'Brien, it seems to me that if Mr. Rivas is

 7     released on bail pending trial, and if, in fact, he's able to

 8     go home to the Bronx, that it should fall under the

 9     jurisdiction of the Southern District of New York.  Perhaps we

10     can inquire of the probation office of the Southern District of

11     New York to facilitate or to serve as the probation office to,

12     in turn, report as necessary to the Onondaga County Court.

13              Does that seem reasonable to you?  Would you be able

14     to work with the probation office on his behalf?

15              MR. O'BRIEN:  Your Honor, I'd be happy to do that.  My

16     interest has been not as a lawyer, but as a volunteer in a

17     Catholic chapel.

18              JUDGE CABRANES:  We understand that.

19              MR. O'BRIEN:  In that regard I would be pleased and

20     certainly willing to do whatever the Court would require.

21              JUDGE POOLER:  Thank you.

22              JUDGE CABRANES:  Thank you very much.

23              Does anyone have any questions of Mr. O'Brien or

24     inquire about how he might be of assistance?  Anyone else?

25              Does anybody else on this panel have any questions for
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

56

G46VRIVA

1    the Court or for other members, other persons here?

2            Mr. Langone, do you have any questions for Mr. Moran

3    or for Mr. Klein?

4            MR. LANGONE:  No, I don't, Judge.  I don't.

5            JUDGE CABRANES:  Mr. Klein, do you have any questions

6    for Ms. Steward or Mr. Moran?  Any clarifications required?

7            MR. KLEIN:  No, your Honor.  Thank you.

8            JUDGE CABRANES:  Mr. Moran, do you have any questions

9    of anyone else in this group --

10           MR. MORAN:  No.

11           JUDGE CABRANES:  -- which would be helpful to you?

12           MR. MORAN:  No, thank you, Judge.

13           JUDGE CABRANES:  All right.

14           MR. LANGONE:  Are we coming back here, Judge?

15           JUDGE CABRANES:  We're not interested in prolonging

16   this.  As indicated in my opening statement, we're simply

17   following through on the mandate that we issued and which may

18   have to be recalled as a matter of form.  But in that decision,

19   we indicated quite specifically that if there are any questions

20   regarding our mandate, that they can be brought to our

21   attention, which is exactly, of course, what Mr. Langone and

22   Mr. Manes have done on several occasions.  That is why we are

23   here.  So we are here pursuant to the original mandate and

24   according to the terms of the mandate.

25           Now, as a formal matter, we may have to actually

                    SOUTHERN DISTRICT REPORTERS, P.C.

```
(212) 805-0300
```

57

G46VRIVA

1    recall the mandate in order to issue further orders.  But we

2    would welcome your advice on how this might work.

3              Mr. Moran, maybe particularly from you, any guidance

4    that you might be able to give us in the form of a letter at

5    your earliest convenience as to how we might accomplish this.

6              MR. MORAN:  Understood.

7              JUDGE CABRANES:  Understood?

8              MR. MORAN:  Yes.

9              JUDGE CABRANES:  Thank you.

10             And what else?  Anyone else have any questions?

11   Comments?

12             Hearing none --

13             MS. STEWARD:  Your Honor, I just need to preserve for

14   the record the arguments that we've made in our papers, that

15   the Court should not recall its mandate.  And that even if it

16   felt that it was appropriate to do so, that because

17   petitioner's conviction has been vacated, his record of the

18   conviction has been expunged and he has been released from

19   custody, there is no longer any jurisdiction under this

20   proceeding with regard to granting him any further relief.

21             JUDGE POOLER:  The writ that we issued was

22   conditional.

23             MS. STEWARD:  It was, but once --

24             JUDGE POOLER:  That's the source of our jurisdiction.

25             MS. STEWARD:  Once the conviction is vacated, the

(212) 805-0300

58

G46VRIVA

```
 1   conditions that you set were the conditions on his release from
 2   the judgment that the Court found to be unconstitutional.  The
 3   unconstitutional judgment here is no more.  It is gone.  There
 4   is no record of him having been convicted of this crime.
 5          JUDGE POOLER:  Correct.  But the conditions of the
 6   writ have not been fulfilled.
 7          MS. STEWARD:  But the conditions were the conditions
 8   on his release.  They were the conditions on the vacatur that
 9   he actually got.  Whether or not the conditions were met no
10   longer matters because there is no conviction.
11          JUDGE CABRANES:  No, I'm afraid not, Ms. Steward.
12   It's very nice of you to supplement the record, but I think I
13   can speak for my colleagues in saying that your statement just
14   now is simply inaccurate.
15          Our mandate specifically spoke of the release of
16   Mr. Rivas if the state had not taken concrete and substantial
17   steps expeditiously to retry Mr. Rivas.  We are here to
18   determine whether or not the state has, in fact, taken concrete
19   and substantial steps expeditiously to retry Mr. Rivas.
20          I think I can speak for my colleagues in saying that
21   that is a challenging question at least.  We are not prepared
22   to make any final decision on that, but, I must say, we would
23   not be here unless we had serious questions as to whether that
24   mandate, the conditions set forth in that mandate, had been
25   fulfilled.  We are adjourned.
```

SOUTHERN DISTRICT REPORTERS, P.C.