UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

                              Plaintiff,

                        -against-                                           No. 19 Civ. 844 (BKS) (TWD)

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
and "JOHN DOES 1-10",

                              Defendants.

-----------------------------------------------------------------------X


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS WILLIAM FITZPATRICK AND DR. ERIK MITCHELL'S MOTIONS FOR SUMMARY JUDGMENT AND ONONDAGA COUNTY'S MOTION TO DISMISS

THE LAW OFFICE OF
JOSHUA MOSKOVITZ, P.C.
14 Wall Street, Suite 1603
New York, New York 10005

RICKNER PLLC
14 Wall Street, Suite 1603
New York, New York 10005

SCOTT A. KORENBAUM, ESQ.
14 Wall Street, Suite 1603
New York, New York 10005

*Attorneys for Plaintiff Sidney Manes,
Administrator of the Estate of Hector Rivas*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT .......................................................................................1

MATERIAL FACTS .........................................................................................................3

PROCEDURAL HISTORY..............................................................................................14

STANDARD OF REVIEW ..............................................................................................15

     A.     Rule 56.............................................................................................................15

     B.     Rule 12(b)(6).................................................................................................16

ARGUMENT....................................................................................................................16

I.     MITCHELL IS NOT ENTITLED TO SUMMARY JUDGMENT FOR VIOLATING RIVAS'S DUE PROCESS RIGHTS BY FABRICATING KEY FORENSIC EVIDENCE CONCERNING HILL'S TIME OF DEATH ........................................................................16

     A.     Legal Standard...............................................................................................17

     B.     There is Substantial Evidence that Mitchell Recklessly Fabricated Key Forensic Evidence ....................................................18

     C.     Evidence of Mitchell's Credibility Problems .....................................................21

     D.     Defendants Misconstrue Dr. Spitz's Deposition Testimony ............................22

     E.     Mitchell Is Not Entitled to Absolute Testimonial Immunity ..........................25

     F.     Sidney Manes' Deposition Testimony ...........................................................27

II.     THE COUNTY IS NOT ENTITLED TO RELIEF ON ITS MOTION .....................28

     A.     The County's Rule 12(b)(6) Motion is Procedurally Improper ........................28

     B.     The County Has Not Made a Rule 56 Motion...................................................28

III.    THE COUNTY IS NOT ENTITLED TO SUMMARY JUDGMENT ......................29

    A. Legal Standard .....................................................................................................30

    B. *Monell* Liability for the Actions of Fitzpatrick and Mitchell as
       County Decisionmakers with Final Policymaking Authority ...............................31

    C. Constitutional Violations by County Decisionmakers...........................................33

        i.        Mitchell's Fabrication of Evidence Due Process Violation.......................33

        ii.       Fitzpatrick's *Giglio* Due Process Violation ...............................................33

    D. The County is Also Liable for its Policy and Custom of
       Withholding Giglio Materials and Deliberate Indifference to
       Mitchell's Reckless Disregard for Protocols .........................................................37

    E. The County Is Not Entitled to Immunity ..............................................................38

    F. Fitzpatrick Acted as a County Official in Failing to Disclose
       *Giglio* Material......................................................................................................40

CONCLUSION.....................................................................................................................43

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(S)**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) .......................................................................................15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......................................................................................15

*Arista Records LLC v. Doe*,
604 F.3d 110 (2d Cir. 2010) ..........................................................................16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................16

*Bellamy v. City of New York*,
914 F.3d 727 (2d Cir. 2019) .....................................................................41, 42

*Binder & Binder PC v. Barnhart*,
481 F.3d 141 (2d Cir. 2007) ..........................................................................15

*Bogan v. Scott-Harris*,
523 U.S. 44 (1998) .........................................................................................38

*Buari v. City of N.Y.*,
530 F. Supp. 3d 356 (S.D.N.Y. 2021) ............................................................21

*Capra v. Cook Cnty. Bd. of Review*,
733 F.3d 705 (7th Cir. 2013) .........................................................................39

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) .............................................................................30, 31, 33

*Coggins v. Buonora*,
776 F.3d 108 (2d Cir. 2015) ..........................................................................26

*Erickson v. Pardus*,
551 U.S. 89 (2007) .........................................................................................16

*Fisher v. State of New York*,
10 N.Y.2d 60 (1961) ..................................................................................40, 41

*Fraser v. City of N.Y.*, No. 20-cv-04926 (CM),
2021 U.S. Dist. LEXIS 69324 (S.D.N.Y. Apr. 9, 2021) ........................34, 35, 36

*Frost v. N.Y. City Police Dep't*,
980 F.3d 231 (2d Cir. 2020) .................................................................17, 21, 25

# TABLE OF AUTHORITIES (cont'd)

**CASES**                                                                     **PAGE(S)**

*Galbraith v. Cnty. of Santa Clara*,
307 F.3d 1119 (9th Cir. 2002) ........................................................................17

*Garnett v. Undercover Officer C0039*,
838 F.3d 265 (2d Cir. 2016)............................................................................17

*Giglio v. United States*,
405 U.S. 150 (1972).................................................................................33, 34

*Goldberg v. Rocky Hill*,
973 F.2d 70 (2d Cir. 1992).............................................................................39

*Guilbert v. Gardner*,
480 F.3d 140 (2d Cir. 2007)............................................................................15

*Higazy v. Templeton*,
505 F.3d 161 (2d Cir. 2007)............................................................................18

*Jeffes v. Barnes*,
208 F.3d 49 (2d Cir. 2000)..................................................................30, 31, 33

*Jett v. Dallas Independent Sch. Dist.*,
491 U.S. 701 (1989)........................................................................................31

*Johnson v. Kings Cnty. Dist. Atty's Office*,
308 A.D.2d 278 (2d Dep't 2003) ....................................................................42

*Keko v. Hingle*,
318 F.3d 639 (5th Cir. 2003) ..........................................................................26

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
507 U.S. 163 (1993)........................................................................................39

*McMillian v. Monroe Cnty.*,
520 U.S. 781 (1997)........................................................................................31

*Mervilus v. Union Cnty.*,
73 F.4th 185 (3d Cir. 2023) ..............................................................17, 21, 23

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978)..................................................................................30, 38

*Myers v. County of Orange*,
157 F.3d 66 (2d Cir. 1998)..............................................................................41

# TABLE OF AUTHORITIES (cont'd)

**CASES**                                                                                                       **PAGE(S)**

*Newson v. City of N.Y.*, 16-CV-6773,
    2019 U.S. Dist. LEXIS 143835 (E.D.N.Y. Aug. 23, 2019)................................42

*Pembaur v. City of Cincinnati*,
    475 U.S. 469, 481 (1986)............................................................................30, 33

*Ramos v. City of N.Y.*,
    285 A.D.2d 284 (1st Dep't 2001) .....................................................................41

*Rivas v. Fischer*,
    687 F.3d 514 (2d Cir. 2012)....................................................................... *passim*

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007).............................................................................16

*Rucks v. City of N.Y.*,
    96 F. Supp. 3d 138 (S.D.N.Y. 2015)................................................................26

*Sample v. City of Woodbury*,
    836 F.3d 913 (8th Cir. 2016) ...........................................................................39

*Thomas v. City of Troy*,
    293 F. Supp. 3d 282 (N.D.N.Y. 2018)..............................................................26

*United States v. Payne*,
    63 F.3d 1200 (2d Cir. 1995).............................................................................36

*Washington v. Doe*, No. 9:21-CV-0002 (BKS/CFH),
    2021 U.S. Dist. LEXIS 273453 (N.D.N.Y. Feb. 10, 2021) ..............................30

*Webb v. City of Maplewood*,
    889 F.3d 483 (8th Cir. 2018) ...........................................................................39

*Zahrey v. Coffey*,
    221 F.3d 342 (2d Cir. 2000).............................................................................25


**STATUTES**

Onondaga Cnty. Charter § 1702 ...............................................................................40

Onondaga Cnty. Admin. Code § 9.02........................................................................32

Onondaga Cnty. Admin. Code § 16.06.................................................................32, 40

**TABLE OF AUTHORITIES (cont'd)**

**RULES**                                                                                                           **PAGE(S)**

Fed. R. Civ. P. 7 ..........................................................................................................................29

Fed. R. Civ. P. 12 ........................................................................................................................28

Fed. R. Civ. P. 56 ....................................................................................................................15, 29

Local Civil Rule 7.1 .....................................................................................................................29

Local Civil Rule 56.1 ...................................................................................................................29

# PRELIMINARY STATEMENT

Having reviewed a comprehensive record of Hector Rivas's 1993 conviction for the murder of Valerie Hill, a unanimous panel of the Second Circuit concluded that it had "serious doubt" about the "central forensic evidence" in the case.[1] This evidence was the work of the disgraced former Onondaga County Medical Examiner, Dr. Erik Mitchell. Mitchell had prepared a report at the time of Hill's death in 1987 claiming Hill could have been killed "2-3 days" before her body was found. In fact, there is no support for a time-of-death beyond 48 hours and there is no support for Mitchell's explanations for "pushing" the time-of-death to three days. The testimony of a respected pathologist, Dr. Cyril Wecht, that Mitchell's report was baseless led the Second Circuit to set aside Rivas' conviction and order a new trial.[2] Tragically, Rivas languished in custody, never receiving a new trial as directed by the Second Circuit and died of cancer in jail.

In this federal civil rights action, Dr. Daniel Spitz, a highly respected forensic pathologist like Dr. Wecht (who is now deceased), testified unequivocally that there is no scientific support for Mitchell's fabricated time-of-death because Hill could not have been killed more than two days before her body was found. This entitles Plaintiff to a trial on his fabrication-of-evidence claim. Defendants ignore Dr. Spitz's key testimony and other testimony discrediting Mitchell's efforts to justify his fabrication.

Defendants also disregard evidence of Mitchell's unscrupulous conduct and disregard for scientific protocols. Mitchell was under investigation at the time of Rivas's trial for complaints about unauthorized tissue harvesting, improperly disposing of bodies, and making unsanctioned use of body parts. The evidence shows Fitzpatrick knew about the investigation before Rivas's trial, and Fitzpatrick admitted in his deposition that he did not disclose this obvious *Giglio* material

---

[1] *Rivas v. Fischer*, 687 F.3d 514, 552 (2d Cir. 2012).
[2] *Id.* at 531.

to Rivas's trial counsel. Indeed, Fitzpatrick conceded that his failure to disclose this material was *consistent* with his office's policy. As the Second Circuit noted, "a reasonable juror would discredit Mitchell's testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony" against Rivas.[3] Viewed in the light most favorable to Plaintiff, the evidence reveals intentional actions by Fitzpatrick and Mitchell – taken as authorized County decisionmakers – that denied Hector Rivas a fair trial and violated his constitutional right to due process.

