Exhibit "X"

```
 1   UNITED STATES DISTRICT COURT

 2   NORTHERN DISTRICT OF NEW YORK

 3   * * * * * * * * * * * * * * * * * * * * * * * * *

 4   SIDNEY MANES, Administrator of the Estate of HECTOR
     RIVAS,
 5
                    Plaintiff,
 6
                            Index No. 19-CV-844(BKS)(TWD)
 7   against

 8   ONONDAGA COUNTY, CITY OF SYRACUSE, WILLIAM
     FITZPATRICK, DR. ERIK MITCHELL, and "JOHN DOES 1-10",
 9
                    Defendants.
10
     * * * * * * * * * * * * * * * * * * * * * * * * *
11

12

13

14

15

16

17

18             **EXAMINATION BEFORE TRIAL** of

19        **DANIEL SPITZ, M.D.**, expert testimony taken

20        via videoconference by Zoom, held in New York

21        State on August 15, 2024.  This deposition

22        was taken by LISA M. SCHUSTER, Court Reporter

23        and Notary Public in and for the State of

24        New York.

25
```

1  interval prior to which one may assert with confidence
2  the individual was alive?
3      A.    The window of death is when somebody is last
4  known to be alive with relative certainty and when
5  they're found deceased, and that is narrowed, based on
6  other factors, including scientific means.
7      Q.    Should the window of death be established
8  according to the most reliable testimony or evidence as
9  to when the individual was last alive?
10     A.    No.  I think the window is determined based on
11 a variety of factors, including circumstantial
12 information and scientific parameters.
13     Q.    So you don't agree with what I've just read to
14 you?
15            MR. MOSKOVITZ:  Objection.
16     A.    I think the way that I just characterized it is
17 the way I would look at it.
18     Q.    Okay.  In terms of this case, did you, in
19 evaluating the case, attempt to determine the window of
20 death for Valerie Hill?
21     A.    I did.  I used the materials that I had
22 available to determine the likely interval between her
23 death and when she was found or when she was last known
24 alive and when she was found deceased, and really in this
25 case, the primary method falls to scientific means even

1  window.
2         So while the initial hypothesis based on
3  circumstantial information might include and should
4  include when was somebody last known to be alive, whether
5  it's accurate or not, and when they were found deceased.
6  The only thing we know for sure is when someone was found
7  deceased. We don't actually know in most situations,
8  sometimes I suppose we do, when somebody was last known
9  alive definitively or when somebody was alive
10 definitively despite when they were last seen to be
11 alive.
12        So we do need to utilize the scientific
13 parameters as an indicator of the postmortem interval and
14 sometimes that correlates with the last known alive time
15 and sometimes it doesn't.
16    Q. With regard to the parameters, I'll have some
17 questions for you about those in a minute, but I'd like
18 to stay with the facts in the case as they were presented
19 at trial.
20        Do you recall reading Dr. Mitchell's testimony
21 in which he was given a hypothetical by Mr. Fitzpatrick
22 with regard to certain facts in the case, including when
23 she ceased to have contact with people in her life? She
24 was going to travel see someone the next day, there was
25 no phone contact after Friday, her stepmother was dying,

1  considering those pieces of information, to my knowledge,
2  haven't all been verified or accurate, at least I don't
3  have any ability to determine their validity and I don't
4  think Dr. Mitchell did either.
5      Q.   Well, doctor, the evidence that was recited in
6  the hypothetical is in the record of the trial, are you
7  aware of that?
8      A.   I don't know what you mean.  It wasn't in the
9  trial transcript that I reviewed of Dr. Mitchell.
10     Q.   I understand that, but you, to my knowledge,
11 and if I'm wrong, by all means correct me.  You only
12 reviewed Dr. Mitchell's testimony.  This trial went on
13 for days and there were twenty some odd witnesses.  You
14 didn't read any of that testimony, correct?
15     A.   No, I didn't.  I reviewed Dr. Mitchell's
16 testimony and his deposition.
17     Q.   And if I understand your testimony with regard
18 to Dr. Mitchell's response to this hypothetical, you have
19 no criticism of his response, correct?
20     A.   Well, I don't have criticism of the response,
21 but I don't really think it changes the opinion that this
22 death, based on scientific means, falls within a 48-hour
23 window.
24          He's taking this as well, assuming all these
25 facts to be true, I suppose the window includes a longer

