EXHIBIT "Y"

S U S A N   S T O N E C I P H E R, called as a witness on behalf of the Defendant, having been duly sworn, was examined and testified, under oath, as follows:

MR. CALLE: Judge --

THE COURT: Hi. Good afternoon. Keep your voice up nice and loud for us, okay?

THE WITNESS: Okay.

MR. CALLE: Judge, may I approach with the district attorney, briefly?

THE COURT: Sure. Yeah.

(Counsel approached the bench. An off-the-record discussion ensued.)

MR. CALLE: Very good.

DIRECT EXAMINATION BY MR. CALLE:

Q   Good afternoon, Miss Stonecipher.

A   Good afternoon.

THE COURT: You'll have to do better than that. I'm just going to drop this down just a little bit. That chair doesn't go anywhere. You're the one that's got to.

BY MR. CALLE:

Q   Miss Stonecipher, I direct your attention to the month of March, 1987. Could you tell this Court the street

```
 1   S. STONECIPHER - DIRECT BY MR. CALLE                    926
 2   on which you lived?
 3        A    On Hickok Ave.
 4        Q    And did you have any cause to know Miss Valerie
 5   Hill at that time?
 6        A    She was my neighbor downstairs.
 7        Q    So would it be fair to say you lived upstairs
 8   from Miss Hill?
 9        A    Yes, I did.
10        Q    And that was with your mother, and your father,
11   and your siblings?
12        A    Yes.
13        Q    And there came a time when you learned that
14   Miss Hill was the victim of a crime?
15        A    Yes.
16        Q    And based upon your proximity and residence to
17   Miss Hill, and some other factors, did you ever give a
18   statement to Onondaga County authorities?
19        A    Repeat that.  I'm sorry.
20        Q    Did you ever give a statement to Onondaga
21   County --
22        A    Yes, I did.
23        Q    -- Onondaga County authorities?
24        A    Yes, I did.
25                  MR. CALLE:  Your Honor, I'd like this
```

S. STONECIPHER - DIRECT BY MR. CALLE                           927

                marked as a defense exhibit, if I may.

                        THE COURT:  J, okay.

                        (Affidavit was marked for identification

                as Defendant's Exhibit J, this date.)

                        MR. CALLE:  Thank you, Ms. Alexander.

BY MR. CALLE:

        Q       Miss Hill (sic), I'd like you to --
Miss Stonecipher, I would like you to take a look at Defense
Exhibit J and tell this Court what that is.

        A       An affidavit.

        Q       I beg your pardon?

        A       It's an affidavit.

                        THE COURT:  Whose affidavit, ma'am?

                        THE WITNESS:  Mine.  I'm sorry, mine.

                        THE COURT:  That's okay.

BY MR. CALLE:

        Q       And when was it given?

        A       Let's see.

                        THE COURT:  Bottom.

        Q       On the bottom.

        A       Okay.  March 30th of '87.

        Q       Do you recall signing -- did you sign that
affidavit?

        A       Yes, I did.

        Q       Do you recall signing that affidavit?

S. STONECIPHER - DIRECT BY MR. CALLE                               928

     A     Yes, I did.

     Q     Was it signed contemporaneously with the time it was typed up, that being March 30th, 1987?

     A     I believe so, yes.

     Q     Okay. Have you had occasion to read that affidavit?

     A     No.

     Q     Did you read it before you signed it?

     A     No, I don't believe so.

     Q     Would you read it here now today?

     A     Sure.

          THE COURT: To yourself.

          MR. FITZPATRICK: Judge, I'd object.

          THE COURT: Yes. I'm going to sustain the objection. What's the purpose of reading it? She hasn't indicated her memory needs any refreshing.

          MR. CALLE: Fine, sir. She said she never read it, that's my point.

          THE COURT: Well --

          MR. CALLE: All right.

BY MR. CALLE:

     Q     Miss Stonecipher, did you ever tell the Onondaga County authorities that on Saturday, the 28th day of March,

2    at approximately 8 or 8:30 in the morning, that you went in

3    the basement of your home at 250 Hickok Avenue to get your

4    work uniform shirt out of the dryer, and you encountered

5    Miss Hill?

6        A    That was not me, that was my mother.

7            MR. FITZPATRICK:  Judge, I'd object.

8            THE COURT:  Sustained.  That's a leading

9        question.

