UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SIDNEY MANES, Administrator of the Estate of
HECTOR RIVAS,

          *Plaintiff,*

vs.

          Civil Action No. 5:19-cv-844
          (BKS/TWD)

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
AND "JOHN DOES 1-10",

          *Defendants.*

---

## *DEFENDANT'S REPLY BRIEF ON BEHALF OF*
## *DR. ERIK MITCHELL*

Robert F. Julian, Esq.
Robert F. Julian, P.C.
*Attorneys for Defendants*
*William Fitzpatrick and*
*Erik Mitchell*
Office and Post Office Address
2037 Genesee Street
Utica, New York 13501
(315) 797-5610

# TABLE OF CONTENTS

                                                                                                         Page #

**POINT I – MITCHELL DID NOT FABRICATE EVIDENCE OR EXPAND HIS OPINION REGARDING THE TIME OF DEATH**..................................................... 1

**POINT II – MITCHELL DID NOT FABRICATE SCIENTIFIC OPINIONS**.................................................. 4

**POINT III – DR. WECHT'S AFFIDAVIT DOES NOT FIND THAT MITCHELL FELL OUTSIDE OF THE STANDARD OF CARE AND FAILS TO ACKNOWLEDGE THAT MITCHELL'S INITIAL OPINION THAT THE RANGE OF DEATH WAS 2-3 DAYS FROM DISCOVERY OF THE BODY**............................................... 7

**POINT IV – MITCHELL IS ENTITLED TO ABSOLUTE IMMUNITY**....... 10

# TABLE OF AUTHORITIES

Page #

*Thomas v. City of Troy*, 293 F. Supp. 3d 282, 300 (N.D.N.Y. 2018).................... 10

# POINT I

## MITCHELL DID NOT FABRICATE EVIDENCE OR EXPAND HIS OPINION REGARDING THE TIME OF DEATH

The Plaintiffs argue in the several points of their brief that Dr. Mitchell fabricated evidence for the purpose of convicting Hector Rivas, including the time of death. They allege in the Complaint that Mitchell extended out the time of death pursuant to Fitzpatrick's request. The flaw in that argument is that Mitchell made the determination that the victim died within 2-3 days of the discovery of her body before he ever knew that Hector Rivas was a possible suspect or that the issue of his alibi was existent and revolved around the events of Friday. There is no evidence of a grand conspiracy to extend the time of death window. Dr. Mitchell's note was made at or before the time Rivas was questioned on March 30, 1987. The autopsy was performed at 5:30 p.m. (Ex. A, pg. 17). Dr. Mitchell completed the narrative medical history at 7:45 p.m. on 3/30/87. (Ex. A, pg. 17). According to the First Amended Complaint, Rivas was questioned for 12 hours on 3/30/87 and told at 5:30 p.m. of Hill's death two hours into the questioning. (Para. 40). Rivas was being questioned as Dr. Mitchell completed his autopsy and report. The conspiracy could not have existed on 3/30/87, because the timing does not make sense. The proof of that is the Plaintiff's theory in their complaint that years later when he took office in 1992 as District Attorney, Fitzpatrick asked Mitchell to "revise Hill's autopsy report to expand the time of death to include Friday, March 27, 1987, when Rivas' alibi was not as strong." (Para. 65). Mitchell did not need to expand the time of death at Fitzpatrick's request. He had already initially formed the opinion on 3/30/87 at 7:30 p.m. that the decedent could have been killed and opined on 3/30/87 that the window period was Friday to Monday. By innuendo the Plaintiff seeks to have this court believe

1

that the so-called conspiracy occurred on 3/30/87. It did not, and that is not what they alleged in the Complaint.

While it is unfortunate this fact was not considered by the Second Circuit, it is stubbornly a fact that supports the integrity of Dr. Mitchell's opinion in this case. Dr. Mitchell based his opinions as to the range of time of death of 2 to 3 days based upon the following on 3/30/87:

1. Being present in the apartment observing the decedent's body on the floor, feeling the temperature of the apartment which was in his opinion 62 degrees with a colder basement below which would have impacted rigor by slowing it down. (Ex. A, pg. 6, 10.)(Ex. B, pgs. 9-10)(Ex. C-1, pgs. 905-906).

2. That the autopsy was performed on the same day that he opined her death to be within 2-3 days of being found and consequently that she could have died on Friday. Only Dr. Mitchell had the advantage to observe the body and to actually transect its tissue giving him a further scientific basis for his opinion. (Ex. A).

3. The Kodachrome slide photographs of the brain demonstrate changes that support his time of death opinion, as does the appearance of the brain at autopsy. (Ex. N)(Ex. E, pg. 84).

