**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

FLOR RIVAS, Executor of the Estate of Hector Rivas, also known as FLORA RIVAS, formerly known as SIDNEY MANES, administrator of the estate of Hector Rivas,

Plaintiff,

5:19-cv-00844 (BKS/TWD)

v.

ONONDAGA COUNTY, WILLIAM FITZPATRICK, DR. ERIK MITCHELL, and JOHN DOES 1-10,

Defendants.

---

**Appearances:**

*For Plaintiff:*
Joshua S. Moskovitz
Rob Rickner
Stephanie Panousieris
Rickner Moskovitz LLP
14 Wall Street, Suite 4C
New York, NY 10005

Scott A. Korenbaum
The Law Offices of Scott A. Korenbaum
14 Wall Street, Suite 1603
New York, NY 10005

*For Defendant Onondaga County:*
John E. Heisler, Jr.
Mark A. Ventrone
Onondaga County Department of Law
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, NY 13202

*For Defendants Fitzpatrick and Mitchell:*
Robert F. Julian
Office of Robert F. Julian
2037 Genesee Street
Utica, NY 13501

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Flor Rivas, as executor of the estate of Hector Rivas, brings this action against Defendants Onondaga County, District Attorney William Fitzpatrick, and the County's former chief medical examiner ("ME"), Dr. Erik Mitchell, asserting claims under 42 U.S.C. § 1983.[1] (Dkt. No. 1). Presently before the Court are Defendant Fitzpatrick's and Defendant Mitchell's motions for summary judgment—in which the County seeks to join—as well as the County's motion to dismiss. (Dkt. Nos. 140, 141, 142). The motions are fully briefed. (Dkt. Nos. 140, 141-3, 142-3, 152, 153, 154-4, 155-4). For the reasons that follow, Fitzpatrick's motion is granted in its entirety, Mitchell's motion is granted in part and denied in part, and the County's motion is denied in its entirety.

## II. FACTS[2]

This action arises out of Hector Rivas's conviction for the 1987 murder of Valerie Hill. Mitchell participated in the original investigation as the county ME and testified before the grand jury and at trial. (Dkt. No. 142-2, ¶¶ 1–2, 8). Fitzpatrick, then the newly elected Onondaga County DA, prosecuted the case which resulted in Rivas's 1993 conviction. (*See* Dkt. No. 141-2, ¶¶ 2, 4–5). The County admits that both were "final policymaker[s]" in their respective offices. (Dkt. No. 151-1, at 1, 4; *see also* Dkt. No. 141-2, ¶ 37; Dkt. No. 141-18, at 120–21).

---

[1] In June 2025, Flor Rivas, in her capacity as the estate's executor, was substituted as Plaintiff after the estate's administrator, Sidney Manes, passed away. (*See* Dkt. No. 162).

[2] The facts, which the Court construes in the light most favorable to Plaintiff as the nonmoving party, are drawn from the parties' exhibits submitted in connection with the summary judgment motions. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). Aside from their respective affidavits, Fitzpatrick and Mitchell have submitted identical exhibits, so the Court cites only to Fitzpatrick's. The parties' submissions have also raised various evidentiary challenges which the Court addresses in its analysis below. Any challenged documents not discussed there are either irrelevant to, or not dispositive on, the Court's conclusions.

After years of litigation in state and federal court, the U.S. Court of Appeals for the Second Circuit overturned Rivas's conviction. *See Rivas v. Fischer*, 780 F.3d 529, 532–33 (2d Cir. 2015). The Second Circuit held that Rivas had made a sufficient showing of actual innocence allowing his otherwise time-barred 28 U.S.C. § 2254 claims to proceed, and that he had received ineffective assistance of counsel. *Id.*; *see also Rivas v. Fischer*, 687 F.3d 514, 517–18 (2d Cir. 2012). Rivas passed away before he could be retried. (Dkt. No. 141-2, ¶ 29).

In this civil rights action, his estate seeks damages for Defendants' allegedly unconstitutional conduct during the investigation and prosecution. (Dkt. No. 16, at 45). As now relevant, Plaintiff has asserted an individual-capacity fabrication of evidence claim against Mitchell and *Monell* claims against the County for the same alleged fabrication, as well as Fitzpatrick's purported failure to disclose potentially exculpatory evidence. (*See id.* at 35, 37).

### A. The 1987 Investigation of Hill's Murder

Hill's brother and father—who had last seen Hill at a dinner the evening of Friday, March 27, 1987—discovered her deceased in her Syracuse apartment the following Monday, March 30. (Dkt. No. 141-39, at 4–5; Dkt. No. 141-41, at 9, 13, 16). When Mitchell arrived at the scene between 3:00 and 4:00 p.m., he observed Hill "lying face down on [the] floor"; she had been strangled with the robe's sash. (Dkt. No. 142-2, ¶ 2; Dkt. No. 141-39, at 6). Her "body was in full rigor with fixed anterior livor."[3] (Dkt. No. 141-39, at 6; Dkt. No. 142-2, ¶ 2). As Mitchell

[3] As Mitchell explained at trial and the parties' experts explain here, the presence of rigor mortis and livor mortis are two data points commonly, though not exclusively, used to estimate how long a person has been deceased. (*See* Dkt. No. 141-7, at 6–8; Dkt. No. 141-40, at 3; Dkt. No. 151-4, at 4). Rigor mortis is the "stiffening" of "muscles" that occurs after a person dies. (Dkt. No. 141-7, at 6; Dkt. No. 151-4, at 5). Under ordinary conditions, it progresses and recedes at a mostly predicable rate; though Mitchell and the parties' experts disagree on the degree to which the temperature of the place where a body resides can affect this timeline, all agree that it has some effect. (*See* Dkt. No. 141-7, at 42–43; Dkt. No. 141-40, at 5; Dkt. No. 151-4, at 4). Livor mortis is the "settling of blood" under the skin after the heart stops beating; initially, the pooled blood can be displaced when touched, or when the body is moved, but after a mostly predicable interval of time—again, under ordinary conditions—the blood can no longer move, at which point the body is said to have "fixed" livor. (*See* Dkt. No. 141-7, at 7–8; Dkt. No. 151-4, at 4–5).

used the term in 1987, "full rigor" meant that each of the muscle groups he "tested" had "some degree of rigor." (Dkt. No. 141-18, at 24–25). Although Mitchell could have more specifically quantified "which muscle groups ha[d] rigor" and "how much," he did not "have a specific note of it." (*Id.* at 25).

Mitchell's scene investigation notes stated that Hill's apartment was "relatively cool as was the basement through ceiling from the floor upon which [Hill] lay." (Dkt. No. 141-39, at 6). Although not reflected in those notes, Mitchell later testified at Rivas's trial (and in connection with this action) that the temperature in the apartment was 62 degrees.[4] (Dkt. No. 141-7, at 43; Dkt. No. 141-18, at 32, 76–77; Dkt. No. 142-2, ¶ 2).

Mitchell autopsied Hill's body that evening, around 5:30 p.m. (*See* Dkt. No. 141-39, at 7, 14, 18; Dkt. No. 141-18, at 33). He again observed "fixed anterior livor" and noted that there was still "full rigor," as well as that the body was "coming out of rigor." (Dkt. No. 141-39, at 7). After documenting Hill's injuries, Mitchell examined her brain and fixed it in formalin so that a neuropathologist could examine it later. (*See id.* at 8–11, 13; *see also* Dkt. No. 142-2, ¶ 5). The neuropathologist's notes reflected that Hill's brain had a "normal structure without evident abnormality" and "essentially normal development," but that the "deeper areas of the brain [were] riddled with cavities developed due to decomposition." (Dkt. No. 141-39, at 13).

Because of "the variability of ascertaining a specific time of death," (Dkt. No. 142-2, ¶ 6), Mitchell could not determine the exact date Hill died, so he marked the death date on Hill's

[4] When asked to identify the document reflecting the 62-degree temperature in his deposition, Mitchell responded that "there was a reference to it at one point in one of the records"; he was also unsure as to whether that measurement was the temperature of the apartment or the basement. (Dkt. No. 141-18, at 32, 77; *see also* Dkt. No. 142-2, ¶ 7 n.1). He was sure, however, that the measurement was not an estimate. (Dkt. No. 141-18, at 76–77). The Court notes that, during the habeas proceedings decades later, an Onondaga County assistant DA represented to the Second Circuit that he possessed "paperwork from the evidence technician at the time [that] documented the temperature at the apartment [as] between 62 and 64 degrees." (Dkt. No. 151-17, at 53). This paperwork does not appear to be part of the summary judgment record. In any event, as explained below, this issue is not dispositive.

death certificate "unk." (Dkt. No. 141-39, at 21; Dkt. No. 141-18, at 42–43). This was his normal practice. (Dkt. No. 142-2, ¶ 7). However, Mitchell's autopsy report gave the following estimated window of death: "Last seen Friday by the father. Appears as though deced. was there appx. 2–3 days" since her body was found on March 30. (Dkt. No. 141-39, at 18; Dkt. No. 141-18, at 40). Peter Tynan, then a sergeant with the Syracuse Police Department working on the Hill investigation, also recalls Mitchell telling him that Hill had "died at least two days before her body was found." (Dkt. No. 141-21, at 19, 21–22).

This conclusion, that Hill could have died as early as the evening of Friday, March 27, 1987, is the evidence Plaintiff asserts Mitchell fabricated. (*See* Dkt. No. 152, at 25–28). The autopsy report did not contain Mitchell's reasoning, but he now states that he based his estimate on his examination of Hill's body, the temperature of Hill's apartment, and "circumstantial evidence" as to when she was last seen.[5] (*See* Dkt. No. 142-2, ¶¶ 6–8, 12; *see also* Dkt. No. 141-18, at 43–46, 76–77). Mitchell also states that the neuropathologist's observations of Hill's brain fixed in formalin—although made at least two to eight weeks after the autopsy, (*see* Dkt. No. 141-18, at 47)—were "[a] component of [his] global assessment regarding the time of death," as the cavities observed "are seen more commonly in persons who have been dead for a longer period of time." (Dkt. No. 142-2, ¶ 5; *see also* Dkt. No. 141-18, at 85–86). Photos of the inside of Hill's brain were memorialized in Kodachrome slides, (*see* Dkt. No. 141-27); however, Mitchell did not review these until after his grand jury testimony, (*see* Dkt. No. 141-18, at 82).

