

**DISTRICT ATTORNEY**
**WILLIAM J. FITZPATRICK**
County of Onondaga
Criminal Courthouse
505 South State Street
Syracuse, New York 13202
(315) 435-2470

VIA ELECTRONIC MAIL ONLY

July 6, 2026

John E. Heisler, Jr.
Onondaga County Department of Law
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, NY 13202
johnheislerjr@onondaga.gov

Mark A. Ventrone
Onondaga County Department of Law
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, NY 13202
MarkVentrone@onondaga.gov

Robert F. Julian
Office of Robert F. Julian
2037 Genesee Street
Utica, NY 13501
robert@rfjulian.com

Scott A. Korenbaum
14 Wall Street, Suite 4C
New York, NY 10005
scott@korenbaumlaw.com

Joshua S. Moskovitz
Rickner Moskovitz LLP
14 Wall Street - Suite 4c
New York, NY 10005
josh@rmcivilrights.com

Stephanie Panousieris
Rickner Moskovitz LLP
14 Wall Street - Suite 4c
New York, NY 10005
stephanie@rmcivilrights.com

Rob Rickner
Rickner Moskovitz LLP
14 Wall Street - Suite 4c
New York, NY 10005
rob@rmcivilrights.com

John G. Powers
Hancock Estabrook, LLP
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202
jpowers@hancocklaw.com

    Re:    <u>Rivas, etc. v. Onondaga County, et al.</u>
           19-cv-00844 (BKS) (TWD)

Counsellors:

Our Office is in receipt of a subpoena dated June 17, 2026, served by Rickner Moskovitz LLP relating to the above matter, and which seeks 11 particular items or responses.  Our Office responds with the following:

1. Produce the letter that Fitzpatrick sent to syracuse.com / The Post Standard mentioned in the article by Jon Moss, The Post-Standard, "A 39-year saga: County to pay $1M over man's murder conviction. 'It makes me sick,' DA says" (Jan. 30, 2026).
     The enclosed 11-page memorandum is the item that was sent to Jon Moss.
2. Produce all other documents that Fitzpatrick sent to the press concerning the settlement.
     None exist.
3. Produce any communications between Fitzpatrick and the press concerning the settlement.
     On January 29, 2026, DA Fitzpatrick received a call from Mr. Moss.  DA Fitzpatrick responded with a text stating, "Send me your email."  The above memorandum was then emailed to Mr. Moss.
4. Produce all records of, including telephone call logs, concerning communications between Fitzpatrick and any of the press concerning the settlement.
     None exist concerning the settlement or mediation.  Enclosed nonetheless is a 2019, three-message email chain between DA Fitzpatrick and a Syracuse.com reporter concerning an article that was published about the criminal matter.  The above memorandum was not sent to the reporter.
5. Produce all other documents that Fitzpatrick authored concerning the settlement.
     The memorandum enclosed predates the settlement, having been drafted in 2019, and did not concern the settlement.  Nothing else has been written since that time.
6. Produce any documents reflecting how Fitzpatrick learned about the settlement reached during mediation.
     DA Fitzpatrick learned of the mediation and settlement months after it already occurred, and otherwise had no knowledge that the matter was in mediation at the time it occurred.
7. Produce any documents sent or received by Fitzpatrick about the settlement or the mediation.
     None exist.
8. Produce any documents that Fitzpatrick sent any member of the Onondaga County Legislature concerning the settlement.
     On February 2, 2026, the above memo was emailed to Brian May, and then was provided in person to Nicole Watts on February 4, 2026.
9. Produce any documents that any member of the Onondaga County Legislature sent to Fitzpatrick concerning the settlement.
     None exist.
10. Produce all records of, including telephone call logs, concerning communications between Fitzpatrick and any member of the Onondaga County Legislature concerning the settlement or the mediation.
     Communications sought under this item are the same as those listed in item 8 above.

11. Produce all communications sent or received by any member of the Onondaga County Legislature concerning the settlement or the mediation.

      None exist.

