UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

FLORA RIVAS, Administrator of the Estate of
HECTOR RIVAS,

*Plaintiff,*

-v-

*Civil Action No. 5:19-cv-844 (BKS/CBF)*

ONONDAGA COUNTY, CITY OF SYRACUSE,
WILLIAM FITZPATRICK, DR. ERIK MITCHELL,
AND "JOHN DOES 1-10",

*Defendants.*

---

**DEFENDANT DR. ERIK MITCHELL'S SUPPLEMENTAL BRIEF**

Robert F. Julian, Esq.
**ROBERT F. JULIAN, P.C.**
*Attorneys for Plaintiff*
Office and Post Office Address
2037 Genesee Street
Utica, New York 13501
(315)797-5610

Dated: July 17, 2026

**TABLE OF CONTENTS**

Page #

Table of Authorities ............ ii

Preliminary Statement ............ 1

Statement of Facts ............ 1

Argument ............ 4

STANDARD OF REVIEW ............

POINT I - THE IS NO PROOF OF SCIENTER ............ 9

POINT II - MITCHELL WAS NOT RECKLESS ............ 12

CONCLUSION ............ 15

WORD CERTIFICATION ............ 17

# TABLE OF AUTHORITIES

**Cases** **Page #**

*Davis-Guider v City of Troy*, 2024 WL 5199294, 2024 US App LEXIS 32451 ............... 10, 14

*Graham v. Columbia-Presbyterian Medical Center,*
185 AD2d 753, 588 N.Y.S.2d 2 [1st Dept. 1992] ............................................................. 13

*Melfi v Mount Sinai Hosp.*,
19 Misc 3d 1129[A], 1129A, 2008 NY Slip Op 50940[U], [Sup Ct, NY County 2008]..... 13

*Mervilus v Union County*, 73 F. 4th 185, 193-195 [3d Cir. 2023] .......................................... 11

*Schiffer v. Speaker,* 36 AD3d 520, 828 N.Y.S.2d 363 [1st Dept. 2007]............................. 13

**Statutes and Publications**

Vincent J. DiMaio & Dominick DiMaio, *Forensic Pathology* (2d ed. 2001) ................. 7, 13

New York Pattern Jury Insutrctions 2:150 ............................................................................. 13

PRELIMINARY STATEMENT

We join in the entirety of the County's Supplemental Brief, including its Preliminary Statement.

STATEMENT OF FACTS/ARGUMENT

In his autopsy report in the section entitled "Scene Investigation," Dr. Mitchell opined on the day he assessed Valerie Hill's body and investigated the crime scene in the apartment in which the decedent was found as follows:

> The apartment appeared to have been relatively cool as was the basement through [the] ceiling from the floor upon which the decedent lay.

Dr. Mitchell further opined on that day March 30, 1987 after he performed the autopsy that

> [The] decedent was found prone in her residence by father and brother. Found prone with a piece of blue material around the neck. Last seen Friday by the father, appears as though decedent was there approximately 2-3 days. (DK# 141-5, pg. 18)

Therefore, Dr. Mitchell, on the day the body was found, was of the opinion that the range of the time of death was 2-3 days based on the coolness of the apartment and the circumstantial evidence that her father had not heard from her since Friday even though her step-mother was dying in the hospital. Dr. Mitchell did not on that date know that Rivas was a suspect, or any detail of his alibi or that the window of death was two days, three days or otherwise was a source of controversy. He was simply following usual and customary practice in the investigation and preparation of his report.

The decedent's brain was placed in formalin and a neuropathologist, Dr. George Collins, found that the brain in its deeper areas was riddled with cavities which had developed due to decomposition. Rivas was questioned by the police, not charged. Mitchell played no role in Rivas' interrogation and there is no evidence he was aware of any of the details of the interrogation.

Thereafter, in 1992 to 1993 when District Attorney Fitzpatrick made the determination to investigate Rivas, Dr. Mitchell was asked to give a window or range of time of death opinion. Much later, Dr. Mitchell, when asked by the District Attorney's Office to determine a time of death, opined that looking at Kodachrome slides that were existent of the brain that there was decomposition seen on the slides as reported by Dr. Collins. Dr. Mitchell opined the slides and the report was supportive of a 2-3 day time of death finding, but as he testified not determinative of that finding. (DK# 141-7, p.52-53)

Dr. Mitchell's opinions regarding the time of death were based on the autopsy performed on 3/30/87 and the investigation he engaged in on that date, and any information he received regarding markers as to the time of death.

