UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FLOR RIVAS, Executor of the Estate of Hector Rivas, also known as FLORA RIVAS, formerly known as SIDNEY MANES, Administrator of the Estate of Hector Rivas,<br><br>Plaintiff,<br><br>v.<br><br>ONONDAGA COUNTY AND ERIK MITCHELL,<br><br>Defendants. | Civil Action No.: 5:19-cv-844 (BKS/CBF) |

# **ONONDAGA COUNTY'S SUPPLEMENTAL BRIEFING REGARDING STATUTE OF LIMITIATIONS, *MENS REA*, THE APPROPRIATE SCOPE OF TRIAL, AND APPLICABLE *BRADY* STANDARD**

Date: July 17, 2026

John G. Powers, Esq.
Mary L. D'Agostino, Esq.
Hancock Estabrook LLP
1800 AXA Tower 1, 100 Madison Street
Syracuse, NY 13202
Tel: 315-565-4500

*Attorneys for the County Defendants*

## PRELIMINARY STATEMENT

Following the Court's summary judgment decision in *Rivas v. Onondaga Cnty.*, No. 5:19-CV-00844, 2025 WL 2675826, at *1 (N.D.N.Y. Sept. 18, 2025) (Sannes, C.J.), there are two limited *denial of fair trial* due process claims remaining to be tried before the Jury trial to commence on November 30, 2026:

1. **Claim 5**: Against Defendant Dr. Erik Mitchell for allegedly fabricating evidence regarding his opinion that the victim "could have died as early as the evening of Friday, March 27"—*i.e.*, the "window of death estimation."[1]
2. **Claim 7**: Against Onondaga County (*via Monell*) for:
   a. Dr. Mitchell's "window of death estimation" as a "municipal policymaker."[2]
   b. Onondaga County District Attorney William Fitzpatrick's[3] alleged failure to turn over *potential Giglio* impeachment material undermining Dr. Mitchell's testimony.[4]

Plaintiff previously confirmed to the Court on the record that no additional theories will be pursued at trial. *See* Transcript from In-Person Conference at 3:10-16.

## ARGUMENT

### I. PLAINTIFF'S ACTION IS TIME BARRED AND MUST BE DISMISSED.

On April 20, 2015, Onondaga County Court Judge Thomas Miller vacated Mr. Rivas's conviction pursuant to New York State Criminal Procedure Law ("CPL") § 440.10(1)(h), which provides that a state court may vacate a criminal conviction where it "was obtained in violation of a right of the defendant under the constitution of … the United States." *See* CPL § 440.10(1)(h); *see also* D'Agostino Decl., Ex. A.

While Mr. Rivas was waiting for his second criminal trial to commence, he was released

---

[1] *Id.* at *12, *see also* fn 17.

[2] Id. at *18.

[3] DA Fitzpatrick is no longer a party to this action.

[4] Id. at *21-22.

from custody due to an unrelated cancer diagnosis. On July 10, 2016, Mr. Rivas passed away. *See* D'Agostino Decl., Ex. D.

Four days following his death, on July 14, 2016, the County Court dismissed the original Onondaga County Grand Jury indictment after having been notified of Mr. Rivas's death.[5] *See* D'Agostino Decl., Ex. E. This lawsuit was commenced on July 13, 2019. *See* Dkt. No. 1. In its operative Answer, the County asserted as an affirmative defense that the applicable statute of limitations barred the pursuit of Plaintiff's constitutional claims. *See* Dkt. No. 22 at ¶¶ 37-39.

The predicate facts necessary to decide this affirmative defense are known and undisputed. However, the threshold question of law to be decided to determine the timeliness of Plaintiff's claims is whether Mr. Rivas's § 1983 claims accrued: (a) on the date his criminal conviction was vacated (April 20, 2015); (b) on the date of his death (July 10, 2016); or (c) on the date the indictment was dismissed by County Court (July 14, 2016). If the claims accrued on the earlier two of the three dates, this lawsuit is untimely.

The statute of limitations ("SOL") for a § 1983 denial of fair trial/fabricated evidence claim is three years.[6] Both the Supreme Court and the Second Circuit have recognized that a fabricated evidence claim will not accrue if the civil claim might undermine a nascent or existing criminal conviction under the *Heck v. Humphrey* doctrine. *See, e.g., McDonough*, 588 U.S. at 119-20 ("[o]nly once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated within the meaning of *Heck*, … will the statute of limitations begin to run"). Thus, the moment the *Heck* bar no longer applies, the accrual clock for the statute

[5] The County Court minutes reflect that the dismissal was entered pursuant to NY CPL §160.50. *See* D'Agostino Decl., Ex. E); *but see People v. Nowell*, 80 Misc. 3d 689, 706 (Sup. Ct., New York County 2023) ("For these reasons, this Court is required to dismiss this case as abated by death. However, the court will dismiss the matter pursuant to CPL 210.20 (1) (h), on the grounds that there 'exists some other jurisdictional or legal impediment to conviction of the defendant for the offense charged,' therefore providing the People an opportunity to appeal this matter to a higher court."), *aff'd sub nom. People v. Cruciani*, 238 A.D.3d 462 (2d Dep't 2025).

[6] *See McDonough v. Smith*, 588 U.S. 109, 113 (2019).

of limitations starts ticking. *See id; see also Smalls v. Collins*, 10 F.4th 117, 136 (2d Cir. 2021) ("all that is required is that the underlying criminal proceeding be terminated in such a manner that the lawsuit *does not impugn an ongoing prosecution* or outstanding conviction" (emphasis added)).

The end of the *Heck* bar—and the ensuing accrual of the statute of limitations period—is effectively measured by the earlier of two alternate benchmarks:

> [a] "once the criminal proceeding has ended in the defendant's favor, *or*
>
> [b] "a *resulting conviction has been invalidated* within the meaning of *Heck*…."

*Smalls*, 10 F.4th at 138 (emphasis added) (citing *McDonough*, 588 U.S. at 119-20) These alternatives are framed as *disjunctives*—meaning that either one or the other would be sufficient to trigger the statute of limitations. *Smalls*, 10 F.4th at 138 ([t]he Supreme Court phrased its accrual rule disjunctively….)[7].

1. *The SOL accrued when Mr. Rivas's underlying criminal conviction was vacated by County Court on April 20, 2015.*

In its 2020 decision adjudicating a motion to dismiss made by the City of Syracuse, this Court did not reach the statute of limitations question, but nonetheless noted in *dicta* in a footnote that the criminal proceedings had *not* terminated in Mr. Rivas's favor until the indictment was posthumously dismissed on July 14, 2016. *See Manes v. Onondaga Cnty*., No. 5:19-CV-00844, 2020 WL 3893021, at *9 n.7 (N.D.N.Y. July 10, 2020). Notwithstanding the

[7] The harmonization of these two benchmarks is that the first applies *before* the conviction is obtained and the latter standard occurs *after* a conviction is obtained. This comports with the holding of *McDonough* itself, which determined whether there was a statute of limitation accrual pre-conviction. In other words, the first trial in *McDonough* ended in a mistrial, while the second ended in an acquittal. The first prong of the bifurcated standard applied because there was never a conviction and so the Court was measuring whether the criminal proceeding terminated in the plaintiff's favor.

potential[8] validity of this observation, the Court's decision never reached the issue of whether the *second* of the disjunctive *McDonough* accrual triggers—*i.e.*, the *invalidation of the conviction*—had occurred prior to the dismissal of the indictment (nor had that particular argument been made to the Court). While the Court's observations contained within footnote 9 of its prior decision were made post-*McDonough*, they were prior to the Second Circuit's clarifying decision in *Smalls*.