The County makes no real effort to address the *Monell* claims against it. The County's perfunctory motion is not only procedurally improper – because a Rule 12(b) motion may not be brought after a responsive pleading is filed and the County answered the Amended Complaint years ago – the County's motion includes none of the requirements for seeking summary judgment under Rule 56. Even if the Court entertains the County's request to "join" Mitchell and Fitzpatrick's summary judgment motions, their motion papers contain no argument or factual predicate for disposing of Plaintiff's *Monell* claims.

Defendants ignore binding precedent that municipalities are *not* entitled to immunity under § 1983, even if municipal officials sued individually have immunity. Likewise, Defendants similarly ignore well-established Supreme Court precedent that constitutional violations caused by the acts of final policymakers, like the County Medical Examiner (Mitchell) and County District Attorney (Fitzpatrick), give rise to municipal liability under § 1983. Defendants also ignore the record evidence that the County remained deliberately indifferent to Mitchell's improprieties for years before Rivas's trial. Thus, the County must face Plaintiff's *Monell* claims at trial.

---

[3] *Id.* at 546.

Since the record evidence supports Plaintiff's claims and Defendants' arguments misconstrue that evidence and ignore controlling law, Defendants' motions must be denied.

## MATERIAL FACTS

Viewed in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, these are the material facts on these motions.

On Monday, March 30, 1987, at approximately 11:45 a.m., Randall Hill discovered his twenty-eight-year-old daughter, Valerie Hill, dead on the living-room floor of her apartment on Hickok Avenue in Syracuse, New York. P1.[4] Randall immediately called the police, who arrived at approximately 1:30 p.m. P2.

Dr. Erik Mitchell, who was the Medical Examiner for Onondaga County and had been since 1983, arrived at the Hill apartment. P3. The Medical Examiner is "the final policymaker of the Onondaga County Medical Examiner's Office for policies or procedures concerning making determinations about the time of death." P3. At Hill's apartment, Mitchell examined her body, which was limited to examining the external surfaces and checking for muscle stiffness. P4.

Back in his office and without notes from his scene investigation, P5, Mitchell prepared a Scene Investigation report, dated March 30, 1987, P6. The Report noted the body had full rigor, which is when all the muscle groups show at least some amount of rigor mortis – or, according to Mitchell, all the muscle groups he decided to test. P6. Some muscle groups may have more rigor than other, and the amount of rigor changes over time, after death. *Id.* It is possible to quantify how much rigor each muscle group has. *Id.* But Mitchell admits that to do this one needs to write down those findings when first examining the body, and Mitchell did not record this information

---

[4] "P_" refers to paragraphs of Plaintiff's Rule 56.1 Counterstatement (Dkt. 150).

when he examined Hill. *Id.*[5] Mitchell pronounced Hill dead at 3:30pm on March 30, 1987, but it was obvious she was dead before then, and he cannot remember how long he had been at her apartment beforehand. P7.[6]

Mitchell did not record the temperature of Hill's body because he personally thought (and still thinks) it was an unreliable way of determining the time of death, and he did not want other experts to use the body temperature to challenge his findings. P10. Mitchell claims he measured the temperature in the basement below where Hill's body was found at 62 degrees. P11. At trial, Mitchell testified the whole apartment was 62 degrees. *Id.* But this is not written in any of his reports, and Mitchell testified that he "can't remember if it came out on trial or whether it came out in one of the records itself." *Id.* Mitchell acknowledged at his deposition that officers had been opening the door and walking in and out of the house, which could have let cold air in from outside, lowering the temperature. *Id.* It was between 55 and 60 degrees in Syracuse the afternoon of March 30, 1987. P12. At trial, Mitchell testified that the temperature of the body as well as the temperature of the apartment can be used to determine how fast rigor mortis would dissipate after it set in, which helps determine the time of death. P13.

Hill's body was taken to Mitchell's office using an unrefrigerated truck. P14. Hill's body was stored in a room, which was as cold as it could be without freezing the body, for two hours while he waited to do the autopsy. P15. During the autopsy, Mitchell removed Hill's brain, weighed it, and examined it. P16. It showed autolytic changes, which means that the brain was beginning to soften a small amount and could not maintain the same integrity as it would have

---

[5] Mitchell also noted in the Report that Hill's body had fixed livor, which means that when one presses on discoloration caused by "red cells" leaking out of the blood vessels into the tissue, the color stays the same. P9. Livor can also change over time, but Mitchell did not record that information because he considered it irrelevant. P9.
[6] March 30, 1987, is the date of death on Hill's death certificate, which Mitchell signed. P8. It says the date of injury is "UNK", meaning unknown. P8.

been when fresh. *Id.* Mitchell admitted that he did not know how long these changes take to develop. *Id.*

After Mitchell examined the brain, he preserved it with formalin until it could be examined by a neuropathologist from Upstate Medical Center, which can take two to eight weeks or even longer. P17. Mitchell cannot remember if he was part of that examination. *Id.* The report, later generated by Dr. George Collins, did not note any decomposition on the outside of the brain. *Id.* It did note decompensation inside the brain, but Mitchell admitted at his deposition that this could be found a day and a half after death, and he could not tell how long based on the decomposition noted in Dr. Collins' report. *Id.*

The heart also showed mild autolytic changes, but Mitchell could not say how long those changes took to develop. P18. Mitchell acknowledged in his deposition that it could be as little as six hours. *Id.* Mitchell admitted at his deposition that he could not say anything meaningful about the time of death based on the gassy crepitus in the liver, meaning gas from decomposition. P19. Mitchell admitted at his deposition that he could not say how recently Hill had eaten based on the stomach contents, and acknowledged he did not see any undigested food in the stomach. P20. Mitchell also noted that the mucosa in the stomach had lost some of its rugal folds, meaning the internal lining was losing some of its structure, but his notes did not reflect if this was from decomposition or not. P21.

The pancreas also showed mild autolytic changes, but Mitchell testified at his deposition that he could not use these finding to determine time of death. P22. Mitchell found nothing worth commenting on after examining the kidneys, or Hill's genitalia, except to note that there were signs of recent menstruation. P23.

As for the toxicology report, which showed amounts of ethanol, Mitchell testified that these findings did not say how much Hill drank or when. P24. At the deposition, when asked if Hill had consumed three standard drinks at dinner, when her father last saw her on March 27, 1987, Mitchell admitted that the ethanol levels would have reached the levels found in her body only an hour or two later. P25.

Mitchell's process for autopsies involved dictating his findings into a device, like a cassette tape or a Dictaphone. P26. After his secretary wrote up the report, he would tape over the recording, instead of saving it. *Id.*

In a diagram Mitchell made during the autopsy, he wrote that there was partial fixed livor, but he did not write down what parts of the body had fixed livor and what parts did not. P27. He did not include this information in the autopsy report because he decided this information was not useful. *Id.* In the same diagram, Mitchell made no notes about Hill's neck, even though she had been strangled. P28. The autopsy report contained no opinion on the time of death, or even a range of dates or times when Hill could have died. P29.

Shortly after the autopsy, in a form from the Onondaga Medical Examiner's Officer dated March 31, 1987, there is a narrative that says that "Appears as though deced. was there appx. 2-3 days." P30. Dr. Mitchell testified that this narrative is his conclusion, at the time, that Hill could have been murdered as early as March 27, 1987, and he provided this conclusion on or before the form was delivered on March 31, 1987 at 9:37 a.m. P31.

Esteemed pathologist Dr. Cyril Wecht concluded that there was no scientific support for Mitchell's assertion that the time of Hill's death was as long as 72 hours, or 3 days, before her body was discovered. P32. Dr. Wecht's conclusion led the Second Circuit to have "serious doubt" about the validity of Mitchell's time-of-death evidence. P33.

Dr. Daniel Spitz reached a similar conclusion: "Valerie Hill's death most likely occurred 36 hours but not later than 48 hours prior to when she was found dead." P34. Dr. Spitz further testified "[t]o a reasonable degree of certainty" there was no "basis in science within the field of forensic pathology that supports an opinion that Valerie Hill's death could have occurred more than 48 hours before she was discovered." P36. Dr. Spitz concluded that: "There is no observable decomposition of Valerie Hill's brain." P37. Additionally, Dr. Spitz testified that there is no scientific support for the assertion that the photographs of Hill's brain show anything meaningful for determining the time of death. P39.[7]

Reviewing Mitchell's assertion that Hill's death could have occurred three days before she was discovered, Dr. Spitz concluded, "[t]here is no valid or reliable medical or scientific support for Dr. Mitchell's opinion that Ms. Hill's death could have occurred more than 48 hours before she was found dead." P35.[8] Dr. Spitz further concluded, "[t]here is no reliable medical or scientific support for Dr. Mitchell's opinion that the timing of Ms. Hill's death could be determined based on the condition of Ms. Hill's brain." P38. Dr. Spitz concluded that: "Mitchell did not rely upon any objective evidence to support his conclusion that the ambient temperature in Valerie Hill's apartment impacted the time of her death," P40; and there was no scientific support for Mitchell's conclusion that the ambient temperature in the room where Hill's body was discovered was low enough to slow the rate of decomposition, P41.

Rivas was not charged with Hill's murder in 1987 because the District Attorney's Office did not believe the evidence against him was sufficient, and the Hill murder became a "cold case."

---

[7] Defendants' forensic expert, Dr. Mary Jumbelic, did not provide an opinion about the forensic value, if any, of the photographs of Hill's brain. P44. She also failed to account for the fact that police had been going in and out of her apartment for as much as 2 hours before Mitchell pronounced Hill dead, and it was below 60 that day. *Id.*
[8] Dr. Spitz testified that anecdotal reports of outliers do not form the basis for a scientifically sound forensic opinion. P42. Dr. Spitz testified that he would not use outliers to provide an opinion on a window of the most likely time of death. P43.

P45. William Fitzpatrick became the District Attorney in January 1992 and started looking at cold cases. P46. P47. Fitzpatrick recruited an investigator, Peter Tynan, from the Syracuse Police Department to work at his office P48. One of the cases Tynan brought to Fitzpatrick's attention was the Hill cases. P49. Tynan handled the reinvestigation, with Fitzpatrick's supervision, and they both spoke to witnesses and reviewed evidence. P50. However, Tynan's investigation was not memorialized in a report. P51.