1  time frame. While, I think unfortunately the scientific
2  parameters really don't corroborate with those pieces of
3  information. And so I don't think, at least in my
4  opinion, it wouldn't change that I think this death that
5  there's a longer period of time. I'd have to review all
6  those things to really evaluate them and not just take
7  them as facts because of a hypothetical. I would have to
8  review them all independently.
9       Q.   All of the facts that form the basis of the
10 hypothetical, is that what you're saying?
11      A.   If those facts exist, yes.
12      Q.   All right. And you don't know if they exist or
13 not, again, because they're derived from the transcript
14 of the trial and you've read Dr. Mitchell's testimony
15 only, fair?
16      A.   Well, like I said, just like I'd have to verify
17 those facts to utilize them to any degree in an opinion,
18 I'd also have to verify facts, including whether her
19 phone was busy during a particular time frame to
20 determine if that plays a role. At this point, the most
21 reliable information are the scientific parameters such
22 as rigor mortis and livor mortis and these types of
23 things which really allow for a scientific basis to
24 determine the postmortem interval.
25      Q.   Doctor, and again, we'll get to those in a

1  minute. But just for completeness, in terms of
2  determining the window of death, is it fair to say that a
3  pathologist exercises judgment in weighing the facts
4  associated with the window in terms of circumstantial or
5  other factual evidence, as well as the scientific and
6  forms a judgment based upon the two?
7      A.   To some degree. However, circumstantial
8  information provides you a hypothesis that a death falls
9  within a particular time frame. Again, we know when
10 somebody is found deceased. We don't know, unless it's
11 witnessed, when somebody was last known to be alive. And
12 we can get various circumstantial information which can
13 help us try to determine when somebody was last known to
14 be alive, it might be a definitive time frame, it might
15 be a range of time, and that forms the broad overall
16 window that needs to now be analyzed. And when you look
17 at the scientific parameters, sometimes it correlates
18 quite well with those circumstantial pieces of
19 information and sometimes there is a discrepancy.
20     And in this case, there is a discrepancy
21 between what you're saying with the circumstantial
22 information, at least some of the circumstantial
23 information, maybe not all of it, and what the scientific
24 parameters really indicate. And even Dr. Mitchell and
25 others have sort of all agreed on how the scientific

1  parameters are analyzed.  So it's a little bit puzzling
2  to me how Dr. Mitchell sort of ignored some of those
3  things and then broadens his time frame despite
4  testifying that the scientific parameters indicate that
5  this death is really no greater than 48 hours from the
6  time that she was found deceased.
7      Q.   So it's your testimony that while puzzled,
8  Dr. Mitchell, in giving his testimony and forming his
9  opinions, was exercising judgment?
10     A.   I'm not sure what he was doing.  He analyzed
11 the scientific parameters and for the most part, as far
12 as rigor mortis and lividity goes, was accurate in his
13 account of how these things progressed following death
14 and it led to the conclusion that this death is within
15 the 48 hour time frame.  He then utilized -- he then
16 utilized nonscientific parameters and maybe
17 circumstantial information to then offer a different
18 opinion.
19     Q.   All right.  Is -- I want to make sure I
20 understand what you just said.  Is it your testimony that
21 Dr. Mitchell concluded that the scientific parameters
22 were 48 hours?
23     A.   Well, you know, Dr. Mitchell said that rigor
24 mortis, you know, goes away after a day or two to
25 48 hours, and his own description was that rigor mortis

1   was still present, and in fact, full rigor was still
2   present. So by his own sort of analysis, he puts the
3   time frame within that 48-hour window based on rigor
4   mortis. He also puts it within that window, even a
5   tighter window, using lividity, because he describes
6   lividity as fixed, but also describes it as partially
7   nonfixed, and that puts the window of the death much
8   closer, even maybe 24 to 36 hours.
9           So his scientific parameters are in agreement
10  with what is known in the literature, what I believe,
11  what others believe, but the utilization of some other
12  findings caused him to sort of reevaluate and come up
13  with a different conclusion. Whether he based it on
14  circumstances or nonscientific means, I'm not entirely
15  sure, maybe both.
16      Q.  Well, that would be an exercise in judgment on
17  his part, correct?
18      A.  I suppose it's judgment. I'm not sure what he
19  was doing, you'd have to really discuss it with him. I
20  just can just tell you what he testified to.
21      Q.  With regard to the weight that is given --
22  withdrawn.
23          So, doctor, what I'd like to do is ask you some
24  further general questions. And do you agree that
25  Dr. Mitchell was the only pathologist who was present at

1  everyone else in the case as he was there and saw the
2  body, correct?
3      A.  I'm not really sure if that's an advantage.  If
4  you prepare a report and the report is accurate and the
5  findings can be analyzed, I think that's certainly
6  appropriate.
7          In terms of, you know, how much weight he's
8  putting on last seen alive by the father, that is the
9  broad window of time, that is the sort of large
10 determination from apparently last known alive.  Whether
11 that's accurate or not, we don't know, but that's what we
12 know at the time.
13         You know.  Information evolves as these cases
14 progress, new information comes forward.  And he's basing
15 it, given that broad window of time, which he thinks is
16 two to three days, which I don't really disagree with
17 initially, but when you look at the scientific
18 parameters, it becomes clear that this is a death that's
19 no greater than 48 hours from the last time she was --
20 from the time that she was found deceased.
21     Q.  The -- let's go to the scientific parameters
22 for a moment, doctor.  I want to make sure I understand.
23 Is it your testimony that rigor, that is rigidity, can
24 only be present up to 48 hours, that there are no reports
25 in the literature or no opinions in your profession that