10   BY MR. CALLE:

11       Q    Did you ever give a statement to the police?

12       A    Yes, I did.  The day of the incident.

13       Q    Miss Stonecipher, did you ever see Miss Hill in

14   the hallway retrieving her cat?

15       A    Yes.

16       Q    On the weekend in question?

17       A    Friday.

18       Q    Did you ever tell the authorities that you saw

19   Miss Hill on Saturday?

20       A    No.  I don't recall.

21           MR. CALLE:  I now would ask that this

22       witness read this voluntary affidavit, Judge.

23           THE COURT:  Well, read it in its

24       entirety, or is there a part you want her to

25       read?

         MR. CALLE: I'd like her to read that part right there, ma'am, the last paragraph.

         MR. FITZPATRICK: I have the same objection, your Honor. She hasn't indicated that she needs her memory refreshed, nor is he allowed to impeach his own witness.

         THE COURT: She indicated that she didn't recall what she had said, so I'm going to let her see if her memory becomes refreshed.

         THE WITNESS: May I read it?

         THE COURT: To yourself, ma'am.

         THE WITNESS: Okay.

         (The witness read the affidavit.)

         THE COURT: Okay.

BY MR. CALLE:

    Q    Finished?

    A    (No verbal response.)

    Q    Miss Stonecipher, did you ever sign an affidavit which stated that you saw Miss Hill on Saturday, March 28th?

         MR. FITZPATRICK: I object to that question.

         THE COURT: Sustained as leading.

         MR. CALLE: Well, may we approach?

         THE COURT: Sure.

         (Counsel approached the bench. An off-the-

S. STONECIPHER - DIRECT BY MR. CALLE                               931

(record discussion then ensued.)

BY MR. CALLE:

Q    Miss Stonecipher, when was the last time you saw Valerie Hill alive, if you recall?

A    Friday.

Q    What date was that?

A    27th.

Q    Of March?

A    Yes.

Q    Where did you see her?

A    I seen her in the hallway.

Q    Is that the hallway of 248-250 Hickok?

A    Yes, yes.

Q    Do you recall what time that was?

A    I'd say around 8:30, 9:00.

Q    Is that a.m. or p.m.?

A    A.M.

Q    And where were you in relation to Miss Hill?

A    Repeat that. I'm sorry.

Q    Where were you in relation to Miss Hill?

A    I was going down the stairs to get my work shirt out of the dryer. She was in the hallway, in front of her door. Her cat had got out of her apartment, and she was trying to get the cat back into her apartment.

Q     Did you see the cat?

A     Yes, I did.

Q     Where was the cat?

A     He was in between her doorway and a pantry.

Q     And this was on Friday morning?

A     Yes.

Q     Did you ever tell the authorities that you saw Miss Hill on Friday -- on Saturday morning, March 28th, in the hallway at 248-250 Hickok?

A     I might have said that in my affidavit, with everything going on that morning -- see, I don't work Saturday mornings at all. And it was Friday morning that I go down in the basement and get my work shirts because I work a double on Friday.

Q     Did you read Defense Exhibit J?

A     Yes.

Q     Does that refresh your recollection as to what you told the police on the 30th of March, 1987?

A     Yes. That was the same day of the incident. Everything was really confusing that day. And they were asking, "Okay. What did you do?" This, that; this, that. "What day did you work?" And I did state Saturday, but as I recalled later, afterwards, I do not work Saturday mornings. I never work Saturday mornings. So it was Friday morning.

S. STONECIPHER - DIRECT BY MR. CALLE                                933

Q    Well, let me ask you this, Miss Stonecipher: Did you ever see Miss Hill's cat out in the hall at all?

A    Only that Friday.

Q    If I were to tell you that the cat was in the hall on Saturday morning, would that refresh your recollection as to what day you saw Miss Hill?

A    I wouldn't. My Saturday mornings don't usually start until like 11:00.

Q    But, Miss Stonecipher, we're dicussing not your usual conditions, but specifically that weekend. So I would ask you if I were to tell you that the cat was out on Saturday morning, would that change your testimony here today as to what day you last saw Miss Hill?

A    No.

MR. FITZPATRICK: I object to the form of the question.

THE COURT: Overruled. The answer is no?

THE WITNESS: No.

MR. CALLE: Nothing further. Thank you.

THE COURT: Any redirect or recross, Mr. Fitzpatrick?