4. Dr. Mitchell later utilized in terms of his opinion the investigative facts in the case after the investigation had begun and after Mitchell concluded based on the temperature of the room that the process of rigor had been slowed by the temperature. Dr. Jumbelic and Dr. Mitchell both testified that it was the standard of care and entirely appropriate for a pathologist to consider the facts and circumstances surrounding the decedent's death in formulating an opinion and to not consider those facts would be below the standard of care. (Jumbelic Affirmation, Ex. Q)(Ex. C-1, pg. 887-888).

Dr. Mitchell's opinion as to the likely date within the two-to-three day range became more certain when he was provided with a hypothetical as set forth in our initial brief.

Dr. Spitz chooses to discount the facts that surround the decedent's demise:

1. The decedent was not seen after Friday night.
2. Her father and best friend tried to reach her all weekend.
3. Her cat was left out.
4. Her car was not moved from the time she returned from having it serviced on Friday.

(Ex. X, pgs. 26-27).

The Plaintiff's entire conspiracy is undone by its statement of facts at page 8 of their Brief. They acknowledge that:

> "During the investigation, Fitzpatrick learned that Rivas had an alibi, but that alibi did not cover March 27, 1987. (p. 52). In reviewing the file to prepare the prosecution, Fitzpatrick saw Mitchell's report that Hill's death could have occurred "2-3" days before her body was found. (p. 53). Fitzpatrick's entire theory of the case was based on Hill dying late Friday night, March 27, 1987, or early Saturday morning, and if she died later on Saturday or on Sunday she would have to contend with Rivas' alibi and would need an entirely new theory of the case to go forward with a prosecution." (p. 54 of Plaintiff Brief).

In this analysis the Plaintiff concedes that Mitchell arrived at his opinion prior to any knowledge as to whether or not Rivas was a suspect or indeed even had an alibi. There is not one iota of proof in the record that suggests that Mitchell knew that Rivas was a suspect or anything about his alibi or lack thereof when he wrote in his records on the day the body was found that the time of window of death was 2-3 days and immediately after performing the autopsy. The concept that this was fabricated evidence as a part of a conspiracy is inaccurate and insufficiently demonstrated.

3

## POINT II

## MITCHELL DID NOT FABRICATE SCIENTIFIC OPINIONS

Plaintiffs' expert Dr. Spitz testified Mitchell did not deviate from the standard of care in the work he performed on this case.

It is clearly not the standard of care for pathologists to fabricate evidence or to misstate science. Defendants' expert pathologist Dr. Mary Jumbelic opines that the standard of care as it pertains to the investigation, the conduct of the autopsy and the trial testimony by Dr. Mitchell was consistent with the standard of care for a practicing pathologist. (Ex. Q).

To Plaintiff's consternation, Dr. Jumbelic is joined in that opinion by Plaintiff's only pathology expert, Dr. Daniel Spitz, who opined in his deposition that Mitchell did not fall below the standard of care either in his conduct of the examination, his autopsy or in his testimony. The existence of that testimony is devastating to Plaintiff's theory that Mitchell fabricated medical evidence or opinions in the investigation of the case and in his testimony.

It is not uncommon for forensic pathologists to disagree with regard to facts and how the medicine is applied to the facts. Dr. Spitz conceded that while Dr. Mitchell's testimony and opinions were an outlier in his opinion, but within a bell shape curve, and that Mitchell's time of death opinion was at the outer part of the curve. His testimony could not be a fabrication and be consistent with the standard of care as reflected by Dr. Spitz's bell-shaped curve. In order for Dr. Spitz to arrive at his outlier opinion, he had to rely on the incorrect theory that Valerie Hill was alive and ignore all the other facts that demonstrated Valerie Hill died on Friday night. (Ex. X pg. 26-27)

The Plaintiff's theory of scientific evidence fabrication is undercut by Dr. Spitz's testimony in which he finds that Dr. Mitchell met the standard of care for pathologists and acknowledged that his own opinion was subject to inconsistency.