---

[5] Specifically, Mitchell states in his affirmation:

> In the case of ascertaining rigor, I had factors which I considered with regard to both temperature of the household and the changes in the brain that were significant to me as well as the circumstantial evidence to place the time of death as more likely late on Friday the 27[th] to early morning hours of the 28[th].

(Dkt. No. 142-2, ¶ 12). The only circumstantial evidence reflected in the 1987 autopsy report was that Hill's father last saw her on the evening of Friday, March 27, when he had dinner with Hill. (*See* Dkt. No. 141-39, at 18).

He acknowledges now, as he did on cross-examination at trial, that his conclusion that Hill could have died on March 27 "was 'probably' on the 'outside edge of possibility.'" (Dkt. No. 142-2, ¶ 8 n.2 (quoting Dkt. No. 141-7, at 44); *see also* Dkt. No. 141-6, at 9 (identical grand jury testimony)).

Early in the investigation, Rivas became a suspect because he had previously dated Hill. (Dkt. No. 141-21, at 19–20). The same day Hill's body was found, police applied for a warrant to search Rivas's Cazenovia residence. (Dkt. No. 141-36, at 2). The application stated in relevant part that "Dr. Mitchell's preliminary estimate on the time of [d]eath . . . was sometime [S]aturday the 28th of March afternoon, and [S]unday morning the 29th of March 198[7]." (*Id.* at 3). Mitchell now asserts that this was "not an accurate representation of [his] opinion," (Dkt. No. 142-2, ¶ 8); and in his deposition, he stated that he had no recollection of speaking with the officer who completed the application, (Dkt. No. 141-18, at 88–91).

A state judge issued the warrant, (*see* Dkt. No. 141-35, at 2), and police searched Rivas's home, finding a "shrine" with Hill's picture, burning candles, and a statue of the Virgin Mary, (Dkt. No. 141-2, ¶ 10; *see also* Dkt. No. 141-41, at 95–97). Police also interviewed Rivas. (Dkt. No. 141-41, at 36–44). Ultimately, the DA's office did not prosecute him in 1987 because it did not believe there was sufficient evidence. (Dkt. No. 141-21, at 20–21).

**B. Initial News Reports of Mitchell's Misconduct**

As early as October 1987—after the original Hill investigation but before Rivas's prosecution—local newspapers began reporting about "turmoil" in the ME office, which Mitchell had headed since 1983. (Dkt. Nos. 151-7, 151-8, 151-9; *see* Dkt. No. 142-2, ¶ 1). Specifically, in the "several months" preceding October 1987, family members of decedents complained "that Mitchell ha[d] failed to complete death certificates" or "inform them of the causes of death." (Dkt. No. 151-7, at 1, 2). Additionally, the "only other physician in the office"

had resigned because of "disagreements with Mitchell," and other employees had quit. (*Id.* at 1). The county executive, "acknowledged . . . that the office ha[d] problems," but Mitchell nevertheless had his (and the health commissioner's) "total support and confidence." (*Id.*).

A December 1988 article detailed a defense attorney's claims that Mitchell "may have misled" a jury in a homicide case when discussing whether the injuries of the type found on the child victim could have been caused by CPR. (Dkt. No. 151-8, at 1). The article also stated that "new evidence show[ed] [that another] autopsy done in Onondaga County was labeled a homicide when it turned out later the injuries were caused by CPR." (*See id.*).

Finally, an April 1992 article—principally concerning another ME office employee who had been charged with state child sex crimes—recounted a "seminar" held at that employee's residence as well as at Mitchell's. (Dkt. No. 151-9, at 3). The seminar was advertised to "law enforcement agencies staff" and consisted of "field classes" on "the discovery of human remains." (*Id.*). To facilitate the classes, a "variety of human and animal bones," apparently "donated" from the ME office, were buried in that employee's and Mitchell's yards. (*See id.*). The remains stayed at the employee's residence long after the seminar concluded. (*See id.*).

### C. Rivas's 1992-1993 Prosecution and Contemporaneous Allegations of Mitchell's Misconduct

Fitzpatrick did not participate in the 1987 investigation. (Dkt. No. 141-2, ¶ 2; *see also* Dkt. No. 141-19, at 19–20). He was elected district attorney in November 1991 and took office the following January. (Dkt. No. 141-2, ¶ 4; Dkt. No. 141-19, at 19–20). Shortly thereafter, Fitzpatrick started revisiting "cold cases," and although he did not have Hill's case "specifically in mind," Tynan—who had since begun working as an investigator for the DA's office—brought the case to Fitzpatrick's attention. (Dkt. No. 141-2, ¶ 4; Dkt. No. 141-19, at 21, 23–24; Dkt. No. 141-21, at 19, 22–24). After reviewing the file, Fitzpatrick determined that there was sufficient

evidence to prosecute Rivas and prepared to present the case to a grand jury. (Dkt. No. 141-2, ¶ 4; Dkt. No. 141-19, at 24–25).

To prepare for the grand jury, Fitzpatrick and Tynan interviewed witnesses and studied the 1987 investigation files. (Dkt. No. 141-2, ¶¶ 5–6; Dkt. No. 141-19, at 24–26). Fitzpatrick believed that Hill had likely been killed on the evening of Friday, March 27, based on Mitchell's autopsy report, the fact that "Rivas had no alibi for that date and time frame," and other circumstantial evidence. (*See* Dkt. No. 141-2, ¶ 5; Dkt. No. 141-19, at 28–31). Fitzpatrick also spoke to Mitchell in October or November 1992 to prepare his grand jury testimony; before that, Tynan "likely" also "confirmed with Dr. Mitchell" that he still thought that Hill could have died as early as March 27, though Tynan does not remember doing so. (Dkt. No. 141-2, ¶ 7; Dkt. No. 141-19, at 26–27; Dkt. No. 141-21, at 26–27). At some point, though he does not recall when, Tynan prepared a note titled "Re: Dr. Mitchell," which stated that the "body ha[d] decomp, including brain (swiss cheese)," and "pushes T.O[.]D. limits further out. (Good!!!)" (Dkt. No. 151-6; *see also* Dkt. No. 141-21, at 29–31).

If Hill could not have died on the evening of March 27 or in the early morning of March 28, that fact "would have been inconsistent with [Fitzpatrick's] theory of the prosecution" and "something that [he] would have had . . . to overcome somehow and account for [Rivas's] whereabouts." (Dkt. No. 141-19, at 30). According to Fitzpatrick, "[h]ad Dr. Mitchell's opinion been inconsistent with [his] theory of the prosecution [he] would not have undertaken to present this matter to the grand jury when [he] had and under the circumstances then present." (Dkt. No. 141-2, ¶ 19).

Fitzpatrick presented the case to the grand jury in the fall of 1992, and Mitchell testified. (*See* Dkt. Nos. 141-6, 141-41). Mitchell stated that he had found the body in rigor, which

commonly tends to subside "[a]fter a period of a day or two." (Dkt. No. 141-6, at 4). As noted above, Mitchell testified that although it was "possible" that Hill died on the evening of Friday, March 27—more than two days before her body was found—"[i]t's on the outside edge of that possibility." (*Id.* at 9). Though the body was still in rigor, he explained, "she was on the floor, which is the cooler area of the house, compared to . . . if you're higher up on the bed or something," and "that tends to prolong the process of rigor." (*Id.* at 9–10). The grand jury indicted Rivas. (Dkt. No. 141-41, at 236).

Before Rivas's trial, which would start on March 17, 1993, (*see* Dkt. No. 141-2, ¶ 23(3)), additional allegations of Mitchell's misconduct came to light in the local news. (*See* Dkt. Nos. 151-14, 151-15). A March 3 article detailed accusations of three ME office employees—including Dr. David Rigle and toxicologist William Sawyer—that Mitchell had undertaken "unethical and possibly illegal practices over the past five years." (Dkt. No. 151-14, at 1). The allegations included, *inter alia*, that Mitchell had (1) exhibited "bizarre behavior" since 1987; (2) ordered employees to "dice up brains and other organs and flush them down the sink," instead of properly disposing of them; (3) improperly handled mercury and "other toxic chemicals," endangering county employees; and (4) "threw a scalpel at an employee" during an autopsy. (*Id.* at 1, 2). According to the county health commissioner—who had met with the county executive concerning the allegations—Mitchell admitted some and denied others. (*Id.* at 1). The article further reported that at least two state agencies, the Department of Health and the Department of Environmental Conservation, were investigating Mitchell for some of this conduct. (*Id.* at 2).

A second article, published days later, documented a press conference Mitchell held to rebut the accusations. (Dkt. No. 151-15, at 1). It included a picture of Fitzpatrick standing next to Mitchell and stated that he had called Mitchell "a brilliant pathologist." (*Id.*). During the press

conference, the article recounted, Mitchell denied that he had flushed brains and other body parts, and that he had ever endangered anyone. (*Id.*). In addition to the two state investigations, the article reported that the county attorney's office and ME office advisory board had also been investigating Mitchell. (*Id.*; *see also* Dkt. No. 151-10).

At the March 17 trial, the jury heard much of the circumstantial evidence the DA's office had gathered, including, *inter alia*, testimony from witnesses who claimed to have seen Rivas near Hill's apartment on Friday night, one of whom had also last seen Hill alive on Friday, March 27, (Dkt. No. 141-8, at 11, 13–14; Dkt. No. 141-9, at 9–11); a friend of Rivas's who confirmed that Rivas's preferred cigarettes were the type police recovered from Hill's apartment, (*see* Dkt. No. 141-10, at 8; Dkt. No. 141-2, ¶ 10); a friend of Hill's whom Hill was supposed to visit that weekend, but who had not spoken to Hill since Wednesday, March 25, and could not reach Hill the following Friday, Saturday, or Sunday, (Dkt. No. 141-12, at 2–3, 5–10); and an additional witness who claimed that he overheard Rivas confess to the crime while talking to himself in a bar weeks later, (Dkt. No. 141-11, at 5–8).[6]

Mitchell testified at trial as follows. (*See* Dkt. No. 141-7). He reiterated his observations of Hill's body and the factors used to estimate time of death. (*Id.* at 5–8, 24–25). Although it was impossible to determine an exact time of death, his observations of Hill's body were not inconsistent with her having died on Friday evening. (*Id.* at 24–25). And considering the circumstantial evidence of when she was last seen alive, it was "more likely that [Hill] died Friday night, to possibly very early Saturday morning." (*Id.* at 25–27). On cross-examination,

[6] The jury also heard testimony that someone else had confessed to killing a woman on the same street where Hill lived. (*See* Dkt. No. 141-13, at 6–7; Dkt. No. 141-19, at 113; Dkt. No. 141-30, ¶ 15). Although this exculpatory information was turned over mid-trial, Fitzpatrick states that as soon as he became aware of it, he disclosed it to the court and defense counsel. (Dkt. No. 141-19, at 113–14). This late disclosure does not form the basis of Plaintiff's claims concerning Fitzpatrick's disclosure practices. (*See* Dkt. No. 152, at 40–44).

when questioned how Hill could have died more than 48 hours before her body was found, even though the body was still in full rigor, Mitchell pointed to the cool floor, the 62-degree apartment, and decomposition in Hill's brain reflected in the Kodachrome slides.[7] (*See id.* at 41–43, 52; *see also* Dkt. No. 141-18, at 82–84).