Very truly yours,

William J. Fitzpatrick
Onondaga County District Attorney

WJF/mm

**Is There Any Such Thing as Finality?**

It's been my honor to be a prosecutor for over 40 years, the last 28 as the elected DA for Onondaga County in Central New York. I have served as the President of the New York DA's Association and the President of the National District Attorneys Association. I have created an Ethics Committee for the State DAs that has been copied by 30 other states to date. I have personally tried over 80 homicide cases to verdict and have investigated and prosecuted probably another 200. I have been a member of the New York Forensic Science Commission for 15 years and have a nationally recognized expertise in forensics. With that background, I hope the reader understands the frustration I felt on learning that a defendant I tried and convicted over a quarter of a century ago, his case having been the subject of numerous unsuccessful appeals, motions, and habeas corpus petitions, had finally found a sympathetic audience in a 3-judge panel of the 2nd Circuit Court of Appeals. In 40 years, I have had a miniscule number of cases reversed. Mistakes are made, legal precedents may be changed. I respect that. But in the decision I am about to discuss, the court clearly was leveling a personal attack on the prosecutor. When did it become a pejorative thing to mention on your office website that you take pride in never giving up on cold cases? Is it too much to expect an appellate court to be fully informed about all the facts of a case and who testified in front of a grand jury? And when, pray tell, does a gadfly forensic pathologist who was paid to opine on the status of an alien autopsy (you read that right) become "renowned"?

The person who wants to know if the surviving loved ones of a homicide victim have achieved "closure" quite frankly does not know much about the dynamics of the criminal justice system. There is never closure for the survivors. But there is a sense of satisfaction knowing that the system worked, that the killer of your child or your loved one has been adjudicated fairly before the bar of justice and made to pay for his or her crime. Now imagine having to make that phone call 25 years after the fact to a victim's family to tell them that their daughter's killer is getting a retrial despite the findings of 12 jurors and 29 state and federal judges because of a disagreement argued by AFFIDAVIT of several hours regarding the time of death.

As you will learn from this article, Hector Rivas was not the victim of a wrongful conviction, but rather was unquestionably guilty of murdering Valerie Hill. He received an eminently fair trial and was represented by a competent lawyer that he chose. And he most assuredly would have been convicted again had he not died shortly after being given a new trial. But we never should have gotten that far.

**Facts of the Case**

On Friday, March 27, 1987, Valerie Hill, a 28-year-old single nurse, met her father, Randall Hill, for dinner in Syracuse. Randall and other members of the family had been visiting his wife, Valerie's stepmother, who was a terminal cancer patient at St. Joseph's Hospital. Valerie was late to the restaurant and was visibly upset and distracted throughout the meal, telling her father that she was late because she had taken back roads to the restaurant in an attempt to avoid her ex-boyfriend, Hector Rivas, who had been following her all day. Valerie also told her father that she had plans to visit a friend, Laura Adams, in the Albany area for the weekend, and that she would be back in Syracuse on Sunday evening. Sadly, this would be the last time that Mr. Hill ever spoke to his daughter.



28 year old Valerie Hill, registered nurse and homicide victim.

After multiple failed attempts to call Valerie that Sunday evening and Monday morning, Mr. Hill went to St. Joseph's Hospital to visit his wife on Monday. While there, Mr. Hill went to the floor where Valerie worked and learned that she had not shown up for her shift. Concerned, Mr. Hill then went to Valerie's apartment and let himself inside. There, to his shock, he found Valerie's lifeless body facedown on her living room floor. She was naked from the shoulders down, had been anally penetrated, and had been strangled with the sash from her own bathrobe, which was still tied tightly around her neck.



Valerie's apartment house at 248 Hickok Avenue in the City of Syracuse.

After arriving at the scene and learning that Valerie and Rivas had recently broken up, Syracuse police officers traveled about 20 miles to Rivas' home in Cazenovia to further investigate the homicide. There, members of the Syracuse Police Department identified themselves to Rivas and he agreed to accompany the officers back to the police station in Syracuse for an interview. During the twenty-minute drive back to Syracuse, Rivas never once asked what was going on or questioned why the police wanted to speak with him.



Hector Rivas, Valerie's killer and serial abuser of women.

During the subsequent interview, Rivas freely spoke about his feelings for Valerie, explaining that he had not wanted the relationship to end and could not understand why she felt differently. He revealed that he had gone to her apartment nearly every day since their breakup in late January, and that he often waited for her or left notes under her door if she was not home. He also mentioned that he had been given a key to her apartment, though he claimed to have returned it after the breakup.