Dr. Mitchell testified before the Grand Jury on November 10, 1992, his testimony being attached as DK# 141-6 at page 126, when asked if he can accurately pinpoint the time of death of the deceased person, he stated:

> A: No, only Jack Klugman can do that.
> Q: Can you offer guidelines or parameters as to when a person may have died?
> A: Yes.
> Q: Are your findings consistent with this death having occurred sometime during the evening hours of Friday, March 27th?
> A: The 27th and I have her on the 30th as possible, it's on the outside edge of that possibility, but it's possible. (DK#141-6, pg. 126)

That is hardly the testimony of an expert fabricating evidence seeking to dupe a grand jury or demonstrating scienter against the Defendant. Dr. Mitchell is carefully qualifying his testimony, pointing out himself that his opinion, is "on the outside edge". This accurately represents Dr. Mitchell's findings during the investigation as communicated to the District Attorney's Office.

Dr. Mitchell then further testified at the trial in detail with regard to time of death. The Court is respectfully referred to Dr. Mitchell's testimony which commences on page 886 of the trial transcript in which he describes on page 887 the various factors that go into determining the time of death (DK# 141-6). At page 888, he testified that based on his observation of the decedent's body, there was nothing inconsistent with her having died either on Saturday March 28th or Friday March 27th. At page 889, he was then asked a hypothetical question which included Ms. Hill's cat being outside on Saturday morning which was described as very unusual, that no one saw Ms. Hill after Friday March 27th at approximately 7-8 p.m. He was further asked to assume that no one had telephone contact with the decedent notwithstanding the fact that she had plans to visit a friend in the Schenectady area on Saturday and made no contact with that friend either on Friday night or Saturday morning and the friend attempted to contact her numerous times. He was asked to assume that her car was found in the driveway with no additional mileage on it after Friday evening, the 27th and he was asked to assume her stepmother was gravely ill at the hospital and that she had been in almost daily contact with her father about that and that she had not been in contact with her father. (DK# 141-6, pg. 889-890) Based on that hypothetical, Dr. Mitchell testified:

> That it's more likely that she died Friday night to possibly very early Saturday morning, would be the possibility that's given there [stating] I don't know when your over lapse are there with phone calls -- than to have been killed the following day.

On pages 903-906 on cross examination he acknowledges that an average range for rigor would be 24 - 48 hours. Dr. Mitchell, however, indicated that in this case there were circumstances which contributed to the delay in the resolution of rigor mortis and decompositional changes in her brain.

> In addition to that there are other things from the scene. She was laying on a cool floor, which retards all of these processes. <u>And I specifically checked, the basement and it was cool, so…there would be cooling of the body, all of which would retard these processes</u>.
> The night temperatures were cool. And the house, itself, was cool, as I believe…it's about sixty-two degrees if I remember correctly, in the house when it was measured. So all of these processes would remarkably slow…have the potential, at least, for remarkably slowing both the onset and the relaxation of rigor. In strict chemical reactions we speak about something called the Q ten. For every ten degree drop in temperature, we expect to have a reduction of the speed of a reaction by about a factor of two. (emphasis added) (DK# 141-6)

Dr. Mitchell was further questioned as follows on cross examination:

> Q. Dr. Mitchell would you say that forty-eight hours is the outside time frame in which full rigor would start to disappear?
> A. It depends on the conditions of the storage of the body.

Dr. Mitchell further acknowledged on cross examination that it's possible that her time of death was Sunday March 29th, Saturday March 28th. He then was asked:

> Q: Well, is it fair to say that the time of death of Valerie Hill, being attributed to March 27, 1987 is on the outside edge of a possibility? Would that be fair to say?
> A: Probably. (DK# 141-6, pg. 905-907)

Dr. Mitchell was present in the apartment, felt it to be cool, recorded it to be 62 degrees, found the basement to be cool and the floor on which the Decedent was laying to be cool and formed opinions with regard to time of death based on that finding, his review of the autopsy Kodachrome slides and the hypothetical evidence presented at trial by District Attorney Fitzpatrick.