Given that the *invalidation of a conviction* is a clear accrual trigger for the SOL under *McDonough*, it necessarily begs the question—does an order of County Court, which vacates a conviction constitute an *invalidation* of that conviction? The plain meaning interpretation of that procedural outcome would suggest it does.

Black's Law Dictionary defines "*vacate*" as: "To nullify or cancel; *invalidate*."[9] The Second Circuit has concluded that an order vacating a conviction is such an *invalidation*. *Poventud v. City of New York*, 750 F.3d 121, 134 (2d Cir. 2014) (A court "*invalidate[s]* the final judgment in [a] state criminal trial when [it] vacate [s] [a] conviction.") (emphasis added);[10] *c.f., Roberts v. City of Fairbanks*, 947 F.3d 1191, 1203 (9th Cir. 2020) ("where, as here, a § 1983 plaintiff's conviction is vacated by a state court, that conviction has been "*declared invalid* by a state tribunal authorized to make such determination," … "and that *Heck* is therefore no bar to the suit." (emphasis added)).

[8] This initial observation by the Court in 2020 was only potentially correct because there is a meritorious argument that any ongoing criminal proceedings against Mr. Rivas necessarily terminated against him by operation of law on the day he passed away. (as discussed more fully *infra*).

[9] VACATE, Black's Law Dictionary (12th ed. 2024).

[10] *See also Johnson v. New York City Police Dep't*, 651 F. App'x 58, 60 (2d Cir. 2016) ("Johnson's *Brady* claim is *Heck*-barred. Johnson has not alleged, either in his complaint or on appeal, that his assault conviction has been invalidated in any way. To the contrary, he stated that the state court denied his motion to vacate his conviction."); *Brown v. Budelmann*, No. 523CV00002, 2023 WL 4424119, at *3 (N.D.N.Y. Apr. 17, 2023) (since the plaintiff's conviction is "not alleged to have been reversed or vacated, [the] Section 1983 claims are not cognizable under *Heck*"); *Ravenell v. Cnty. of Nassau*, No. 18-CV-6010, 2019 WL 5423435, at *7 (E.D.N.Y. Oct. 21, 2019) (a "conviction has been invalidated" under *Heck* where it has been "reversed or vacated").

Under a plain interpretation of *McDonough v. Smith*, as interpreted and clarified by the Second Circuit in *Smalls v. Collins*, Mr. Rivas's claim accrued when his criminal conviction was first invalidated by County Court Judge Miller on April 20, 2015, in which he ordered Mr. Rivas's conviction vacated pursuant to CPL § 440.10(1)(h). *See* D'Agostino Decl., Ex. B. At that moment, any *Heck* bar associated with Mr. Rivas's original conviction was dissipated and he could have commenced a lawsuit. Because this lawsuit was initiated more than three years after that accrual date, this lawsuit is time barred and should be dismissed.

Plaintiff may argue that the fact that Mr. Rivas was to be *retried* after his conviction was vacated either continued the existing *Heck* bar, or otherwise resurrected or created a new one, that further tolled the SOL on any fabrication claim. To be fair, there is some support for this position within the district courts, including this court. *See, e.g., Arrington v. LoTempio*, No. 22-CV-6141-FPG, 2023 WL 375098, at *4 (W.D.N.Y. Jan. 24, 2023) ("[b]ecause [plaintiff's] criminal case has been remanded for a new trial and is still pending, his fair trial claim has not yet accrued");[11] *Thomas v. Mason*, No. 1:17-CV-626 (DJS), 2019 WL 6111572, at *3 (N.D.N.Y. Nov. 18, 2019). But, these cases, for the most part, did not consider or otherwise have the benefit of the Second Circuit's August 2021 *Smalls* discussion of *McDonough* and assumed that a "favorable termination"—*i.e.*, that the ending of all criminal proceedings against the plaintiff "in [his] favor" was the *only* way to measure the accrual of the statute of limitations for a fair trial claim. The Second Circuit's interpretation in *Smalls* cannot be reconciled with such an interpretation. As noted above, there the Second Circuit recognized that *McDonough* set forth *two disjunctive triggers* for accrual of a fair trial claim: (1) "once the criminal proceeding has ended in the defendant's favor" [*i.e.*, favorable termination of the criminal proceedings] "**or**" (2)

---

[11] This decision was issued pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A and, thus, did not address *McDonough* or *Smalls.*

upon invalidation of "the resulting conviction." *Smalls*, 10 F.4th at 135, 138.

These two triggers simply could not be interpreted disjunctively if the accrual rule merely provided that as long there were ongoing criminal proceedings, there could be no fair trial claim. If that were the case, there would be no need for the second prong of the *McDonough* standard. In other words, the first prong would swallow the second prong. Thus, under *McDonough* and *Smalls*, *it cannot be* that the order vacating Mr. Rivas's original conviction (which would accrue the statute of limitation under the second prong of *McDonough*) did not lift the *Heck* bar, simply because he had not yet satisfied the first prong of the disjunctive *McDonough* standard.

This makes practical and logical sense. The "fair trial" that is at issue is the conviction that resulted from Mr. Rivas' *first* criminal trial—*i.e.,* the one that was vacated by Judge Miller on April 20, 2015. It is the conduct underlying *that* conviction (and the imprisonment that resulted from that conduct) that Mr. Rivas challenges by this action. Any future potential second criminal trial had nothing to do with alleged constitutional violations being challenged in this case, which arise solely from the conduct associated with first trial that resulted in a now-vacated conviction.

While this issue does not appear to have been directly addressed by the Second Circuit post-*Smalls*, every other Circuit to have addressed this issue has validated this logic. For example, in *Smith v. Gonzales*, 222 F.3d 1220, 1222 (10th Cir. 2000), the plaintiff's initial conviction was vacated by the Tenth Circuit based on *Brady* violations and remanded for retrial. Applying *Heck*, the Tenth Circuit determined that the original conviction had become "invalid" under *Heck* when it was vacated and therefore any fair trial claim accrued upon the decision vacating the initial conviction. *Id*. The Tenth Circuit rejected the argument that the plaintiff's future retrial continued to toll the SOL because the future trial "necessarily could not have

implicated the constitutional violations at issue in Smith's [initial] trial." *Id*.

Other Circuits confirm this application. *See Jackson v. Barnes*, 749 F.3d 755, 761 (9th Cir. 2014) (accrual occurred when plaintiff's "initial conviction was overturned in March 2004" regardless of his retrial thereafter); *Del Real v. Gomez,* 330 Fed. Appx. 110, 111 (7th Cir.2009) ("[w]hat might happen in a subsequent prosecution is neither here nor there; the claim accrues as soon as the only obstacle to the litigation—the adverse judgment—has been lifted"); *D'Ambrosio v. Marino*, 747 F.3d 378, 384 (6th Cir. 2014) (rejecting the "argument that *Heck* tolls the accrual of [plaintiff's] claims until the state cannot possibly retry him");[12] *see also McCarty v. Gilchrist*, 646 F.3d 1281, 1290 (10th Cir. 2011) ("For purposes of the accrual date, the dispositive question is when McCarty's conviction was no longer outstanding.").

Although it did so on a corollary (but related) issue, the Second Circuit discussed and approved of the Tenth Circuit's holding in *Smith v. Gonzales* in its 2014 decision in *Poventud v. City of New York*, 750 F.3d at 134. In *Poventud*, the Second Circuit cited *Smith* and observed that even if a criminal defendant is retried, "a § 1983 suit concerning the earlier trial *could not impeach the new trial's result*" and accordingly, from the moment the earlier conviction was vacated, "a § 1983 suit would not demonstrate the invalidity of the vacated conviction" *nor would it "impugn a retrial*." *Id*. (emphasis added). Under *Poventud*'s holding, any *Heck* bar associated with Mr. Rivas's first conviction would not be implicated by any potential retrial. *Id*. ("a retrial … could not replicate the constitutional violations at issue (since the defendant must, by definition, have been made aware of the *Brady* material before *vacatur*").