During the investigation, Fitzpatrick learned that Rivas had an alibi, but the alibi did not cover March 27, 1987. P52. In reviewing the file to prepare the prosecution, Fitzpatrick saw Mitchell's report that Hill's death could have occurred "2-3 days" before her body was found. P53. Fitzpatrick's entire theory of the case was based on Hill dying late Friday night, March 27, 1978, or early Saturday morning, and if she died later on Saturday or on Sunday, he would have had to contend with Rivas' alibi – and would need an entirely new theory of the case to go forward with a prosecution. P54.

In October 1992, a month before the grand jury, Fitzpatrick met with Mitchell to discuss his testimony and confirmed that it was his opinion that Hill could have died on March 27, 1987. P55. If Mitchell had told Fitzpatrick that Hill could not have died Friday night or Saturday morning, he would have had to come up with more evidence and a new theory of the case. P56. If Mitchell had told Fitzpatrick that Hill could not have died Friday night or Saturday morning, he would not have gone forward with the grand jury indictment of Hector Rivas. P57.

To support his claim that it was possible Hill was killed on March 27, 1987 – what Mitchell described as "on the outside edge of that possibility," P58 – Mitchell fabricated a story about the "slides" of Hill's brain. In fact, during the autopsy, Mitchell did not make tissue slides of the brain, the type of slides you look at under a microscope. P59. Instead, photographs were taken of the

brain that were put on Kodachrome slides. P60. These slides showed Hill's whole intact brain inside of her skull, and sometime before trial, Mitchell reviewed these Kodachrome slides. *Id.*

Mitchell also discussed his autopsy findings with investigator Tynan, P61, who wrote a note that says "RE: DR. MITCHELL … #2 BODY HAS DECMOP, INCLUDING BRAIN (SWISS CHEESE). PUSHES T.O.D. LIMITS FURTHER OUT. (GOOD!!!)." P62. The note is not dated, but Tynan was only investigator at the district attorney's office from January 1992 until January or February of 1993. P63. Mitchell did not prepare the report showing the decomposition of the brain and he had not viewed the inside of the brain himself; there is no evidence he was part of the autopsy that was performed later by Dr. Collins. P64. There is no evidence that Mitchell told Fitzpatrick that he (Mitchell) was working solely off the report of Dr. Collins, who did not testify at trial. *Id.* Fitzpatrick knew that Mitchell had reviewed photograph slides, but he assumed that Mitchell had also reviewed microscopic slides. P65.

Fitzpatrick spoke to Mitchell again before the trial, and during these conversations Mitchell again stated that Hill could have died on March 27, 1987. P66. After Rivas' defense attorney cross-examined Mitchell with his grand jury testimony that it was only an "outside" possibility that Hill died on March 27, 1987, P67, Fitzpatrick used Mitchell's fabrication about the brain slides to rehabilitate Mitchell, who ultimately testified that he claimed to see decomposition of the brain in the slides that allowed him to "push" the time of death further out. P68.

At his deposition, Mitchell admitted that the Kodachrome slides of the brain do not show decomposition on their own. P69. Mitchell admitted that the report by Dr. Collins showed no decomposition on the outside of the brain (*i.e.*, the parts of the brain you can see on the slides). *Id.* In fact, the report stated specifically that: "External examination of the brain over the convexities and at the base reveals normal structure without evident abnormality." *Id.* Mitchell also admitted

that reviewing these slides did not change his opinion regarding the time of death, or his opinion as to whether Hill dying on March 27, 1987 was only an outside possibility. P70.

Before trial, Mitchell had been and remained the subject of numerous troubling complaints. P73-P81. These complaints involved, among other things, allegations that the ME's Office was improperly disposing of bodies, tissues were being collected during autopsies without permission, and other misbehavior, including improperly disposing of toxic chemicals. *Id.* There were further allegations that seriously undermined Mitchell's credibility and regard for scientific and medical protocols. *Id.*

While Fitzpatrick has suggested in his motion that he was unaware of these investigations or the nature of the allegations against Mitchell, Fitzpatrick had worked with Mitchell on at least 15 to 18 homicide cases when he ran the homicide bureau at the district attorney's office from 1983 to 1986. P71. Fitzpatrick had read newspaper articles about the allegations against Mitchell, and after he was elected, Fitzpatrick made it his practice to follow any stories regarding Mitchell, because he wanted to know whether the articles called into question Mitchell's competence or expertise. P72. Also, Fitzpatrick acknowledges that he "did attend a press conference called by Dr. Mitchell on March 3, 1993 regarding the State Health Department investigating his department." Fitzpatrick Aff. ¶ 21; *id.* ("From a review of Dr. Mitchell's statement, an investigation had commenced by the State Health Department").[9] Fitzpatrick admitted in his deposition that, as early as January 1993, he was aware of accusations from Mitchell's coworker, Dr. David Rigle, that Mitchell admitted he was a manic depressive and would use his mania to get more work done, that Mitchell ignored staff safety and put lives at risk, and that other forensic

---

[9] *See also Rivas* 687 F.3d at 521 ("The State concedes that Mitchell was accused of various forms of misconduct as early as 1989, . . . and does not dispute that he was under investigation by the State Department of Health at the time he testified against Rivas. It is also undisputed that Mitchell resigned in November 1993, in part to avoid prosecution by the District Attorney's Office.").

pathologists refused to work with Mitchell. P83. Fitzpatrick also spoke to an investigator in the Medical Examiner's Officer about the allegations being made about Mitchell's misconduct. P84.

Fitzpatrick did not disclose information about the DOH investigation or the allegations about Mitchell to Rivas's counsel. P88. This was consistent with his office's policy. P88. Had he disclosed these allegations, and the people making them, including Dr. Rigle, it would have led to even more evidence of misconduct against Mitchell: witnesses gave detailed descriptions of Mitchell's problems in 1987, when he performed the Hill autopsy, and the ways Mitchell would manipulate autopsies to make sure he could modify his findings after the fact, if needed. P79. P80.

Rivas' trial started on March 17, 1993. Fitzpatrick Aff. at 23. The linchpin of the People's case was Mitchell's testimony. As the Second Circuit noted, "No matter how much circumstantial evidence the prosecution could amass tending to link Rivas to the crime, . . . it had no case unless it could prove that Hill died on Friday night" because "Fitzpatrick himself acknowledged that Rivas's alibi was 'complete—for Saturday night.'" *Rivas*, 687 F.3d at 524. "Indeed, it was the People's position that Rivas's alibi was so strong on Saturday night precisely because he had concocted it," and "[t]herefore, the prosecution's case rested almost entirely on the testimony of Mitchell, the medical examiner, to persuade the jury that Hill died on Friday night." *Id.* Rivas was convicted after trial.

Rivas brought several challenges to the legality of his conviction. In connection with his efforts, he presented the expert testimony of Dr. Wecht, which led the Second Circuit to doubt the veracity of Mitchell's time-of-death evidence:

> Wecht testified that he had reviewed the medical examiner's file, as well as the relevant trial testimony, and concluded "with a reasonable degree of medical certainty," that "this death could not have occurred longer than 48 hours prior to the time that Mitchell examined the body on Monday, March 30 at 3:30 p.m." . . . Wecht arrived at this conclusion primarily because Mitchell had written in his scene investigation report that the body was in "full rigor" when he examined it and a

body generally cannot remain in "full rigor" more than forty-eight hours after death. . . . Furthermore, Wecht noted that the autopsy report contained no reference to discoloration around the abdominal wall, which would generally be found in a body that has been lying face-down on the ground for longer than forty-eight hours.

Wecht further testified that the reasons Mitchell had provided at trial for "push[ing] the time limits further out" were without scientific basis. With respect to Mitchell's claim that cool temperature conditions in Hill's apartment could have delayed the onset and relaxation of rigor, Wecht testified that, though a colder environment may slow down the development of rigor mortis, the temperature in Hill's apartment could not have been low enough to make a difference . . . .

*Rivas*, 687 F.3d at 531.

The Circuit also noted that Wecht disputed the veracity of Mitchell's alleged observance of decomposition in Hill's brain when he examined the Kodachrome slides. "Wecht testified that such decomposition could not be observed in photographic slides, but only in sectional slides, containing actual brain tissue." *Id.* "Inasmuch as there were no sectional slides in the medical examiner's file, and inasmuch as the neuropathologist who in fact examined Hill's brain had found no evidence of external decomposition, Wecht opined that Mitchell's trial testimony in this regard was unfounded. *Id.* In conclusion, the Circuit noted that

Wecht found Mitchell's explanation for expanding the possible time of death to include Friday to be unsound, and perhaps improper. He stressed that "any forensic pathologist in the world" would agree that an estimation of time of death is more reliable if made at the time of the autopsy, and stated that Mitchell's claim that he could "come back in six years later and say that now I have a new estimate" was, at best, "a misrepresentation."

*Id.* at 532.

Dr. Wecht's conclusions are shared by Dr. Spitz. As Dr. Spitz notes in his expert report, "Valerie Hill's death most likely occurred 36 hours but not later than 48 hours prior to when she was found dead." P34. Additionally, "[t]here is no valid or reliable medical or scientific support for Dr. Mitchell's opinion that Ms. Hill's death could have occurred more than 48 hours before she was found dead." P35. Regarding Dr. Mitchell's reliance on the state of Hill's brain, Dr. Spitz

concluded: "There is no observable decomposition of Valerie Hill's brain." P37.

In July 1993, Tynan started to investigate some of the accusations against Mitchell. P91. He found credible evidence that Mitchell was illegally disposing of human remains by flushing them down the toilet, as recently as 1992, that Michell had been donating body parts to researchers without the family's consent – even when consent was specifically withheld – and that an employee of the Medical Examiner's Office had been burying skeletal remains on his property in 1988 and 1989 to use in a forensics courses, again without permission from the families. *Id.* In his deposition, Mitchell admitted to being part of these courses and admitted bodies were buried on the farm, although he denied it in 1993. *Id.* On November 13, 1993, Fitzpatrick issued a press release detailing what he discovered during Tynan's investigation. P92.

Fitzpatrick reached an agreement with Mitchell's attorney that he would stop the investigation, avoiding any criminal charges, if Mitchell resigned, which he did, and Fitzpatrick was satisfied by the resignation. P93. A few months later, Onondaga County resolved the New York State Department of Health's investigation into the allegations against Mitchell's office. P94.

After years of litigation, Rivas finally won his habeas petition on appeal to the Second Circuit. P95. The court ruled that Rivas must be released within sixty days unless the State took steps to expeditiously retry him. *Id.* However, Fitzpatrick's office did not retry the case for well over a year, despite severe criticism from the Second Circuit, which ordered an expeditious retrial. P96. Rivas was diagnosed with cancer and died in prison before his retrial. P97. The indictment was dismissed after Rivas' death. P98.