1           five-minutes, please?
2                   MR. MOSKOVITZ:  Sure.
3                   VIDEOGRAPHER:  Okay.  The time is 3:15.
4           We are off the record.
5                   ( Whereupon, a recess was taken )
6                   VIDEOGRAPHER:  We are on the record.  The
7           time is 3:33 p.m.  Please continue.
8           Q.   Doctor, when we left off, I was asking you some
9     questions about rigor and you were discussing outliers in
10    terms of -- oops, lost you.  Can you hear me, doctor?
11          A.   Is that better?
12          Q.   Sure.
13          A.   There you go.
14          Q.   Any time I can see you and hear you, that will
15    be better.  So you were talking about outliers as it
16    pertains to rigor.
17          A.   Go ahead.  The computer is like blowing up, but
18    we're good.
19          Q.   Well, computers hate me, so it's my fault.
20               Is it your testimony that if we look at the
21    literature, we will not find any reputable peer-reviewed
22    articles that say rigor can be as long as 72 hours?
23          A.   No, I didn't say that.  I said there are
24    outliers, there are situations where you have extremes of
25    temperature which can alter the typical parameters, but

1   that the general reliable understanding that is
2   throughout the literature is that rigor mortis and
3   lividity follow particular time sequences, and you know,
4   assuming and utilizing typical standard parameters with
5   comfortable room-type temperature and environmental
6   factors are relatively constant and comfortable in that
7   65 to 75-degree range, that it's a reliable method to
8   determine postmortem interval and that that time frame
9   generally puts rigor mortis as disappearing by the 48
10  period, and it disappears with the beginning of some
11  decomposition.
12        And externally this lady shows no decomposition
13  whatsoever.  I know there's some description of brain
14  findings and what have you, but that's really not the
15  method upon which you utilize to determine time of death.
16     Q.  So just to be clear, did she have any other
17  factors that would potentially extend the time of rigor?
18     A.  Not that I see and not past the 48-hour time
19  frame.
20     Q.  Does strangulation --
21     A.  And, again, she has rigor, that's the important
22  part here.  She has full rigor still when she is
23  evaluated.
24     Q.  Does strangulation impact rigor?
25     A.  Not really.  I mean, extremes of exertion can

1   of death for this patient, for this woman?
2        A.   It's not a factor that should have been used.
3   I don't know if he specifically used it.  I know he
4   utilized some of the cavitary changes in the deep brain
5   when it was sectioned, you know, presumably weeks later
6   by the neuropathologist, and that's a really inaccurate
7   method to utilize because the brain continues to undergo
8   some decompositional changes even if it's put in
9   formalin, because the formalin takes a while to penetrate
10  into the deeper tissue.
11       Q.   Do you recall his deposition at page 84 where
12  he said -- he was asked this question by Mr. Rickner and
13  he gave this answer.  "Question:  Okay.  And what did you
14  see, and please look at them now, what did you see in
15  those slides that indicated decomposition?  Answer:  That
16  is consistent with it, I mean, those slides are not in
17  themselves the definition of decomposition.  But I
18  described in my autopsy report softening and autolytic
19  change on gross exam, and what you've got here is a brain
20  that is slumping slightly down in the brain cage and has
21  a slight flattening of the gyral definition, but handed
22  this independently with no history, you're not going to
23  derive.  It goes along with what I observed, but it's not
24  ethonomic of it."  Are you saying that that response,
25  you have a criticism of that response?

1    A.   No, I don't have a criticism of it.  I think
2  it's a difficult paragraph to sort of understand exactly
3  what he's saying.  It's just descriptive.  It's just not
4  anything that you could use to determine a time of death.
5    Q.   Then he was asked the question at page 85,
6  "Just" -- "So just to be clear, examining the slides in
7  preparation for trial didn't really do anything with
8  respect to the time of death testimony, is that correct?
9  Answer:  It did not change my opinion that it could be 2
10 to 3 days."  From his testimony, does it sound like he
11 was placing great reliance on the slides?
12           MR. MOSKOVITZ:  Objection.
13    A.   Are you talking about the photographs?
14    Q.   Yes.
15    A.   Okay.  No, I don't think -- apparently he is
16 not putting a whole lot of, you know, he's not putting a
17 whole lot of thought into those slides being a factor
18 with the time of death determination.  I think he was a
19 little more certain about some of the other brain
20 findings.  But the changes in the brain really are not
21 something you can use.  I mean, you can describe them,
22 but they're not in any way, shape or form helpful to
23 determine a postmortem interval.
24    Q.   Do you agree that he, like any forensic
25 pathologist preparing to testify at the trial in this