CROSS-EXAMINATION BY MR. FITZPATRICK:

Q    Miss Stonecipher, in addition to the affidavit

2  which Mr. Calle showed you, two days after you gave that, the
3  police came back to you and reinterviewed you, isn't that
4  correct?
5      A    Yes.
6      Q    And when you gave the first affidavit, it was on
7  the same day when the woman downstairs from you had been
8  found strangled and murdered?
9      A    Yes.
10     Q    And did you sleep at 250 Hickok Avenue --
11     A    Yes.
12     Q    -- that night?
13     A    (No verbal response.)
14     Q    Would I be fair in characterizing you as being
15 a little bit upset on Monday, March the 30th?
16     A    Very much so.
17     Q    Your best recollection -- you're under oath here
18 now, and these people want to hear what you have to say --
19 your best recollection, as you sit here, is that the last
20 time that you saw Valerie Hill alive was the morning of
21 Friday, March the 27th?
22     A    Yes.
23     Q    Is that what you indicated in the affidavit that
24 you gave two days later?
25     A    Yes.

S. STONECIPHER - CROSS BY MR. FITZPATRICK                               935

    Q    And that affidavit was signed on April the 1st of 1987?

    A    Yes.

    Q    Did you -- do you know the defendant in this action, Hector Rivas?

    A    Yes.

    Q    Did you see him at 248 Hickok Avenue back in March of '87?

    A    Occasionally.

            MR. CALLE:  Object to the date.

            THE COURT:  I'm sorry?

            MR. CALLE:  Which date specifically?

            MR. FITZPATRICK:  I was referring just to the month.

            THE COURT:  To the month of March, '87, sir?  Now I'll overrule the objection.

BY MR. FITZPATRICK:

    Q    Your answer was?

    A    Yes.

    Q    Did you see him -- did you ever see him enter the apartment, 250 Hickok Avenue?

    A    Yes.

            MR. CALLE:  Object.  Beyond the scope of the direct exam.

THE COURT: No. I'll take that.

BY MR. FITZPATRICK:

Q   Your answer is yes?

A   Yes.

Q   Were some of those occasions when Miss Hill was not home?

A   Yes.

Q   Did you ever hear him bang on the door and whine to get let in?

MR. CALLE: Objection as to the characterization.

THE COURT: Sustained.

MR. CALLE: As to "whining."

THE COURT: Sustained.

BY MR. FITZPATRICK:

Q   Did you ever hear him bang on the door and ask to get in?

A   Yes, I did.

Q   Did you see him Friday night, March 27th, 1987?

A   Yes, I did.

Q   Do you remember as to about what time that was?

A   It was anywhere between 11 and 1.

Q   And you remember who you were with?

A   My ex-boy friend.

S. STONECIPHER - CROSS BY MR. FITZPATRICK                    937

    Q       What was his name?

    A       Jim Crimi.

    Q       What was Mr. Rivas doing when you saw him Friday night?

    A       Sitting in his car, parked with the parking lights on, smoking a cigarette, in front of my next door neighbor's house.

    Q       Thank you, Susan.

            THE COURT: Any redirect?

REDIRECT EXAMINATION BY MR. CALLE:

    Q       Do you recall what the vehicle looked like?

    A       It was -- I don't know my cars, so it was a two-door, looked like bluish-silver-gray.

    Q       In which direction was it facing?

    A       It was facing forward. It was facing up, so if you were to go from -- okay, how can I explain this one. If you were coming up our street from the 100 block to the 500 block, he was going up, he was going up like to the 500 block, that's -- his car was facing that way.

    Q       Well, my question is, if I were to come out of 248-250 Hickok, would the vehicle be facing to the left or to the right?

    A       I don't get it.

S. STONECIPHER - REDIRECT BY MR. CALLE                          938

    Q    You don't recall?

    A    I don't understand -- I don't understand what you're saying.

    Q    If you were to walk outside --

    A    Okay.

    Q    -- of your house, which direction was this vehicle facing, was it facing left or was it facing right?

    A    He was right there on the left.

    Q    Which direction were his headlights facing, left or right?

    A    He was facing the right.

    Q    He was facing right?

    A    The lights.

         THE COURT:  Were they pointed towards the area of the direction of your house, or away from the direction of your house?

         THE WITNESS:  Away.  They're like -- okay. Here's the house right here, here's our driveway.  He was like right there, right next to our driveway, right in front of our neighbor's house.  Is that what you're asking me?