- He opined the autopsy was not below the standard of care. (Ex. X, pg. 57)
- He opined Dr. Mitchell's opinion testimony based on the hypothetical he was given at trial was not below the standard of care and that he had no criticism of it. (Ex. X, pg. 26, 62, Ex. C-1, pg. 890). He acknowledged he was not aware of those facts that were set forth in the transcript and that "I'd have to verify those facts to utilize them to any degree in an opinion." (Ex. X, pg. 27, line 16-17; see pgs. 26—27). He did not read the trial transcript, just Dr. Mitchell's testimony. (Ex. X, pg. 26).
- He testified he did not criticize Mitchell's opinion at page 84 of Mitchell's deposition regarding findings observed in the brain slides which Mitchell deemed as supportive of his time of death analysis. (Ex. X, pg. 43-44 Spitz depo)
- He acknowledged that even though Mitchell's opinion regarding the temperature of the apartment as impacting the length of rigor was in Dr. Spitz's opinion an outlier, he also admitted that there were peer reviewed articles that temperature can extend rigor by as much as 72 hours. (Ex. X, pg. 40-41) (Ex. X, pg. 36-37)
- He agreed that circumstantial evidence must be used by a forensic pathologist in determining time of death. (Ex. X, pgs. 19, 27).
- He acknowledged that he was unaware that Susan Stonecipher's statement that she saw the decedent alive on Saturday had been changed and Stonecipher had testified she saw the decedent during the day on Friday. (Ex. X, pg. 18-23). This was

5

inconsistent with Dr. Spitz's report in which he relied on the inaccurate initial Stonecipher affidavit.

- He acknowledged that he did not read the trial transcript and did not therefore read the testimony that helped form the basis for Mitchell's trial testimony. (Ex. X, pg. 26)

- Admits that judgement was used by Mitchell in his work on the case. (Ex. X, pg. 28-30)

Both Dr. Spitz and Dr. Wecht provided no credible support for the Plaintiff's fabrication theory. Both conveniently overlooked Dr. Mitchell's opinion on March 30, 1987 that there was a 2-3 day from discovery window of death. (Ex. A, pg. 17). Both had Susan Stonecipher's trial testimony wrong, Ms. Hill was not seen on Saturday morning. (Ex. Y, pgs. 930-932). Each must base their opinions on conjecture regarding the temperature of the apartment when the decedent was found. Only Dr. Mitchell was there in the apartment in real time. Dr. Spitz concedes that Mitchell's opinion that rigor could be as long as 72 hours, this is reported in the peer-reviewed literature and included in the bell-shaped curve for determining time of death. As Defendant's expert Dr. Jumbelic notes in her Affirmation, Dr. Mitchell's opinion as to the range of time of death remained consistent from the day the autopsy was performed through his testimony. His scientific opinion, including regarding rigor being impacted by temperature in the apartment and the basement, are supported by medical literature and the standard of care.

While Dr. Spitz and Dr. Wecht disagree with Dr. Mitchell as to range of time of death, Dr. Jumbelic agrees with his opinion. There was no fabrication of evidence designed to convict Rivas. The four pathologists in the case opining are divided in their opinions, a classic battle of the experts with no proof of fabrication.

## POINT III

**DR. WECHT'S AFFIDAVIT DOES NOT FIND THAT MITCHELL FELL OUTSIDE OF THE STANDARD OF CARE AND FAILS TO ACKNOWLEDGE THAT MITCHELL'S INITIAL OPINION THAT THE RANGE OF DEATH WAS 2-3 DAYS FROM DISCOVERY OF THE BODY**

Dr. Wecht is deceased and his affidavit should not be considered.

Dr. Wecht in his five-page affidavit fails to acknowledge that Dr. Mitchell was of the opinion on the day he saw the body and did the autopsy that the time of death occurred within 2-3 days. Dr. Wecht's affidavit at page 13 states "Dr. Mitchell's testimony about why he enlarged the period of time of death does not make sense." The fact is Dr. Mitchell did not enlarge the period of time of death. It was his opinion at the threshold once he had done his examination and due diligence that the likely time of death was 2-3 days. (Ex. A. pg. 17) The premise that he somehow engaged in a modification of that opinion as inferred by Dr. Wecht as alleged by Mr. Manes and as opined by the Second Circuit simply is contrary to the facts in the case. (PO 10146)

Dr. Wecht states at paragraph 15 "I believe that Dr. Mitchell was accurate in his original opinion of up to 48 hours but became clouded by the slight room temperature decrease and his misinterpretation of brain decomposition." (PO 10146). This is again utterly inaccurate as it ignores the fact which is that Dr. Mitchell on the day he saw the body was in the room attending to the investigation, formed the opinion and wrote that he believed the time of death was 2-3 days prior to his finding the body. (Ex. A, pg. 17)

Consequently, Dr. Wecht's opinions are based upon a faulty premise and are conjecture and not scientifically germane to the issues at bar.