Fitzpatrick's summation emphasized Mitchell's testimony that it was "possible" Hill died on Friday, March 27, based on his observations of the body and the 62-degree apartment temperature, as well as Hill's brain and the testimony concerning when she was last seen alive. (Dkt. 141-13, at 17–19). He further noted that Hill having been killed on this date was not inconsistent with Rivas's attempted alibi defense. (*See id.* at 13, 19, 33–35). As discussed, that Hill died on March 27 had been his "theory of the prosecution" since he presented the case to the grand jury.[8] (Dkt. No. 141-19, at 30; *see also* Dkt. No. 141-2, ¶ 5). Thus, like in "[e]very one" of Fitzpatrick's other homicide cases, Mitchell's testimony was "very, very helpful." (Dkt. No. 141-19, at 132–33). The jury convicted Rivas. (*See* Dkt. No. 141-2, ¶ 27).

**D. Fitzpatrick's 1993 Disclosure Practices**

Although defense counsel's file is not part of the summary judgment record, nor has he testified, it does not appear that Fitzpatrick turned over any information regarding Mitchell's misconduct, as Plaintiff contends he should have. (Dkt. No. 152, at 40). Nor does the transcript

---

[7] Mitchell clarified in his deposition that "those slides are not in themselves the definition of decomposition," but that they were "consistent with" his window of death estimation. (*See* Dkt. No. 141-18, at 85).

[8] Consistent with this theory, Fitzpatrick's criminal law expert retained in connection with this action—who has reviewed the full trial transcripts—states that "Rivas was indisputably alibied for almost the entire time period between Ms. Hill's dining with her father on Friday evening, March 27, 1987, until her body's discovery in the early afternoon of Monday, March 30, 1987." (Dkt. No. 141-30, ¶¶ 3, 18). Rivas had no alibi only "for a window between approximately 8:00 p.m. and about midnight on Friday," so "it was incumbent upon the prosecution to establish [that] the crime was committed then, and as important for the defense to preclude that possibility." (*Id.* ¶ 18).

of Mitchell's trial testimony reflect that the allegations were used to attack Mitchell's credibility.[9] (*See* Dkt. No. 141-7, at 29–52).

Fitzpatrick first saw news coverage of Mitchell's alleged improprieties before he was elected, and he kept track of such stories when he became DA. (Dkt. No. 141-19, at 77–79). He acknowledges his presence at the March 1993 press conference during which Mitchell defended himself against the allegations—as reflected in the photograph described above—but states that he has no independent memory of attending or speaking. (*Id.* at 83–84; *see also* Dkt. No. 141-2, ¶ 21). At some point between January 1 and March 3, 1993, Fitzpatrick was aware of allegations that "Mitchell was a bad manager and wasn't running the office properly." (Dkt. No. 141-19, at 85). He was also "aware that certain of [Mitchell's] employees had complained to the County and State officials and those complaints were the subject of administrative review." (Dkt. No. 141-2, ¶¶ 14, 20–21).

However, Fitzpatrick admits that he did not disclose any of the articles or other related information as part of his discovery obligations, (Dkt. No. 141-19, at 79, 85–86)—he did not believe that they constituted *Brady* or *Giglio* material because:

> the allegations was people, not necessarily Dr. Mitchell himself, but people under his employ that were illegally - - allegedly illegally disposing of human tissue samples, and there were articles that I recall about a - - the best way to describe it would be a forensic examination setup that he had where bones were buried, and investigators were to come out to the scene in an attempt to exhume the body and examine the scene and make determinations. None of that has, in my judgment - - it might be salacious, it might be bad management, but it doesn't have anything to do with his credibility.

[9] During Fitzpatrick's deposition, a recording not part of the summary judgment record "sparked a memory that [Rivas's defense counsel] had shown up to court with newspaper articles about Dr. Mitchell to use in the Rivas trial." (Dkt. No. 141-19, at 97–98). Fitzpatrick did not state which articles counsel had or the newspapers in which they were printed, (*see id.*); defense counsel was not from the Syracuse region, (*see* Dkt. No. 141-30, ¶ 7).

(*Id.* at 79–80). Still, Fitzpatrick worried that, if allegations of improperly storing body parts came to light, a jury could have believed that Mitchell was not "performing other parts of his job adequately." (*Id.* at 80–81). He also worried that were Mitchell charged with a crime, "it would affect the jury's impression of him." (*Id.* at 81).

As to his personal 1993 disclosure practices generally, Fitzpatrick continued:

> Back then, the disclosures to Defense Counsel regarding Brady would have to do with credibility, misconduct. If I knew that an expert witness had an affair, I would not disclose that to Defense Counsel even though it may be salacious and fertile grounds for cross-examination in somebody's twisted mind. But I did not think in 1993 or today that being accused of being a bad manager is Brady material.

(*Id.* at 86–87). According to Fitzpatrick, "an allegation that somebody is dicing up brains and flushing them down the toilet" was also not the type of misconduct he would have disclosed as *Brady* or *Giglio* material. (*Id.* at 87). As distinguished from other information, that sort of allegation did not involve: "Did he lie, did he conceal, did he manipulate evidence, did he change something, did he . . . change the time of death to please the district attorney, has he done something that would reflect on his competence, did he lie about his pedigree, his education, his training." (*Id.* at 87–88). For all cases he personally "handled" at that time, Fitzpatrick's practice was to not turn over material that did not "arise to [that] level."[10] (*Id.* at 88).

As to his office's disclosure practices at the time, Fitzpatrick "did not have initially a specific policy regarding Brady material other than the clear [and] obvious education of assistant DAs[] [of] what their obligations were under Brady." (*Id.*). According to Fitzpatrick, "[e]very

[10] Fitzpatrick does not recall whether he disclosed information about Mitchell's misconduct in cases after the Rivas trial; when asked whether it would have been his practice to do so, he replied, "sure," but also noted that, by that point—as described below—any "defense attorney would have to live in Siberia not to know that something was happening with" Mitchell. (Dkt. No. 141-19, at 66–67). For his part, Mitchell does not remember whether he was cross-examined in subsequent cases on topics concerning the investigations; no one at the DA's office told him "directly" that they planned not to use him as a witness for that reason. (Dkt. No. 141-18, at 115).

[assistant] DA hired today gets a booklet regarding his or her obligations under many, many things, including Brady . . . . In addition, they get an office manual. I did not have those in 1993. When I instituted those, I don't remember." (*Id.* at 88–89). When asked whether it was his understanding in 1993 that what he did, as the DA, was the policy of the office, and that other attorneys would follow suit, Fitzpatrick replied:

> No. I mean, if I did something or did not do something, is that policy of the office? You know, each lawyer has his or her own procedure, style, manner of dealing with things. I don't think that I would say that if I did something, that's office policy. I would expect people to say, well, if he does it, that's the boss, let's try and copy him.

(*Id.* at 89).

**E. Post-Trial Developments**

Following the Rivas trial, Fitzpatrick attended an April hearing and investigatory session held by the county attorney and legislature "relating to the management of" the ME office. (Dkt. No. 141-2, ¶ 23(4)). Then, the following July, he received a report concerning Mitchell's handling of a corpse and, around that time, spoke to a state health official about the then-pending investigations into Mitchell. (*Id.* ¶ 23(5), (6); *see also* Dkt. No. 141-19, at 59). Fitzpatrick subsequently began his own investigation headed by Tynan. (Dkt. No. 141-2, ¶ 23(7)). Tynan prepared a memorandum and report, both of which Fitzpatrick shared with the county executive, detailing allegations of inappropriate autopsy photos, tissue harvesting, and body and body part mismanagement. (*Id.* ¶ 23(9); *see also* Dkt. Nos. 141-24, 141-25).

In the fall of 1993, Fitzpatrick interviewed Mitchell and his attorney, and thereafter attended a meeting in which Mitchell offered his resignation to the county executive, prompting Fitzpatrick to end his investigation. (Dkt. No. 141-2, ¶ 23(10), (11); *see also* Dkt. No. 141-19, at 65–66, 68–70). Fitzpatrick also issued a public statement in which he confirmed that he anticipated Mitchell's resignation, which would result in "no further prosecution." (Dkt. No.

141-2, ¶¶ 25–26; *see* Dkt. No. 141-26). The state health department investigation ended, without the County admitting "to any violation of law," following Mitchell's resignation and the County's agreement to institute reforms to ME office policy. (*See* Dkt. No. 151-11, at 22–29).

Meanwhile, Rivas had been unsuccessfully challenging his conviction in state post-conviction proceedings. *See Rivas*, 687 F.3d at 528 (describing these proceedings). As part of this endeavor, he obtained an affirmation from Dr. Cyril Wecht. (*See* Dkt. No. 151-3 (the "Wecht Affirmation")). Wecht averred that, based on his review of the evidence and Mitchell's autopsy report, Mitchell's conclusions "were without scientific basis and, further, that the assumptions that supported his findings were inapposite to accepted scientific methods in the field of forensic pathology." (*Id.* ¶ 2). He also concluded to "a reasonable degree of medical certainty" that Hill could not have died more than 48 hours before her body was found on Monday, March 30, and that she "more likely" died less than 36 hours from that time. (*Id.* ¶ 17 (emphasis omitted)).