One of the notes Hector would repeatedly leave begging
Valerie to take him back.  Recovered from Valerie's kitchen table.

When asked about his activities over the prior weekend, Rivas claimed that he last saw Valerie on the evening of Thursday, March 26, when he went to her apartment to once again ask her to get back together. He said that he then made two attempts to see Valerie at her apartment on Friday, but that she was not home either time, and that he spent much of the remainder of the weekend bouncing between various bars and friends' houses in the Syracuse and Cazenovia area. When the officers asked why he made no attempt to see Valerie for the remainder of the weekend even though he had been close to her apartment, Rivas had no answer.

Approximately two hours into the interview, the police revealed to Rivas that Valerie had been murdered. Upon learning that Valerie, the love of his life, was dead, Rivas simply sat there and had no visible reaction at all.

While the interview was taking place, other officers obtained a warrant to search Rivas' residence for various items that may have been related to Valerie's murder. While searching his home, the officers found a torn-up note in Rivas' trash written from Valerie to another former boyfriend, Bob Lucas, thanking him for their time together. And in Rivas' bedroom closet, the officers discovered a shrine consisting of a large statue of the Virgin Mary that was surrounded by two burning candles, a bowl of coins, and a photograph of Valerie.

Despite the evidence pointing to Rivas' involvement, two district attorneys declined to prosecute him, and Valerie's murder became a cold case for five years.

**The Indictment of Hector Rivas**

In January 1992, I was sworn in as the District Attorney of Onondaga County. After taking office, I quickly reviewed a number of cold cases and reopened Valerie's case. Assigning a new investigative team to the case, I learned that a former acquaintance of Rivas, Joe Fields, had come forward to police with crucial new information. Joe said that a few weeks after Valerie's murder, he and his then-girlfriend ran into Rivas at Albert's Bar in Cazenovia. Rivas had been sitting at the bar, drinking heavily and crying about Valerie's death. At one point in the evening, Joe stepped back from his spot at the bar to let his girlfriend pass by, presumably leading Rivas to believe that he had walked away and was no longer in earshot. Rivas then said to himself, thinking no one was close by, "Valerie, Valerie, I didn't mean to do it." Joe explained that he was shocked to hear this, as he had not believed Rivas was involved in Valerie's death. When Rivas looked up and realized he was still standing there, his demeanor changed instantly, and he stopped drinking and quickly left the bar. When asked why he never came forward with this information before, Joe explained that he began to believe Rivas was dangerous and was afraid of what he might do to him if he cooperated with police.

In light of this new evidence, as well as the evidence that already existed, I moved forward with the case against Rivas, and in November 1992, an Onondaga County Grand Jury returned an indictment charging him with the second degree murder of Valerie Hill.

**Trial**

*Rivas' Obsession*

Rivas was tried before a jury in March 1993. A significant portion of the evidence presented at trial dealt with the nature of Valerie and Rivas' relationship and showed that, for Valerie, the relationship was more of a brief love affair, but for Rivas, it had grown into a seriously unhealthy obsession.

Valerie's best friend, Liz Lewis, provided key testimony about the relationship. She explained that it had started as a whirlwind summer fling after Valerie had ended a five-year relationship with her prior boyfriend, Bob Lucas. Liz recalled that by the fall, Rivas had become possessive and dependent. Valerie, who was independent and committed to her job, revealed to Liz that she had begun to think she had made a mistake in getting so involved so quickly. By late January

1987, Valerie ended the relationship and Rivas then began relentlessly stalking her. On one occasion in March, Valerie came home late to find him sitting in the dark in her living room, smoking cigarettes and waiting for her. Another night, Valerie and her father returned to her apartment after having dinner. While they chatted in his car in her driveway, Rivas emerged from the side door of her apartment. As Mr. Hill later recalled, Valerie reacted by saying, "that bastard. He's in my house again."

Travel agent Cynthia Reiser also testified that she had met with Valerie that afternoon of Friday, March 27th for her to make a final payment and pick up an airline ticket for an upcoming trip to the Bahamas, recalling that Valerie wanted to go away by herself. Of great significance, Valerie's ticket was the only item missing from her apartment after her murder.