## ARGUMENT

This brief addresses the Court's statement in Footnote 21 in its Memorandum – Decision – Order (Decision) which permits further briefing on the issue as to whether Mitchell recklessly fabricated evidence. We join in the brief of the County and adopt its arguments made therein. The

Court's Decision denying summary judgment centers upon the following as articulated at page 28 of the Decision.

> Were a jury to credit Spitz's testimony, it could fairly conclude that there was no scientific basis for the underlying reasoning Mitchell used to reach his window of death estimation. Mitchell has explained that, in making that estimation, he relied on his examination of Hill's body, the temperature of Hill's apartment, his observations of Hill's brain, and "circumstantial evidence" as to when she was last seen. (See Dkt No. 142-2, ¶¶ 6-8, 12; see also Dkt. No. 141-18, at 43-46, 76-78). Spitz states that, even assuming Hill's apartment was 60 to 70 degrees, rigor and livor would have followed "a fairly standard progression and be[en] consistent with known parameters which allow for a reproducible estimate of the time of death." (Dkt. No. 151-4, at 4). Under that progression, the stiffness would have receded within 48 hours of Hill's death; because her body was stiff when discovered, however, Spitz states that she likely died within 36 hours, and not more than 48, of being discovered. (See *id.* At 5). He also states that Mitchell's livor observations support the same conclusion. (*Id.*). Spitz is aware of no scientific literature supporting the proposition that a 62-degree environment could "prolong rigor mortis . . . to any significant measurable degree." (Dkt. No. 151-5, at 8-9). Similarly, he states that, to the extent Mitchell used the observation of cavities in Hill's brain to determine her time of death, that would have resulted in an "inaccurate and forensically unreliable" estimation. (See Dkt. No. 151-4, at 5).

At no time does the Court reference any testimony from Dr. Spitz declaring that Dr. Mitchell's opinions were reckless or that he had scienter.

Dr. Mary Jumbelic, who served as the Chief Medical Examiner of Onondaga County from 1998 – 2009 and prior to that served as Deputy Chief from 1995 to January 1998 and who served as a clinical assistant professor and then a clinical associate professor in the State University of New York Department of Pathology from 1996 to 2009, identified that:

- Mitchell's opinions as to time of death having been 2-3 days was reached consistent with and within the standard of practice. (para. 3)
- Forensic pathologists used multiple observations to estimate the time of death including "rigor mortis, livor mortis, body cooling and gastric contents". These would have been

the parameters in 1987. The time of death falls between "when the Decedent was last seen alive and when they were found dead." (para. 2) She further affirmed that while time of death estimations would not exclusively be based on history, it is a integral part of the scientific process which along with his examination of the scene, the condition of the brain and opinions based on the slides, the autopsy and the investigation complied with the consensus standards for pathologists. (DK# 141-29)

Mitchell did not fabricate that window. The facts available to him on March 31, 1987 were that the father had not heard from the Decedent since Friday. Decades later we do not know what other details he learned regarding the significance of this fact. He opined the window was therefore 2-3 days. There is no testimony or opinion by Dr. Spitz that considering the history in reaching the time of death range was reckless.

Dr. Jumbelic opines that the ambient air temperature reported by Dr. Mitchell which was that the apartment a cool 62 degrees, the floor she was laying on was cool, "as was the basement which Dr. Mitchell was in as part of the investigation were appropriate factors to consider" (DK# 141-29, para. 12) She states further that Dr. Spitz is incorrect in stating there was no reliable medical or scientific support for Dr. Mitchell's opinions at trial. (DK# 141-29, para. 7) She recites the circumstantial markers, the brain slides, the scene investigation, the autopsy, and investigative facts. (DK# 141-29, para. 2)

The Court quotes our initial brief as stating this is a classic battle of experts. That is accurate as to the issue whether or not Mitchell was negligent in his performance of the autopsy, his participation in the investigation or otherwise. At no time did Dr. Spitz opine Dr. Mitchell was reckless. Dr. Spitz opined he did not deviate from the standard of care and that he used judgment but Dr. Mitchell's conclusion regarding rigor was an outlier. That does not make Dr. Mitchell

reckless much less demonstrate scienter. It is difficult to reconcile Dr. Spitz's inconsistency in his testimony except to accept at face value his opinions that there was no deviation; he did not agree with the outlier opinion regarding duration or rigor and that if there was a deviation it was that opinion as offered at trial.