As a result of the foregoing, and the bifurcated/disjunctive standard articulated by the Supreme Court in *McDonough* and the Second Circuit in *Smalls*, Mr. Rivas's fair trial claims

[12] *But see Jordan v. Blount Cnty.*, 885 F.3d 413, 416 (6th Cir. 2018) (referring to *D'Abrosio*'s analysis as dicta and reaching a contrary conclusion).

should be found to have accrued on April 20, 2015 and are therefore time barred.

2. *The latest Mr. Rivas's fair trial claims accrued were upon his death, which necessarily abated the underlying criminal proceeding.*

Even if the Court determines that the invalidation of Mr. Rivas's original criminal conviction did *not* constitute the accrual trigger for his § 1983 fair trial claims, the latest his cause of action could have accrued was on the date of his death, *i.e.*, on July 10, 2016.

What recent case law from the Supreme Court and the Second Circuit makes clear is that the only impediment to § 1983 fair trial claim accruing at the time the alleged unconstitutional conduct occurs is the procedural bar implicated by *Heck v. Humphrey. See, e.g., McDonough.*, 588 U.S. at 119-20 (there is not a "a complete and present cause of action" until the *Heck* bar is lifted). Thus, the moment *Heck* no longer applies, the accrual clock for the statute of limitations starts ticking. *See id; see also Smalls*, 10 F.4th at 136 ("all that is required is that the underlying criminal proceeding be terminated in such a manner that the lawsuit *does not impugn an ongoing prosecution* or outstanding conviction").

The Supreme Court in *Heck* indicated that the first moment that any subsequent civil action "will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, *the action should be allowed to proceed.*" *Heck*, 512 U.S. at 487. The test for this specific point in time requires a district court to determine the *first point in time* where a civil suit would not "imply the invalidity of a conviction or sentence" against the plaintiff. *Id*.

It is beyond dispute that the People of the State of New York lost the ability to retry Mr. Rivas the moment that he passed away. *People v. Matteson*, 75 N.Y.2d 745, 747 (1989) (the death of a defendant abates "all proceedings in the prosecution *from its inception*" (emphasis added)); *People v. Mintz*, 20 N.Y.2d 770, 771 (1967) ("The appeal to this court from the Appellate Division's order should likewise be dismissed for the reason that the entire criminal

prosecution has abated by reason of his death"), *clarifying earlier decision at* 20 N.Y.2d 753 (1967) ("If affirmed, the judgment of conviction could not be enforced and, if reversed, there is no person to try."); *People v. Cruciani*, 238 A.D.3d 462 (1st Dep't 2025).

Abatement occurs upon death, *not* upon the later ministerial act of dismissal. *See, e.g., People v. Santiago*, 67 A.D.2d 843, 843 (1st Dep't 1979). For example, in *Santiago*, unbeknownst to the Appellate Division, it heard oral argument on an appeal from a criminal defendant *after* the defendant had died. The Appellate Division ruled that because the defendant had already died, it "lacked jurisdiction" at the time of oral argument and its later decision—even though the case had not yet been formally dismissed. *Id. c.f., People v. Endruschat*, 283 N.Y.S.2d 124, 125 (Erie Co. Ct. 1967) (appellate decision issued after the defendant's death, but before the criminal proceedings were dismissed, must be vacated). As a result, upon death, a criminal proceeding is deemed abated *ab initio*. *See People v. Cruciani*, 238 A.D.3d 462, 465-67 (1st Dep't 2025). Thus, any criminal proceedings still pending against Mr. Rivas at the time of his death were rendered moot. *See, e.g.*, *People v. Coscia*, 26 A.D.2d 649, 649 (2d Dep't 1966) ("the death of the defendant Vincent Taddeo has rendered his appeal moot"); *see also Crooker v. United States*, 325 F.2d 318 (8th Cir. 1963) (collecting cases);[13] *see generally United States v. Libous*, 858 F.3d 64, 65 (2d Cir. 2017) (discussing abatement *ab initio*).

Under the controlling standard for determining the accrual of a fair trial claim, the latest moment that there existed "a complete and present cause of action" for Mr. Rivas, that was not barred by *Heck*, was upon his death. This standard is easily met because if his Estate had initiated his claim on the date of his death—July 10, 2016—no defendant would be able to successfully take the position that *Heck* barred the action because criminal prosecution became

[13] *See also State v. Blake*., No. 36257, 1977 WL 201465, at *3 (Ohio Ct. App. Aug. 18, 1977) ("The majority rule, and the one which we now choose to follow, holds that upon the death of the defendant pending appeal, the criminal prosecution, *from the indictment forward*, abates ab initio.").

impossible at that moment. While this appears to be an issue of first impression in this and every other Circuit,[14] a straight-forward application of the accrual rule under *Heck* would dictate that the latest Mr. Rivas's fair trial claim would have accrued was the date of his death, which was more than three years from when this action was initiated.

* * *

Accordingly, for each of these reasons, this lawsuit was untimely commenced and must be dismissed.

## II. THE PROPER *MENS REA* FOR PLAINTIFF'S CLAIM IS *KNOWING* (RATHER THAN RECKLESS) FABRICATION.

In addressing the parties' summary judgment briefing on Plaintiff's fabrication of evidence claim, the Court observed that it "need not, and does not, definitively decide" whether recklessness alone is sufficient to satisfy the *mens rea* requirement for such a claim, but stated that it would "permit further briefing on this issue before trial." *Rivas*, 2025 WL 2675826, at *13 n. 21. This undecided question is central to the first two of the three remaining claims, because they focus on whether the Dr. Mitchell's time of death opinion given to the first criminal jury was an unconstitutional fabrication of evidence. The evidence presented by Plaintiff, in the form of the opinions offered by Dr. Daniel J. Spitz, is that Dr. Mitchell's time of death *opinion* was scientifically unsound. There does not, however, appear to be any evidence that Dr. Mitchell's opinion (even if arguably wrong), was an *intentional* fabrication.

As a result, in addressing the viability of the fabrication claims on this theory, this Court wrestled with the question of whether testimony that was sincere but recklessly wrong (again

---

[14] *See, e.g., c.f., Gold v. California Highway Patrol,* 763 F. Supp. 3d 914, 925 (N.D. Cal. 2025) ("because Ari Gold's state [conviction] was abated [by his death], his conviction no longer stands, and the presumption of innocence has now been restored"); *but see Heidelberg v. Manias*, 503 F. Supp. 3d 758, 795 (C.D. Ill. 2020) (while the plaintiff's death at the time the criminal proceedings against him may have abated *ab initio* upon his death the court could not determine whether that dismissal was "indicative of innocence."[adjudicating a malicious prosecution claim]).

allegedly) would still be sufficient to constitute violation of the Due Process clause. We provide the Court further briefing on this issue below.

As an initial matter, "[t]he mere fact that the parties present conflicting evidence does not mean that one side's evidence was fabricated." *Davis-Guider v. City of Troy*, No. 23-589, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024); *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) (a plaintiff must prove a defendant's fabrication was "made knowingly"). The Second Circuit has held that, in addition to establishing that the evidence is wrong or mistaken, a plaintiff must *also* offer "proof of *scienter*"[15] *i.e.*, that the evidence was "*knowingly* fabricated."[16] *Davis-Guider*, 2024 WL 5199294, at *3 ("Because [the plaintiff] has adduced no evidence that Defendants *knowingly* fabricated evidence, the district court properly granted Defendants' motion for summary judgment on [the plaintiff]'s fair trial claims."). In *Davis-Guider*, the Second Circuit held that testimony that is merely "mistaken" or "false," without showing that the proponent *knew* it was false is not enough to constitute fabrication. *Id*. at *3 ("[a]bsent scienter, showing that the prosecution relied on false evidence is insufficient"); *see also Ashley v. City of New York*, 992 F.3d 128, 143 (2d Cir. 2021) ("The fabrication element requires ... that the defendant knowingly make a false statement or omission."); *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014) ("[T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong.").