## PROCEDURAL HISTORY

Plaintiff filed this lawsuit on July 13, 2019, naming as defendants Onondaga County ("the County"), the City of Syracuse ("the City"), William Fitzpatrick, Dr. Erik Mitchell, and several John Does (Dkt. 1). The City moved to dismiss the Complaint (Dkt. 7). Plaintiff filed an Amended Complaint on August 27, 2019 (Dkt. 16). Fitzpatrick, Mitchell, and the County answered the Amended Complaint on September 16, 2019 (Dkts. 20, 21, 22). The City renewed its motion to dismiss (Dkt. 23). On July 10, 2020, the Court denied the City's motion (Dkt. 31). On May 27, 2022, Plaintiff voluntarily dismissed his claims against the City (Dkt. 92).

On October 31, 2024, the County filed a Notice of Motion requesting "an Order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissing Plaintiff Sidney Manes Complaint" (Dkt. 140). Defendants Fitzpatrick and Mitchell moved the same day "for summary judgment pursuant to Rule 56" (Dkts. 141 & 142).[10] The County also filed an affirmation of counsel that asserts, "[t]he County hereby joins the Motion for Summary Judgment made by codefendants William Fitzpatrick and Dr. Erik Mitchell in this matter." Ventrone Aff. ¶ 3.[11] The County did not file a memorandum of law, nor an affidavit citing materials in the record, a Statement of Material Facts, nor any other paper in support of its motion.

---

[10] As used herein, "Fitzpatrick MOL" refers to the Memorandum of Law on Behalf of William Fitzpatrick in Support of Defendants' Motion for Summary Judgment (Dkt. 141-3); "Mitchell MOL" refers to the Memorandum of Law on Behalf of Dr. Erik Mitchell in Support of Defendants' Motion for Summary Judgment (Dkt. 142-3); "Fitzpatrick Aff." refers to the Affirmation of William J. Fitzpatrick, affirmed October 30, 2024 (Dkt. 141-2); "Mitchell Aff." refers to the Affirmation of Erik K. Mitchell, affirmed October 23, 2024 (Dkt. 142-2); letter exhibits are the exhibits attached to the Affirmation of Robert F. Julian, Esq.; and numbered exhibits are the exhibits attached to the Declaration of Rob Rickner, Esq.

[11] As used herein, "Ventrone Aff." refers to the Affirmation of Mark A. Ventrone dated October 31, 2024 (Dkt. 140-1).

# STANDARD OF REVIEW

**A.     Rule 56**

Summary judgment under Rule 56 is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists "where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007).

Defendants Fitzpatrick and Mitchell as the movants bear the burden to show the absence of a genuine dispute of any material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), and "[a]ll reasonable inferences must be construed in the nonmoving party's favor," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). "[I]f there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id.*

On a motion under Rule 56, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:"

> (a)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (b)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

### B. Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[12] On a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus,* 551 U.S. 89, 94 (2007), and "draw inferences from those allegations in the light most favorable to the plaintiff," *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). A complaint may allege facts "upon information and belief" when those facts "are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records LLC v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted) (citing *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008)). Facts alleged upon information and belief, as with any factual allegations, must be accepted as true in reviewing a Rule 12(b)(6) motion. *Id.* at 119-20.

## ARGUMENT

### I. MITCHELL IS NOT ENTITLED TO SUMMARY JUDGMENT FOR VIOLATING RIVAS'S DUE PROCESS RIGHTS BY FABRICATING KEY FORENSIC EVIDENCE CONCERNING HILL'S TIME OF DEATH

Mitchell is not entitled to summary judgment on Plaintiff's fabrication-of-evidence claim because there is sufficient evidence for a jury to find that Mitchell recklessly fabricated key forensic evidence in violation of Mr. Rivas' constitutional right to due process. As Defendants readily admit, Mitchell created a report during the investigation that claimed Hill could have been murdered more than two days before she was found and this report was transmitted to the

---

[12] Facial plausibility requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.*

Onondaga District Attorney's Office, which led Fitzpatrick to prosecute Rivas. Mitchell is not entitled to absolute testimonial immunity because this claim is not based on Mitchell's grand jury or trial testimony. Additionally, as explained *infra* in Point III, the County is liable for Mitchell's conduct under *Monell* because Mitchell, as the Onondaga County Medical Examiner, was the County's authorized decisionmaker for investigating circumstances of death.

### A.    Legal Standard

A due process, fabrication-of-evidence claim, has five elements: "(1) [an] investigating official (2) fabricates evidence (3) that is likely to influence a [fact finder's] decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016). A fabrication-of-evidence claim does not require that the fabricated evidence was introduced at trial – the essence of the claim is that fabricated evidence provided to the prosecutor influences the prosecutor's decision to pursue the prosecution. *See Frost v. N.Y. City Police Dep't*, 980 F.3d 231, 250 (2d Cir. 2020) (noting that the claim has been "imprecisely named" a "fair trial" claim, even though the evidence at issue need never be presented to a jury).

The claim may proceed if the fabrication is intentional or reckless. *Mervilus v. Union Cnty.*, 73 F.4th 185, 194-95 (3d Cir. 2023) ("formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth."); *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002) ("a coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth Amendment"). Probable cause is no defense to a fabrication claim. *Garnett*, 838 F.3d at 278. Finally, the question of whether the fabrication caused the alleged deprivation of liberty and resulting damages is, as with most causation questions, best left to a

jury. *See Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) (finding that causation and foreseeability in civil rights cases are best left to the finder of fact).

**B.**   **There is Substantial Evidence that Mitchell Recklessly Fabricated Key Forensic Evidence**

There is substantial evidence from which a jury can find that that Mitchell's March 30, 1987 report and his other statements to investigators concerning Hill's possible time of death were fabricated. Plaintiff's forensic expert, Dr. Daniel Spitz, has testified that there is no basis in science for Mitchell's conclusion that Hill's death could have occurred more than two days before she was found. Ex. 5 at 70. Dr. Wecht reached the same conclusion during the federal habeas proceedings, which led the Second Circuit to have "serious doubt" about the validity of Mitchell's time-of-death evidence. *Rivas*, 687 F.3d 531. Mitchell's post-hoc explanation for his opinion is baseless and supports a finding that he acted with a knowing or reckless disregard for the truth.

The cornerstone of Hector Rivas's conviction, as the Second Circuit explained, was the "central forensic evidence" created by Dr. Mitchell concerning Hill's time of death. *See Rivas*, 687 F.3d at 552. Hill's body was discovered Monday, March 30, 1987 at approximately 11:45 a.m. *Id.* at 518. Hector Rivas, as DA Fitzpatrick knew, had a strong alibi for the entire weekend of March 28-29 but not for Friday, March 27. P52, P54. Thus, it was integral to the prosecution of Hector Rivas that Hill's death occurred more than 48 hours before she was discovered.

Defendants concede that the same day Hill was discovered, March 30, 1987, Mitchell created a report that claimed Hill's death occurred "2-3 days" before her body was discovered. *See* Fitzpatrick 56.1 ¶ 45; Mitchell ¶ 17; Fitzpatrick Aff. ¶¶ 5, 7, 14; Mitchell Aff. ¶ 6. That is, according to Mitchell's forensic report, Hill could have been killed on Friday, March 27. Defendants further concede that "on or about March 30, 1987," Mitchell told Sgt. Tynan, who was

then investigating Hill's murder for the Syracuse Police Department, "that Ms. Hill had been dead not less than two days." Mitchell 56.1 ¶ 38.

Defendants further concede that Mitchell's report and his statements to Tynan that Hill could have been killed more than 48 hours before she was found formed the backbone of the District Attorney's decision to prosecute Rivas. Defendants admit that following his discussion with Mitchell, Tynan "recommended to William Fitzpatrick the prosecution of Hector Rivas." Mitchell 56.1 ¶ 40. And Fitzpatrick concedes that Mitchell's report, and the evidence within it concerning time of death, were integral to his decision to prosecute Rivas. *See* Fitzpatrick Aff. ¶ 19 ("The investigation in this case was previously conducted by the Syracuse Police Department. My office utilized that investigation for prosecution to the Grand Jury and trial jury. Had Dr. Mitchell's opinion been inconsistent with the theory of prosecution ascribed by me I would not have undertaken to present this matter to the grand jury when I had and under the circumstances then present.").[13]

The baseless explanations Mitchell later supplied the District Attorney's Office for why Hill could have been killed three days before she was discovered provide a good reason the jury to find that Mitchell knew that to "push" the time of death beyond 48 hours was a fabrication.

---

[13] *See also* Fitzpatrick Aff. ¶ 7 ("It is likely that prior to the Grand Jury, Investigator Tynan confirmed with Dr. Mitchell that he still was of the opinion that the range of time of death was 2 to 3 days from discovery of the body. I am certain that I also spoke with him to review his testimony. This is our custom and practice."); *id.* ¶ 10 ("[B]ased on my many years as a homicide prosecutor, it was my opinion as an advocate that the overwhelming circumstantial evidence demonstrated that Mr. Rivas had caused the death of Valerie Hill most likely on [Friday] March 27, 1987. That date of death was within the range opined and recorded by Dr. Mitchell on the day he saw the body in her apartment."); *id.* ¶ 12 ("Dr. Mitchell's typed note that death had occurred two to three days before her body was discovered lead me to conclude that the possibility of her having been murdered on Friday was consistent with both the circumstantial facts and his opinion."); *id.* ¶ 18 ("Dr. Mitchell, on the day Ms. Hill's body was discovered, opined in writing a range of time of death from that date of two to three days placing the time of death possibilities of Friday 3/27, Saturday 3/28 or Sunday 3/29. His opinion as to the range of time of death in testimony to the Grand Jury and at trial was reached at in writing five years before the Grand Jury and the trial were convened."); *id.* ¶ 19 ("That Peter Tynan, the chief investigator of the District Attorney's Office, as he conducted the Syracuse Police Department investigation for the Grand Jury and trial, communicated with Dr. Mitchell or reviewed his records to confirm with Dr. Mitchell's original opinion regarding the range of the time of death of two to three days prior to March 30, reflects routine Grand Jury/Trial preparation.").