1    objective evidence to support his conclusion that the
2    ambient temperature in Valerie Hill's apartment impacted
3    the time of her death." Have we covered this or is there
4    something more you would like to say?
5        A.   I think we've covered that, as well.
6        Q.   Doctor, is it your position; therefore, that
7    Dr. Mitchell fell below the standard of care and departed
8    from good, usual, customary and accepted practice in
9    performing the autopsy on Valerie Hill?
10       A.   No, I don't think he deviated from what would
11   be his autopsy examination. I think where the problem
12   arose is that there were some opinions that were
13   generated using scientific parameters that just fall
14   outside of what is generally accepted.
15       Q.   And in terms of that, if I take your testimony
16   and summarize it, are you saying you disagree with
17   certain of the opinions he formed based upon the autopsy
18   and the investigation?
19       A.   I disagree with his time of death determination
20   and some of the ways in which he came to that conclusion.
21   I disagree that the evidence indicates that Valerie Hill
22   was sexually assaulted. It's a possibility that she was,
23   I just don't think there's evidence to support it. I
24   haven't seen any results from a rape kit to know if
25   anything of importance was identified. I don't disagree

1    A.   To some degree, which is why you can't pinpoint
2    somebody's death to the minute or to the hour, which is
3    why the window of 48 hours encompasses a 12-hour period
4    to account for those variances that occur.
5    Q.   Doctor, in summary, are you saying that
6    Dr. Mitchell fell below the standard of care and deviated
7    from good, usual, customary and the accepted practice in
8    offering the opinion that the window of death was
9    somewhere between Friday night at 7 o'clock on the 27th
10   and the time of Valerie Hill being found on Monday?
11   A.   I'm not really saying he fell below the
12   standard of care, that's not really what I'm here for.
13   What I'm doing is giving you my opinion based on the
14   information associated with this case.
15        I think my opinion is different than
16   Dr. Mitchell's.  The scientific information, in my
17   opinion, clearly puts this death within a 48-hour period.
18   You know.  I mean, if Dr. Mitchell wasn't aware of some
19   of these factors and therefore gave an opinion that I
20   believe to be erroneous, so be it.  If there were other
21   factors involved in his conclusions, you know, so be it.
22   I don't know all the information associated with it.
23   Q.   So you are, I think saying, that Dr. Mitchell
24   in offering his opinion as to the window of death from
25   Friday to Monday was exercising judgment?

1  rendering opinions that are reproducible and known and
2  understood with respect to those parameters.
3      Q.  I want to focus on the scientific aspect of the
4  forensic pathologist's work.  Based on your experience
5  and to a reasonable degree of certainty from that
6  experience and training, is there any basis in science
7  within the field of forensic pathology that supports an
8  opinion that Valerie Hill's death could have occurred
9  more than 48 hours before she was discovered?
10     A.  No, I don't think the scientific data would
11 support a longer time frame than 48 hours.
12     Q.  So we talked or you spoke a bit with Mr. Julian
13 about outliers.  Now, is it fair to say that in human
14 experience, there's always outliers?
15     A.  Of course.  There's outliers in virtually
16 everything that goes on.
17     Q.  Right.  And so science is aware of outliers and
18 takes that into account and that's not unusual, right?
19     A.  Right.  You know.  You're not saying that a
20 hundred percent of people follow the exact same process.
21 What you're saying is that we have known reproducible --
22 known reproducible process to analyze these kinds of
23 things, and while there's a bell curve, the overwhelming
24 majority, you know, follow that process, and there are
25 outliers.  And usually there's reasons for those

1   outliers, but sometimes there's not or the reasons that
2   exist might not be known.
3       Q.   So when giving a scientific opinion or medical
4   opinion in your report, you talk about a reasonable
5   degree of medical certainty.  That's the type of opinion
6   that's based on reproducible data acknowledging that
7   there might be some extreme outliers, right?
8       A.   Correct.
9       Q.   And so would you say that in your experience in
10  providing an opinion on a window of the most likely time
11  of death, you would use outliers in expressing that
12  opinion?
13      A.   I would not.  I would not, because again,
14  you're looking at the overwhelming majority of cases, and
15  I suppose if you wanted to mention that outliers can
16  exist, but outliers are rare, you know, that would be a
17  truthful and accurate statement.  But as far as giving
18  opinions to a reasonable degree of medical certainty,
19  that encompasses what is known and reproducible and
20  doesn't really need to incorporate outliers, because
21  outliers exist in everything we do.
22      Q.   Are you aware of any scientific literature that
23  supports the conclusion that a room ambient temperature
24  of 62 degrees can prolong rigor mortis?
25      A.   Not to any significant measurable degree.  No,