BY MR. CALLE:

    Q    So if I were to come out of your house on that

night in question, the vehicle would be on my left facing

right?

    A    No. It would be on -- if I was facing my house,

it would be on the left.

          THE COURT: We've got some photographs

          here, Counselor, if that might help.

          MR. CALLE: Yes. I wouldn't mind seeing

          the photograph.

          THE COURT: Let's settle down, folks.

BY MR. CALLE:

    Q    I show you People's Exhibit 13. Miss Stonecipher,

would you indicate to the jury where the vehicle was

parked?

    A    Okay. Here's our driveway. He was parked

right here, right here (Indicating) on the side, so if I

was -- that's the left, right?

    Q    And which way was the vehicle facing?

    A    Diagonally. It was like right here on the road.

Here's the street. He was like right here (Indicating) --

    Q    Is that a two-way street?

    A    -- parked. Yes.

    Q    Are you any relation to Police Officer

Steven Stonecipher?

    A    He's a cousin, I believe.

Q    Were you aware that he was involved with the investigation of this crime?

A    No, not that I know of.

Q    You never spoke to Steven about the case?

A    I honestly don't even think I ever met Steven. There's a lot of Stoneciphers.

Q    So would your answer be no, you never spoke to him about the case?

A    No.

Q    Do you know where Valerie Hill usually parked her vehicle?

A    In her driveway.

Q    Did she ever use her garage?

A    A couple times she probably used the garage. I've always noticed her car in front of the garage, but she never --

Q    On the night in question, was her car parked in the driveway in front of the garage?

A    I don't recall.

           MR. FITZPATRICK:  Your Honor --

A    I don't remember.

           MR. FITZPATRICK:  I'm sorry.  I didn't mean to interrupt.  I just want to establish if we were talking about the night of the 27th.

S. STONECIPHER - REDIRECT BY MR. CALLE                          941

                MR. CALLE: Yeah.

                MR. FITZPATRICK: I'm sorry.

BY MR. CALLE:

    Q     You don't recall that?

    A     I don't recall it. I don't recall when -- I just ran in the house, so I don't -- I don't recall.

    Q     Where did Jim Crimi leave you off that evening?

    A     Right in front of our house.

    Q     And which direction was his car facing?

    A     His car was facing the opposite of Hector's, so here's -- here's -- Hector's is facing this way right here, Jim was like headlight to headlight.

    Q     Was Mr. Rivas' headlights on?

    A     Parking lights.

    Q     Was his interior light on?

    A     No.

    Q     Did you notice any specifics about the vehicle that would identify it as Mr. Rivas'?

    A     I seen him, eye contact, face to face.

    Q     This was between the hours of 11 p.m. and 1 a.m.?

    A     Yes.

    Q     Would you consent that that was nighttime?

    A     Yes.

    Q     And you used the front door that evening?

S. STONECIPHER - REDIRECT BY MR. CALLE                             942

  A    Yes, I did.

  Q    Did you notice any other vehicles there that evening?

  A    I didn't -- I didn't go through the driveway way, so, no, I didn't.

  Q    How about on the street?

  A    I don't remember, no.

  Q    So only one vehicle you noticed, and that was Mr. Rivas', correct?

  A    I was scared of Hector, so, yes, I did notice his car.

  Q    Nothing further.

  A    I thought it was very strange --

          THE COURT: That's okay.

          MR. FITZPATRICK: I have nothing more.

          THE COURT: You can step down, ma'am. Watch your step coming off.

          (Witness excused.)

          MR. CALLE: This is yours, do you want a copy?

          THE COURT: Could we --

          MR. CALLE: Judge, may we approach briefly?

          THE COURT: Yes.

943

(Counsel approached the bench. An off-the-record discussion ensued.)

THE COURT: Ladies and gentlemen, we're going to break for the day. I want you in the jury room 10:00 tomorrow. Don't talk about the case, form any opinions, do any research, visit any scenes, read anything or watch anything in the news media. 10:00, please, tomorrow.

(The proceedings of March 23, 1993 were adjourned.)

\*        \*        \*

## C E R T I F I C A T E

I, PATRICIA A. ALEXANDER, C.S.R.-R.P.R., an official reporter of the Supreme and County Courts, Fifth Judicial District, State of New York, do hereby certify that the foregoing is a true and correct transcript of my stenographic notes taken in the foregoing matter, at the time and place first herein mentioned.

_____
PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

September 30, 1993
DATE