While Defendant objects to Dr. Wecht's Affirmation being used as he cannot testify in this case, his affidavit is based on pure speculation in crucial areas. Specifically in paragraph 5 he states the following:

7

> "In this case, I feel that the apartment likely did have temperate conditions, with the temperature around 70°F, for the following reasons: The first is that Ms. Hill was able to walk around the apartment in only a robe and shirt (as she was found), indicating the apartment was unlikely to have been cold. The second is that all the plants appeared green, healthy, and growing indicating again that the apartment was likely kept at a comfortable temperature. Dr. Mitchell, in his testimony and scene investigation report, stated that the apartment was very cool, but he has no actual temperature reading recorded to substantiate what he said in Court, namely, that he thought it was 62°F. Also, he may have come to the scene from a heated environment, such as his car, giving him the impression that the temperate climate was cool. Finally, with all the officers, investigators, and Dr. Mitchell present, the temperature may have decreased due to numerous door openings." (emphasis added) (Ex. 3 to Rickner Declaration page 3)

Dr. Wecht, in order to discount Dr. Mitchell's opinion, had to make those speculations that are without factual or scientific basis and would likely not be permitted in evidence at trial. Moreover, he has the affront to ignore the facts and to speculate on the foregoing overriding and discounting the opinion of the trained forensic pathologist who was actually on the scene, Dr. Mitchell.

Dr. Wecht's orgy of speculation continues at paragraph 7:

> "I feel the temperature was more temperate. Even if the temperature averaged around 60°F to have rigor without any flaccidity, no matter if easily broken, the time of death would not have been more than 48 hours."

Dr. Wecht then goes through his analysis of rigor and the like. He states in the concluding paragraphs of his affidavit that at paragraph 12:

> "During the trial, a great deal was made about the last time Ms. Hill was seen or spoken to. There was a police report indicating she may have bene seen as late as 8:30 A.M., on Saturday, March 28, 1987, and not on Friday night, March 27th."

Dr. Wecht once again is using facts that were clearly demonstrated to be incorrect. If he had read the actual trial transcript, he would have seen that the witness who initially told the police she saw the decedent on Saturday at 8:30 a.m. in fact within several days of her police interview

8

corrected and indicated that she last saw Valerie Hill on Friday and not Saturday. (See testimony of Susan Stonecipher attached Ex. Y, pg. 930-932)(Dr. Spitz also relied on this incorrect fact in his report Ex. 4, pg. 2).

The scientific process as indicated by Dr. Jumbelic requires the forensic pathologist to accumulate facts and utilize those facts along with scientific findings to make a determination. Dr. Wecht's fact finding is deficient in that he was unaware of Dr. Mitchell's initial opinion on the day of the autopsy, that the time of death could have been within 2-3 days of the decedent being found or therefore could have occurred on Friday and he was unaware that Ms. Stonecipher had testified in Court as well as provided the police with a corrected testimony as to when she had last seen Valerie Hill.

Finally, it is stunning that Dr. Wecht who was also a attorney would conclude that based on hearsay evidence that Dr. Mitchell ever opined that the time of death was 48 hours. In paragraphs 13 and 14 of his affidavit he appears to be relying upon the affidavit of Sgt. Timothy Phinney, a police officer who indicated that "Dr. Mitchell's preliminary estimate on the time of death of the victim . . . was sometime Saturday the 28th of March afternoon and Sunday morning." . . (Ex. U). Dr. Mitchell has made it clear both in his testimony and in the actual record that that was not his opinion, that it was his opinion that she had been dead within 2-3 days of being found. Dr. Mitchell did not author that record and is not bound by it. To utilize pure hearsay without any foundational basis in this way is utterly unfair to Dr. Mitchell. In fact, when asked at trial, Dr. Mitchell testified "As I had no communication with them and generated no such report, I think you are going to have to talk to the person who wrote that article." (Ex. C-1, pg. 895). Dr. Mitchell further testified he never tied himself to that time. (Ex. C-1, pg. 895).

## POINT IV

## MITCHELL IS ENTITLED TO ABSOLUTE IMMUNITY

While the Defendants rest on our initial brief in support of the motion, we must correct a misimpression promulgated by the Plaintiff in their brief. In *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 300 (N.D.N.Y. 2018), Judge Suddaby in this case denied a motion to dismiss based on immunity of the medical examiner, based on the pleadings but stated in giving leave to reapply ostensibly later in the case for summary judgment:

> The Court is mindful of the public policy arguments regarding immunity for medical examiners who perform autopsy reports and their decision and order should not be construed to foreclose future motion practice on this point once additional information is available.

Dr. Mitchell's testimony is the basis of the claim of liability in this case. The claim is he expanded the time of death window when he testified at trial. He did not. He testified consistent with his opinion on March 30, 1987. The claims of his not following scientific standards are contradicted as set forth above and constitute a disagreement between experts solely. All causes of action should be dismissed.

Dated: January 21, 2025

Robert F. Julian, Esq.