Mitchell's credibility was also challenged in at least one other mid-2000s state post-conviction proceeding following Rivas's. In that case, William Sawyer—a toxicologist who had worked with Mitchell from 1988 to 1993 and been a source for one of the articles discussed above—submitted an affidavit commenting on Mitchell's office practices around the time of the 1987 Hill investigation. (*See* Dkt. No. 151-13, at 2 (the "Sawyer Affidavit")). In addition to reiterating the allegations described in the articles, (*see id.* at 3–5), Sawyer stated that he "witnessed [Mitchell] on several occasions slanting the interpretation of evidence and/or excluding evidence to serve his predetermined objectives," (*id.* at 5). For example, Mitchell "edited" Sawyer's "draft report on Syracuse fire fighters [sic] [having been] exposed to PCBs at their practice fire tower"; in Sawyer's presence, Mitchell "began . . . altering and/or removing . . . findings and their relevance," stating that it "was necessary to prevent the firefighters' union

from using the results of the study in a law suit [sic].” (*Id.* (boldface omitted)). Sawyer further stated that in the case for which he was providing testimony, Mitchell had interpreted “equivocal evidence . . . as scientific evidence of homicide.”[11] (*Id.* at 6).

**F. The Parties’ Experts**

Finally, in addition to the criminal law expert mentioned above, the parties have submitted testimony and a report from forensic pathology experts concerning Mitchell’s conduct and conclusions in Hill’s case. (*See* Dkt. Nos. 141-20, 141-40, 151-4, 151-5, 155-1).

Plaintiff’s expert, Dr. Daniel Spitz, states as follows in his report and deposition testimony. Hill’s death “most likely occurred 36 hours and possibly up to 48 hours prior to when she was found dead on March 30.” (Dkt. No. 151-4, at 2, 5). Assuming the apartment was “a comfortable ambient temperature” of 60 to 70 degrees, rigor and lividity would have followed “a fairly standard progression and be[en] consistent with known parameters which allow for a reproducible estimate of the time of death.” (*Id.* at 4). The body having been found in full rigor “strongly supports a postmortem interval at or around 36 hours”; such condition “would not be expected” had she died more than 48 hours before she was discovered.[12] (*Id.* at 5). Mitchell’s observations of livor supported the same conclusion. (*Id.*).

Spitz acknowledges that “environmental extremes” like temperature can affect the progression of rigor and livor, (*id.* at 4), but he clarified that he was aware of no “scientific

[11] Plaintiff has also submitted an unsworn expert report from another one of Mitchell’s former employees and source for one of the articles, David Rigle. (*See* Dkt. No. 151-12 (the “Rigle Report”)). However, as explained below, the Court has not considered this report as evidence for purposes of Mitchell’s summary judgment motion. *See infra* Section IV.B.2.b.ii.

[12] Spitz acknowledged the possibility of “outliers,” “anecdotal reports,” and “situations where rigor mortis lasts longer than 48 hours,” some of which can be “related to extremes of temperature.” (Dkt. No. 151-5, at 3). But, he continued, opinions are not based on anecdotal reports “that really can’t be scientifically analyzed because we don’t have a series of situations.” (*Id.*). Of course, science “is aware of outliers and takes that into account”; but there is a “known reproducible process to analyze these kinds of things, and while there’s a bell curve, the overwhelming majority . . . follow that process, and there are outliers.” (*Id.* at 7). In Spitz’s experience, when asked to provide a window of death estimation, he would not “use outliers in expressing that opinion.” (*Id.* at 8).

literature that supports the conclusion that a room ambient temperature of 62 degrees can prolong rigor mortis," as least "[n]ot to any significant measurable degree," (Dkt. No. 151-5, at 8–9). Thus, Spitz concludes, Mitchell used no "objective evidence to support his conclusion that the ambient temperature in [the] apartment impacted the time of . . . death." (Dkt. No. 151-4, at 6).

Although the neuropathologist determined that Hill's brain had decomposition, this observation was "essentially of no forensic value with respect to the time of death determination."[13] (Dkt. No. 151-4, at 4, 5). To the extent Mitchell used that observation to estimate time of death, the estimate would have been "inaccurate and forensically unreliable." (*Id.* at 5). In sum, there was "no valid or reliable medical or scientific support for Dr. Mitchell's opinion" that Hill could have died as early as March 27.[14] (*Id.* at 6).

Defendants' expert, former Onondaga County ME Dr. Mary Jumbelic, disagrees with Spitz. (*See* Dkt. No. 141-40, at 7). In her opinion, to "a reasonable degree of medical certainty," Mitchell's window of death estimation was "reached consistent with the standard of practice." (*Id.* at 3). Based on the "factors as reported in the [autopsy report] and the facts provided to Dr. Mitchell in his trial testimony, [Hill's] time of death was within a range of Friday to Sunday, but more likely Friday." (*Id.* at 3–4). Jumbelic further asserts that Spitz's opinions are erroneous

[13] Explaining why, Spitz states that "[b]rains placed in formalin will often show decompositional changes in the deep structures because the formalin does not readily penetrate into these areas." (Dkt. No. 151-4, at 5).

[14] Defendants characterize Spitz as testifying that Mitchell's conduct in offering his window of death estimation "did not fall below the standard of care." (*See, e.g.*, Dkt. No. 142-3, at 18–19; Dkt. No. 141-3, at 18). They are correct that, when asked whether Mitchell "fell below the standard of care" in performing Hill's autopsy, Spitz replied, "No. I don't think he deviated from what would be his autopsy examination." (Dkt. No. 155-1, at 15). But in the next sentence, Spitz explained that "where the problem arose is that there were some opinions that were generated using scientific parameters that just fall outside what is generally accepted." (*Id.*). Further, when asked whether Mitchell "fell below the standard of care" in giving the three-day window of death estimation, Spitz replied, "I'm not really saying he fell below the standard of care, that's not really what I'm here for. What I'm doing is giving you my opinion based on the information associated with this case." (*Id.* at 16). If there were any doubt, when subsequently asked whether there was "any basis in science within the field of forensic pathology that supports an opinion that Valerie Hill's death could have occurred more than 48 hours before she was discovered," Spitz replied, "[n]o, I don't think the scientific data would support a longer time frame than 48 hours." (*Id.* at 17).

because he did not consider the circumstantial evidence of when Hill was last seen alive and improperly concluded that the cool temperature in the apartment and basement below could not have impacted rigor; he is therefore incorrect to state that Hill could not have been killed more than 48 hours before her body was discovered. (*Id.*at 4–5, 6). Jumbelic also notes that the "time of death could not be determined by the condition of [Hill's] brain exclusively." (*See id.* at 5).

## III. MOTION TO DISMISS

Over five years after answering the amended complaint, (*see* Dkt. No. 22), the County moves to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), (Dkt. No. 140). But even were this motion procedurally proper, *see* Fed. R. Civ. P. 12(b), (c), (h)(2)(B), the County has not complied with this Court's local rules. Specifically, it has not filed a memorandum of law as required by Local Rule 7.1(b)(1). Instead, it supplied an affidavit containing legal arguments, which is prohibited by Local Rule 7.1(b)(2). (*See* Dkt. No. 140-1).

The Court accordingly will not consider the County's motion to dismiss. *See* L.R. 7.1(a)(3). However, the Court will permit the County to adopt the summary judgment motions Fitzpatrick and Mitchell have filed. (*See* Dkt. No. 140-1, ¶ 3 (seeking to "join[] the Motion for Summary Judgment made by co-defendants")).

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*,

477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (per curiam) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a

genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B. Analysis

#### 1. Fitzpatrick

Fitzpatrick argues that he is entitled to absolute prosecutorial immunity. (Dkt. No. 141-3, at 15–17). He appears correct to the extent Plaintiff's individual-capacity claims against him are predicated on "prosecutorial activities intimately associated with the judicial phase of the criminal process." *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022) (quoting *Barr v. Abrams*, 810 F.2d 358, 360–61 (2d Cir. 1987)). In any event, Plaintiff has failed to respond to this argument. The Court accordingly grants Fitzpatrick's summary judgment motion as to those claims. *See Barton v. Warren Cnty.*, No. 1:19-CV-1061, 2023 WL 3981414, at *5, 2023 U.S. Dist. LEXIS 102281, at *12 (N.D.N.Y. June 13, 2023) (noting that, under Local Rule 7.1(b)(3), "when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess[es] facial merit").

The Court also dismisses any official-capacity claims against Fitzpatrick as duplicative of Plaintiff's claims against the County. *See, e.g.*, *Peck v. Cnty. of Onondaga*, No. 5:21-CV-651, 2024 WL 2111979, at *1, 2024 U.S. Dist. LEXIS 84940, at *2–3 (N.D.N.Y. May 10, 2024) (citing *Dudek v. Nassau Cnty. Sheriff's Dep't*, 991 F. Supp. 2d 402, 413 (E.D.N.Y. 2013)); *see also Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))).

**2. Mitchell**

**a. Absolute Immunity**

Mitchell first argues that he is entitled to absolute immunity for his grand jury and trial testimony. (Dkt. No. 142-3, at 15–17). Plaintiff responds that the fabrication of evidence claim does not arise from Mitchell's testimony, but rather "from the forensic evidence Mitchell fabricated and provided to investigators" in March 1987. (Dkt. No. 152 at 32–33). Plaintiff does not address the other individual-capacity claims against Mitchell. (*See id.*).

Grand jury and trial witnesses are absolutely immune from § 1983 claims arising from their testimony. *See Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) (citing *Briscoe v. LaHue*, 460 U.S. 325, 332–33 (1983)); *see also Rolon v. Henneman*, 517 F.3d 140, 145 (2d Cir. 2008) (Sotomayor, J.). Upon an assertion of witness immunity, a court must "determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury [or trial] testimony." *See Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015); *see also Poulos v. Cnty. of Warren*, No. 21-2656, 2023 WL 4004692, at *2 n.2, 2023 U.S. App. LEXIS 14868, at *6 n.2 (2d Cir. June 15, 2023) (applying *Coggins* to "testimony" generally). If a plaintiff's claim survives without relying on the testimony and "exists independently of" it, the defendant may be liable; if it does not, the defendant is absolutely immune. *See Coggins*, 776 F.3d at 113.

Here, Plaintiff contests only Mitchell's assertion that he is entitled to witness immunity on the fabrication of evidence claim. For this reason, and because the remaining claims appear to be barred to the extent they arise from Mitchell's testimony, *see Coggins*, 776 F.3d at 113, the Court grants Mitchell's motion as to all the individual-capacity claims against him except the fabrication of evidence claim.[15] *See Barton*, 2023 WL 3981414, at *5, 2023 U.S. Dist. LEXIS

[15] The Court also dismisses any official-capacity claims against Mitchell for the same reason discussed above as to Fitzpatrick.