Finally, it was revealed that Rivas sent Valerie 45 notes in the 45 days leading up to her death. In a highly incriminating circumstance, the last time Rivas tried to contact Valerie was at the end of that 45 day streak, Friday, March 27th. Undoubtedly, Rivas became enraged that Valerie was planning on traveling to the Bahamas without him.

*Rivas's False Alibi*

The evidence at trial also discredited the alibi that Rivas had provided to police. It became apparent that there was a critical three-hour window of time on Friday night between the time he was seen leaving Colemans Pub in Syracuse, between 9:00 p.m. and 9:30 p.m., and when he arrived at Albert's Bar in Cazenovia, which was not until at least 12:30 a.m., though he told police he had gone from Colemans straight to Albert's. In normal traffic, that drive would take approximately 35 to 40 minutes.

One witness, John Cassano, who had then worked as a clerk at Liquor Square in Syracuse, testified that Rivas had rushed into the store at around 9:45 p.m. that Friday night just before closing, and had purchased a bottle of wine and a bottle of Bacardi rum (a bottle of wine and a bottle of Bacardi rum were also recovered from the murder scene, with Rivas' fingerprints on the bottles). Another witness, James Crimi, who had been dating Valerie's upstairs neighbor at the time in question, testified that he saw Rivas sitting in his car smoking cigarettes outside Valerie's apartment sometime between 11 p.m. and 12 a.m. that Friday night.

The evidence also indicated that Rivas had spent the remainder of the weekend attempting to craft a solid alibi while also creating the impression that Valerie was still alive. Rivas' former friend Mark Brosh testified that Rivas had called him to make plans that weekend, though the two had not socialized together in about six months (Mark also admitted that Rivas had been arrested for beating up a prior girlfriend, who had left town to get away from him. Rivas' extensive history of domestic violence with multiple partners was ruled inadmissible by the trial court). Additionally, Liz Lewis testified that she saw Rivas at a mutual friend's party on Saturday night, and that Rivas had said to her, "it's too bad Valerie's not here, that she's not feeling well." Liz, who was aware of Valerie's plans to leave town for the weekend, found the comment odd. Liz also recalled that, throughout their entire conversation, Rivas spoke of Valerie only in the past tense.

*Questions Regarding the Time of Death*

The time of Valerie's death became a key issue at trial. Then-Onondaga County Medical Examiner Dr. Erik Mitchell, the final witness to testify for the prosecution, told the jury that Valerie most likely died late Friday evening or in the early morning hours of Saturday morning. The defense attempted to suggest that Dr. Mitchell had recently changed his time of death estimate, referencing hearsay news articles reporting that Dr. Mitchell had estimated that Valerie died late Saturday night or early Sunday morning. However, those news articles were based on a search warrant affidavit authored by a Syracuse Police Officer the day Valerie's body was found, which simply stated that Dr. Mitchell had "preliminarily" estimated her time of death being sometime between Saturday afternoon and Sunday evening. Additionally, Dr. Mitchell testified that he had not given "the opinion of a specific time of death," and though he may have stated at one point that it was possible that Valerie died on Saturday or Sunday, he "never tied [himself] to such a time." He also stressed the variety of subjective factors that go into determining time of death, including rigor mortis, and went on to explain that it could be slowed by cold temperatures. After considering these and a number of other external factors, he first overtly opined that Valerie had most likely died late Friday night.

On March 25, 1993, nearly six years to the day after Valerie's death, not surprisingly, the jury returned a verdict finding Rivas guilty of her murder, and the Hill family finally received long-awaited justice for Valerie's brutal death.

Sadly, finality for Valerie's death would remain just out of reach for the Hill family. What followed were decades of appeals and post-conviction proceedings in both state and federal court. Though Rivas' conviction was affirmed in nearly every court, he finally prevailed in 2015. Nearly three decades after Valerie's murder, in a decision fraught with factual errors and personal digs toward those involved in Rivas' conviction, the United States Court of Appeals for the Second Circuit found in favor of Rivas, and granted him a new trial. Only in America could 29 state and federal judges and 12 jurors be wrong, while 3 judges on the Second Circuit are right.