His disagreement with Mitchell's scientific basis is that he is aware of no scientific support for Mitchell's opinion based on the fact that the apartment was 62 degrees was verbal gymnastics. But he also states, "I think the scientific data associated with this case is really more reliable concerning those pieces of information, to my knowledge haven't been verified," referring to the circumstantial facts set forth in the trial hypothetical (DK#, 141-20, pg. 26). In fact the hypothetical assumptions were based on that transcript which Dr. Spitz did not read (DK# 141 -20, pg. 15-16 , 26-48). He agreed that a cool or cold environment could delay rigor – he simply stated there was no literature supporting 62 degrees temperature as delaying rigor (DK# 141-20, pg. 32-33). In fact, Mitchell opined the apartment, the floor of the apartment and basement of the apartment were relatively cool as noted above. One major source agrees with Dr. Mitchell that cold impacts rigor mortis – DiMaio and DiMaio[1] in Forensic Pathology, 2d Edition, stated on page 26 of their 2001 text: "Cold and freezing will delay the onset of rigor mortis as well as prolong its presence". All of the foregoing reflects that Dr. Mitchell was not reckless. Here is what DiMaio says about the use of circumstantial evidence in the manner used by Mitchell in the investigation and in his testimony:

> Scene Markers
> One of the most reliable ways of predicting time since death is simply to investigate when the decedent was last seen alive and when they were found dead – indicating that the death

[1] Dr. Dominick J. DiMaio specialized in medicolegal death investigations and helped shape modern forensic protocols during his storied career as Chief Medical Examiner of New York City in the 1970s. His son, Dr. Vincent J.M. DiMaio, is also considered a world renown expert in the field of forensic pathology having served as a gunshot expert in many high-profile cases and Chief Medical Examiner of Bexar County in San Antonio, Texas from 1981 to 2006.

occurred sometime in between. Though unscientific and often imprecise, this method does give the most reproducible and accurate account of the postmortem interval.
In order to narrow this window, investigators may also utilize markers present at the scene in an attempt to determine the last known alive time. Helpful scene markers may include:

- Cell phone calls or text messages
- Uncollected mail or newspapers
- Whether the lights are on or off
- How the individual is dressed
- Any food that is out or dirty dishes in the sink
- Sales receipts or dated slips of paper in the deceased's pockets
- Witness statements – for example, if a decedent typically went for a walk every evening and suddenly is no longer seen, then one might conclude that death occurred on or about the day they failed to take his walk (pg. 31)

The markers used by Mitchell in drawing his conclusions at trial were investigative facts proven at trial. That Mitchell had scienter or intent to recklessly misrepresent evidence is not credibly demonstrated when Mitchell first opined the time of death was two to three days in his 3/31/87 autopsy report. He testified and affirmed that he formed this opinion based upon the temperature in the apartment of 62 degrees, the body being on a cold floor delaying the body advancing out of rigor, the fact that the Decedent's father did not hear from her since Friday and the appearance of the brain. There is no proof at that point Mitchell was aware of Rivas as a suspect or any fact surrounding his alibi or that this finding was reached too. Mitchell was not under investigation and Fitzpatrick was not employed by the DA's office on March 30, 1987. There is not one single fact that would indicate scienter – a reckless effort to jade the evidence.

Mitchell next opined thereafter during the investigation that 3 days (Friday) was at the outer limits of the range for the time of death. His opinion was based on the same facts with additional circumstantial facts of the Decedent's not engaging in contact with anyone or being seen after Friday night. There is no factual dispute offered by the Plaintiff because the facts considered by

Mitchell set forth in the trial hypothetical were in the trial record to provide a foundation for the question.

While Mr. Mitchell and Dr. Spitz may disagree regarding what is or is not a outlier with regard to the effect of temperature on rigor, there is no hard and fast rule or range as Dr. Spitz concedes, there is rather the exercise of judgement (DK# 141-20, pg. 28-30). Moreover, he concedes that Mitchell did not deviate from the standard of care in performing the autopsy or range of death opinion but asserts he was using an outlier while acknowledging Mitchell had the advantage in actually being in the apartment to gauge the factors relating to rigor.

Mitchell was not under investigation on 3/31/87 and his opinions did not change during the investigation of this case up to his testimony in the Grand Jury or at trial.