This requirement is consistent with the terminology of the claim language itself. Black's Law Dictionary defines "fabrication" as "[f]alse information *invented* to deceive others."[17] Thus, even as the common vernacular suggests, fabrication" does not just implicate a falsehood, it

---

[15] (emphasis in original)

[16] (emphasis added).

[17] FABRICATION, Black's Law Dictionary (12th ed. 2024) (emphasis added).

suggests an intentional *creation* or *manufactur*e of that falsehood for the purpose of deceiving.

Other Second Circuit case law confirms the standard set forth in *Davis-Guilder*. For example, in *Rentas v. Ruffin*, the Second Circuit also defined the fabrication elements as requiring "***knowingly created false information***" by a government official who "***specifically intend[ed] to deprive a plaintiff of his right to liberty***." *Rentas v. Ruffin*, 816 F.3d 214, 224 (2d Cir. 2016) (emphasis added); *see also Morse*, 804 F.3d at 547 (explaining that a plaintiff must prove a defendant's fabrication was "made knowingly").[18] In *Ricciuti v. N.Y.C. Transit Auth.,* the Second Circuit describes an unconstitutional fabrication as requiring the defendant "to *deliberately manufacture* false evidence against an arrestee." *Ricciuti v. N.Y.C. Transit Auth*.,124 F.3d 123, 130 (2d Cir. 1997). Thus, the unacceptable "corruption of the truth-seeking function of the trial process" is only present where the deception is a *knowing* one. *Id.* ("a police officer's fabrication ... of *known false evidence* works an unacceptable corruption of the truth-seeking function of the trial process")(internal quotations omitted); s*ee also Ashley v. City of New York,* 992 F.3d 128, 143 (2d Cir. 2021)(fabrication claim requires "that the defendant knowingly make a false statement or omission"); *Lalonde v. City of Ogdensburg*, No. 8:22-CV-00164 (LEK/DJS), 2026 WL 879705, at *15 (N.D.N.Y. Mar. 31, 2026) ("[p]laintiffs have presented no evidence of *intentional* fabrication that would meet the *scienter* requirement of their claim" (first emphasis added)).

Given the required *scienter* for a fabrication claim is to "knowingly" present false

---

[18] In *Morse*, the trial court *did* appear to have charged the jury that fabrication could have been satisfied by the defendants either acting knowingly *or* with reckless disregard for the truth. *See Morse*, 804 F.3d at 544. The Second Circuit, however, did not address the correctness of this instruction—presumably because the jury expressly concluded that the alleged falsehoods were made "knowingly. "*Id*. The Second Circuit narrowly cabined the required mental state, citing with approval the findings of the jury that the falsehoods were made "knowing that such information was false or fraudulent" … "where 'false' is defined as 'untrue when made and ... known to be untrue when made by the person making it or causing it to be made' and 'fraudulent' as 'falsely made *with intent to deceive*." *Id*. at 549.

evidence with a "specific intent" to deny the plaintiff liberty, that stated requirement necessarily precludes any argument that a reckless mental state would be sufficient. It is beyond *cavil* that "knowingly" and "recklessly" are two entirely distinct mental states, with recklessly being a lesser level of scienter. *See, e.g., United States v. Van Mead*, 773 F.3d 429, 433 (2d Cir. 2014) ("the Supreme Court has distinguished between offenses that have 'a stringent *mens rea* requirement,' demanding that a defendant act knowingly, intentionally, or the like as to the core element or elements of the offense, and those offenses commonly characterized as sounding in strict liability, negligence, or recklessness"); *see also In re Payne,* 707 F.3d 195, 204 (2d Cir. 2013) (noting that "recklessness" was a "*lesser mens rea" level* than intentional or knowingly (emphasis added)); *S.E.C. v. Harcharik,* 353 F. App'x 636, 638 (2d Cir. 2009) ("knowingly" is "a more stringent standard than extreme recklessness"). Thus, recklessly incorrect testimony is not sufficient to establish scienter, which requires a knowing or intentional creation of false evidence.

In addition, the Supreme Court has *never* held that the Due Process clause is violated by the reckless presentation of false evidence. Indeed, in 2021 in *McDonough v. Smith*, the Supreme Court restated the Second Circuit's standard for a fabrication of evidence claim, assuming *arguendo* it to be correct, but did *cite* to its prior 1959 decision in *Napue v. People of State of Ill.* as authority for such a claim. *McDonough,* 588 U.S. at 115 (2019). In *Napue,* the Supreme Court observed that the due process clause is violated where the prosecution uses "false evidence, *known to be such*" by prosecutors[.]" *Napue v. People of State of Ill.* 360 U.S. 264, 269 (1959) ("a State may not *knowingly* use false evidence" (emphasis added)). Thus, the Second Circuit's scienter standard comes directly from Supreme Court precedent for such a claim.

In its summary judgment decision, this Court referenced out-of-circuit decisions that

recklessness may be sufficient to support a fabrication claim. *See Rivas*, 2025 WL 2675826, at *13. As the Court correctly observed, however, one of those decisions—*Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)—related to the *Fourth* Amendment standard for submitting information in support of an arrest warrant, and thus is inapposite. *Dean v. Phatak,* discussed below *infra,* recognized that such warrant application claims are entirely distinct, and distinguishable, from Fourteenth Amendment fabrication/fair trial claims.

The other decision referenced by the Court—*Mervilus v. Union Cnty.,* 73 F.4th 185, 194 (3d Cir. 2023)—attempted to "clarify" the Third Circuit's view on the required scienter for a fabrication claim. It found that such a claim "obviously" encompassed "the knowing or willful submission of false evidence." *Id*. It next considered the sufficiency of recklessness alone, finding that it should be, principally by drawing on arguably analogous claims focused on the violation of the Fourth Amendment. *Id*. The Third Circuit neither cited any consensus authority from other circuits nor controlling guidance from the Supreme Court.[19] Its cursory policy justification given for equating Fourth and Fifth Amendment claims is certainly up for debate. Indeed, where probable cause is the trigger for a Fourth Amendment seizure, the government's actions are virtually always premised on a one-sided presentation of the facts—whether in a criminal information or sworn out in an arrest warrant. Lacking balance, it makes sense in that context to constitutionally preclude sincerely-held (but recklessly-premised) facts from the decision-making process. However, in a fair trial scenario—such as the one here—facts presented at trial are necessarily tested vigorously through the crucible of (i) cross-examination; (ii) the presentation of opposing facts or expert opinion; (iii) the enforced rules of evidence; and,

[19] The Third Circuit did cite to *Medina v. California*, 505 U.S. 437, 446 (1992). *Id*. But review of that case indicates that the holding generally discusses the relationship between due process protections and the "traditions and conscience of our people …" *etc*. *Medina*, 505 U.S. at 446. However, the decision offers no guidance on the question of what *mens rea* should be required for a fabrication/fair trial claim.

in certain circumstances; (iv) the court's expert witness gatekeeping role under either *Daubert* or *Frye* (depending on the jurisdiction). These balancing factors all protect against reliance upon sincerely held, but otherwise unreliable or incredible evidence without the need for a more discerning constitutional safety net. Thus, the Third Circuit's *ipse dixit* conclusion in *Mervilus* that an affidavit for warrant application is equivalent to the presentation of evidence at trial can fairly be criticized as an *apples-to-oranges* comparison.