First, Mitchell claimed to see decomposition in Hill's brain in the photographic slides and that this decomposition supported his time-of-death opinion. But in his deposition testimony, Mitchell himself cast doubt on the claim that the slides showed *any* decomposition:

> I mean, those slides are not in themselves the definition of decomposition. But I described in my autopsy report softening and autolytic change on gross exam, and what you've got here is a brain that is slumping slightly down in the brain cage and has slight flattening of the gyral definition. But handed this independently with no history, you're not going to derive -- it goes along with what I observed but it's not pathognomonic of it.

Ex. E at 84:13-21. Thus, by Mitchell's own admission, the slides are not pathognomonic, or indicative of, decomposition.

Mitchell's concession is buttressed by Dr. Spitz's testimony that there is no scientific support for the assertion that the slides show anything meaningful for determining the time of death. *See* Ex. 5 at 72. The report of Defendants' forensic expert, Dr. Mary Jumbelic, is notably silent on this issue. Defs.' Ex. Q. In fact, she admits that the "time of death could not be determined by the condition of the decedent's brain exclusively but rather the investigation at the scen, the autopsy and testimonial investigative facts." *Id.* ¶ 10. Notwithstanding Mitchell's self-serving testimony that the slides show decomposition "consistent with my time of death range of 2 to 3 days," Mitchell 56.1 ¶¶ 24-25; Mitchell Aff. ¶¶ 13-14, there is a clear dispute of fact for the jury to decide whether these statements are false.

Additionally, Mitchell has claimed that the ambient temperature in the room where Hill's body was discovered was low enough, at 62 degrees, to slow the rate of decomposition.[14] But there is record evidence for a jury to disbelieve this assertion as well. Mitchell Aff. at 4 n.1. Dr. Spitz

---

[14] Contrary to his testimony at trial that "***the house***" and the room where Hill's body were found were 62 degrees, *see* Mitchell Aff. ¶ 11; *id.* ¶ 2, Mitchell now claims that "[t] temperature of ***the basement***, which was directly below Ms. Hill's apartment, was approximately sixty-two degrees," Mitchell Aff. at 4 n.1 (emphasis added). If the basement was 62 degrees, the logical inference is that the room above it was warmer, which further undermines Mitchell's assessment that a "cooler" 62-degree room temperature would slow the process of decomposition.

testified that there was no scientific support for this assertion. Ex. 5 at 71-72. Again, the report from Dr. Jumbelic (Defendants' forensic expert) stops short of claiming that an ambient room temperature of 62 degrees would measurably slow decomposition to justify "pushing" Hill's time of death beyond a 48-hour window. *See* Defs.' Ex. Q. Accordingly, a jury must weigh this dispute.

In short, Mitchell is not entitled to summary judgment on Plaintiff's fabrication of evidence claim. *See Mervilus*, 73 F.4th at 195 (denying summary judgment to polygrapher who certified test result knowing it was unsupported by scientific method); *see also Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 385 (S.D.N.Y. 2021) ("[W]here, [investigators] allegedly deceive and mislead subsequent decision-makers with false information, the chain of causation remains intact because the officers are charged with reasonably foreseeing that their actions will influence the subsequent decisions resulting in a deprivation of the plaintiff's liberty."); *accord Frost*, 980 F.3d at 250 (allowing fabrication claim where false statements about identification procedures influenced prosecution's decision to charge the plaintiff).

## C.    Evidence of Mitchell's Credibility Problems

In addition to the direct evidence of Mitchell's fabrication, there is substantial record evidence undermining Mitchell's credibility and casting serious doubt on his respect for scientific protocols. *See* P73-82, P91-94. The Second Circuit has already concluded, "a reasonable juror would discredit Mitchell's testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony" in Rivas' trial. *Rivas*, 687 F.3d at 546. The record evidence in this case amply supports this conclusion and would convince a reasonable jury that Mitchell lacked good judgment and disregarded scientific protocols.

### D.  Defendants Misconstrue Dr. Spitz's Deposition Testimony

Defendants' principal argument is that Dr. Spitz did not dispute the validity of Mitchell's forensic evidence but actually *endorsed* his time-of-death determination. *See* Mitchell Aff. ¶¶ 12-13 ("It is gratifying that Dr. Spitz admitted that my opinion as to the time of death was consistent with the standard of care . . . ."); *see also* Fitzpatrick Aff. ¶ 16 ("Plaintiff's expert, Dr. Spitz, and Defendants' expert forensic pathologist agrees that Dr. Mitchell's testimony regarding the range of time of death was within the standard of care."); Mitchell 56.1 ¶ 29 ("Dr. Spitz testified that Dr. Mitchell did not deviate from the standard of care in giving his estimates as to the time of death."); Ventrone Aff. ¶ 14 ("Plaintiff's expert Dr. Spitz testified that Mitchell did not deviate from the standard of care . . . in his testimony with regard to time of death."). Defendants' insistence that Dr. Spitz "testified that Dr. Mitchell did not deviate from the standard of care" appears so often in Defendants' motion papers that it seems Defendants thought repetition would make the assertion true. In fact, it is plainly wrong.

Dr. Spitz testified unequivocally that there was no scientific support for the statement in Mitchell's report that Hill's death could have occurred three days before she was discovered. Defendants conveniently omit the following testimony of Dr. Spitz from their motion papers:

> Q.     . . . [T]o a reasonable degree of certainty from that experience and training, is there any basis in science within the field of forensic pathology that supports an opinion that Valerie Hill's death could have occurred more than 48 hours before she was discovered?
>
> A.     No, I don't think the scientific data would support a longer time frame than 48 hours.

Ex. 5 at 70.

Defendants' explanation for their tortured version of Dr. Spitz's testimony is the following pithy exchange in the middle of Dr. Spitz's deposition:

Q. Doctor, in summary, are you saying that Dr. Mitchell fell below the standard of care and deviated from good, usual, customary and the accepted practice in offering the opinion that the window of death was somewhere between Friday night at 7 o'clock on the 27th and the time of Valerie Hill being found on Monday?

A. I'm not really saying he fell below the standard of care, that's not really what I'm here for. What I'm doing is giving you my opinion based on the information associated with this case.

I think my opinion is different than Dr. Mitchell's. The scientific information, in my opinion, clearly puts this death within a 48-hour period.

Mitchell 56.1 ¶ 29. It is a wonder how Defendants extrapolate from this testimony that Dr. Spitz "testified that Mitchell did not deviate from the standard of care."[15]

Finally, Defendants make much of the discussion in Dr. Spitz's deposition of "outliers" and the common bell curve of natural results. Essentially, Defendants maintain that Dr. Spitz testified that the mere possibility, however unlikely, that Hill's death occurred more than two days before she was found could represent a statistically insignificant phenomena – an outlier – and therefore, Dr. Spitz endorsed the validity of Mitchell's 3-day determination. This again misconstrues Dr. Spitz's testimony.

Dr. Spitz explained that the existence of anecdotal reports of outliers does not form the basis for a scientifically sound forensic opinion:

Following the scientific method and process of lividity and rigor mortis, we get some parameters upon which opinions are made on a day-to-day basis by forensic pathologists. . . . Are there anecdotal reports? Sure, there's anecdotal reports of everything, that's not where opinions are based. We're not basing our opinions based on an anecdotal report that really can't be scientifically analyzed because we don't have a series of situations.

---

[15] It is not even clear what defense counsel meant by "standard of care" in questioning Dr. Spitz. This isn't a medical malpractice case. The relevant question is whether Mitchell fabricated evidence. As explained above, Dr. Spitz testified that there was no scientific basis for the statement in Mitchell's report that the death could have occurred three days before Hill was found. Thus, the evidence demonstrates Mitchell created a forensic report expressing a time of death that was unsupported by forensic science. This evidence supports a fabrication of evidence claim. *See Mervilus*, 73 F.4th at 195.

. . . . If you look at all the forensic textbooks, sure they say that there are outliers, but when you look at the real scientific reproducible data, you get more of a defined sequence for lividity and rigor mortis and that's where opinions are based. It doesn't mean that it's a hundred percent across the board, nothing really is in medicine.

Ex. 5 at 39. Dr. Spitz testified further that a scientific opinion expressed to a reasonable degree of medical certainty does not incorporate outliers:

> Q.    And so would you say that in your experience in providing an opinion on a window of the most likely time of death, you would use outliers in expressing that opinion?
>
> A.    I would not. I would not, because again, you're looking at the overwhelming majority of cases, and I suppose if you wanted to mention that outliers can exist, but outliers are rare, you know, that would be a truthful and accurate statement. But as far as giving opinions to a reasonable degree of medical certainty, that encompasses what is known and reproducible and doesn't really need to incorporate outliers, because outliers exist in everything we do.

*Id.* at 71.

Defendants' argument effectively rehashes an argument from Rivas's habeas proceeding that the Second Circuit rejected. In that proceeding, the magistrate judge had found Dr. Wecht's testimony "insufficiently persuasive because Wecht was 'unable to state with absolute certainty that [Hill] could not have died late Friday night.'" *Rivas*, 687 F.3d at 544. The Second Circuit rejected the magistrate's finding:

> Though Wecht conceded that it was not impossible for Hill to have died as early as 9:30 a.m. on Saturday, he did not agree that she could have died any earlier. He further clarified that he was "allowing for possibilities on a bell-shaped curve," meaning it was most likely that she died early Sunday morning and much less likely that she could have died at any time before 3:30 in the afternoon on Saturday. As discussed above, when asked whether it would be impossible for Hill to have died as early as 2:30 a.m. on Saturday morning, Wecht responded:
>
> > I am always very hesitant to use words like absolute and impossible, in the realm of human biology, . . . but I'll answer with reasonable medical probability or reasonable medical certainty, I do not believe that Ms. Hill could have been killed as far back as 2:30 a.m. on Saturday morning, August 28, that is after midnight on Friday,

the 27th into the morning hours of Saturday, the 28th, with reasonable medical probability.

Wecht can hardly be expected to have stated his opinion with any more certainty. "Absolute certainty" cannot be the standard by which to evaluate the testimony of a forensic witness; it is not possible for anyone who was not actually present at the time of death and it is certainly not required by law.

*Id.* at 544-45.

For these same reasons, Defendants' arguments about Dr. Spitz's testimony concerning "outliers" must be rejected. Dr. Spitz gave his opinion "to a reasonable degree of medical certainty," Ex. 5 at 70, and that is as definitive as he needed to be or legally could be. The final determination of whether Mitchell's report was recklessly false is for the jury.

### E. Mitchell Is Not Entitled to Absolute Testimonial Immunity

Mitchell's argument that he is entitled to absolute immunity for his grand jury and trial testimony is a red herring because Plaintiff's fabrication of evidence claim does not arise from Mitchell's grand jury or trial testimony, or preparation to testify. Rather, Plaintiff's claim arises from the forensic evidence Mitchell fabricated and provided to investigators on March 30, 1987, *years* before Rivas was arrested or charged with Hill's murder.