102281, at *12. As to that claim, Plaintiff does not purport to rely on Mitchell's grand jury or trial testimony, and the Court will not consider such evidence in its analysis. *Coggins*, 776 F.3d at 113.

**b. Fabrication of Evidence**

The Due Process Clause confers "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000); *Ortiz v. Stambach*, 137 F.4th 48, 66 (2d Cir. 2025).[16] When an officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). "To succeed on a fabricated evidence claim, a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Carruthers v. Colton*, --- F.4th ----, 2025 WL 2405451, at *14, 2025 U.S. App. LEXIS 21278, at *44 (2d Cir. Aug. 20, 2025) (cleaned up); *see also Garnett*, 838 F.3d at 279.

In this case, Plaintiff contends that Mitchell fabricated evidence by forwarding to police his "March 30, 1987 report" and "other statements" concluding that Hill could have died as early as the evening of Friday, March 27. (Dkt. No. 152, at 25). Mitchell responds that he did not

[16] The Second Circuit has noted some "inconsisten[cy]" in its caselaw about whether the source of the constitutional right in fabricated evidence claims is the Sixth Amendment, or the Fifth and Fourteenth Amendments' due process clauses. *See Morse v. Fusto*, 804 F.3d 538, 547 n.7 (2d Cir. 2015); *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276 n.6 (2d Cir. 2016). More recent cases have analyzed such claims using due process principles, *see Ortiz*, 137 F.4th at 66; *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244 (2d Cir. 2020), and the Supreme Court has "express[ed] no view" on "what other constitutional provisions (if any) might provide" safeguards against fabricated evidence, *see McDonough v. Smith*, 588 U.S. 109, 115 n.2 (2019). In any event, Plaintiff frames this claim as arising under the Due Process Clause, (*see* Dkt. No. 152, at 24), and the Court does as well.

fabricate evidence. (*See* Dkt. No. 154-4, at 4–9). Accordingly, the only contested element is the second, which Plaintiff asserts can be satisfied with a recklessness mens rea.[17] (*See* Dkt. No. 152, at 24–28). Mitchell has not addressed this argument. (*See generally* Dkt. No. 154-4).

**i. The Required Mens Rea**

The Second Circuit has explained that "[t]he fabrication element requires only that the defendant knowingly make a false statement or omission." *Carruthers*, 2025 WL 2405451, at *14, 2025 U.S. App. LEXIS 21278, at *45 (quoting *Ashley v. City of New York*, 992 F.3d 128, 143 (2d Cir. 2021)); *see also Morse*, 804 F.3d at 547 (explaining that, under *Zahrey*, "government officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly").[18] Although the Circuit has not explicitly foreclosed recklessness, recent summary orders have suggested that knowledge is required. *See Davis-Guider v. City of Troy*, No. 23-589, 2024 WL 5199294, at *3, 2024 U.S. App. LEXIS 32451, at *7 (2d Cir. Dec. 23, 2024); *Steinbergin v. City of New York*, No. 21-536, 2022 WL 1231709, at *3, 2022 U.S. App. LEXIS 11369, at *8–9 (2d Cir. Apr. 27, 2022). District court decisions throughout the Circuit reflect a similar assumption. *See, e.g.*, *Roland v. City of New York*, No. 20-CV-05392, 2024 WL 2832691, at *22, 2024 U.S. Dist. LEXIS 97689, at *57–58

[17] Defendants also argue that there was otherwise sufficient evidence to support Rivas's conviction. (*See, e.g.*, Dkt. No. 141-3, at 18–19; Dkt. No. 142-3, at 19–20). But that is not a defense to a fabricated evidence claim. *Cf. Frost*, 980 F.3d at 248; *see also Garnett*, 838 F.3d at 277–78. To the extent Defendants contest the fifth element, causation, the Court rejects that argument. The record contains sufficient evidence to establish that Mitchell communicated the allegedly fabricated window of death estimation to Tynan during the original investigation, who prompted Fitzpatrick—supported by Mitchell's autopsy report containing the same estimation—to pursue the case that led to Rivas's conviction and confinement. (*See* Dkt. No. 141-2, ¶ 5; Dkt. No. 141-19, at 30–33).

[18] *See also Ortiz*, 137 F.4th at 68 n.10 (concluding that there was sufficient evidence for a jury to find "that the confession was falsified by [the defendant] and that [the defendant], knowing it was fabricated, sent the confession to prosecutors for use in [the plaintiff's] prosecution"); *Victory v. Pataki*, 814 F.3d 47, 64 (2d Cir. 2016) ("[W]e have held that Section 1983 liability attaches for knowingly falsifying evidence even where there simultaneously exists a lawful basis for a deprivation of liberty."); *Ricciuti*, 124 F.3d at 130 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976))).

(S.D.N.Y. June 3, 2024) ("To establish fabrication, plaintiff must show that defendants knowingly made a false statement or omission." (cleaned up)).[19]

Even so, the Circuit does not appear to have considered mens rea at length in this context. A recent panel remarked only that the "use of inaccurate information" must have been "knowing, as opposed to mistaken," and that "[a]bsent *scienter*, showing that the prosecution relied on false evidence is insufficient." *Davis-Guider*, 2024 WL 5199294, at *3, 2024 U.S. App. LEXIS 32451, at *7 (first quoting *Barnes v. City of New York*, 68 F.4th 123, 129 (2d Cir. 2023); then citing *Garnett*, 838 F.3d at 280). The Second Circuit has not explained, for example, whether a plaintiff—like Ninth Circuit plaintiffs who are required to show that evidence was "deliberately fabricated"—may prevail by demonstrating the use of "investigative techniques that were so coercive and abusive that [the defendants] knew or should have known that those techniques would yield false information." *See Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc)).

Plaintiff cites two out-of-circuit cases for the proposition that recklessness is sufficient. (Dkt. No. 152, at 24). Although one of those cases concerned Fourth Amendment claims, *see Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002), Plaintiff is correct that

[19] *See also Cipley v. Cnty. of Nassau*, No. 20-cv-975, 2025 WL 1319006, at *5, 2025 U.S. Dist. LEXIS 87421, at *15 (E.D.N.Y. May 7, 2025) (describing fabricated-evidence jury instruction as follows: "A statement is false if it was untrue when made and known at the time of making to be untrue by the person making it."); *Birch v. Town of New Milford*, No. 3:20-cv-1790, 2023 WL 4684720, at *16, 2023 U.S. Dist. LEXIS 125836, at *42 (D. Conn. July 21, 2023) (relying on *Ricciuti* for the proposition that, "when an investigating official fabricates and forwards to prosecutors known false evidence," he violates a plaintiff's due process rights (cleaned up)); *Collins v. City of New York*, 295 F. Supp. 3d 350, 371 (S.D.N.Y. 2018) (Nathan, J.) ("[T]he Second Circuit has held that it was clearly established prior to 2007 that it was unconstitutional for a defendant to knowingly fabricate evidence, thereby denying the plaintiff a right to a fair trial." (cleaned up)); *Harris v. City of New York*, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016) ("A plaintiff can establish a fabricated-evidence claim by proving that a police officer knowingly supplied false facts to a prosecutor.").

the Third Circuit has held recklessness sufficient in the due process fabricated evidence context.[20] *Mervilus v. Union Cnty.*, 73 F.4th 185, 193–95 (3d Cir. 2023).

In *Mervilus*, the Third Circuit explained that the Due Process Clause "ensures individuals are not unlawfully deprived of liberty after a fundamentally unfair trial." *Id.* at 194. "In other contexts where the law protects those interests," the court continued—including as to claims of malicious prosecution and unlawful seizures "based on a warrant obtained through the affiant's false statements"—"recklessness is enough." *Id.* So "[i]t would be anomalous to treat recklessness as sufficient in those contexts, but not" in the fair trial fabrication context. *Id.*

The Second Circuit does not appear to have addressed *Mervilus*'s reasoning. Although the Circuit has frequently referenced the knowing mens rea, this Court has found no published decisions—and Mitchell points to none—stating that recklessness in insufficient. Notably, the Second Circuit has held recklessness sufficient in the two analogous contexts identified by the Third Circuit. *See Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (warrant procured through false statements); *Manganiello v. City of New York*, 612 F.3d 149, 163–64 (2d Cir. 2010) (§ 1983 malicious prosecution claim predicated on New York law). And in another due process context, the Second Circuit has noted that "any § 1983 claim for a violation of due process requires," at minimum, "proof of a *mens rea* greater than mere negligence." *Lara-Grimaldi v. Cnty. of Putnam*, 132 F.4th 614, 632 (2d Cir. 2025) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017)). Under that line of cases, both the Circuit and the Supreme Court have not decided "whether . . . recklessness . . . is enough to trigger the protections of the Due Process Clause."

[20] Additionally, the Eighth Circuit has acknowledged that an officer's "[i]ntentionally or recklessly failing to investigate other leads or manufacturing false evidence may shock the conscience and can violate the Fourteenth Amendment's due process clause." *Livers v. Schenck*, 700 F.3d 340, 351 (8th Cir. 2012) (citing *Winslow v. Smith*, 696 F.3d 716, 731–32 (8th Cir. 2012)).

*Newton v. City of New York*, 779 F.3d 140, 156 (2d Cir. 2015) (quoting *Daniels v. Williams*, 474 U.S. 327, 334 n.3 (1986)); *see also Allen v. Cooper*, 589 U.S. 248, 261 (2020).

Ultimately, the Court need not, and does not, definitively decide this issue now. Mitchell's reply brief fails to present any response to Plaintiff's assertion that recklessness is sufficient.[21] (*See* Dkt. No. 154-4, at 4–9). In light of Mitchell's failure to address this central issue and the absence of within-circuit caselaw addressing the scienter applied in the Third and Ninth Circuits, at this time, the Court has considered whether there is sufficient evidence to show that Mitchell recklessly fabricated evidence. *See United States v. Fayton*, 704 F. Supp. 3d 449, 453 (S.D.N.Y. 2023) (citing *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013)). Because, as discussed below, there is sufficient evidence for a jury to conclude that Plaintiff has made that showing, the Court denies Mitchell's motion.

**ii. Evidence of Mitchell's Fabrication**

The principal evidence with which a reasonable jury could conclude that Mitchell recklessly fabricated his window of death estimation is the expert report and testimony of Plaintiff's expert, Daniel Spitz. As an initial matter, however, Fitzpatrick contends that Spitz's report cannot be considered on summary judgment, arguing that it is "inadmissible as [Spitz] is an expert and he has provided testimony."[22] (Dkt. No. 155-2, at 8).