**Direct Appeal**

In 1995, Rivas' conviction was unanimously affirmed by the Fourth Department on direct appeal. Rivas later filed a CPL 440.10 motion to vacate judgment in Onondaga County Court, arguing that he had received ineffective assistance of counsel at trial. Rivas pointed to a number of alleged errors made by defense counsel, Richard Calle, a former prosecutor from Queens, New York retained by Rivas, with the most significant being his claim that Calle failed to effectively challenge the findings and testimony of Dr. Mitchell. As part of the basis for this claim, Rivas asserts that Calle failed to address the fact that Dr. Mitchell was then under investigation by the department of health for professional misconduct, suggesting that Dr. Mitchell had colluded with me as the D.A. regarding his time of death estimate in order to avoid prosecution for his misconduct.

After a hearing, Onondaga County Court denied Rivas' motion in 2000, finding in part that because Dr. Mitchell had not been accused of performing autopsies incorrectly or testifying falsely in any proceedings, Rivas failed to show how information regarding the investigation could have altered the jury verdict. The court also determined that Calle did effectively challenge Dr. Mitchell's findings by suggesting to the jury that he had changed his time of death estimate

sometime between 1987 and Rivas' indictment, and by successfully eliciting testimony from Dr. Mitchell that Valerie dying on Friday was on the "outside edge of possibility."

**Federal Court**

After exhausting his avenues for post-conviction relief in state court, Rivas turned to the federal courts by filing a petition for habeas corpus in 2002, renewing, among other arguments, his claim that he had received ineffective assistance of counsel.

After the United States District Court for the Northern District of New York dismissed Rivas' habeas corpus petition as untimely, the Second Circuit remanded the case with instructions to conduct an evidentiary hearing to determine whether the petition was untimely (i.e., whether Rivas could have discovered the factual predicates for his claims before the cut-off date), and if so, whether he had nonetheless established a claim of actual innocence. In 2009, Magistrate Judge David E. Peebles conducted the hearing and determined that Rivas' petition was untimely, and that he failed to establish actual innocence through his claims of newly discovered evidence, *Brady* violations, and ineffective assistance of counsel. Based on his findings, Judge Peebles issued a Report and Recommendation that Rivas' claims be dismissed, which was adopted in its entirety by U.S. District Court Judge Gary L. Sharpe, who noted the "strength of the evidence" against Rivas.

In 2012, the Second Circuit disregarded the determinations made by the fact-finding court, and decided that Rivas had made a credible and compelling showing of actual innocence, serving as an equitable exception to the limitations period for habeas corpus review. The Second Circuit then once again remanded the case to the District Court to determine Rivas' claims on the merits. In doing so, the court also attacked the impartiality of Judge Peebles and presented an ad hominin attack on me, even going so far as to quote my website suggesting that my expertise in forensics and handling cold cases is somehow a negative trait. The court also called out Judge Peebles for previously having a professional and personal relationship with me (a fact Rivas' counsel were aware of, and had not sought to have Judge Peebles disqualified over), and instructed that the case not be reassigned to Judge Peebles on remand. Though the Court claimed not to "comment on" or "endorse" the merits of Rivas' claims, it effectively did just that in stating, "Rivas alleges that Fitzpatrick deliberately withheld exculpatory information from him and suggests improper collusion between Fitzpatrick and . . . Mitchell . . . in order to avoid any appearance of impropriety we think the interests of justice require that this case be adjudicated by judges without personal and professional ties to the prosecutor." Thank you for that underwhelming disclaimer.

On remand, the District Court obeyed the instructions of the Second Circuit, and a hearing was held by District Court Judge Sharpe to determine, among other claims, whether County Court's denial of Rivas' ineffective assistance of counsel claim was based on an unreasonable determination of the facts or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). In doing so, the court stressed the high degree of deference that federal courts are to give state courts in reviewing habeas claims, specifically noting that it would be insufficient to overturn the trial court's determination "even where reasonable jurists might disagree."

After hearing oral argument (and despite his lack of a "personal or professional relationship with the prosecutor"), Judge Sharpe nonetheless held that County Court's determination "was comprised of both reasonable factual determinations and a reasonable application of *Strickland*,"

and denied Rivas' petition. In reaching its conclusion, the court noted that even if Calle had called an expert to opine that Valerie had likely died on Saturday, Rivas' alibi was still incomplete for much of the weekend, and Calle was therefore not ineffective for failing to hire a competing expert. Taken together with the "considerable circumstantial evidence" suggesting Rivas' guilt, the court ruled that Rivas had not been prejudiced by Calle's trial strategy.