THE IS NO PROOF OF SCIENTER

There is no scienter on the part of Mitchell. Both the Defendant Mitchell and his expert have provided the Court with sworn testimony or affirmation swearing that integral to determining time of death is an examination of the circumstances surrounding the death. Plaintiff has not met her burden. The Court must give great weight to the circumstantial evidence or markers which are important to evaluate whether there is sufficient proof of scienter to deny summary judgment and which directed Mitchell to a time of death which was within the range of 2-3 days prior to the body of Valerie Hill being found. The fact that the decedent was not seen after Friday, that she was intended to be with her best friend on Saturday and did not respond to phone calls, that her step-mother was dying in the hospital and she did not check in with her family, that she was last seen by anyone alive on Friday, and that her car had not been moved from Friday. These facts proven at trial were part of the investigation and conclusively undercut any scienter assertion by the Plaintiff.

Dr. Spitz ignores in his letter report the underlying facts in the case that were accumulated during the investigation and proven at trial: the Decedent was not seen after Friday, her car was not moved from Friday, her step-mother was dying in the hospital and yet she had no contact with her father after a Friday night dinner, she was scheduled to see her friend in Saratoga on Saturday but did not call to advise her she was not coming and did not answer her phone. Given the facts of the window of death, Hill's not providing any proof of life, the cool environment of Hill's apartment noted in the autopsy report becomes an explanation for the body being in rigor when found.

On March 28, 1987 within a few hours of her body being found, Mitchell opined that Valerie Hill had been dead 2-3 days based upon his autopsy and his investigation at the scene. At that point there is no proof that Mitchell knew or even could have known anything about the relevance of that opinion as it related to the alibi of Rivas. There was no scienter. There was no malevolent attempt and certainly no fabrication as he formed his opinion based upon the findings of the investigation which included a finding that 62 degrees was the temperature in the apartment which was recorded contemporaneously. Mitchell noted that the apartment was cool, that the basement was even cooler, that the body was laying on the floor, and that these factors impacted the status of her rigor. Consequently, at that point there can be no reasonable finding based on the facts that Mitchell was in any way reckless in forming his opinions as to the range of the cause of death. In fact, the exclusion by Dr. Spitz of any consideration of circumstantial evidence as a factor in forming time of death could be argued to be reckless. It is well established as noted by Defendant's expert Dr. Jumbelic that a consideration of the circumstances – the circumstantial evidence is integral to arriving at cause of death.

The Court's reliance upon a note generated by Investigator Tynan years later when Rivas case was being prepared for prosecution is nothing more than an unrecollected brief jotting of a

conversation with Mitchell. Mitchell does not remember the conversation. Brain decomposition was only one factor in terms of Mitchell's determination of cause of death. That there was decomposition was noted and there could have been several causes including but not limited to the body having been present for 2-3 days dead and undiscovered.

The Second Circuit found in *Davis-Guider v City of Troy*, 2024 WL 5199294, 2024 US App LEXIS 32451, that the Defendant Medical Examiner's failure to wait for all medical test results before declaring the death a homicide, failing to tell the Grand Jury that EMS's unsuccessful CPR attempts might have contributed to the death of the Decedent. The Court noted "And even assuming Sikirica should have given greater consideration to alternative explanations for V.D.'s death, that failure would not be akin to bad faith, which requires that any "discrepancies between the evidence assessed by the authorities and the evidence presented [must be] so substantive that the failure to disclose them would be comparable to fraud or perjury."[2] Further citations omitted. This Court in its decision cites *Mervilus v Union County*, 73 F. 4th 185, 193-195 (3d Cir. 2023). In *Mervilus* the polygraph examination used to CONVICT the defendant was performed with a protocol that was unambiguously not generally accepted by the governing polygraph organization and in fact discredited. Moreover, the State of New Jersey required established polygraph techniques to be used as a condition for the admissibility of polygraph examinations which was not complied with by the examiner in *Mervilus*. Moreover, there was a formal opinion from the National Trade Association that the test was unreliable and had been criticized in polygraph literature. There was subjectivity and bias found in the observations of the polygraph officer who deemed *Mervilus* to not be truthful.