With all due respect to the Third Circuit, given that the Supreme Court and the Second Circuit precedent discussed above expressly requires a "knowing" mental state with "specific intent" to injure in order to sustain a fabrication due process claim, it is respectfully submitted that this Court should not create new law by holding that mere recklessness is sufficient. Such an expansion could have staggering consequences on the scope of civil challenges to unsuccessful convictions. Indeed, creating a new, and more permissive *mens rea* standard—where a sincerely-held but mistaken opinion or conclusion by an investigator, prosecutor, or other governmental witness could be found to violate the constitution—may open virtually every judgment call to civil second guessing and would largely denude any ability to rely on qualified immunity to protect good faith, but mistaken judgments. Given that recklessness was not contemplated in *Napue* or its progeny, such an expansion of a fair trial claim should rightfully come from the Supreme Court, if at all.

Recently, in *Dean v. Phatak*, the Fifth Circuit rejected the position that a fabrication/fair trial claim could be premised on mere recklessness as being inconsistent with the consensus of authority, including the Supreme Court's decision *Napue*. *See Dean v. Phatak*, 162 F.4th 555, 567 (5th Cir. 2025) ("because a *Napue* violation requires knowledge, a freestanding fabrication claim does as well"). As is relevant here, *Dean* involved a medical examiner's autopsy report

whereby the plaintiff claimed the medical examiner fabricated his opinion that the victim's death was a homicide. *Id*. at 560-61. The Court observed that a constitutional violation *only* occurred if the medical examiner knew his opinion was false when he testified—rather than merely being mistaken. *Id*. at 567 ("If Dr. Phatak did conclude that Shannon's death was a homicide (rightly or wrongly), then he did not intentionally misstate his finding; at most, he reported a mistaken finding, not a fabricated one."). The Fifth Circuit held that the trial court committed reversible error by concluding that it was enough for it to find that the medical examiner was "deliberately indifferent" to the correctness of the opinion. *Id*. ("the court [erroneously] treated intentional falsification as interchangeable with a lesser deliberate-indifference standard.")

Here, the summary judgment record establishes a paucity of evidence that the basis for two of Plaintiff's claims—Dr. Mitchell's opinion testimony regarding the time Valerie Hill is believed to have died—was *knowingly* false and made with a specific intent to bring about Mr. Rivas's loss of liberty. Indeed, Dr. Mitchell freely admitted that his testimony was based on his opinion and was subject to principled debate and/or disagreement. These are hallmarks of good faith—not deception. The County submits that Plaintiff's burden on the fabrication claim *must* be measured by the scienter standard set forth in the Second Circuit's *Davis-Guider* and *Rentas* decisions.

The County respectfully submits that this how the claim should be instructed to the Jury and otherwise enforced by the Court in any Fed. R. Civ. P. 50 ruling.

## III. SCOPE OF EVIDENCE TO BE USED AT TRIAL – PROPER USE OF THE CRIMINAL CASE TESTIMONY AND EXHIBITS

### A. Elements which require the Jury's consideration of the criminal record

As a starting point, it is clear that Plaintiff's *denial of fair trial* claims will require the Jury to evaluate the evidence presented during Mr. Rivas' original criminal trial in 1993, make

findings regarding the weight of that original evidence, and predict the impact of certain hypothetical changes to that evidence on the outcome of that earlier criminal trial. This is because that original criminal evidence is relevant to two material elements that the civil Jury will be deciding—materiality and causation.

*Materiality*

One of the elements of proof for a *Brady* fair trial claim is whether the suppressed disclosure was "material" to the outcome of the criminal trial. *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014). This requires a plaintiff to demonstrate by a preponderance of the evidence that the omitted disclosure would create a "'*reasonable probability of a different result*'" in the original criminal jury's verdict. *Id.* (*quoting Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)); *see also Turner v. United States*, 582 U.S. 313, 324 (2017) ("[E]vidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." (internal quotations omitted)).

Stated differently, the Jury must answer the question whether, in the absence of the challenged evidence, the criminal verdict is still "*worthy of confidence*." *Poventud,* 750 F.3d at 133 (quoting *Leka*, 257 F.3d at 104). Conversely, the defendant would therefore be entitled to marshal all of the original inculpating evidence placed before the criminal jury to argue, in light of the weight of that original inculpating evidence, the verdict was "worthy of confidence" and the omitted evidence (or *Brady* material) would *not* have likely produced "a different result." *Poventud,* 750 F.3d at 133. The question of materiality is decided "in the context of the *entire [criminal] record*." *Turner*, 582 U.S. at 324.

Similarly, in a *fabricated evidence* fair trial claim, the jury must consider a materiality

element that focuses on whether the fabricated evidence was "likely to influence a jury's decision." *Ashley*, 992 F.3d at 142; *c.f.*, *Rentas v. Ruffin*, 816 F.3d 214, 224 (2d Cir. 2016) ("even if Rentas suffered a loss of liberty due to the 'criminal prosecution,' the jury reasonably could have found that the loss of liberty was not caused by the defendants' alleged fabrication of evidence, but rather by whatever independent, untainted evidence supported probable cause'");

*Causation*

In *Santiago v. Fischer*, the Second Circuit addressed the issue of damages causation for § 1983 claims where the plaintiff's injury is a wrongful incarceration. 158 F.4th 397, 409 (2d Cir. 2025). The Second Circuit held that the causation element requires the finder of fact to "*reconstruct what would have occurred* had proper procedure been observed." *Id.* (emphasis added) (quoting *Patterson v. City of Utica*, 370 F.3d 322, 338 (2d Cir. 2004)). After doing so, should the Jury conclude that conviction "would have [occurred] even in the absence of the wrongful conduct, the plaintiff is entitled only to nominal damages." *Id.*; *see also Rentas*, 816 F.3d at 223 (the Jury must consider whether "the submission of the non-fabricated evidence would have resulted in [the plaintiff's] loss of liberty [at the criminal trial] even in the absence of the fabricated evidence.").

Even though it is part of a plaintiff's burden, it logically stands to reason that it is the defendant who will have the incentive to put forth the full weight of the "submission of the non-fabricated evidence" presented during the criminal trial to establish that it "would have resulted in" plaintiff's conviction and resulting loss of liberty "even in the absence of the fabricated evidence." *Rentas*, 816 F.3d at 224.[20]

---

[20] *But see Nnodimele v. Derienzo*, No. 13CV3461ARRRLM, 2016 WL 3561708, at *6 (E.D.N.Y. June 27, 2016). In *Nnodimele*, the district court theorized that the materiality element in a fabrication claim is "more abstract" than the materiality element in a civil *Brady* claim—and thus easier to establish. *Id*. The district court's analysis is largely unsupported and seems to rely on the proposition that a due process fabrication violation does not require an actual

### B. The *entire* prior criminal trial record is admissible and necessary for the jury to decide materiality and causation

In the case of *either* type of fair trial claim, the basis for the original criminal jury's determination and the evidence presented at the original criminal trial are both squarely at issue in a subsequent civil § 1983 fair trial claim.[21] This Court has previously recognized the centrality of a comprehensive evaluation of the prior criminal record to the determination of the elements of a "fair trial" claim. For example, in *Jeanty v. City of Utica*, this Court went through an exhaustive analysis of the quality, quantity, and weight of inculpatory evidence presented during the underlying criminal trial to determine whether there was a jury question on whether the allegedly withheld evidence was "material" to the outcome of the criminal proceeding. *Jeanty v. City of Utica,* No. 616CV00966, 2021 WL 149051, at *17-19 (N.D.N.Y. Jan. 14, 2021) (Sannes, C.J.).