Again, Defendants concede that Mitchell created a forensic report on March 30/31, 1987 that said "2-3 days" for the time of death and told Sgt. Tynan "on or about March 30, 1987," that Hill had been dead "not less than two days," Mitchell 56.1 ¶ 38. Defendants also concede that Fitzpatrick's decision years later to prosecute Rivas rested on Mitchell's earlier report and statements. *See supra* Point I.B.

Given these concessions, Mitchell is not entitled to testimonial immunity. *See Frost*, 980 F.3d at 250; *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) ("A prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed

to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced that decision."); *Rucks v. City of N.Y.*, 96 F. Supp. 3d 138, 151 (S.D.N.Y. 2015) (investigators are liable when they create false narrative that influences the course of the prosecution); *accord Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003) (noting "there is virtually no authority to support" a medical examiner's policy arguments for extending absolute immunity to him and holding, "if, as alleged, Dr. West used shoddy and unscientific research techniques that resulted in a report critical to a baseless murder prosecution of Keko, there is no obvious reason why Dr. West should enjoy immunity greater than that of other investigators").

The fact that Mitchell later testified in a grand jury and at trial consistent with his earlier fabrication does not immunize him from liability. *See Coggins v. Buonora*, 776 F.3d 108, 112-13 (2d Cir. 2015) (allowing fabrication of evidence claims to go forward even though the officer ultimately testified to the same facts in the grand jury).

This Court in *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 300 (N.D.N.Y. 2018), denied absolute immunity to a county medical examiner under similar circumstances, *i.e.*, falsifying an autopsy report that led to the plaintiff's prosecution. *Id.* at 288, 299-300. The *Thomas* Court noted that "absolute immunity on a § 1983 claim is 'only available where the defendant can show that his or her function is so sensitive as to require a total shield from liability, and that absolute immunity is essential if that function is to be properly performed.'" *Id.* at 299 (citing *Robison v. Via*, 821 F.2d 913, 919 (2d Cir. 1987)). The Court held that "a medical examiner conducting an autopsy pre-conviction" was acting in an investigatory capacity and therefore, not entitled to absolute immunity. *Id.* at 300.

Thus, Mitchell does not enjoy absolute immunity for fabricating key forensic evidence of Hill's time of death long before the prosecution commenced.

**Sidney Manes' Deposition Testimony**

Defendants make much of Sidney Manes' testimony – indeed, they dedicate two full argument points and more than eight pages of briefing to nit pick alleged inconsistencies between Mr. Manes' deposition and select allegations in the Complaint. *See* Fitzpatrick MOL at 18-22 (Point III); Mitchell MOL at 21-25 (Point III).[16] Whether or not Manes' testimony supports certain allegations in the Complaint is immaterial. Manes did not represent Rivas at trial and has no personal knowledge of what occurred there. Manes is the Plaintiff in this case for the sole reason that he was appointed by the Onondaga County Surrogate's Court to serve as the Administrator of Rivas' estate. Rule 56(c) does not require all material facts to be established or disputed solely based on the personal knowledge of the Plaintiff. There is ample record evidence to support the material elements of Plaintiff's claims and that evidence is cited in Plaintiff's Rule 56.1(b) Statement of Additional Material Facts and submitted with Plaintiff's counsel affirmation.

While Defendants' argument does not expressly attack Plaintiff's fabrication of evidence claim,[17] they assert that "Manes conceded that Mitchell did not put forward any signed document that Ms. Hill's time of death was Saturday or Sunday." Fitzpatrick MOL at 19; Mitchell MOL at 23. This is irrelevant because Defendants concede that Mitchell prepared the March 30, 1987 forensic report that said Hill could have been killed three days before her body was found. *See*

---

[16] Both Fitzpatrick and Mitchell include in Point III of their argument what they call a "summary" of "ample evidence for the indictment and the conviction." Fitzpatrick MOL at 18; Mitchell MOL at 21. This evidence, even if true, is immaterial because probable cause is no defense to a fabrication of evidence claim. *Garnett*, 838 F.3d at 278. Moreover, without evidence that the crime occurred Friday, March 27, which Mitchell's fabricated report supplied, there was no probable cause to prosecute Rivas because, as Fitzpatrick has conceded, Rivas had an airtight alibi for Saturday and Sunday. P52, P54.

[17] Mitchell maintains that Manes' deposition testimony requires dismissal of "causes of action One through Four and Eight of the Complaint." Mitchell MOL at 23. Fitzpatrick is less precise, arguing only that unspecified "causes of action in the Complaint should be dismissed." Fitzpatrick MOL at 20. Either way, these arguments do not attack Plaintiff's Fifth Cause of Action, which pleads a fabrication of evidence claim against Mitchell (*see* Dkt. 16 at 35-36). Nor do these arguments attack Plaintiff's Seventh Cause of Action, which pleads a *Monell* claim against the County (Dkt. 16 at 37-44). As addressed *infra* in Point III, the County is liable for Mitchell's and Fitzpatrick's constitutional violations because they acted as an authorized policymakers for the County, which Plaintiff expressly pled in his Seventh Cause of action (*see* Dkt. 16 at 38 ¶ 225).

Fitzpatrick 56.1 ¶ 45; Mitchell ¶ 17; Fitzpatrick Aff. ¶¶ 5, 7, 14; Mitchell Aff. ¶ 6. Defendants do not dispute, and Fitzpatrick concedes that his decision to move forward with prosecuting Rivas depended on the statement in Mitchell's March 30, 1987 report, that the crime could have occurred three days before Hill was found. *See, e.g.*, Fitzpatrick Aff. ¶ 19.

## II.     THE COUNTY IS NOT ENTITLED TO RELIEF ON ITS MOTION

The County is entitled to no relief on its procedurally improper motion. A motion under Rule 12(b) must be filed prior to a responsive pleading and the County filed its Answer in 2019. The Court should also deny the County's informal request for relief under Rule 56 because the County complied with none of the requirements for seeking relief under Rule 56.

### A.     The County's Rule 12(b)(6) Motion is Procedurally Improper

The County has moved for "an Order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissing Plaintiff Sidney Manes Complaint" (Dkt. 140). The County's motion is procedurally improper because a Rule 12(b) motion is not permitted after a responsive pleading has been filed. Rule 12(b) is clear that "[a] motion asserting any of these defenses," meaning the foregoing list of seven enumerated defenses, "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). The County filed its responsive pleading on September 16, 2019 (Dkt. 22). Thus, the County's present motion is more than four years too late.

### B.     The County Has Not Made a Rule 56 Motion

To the extent the Court entertains the County's procedurally dubious request to "join[] the Motion for Summary Judgment made by codefendants William Fitzpatrick and Dr. Erik Mitchell," Ventrone Aff. ¶ 3, the Court should deny the County's motion because the County has failed to comply with any of the necessary prerequisites to move for relief under Rule 56.

First, the County did not follow the applicable Federal Rules of Civil Procedure for requesting relief under Rule 56. Rule 7 demands that a motion "state with particularity the grounds for seeking the order" and "state the relief sought." Fed. R. Civ. P. 7(b)(1). Nowhere in the County's motion appears a request for summary judgment or relief under Rule 56. And nowhere in the County's motion is there a statement "with particularity" of "the grounds for seeking" summary judgment. Rule 56, in turn, requires "[a] party asserting that a fact cannot be or is genuinely disputed" to support the assertion by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c). Nowhere in the County's motion is a citation to any materials in the record in this case.

Second, the County did not follow this Court's applicable Local Civil Rules. Rule 7.1(b) demands, "all motions and opposition to motions require a memorandum of law." The County did not file a memorandum of law. Local Civil Rule 7.1(b) and Local Civil Rule 56.1 require "[a]ny motion for summary judgment shall include a Statement of Material Facts." The County did not file a Statement of Material Facts. Local Civil Rule 56.1 emphasizes: "<u>Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion</u>."

Accordingly, the Court should not consider the County's motion as seeking relief under Rule 56, and to the extent it does, it should deny the motion for failure to comply with the applicable procedural rules.

## III.    THE COUNTY IS NOT ENTITLED TO SUMMARY JUDGMENT

To the extent the Court entertains the County's motion as one seeking summary judgment, the County is not entitled to that relief. The County is liable for the actions of its authorized decisionmakers, including the County District Attorney (Fitzpatrick) and County Medical

Examiner (Mitchell).[18] Since the County is not entitled to absolute immunity, even if County policymakers are entitled to absolute immunity in their individual capacity, the County's motion must be denied. The County is also liable for its deliberate indifference in failing to supervise Mitchell despite shocking allegations that cast serious doubt on his credibility, judgment, and concern for scientific protocols.

## A. Legal Standard

Municipalities may be liable under § 1983 – commonly referred to as "*Monell* liability" based on the seminal case, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) – where "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers [or] pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels." *Jeffes v. Barnes*, 208 F.3d 49, 56-57 (2d Cir. 2000) (citations and quotations omitted). Liability is also available where the injury complained of "was inflicted by . . . those whose edicts or acts may fairly be said to represent official policy." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-22 (1988) (plurality opinion) (quotations omitted); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."). In *Pembauer*, the Supreme Court held that the county could be liable for the plaintiff's Fourth Amendment violation because the county prosecutor acted with final county decisionmaking authority to direct county deputies to enter the plaintiff's clinic to serve a warrant.

---

[18] Plaintiff sued Fitzpatrick and Mitchell in their official as well as individual capacities (*see* Dkt. 16 ¶¶ 13, 20), and Plaintiff specifically brought his *Monell* cause of action (Seventh Cause of Action) against Fitzpatrick "in his official capacity" (Dkt. 16 ¶ 238). As this Court has noted, a "claim asserted against an individual in his official capacity . . . is in effect a claim against the governmental entity itself." *Washington v. Doe*, No. 9:21-CV-0002 (BKS/CFH), 2021 U.S. Dist. LEXIS 273453, at *5 n.5 (N.D.N.Y. Feb. 10, 2021) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012)). Thus, Plaintiff's official capacity claims against Fitzpatrick and Mitchell survive summary judgment for the same reasons explained below that the County is not entitled to summary judgment.