"[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question 'will be presented in admissible

[21] The County has adopted Mitchell's brief and in its reply brief has also failed to address this argument as to the fabricated evidence *Monell* claim. (*See generally* Dkt. No. 153). The Court will permit further briefing on this issue before trial.

[22] Except as to one document, Fitzpatrick, not Mitchell, has raised challenges to Plaintiff's summary judgment evidence, though none of the identified documents are relevant to the Court's conclusion concerning Fitzpatrick's immunity. (*See* Dkt. No. 154-4, at 10; Dkt. No. 155-4, at 8). The Court nevertheless addresses Fitzpatrick's arguments because it "may rely only on admissible evidence" in ruling on Mitchell's summary judgment motion. *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam); *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205 (2d Cir. 2005).

form at trial,' it may be considered on summary judgment." *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (quoting *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam)); *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169–70 (2d Cir. 2014) (per curiam).

The Court sees no reason why Spitz's status as an expert alone would preclude it from considering the report. To be sure, courts agree that *unsworn* expert statements are not properly considered on summary judgment. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005); *see also Reza v. Khatun*, No. 09-CV-233, 2017 WL 3172816, at *2, 2017 U.S. Dist. LEXIS 116080, at *4–5 (E.D.N.Y. July 25, 2017); *Lynn-Ford v. Shores*, No. 5:21-cv-169, 2023 WL 6133047, at *6, 2023 U.S. Dist. LEXIS 167949, at *17 (N.D.N.Y. Aug. 28, 2023). But Spitz's report, although unsworn, is signed, dated, and states: "I hereby affirm the foregoing under penalty of perjury." (Dkt. No. 151-4, at 1, 6). This "substantially" complies with 28 U.S.C. § 1746, giving the report the same effect as if it were a sworn statement. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65–66 (2d Cir. 1999) (holding that a signed and dated letter substantially complied with § 1746, and could be considered on summary judgment, where it stated: "Under penalty of perjury, I make the statements contained herein"). And in any event, Spitz unambiguously states that he would testify to the contents of the report at trial, (Dkt. No. 151-4, at 6); the contents could thus be produced in an admissible form and are properly considered for summary judgment purposes.[23] *See Fernandez v. Wenig Saltiel LLP*, No. 19-CV-1979, 2024 WL 1345645, at *6 n.23, 2024 U.S. Dist. LEXIS 58933, at *11 n.23 (E.D.N.Y. Mar. 29, 2024) (citing *Santos*, 243 F.3d at 683).

[23] Fitzpatrick and Mitchell also object to the Wecht Affirmation. (Dkt. No. 154-4, at 10; Dkt. No. 155-4, at 8). In light of Spitz's testimony, however, that document is not dispositive on any of the Court's conclusions. Therefore, the Court declines to consider it at this time.

Were a jury to credit Spitz's testimony, it could fairly conclude that there was no scientific basis for the underlying reasoning Mitchell used to reach his window of death estimation. Mitchell has explained that, in making that estimation, he relied on his examination of Hill's body, the temperature of Hill's apartment, his observations of Hill's brain, and "circumstantial evidence" as to when she was last seen.[24] (*See* Dkt. No. 142-2, ¶¶ 6–8, 12; *see also* Dkt. No. 141-18, at 43–46, 76–78). Spitz states that, even assuming Hill's apartment was 60 to 70 degrees, rigor and livor would have followed "a fairly standard progression and be[en] consistent with known parameters which allow for a reproducible estimate of the time of death." (Dkt. No. 151-4, at 4). Under that progression, the stiffness would have receded within 48 hours of Hill's death; because her body was stiff when discovered, however, Spitz states that she likely died within 36 hours, and not more than 48, of being discovered. (*See id.* at 5). He also states that Mitchell's livor observations support the same conclusion. (*Id.*). Spitz is aware of no scientific literature supporting the proposition that a 62-degree environment could "prolong rigor mortis . . . to any significant measurable degree." (Dkt. No. 151-5, at 8–9). Similarly, he states that, to the extent Mitchell used the observation of cavities in Hill's brain to determine her time of death, that would have resulted in an "inaccurate and forensically unreliable" estimation. (*See* Dkt. No. 151-4, at 5).

Defendants' arguments concerning other portions of Spitz's testimony are inapposite. They and their expert characterize Spitz's testimony as acknowledging that Mitchell acted within the standard of care in giving his window of death estimation. (*See, e.g.*, Dkt. No. 141-3, at 18; Dkt. No. 142-3, at 18–19; Dkt. No. 141-40, at 4). But as the Court explained above, this

---

[24] As the Court noted above, the summary judgment record reflects that all Mitchell knew at the time of the autopsy was that Hill's father had last seen her on Friday evening. (*See* Dkt. No. 141-39, at 18; *see also* Dkt. No. 142-2, ¶ 8 (mentioning this circumstantial evidence for the first time while describing trial testimony)).

characterization is inaccurate. Mitchell also points to Spitz's acknowledgement of outliers in scientific data, as well as a host of other purported inconsistencies in his testimony. (*See* Dkt. No. 154-4, at 8–9). But these arguments all boil down to credibility determinations that the Court cannot resolve on summary judgment. *See Jeffreys*, 426 F.3d at 553–54. Indeed, Mitchell characterizes this case as "a classic battle of the experts." (Dkt. No. 154-4, at 9). But where, as here, such conflicts bear on a material issue of fact, they are to be resolved by a jury. *Cf. Jeffreys*, 426 F.3d at 553–54; *see also Knight v. N.Y. State Dep't of Corr.*, No. 18-CV-7172, 2022 WL 1004186, at *10, 12, 2022 U.S. Dist. LEXIS 59031, at *28, 35 (S.D.N.Y. Mar. 30, 2022) (collecting cases).

To be sure, as a recent Second Circuit panel explained, it would "not [be] a reasonable inference" for a jury to conclude that "because [Mitchell] provided prosecutors with inaccurate information, [he] must have fabricated evidence." *Davis-Guider*, 2024 WL 5199294, at *3, 2024 U.S. App. LEXIS 32451, at *7. In that case, however, which also involved a fabricated evidence claim against a medical examiner, the district court found only that the plaintiff had, "[a]t best, . . . raised questions of fact about the correctness of [the] statements or medical conclusions reached." *Davis-Guider v. City of Troy*, No. 1:17-CV-1290, 2023 WL 2693438, at *10, 2023 U.S. Dist. LEXIS 53457, at *30 (N.D.N.Y. Mar. 29, 2023). Here, Plaintiff has provided evidence of a different kind. Were a jury to credit Spitz's testimony, it could fairly conclude not merely that Mitchell provided an inaccurate statement or conclusion, but that there was no basis in science for the reasoning used to reach his conclusion—i.e., that a 62-degree apartment could have meaningfully slowed the progression of rigor mortis, or that the decomposition in Hill's brain was useful in estimating a time of death.

Plaintiff has also pointed to additional evidence bearing on Mitchell's state of mind. For example, Mitchell admits that his March 27 estimation was "probably" on the "outside edge of possibility."[25] (Dkt. No. 142-2, ¶ 8 n.2). And Sawyer—who worked with Mitchell around the same time as the Hill investigation—stated that he "witnessed" Mitchell "slanting the interpretation of evidence and/or excluding evidence to serve his predetermined objectives," including by "altering and/or removing" findings in a report on firefighters' exposure to PCBs, (Dkt. No. 151-13, at 2, 5).[26] *See* Fed. R. Evid. 404(b)(2). Additionally, despite his testimony otherwise, (*see* Dkt. No. 142-2, ¶ 8; Dkt. No. 141-18, at 88–91), a jury could also reasonably conclude that, at some point, Mitchell did not believe that Hill could have died on March 27 based on the search warrant stating that his "preliminary estimate on the time of [d]eath . . . was sometime [S]aturday the 28th of March afternoon, and [S]unday morning the 29th of March 198[7]," (Dkt. No. 141-36, at 3). It could also conclude the same based on Tynan's note, titled "Re: Dr. Mitchell," stating that brain decomposition "pushe[d]" the time of death "limits further out." (Dkt. No. 151-6, at 1). The Court cannot resolve the conflict between Mitchell's testimony and the other evidence at this stage; that determination must be made by a jury. *See Jeffreys*, 426 F.3d at 553–54.

Viewing the summary judgment record in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find that Mitchell consciously disregarded a substantial

---

[25] The Court emphasizes that, consistent with Mitchell's assertion of witness immunity, it does not rely on his trial or grand jury testimony itself. *See Coggins*, 776 F.3d at 113. Rather, the Court relies on Mitchell's reassertion of the same proposition in his affirmation submitted in connection with this action. (*See* Dkt. No. 142-2, ¶ 8 n.2).

[26] Fitzpatrick objects to the Sawyer Affidavit on the ground that it "has no significance to the case at bar." (Dkt. No. 155-4, at 8). To the extent he makes a relevancy argument, the Court has considered this document only for relevant purposes. Additionally, the Court notes that the Sawyer Affidavit, although prepared in connection with a different proceeding, appears to meet the requirements of Federal Rule of Civil Procedure 56(c)(4). *See DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (describing these requirements). In any event, Fitzpatrick has challenged this document solely on relevancy grounds, and it is not dispositive on the Court's mens rea conclusion.

risk that his window of death estimate was false. *See Mervilus*, 73 F.4th at 194–95. Therefore, Mitchell is not entitled to summary judgment on the fabricated evidence claim.[27]

**3. The County**

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents," and is liable only when it actually deprives, through the execution of its policies, an individual of his constitutional rights. *Monell*, 436 U.S. at 694. "To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019); *see also Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020).

A municipal policy or custom may be established where the facts show: (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1988); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). To prevail on a municipal liability claim, a plaintiff must show "a direct

[27] The Court notes that Plaintiff has pointed to evidence which, if presented in an admissible form and admitted at trial, could permit a jury to infer that Mitchell knew that his window of death estimation was fabricated. Specifically, the Rigle Report states that Mitchell directed Rigle to "fashion" or "craft[]" his autopsy reports "in such a manner that the wording would allow [Rigle] to change [his] case-specific, medical opinions concerning cause of death and manner of death determination at any time." (Dkt. No. 151-12, at 8, 16). Mitchell explained to Rigle that "he had become very adept at this and could change the basis of his expert medical opinions at any time as the case progressed, to suit the needs of the case as circumstances may develop over time." (*Id.* at 16). However, the report is unsworn and does not appear to meet the requirements of 28 U.S.C. § 1746 described above. (*See generally* Dkt. No. 151-12). Because Plaintiff has not stated whether Rigle would testify at trial, the Court lacks sufficient information to determine whether the contents of his report could be presented in some admissible form. *See Santos*, 243 F.3d at 684. Accordingly, it has not considered the Rigle Report for purposes of summary judgment.

causal link between a municipal policy or custom and the alleged constitutional deprivation."[28] *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (quoting *Harris*, 489 U.S. at 385).