**The Second Circuit's 2015 Decision**

In 2015, a three-judge panel on the Second Circuit reversed the District Court's decision and ordered a new trial for Hector Rivas nearly three decades after Valerie's death. In reaching its decision, the court first determined that County Court's decision involved an "unreasonable application of *Strickland*" because Calle's "alibi defense amounted to no defense at all." The court insisted that the People's entire case depended on Valerie's time of death being late Friday evening, when Rivas did not have an alibi. Thus, the court reasoned, Calle was inefficient for failing to dispute Dr. Mitchell's testimony and failing to show that Valerie had most likely died on Saturday, and that there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." It's hard for me to imagine that any reasonable jurist could read the record and come to that conclusion.

The 2nd Circuit's attempt at logic and reason fails, however, because its characterization of the People's case and Rivas' alibi defense is wrong. The court seemed to imply that I theorized that Valerie died on Friday night simply because that was when Rivas' alibi was weakest. In reality, regardless of Rivas' "alibi", there was ample circumstantial evidence that showed Valerie could not have been alive after Friday night, and that Rivas lied about not being at her apartment Friday night: she was not seen or heard from after Friday night; she never called Laura Adams to tell her she was not coming to visit on Saturday, and did not answer any of Laura's dozens of calls to the apartment; there was proof from her odometer that she had not driven her car after Friday night; and she made no attempt to contact her father, whose wife was dying of cancer; Valerie's beloved cat was seen wandering outside Valerie's apartment on Saturday morning; an eyewitness who knew Rivas saw him in his usual stalking act outside Valerie's apartment on Friday night; no burglary nor sexual assault took place; Valerie was strangled to death and dehumanized by her killer inserting a foreign object into her rectum; bottles of liquor that the proof indicated Rivas had purchased on Friday night were found in her apartment; and Valerie, a meticulous housekeeper, had somehow left multiple cigarettes in her kitchen ashtray of a peculiar brand that just happened to be the kind smoked by Rivas. Further, Rivas, by his own account, was alone for much of Sunday, and his alibi therefore was not complete for the entire remainder of the weekend. The prosecution's theory of the case was that Valerie died on Friday night because overwhelming circumstantial evidence supported that theory, but the case did not entirely depend on Dr. Mitchell's time of death estimate.

In addition its lack of basis in law or fact, the 2nd Circuit's decision was also replete with significant factual errors about the case and personal comments about me.

*Dr. Mitchell's Time of Death Estimate*

At several points in the decision, the 2nd Circuit suggests that Dr. Mitchell had previously estimated that Valerie's death occurred sometime between Saturday, March 28, and Sunday, March 29, and that six years later, he changed his estimate to Friday, March 27 (seemingly, in Rivas' words, out of "eagerness to please the prosecutor"). While a search warrant affidavit

authored by a Syracuse Police Officer the day Valerie's body was found indicated that Dr. Mitchell had "preliminarily" estimated the time of Valerie's death to be sometime between Saturday afternoon and Sunday morning, there is no evidence to indicate Dr. Mitchell offered an opinion as to her time of death after performing the autopsy or considering the relevant circumstantial factors. In fact, Dr. Mitchell testified at trial that he had not given "the opinion of a specific time of death," and though he may have stated at one point that it was possible that Valerie died on Saturday or Sunday, he "never tied [himself] to such a time." Additionally, he was not investigated by the D.A.'s office until July 1993, four months after Rivas was convicted, leading nothing to indicate that he changed his estimate in order to avoid a criminal investigation.

*Susan Stonecipher's Testimony*

At another point, the court mentions the testimony of a defense witness, Valerie's neighbor Susan Stonecipher. On direct examination, Calle introduced an affidavit that she had written, stating that she saw Valerie in their shared basement on Saturday morning. Presumably, Calle was trying to establish that Valerie had been alive on Saturday, thus disrupting Dr. Mitchell's time of death estimate. In the decision, the court claims that Mrs. Stonecipher promptly changed her testimony during cross-examination by me, stating "on cross-examination . . . the witness readily conceded that she had been mistaken in her affidavit and had in fact seen Hill on Friday morning." This portrayal of the testimony is entirely disputed by a review of the trial transcript, which shows that Mrs. Stonecipher tried to immediately correct Calle on direct examination when he asked her to read the affidavit. Mrs. Stonecipher explained that she had been upset and distracted by Valerie's murder when she gave the first affidavit, but that a few days later, she realized it must have been Friday that she saw Valerie because she had gone into their shared basement to get her uniform before going to work, and she did not work on Saturdays. Mrs. Stonecipher further stated that when she realized her mistake a few days later, she went back to the police and authored a new, correct affidavit. Despite the court's attempt to suggest otherwise, it was therefore on direct examination by defense counsel, rather than on cross-examination by me, that Mrs. Stonecipher "readily conceded that she had been mistaken."