[2] Mitchell testified both to the Grand Jury and Trial that his opinion regarding the time of death was on the "edge" of the window and in part based on the hypothetical that demonstrated there was no proof the decedent was alive after Friday evening he testified at trial that it was most likely she dies in the late hours of Friday or early Saturday (DK# 141-6, pg. 889-890)

In the case at bar, Dr. Mitchell used established techniques. He investigated the site. He found the temperature to be 62 degrees with the floor cool and the basement cool. He formed impressions with regard to the Decedent's rigor based upon the temperature in the apartment that he experienced while in the apartment investigating including the cool floor above the basement. He observed the brain of the Decedent. Dr. Sikirica did not wait for lab tests and misstated facts. The second circuit did not find him to be reckless. He had an initial factual marker that by the time of trial was part of accumulated facts demonstrating that the decedent was not alive after early Friday night. Mitchell's detailed examination and conclusions based thereon are demonstrably superior to the work of Dr. Sikirica. When he arrived at the initial conclusion of 2-3 days as to the time of death, he was unaware of Rivas' alibi.

MITCHELL WAS NOT RECKLESS

Mitchell was consistent from the very day that he examined the deceased body 3/31/87 throughout the investigation in his opinion that the time of death range was 2-3 days. In his autopsy report he wrote: "Last seen Friday by the father. Appears as though deceased was there approximately 2-3 days." The father and brother found the deceased on March 31st and reported her demise to the police. It was an important piece of information for Dr. Mitchell because we know that the Decedent's step-mother was in the hospital dying, that Valerie had dinner with her father Friday night. This note in the autopsy report indicates that Mitchell either directly or indirectly attempted to determine the last time the Decedent was seen alive, which as noted by Dr. Jumbelic is an appropriate and legitimate area of inquiry, one which Dr. Spitz dismisses. While this is in fact a classic battle of the experts, Dr. Spitz admitted that the autopsy was done within usual, customary and accepted practice as was the determination of the range of time of death. He differs in the opinion regarding rigor being impacted by the coolness of the room. Dr. Spitz is not in any place

arguing that Mitchell conjured up or manufactured evidence. Dr. Spitz simply opines that, Dr. Mitchell's opinion as to the temperature of the apartment impacting time of death was an outlier. However, he concedes that there is a bell shaped curve with regard to rigor developing and subsiding and that Mitchell's opinion is on that curve. Mitchell himself both in the Grand Jury and at the Trial candidly acknowledged that Friday was on the edge of the window of death, made more likely by the circumstantial facts in the case that the decedent was not alive after Friday. While that may be an issue as to the standard of care, respectfully the Court cannot properly reach that there was evidence of recklessness or scienter to support a denial of summary judgment. Existing New York State Common Law is instructive.

The standard of care in medical malpractice cases in New York is defined as a deviation from good, usual, customary and accepted practice. (see New York State PJI 2:150) The common law must be applied by the Court in its analysis whether Dr. Mitchell's performance as a physician was negligent or reckless. The assertion by Plaintiff through Dr. Spitz is that Dr. Mitchell was incorrect in applying the science applicable to rigor and that there is no scientific support for his opinion that 62 degrees delays rigor, is undercut by his investigation. In the "scene investigation" portion of the autopsy report he states:

> "The apartment appeared to have been relatively cool as was the basement through the ceiling from the floor upon which the Decedent lay."

As noted above, a leading pathology text supports Mitchell's opinion in this case that the cool condition in the apartment, on the floor of the apartment/ceiling of the basement, could impact rigor:

> "Cool or freezing will delay the onset of rigor mortis as well as prolong its presence." (DiMaio pg. 19)
> "Rigor mortis usually appears 2-4 hours after death and fully develops in 6-12 h. This can vary greatly. (ibid pg. 19)

In this case the Court is applying the recklessness standard to evaluate whether Mitchell violated Rivas' constitutional rights, based on a reckless deviation from the standard of care. There is no opinion offered by Plaintiff's expert that Mitchell was reckless. Punitive damages in medical malpractice actions are recoverable where a defendant's conduct is so wantonly dishonest, grossly indifferent to patient care, or malicious and/or reckless, where a defendant doctor's conduct was not wantonly dishonest, grossly indifferent or malicious or reckless an award of punitive damages is not appropriate. *See Schiffer v. Speaker,* 36 AD3d 520, 828 N.Y.S.2d 363 [1st Dept. 2007]; *see also Graham v. Columbia-Presbyterian Medical Center,* 185 AD2d 753, 588 N.Y.S.2d 2 [1st Dept. 1992]." *Melfi v Mount Sinai Hosp.*, 19 Misc 3d 1129[A], 1129A, 2008 NY Slip Op 50940[U], [Sup Ct, NY County 2008]. While there may be a difference between Dr. Spitz and/or the deceased Dr. Wecht, there had been no demonstration of Mitchell's conduct in this case as being wantonly dishonest, grossly indifferent or malicious and/or reckless sufficient to support a fabrication of evidence claim. A finding therefore of a reckless intent or scienter is not possible or discernible based on the facts in this case, and clearly Mitchell's thought process had a basis that he consistently followed throughout the investigation and was indeed buttressed by further circumstantial facts. He did not ignore the science, he interpreted the science based upon the facts that he was presented with including the temperature of the apartment and the fact that he had been advised by either the father or the police department that she had last been seen Friday by the father. While Dr. Spitz, who did not read any of the trial transcript except for Dr. Mitchell's testimony, Dr. Mitchell weighed all of the available evidence in forming his opinion. (DK# 141-20, pg. 15-16, 48)