Similarly, in the summary judgment decision in this case, this Court considered the "considerable circumstantial evidence of [Mr.] Rivas's guilt" in evaluating whether there was a jury question on the issue of materiality. *Rivas*, 2025 WL 2675826, at *22. In order to resolve the questions of fact as to materiality and causation for both fair trial claims, the civil jury at trial will thus need to hear and consider the relevant evidence presented to the previous criminal jury. *Nnodimele*, 2016 WL 3561708, at *11 ("[t]he jury in this trial is entitled to understand the nature and quality of that inculpatory evidence [presented to the criminal jury] so it may properly assess

---

conviction. *Id*. While this is true, absent a deprivation of liberty, such a constitutional violation would only justify nominal damages. *See Rentas*, 816 F.3d at 223. Thus, the district court in *Nnodimeli*, without regard to the clear import of *Renta*s, nor benefit of the *Santiago*, decision, mistakenly reduced the materiality question to whether the alleged fabrication might have "swayed" the jury, without looking at the complete record below. The *Nnodimele* did, however*, correctly describe the scope of materiality as it related to civil Brady claims* (as will be discussed further below).

[21] *See* Fed. Civ. Jury Instr. 7th Cir. 7.14 (2021), Fed. Civ. Jury Instr. 7th Cir. 7.14 (2021) (charging the jury that "fabricated[]] evidence is "material' if there is a reasonable likelihood that the result in the criminal proceeding would have been different if the evidence had been disclosed.")

the reasonably probable effect of the evidence allegedly withheld"); *c.f., Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (in the context of an application for a writ of habeas corpus in which petitioner advanced *Brady* claim, court analyzed the materiality of the evidence withheld "in light of the evidence adduced against the defendant at trial").

Again, the inculpatory evidence from the criminal trial cannot be limited in a piecemeal fashion because the question of materiality is decided "in the context of the *entire* record." *Turner*, 582 U.S. at 324 (emphasis added)

Similarly, the "strength" of the original inculpatory evidence is also highly relevant to the *Brady* standard on multiple levels, because the second prong requires the prosecutor to objectively assess importance of the purported exculpatory evidence in light of the record as a whole in determining whether disclosure is required. *See, e.g., Fuentes v. T. Griffin*, 829 F.3d 233, 249 (2d Cir. 2016) ("a *materiality* analysis requires a careful, balanced examination of *the nature and strength of the evidence presented*, as well as an evaluation of the potential impact of the evidence on the witness's credibility." (emphasis added)). Thus, for a civil *Brady* claim, the criminal trial record is also relevant to whether the defendant had the requisite intentional mental state required for liability. *See Nnodimele*, 2016 WL 3561708, at *11 ("the sufficiency of the evidence against plaintiff prior to the occurrence of the defendants' alleged misconduct [under *Brady*] is relevant to the defendants' states of mind").

**C. Practical questions about how the prior criminal testimony and evidence is to be used during the civil trial.**

However, there are practical questions relative to the admission, scope, and use of this highly relevant category of evidence—*i.e.*, the admitted inculpatory evidence at the original criminal trial—that are not well defined in the law, including: (1) how a civil jury is charged to consider what would or would not be important to a criminal jury deciding a matter more than 30

years ago; (2) how the competing burdens of proof in the two actions are reconciled in determining what would have altered a criminal jury's determination; and (3) how the original inculpatory testimony heard more than 30 years ago will be presented to the civil jury. Relevant case law dealing with these types of fair trial claims in the Fed. R. Civ. P. 12 and 56 contexts do not really shed much light on these questions concerning these trial practicalities and the case law directly addressing these questions is exceedingly sparse.

*Actual guilt or innocence are not at issue*

When addressing the proper use of a plaintiff's prior criminal record in a § 1983 trial involving fabrication-of-evidence and *Brady* claims, the district court in *Nnodimele v. Derienzo* recognized that witnesses who had testified in the underlying criminal proceeding would likely also testify in the civil trial. *See id.* at *11. However, the court limited their testimony to the matters about which they testified during the criminal trial. *See id.* at *11. The court emphasized, however, that the testimony would not be considered relative to the issues of guilt or innocence (*i.e.*, for the truth) but would be considered on the issue of materiality. *Id.*; *see also Wepnner v. Cnty. of Erie*, No. 22-CV-00519-MAV, 2025 WL 3052048, at *10 (W.D.N.Y. Nov. 2, 2025) ("it is well-established that materiality is measured solely against the universe of evidence that was in fact introduced at the underlying criminal trial"). It is respectfully submitted that this is the correct approach on the question of materiality.

However, since the issue of materiality and causation are directly at issue it would be nonetheless appropriate for either party to argue: (1) that based on weight, nature, and quality of the evidence presented to the criminal jury that the omitted evidence would or would not have created a "reasonable probability of a different result" in the original criminal jury's verdict; (2) that in light of the weight, nature, and quality of the evidence presented to the criminal jury, the

criminal jury's verdict was or was not still "worthy of confidence"; or (3) or otherwise point to the exculpatory or inculpatory evidence contained in the criminal record as probative of its probable effect on the criminal jury. *C.f.*, *Nnodimele*, 2016 WL 3561708, at *11 (the "jury in this trial is entitled to understand the nature and quality of that inculpatory evidence [presented during the criminal trial] so it may properly assess the reasonably probable effect of the evidence allegedly withheld"). While such arguments seem close in meaning to arguments that Mr. Rivas was actually innocent or actually guilty, they appropriately focus on the effect of the evidence on the criminal jury's conviction rather than the universal concepts of guilt and innocence.

*The prior criminal testimony/evidence is not hearsay*

However, while it is not subject to reasonable dispute that the prior criminal testimony is highly relevant, there remains the question of whether there are hearsay implications for presenting the prior criminal record either through live witnesses or the reading of the prior criminal transcript. While the civil jury in this case will not be deciding Mr. Rivas' actual guilt or innocence anew, the Jury *is* still deciding the closely related issue whether based on the weight of the testimony previously presented, what effect, if any, the withheld (or fabricated) information would have had on the outcome of the criminal trial. As a result, the submission of the prior criminal testimony and evidence is being considered by the civil jury, not for its truth but rather for its effect on the listener (*i.e.*, the effect on the original criminal jury). Thus, the entirety of the prior criminal trial testimony is admissible as non-hearsay under Fed. R. Evid. 801 because it is not being offered for the "truth of the matter asserted." *See* Fed. R. Evid. 801(c)(2); *c.f., United States v. Gillier*, No. 23-6280-CR, 2024 WL 4344732, at *2 (2d Cir. Sept. 30, 2024) ("[b]ecause these statements were admitted for their effect on the listener and not for the truth of the matter asserted, they are not hearsay").

This was the precise holding of the Second Circuit in *Santiago v. Fisher* under directly analogous circumstances. *Santiago*, 158 F.4th at 407. There, the Second Circuit evaluated a challenge to the scope of evidence that was relevant and admissible during a jury trial on the issue of whether a defendant's due process violation *caused* the plaintiff's loss of liberty through his continued incarceration. *See id*. at 409. If, based on circumstances present at the time, the same loss of liberty would have happened even without the due process violation, then the plaintiff would have failed to prove causation. *Id*. In the civil trial, the district court precluded the defendants from offering evidence of the underlying circumstances causing the plaintiff's continued incarceration that were independent of the alleged procedural violation. *See id.* at 408, 411. The result was that the jury heard only about the procedural violation and loss of liberty, but not about the other circumstances that may have independently caused the continued incarceration. *See id*. The Second Circuit found the trial court's preclusion of the other independent evidence justifying the incarceration to constitute reversible error. *See id.* at 411.