When *Monell* liability rests on the edicts of a municipal decisionmaker, "the court must determine whether that official had final policymaking authority in the particular area involved." *Jeffes*, 208 F.3d at 57 (citations omitted). Final policymaking authority by the official presents a question of law. *Praprotnik*, 485 U.S. at 124 (plurality opinion), which requires reference to state law. *See*, *e.g.*, *McMillian v. Monroe Cnty.*, 520 U.S. 781, 786 (1997). "The relevant legal materials, include state and local positive law, as well as custom or usage having the force of law." *Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks omitted).

"[T]he official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the [municipality's] business." *Jeffes*, 208 F.3d at 57; *see Pembaur*, 475 U.S. at 481 (the official must "possess[] final authority to establish municipal policy with respect to the action ordered"). Stated another way, the Court must determine "whether [the] governmental official [is a] final policymaker[] for the local government in a particular area, or on [the] particular issue involved in the action." *Jeffes*, 208 F.3d at 57 (quoting *McMillian*, 520 U.S. at 785).

**B.** *Monell* **Liability for the Actions of Fitzpatrick and Mitchell as County Decisionmakers with Final Policymaking Authority**

The County is liable under § 1983 because the relevant actions of Fitzpatrick and Mitchell were undertaken as the County's authorized decisionmakers with "final policymaking authority in the particular area involved." *Jeffes*, 208 F.3d at 57; *see also Jett*, 491 U.S. at 737 (determining final policymaking authority requires review of "state and local positive law, as well as custom or usage having the force of law"). The relevant decisionmaking areas are, in the case of Mitchell, decisions about the circumstances and time-of-death and, in the case of Fitzpatrick, decisions about the conduct of criminal proceedings.

As a preliminary matter, the County admits that Mitchell and Fitzpatrick were final policymakers in the relevant decisionmaking areas. In response to Plaintiff's Rule 36 requests for admissions, Onondaga County admits that "Mitchell was the final policymaker of the Onondaga County Medical Examiner's Office" and "as the Chief Medical Examiner, Defendant Erik Mitchell was the final policymaker of the Onondaga County Medical Examiner's Office for policies or procedures concerning making determinations about the time of death." P3; Ex. 1. Likewise, Onondaga County admits that "as the duly-elected Onondaga County District Attorney, Defendant William Fitzpatrick is the final policy-maker for the Onondaga County District Attorney's Office." Fitzpatrick emphatically maintains his status as a final policymaker. *See* Fitzpatrick Aff. ¶ 37 ("No one in County government supervises me."). These admissions reflect Onondaga County law.

The County Administrative Code bestows final decisionmaking authority on the County Medical Examiner to "investigate and record the causes of, and the circumstances surrounding, all unattended deaths or deaths resulting from unnatural means within the County in the manner prescribed by law." Onondaga Cnty. Admin. Code § 16.06. It also empowers the Medical Examiner to "assist prosecuting attorneys, law enforcement agencies and others within and without the County in the prosecution and defense of criminal actions." *Id.*

County law bestows decisionmaking authority on the District Attorney to "conduct all grand jury proceedings, criminal trials and other criminal proceedings within the County." *Id.* § 9.02. It further empowers the District Attorney to "participate in such investigative procedures and activities with law enforcement authorities and otherwise as may be deemed appropriate" and to "coordinate enforcement and investigative procedures and cooperate in the training of police and related personnel." *Id.*

It is clear that County law made Mitchell and Fitzpatrick final decisionmakers in the relevant areas. As the County Medical Examiner, Mitchell acted as the County's authorized decisionmaker concerning the investigation and determination of the circumstances of Hill's death. Therefore, Mitchell's actions and decisions to fabricate Hill's time of death are considered actions of the County. Similarly, by delegating final decisionmaking authority to Fitzpatrick for matters concerning "grand jury proceedings, criminal trials and other criminal proceedings," the County is responsible for Fitzpatrick's decision to not disclose *Giglio* materials to Rivas. *See Praprotnik*, 485 U.S. at 121-22; *Pembaur*, 475 U.S. at 481; *Jeffes*, 208 F.3d at 57.

### C.    Constitutional Violations by County Decisionmakers

#### i.    Mitchell's Fabrication of Evidence Due Process Violation

A fulsome discussion of Mitchell's fabrication of evidence and resulting violation of Rivas' due process rights is addressed above at Point I. Because Mitchell acted as the County's authorized decisionmaker for determining the time of death, the County is liable for Mitchell's fabrication under § 1983. Additionally, there is sufficient evidence for the jury to find that the County was deliberately indifferent to Mitchell's improprieties during his time as the County Medical Examiner, and therefore, liable under a separate *Monell* for Mitchell's reckless fabrication of forensic evidence against Rivas.

#### ii.    Fitzpatrick's *Giglio* Due Process Violation

There is also sufficient evidence that Fitzpatrick – acting as the County's designated decisionmaker for conducting criminal proceedings, *see infra* Point III.C – violated Rivas' due process rights by withholding information about Mitchell's credibility and which tends to undermine Mitchell's regard for scientific protocols. While this evidence is more accurately described as "*Giglio* material" – referring to *Giglio v. United States*, 405 U.S. 150 (1972), which

held that prosecutors have a duty to disclose material "evidence affecting credibility" – it is commonly referred to generically as *Brady* material. Indeed, *Giglio* rests on the constitutional standards announced in *Brady*, *see* 405 U.S. 151, 155; and judicial decisions address *Brady-Giglio* disclosure requirements interchangeably. *See generally Fraser v. City of N.Y.*, No. 20-cv-04926 (CM), 2021 U.S. Dist. LEXIS 69324 (S.D.N.Y. Apr. 9, 2021).

"'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Id.* at *10 (quoting *Poventud v. City of N.Y.*, 750 F. 3d 121, 133 (2d Cir. 2014) (en banc)). The summary judgment record in this case includes sufficient evidence for the jury to find each component is met by Fitzpatrick's admitted failure to disclose the credibility information about Mitchell.

Fitzpatrick admits he chose not to disclose to Rivas's counsel that Mitchell was under investigation for troubling allegations. P88. Moreover, Fitzpatrick testified that his decision to not disclose this information was consistent with the policies of his office. *Id.*

Defendants concede, as they must, that Mitchell was under investigation prior to and during Mr. Rivas's trial. *See* Mitchell Aff. ¶ 15. That investigation concerned allegations from employees in Mitchell's office that he had directed them to dispose of body parts and fluids by flushing them down the toilet, he had taken cadavers and parts thereof without permission to a farm where he buried them as part of an unsanctioned forensics training course, and other highly disreputable conduct that dramatically undermines his regard for scientific and medical protocols. P73-82.

Fitzpatrick admits that these allegations cast serious doubts on Mitchell's credibility and could undermine the reliability of his opinions. *See* Fitzpatrick Aff. ¶ 24. This is, of course, the

conclusion already reached by the Second Circuit: "we think a reasonable juror would discredit Mitchell's testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony in [Rivas'] criminal trial." *Rivas*, 687 F.3d at 546.

A reasonable jury will find that Fitzpatrick had this information prior to and during Rivas' trial. Fitzpatrick admits he "did attend a press conference called by Dr. Mitchell on March 3, 1993 regarding the State Health Department investigating his department." Fitzpatrick Aff. ¶ 21. That was *two weeks* before Mr. Rivas's trial commenced. Moreover, there is evidence that Fitzpatrick intentionally withheld this information: he testified in his deposition that he does not believe this information needed to be disclosed, P88, and when Mitchell eventually resigned, Fitzpatrick noted that he "cannot tolerate the possibility of a guilty person going free because a jury *has been distracted from the evidence*." Ex. M (emphasis added).

Thus, there is sufficient evidence, based primarily on Fitzpatrick's and Mitchell's own admissions in their recent affirmations, that establish the three components of Rivas' *Brady-Giglio* due process claim against Fitzpatrick. *Fraser*, 2021 U.S. Dist. LEXIS 69324, at *10.

While Fitzpatrick and Mitchell suggest in their recent affirmations that Fitzpatrick was unaware of the nature of the allegations against Mitchell at the time of Rivas' trial, that suggestion is not credible. Mitchell claims he "never discussed any of those matters with Mr. Fitzpatrick" prior to Rivas' trial. Mitchell Aff. ¶ 15. But the fact that Fitzpatrick attended a press conference "called by Mitchell" concerning those matters, *see* Fitzpatrick Aff. ¶ 21, seriously undercuts the credibility of this assertion. Fitzpatrick makes much of the fact that no complaints about Mitchell had been referred to his office until *after* Rivas was convicted. *See* Fitzpatrick Aff. ¶ 20 ("No

referral for prosecution had been made by any agency or complaint by any citizen to my office about Dr. Mitchell until July of 1993."); *see also Id.* ¶ 21 ("no charges had been filed by the Health Department and no complaints or referrals about Dr. Mitchell of any type had been made to my office" prior to Rivas' trial). But that proves nothing about the information Fitzpatrick unquestionably had available to him about the allegations and investigation pending against Mitchell at the time of Rivas' trial.

As already noted, Fitzpatrick does not dispute that he failed to turn over this *Giglio* material, but he maintains that he did not have to because there were press reports in local papers about the State investigation into Mitchell's misconduct. This argument is wrong. "Second Circuit precedent establishes that a 'government's duty to produce [exculpatory material]' is not 'eliminated by that document's availability in a public court file.'" *Fraser*, 2021 U.S. Dist. LEXIS 69324, at *15 (quoting *United States v. Payne*, 63 F. 3d 1200, 1209 (2d Cir. 1995)). "Under *Brady* and its progeny," which includes *Giglio*, "the government has an affirmative duty to disclose favorable evidence known to it." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). "[W]hether documents in the public record are 'suppressed' for purposes of Brady is evaluated under the same metric as any other piece of evidence." *Fraser*, 2021 U.S. Dist. LEXIS 69324, at *16. Whether Rivas's trial counsel "actually knew or should have known" about the investigations pending against Mitchell, "is an issue of fact." *Id.*

There is sufficient evidence for the jury to find that Rivas's trial counsel did not know nor should have known about the State Department of Health's pending investigation of Mitchell. Clearly, if Rivas's counsel knew about those investigations, he would have cross-examined Mitchell on them. The trial took place in 1993, before the advent of the modern internet, electronic newsfeeds, and search engines. Mitchell knew that Rivas's trial counsel was not local to Syracuse

and thus, would not be a daily reader of *The Post-Standard*. Whether Rivas's counsel should have known about the investigations of Mitchell is a factual matter for the jury to decide.

Accordingly, given Fitzpatrick's final decisionmaking authority to conduct criminal proceedings within the County, the County is liable for Fitzpatrick's violation of Rivas' due process rights under § 1983.