Plaintiff principally argues here that the County is liable for Mitchell's fabrication of evidence, and Fitzpatrick's failure to disclose exculpatory evidence, as final policymakers.[29] (Dkt. No. 152, at 38–44). The County, Mitchell, and Fitzpatrick respond that the County cannot be held liable under *Monell*, and that Fitzpatrick committed no underlying constitutional violation. (*See* Dkt. No. 142-3, at 29; Dkt. No. 153, at 1–3; Dkt. No. 155-4, at 4–8).

**a. The ME Office**

Plaintiff first argues that the County is liable for Mitchell's fabrication of evidence as the final policymaker for the ME Office. (Dkt. No. 152, at 38, 40). In light of the Court's analysis above, Plaintiff has established the denial "of a constitutional right that was caused by" Mitchell's conduct. *Bellamy*, 914 F.3d at 756. Thus, the only remaining issue is whether that conduct can be fairly characterized as "an official municipal policy or custom." *Id.*

Under *Monell*, municipalities may be held "liable for a 'single decision by a municipal policymaker.'" *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (alterations adopted) (quoting *Pembaur*, 475 U.S. at 480). But "liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembauer*, 475 U.S. at 481. "When an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Nagle*

[28] As Plaintiff correctly notes, (Dkt. No. 152, at 45–46), "no immunity, either qualified or absolute, is available" to the County. *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 74 (2d Cir. 1992); *see also Monell*, 436 U.S. at 701.

[29] Plaintiff also argues that the County is liable for its deliberate indifference to Mitchell's improprieties and "serious problems with [his] disregard for scientific protocols," as well as its policy and custom of withholding exculpatory evidence. (*See* Dkt. No. 152, at 40, 44). However, each of these theories is either inadequately briefed or framed as an alternative to Plaintiff's final policymaker theories, (*see id.* at 40, 44, 45), so the Court does not address them at this time, *see Fayton*, 704 F. Supp. 3d at 453.

*v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (cleaned up). The relevant official "must have been sufficiently high up in the municipal hierarchy that he was responsible . . . for making policy in that area of the municipality's business." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (internal citations and quotation marks omitted). In conducting this inquiry, courts analyze state law. *Id.*; *see also Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008).

Here, the County has admitted that Mitchell, as the chief ME, "was the final policymaker of the" ME Office. (Dkt. No. 151-1, at 1). State law confirms this admission. In New York, medical examiners are "appointed county officer[s]" whose "general powers, jurisdiction and manner of investigation are codified in [New York] County Law article 17-A." *Scheufler v. Bruno*, 684 N.Y.S.2d 305, 306 (3d Dep't 1999). That provision requires, as now relevant, that a medical examiner "make inquiry into unnatural deaths within his county as prescribed by law," N.Y. County Law § 671(1)(a), and "make . . . such examinations . . . necessary to establish the cause of death, or to determine the means or manner of death," *id.* § 674(3)(a). Medical examiners must also investigate and certify the "caus[e]" and "means" of deaths "occurring without medical attendance." N.Y. Pub. Health Law § 4143(2), (3).

As the sole official entrusted with these responsibilities, a county's medical examiner appears to be at the top of the "municipal hierarchy" as to the tasks of determining the cause, means, and manner of death. *Agosto*, 982 F.3d at 98; *cf. Forbes v. Park Ridge Mental Health Ctr.*, 570 N.Y.S.2d 253, 254 (4th Dep't 1991) (Mem.) ("[I]t was the Medical Examiner's statutory responsibility and obligation to determine the manner of decedent's death . . . ."). Therefore, Mitchell was a final policymaker for purposes of *Monell* in this "area of the [County's] business." *See Agosto*, 982 F.3d at 98 ("The authority to make policy 'necessarily'

means 'the authority to make *final* policy.'" (quoting *Praprotnik*, 485 U.S. at 127)). The Court therefore denies summary judgment as to Plaintiff's first *Monell* theory.

**b. The DA's Office**

**i. The County's Liability for a DA's Conduct**

As an initial matter, the County argues that Fitzpatrick's actions are not attributable to the County for purposes of *Monell*, but rather to New York State. (*See* Dkt. No. 153, at 2). Plaintiff counters that the relevant conduct is attributable to the County under Second Circuit precedent. (*See* Dkt. No. 152, at 48–49).

*Monell* claims redress constitutional violations caused by "local governments," not states. *See Outlaw*, 884 F.3d at 372 (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). In searching for the proper local government defendant, courts "look for those official or governmental bodies who speak with final policymaking authority concerning the action alleged to have caused the particular violation at issue." *Bellamy*, 914 F.3d at 757 (cleaned up). The Second Circuit has "held that the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow exception being the decision of whether, and on what charges, to prosecute." *Anilao*, 27 F.4th at 874 (cleaned up); *Bellamy*, 914 F.3d at 757–59. When that "narrow exception" applies, "a district attorney in New York 'is not an officer or employee of the municipality but is instead a quasi-judicial officer acting for the state in criminal matters.'" *Anilao*, 27 F.4th at 874 (quoting *Ying Jing Gan v. City of New York*, 996 F.2d 522, 535–36 (2d Cir. 1993)).

The relevant *Monell* claims here are not predicated on Fitzpatrick's decision to prosecute Rivas, nor the charge Fitzpatrick chose. They concern Fitzpatrick's alleged failure to disclose *Giglio* material in Rivas's case, and, more generally, the DA's office's policy concerning *Giglio* material. (*See* Dkt. No. 152, at 40–44). Indeed, the Second Circuit has ascribed a district

attorney's conduct to a municipality, rather than the state, in cases involving a prosecutor's office failing "to adequately train its prosecutors to turn over exculpatory evidence," and other actions related to "the administration of the district attorney's office." *Bellamy*, 914 F.3d at 758 (first citing *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992); then quoting *Ying Jing Gan*, 996 F.2d at 536). The relevant conduct here is attributable to the County.[30]

**ii. *Brady* and *Giglio* Violation**

Turning to Plaintiff's next *Monell* theory that the County is liable for Fitzpatrick's alleged failure to turn over potentially exculpatory evidence as a final policymaker, the only contested *Monell* element is whether an underlying constitutional violation occurred. The County admits that Fitzpatrick acted as such a policymaker for the DA's office, (*see* Dkt. No. 151-1, at 4), and New York law confirms as much, *see* N.Y. County Law § 700(1) ("[I]t shall be the duty of every district attorney to conduct all prosecutions for crimes and offenses cognizable by the courts of the county for which he or she shall have been elected or appointed . . . ."). *See Agosto*, 982 F.3d at 98. Nor does Fitzpatrick appear to dispute that, if his conduct in withholding potentially exculpatory material violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), such conduct caused a constitutional violation; rather, he argues that he did not violate *Brady* and *Giglio*. (*See* Dkt. No. 141-3, at 27–29; Dkt. No. 155-4, at 4–8). Plaintiff disagrees, responding that Fitzpatrick wrongfully withheld "information about Mitchell's credibility" undermining "Mitchell's regard for scientific protocols." (Dkt. No. 152, at 40–44).

---

[30] Arguing otherwise, the County relies on *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988). (Dkt. No. 153, at 2). But as the Second Circuit explained in *Bellamy*, *Baez*—which held that the actions of an Onondaga County prosecutor, who wrongfully indicted a defendant after misreading a grand jury voting sheet, were attributable to the state, not the county, *Baez*, 853 F.2d at 74, 77—has been "narrowed" and "cabin[ed]" over the past three decades such that it now represents the exception described above, not the general rule. *See Bellamy*, 914 F.3d at 757–59 (collecting cases).

The Second Circuit has recognized *Brady* violations as actionable under § 1983. *Poventud v. City of New York*, 750 F.3d 121,132 n.12 (2d Cir. 2014) (en banc). "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). The Second Circuit has "suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional." *Bellamy*, 914 F.3d at 751 n.23 (citing *Fappiano*, 640 F. App'x at 118); *see also Jackson v. Nassau Cnty.*, No. 18-CV-3007(JS)(AYS), 2024 WL 4252047, at *21, 2024 U.S. Dist. LEXIS 170450, at *64 (E.D.N.Y. Sept. 20, 2024).

Preliminarily, the Court rejects Fitzpatrick's and the County's argument that Plaintiff is attempting to hold them "to the present interpretations" of *Brady* and *Giglio*. (Dkt. No. 155-4, at 4, 6–7; *see also* Dkt. No. 141-3, at 27–28; Dkt. No. 141-30, ¶¶ 10–13; Dkt. No. 153, at 1). Defendants have not articulated any alternative standard with which they would have the Court evaluate Fitzpatrick's conduct, and Fitzpatrick cites principally to New York state caselaw in support of his assertion that prosecutors' *Brady* and *Giglio* obligations have expanded over the years. (Dkt. No. 141-3, at 27–28; Dkt. No. 155-4, at 7). But none of those state decisions support this assertion. The Supreme Court—which has the final say on issues of federal constitutional law, *cf. James v. City of Boise*, 577 U.S. 306, 307 (2016) (per curiam)—has held since before Rivas's trial that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,'" the intentional failure to disclose "evidence affecting credibility" violates the *Brady*

rule.[31] *Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Although Fitzpatrick cites several contemporaneous federal courts of appeals decisions involving facts unlike the facts of this case, (*see* Dkt. No. 155-4, at 7), that he cannot find a decision exactly on point is not dispositive.

Under the well-established *Brady* and *Giglio* standard, Plaintiff's *Brady* claim survives summary judgment. As to the first element, "[i]mpeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.'" *Rivas*, 377 F.3d at 199 (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)). When offered, such evidence reduces the "effectiveness" of a witness's testimony by explaining "why the jury should not put faith in" the testimony. *Friedman v. Rehal*, 618 F.3d 142, 153–54 (2d Cir. 2010) (quoting *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993)).