*The Library Book*

One significant piece of evidence at trial was a Stephen King novel that Valerie had checked out from the Cazenovia Public Library. The proof showed that the book had been returned to the library's drop box sometime between Saturday afternoon and Sunday morning, suggesting that Valerie had been alive over the weekend. At trial, however, I theorized that Rivas had returned it in yet another attempt to solidify his alibi and imply that Valerie was still alive. In its decision, the court seemed to dismiss this theory as farfetched or even malicious, stating in a footnote that because the book had been borrowed through interlibrary loan, only Valerie would have known to return it to the Cazenovia Public Library. How could it not occur to the court that Rivas learned about the book when he was in Valerie's apartment Friday night (Note: the 2nd Circuit justices were unfortunately not informed that in preparing the case for retrial, Rivas' fingerprints were found on the library book, conclusively proving that he returned it in an effort to create an alibi).

The 2nd Circuit conveniently disregarded the testimony of two key witnesses, which supported my theory and proved that it was impossible that Valerie returned the book. The first witness, Anita Balducci, had been an employee at Nye Ford in Oneida, where Valerie had gotten her car

serviced on Friday, March 27. Ms. Balducci testified that Valerie's car had an odometer reading of 14,507 miles when it arrived. A police investigator later testified that the odometer reading was at 14,539 miles after Valerie's death, showing it had been driven about thirty-two miles. Officers retraced Valerie's known route for the rest of the day, and found that it consisted of thirty-three miles from Nye Ford, which is nowhere near the Cazenovia Library, to Valerie's apartment. Through their testimony, Valerie's own vehicle provided undisputed proof that she had not driven it after Friday evening—a critical fact that the court chose to ignore in order to support its theory that Rivas was framed.

*New Evidence*

The 2nd Circuit also suggests at various points throughout the decision that there was no new evidence to support Rivas' indictment six years after Valerie's murder, claiming that the state "has identified no new evidence that came to light between March 1987 and November 1992 that led to the indictment," as if that was somehow relevant. Again, the court conveniently ignores facts that dispute its characterization of the case, and completely disregards the new information that was provided by Joe Fields before the indictment. Though the court specifically referenced Joe's trial testimony, it failed to mention that he gave the same testimony before the Grand Jury, thus providing the "new evidence" that led to Rivas' indictment. Incredibly, in its decision, the 2nd Circuit opined that "prosecutors evidently did not learn of this alleged statement until after the indictment was returned, when the witness's girlfriend came forward." In fact, Fields was witness number 17 before the Grand Jury. How is an error like that allowed to occur in a case of this magnitude?

*Dr. Cyril Wecht*

Finally, the 2nd Circuit repeatedly praises forensic pathologist Dr. Cyril Wecht throughout its decision. This is beyond astonishing. Dr. Wecht first achieved fame with conspiracy theorists by being the only pathologist out of the nine hired by the U.S. Congress to opine that President Kennedy was shot from the front, despite overwhelming evidence he was shot from the rear. He has more recently achieved fame by being a paid expert in the infamous Alien Autopsy video as well as being under scrutiny for his online forensic examiner course, complete with certificate suitable for framing by the esteemed doctor. Rivas retained Dr. Wecht after conviction to provide an opinion regarding Valerie's time of death in support of his CPL 440.10 motion. Dr. Wecht estimated that Valerie had likely died sometime between Saturday afternoon and Sunday morning. In the decision, the court describes Dr. Wecht as "renowned," while disparaging Dr. Mitchell as "disgraced" and "allegedly beholden." Despite attempting to compare the character and ethics of Dr. Mitchell to Dr. Wecht, the court conveniently failed to mention that Dr. Wecht was the subject of a six-count Pennsylvania state court indictment in 1980 and an 84-count federal indictment on public corruption charges in 2006. He was acquitted on state charges and the federal case was reluctantly dismissed after a hung jury and court ordered suppression of key evidence. Dr. Mitchell has never been charged with any crime and was investigated for not following proper protocols in removing certain organs from deceased patients. I'm not sure I will ever consider the appellation of "renowned" quite the same in the future.

**Conclusion**

Factual precision and accurate characterization of the evidence matters in all judicial decisions, but perhaps even more so in cases such as this, where a federal court overturns the findings of a state court decades after conviction. To an outside reader with no further knowledge of the facts of this case, it might appear from this decision alone that Hector Rivas was railroaded by a corrupt D.A.'s Office that colluded with an unethical medical examiner. In reality, the evidence against Rivas was overwhelming, as noted by both Onondaga County Court and multiple appellate courts. If federal appellate courts are going to make a habit of overturning state court convictions, they would be well-advised to perform a more thorough review of the record—let alone hold back their personal feelings regarding the public actors involved—if the system is to have any trust in their ability to be fair and impartial.

Many legal scholars and commentators criticize the lack of finality produced by federal habeas review and other extensive avenues of post-conviction relief for state court convictions—a prisoner's conviction can be litigated for decades, preventing both justice for victims and a sense of finality for the survivors. In the current political climate surrounding concern over wrongful convictions, we see this happening more and more: in 2018, the Connecticut Supreme Court ordered a new trial in the case of Michael Skakel, more than 40 years after he murdered his neighbor, Martha Moxley. To best understand my point of view, see the dissent of Justice Carmen Espinosa in this case (*Skakel v. Commissioner of Correction*, 329 Conn. 1, 221 [Supreme Court of Connecticut, 2018]).

As a final note, one of the items found at the crime scene in Valerie's apartment was a marijuana pipe. The pipe had been preserved as evidence and was undergoing testing for DNA as my office attempted to move forward with the new trial against Rivas in 2016. During a bail hearing, Rivas' defense counsel argued that the case could not go to trial until DNA results came back, insisting that the DNA on the marijuana pipe and the cigarettes on Valerie's kitchen table would reveal the identity of Valerie's true killer. After Rivas' untimely death before he could be tried again, the DNA on the pipe and the cigarettes did in fact match the identity of Valerie's killer: Hector Rivas.



Marijuana pipe that Hector's defense attorney demanded be tested
because it contained the DNA of the "real killer."  It did.

 Outlook

---

## Re: Rivas

---

**From** William Fitzpatrick <WilliamFitzpatrick@onondaga.gov>
**Date** Fri 7/19/2019 1:18 PM
**To** jmcmahon <jmcmahon@Syracuse.com>

Thanks Julie. I'm working on a lengthy article about the case. Would be happy to send a draft if you're interested.

Sent from my iPhone

> On Jul 19, 2019, at 1:07 PM, Julie McMahon <jmcmahon@syracuse.com> wrote:
>
> Hi Bill,
>
> Thanks for your note.
>
> I hadn't been very familiar with this case until reading through court papers and our archives this week. Thanks for sharing additional insights. I have tweaked the article in an attempt to be more clear and straightforward about the appeal and the reason the court gave for reversal. I also included a note on your '91 run for office, and that you said you did not mention it.
>
> Always feel free to call if you want to discuss.
>
> Take care, and have a good weekend!
> -Julie
>
>
>
>
>
> -----Original Message-----
> From: William Fitzpatrick <WilliamFitzpatrick@ongov.net>
> Sent: Friday, July 19, 2019 12:07 PM
> To: Julie McMahon <jmcmahon@Syracuse.com>
> Subject: Rivas
>
> Julie, a few things not mentioned in the article.
> 1. There was never a judicial finding that exculpatory was withheld; 2. I never mentioned the case while running in 1991 (I was unopposed); 3. The 2nd Circuit reversed because Rivas' lawyer, in its view, did not effectively pursue an alibi defense; and 4. When faced with a retrial, the People requested DNA analysis of cigarettes and a marijuana pipe found on Valerie's kitchen table. Rivas' new lawyer contended in court this would conclusively reveal the "real killer." It did. Rivas DNA was on the cigarettes and the pipe.
>
> Sent from my iPhone