Given the absence of proof of recklessness, it is difficult therefore to reconcile the Court's decision in this case with *Davis-Guider*, 2024 WL 5199294, *Supra*. Unlike Dr. Sirika in *Davis-*

*Guider*, Mitchell was not ignoring facts or engaged in an incomplete investigation. Rather, he investigated, had a basis for his opinion as to why rigor was still present which is the cool temperature of the apartment and the basement below it, and found his opinion to be buttressed by the circumstantial facts cited in his testimony. Nowhere in this circumstance is there recklessness or scienter to do harm to Rivas.

We would respectfully point out that Dr. Spitz in testifying that Mitchell did not deviate from the standard of care and was using judgment –was essentially saying that he thought Mitchell was wrong but that was an honest disagreement between the two professionals. Likewise, as Dr. Jumbelic points out, Dr. Spitz in ignoring the circumstantial evidence in the case demonstrating the decedent's likely demise on Friday evening/the early hours of Saturday was providing an incomplete opinion to the Court.

## CONCLUSION

There is no evidence of scienter or an effort by Dr. Mitchell to any way jade or impact the investigation in the Rivas case. There is no fabrication of evidence. As he has acknowledged in his deposition his opinion with regard to time of death was consistent with the standard although the time of death on Friday was at the outer limits thereof. His opinion that based on the circumstantial evidence, it was more likely that the time of death was on Friday is well within the accepted confines of a pathologist providing opinions to police agencies and district attorneys. It is noteworthy that neither Dr. Mitchell nor District Attorney Fitzpatrick were asked directly the central theory of the case here which is did he fabricate his testimony for the district attorney for any reason including but not limited to the pending investigation which the Court draws inferences from but there is no direct proof of. We respectfully submit that this is an unfair and unsubstantiated inference not supported by any competent evidence.

Dated: July 17, 2026

Yours, etc.

Robert F. Julian, Esq.
ROBERT F. JULIAN, P.C.
*Attorneys for Defendants*
Office & P.O. Address
2037 Genesee Street
Utica, New York 13501
(315) 797-5610

To: Rob Rickner, Esq.
Joshua S. Moskovitz, Esq.
RICKNER MOSKOVITZ LLP
*Attorneys for Plaintiff*
Office and Post Office Address
14 Wall Street, Suite 4C
New York, New York 10005

Scott A. Korenbaum, Esq.
LAW OFFICES OF SCOTT A. KORENBAUM
*Attorneys for Plaintiff*
14 Wall Street, Suite 1603
New York, New York 10005

John E. Heisler, Jr., Esq.
ONONDAGA COUNTY DEPARTMENT OF LAW
*Attorneys for Defendants*
421 Montgomery Street, 10th Floor
Syracuse, New York 13202

Mark A. Ventrone, Esq.
ONONDAGA COUNTY DEPARTMENT OF LAW
*Attorneys for Defendants*
421 Montgomery Street, 10th Floor
Syracuse, New York 13202

WORD COUNT AND PAGE LIMIT CERTIFICATION

I hereby certify that the total number of words in the Defendant Dr. Erik Mitchell's Supplemental Brief, including of point headings and footnotes, and exclusive of the caption, the table of contents, table of authorities, and signature block, is 5,253 words and a total of 17 pages, which meets the word count and page limits.

Dated: July 17, 2026

Robert F. Julian, Esq.
ROBERT F. JULIAN, P.C.
Attorneys for the Plaintiff
2037 Genesee Street
Utica, New York 13501
Tel: (315) 797-5610