In trying to justify the trial court's ruling, the Appellee argued that a portion of the evidence that the trial court precluded as irrelevant was properly excluded anyway because it was inadmissible hearsay. *Id*. at 410, n.13. The Second Circuit disagreed, observing that the witness's testimony regarding their prior statements and testimony underlying plaintiff's initial incarceration was being "introduced not for their truth" but rather were being offered for their effect on the listener, "providing the [civil] jury with the full context" underlying the reasons for the plaintiff's continued incarceration. *Id*.; *see also c.f.*, *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 671 (2d Cir. 2015) (finding that guests' survey responses that would otherwise be hearsay if admitted for the truth of the matter asserted in the statement were admissible "because those responses were admitted solely for the purpose of

showing their effect on HLT's decision to terminate the franchising agreement.").[22]

Thus, the evidence to be presented during the upcoming civil trial concerning the nature and weight of the testimonial evidence that was presented to the original criminal jury in 1993 is admissible for similar and directly analogous reasons: it is highly relevant to an essential element of Plaintiff's claims—*i.e.*, its effect on the criminal jury's decision making—and thus is not hearsay. *C.f., Alley v. Cnty. of Pima*, No. CV-15-00152, 2024 WL 1908965, at *7 (D. Ariz. May 1, 2024) (in § 1983 action, introduction of "prior testimony of witnesses from [plaintiff's] 1972 trial" was "not hearsay because Defendants [did] offer it not to prove the truth of the matters asserted"); *Trulove v. D'Amico*, No. 16-CV-050, 2018 WL 1248095, at *1 (N.D. Cal. Mar. 11, 2018) (in civil *Brady* action, "the prior testimony is not being offered for its truth, but to show that the statements were made, and their effect on the listeners, *i.e.*, the juries in the criminal trials before whom the testimony was made, resulting in plaintiff's conviction at the first trial").

In addition, a fair portion of the witnesses who testified at the criminal trial in 1993 are now deceased. Their prior testimony is independently admissible under Fed. R. Evid. 804(b)(1)(A); *see also Alley*, 2024 WL 1908965, at *7 (testimony of deceased witnesses from 1972 criminal trial admissible in civil Brady lawsuit under Fed. R. Evid. 804); *Jackson v. Dempsey*, No. 18-CV-3007, 2026 WL 205979, at *18 (E.D.N.Y. Jan. 27, 2026) (unavailable witnesses' prior criminal testimony admissible because plaintiff "had an opportunity and similar motive to cross-examine [witness] about her [testimony] at the criminal trial").

*Evidence of guilt or innocence that the criminal jury **<u>did not hear</u>** is inadmissible*

Plaintiff has indicated an intent to submit exculpatory evidence establishing Mr. Rivas'

[22] *McEvoy v. Fairfield Univ*., No. 3:17-CV-1861 (MPS), 2019 WL 5579375, at *2, n.2 (D. Conn. Oct. 29, 2019) (finding that testimony that would otherwise be hearsay was admissible because "[t]he [c]ourt does not rely on Dr. Sapp's statements for their truth, but rather for their effect on Dr. Williams, who was involved in the decision not to renew Dr. McEvoy's appointment.") *aff'd*, 844 F. App'x 420 (2d Cir. 2021).

innocence that the criminal jury *did not hear*. This is improper for two related reasons: (1) any evidence that the Jury did not hear does not relate to materiality or causation because it did not affect the Jury's decision to convict; and (2) Mr. Rivas' guilt or innocence is not relevant in a fair trial case. *See Walker v. City of Buffalo*, No. 22-CV-00520-MAV, 2025 WL 828242, at *9 (W.D.N.Y. Mar. 17, 2025) ("materiality and substantial prejudice, as relevant to whether prosecutor(s) violated Walker's constitutional rights, are measured against ***the evidence that was actually admitted and argument actually made in Walker's criminal trial***—not what anyone, including Walker, personally recalls from the day of the murder, the investigation, or prosecution") (emphasis added); *Nnodimele*, 2016 WL 3561708, at *10 ("plaintiff's actual innocence is irrelevant to his fair trial claims"). Thus, neither Plaintiff nor Defendants should be allowed to rely on evidence *outside of the criminal trial* record to try to argue "what really happened" based on evidence outside the scope of the criminal trial. *Id*.[23]; *Wepnner*, 2025 WL 3052048, at *10 ("[p]ersonal opinions of factual guilt or innocence, evidence about 'what really happened' on January 2, 1976, and *additional extrinsic evidence* that … tends to support [or undermine] confidence in Boyd's conviction have no place in this trial and are inadmissible").

*Exception: DA Fitzpatrick's state of mind and Dr. Mitchell's state of mind and/or veracity*

Since a civil *Brady* claim requires the plaintiff to plead and prove that the defendant acted

[23] If the Court allows the Plaintiff to present exculpatory evidence outside of the criminal record as trial, Defendants intend to offer the forensic evidence developed after Mr. Rivas's release in 2015 based on enhanced fingerprint and DNA capabilities that places Mr. Rivas in Valerie Hill's apartment the night of the murder as well as him handling the library book that was returned the Sunday after the murder in Cazenovia. Defendants will also seek to offer this evidence if Plaintiff's witnesses open the door by claiming him to be innocent.

intentionally,[24] Defendants are certainly entitled to present evidence and/or elicit testimony regarding DA Fitzpatrick's own subjective mental state at the time, including his knowledge, opinions, and internal decision-making process regarding his *Brady* disclosure obligations at the time. Similarly, his testimony regarding regular practices of him and his office with respect to *Brady* are also relevant to his state of mind. DA Fitzpatrick's *mens rea* is an entirely separate issue from materiality and does not rise or fall on the criminal record.

In addition, relative to the fabrication of evidence claim against Dr. Mitchell, the Jury will be deciding whether Dr. Mitchell actually fabricated—*i.e.*, *knowingly* made up—his opinion on the time of death window. The scope of *this* issue, which is unrelated to materiality or causation, is not logically limited to the evidence presented in the criminal trial. For example, he would be entitled to submit evidence to rebut Plaintiff's argument in this case that either (a) he fabricated his opinion based on pressure from the DA's Office; or (b) that he changed his opinion at some point during the prosecution to make it more inculpatory. This could include documentation of his opinions, the timing and development of his opinions, and his prior consistent testimony and statements. *See, e.g., United States v. Quinto*, 582 F.2d 224, 234 (2d Cir. 1978) (prior consistent statement admissible to rebut implied or express allegation of recent fabrication or improper influence or motive).

*Evidence of openings and closings*

Given that the criminal jury's decision-making is at issue with respect to the question of the nature and the weight of the inculpatory evidence, a logical follow up question is whether the

[24] *Valentin v. City of Rochester*, No. 11-CV-6238 CJS, 2018 WL 5281799, at *13 (W.D.N.Y. Oct. 24, 2018) ("To establish liability against a police officer for a *Brady* due process violation, the plaintiff must show that the officer intentionally withheld information from prosecutors."), *aff'd*, 783 F. App'x 97 (2d Cir. 2019).

civil jury should hear evidence of what was argued in openings or closings. There does not appear to be authority in the Second Circuit addressing this question relative to a civil Brady trial. However, in *Strickler v. Greene*, 527 U.S. 263 (1999), the Supreme Court did point to the content of a criminal closing argument as relevant to determining the question of materiality. *Id*. at 290 ("District Court's conclusion that the admittedly undisclosed documents were sufficiently important to establish a violation of the *Brady* rule was supported by the prosecutor's closing argument") This authority would tend to support the position that the "entire record" of the original criminal case to be considered would also include opening and closing statements.

**D. Proposed ground rules for use of the criminal trial record at the upcoming trial**

1. Evidence of the "nature and quality of the inculpatory evidence" presented in the criminal trial will be admissible for its effect on the criminal jury, as follows:

    a. All witnesses, testimony, and exhibits admitted at the criminal trial are automatically admissible in the upcoming trial, not for their truth, but for their effect on the criminal jury as relevant to the elements of materiality and damages causation;

    b. For those witnesses at the criminal trial that are still alive and/or available, their testimony *may* be presented by the parties live during the civil trial; however (with one exception), the scope of the criminal witnesses' testimony will be limited to the scope presented at the criminal trial (for both direct and cross).

    c. The parties may also admit the testimony of criminal trial witnesses by reading their transcript into the record before the Jury.

    d. The parties may identify portions of the criminal openings and closings to

publish to the Jury to the extent relevant to the elements of materiality and causation.

2. Evidence and testimony from witnesses regarding the issues of fabrication and violation of *Brady*, and/or damages will not be restricted beyond the application of the Federal Rules of Evidence and the rulings of the Court, *in limine*, or at trial.

    a. Because Dr. Mitchell is a defendant and subject to additional elements of proof, including fabrication and intent, his testimony at trial will not be cabined to his original criminal trial testimony.

    b. While William Fitzpatrick was an advocate during the original criminal trial process, his conduct is at issue in this action, including his state of mind relative to his *Brady* compliance.

3. Neither party will present evidence or argument:

    a. that Hector Rivas was actually guilty or actually innocent;

    b. to establish "what really happened."

4. However, the parties *may* permissibly frame their theories and argument based on the actual standards of materiality and causation, as set forth more fully above, based on the jury's probable decision on guilt or innocence in light of the quality and weight of the evidence before it.

## IV. *BRADY*, AS IT EXISTED IN 1993 CONTROLS.

As a starting point, DA Fitzpatrick's theoretical individual liability, if at all, for any alleged violation of *Brady* necessarily derives from whether or not he observed the clear, established parameters of *Brady* existing at the time of his decision not to disclose. Even if absolute immunity did not apply, he would be subject to qualified immunity, which would have

assessed what was clearly established by *Brady,* and its progeny, at the time of the non-disclosure. Nonetheless, the Court has found that he is immune individually for any potential *Brady* violations; however, the County remains in the action with potential derivative liability for the same alleged conduct.

Relative to the County's potential liability for DA Fitzpatrick's *Brady* violation, that claim is brought exclusively under *Monell*'s so-called "final policymaker" theory. *See Rivas v. Onondaga Cnty.*, No. 5:19-CV-00844 (BKS/TWD), 2025 WL 2675826, at *17 (N.D.N.Y. Sept. 18, 2025). Under that theory, *if* a municipal state actor holds final policymaking authority as a matter of law, his or her individual unconstitutional actions may *also* be deemed unconstitutional actions of the municipality. *Id*. ("municipalities may be held liable for a single decision by a municipal policymaker") (internal quotations omitted).

In order to establish such a claim, Plaintiff must successfully establish a due process claim against DA Fitzpatrick for violation of *Brady*. A civil *Brady* claim against DA Fitzpatrick will require Plaintiff to establish that his non-disclosure was required under *Brady*, was material, and was "intentional." *Valentin v. City of Rochester*, 783 F. App'x 97, 100 (2d Cir. 2019) ("[w]e have suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional.") (citing cases);[25] *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) ("We have never held that anything less than an intentional *Brady* violation establishes a § 1983 due process claim for damages, however, and we decline to do so here").

But "'[t]he *Brady* rule is a general rule' that asks 'a question that is a matter of judgment rather than one with a clear, obvious answer.'" *McGhee v. Martuscello*, No. 24-326, 2024 WL

[25] Intent is *only* relevant in civil *Brady* claims brought under § 1983, it is not relevant in determining a criminal *Brady* violation. *See United States v. Agurs*, 427 U.S. 97, 110 (1976), *holding modified by United States v. Bagley*, 473 U.S. 667 (1985).

4891270, at *2 (2d Cir. Nov. 26, 2024) (quoting *McCray v. Capra*, 45 F.4th 634, 641 (2d Cir. 2022)). Indeed, *Brady* is an "inevitably imprecise standard" where "the significance of an item of evidence can seldom be predicted accurately until the entire record is complete." *Agurs*, 427 U.S. at 108.[26] Thus, a prosecutor's *Brady* disclosure decisions often require judgment calls.

"Intent [to violate *Brady*] may be shown through circumstantial evidence [of the defendant's state of mind] that suggests the defendant intentionally withheld evidence." *Carmon v. City of New Haven*, No. 3:23-CV-00944 (JCH), 2025 WL 2680668, at *16 (D. Conn. Sept. 18, 2025). "Intentionality may [also] be deduced based on [defendants] deviating from what they described as typical practice." *Rosario v. City of New York*, No. 18 CIV. 4023 (LGS), 2021 WL 199342, at *7 (S.D.N.Y. Jan. 20, 2021). In *Jimenez v. City of New York,* the district court found that because "reasonable jurists disagreed," "that lack of consensus" regarding whether the withheld information was required to be disclosed under *Brady* created an inference that the non-production was *not willful or intentional." Jimenez v. City of New York*, No. 23 CIV. 06751 (NRB), 2025 WL 935233, at *18 (S.D.N.Y. Mar. 27, 2025) (emphasis added) ("lack of consensus clearly demonstrates that any alleged *Brady* violation was not so glaringly intentional or flagrant as would be required to satisfy the civil *Brady* standard").

Given that *Brady* questions rarely have a "clear, obvious answer," and that a prosecutor's intent to withhold disclosure depends on his or her state of mind, it stands to reason that DA Fitzpatrick certainly cannot be found to have "intentionally" withheld the alleged Mitchell impeachment material—*i.e.*, that he was being administratively investigated—unless there was some clearly established legal standard in March of 1993 that would make that disclosure obligation *obvious* to a prosecutor or otherwise part of the *typical practice* for disclosure. *C.f.,*

[26] holding modified by *United States v. Bagley*, 473 U.S. 667 (1985).

*Bolt v. City of New York*, No. 22-CV-3318, 2023 WL 11916695, at *12 (E.D.N.Y. Sept. 15, 2023) (finding an inference of intentionality where the withheld information was "of obvious exculpatory value" at the time of the non-disclosure). The only operational guideposts available for prosecutors to make these judgment calls would be to read the law and make determinations based on their research. *See Connick v. Thompson*, 563 U.S. 51, 66–67 (2011) ("Prosecutors are … ethically bound to know what *Brady* entails and to perform legal research when they are uncertain").

As a result, among the potential facts bearing on the issue of intent, the state of the case law defining DA Fitzpatrick's non-debatable *Brady* obligations in 1993 is relevant to determining whether it was "obvious" or "typical practice" to disclose the type of material alleged to be a violation here. While potentially not dispositive, the presence or absence of contemporaneous (as of 1993) or previous precedent requiring disclosure is highly probative to whether his non-disclosure was or was not intentional. By the same token, changes to *Brady* standards that occurred after 1993 will have no relevant bearing on DA Fitzpatrick's state of mind.

Dated: July 17, 2026
Syracuse, New York

Respectfully submitted,

**HANCOCK ESTABROOK, LLP**

By: [signature]

John G. Powers, Esq. (No. 508934)
Mary L. D'Agostino, Esq. (No. 520301)
100 Madison Street, Suite 1800
Syracuse, New York 13202
(315) 565-4500 (Office)
(315) 565-4700 (Facsimile)