### D. The County is Also Liable for its Policy and Custom of Withholding *Giglio* Materials and Deliberate Indifference to Mitchell's Reckless Disregard for Protocols

In addition to policymaker liability, the County has *Monell* liable for its admitted policy and custom of withholding *Giglio* material and deliberate indifference to Mitchell's reckless disregard for protocols and unsound judgment.

Fitzpatrick conceded that his withholding of *Giglio* material from Rivas's trial counsel was done pursuant to the policy of his office. P88. Thus, there is sufficient evidence for a jury to concluded that a County policy or custom was the moving force of the violation of Rivas's due process right to receive disclosure of known credibility issues of a key witness at trial.

Additionally, a municipality can be held liable under *Monell* for deliberate indifference to the misconduct of its officials, and there is ample evidence that the County was aware of serious problems with Mitchell's disregard for scientific protocols going back as far as 1988 when "a Medical Examiner Oversight Committee [was] appointed by the County." Fitzpatrick Aff. ¶ 23(1) ("summariz[ing] what appear to be investigative events surrounding Dr. Mitchell"). Then-County Executive Nicholas Pirro was aware of these allegations, as noted in news reports. And "a hearing/investigatory session conducted by the County Attorney and the County Legislature relating to the management of the Medical Examiner's Office" was held on April 13, 1993, just two weeks after Rivas' conviction. Fitzpatrick Aff. ¶ 23(4).

The County has offered no evidence to show it took any steps whatsoever to supervise Mitchell or discipline him for the many obvious problems with his overseeing the County Medical Examiner's Office. The County does not contest its deliberate indifference to Mitchell's deviation from reasonable judgment and scientific protocols. Thus, even if, *arguendo*, a jury could find that Mitchell did not act with sufficient recklessness to be liable individually for fabricating Hill's time of death, there is sufficient evidence for the jury to find the County liable for failing to supervise Mitchell and remaining deliberately indifferent to his reckless behavior, unsound judgment, and disregard for protocols.

### E. The County Is Not Entitled to Immunity

The County's motion rests on the legally mistaken argument that Plaintiff's *Monell* claim "should fail due to [Fitzpatrick's and Mitchell's] absolute and/or qualified immunity." Ventrone Aff. ¶ 8. Fitzpatrick similarly maintains that the County is "entitled to absolute immunity" because of Fitzpatrick's individual immunity. Fitzpatrick MOL at 14.[19] Neither Fitzpatrick nor the County has cited any authority that a county – as opposed to an official sued in their individual capacity – is entitled to immunity under § 1983. Indeed, long-standing Supreme Court and Second Circuit precedent dictates that municipalities are not entitled to any such immunities.

The law is clear that "municipal bodies sued under § 1983 cannot be entitled to an absolute immunity." *Monell*, 436 U.S. at 701; *see also Bogan v. Scott-Harris*, 523 U.S. 44, 52-53 (1998) (holding that municipal legislators are entitled to absolute immunity for their legislative activities and noting that a deterrent against "legislative abuse" remains, despite this newly-recognized

---

[19] The County maintains, without legal authority or explanation, that "[t]he doctrine of sovereign or official immunity has protected medical examiners." Ventrone Aff. ¶ 14. But since the County provides no authority or explanation for this sweeping assertion, the Court need not address it. Plaintiff could not find a legal authority whatsoever that supports the contention that a **county** medical examiner (as opposed to a state agency) is entitled to "sovereign" immunity or "official immunity" in a § 1983 lawsuit.

immunity, because "[m]unicipalities themselves can be held liable for constitutional violations"); *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993) ("unlike various government officials, municipalities do not enjoy immunity from suit — either absolute or qualified — under § 1983"); *accord Goldberg v. Rocky Hill*, 973 F.2d 70, 74 (2d Cir. 1992) ("we hold that there is no immunity defense, either qualified or absolute, available to a municipality sought to be held liable under 42 U.S.C. § 1983"); *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) ("So it is now clear that the absolute immunity of its policymakers does not shield a city from liability for its policies."); *Sample v. City of Woodbury*, 836 F.3d 913, 917 (8th Cir. 2016) (rejecting municipal absolute immunity even where municipal official received prosecutorial absolute immunity: "Unlike government officials, municipalities do not enjoy absolute immunity from suit under section 1983. . . . Although the City laudably argues that extending absolute immunity to municipalities would further the underlying policy governing immunity protections to prosecutors, we cannot ignore the Supreme Court's explicit holding in *Leatherman* that absolute immunity does not apply to municipalities." (citation omitted)); *Capra v. Cook Cnty. Bd. of Review*, 733 F.3d 705 (7th Cir. 2013) ("We have . . . held consistently that municipal entities are not entitled to absolute immunity even where the entity's officers are entitled to immunity.").

Thus, even if, *arguendo*, Fitzpatrick or Mitchell was entitled to absolute immunity, the County is not immune from liability because the County is liable for the acts of Fitzpatrick and Mitchell as final County decisionmakers. Additionally, the County is liable for its admitted policy of the County DA's Office of withholding *Giglio* material and its deliberate indifference to Mitchell's lack of sound judgment and disregard of protocols.

### F.  Fitzpatrick Acted as a County Official in Failing to Disclose *Giglio* Material

Fitzpatrick has impliedly argued that the County is not liable for his actions because he is "the elected District Attorney of Onondaga County" and "[n]o one in County government supervises me." Fitzpatrick Aff. ¶ 37. But those facts to absolve the County of the fact that the Onondaga County District Attorney is an Onondaga County official. The Onondaga County Charter identifies the District Attorney as a County official. Onondaga Cnty. Charter Art. IX. Notwithstanding Fitzpatrick's asserted independence, the Onondaga County Charter subjects the District Attorney to the authority of the County Executive and Board of Supervisors. *See* Onondaga Cnty. Charter § 902 ("The district attorney . . . shall perform such other and related duties as shall be required or delegated to him by the county executive or board of supervisors.").[20] Thus, County law does not support Fitzpatrick's claim that his office is legally independent from the County.

Fitzpatrick also seems to argue that he is not a county official but a state official when prosecuting cases, but this argument is also wrong. In *Fisher v. State of New York*, 10 N.Y.2d 60 (1961), the New York Court of Appeals held that in presenting allegedly false information to a Grand Jury and to a trial jury, an Assistant District Attorney of New York County was *not* an officer of the state. As the Court explained, the "theory that an Assistant District Attorney is a State officer," implicit in Defendants' present motion, "collides head on with section 2 of the Public Officers Law which defines 'state officer' and 'local officer'" and "does not include prosecutors" in the list of "state officers." *Id.* at 61.

---

[20] The office of Medical Examiner is established by the Onondaga County Charter, *see* Art. XVI; and the ME is subject to the authority of the County Executive and Board of Supervisors. *See* Onondaga Cnty. Charter § 1702 ("The medical examiner . . . shall perform such other and related duties as shall be required or delegated to him by the county executive or board of supervisors."); *see also* Onondaga Cnty. Admin. Code § 16.06 (the Medical Examiner "shall be appointed by the County Executive upon consultation with the Commissioner" and "shall be directly responsible to and serve at the pleasure of the County Executive").

New York appellate courts have followed *Fisher* to conclude that county district attorneys are county policymakers and not State officials based on claims akin to Plaintiff's claims here. In *Ramos v. City of N.Y.*, 285 A.D.2d 284 (1st Dep't 2001), the Court held: "where prosecutors, pursuant to policy or custom, conceal exculpatory evidence and commit other wrongs in order to secure a conviction, liability rests with the county . . . rather than with the State and may be asserted under section 1983." 285 A.D.2d at 302 (cleaned up).

> This conclusion is also firmly grounded in New York law. After all, a District Attorney historically has been categorized as a local, rather than a State, officer, which is unremarkable in that the District Attorney is elected and compensated by the county's voters and enjoys no extra-county jurisdiction as a result of which *a District Attorney's torts are the torts of the county rather than of the State.*

*Id.* at 303 (emphasis added) (citations omitted) (citing, *inter alia*, *Fisher*, 10 N.Y.2d at 60; *Walker v. City of N.Y.*, 974 F.2d 293 (2d Cir. 1992)). *Ramos* noted that the Administrative Code of the City of New York – like the Onondaga County Administrative Code and Charter – "identifies the District Attorney as a City official." *Id.* at 303.

In *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998), the Second Circuit addressed the Orange County District Attorney's policy of refusing to accept cross-complaints by complaining witnesses. *Id.* at 69. After reviewing its earlier case law, the Second Circuit reaffirmed its longstanding holding that "[u]nder New York law, DAs and ADAs are generally presumed to be local county authorities, not state officers" for purposes of *Monell* liability. *Id.* at 76-77.

The Second Circuit reaffirmed this holding in *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019), noting that "the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow exception emanating from *Baez [v. Hennessey*, 853 F.2d 73 (2d Cir. 1988)], being the decision of whether, and on what charges, to prosecute." *Bellamy*, 914 F.3d at 68. In holding that a county district attorney is a local official

and not a state official in matters relating to the withholding of evidence under *Brady* and *Giglio*, the Second Circuit approvingly noted the First Department's *Ramos* decision, discussed above, and *Johnson v. Kings Cnty. Dist. Atty's Office*, 308 A.D.2d 278 (2d Dep't 2003). *See Bellamy*, 914 F.3d at 760-61. In *Johnson*, the Second Department reached the identical conclusion. *Johnson*, 308 A.D.2d at 295-96; *see also Newson v. City of N.Y.*, 16-CV-6773, 2019 U.S. Dist. LEXIS 143835, *8 n.7 (E.D.N.Y. Aug. 23, 2019) ("The proper municipality for *Monell* purposes is the City of New York where assistant district attorneys in the City are alleged to have withheld exculpatory evidence.").

_____

In sum, Onondaga County is not entitled to summary judgment because it is liable under *Monell* and is not entitled to immunity.

**CONCLUSION**

For the foregoing reasons, the Court should deny Mitchell's and Fitzpatrick's motions for summary judgment and deny the County's motion to dismiss. Hector Rivas is entitled to the trial the Second Circuit *twice* concluded he deserved. The defendants' actions denied him that trial and caused him to be wrongfully incarcerated until his death. Justice demands a trial on the merits of this case.

Dated:  January 13, 2025

THE LAW OFFICE OF JOSHUA MOSKOVITZ, P.C.

/s/

———————————————————
Joshua S. Moskovitz

RICKNER PLLC

/s/

———————————————————
Rob Rickner
Stephanie J. Panousieris

SCOTT A. KORENBAUM, ESQ.

/s/

———————————————————
Scott A. Korenbaum