Plaintiff here alleges that Fitzpatrick wrongfully withheld information concerning the Mitchell's alleged misconduct. (Dkt. No. 152, at 40–44). The specific allegations Plaintiff argues should have been disclosed are that Mitchell had: (1) directed the disposal of "body parts and fluids by flushing them down the toilet," (2) "taken cadavers and [body parts] without permission to . . . bur[y] them as part of an unsanctioned forensics training course," and (3) engaged in "other highly disreputable conduct that dramatically undermines his regard for scientific and medical protocols." (*Id.* at 41).

This information could potentially have altered the jury's assessment of Mitchell's credibility. *See Rivas*, 377 F.3d at 199. That Mitchell had allegedly improperly disposed of body

[31] The Second Circuit has observed the Supreme Court's "clarifi[cation]," *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001), and "refine[ment]," *Fuentes v. T. Griffin*, 829 F.3d 233, 245 (2d Cir. 2016), of the *Brady* rule over time. But Defendants' submissions do not cite these cases or otherwise explain which clarification or refinement could be relevant to assessing Fitzpatrick's conduct.

parts and allowed them to be used in an unapproved field exercise might very well have caused jurors to lose "faith" in his ability to properly handle deceased bodies generally, and by extension his ability to properly examine them. *Friedman*, 618 F.3d at 153. Similarly, the fact that Mitchell was accused of job-related misconduct—for which he was under investigation by two state agencies—would have led the jury to doubt whether he could be trusted to competently perform other parts of his job. As the Second Circuit noted in Rivas's habeas proceedings, "a reasonable juror would discredit Mitchell's testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony in the criminal trial."[32] *Rivas*, 687 F.3d at 546.

Second, a reasonable jury could conclude that Fitzpatrick was aware of, and intentionally withheld, the relevant information. *Fappiano*, 640 F. App'x at 118. Fitzpatrick admits that he "was aware that certain of [Mitchell's] employees had complained to the County and State officials and those complaints were the subject of administrative review." (Dkt. No. 141-2, ¶ 14). And in early 1993, Fitzpatrick knew that Mitchell had been accused of being "a bad manager and [not] running the office properly." (Dkt. No. 141-19, at 85). Fitzpatrick also acknowledges that he was present, two weeks before the trial, at the early March 1993 press conference Mitchell called to rebut the relevant allegations. (*See id.* at 83; *see also* Dkt. No. 141-2, ¶ 21). Although Fitzpatrick now has no independent memory of attending, (Dkt. No. 141-19, at 83–84), his presence alone could lead a reasonable jury to infer that he was aware of the allegations discussed at the press conference, described above.

---

32 Although not dispositive, the Court notes that Fitzpatrick himself acknowledged in his deposition that if a jury learned that Mitchell "was improperly storing body parts or improperly disposing of them," it might believe that Mitchell was not "performing other parts of his job adequately." (Dkt. No. 141-19, at 80–81).

Fitzpatrick also acknowledged that he first saw local newspaper coverage of Mitchell's alleged improprieties before he was elected and kept track of such stories after taking office in January 1992. (*See* Dkt. No. 141-19, at 77–79). As noted above, a March 3, 1993 article described Mitchell's behavior as a pattern of "unethical and possibly illegal practices," and noted that he was under investigation by at least two state agencies.[33] (Dkt. No. 151-14, at 1, 2). Given this testimony, at minimum, a jury could also reasonably infer that, shortly before Rivas's trial, Fitzpatrick was aware of the allegations bearing on Mitchell's credibility recounted in the March 3 article.

Critically, Fitzpatrick further admits that, at least as to the information of which he was aware, he did not disclose it because he did not believe it was the type of material covered by *Brady* or *Giglio*. (Dkt. No. 141-19, at 85–87). Thus, a jury could reasonably conclude that Fitzpatrick both knew of, and intentionally suppressed, the information about Mitchell's improprieties.[34]

---

[33] Fitzpatrick argues that the newspaper articles describing Mitchell's misconduct are inadmissible as "unsworn." (Dkt. No. 155-4, at 8). This argument appears to concern authentication, but newspapers are self-authenticating documents. *See* Fed. R. Evid. 902(6). Additionally, the Court notes that all the articles were published before 1998 and therefore fall under the ancient document hearsay exception. *See* Fed. R. Evid. 803(16) (establishing hearsay exception for "[a] statement in a document that was prepared before January 1, 1998, and whose authenticity is established"); *see also In re Davis N.Y. Venture Fund Fee Litig.*, No. 14 CV 4318-LTS-HBP, 2019 WL 11272913, at *3 n.4, 2019 U.S. Dist. LEXIS 111521, at *7 n.4 (S.D.N.Y. July 2, 2019) (deeming a May 1993 Wall Street Journal article admissible under Rules 803(16) and 902(6)); *TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 321 n.33 (S.D.N.Y. 2016) (similar). To the extent the articles contain relevant hearsay within hearsay, the Court does not consider those statements for the truth of the matters asserted, but rather for their effect on Fitzpatrick's mind.

[34] To be sure, evidence is not deemed suppressed if defense counsel "knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Constantine*, No. 20-4278, 2022 WL 950954, at *2, 2022 U.S. App. LEXIS 8374, at *4 (2d Cir. Mar. 30, 2022) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)). Fitzpatrick remembered in his deposition that defense counsel came to a day of trial with local news articles to potentially use in cross-examination of Mitchell and chose not to use them. (*See* Dkt. No. 141-19, at 96–98). At the same time, the trial transcript does not reflect that Mitchell was cross-examined with any of this information. (*See* Dkt. No. 141-7, at 29–52). Defense counsel did cross-examine Mitchell with an unrelated *Syracuse Herald-Journal* article, which had reported that Mitchell initially assessed Hill's time of death on Saturday or early Sunday morning. (*Id.* at 31–32). A jury may infer that, had defense counsel known of the information regarding Mitchell's job-related misconduct, he would have used it. It is also fair to infer that defense counsel, who was not a local practitioner, (Dkt. No. 141-30, ¶ 7), would likely not have kept up on local news articles. The Court cannot resolve these factual issues on summary judgment.

Finally, to establish prejudice, the evidence withheld must have been "material." *Fappiano*, 640 F. App'x at 118 (citing *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)). "Undisclosed 'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985)). The relevant inquiry

> is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Leka*, 257 F.3d at 104 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)); *see also Bellamy*, 914 F.3d at 751. "Evidence of impeachment is material if 'the witness whose testimony is attacked supplied the only evidence linking the defendants to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.'" *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (quoting *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996)); *see also United States v. Zhang*, 135 F.4th 44, 53 (2d Cir. 2025). In assessing materiality, the Court must "evaluate the withheld evidence in the context of the entire record." *Turner v. United States*, 582 U.S. 313, 324–25 (2017) (cleaned up).

Here, the information concerning Mitchell's improprieties was material. Fitzpatrick's overarching theory of the prosecution through the investigation and trial was that Hill must have died on the evening of March 27 or early in the morning of March 28. (*See* Dkt. No. 141-2, ¶¶ 5, 19). Notably, Fitzpatrick's expert states that, based on his review of the trial transcripts, Rivas was "indisputably alibied" for the remainder of the relevant period. (Dkt. No. 141-30, ¶ 18). This theory was reflected in Fitzpatrick's summation, (*see* Dkt. 141-13, at 17–19), and he admitted

that, if the evidence showed that Hill had in fact died later, he would have had "to overcome [that fact] somehow and account for [Rivas's] whereabouts," (Dkt. No. 141-19, at 30). Thus, had a jury found Mitchell uncredible and disbelieved his testimony establishing that Hill could have been killed on March 27, it "would have undermined a critical element of the prosecution's case." *Amiel*, 95 F.3d at 145.

Information concerning Mitchell's credibility would have been especially relevant considering other trial evidence suggesting that his three-day window of death estimation was a stretch. Mitchell himself acknowledged that Hill having died as early as March 27 was on the "outside edge of possibility." (Dkt. No. 141-7, at 43–44). Additionally, he only raised the 62-degree apartment temperature and decomposition in Hill's brain—which he testified on re-direct examination was reflected in Kodachrome slides that he now admits "are not in themselves the definition of decomposition," (*id.* at 52; Dkt. No. 141-18, at 85)—as relevant factors for the first time on cross-examination. (Dkt. No. 141-7, at 42–43). Had it been made aware of the withheld evidence bearing on Mitchell's credibility, a jury might well have viewed these seemingly post-hoc rationalizations for the window of death estimation as particularly suspect.

To be sure, as Defendants point out, there was considerable circumstantial evidence of Rivas's guilt and testimony from a witness who claimed to have overheard Rivas admit to the murder. (*See, e.g.*, Dkt. No. 141-3, at 18–19). And "[w]here the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *United States v. Hunter*, 32 F.4th 22, 32 (2d Cir. 2022) (quoting *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002)). But all the circumstantial evidence, no matter how convincing, would have been essentially useless to the prosecution's theory without Mitchell's testimony that it was possible Hill died during the period for which Rivas had no alibi.

The jury would then have been left with the testimony concerning Rivas's confession, pitted against the defense's evidence that a different person had confessed to murdering a woman on the same street where Hill lived. (*See* Dkt. No. 141-13, at 6–7; Dkt. No. 141-19, at 113; Dkt. No. 141-30, ¶ 15). Although, under these circumstances, the Court cannot conclude that "the undisclosed evidence would have rendered the evidence as a whole insufficient to support a conviction," or that Rivas's acquittal would have been certain had the relevant evidence been disclosed, that is not required. *Payne*, 63 F.3d at 1209; *see Leka*, 257 F.3d at 104. Rather, in light of the entire record, *see Turner*, 582 U.S. at 324–25, the Court concludes that there is a reasonable probability that "the result of the proceeding would have been different." *Payne*, 63 F.3d at 1209. This *Monell* claim accordingly survives summary judgment.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the County's motion to dismiss (Dkt. No. 140) is **DENIED** in its entirety; and it is further

**ORDERED** that Fitzpatrick's summary judgment motion (Dkt. No. 141) is **GRANTED** in its entirety, and the Clerk is respectfully requested to terminate Fitzpatrick as a defendant; and it is further

**ORDERED** that Mitchell's summary judgment motion (Dkt. No. 142) is **DENIED** as to the individual-capacity fabrication of evidence claim, and **GRANTED** in all other respects; and it is further

**ORDERED** that each of Plaintiff's claims, except for the individual-capacity fabrication

of evidence claim against Mitchell and *Monell* claims against the County, are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Dated: September 18, 2025
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge