# Exhibit “A”

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ONONDAGA

COPY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

-against-

HECTOR M. RIVAS,

Defendant.

Indictment Number 92-1114-1

Index Number 92-2794

Volume I

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Onondaga County Courthouse
401 Montgomery Street
Syracuse, New York 13202
March 17, 1993

B E F O R E : HONORABLE J. KEVIN MULROY, County Court Judge, and a Jury.

A P P E A R A N C E S :

WILLIAM J. FITZPATRICK, ESQ.
Onondaga County District Attorney
Onondaga County Civic Center
421 Montgomery Street
Syracuse, New York 13202

RICHARD J. CALLE, ESQ.
Attorney for the Defendant

PATRICIA A. ALEXANDER, R.P.R.-C.S.R.
Official Court Reporter

# I N D E X


| | PAGE |
|---|---|
| OPENING STATEMENT BY MR. FITZPATRICK. . . . . . . . . . . . . | 27 |
| OPENING STATEMENT BY MR. CALLE. . . . . . . . . . . . . . . . | 65 |

| WITNESSES | PAGE |
|---|---|
| RANDALL HILL | |
| Direct Examination by Mr. Fitzpatrick. . . . . . . . . | 88 |
| Cross-examination by Mr. Calle . . . . . . . . . . . . | 120 |
| Redirect Examination by Mr. Fitzpatrick. . . . . . . | 136 |


## E X H I B I T S


| PEOPLE'S NUMBERS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| 1 | Calendar (March 1987) | 25 | 27 |
| 2 | Map (Countywide) | 25 | 27 |
| 3 | Map | 25 | 27 |
| 4 | Photograph (Valerie Hill) | 25 | - |
| 5 | Photograph (Two-Sided Letter) | 25 | - |
| 6 | Photograph | 25 | - |

(All parties are present. Proceedings resumed at this time.)

THE COURT: I'm all set. Okay. Well, for those of you I haven't seen yet today, good morning. You can tell we're late. We've been working hard; we haven't been sitting around playing cards. We had to get the rest of the jurors here, so that's why the delay. But we're all here together.

And the record should reflect the defendant is present, the jurors are all present, and counsel is present. I'm about to give you the preliminary charge, ladies and gentlemen, and although I don't think anybody has had a problem hearing me throughout the course of this trial, I will occasionally look at you -- Ms. Cathcart, okay, you are the farthest person away, and when you see me look up, if you can hear, I'm assuming we can all hear. Just give me a nod that it's loud enough and everything is going all right, so I don't worry about it, okay? Thank you.

And, of course, during the course of the trial, I'll also ask, if a witness is testifying,

I'll continually look up at you or Mr. Hullihen down there, and just point to my ear. If everything's okay, give me a nod, let me know. But if anyone cannot hear anything during the course of the trial, shoot a hand right up. I don't want anybody to miss anything.

Members of the jury, we are about to commence the trial of the People of the State of New York versus Hector Rivas, concerning which you've heard some details during the process of jury selection. The law requires the Court to give preliminary instructions to the jury. The preliminary instructions and comments that I will make are designed to acquaint you with the separate functions, duties, and responsibilities of the Court, counsel, and jury; and to give you a preview of how the trial will be conducted, and eventually proceed to its conclusion.

In these preliminary instructions, I will refer briefly to rules of law that are generally applicable to criminal trials and may, whenever necessary, refer to provisions of law applicable to this particular case.

For your information, the law also

requires the Court at the close of the trial, to charge and instruct you, the jury, as to your duties and functions in evaluating the evidence in arriving at your final verdict.

Further, the law requires the Court in its final charge to the jury, to instruct you as to the laws applicable to the specific crimes which will be submitted to you for your final determination.

Some of the instructions that I will give you in my final instructions will also be included in these preliminary charges to you.

First of all, let me explain to you how the trial will proceed. After my preliminary instructions to you are given, the law requires the district attorney to make what is commonly referred to as an opening statement. In his opening statement, Mr. Fitzpatrick will give you some form of detail or outline of how his case will proceed, how he intends to prove this defendant's guilt.

After he sits down, I will ask Mr. Calle whether or not the defense chooses to give an opening statement. You must bear in mind, ladies

and gentlemen, throughout this trial, that the defense is under no obligation to prove anything. Mr. Calle is under no obligation to give an opening statement, conduct cross-examination, or do anything in this particular case.

However, if Mr. Calle chooses to give an opening statement, he will stand before you and ask you to keep your eye out for some of the things he thinks are important during the course of the trial.

After the opening statements by the attorneys have been given, Mr. Fitzpatrick will call his first witness. That person will come in, be sworn, take the witness stand, and Mr. Fitzpatrick will conduct what's commonly referred to as direct examination.

After Mr. Fitzpatrick concludes his direct examination, Mr. Calle will have an option of whether or not he chooses to cross-examine the witness. Bear in mind again that he's under no obligation to ask any questions. If he does, however, cross-examine the witness, when he's concluded, Mr. Fitzpatrick, by law, may ask more questions; that is called redirect

examination. And Mr. Calle conversely is allowed to recross the witness.

Basically, the questioning goes back and forth until the attorneys have exhausted all the information they deem important from the witness.

The witness is then excused; the next witness called. They're sworn. Direct examination, cross-examination, redirect examination, recross-examination.

There will come a time when Mr. Fitzpatrick stands before you and announces that the People rest. That means Mr. Fitzpatrick has concluded his direct case against the defendant. At that time, I'll ask Mr. Calle whether or not the defense chooses to call any witnesses in this case, bearing in mind they're not obligated to do so.

However, if counsel for the defense chooses to call witnesses, they will come in, be sworn, take the witness stand, and Mr. Calle will conduct the direct examination, Mr. Fitzpatrick the cross-examination, redirect, recross, so on and so forth. The roles are

literally reversed.

There will come a time when Mr. Calle stands before you and announces that the defense rests. At that time, ladies and gentlemen, we may hear other evidence called rebuttal, but -- normally we usually don't do that -- but, however, once the proof is closed, summations follow.

Under our rules of evidence, the defense goes first with their summation, the district attorney last with his summation. I then give you the final instructions on the law. And you will then retire for your deliberations.

Before discussing the Constitutional safeguards surrounding every person accused of a crime, let me emphasize that an indictment is simply an accusation required by law, solely for the purpose of informing the defendant of the offenses with which he is charged. It's not, I repeat, not evidence of anything.

The allegations set forth in the indictment are allegations only. They are not evidence. As I say, the indictment is merely the device required by law to inform the defendant of the

offenses with which he is charged and to bring those charges to trial.

To this indictment this defendant has pled not guilty. By his plea of not guilty, the defendant puts in issue each and every allegation contained in the indictment. It is a fundamental principle of our law that a person accused of a crime is presumed to be innocent unless the contrary is proved, according to law.

The presumption of innocence remains with the defendant throughout the trial, unless and until the trial jury finds in its final deliberations that the presumption of innocence has been overcome by proof of guilt beyond a reasonable doubt, as I shall later define that term to you.

Thus the trial begins with no evidence against the defendant and the presumption of innocence of the defendant standing alone, is sufficient to require the acquittal of the defendant, unless the jury finds in its final deliberations, that the People have proved to the jury's unaninous satisfaction beyond a

reasonable doubt, that the defendant is guilty of the crimes charged against him.

Because of the presumption of innocence, the burden of proof is never on the defendant to prove his innocence. It is our law that the burden of proof to establish guilt is upon the People. Indeed, it is our law that the burden is on the law to establish to your satisfaction beyond a reasonable doubt, each and every element of the crimes charged, as I shall later define those elements to you at the conclusion of the trial and the defendant's commission thereof.

The standard of proof required by law in every criminal case is proof of guilt beyond a reasonable doubt. That standard, however, does not require the People to prove the defendant's guilt beyond a shadow of a doubt, or beyond all possibility of a doubt. Rather, it requires the People to establish the defendant's guilt beyond a reasonable doubt.

Our law, therefore, requires that before this jury may convict the defendant, each of you must be satisfied that the credible evidence

is sufficient to convince you, beyond a reasonable doubt, that the defendant is, in fact, guilty.

The evidence must satisfy you beyond a reasonable doubt that the defendant is, in fact, the person who committed the crimes charged. The evidence must also establish beyond a reasonable doubt each of the -- each and every essential element of the crimes charged, as I shall define those elements to you at the conclusion of the trial.

What does the law mean when it requires proof of guilt beyond a reasonable doubt? When is a doubt of guilt a reasonable doubt under our law? A doubt of the defendant's guilt, to be a reasonable doubt, must be a doubt for which some reason exists. The doubt to be reasonable must therefore arise because of the nature and the quality of the evidence in the case, or from the lack or insufficiency of the evidence in the case.

The doubt to be a reasonable doubt should be one which a reasonable person acting in this manner would be likely to entertain

because of the evidence, or because of the lack or insufficiency of the evidence in the case.

A doubt of guilt is not reasonable if instead of being based on the nature and the quality of the evidence in the case, it is based on -- or the insufficiency of the evidence, it is based on some guess or whim or speculation that is unrelated to the evidence in the case.

Also, a doubt of guilt is not a reasonable doubt if it is based merely on sympathy for the defendant, or from the mere desire by a juror to avoid a disagreeable duty.

I therefore repeat, a doubt of a defendant's guilt, to be a reasonable doubt, must arise either from the nature and the quality of the evidence in the case, or from the lack or insufficiency of the evidence in the case.

Therefore, the first duty of each juror is to consider and weigh all the evidence in the case and decide which you believe is credible and worthy of your consideration.

The next duty of each juror is to determine whether the juror has, in fact, a

reasonable doubt of the defendant's guilt, as that term is defined in our law. A reasonable doubt, our law says, is an actual doubt. One which you are conscious of having in your mind after you have considered all the evidence in the case.

If after doing so you then feel uncertain and not fully convinced of the defendant's guilt and you are also satisfied that in entertaining such a doubt you are acting as a reasonable person should act in a matter of this importance, then that is a reasonable doubt of which the defendant is entitled to the benefit. I repeat, it is the duty of each juror to carefully review and consider all the evidence in the case.

If after doing so you find the People have not proved the defendant's guilt beyond a reasonable doubt, as I've defined that term to you, you must find the defendant not guilty.

On the other hand, if you are satisfied that the People have proved the defendant's guilt beyond a reasonable doubt, as I've defined that term to you, then you must find the defendant guilty.

In determining your verdict or considering the evidence in this case, you may not consider or speculate concerning matters relating to sentence or punishment. You must not discuss such matters, nor should your deliberations in any way be influenced by such matters.

If you render a verdict of guilt, I am required to impose a sentence in accordance with the law. The jury has no function relating to sentence or punishment, and such matters are wholly immaterial to your deliberations.

Ladies and gentlemen, during the course of this trial, you may hear the attorneys stand up and object to certain questions that are asked, to certain exhibits being offered or marked into evidence. Be advised, ladies and gentlemen, that each one of these attorneys is an officer of the court. Each attorney owes a high duty to his client: Mr. Fitzpatrick, the People of the State of New York; Mr. Calle, Mr. Hector Rivas.

Each one of these attorneys will represent their client vigorously and to the

best of their ability. If for some reason the attorneys feel that the other attorney is not following strictly the rules of evidence, their job is to stand up and object and bring that to my attention.

My function, as the judge in this case, is to rule upon their objection and to determine whether or not the rules are being followed properly. Oftentimes when an attorney objects to something, he follows it up with an explanation or a basis for his objection. Please be advised, ladies and gentlemen, what these attorneys say during the course of this trial is not evidence. The evidence that you will make your determinations on will come from the mouths of the witnesses who testify, and any exhibits that are offered and received into evidence.

Don't hold it against any attorney for making an objection; that's his job, and my job is to rule on that objection. Don't get caught up in any colloquy between the Court and the attorneys. It's not evidence and not for your consideration. I don't want to get

you sidetracked here.

Also, let's talk about exhibits. An exhibit can be anything. It can be a photograph, a diagram, a statement, a knife, a gun, a chair leg, a hundred things. What happens usually is that the attorney will mark the exhibit by the court reporter, show it to the witness. The witness will identify it, testify about the exhibit.

The attorney may or may not offer the exhibit into evidence. If an exhibit is offered into evidence, I must make a determination whether it should be received into evidence. If it's received into evidence, the reporter notes it as being received. It's usually placed on a table somewhere.

I oftentimes do not stop a trial and pass an exhibit around amongst the jury. Be advised, though, ladies and gentlemen, that during your deliberations at the end of this case, you have an absolute right to have any and all exhibits that are offered and received into evidence sent into the jury room for your inspection, perusal, discussions, whatever. I

just don't want to get you antsy if you see these exhibits pile up and you're not getting a chance to look at them.

I may, during the course of the trial, if I think it's necessary, pass an exhibit amongst you, if it will help you better understand the evidence or the testimony of the witness.

Members of the jury, during the trial to follow, the evidence will probably be presented in the form of testimony, exhibits, and perhaps stipulations. Basically, there's two types of evidence: there's direct evidence and circumstantial evidence.

Direct evidence is direct proof of a fact, such as the witnesses -- excuse me, such as the testimony of an eyewitness saying, "I saw this. I heard this. I smelled this," and whatnot.

Circumstantial evidence is proof of a chain of circumstances from which you may infer that a fact exists, even though it has not been proved directly. You are entitled to consider both kinds of evidence.

The word infer, or the expression to draw

an inference, means to find that a fact exists based upon proof of another fact. The age-old saying, for example, is that you go to bed one night and your lawn is free from snow, and there's nothing but grass there. You wake up in the morning and there's a foot of snow, and there's some footprints walking through the snow. Now, you can draw some inferences from that. You can draw the inference that during the night while you were sleeping it snowed, as evidence by the snow on the ground. You can also draw another inference. You can infer that someone walked across your yard either during the snowstorm, or after it had snowed, even though you didn't see anybody, but it is evidenced by the footprints in the snow. Those are examples of circumstantial evidence.

You cannot, however, take that inference another step by saying who it was that walked through your yard, unless there's some other evidence that points to that, the conclusion that you would draw. I will instruct you further at the end of the trial on circumstantial evidence, but that's a brief example that I want

to give you in this particular case.

At the close of the trial, following the summations of counsel, I will instruct you on the rules of law applicable to the case, and then you'll retire for your deliberations.

Your function as jurors is to determine what the facts are and to apply the rules of law that I give you to those facts as you determine them to be.

The conclusion you reach will be your verdict. You will determine what the facts are from all the evidence in the case. You and you alone are the sole and exclusive judges of the facts. In that field, neither I, nor anyone else, may invade your province.

I shall endeavor to preside impartially and not to express any opinions of mine concerning the facts. Any views of mine on the facts would, in any event, be totally irrelevant. On the other hand, and with equal emphasis, I instruct you that you are bound to accept the rules of law that I give to you, whether you agree with them or not.

The law requires you to weigh all the

evidence the Court receives and admits. You must make your own evaluation of the testimony given by each witness, and determine the weight, if any, you choose to give to such testimony.

The testimony of a witness may fail to conform to the facts as they occur, because the witness is intentionally telling a falsehood; because the witness did not accurately see or hear that about which the witness testified; because the witness' recollection of the event is faulty; or because the witness has not expressed himself or herself clearly in giving that testimony.

Suffice it to say that you are at liberty to accept and consider, either in whole or in part, the testimony that you believe, and you are at liberty to reject, either in whole or in part, the testimony you do not believe.

There's no magical formula by which one may evaluate testimony. You bring with you to this courtroom, ladies and gentlemen, all of the experiences and background of your lives. In your everyday affairs you determine for yourselves the reliability or unreliability of

statements made to you by others. The same tests which you use in your everyday dealings are the same tests which you should apply in your deliberations as jurors.

For example, the interest or lack of an interest of any witness in the outcome of the case, the bias or prejudice, if any, of a witness, the age, the appearance, the manner in which the witness gives testimony on the stand, the opportunity that the witness had to observe the facts concerning which the witness testified about, the probability or improbability of the witness' testimony when viewed in light of all the other evidence in the case, are all items to be taken into consideration in determining the weight, if any, that you will assign to that witness' testimony.

If it appears that there are discrepancies in the evidence, you will have to -- you will have to consider whether any apparent discrepancy may be reconciled by fitting the various versions together. If, however, that is not possible, you must then determine which of the conflicting versions you're willing to

accept.

Every time you leave that jury box, ladies and gentlemen, I am bound by law to give you the following admonitions or warnings, or whatever you want to call them. One, that you are not to form any opinions about this case; that you're not to talk about it amongst yourselves or with anyone else; that you are not to visit the scene or anyplace that may have come up during the course of the trial, on your way home or at any time; you are not to read or listen to any news accounts of this trial.

I say that to you not because I don't think you listen to me, it's because I'm required to do so.

Also, I have to advise you that during the course of this trial, ladies and gentlemen, none of you may contract with any publishing or movie company for your rights to this trial. That usually brings a smile to some people's faces. It always does to mine. I guess the new rules, I guess sometimes in those big trials in other cities people are oft -- they have problems with juries making deals

with movie companies before they made up their mind on the case. So they thought they ought to warn you about that. So if Steven Spielberg comes back by tonight and wants to make a deal, tell him to wait a couple weeks.

There's also no rule, ladies and gentlemen, that says a jury cannot take notes during the course of a trial. As you have noticed, Mrs. Alexander here is a highly trained and professional court reporter. Her function is to take down every word that is spoken in this courtroom.

You will have an opportunity during your deliberations to have any testimony read back to you that you desire. All you have to do is ask, and we'll talk a little bit more about that at the end of the trial, but you'll have an opportunity to have a witness' testimony read back word for word. Her transcript, or her record, constitutes the official court record of this trial.

The concern I have, I don't want some juror scribbling notes down, unless you possess some extraordinary skills, while the

witness is testifying, and then missing the next bit of testimony, or the next answer, nor do I want to have the situation where you whip out your notebook in the jury room and, God forbid, that you took it down wrong, and certain decisions were made.

And so my advice is, sit back, listen carefully to the trial, and let the professional take down this case.

Members of the jury, you and you alone will make the final decisions in this case, and you and you alone will decide the facts after applying the law as given to you by the Court. You will make your final determination of what the facts are by giving, as I know you will, careful and patient attention to all the evidence that you will see and hear during the course of this trial. And the conclusions you reach will be your verdict.

As I say, you and you alone are the sole and exclusive judges of the facts in this case. We'll break now until 2:00 for lunch. At that time, we'll come back, we'll hear the opening statements of the attorneys, and we'll have our

first witness called, and we'll get underway.

Let me just advise you of one other thing. All trials, ladies and gentlemen, in this state are open to the public. That means at any time people can walk in that door and have a seat and see what's going on. And I have no objection to that. We have nothing to hide here. However, it's -- it can sometimes be annoying. And sometimes that lobby, there's a lot of noise that's generated out there, when the door swings open, the noise comes in with the people.

I would ask you to carefully pay attention to what's going on and not be too concerned about whether a classroom full of kids comes in or people off the street come in and sit down and see what's going on. It can be annoying, but if we all focus in on what's happening here, we won't have a problem with this.

So we'll break for lunch today. I don't know if you know that there's the Civic Center, that you can get to.

COURT ATTENDANT: I'll direct them, your Honor.

THE COURT: And the court attendant will direct you. You can do it all underground, if you don't want to face the weather outside. It's open, close by; you can do that, if you want.

Again, if you see the attorneys in the hall, they're ordered not to talk with you, so take that into consideration. Don't read about the case in the paper; don't form any opinions; don't watch anything on TV, and don't go visit the scene or anyplace you think where something happened.

Okay. I'll see you at 2:00 sharp and we'll start this trial. All right.

COURT ATTENDANT: Court is in recess until 2:00 p.m. Right this way.

(A luncheon recess was taken at 12:36 p.m.)

*   *   *

(March 17, 1993 - Afternoon Session)

(Court and counsel are present. Proceedings resumed at this time.)

(Calendar, Maps, and Photographs were marked for identification as People's Exhibit Numbers 1, 2, 3, 4, 5, and 6, this date.)

THE COURT: Let me see if I understand this right. You're going to offer those exhibits prior to your opening statement, to use them, correct?

MR. FITZPATRICK: Yeah, 1, 2, and 3, Judge.

THE COURT: Yes, because it's got to be done in front of the jury. Let's bring --

MR. CALLE: 1 is the calendar; 2, the map; and 3, the larger map or the smaller map?

MR. FITZPATRICK: 3 is the map that is labeled.

MR. CALLE: Right. Okay.

MR. FITZPATRICK: 2 is the generic map, and 1 is the calendar.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Okay. We're in session. The record should reflect counsel is present, the

defendant is present, the jury is present.

Ladies and gentlemen, before we begin opening statements, there are some exhibits that are going to be marked and offered prior to the opening statements. And, Mr. Fitzpatrick, if you would proceed, please.

MR. FITZPATRICK: Your Honor previously marked Exhibit 1. It's a calendar of the month of March 1987. I would offer that.

THE COURT: All right. That will be People's Exhibit Number 1, is a March calendar for the year 1987.

MR. FITZPATRICK: '7, yes, your Honor.

THE COURT: All right. Mr. Calle, is there any objection to Exhibit 1 being received?

MR. CALLE: No, sir. And to facilitate, I also saw the other two prior to the jury entering. There's no objection to the other two exhibits, should they be introduced now.

THE COURT: Okay. Mr. Fitzpatrick, if you'd just identify those for us.

MR. FITZPATRICK: Yes, your Honor. Exhibit 2 is a map showing the southeast corner of Onondaga County, and part of Madison County.

THE COURT: All right. And that's received by stipulation. People's Exhibit Number 3?

MR. FITZPATRICK: Exhibit 3, your Honor, is a map of the area surrounding 690 from the west side of the City of Syracuse, all the way over to the Thompson Road off-ramp. And it has some labels of points that will be described during the course of the trial.

THE COURT: All right. People's Exhibit 3, by stipulation, is received.

(People's Exhibit Numbers 1, 2, and 3 were then received into evidence.)

THE COURT: At this time, Mr. Fitzpatrick, are you prepared with your opening statement?

MR. FITZPATRICK: Yes, your Honor.

THE COURT: Go ahead, sir.

MR. FITZPATRICK: Thank you.

OPENING STATEMENT BY MR. FITZPATRICK:

Thank you, ladies and gentlemen, and good afternoon to everybody.

The jury selection process is certainly not the most exciting part of a trial, but it's very important. You might sit there and say to

yourself, you know, why am I here. And maybe forty or fifty of my neighbors are excused. They seemed like pretty nice people, too. What's the rub? Well, from my point of view, I'll tell you, it's those three things: it's your intelligence; your common sense; and your ability to be fair and impartial.

I'm going to rely very, very heavily on those three traits over the next couple of days, and perhaps into the later part of next week. I want to tell you what this trial is not going to be about, and I remind you that what I say should be, obviously, is not evidence. I was not anywhere near Hickok Ave. in March of 1987. I did not witness anything. I did not hear anything. I did not see anything, neither did Mr. Calle.

So for that obvious reason, what I'm about to say in this case is not evidence, but it's an overview. An opening statement is an overview of what the People believe the evidence in this case will show.

Let me tell you -- and let me begin by saying what this case is not. It's not about,

gee, it's been six years, wouldn't it be nice to solve this particular case? Let's arrest Hector Rivas. Let's make a scapegoat out of him.

I can tell you, there are dozens of homicides. And there are hundreds all over New York State, all over the United States, that go unsolved, and will probably go unsolved long after Bill Fitzpatrick is dead and buried.

It's not and has absolutely nothing to do with someone's discomfort or displeasure at a Hispanic male dating a white woman. That is absolutely not, nor will it be, an issue in this case.

I also want to tell you, importantly, it is not a police case. There's no police officer who's going to walk into this courtroom and say, "I think Hector Rivas killed Valerie Hill." No police officer is going to say, "This man confessed to me that he did this terrible deed."

And police officers, just like everybody else that testifies in the case, will offer pieces of evidence that will ultimately lead you to be convinced that this man killed Valerie Hill.

What this case is, is for you to begin the very serious task of determining what happened back on this day, Friday, March the 27th, of 1987.

The reason Mr. Rivas is in the courtroom is because an Onondaga County Grand Jury has returned an indictment. Not evidence, but it's an indictment. It's a piece of paper that charges him with a crime, single-count indictment.

It charges that Hector Rivas committed the crime of Murder in the Second Degree on or about the 27th day of March, 1987, in the City of Syracuse in Onondaga County, intending to cause the death of another person, he caused the death of that person, to wit: intending to cause the death of Valerie Hill, defendant caused her death by strangling her with the belt from her bathrobe.

Unlike many cases, there will be no question about some very important things in this case. And I want to review those, what the evidence will show, and I don't mean to speak for Mr. Calle, but I'm fairly confident when I say this, that there will be no question about the manner and cause of Valerie Hill's death.

She died as a result of being strangled with a belt. There won't be any question about that.

Many times during the course of a trial, lawyers can argue about the intent of an individual, what was in the person's state of mind. That will not be an issue in this case. There is no question but that this person that killed Valerie Hill intended to cause her death.

You'll hear from the medical examiner about how she was killed. You'll see photographs of her in death. You'll see photos of her in life. There's no question that the strangulation death that she suffered is a very slow and agonizing way to die, and there can be no question whatsoever as to the intent of the person performing that act upon her.

Which leads us to the only question that you will have to deliberate on, is the identity of the person that killed her. Who did it? Who did this to Valerie Hill? We will prove -- the People will prove, by direct and circumstantial evidence, two things, and I want you to appreciate the difference, because they're really -- there may be a distinction without a --

or a difference without a distinction, but we will not only prove that it was Hector Rivas that killed Valerie Hill, we will prove that it could not have been anyone else in the world that killed Valerie Hill.

Those two things, when you think about them, are really the same. If we prove to you that no one else could have killed Valerie Hill, then we have proved to you that Hector Rivas did that. We will not only prove that, but we will prove to you Hector Rivas killed her, no one else in the world.

The evidence will show he had the motive, the means, and the opportunity to kill this particular woman, as well.

This case begins and ends with Valerie Hill. She will be, because of this incident, forever twenty-eight years old. She was, the evidence will show through the witnesses that knew her and cared about her, a thoroughly decent and caring human being, and in many ways, I would hope, like all of you.

Valerie Hill had a lot of things going for her. She was continuing her education. She was

striving to be as good a person as she could be. She was keeping herself physically fit, which will be important, I think, during the course of the trial. Her profession was that she was a pediatric nurse at St. Joseph's Hospital, here in the City of Syracuse.

She cared for sick children. And obviously, as many of us, had hoped to one day have a family of her own.

In 1981 she met a man by the name of Bob Lucas, and you will meet and hear Bob Lucas testify during the course of this trial. The evidence will show that she fell in love with Bob Lucas, she developed an intimate relationship with him, and she lived with him for a period of time. They lived over in the Cazenovia area over in Madison County. And the relationship went on for a number of years.

And for whatever reason, who am I to say, this relationship was not meant to continue. It wasn't in any way a relationship that was marked by episodes of violence. There were no police reports. There were no orders of protection. It just, for whatever reason, these two particular

people did not develop to the point where they would be married, as we would all hope to be.

And then Valerie Hill moved away, in a sense, going out on her own, moved away from Cazenovia, not necessarily to get away from Bob Lucas, but maybe just to get away from everything and be on her own. And she moved to the City of Syracuse. And if I can refer to Exhibit 3, to give you an idea of what we're talking about, so you can familiarize yourselves and you'll see Exhibit 3 a lot during the course of the trial, but over here (Indicating) on your far left, 690, there's some points here that are going to be of importance during the course of the trial. And I'll mention those as I go on, Coleman's Restaurant and another restaurant here (Indicating).

But here where I'm pointing to, 248 Hickok Avenue, usually called the Eastwood section of the City of Syracuse, is where Valerie Hill took up residence. She lived alone, with the exception of some cats that she had. It was a two-family house. You'll see pictures of it.

Valerie lived downstairs, another family by the name of Stonecipher lived upstairs, and

you'll hear from several members of the Stonecipher family.

About -- and I can't tell you, and the evidence isn't going to show you exactly the date, but sometime in the summer of 1986 while the break with Bob Lucas, Valerie Hill -- and don't forget, they had been seeing each other for some five years -- but sometime in the summer of '86 when that break is perhaps not complete, she meets and begins to date a self-employed plumber from Cazenovia by the name of Hector Rivas, the gentleman here in court.

And the evidence is going to show that Bob Lucas' personality -- you'll get some feel for his personality -- in many ways Hector Rivas and Bob Lucas are as different as two people can be. The defendant was outspoken, outgoing. He was, I guess, flashy might not be an inappropriate term. He's got a nice car. He had a nice job. He had customized license plates which you'll hear about, because they're important.

Bob Lucas was probably the type of guy who'd want to stay home and watch a movie. The defendant and Miss Hill loved to travel.

OPENING STATEMENT BY MR. FITZPATRICK

Bob Lucas would probably rather stay home; that type. I think you follow where I'm getting at.

I don't want to play psychologist and I'm not going to tell you that the evidence is going to show this to you, but it very well may be clear to you at the end of the trial, that Valerie Hill was dating someone who was very much the opposite of Bob Lucas, not that that is necessarily a bad thing.

The break-up with Lucas essentially becomes complete in 1986, sometime during the summer when Miss Hill becomes more than casual friends of the defendant. They develop an intimate relationship, as well. And I think it's important that you know that during the course of the entire trial, you'll hear that Valerie Hill, in six years, dated two people: Bob Lucas and Hector Rivas.

And Hector Rivas and her did many things together early on. She was swept away, if you will, if that's not a bad phrase. They went to Toronto together. They, I would imagine, had a nice time there. They went to Nashville, Tennessee in December of 1986. Valerie Hill's

brother, who you will hear from, David, and his wife, they went with them. They saw Icie Hill, who is Valerie's mother. Valerie's mother and dad were divorced a number of years. Icie Hill still lives down in Nashville.

And then there isn't going to be any question that Valerie Hill begins to have second thoughts about the relationship with Mr. Rivas. There's a strain that develops between the two of them. That doesn't mean that he killed her, but it's going to be part of the People's proof.

She is a woman apparently that has begun to enjoy her independence. She's very committed to her work. Her co-workers will speak very, very highly of her dedication at work.

Very, very much likes her apartment. She cares for it very well. She's a very neat person. You'll hear from anybody that ever had an association, that ever lived with her, that -- not meticulous or fastidious, but very, very careful, very neat. She kept good records about what she did, and so forth and so on.

The defendant, however, is not very happy with that. You know, the evidence is going to

show that he wants to control more of Miss Hill's life than she is willing to allow. And he isn't apparently getting the message that she would like to break this relationship off. Until finally, sometime -- again, I can't give you the specific date, the proof won't show you the specific date -- but sometime in January of '87 the defendant is told by Valerie Hill, "Look, that's it. We're done. No hard feelings. I don't have you. I don't want anything bad to happen to you, but I would like very much to be left alone, and I would like to go on with my life."

And not surprisingly, Valerie begins to communicate with someone other than in her immediate family, who she has been closer with than anyone else in her entire life, Bob Lucas. And she begins to communicate with him. And that's why I ask you to remember your own relationships and bring that common sense that you have about those with you, into the jury room.

They communicate by telephone on a couple of occasions. Neither one is saying, "Let's get back together," but both of them were saying,

"There were things, perhaps, that were unsaid. I would like to talk with you to maybe clear those up."

And then in February -- February 26th, to be specific -- Bob Lucas receives a letter from Valerie Hill. And we'll see that letter, and if it's allowed into evidence, we'll actually read the letter and get a look, or get a feel as to what was in Valerie Hill's state of mind, at least as of February 26th of 1987.

There's no mention whatsoever of Hector Rivas. As far as Valerie Hill is concerned, it's done, it's a done deal, it's over.

Lucas, in fact, at this point, has another girlfriend, and is attempted to build that relationship. In fact, it's the woman he eventually married, and is still married to today. But while this train is going that way, this defendant is going this way. He doesn't get -- he doesn't seem to have gotten the message, because there's going to be proof, and I can't give you the qualification in terms of what's the most important exhibit you're going to see, but let me tell you that a large group of the most important

exhibits that you are going to see, are the notes that the defendant gave to Valerie Hill. And when I say notes, ladies and gentlemen, I want to underscore that. Notes upon notes upon notes, letters, cards; St. Valentine's Day he sends three letters, flowers; St. Patrick's Day he sends cards. Virtually every single day in March of '87 and February of '87 and January of '87 when Valerie has told him very politely and in a very ladylike fashion good-bye, this defendant is stopping by at her house, "Oh, I just happened to be in the neighborhood. I thought I would stop in. Here's a note, or if you're not at home, I'll leave a note, or a card for you."

It becomes not a brief love affair, which is what it was for Valerie Hill. It will become what the People's case is all about. It becomes an obsession. And that's what the proof is going to show because you're going to see these notes. There's no question that they were written by Mr. Rivas. Mr. Calle and I have both agreed that that is so, that they were written by the defendant.

You'll hear a note that says, "Don't ever

leave me, Val. Don't ever go away, Val. You're the sunshine in my life, Val. I need you, Val," et cetera, et cetera, et cetera.

Almost every day calling her, stopping by to see her, showing up unexpectedly, things mysteriously missing from her house, her coming home and finding Hector Rivas waiting for her in the darkness, smoking cigarettes. He doesn't get it. Instead of saying, "Okay. I will get on with my life," he begins to stalk her, day after day. She becomes so distraught about the situation that she actually things about leaving not the City of Syracuse, or the County of Onondaga, but she thinks about leaving the State of New York and actually going to California.

And unknown to him, she does a thing that very well may have cost her her life. Not something stupid, something that anybody should have the right to do, free of interference from an ex-boy friend. She calls a travel agent and says, "I would like to go to the Bahamas," and we'll hear from the travel agent. And the travel agent talks to her about price and says, you know, "It would be cheaper if you went with

someone." And she knew that at some point Valerie had been dating Hector Rivas. I don't know if she's actually going to say that she suggested that, but there isn't going to be any question, Valerie says, "No. I want to go alone. I want a single ticket to go to the Bahamas."

Now, he doesn't know about it, at least not until March 27th of 1987. But the notes continue, the calls continue. You'll hear testimony about her being out with her friends at the restaurant, and guess who just happens to pop in, sends over some drinks? "Would you like to talk to me? I'd like to talk to you."

You'll hear Valerie's reaction, which is essentially, "Oh, my God. Not again."

And we will eventually arrive at Friday. All of this will lead up to Friday, March the 27th, 1987, sadly, the last day of her promising life.

She works that morning. She leaves in the a.m. early. As I said, she worked as a nurse at St. Joe's. She does some errands. We can't tell you everything that she did. She's not here to tell us, but we know she made a deposit at a

local bank, and we know, and this is important again, unbeknownst to the defendant, because she didn't want him to know she was going to take that trip, not a long trip, but she was going to go away for the weekend to visit her girlfriend in college. That girlfriend is going to testify. She's supposed to be here today. She's battling the weather. The last I heard she was in Albany somewhere, but she will be here today or tomorrow, and she will tell us how she expected Valerie alone the weekend of the 27th, to visit her.

She traveled, probably in preparation for that trip, she traveled to Oneida, which is over in Madison County, from Syracuse. You can see the O-N, and part of the E, that's Oneida. That's Nye Ford, that's a place called Nye Ford, N-Y-E Ford, and she had her car fixed. And we know that because some of the people from Nye Ford are going to come in and tell us that they saw Valerie Hill having her car fixed.

And we know that the car service took longer than expected, because the evidence is going to show that she probably intended to stop in Cazenovia to return a library book, but did

not do that because she had to get to Fayetteville before the travel agency closed, because that Friday was the day that she picked up her ticket to the Bahamas. And we'll have the travel agent herself, Cindy Reiser will come in and tell us that she remembers Valerie Hill coming in. It's a person that she knew, as a matter of fact, and that she had paid earlier in the month a large portion of the bill for that ticket.

She will give her final payment, and she will take the ticket and her itinerary and put it in her purse. And no one in this courtroom will ever see that ticket -- no one has ever seen that ticket since March 27th. And I'll talk to you about that at great length probably when I sum this case up.

So we can account for her almost the whole day, up until dinnertime, 6:00 or thereabouts, when she's supposed to meet her father at Candy's Restaurant, which is here in the 300 block of Burnet Ave. I don't know if anyone is familiar with Candy's Restaurant or not.

Now, on Friday, now that we know where Valerie was, where is Hector? What is the

evidence going to show as to where Hector Rivas is? Well, he's doing what he's been doing since January of '87, he's stalking Val another day, the evidence is going to show.

Two o'clock a guy that he knows sees him driving near DeJulio's Army and Navy Store. He's heading, I guess this would be easterly. And guess where he's going to? 248 Hickok, because the Stoneciphers see him at 248 Hickok Ave. on Friday.

What's he doing? Sitting there in his red van, waiting for Valerie. Not for five minutes. Not for ten minutes. But for hours, because at 4:30, we're going to hear testimony from the paperboy who delivers in this area, and the paperboy is going to tell you that about 4:15, 4:30, while he's collecting, he sees this man right by 248 Hickok Ave. And they have a brief encounter. Hector seemed very annoyed and gives the paperboy a dirty look, or whatever. And he goes and he heads back -- Hector goes to Cazenovia and he changes clothes and he switches automobiles. He now gets his silver car with the "RIVAS-1," or "1-RIVAS" license plate, and then

he goes right back doing what he does best, going back to Hickok Ave., the evidence is going to show, "Got to find Val. Got to see what she's doing."

And we know that he drives back to Hickok Ave. And I want you to keep these things in mind, because in a moment, I'm going to tell you what Hector said when the police picked him up. It's a short conversation, a couple hours with an Investigator John Brennan, but keep that in mind.

Now let's go back to what we know, that would be Candy's Restaurant where Randall Hill is waiting for his daughter. And he's a little concerned -- not much, but he's a little concerned, she's late. Doesn't know why.

She gets there. She comes in. She's upset. Seems excited. "What's the matter?" "I had to drive through Eastwood because Hector was waiting by Hickok Ave. and he followed me." "Oh, what else is new?"

So they sit and talk. They have dinner. Randall Hill has remarried and his wife -- and this is really a human tragedy, and it has nothing to do with Mr. Rivas, but Randall Hill's

second wife is up at St. Joe's, and is dying, literally. I mean, she's -- coincidentally, ironically, died on March 30th, the date that Val's body was found.

And they're talking about this and that and so forth and so on, father and daughter. And she really does not have a lot of appetite. She picks at some food. She has a couple of drinks, and then she leaves. And we know, at some point, we don't know if she ran an errand or went straight home, but we know she winds up back at Hickok Ave. and she is making preparations to see her college friend.

Back to Mr. Rivas. Having been unsuccessful in following her and not knowing that she's going to go to Candy's Restaurant, he has earlier in the day called a friend of his, an associate that he hasn't seen or heard from in several months, and asks him if he is going to Coleman's Restaurant -- and that also is marked here on Exhibit 3 -- over on the Tipperary Hill, west side of the City of Syracuse.

And there are a number of witnesses that were at Coleman's Restaurant -- we're not going

to bring in all of them, but if there's any problem, we'll bring in as many as we need to. But we're going to bring in a number of people, at least two people that say Hector got to Coleman's at about 6:30, about the same time Valerie Hill is arriving at Candy's Restaurant. And he has some beers.

There's a photo that's taken of him. We'll show you that photo, show you what he was wearing the night of the murder. He has some beers. He's kibitzing with various women at the bar. And he leaves 9:15 or 9:30, somewhere in between. No question in the minds of the people that saw him leave, that he left Coleman's at 9:15 or 9:30 at night.

Now, meanwhile, half a city away, at Liquor Square -- now, this is what I mean by pieces of this case beginning to fall together, because a person at Liquor Square doesn't know anybody at Coleman's, and doesn't have any knowledge -- or what they said to the police or vice versa. But there's a fella by the name of John Cassano who is a store manager at Liquor Square. And it's about 9:45 at night, and he's beginning to close

up. And it's the final four weekend; that's the weekend of Syracuse's ill fated trip to New Orleans. Saturday was the Providence game, and then Monday night was the Indiana game. And he is very aware of who his regular customers are, a lot of people that come in that day to buy alcoholic beverages, maybe some party things, to get ready for, you know, a party, final four parties at their house or whatever.

And then suddenly a big silver car pulls up and parks, and Cassano is sort of tuned into this guy. It's late. And he fears that the person getting out of the car is coming to rob him. Not for any particular reason, other than it's very late; it's close to closing time.

So for that reason, he pays somewhat -- not somewhat, but he pays very close attention to this man's features. And he describes him. He says he's Hispanic, he's about whatever height. He'll say he has a scar on the right side of his face. And he buys a bottle of Bacardi rum, and at least two other bottles of some type of liquor he doesn't recall, but he remembers the Bacardi rum.

And a review of his cash register receipts show that this person left Liquor Square, or checked out of Liquor Square at exactly 9:50 p.m.

Now, Valerie at 9:50 p.m. is at Hickok Ave. We know from an examination of the scene that she has turned on her electric blanket. She has her bathrobe on. She very well could be preparing to take a shower, anticipating her trip to see Laura Adams, anticipating, you know, having a nice time, just anticipating whatever.

But some time after 9:50 p.m. -- all right. And let me tell you that it's sometime -- I can't tell you the exact time, but it's within an hour, hour and a half of 9:50 p.m., Valerie Hill let someone into her apartment. Was it the defendant that she let in?

Jim Crimi, a witness who has absolutely no ax to grind with anyone; doesn't know the defendant; doesn't know me outside of this particular case; isn't a police officer; says that on Friday night, at night -- he can't tell you what time; it was sometime after he took his girlfriend home, he sees sitting in "1-RIVAS" or "RIVAS-1" sitting there, stalking, like he had

done all day, he sees the defendant, Hector Rivas, who he knows from Hickok Ave.

Later that night, the People are going to produce evidence that the defendant arrives at Albert's Bar in the middle of Cazenovia sometime after midnight. We'll produce an eyewitness that saw the defendant come into the bar at that particular time.

Witnesses say that he stayed there most of that morning; that he went out to breakfast, and partied, and then sometime in the middle of the morning, or whatever you want to call it, he went home.

Now, Saturday, March 28th, as I said, S.U. was playing Providence. A number of unusual things occurred. A neighbor sees Valerie Hill's cat outside their apartment. Never happened before. She would never leave her cat unattended. Laura Adams, who's expecting her arrival in Glens Falls, I think it is, is on the phone calling and calling and calling all morning, and getting no answer. And Valerie Hill's car stays in the driveway. No one sees her. No one hears her.

Sunday, March the 29th, again, no sign of Valerie. No one has heard from her; no one has seen her. The father calls the house, gets no answer. They don't know that really on Friday night she's been killed.

On Monday, March the 30th, her brother, David, responds to 248 Hickok Ave., along with his father, Randall Hill, and they get there sometime in midday, sometime around noon, 1:00 in the afternoon. And they find, I think what Mr. Calle has said, is a tragedy. They find their sister, they find their daughter, dead.

She was strangled. She is lying face down on her living room floor. She has had a phone book propped up under her pelvic area. They believe, Randall and David, that there is blood on her buttocks, because she is nude from the waist down; the bathrobe has been scrunched up to above her waist. And she clearly has been dead for some time.

And wrapped around her neck tight enough to cause her death is the belt from her bathrobe. And then the police and other professionals take over and they attempt to piece together what

happened, bring a lot of the things -- some of the things they piece together back then. Some of the things they didn't piece together until recently. And they put all these things together to try to tell you what happened back on March the 27th.

I want you to listen very, very carefully to the police officers that come in and testify as to what they find at the crime scene, what physical evidence was found, and what was missing.

There are two things of significance missing: a ticket to the Bahamas missing, never been found, never been used; another interesting thing that's missing is a library book. You remember I told you that Val Hill was probably intending to go to Cazenovia Library because earlier in the week she had gotten a phone call from the librarian complaining about her failure to return, and the woman at Nye Ford in Oneida is going to say that, you know, "I sometimes check the cars because I don't want people to claim that some valuables were stolen." Then she looks in the back of the car and she sees a

library book, and she knows it's a library book because it's got a plastic cover, a protective cover on it. And it's very, very dark, almost a black book. And what do you think happened to that book? Someone returned that book to Cazenovia Public Library between Saturday at 3:30 and Sunday at 10 a.m., because somebody knew that they wanted people to think that Saturday night Valerie Hill was alive, that's how clever the killer in this case was.

Because Saturday night Hector Rivas is Mr. Social. He is out partying. He is at this party, he's with this person. He's talking, he's on the telephone. He's talking to Val on the telephone. Val's friends were going, "What is he talking about? She's in Glens Falls." "Oh, Val is not feeling too good. I just talked to her on the phone. I hope she can go to the party with me later tonight."

He meets a girl later that night, practically begs her to take him home with her so he could spend the night with her. She finally says no, and off he goes. His alibi is complete -- for Saturday night.

The physical evidence will consist of fingerprints, cigarette butts, the things that were missing from the apartment. And it will all point inexorably, overwhelmingly, to the defendant being in that apartment Friday night, March the 27th.

At about 2:00 -- getting back to March 30th -- people got worried about Val and finally the day that Randall Hill went over to her apartment, on the 30th of March, which is Monday, they found the body. And I've already described to you what the evidence is going to show about that.

At about 2:00, having interviewed some neighbors and talked to a friend, which is just standard police procedure, someone says, not remarkably, it doesn't take a rocket scientist, and they did have one-tenth, if not one one-hundredth of everything I've just told you, "Let's go talk to Hector Rivas. He lives out in Cazenovia. Let's go talk to him. He knows her. He's the last person to date her."

And I can't tell you -- again, I don't want to overemphasize, but John Brennan, who's

now a sergeant, goes to Cazenovia. And it's the most peculiar conversation you'll ever hear. He says to the defendant -- knocks on his door. The defendant comes to the door; didn't go to work that day, he had a sore throat. He had just called work about fifteen, twenty minutes earlier. And when he comes to the door, he appears to Brennan that he's just gotten up.

And Brennan says to him, "Hi. I'm Investigator Brennan of the Syracuse Police Department. I would like to talk to you about Valerie Hill." And the defendant's response is, "Can I get dressed? I'll be with you in a minute." And Brennan says, "Okay."

And they wait, and the defendant comes out and says nothing, gets in the car, drives to Syracuse, never says to Brennan, "What about Valerie Hill? Is Valerie Hill okay? Is something wrong with her?" Just drives to Syracuse, sits down in an interrogation room, and Mr. Brennan begins to ask him some questions.

"When did you last see Valerie Hill?" "I last saw Valerie Hill Thursday, March the 26th,

just for a brief period of time." "How are things between you and Valerie Hill?" "Oh, everything is fine. We're just a couple of people in love, dating."

"What did you do Friday?" "Oh, Friday, oh, I stopped by, too. I just happened to be in the area and she wasn't there, so I left." "Did you go back Friday?" "Well, I went back. Some friends of mine called me and wanted me to meet them at Coleman's. So I went back around 6:00. After all, it's right on my way to Cazenovia, on my way to Coleman's, I just thought I'd stop and she wasn't there, so I left a note."

The evidence will show he's saying, "And then I got back and went on my way to Coleman's." "And what time did you get to Coleman's?" "Oh, I don't know. Probably 6, 7:00." "And how long did you stay there?" "Not until 9:15, no. I stayed there -- I stayed there until 11:00 at night, and then I went to Albert's. I went from Coleman's at 11:00 to Albert's over here in Cazenovia."

And you know, folks, the evidence is going to show, and you'll be just dying to know, did

Brennan ask him, "Well, did you stop at Hickok Ave.?" "No, I didn't. I just went right on to Albert's." "Well, how often did you stop and try to see Miss Hill, Mr. Rivas, just about every day?" "Just about every day." "Well, you must have tried to see her Saturday?" "No."

"You must have tried to see her Sunday?" "No." "You must have tried to see her Monday?" "Well, I called. I had a sore throat. I called her at work at about 1:00, and I talked to Margaret Burke. And then you guys arrived at my house."

And then another very peculiar thing happens at 5:30 on March the 30th, Monday. Investigator Brennan says to Mr. Rivas, "Hector, Valerie Hill is dead." Now, the evidence is going to show that the man that left forty to fifty to sixty notes, cards, letters, dropped by her house, stalking her for three months, the evidence is going to show that his reaction was nothing. Exactly the same reaction as the fourteen people looking in front of me. Because just like the defendant, you already knew that Valerie Hill was dead. You already knew.

The police that night, much later, searched the defendant's house pursuant to a lawfully issued search warrant, in Cazenovia. They find three things that will be of interest. One, they find the jacket that he wore the night of the 26th. We know it's the same jacket, because we are fortunate to have a picture of it. And unusual or not, the jacket has been freshly washed by the defendant in his basement. Some of you gentlemen may think that's unusual, you may not. I find it a very peculiar thing.

In one of the closets they find, I don't know how to describe it in words, other than to allow the witnesses to describe it. They find a statue of the Virgin Mary. They find two little candles still lit. They find two glasses filled with change, and a liquid, and they find a picture torn in half, and the remaining half of which contains a picture of Valerie Hill.

Now, this is not something that you're going to see. You are going to hear a description of that from the police officers who were there.

And the last thing you're going to hear

about, recovered from Mr. Rivas' house, is a note torn into several dozen pieces, written to Bob Lucas, and written by Valerie Hill, in his trash, wrapped up in a ball, put inside of a newspaper, and put inside of a trash bag that he had in his kitchen. He had this in his trash, and that will be acknowledged evidence of his motive in this particular case, along with her desire to be independent, the trip to the Bahamas, and the other things that I have mentioned.

Dr. Erik Mitchell, the medical examiner, will be the last witness you'll hear from. He will tell you about the nature of the crime scene. You remember how I told you she was nude from the waist down? Remember I told you how her brother and her father thought that there had been blood on her buttocks? Well, it was not blood, it was fecal matter, because whoever killed Valerie Hill decided to insert some type of object into her anus and wipe it off after she was dead. And the evidence is going to show that in all likelihood, this anal violation was done after she was dead.

What's the importance of that? I told you

in the beginning of my opening statement, and I'll emphasize it again. The People are going to prove two things: We are going to prove to you that that man killed Valerie Hill, and that no one else could have killed Valerie Hill, because when you ask yourselves, was this a burglary, was this a sex crime? A sex crime -- there is no ejaculant found, there was no semen found in her. She let this person in. She knew this person. He was not someone she was afraid of. There was no forced entry.

The evidence will show there was no money taken. The only thing missing was the ticket, the ticket that she had picked up earlier that day, which, as I said, probably cost her her life.

The evidence will show, ladies and gentlemen, naturally, just as obvious as the beauty of Mark Brosh saying that Rivas left Coleman's at 9:30 and not knowing John Cassano from anybody else in the world, Cassano not knowing Mark Brosh from anyone else in the world, says that he was there at 9:45 getting a bottle of rum.

The evidence, the facts, the inferences, that you'll be able to draw, will flow inexorably, overwhelmingly to one person and one person only, Hector Rivas.

And I will ask you to give this the deliberation it deserves, to talk about it amongst yourselves once you've heard all the evidence, and to bring back the only right verdict in this case.

Thank you very much.

THE COURT: Thank you, Mr. Fitzpatrick.

Mr. Calle, does the defense choose to give an opening statement, sir?

MR. CALLE: Your Honor, may I approach with the district attorney, please?

THE COURT: Certainly.

(Counsel approached the bench. An off-the-record discussion then ensued.)

THE COURT: Ladies and gentlemen, I'm going to ask that we take a brief recess at this time before we continue on. I'd like to, of course, admonish you not to talk about this case, form any opinions, or read anything.

We'll take ten minutes, please.

COURT ATTENDANT: Right this way, please.

(The jurors left the courtroom.)

THE COURT: Would the record reflect that the jury has been excused, counsel and the defendant are present.

Defense counsel has requested of this Court permission to allow him to proceed with his opening statement at the close of the People's case. Mr. Calle, is that my understanding of your request at this time?

MR. CALLE: Yes, sir.

THE COURT: Okay. Any reason for that, sir, other than mere convenience for you, or some tactical reason?

MR. CALLE: Both, your Honor.

THE COURT: Okay. Mr. Calle, this Court, pursuant to Section 260.30, Subdivision 4 of the Criminal Procedure Law, citing People versus Pickett at 75 Appellate Division, Section 970, and People versus Pollard, 54 Appellate Division, 1012, denies your request to open at the close of the People's case. And I'm directing you that if you choose to give an opening statement, sir, it will be done at this

time.

I'll note your Exception to that decision. Would you bring in the jury, please?

MR. FITZPATRICK: Judge, while the jury is coming in, I'm going to offer to Mr. Calle a two-page report dated April 18th, 1987, and a one-page report dated May 27th, '87, relating to a Joseph Morgan and the information we talked about earlier.

THE COURT: Can I see you, Mr. D.A., before you do that?

MR. FITZPATRICK: Before I do --

THE COURT: Well, bring these people in. Would you bring in the jury?

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Okay. The record will reflect the jury is all present, counsel, the defendant.

Mr. Calle, at this time, does the defense choose to give an opening statement, sir?

MR. CALLE: Yes, your Honor.

THE COURT: Okay. You may proceed.

MR. CALLE: Thank you.

OPENING STATEMENT BY MR. CALLE: Your Honor,

Mr. Fitzpatrick, ladies and gentlemen of the jury, it is the defense's premise that this particular case was solved by working backwards, and I state that because, basically, what has to be done here is a body has been discovered on the 30th of March, 1987, and then all the work was done to blame Mr. Rivas for this crime.

With that in mind, the defense's proposition is that the evidence that will be presented to you excludes evidence of other possibilities. That, in fact, instead of examining other areas where this case might be solved, the concentration was strictly limited to Mr. Rivas.

The defense believes that Miss Valerie Hill's father and brother were the ones who initially incriminated Mr. Rivas. Based upon that, the police then did everything in their power to make the accusations stick.

Allow me just to briefly remark concerning Mr. Fitzpatrick's opening statement. He made a point of explaining to you that the grand jury returned an indictment against Mr. Rivas. That indictment, I believe, came down in November of 1992. It was explained that just because a grand jury

decides upon an indictment, that that is not a conviction. It's entirely up to only you jurors here to make that determination. An indictment keeps the accusation open for trial.

Valerie Hill is dead. There's not a person anywhere in this room, perhaps in the county, perhaps in the world, that is happy with that fact. We cannot change that fact. However, the fact is, Mr. Rivas did not kill her.

And my job is to present evidence, or to, on cross-examination of the People's witnesses, to contradict evidence.

I'd like you to be mindful of not only what is said on that stand with the People's witnesses, but in the manner in which it's presented. I ask that you not be swayed by the presentation, to follow the lead of the witnesses.

How anyone knows that Valerie Hill wasn't seeing anyone else is beyond me. I believe Mr. Fitzpatrick said that in the six years prior to Miss Hill's death, that she only dated two men: Bob Lucas and Hector Rivas. Well, I believe there will be evidence presented that will show that Miss Hill was dating Mr. Rivas,

at the beginning of their relationship, and at the same time she was dating Bob Lucas at the end of theirs. This I'd like you to keep in mind because there may just be a pattern in which Valerie Hill was seeing someone else at the end of Mr. Rivas' relationship. Just keep an open mind.

We'll hear testimony. We'll see what will be presented. But to state categorically that, in fact, there was only two people, two people, Hector Rivas and Bob Lucas, and both being on opposite ends of the spectrum as personalities, well, I caution you not to let that lead up, that if the police do not believe it was Bob Lucas, and the defense is not making that accusation, then, therefore, it must be Mr. Rivas.

I think that's basically why we're here, because it must be Mr. Rivas. But listen to the evidence as it's presented by the People, to determine if, in fact, that is a certainty.

Mr. Fitzpatrick endeavored to show that Valerie Hill was gaining her independence; Mr. Rivas was possessive. Well, I believe that's not exactly the case. I believe there is a

witness, if not more than one, that would attest to the fact that originally it was Mr. Rivas who suggested the break-up.

There's also an indication that, in fact, Miss Hill was willing to go along with the break-up, nor did she not believe that Hector Rivas loved her so much because he was dating other people.

There's going to be a big play pertaining to notes; that Mr. Rivas indisputably agrees he sent to Miss Hill. Well, their relationship was approximately a year at the time of Miss Hill's death, that she shared, Mr. Rivas and she. I ask you, repeating what Mr. Fitzpatrick said, to keep in mind your own personal experiences.

First year of a relationship, aren't there many notes sent? I see people wearing green. Are people not celebrating St. Patrick's Day? Is it not proper to send a St. Patrick's Day card, or Christmas card, or flowers on Valentine's Day?

The prosecution wishes that you'll find this unseemly, out of order. You make that

decision based upon your own life experience, if that was out of order.

Yes, I'll take -- I will take Mr. Fitzpatrick's word that there would be witnesses to indicate that Valerie Hill was contemplating moving to California. I don't know that personally. I don't know anything personally here.

But, again, the prosecution says that it just goes to possessiveness of Hector Rivas. Well, Valerie Hill was close to her father. She lived in Tennessee, so she didn't have a mother in Onondaga County to keep her around. The father, Mr. Hill, his second wife was seriously ill in the hospital. Okay. There was a lot of pressure. Miss Hill worked on the same floor, only the next ward, pediatrics, both for terminally ill patients. It would seem to me there was a lot of stress and strain going on in her life, and perhaps a move to California was contemplated not so much to escape Mr. Rivas, the prosecution would have you believe, but perhaps just to escape the unhappiness in her life at that time.

Next we have the travel agency, the Bahamas trip. Again, the prosecution wishes that you would believe that Miss Hill's state of mind was that she wanted to go to the Bahamas and she was desperately and with great determination, wanted to go alone.

However, the prosecution asks you to believe that again, she was escaping Mr. Rivas. Now, you know, I don't believe you will hear any evidence indicating that Valerie Hill once makes a complaint in Syracuse, or any state police, pertaining to the harassment that the prosecution would have you believe was caused upon her by Mr. Rivas.

I don't believe there's any indication that the locks on her house, her apartment door were changed, in order to escape Mr. Rivas. There's no indication that she sought to move from the apartment. We have a situation where this woman, Miss Hill, had a relationship with Bob Lucas. She keeps in contact with Mr. Lucas by telephone, perhaps by one or two letters. I don't believe that that is deemed unseemly by the prosecution. Why is it that if, in fact, the

break-up was final between Mr. Rivas and Miss Hill, why is their continued communication unseemly.

Well, the prosecution would have you believe that Mr. Rivas stalked Miss Hill. And that on the week following up to her death, he then has a pattern of going to her house, or calling her up, or both, on Monday, on Tuesday, perhaps, not on Wednesday, on Thursday he sees her. On Friday he goes there and leaves a note. And then Saturday, Sunday, and Monday, there's no evidence that he goes there.

Well, if you recall, on Thursday, Mr. Rivas did have a meeting with Miss Hill at her apartment, where she let him in. There will also be called a witness who will testify that earlier that week she had seen Mr. Rivas and Miss Hill on the walkway of Miss Hill's home, and there didn't seem to be a problem. In fact, it's in unison that Mr. Rivas never caused any problems with Miss Hill at that location, or anywhere else; that, in fact, he was respectful and caused no problems.

Now, Mr. Rivas saw Miss Hill on Tuesday,

and I believe it was Tuesday. It was earlier in the week, according to the names. And then again on Thursday, by his own admission. Well, Valerie Hill was going away that weekend to a friend's, Ms. Adams, for the entire weekend. And I ask you to consider, if you know that someone is not going to be home that weekend, would you bother going over there?

Miss Hill is leaving Saturday morning for, I believe, Schenectady. Well, Mr. Rivas knows this. Is he going to be calling her home? Is he going to be going there? Makes perfect sense, and that's all I'm asking, is that you bring your own judgment into consideration of the testimony.

By the way, not only was that of Mr. Rivas' own admission, but he freely and willingly answered questions on March 30th, 1987. But it wasn't just a couple of hours. It was approximately ten hours of questioning. Surely if this man was a psychopath, and by all indications, by the prosecution, must claim him to be a psychopath, which we'll get into later, would he freely and voluntarily go and sit for

ten hours and be grilled by the police concerning a murder that he did?

Well, now there's questions that arise as to, well, he didn't ask anything. Spanish people are fearful of authority, as a stereotype. If you don't know it, find out about it. It has nothing to do with this case; ask around. Not only that, but Mr. Rivas was going by her house all that week. Is it so unusual to remain silent? They want to speak to him about Valerie Hill.

Gee, well, I know she was mad at me the other day for showing up, maybe she told the police she doesn't want me going around there anymore. What's so unusual about remaining silent and accompanying the police to the police station, and giving answers to questions such as, that he did purchase liquor in Liquor Square. Did he have to say that? If he is a psychopath, he's going to be covering his tracks. He's not going to be telling people, to the best of his ability, what he recalls.

You'll hear John, or Mr. Cassano, identify Mr. Rivas. However, he couldn't say what he was

wearing, when asked. You'll hear Mr. -- he was never shown a number of photographs. He was shown one photograph first. "Mr. Cassano, did this man buy liquor?" I ask you to determine if that was suggestive or not.

The tickets were never found; these Bahamas tickets were never found. Well, what the police claim they found in Mr. Rivas' trashbag in his kitchen was a note to Bob ripped up in pieces on the bottom of the bag. Well, I ask you, if one were to kill someone and take a letter because they were angry, would one rip it up and put it in their trashcan or trashbag for it to be found later? And if that note was taken, which caused the anger of Mr. Rivas to the point where he killed Miss Hill, well, the tickets were missing. The prosecution asks you to believe that those tickets were what forced Mr. Rivas over the deep end.

Well, why weren't the tickets at the bottom of the bag, along with the torn note? If he's stupid enough to put the note there, you're going to be smart enough to throw the tickets out the window fleeing the scene?

I ask you to ask yourselves, we have the issue of this library book. I'm only human. I'm not perfect. I don't recall in the opening statement where this library book was first seen, so if I'm wrong, I stand corrected.

However, there's an indication that Mr. Rivas returned the book to the library between 3 p.m. and 10 a.m., the days of the 28th and the 29th of March, 1987 -- about an hour apart? I missed that. He's hard to hear. Where -- well, where was this book discovered?

There was mention about Nye Ford. If it was in the vehicle, Mr. Rivas had to -- and I can't even bring myself to say the purported deed -- had to then go in the vehicle and search the vehicle for something, and then find the book and say, "Hey, this is the library book. I'm going to take this back to the library. I got my alibi."

I mean, surely is it believable that Miss Hill told Hector on Thursday, "Oh, just a couple days ago on the 24th, the librarian called me and sakd that Stephen King's, The Black Tower, is overdue"?

Now, but what -- do you see a pattern here? Don't you see a pattern of making Mr. Rivas the scapegoat for Miss Hill's murder? And that's what this is.

In fact, I think it's far more convincing that Miss Hill was not even killed on Friday, the 27th. Perhaps she was killed on Saturday, the 28th after she deposited the book to the library.

What do I know? What does anyone know? The prosecution is certain that Miss Hill was killed Friday night. Therefore, she couldn't have returned the book back on Saturday or Sunday.

Yet the medical examiner is not certain it was Friday night. The medical examiner originally estimated time of death late Saturday, early Sunday. The basis, his finding that rigor mortis sets in, and after about forty-eight hours, it dissipates. But the body was in rigor mortis, indicating a shorter duration of time of the death than the prosecution case claims.

The prosecution claims between the hours of 9 or 10 p.m., Friday the 27th of March, and

midnight. Well, if the medical examiner is not sure, how can the prosecution or the police be sure?

Again, as I said, backwards scapegoat. Why? December there's the trip to Tennessee. Mr. Rivas accompanies Valerie Hill to see her mother. Her brother, with Miss Hill, goes down with his wife and baby. There's indication that the mother is none too pleased with Valerie Hill's relationship with Hector Rivas.

Take that one step further. The brother, Mr. Hill, is not too pleased; father is not too pleased with this relationship. Bob Lucas -- I haven't met him -- probably indisputably a very nice man. "She left Bob Lucas for that guy and look what happened to her. He's the cause of this."

This is a very fine, commendable job, but the prosecution intends to show that out of all these streets in this county, in this city, any-time Hector Rivas is going somewhere, he's going to 248 Hickok, Valerie Hill's house. What's more likely that he is going, or that he's just going. You determine. The prosecution wants to make an obsession out of this relationship.

Surely that Hector -- they have to provide some motive to stick on him, to satisfy the death of Miss Hill.

There was another statement that I find to be incorrect, or that Mr. Fitzpatrick made, although maybe I'm wrong. But there's going to be a witness by the prosecution by the name of Mark Brosh. That Mr. Brosh will say that after six months of not seeing Hector Rivas, Hector Rivas calls him up and says, "What are you doing tonight," or, "We're going to Coleman's," sets up a meeting.

However, just hold that in the air a second. The prosecution is attempting to show that Hector Rivas went to Coleman's later that night because he was following Valerie Hill, and when she went into the restaurant in Candy's to visit her father, Hector just decided to go to Coleman's. But that doesn't make sense, because Hector didn't know if it's true that he was going to be following Valerie at 6:30 that evening. So how could he have called up and said to Mark Brosh earlier in the day, "What's doing? Are you going to Coleman's?" We're going to Coleman's."

"Oh, I'll come." He didn't set this up.

The prosecution has you believing he set it up. Well, if he set it up, he didn't know about it, or he did know about it, but you can't have it both ways.

Now, does -- there's an attempt that's going to be made that Mr. Rivas was lying to the police on the 30th when he gave statements saying, "Oh, my friends called me up and asked me to go to Coleman's." Well, is that -- you know, convict someone of murder because he maybe interchanged it, "I went there"? I don't know what was said, but nobody knows what was said. It wasn't videotaped, so there's no one to dispute it.

The police are going to say what Mr. Rivas said. However, Mr. Rivas, according to Mark Brosh, called him earlier that evening. Earlier that day in the afternoon. So could it -- could it have been that Mr. Rivas wasn't following Miss Hill, but was going to Coleman's? And I don't even know if Coleman's is next to Candy's. But all I'm trying to show is that every action that this man does at the time of the murder, is taken all in the search of pointing the finger at him.

And I submit to you that there's no one in

this room, that if they were convicted of every crime they committed, would spend the rest of their life in jail. How would you like any one of your lives subjected to a microscope? How would you fare?

The man was flashy. I mean, these are words designed for the aim to convict. He was flashy. He had two cars. He had "RIVAS-1" on his license plate. All designed to alienate you; that this man was some hotshot, possessive, macho, Latin killer. You be the judge.

Now, if this was such a man as Mr. Rivas, if described accurately in those terms, well, then, he did a decent job about it, because he was that night at Coleman's. No problem. Again, he was at Albert's later in the evening, where there will be witnesses to testify that he came earlier than 12 midnight, who would say that he was at Albert's at the time that the district attorney believes Miss Hill was killed.

Proceeds to spend the entire evening there, not giving the appearance of anything out of the ordinary. Nothing unusual. Drinking, partying, talking, watching ball games.

And all designed because Mr. Rivas planned to kill this woman on Friday night. Well, that doesn't make sense. And the airline ticket thing that cost Miss Hill her life, how do we even know that he knew about the airline ticket? Because he took it. Yeah, he took it. He must have taken it; that one he went and threw out the window; the torn note from Val to Bob, he put in his trash. That's how smart this man is, that he is going to do that, but then he's dumb enough to do that, but he's smart to go hang out and be with a bunch of people and cover any appearance of impropriety, cover any appearance of nervousness.

Regret, remorse, despair. Would not despair show on the man who, according to the prosecution, was madly in love with Miss Hill? Sent her notes and flowers? Girls, you better watch out next time you get flowers. I'm just professing to you that the prosecution's theory does not hold up.

He has a statement by a Susan Stonecipher, who --

MR. FITZPATRICK: Judge, excuse me. I

object to what she said in a statement. If the defense is saying he's going to call Miss Stonecipher, then I have no objection.

MR. CALLE: Well --

MR. FITZPATRICK: I object to him referring to a statement which is not in evidence, nor will be in evidence.

MR. CALLE: I will withdraw that. I do intend to call her, if the prosecution does not.

THE COURT: Well, let me just say that, Counselor --

MR. CALLE: Yes, sir.

THE COURT: Comments by the counselors, ladies and gentlemen, as I've already indicated to you, any statements made by either the prosecution or defense in their opening statements is not evidence, as I've cautioned you already.

The only evidence in this case will come from the mouths of the witnesses and any exhibits that are offered and received into evidence.

What the attorneys say to you today, at this moment and throughout the trial, is not, I repeat, not evidence of anything.

Go ahead, sir.

MR. CALLE: Yes. Thank you. There will be a witness called who will testify accurately that she saw Miss Hill alive on Saturday, the 28th of March, 1987, at approximately 8, 8:30 in the morning in the basement of 248-250 Hickok.

Theoretically, that -- this witness will state that that -- this witness will testify to that. She retracted that statement subsequent to making it.

We will learn together when this occurred. We have the medical examination who originally -- will testify the body was dead for Saturday night to Sunday morning. You have a witness who saw Miss Hill alive on the 28th, the day after she was theoretically murdered.

I, again, state, my premise to you, the prosecution's case does not add up. This is a concerted effort, at what, for what, you be the judge.

Interestingly Mr. Fitzpatrick mentions that at the crime scene, the evidence that was not found theoretically can't be evidence, but the items which were not found are significant, that

being a library book and tickets to the Bahamas.

Now, I'll just go one step further with that and ask you to listen for testimony that you do not hear. Who returned the book? If the People -- the prosecution is going to say it was Mr. Rivas creating an alibi. Well, did they take fingerprints of that book? Does anybody find him at the library? These are questions that there may be no testimony given for answers. What I'd like all of you to do is to concentrate on what's missing. I understand that there are two sides to every story. I ask you all to concentrate on the side that you may not hear.

Val's cat is out on Saturday, the 28th. Val's car remains in the driveway. The more the opinion is stated, the stronger one believes it.

I would like repeating the opinion that if she was seen on Saturday by a witness, and the medical examiner believes she was killed Saturday night or Sunday, and a library book was taken back Saturday or Sunday, I suggest to you the premise is that Valerie was alive on Saturday and could not have been killed Friday night by anyone.

Lastly -- don't get tired of me. Lastly, we have the warrant, the search warrant executed at Mr. Rivas' home. What evidence was recovered which would indicate that Mr. Rivas committed the crime of murder? Was there a key to Valerie Hill's apartment? That's a question I would like you to ask yourselves. The jacket was freshly washed. Is that so unusual? And whether the shirt, or whatever it was, was just damp in the unheated basement -- undried. Were any forensic tests taken on this jacket? Was there any blood found? Any fecal matter?

The statue of the Virgin Mary. Very interesting. I understand that there are certain people who like votive candles in their homes in order to pray to God. I have never, in my experience, ever seen lit candles inside a closet unattended. This makes no sense to me.

Now, these -- this shrine was found after the search warrant was executed after 10 p.m. Mr. Rivas had been out of the house from 7:30 -- from 3:00. There, I'm talking about seven hours of a burning candle inside a closet.

And, by the way, there's hundreds of

exhibits and photographs. Why was there no photograph taken of this shrine? Where's the objective proof, the hard evidence that there was this eighteen-inch statue of the Virgin Mary, with the torn picture?

This is a conspiracy to hang that man. Big time. And you'll find out by the evidence you'll hear and by the evidence you don't hear.

THE COURT: Thank you, sir.

MR. CALLE: Thank you.

THE COURT: Call your first witness.

MR. FITZPATRICK: Yes, your Honor. The People call Randall Hill.

* * *

R A N D A L L H I L L , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

THE COURT: May I ask you to pull that microphone toward you, sir.

(Witness complied.)

THE COURT: Thank you. And I'd ask you to keep your voice up nice and loud. And if you do not understand any questions that are asked, please ask him to repeat it. All right?

THE WITNESS: Yes, sir.

THE COURT: All right. Thank you.

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Mr. Hill, good afternoon. Thank you for waiting so patiently.

Tell the jury, please, your full name and where do you currently live?

A Randall Hill. I live in Canastota.

Q And are you married or single, sir?

A I'm married.

Q Your wife's name?

A Carlie.

Q And do you have any children?
A I have a son, David, now.
Q And did you have any other children?
A I have Valerie, my daughter.
Q Valerie's date of birth was when, sir?
A December 10, '58.
Q And could you tell me, sir, back in 1987, where were you living then?
A The same place in Canastota.
Q And were you married then, sir?
A Yes.
Q To whom were you married back in '87?
A My wife was Patricia.
Q And was Patricia Valerie's mother?
A Stepmother.
Q Is Patricia still alive?
A No, Patricia is dead.
Q When did she die, sir?
A March 30th, 1987.
Q Could you tell the jury, please, back in 1987, was your daughter, Valerie, employed?
A She was.
Q Where?
A Registered nurse at St. Joseph's Hospital.

Q And do you know what she did there?
A She worked in the pediatric section with children.
Q Also, back in 1987, do you know where she lived?
A Hickok Ave. in Eastwood.
Q You know the address?
A 287.
Q All right. We'll hear testimony --
A All right.
Q -- as to the exact number.
Do you know how long your daughter had been living at Hickok Avenue?
A About a year.
Q And had you ever been to her apartment on Hickok Ave.?
A Yes, sir, several times.
Q When you say "several," Mr. Hill, give us an approximation as to how many.
A Five times.
Q Would you describe the apartment for us, or building, or whatever it was?
A It was a, a two-story home, Valerie had the bottom. It was strictly for rentals. And Valerie had the bottom half of the house, and there was other tenants up

in the upper part.

Q Did you know the other tenants that lived upstairs?

A No. No, sir, I didn't.

Q Never met them?

A Other than to say hello, no.

Q Did Valerie live with anyone?

A No.

Q Did she have any household pets?

A She had two cats.

Q Would you give the jury, please, an idea as to her housekeeping habits that you had observed on your visits to her home?

A Valerie all her life was very neat, very tidy. Her room, when she lived with us, her room was always clean, her houses, her apartments. Valerie was very neat.

Q All right, sir. Now, did you know your daughter to have dated anyone, or had a relationship with anyone in the mid '80s?

A Mid '80s, that would have been Bob Lucas.

Q Did you know Mr. Lucas?

A Very well.

Q And do you know how long your daughter dated Mr. Lucas?

A Off and on, three years.

Q All right. And had you ever socialized with your daughter and Mr. Lucas?

A Yes.

Q Now, did there come a time, Randall, in 1986, specifically the middle of '86, when you became aware your daughter was seeing someone else?

A Yes. Early -- well, early summer of '86, I knew she was having trouble with -- Mr. Lucas and she were not getting along well, and she told me that she had another boy friend.

Q Now, did you meet this new boy friend?

A Not for about two months.

Q Then you eventually did meet him, though?

A Yes, sir.

Q Did you learn his name?

A Yes, Hector. I knew that from the outset.

Q All right. And do you see Hector in the courtroom this afternoon?

A Yes.

Q Would you just mention to the jury, please, what he's wearing, and point to him?

A (Indicating.) Mr. Riveras (sic) is sitting at the front table with his attorney.

Q What is he wearing?
A A suit, tie.
MR. FITZPATRICK: Judge, even though the witness said Riveras, let the record reflect he's identified the defendant, Rivas.
A Rivas, excuse me.
Q That's all right. Now, when you met Mr. Rivas, was it a social setting?
A Val brought him to my house.
Q And would you describe any interaction that you had with Mr. Rivas?
A No. It was just a meeting. He came in the house. That was the first time.
We went to -- we went to dinner that afternoon.
Q All right. And this would have been sometime --
A Late summer, early fall; late summer, early fall.
Q Late summer of '86. Did you ever express at any time during the calendar year 1986, any dissatisfaction about Mr. Rivas, to your daughter?
A None.
Q All right. And did you ever see Mr. Rivas on other occasions, other than this first meeting that you had with him?
A Yes. He was at my house one other time, helped

me move a stove in the house; and Valerie's birthday, on or about December 10, I was out at his house in Cazenovia.

Q All right. And was there ever any conflict between the two of you on any of those occasions?

A No, sir.

Q Now, did there come a time, Mr. Hill, when you learned that your daughter was no longer dating or no longer seeing Mr. Rivas?

A Yes, after the first of the year, she called me and said that she wanted to break off with Hector.

Q All right. And did you ever see him on a social occasion after the 1st of January, 1987?

A No, sir.

Q All right. Now, I want to take you, if I could, Mr. Hill, into the month of March, 1987. And is it correct that your daughter was still living in the 200 block of Hickok Ave. at that time?

A Yes, she was.

Q Do you know if she had any plans to move --

A No, not --

Q -- to another location?

A Not that I'm aware of.

Q All right. I want to take you -- and, Randy, I want to put this up here. Can your vision -- can you see

that okay from where you are?

A Yes.

Q I want to take you to this Friday, March the 27th of 1987. And I want to ask you if you had occasion to see your daughter on that date.

A Yes, I did.

Q When and where, sir?

A Candy's Restaurant.

Q Do you know where that is located?

A Burnet Street. I can't tell you the cross street, but it's on Burnet Ave.

Q And how was it that you came to see your daughter at Candy's Restaurant?

A I was at the hospital visiting Pat, and we had talked about having dinner together.

Q Now, Pat being?

A Pat is my late wife.

Q Your late wife. What hospital was Pat at?

A St. Joseph's.

Q And that's where your daughter worked?

A Yes.

Q Some time during the day on the 27th, you discussed having dinner with Valerie?

A We discussed it the day before, the Thursday,

because Valerie was going to be gone all day Friday. So it was on Thursday when we made the plans to have dinner Friday.

Q What specific plans did you make?

A To have dinner. She was to meet me at Candy's.

Q Specific time discussed?

A About 6:30-ish.

Q Now, did you, at approximately 6:30, proceed to Candy's Restaurant?

A Yes, I did.

Q Did you meet your daughter there at 6:30?

A No. I was there at 6:30, she wasn't.

Q What did you -- what occurred after you got there, sir?

A I waited for about half an hour for Valerie to show up.

Q What, if anything, did you do?

A Sat at the bar.

Q Did she eventually arrive?

A Yes, she did, about 7:00.

Q Tell us how she appeared and what, if anything, occurred.

A She was upset. She explained to me --

MR. CALLE: Objection as to what was

explained.

THE COURT: Sustained.

THE WITNESS: Excuse me. I missed that.

THE COURT: It means you cannot tell us what she said to you, sir; that's called hearsay.

THE WITNESS: Okay.

BY MR. FITZPATRICK:

Q At 7:00, correct?

A 7:00.

Q Okay. And your testimony is that she was upset?

A Yes, she was.

Q Don't tell us what it was, but she said something to you?

A That's correct.

Q All right.

MR. FITZPATRICK: Judge, I don't want to argue the point now, but perhaps at some other point, outside the presence of the jury, I'd like to be heard on that objection.

THE COURT: You're drawing -- you are focusing on the present sense impression --

MR. FITZPATRICK: Exactly, your Honor.

THE COURT: -- exception, recent Court of Appeals case. I think what we'll do, we'll take

a recess in a short period of time, sir, and then we'll discuss that.

MR. FITZPATRICK: Very well, your Honor.

BY MR. FITZPATRICK:

Q How long did your daughter stay in your presence at Candy's Restaurant, approximately?

A Hour, hour and fifteen minutes.

Q And did she have anything to eat or drink?

A She had a cocktail and she sampled some of my dinner. She did not eat.

Q Do you remember what type of food it was that she sampled?

A I had a fish dinner and she sampled some of that.

Q And she had a cocktail. Do you remember what kind?

A I'm going to say a rum and Coke, but I'm not certain because that was one of her favorite drinks.

Q All right. And she left your company about 8, 8:15?

A Yes, sir.

Q And that is the last time that you saw her alive?

A That's right.

Q What, if anything, did you do, Mr. Hill, after you left Candy's Restaurant?

A Went back to the hospital.

Q All right. Now, I want to take you to Saturday, March 28th, of '87, Randy, and ask, at any time that day, did you attempt to contact your daughter, either in person or by phone?

A No.

Q And why is that?

A She had plans of being out of town. She was going to go to Schenectady to visit a friend that Saturday morning, and wasn't coming back until Sunday night.

Q On any time Sunday, March 30th (sic), 1987, did you make any attempt to contact your daughter, either by phone or in person?

A By phone.

Q And when was that?

A Starting at 8:00 that night.

Q And approximately how many times did you call?

A I called three times between 9 and 11.

THE COURT: I'm sorry. This is Sunday the 29th, sir?

THE WITNESS: Yes, sir. Thank you.

BY MR. FITZPATRICK:

Q Did you get any response?

A No response.

Q Did you ever try to contact her on Monday, March the 30th, of '87?

A I called her first thing in the morning and got no response.

Q What, if anything, did you do upon getting no response?

A I left for the hospital.

Q St. Joseph's?

A St. Joseph's.

Q What, if anything, happened when you got there, Mr. Hill?

A Uh -- I knew Valerie was supposed to be to work in the morning. I had no idea what time, but I went down to Pat's room, which was around the corner from the nurse's station, and Valerie's station was down the hall from where Pat was, so I went down past Pat's room to find Valerie, to find out what had happened to Pat during the night, because she had kept track of Pat for me.

She would talk with the nurses. And I met one of Valerie's co-workers halfway down the hall, and she said, "If you're looking for Valerie, she's not here."

Q Did you become concerned at that point?

A Concerned, because I knew Valerie was in a car traveling and she had been traveling all weekend, so I

started making phone calls.

Q Where did you call?

A I called some of her friends in Cazenovia; I called my son, David; and nobody had heard from Valerie.

Q What, if anything, did you do after learning that?

A I went to Valerie's apartment on Hickok Ave.

Q Okay. When you got to Val's apartment, Mr. Hill, did you drive there?

A I drove.

Q Where did you park when you got there?

A In the driveway --

Q Did you see any vehicles?

A -- behind Valerie's car, which was parked outside, which was unusual.

Q Any other vehicles that you saw there, sir?

A No, sir.

Q What did you do after you parked your car?

A Went in through the back door, the side door.

Q All right. About what time was this, Mr. Hill?

A This would have been about quarter of 12.

Q Okay. Now, when you say you went in a side door, is this a door that leads to the outside of the house?

A Yes, it is, and faces the driveway.

Q And is this a door that you have entered before?
A Yes.
Q Do you know from your experience, having been to the house, whether or not that door was usually kept locked?
A All I can say is when -- everytime I was going to go to Valerie's house, she expected me, so that door was open for my benefit. But I understand it was normally locked.
Q All right. But when you were there --
A It was unlocked.
Q -- it was unlocked.
Now, where would I be if I were to enter that door back in March of '87?
A You would have access to the cellarway, or you could go up into a hallway, up a set of -- a flight of stairs, a short flight of stairs, and Valerie's door was right there.
Q Now, again, based on your experience, having been to the house, this doorway at the top, is it at the top of a short flight of stairs, is that what I understood you to say?
A Yes, that's right.
Q Would this door normally be locked or unlocked?
A Locked.

Q Regardless of whether she expected you or not?

A That's correct.

Q All right. And what condition did you find that door in, Mr. Hill?

A Unlocked.

Q Did you go in her apartment?

A Yes.

Q And did you find any evidence that anybody else had been there, family member, or your son, or anyone?

A No. I was in the apartment alone.

Q Tell us what you did and what you saw.

A Hollered, knocked on the door, hollered, and got no response. I walked through the apartment and found Valerie in the living room.

Q And I know this is difficult, sir, but I'd appreciate it if you would explain, as you are the first person to see her, if you would explain to the jury how your daughter appeared.

A She was lying on the living room floor, face down on the carpet. She had a robe on, and the robe was up around her shoulders, and she was naked from there down.

Q Did you see what appeared to be any sign of injury to her, sir --

A No.

Q -- on any part of her body that was exposed?
A No.
Q Did you see anything on her buttocks?
A No.
Q Was it clear to you that she was deceased at that time that you saw her?
A I touched the shoulder and there was no response.
Q All right, sir. What, at that point, what did you do at that point, Mr. Hill?
A Became unglued; called the police.
Q All right. And about how long did it take the police to get there?
A Ten minutes.
Q Anybody else from your family arrive during that ten minutes?
A While I was on the phone with the police, David drove in, my son.
Q David Hill?
A Yes.
Q What were you doing while you were waiting for the police?
A I went outside.
Q All right. Did you ever -- do you smoke, Mr. Hill?

A I do.

Q And back in March of '87, what brand of cigarette did you smoke?

A Carlton menthols.

Q Did you, at that time, light up a cigarette or cigarettes --

A Yeah.

Q -- in your daughter's apartment?

A Yes, I did.

Q And where did you smoke those cigarettes?

A Wherever there was an ashtray.

Q All right. Did you deposit any of those cigarettes in an ashtray?

A Yes, sir.

Q On Monday, March the 30th, of 1987?

A Yes, sir.

Q Mr. Hill, I want to show you a series --

MR. FITZPATRICK: May I approach him, Judge?

THE COURT: Sure.

BY MR. FITZPATRICK:

Q I first want to show you Exhibit 4 and ask you if you recognize the young lady shown in that photograph?

A That's my daughter, Valerie.

Q Is that roughly the way she appeared at the time --
A She had been older, but yes.
Q -- approximately, at the time of her -- now, have you ever seen samples of your daughter, Valerie's, handwriting?
A Oh, my goodness, birthday cards, letters, scribbling, notes that she's written to me, yes.
Q I want to show you, strictly for identification, Mr. Hill, two photographs comprising Exhibit 5. Do you recognize the handwriting in Exhibit 5?
A Yeah. That's Valerie's handwriting.
Q All right.
MR. FITZPATRICK: Did everybody on the jury hear that?
Q And I want to show you Exhibit 6, sir. Can you identify what is shown in Exhibit Number 6?
A Yeah.
Q What is that?
A That's Valerie's -- that's Valerie's table, flowers.
Q What area of her apartment is that table located, what room?
A That is an end table. It looks -- it's in the --

that would have been in between the dining room -- or between the kitchen and the living room.

Q Now, is there an ashtray shown in Exhibit 6?

A Yes.

Q Did you deposit any of your Carlton cigarettes?

A There's cigarettes there. It's one of my cigarettes.

Q In that ashtray?

A In that ashtray.

Q Did you, Mr. Hill, when entering the apartment by the door that led from the driveway to the inside foyer, from the door that led at the top of the stairs to the inside of your daughter's apartment, and in walking through the apartment and making any observations that you did, see any sign of a break-in tothe apartment? By that, I mean, did you see a broken window, a door handle that had been jimmied, or anything like that at all?

A The only part of the house I was in was those three rooms, and there was no sign of force had in any of the doors, front or rear.

Q Now, you indicated previously to the jury that after March 1st of '87 you never saw Mr. Rivas on a social setting. But I want to ask you about six years ago today, Tuesday, March the 17th, '87. First of all, does that date have

any significance to you, other than St. Patrick's Day?

A It's my birthday.

Q All right. And back in '87, on your birthday, did you see your daughter?

A Yes.

Q And would you tell us the circumstances, time, and place, so forth, as that you saw your daughter, Valerie?

A Patricia wanted to give me our -- I was in the hospital with Pat. Valerie wanted to give me a break, take me out to dinner for my birthday. We went to Bennigan's. I picked her up at her house.

Q And do you remember what time it was that you picked her up?

A It was after dark, so it would -- it must have been 6:30 or 7:00.

Q And you went to Bennigan's?

A Bennigan's on the boulevard.

Q Do you know where that is located? I'm sorry, on --

A The boulevard.

Q On Erie Boulevard?

A Yes, sir.

Q And without belaboring the point, was it just a

pleasant birthday dinner with your daughter?

A That's right.

Q And where did you go after Bennigan's?

A I brought Valerie back home, because I wanted to be back in the hospital.

Q You were attending to Pat?

A Yes.

Q Now, when you brought Valerie back home, where did you put the car, your car?

A In the driveway beside the door. This is the outside entrance door in the driveway.

Q And I take it, it was dark out?

A It was black out.

Q Do you have any recollection what time it was?

A Well, 8:00, 8:30. It wasn't important at the time, so I -- so I don't remember.

Q When you put the car in the driveway, did Val get out immediately?

A No. We sat in the car talking.

Q What occurred?

A We were talking about, oh, less than five minutes, and Hector walked out the side door.

Q Hector Rivas, the defendant here?

A Yes, sir.

Q Now, is this the same side door that you referred to earlier in your testimony, that is adjacent to the driveway?

A Yes.

Q And when he walked out that side door, what, if any, reaction did Valerie have?

A Do you want me to repeat what she said?

MR. CALLE: I would object.

MR. FITZPATRICK: Sure.

THE COURT: We are going to take a recess, ladies and gentlemen. I don't want you to discuss the case, form any opinions about it, look at any newspapers about it. Step out for ten minutes, please.

Just hold on if you would, please, sir.

(The jurors were excused.)

THE COURT: I think the record should reflect the jury has been excused. We're still in session with the spectators.

Mr. Fitzpatrick, I get the sense that you are, at this time, moving to have some evidence admitted, what has been commonly referred to as hearsay -- the statements of a person who's not able to be cross-examined. But you're trying to

admit them under the present sense impression exception to the hearsay rule established by the Court of Appeals, in a case, People versus Brown, authored by Judge Stewart Hancock, issued on February 18 of 1993, wherein the Court of Appeals has carved out or expanded this exception to the hearsay rule.

Can you explain to me, sir -- first of all, am I correct in my assumptions?

MR. FITZPATRICK: Yes, your Honor. I would also submit that most definitely the statement on the 17th would, in addition, be a present sense impression, and would also be an excited utterance, her contemporaneous and spontaneous reaction to the surprising event of seeing the defendant come out the door, as well as, although I think less notably, would be her statement on the 27th, being in an agitated state and explaining to her father why she was a half an hour late.

THE COURT: Okay. Mr. Calle, you had objected to that, sir. The basis of your objection is a blanket hearsay objection?

MR. CALLE: Yes, sir.

THE COURT: Okay. Have you had an

opportunity to review the case of the People versus Brown?

MR. CALLE: No, sir.

THE COURT: All right. Well, as I indicated, it was recorded on February 18, '93. And just to quote that, so that the record is clear as to the Court's interpretation of that, that before present sense impression testimony is received, there must be some evidence, in addition to the statements, themselves, to assure the Court that the statements sought to be admitted, were made contemporaneously and spontaneously with the events described.

I think what I'm going to do, if I can, Mr. Hill, I'm going to allow Mr. Fitzpatrick to question you, and we'll see what the response of the witness is --

MR. FITZPATRICK: Offer proof --

THE COURT: -- to get a better determination as to how this exception may or may not apply.

MR. FITZPATRICK: I'll do the March 27th conversation first.

BY MR. FITZPATRICK:

Q Mr. Hill, do you have that in mind, you and your

daughter are at Candy's Restaurant. You indicated that you were at the bar. Your daughter arrived a half-hour late?

A Yes.

Q And would you tell us, did you say anything to her upon her arrival?

A No. She was agitated; she was upset.

Q Did she say anything to you?

A She explained why she was late.

Q Would you tell us what she said, as best you remember?

A She said that Hector was in -- up the street. Excuse me. And, uh -- when she drove out of the driveway, he followed her. And she drove around the back streets of Eastwood trying to lose him before she came to Candy's.

Q Now, I want to take you to March the 17th. And you have in mind, now you're sitting in the car in the driveway with your daughter discussing whatever, when suddenly Mr. Rivas appears out of the side door?

A Yes.

Q And you were about to indicate that your daughter said something. Would you tell the Court, please, what that was?

A "That bastard. What's he doing in my house again?"

Q Okay.

MR. FITZPATRICK: And I think that would be it, Judge.

THE COURT: Okay. And those are the only two instances where you intend to use --

MR. FITZPATRICK: Yes.

THE COURT: -- this present sense impression testimony? Okay.

MR. FITZPATRICK: Judge, one last argument for the admission of the 17th statement. I'm not offering that statement to prove the truth of the matter asserted, but I am offering the statement of the 27th to prove the matter asserted.

THE COURT: Okay. Again, I'll take a brief recess. We'll come back. I'll consider this.

The afternoon recess, gentlemen, it will be about ten, fifteen minutes. All right?

MR. CALLE: Yes.

THE COURT: Mr. Hill, you can obviously step down. Okay?

THE WITNESS: Okay.

THE COURT: Thanks.

THE WITNESS: Thank you.

(Proceedings stand in recess.)

(Court and counsel are present. Proceedings resumed at this time.)

THE COURT: Okay. If you wouldn't mind, sir. We're in session. Would the record reflect that the counsel is present, the defendant is present, the witness is still on the stand, the jury is not present.

The Court has given some thought to Mr. Fitzpatrick's request here. This is my ruling, Mr. Fitzpatrick: I will allow this witness to testify about observations he made and statements of the victim made on March 17. The basis of that is that there is evidence before this jury that corroborates not only the events leading up to this present sense impression of the victim, there is, in that Mr. Hill was there when the defendant came out of the apartment, and statements were made by the daughter that would give the jury a present sense impression on her part.

However, as to statements made on the 27th of March in a restaurant, wherein the victim came into the restaurant, made some statements to

the witness that she was, in fact, being followed by the defendant, I am not going to receive those statements as of yet.

However, I will allow the People to continue their proof and if there is corroborative evidence putting the defendant in the area of her home, then I will allow this witness to be recalled to testify about the present sense impression he got from the victim at that time.

MR. FITZPATRICK: Thank you, your Honor.

THE COURT: I find that the present sense impression testimony, before it's received, there must be some evidence, in addition, that would corroborate those statements. And that is my decision on that case.

So given that, I want to make it clear to you, Mr. Hill, you will be able to testify about the events on March 17th at this time, while you are in the driveway of the home.

THE WITNESS: Yes, sir.

THE COURT: But, of course, as you've heard, not yet, anyway, of testimony on March 27th.

THE WITNESS: Correct.

THE COURT: Okay.

THE WITNESS: Yes, sir.

THE COURT: Would you get the jury, please?

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Okay. Will the record reflect the jury is now -- has now joined us. And Mr. Fitzpatrick, if you'd continue, please.

MR. FITZPATRICK: Thank you, your Honor.

BY MR. FITZPATRICK:

Q Mr. Hill, I want to take you back to your previous testimony and to refresh your memory, March 17th, your birthday, of '87, when you returned from Bennigan's Restaurant, you indicated to the jury that you were in the driveway of your daughter's home engaged in some conversation with her in your car. Do you have that in mind?

A Yes, sir.

Q And then you indicated that you saw Mr. Rivas exit the side door whereupon your daughter said something, is that correct?

A That's correct.

Q Would you tell the jury, very simply, what it is your daughter said?

A "That bastard. He's in my house again."

Q All right. Now, did you have any conversation with Mr. Rivas?
A He stopped at the side window of the car. He didn't recognize my car. And he came up to see who was in there. I rolled the window down and we had a five minute conversation about nothing in particular, the weather, and how are you, and pleasantries, that was all.
Q Did you leave?
A Yes.
Q Did you leave your daughter there?
A Yes. I didn't go in the house.
Q I'm sorry?
A I did not go in the house.
Q Did you see if your daughter went in the house?
A Yes, she did.
Q Did you see if Mr. Rivas went into the house?
A Yes, he did.
Q And did they appear to go in together?
A Yes.
Q All right. Now, Mr. Hill, I'm almost finished. I want to ask you about the time where you indicated in response to my questioning about your relationship with Hector Rivas, where you told the jury that he had helped you move a stove into your house. Do you have that in mind?

A Yes, sir.

Q Remember when that was?

A Yeah. It was the end of November of '86.

Q And what type of stove was it?

A It's a wood stove. I heat with a wood stove.

Q This was your house in Canastota?

A That's right.

Q And Mr. Rivas helped you move the stove from where to where?

A Well, we had it in the garage, which was across the road. He was kind enough to provide us with a cart, loading cart. And we brought it from the house, or from the garage to the house and up the stairs into the house.

Q Did anyone help you or Mr. Rivas move the stove?

A Just my son, David, was with us.

Q And what, if anything, can you tell us about the weight of the stove?

A It's about eight hundred pounds.

Q And did you make any observations as to Mr. Rivas' ability to lift the stove, or part of the stove?

A If it hadn't been for Hector, we wouldn't have gotten the stove in the house. He's a strong man.

Q All right. Mr. Hill, I want to thank you very much. If you'd sit right there, please, Mr. Calle may have

some questions for you.

MR. CALLE: Thank you, Mr. Fitzpatrick.

CROSS-EXAMINATION BY MR. CALLE:

Q Good afternoon, Mr. Hill.
A Good afternoon, sir.
Q Mr. Hill, how long did you know Bob Lucas?
A Mmm -- since he was about ten years old.
Q And what was the nature of that relationship?
A I knew his whole family. They were in the farm implement business.
Q How did you come to know the family?
A I was on a farm. I was a farmer.
Q You were a farmer?
A I was a farmer.
Q I didn't know.
A Okay.
Q Did you blame Hector Rivas for the break-up of Bob and Valerie?
A Absolutely not.
Q Were you disappointed when Bob and Valerie broke up?
A Yes. I liked Bob.
Q You said that you had met Mr. Rivas when, sir,

the fall of '86, is that when you met Mr. Rivas?
A He and Valerie started dating, I think sometime in May of '86. I met him maybe two months after that.
Q Would it be the summer of '86?
A Summer, late summer of '86.
Q And can you recall how many times you two were in each other's company between the summer of '86 and January of '87?
A Valerie introduced me to Hector at my house late summer. The second time I met Hector was when he helped me move the stove. Valerie's birthday, December 10th, thereabouts, I don't remember the exact date, but it was -- I think it was her birthday celebration, I went to Hector's house. My wife, Pat, and David -- son, David, were there. We had dinner, a little party.
Q So three times, sir, to the best of your recollection?
A I ran into Hector in Albert's Restaurant in Cazenovia a time or two, but not something that was planned. It was just a happenstance.
Q Did you engage in conversation with him at the time?
A Other than saying, "Hello. How are you," no.
Q Did you ever see any instance in which Mr. Rivas

was violent?

A No.

Q Were you privy to any knowledge of whether Hector and Valerie were violent with each other?

A If they had been, Valerie would have told me, but I observed nothing and heard nothing.

Q Did you ever observe any bruises on Valerie during the course of her relationship with Hector?

A No, sir.

Q Sir, I don't mean to -- to take you back to this date in question. I will be brief. I understand this is difficult for you.

Just briefly, sir, when you did enter that apartment on this day in question, did you notice if Valerie Hill had any clothing out of place in the apartment?

A No, sir. I was in such a state of shock, I didn't notice anything.

Q Okay. Did you say she was wearing a robe?

A She had a robe on.

Q Do you know if she was wearing any other clothing?

A No, sir.

Q And was it your testimony on direct examination that you did notice any bruises on Valerie during March?

A I didn't look. As I said, I left the apartment. I touched Valerie. I didn't know how long she had been there, whether she was unconscious, sick, or what. I touched her, and there was no response, and I left.

Q What was the state of the apartment, as far as cleanliness and neatness on the date in question, if you know?

A Typical Valerie, it was clean.

Q So would it be fair to say there was nothing extraordinarily out of place --

A No, sir.

Q -- that came to your attention?

A No, sir.

Q Now, sir, Valerie lived in that apartment approximately one year, would that be correct?

A That's correct.

Q And can you recall or approximate how many times you visited her at that apartment house?

A Seven, eight times, over the course of that year.

Q And is it a fact that each time you went over to 248 Hickok Ave., you notified Valerie beforehand?

A Oh, yes.

Q Do you personally know for a fact that she would open that rear door of that structure when you were coming?

A Which rear door? The outside rear door?

Q The outside rear door, sir.

A Well, the upstairs tenants use that door, also. That was the access to the upstairs, as well as Valerie's entrance.

Q So, then, would it be fair to say that this outside rear door led into a vestibule?

A Yes, sir.

Q Wherein one can enter either 248 Hickok, or go upstairs to 250 Hickok?

A That's correct.

Q Now, my question, sir, is: Do you have personal knowledge that Valerie would open the door in anticipation of your visiting?

A No, I don't. I can't answer that one.

Q Mr. Hill, I believe on direct examination your testimony was that you normally understand that that outside rear door was kept locked. Do you recall saying that?

A Yes, I do.

Q That is sort of a paraphrase.

Sir, what is the basis for your understanding that it was normally kept locked?

A It had a lock on it and there was one time I found the door locked and had to rap on the window to get

Valerie to come and open it.

Q Do you know if that lock was functional on March 30th --

A No, I don't.

Q -- 1987?

A On March 30, no, I do not.

Q I see. Aside from the fact that on that one occasion that outside rear door was locked, do you have any other basis for your understanding that that door was normally kept locked?

A No, sir.

MR. CALLE: May I see this photograph?

MR. FITZPATRICK: Sure.

BY MR. CALLE:

Q Sir, I show you again, People's Exhibit 6, the ashtray.

A Yes, sir.

Q Would it be fair to say that the white filtered cigarette is a Carlton menthol?

A That's mine.

Q I see. And you don't know when that picture was taken, do you, Mr. Hill?

A No, sir.

Q In fact, you don't even know if that cigarette is

yours, do you?

A I am the only one that smokes Carlton menthols; Valerie didn't.

Q Can you tell the Court, how do you know if that cigarette in there is yours?

A I can't. I have no idea. I can't prove that.

Q Do you recall placing that Carlton menthol cigarette in that ashtray?

A I smoke Carlton menthols; that ashtray is in Valerie's house; I recognize the table.

Q Yes, sir.

A Okay.

Q But do you have a recollection of putting that cigarette in there?

A I smoked probably four cigarettes in that fifteen-minute period that I was in the house on the 30th.

Q And, sir, but --

A When those pictures were taken, I can't tell you, and I was never back in the house after that.

Q With all due respect, sir, my question is: Do you have a recollection of placing that particular cigarette in that ashtray?

A Absolutely.

Q You remember that?

A Yes, sir.

Q You remember where that ashtray was when you got there?

A There's the picture.

Q I beg your pardon, sir?

A There's the picture.

Q So, by your answer, "There's the picture," would you then be telling this Court that when you placed the cigarette in the ashtray on March 30th, that you just placed the cigarette in the ashtray that was on this table, is that your testimony?

A That's what I'm saying.

Q So you never moved this ashtray?

A Not to my recollection, no. Why would I move it?

Q I'm just --

THE COURT: Well, let him ask the question --

THE WITNESS: Okay.

THE COURT: -- Mr. Hill.

BY MR. CALLE:

Q Would you tell this Court what room is this table on, which this ashtray is placed, Mr. Hill?

A Between the kitchen and the living room.

Q Do you have any knowledge of whether there were other ashtrays in the living room on that day in question?

A I wasn't in the living room smoking. I left the living room. I was in the kitchen.

Q So would it be fair to say you can't answer that question?

A You mean about the ashtray?

Q Other ashtrays in the living room.

A No, I can't answer that question.

Q Now, sir, directing your attention to your birthday -- by the way, happy birthday, sir.

Concerning your birthday in 1987, it's your testimony that you and your daughter remained inside your vehicle in the driveway at her home for approximately five minutes?

A Yes, that would be no longer than five, maybe shorter.

Q Could it have been four minutes?

A Probably.

Q Could it have been two minutes?

A No.

Q So it was somewhere between two and five minutes?

A Two and five minutes, yes.

Q Did Valerie own this structure at 248-250 Hickok?

A She was a renter.

Q So, would it be fair to say that that was not her

house?

A It was her rental place of residence.

Q And on March 17, 1987, did you see Hector Rivas inside Valerie's rental apartment at that time?

A No.

Q So you don't know if he was in that apartment of hers at that time, do you, Mr. Hill?

A No, sir.

Q For all you know, he could have been outside her front door in the vestibule, knocking, seeing if she were home?

A That's right.

Q Did you ever make a statement that, "He's inside her apartment sitting alone in the dark"?

A Did I make that statement?

Q Yes.

A No, sir, I didn't. Unless I was repeating something she said.

Q Well, do you recall what your answer would be, sir?

A Did I?

Q I'll ask the question --

A Didn't I make myself clear?

Q I'm sure you did, sir. I would just like to ask

the question again.

Do you recall ever stating on March 17th, 1987, when you were with Valerie in your car in her driveway, "He's sitting in the apartment alone in the dark"? Do you recall saying that ever?

A Yes.

Q You recall saying that?

A Yes.

Q But, sir, you don't know if Mr. Rivas was inside the apartment sitting alone in the dark, do you?

A No, I did not. As I said, I was repeating --

Q You --

A Okay.

Q You were repeating something that Valerie was saying, is that correct?

A That's correct.

MR. CALLE: One moment, your Honor.

THE COURT: Sure.

(Proceedings paused.)

MR. CALLE: Thank you.

BY MR. CALLE:

Q Sir, do you remember giving testimony in the grand jury on November 9th, 1992?

THE COURT: Regarding this case, I take

it?

MR. CALLE: Yes. Thank you, sir.

A Yes.

BY MR. CALLE:

Q Do you remember being asked this question: "Did anything occur after he chitchatted with you," pertaining to --

MR. FITZPATRICK: Could I have the page, your Honor?

MR. CALLE: Page number is 18, Line number is 10.

THE COURT: Would you start again with the question, please?

MR. CALLE: Yes.

BY MR. CALLE:

Q Do you remember, Mr. Hill, being asked pertaining to this March 17th incident, "Did anything occur after he chitchatted with you?"

Answer: "I -- Valerie went in the house, I left. We talked for a few more minutes, and then they went in the house together. But he had been sitting in the house with the lights off, in the dark."

Sir, do you remember being asked that question and giving that answer?

A Yes, sir, I do.

Q But, sir, you don't know that Mr. Rivas was in Valerie's rental apartment?--

A No, I do not.

Q -- sitting alone in the dark, do you?

A No, I do not.

Q Yet at the time that you said it, would it be fair to say that you believed that that was the case?

A I'm going by what my daughter said, that Hector had a habit --

MR. CALLE: I would ask that that be stricken.

A Okay.

MR. FITZPATRICK: I object to it being stricken.

THE COURT: Hold on, Mr. --

THE WITNESS: Yes.

THE COURT: Hold on. Read it back to me, the question.

(The requested portion of the record was read back by the court reporter.)

THE COURT: I'm going to allow him to answer the question. Now, whether you think it's responsive or not, you can make your objection after the answer is given.

MR. CALLE: I would just withdraw the question, if that's the case. May I?

MR. FITZPATRICK: I object, Judge. The question was asked. The witness was beginning to answer. He should be allowed to answer.

MR. CALLE: Well, Judge, my --

THE COURT: I have no objection to him striking -- withdrawing the question, but that's not to say the door is not open to that area.

Go ahead, sir. Your question, and the answer, are stricken from the record. You may ask another question.

BY MR. CALLE:

Q Lastly, sir, on March 30th, 1987, there came a time you arrived at Valerie's apartment. Can you tell this Court where her vehicle was parked when you arrived?

A In front of the garage.

Q Was anything unusual or out of the ordinary for Valerie to park there, to your knowledge?

A Normally she would have had the car in the garage, instead of outside.

Q Was there anything unusual about the angle of the parking?

A No, sir.

Q Can you tell me if you checked to see if the vehicle was locked?

A No, I didn't.

Q Now, sir, I believe your answer to a question by Mr. Fitzpatrick was when Hector was exiting the rear outside door of the structure, something to the effect, "That bastard. He's in my house again." You attributed that to Valerie, is that correct?

A That was Valerie's statement.

Q Are you certain that that's -- were those her exact words?

A Yes, sir. She was furious. I remember them and I was surprised.

Q Well, sir, did you ever give an answer to the same question that she then responded, "What is he doing in my house?"

MR. FITZPATRICK: Judge, could I have the specific page, line, question, answer?

THE COURT: We're talking about prior grand jury testimony?

MR. CALLE: No, sir.

THE COURT: No?

MR. CALLE: May we approach?

THE COURT: No. That's all right.

MR. CALLE: No?

THE COURT: I'll let the question stand.

BY MR. CALLE:

Q Did you ever give a prior statement with those words, sir?

A Yes, sir.

Q Well, did she say both? Did she say her first statement, did she say the second statement, sir? Could you tell us what her exact words were, to the best of your recollection at the time Mr. Rivas exited the rear outside door, if you know?

A Yes. Again, "What's he doing in my house again?"

Q Did she say, "He's in my house again," or, "What is he doing" --

A "What's he doing in my house again?"

Q And did she call him, "That bastard"?

A Yes.

Q And you say she was furious, is that correct?

A Yes.

Q Yet she then got out of your vehicle and entered 248 Hickok with Hector Rivas?

A That's correct.

Q Did she not?

A Yes, she did.

Q Well, is that action consistent with someone being furious with someone else, Mr. Hill?

MR. FITZPATRICK: Objection, your Honor.

THE COURT: Sustained. You don't have to answer that.

MR. CALLE: Nothing further.

THE COURT: Anything?

MR. FITZPATRICK: A couple of questions, your Honor, if I may.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Mr. Hill, back on March the 17th, when you pulled into the driveway of your daughter's apartment at 248 Hickok Ave., did you notice whether or not any lights were on in her apartment?

A No. The apartment was totally dark.

Q Did you know back in March of '87, and months previous to that, what type of vehicle or vehicles Hector Rivas drove?

A He had a van and he had an automobile, a car.

Q Did you see either that van or the automobile back on March 17th?

A No, sir. No, sir, I did not.

Q Now, you had some dialogue with Mr. Calle about

whether or not on March the 17th, Mr. Rivas was waiting in the apartment in the dark for Valerie. Now, had your daughter ever made any statements to you about Mr. Rivas' habits regarding waiting for her in her apartment?

MR. CALLE: Objection.

THE COURT: I won't allow the statements to be articulated. I will allow him to answer whether or not his daughter had ever mentioned anything about prior visits by this defendant.

MR. FITZPATRICK: In other words, just a yes or no?

THE COURT: Yes, sir.

BY MR. FITZPATRICK:

Q All right. Can you answer that yes or no?

A Yes.

Q Thank you.

THE COURT: Any recross?

MR. CALLE: No, sir.

THE COURT: All right. Mr. Hill, thank you. You're excused, subject to being recalled at some later date. Okay.

THE WITNESS: Yes, sir.

THE COURT: Thank you.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: I think what we'll do, probably versus putting a witness on the stand --

MR. FITZPATRICK: Judge, if, you know, I don't have any problem bringing -- I've got a witness who's a police officer. I'll call him out of order; unless Mr. Calle has some cross-examination I'm completely unaware of, it would take about three minutes.

THE COURT: Well, then, let's try it, then. Any progress we can make, I'll take a shot at it.

MR. FITZPATRICK: Stan Hodell.

(Proceedings paused.)

THE COURT: Ladies and gentlemen, we're going to break for the day.

MR. FITZPATRICK: Is he gone?

THE COURT: Yes. We're going to break for the day. It's five of 5 and -- or ten of 5, and I'll ask you to please be in the jury room tomorrow at -- by 9:00. I have canceled my morning's work, so we can get started and give this trial a full day tomorrow. Please be in the jury room at 9:00.

I ask you not to linger in the courthouse

once you come in. In other words, go right to the room.

Now, in terms of parking, did the commissioner of jurors give you an idea of where you're to park tomorrow? Okay. If for some reason that garage is full, and it shouldn't be if you're here at 9:00, make what accommodation you can, even if you have to stick it in front of a meter. We'll address that problem if and when we get to it, but -- all right. But try to head for that garage. If you get here right about 8:30, quarter to 9, you shouldn't have a problem with it.

Please, now don't discuss the case amongst yourselves. I know members of the media have been in this courtroom, so I would expect that there may be some news about this in tomorrow's papers. Do not buy it to read it. If you feel you have to keep track of this trial in the paper, have your spouse or a friend cut it out, save the article for you. After the trial is over, read it and do what you want, but do not read or listen to anything about this case in the news media.

Also, do not ever throughout the course of this trial, do any independent research on your own about some issue that may have come up in this trial, or that may come up. You are not to do any independent research through any source to try to solve some issues that may have arisen during this trial.

I'll see you tomorrow in that jury room, 9:00. Have a nice St. Patrick's Day.

COURT ATTENDANT: Court is in recess until 9:00 tomorrow.

(The proceedings of March 17, 1993 were adjourned.)

*                    *                    *

C E R T I F I C A T E

I, PATRICIA A. ALEXANDER, C.S.R., R.P.R., an an official reporter of the Supreme and County Courts, Fifth Judicial District, State of New York, do hereby certify that the foregoing is a true and correct transcript of my stenographic notes taken in this matter, at the time and place first herein mentioned.

Patricia A. Alexander
PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

Jul. 29, 1995
DATE

COPY 

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ONONDAGA

---

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

Indictment Number 92-1114-1

-against-

Index Number 92-2794

HECTOR M. RIVAS,

Defendant.

Volume II

---

Onondaga County Courthouse
401 Montgomery Street
Syracuse, New York 13202
March 18, 1993

B E F O R E : HONORABLE J. KEVIN MULROY, County Court Judge, and a Jury.

A P P E A R A N C E S :

WILLIAM J. FITZPATRICK, ESQ.
Onondaga County District Attorney
Onondaga County Civic Center
421 Montgomery Street
Syracuse, New York 13202

RICHARD J. CALLE, ESQ.
Attorney for the Defendant

PATRICIA A. ALEXANDER, R.P.R.-C.S.R.
Official Court Reporter

# I N D E X


| WITNESSES | PAGE |
| --- | --- |
| DAVID HILL | |
| Direct Examination by Mr. Fitzpatrick. . . . . . | 144 |
| Cross-examination by Mr. Calle . . . . . . . . . | 158 |
| ELIZABETH KENNEDY MICHAEL | |
| Direct Examination by Mr. Fitzpatrick. . . . . . | 171 |
| Cross-examination by Mr. Calle . . . . . . . . . | 180 |
| ANITA BALDUCCI | |
| Direct Examination by Mr. Fitzpatrick. . . . . . | 184 |
| Cross-examination by Mr. Calle . . . . . . . . . | 192 |
| CYNTHIA L. REISER | |
| Direct Examination by Mr. Fitzpatrick. . . . . . | 196 |
| STANLEY CHARLES HODELL | |
| Direct Examination by Mr. Fitzpatrick. . . . . . | 208 |
| LAURA LYNN ADAMS | |
| Direct Examination by Mr. Fitzpatrick. . . . . . | 212 |
| Cross-examination by Mr. Calle . . . . . . . . . | 220 |

I N D E X (Continued)

WITNESSES PAGE

JOHN D. BRENNAN

Direct Examination by Mr. Fitzpatrick. . . . . . .226

Cross-examination by Mr. Calle . . . . . . . . . . .249

Redirect Examination by Mr. Fitzpatrick. . . . . .259

Recross-examination by Mr. Calle . . . . . . . . . .262

DAVID A. PHINNEY

Direct Examination by Mr. Fitzpatrick. . . . . . .267

Cross-examination by Mr. Calle . . . . . . . . . . .276

THOMAS JOHN STASSI

Direct Examination by Mr. Fitzpatrick. . . . . . .307

Cross-examination by Mr. Calle . . . . . . . . . . .321

Redirect Examination by Mr. Fitzpatrick. . . . . .341

DONALD STONECIPHER

Direct Examination by Mr. Fitzpatrick. . . . . . .346

Cross-examination by Mr. Calle . . . . . . . . . . .357

Redirect Examination by Mr. Fitzpatrick. . . . . .382

Recross-examination by Mr. Calle . . . . . . . . . .389

KAREN STONECIPHER

Direct Examination by Mr. Fitzpatrick. . . . . . .395

Cross-examination by Mr. Calle . . . . . . . . . . .405

# E X H I B I T S

| PEOPLE'S NUMBERS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| 4 | Photograph | - | 174 |
| 7 | Evidence Bag Containing The _Dark Tower_ | 187 | - |
| 8 | Nye Ford Repair Order, 3/27/87 | 187 | 188 |
| 9 | Note of Travel Agent (Yellow) | 201 | 203 |
| 10 | Travel Brochures | 204 | - |
| 11 | Police Report of S. Hodell, 3/31/87 | 207 | - |
| 12 | Photograph | 207 | 230 |
| 13 | Photograph | 207 | 230 |
| 14 | Photograph | 207 | 230 |
| 15 | Photograph | 207 | 234 |
| 16 | Photograph | 207 | 234 |
| 17 | Photograph | 266 | - |
| 18 | Photograph | 309 | 311 |
| 19 | Photograph | 309 | 311 |
| 20 | Photograph | 309 | 311 |
| 21 | Photograph | 309 | 311 |
| 22 | Evidence Bag Containing Crumpled Letter | 313 | - |
| 23 | Photograph | 313 | 315 |
| 24 | Affidavit of Donald Stonecipher (Four Pages), 4/5/87 | 387 | - |

| DEFENDANT'S EXHIBITS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| A | Search Warrant Application | 285 | - |

(Court and counsel are present. Proceedings began at this time.)

THE COURT: Mike, would you bring them in, please.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Okay. We're in session, and the record should reflect the jury is present, counsel, the defendant.

Good morning, ladies and gentlemen. And Mr. Fitzpatrick, if you'd call your next witness, sir.

MR. FITZPATRICK: Yes, your Honor. The People call David Hill.

* * *

D A V I D H I L L , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

MR. FITZPATRICK: Good morning.

THE COURT: Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Just ask you to keep your voice up, please, so the jury can hear.

THE WITNESS: Okay.

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good morning, sir. Tell us, please, your full name and where you live.

A My name is David Hill. I live here in Syracuse on 256 Armstrong Place.

Q How old are you, Mr. Hill?

A I'm thirty-six.

Q Are you married, single?

A I'm married. Been married for thirteen years, and I have a nine-year-old son.

Q Your wife's name?

A Sheri Hill, S-H-E-R-I.

Q Were you related to Valerie Hill?

A She was my sister.

Q All right. Sir, could you tell us whether or not you and she grew up together?

A Yes, we did.

Q Were you born and raised --

A Born in Syracuse and raised in Cazenovia, until 1977. I went to college in '77 and I came back after two years of school, and proceeded to live in Syracuse.

Q How about your sister, how long did she live in Cazenovia?

A Well, she grew up in Cazenovia and went to school at Cazenovia College, and graduated from Cazenovia College in '79, I believe.

Q And did she settle in Cazenovia?

A Um -- later -- she later moved to Syracuse and got an apartment on Mathers Street with a friend of hers from college, Laura, I believe her name was, Laura Weldon. And they lived together for about six months, and then Laura had a boy friend and they got married, and Laura moved to the Albany area.

And my sister needed a roommate, and I needed a place to live, so I moved in with my sister.

Q When was that, David?

A 1978.

Q And where did you live with your sister?
A On 128 Mathers Street in Syracuse.
Q Here in Syracuse?
A In Syracuse.
Q How long did you live with her?
A I believe it was about a year.
Q And did she make other arrangements after the year was up?
A That's why I moved away, because I was all set to be married to my present wife and the lease was up on the apartment, so we both moved out at the same time.
Q Where did your sister move to?
A It was an apartment in Syracuse, but I can't think of the name of the street. She wasn't there -- I don't think she lived there for eight months, maybe a year, if that long.
Q Now, did your sister begin dating a person by the name of Bob Lucas?
A Yes, she did.
Q All right. And did you know Bob Lucas prior to your sister dating him?
A He graduated high school, I believe, two, maybe three years before I did. Oh, I knew him from school. And his family owns a large farm machinery shop in Cazenovia.

They sell lawn tractors and farm implements.

Q Do you know when Valerie first started dating Mr. Hill (sic) -- excuse me, Mr. Lucas?

A I believe it was in 1980, maybe 1981.

Q And do you know how long she went out with him?

A About five years.

Q And did there -- was there ever a time where they lived together?

A Bob had a house in Cazenovia, and Valerie would spend evenings, sometimes weekends, while they were going out. She had an apartment, a room in Cazenovia College for most of the time that they went out, so she had another place to stay instead of having to stay with Bob.

Q All right. Now, David, did there come a time when you became aware of your sister dating a person by the name of Hector Rivas?

A About June of 1986.

Q How did you become aware of that fact?

A The first time that I met Mr. Rivas, I was working for Roth Brothers on the night shift, Roth Brothers on Thompson Road. And during a lunch break, I had to stop by my sister's house -- I forget the exact reason, but it was late in the evening and I stopped by, and Mr. Rivas was at my sister's apartment on Hickok.

Q Now, when did your sister move to Hickok Ave., do you know?

A I believe it was the spring of '86.

Q And you were about to tell us about the first time you met Mr. Rivas. Describe that encounter for us, please.

A Like I say, it was during a lunch break from work, and I had stopped by, I guess I forgot the reason why I stopped by. But they were, I believe, just getting set to go out to dinner. And what, in particular, would you like me to tell?

Q Just -- that's the first time that you met Hector Rivas?

A To the best of my knowledge, yes, it was the first.

Q Did you, David, observe, over the course of the next several months, your sister in Mr. Rivas' company?

A Very rarely. I think I only saw them together maybe four times, five, at the very most.

Q But you were aware that they were dating and there was a relationship?

A Yes, I was.

Q Now, David, did there come a time during the Christmas season, 1986, when you traveled to Nashville?

A My wife, my son, and I drove down to Nashville for the Christmas holiday to be with my mother. And at that same instance -- weekend, if you will, Valerie and Hector flew down to be with my mother and my wife and myself.

Q What is your mother's name?

A Icie, I-C-I-E, Hill.

Q And how much time did the group of you spend together in Nashville?

A I think we were together for three days, a long weekend.

Q Now, from June of '86, David, up until the time of her death, had you visited your sister at Hickok Avenue on occasion?

A I'd stopped by probably twice a month.

Q And did you socialize or converse with your sister on occasions other than stopping by?

A On a very regular occasion. My son was quite young at the time, two, three years old, and my sister had become very attached to my son. It was the first of the next generation, if you will.

Q Right.

A And she would stop by, oh, at least once a week, and call more often than that, just to see how he was.

Q Okay. And certainly, I think you indicated you

lived with your sister for about a year?

A Yes, I did.

Q Would you describe for the jury, please, your sister's habits, in terms of housekeeping?

A Very, very neat. Always, if she had dinner, she would wash the dishes right away after dinner, clean up the pots and pans. On a daily basis, she would go through and straighten up, almost a daily basis, I'm sure, because the place was kept very, very neat, on Mather Street, when I lived with her, and again on Hickok, she was a very, very good housekeeper.

Q Let me ask you her personal habits. Did she drink alcoholic beverages?

A Yes, she was a social drinker.

Q Do you know what type of liquor she favored?

A Exotic drinks, rum and Coke, Brandy Alexanders, she liked to drink Blue Nun.

Q Blue Nun is a wine?

A Wine, yes.

Q Okay.

A White Russians, Black Russians. Like I said, the exotic drinks, mixed drinks.

Q How about her smoking, did she smoke?

A Most of the time I ever saw her smoke would be if

she was drinking, I think that's almost the only time that she would smoke, or maybe if she was under stress she might smoke once in a while, if things weren't going well in her personal life.

Q Do you know what brand she smoked, if you know?

A It's a green and white -- Newports.

Q All right. You believe --

A I believe.

Q -- green and white box?

A Newports.

Q And you believe it to be Newports. All right.

And, now, did you ever see Mr. Rivas smoke when you were with him?

A I believe so.

Q And do you happen to remember if he favored one brand or another, if you remember?

A Barclay seem to come to mind.

Q And that's a brand of cigarette?

A I believe so, yes.

Q How about, did you ever see Mr. Rivas drink alcoholic beverages?

A With my sister he would drink the same sort of rather exotic drinks, rum and Cokes, I believe, was one of the drinks I can remember. When we were in Nashville, we

went to a restaurant there and had dinner, and he was drinking mixed drinks at the time.

Q Okay. Now, I want to direct your attention, David, to sometime in the middle of January of '87, and ask if you became aware of some change in the status of the relationship between Valerie and Hector?

A A rather drastic change.

Q And how was that?

A My sister would stop by either before going to work or after work, asking if she could stay for a while because --

MR. CALLE: Objection.

THE COURT: No. I'll allow that. I'll strike it if it's not responsive, if it's hearsay.

Go ahead, sir.

A My sister would stop by, say that --

MR. CALLE: Objection to what his sister would say.

THE COURT: Sure. Yes. I don't want you to repeat what your sister said.

BY MR. FITZPATRICK:

Q David, if you can focus on that, you can't tell us what Valerie said on this particular occasion, but your answer was yes or no, did you become aware of a change in

their relationship?

A In the relationship, yes, because my sister would come over to the house much more frequently, two to three times a week, instead of the once a week.

Q Without telling us what she said, tell us what your observations were as to the change in the relationship.

A She was distraught.

Q Did they see each other as frequently, if you know, after the middle of January of '87, as they had prior?

A No, they weren't seeing each other. She was trying to get away from him.

MR. CALLE: Objection.

THE COURT: I'll allow it to stand, but, again, I want to caution you, we're dabbling on the edge of hearsay here. All right.

THE WITNESS: Okay.

THE COURT: Only what you observed. All right.

THE WITNESS: As far as her stopping by much more often?

THE COURT: Yes, sir.

THE WITNESS: Okay.

Q I think you said -- you indicated that she

would begin to spend more time at your house?

A Yes.

Q Did she ever spend the night at your house?

A No. She never spent the night.

Q And just answer this yes or no. Was she spending more time there for reasons other than seeing her nephew, your son?

A Yes.

Q Okay. Did you ever socialize with your sister and Mr. Rivas after the middle of January 1987?

A No.

Q And I should point out, David, do you see Mr. Rivas in this courtroom this morning?

A Yes.

Q And would you just point to him and describe, for the jury, what he's wearing?

A The gentleman in the gray suit, the blue shirt (Indicating).

Q All right. That's fine.

MR. FITZPATRICK: For the record, your Honor, the defendant, Hector Rivas.

THE COURT: Okay.

BY MR. FITZPATRICK:

Q David, I want to take you to Monday -- and I'm

going to hold the calendar out here, if you need it as an assistance. Monday, March 30th of 1987, were you employed back on that date?

A Yes, I was. I still worked at Roth Brothers on the night shift.

Q And during the afternoon hours, what would you have been doing?

A Um -- I had to report to work at 4:00, so I would normally get up 9:30, 10:00 in the morning, and have some breakfast, enjoy my son's company. On this particular morning, I had a phone call from my father saying --

Q Do you remember what time it was, David?

A 10:30 in the morning.

Q Okay. Go ahead.

A He was concerned about my sister, because she had taken a -- was supposed to have taken a trip to Albany, and hadn't reported to work on time. And, um -- we were a little concerned about her whereabouts. So --

Q What did you do in connection with that concern?

A Called some of the friends that knew she was going, called the folks that she was supposed to be going to see, and nobody knew where she was.

Q What did you do at that point?

A Got back in touch with my father. I told him that

nobody had seen my sister since, I believe, Friday afternoon. And she was going to take the thruway, so we called -- my father called the thruway authority and found out -- tried to find out if there was any accidents of any kind on the highway, to see if she might have been involved in something like that.

At about 1:00, quarter to 1, my wife and myself decided to -- there must be something wrong, so I drove to my sister's house and found my father's car parked in the driveway, my sister's car in the driveway. And, at that point, I knew there must be something wrong.

Q And did you enter the apartment?

A Yes, I did. There was a side door from the driveway, went through that door and into the apartment. When I got into the apartment, my father was on the telephone with a police dispatcher, very distraught. So I walked through the rest of the apartment and found my sister lying on the floor, and surmised that she had passed away, and went back to the telephone and took it from my father, because he wasn't able to answer any of the questions that they were trying to ask him.

I gave the address and some of the other particulars about what had happened, and then hung up the phone and proceeded to go back in and --

Q How long did it take for the authorities to get there?

A Eight to ten minutes, if that long.

Q All right. And, David, I'm not trying to distress you, but would you describe for us how your sister appeared, that you saw?

A Lying face down with her head turned, I believe it was to the left, with a, a bathrobe on, and with the belt of the robe around her neck.

Q Well, did she have any clothing on from the waist down?

A No. The bathrobe had been pulled up almost to her waist.

Q And were you able to observe her buttocks?

A Yes, I could.

Q Did you observe anything about them?

A I saw no marks, no bruises of any kind. There was a, a stain, but I couldn't tell you what kind of stain it was.

Q All right. And did you make any particular judgment at the time as to what it was?

A No.

Q And did you move anything or disturb anything?

A No.

Q You mentioned your sister's car being in the driveway?

A (The witness indicated affirmatively.)

Q Do you recall that?

A Yes.

Q Now, did you, at some point, sir, come into possession of that car?

A Yes, I did. After the police investigation of the vehicle was complete, they turned the car over to me.

Q David, do you recall whether or not you recovered any items from inside of the car?

A That car looked showroom clean. The only thing that I could find in it was a small pouch that held the registration, a tire pressure gauge, an insurance card, and a small package of Kleenex.

Q Did you find any books in the car?

A No. There was nothing like that in the car.

Q All right. David, thank you very much. You can sit right there. Mr. Calle may have some questions for you.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Mr. Hill.

A Good morning.

Q Mr. Hill, you liked your sister very much, did you not?

A Yes, I did.

Q And this was a tragedy that befell your family, including yourself, correct?

A Yes.

Q And the fact that no one was punished for the crime for six years, that hasn't set very well with you, is that true?

A It could be true.

Q Mr. Hill, you say you've seen Miss Hill, your sister, and Mr. Rivas together approximately four or five times during the course of their relationship?

A To the best of my knowledge, four or five. It was not very many times.

Q I see. Do you recall what those occasions were?

A The first time that I described to Mr. Fitzpatrick, the very first meeting --

Q When was that, in the summer of '86?

A Early summer, probably June of '86.

Q Yes, sir.

A There was a birthday party for my sister that was at Hector's house on Nelson Heights Road in Cazenovia.

Q And that would be around December 10?

A My sister's birthday, yes. Her birthday was the 9th, and I believe it was the 10th we got together. It may have been the 10th, I know it was sometime around the 9th or 10th.

Q Do you recall the next time you saw them together?

A I believe it was the Christmas, um, when we went to Nashville would have been the next time, and possibly one time after that, but I couldn't remember the specifics for you. I believe it was my sister's apartment that we were together.

Q Mr. Hill, during the course of those particular occasions, June of 1986, approximately, your sister's birthday in early December, Christmas in Nashville, and perhaps one other time after that, did you ever see them at any other time together?

A There was, in Nashville, there seemed to be a little bit of tension. I attributed it to the trip and unfamiliar surroundings. I didn't put much more emphasis on it than that.

Q Well, in Nashville you visited your mother?

A Yes, we did.

Q Okay. Was that the first time your mother met Mr. Rivas?

A Yes, it was.

Q Do you know how your mother got along with Mr. Rivas?

A Pleasantly.

Q Did she accept him as a boy friend of Valerie?

A That I couldn't answer for you.

Q But it wasn't apparent that she did, is that correct?

A Being my sister's boy friend, my mother accepted the fact that she had brought somebody along with her. And not wanting to cause any trouble, I would have to say that my mother accepted it for what it was.

Q Your father was divorced at the time from your mother, is that correct?

A Yes, he was.

Q Was he currently married?

A In December.

Q December?

A In what particular time?

Q December of '86?

A Yes, he was.

Q And that woman would be Pat?

A Pat Loft, her maiden name was Pat Loft.

Q And what was the condition of Pat in December of

'86?

A As far as health-wise?

Q Yes, sir.

A I know she had been to a doctor, because she had been complaining of pain in her hip. The true specifics I never -- I don't really know. I couldn't tell you about how she was physically.

Q Did she -- it's a fact that she passed on on March 30th, 1987?

A The same day that my father and I found my sister, yes.

Q And she was hospitalized at that time?

A At the time, yes.

Q Do you recall how long her hospitalization was?

A I don't believe it was very long. A month, a month and a half, maybe.

Q So that would put it around February she went into the hospital?

A I'm, I'm really -- I really don't remember, but sometime in the early spring of '87, yes.

Q Well, you say a month, month and a half, from March 30th would bring us into February of 1986 (sic), would that be fair to say?

A Yes.

MR. FITZPATRICK: Judge, I think counsel misspoke. He meant February of '87.

MR. CALLE: Of '87. Thank you, Mr. Fitzpatrick. '87, yes.

BY MR. CALLE:

Q Sir, do you know if she was not feeling well prior to February when she went into the hospital?

A I'm sure she must have been complaining of some distress or some ailments.

Q How long was your father married to Pat at that time?

A I believe they had been married for three years.

Q And did you ever have occasion to be in the company of your father's wife and Valerie together during the course of those three years?

A I'm sure there must have been times that we were together.

Q Would you describe the relationship of Val with Pat?

MR. FITZPATRICK: Judge, I object on the grounds of relevance.

THE COURT: Yes. Is there some relevance to this question, sir?

MR. CALLE: Yes, sir.

THE COURT: I'll let you ask it, but I don't want to get off on a tangent.

MR. CALLE: No, sir.

THE COURT: You can answer that, sir, if you would.

THE WITNESS: Okay.

THE COURT: If you know.

A Could you repeat the question, please?

MR. CALLE: I've forgotten exactly what I said. Could we have it read back, your Honor?

THE COURT: Well, I think I can help you. Do you know what the relationship was between Pat and Valerie during those three years?

THE WITNESS: They got along. I'm sure they accepted each other for what they were. I can never remember any harsh words being said by either one of them about the other.

BY MR. CALLE:

Q If you know, did Valerie accept Pat as family?

A I believe she did.

Q Now, you had mentioned that, in fact, in January of 1987 your sister was coming over to your home where your wife and your son lived, more often, is that correct?

A Yes, it is.

Q And you said that she was -- she seemed to be under some stress?

A Yes, sir.

Q Would not the condition of the father's wife have caused stress in your family at that time?

A Well, my wife -- excuse me, my sister worked in the same hospital that Pat was in, but I don't believe that that would have caused her any stress. And I believe that she would have gone to my father with any stressful thoughts that she would have had, instead of coming to me.

Q Directing your attention to March 30th, 1987, Mr. Hill, can you tell us the condition of the apartment in relation to household cleanliness and neatness that Valerie was known for?

A You'd like me to describe what I saw on the day that I entered the apartment?

Q I wouldn't take you there, sir, again, but I would like you just generally, if you would, just answer what the cleanliness, the condition of cleanliness of the apartment was at the time, if you can.

A It seemed to be a little more lived in than normal. Possibly a little bit messier.

Q Did you know how Valerie spent her day on Friday, the 27th?

A I know that she had to go to -- excuse me -- to Nye Ford in Oneida to have some work done to her vehicle, and she had a dinner appointment with my father.

Q Do you know anything else she had to do that day?

A Not specifically.

Q But you did say she usually cleaned once a day, to your knowledge?

A If she made a mess, yes, she would take time directly after that to clean it up.

Q Well, your testimony on direct examination was, I believe, that she would clean at least once a day. Do you recall saying that?

A By "once a day," I meant that if -- like, for instance, if she had dinner, she would clean the dishes, put them away, as a rule.

Q What about general household cleanliness, was that a once a day trip?

A I -- not being there every day, I really couldn't tell you, but it seemed like every time I stopped by, the house was in a very good order.

Q Do you know if she worked on March 27th, 1987?

A I don't know for sure.

Q Now, there came a time when -- on March 30th, that you entered Valerie's vehicle, is that correct?

A Into her vehicle on the 30th?

Q Yes, sir.

A If I did, I don't remember doing that.

THE COURT: You had indicated there came a time when you took control of your sister's car, at some point, is that correct, sir?

THE WITNESS: Yes, sir.

THE COURT: Do you have any idea when that occurred, in terms of a month after the incident, or six months?

THE WITNESS: Uh -- it was a much shorter period of time than that. It was a week -- it was after the criminal investigation department had gone through the car, because I remember asking several times, and they said, "No, we aren't finished with our investigation yet."

THE COURT: So it was within two weeks that you gained control of your sister's car?

THE WITNESS: Yes, sir.

BY MR. CALLE:

Q Mr. Hill, did you look around the apartment on the 30th when you were there, looking for anything in particular or in general?

A The brief time that I had before the authorities

showed up, I was on the telephone. I did have a chance to walk in and look around a bit, but I didn't disturb anything, knowing that it might be important to the criminal investigation department to leave the scene as I had found it.

Q Did you find any packs of cigarettes?

A I don't believe so. There were so many things that there were to look at, I could have looked at cigarettes and just not remembered.

Q You don't recall seeing a pack of Newports there, do you?

A No, sir.

Q You don't recall seeing a pack of Barclays there, do you?

A No, sir.

Q Now, directing your attention back to the times, those four or five occasions that you saw Valerie and Hector together, did you ever see Valerie smoke Hector's cigarettes?

A Smoke Hector's cigarettes?

Q Yes. Bum a cigarette, ask for a cigarette?

A No. I believe she always had her own and smoked her own cigarettes.

Q So would you say that she bought her own

cigarettes?

A Yes, sir.

Q Even when she wasn't drinking, she would buy cigarettes?

A Usually she had a pack with her. I couldn't tell you how fresh the pack was, but she would carry a pack, maybe have one that had been unopened, have that with her.

Q To the best of your knowledge, she always had a pack of cigarettes with her?

A Yes, sir.

Q Yet you wouldn't call her a smoker, is that your testimony today?

A Socially she would smoke, and if she was in public, she would, and drinking, then she would be smoking.

Q Do you know if your sister smoked marijuana?

A I'm sure she did occasionally.

Q Did you smoke marijuana with her?

MR. FITZPATRICK: Judge, is this relevant?

THE COURT: I'll allow it.

A There have been times that I have.

BY MR. CALLE:

Q Did you notice marijuana pipes inside Valerie's apartment on March 30th --

A Yes, I did.

Q -- 1987? How many pipes were there?

A Two.

Q When you -- on those occasions you smoked with Valerie, would you each light up a pipe of marijuana?

A No.

Q Would you share a pipe?

A Yes, we would.

Q So, would it be fair to say, based upon your experience, that if two people were smoking, they would share a pipe, but if there were more than two people, perhaps more than one pipe would be passed around, if you know?

THE COURT: Wait a second. I'm going to sustain the objection.

MR. CALLE: I have nothing further.

MR. FITZPATRICK: I have nothing. Thank you, David.

THE COURT: Thank you, Mr. Hill. You can step down, sir.

THE WITNESS: Thank you.

(Witness excused.)

MR. FITZPATRICK: Anita Balducci.

COURT ATTENDANT: Mr. Fitzpatrick, she went downstairs for a few minutes.

MR. FITZPATRICK: All right. Elizabeth Michael.

*                    *                    *

E L I Z A B E T H   K E N N E D Y   M I C H A E L ,

called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Ma'am, good morning. Tell us, please, your full name and where you live.

A Elizabeth Kennedy Michael; Cazenovia, New York.

Q And are you married or single?

A Single.

Q And what do you do for a living?

A I'm a library director.
Q And what library do you direct?
A Cazenovia Public Library.
Q How long have you worked there?
A Fourteen years.
Q Great. And how long have you been director?
A Ten.
Q Were you the director back in March of 1987?
A Yes, I was.
Q And did you also live in Cazenovia back then?
A Yes.
Q And could you tell us where in Cazenovia the library is located?
A It's on Albany Street, three buildings down from the main intersection on the right-hand side going east.
Q All right. And when you say, ma'am, the "main intersection," what streets are those?
A Lincklaen Street and Albany Street, which is Route 20.
Q Albany Street is Route 20?
A Yes.
Q And do you know where Albert's tavern is?
A Yes, I do.
Q And could you tell us where that is located?

A It's on Albany Street before you come to Lincklaen Street, about a block on the east, on the right-hand side going east.

Q About how far is it from the library?

A A block and a half, at the most.

Q Now, do you have a book return policy at the library when you check out a book?

A Books are loaned for two weeks and they can be returned in the book drop or the side door, or be brought in, or they can be called and renewed if --

Q Back in March of '87, what hours did the library keep?

A We were open, I believe, Monday through Friday, 10 to 5 and 7 to 9, and Saturday, 10 to 5.

Q And was the book drop available twenty-four hours a day?

A Yes.

Q Could you describe where that is physically located, or where it was physically located back in March of 1987?

A As you enter the library, it's on the right-hand side of the door.

Q Okay. Now, did you also loan other things, other than books from the library?

A Oh, yes, videos, magazines, audio cassettes.

Q Elizabeth, did you know a woman by the name of Valerie Hill?

A Yes.

Q All right. And just so we're certain we're talking about the same woman, do you recognize the woman in Exhibit 4?

A Yes, that's Valerie.

MR. FITZPATRICK: Judge, I haven't offered Exhibit 4 yet. I would offer it at this time.

THE COURT: Mr. Calle, any objection to the receipt of Exhibit Number 4?

MR. CALLE: May I see it?

THE COURT: Yes, sir.

MR. CALLE: Yes, sir. I fail to see the purpose for a photograph.

THE COURT: Okay. I'm going to receive Exhibit Number 4.

(People's Exhibit Number 4 was then received into evidence.)

BY MR. FITZPATRICK:

Q Was Miss Hill a user of Cazenovia Library?

A Frequent user, yes.

Q And how long did you know her?

A Probably at least three years.

Q Was she a frequent customer?

A When she lived in Cazenovia, yes. Probably at least once a week.

Q And did you become aware that she moved to Syracuse?

A Yes.

Q How often would she come to the library after she moved to Syracuse?

A Not as frequently. Maybe once a month, probably.

Q Would you converse with her if you happened to run into her?

A Oh, yes.

Q All right. And did you become aware, ma'am, that Miss Hill had taken out a Stephen King book sometime in February or March of '87?

A Actually it was January when she originally received the book, yes.

Q Okay. And was there something special about the book, in terms of how you had it or come into possession of it?

A We didn't own the book and we had to borrow it from Mid York Library System in Utica.

Q Did there come a time when you became aware the

book was overdue?

A Yes. We received a notice from Mid York saying that the book was overdue and they would like it back.

Q Okay. And did you make some effort to retrieve the book?

A My assistant called Valerie and said, you know, the book was overdue and the other library wanted it back.

Q Do you remember when that call was placed?

A It was placed Tuesday, March 24th.

Q Okay. And did you get the book back that day?

A No.

Q Were you making any special -- were you paying any special attention to when the book came back in your possession?

A Yes. Well, my assistant called Val. Val said she had returned it a couple of weeks ago, and Valerie was a very conscientious library user. So we started looking for it, thinking maybe it got on our shelves by mistake, or maybe our paperwork wasn't right. So we were looking for it, trying to see if we could find it in our library.

Q You were making a special note of looking for it to come back?

A Yes.

Q Now, did you -- and, again, Elizabeth, you can

refer to this calendar that's placed in front of me in your view.

Did you locate the book on Friday, March 27th?

A No.

Q And whose responsibility is it to clear out this book drop?

A All the staff members have the responsibility of clearing it out.

Q And could you tell me who accepted that responsibility on Saturday, March the 28th?

A On Saturday, March 28th, Carol Herbert would have been working, and she would have emptied it in the morning. And then before she leaves, she would have emptied it.

Q All right. And was the book bin cleared out on Saturday, March the 28th?

A Yes. As a matter of fact, I stopped by the library late that afternoon and it's my habit when I go into the library at any time to check the book drop, see if there's anything in it, and clear it out at that time, which I did.

Q What time did you do that?

A It was about 3:30.

Q And any sign of the Stephen King book?

A No.

Q And did you return to the library any time this weekend?

A Yes. I went in on Sunday morning about 10:00.

Q What was the reason for going in on Sunday?

A We have a cat at the library, and I had to feed her.

Q Okay. And did you check the book drop?

A Yes.

Q What, if anything, did you observe?

A It was probably about a quarter full, and the book that we had been looking for, Dark Tower, by Stephen King, the one Valerie had, was on top.

Q Indicating it had been returned?

A Sometime between Saturday afternoon, 3:30 and Sunday at 10 a.m.

Q And I want to show you, Ms. Michael, what has been marked, and I want to caution you not to touch anything on the inside, because it has been treated with a chemical, but Exhibit 7. Do you recognize that?

A Yes, I do.

Q And would you just state, for the record, what it is?

A It's the book, Dark Tower, by Stephen King, owned by the Mid York Library System.

Q And is there some way you can identify --
A It has a gold label on the spine with Mid York Library System written on it.
Q Now, did this library book, as many library books, have some type of protective cover on it?
A Yes, a plastic cover that's put on when it's purchased.
Q Okay. And, Ms. Michael, were you interviewed by the police back in March and April of '87 about this particular book?
A Yes. Uh -- it -- I was interviewed April 1st.
Q And did the police contact you?
A No, I called them.
Q As a result of what?
A Well, as I say, when I found the book, I thought, "Oh, there it is. She must have found it and returned it in the book drop," that was my thinking. And then when I read in the newspaper on Tuesday morning that Valerie had been killed, and what was assumed the time of her death, I thought, "That's odd. That book was returned after she was supposed to have been dead."
Q All right. Ms. Michael, I want to thank you very much. Mr. Calle may have some questions for you.
A Okay.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Ms. Michael.
A Good morning.
Q Ms. Michael, I'll be very brief. This -- what's the local library called where you are employed?
A Cazenovia Public Library.
Q Cazenovia Public Library. Now, your testimony here this morning was that Cazenovia Public Library did not own this book, correct?
A Right.
Q That it was the New York Public Library --
A Mid York.
Q -- Mid York?
A Mm-hmm.
Q Mid York Public --
A No. Mid York Library System.
Q Mid York Library. Thank you.
A Mm-hmm.
Q Okay. And bear with me, because I don't use the library much, so I'm not too familiar. I understand there's some sort of piece of paper inside the jacket of books that are owned by libraries, is that correct?
A A library card, book card, yes.
Q Library card, book card. And was there one in

this particular book?

A There was before Valerie signed it out.

Q Okay. And then once the card -- is there a pocket for the card?

A Yes.

Q Okay. Does that remain in the book?

A Yes.

Q Even after one takes the book out?

A Yes.

Q Okay. Now, the pocket holds the book card, correct?

A Right.

Q Okay. Now, that pocket, is it in the first page after you open up the book?

A It depends on the library, but in the Mid York Library System, we put it in the back -- in the back left-hand side page.

Q When you say "we," you mean Mid York Library puts it in the back left-hand side?

A Right.

Q This pocket card holder?

A Right.

Q Okay. And where does the Cazenovia Library put it?

A Same place.

Q Same place. Okay. Are the pockets the same? Is there a universal pocket system?

A They're printed with the library who owns it, name and address on them. That would be the only difference.

Q Okay. And on this particular book, the Dark Tower, that was owned by the Mid York Library System, what name was on that card pocket?

A It would be Mid York Library System.

Q And Mid York Library System is not the library in Cazenovia where you work, correct?

A Correct.

Q Okay. Did you ever see Mr. Rivas use the library?

A I don't -- I don't know who Mr. Rivas is.

Q That's the gentleman at the table right there. If you look at him --

A No.

Q He wasn't a regular at your library, to the best of your recollection, correct?

A Correct.

Q Where is the Mid York Library anyway, Ms. Michael?

A In Utica.

Q And how far is Utica from here?

A Forty miles easterly from Cazenovia.

Q Is there anything in that book, the Dark Tower, which would indicate that it was on loan from the Cazenovia Library?

A No.

Q Nothing further.

THE COURT: Mr. Fitzpatrick, any questions?

MR. FITZPATRICK: No, thank you.

THE COURT: I have a couple. Ma'am, if you would, you indicated the book drop, is that available to the public twenty-four hours a day?

THE WITNESS: Yes.

THE COURT: But the book drop, itself, is located inside a foyer in the library?

THE WITNESS: No. It's on a porch.

THE COURT: On a porch. Okay.

THE WITNESS: Yeah.

THE COURT: And you indicated that you visited the book drop between 3:30 on March 28th, is that correct?

THE WITNESS: Yes.

THE COURT: And you again visited the library on 3/29 at what time again?

THE WITNESS: About 10:00 in the morning.

THE COURT: 10:00 a.m. All right. Thank you very much, ma'am. Watch your step.

THE WITNESS: Okay.

(Witness excused.)

MR. FITZPATRICK: Anita Balducci.

* * *

A N I T A B A L D U C C I , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good morning, ma'am.

A Good morning.

Q How are you? Would you tell us, please, your full name and where you live?

A Anita Balducci. I live on Lot 10 Road, Central

Square.

Q And that's up in Oswego County?

A Yes.

Q And how long have you lived there?

A Uh -- seven and a half years.

Q Are you employed?

A Yes.

Q Where do you work?

A I work for the Sam Dell Group.

Q And what do you do for them?

A I'm a servicing parts administrator, warranty administrator.

Q Okay. How long have you worked with Sam Dell?

A Six years.

Q And where did you work back in March of '87?

A At Harold Nye Ford.

Q And that's located where?

A In Oneida.

Q That's the City of Oneida?

A Yes.

Q And do you know the address of Nye Ford in Oneida?

A It's just Route 5, Oneida.

Q And what did you do there, Anita?

A Um -- I was a service advisor and warranty clerk.
Q And how long had you been at Nye Ford as of March of '87?
A Just about four years.
Q And were you working on March the 27th of 1987?
A Yes.
Q And you've been questioned by the police about a particular customer you had that day back in 1987, is that correct?
A Yes. Yes.
Q Do you remember a particular woman identifying herself as Valerie Hill, coming into Nye Ford for car service?
A I -- what I remember, actually, is not today so much her, specifically, but her car.
Q All right. Do you remember what time this person came in?
A Just before 1:00.
Q And what was the purpose for her visit to Nye Ford, if you remember?
A Um -- what I exactly recall is that she did have some kind of electrical or drivability-type concern with her car that she wanted us to take a look at.
Q Okay. And did she leave the car there for

service?

A No, she waited for it.

Q And there's a waiting room, is there, at Nye Ford?

A Yes.

Q And do you know how long she was there?

A She was there for a little over two hours.

Q And would that be a normal waiting period for the type of work that she wanted to have done?

A Yes.

Q I want to show you exhibit --

MR. FITZPATRICK: Judge, do you have any scissors on your desk?

THE COURT: Matt, do you have scissors?

(Evidence Bag and Repair Order were marked for identification as People's Exhibit Numbers 7 and 8, this date.)

MR. FITZPATRICK: Thanks. This will be Exhibit 8, your Honor.

(People's Exhibit Number 8 was shown to Mr. Calle.)

BY MR. FITZPATRICK:

Q Anita, I'm going to hand you Exhibit 8. Do you recognize that?

A Yes, I do.

Q What is it?

A It's a repair order that I wrote up when Valerie was in the dealership.

Q And is this a record that you're required to keep at Nye Ford --

A Yes.

Q -- in the course of your business there?

A Yes.

Q And does Nye Ford maintain a record such as Exhibit 8 in the regular course of its business?

A Yes.

Q And did you make this exhibit out on or about March 27th of '87?

A It was on March 27th of '87.

Q Okay.

MR. FITZPATRICK: Judge, I'd offer it at this time.

MR. CALLE: No objection.

THE COURT: Exhibit Number 8 is received.

(People's Exhibit Number 8 was then received into evidence.)

BY MR. FITZPATRICK:

Q Now, what would you call that, a receipt, an

invoice?

A Well, this is the customer's copy of the repair order.

Q So it would be a receipt --

A Yes.

Q -- that would have been given to Miss Hill upon leaving the dealership?

A Yes.

Q Yes, it would have been given --

A Yes.

Q -- to Miss Hill?

A Yes.

Q Would you tell us what information is contained on there, in terms of a description of her car?

A Well, that it's a 1985 Tempo, the V.I.N. number, her license plate number, and the odometer reading that was on the car.

Q All right. And who takes the odometer reading?

A Well, I did.

Q Okay. And would you tell us, first of all, what was the license plate number of her car?

A 169TUI.

Q TUI?

A (The witness indicated affirmatively.)

Q And the odometer reading on March 27th?

A Fourteen thousand five hundred seven miles.

Q And this would have been as she entered Nye Ford?

A Yes.

Q And to your knowledge, did any of the service people take it out to drive it around?

A Um -- I believe the technician did take it for a road test.

Q All right. Would that have been a very short period of distance?

A Yes, yes.

Q All right. And did you do anything else, Miss Balducci, when you go inside the person's car?

A I generally take a quick look for any contents that are in the car.

Q Did you do that in Miss Hill's case?

A Yes.

Q And did you observe anything in her car?

A I remember there being library books in her car.

Q And where were the books located?

A Back seat.

Q Would you describe -- was it how many books?

A I remember two.

Q Describe those two books for us, as best you can recall.

A The one on the bottom, I really can't tell you anything about -- I don't remember now. But the one that was on top I remember as being a -- it had a dark black cover on it, a library -- a plastic cover, with the paper cover inside. Like what you find in a library. And I remember it being as like a novel.

Q And do you remember anything about the color of the book?

A I remember the cover; it was dark and black.

Q All right. And how about the book underneath that?

A That I can't remember anything about right now.

Q All right. Do you know if that was a library book or not?

A Yes, it was a library book.

Q All right. And did you remember anything else on the inside of the car?

A No.

Q Okay. Anita, thank you very much. If you -- or, I'm sorry. Do you know what time Miss Hill left your establishment?

A It was, I remember when I was questioned, that I

pulled the records and it was a little after 3:00 that she left.

Q Okay. All right. Thank you very much, Anita. Mr. Calle may have some questions for you.

THE COURT: What time did you say, ma'am, I'm sorry, I missed that, that she left?

THE WITNESS: A little after 3.

THE COURT: A little after 3.

Mr. Calle.

MR. CALLE: Yes.

CROSS-EXAMINATION BY MR. CALLE:

Q Ms. Balducci, how were you able to determine these books were both library books?

A Just by observation.

Q What did you observe?

A Only that they looked like reading, novel-type books, not school-type books, or something like that.

Q But was there any identifiable marks that you observed on this instance in question, which would indicate that these books were obtained and were the property of the library?

A I would have to say that the reason I believed them to be library books is due to the covers that they had

on them. Because generally people that have -- at least if I relate it to myself, I don't have plastic protective covers on my books at home, and library books do.

Q Do you know if Valerie had plastic covers on books that she owned?

A No.

MR. FITZPATRICK: Objection, your Honor. There's absolutely no foundation for that.

THE COURT: Well, she's answered she doesn't know, so I'll let it stand.

BY MR. CALLE:

Q Did you open up these books to see if there was a library pocket inside?

A No.

Q You weren't able, independently, to determine what the name of the books were?

A Today I can't.

Q At the time, March 27th, 1987 --

A Um --

Q -- could you then?

A What I can say with respect to that, I guess, is on the date I knew the title of the book, and when I was questioned after her death, the investigators had the dark covered book that I remember with them, and I was able to

say, yes, that is the book that was in Valerie's car. Today, I can't tell you the title. I don't remember.

Q How long did you look at this book in the vehicle?

A Oh, just for approximately, probably a couple of seconds.

Q Did you see anything else in the vehicle?

A No.

Q Did you leave the books in the vehicle?

A Yes.

Q Did you touch them in any way?

A No.

Q Where were they in the vehicle, in the front, in the back?

A I remember them being in the back seat.

Q On the left side or the right side?

A Actually, in the center.

Q Were they in a bag?

A Pardon me?

Q Were they in a bag?

A No.

Q You said they were in plastic. Can you describe this plastic?

A Um -- like a clear, hard, but flexible, plastic,

the type you find on a library book. That's why I thought they were library books with the paper cover inside and then the whole cover over the book.

Q Are all library books kept in plastic up here?

A As far as I know, yes.

Q Nothing further.

THE COURT: Is that it?

MR. FITZPATRICK: Thanks, Anita. Thanks very much.

THE COURT: Thanks, ma'am. Watch your step coming off there.

(Witness excused.)

MR. FITZPATRICK: Cindy Reiser, please.

* * *

C Y N T H I A L. R E I S E R, called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

THE COURT: Try to do the best you can to keep your voice up.

THE WITNESS: Okay.

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Ma'am, good morning. Tell us again your full name and where you live.
A Cynthia L. Reiser from Morrisville.
Q And are you married or single?
A I'm married.
Q Are you working now?
A Yes, I am.
Q What do you do for a living?
A I'm a travel agent.
Q Where do you work?
A Jim Brown Travel in DeWitt.
Q And how long have you worked there?
A Approximately five years.
Q Okay. And were you working back in March of 1987?

A Yes, I was.
Q And where were you working back then?
A All Seasons Travel in Fayetteville.
Q Where was that located in Fayetteville?
A It was in Fayetteville Square.
Q And can you tell us what street that's on?
A It's on Route 5.
Q Okay. And how long had you been working at All Seasons, as of March of '87?
A Approximately a year.
Q And what were you doing there?
A I was the manager.
Q And did you also work as a travel agent?
A Yes, I did.
Q Did you know a person by the name of Valerie Hill?
A Yes, I did.
Q How long had you known Valerie?
A Probably a year and a half.
Q All right. And is she the woman in Exhibit 4?
A Yes, she is.
Q That's the Valerie Hill that you knew?
A Yes.
Q Now, did you have some contact with her, Miss Reiser, in 1987 concerning her taking a trip to the

Bahamas?

A Yes, I did.

Q And do you recall when it was that you and Miss Hill first conversed about that?

A It was in March, around the 15th or 16th of March.

Q All right. Below my eye level with you I have a calendar of March of '87. Feel free to refer to that, if you need to do so.

Sometime in mid March you conversed with Miss Hill. Now, do you remember who made the contact? Was it she calling you, or vice versa?

A She had called me.

Q All right. And what was her request at that time?

A She wanted to get away.

Q And did she specify a destination?

A Uh -- no, actually we talked about a few different destinations before she decided on the Bahamas.

Q And did you make any suggestions to her as to mode of travel, as to how she could get there, whether she would go with anyone, et cetera, et cetera?

MR. CALLE: Objection. Mr. Fitzpatrick is leading the witness.

MR. FITZPATRICK: Well --

THE COURT: I'll overrule the objection. I'll take it. Can you answer that question, ma'am?

THE WITNESS: I'm not sure I understand the question.

BY MR. FITZPATRICK:

Q Okay. Good. It was a bad question anyway. When you talked to her, apparently you and she discussed as to where she was going to go?

A That's correct.

Q All right. And obviously this was to be a plane trip, as opposed to a cruise?

A Oh, yes. Yeah.

Q And did you discuss with her, cost?

A Yes, I did.

Q And what did you say to her in that regard?

A I'm sorry?

Q What did you say to her in that regard, about cost of the trip?

A That it would be less expensive per person if more than one person traveled.

Q And what did she decide?

A She didn't care. She still wanted to go away by herself; that she didn't care.

Q And did you, in fact, make a reservation for her?

A Yes, I did.

Q And would that have been the same day as the phone call, or after that?

A We had spoken on the 16th, and we had talked about Barbados, and then she changed her mind and wanted to go to the Bahamas, and it was booked on the 17th of March.

Q All right. And did she make some type of payment?

A That was on the 23rd of March.

Q And was that payment in full?

A No, it was not.

Q And do you remember what mode of payment she used? Was it a credit card?

A It was a check.

Q A check. All right. And was there an outstanding balance?

A Yes.

Q Was there any deadline as to when that was to be paid?

A Uh -- a month prior to her travel.

Q And as you sit here today, Cindy, do you recall the dates that she was to travel and the cost of the trip?

A Um -- yes. She was to travel on April 27th of '87 and it was approximately $650 for the total trip.

Q Did you make any notations on any items of paper as to the cost and dates of travel, and so forth?

A Uh -- any notations, as far as notes in my office?

Q Yes.

A Yes.

Q All right. I want to show you one thing, if you'd just give me a moment.

(Proceedings paused.)

MR. FITZPATRICK: Your Honor, for the record, I'm removing an item of paper from a plastic bag which has not been marked yet as an exhibit, but for identification purposes, is Police Number 22, that will be testified about later in the trial. And I'd like that paper marked as Exhibit 9.

(Travel Agent's Note was marked for identification as People's Exhibit Number 9, this date.)

(People's Exhibit Number 9 was handed to Mr. Calle.)

MR. CALLE: No objection.

MR. FITZPATRICK: I wasn't going to offer -- I guess I'll offer it, then, and make it simple.

THE COURT: Let's identify it and then we'll offer it.

BY MR. FITZPATRICK:

Q Exhibit 9, Ms. Reiser -- forgive me for smiling -- could you tell us if you recognize what that is?

A It's rate quotes that I had given Valerie.

Q And the handwriting and the printing on Exhibit 9, do you recognize that?

A It's mine.

Q And does that, perhaps, help refresh your recollection as to dates and amounts?

A Yes, it does.

Q Okay. Tell us, then, the cost of the trip you quoted to Miss Hill.

A Uh -- the total was originally 620.70.

Q All right. And the dates of travel?

A The 28th of April to the 3rd of May.

Q And is this something, this little note here, Exhibit 9, is this something that you gave to Miss Hill?

A Yes, with other date quotes, as well, for May.

Q All right.

MR. FITZPATRICK: Now Exhibit 9, then, is

received, Judge?

THE COURT: Well, are you offering it? No objection?

MR. CALLE: None.

THE COURT: All right, sir. I'll receive it.

(People's Exhibit Number 9 was then received into evidence.)

MR. FITZPATRICK: I'm going to return it to its original place at this time.

BY MR. FITZPATRICK:

Q Now, forgive me, Ms. Reiser, what was the day that Miss Hill came in to make the initial deposit on the trip?

A It was paid on the 23rd.

Q The 23rd would have been Monday?

A Right.

Q Now, on the 23rd, did you give her anything?

A I gave her some brochures.

Q Okay.

MR. FITZPATRICK: Judge, I'm removing an item from, again, what has not been marked for identification, but is Police Exhibit Number 54.

MR. CALLE: 54?

MR. FITZPATRICK: Yes. And from that I'm removing an item which I would like to have

marked Exhibit 9 (sic).

MR. CALLE: 10, right?

THE COURT: 10.

MR. FITZPATRICK: 10, I'm sorry, your Honor.

(Travel Brochures were marked for identification as People's Exhibit Number 10, this date.)

BY MR. FITZPATRICK:

Q Cindy, I'd like to show you Exhibit 10 and ask if you recognize that?

A Yes, I do.

Q And what is that?

A That's a brochure about the Bahamas.

Q And can you say, or can you say that it's a brochure that you gave to Miss Hill?

A Absolutely. This is the tour operator that she booked.

Q Okay. Now, did she come in to All Seasons at any time later in the week?

A Yes. She came back on the 27th and paid a small amount.

Q And how was that paid?

A It was paid in cash.

Q And do you remember the amount?
A It was approximately $28.
Q This would have been the balance that she owed?
A It was something that she had added afterwards, yes.
Q Some additional feature to the trip?
A Yes.
Q And what were your store hours at All Seasons on Friday the 27th?
A 8:30 a.m. to 5:30 p.m.
Q And what time did you say she came in on Friday?
A It was late afternoon, 4:30, maybe.
Q And what occurred when she came in on Friday, the 27th?
A She came in to pick up her airline tickets and her documentation for her transfer, her hotel and her sight-seeing.
Q And did she pick those up --
A Yes, she did.
Q -- from you?
A Yes, she did.
Q And would you describe whatever you gave to her, please?
A I gave her airline tickets for Syracuse to

New York, and a separate ticket from New York to the Bahamas, and she had two airline tickets. I gave her transfer documents, hotel documents, and sightseeing. It would have probably all fit in a regular envelope.

Q And I don't want to have any confusion. When you say "a regular envelope," what do you mean?

A A, a business envelope, like a Number -- I think they're a Number 10 envelope. This would be the big regular sized --

MR. FITZPATRICK: The witness is gesturing with her hands.

Q I think we all understand what you're talking about, basically a business envelope.

Do you remember what she did with those tickets and those other documents?

A She put them into her purse.

Q And you're sure of that?

A Positive.

Q And did she then leave?

A Shortly thereafter.

Q Okay. And Ms. Reiser, were you interviewed by the police back in March and April of '87 about these events?

A Yes, I was.

Q Okay. Thank you very much, ma'am. If you'd stay right there, the defense attorney may have some questions for you.

MR. CALLE: No questions.

THE COURT: No?

You say she put two tickets, two airline tickets -- to make it clear, they're for one person, though; however, two separate tickets -- to fly from Syracuse to New York, and one ticket from New York to the Bahamas, for one person?

THE WITNESS: That's correct.

THE COURT: Thanks very much. And watch your step, ma'am.

(Witness excused.)

THE COURT: We're going to take a -- ladies and gentlemen, we're going to take a fifteen-minute morning recess. Again, I remind you not to talk about the case, form any opinions, don't go browsing through the paper. We'll see you in fifteen minutes.

(Proceedings stand in recess.)

(All parties are present. Proceedings resumed at this time.)

(Documents were marked for identification as

People's Exhibit Numbers 11, 12, 13, 14, 15, and 16, this date.)

THE COURT: Okay. We're back in session. The record should reflect that counsel is present, the defendant is present, the jury is present.

Mr. Fitzpatrick, your next witness, sir.

MR. FITZPATRICK: Yes, your Honor. Stanley Hodell.

* * *

S T A N L E Y C H A R L E S H O D E L L , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good morning, Mr. Hodell. Tell us what you do for a living, sir.

A I work for the City of Syracuse, the Department of Police, assigned to the Criminal Investigations Division.

Q How long have you been a Syracuse police officer?

A Be twenty-eight years next month.

Q And how long have you been in Criminal Investigations?

A Nineteen.

Q Sorry?

A Nineteen years.

Q How were you employed back in March of 1987?

A As a -- assigned to the Criminal Investigations Division.

Q All right. Sir, and back in March of 1987, did you have occasion to proceed to the scene of a homicide at 248 Hickok Ave.?

A Yes, sir.

Q And when did you proceed there, sir? There's a calendar in front of you, if you need to refer to it.

A I was there the first day, on the 30th of March of 1987, and I returned back the next day, on the 31st.

Q Did you have occasion, sir, to examine a vehicle that was parked in the driveway of 248 Hickok Ave.?

A Yes, sir.

Q And did you make some notation regarding the odometer reading of that vehicle?

A Yes.

Q And memorialize that in a police report?

A Yes, sir.

Q All right. I'd like to show you for identification, Officer Hodell, People's Exhibit 11, and ask if you recognize that, sir?

A Yes, sir. That's a police report I made on the 31st of March, 1987.

Q Would you need to refer to that to refresh your recollection as to the exact odometer reading of this vehicle?

A Yes, sir.

Q All right. And would you tell us, please, first of all, what was the license plate of the vehicle that you checked?

A It was New York State License Plate 169TUI, that's Tom, Union, Indian.

Q And what was the odometer reading of that vehicle, sir?

A Fourteen thousand five hundred and thirty-nine miles.

Q All right. Investigator, thank you very much. I have no more questions.

MR. CALLE: None, sir.

THE COURT: Thank you, Officer. You may step down.

THE WITNESS: Okay. Thank you.

(Witness excused.)

MR. FITZPATRICK: Peter, would you get Laura Adams.

(Proceedings paused.)

* * *

L A U R A  L Y N N  A D A M S , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Ma'am, good morning. Would you tell the ladies and gentlemen of the jury your full name?
A Laura Lynn Adams.
Q And where do you live, ma'am?
A In Gansevoort, New York. It's right outside of Saratoga.
Q Could you tell us, please, are you married or single?
A Married.
Q And how long have you been married?
A Ten years.
Q Do you have any children?
A Two.
Q And what are their ages?
A Six and two.
Q And what do you do for a living?
A I'm a registered nurse.
Q Did you know the deceased, Valerie Hill?
A Yes.

Q And when did you first meet Miss Hill?
A In 1977 when I first attended Cazenovia College.
Q Were you a freshman in 1977?
A Yes.
Q And she?
A Yes.
Q And did you room together?
A Our second year we roomed next door to each other. We weren't roommates in college. After college we were roommates.
Q Did you continue a relationship after college?
A Yes.
Q And how close would you say you were to Miss Hill?
A We were good friends.
Q And did you ever visit her in Cazenovia, or -- strike that.
When did you move to the Saratoga area?
A Approximately November, November-December.
THE COURT: Of what year, ma'am?
THE WITNESS: I'm trying to think. '80, I believe.
BY MR. FITZPATRICK:
Q 1980. And did you keep in contact with Miss Hill

from 1980 up until the time of her death?

A Yes.

Q And how often would you see her, or she see you?

A Periodically -- in the summertime more. We had a boat. She would come up and go out in our boat. I visited her before I got married by myself, and after I got married, you know, we went to college reunions together. She would come up once every couple of months -- not every year during that whole time span, depending on, you know, pregnancies, babies.

Q Did you -- were you aware that she was involved in a relationship with a Bob Lucas?

A Yes.

Q And had Mr. Lucas ever visited you with Miss Hill?

A I had been to his home when she lived with him, I had stayed there with my husband and myself, with Valerie.

Q All right. And when was your first child born?

A 1986.

Q And what date?

A May 23rd.

Q And did Miss Hill ever visit you and see your first child?

A Yes.
Q How many times?
A I don't recall exactly how many times. I know that I went to see her with the baby, also.
Q And where was she living when you went to see her?
A In Syracuse.
Q All right. Do you remember the address?
A No.
Q Okay. Did you become aware, Mrs. Adams, that Valerie began to see another person by the name of Hector Rivas?
A Yes.
Q Did you ever meet Mr. Rivas?
A Yes.
Q Where was that?
A In my house, or -- we were renting at the time.
Q Do you remember when that was?
A It was in the summertime. It was warm weather, and I just had a baby. I don't think she was more than a month old. So it was probably June of 1986.
Q This is -- of 1986. All right.
Now, I want to, first of all, I want to show you, in front of me here there is a calendar of March of 1987.

Did you have any contact with Valerie Hill in that month?

A She was coming to visit me.

Q And when did you and she make plans for that visit?

A During the week before she died.

Q All right. And we know that she died sometime on the weekend of March 27th. So you're saying it would have been the week preceding that?

A I believe the last time I spoke with her was Wednesday, the 25th.

Q Okay. And when was the intended visit to be?

A She was coming either tentatively Friday night or Saturday morning.

Q Friday night, the 27th?

A Yes.

Q Or Saturday morning, the 28th?

A Yes.

Q All right. And was that discussed on the phone --

A Yes.

Q -- on Wednesday?

A Yes.

Q All right. And was she coming with anyone?

A No.

Q And could you tell us, did you ever talk to her

after Wednesday, the 25th?

A No.

Q Did you make any effort to talk to her after Wednesday, the 25th?

A Several.

Q Would you describe those for the jury, please?

A Well, Friday I started calling her approximately 4:30-ish, right up -- I went out for a few hours and then came back. I believe the last time I tried to call her was around midnight.

Q All right. Let's go a little bit slower now. You started around 4:30?

A Yeah. I was trying to find out, you know, "Are you going to come? What do you think, Friday night or Saturday morning?" She was going out to dinner, I think. It depended on what time she got home from dinner.

Q Did you -- you were unsuccessful Friday night?

A I was unsuccessful.

Q Now, you indicated you went out, and with whom did you go out?

A My husband.

Q And do you know if you had a babysitter for the child?

A I believe we took the baby to a friend's house

and, you know, we came home early evening, 9-ish, maybe 9:30.

Q Did you continue your efforts --

A Yes, I did.

Q -- to contact Miss Hill?

A Yes, I did.

Q And do you remember how many times you called her Friday night?

A Dozens.

Q And did you ever get a response?

A No.

Q And you estimate the last effort was around midnight?

A Yes.

Q Now, you are -- I know this is silly, but do you have any recollection of when you awoke Saturday morning?

A Well, it would be early. I had a ten-month-old baby, I mean, I would certainly be up by 8.

Q Did you resume your efforts?

A Yes, I did. I called her first thing in the morning.

Q Any response?

A No.

Q And did you continue that throughout the day?

A I continued until early afternoon.

Q Any success?

A No.

Q Okay. And when, after that, did you, if you did, did you ever attempt to contact her again?

A I believe I tried Sunday and, you know, I still got no response. And then Monday I heard of her death.

Q Okay. Now, how did you learn about her death?

A My husband told me a police officer had come to the house.

Q This would have been at your home outside of Saratoga?

A Right.

Q Now, Mrs. Adams, you knew Miss Hill for almost a decade?

A Mm-hmm.

Q And you describe your relationship with her as close?

A Yes.

Q All right. Now, I want you to tell me, and tell the ladies and gentlemen of this jury, the likelihood, in your judgment, of her not calling you to tell you that she was not coming to visit?

A She had come to visit me many, many times and

never once had she never, ever, not shown up or not called when she was coming to visit. I mean, she would -- she would not not call me to tell me. There'd be no reason for her just not to show up.

Q All right. Mrs. Adams, thank you very much. The defense may have some questions for you.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Mrs. Adams.

A Good morning.

Q Mrs. Adams, you recall that on March 25th of 1987 you attempted to call Valerie Hill approximately 4:30 in the afternoon, is that correct?

A No, 27th.

Q That's the 27th?

A 25th I spoke with her; 27th --

Q You spoke with her the last time on the 25th. Okay. And the next time you attempted to speak with her would be the 27th?

A Yes.

Q And what time was that?

A Approximately 4:30.

Q That was 4:30. All right. And you say you were unsuccessful. What do you mean by unsuccessful?

A I didn't get any answer.
Q So did the phone ring?
A Yes.
Q And how many times did you call on Friday, the 27th?
A Dozens. I mean, I can't tell you exactly how many. I called several, several times.
Q Dozens is twenty-four, would you say?
A I'd say at least twenty, throughout that night.
Q Up until what hour?
A Approximately midnight.
Q And on those twenty times that you called there, the phone always rang?
A Except for one time it was busy on Friday.
Q What time was that?
A I don't recall exactly the time, and it was a very short time, and then it was -- there was no answer.
Q Well, you know, what numbered call that was, that you called and got this busy signal at Valerie Hill's house on March 27th, 1987?
A I would guess it would probably have been the eighth or ninth time.
Q Can you approximate what time?
A I'm uncertain if it was before I went out, or when

I came home.

Q What time did you go out?

A Early evening.

Q 6 p.m., would that be fair?

A That would be approximate.

Q But you had no idea what time that was that you made that call, that you received a busy signal?

A I can't tell you exactly what time that was, no, not at this time.

Q Can you estimate?

A It wouldn't be fair to estimate. I, I don't recall.

Q Directing your attention to the morning of March 28th, you estimate that you awoke approximately 8 p.m., because you had a new baby --

A Ten months old, at that time.

Q -- is that correct?

A Yes.

Q Okay. And you had called, when you decided to call Valerie that morning?

A I called her first thing in the morning, as soon as I awaken.

Q And you -- and your call was unsuccessful at that time?

A There was no answer.
Q Tell this Court, please, at 8 a.m. on the 28th of March, did you receive a busy signal?
A No.
Q Do you recall hearing your husband tell that to a police officer?
A No.
MR. FITZPATRICK: Judge, I object. That question is asked in bad faith.
THE COURT: I'm going to sustain the objection; improper question.
MR. FITZPATRICK: Could I be heard after we break for morning on that, if you'd just make a mental note of that, your Honor?
THE COURT: Sure.
BY MR. CALLE:
Q Is your husband here today, Mrs. Adams?
A No.
Q Sure.
A My husband never attempted to call her, so I don't know that he would --
THE COURT: Can I just stop you? Would you mark your record?
(Proceedings paused.)

THE COURT: Go ahead, sir.

MR. CALLE: Thank you.

BY MR. CALLE:

Q At the time, Mrs. Adams, you were living in Schenectady?

A No. I was living at the same area that I'm living in now.

Q Where is that?

A In Gansevoort. It's about five minutes outside of Saratoga.

Q Oh, outside Saratoga. So that weekend she was to visit you, she was to come to that area of Saratoga?

A Yes.

Q And how long had you been living in that area at this particular time in 1987?

A Well, I've always lived in that area. That particular place, I think we just moved in the house.

Q Did you ever live in Onondaga County?

A Yes.

Q And how long ago was that?

A Right after college, '79.

Q And can you tell me what the distance is in mileage from Onondaga County to the Saratoga area, if you know?

A It takes about three hours and fifteen minutes.
Q Approximate the mileage, if you know?
A No. However long it takes to drive three hours and fifteen minutes at the speed limit.
Q And at the time you and Valerie were uncertain as to whether Valerie was to leave Friday night or Saturday morning, is that correct?
A Correct.
Q Just to sum up, Mrs. Adams, getting back to the 27th, you went out early evening?
A Correct.
Q And there came a time when you came home that evening?
A Approximately 8:30, 9:00.
Q And you don't know if you received a busy signal before you got home, or after, is that correct?
A That's correct.
Q Thank you.
THE COURT: Any redirect, sir?
MR. FITZPATRICK: No. Thank you, Mrs. Adams.
THE COURT: Watch your step. Thanks very much, ma'am.
(Witness excused.)

MR. FITZPATRICK: Sergeant John Brennan.

* * *

J O H N D. B R E N N A N , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good morning, Sergeant.
A Good morning.
Q Tell us your full name.
A My name is John D. Brennan.
Q By whom are you employed?
A I'm employed by the Syracuse Police Department,

City of Syracuse.

Q How long have you been with the Syracuse Police Department?

A Approximately twenty-three years.

Q What is your current rank and assignment?

A I'm a police sergeant for the city, and I'm assigned to the Criminal Investigations Division.

Q What are your duties in Criminal Investigation?

A Currently I'm assigned in charge of the crimes against persons unit.

Q How long have you been in the Criminal Investigations Division?

A Approximately fourteen years.

Q How long have you been at the rank of sergeant?

A Approximately five years.

Q How were you employed back in March and April of 1987?

A I was a police investigator at that time.

Q Were you also assigned to Criminal Investigations?

A Yes, sir, I was.

Q Did you have any particular assignment back in '87?

A I was assigned to what we call the burglary squad. It was also known as the selective enforcement unit.

Q Did you become involved in March of '87, in investigating the death of Valerie Hill?
A That's correct.
Q Where -- did you respond, sir, to the scene, 248 Hickok Avenue on Monday, March the 30th, of 1987?
A That's correct.
Q Approximately what time did you arrive at that address?
A The call was dispatched at 1:09. I arrived a short time thereafter.
Q Would you tell us what you observed upon arrival?
A Upon arrival, I observed a uniformed officer on the scene, securing the scene. I entered the rear door of 248 Hickok Ave. and found the rear door open, and I then entered the premises.
Q Would you describe the interior of 248 Hickok Ave. for the jury, please?
A Well, first thing I walked in, the door was open. I noticed that there was -- there was no forced entry. The locks were still intact. I checked the apartment very quickly and found it very neat. It wasn't ransacked; everything appeared to be in order.
Q Did you check any other areas for signs of

forced entry?

A Uh -- just the rear door.

Q And you found none --

A Found none.

Q -- in that area? Did you observe the deceased?

A Yes, I did.

Q Would you describe her body and position?

A She was in what I would call a front room. She was lying face down on a rug, and she appeared to be wearing some type of a bathrobe.

Q All right. Sir, and did you take any photographs at the scene?

A No, sir, I did not.

Q Sergeant Brennan, I want to show you some photographs, however, and ask you to identify them for the jury, please.

MR. FITZPATRICK: First, if I may approach, Judge.

THE COURT: Yes.

BY MR. FITZPATRICK:

Q Exhibit 12, can you identify that for us, sir?

A Sir, yes, sir. This is a photograph of 248-250 Hickok Ave.

Q Also Exhibit 13?

A Yes, sir. This is a front view, again, of 248-250 Hickok Ave., which is a two-family residence.

Q And Exhibit 14?

A Yes, sir. This is the two-car garage located in the rear of 248 Hickok Ave. Also in the photograph is a Ford Tempo, color white, with the New York registration, 169TUI, which we later learned to be the victim's vehicle.

Q Do the three photos, Exhibits 12, 13, and 14, fairly and accurately show 248 Hickok Avenue, the driveway, and the victim's vehicle, as they appeared to you on March 30th of '87?

A That's correct.

MR. FITZPATRICK: I would offer them, your Honor.

(People's Exhibit Numbers 12, 13, and 14 were handed to Mr. Calle.)

MR. CALLE: No objection.

THE COURT: All right. People's 12, 13, and 14 are received.

(People's Exhibit Numbers 12, 13, and 14 were then received into evidence.)

BY MR. FITZPATRICK:

Q Sergeant, as you're looking at that photo, which is Exhibit 13, we have a two-family house?

A Yes, sir.

Q And on the left would be what?

A That's 250 Hickok.

Q On the left would be 248?

A That's correct.

Q And the victim lived downstairs?

A That's correct.

Q Okay. I'm just going to hold this up for the jury.

MR. FITZPATRICK: I remind you, ladies and gentlemen, that you certainly have a chance to take these with you into the jury room at a later time.

(Mr. Fitzpatrick held up People's Exhibit Number 13 for the jury.)

BY MR. FITZPATRICK:

Q Another photo here, Sergeant, you can see it, Exhibit 12 is the door you entered, shown in Exhibit 12?

A Just barely you can see it, a partial -- a portion of it behind our crime laboratory van.

Q Okay. Now, as I'm looking at the photo, I'm pointing to what, the only vehicle in the photo to the right here, you're saying the door is just to the other side of that?

A That's correct.

Q Okay. And, lastly, you identified a photo of what you later learned to be the victim's car in the driveway, Exhibit 14?

A That's correct.

Q Okay. Now, sir, I want to show you People's Exhibit 15, and ask if you can tell us what that is.

A Yes, sir. This is the photo of the victim laying face down in what I described as the front room.

MR. CALLE: I would ask to approach, please.

THE COURT: Sure.

MR. CALLE: Thank you.

(Counsel approached the bench. An off-the-record discussion ensued.)

BY MR. FITZPATRICK:

Q Sergeant, will you finish describing Exhibit 15?

A Okay. Yes, sir. As, as stated, this is a photo of the victim laying face down in what I described as the front room. She's clad in a, a blue -- appears to be a bathrobe.

MR. CALLE: I would object to this continued line of questioning.

THE COURT: Okay. Your objection is overruled.

BY MR. FITZPATRICK:

Q I'll also show you Exhibit 16. Could you tell us what that is, please, Sergeant?

A Again, this is another photo of the victim from a different angle, laying face down in the same room, basically the same position that she was in the other photo.

Q Do Exhibits 15 and 16 fairly and accurately portray the victim as you saw her in the afternoon hours of March the 30th, 1987?

A That's correct.

MR. FITZPATRICK: I would offer them, Judge.

MR. CALLE: Objection.

THE COURT: Okay. Counsel's objected to the receipt of Exhibit 15 and 16. I'm going to receive these exhibits, and when I do so, it's with the following instruction, ladies and gentlemen: as I've indicated to you, you will, during your deliberations, have an opportunity to, of course, view all the exhibits that have been received into evidence, and they now include People's Exhibits 15 and 16, which are photographs depicting the body of Valerie Hill, as testified to by this officer. Let me caution

you that the photographs are grim. They are introduced not to incite or inflame any passions you may have.

And they are sought to be introduced as part of the evidence in this case, and should be viewed in that light. And connect it with whatever evidence you want to connect it to in this trial, and give these photographs whatever weight you want to give to them.

Again, I caution you, they are not meant to inflame or incite any passions, and you should not dwell upon them, of course, but merely give them whatever weight you deem appropriate.

Go ahead, sir.

(People's Exhibit Numbers 15 and 16 were then received into evidence.)

MR. FITZPATRICK: Thank you, your Honor.

BY MR. FITZPATRICK:

Q I'm going to display Exhibits 15 and 16 to the jury.

THE COURT: Well, instead of displays, I'd ask you to pass them.

MR. FITZPATRICK: All right. Fine.

THE COURT: Give them to the jury. I'll allow -- again, don't dwell upon them. Pass them on after you've observed them, ladies and gentlemen.

MR. FITZPATRICK: Why don't we split them up?

THE COURT: All right.

BY MR. FITZPATRICK:

Q Now, Sergeant, did you receive a specific assignment that afternoon in connection with investigating this death?

A Yes, I did.

Q What was that?

A Myself and Investigator James Driscoll were assigned to locate one Hector Rivas.

Q Do you know -- do you recall who gave you that assignment?

A That would have been Sergeant Michael Lynch.

Q And do you know the reason why you were given that assignment, how Mr. Rivas' name came up?

A Yes. We learned at the scene that Mr. Rivas was a former boy friend of the victim's, and had just recently broken up.

Q Other than what you just stated, did you have any

other information concerning Mr. Rivas?

A No, sir, we did not.

Q And about what time did you attempt to interview him?

A Uh -- we proceeded to his residence out in Cazenovia, and we located him at his residence at approximately 2:40 p.m.

Q Yourself and Mr. Driscoll?

A That's correct.

Q Anyone else with you?

A Uh -- we -- uh -- had a New York State trooper in uniform escort us to the house.

Q What was the reason for having a trooper?

A Well, myself and Investigator Driscoll were in plain clothes. We were dressed in jeans and sneakers. And we were outside the City of Syracuse and outside the County of Onondaga, and we felt we should have some type of uniformed police officer with us.

Q Would you tell us -- would you describe the residence that you went to?

A This was a single-family dwelling, wood structure, appeared to be a ranch-style home.

Q And did you knock on the door or ring a doorbell?

A I believe we knocked on the door.

Q Now, would you tell us exactly what happened from this point on, after you knocked on the door?

A After several minutes, a male came to the door and answered it. We identified ourselves as Syracuse police officers. And we asked if we could come in to talk to the gentleman.

Q Did the gentleman identify himself?

A Yes, he did.

Q How so?

A We asked him if he was one Hector Rivas. He stated he was. At that time, we asked him if we could come in and talk to him.

Q What exactly did you ask him after that?

A Upon entering the residence, we told him we'd like to talk to him about his former girlfriend, Valerie Hill. And we asked him if he would accompany us to our offices in Syracuse to talk to us.

Q Did he say anything in response?

A Nothing at all. He agreed to come with us. He just asked if he could get dressed very quickly, which he did.

Q And how did he appear when he first came to the door?

A He appeared like he had just woken up. And

upon our entering, he appeared very nervous.

MR. CALLE: Objection, as to how he appeared.

THE COURT: I'll take the answer.

BY MR. FITZPATRICK:

Q How was he dressed?

A When we got -- first gained entrance, he was, I believe, in his underwear and a T-shirt, and he asked to get dressed.

Q And then did you proceed then to Syracuse?

A Yes, we did.

Q Now, have you told the ladies and gentlemen of the jury everything that Mr. Rivas said, in words or substance, at his house in Cazenovia?

A Yes, sir. That's the only conversation we had at that time. There was no other questions asked by either parties.

Q Was there any conversation on the way to Syracuse?

A Absolutely none at all the entire time from Mr. Rivas' residence, until we arrived in our offices.

Q Now, how long did it take you to get to Syracuse?

A I would say, approximately twenty-five minutes.

Q And what happened when you got there? Where did

you go, first of all?

A Upon our arrival, we went to the third floor, which is called the Criminal Investigations Division. We entered the office and Mr. Rivas was seated in what we call the gold polygraph room.

Q And did you proceed to interview him at that point?

A Yes, we did.

Q Was he in custody?

A No, he was not.

Q Did you give any Miranda warnings -- what we typically call his -- advise him of his Constitutional rights?

A No, sir. We did not.

Q And why is that?

A Well, at the time, we had no reason to suspect Mr. Rivas. We only considered him a witness, and we thought we could -- we would interview him to get any background information on the victim, as much as possible.

Q About what time did you commence the interview of Mr. Rivas?

A This would have been shortly after 3 p.m.

Q All right. And could you tell us what you said to him and what he said to you?

A Well, the first thing I asked him, I asked him the last time he saw Miss Hill. He stated to me that the last time he had seen and spoken to her was on the 26th of March, at approximately 7 p.m. He stated that he went over to her residence, stayed approximately half an hour, and left.

Q All right. And was there any, any detailed description of that visit as to what they did or what they talked about?

A No, sir, none at all. We didn't get into any detail about that.

Q Did he then proceed to describe the 27th?

A Yes, he did.

Q Tell us what he said about that.

A On Friday, the 27th of March, Mr. Rivas stated that at approximately 2 p.m. he came into the city to check on a job site, which I believe was on Green Street. He stated he drove into the city in his red van that he used for work. He stated once he got into the city, he stopped by Miss Hill's apartment. He found that she was not at home. He stated he continued on and went to the job site and returned back to Cazenovia at approximately 5 p.m.

Q So this 2:00 visit would have been just a drive-by, according to him?

A Right. He stated he drove by, stopped. I believe he knocked on the door and found that she was not at home.

Q Okay. And, I'm sorry, I interrupted you. He returned to Cazenovia at what time?

A At approximately 5 p.m.

Q And what does he next say occurred?

A He states that this time he receives a phone call from a friend of his called Mark Brosh. And at that time, during the conversation, they make arrangements to meet at Coleman's later on, with some other friends.

Q All right. And what does he next say happened?

A He states at this time, he gets ready to go out. He, this time, drives back into the City of Syracuse, this time driving a silver Olds Toronado. Once back in the city, again he stops at Miss Hill's apartment.

Q About what time would this have been, according to him?

A This would have been approximately 6 p.m.

Q Okay.

A Once at Miss Hill's apartment, again, he states he does not find her at home and this time he leaves a note under her door.

Q All right. What does he say happened next?

A After he leaves Miss Hill's apartment, he goes to Coleman's, meets his friends, and he stays there until approximately 11 p.m.

Q And upon leaving Coleman's, according to him, at 11 p.m., what does he then do?

A He states after leaving Coleman's, he drove back to Albert's bar, which is located in the Village of Cazenovia.

Q And does he indicate how long he stayed there?

A He stayed there until approximately 2 p.m. -- 2 a.m., I'm sorry.

Q And did what at 2 a.m.?

A At 2 a.m., I believe he and some other friends that were at Albert's bar decided to return again to Syracuse to go to breakfast.

Q All right. And does he indicate what time he retired for the evening?

A He states at approximately 4 a.m. he returned to his residence.

Q And does he give any description of his activities on Saturday and Sunday?

A Yes, he does.

Q And, just briefly, tell us about that.

A On Saturday he goes -- he gets up and goes, at

about 11:30, he goes to Albert's bar for the purpose of doing some plumbing work at the bar. He states once he gets there, he decides he doesn't want to do the plumbing; that he's going to have lunch instead. He has lunch and then returns home to do some errands around the house, and he states at approximately 3:30, he returns back to Albert's bar to watch the S.U. game.

He stays at Albert's bar until approximately 8 p.m., at which time he goes to a house party which is being hosted by a Robert Giardano, I believe. He stays at this house party until approximately 4 a.m. While he's at this house party, he's talking to several friends, and he runs into several of Miss Hill's friends at the party, also. And he stated that he talked to several of Miss Hill's friends and made inquiries as to how she was.

Q How about Sunday, March 29th, what does he say he did that day?

A On Sunday, March 29th, I believe he gets up at approximately 11 a.m., goes into town. He gets a newspaper. Drives around town for a little while. Then returns home to wash his car. He states he -- later in the afternoon, he returns back to Albert's bar and stays there until approximately 11 p.m. at night, and then he goes home.

Q And now, Monday, March the 30th, what does he say

he did prior to coming in contact with you?

A On March 30th, which was Monday, he gets up at around 9, he decides he doesn't want to go to work today because of -- he was complaining of a sore throat, he said. So he states he gets up, he just stays around the house. He states at approximately 2 p.m. he calls Miss Hill's employment and learns through a friend of hers, that the victim never showed up for work. And approximately 2:40 is when myself and Investigator Driscoll arrived.

Q All right. Now, during the course of your interview with him, when he related all this material to you, did he ever complain, in your presence, about a sore throat?

A Not at all.

Q Did he seem hoarse in any way?

A No, sir, not at all.

Q Now, did he describe any details about his relationship with Miss Hill as to how he met her?

A Yes, he did.

Q What did he say in that regard?

A He stated he met Miss Hill in May of 1986. He was introduced to her by a friend, a Robert Lucas, who also used to date the victim. He stated from that time he dated Miss Hill steadily, up until two months prior to her

death, at which time she wanted to break it off.

Q All right. And did he use the words "prior to her death"?

A No, he did not.

Q Okay. Did he indicate what the status of their relationship was as of March of '87?

A He stated that they were broken up. She did not wish to see him anymore. In fact, she was talking about moving out of the area. She wanted time to think things out.

Q Okay. Did you ever inquire of Mr. Rivas as to whether or not he had a means of access to her apartment?

A Yes, sir. He stated that during their relationship he had, had obtained a key to her apartment and would go over there several times to wait for her.

Q And did you ask him what happened to that key?

A Yes. He stated that at the time when they were breaking up, Miss Hill requested the key back, and he complied and gave the key back.

Q All right. And did you ask him how frequently he would visit or contact the victim in February and March of '87?

A Yes, sir. Since the break-up, he stated nearly every day he would go to her residence in an attempt to see

her. He would drive by, sometimes wait for her in the hallway. And if she was not at home, leave notes for her under her door, or on her door. He stated he did this nearly every day.

Q All right. And did he indicate his feelings as to the relationship?

A Well, he stated he did not want to end the relationship. He wanted to continue as it had been previously. And he could not understand why she wanted to break it off.

Q Now, with this information that he stopped by her house and waited for her, or left a note nearly every day, did you inquire of him as to whether or not he made any effort to contact her on Saturday, the 28th, or Sunday, the 29th?

A Yes, sir, I did.

Q And what, if anything, did he say?

A He -- I asked him if he made any contact with her either Saturday, the 28th, or the 29th on Sunday. He stated at no time did he ever go into the city, stop by her residence, or call her, or make any attempt to contact her at all.

Q Did you ask him for an explanation?

A Yes, sir. I, I asked him why he didn't, since he previously explained that he, he was stopping at her

house nearly every day in an attempt to contact her, or talk to her. And I asked him why he didn't see her on these days. And he couldn't offer an explanation.

Q Okay. Now, did there come a time, Sergeant Brennan, when you informed Mr. Rivas that Valerie Hill was dead?

A Yes, sir, I did.

Q Would you tell us the exact words you told him?

A At -- when I advised him, I stated that I believed -- my words were, uh -- that Valerie is dead.

Q Would you describe for the ladies and gentlemen of the jury, as accurately as you can, Mr. Rivas' reaction, if any?

A There was no reaction.

Q All right. And by that, you mean what?

A Mr. Rivas was sitting in a chair, the same way as when we first brought him in, and when I advised him that she was, in fact, dead, he showed absolutely no reaction at all.

Q All right. And about what time was that?

A This would have been approximately 5:30 p.m. on the 30th.

Q All right. I understand, Investigator, a number of other officers talked to him as well, after you?

A Yes, sir, that's correct.

Q And eventually, later that morning, Mr. Rivas left the Public Safety Building?

A That's correct.

Q Sergeant, thank you very much. If you'll stay right there.

THE COURT: One question: When you informed the defendant that Miss Hill was dead, was it at the beginning of this discussion, at the end of it, or in the middle? You may have said --

THE WITNESS: Approximately 5:30, your Honor, I advised him.

THE COURT: 5:30. So you had had some conversation with him for about two hours prior to informing him of this?

THE WITNESS: That's correct.

BY MR. FITZPATRICK:

Q Sergeant, do you see Mr. Rivas in the courtroom?

A Yes, sir, I do.

Q And would you describe, for the jury, what he's wearing and point to him?

A Yes, sir. (Witness complied.) He's the gentleman in the light gray suit, blue shirt, sitting next to Mr. Calle (Indicating).

Q Thank you, sir. For the record, the defendant, Hector Rivas.

THE COURT: All right.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Sergeant Brennan.

A Good morning, sir.

Q Sergeant, this Public Safety Building, there is a polygraph room that you mentioned?

A Yes, sir.

Q Is that set up for videotaping?

A It was at that time, yes, sir.

Q And was a videotape made of the question and answer session with Mr. Rivas?

A During my, my conversation with him, sir?

Q To the extent of the conversation Mr. Rivas had, that you know about?

A No, sir. Our interview was not taped at all.

Q Sergeant, you mentioned that there was no conversation inside the police vehicle on the way from Cazenovia to the Public Safety Building, correct?

A That's correct.

Q Did you ask him any questions in the vehicle on the way to the Public Safety Building?

A No, we did not.
Q Did you make conversation with him?
A No, sir, I did not.
Q From whom did you receive the name of Hector Rivas pertaining to this case?
A I believe Miss Hill's father and brother were at the scene, and that's where we had learned of Mr. Rivas' name.
Q When you were at the scene, did you have occasion to look around?
A Yes, sir, I did look around briefly.
Q Did you go by the vehicle in the photographs?
A No, sir, I did not.
Q Did you go by the garage area?
A Pardon me?
Q By the garage area, did you go by the garage area?
A No, sir, I did not.
Q Subsequent to that date, did you go over by the garage area at all?
A I don't recall going over near the garage area, no, sir.
Q Now, approximately what time did you arrive at Mr. Rivas' home?

A We arrived at Mr. Rivas', I believe at approximately 2:40 in the afternoon.
Q And you say you arrived -- you say that the interview commenced at 3 p.m.?
A Approximately 3 p.m., could be a short time afterwards.
Q You arrived in Cazenovia at 2:40, is that correct?
A That's correct.
Q And Mr. Rivas appeared to have just woken up? No?
A That's correct.
Q Yes. Did you notice if his bed was unmade?
A I did not notice, sir.
Q But he was not dressed?
A No, sir, he was not.
Q So, did you watch Mr. Rivas get dressed?
A Yes, sir.
Q And could you tell the Court what he did before he was ready to leave?
A What he did before he --
Q Yes, sir.
A He got dressed and he accompanied us out to the police car.
Q Did he comb his hair?

A I don't recall if he did or not.

Q You were watching him, were you not?

A Yes, sir.

Q But you don't recall that now?

A No, sir, I don't.

Q And did he brush his teeth?

A I don't believe he did.

Q Did he wash his face?

A I don't recall if he did.

Q Did he use the bathroom facilities?

A I don't recall.

Q What is the distance in mileage, if you know, from Hector Rivas' home in Cazenovia, to the Public Safety Building?

A I don't know the mileage.

MR. CALLE: Do we have a map here. Is it that one?

MR. FITZPATRICK: Yeah.

BY MR. CALLE:

Q Sir, if I were to show you this exhibit, Exhibit Number 3 -- Number 2 -- could I put it here -- would it be fair to say that this is Cazenovia over here?

A Yes, sir.

Q And could you tell me, where would the Public

Safety Building be in Onondaga County -- would it be where it says Syracuse?

A It's located right in downtown Syracuse.

Q Cazenovia to Syracuse, would you estimate it to be, based upon this map, there is no key here, but would you say it would be thirty miles?

A That would be a guess, yes.

Q Would it be more than thirty miles, on a guess?

A I have no idea.

Q Well, sir, you've told this Court you arrived at Mr. Rivas' house at 20 of 3 and the interview commenced at 3 p.m.?

A At approximately 3 p.m. It could have started a little after.

Q Could it have been 3:30?

A Not that late, no, sir.

Q So Mr. Rivas got dressed, attended to himself to getting presentable, got into a vehicle, the vehicle was driven -- did you have a siren on the vehicle?

A No, sir. Our unmarked cars are not assigned or equipped with sirens.

Q So it wasn't like you were speeding through red lights and passing everyone, to rush to this Public Safety Building, were you?

A There was no rush to get there, no.

Q And then when you got to the Public Safety Building, where does one go -- the entrance to get to the polygraph room?

A You take the elevator to the third floor, you enter our office complex, and you walk to the back of the offices where this room is located.

Q What floor was that?

A Third floor.

Q And what is the procedure that was followed this day in question when you got to the third floor, if you remember?

A Upon our arrival, we went to the -- what we call the gold polygraph room. Mr. Rivas had a seat, and myself and Investigator Driscoll began to talk to Mr. Rivas.

Q So you all stayed in the same room together? You didn't leave him alone in there at all for any time?

A At certain times we had left the room and then returned, yes, sir.

Q I'm talking about initially when you got there, did you have to do any paperwork or see any superior officers to let them know you were checked in? Do you have any routine police business to do prior to beginning the interview?

A I believe upon our arrival, we did exit the room for a few minutes and talked to officers that were still in C.I.D.

Q Now, this testimony that you've given, you've given this testimony at the grand jury proceeding back in November of '92, is that correct?

A Yes, sir.

Q And since there was no videotape of this particular interview, was there a stenographer there taking down what was said?

A No, sir.

Q Was there an audiotape recorder there taking down what was said?

A No, sir.

Q Did Mr. Rivas sign any statements that you allege he made to you to memorialize what took place at this interview?

A No, sir, no written statements were taken at all.

Q How many officers were assigned to this case at that day in question, if you know?

A On that day, I -- just about everybody in the office, I would say. Fifteen investigators, probably.

Q Were there fifteen investigators in the office?

A There's several investigators.

Q Would you say, when you say "everybody," the entire office was on this case?

A Yes, sir. It's our policy, when we respond to an incident like this, that everybody in the office works on it.

Q Did everybody in the office work on it together?

A Yes, we did.

Q Are you aware of any brother officer attempting to get a search warrant to search Mr. Rivas' home on that day in question?

A I learned later on in the evening that there was one obtained.

Q Did you have any participation in that search warrant?

A No, sir, none at all.

Q Do you know who was attempting to obtain the search warrant in your office?

A No, sir, I couldn't give the exact officer's name.

Q Do you know, at this time?

A I believe now it was Investigator Timothy Phinney and David Phinney.

Q Did you have an opportunity to converse with Investigators Phinneys pertaining to the interview with Mr. Rivas prior to their getting a search warrant obtained?

A No, sir, I did not talk to them at all.

Q Did you search the murder scene at all, sir?

A No, sir, I did not.

Q Did you conduct a search at Mr. Rivas' home or his vehicle, sir, at the time you were there?

A No, sir.

Q Were any other names given to you at the time you arrived at the scene of the murder site?

A No, sir.

Q At the time that you received Mr. Rivas' name?

A No, sir. His name was the only one.

Q And was that name given to you by both father and son?

A I believe it was, yes, sir.

Q Hold on one second, Sergeant.

(Proceedings paused.)

BY MR. CALLE:

Q Do you know what time Mr. Rivas left the Public Safety Building on March 30th, 1987?

A He left at approximately 1:30 a.m., which would have been the 31st.

Q So Mr. Rivas was, for that duration, at that Public Safety Building on the 30th of March, between 3 p.m. and 1:30 a.m., approximately?

A Yes, sir, that's correct.

Q That's approximately ten and a half hours, would you agree with that, sir?

A Yes, sir.

Q Did Mr. Rivas leave for dinner at all during that time?

A No, he did not leave. We asked him if he wanted anything to eat, though.

Q Did he eat anything?

A Pardon?

Q Did he eat anything?

A No. He stated he did not want anything.

Q Did he drink anything?

A I believe we got him two or three glasses of water; that's all he requested.

Q Did you officers eat dinner that night?

A I did not, no.

Q Do you know if your other brother officers did?

A I don't know, sir.

Q Did Mr. Rivas at all, in the course of those ten and a half hours, ever tell you that he did not want to

answer any more questions?

A No, sir. At no time did he ever indicate that.

Q And did he freely answer the questions that you posed to him, based upon your observation?

A Yes, he did.

MR. CALLE: One moment, your Honor.

THE COURT: Sure.

(Proceedings paused.)

BY MR. CALLE:

Q Just briefly, Sergeant, did you ever vouchsafe any articles from Mr. Rivas' possession on that day in question, particularly keys?

A No, sir, I did not.

Q Did you tell Mr. Rivas on that day that, in fact, Valerie Hill was hurt and that's why you wanted to speak with him?

A No, sir, I, at no time, I never mentioned that.

Q Sir, did not Mr. Rivas ask you if he can call up Valerie's father to see how badly she was hurt?

A No, sir, he did not.

Q Nothing further.

THE COURT: Any redirect?

MR. FITZPATRICK: Briefly, your Honor.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Sergeant Brennan, Mr. Calle asked you whether or not this conversation that you had with Mr. Rivas was videotaped. What was the Syracuse Police Department's policy regarding videotaping in March of '87?

MR. CALLE: Objection.

THE COURT: Overruled. It was brought up on cross.

A Our policy, at that time, was we do not videotape witnesses, and it was just for videotaping suspects making confessions.

BY MR. FITZPATRICK:

Q Well, would it be fair to say that in many homicide cases, hundreds of people are interviewed?

A That's correct.

Q And back in '87, it would be the policy only to videotape those people who are making confessions or considered suspects?

A That's correct.

Q Now, you indicated to the jury that you informed the defendant at approximately 5:30, that Valerie Hill was dead. Do you have that in mind?

A Yes, sir, I do.

Q You also told us about his description of Thursday, Friday, Saturday, Sunday, and Monday, in the latter

part of March. Do you have that in mind?

A Yes, sir, I do.

Q Now, was that information regarding these activities of the previous three or four days, given to you prior to 5:30?

MR. CALLE: Objection; beyond the scope of the redirect.

THE COURT: No. I'll allow it.

A All that information was given prior to my advising him that she was dead.

BY MR. FITZPATRICK:

Q And did you, sometime that evening or early the following morning, memorialize what he told you in a police report?

A Yes, sir, I did.

Q All right. And you've reviewed that, obviously, before coming in here today?

A That's correct.

Q And Mr. Calle asked you if Mr. Rivas freely answered all of your questions, and you responded that, yes, he did. Do you have that in mind?

A Yes, I do.

Q And that would be, with the exception of your question as to why on Saturday and Sunday he had made no

effort to contact her?
A That's correct.
Q All right. Thank you, Sergeant.

RECROSS-EXAMINATION BY MR. CALLE:

Q Sergeant, just on redirect, given the testimony pertaining to policy of polygraph room videotaping, is that correct?
A That's correct.
Q Okay. And I believe your answer was, is that Mr. Rivas was not a suspect at that time, is that correct?
A That's correct.
Q Do you know what the police department's policy is regarding search warrants?
A When we have probable cause or when we confer with the D.A. and we obtain search warrants.
Q So, probable cause would, based upon your experience, would that mean that Mr. Rivas was a suspect pertaining to the search warrant?
A Not necessarily, no, sir.
Q Well, what was the probable cause pertaining to the search warrant, if Mr. Rivas was not a suspect?
A Again, I did not draw the search warrant. I don't know -- I do not know what the probable cause was.

Q Nothing more.

MR. FITZPATRICK: Nothing.

THE COURT: Thank you, Officer.

(Witness excused.)

THE COURT: Ladies and gentlemen, I'm going to ask you to step out about fifteen minutes, not to discuss the case, or form any opinions, or read anything about it. We're still in session, though.

(The jurors left the courtroom.)

THE COURT: Let me just make a record, and then the record should reflect the jurors have been excused.

At some point, either during Officer Brennan or, I guess, Laura Adams' testimony, Mr. Fitzpatrick objected to a question Mr. Calle asked, and I don't have that question in mind. Do you want to make a statement regarding that question, Mr. Fitzpatrick?

I -- before we get into that, I would ask the court reporter to find that question and read it back for my edification. So would you do that?

(The court reporter read back the requested

testimony from the record, Page 223, Lines 3 through 8.)

THE COURT: Okay. Mr. Fitzpatrick, you had an objection at that point? You mentioned something about bad faith?

MR. FITZPATRICK: Judge, there isn't a shred of evidence anywhere in this case, in any of the voluminous material that I've turned over to the defense, that Doug Adams told the police that he heard -- he called and got a busy signal Saturday morning at her house. And I object to that question as being in bad faith.

And, you know what, Judge? I'd just say, let's end it right now, because I'm going to deal with that in summations, Judge.

MR. CALLE: If I may be heard, I have --

THE COURT: I just want to know --

MR. FITZPATRICK: I felt the question was asked in bad faith, just like the question about -- of Anita Balducci, "Well, don't you know that Valerie Hill has all her of books kept in plastic?" We've got another completely fabricated question.

I'm not going to sit here for the rest of

the trial and listen, you know, to that type of stuff. And I made my objection; you made your ruling.

THE COURT: All right.

MR. CALLE: Judge, with all due respect, I would like to respond to that. Number one, Mr. Fitzpatrick, with all due respect to you, I did not say that question to Ms. Balducci that way. I said, "Do you know if Valerie Hill kept her books in plastic or not?" So that was not in bad faith.

Secondly, my question regarding to Ms. Adams wasn't in bad faith either, because the defense is going to subpoena Mr. Adams. I have a police report which indicates that Mr. Adams stated to Thomas Stassi that, in fact, his wife did attempt to call Valerie at 8 a.m. Saturday morning, to try to confirm that Valerie was still coming; and that when his wife called at 8 a.m., she received a busy signal. And this is from a report that I received from the district attorney's office, so I, in no way, did I ask that in bad faith. I was trying to see if I can impeach her credibility somewhat. Okay?

THE COURT: Look it, I don't think it's a big deal, at that point, then I will end it, at that point. We'll take a fifteen-minute recess.

MR. CALLE: Thank you.

THE COURT: Fifteen minutes.

(Proceedings stand in recess.)

(Court and counsel are present. Proceedings resumed at this time.)

(Photograph was marked for identification as People's Exhibit Number 17, this date.)

THE COURT: Okay. Captain, if you would.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Okay. All right. We're back in session. The record should reflect the jury is present, counsel, the defendant.

Mr. Fitzpatrick, your next witness.

MR. FITZPATRICK: Yes, your Honor. David Phinney.

COURT ATTENDANT: Yes. David Phinney. David A. Phinney.

* * *

D A V I D A. P H I N N E Y , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

THE COURT: Good morning, Officer.

THE WITNESS: Good morning.

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Sir, good afternoon. Tell us and the jury, please, your full name.

A David A. Phinney.

Q What do you do for a living, Mr. Phinney?

A Syracuse police officer.

Q How long have you been with the Syracuse Police Department?

A Since August 1st of 1977.

Q What is your current assignment with them?

A I'm currently assigned to the Special Investigations Division as a narcotics investigator.

Q How long have you been doing that?

A Since 1989.

Q And how were you employed back in March of '87?

A At that time I was assigned to the Criminal Investigations Division.

Q What were your duties back then?

A I was assigned to the burglary squad.

Q And on March 30th, 1987, did you have occasion to respond to 248 Hickok Avenue?

A Yes, sir, I did.

Q About what time, Investigator?

A Approximately 1 p.m.

Q And what was your assignment at 248 Hickok?

A I responded to an ambulance call that went out there for a possible D.O.A.

Q Could you tell us what observations you made at the scene?

A Upon my arrival there, I met a gentleman in the driveway, and he told me that he had come home and that he had found his daughter inside. I entered the house and I observed the body of a white female, in the front room, deceased.

Q Did you collect any evidence at the scene?

A No, sir, I did not.

Q Did you make any effort to investigate as to whether or not there appeared to be forced entry at 248 Hickok?

A Yes, sir, I did.

Q And what observations, if any, did you make?

A I did a check in the apartment, the windows and doors, and I observed no indications of forced entry.

Q Now, you say you were on a burglary squad back in '87?

A Yes, sir.

Q How long did you serve on the burglary squad?

A Approximately a year.

Q Give the jury an idea of how many burglaries you've investigated in your career.

A Well, over six hundred.

Q And did you make efforts to determine whether or not a home has been broken into by force?

A Yes, sir.

Q And you didn't see any indication of that in this particular case?

A No, sir, I did not.

Q Did you see any inside of 248 Hickok Ave., did you see any money or any valuables in plain view?

A In the -- in one of the bedrooms there were coins and currency laying in the open. And also in the kitchen area there was a purse and wallet open to view.

Q Did you make any observations regarding that purse?

A The purse appeared intact.

Q Now, how long did you stay at the scene, 248 Hickok, Investigator?

A Approximately forty-five minutes.

Q And I take it you received some other assignment late that afternoon?

A Yes, sir, I did.

Q All right. Now, I want to take you to a more specific assignment that you were involved in that night, the night of March 30th, '87. I'm referring to the execution of a search warrant on the defendant's residence.

Now, did you participate in that?

A Yes, sir, I did.

Q Did you participate in applying for the search warrant?

A Yes, sir, I did.

Q And can you tell the ladies and gentlemen on the jury when, on the evening of March 27th (sic), 1987, you physically had a search warrant in hand?

A It was approximately 9:30 or 10 p.m.

Q And that was a warrant signed by a county court judge?

A Yes, sir, it was.

Q And could you tell us what you were directed to search and what you were looking for?

A We were directed to search a residence on Nelson Heights Road, the residence of Hector Rivas. Specifically, we were looking for keys, articles of clothing that were stained with blood or fecal material, or correspondence, or implements of the crime.

Q All right. Sir, now did any of your brother or sister officers accompany you to Nelson Heights Road?

A Yes, Lieutenant Lynch, Investigator Tim Phinney, and Investigator Tom Stassi.

Q All right. Did you -- could you describe the residence for us, as you -- strike that.

What time did you get there to Nelson Heights Road?

A Approximately 10 p.m.

Q Observe any vehicles?

A There was a red step van with, I believe, ladder racks on the roof, and a green Toronado.

Q Now, did you enter the residence, sir?

A Yes, sir.

Q And how did you get inside the residence?

A Uh -- my -- I'm sorry. Investigator Tim Phinney had a key for the house.

Q And do you know where he got the key?

A I believe from Hector Rivas.

Q All right. Were you aware that Mr. Rivas was still at the Public Safety Building as of 10:00 at night?
A Yes, sir, I was.
Q Did you have any contact with him?
A None.
Q Did you have any contact with, then, Investigator John Brennan?
A Not up to that point.
Q Prior to executing the search warrant?
A Yes.
Q Okay. So you did not have any contact with Brennan prior to executing the search warrant?
A That's correct.
Q All right. Sir, now would you tell us what observations you made that were of some significance to you inside of Mr. Rivas' residence?
A Well, I was directed to, uh -- search the bedroom area, and also the basement area of the house. While I was doing a search inside the bedroom, when I opened up the closet, I observed on a closet shelf a rather large statue of the Virgin Mary. Also on the shelf were two candles that were burning. There was a plate with some change in it and a photograph -- half of a photograph that was leaning up against the base of the Virgin Mary.

Q Now, what made you conclude that it was half a photograph?

A The edge was -- it wasn't the normal size of a snapshot. It was approximately a little over a half-inch, and the edge was ragged.

Q And was there anything portrayed in the photograph?

A It was a picture of Valerie Hill.

Q And how did you recognize the woman in the photograph as being Valerie Hill?

A I had seen photographs earlier that day of the victim, and I recognized the same person in the photograph.

Q Would you describe the candles for us, please?

A The candles were of a large-type, approximately 12 inches tall, very heavy glass, like a religious candle. And it was filled with wax, approximately three-quarters of it.

Q And are you certain, as you sit here today, that those candles were burning?

A Absolutely.

Q Now, were any photographs taken of this, whatever it was?

A No, sir.

Q And why is that?

A We had two cameras when we responded to Nelson Heights Road. We had a 35-millimeter and a Polaroid. The 35-millimeter camera, upon trying to use it, malfunctioned, for some reason it didn't work. The Polaroid camera, we had only a certain amount of shots in it, I believe four or five. Those photographs were taken of evidence that was recovered.

Q All right. Was there anything in the search warrant that allows you to seize any religious articles, as far as you knew?

A None.

Q Okay. And did you make any observations of clothing in the house, at any other location inside the house?

A In the basement of the house I discovered a gray Members Only jacket. It was draped over a clothesline. hanging. By there, was two or three washing machines, and I think two of them were broken. They were all taken apart. Anyway, this jacket was hung over a clothesline.

Q And what was the condition of the jacket?

A The jacket was wrinkled. It was damp to the touch. I went through the pockets of the jacket and also examined the jacket.

Q All right. I want to show you a photograph of

People's Exhibit 17, and direct your attention to the gentleman on the far right in the photograph, and ask if you have seen the jacket that that gentleman is wearing before?

A This is the same style and type, make of jacket that was hanging in the cellar.

Q All right. And whether or not it was the same make and type of jacket, I take it, would be impossible to say?

A Absolutely.

Q Now, did you make any observations inside the defendant's home, on Monday night, March 30th, 1987, of cigarettes?

A Yes, sir.

Q What did you observe in that regard?

A Part of my duties of that search warrant were to search a number of bags of garbage which were located inside the home and outside the home. During my search of those bags, I found numerous packs of Barclay cigarettes that had been smoked and crinkled up, as well as a large number of Barclay butts.

Q Could it have been any other brand, other than Barclay?

A None.

Q All right. Thank you very much, Investigator. If you'll sit right there, the defense will have some questions for you.

CROSS-EXAMINATION BY MR. CALLE:

Q Good afternoon, Investigator Phinney.

A Good afternoon.

Q Sir, were you the police officer that was involved with the obtaining of a search warrant?

A Uh -- Investigator Tim Phinney is the one who actually applied for the warrant.

Q Did you work with Tim Phinney leading up to the application of the search warrant?

A Yes, sir.

Q Could you tell this Court what basis was offered for the obtaining of the search warrant --

MR. FITZPATRICK: Judge --

Q -- if you know?

MR. FITZPATRICK: -- if the defense really wants to ask that question -- I mean -- I don't know.

THE COURT: What is that? Is that an objection or --

MR. FITZPATRICK: I don't know what it is.

THE COURT: I don't know what it is, either.

MR. FITZPATRICK: I really think -- well, I just want maybe the Court to inquire of counsel -- if I really want to hear the answer to that question, I don't know.

THE COURT: I -- that's not my function.

MR. FITZPATRICK: I'll sit down, your Honor.

THE COURT: Thanks.

BY MR. CALLE:

Q If you know, sir.

A Are you asking me what was the basis that we applied for the search warrant on?

Q Yes, sir, if you know.

A Well, I know some of the things, or I couldn't have gotten the application. But we used as the basis the fact that Hector Rivas had been following the victim around; had been in her house without her knowledge -- she was quite angry about that; and that he probably or possibly had a key to her house.

Q So are you telling this Court that you applied to the Court for a search warrant based upon that information?

A I'm saying that was part of the information, sir. As far as exact details of that application, I wouldn't be able to testify, without looking at it.

Q So you don't recall, is that your answer?

A I recall some of the things. I don't recall them all.

Q Were affidavits signed?

A Yes.

Q And could you tell this Court who signed the affidavits?

A I believe Investigator Jim Driscoll made an affidavit. I believe I made an affidavit. Investigator Tim Phinney would have to do an affidavit. I don't know if there's any more.

Q And, sir, you said that you made an affidavit. Do you recall what that affidavit was, in part or substance?

MR. FITZPATRICK: Judge, could I approach the bench for a second, before that answer?

THE COURT: Sure.

(Counsel approached the bench. An on-the-record discussion ensued, outside the presence of the jury.)

THE COURT: First of all, I want the record -- the record will speak for itself as to the line of questioning that's being conducted by counsel on cross-examination. The district attorney and counsel are at the bench here, and

there's been some concern voiced by the district attorney as to this line of questioning opening up the opportunity on redirect to explore all aspects of the supporting affidavits surrounding the search warrant application.

There are some matters contained in those affidavits that are clearly hearsay; that I'm informed by the D.A. constitute prior bad acts by the defendant, and a host of other items that would normally not be grounds for examination of this witness at this time.

However, if the door is being opened here, Mr. Fitzpatrick, if he chooses, is going to be allowed to redirect on this issue.

Now, Mr. Calle, it's unusual for the Court to strike that. It's more unusual for the district attorney to voice their concern about an advantage that may be gained through cross-examination. I just -- do you understand, sir, two things: one, you are not going to be able to litigate the validity of that search warrant before this jury, that has been determined by the Court already; second of all, Mr. Calle, you are, sir -- or, you have, and you continue, to open

the door on redirect as to other issues that may prove to be very damaging for your client, and would normally be outside the scope of any examination by the prosecutor.

And I -- and I'm not telling you how to try your case, sir. I'm just saying you ought to proceed with caution.

MR. CALLE: It's defense's position that, one, the question was objected to by the district attorney; and secondly, that the fact that I've asked the question pertaining to an affidavit does not open the gate, in defense's position, to allow any hearsay evidence. Hearsay evidence is always objectionable.

And if there's legitimate affidavits, the basis -- the basis for the affidavit, that is nonhearsay and admissible evidence. If it's nonadmissible, I don't feel the door has been opened for the district attorney to achieve what is not allowed.

THE COURT: Okay. Thank you. You can --

MR. CALLE: Thank you.

THE COURT: All right.

MR. CALLE: I would withdraw the question.

BY MR. CALLE:

Q Continuing, Investigator Phinney, you mention that when you arrived at Mr. Rivas' house, you had keys to the structure, correct?

A That's correct.

Q And these keys were obtained by Tim Phinney?

A That's correct.

Q Were you in the presence of Tim Phinney when he obtained these keys?

A No, I was not.

Q Now, directing your attention to the interior of Miss Hill's apartment, was it your testimony that you had an opportunity to make observations pertaining to the scene?

A That's correct.

Q And based upon those observations, was it your testimony here today that you saw coins and currency inside the apartment?

A That's correct.

Q Did you vouchsafe for the currency?

A Excuse me?

Q Did you take the currency into your custody?

A No, I did not.

Q Did you have an opportunity to notice the amount

of the currency added up to?

A No, I did not.

Q Did you touch the currency at all?

A No.

Q You don't know how much money was there?

A That's correct.

Q Could it have been $2 there?

A I have no idea how much was there.

Q Now, you said that inside the kitchen, if I'm not mistaken, you observed in plain view a purse and a wallet?

A That's correct.

Q And was it your testimony that they were open?

A The purse was hanging on a chair. The wallet was laying unfolded.

Q When you say, "the wallet was unfolded," you mean it was open?

A I mean it was unfolded. It's a clutch-type wallet, which would fold once over, similar to a checkbook, and it was open.

Q Was there a snap on it, if you recall?

A I don't recall.

Q Did you look inside the wallet?

A No, I did not.

Q Do you know who vouchsafed the property, if anyone?

A I'm sorry, who what the property, sir?

Q Who took the property into custody?

A I don't know.

Q One moment, please.

(Proceedings paused.)

BY MR. CALLE:

Q Sir, at all did you search the, the Tempo that was owned by the victim?

A No, sir.

Q How about the garage area, did you have an opportunity to make your observations there?

A No, sir.

Q Did you notice if there was any street clothing that wasn't put away of the victim?

A I don't recall seeing any clothing out somewhere conspicuous. There probably was clothing there, but I didn't see it.

Q Well, I ask you not to guess, sir.

A All right.

Q Now, basically, sir, based upon the execution of the search warrant, you were directed to go to Cazenovia to conduct a search of Hector Rivas' home and/or vehicles?

A Yes, sir.

Q And do you know if the search warrant designated what property you were searching for?

A It had the address on the search warrant, itself.

Q Specifically directing your attention to the property that the search warrant allowed or empowered you to search for, do you recall if the search warrant designated what property you were searching for?

A Yes, sir.

Q And what was that, sir, if you recall?

A Well, without seeing the search warrant, itself, I find that question difficult to answer.

Q Well, did you not, on direct examination by Mr. Fitzpatrick, answer, "keys, clothing, blood, or fecal stains"?

A Yes, sir.

Q "Correspondence and implements of the crime"?

A Yes, sir.

MR. CALLE: May I have this marked as a defense exhibit?

THE COURT: Defense Exhibit A.

MR. CALLE: A, sir.

(Search Warrant Application was marked for identification as Defendant's Exhibit A, this

date.)

(Defendant's Exhibit A was shown to Mr. Fitzpatrick.)

BY MR. CALLE:

Q Officer Phinney, I'll ask you to take a look at this and tell the Court what this is.

A This is a photocopy of the search warrant.

Q And, Investigator Phinney, could you tell me if there's property designated on the face of that search warrant?

A Yes, sir, there is.

Q And would you tell this Court what property is designated there?

MR. FITZPATRICK: Judge, I would object. The admissibility of items seized, as a result of this search, is a legal question for the Court and is not within the province of the jury, at this point. So I see this as irrelevant.

MR. CALLE: Judge, I'm only submitting it for the limited purpose of rebutting this particular gentleman's recollection, and as an attempt to impeach his veracity.

THE COURT: Okay. I'll allow it.

MR. CALLE: Strictly on those grounds only,

sir.

THE COURT: Okay.

BY MR. CALLE:

Q Would you tell the Court what was designated on that search warrant?

A Okay. House keys for 248 Hickok Ave., Syracuse, New York; a gray sweater and gray pants of Hector Rivas; and other blood stained, semen stained, or contaminated clothing, as specified in Paragraph 2 above. Paragraph 2 above says, "gray sweater, gray pants of Hector Rivas, any clothing, and any other possible implements -- fecal material -- stained by blood" -- I'm sorry, the fecal material goes with the blood and semen -- "or contaminated other body fluids and hairs which may be identified within '86 Chevy van -- or 1986 Chevy van with New York plate," and then it gives the plate number.

Q Okay. Thank you very much. So, directing your attention to the jacket that you observed in the basement of Mr. Rivas' home, you did not seize that jacket, did you?

A No, I did not.

Q So, therefore, would it be fair to say that you did not believe that this jacket was designated property that the search warrant allowed you to seize?

A Yes, sir.

Q Did you ever find airline tickets or any documentation pertaining to a Bahamas trip at Mr. Rivas' home?
A No, sir.
Q Did you ever find any keys that would have opened the lock to Valerie Hill's home in Hector Rivas' home?
A No, sir.
Q Now, directing your attention to the bedroom where there was this statue of the Virgin Mary, sir, did you take the photograph of Valerie Hill into your possession, this torn photo?
A No, sir, I did not.
Q Now, you did mention that you had two cameras there that day?
A Yes, sir, we did.
Q And one camera did not work, is that correct?
A That's correct.
Q Did you ever find out what was wrong with it?
A No, sir.
Q Did you ever turn it in to be repaired?
A No, sir.
Q And the second camera was the Polaroid?
A That's correct.

Q And what happened with the Polaroid? You say you finished the film in that roll in that, and couldn't take any more photos?

A That's correct.

Q Did you find significance in this two candles being lit inside a closet?

A I found it odd.

Q And yet you find this statue of the Virgin Mary inside a closet with two candles -- was it burning?

A That's correct.

Q And yet you didn't see the need to perhaps go out to the corner store and buy a roll of film, is that correct?

A As I say, sir, I found it odd. As far as going to buy film elsewhere, I, I saw no reason to do that.

Q Yet your testimony here today was that you knew that that photograph was of the victim you were investigating?

A That's correct.

Q But yet you didn't feel it was important enough to take a photograph, is that correct also?

A That's correct.

Q Directing your attention, sir, to the jacket, did you know if the jacket --

MR. CALLE: Well, I'll withdraw that, your

Honor.

BY MR. CALLE:

Q The jacket was in the basement of this home?

A That's correct.

Q You know if the basement was heated, based upon your recollection of how your body felt going downstairs. Was it colder down there than in the proper area?

A Yes, it was damp.

Q Sir, would you know if something is wet, does it take a longer time to dry in a damp area than it does in a heated area?

A Yes, it does.

Q Did you ever test that jacket to see if there was blood or fecal matter on it?

A No. I looked at the jacket. I did a visual observation of it.

Q Was there blood or fecal matter on it?

A Not that I observed.

Q Based upon your police experience, would your lab have been able to determine if there was blood or fecal matter on that jacket?

A I have no idea.

Q What color was that jacket?

A Gray.

Q And on the search warrant, you were looking for a gray sweater. Did you make a connection as to gray jacket, gray sweater, at the time?

A No, sir.

Q Did you find it odd that that jacket was down in the basement damp?

A Yes, I did.

Q What was the basis for the unusual connotation you gave it?

A I'm sorry?

Q I'm sorry. What was the reason you found it odd that there was a damp jacket in the basement?

A Well, the jacket was in fairly good condition, fairly new, yet it had been washed and haphazardly thrown over a clothesline in a wet cellar.

Q In a wet cellar?

A A damp cellar.

Q Did you see clothespins anywhere around?

A No.

Q Well, when you say "haphazardly," I mean, what was -- was most of it on the floor? I mean, what do you mean by haphazardly?

A Well, it was hung over the clothesline with both sleeves dangling straight down and the clothesline running

up the middle of the back.

Q Well, sir, do you do much laundry?

A No.

THE COURT: I'm going to take an hour recess for lunch. I'm going to ask you and direct you, of course, not to form any opinions, or discuss the case amongst yourselves, or with anyone else. Do not attempt to go and visit the scene of the crime that is mentioned, do not go to the library, or any source and attempt to research any materials or any issues that have come up during the course of this trial.

2:00, please. You're excused.

(A luncheon recess was taken.)

* * *

(March 18, 1993 - Afternoon Session)

(Court and counsel are present. Proceedings resumed at this time.)

THE COURT: Would you put us in session outside the presence of the jury. Counsel and the defendant are present.

Mr. Calle, you had wanted to put something on the record prior to bringing in the jury, and, of course, sir, I'll give you that opportunity now.

MR. CALLE: Thank you, sir. Regarding the issue that was discussed at the sidebar, I believe the question that was asked of Investigator Phinney, David, was what was the basis for the search warrant.

At that point, I was not looking for hearsay evidence. I was looking for the names of people who gave statements. Based upon that, it's my belief that I withdrew the question and it is the defense's belief that the door was not opened on that question. He did not give hearsay evidence in response to his answer, and I would object to the district attorney's attempt to delve into that on redirect, to bring out

hearsay evidence.

MR. FITZPATRICK: I'm not going to go into it on redirect, Judge.

MR. CALLE: Thank you very much.

MR. FITZPATRICK: I'm not responding to the correctness of his legal argument. I have chosen not -- I'm not going to go into it on redirect.

THE COURT: Okay. Officer Phinney -- if you'll bring him back.

We're back on the record. And if you'll get the rest of the jury.

Do you need any of your prior questions?

MR. CALLE: No, sir. You have an excellent stenographer. That was the first thing she said to me when I came into the courtroom, and I appreciate it very much.

(Proceedings paused.)

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Okay. We're back in session. The jury is present, Officer Phinney is still on the witness stand, under oath, and Mr. Calle is

conducting his cross-examination.

MR. CALLE: Thank you, sir.

BY MR. CALLE:

Q Good afternoon, sir.

A Good afternoon.

Q If you would, would you describe, to the best of your recollection, the basement area in the Rivas home on the date that you entered, that being March 30th, 1987.

A Well, the house -- the basement was made out of cement blocks; cement floor. It had a furnace and hot water tank. There was a large amount of -- there is a large amount of things stored in the cellar: trunks, boxes, articles of furniture. It was quite cluttered.

Q Did you ever find any correspondence -- I'll withdraw that question.

Sir, was there a washer and dryer down there?

A Yes, sir.

Q Sir, did you check the contents of the washer or the dryer or both, to see if there was clothing inside that had been recently washed?

A I -- no, I don't specifically recall a dryer being there. I know there was at least two washers, because one appeared to be in not working order. And, yes, I did check the contents.

Q And did it have clothing in it?

A No.

Q It's your testimony here that the only damp clothing down in the basement was this jacket?

A To -- it's my testimony the only thing hanging on the clothesline was the jacket. There was other clothing in the cellar.

Q Where would that be located?

A There was garbage bags that had clothing in it. There was some Carhart-type coveralls -- I'm not sure if they were Carhart. They were duck cloth coveralls, some work clothes.

Q Any clothing by the washer or dryer stacked anywhere near there?

A No, sir, not that I recall.

Q Do you recall any dirty laundry anywhere in the house?

A No, sir.

Q I'm going to be all over the place for the next five questions, Investigator Phinney, and I'll move on, but bear with me, please.

Directing your attention upstairs -- let's keep it down in the basement. How many rooms were in the basement, if you recall?

A I believe it was one large room.

Q You don't recall the room being set up with a divider?

A No, sir.

Q Directing your attention to the closet in the bedroom upstairs where I believe candles were there, was there clothing in the closet?

A Yes, there was.

Q Did you notice if it was any warmer inside the closet, based upon the burning of candles?

A Warmer than what, sir, the outside air in the room?

Q Yes.

A No.

Q Was it your observation that this is quite possibly a fire hazard, candles burning in a closet with clothing?

A Absolutely.

Q Correct me if I'm wrong, sir, was it your testimony that you took a number of Polaroid pictures at Mr. Rivas' home on that date in question?

A I did not take the photographs. There were photographs taken.

Q Okay. Who took these photographs?

A I don't know, whoever is recovering that particular piece of evidence. I don't know.

Q Well, do you know who had the camera on the day in question?

A No.

Q Did you attempt to take a picture of the shrine in the closet with the lit candles and the clothing?

A No, sir.

Q So you never went and asked for a camera to take a photograph of this closet, did you?

A I asked if there was any film left, and was told no.

Q Who did you ask and who told you?

A I believe Investigator Stassi.

Q He is the one who had the Polaroid camera?

A No one specifically had the Polaroid. The Polaroid --

Q Where was the Polaroid?

A -- was there at our disposal.

Q Where was the Polaroid?

A I have no idea.

Q So you didn't look for it once you saw this odd shrine, did you?

A No, sir.

Q Yet you asked if there was any film in the camera?
A Yes.
Q Did you specifically say which camera you were looking for film for?
A No, because I knew that the 35 was broken.
Q When did you know the 35-millimeter camera was broken?
A Uh -- very shortly after we arrived.
Q And how did you come to learn it was broken?
A Well, when we started a search warrant, normal course of events would be to photograph the entire interior of the home. As we attempted to do that, we discovered that the camera was not operable.
Q Who attempted to do that?
A Investigator -- my brother, Investigator Tim Phinney.
Q He would be the one that had the 35-millimeter camera?
A Again, sir, I don't know who had the camera. He tried to use the camera, and the camera didn't operate. After that, I don't know where it was placed, or who particularly had it in their custody, or had it with them.
Q Well, was there anything else that you saw to

photograph in Mr. Rivas' home on that date in question?

A I don't understand. Anything else that I would have liked to have photographed?

Q Anything else that you attempted to photograph?

A No.

Q Getting back to Valerie Hill's home at 248 Hickok, earlier that day, sir, what did you observe when you first arrived?

A The body of a white female.

Q Okay. Is that the first person you saw there that day?

A No.

Q Who was the first person you saw?

A The victim's father.

Q So the victim's father, Mr. Hill, would be the first person you saw, the first observation you made when you went there that day?

A Yes, sir.

Q And where was he located, outside?

A No. He was coming out the side door of the house.

Q That's the rear side door?

A No, it's the side door.

Q Is that in the middle of the house?

A Yes.

Q Is there a rear side door, also?

A A rear side door?

Q Yes, sir.

A I don't know what a rear side door would be.

THE COURT: A side door.

Q Rear of the house on the side.

A The rear door, the apartment --

Q Not the apartment, sir, the house structure, itself.

A Is there a back door on that house, is that your question? I don't know what a rear side door is, sir.

Q If you'd like to phrase it that way, I have no problem, if it would facilitate your answer.

A I don't know if there's a back door on the house. There is a side door that is located on the side of the house about halfway between the front and the back.

Q And is that where you entered on March 30th, 1987?

A Yes, it is.

Q And is it your testimony that other than -- how many doors that you -- how many doors do you recall being in that structure on the outside? Would it be fair to say you recall two: a front and the side?

A I don't recall a front door on the house, so I'm not certain. I know for sure there's one door on the side of the house.

Q Well, I'll show you prosecution's Exhibit 13.

MR. CALLE: If I may, your Honor?

THE COURT: Yes, sure.

A Yeah.

BY MR. CALLE:

Q Would that be how the structure looked at 248-250 Hickok?

A It appears to be, yes, sir.

Q Investigator Phinney, does that refresh your recollection as to whether there's a front door?

A Yes, sir.

Q Okay. Thank you, sir. Well, would you indicate to me where the side door is that you're speaking of, sir?

A The side door is on this side (Indicating) that runs off the driveway. It goes in the side of the house.

Q Thank you very much.

A You're welcome.

Q So it's your testimony you never went through the front door that day?

A That's correct.

Q Did you ever check the front door?

A Yes, sir.

Q Investigator Phinney, how could you check the front door and not go through it?

A Well, I was -- I thought the front doors that I checked were the ones that led -- once you come into the apartment, that front door, I don't believe, leads to that apartment.

Q Do you know where that front door leads to?

A No, sir, I don't.

Q Did you check that front door that you just indicated in the photograph?

A No.

Q Exhibit 13?

A No.

Q You don't know if there was evidence of a break-in there, do you?

A No, sir.

Q Now, once you entered the side door adjacent to the driveway, where would that take one, that side door, if you know?

A You'd go up a small -- a series of steps that would lead into a small hallway.

Q And is that a common hallway for the tenants down and up of 248-250 Hickok, if you know?

A I'm not sure. I know it leads to the back door of this apartment.

Q There are two doors to Valeriė Hill's apartment?

A There's the outside door and then the inner door.

Q What I'm trying to determine, sir, is the apartment proper, Miss Hill's apartment --

A Mm-hmm.

Q -- do you know how many doors led into her apartment that she rented?

A I believe one.

Q And is it your testimony that you checked the side door for evidence of break-in?

A Yes, the rear door of her apartment.

Q Well, you just got through telling the Court there is no rear door.

A There's a rear door on her apartment. There is a side door on the house.

Q So her apartment has one doorway and that is located in the rear of her apartment?

A Yes, sir.

Q Thank you.

A You're welcome.

Q And you checked the rear door of her apartment

of only her apartment, for evidence of break-in, is that correct?

A That's correct.

Q What do you look for when you look for evidence of break-in?

A Well, pry marks, lock tampering, almost anything that would indicate forced use.

Q Do you have a locksmith license, by the way?

A No.

Q Did you call in a professional locksmith to indicate if that lock had been jimmied or not?

A No.

Q So you have no schooling in determining whether locks have been jimmied, do you?

A No, no formal training.

Q What you just said, it was based upon your observation, you concluded that, in fact, that this lock wasn't jimmied?

A Yes, sir.

Q Did you check the side door of the structure adjacent to the driveway for evidence of break-in?

A No, sir.

Q You don't know if that lock was functional or not that day, do you?

A No, I don't.

Q Pertaining to other areas where you checked for either your observation to determine if, in fact, there was evidence of a break-in, did you check all the windows?

A Yes, sir.

Q How many windows in that apartment, do you recall?

A I have no idea.

Q Is it your testimony here today those windows were locked from the inside? I haven't heard that yet.

A They were secure.

Q What does that mean, sir?

A That means they were closed.

Q But you can't testify today whether they were locked from inside, can you?

A No, sir.

Q Thank you, sir. Just -- now we're traveling back to Mr. Rivas' house. I've just got two questions for you, sir, if you would.

Number one, perhaps I don't recall asking this question, so I'm not trying to be in bad faith, sir, did you take into your possession the torn photo of Valerie Hill, or the photo that, at least, appeared to be torn to you?

A No, sir.

Q What did you do with it?

A I returned it to the shelf.

Q And is there a reason why you returned it to the shelf and not take it into possession?

A Because I didn't feel I had a right to.

Q And could you tell this Court, what was the basis for you feeling you did not have a right to take that photograph?

A Because there -- it wasn't authorized in the search warrant.

Q By the way, was correspondence authorized on the search warrant?

A I don't recall if it was or not.

THE WITNESS: Do you have that application?

MR. FITZPATRICK: I'll stipulate that it wasn't, Judge.

THE COURT: Okay.

MR. CALLE: Thank you, sir.

BY MR. CALLE:

Q By the way, did you ever find any overdue library books in either Mr. Rivas' home, or Miss Hill's apartment?

A No, sir.

Q Thank you, sir. Good day.

THE COURT: Any redirect, Mr. Fitzpatrick?

MR. FITZPATRICK: No. Thank you, Investigator.

THE COURT: Thanks.

(Witness excused.)

MR. FITZPATRICK: Tom Stassi.

* * *

T H O M A S J O H N S T A S S I , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good afternoon, sir. Would you tell us and the jury, please, your full name.

A Thomas John Stassi.

Q Mr. Stassi, what do you do for a living?

A I'm currently employed by the Onondaga County District Attorney's Office as an investigator.

Q How long have you been so employed?

A Since January of 1991, sir.

Q And what did you do prior to that?

A Prior to that, sir, I was a member of the Syracuse Police Department, sir.

Q How long were you with the Syracuse Police Department?

A Twenty years.

Q And when you retired, what rank were you at?

A I, I was assigned to, at that time, the -- detective assigned to the Criminal Investigations Division.

Q How were you employed back in March of 1987?

A At that time, sir, I was an investigator in the Criminal Investigations Division.

Q Did you become involved, Investigator Stassi, in investigating the death of Valerie Hill?

A Yes, I did, sir.

Q And specifically on the evening of March 30th, 1987, were you called upon to assist in the execution of a search warrant at the defendant's house?

A Yes, I was, sir.

Q Could you tell us if you participated in drafting that search warrant application?

A I did not, sir.

Q About what time were you assigned to assist in the execution of the search warrant?

A It was approximately 2205 hours, or 10:05 p.m., sir.

Q Who, if anyone, contacted you?

A It was Sergeant Lynch, Investigator Dave Phinney, Investigator Tim Phinney, and myself, sir.

Q And where did you proceed?

A Uh -- we proceeded to Nelson Heights Road out in Cazenovia. And I was advised at that time, that we had a search warrant for the residence of Hector Rivas.

MR. FITZPATRICK: I'd like to have four photographs marked, your Honor, People's Exhibits 18, 19, 20, and 21.

(Photographs were marked for identification as People's Exhibit Numbers 18, 19, 20, and 21, this date.)

(People's Exhibit Numbers 18, 19, 20, and 21 were shown to Mr. Calle.)

MR. CALLE: Thank you. No objection.

BY MR. FITZPATRICK:

Q Investigator, this search was conducted, obviously, at night?

A Yes, sir.

Q I want to show you some photographs that appear to be taken during the day, and regardless of -- I ask if you recognize them -- Exhibit 18, can you tell us what that is?

A That is the residence of Hector Rivas, sir, or was the residence of Hector Rivas back on March 30th, 1987.

Q Okay. And Exhibit 19, what is that?

A Again, that's the two vehicles that were in the driveway at Nelson Heights Road, out in Cazenovia. I believe the car -- the van I can't recall -- the car belonged at that time to a Hector Rivas.

Q Okay. And 20 and 21, different views of the same car and same van?

A Yes.

Q Okay.

MR. FITZPATRICK: Judge, if there's no objection, I'd offer those.

MR. CALLE: None.

THE COURT: Okay. 18, 19, 20, and 21 are received.

(People's Exhibit Numbers 18, 19, 20, and 21

were then received into evidence.)

BY MR. FITZPATRICK:

Q Now, when you entered the house, sir, do you know how you get in? Do you remember how you get in?

A I really don't recall, sir.

Q You remember if you broke the door down?

A I don't recall doing that, no, sir.

Q All right. When you searched the house, could you tell us what, if anything, of significance, you observed during the course of the search?

A During the course of my search, I searched the kitchen area of that residence. And while going through the garbage, I came upon some -- a crumpled piece of newspaper. And when I opened that newspaper up, I observed what appeared to be a torn -- a torn letter.

Q Did you make any observation as to what was written on the letter?

A Um -- part of that letter, or part of the letter that I -- that I saw, or part of the stationery that I had seen that was torn had the salutation of, "Hi, Bob."

Q Now, did the name Bob have any significance to you in connection with this case?

A Well, yes, sir. We had developed information or had received information that one of Valerie's former boy

friends was a -- was a Bob Lucas.

Q And what, if anything, did you do with this, what you described as a letter?

A I secured that note, sir. I seized it and secured it.

Q And do you remember how many pieces there were?

A I believe sixteen, sir.

Q And did you seize the newspaper that the pieces were in?

A No, I didn't, sir.

Q Do you have a current recollection as to the date of that newspaper, if it was dated?

A No, I don't, sir.

Q Now, the search warrant that you had, did it specifically authorize you to seize correspondence, if you recall?

A To the best of my recollection, no, sir.

Q Are you allowed, as a police officer, to seize certain items that come into your view during the course of a search warrant?

A Yes, sir.

Q If you believe that they are somehow connected as evidence to the case?

A Yes, sir.

Q And that's what you did in this case?

A Yes, sir.

Q And did you attempt to piece the fragments of the letter together?

A Absolutely.

MR. FITZPATRICK: I want to have this marked, your Honor, as People's Exhibit --

MR. CALLE: What is it?

MR. FITZPATRICK: -- 22, and also a Polaroid photograph which would be 23.

(Letter and Photograph were marked for identification as People's Exhibit Numbers 22 and 23, this date.)

BY MR. FITZPATRICK:

Q Investigator Stassi, I'm handing you, Investigator, 22. Can you identify that, please, for the jury?

A Yes. This is the -- it's a plastic bag that I sealed on March 31st, 1987, at 2:00 in the morning. And the bag contains a police report and the, the torn correspondence that I found in the garbage bag at the residence of Hector Rivas.

Q And can you identify Exhibit 5, two photographs?

A Yes, sir. Exhibit Number 5 is the photograph of the correspondence that was pieced together -- that I pieced

together, and it's the front, and the second picture is the back of that correspondence that I recovered, the stationery that I recovered at the residence of Hector Rivas.

Q Now, when you reconstructed it, was this one piece of paper written on both sides?

A Yes, sir.

Q And I'd like to show you the Polaroid, People's Exhibit 23. Can you identify that, please?

A Yes, sir.

Q What is Exhibit 23?

A This is the garbage bag that contained the crumpled newspaper which contained the pieces of torn, torn correspondence that I recovered at the residence of Hector Rivas.

Q Could you describe the garbage bag where it was?

A The garbage bag was dark in color, was just hanging on the -- on a drawer, just hanging there, and it contained garbage. I decided, you know -- I searched it.

Q It wasn't any type of receptacle?

A No, sir.

Q Does it fairly and accurately show the way it appeared on the night of March 30th?

A Yes, sir.

MR. FITZPATRICK: I would offer 23, your

Honor.

THE COURT: People's 23, a Polaroid photograph, Mr. Calle.

MR. CALLE: No objection.

THE COURT: Okay. I'm going to receive People's 23.

(People's Exhibit Number 23 was then received into evidence.)

BY MR. FITZPATRICK:

Q Did you take the Polaroid photos, Investigator?

A No, sir.

Q Do you know who did?

A I believe Investigator Phinney did, sir.

Q Timothy or David?

A I'm not sure.

Q One of the Phinney brothers?

A One of the Phinney brothers, yes, sir.

Q I'm sure Mr. Calle will have some questions about the cameras and photographs. Did you make any observations of the defendant's closet in the defendant's home?

A During the course of the search, Investigator Phinney, David Phinney opened up a closet door and much to his surprise -- I mean it was, "Hey, look at this." The

closet contained a, a statue of the Blessed Virgin, the Madonna, along with some burning candles, what appeared to be a torn photograph of the victim.

Q How do you know it was a photograph of the victim?

A Well, again, earlier that day I was one of the first persons to respond to 248 Hickok Avenue when the initial call went out, and there were photographs that had been circulated to the investigators to do canvass work in the neighborhood.

Q All right. Continue your description of this, whatever it was in the closet.

A It was a, what appeared to be a torn picture or a snapshot of Valerie Hill. It was laying up against the Madonna. There were candles, lighted candles -- um, a small dish which contained some silver change.

Q Now, not to be facetious, but what -- do you belong to any religious faith?

MR. CALLE: Objection.

THE COURT: I'm sorry. What was --.

MR. FITZPATRICK: I asked him if he belonged to any religious faith.

THE COURT: This officer?

MR. FITZPATRICK: This officer.

THE COURT: Yes. I'm going to sustain the objection.

BY MR. FITZPATRICK:

Q Did that have any -- did that have any significance to you as you saw it that day, March 30th?

A No, sir.

Q Now, have you completed your description of this, this shrine, I think we've referred to it as?

A Yes.

Q And both candles were lit?

A There, there were lighted candles.

Q All right, sir. Now, I want to ask you, sir, if part of your duties in connection with this investigation were to ascertain whether or not an airline ticket made out to Valerie Hill for a trip in April of 1987 to the Bahamas had ever been used?

A Yes, sir.

Q And what, if anything, did you find in connection with that?

A I was -- I was -- I was assigned to go out, I believe it was to All Seasons Travel Agency, to talk to a ticket agent to determine the date that the ticket was, or the date that Valerie was supposed to go to the Bahamas.

The ticket number -- I ascertained the ticket

number, and to find out, first of all, if the ticket had been used, and if the ticket had not been used, to see if we couldn't put a stop or blacklist on that ticket.

Q All right. And did you -- what did you discover?

A Through my investigation, I found that the ticket had not been used. We found that Valerie had indeed picked up the ticket, but the ticket had not been used.

Q All right. Now, I want to ask you, sir, if at my request, approximately a week ago, you chronicled certain mileages here in Onondaga County and Madison County?

A Yes, I did, sir.

Q All right. First of all, have you, yourself, either on your own time or on police time, have you ever made the trip from Syracuse to Cazenovia?

A Yes, I have, sir.

Q All right. And did you specifically make a trip where you made certain recordings from Coleman's tavern in the City of Syracuse, to Albert's tavern in the Town of Cazenovia?

A Yes, I did, sir.

Q And could you tell us the approximate driving time and distance?

A The approximate drive time was roughly thirty

minutes, and the distance was approximately twenty-three and a half miles.

Q And were you observing the speed limit?

A Yes, sir. The average of speed averaged out to approximately fifty miles an hour, sir.

Q Thank you. And did you also take a mileage reading of the following: of the distance from Nye Ford in Oneida, New York, traveling along Route 5 through the Village of Fayetteville, and then into the City of Syracuse to 248 Hickok Avenue, from 248 Hickok Avenue to Candy's Restaurant at 305 Burnet Ave., and then back to 248 Hickok Avenue?

A Yes, I did, sir.

Q And what was the mileage you recorded for that trip?

A Approximately thirty-three miles, sir.

Q Thank you very much, Investigator. Stay right there, please.

THE COURT: Go ahead. Do you have any questions?

MR. CALLE: A couple.

THE COURT: Before you start, I want to clear up something. The places Mr. Fitzpatrick gave you, is that all in one continuous trip,

that thirty-three miles?

THE WITNESS: No, sir.

THE COURT: I got lost on the trip.

THE WITNESS: The first trip that I made to Albert's bar, that trip originated at Coleman's Pub on South Lowell, and that was out to Albert's bar.

THE COURT: Okay.

THE WITNESS: That was the one trip. Then from there after I completed that, I went over to Nye Ford in Oneida; that was the second trip, and that trip there was approximately thirty-three miles from Nye Ford to Hickok Avenue, to Candy's Restaurant, back to Hickok Avenue.

THE COURT: Okay. So that's the total mileage traveling that distance?

THE WITNESS: From Nye Ford, the first trip.

THE COURT: Why does this remind me of colloquy about somebody being on first?

THE WITNESS: The first trip, your Honor --

THE COURT: No, I understand.

THE WITNESS: Okay.

THE COURT: That's Coleman's to Albert's?

THE WITNESS: Right. That was one trip. And the second trip, right, the total was thirty-three miles, or approximately thirty-three miles.

THE COURT: All right, sir. I'm sorry to confuse you.

THE WITNESS: Yes, your Honor.

THE COURT: Go ahead, Mr. Calle.

MR. CALLE: Yes, sir.

CROSS-EXAMINATION BY MR. CALLE:

Q Mr. Stassi.

A Yes, sir.

Q Is that it, Stassi? You gave testimony here that, in fact, correspondence was not designated property inside the search warrant, to your knowledge, on March 30th, 1987, correct?

A Yes, sir.

Q However, you explained that you seized the letter, or the exhibit, on that date in question, correct?

A Yes, sir.

Q What time did you seize that exhibit, if you know?

A I don't know the exact time. I know the search

warrant was executed at 10:05 p.m., sir. So it was some-time within that -- some time between 10:05 p.m. and the time that I turned it in at 2:00 the following morning.

Q Well, you couldn't have seized it at 2:00 in the morning because you turned it in to the authorities, right?

A Yes, sir.

Q Okay. So do you recall how long you were there after 10:05 before you found this particular item?

A I really can't, sir.

Q Well, was it an hour? Had you searched any other rooms? Where did you go the first time you went in?

A I searched the kitchen, sir.

Q You searched the kitchen at first when you went in that night?

A Yes, sir.

Q And where did you search in the kitchen?

A Cupboards -- anything that was in that kitchen, I searched cupboards, the drawers, the garbage bag.

Q Once you found this torn letter, do you recall conducting any further search of the kitchen?

A I continued to search until my search was complete, yes, sir.

Q Well, the question is, sir: Did you continue to

search the kitchen after you recovered this torn letter, allegedly --

A Yes, sir, until my search was complete.

Q You only searched the kitchen?

A To the best of my recollection, yes, sir.

Q And there was a question by Mr. Fitzpatrick that, based upon your police knowledge, you had authority to seize this particular letter, is that correct?

A I just thought the letter might be significant, yes, sir.

Q But I believe the question, in answer to Mr. Fitzpatrick's question was, was that you had authority to seize that letter, and you gave a basis for it. Do you recall that on cross -- on direct examination by Mr. Fitzpatrick?

A I said I seized it, yes, sir.

Q Directing your attention to the question that I just asked, sir, I believe that on direct examination Mr. Fitzpatrick asked you a question pertaining to your authority to seize this letter, although correspondence was not designated property in the search warrant. Do you recall Mr. Fitzpatrick asking you the basis for the seizure, even though correspondence was not designated on the search warrant as property which could be legally taken?

MR. FITZPATRICK: Judge, I object to the question.

THE COURT: Yes. Let me put this issue to bed right now. Ladies and gentlemen, whether or not items were legally or properly or improperly seized, that's a question of law that I've already determined. And I don't want to make this any more of an issue than it already is. I've already made a decision as to what was properly seized or what may not have been properly seized. So I'd like to move away from this legal issue, Mr. Calle, since it's already been determined. I won't prohibit you from inquiring about it, if there's another --

MR. CALLE: Well --

THE COURT: -- reason for it, sir.

MR. CALLE: Thank you, Judge. I'm not litigating the issue of the search warrant or seizure --

THE COURT: Okay.

MR. CALLE: -- of this property. I'm trying to get on to another area --

THE COURT: Fair enough.

MR. CALLE: -- which I believe this witness

has knowledge.

THE COURT: Fair enough.

MR. CALLE: Thank you. Would it be improper to ask for a readback of Mr. Fitzpatrick's question, and have the answer read back of what this witness said, because he seems to not recall the question, nor the answer, that was given, just some minutes ago.

THE COURT: Let me try. Do you recall being asked what authority you felt you had to take this letter, even though it wasn't designated in the search warrant? Do you remember being asked that by the district attorney?

THE WITNESS: Yes, I do, your Honor.

THE COURT: What was your response to that?

THE WITNESS: My response is, I thought that that -- at that particular time, that that particular piece of correspondence was written to a person by the name of Bob -- not written -- and to the best of my knowledge, at that time, there was no one at that house that had the name of Bob.

I knew through investigation that a former boy friend of Miss Hill's was Robert Lucas, or

Bob Lucas, and I felt at that particular time, that that was significant, that that piece of stationery, that ripped up stationery, was significant.

BY MR. CALLE:

Q Now, it's your testimony, Mr. Stassi, that, in fact, it was torn into approximately sixteen pieces, correct?

A Yes, sir.

Q Do you recall what the first piece you observed upon reaching into this garbage bag on that night in question --

A Well, again, as I stated, when I opened up the paper, the crumpled newspaper, everything fell out. And one of those -- on one part of that torn stationery was the salutation of, "Hi, Bob," and that's what caught my eye.

Q Okay. Now, I ask you, Mr. Stassi --

MR. CALLE: If I may approach the witness, Judge?

THE COURT: Sure. Yes.

BY MR. CALLE:

Q I show you People's Exhibit 5. Is that a fair and accurate representation of the papers you allegedly took out of that garbage bag?

A Yes, it is, sir.

Q Okay. And I ask you to look at the salutation, "Hi, Bob," in the left, top corner?

A Yes, sir.

Q Would you state that that wasn't written, but printed?

A No, sir, that's written.

Q It's written. Do you know the difference between script and printing, Mr. Stassi?

A Yes, sir.

Q Would you tell this Court what mode of handwriting that is, what method of handwriting that is, if you know?

A In my opinion, it's written script, written. It doesn't appear to be printing to me.

Q Not printed?

A Right. Printed -- it doesn't appear to be printed to me. It appears to be written, sir.

Q Okay. Okay, thank you.

Did you know anything about Mr. Rivas before you got involved with this investigation on March 30th, 1987?

A No, sir.

Q You didn't know if Mr. Rivas had a friend named Bob, did you?

A No, I didn't, sir.

Q Okay. Had you ever seen Valerie Hill's writing before?

A No, sir.

Q So you didn't know that Miss Hill wrote this, did you, at the time that you seized it?

A No, sir.

Q Now, I'll show you the second page of People's Exhibit 5, the back of the particular letter, sir, if you would look at that.

A Yes, sir.

Q Is there a signature as to the person who was writing that?

A No, there isn't, sir.

Q So it's unsigned, correct?

A Yes, sir.

Q So at the time you didn't know who wrote this, did you?

A No, sir.

Q Okay. Would it be fair to say that you just presumed that Miss Hill wrote that; that you had no independent basis, no knowledge, nor fact, as to who wrote this?

A Right. It was my opinion, yes, sir.

Q How long were you in that particular residence

before you left? You got there at 10; I understand you got back to your headquarters at 2. What time did you leave? Did you leave at 1:30?

A I'm not -- I am not certain, sir. I would -- I'm not certain.

Q But you understand that, in fact, this other People's Exhibit 23, you are claiming is the garbage bag in which you recovered this particular torn note, is that correct?

A Yes, sir.

Q Okay. Were any photographs of the contents of Mr. Rivas' home taken before this Exhibit 23 photo was taken, to your knowledge?

A You mean prior, any photographs taken prior to the actual search warrant being executed?

Q No, sir. That was an awkward question.

Sir, was this the first photo that was taken inside Mr. Rivas' home, this garbage bag, this People's Exhibit 23, to your knowledge?

A I can't recall that, sir.

Q Do you remember what other photographs were taken on this night in question?

A I believe photographs were taken of anything that we seized that night, sir.

Q I understand that, sir, but you didn't seize this garbage bag, did you?

A No, I didn't, sir.

Q So you did take photographs of property that you didn't seize, is that correct? There's the photograph. You didn't seize this bag, did you?

A No, I didn't, sir.

Q So you took photos of property you didn't seize, correct?

A I didn't take that photograph, but, yes, that's where the note was found, sir.

Q Who took that photograph?

A To the best of my recollection, sir, I believe Officer Phinney, or Investigator David Phinney.

Q So did you call in and, "Dave, look what we got here. Take a picture of this garbage bag"; is that what you did, to the best of your recollection?

A No. To the best of my recollection, I advised Investigator Phinney that I recovered a note, and that the note was recovered in a piece of crumpled newspaper in that garbage bag.

Q And then he took it upon himself to photograph that garbage bag?

A That was before the note was recovered, yes, sir.

Q Was Dave the one who had the camera at the time?
A To the best of my recollection, sir, I believe Investigator Phinney took that photograph.
Q And when you were searching the kitchen, what was Investigator Phinney doing, to the best of your knowledge?
A He was also searching, sir.
Q Where was -- was he searching in the kitchen?
A No, he wasn't.
Q Did you ever leave the kitchen in order to get David -- to tell Dave Phinney what you found allegedly in the garbage bag?
A I can't recall that, sir.
Q You don't recall. Did anyone else find anything of interest that should have been photographed that evening, to the best of your knowledge?
A Well, I think that shrine probably should have been photographed that evening.
Q Well, what I'm saying is, did anyone say, "Hey, Dave, look what I found in the bathroom. Bring the camera." Did anyone do that?
A I can't recall that, sir.
Q So to the best of your knowledge, you didn't hear anyone, or you can't recall anyone saying, "Look, Dave, photograph this"; you can't categorically state that this

day, can you?

A I just know photographs were taken, yes, sir.

Q Sir, please be responsive to the question.

MR. FITZPATRICK: Judge, I think it was responsive. I object to comments --

MR. CALLE: I --

THE COURT: Go ahead.

MR. CALLE: I didn't get a responsive --

THE COURT: Go ahead and ask it again.

MR. CALLE: I forgot what I asked.

THE COURT: About the photographs. Did anybody take any other photographs in that house on that evening?

THE WITNESS: I believe there were other photographs taken, yes, sir, your Honor.

THE COURT: Did you see anyone take any other photographs, other than Exhibit 23, to your knowledge?

THE WITNESS: I just can't recall, Judge.

MR. CALLE: Thank you, Judge.

BY MR. CALLE:

Q Do you recall hearing anyone call Dave into another room to take a photograph of something?

A No, I can't, sir.

Q Do you remember when you handed this photograph in at 2 a.m., when you returned to headquarters?

A I did not hand that photograph in, sir.

Q But you handed in the torn note at 2 a.m.?

A I was the one to find it, sir, and I was the one that had to secure it, yes, sir.

Q You secured the torn letter -- note, but you did not secure this photograph, correct?

A No, sir.

MR. CALLE: Then I would object to this photograph being put into evidence, based upon a lack of proper foundation. This gentleman didn't take the photograph; he didn't secure it.

THE COURT: Well, let me see if I can get something clear here.

Does Exhibit 23 clearly and accurately portray the condition of the garbage bag where the note was found on the evening of March 30th?

THE WITNESS: Yes, sir.

THE COURT: Okay. The note in the photograph is received. Your request to have it thrown out of evidence is denied.

MR. CALLE: Yes.

THE COURT: I'll leave it in.

BY MR. CALLE:

Q Mr. Stassi, can you recall if you've seen any other photographs, Polaroids, that were taken inside the Rivas home on March 30th, 1987?

A No, sir.

Q This is the only Polaroid picture you know about, is that what you're telling this Court?

A Yes, sir.

Q Tell me something, Mr. Stassi, at the time that you go in to execute a search warrant, you mentioned here today that you bring cameras because it's your policy to photograph the interior of a place where the search is to be executed, correct?

A Yes, sir.

Q Therefore, would it not be proper to bring a camera and film -- that is, a camera that is functioning and a new roll of film, or perhaps a second roll of film; would that not be proper police procedure?

A Sure.

Q Would it not be prudent for the police to make certain that since it's their policy to take photographs of the interior of a residence in which they're executing a search warrant, would it not be normal police policy to make sure cameras are functioning and there's adequate film?

A Absolutely.

Q Yet you can only tell this Court that this is the only photograph that was taken on the night in question, March 30th, 1987, in Mr. Rivas' home; didn't you just tell the Court that?

A Well, yes, I did, sir.

Q Where are all the other Polaroids, if you know, Mr. Stassi?

A I know -- I know that the camera -- we had two cameras that night, one camera was not functioning.

THE COURT: Officer, the question is: Do you know where the other photographs are?

MR. FITZPATRICK: Judge, I have the other photos. If he wants to see them, I'll break up -- I'd be glad to show them to him.

THE COURT: The question --

MR. CALLE: With all due respect --

THE WITNESS: Judge, the only -- your Honor, the only photograph I've ever seen, or the only photograph that I'm aware of was the photograph that was that exhibit right there, because that's where I recovered it.

THE COURT: Okay. Fair enough.

BY MR. CALLE:

Q What was your function in that investigation, Mr. Stassi?

A To investigate the death of Valerie Hill.

Q And how many other people were functioning in that capacity?

A Dozens. Many, many people.

Q Dozens is twenty-four, is that correct?

A Well, dozens. Three dozen could be thirty-six, sir, but there was a lot of investigators, a lot of police personnel investigating the death of Valerie Hill that day, and continuing to investigate it.

Q So you're saying between twenty-four and thirty-six investigators on this case?

A Sir, I'm saying that when Mrs. -- when Miss Hill was found, every available investigator within the Criminal Investigations Division, and every possible uniformed police officer that could be made available, was assigned to investigate that particular death.

Q Can't give me a number?

A I can't, sir.

Q Okay. Fair enough. By the way, did you find airline tickets to the Bahamas in this bag here by chance?

A No, I didn't, sir.

Q Did you find anything else while you were

photographing --

A I'm sorry?

Q Did you find any other property worthy of photographing that evening?

A Did I find?

Q Yes, sir.

A No, sir.

Q Mr. Stassi, there came a time when you were called into the bedroom to look at what was inside a closet, is that fair to say?

A I was -- I was -- looked inside a closet, yes, sir.

Q Yes. So there came a time when you looked inside the closet, is that correct?

A Yes, sir. Yes, sir.

Q You were searching the kitchen at that time, is that fair to say?

A Yes, sir.

Q Okay. What made you leave the kitchen and go over to the -- to the bedroom?

A Investigator Phinney just said he had found something in the closet.

Q Okay. Did he call Dave for the camera at that time? Maybe that refreshes your recollection.

A Investigator Phinney -- it was Dave Phinney that actually found the Madonna, sir.

Q So Dave had the camera?

A To the best of my knowledge, sir, Investigator -- one of the Phinney brothers -- and I believe it was Dave -- was taking photographs that night.

Q You saw him taking more photographs than just this one?

A There were photographs taken that night, sir, of property that was seized from that residence.

Q Well, sir, you just got through saying that Dave was taking photographs that evening. My question is: Did you see him take other photographs?

A I saw him take that photograph, yes, sir.

Q You said photographs. You said Dave, or one of the Phinney brothers, was taking photographs; is that a fair claim?

A Yes, sir.

Q What other photographs was Dave taking?

A Of property seized from the residence of Hector Rivas, sir.

Q But you just testified that this is the only photograph you know about, so how do you know he was taking other photographs?

A Sir, all I know is that he took a photograph of that particular garbage bag.

Q Was that before or after --

THE COURT: I'm sorry. Wait a second.

(Proceedings paused.)

THE COURT: Go ahead.

A He took a photograph of that particular garbage bag regarding the property that I seized from that garbage bag. There were other photographs taken of property seized from that residence.

THE COURT: Now, let me see if I can -- how do you know this?

THE WITNESS: He had the camera, your Honor.

THE COURT: Well, I can walk around all day with a camera, it doesn't mean --

THE WITNESS: I'm sorry, Judge. There was a flash going off.

THE COURT: A flash going off. And you were -- you saw that, or were aware --

THE WITNESS: Right. I was aware of the flash going off.

THE COURT: Had you seen any other photographs that were taken, that were produced that

night?

THE WITNESS: No, I haven't, your Honor.

THE COURT: Okay.

BY MR. CALLE:

Q Sir, you are aware of flashes going off. How many flashes were you aware of?

MR. FITZPATRICK: Judge --

THE COURT: Yes.

MR. FITZPATRICK: This is silly. I object.

THE COURT: It's getting -- it's getting repetitious. I fail to see the relevance.

MR. CALLE: Well, Judge, if you'd let me continue, momentarily, perhaps -- well --

THE COURT: Well, okay. Let's --

MR. CALLE: I think I have covered --

THE COURT: Try to bring it up, sir.

A I don't recall sir.

THE COURT: Let's try to --

BY MR. CALLE:

Q So there came a time when you went into the bedroom, and you saw the shrine in the closet, with the lit candles and the Madonna, is that correct?

A Yes, sir.

Q What did you do after you left the viewing of

the Madonna?

A Continued searching.

Q Where did you continue searching?

A The residence, sir.

Q Specifically, sir, what room? Did you go back into the kitchen?

A I, I cannot recall, sir.

Q Did you go back in the kitchen and find the torn note?

A That note had already been found, sir.

Q Nothing further.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Investigator, in response to Mr. Calle's cross-examination, one of his questions, you indicated that the -- that in your judgment today, a photo of the shrine should have been taken?

A Yes, sir.

Q Now, is your judgment regarding the significance of the shrine changed since March 30th, 1987, until today?

A Yes, sir.

Q And does that shrine have some meaning to you today, as a result of the last six years of your police experience?

A Yes, it does, sir.

Q Would you explain to the jury what it is?

MR. CALLE: Objection.

THE COURT: I'm going to ask the jury to step out, please.

Don't form any opinions or talk about the case.

(The jurors were excused.)

THE COURT: Would the record reflect that the jury has been excused. I'd like you to read the last question back, please.

(Page 341, Line 23 through Page 342, Line 3 was read back by the court reporter, as requested by the Court.)

THE COURT: Answer the question, please, if you can.

MR. CALLE: Judge, I'm going to continue to object, all right, just --

THE COURT: I'm taking the --

MR. CALLE: Yes, sir. Yes, sir.

THE COURT: I'm taking the answer.

THE WITNESS: During the -- during the course of over six years, your Honor, and through some training, um, I've attended a couple different

seminars, and there's a religion called -- what we call Santerra. And it's a religion that's practiced in some Latin American countries, and some down in the Bahamas.

It's based on Catholicism, Roman Catholicism. And parts of it have to do with the occult, whereby if a person dies unexpectedly, or maybe a violent death, um, that that person's picture is placed in front of the Madonna, or a statue of a saint; there's an offering made -- the significance of the change in the little plate in front of the -- in front of the picture. And the Madonna with the lit candles has to do with several different reasons: one is to ward off the evil spirits, according to that belief; um, the second one is to make sure that that person is resting in peace and has gone to the hereafter, um, and won't come back to, to roam that particular residence or bother that particular person.

THE COURT: Through the course of your investigation in this case, did you come to learn that the defendant practiced this practice, this religion, or participated in this type of worship?

THE WITNESS: I have no knowledge of that, no, sir.

THE COURT: Okay. Your objection is sustained, Mr. Calle.

MR. CALLE: Thank you.

THE COURT: We'll take a ten-minute recess.

MR. FITZPATRICK: The witness is excused, right?

THE COURT: No. I don't know. I'd like you to conclude your questioning, though, in front of the jury, and I want to sustain the objection in front of the jury, so I'll need you back, Mr. Stassi.

(Proceedings stand in recess.)

(All parties are present. Proceedings resumed at this time.)

THE COURT: Okay. We're back in session. The record should reflect the jury is present, counsel, and the defendant.

And the last question that was asked by the district attorney, would you read that back, please?

(The requested portion of the record was

read back by the court reporter.)

THE COURT: And note that Mr. Calle had made an objection. His objection is sustained.

MR. FITZPATRICK: I have no more questions, your Honor.

THE COURT: Anything?

MR. CALLE: Nothing pertinent to recross.

THE COURT: Go ahead. Thanks, Officer.

MR. CALLE: Thanks, Officer.

THE WITNESS: You're welcome, sir.

(Witness excused.)

MR. FITZPATRICK: Donald Stonecipher.

*   *   *

D O N A L D  S T O N E C I P H E R , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

THE COURT: Good afternoon, sir. You can push -- get in there okay?

THE WITNESS: Okay.

(Proceedings paused.)

THE COURT: Please be seated.

* * *

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Mr. Stonecipher, regardless of what book you put your hand on, you promise you're going to tell the truth here today?

A Yes.

Q All right. Sir, tell us -- tell these fine folks here your full name and where you live.

A My name is Donald Stonecipher. I live at 172 Woodbine Ave.

Q And could you tell us about your family, sir; are you married?

A Yes, I am.
Q Any children?
A Yes, I have.
Q How many children do you have?
A I have four children.
Q Their names, sir?
A Donald, Jr., Susan Marie, David, and Sandra.
Q And what do you do for a living?
A I, I work for Crouse Hinds. I work as a machinist.
Q How long have you been there?
A Uh -- eighteen years.
Q And how long have you lived at Woodbine Ave.?
A Five years.
Q Back in March --

THE COURT: Excuse me. I don't mean to interrupt. Where is Woodbine Ave., in the City of Syracuse?

THE WITNESS: Yes. It's right in Eastwood.

THE COURT: Thanks. Sorry.

BY MR. FITZPATRICK:

Q Back in March and April of '87, Mr. Stonecipher, where did you live?
A Uh -- 250 Hickok Ave.
Q All right. Sir, can you see the calendar before --

below me here? If you need to refer to it, it might help refresh your recollection --

A Okay.

Q -- as to some dates back in March of '87.

I want to show you a photo, sir, that's already been received in evidence, People's Exhibit, looks like 13. Do you recognize that structure?

A Yes. It's -- that's the house we used to live in.

Q And where would you be, on the left side or the right side?

A I'd be on the left side.

Q And would you live upstairs or downstairs?

A Upstairs.

Q And how long had you lived there prior to March of '87?

A Uh -- I would say a good ten years.

Q And who lived there with you?

A My wife and my children.

Q All four of the children?

A Oh, yes.

Q Back in March of '87?

A Right.

Q And did you have, in March of '87, a downstairs

neighbor?

A Yes, I did.

Q Do you remember her name?

A Valerie Hill.

Q And that's this woman here shown in Exhibit 4?

A Yes, sir.

Q Is that the woman that lived downstairs from you?

A Yes.

Q All right, sir. And how long had she been your neighbor prior to March of '87?

A Um -- I would say she lived there about a year, maybe.

Q Had you ever been inside her apartment?

A No.

Q Did you know --

A Oh, I'm sorry. I can't say that. Yes, I have been in her apartment.

Q Okay. And did you know her to say hello, and things like that?

A Yes.

Q Okay. What was -- what occasion were you to be in her apartment, do you remember that?

A My wife and I came home, and she came out her --

or out her door and asked if I would check her gas stove. Her gas pilots were off.

Q Okay. I don't want to get into -- forget about that. I'm sorry I brought that up.

A All right.

Q I want to talk to you, Mr. Stonecipher, and ask if you know the defendant in this case, Hector Rivas?

A Yes, I know --

Q And how do you know Mr. Rivas?

A From walking up and down the driveway.

Q At Hickok Ave.?

A Yes.

Q Can you give us an estimation how many times you've seen Mr. Rivas?

A Maybe fifteen, maybe twenty times.

Q All right. And I want to ask you if you have a recollection of March the 27th of 1987?

A (No verbal response.)

Q That would be a Friday.

A Yes, I do.

Q All right, sir. And were you working that day?

A Yes, I did.

Q And about what time did you get off work?

A 3:30.

Q And after getting off work, where did you go?
A I went right home.
Q Tell us what happened when you got home.
A I drove home and, uh -- driving up the driveway, I had to get out of my car, and I seen Hector Rivas' red van parked out in front. He was sitting in it.
Q And this was about what time?
A I would say approximately 3:45 to 3:40.
Q I'm going to show you another photo which has been received in evidence, Exhibit 21. Do you recognize that red van?
A Yes.
Q And does that appear to be the same van you saw Mr. Rivas sitting in?
A Yes.
Q What was he doing?
A Just sitting in his van.
Q Did you have any conversation with him?
A No, I did not.
Q Did you acknowledge him in any way with a wave or gesture?
A No.
Q All right. And what did you do, sir?
A I proceeded to go in the house.

Q And do you remember what you did when you got inside?

A Just normal things, you know.

Q Okay.

A Changed my clothes, you know.

Q Did you at any time after that again see Mr. Rivas?

A That same day?

Q Yes.

A No, I did not.

Q Okay. Did you ever look out the window after you got inside your apartment?

A Yes, I did, the front window, yeah. I could see he was still sitting out there in the van.

Q All right. Let me go slower. How long after you got home did you take a look out your front window?

A Probably about twenty minutes, approximately twenty minutes.

Q And twenty minutes after you got home, you looked out and you again saw Mr. Rivas sitting there in the red van?

A Yes, I did.

Q And where was he parked?

A He was parked on our side, on our side of the

house, in the street in the front of the next door neighbor's house.

Q All right, sir. And, again, on that occasion, did you acknowledge him in any way?

A No.

Q All right. Did you ever see Mr. Rivas leave?

A No, I did not.

Q And did you ever go out that evening?

A Yes, we did.

Q When you say "we," who went out with you?

A My wife and I had a dinner engagement.

Q What time did you go out to dinner?

A I think it was probably about 8 -- 7:30, 8:00.

Q And where did you go to dinner?

A Lyncourt Grill on, I believe, Court Street.

Q Now, where would you normally park your vehicle, on the street or in the driveway?

A No. I park it in the driveway.

Q The driveway?

A Oh, yeah.

Q Okay. When you left to go to dinner about 7:30, 8:00, did you happen to notice whether or not Miss Hill -- strike that.

Did you know what type of vehicle Miss Hill drove

back in March of 1987?

A I believe it was a white, white car. A Ford or something, I think.

Q I'm not asking you to remember it today. I'm -- I just want to know, back in March of 1987, you knew what type of vehicle she drove?

A Yeah.

Q You knew it by sight?

A Pardon me?

Q You knew it by sight?

A Yes, I would.

Q When you left to go to dinner with your wife at about 7:30 or 8:00, did you notice her vehicle?

A To be perfectly honest with you, I really don't know.

Q Fine. That's all I can ask from you, Mr. Stonecipher.

Now, how long did you stay at dinner?

A Well, I think it was around 10:30, 11:00, is when we left.

Q Where did you go?

A We went right directly home.

Q And when you got home, do you remember whether or not you saw Miss Hill's car?

A Um, geez, I can't -- no, I can't remember.
Q You just don't have any recollection?
A No, I can't, no.
Q All right. That's fine, sir. And do you remember, sir, when you got home whether or not any of the downstairs lights were on or not?
A Um, I do remember all the lights being on when I picked my son up at Friendly's Ice Cream. I had to leave --
Q Tell us about that.
A Okay. Okay. My wife and I went to Lyncourt Grill. We sat with another couple for dinner. I had to pick my son up at Friendly's Ice Cream --
Q What time?
A -- because he works there part time.
Pardon me?
Q What time did you have to leave to pick him up?
A I had to pick him up. I left there at 9:00 and he got out between 20 after 9, 9:30, somewheres around there.
Q And you then took him where?
A I took him directly home. I almost always pick my son -- my kids up and take them home.
Q Good for you. After you dropped your son off at Hickok Ave., did you go back to Lyncourt Grill?

A Yes.

Q And you're telling us when you dropped your son off, the downstairs lights --

A All the lights were on. I mean, that's very unusual to see Valerie have all of her lights on. That kind of struck me kind of funny, seeing all the lights on.

Q When you came back, were the lights in the same condition?

A No, they were not.

Q What was different?

A Just the living room light was on.

Q All right. Now, did you see Valerie that night at all?

A No, I did not.

Q Did you hear anything unusual from the downstairs apartment?

A No, I did not.

Q Did you see her Saturday?

A No, I did not.

Q Or Sunday?

A No.

Q All right. Mr. Stonecipher, thanks very much. Stay right there, if you would. The defense may have some questions for you.

A Okay.

MR. CALLE: One moment, please.

(Proceedings paused.)

THE COURT: Sir, when you saw Mr. Rivas' van and Mr. Rivas in front of your house at about 3:45 p.m., you then testified about twenty minutes later you saw him again, is that correct?

THE WITNESS: That's right.

THE COURT: Had he changed the position where he was from the first time you saw him?

THE WITNESS: No, he did not.

THE COURT: Okay. He was in the same location?

THE WITNESS: Same spot, yeah.

THE COURT: Thank you.

CROSS-EXAMINATION BY MR. CALLE:

Q Good afternoon, Mr. Stonecipher.

A How do you do.

Q Mr. Stonecipher, at the time you were living at 250 Hickok --

A Pardon me?

Q Back in March of 1987 you were living at 250

Hickok?

A Yes, I did.

Q And that's the upstairs apartment of the structure?

A Right.

Q 248 is the downstairs apartment?

A Pardon me?

Q 248 is the downstairs apartment?

A Right, exactly, yeah. I lived at 250.

Q Am I correct in saying that, in fact, this is an adequate representation of the back yard of 248-250 Hickok, that is People's Exhibit 14?

MR. CALLE: May I approach, Judge?

THE COURT: Yes. Sure.

A Yeah, that's the back yard, yeah.

BY MR. CALLE:

Q Okay. To the best of your knowledge, is this Valerie Hill's vehicle, or some vehicle that appears to look similar to Miss Hill's vehicle?

A No, I would say that's her car.

Q And do you notice in this background at 248-250 Hickok, there is a garage structure?

A Right. That's the garage, yeah.

Q And would it -- would I be correct in stating

it's a two-car garage?

A Two-car garage.

Q Okay. And Miss Hill's vehicle that you identified as hers, this vehicle is parked in front of one garage door?

A That's her side. That's where she would park her car, on this -- that side.

Q This is her garage --

A That's right.

Q -- for 248 Hickok?

A Yeah.

Q Am I correct in presuming that the garage to the left of Miss Hill's garage would be yours, or the tenant in 250 Hickok?

A That's my -- yeah, right.

Q And Mr. Stonecipher, on -- in March of 1987, would it be correct to say that there was limited parking hours on -- outside the street of Hickok Avenue on the street of your home?

A No, I would say it wasn't limited. It was, anybody who wanted to park out front, they could.

Q Well, I was over there recently and there's signs up that on certain hours, or certain days, to the best of my recollection, you can't park on one side of the

street or the other. Are you familiar with that?

A Right, odd and even street, yeah.

Q Was that the traffic parking rule back in 1987, to the best of your recollection?

A Geez, I really don't know. Whatever day that was, if it was an odd day or it wasn't.

THE COURT: But back then, sir, people had to switch sides of the street?

THE WITNESS: Oh, yeah, yeah.

THE COURT: I think that is the question.

MR. CALLE: Thank you, Judge.

BY MR. CALLE:

Q So, Mr. Stonecipher, where did you keep your vehicle when you parked it?

A Uh -- geez, you know, on that side there with the garage. If you're driving up the driveway, mine would be on the left side.

Q So on the evening of March 27th when you came home, did you see if Miss Hill's vehicle was parked in this particular spot?

A I can't honestly say. I can't remember on that date, I really can't. I cannot be untruthful. I don't know.

Q This might be an unfair question, and the Judge will stop me, but Mr. Stonecipher, do you recall how many

drinks you had that evening when you went out to dinner, if any?

A Uh -- very few. Maybe three, maybe.

Q So it's just that it slipped your observation in the course of you driving and coming home, and you do the driving as a husband and father, whether you recall this vehicle parked there or not on the evening of March 27th?

A I couldn't remember, it's been so long.

Q Tell me something, Mr. Stonecipher: How does one open up this garage door?

A Well, you pull it up by hand.

Q It's not an electric garage door opener? Do you know if Miss Valerie Hill's garage was electrical or power?

A No, neither one of them.

Q You can categorically state that one -- when one would come home to park their vehicle in the garage, they would have to get out of the vehicle and walk to the garage door and bend down and pick it up and open it up? Would that be a fact?

A Yes. Mm-hmm.

Q By the way, do you recall on the evening of March 27th, whether this garage door was open?

A No, I couldn't really, no.

Q How many years did you live at 250 Hickok, for

the length of time or longer than Miss Hill lived at 248 Hickok?

A A lot longer, about ten years I lived there.

Q So you were the only upstairs neighbor that Miss Hill had during her tenure there at 248 Hickok, would that be correct?

A That's correct.

Q Do you recall just by being neighborly and for no other reason, whether Miss Hill would park her car in the garage when she would go home at night?

A No, she usually left it outside.

Q She left it outside where, sir?

A You know, not inside the garage, but on the outside.

Q On the outside. Did she -- is it your testimony that she normally didn't park the car in the garage?

A No, no.

Q Can you testify as to whether she would come home and lift up the garage door and then leave the vehicle in the driveway? Was that a habit of hers?

A I never -- I never paid any attention, to be honest with you. I never -- I never even seen her open that door. You know, I mean the garage door.

Q Never seen her open the garage door?

A No.

Q So would it be fair to say that it was unusual to see the garage door open if she never parked inside the garage, and you'd never seen her open the garage door?

A I would say the garage door was open most of the time.

Q The garage door was --

A Open most of the time.

Q -- open most of the time?

A Yeah.

Q Was there anything of value inside the garage?

A No, nothing in there, no.

Q And your garage door was closed most of the time?

A Yeah, mine was closed.

Q And Miss Hill's was open?

A Right.

Q Any particular reason why Miss Hill's was open? Was it functional?

A Whose door?

Q Valerie Hill's garage door.

A Oh, no, that --

Q Was it functional, to your knowledge?

A Oh, yeah, it was functional.

Q Did it have a lock on it?
A No, no lock on it.
Q Were you given a key to your garage door when you rented the apartment?
A Those locks didn't even work half the time. I didn't even -- I never locked it because I had no reason to lock it.
Q Tell me, was the garage structure, structure erected around the same time as the house, if you know?
A I don't understand that. Say that --
THE COURT: Did they build the garage the same time as they built the house --
THE WITNESS: Oh, yeah, I would say --
THE COURT: -- if you know?
THE WITNESS: -- I would say so.
BY MR. CALLE:
Q And pertaining to the garage area -- pertaining to the front door of 248-250 Hickok, would you tell this Court, is that normal ingress and egress, that you would take coming and going home?
A You mean -- I don't understand.
Q Did you use the front door?
A Oh, yes. Yes, we did.
Q Even though you parked out in the back in the

driveway, you would walk around the front?

A Well, we usually opened -- go out the back, go in the front door, because of -- because we had break-ins earlier before Valerie moved in. So we always bolted the back door and always came in the front way, that's the reason.

THE COURT: That's how you would come in the house?

THE WITNESS: Right, exactly, I and my wife.

BY MR. CALLE:

Q I beg your pardon?

A I and my wife always --

Q When you say "bolted," what do you mean by "bolted"?

A Well, on the inside of our door we had a latch that went across.

Q On the inside, the rear side door there was a latch, is that what you said?

A Yeah, my door, yeah.

Q Would this latch be able to be opened with a key from the outside, the side door?

A No.

Q This is a latch that sort of moves a bolt into a catch?

A Right, yeah.

Q And is there any other lock on that rear side door --

A No.

Q -- that you are aware of?

A No, that's the only lock right there.

Q So, therefore, if the bolt was not secured, that door would be opened?

A Normally.

Q Unlocked, that is.

A Right. If it was unlocked, yeah.

Q Did you know Valerie Hill's habit when she left her apartment? Do you know what she used the front door as, you and your wife did?

A No. She usually -- normally used the back door most of the time, that's when my wife and I would see her.

Q So there -- if Miss Hill were to use the back door, and anyone used the back door to leave, get in their vehicle or walk away, there would be no way of locking that rear back door from the outside, is that correct?

A That, that back door was never locked. We locked -- never lock the back door going down the hallway.

Q I mean this back door on the side of the driveway.

A Right.

THE COURT: In other words, sir, if you walked out of that side door, would it be possible to put a key in some lock and turn it and lock it up and secure it, or would it be -- would it remain open?

THE WITNESS: Oh, no, it would lock. It had a lock on there, but it was like one of them bolt-type things there.

THE COURT: Yes. From the inside, though, right?

THE WITNESS: From the inside, right.

THE COURT: What I'm saying to you, sir, if you walked out of that door, there's no way you could lock it then, is there?

THE WITNESS: Oh, no. No, there's no way you could lock it.

THE COURT: So the door would be open?

THE WITNESS: Exactly.

THE COURT: Unlocked, I should say.

THE WITNESS: Exactly, yeah.

THE COURT: And there is nothing to put a key and turn it and lock it?

THE WITNESS: No.

THE COURT: Okay.

THE WITNESS: I'm sorry.

THE COURT: That's okay. That's all right, Mr. Stonecipher.

BY MR. CALLE:

Q Did you ever see Valerie Hill enter that door when she was going home?

A My wife and I have seen her go in, yeah.

Q And would -- at that particular time, that door would be opened in order for one to gain entry, or unlocked?

A Oh, I don't know. You mean Valerie? I don't know.

Q I'm talking about -- I'll withdraw the question.

A Okay.

Q Mr. Stonecipher, in March of 1987, were you employed?

A Yes, I was.

Q What were your normal hours of work, if you did have normal hours of work?

A 7 to 3:30.

Q 7 to 3:30?

A 7:30 to 3:30.

Q 3:30?

A Yeah.

Q Did you work on the 27th of March --
A (No verbal response.)
Q -- to the best of your recollection?
A Yes, I did. That was on the Friday, right? Would that be on the Friday -- yes, yes, I did.
Q Therefore, you left work at 3:30?
A Right.
Q And how long did it take you -- did you come straight home?
A Yes, I did.
Q And how long did it take you to drive from your place of employment, to your home?
A Between fifteen to twenty minutes.
Q Did you stop off anywhere that day to purchase anything?
A No, I did not.
Q Now, your testimony here today was -- is you got home about 3:45 and you saw Hector Rivas sitting in his van parked on your house side of the street?
A Yes, I did.
Q Is that correct?
A Yes, I did.
Q You are positive it was Hector Rivas?
A Yes, yes, I'm positive.

Q Did you observe what he was doing, if anything?
A Just sitting -- just sitting in the van.
Q Was he with anyone?
A No, he was not.
Q And at that time, you don't have a recollection as to whether Valerie Hill's car was in the driveway or not?
A Can't remember, no.
Q Then there came a time, Mr. Stonecipher, that you looked out your front window and that was about twenty minutes later, or approximately 4:05 when you saw Mr. Rivas remaining in his van, is that fair to say?
A Would -- I would -- yeah, that's right.
Q Now, I believe your testimony here by Mr. Fitzpatrick was elicited that, in fact, you never saw Hector to leave?
A No, I did not.
Q So you don't know how long he was out there?
A No, I did -- do not.
Q Did you, or do you recall hearing Mr. Rivas coming into the vestibule or the common area of the structure and knocking on Valerie Hill's door downstairs at any time?
A During that day?
Q Yes.
A No.

Q During -- yes, during that time period.
A No, I did not.
Q Did you know if you noticed if Valerie Hill's lights were on at that time, 3:45?
A Uh -- I -- no.
Q At 4:05?
A No, no, I do not.
Q When you were upstairs, did you hear anything inside the apartment?
A No, no.
Q Did you ever hear any commotion inside the apartment of Valerie's?
A Only through my daughter -- well, I was at work when it happened.
Q I'm talking about, did you ever hear --
A No.
Q -- of Valerie or anyone interacting?
A No. It's always been quiet. It's always been quiet to me, anyways.
Q Now, there came a time, Mr. Stonecipher, that you left home for dinner, and that was approximately 7:30 or 8 p.m., correct?
A That's right.
Q And it's at that period that you went out to your

vehicle, you went into your car in order to drive to dinner?
A Right. Yeah.
Q And your car was parked where, sir?
A Right on the left-hand side of that garage.
Q And did your wife -- was it -- was it necessary in -- did you have to back out when you left?
A I can't remember. Sometimes I back it in, sometimes I drive in. It all depends on how I feel that day, I guess.
Q Well, do you know that if Valerie Hill's car was there, would there be difficulty in someone getting in your vehicle, be it the passenger or the driver's side?
A No.
Q Based upon the close proximity of the two vehicles parked there?
A No, no, there's enough room to get in and get out.
Q And at that time, did you notice if Valerie Hill's lights were on about 7:30, 8:00 that evening?
A No, I didn't pay any attention.
Q But there came a time when you did notice all of the lights on that evening, correct?
A That's right.
Q And what drew your attention to this observation, if you know?

A Well, when I brought my son home from work -- he worked at Friendly's Ice Cream -- and I brought him -- I come up Hickok, I noticed that her lights were on. Every light in her house was on, that's very unusual for Valerie to have all her lights in her house on. I mean, like that. It was just lit up like a Christmas tree.

Q You say your son got out of work approximately 9:30?

A Well, I left to pick him up at -- he gets out 9:30 -- but between 9, 9:30.

Q And how long did it take for you to drive back to -- drop your son off at your home?

A Approximately, about five minutes.

Q Five minutes. So would you say approximately what, 9:35 you got home? What hour would you say?

A Dropping my son off, you mean?

THE COURT: Yeah.

Q Dropping him off.

A I would say somewhere between 9, 9:30, I dropped --

Q I beg your pardon, sir?

A Between 9:30. Probably by 9:30 I dropped him off.

Q 9:30?

A I dropped him off.

Q And at 9:30 p.m., all the lights were on, is that right?

A Right.

Q Is that correct?

A Right.

Q And based upon your words, that was unusual for it to be lit up like an airport?

A No, Christmas tree.

Q I beg your pardon, sir.

A Like a Christmas tree.

Q Like a Christmas tree. You hadn't seen all those lights on before, had you?

A Never, never seen them on.

Q Did you go inside the house?

A No.

Q So you left your son out on the street in front of the structure?

A Yeah, I left -- I dropped him off out in the street, and he had his key to get in the house.

Q He had his key to get in the front entrance --

A Right.

Q -- entranceway, where the porch is?

A Right, exactly.

Q Did you notice if any windows were open in

Miss Hill's house? Did you hear music playing or anything?

A I beg your pardon?

Q All right. Did you notice if you heard any sounds coming from Miss Hill's apartment when you dropped your son off at 9:30?

A No, because I was out in the street when I let my son out, and he just jumped out of the car, and I just continued on driving.

Q Okay. Now, you mentioned, sir, that the reason why the side rear door was bolted from the inside usually was because there were burglaries in the area?

A Well, prior to Valerie Hill, we had problems with break-ins.

Q Well, how far away -- prior, when was that, do you recall?

A Oh, prior, about three or four years before Valerie moved in.

Q And, again, when you say "break-ins," how many break-ins?

A Oh, probably about two, maybe.

Q They broke into 248-250 Hickok --

A Yeah.

Q -- twice?

A I would say at least twice, yeah.

Q And did they commit a burglary?
A Well, they took some -- most of the kids' Christmas presents, is what they did.
Q They burglarized your -- 250 Hickok twice?
A Yeah.
Q And do you recall who was living downstairs at the time?
A Uh-- yeah. Isn't that awful. Marie Lorenzo.
Q A woman?
A Yeah.
Q Was she ever burglarized --
A No.
Q -- to your knowledge?
A Not to my knowledge, no.
Q Now, sir, you dropped your son off approximately 9:30 and you drove back to the restaurant; your wife was waiting there for you, I presume?
A Yes, with the other couple, yes.
Q With another couple. And at that time, you left at about 10:30 or 11 p.m.?
A Yes, sir.
Q Well, can you be more definite as to time? Was it 10:30, was it 11 p.m., if you can --
A (No verbal response.)

Q You remember watching the 10:30 news or something when you got in? I mean, did you put the TV on?

A I can't remember. I can't remember.

THE COURT: That -- between 10:30 and 11 is your best estimate of when you got home?

THE WITNESS: I would say that is my best estimate.

BY MR. CALLE:

Q At that time, sir, when you pulled up to your home, all the lights in Valerie Hill's apartment were not lit up like a Christmas tree?

A No, just one light in the living room was on.

Q And could you tell this Court where the living room is situated? Is it in the front of the house by the front door, by the porch, is it on the side of the house by the driveway, is it in the rear of the house?

A No, it's in the front of the house.

Q And that's how you noticed that it was lit up?

A Right.

Q And then did you drive down the driveway?

A Yes, I did. I parked the car and my wife was opening the front door, and we went up the front way.

Q So you left your wife out by the front while you went in the back, is that correct?

A Right, to park the car.

THE COURT: You parked the car in back, but you went in the front?

THE WITNESS: Exactly, yeah. I walked all the way around.

BY MR. CALLE:

Q But you then entered the home by walking around to the front?

A That's right. That's how we go in, my wife and I.

Q So you didn't drive to the back rear door to see it unlocked, did you?

A No, I did not.

Q You don't know if it was bolted or not that evening, do you?

A No, I don't.

Q You can't recall if Miss Hill's vehicle was parked in the driveway?

A I can't recollect that, I --

Q And you can't recall if the drive -- if the garage door was open or not, can you?

A No, no.

MR. CALLE: One moment, Judge. It's important I ask for this time.

THE COURT: Sure.

(Proceedings paused.)

BY MR. CALLE:

Q When you came home, Mr. Stonecipher, at 10:30 or 11:00, did you notice that there was a familiar vehicle in the vicinity of your home?

A No, I didn't pay any attention, no.

Q So you can't tell this Court that you saw Hector Rivas sitting in his red van or his gray car at the time you came home that evening of the 27th at approximately 10:30 or 11:00, can you?

A No. I wasn't -- I'm -- I wasn't observant, I guess.

Q What time did you go to bed?

A Oh, probably about 11:30, quarter to 12, somewheres around there.

Q Did you have occasion to look out your front window at all between the time you arrived home and the time you went to bed on that night in question?

A No.

Q You have children, don't you, sir?

A Yes, I do.

Q Is that three children?

A No, four children: two boys --

Q Four children?

A Yeah.
Q Okay. Do you recall who was home that evening?
A Yeah. My daughter, Sandy, and Susan -- no, not Susan. It was Sandy, I think, I think was home, and she had to babysit, and then --
Q She what, sir?
A She had to babysit that evening, and when we came home, she was home at the time we got home.
Q So Sandy was home?
A Right.
Q Oh, all right. Now, you have three other children, correct?
A Yes, I do.
Q What are their names?
A Donald, Jr.
Q Donald, Jr.
A David, and Susan.
Q And Donald, David, and Susan were not home when you got home that evening?
A No.
Q And when you went to bed at approximately 12, was Donald, David, or Susan -- had they arrived home --
A No, no.
Q -- when you arrived home that evening?

Were you awaken when any one of those three arrived home?

A No.

Q Where is your bedroom in relation to the street, Hickok Avenue, sir? Is it in the front of the house, the side of the house, or the rear of the house?

A No, about right in the middle, about in the middle on the side.

Q When any of your children would arrive home, was it normal for you to hear the motor running?

A Hear what?

Q The motor of the vehicle running, and then you'd sense that someone was coming home?

A No, my hearing is not all that great. I wouldn't hear, no.

Q Okay. Between the hours of 10:30 or 11, and 11:30 when you went to bed, did you hear anyone enter the common area of 248-250 Hickok?

A No, I did not.

Q Did you hear any noise downstairs between those hours --

A No.

Q -- in Valerie Hill's house, specifically, sir?

A No, I did not.

Q Did you hear any radio playing?

A No.

Q Did you have a sense that the apartment was either vacated or occupied at the time?

A I didn't really even pay any attention.

Q Would it be fair to say that nothing unusual came to your attention in the hours that you were home that evening?

A No.

Q Would it be fair to say that nothing unusual happened?

A No, nothing unusual.

MR. CALLE: One moment, your Honor. I believe that's all. One moment, please.

THE COURT: Sure.

(Proceedings paused.)

MR. CALLE: Nothing further. Thank you. No further questions.

THE COURT: Mr. Fitzpatrick?

MR. FITZPATRICK: Very briefly.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Don, when you say that when you came home from your dinner, your children, Don, Jr., David, and Susan, were

not home, is that based on actual knowledge? I mean, did you look in their bedrooms and see that they were not home?

A No, I did not look in their bedrooms, but I know they weren't home because -- no, I didn't look in their bedrooms. No, I didn't.

Q But you didn't hear them and you didn't see them?

A No.

Q So you assumed they were not home?

A Exactly.

Q Okay. Now, I want to see if I can be clear, so that I'm sure that the jury understands. Adjacent to this vehicle in Exhibit 12, sir, there is a side door to this 248-250 Hickok Ave.?

A Yes, sir.

Q Okay. Now, that is in the back of the house, and it's closer to the garage, than the front door?

A Oh, yes.

Q Regardless of that fact, though, you used the front door to enter and exit your house?

A Right.

Q All right. Now, was this side door over by this vehicle, was that -- did you ever use that door?

A Yeah, we'd use it, yeah.

Q All right. And do you know if that door that would lead from the driveway inside the entire structure, do you know if that door was normally kept locked?

A On the outside again?

Q On the outside.

A No, it was never locked.

Q It was never locked?

A It was never locked.

Q Now, if I were to go into that door, did I get to your apartment?

A Get to my apartment, yes, you can.

Q And could I also get to Miss Hill's apartment?

A Yes, you can, yeah.

Q All right. Now, would I get into your apartment going in that side door?

A You'd have to go up two stories, two flights.

Q Step up and then --

A Up two flights of stairs.

Q And then I would come to another door?

A Yeah.

Q And that door, would you normally keep that door locked?

A Oh, yes, yeah.

Q And how would you lock it?

A We usually bolted -- bolt the inside.
Q You would bolt it?
A Yeah.
Q And can it be opened from the outside?
A If somebody's home.
Q If it's bolted, can it be opened?
A Oh, no, no.
Q All right. Now, when you were talking to Mr. Calle a few moments ago about a door being bolted, is that the door you were referring to, the door that leads into your apartment?
A I don't understand your question. I didn't understand -- say it again. Sorry.
Q Okay. Relax, Don. I know this is an unusual experience for you.
Mr. Calle was asking you some questions a few moments ago, and you were explaining how you bolted a door.
A Right.
Q And how the door could not be opened from the outside.
A Right.
Q Do you have that in mind?
A Right.
Q All right. Is that door you are speaking of, the

door on top of the stairs that would lead into your apartment?

A Right.

Q Okay. Not the door that's adjacent to the driveway?

A No.

Q Okay. Fair enough.

A Okay.

Q And Miss Hill's normal method of entrance and exit, as far as you know, would be to go through the side door, enter the building, itself, and then go to her apartment door?

A Right.

Q Okay. Now, did you back in April give an affidavit to the police?

A Yes, I did.

Q All right. And if that affidavit contained a reference to Miss Hill's car being in the driveway or not being in the driveway, might it refresh your recollection today to look at that affidavit? Might it help you remember?

A Yes, it probably would.

Q All right.

MR. FITZPATRICK: I'd like to have this

four-page affidavit marked as People's Exhibit 24.

(Affidavit was marked for identification as People's Exhibit Number 24, this date.)

BY MR. FITZPATRICK:

Q Don, I'm going to show you People's Exhibit 24, four pages. And do you recognize that, sir?

A Yes, yes, I do.

Q All right. And does your signature appear there?

A Yeah, that's my signature.

Q And is it dated April 5th, 1987?

A Yes, it is.

Q All right. Now, I want you to read to yourself -- I want you to read the last paragraph on Page 4 to yourself.

A I ain't got my glasses. They're out there in my coat. You know, my wife's out there.

THE COURT: Would you ask his wife to get his glasses for him?

Q First it's your ears, Don, and then it's your eyes, Don.

(Proceedings paused.)

Q I hope those are the right ones.

A Okay. The last --

THE COURT: Hold on, Don. Now we're feeding the jury.

THE WITNESS: Okay.

BY MR. FITZPATRICK:

Q Now, have you read that to yourself?

A Not the whole paragraph, I didn't.

Q Take your time. Read the whole paragraph. Just the last paragraph.

A Okay. (Witness complied.)

Q Was that statement true when you gave it?

A Yes, it is.

Q Does that, reading that, does that help refresh your memory six years ago as to whether or not when you dropped your son off at about 9:00 at night, you saw Valerie Hill's car in the driveway?

A Yes.

Q And what is your recollection now having read that, did you see Valerie Hill's car in the driveway back then at 9:00?

A If this is what I said, this is probably what the car -- if this is what I put on here, this is probably why her car was there, then, because, you know, I don't remember today, though.

Q Okay. But reading that, does it help refresh your memory, what you said back then was true?

A Yes.

Q And you said back then that her car was in the driveway?

A Right.

Q Okay. Thank you very much. I don't know, Mr. Calle may have some more questions.

THE COURT: Anything else?

MR. CALLE: Maybe just one, your Honor.

RECROSS-EXAMINATION BY MR. CALLE:

Q Hello, again, Mr. Stonecipher.

A Hello.

Q Mr. Stonecipher, just in clarification of the issue of the door, okay, because I think it's a bit confusing here, at least to me , at any rate. This structure here, 248-250 Hickok, is there a door in close proximity, an outside door in close proximity to the driveway garage area?

A Yeah, there's an outside door, yes.

Q Okay. And this outside door, Mr. Stonecipher, was that the door you were talking about when you said you and your wife normally don't use it?

A Right.

Q Now, Mr. Stonecipher, did you or do you have the knowledge of the type of lock that's on that door?

A No -- on my door?

THE COURT: No, the outside door.

A Outside door, I keep on forgetting about that.

Q No, the outside door.

A I -- no, you can't lock it, I know that, because we've gone in there and many times --

THE COURT: So you're saying you cannot lock the outside side door either from the inside or the outside?

THE WITNESS: Right.

THE COURT: It just doesn't lock, right?

THE WITNESS: Yeah.

THE COURT: Okay.

THE WITNESS: I'm sorry. That's, that's it?

BY MR. CALLE:

Q And is that the door you were talking about when you said that that was the way that Valerie Hill got in and outside?

A Yeah, I would -- yeah, she uses this back door, yeah, all the time.

Q So would it be fair to say that anyone could use that back door because it's never locked?

A Well, yeah, you could go in there, yeah.

Q What's to stop someone from going in that door, if it's not locked, is that a fact, sir?

A Uh -- well, we never had no problem, except for if you locked -- if you left your house or left your apartment, you always make sure you locked it, you know.

Q You lock your apartment door, right?

A Well, see, the meter man, or whatever, had to get in there to go down and read the meters, that's why.

Q It's to -- the meter man would come in and out of there; he knew that door was unlocked?

A Probably, yeah.

Q Is that what you're saying? And at the time that your house was burglarized three years before, that door wasn't locked at that time either, was it?

A Geez, I don't remember if it was or not.

Q Well, you say you never got a key to that door, did you?

A No.

Q When you took the rental, they gave you a key to your apartment door, did they not?

A Right.

Q But they didn't give you a key to the garage door, did they?

A No, they -- I can't remember now. That was ten

years ago or longer than that. I can't remember if they did.

Q And they didn't give you any other key, but the key to your apartment, is that your recollection?

A That's right.

Q Now, your recollection was refreshed based upon the reading of the paragraph that you gave some six years ago. Does that refresh your recollection as to whether the garage door of Valerie Hill's garage was open at the same time that you noticed the car there?

A I don't -- not too -- I'm not -- I don't know about the garage door being opened, but I -- if I said her car was there, then I'm pretty sure her car was there at the time. But as far as a garage door being open, I don't know that. I couldn't tell you.

Q So your recollection is not refreshed?

A I would say, yes, it would be with that affidavit, with her car being there, but as far as a garage door being open, I wouldn't know that if it was open or closed. I don't know.

Q So isn't it a fact, whether it's open or closed, it's not something unusual that you would call your attention to --

A No.

Q -- as being odd, is that what you're basically saying?

A No, I never paid any attention to it, you know.

Q By the way, Mr. Stonecipher, what does the rear yard of 248-250 Hickok face, by the garage area?

A The what?

Q The rear yard, what does it face?

A The yard?

Q Yes. What does it abut to; what is it next to?

A It would be --

Q What's behind the house?

A Behind the house?

THE COURT: Listen. Your back yard, they walk through your back yard. What would you come into?

THE WITNESS: A fence.

BY MR. CALLE:

Q What's on the other side of the fence?

A A garage.

Q Somebody living --

A Yeah.

Q It's residential?

A Yeah, right. It would be on the other block there.

Q Thank you.

A All right.

Q Nothing further. Thank you.

THE COURT: Anything?

MR. FITZPATRICK: No, thanks.

THE COURT: Thanks, Mr. Stonecipher. Get this out of your way. You're free. Watch your step there, sir. Thank you.

THE WITNESS: Okay.

(Witness excused.)

MR. FITZPATRICK: Karen Stonecipher.

* * *

K A R E N S T O N E C I P H E R , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

THE COURT: Hello. Good afternoon.

THE WITNESS: Hello.

THE COURT: I'm going to push this over. Okay.

THE WITNESS: Mm-hmm.

THE COURT: Now try to keep your voice up, so we can all hear. If you don't understand any question, ask him to repeat. All right?

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Ma'am, good afternoon. Tell us your full name, please.

A Karen Stonecipher.

Q And Don is your husband? That's the gentleman that just left the courtroom?

A Yes.

Q And where do you live, ma'am?

A 172 Woodbine Ave.

Q All right. And your husband has told us a little bit about your family. You have four children?

A Yes.

Q And did you, at some point, live at 250 Hickok Ave.?

A Yes, I did.

Q When did you live there?

A Well, we moved out in '87.

Q And did you live there in March of '87?

A Yes, we did.

Q And how long had you been there?

A Almost approximately ten years.

Q And did you, at some point, meet your downstairs neighbor, Valerie Hill?

A Yes, I did.

Q And do you know how long she lived there prior to her death?

A About a year, maybe. I'm not exactly sure.

Q All right. And what was your relationship with her? Did you ever socialize with her?

A No, we never socialized. Just neighbors and that's it.

Q All right. And you were friendly with her and vice versa?

A Right.

Q Had you ever been in her apartment?

A Yes.
Q Okay. And was that just neighborly things?
A Um -- yes, oh, if she went away on the weekend, my daughter was asked to go feed the cats, and I went down and fed two cats.
Q Okay. Now, did you know a person she was dating by the name of Hector Rivas?
A Yes.
Q And approximately how many times had you seen Hector Rivas at 248 Hickok Avenue?
A Quite a few times. I, I don't know how many. Quite a few.
Q But you had? Do you remember him?
THE COURT: Keep your voice up.
Q Were you ever introduced to him?
A No.
Q But you knew who he was?
A Yes.
Q You knew him by sight?
A Right.
Q Okay. Did you ever see -- did you see Mr. Rivas gain access to Valerie's apartment?
A Yes.
Q Can you tell us in terms of a time frame when this

was?

A I, I seen him enter into the house with keys, but to keep time -- what time it was or anything, I have no idea.

Q Who did you see enter the apartment with keys?

A Hector.

Q And do you know when this was, whether it was prior to January of '87, or after January of '87?

A Yes, prior.

Q Okay. And on these -- was it more than one occasion?

A Yes.

Q On the occasions when you would see him enter with a key, do you know whether or not Miss Hill would be home?

A Um -- I know a few times she was, but I know that before I didn't see her car, I don't know if she was in the house or not. I don't know.

Q All right. Now, I want to ask you, Karen, if I can, if you recall -- there's a calendar here in front of you -- if you recall an incident involving Mr. Rivas on Tuesday, March the 24th, a time when he attempted to gain entrance?

A Just heard somebody knocking at the door, you

know, banging at the back door.

Q Okay. What door is that you're referring to?

A We have a back entrance and, and her back door, Valerie's back door.

Q All right. The inside back door?

A Right.

Q You heard somebody banging on it?

A Right.

Q Do you know who that person was?

A Yes, it was Hector.

Q How do you know it was Mr. Rivas?

A First of all, I looked out down my hall and I knew it was him because I had seen him there before.

Q And what did you hear him doing?

A Knocking on the door, trying to get in.

Q And how long was this knocking continuing?

A Um -- maybe, approximately five minutes. I have no idea.

Q Do you remember what time this was on the 24th?

A Um -- it would have to be after 2:00 in the afternoon, that's all I know.

Q And do you remember anything that you heard him say?

A He just wanted to enter.

Q All right. What did you hear him say that led you to conclude that?

A Just, "Let me in."

Q Do you know if Miss Hill was home?

A Uh -- at the time, yes. Mm-hmm.

Q All right. And did there come a time when the banging stopped?

A Yes.

Q And do you know if Mr. Rivas was admitted into the apartment?

A Uh -- yes, he was.

Q All right. And this was on Tuesday, the 24th?

A Mm-hmm.

Q Did you see him leave?

A Didn't pay any attention.

Q Did you hear any voices from downstairs?

A No.

Q Now, I want to take you, Mrs. Stonecipher, to Friday, March the 27th. Do you have that date in mind?

A Yes.

Q Did you see Mr. Rivas on that date, March the 27th?

A His vehicle, not him.

Q And when was this?

A Oh, it had to be anywheres from 2 to 3:00, in between there.

Q Was your husband home?

A Not at that time.

Q Where was Mr. Rivas' vehicle?

A Um -- out on the street.

Q And do you know, was it on your side of the street, on the other side of the street, or what?

A I can't remember.

Q Okay. But there's no question in your mind it was Mr. Rivas' vehicle?

A Right.

Q And what type of vehicle or vehicles did you know him to drive back in March of '87?

A It was a silver Riviera. I don't know what the brand name is, because I don't know them, but it was a silver, two-door car, silver-gray.

Q Did you know him to drive any other type of vehicle?

A A red van.

Q Do you recall which of those two vehicles it was that you saw?

A I believe it was the red van.

Q All right. And did you pay any -- was it just one

time that you saw it?

A On that Friday?

Q Yes.

A Yes.

Q I mean, did you ever look out again to see if the vehicle was there?

A No.

Q And your best recollection is that this was sometime between 2 and 3:00?

A Right.

Q All right. Now, did you go out that evening --

A Yes.

Q -- Mrs. Stonecipher?

A Yes.

Q And what time did you go out?

A I'd say around 7:30, 8:00.

Q And where did you go?

A To dinner.

Q And your husband described for us already, this was at the Lyncourt Grill?

A Right.

Q And then did you -- he's testified that he left to pick up your son. Did you leave with him?

A No, I stayed.

Q And what time did you get home?
A Uh -- I would say, approximately 10:30, 11:00, around that area. I'm not quite sure.
Q All right. And do you remember if any of your children were home when you got home?
A No.
Q You don't recall or they were not home?
A Right, I don't recall.
Q All right. And when you got home, do you remember whether or not Miss Hill's car was in the driveway?
A Yes, it was.
Q And when you got home, do you remember if any of her lights were on?
A Her living room light was on.
Q When you left for dinner, do you remember whether or not Miss Hill's car was in the driveway?
A No, I don't.
Q And when you left for dinner, do you remember whether or not any of her lights were on?
A No, I don't.
Q You don't. Okay. Did you hear anything unusual that Friday night?
A No.

Q And did you hear anything unusual that entire weekend coming from downstairs?
A Not at all, no.
Q Did you see Miss Hill on Saturday or Sunday?
A No.
Q Did you know if she had any pets?
A Yes.
Q Earlier you said that --
A Two cats.
Q -- she had two cats.
A Mm-hmm.
Q Did you see any of the cats on Saturday, March the 28th?
A Yes, one cat, in our back hall.
Q Where did you see it?
A In our back hall.
Q On your left, the second story --
A Um -- when I was -- I had to go to work Saturday morning. I came down the stairs to go down to our basement to my dryer, and one of her cats was in the hall between her stairway and mine.
Q Okay. Now, is that -- was that in any way unusual?
A Very unusual. Her cats were never out.

Q All right. And in the one year that she lived there beneath you, did you ever know her to have any male visitors, other than family members, or Hector Rivas?

A No, just, just Hector was the only one that ever came there.

Q Thank you very much, Karen. If you'd stay right there.

THE COURT: I'm going to take a recess. Ladies and gentlemen, don't form any opinions, don't discuss the case. We'll take ten minutes, just to stretch.

(Proceedings stand in recess.)

(All parties are present. Proceedings resumed at this time.)

THE COURT: Okay. We're back in session. The record should reflect the jury, counsel, the defendant are present.

Mrs. Stonecipher, the witness, is still under oath. And are you through, Mr. Fitzpatrick?

MR. FITZPATRICK: Yes, your Honor.

THE COURT: Okay. Mr. Calle, if you would, please.

MR. CALLE: Thank you, sir.

CROSS-EXAMINATION BY MR. CALLE:

Q Good afternoon, Mrs. Stonecipher.
A Hello.
Q Mrs. Stonecipher, directing your attention to the evening of March 27th, 1987, would it be accurate to state that you arrived home between 10:30 and 11 p.m.?
A Yes.
Q Do you recall how long it was before you retired for the evening?
A Probably before midnight, I have no idea of the time.
Q So it would be no later than midnight, but it could be anywhere from 11 p.m. to -- or 10:30 p.m. to midnight?
A I would say between 11 and midnight.
Q 11 and midnight. Can you recall if any of your children arrived home that evening while you were still up?
A Yes.
Q And who would that be?
A My youngest daughter, Sandra.
Q Sandra?
A Mm-hmm.
Q And did you have occasion to speak with her --
A Yes.
Q -- that night? Approximately how long did you

speak with her, do you know?

A I don't recall. I really don't.

Q Well, was it a short duration or long duration?

A Short.

Q Anything unusual --

A No.

Q -- about that conversation?

A No.

Q And it was your testimony that when you arrived home, Valerie Hill's car was in the driveway, to the best of your recollection?

A Yes.

Q Can you tell this Court if you recall whether the garage door was open on Valerie Hill's garage?

A No.

Q You can't recall, or it was not?

A No, it was not open.

Q So then at approximately 10:30 or 11 p.m. on the evening of March 27th, 1987 your testimony is that Valerie Hill's car was at the location, and the garage door was closed?

A Right.

Q Were both garage doors closed --

A Right.

Q -- to the best of your recollection?

A Yes.

Q And that would be approximately the same time that you observed the living room light on in Valerie's home?

A Yes.

Q And no other lights on?

A Right.

Q If you know, Mrs. Stonecipher, does the garage interior have a light?

A Yes.

Q Electrical light?

A Yes.

Q Do you recall if the light was on?

A No, it was not on.

Q By the way, do you know where the car was parked that evening?

A In the -- in front of -- on her side -- we have one side and she was on her side right in front of the garage door.

Q Is that where she usually parked?

A She always would park there.

Q So would you say that she never parked in the garage?

A No.

Q You wouldn't say that, or she never parked --

A She never parked in the garage.

Q To the best of your knowledge?

A Right. Mm-hmm.

Q Did you ever notice her vehicle parked out on the street?

A No.

Q Now, your testimony was that between 2 and 3 p.m. you observed a red van on the street where you lived?

A Right.

Q And when you went out to dinner between 7:30 and 8 p.m., you have no recollection of that red van --

A No.

Q -- on the street where you live? And is it accurate that you didn't notice the lighting conditions of Valerie's home?

A When we went out?

Q Yes.

A Yes. No, no, I don't recall what it was.

Q Now, when you came home, that was approximately 10:30 or 11:00, did you notice if there was a red van outside?

A I didn't recall.

Q One moment.

(Proceedings paused.)

BY MR. CALLE:

Q Now, during the course of the approximate year that Valerie Hill lived at -- below you at 248 Hickok, do you have any personal knowledge of whether Mr. Rivas had ever spent the night?

A I don't recall, no.

Q Well, did you ever observe Mr. Rivas' vehicle parked in the vicinity overnight?

A Never paid any attention. No, can't recall.

Q Now, on the morning of the 28th, was it your testimony that you, in the morning, approximately 8, 8:30, were going down to the basement and observed one of Valerie's cats in the vestibule?

A Yes.

Q What time was that, approximately?

A I don't recall. I had to be to work by 10. It was before that.

Q Were all your children home that morning?

A I had -- well, I have four children. Three were home.

Q What three would that be?

A Pardon me?

Q What three children would that be?
A There'd be Susan, David, and Sandy.
Q And was it your testimony you went into the basement to do some laundry?
A Um -- to get a sweatshirt out of my dryer.
Q Okay. Did you go get the sweatshirt, yourself?
A Yes.
Q And no one accompanied you?
A No.
Q While you were down in the basement, did any of the children come down?
A No.
Q Did you notice anyone in the common area of the structure at that particular time?
A No.
Q Just the cat?
A Just the cat.
Q What was the cat doing, if anything?
A He was just, like he was scared in the hall. I just ran past him and up and down, that's it.
Q Was he meowing?
A I don't recall.
Q Was he trying to get out of the hallway?
A No.

Q Was he moving around?
A Yes, up and down the stairs.
Q He was going up the stairs towards where you were, or the stairs that lead to the basement?
A Lead to the basement.
Q The stairs that lead to the basement, is there a lock -- is there a door with a lock there?
A No.
Q There's no doorway at all?
A Well, there's a doorway to go outside, but it's never been locked.
Q Directing your attention, though, specifically, ma'am, to the stairs that lead to the basement, is there some door that secures the basement area?
A No.
Q Are there windows in the basement --
A Yes.
Q -- that lead to the outside?
A Yes.
Q Do you recall if any of those windows were broken at that particular time --
A I don't recall.
Q -- or shortly thereafter?
A I don't recall that.

Q You said there was a door that led to the basement?
A No, no door.
Q No door at all?
A No.
Q It's just wide open?
A Well, there's a back entrance that goes to two other -- you walk right straight down the basement, when you come down in the back door, or you go up to a flight of stairs, hit the back of Valerie Hill's -- or go up the stairs more and hit mine.
Q I see. All right. You notice anything unusual down in the basement area that morning?
A No.
Q All right, ma'am, we're almost done here.
If you would, I'm directing your attention now to Tuesday, March 24th, relating to testimony Mr. Fitzpatrick got into with you. That would be the Tuesday before the weekend of Miss Hill's death, correct?
A Mm-hmm. Right.
Q Okay. You said that you saw Hector Rivas knocking on Valerie Hill's door?
A Back door, mm-hmm.
Q Well, when you say "back door," what does that

mean, ma'am, if you can try to be more specific to my question.

THE COURT: The inside door or the outside door?

A The inside door to her apartment.

Q How many doors to her apartment were there?

A Two, front and back.

Q Did you ever see Valerie Hill come home and enter her apartment?

A Yes.

Q Which door would she use?

A Back door.

Q Is the back door nearest the rear outside door?

A Right. Mm-hmm.

Q Do you know what room that back door leads into?

A Kitchen.

Q And you say on Tuesday, March 24th, Hector Rivas was knocking on the back apartment door of Valerie Hill?

A Right.

Q And you said that he was knocking for about five minutes --

A Yes.

Q -- is that correct?

A Yes.

Q You didn't see him use a key to get in, did you, on that occasion?

A No.

Q Was it your testimony you sometimes saw Hector letting himself in with a key?

A Yes.

Q What door would he use?

A Back door.

Q So, to your knowledge, prior to Tuesday, March 24th, 1987, Mr. Rivas had been in possession of Valerie's back door key?

A Not of that week, that I know of; before that, prior to that.

Q That was the question, ma'am. I got it --

A I'm sorry. Okay.

Q Prior to that, whatever time before then during the course of the relationship, you'd seen Mr. Rivas use a key to that rear back door that he was knocking on --

A Yes.

Q -- on March 24th, 1987, that Tuesday?

A Prior to March 24th, right.

Q Yes, ma'am.

A Yes.

Q And on March 24th he wasn't using the key, was he?

A No.

Q He was knocking, wasn't he?

A Yes.

Q And his knocking lasted for around five minutes, is that correct?

A Right.

Q And someone knocking five minutes struck you as unusual?

A Yes.

Q And then there came a time after five minutes that Valerie had opened the door?

A I don't recall her opening it. I don't really -- I don't know. It just stopped.

Q Okay. But I thought on direct examination by Mr. Fitzpatrick you said that Hector Rivas, you overheard, say, "Let me in"?

A Yes.

Q And you knew Valerie Hill was home?

A Yes.

Q And then Hector Rivas was admitted into the apartment?

A It just stopped. I just assumed -- I shouldn't do that, sorry.

Q But you didn't -- assumed that Valerie Hill was

home, did you?

A No. She was home.

Q You knew; you had personal, independent knowledge --

A Right.

Q -- that she was home?

A Yes.

Q Now, once he was either admitted or after the knocking stopped, did you hear anything unusual emanating from that downstairs apartment?

A No, nothing.

Q Did you hear any arguing?

A No.

Q Did you ever hear Hector Rivas and Valerie Hill arguing?

A No.

Q Did you ever see Hector Rivas strike Miss Hill at all?

A No.

Q Did you ever see Miss Hill walking around the house with bruises anywhere?

A No.

Q Thank you, Mrs. Stonecipher.

A Mm-hmm.

THE COURT: Anything on redirect?

MR. FITZPATRICK: If I can have a moment, Judge.

(Proceedings paused.)

MR. FITZPATRICK: I'm all set. Thank you, Karen.

THE COURT: Thank you, ma'am. Watch your step.

(Witness excused.)

THE COURT: I think we'll break for the day.

MR. FITZPATRICK: Okay, your Honor.

THE COURT: So, ladies and gentlemen, that's it. We're going to break for today. We can get started at 9:00 tomorrow, so I'd ask you to please be in the jury room at 9:00 tomorrow morning. In the meantime, don't form any opinions about the case; don't talk about it with anybody; don't read any news accounts or listen to any media accounts of this trial; don't go up to Hickok Ave. to have a look around. If I think we ought to go, we'll all go together. And, certainly, don't do any independent research on any issues that may have arisen during the course of this trial.

Have a nice evening. See you tomorrow.

(The proceedings of March 18, 1993 were adjourned.)

* * *

CERTIFICATE

I, PATRICIA A. ALEXANDER, C.S.R.-R.P.R., an official reporter of the Supreme and County Courts, Fifth Judicial District, State of New York, do hereby certify that the foregoing is a true and correct transcript of my stenographic notes taken in the above-entitled matter, at the time and place first herein mentioned.

Patricia A. Alexander
PATRICIA A. ALEXANDER, C.S.R. R.P.R.
Official Court Reporter

August 10, 1993
DATED

P01075

COPY



S T A T E  O F  N E W  Y O R K
COUNTY COURT : COUNTY OF ONONDAGA

---

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

Indictment Number 92-1114-1

-against-

HECTOR M. RIVAS,

Index Number 92-2794

Defendant.

Volume III

---

Onondaga County Courthouse
401 Montgomery Street
Syracuse, New York 13202
March 19, 1993

B E F O R E : HONORABLE J. KEVIN MULROY, County Court Judge, and a Jury.

A P P E A R A N C E S :

WILLIAM J. FITZPATRICK, ESQ.
Onondaga County District Attorney
Onondaga County Civic Center
421 Montgomery Street
Syracuse, New York 13202

RICHARD J. CALLE, ESQ.
Attorney for the Defendant

PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

P01077

# I N D E X


| WITNESSES | PAGE |
|---|---|
| CHRISTOPHER S. REYNOLDS | |
| Direct Examination by Mr. Fitzpatrick. . . . . . . . | 427 |
| PETER F. COONEY | |
| Direct Examination by Mr. Fitzpatrick. . . . . . . . | 434 |
| Cross-examination by Mr. Calle . . . . . . . . . . . | 441 |
| Redirect Examination by Mr. Fitzpatrick. . . . . . . | 451 |
| Recross-examination by Mr. Calle . . . . . . . . . . | 453 |
| MARK J. BROSH | |
| Direct Examination by Mr. Fitzpatrick. . . . . . . . | 457 |
| Cross-examination by Mr. Calle . . . . . . . . . . . | 463 |
| Redirect Examination by Mr. Fitzpatrick. . . . . . . | 474 |
| Recross-examination by Mr. Calle . . . . . . . . . . | 483 |
| LORI F. BROSH | |
| Direct Examination by Mr. Fitzpatrick. . . . . . . . | 485 |
| Cross-examination by Mr. Calle . . . . . . . . . . . | 490 |
| JOHN N. CASSANO, JR. | |
| Direct Examination by Mr. Fitzpatrick. . . . . . . . | 492 |
| Cross-examination by Mr. Calle . . . . . . . . . . . | 502 |
| Redirect Examination by Mr. Fitzpatrick. . . . . . . | 524 |

I N D E X (Continued)

WITNESSES PAGE

JAMES CRIMI

Direct Examination by Mr. Fitzpatrick. . . . . . . . .526

Cross-examination by Mr. Calle . . . . . . . . . . . .534

JAMES PAUL KIMAK

Direct Examination by Mr. Fitzpatrick. . . . . . . . .542

Cross-examination by Mr. Calle . . . . . . . . . . . .560

Redirect Examination by Mr. Fitzpatrick. . . . . . . .567

THOMAS JOSEPH BLAND

Direct Examination by Mr. Fitzpatrick. . . . . . . . .573

Cross-examination by Mr. Calle . . . . . . . . . . . .582

WILLIAM GREGORY DONOHUE

Direct Examination by Mr. Fitzpatrick. . . . . . . . .583

Cross-examination by Mr. Calle . . . . . . . . . . . .594

Redirect Examination by Mr. Fitzpatrick. . . . . . . .606

# E X H I B I T S

| PEOPLE'S NUMBERS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| 6 | Photograph | - | 581 |
| 17 | Photograph | - | 487 |
| 25 | Photograph | 484 | 489 |
| 26 | Photograph | 484 | 489 |
| 27 | Videotape of Crime Scene | 541 | 547 |
| 28 | Evidence Bag Containing Bacardi Rum Bottle | 500 | - |
| 29 | Evidence Bag Containing Note | 541 | - |
| 30 | Pieces of Stationery | 541 | - |
| 31 | Photograph | 568 | 569 |
| 32 | Photograph | 572 | 581 |
| 33 | Photograph | 572 | 580 |
| 34 | Evidence Bag Containing Blue Nun Wine Bottle | 572 | - |
| 35 | Evidence Bag Containing Brass Ashtray | 572 | - |
| 36 | Fingerprint Chart | 582 | 594 |
| 37 | Fingerprint Chart | 582 | 591 |

| DEFENDANT'S EXHIBITS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| B | Record of Conviction, P. Cooney | 452 | - |
| C | Affidavit of J. Cassano | 506 | - |
| D | Affidavit of J. Cassano, (One Page) | 509 | - |
| E | Inventory Report, (Four Pages) | 564 | - |

(Court and counsel are present. Proceedings began at this time.)

THE COURT: All right. Would the record reflect that we're in session, with just the defendant and the attorneys present.

Mr. Fitzpatrick wanted to place something on the record. Go ahead, Mr. Fitzpatrick.

MR. FITZPATRICK: Your Honor, I've just given Mr. Calle Rosario material regarding a Mary Fallon Bigsby. She was on the original witness list. She was not on the witness list of the People that I streamlined, intending to call to trial.

I would ask that I be allowed to call her as a witness. It's no prejudice to the defense. By way of an offer of proof, the testimony I'm going to attempt to elicit from her is simply that on Friday evening she had a telephone conversation with the victim, Valerie Hill. I'm not going to attempt to go into the substance of the telephone conversation.

THE COURT: She has made an affidavit to that effect?

MR. FITZPATRICK: She did not, but her

conversation with the police was memorialized and --

THE COURT: And she was on the original list that you handed up to me and, I believe, Mr. Calle, is that correct?

MR. FITZPATRICK: Yes, your Honor.

THE COURT: And -- well, I think what we ought to do -- I'll let Mr. Calle be heard on this -- we ought to bring the jury in before we bring in Ms. Bigsby and make sure that she doesn't have a relative or something on this panel, so we can address that issue with them to see if there's any prejudice to the jury.

Mr. Calle, do you have any problem with this witness being called?

MR. CALLE: Judge, I just received the material now and I'm just trying to read it all.

THE COURT: Okay. Sure.

MR. CALLE: If I may have a moment?

THE COURT: Sure. Take a moment and read it.

MR. FITZPATRICK: I have one other thing before --

MR. CALLE: I don't see any problem, for

the limited purpose for which it's offered, your Honor.

THE COURT: Okay. Fine. If there's no objection, she will be allowed to be called. What else do you have, sir?

MR. FITZPATRICK: The other thing, since your Honor was not impressed by Mr. Stassi's credentials to explain the significance of the shrine in the defendant's home, I am attempting to locate an expert on Santeria, to explain the meaning of the shrine to the jury.

THE COURT: Well, Mr. Fitzpatrick, I assume counsel is going to object to that, the expert being called.

Two things come to mind immediately: One, that it may, in fact, be come sort of a collateral issue; and second of all, is whether or not this defendant is a -- practices this, this -- I don't know what it is, a religion?

MR. FITZPATRICK: I don't know if you'd call it a religion.

THE COURT: Well, I'd like to say, just because someone has this shrine -- I mean, I

don't know too much about this practice.

MR. FITZPATRICK: Well, it's like -- that's why I'd like the expert to get into that. If you were to go out and finger rosary beads, send mass cards, if you were to pray to a crucifix, you might not know or be able to prove what religion that person was, but you could infer that the person was Christian, perhaps Catholic.

In this same regard, although I cannot produce a witness to say that the defendant practices Santeria, I can produce a witness to say that a Madonna, a photograph of a person, candles lit, and an offering in front of it, has some special meaning.

THE COURT: Are you going to say that the person who would send this person to the hereafter is the one who would build this shrine, or just someone who's connected with the person who's deceased, would worship in this way?

MR. FITZPATRICK: What I'm ultimately getting at would be to prove that the defendant knew Valerie Hill was dead.

THE COURT: Well, you're continuing to look and I'll --

MR. FITZPATRICK: Continue to think about it.

THE COURT: Because this is interesting, but I'll give it some thought. You have not yet located anybody, is that correct?

MR. FITZPATRICK: No.

THE COURT: All right. I'm not saying to discontinue your search.

MR. FITZPATRICK: No.

THE COURT: Continue your search and I'll continue my --

MR. FITZPATRICK: Continue your musings.

THE COURT: Would you bring in the jury, please.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Well, good morning, ladies and gentlemen.

(The jurors collectively responded, "Good morning.")

COURT ATTENDANT: Good morning, your Honor.

THE COURT: Would the record reflect the jury is present, counsel, and the defendant.

Ladies and gentlemen, there was a -- there's going to be a person called to testify today, I believe, whose name was not mentioned to you before. That person's name is Mary Fallon Bigsby, Fallon being her maiden name. Does anybody recognize that name, Mary Fallon Bigsby? She is a woman of approximately thirty, thirty-two years old, I think.

(No response from the jurors.)

THE COURT: Okay. Fine. Mr. Fitzpatrick, if you're ready to proceed.

MR. FITZPATRICK: Yes, your Honor. Mike Christopher Reynolds, please.

Good morning, ladies and gentlemen.

(The jurors collectively responded, "Good morning.")

THE COURT: Hi.

MR. REYNOLDS: Hello.

* * *

C H R I S T O P H E R S. R E Y N O L D S,

called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Chris, good morning. Tell the jury, please, your full name and where you live.

A Christopher Scott Reynolds. I live at 1615 Burnet Ave. in the city.

Q And how old are you?

A Twenty-four.

Q What do you do for a living?

A I'm a college student.

Q Where did you go to school?

A O.C. -- I mean, O.C.C.

Q What year are you in there?

A I'm in the first semester of my second year.

Q And what are you studying?

A Photographic design.

Q All right, sir. And, Christopher, I want to ask you, back in March of 1987, where did you live?

A Um -- 548 Hickok Avenue.

Q And back in March of '87, you would have been how old?

A Eighteen.
Q And did you go to school back then?
A Yes. I was a senior at Henninger High School.
Q Very good. And did you have any type of employment?
A I worked as a paperboy on, um, the 100 and 200 block of Hickok Avenue.
Q On Hickok Ave. Did you deliver papers to anyone at 250 Hickok?
A Yes, I did.
Q Do you remember those people?
A Yes, Stonecipher's.
Q And did you deliver a paper to anyone at 248 Hickok Ave.?
A No, I didn't.
Q When -- what would your paper route entail? What time would you start?
A Um -- I would begin approximately 3:30 each day, and, um -- it would take me -- I would do the 100 block, both sides first, and then work my way up the 200 block, and it would take, on a normal day, about a half-hour to do, and on collecting days, anywhere from forty-five minutes to an hour.
Q Now, did you deliver Monday through Saturday?

A Yes.

Q And what --

A And Sunday.

Q And Sunday, as well. Okay. What days did you collect on?

A Thursdays, Fridays, Saturdays, and then I had a few people who I had to collect on Sundays.

Q All right. Now, do you have a recollection, Christopher, of delivering papers on Friday, March the 27th?

A Yes, because I, um -- I went to the house, uh, 242-244, and went -- and I had to collect at 250 there, the Stonecipherss.

Q All right. Now, what time would you, approximately, would you have been at 242 Hickok Ave.?

A Um -- 25 after 4, 4:30, around there.

Q All right. And would you describe for the jury, Christopher, what happened after you left 242 Hickok Ave.?

A I had just finished dropping the paper off at 242-244, and was cutting across their front lawn to go to 250 to collect and drop off their paper.

Q When you say "their," you're referring to the Stonecipherss?

A Yeah, the Stonecipherss' paper.

Q Go ahead.
A And I seen, um -- someone standing on the -- their front steps.
Q Would you describe this person?
A He was Hispanic, male, approximately six feet tall, maybe, medium build, wearing a gray Members Only coat, I think, jeans.
Q Did you have any conversation with him?
A No.
Q Tell us what happened.
A As I proceeded across the lawn, he came down off of the porch and onto their first landing, because they had two landings to the street, and he was sitting there looking at me, you know, giving me this look --
Q All right.
A -- like I had said something to him, or something.

MR. CALLE: Judge --

THE COURT: Overruled.

BY MR. FITZPATRICK:

Q Well, was it an unusual look?
A Yes.
Q And you took note of it?
A Yes.
Q Did you have any conversation with him?

A No.

Q Tell us what happened next.

A Um -- I, I thought about the look he gave me and I said, you know, it isn't worth arguing with this person, whatever their problem is. And I continued down the sidewalk to the 250 side of the -- of the porch, because I had to -- two separate, um, walkways up to the door, and went to 250 to collect from the Stoneciphers.

Q All right. Now, as you were walking from 242 over to the Stonecipher and had this encounter with this gentleman, did you notice any vehicles on the street?

A Yeah. I saw a red Chevy van with a ladder rack on the top of it.

Q And do you know, was that -- strike that.

Did you observe that as you were leaving 242?

A Yeah, because it was sitting right across the street and it was a real sunny day, and it was, um -- it was like the van had just been cleaned or something, because it was nice and shiny.

Q Now, as you saw this van, did you happen to notice whether or not the engine was running?

A It didn't appear to be running.

Q You then encountered this individual and you proceeded to the Stonecipher, correct?

A Yes.
Q Did you collect from the Stonecipher?
A Yes, I did.
Q When you left 250, did you again see this individual?
A No, I didn't.
Q Did you see the van?
A No.
Q Now, Christopher, do you see the individual that you saw, in the courtroom today?
A Yes, I do.
Q All right. Would you just point to him and tell the jury what he's wearing?
A (Witness complied.) Right there (Indicating); he's wearing a gray suit, a mauve tie with triangles on it, I believe.
Q Okay. Thank you very much.

MR. FITZPATRICK: For the record, he's identified the defendant, Hector Rivas.

Q Mr. Reynolds, than you very much. Would you stay right there, Mr. Calle will have some questions for you.
A Okay.

MR. CALLE: I have nothing. Thank you.

THE COURT: Okay.

MR. FITZPATRICK: Thank you, Christopher.

THE COURT: Thanks, Mr. Reynolds. Take care.

THE WITNESS: Mm-hmm.

(Witness excused.)

MR. FITZPATRICK: Peter Cooney.

COURT ATTENDANT: Right this way, please, sir.

THE COURT: How are you doing?

MR. COONEY: Good.

THE COURT: Just ask you to keep your voice up nice and loud, please, for us.

* * *

P E T E R F. C O O N E Y , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Peter, good morning. Would you tell us your full name, please, and where you live?
A Peter Frederick Cooney, Cazenovia.
Q And what do you do for a living, sir?
A I work at Burns Brothers, inside sales.
Q Burns Brothers. What kind of business is that?
A It's a plumbing wholesaler.
Q And how long have you worked for Burns Brothers?
A Five years.
Q And how old are you, Peter?
A Twenty-eight.
Q Twenty-eight. And do you know the defendant in this case, Hector Rivas?
A Yes.
Q And this is him in the courtroom this morning?
A Yup.
Q How long have you, or had you known him prior to March of '87, Mr. Rivas?
A A couple years.

Q And what was -- how would you describe your relationship with him?

A Uh -- I knew him through -- I worked with him. I knew him through the bars, and just -- I knew him through living in Cazenovia.

Q Okay. And how were you -- where were you working back in March of '87?

A J.C. Smith.

Q What did you do for them?

A I was in sales and I was a driver for them.

Q Peter, I want to direct your attention to March of '87. There's a calendar here in front of me, if you can observe that, it may help you remember some of these days. But I want to direct your attention to March 27th of 1987, and ask if you were working that day?

A Yes, I was.

Q What hours were you working that day?

A 7:30 to 5.

Q 7:30 in the morning?

A Yes.

Q To 5 p.m.?

A Yup.

Q And do you have some type -- did you have some type of company vehicle?

A Yeah. I drove a truck for them, a small pickup truck.

Q Was it identifiable as a company truck?

A Yes, it was.

Q And, Peter, where were you about 2:00 that afternoon, the afternoon of 3/27?

A I was driving on Burnet Ave. down towards the city, going west.

Q See anybody you knew?

A Yeah. I passed Hector.

Q And do you remember what type of vehicle he was driving?

A His red van.

Q And did you acknowledge him or he acknowledge you in any way?

A Yeah. I waved to him.

Q Did you see any response from him?

A No. I don't think he saw me. I'm not sure if he saw me.

Q All right. Do you remember where you were on Burnet Ave.?

A Somewhere down near DeJulio's, DeJulio's store there.

Q All right. And did you then proceed into the

city for some business?

A Yeah.

Q And what time did you get off work that day?

A Five o'clock.

Q And, by the way, where is -- where was your company located back then?

A On Burnet Ave.

Q And when you got off at 5:00, what did you do?

A I went home.

Q Could you tell us what route, or -- strike that.

Where did you live back in March of '87?

A In Cazenovia.

Q And what route did you take from J.C. Smith to Cazenovia?

A Uh -- 690 to Route 92, or to 481 to Route 92.

Q And then into Cazenovia from there?

A Yeah.

Q And, again, on the way home, did you see anyone?

A Yeah. I passed Hector. He was driving his car there.

Q And where was it that you passed Mr. Rivas?

A It was -- it was on Route 92, I think it was in Manlius, near the old Suburban Park.

Q All right. You were heading into Cazenovia?

A Yes.
Q He was heading in what direction?
A Towards Syracuse.
Q And you estimate that to be about what time?
A Somewhere in between 5 and 5:30.
Q All right, sir. And on this second occasion, did you acknowledge him in any way, beep your horn, wave to him?
A I think I waved to him. I'm not sure if I did or not.
Q Same thing, you are not sure if he noticed you or not?
A No.
Q All right, sir. And when after you got home, did you go out anytime that night?
A Yeah, I did go out.
Q What time did you go out?
A I went out around 10, 10:30.
Q And when you went out at 10, 10:30, did you go with anybody?
A Yeah, I met a friend in town.
Q Do you remember that person's name?
A Dave Eberst.
Q And where did you go?

A Went into Albert's tavern bar.
Q What time would you say that you got to Albert's?
A Ten-thirty at night.
Q And what did you do at Albert's?
A Just walked in there, went and had a few beers.
Q How long did you stay at Albert's?
A I'd say about a half-hour, forty-five minutes. I'm not sure.
Q So you were there some time between 10:30 and 11:00, approximately?
A Yeah.
Q During that time that you were in Albert's, did you make any observation of Hector Rivas being in the bar?
A No, I didn't see him.
Q And when you left Albert's, where did you go?
A I went to the Cazenovia Tavern.
Q Where is that located, in relation to Albert's?
A It's right next door.
Q And how long did you stay there?
A An hour, hour and a half.
Q What did you do after that?
A I returned to Albert's.
Q So this would have been some time around 12 midnight, 12:30?

A Yes, sir.
Q And at that time, did you see Mr. Rivas?
A Yeah, I saw him in the bar.
Q Do you know if he was there when you got there?
A Uh -- he was there, but I didn't see him walk in. I just -- I saw him at the bar.
Q And how soon after you walked into Albert's did you see Mr. Rivas?
A I'm not sure how soon it was after I saw him, but --
Q Okay. No question, though, that he was there sometime after midnight?
A Right.
Q Did you have any conversation with him?
A Yeah. I had asked him if he had seen me during the day because I passed him a couple times. And he did say he saw me in Syracuse. He mentioned that he saw me in the J.C. Smith truck.
Q And did you have any further conversation about the unexpected encounters earlier in the day?
A Excuse me?
Q Did you have any further conversation with him?
A Uh -- you know, I just told him I saw him twice that day, and he -- that's all he said. He saw me in the

J.C. Smith truck.

Q All right. Did you ask him -- did you ask him where he was going or what he was doing, or anything like that?

A No.

Q All right, sir. And I want to show you a photograph, Peter, if I may, People's Exhibit 19. Do you recognize the vehicles in that photo?

A Yeah.

Q Do you recognize the red van?

A Yeah.

Q And the other vehicle?

A Yeah.

Q And do you recognize them as Mr. Rivas' vehicles? You have to say yes or no.

A Yes.

Q All right, Peter, thank you very much. If you'd sit right there.

THE COURT: Any questions, Mr. Calle?

MR. CALLE: Yes, sir.

THE COURT: Your witness.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Mr. Cooney.

A Good morning.

Q Mr. Cooney, do you remember what the weather was like that day?

A What the weather was like?

Q Yes.

A No.

Q Mr. Cooney, you knew Mr. Rivas for how long, up to that particular time, 1987?

A At that particular -- a couple years, maybe.

Q What was your relationship with Mr. Rivas, if any?

A Well, I used -- I worked for him part time, also. And I just knew him through living in Cazenovia.

Q How long did you work for him?

A Uh -- three, four months.

Q And then what happened, if anything?

A With what?

Q With your working relationship with him? Is it a fact that he had to let you go from your employment with him?

A No.

Q You were never fired by Mr. Rivas --

A No.

Q -- from your job?

A No.

Q You seem to recall taking a vacation and then coming back to work for Mr. Rivas, and he let you go?

A No.

Q Directing your attention to the instance on the 27th of March, 1987, Mr. Cooney, you were driving this truck, J.C. Smith, is it?

A Yes.

Q Okay. Were you drinking while you were driving?

A No.

Q Okay. Is it a fact you've been convicted of intoxication while driving?

A Yeah.

Q But you weren't drinking on this day in question?

A No.

Q Now, Mr. Cooney, you recall giving testimony in the grand jury, 1992, I presume it was, either October or November?

A Yes, I did.

Q And it was the Onondaga County District Attorney's Office that asked you questions pertaining to this particular incident you've testified to today, is that correct?

A Yes.

Q Okay. Do you recall, on Page 67, Mr. Fitzpatrick,

and I'll go -- I guess I'll go Lines 6 through 13 -- or 15. Would it be fair, Mr. Cooney, do you remember being asked this question, "Now, did there come a time during the evening when you went to Albert's bar or tavern in Cazenovia?"

"Answer: Yes."

A Yes.

Q "Do you remember what time it was when you got there?"

"Answer: I got there, I'd say, around 8 or 9 at night, and then I had left that bar."

Do you remember being asked that question and giving that answer?

A Yes, I do.

Q And then the next question was, and your -- "All right. And your affidavit indicates, Peter, if I can refer to it, that you were there sometime around 10:30." Well, that's not exactly a question, but do you remember giving the answer, "Yeah"?

A Yeah, I was there at 10:30; yes, I do.

Q So, Mr. Cooney, is it not a fact that you don't know if you got there at Albert's at 8 or 9 or 10:00?

A Well, when I was questioned about a week after this happened, I had said it was around 10:30, and that's -- at

that time, that's what I remember it being at, is around 10:30 at night.

Q Well, how did you know it was 10:30?

A I just -- because that's about -- I remember I was watching basketball games. It was during the N.C.A.A. tournaments, and I went into Albert's.

Q Did you have a watch that you looked at?

A No, I didn't look at my watch.

Q And when you were on Burnet Ave. earlier that day when you saw Hector, did you have a watch that you looked at and noted the time as 2 or so?

A No, I didn't look at my watch.

Q And did you have a watch on?

A Did I have a watch?

Q Yeah.

A Yeah, I wear a watch.

Q You have one on today?

A No, I don't.

Q Mr. Cooney, when you saw Mr. Rivas on the second time in the vehicle, did you look at your watch then?

A No.

Q So, Mr. Cooney, how are you judging all these times and the way you testify so exactly, to the time, how -- what is the -- what is your gauge?

A Well --

MR. FITZPATRICK: Object to the form. Excuse me, Peter. I object to the form of the question, Judge. He's not testifying exactly.

THE COURT: I'll sustain it as to the form of the question, but I'm not going to preclude the area of examination.

BY MR. CALLE:

Q How can you be certain what times these were, if you can?

A Well, the one at 2:00 is, I work from 7:30 to 5:00, and it was sometime in the afternoon. And the second time it was after I got -- I get out of work, which will -- probably takes about twenty minutes, fifteen, twenty minutes to get to Manlius from where I worked.

Uh -- at 10, 10:30, it was during -- when I was watching the basketball games that I went into town. And then returning from the tavern to go to Albert's, it was sometime after midnight.

Q Okay. Now, Mr. Cooney, you say you were watching the basketball game. Where were you watching the basketball game?

A At home.

Q And were you drinking there?

A No.

Q The drinking you did was when you went into Albert's that night?

A Yeah.

Q Would you say you did not have a drinking problem at that time?

A No, I don't -- didn't.

Q I beg your pardon, sir?

A No, I don't -- didn't.

Q You deny you are an alcoholic?

A Yes.

Q You do deny it?

A Yeah.

Q Mr. Cooney, there came a time that evening that you arrived at Albert's for the first time, correct?

A Mm-hmm. Yes.

Q What exactly did you do when you got there?

A Went to the bar.

Q Did you have a drink?

A Yes.

Q What did you order, do you remember?

A I was drinking beer.

Q And how long did you stay at Albert's before you went to the tavern next door, or down the block?

A It was a half-hour, forty-five minutes.
Q And did you have an opportunity to go to the bathroom?
A The second time or the first time?
Q The first time.
A I don't remember going to the bathroom.
Q Well, did you -- where did you sit when you had the beer?
A I don't remember. At the bar.
Q And would it be fair to say that Albert's is two rooms --
A Yeah.
Q -- divided by a wall?
A Right.
Q Okay. And can you testify here today that you saw everyone who was in that bar during those forty-five minutes?
A No.
Q Can you testify here today that you know for a fact that Hector Rivas was not in the back somewhere in Albert's?
A I didn't see him in the back.
Q Well, you just said you sat at the bar the whole time. How --

A Right.

Q How could you see in the back, if there's two rooms at Albert's, Mr. Cooney?

A I said I didn't see him in the back of the bar.

Q Did you see anyone in the back?

A No.

Q But you didn't go in the back?

A Right.

Q So, truthfully, you don't know if Mr. Rivas was or was not in Albert's bar whenever you arrived there, do you?

A The first time?

Q Yes.

A I didn't see him in the bar the first time.

Q But you just said -- you just answered you didn't go in the back.

A I don't know if he was in the back or not.

MR. FITZPATRICK: Judge, I object.

MR. CALLE: All right. I'll withdraw it. I'm sorry. I'm sorry.

BY MR. CALLE:

Q All right. Mr. Cooney, there came a time you had beers at Albert's, you left, you go to Cazenovia Tavern, you come back at midnight?

A Yeah.
Q Did you have your watch on then?
A No. There was -- I don't know if I had it on. I didn't look at it. I didn't look at it when I walked in the bar.
Q But you know you had it on when you were working?
A Yes.
Q But you don't know if you had it on when you went out that night?
A I -- at this time, no, I don't.
Q Did you go home from work, or did you take a shower?
A Yes.
Q What time did you leave Albert's?
A Which time?
Q That evening, for the last time.
A Oh, 1:30, 2.
Q Did you notice anything unusual about Mr. Rivas?
A No.
Q Anything abnormal about him?
A No.
Q Anything unnatural about him?
A No.

Q Anything that made you suspicious?
A No.
Q Did he appear nervous?
A No.
Q Did he appear preoccupied?
A He was talking with some people at the bar.
Q Okay. That's a fair answer.
Did he appear disturbed?
A No. I didn't notice.
Q Did he look like a man who just got through strangling a woman and then sexually assaulting the corpse?

MR. FITZPATRICK: Excuse me, Judge, but I'm not sure what a person like that looks like. If counsel could enlighten us --

THE COURT: Are you objecting?

MR. FITZPATRICK: Yes. Yes, your Honor.

THE COURT: I'm going to sustain it. It's outside -- I mean, sustained.

MR. CALLE: Nothing further.

THE COURT: Okay.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Peter, I apologize for what was brought up by defense counsel. In 1988 you were arrested for D.W.I. and

you pled to a noncriminal offense, driving while your ability was impaired?

A Right.

Q Never been in any other trouble than that one incident --

A No.

Q -- four or five years ago? Thank you.

MR. CALLE: What -- may I just -- I, I want to recross, your Honor, if I may, but I wasn't sure I heard what the district attorney said. Can I ask for a readback on that --

THE COURT: Sure.

MR. CALLE: -- before I make a mistake?

THE COURT: Patti, would you do a readback of that redirect.

(The requested portion of the record was read back by the court reporter.)

MR. CALLE: Okay. If I may, may I have this record --

THE COURT: Sure.

MR. CALLE: -- marked as Defense Exhibit B?

(Record of Conviction was marked for identification as Defendant's Exhibit B, this date.)

MR. CALLE: Thank you. If I may, your Honor, I'd like to show this to the witness.

THE COURT: Sure.

(Defendant's Exhibit B was handed to the witness.)

RECROSS-EXAMINATION BY MR. CALLE:

Q Okay. I hand you what's been marked Defense Exhibit B, Mr. Cooney. Mr. Cooney, could you take a look at that, please.

THE COURT: You know what that is, Mr. Cooney?

THE WITNESS: No. It's something about the conviction of a D.W.I.

THE COURT: For you, sir?

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. CALLE:

Q Would you tell this Court what you were convicted of?

MR. FITZPATRICK: Judge, I object.

A D.W.I.

MR. FITZPATRICK: Well, he appears to be reading from it. It's not in evidence. He

doesn't know.

THE COURT: Does that refresh your recollection as to what offense you were convicted of back there in '88, sir? Do you have any independent recollection of what that was?

THE WITNESS: It was a D.W.I. conviction.

THE COURT: D.W.I. conviction. All right.

BY MR. CALLE:

Q And was that for a misdemeanor offense, sir?

A Where would it say misdemeanor on here? I don't know.

THE COURT: Do you know what level offense driving while intoxicated is, sir --

THE WITNESS: No.

THE COURT: -- in the State of New York?

THE WITNESS: No, I don't.

THE COURT: Okay.

BY MR. CALLE:

Q Okay. Could I see it, Mr. Cooney?

(Defendant's Exhibit B was handed to Mr. Calle.)

Q Mr. Cooney, if I were to direct your attention to under where it says, "V.T.L. 1192," would that refresh your recollection as to what you were convicted of?

A Where is that?

(The Court indicated for the witness.)

Q Mr. Cooney, were you convicted of a misdemeanor, if you know?

A Yes.

THE WITNESS: Is that what that is?

THE COURT: Yes.

A It says right there, "misdemeanor."

BY MR. CALLE:

Q Okay. And to your knowledge, is that a criminal offense?

A Not to my knowledge. It's -- yeah, I got arrested.

Q Nothing further.

MR. FITZPATRICK: I have nothing, Judge.

THE COURT: Thanks, Mr. Cooney. You can step down, sir.

(Witness excused.)

MR. FITZPATRICK: Mark Brosh.

(Proceedings paused.)

MR. FITZPATRICK: He's not here yet, Judge. Could we take a few minutes?

THE COURT: All right. We'll take a five-minutes recess, ladies and gentlemen. Don't talk

about the case or form any opinions, please.

COURT ATTENDANT: Right this way.

(Proceedings stand in recess.)

(All parties are present. Proceedings resumed at this time.)

THE COURT: Okay. The record should reflect the jury is present, counsel, the defendant, And Mr. Fitzpatrick --

MR. FITZPATRICK: Thank you, Judge.

THE COURT: -- your next witness.

MR. FITZPATRICK: It's going to be Mark Brosh.

THE COURT: Keep your voice up, if you would, please.

* * *

M A R K J. B R O S H , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Mark, good morning. Tell us your full name and where you live, please.
A Mark J. Brosh, Liverpool, New York.
Q And what do you do for a living, Mark?
A Plumbing and heating business.
Q How old are you?
A Thirty-one.
Q Married?
A Yes.
Q Wife's name?
A Lori.
Q How long have you been married?
A Going on five years.
Q Good for you. Any kids?
A Yeah, one.
Q All right. And any on the way?
A Yes, one.
Q All right, sir. And back in March of '87, Mark, where were you living back then?

A Liverpool.
Q And were you married back in March of '87?
A No.
Q Were you engaged?
A Yeah.
Q All right. Did you know Hector Rivas, the defendant, here?
A Yes.
Q How long had you known Hector Rivas prior to March of '87?
A Probably seven years.
Q And what was your relationship with him?
A Friends.
Q Did you have a business relationship with him?
A Yeah. We worked for a company together.
Q All right. And you developed a friendship over the course of time?
A Yeah.
Q Now, did you know the deceased, Valerie Hill?
A No. Knew of her, met her a few times, yeah.
Q And did you meet her in connection with Hector?
A Yeah.
Q And did you ever discuss with Hector his relationship with Ms. Hill?

A Not too much.

Q All right, sir. Did he ever express any feelings that he had for her to you?

A Yeah. He was, you know, in love with her.

Q Did he ever say he had any plans regarding Miss Hill?

A I assumed he was really in love with her and wanted to get married someday.

Q Are these thoughts that he expressed to you?

A Yeah. I guess so. Thoughts that I took it that way.

Q And did he ever talk to you about Miss Hill's plans regarding staying or leaving the area?

A He said she was going to leave the area for a while.

Q And do you remember when he told you that? Do you remember when he told you, what time frame?

A I don't recall.

Q All right. I want to ask you, Mark, if you do recall Friday, March the 27th? I have a calendar here in front of me that may help you.

Do you recall that date, sir?

A Yes.

Q And did you work that day?

A Yes.

Q And what time did you get off work?

A Five, five-thirty.

Q And what did you do that evening?

A Well, we went up to Coleman's bar.

Q Did you hear from Hector that evening prior to going to Coleman's?

A Yeah. He called me, asked where we were going to be.

Q Where had he called you?

A I think it was my office.

Q And what was the conversation all about?

A What's happening this weekend, what's going on. I said, "We're going up to Coleman's," and, "Meet us up there."

Q When you say "we," who?

A Normal people that we'd have job meetings on Friday and everybody would go up there.

Q Now, was this the regular thing where you would meet Mr. Rivas at Coleman's?

A We worked for A.B.O. Plumbing. We'd meet up there after job meetings, and he went into his own business, and I went into my own business, and we really didn't go out too much after that, but --

Q All right. How long had it been prior to that phone call on Friday, that you had heard from Hector?

A Uh -- I don't know. We really hadn't done anything in about six months, I'd say.

Q Now, did you tell him what time you were going to be there?

A Yeah, 6:00.

Q And did you, in fact, get there at 6:00?

A Six, six-thirty, right in there.

Q And did you meet your fiancee there?

A Yeah.

Q I'm sorry. Were you engaged then? I asked you then --

A I thought I was. I thought I was.

Q All right. And did you see Mr. Rivas at Coleman's?

A Yes.

Q Do you remember what time he got there?

A It had to be 6:30, quarter of 7, right in that area.

Q All right, sir. And describe for us any conversation you had with him.

A Well, there were several people there with us, you know. We were just talking informal stuff, "How's

things going," you know.

Q Okay. Anything unusual happen while you were at Coleman's?

A No.

Q Everybody having a good time?

A Yeah.

Q I want to show you a map here of a part of the city, Mark. I'll give you a second to orientate yourself to that.

A (Witness complied.)

Q Are you familiar with some of the roads shown here, 690?

A Mm-hmm.

Q Teall Avenue? There's an indication of Coleman's restaurant over here on the west side?

A Mm-hmm.

Q I believe it's on Tompkins Street. Does that coincide with your judgment as to where Coleman's is located?

A Yes.

Q All right, sir. And do you know what time Hector Rivas, or -- strike that.

Did you see Mr. Rivas leave Coleman's?

A Yeah.

Q And when did he leave Coleman's? What time?

A Between 9 and 9:30.

Q And how were you aware of that time?

A Well, he left fifteen, twenty minutes before my wife and I left -- or my fiancee then, and we went home. We would go home before 10:00.

Q And you're certain you were home before 10?

A Yeah, right in that area, yeah.

Q All right, sir. And do you know anything about the defendant's personal habits regarding smoking? Do you know if he was a smoker?

A Yeah, he was a smoker.

Q And do you know what brand he smoked back in March?

A I don't know what he smoked in March, because like I said -- but he used to smoke cigarettes.

Q Do you know what brand he used to smoke?

A I thought they were Barclays.

Q Barclays, all right. Mark, thanks very much. Why don't you stay right there.

MR. CALLE: Thank you, sir.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Mr. Brosh.

A How are you doing?
Q Mr. Brosh, directing your attention to the month of March 1987, can you recollect how long you had known Hector at that time?
A Seven years.
Q And in the course of those seven years, did you have occasion to go out with him?
A Yes.
Q On a friendly --
A Yes.
Q -- private life basis?
A (No verbal response.)
Q Did you have occasion to work with him?
A Yes.
Q Did you ever work with him out of town?
A Yes.
Q Would you say it was a number of occasions you did both?
A Mm-hmm. Yeah.
Q I'm not intimating --
A I'd say so. Yeah, we worked --
Q More than one time each --
A Yeah, right.
Q Directing your attention to one month prior

to the telephone call setting up the evening meeting at Coleman's, do you recall socializing with Hector Rivas at a place called O'Toole's sometime in February 1987?

A I don't recall right now, no.

Q Okay. Is it possible that you did?

A Yeah, I could. It would have been possible.

Q It's just that you don't recall?

A Yes, right.

Q Then you are not sure that you didn't see him for six months on a social basis?

A Right. Well, we used to every weekend, we used to go out, you know, back when we worked together. Like I said, I went in business, he went in business, and we parted our ways, and we didn't see each other that much anymore.

Q But did you remain friendly with him?

A What's that?

Q Did you remain friendly with him?

A Yes.

Q Mr. Brosh, in the course of this friendship or business relationship or both, did you ever have occasion to see Mr. Rivas interact with females?

A Yes.

Q Okay. Can you describe his behavior, demeanor,

with females, to this Court?

A He was a gentleman and polite.

Q Did you ever see Mr. Rivas strike any women?

A No.

Q Did you ever see Mr. Rivas harass sexually any women?

A No. I -- no.

Q Were you privy to any weird sexual habits that he might have possessed?

A No.

Q Now, when you said you went on jobs out of town, does that mean that you stayed in some place other than your respective homes?

A Right.

Q Would that be a motel --

A Right.

Q -- or hotel?

A Motel.

Q Did you share a room?

A Uh -- I can't recall. There were several people working on job sites.

Q And did you ever see Mr. Rivas cause any problems with anyone during --

A No.

Q -- during the course of either your business or private relationship with him?

A No.

Q Did you ever know Mr. Rivas to have a girl-friend?

A Yes.

Q Did you ever see Mr. Rivas interact with his girlfriend or girlfriends?

A Occasionally, yeah.

Q Did you ever see him strike any of his girl-friends?

A No.

Q Did you ever see Mr. Rivas get stricken by any female?

A No.

Q Did you ever hear any complaints by females about Mr. Rivas' sexual attitude?

A I don't recall anything like that.

Q Now, did you know where Mr. Rivas lived in 1987?

A Cazenovia.

Q Did you know where?

A I don't know the road, but I knew where the house was, yeah.

Q And so he had been a resident of this particular

part of New York State for about seven years, you say you knew him?

A Mm-hmm.

Q So he was a local, was he not, at that time?

A Uh -- I, I guess so. I don't know what you define a local as.

Q Well, he was living up here for at least seven years, that you knew?

A Yeah, but he was living in North Syracuse. I think he only lived in Cazenovia a year or two at the time.

Q But the general vicinity of this area, would you not say that he was a resident here?

A Well, he's from Buffalo.

Q I beg your pardon?

A He came from Buffalo. I worked with him --

Q He came from Buffalo?

A Yeah.

Q And in 1987, you knew him for seven years, correct?

A Could be eight, could be six; approximately seven, that's right.

Q Approximately. So he was at least a local resident for about seven years --

A Yes.

Q -- that you know of?

A Yes.

Q Is your testimony here today, Mr. Brosh, that Hector Rivas got into Coleman's about 6:30, 6:45?

A Yeah. Could have been 6:15, right in that area.

Q Could have been 6:00?

A Mm-hmm, could have been.

Q So you are not sure?

A No.

Q It was around 6 to 6:45 --

A Right.

Q -- something like that?

And is it fair to say that this meeting was tentatively set up earlier in the day?

A It wasn't a meeting-type deal.

Q Well, a get-together?

A Everybody goes there -- everybody, you know, everybody that I know, goes to Coleman's for happy hour.

Q But you had a conversation with Mr. Rivas earlier --

A Right.

Q -- earlier on the 27th?

A Yes.

Q Do you know approximately what time that was?
A I don't recall.
Q Well, was it lunchtime?
A Probably midafternoon, I'd say.
Q What's midafternoon?
A Two o'clock, one-thirty, two o'clock.
Q So based upon that conversation, Mr. Rivas at least was aware that you and a bunch of other guys were going to be in Coleman's at that evening, and he knew this about 1:30, 2:00, approximately, correct?
A Yes.
Q You weren't surprised that he showed up at Coleman's --
A No.
Q -- were you?
A No.
Q You had spoken to him about it earlier that day?
A Right.
Q Now, there came a time that Mr. Rivas left Coleman's that evening, is that correct?
A Yes.
Q Do you recall what time he left?
A Between 9 and 9:30.

Q So it could have been 9:00, it could have been 9:30?

A Yes.

Q Could it have been 8:30?

A No.

Q Could it have been 10:00?

A I don't think so, no.

Q Do you recall if Mr. Rivas was drinking?

A Yes, he was.

Q Do you recall what he was drinking?

A Uh -- I, I don't recall. Beer.

THE COURT: Are you guessing, or are you --

THE WITNESS: He was drinking beer with me. I don't know what flavor of beer, or -- you know, we were drinking beer.

BY MR. CALLE:

Q How did he appear, in terms of sobriety?

A Fine.

Q Did you see him anytime after he left Coleman's that evening?

A No.

MR. CALLE: One moment.

(Proceedings paused.)

BY MR. CALLE:

Q I just have two further questions for you, Mr. Brosh. Do you recall how much you were drinking that evening?

A We were drinking pretty good, probably ten beers, at least.

Q Okay. So you were fairly intoxicated, would you say?

A No, no. I don't think fairly intoxicated. Under control.

Q But you had ten beers in the course of how long?

A Four, five hours. Four hours.

Q From 6 to 10?

A Six to nine, nine-thirty. I won't reveal how much I drink in front of a court of law, you know what I'm saying?

Q I understand. Mr. Fitzpatrick is taking down notes here.

MR. FITZPATRICK: It's six years ago. The statute of limitations has run out.

BY MR. CALLE:

Q Mr. Brosh, between 6 and 9:30 -- is that the time you were there, three and a half hours? You just said you had about ten beers during the course of 6 p.m. and 9:30?

A Right.

Q Okay. Would that be correct?
A That's --
Q Fair, accurate?
A Yeah, fair.
Q Okay. And would it be fair to say, Mr. Rivas left a half-hour before you did?
A No. He left around 9:15, 9:30. I left about quarter to 10. He left before I did.
Q By the way, are you wearing a watch today?
A No, I'm not.
Q Did you have a watch on?
A No, I didn't.
Q Did you look at a clock that evening?
A No, I didn't.
Q So these are guesses, would you say, fair guesses?
A Yes, yes.
Q As to the time frame, and it could be a little earlier, could be a little later?
A I don't think it would have been much later.
Q But they're all guesses?
A Yeah.
Q Thank you.

THE COURT: Any redirect, Mr. Fitzpatrick?

MR. FITZPATRICK: Yes, your Honor.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Mr. Brosh, you testified in response to a question by Mr. Calle that Mr. Rivas was polite and gentlemanly around women. Do you recall that?

A Yeah.

Q Do you know Sarah Hamlin?

A No. I know of her, yeah.

Q And do you know of her relationship with the defendant, Hector Rivas?

A Yeah. They went out for a few years.

Q And was he polite and gentlemanly around Sarah Hamlin, as far as you know?

A In front of me, yes, he was.

Q Are you aware that Sarah Hamlin has moved out of the Central New York area?

A Yes.

Q Are you aware that is a result of her relationship with Mr. Rivas?

MR. CALLE: I would object. I don't believe there is any --

THE COURT: Sustained.

MR. CALLE: -- testimony pertaining to

this.

MR. FITZPATRICK: Well --

THE COURT: Sustained.

MR. FITZPATRICK: Well, Judge, I would like to be heard outside the presence of the jury.

THE COURT: Okay. Would you like this witness on the stand when you make that offer, sir?

MR. FITZPATRICK: I have no more questions of this witness.

THE COURT: Okay. Wait a second. Do you want to be heard now outside the presence of the jury, sir, to put this issue to rest?

MR. FITZPATRICK: At the Court's convenience. I can call another witness or --

THE COURT: Okay. We'll move on then and I'll give you the opportunity -- you're telling me you don't want this person held, or on call, or anything?

MR. FITZPATRICK: I'd like him, if your Honor changes his ruling, I'd like him held.

THE COURT: Let's put it to bed now. I'm going to ask you to step out a minute, folks.

Don't discuss the case.

COURT ATTENDANT: Right this way, please.

(The jurors were excused.)

THE COURT: This is what we'll do. The record should reflect the jury has been excused. Mr. Fitzpatrick, I will give you an offer of proof at this time with this witness, and then we'll review the objection.

MR. FITZPATRICK: Yes, your Honor.

THE COURT: Strategy.

MR. FITZPATRICK: Judge, outside the scope of my direct examination, because I never asked Mark Brosh any questions about how the defendant interacted with women --

THE COURT: Correct.

MR. FITZPATRICK: -- the defense made him his own witness and asked him, in fact, a character question, "How does he act around women?" "He is gentlemanly and polite." I would like to impeach this witness on that point because I have sworn statements from Sarah Hamlin that she was stalked by this defendant; that she had him arrested several times; that he tried to strangle her on occasion; that he threatened to kill her and

threatened to kill her children; and that as a result of all of this conduct, she finally moved out of the Central New York area to get away from him. In other words, exactly the same --

THE COURT: Okay.

MR. FITZPATRICK: -- as Valerie Hill, except she -- Valerie Hill didn't get a chance to move out --

THE COURT: I think the key is you've asked this witness what he knew about this man's behavior and he said, in his experience, he saw him act a certain way. Now you want him to testify about someone else's state of mind.

MR. FITZPATRICK: I want to be able to impeach him on that point.

THE COURT: Well, take your shot now outside the presence of the jury, because I want to know what questions you're going to ask him and what knowledge he may or may not have about that issue.

BY MR. FITZPATRICK:

Q Mark, are you aware that Sarah Hamlin had the defendant arrested?

A Yes.

Q Are you aware that these were for acts of violence against her?

A Yes.

THE COURT: Okay. Fair enough. Then I'm going to -- how did you come to be aware of this, sir?

THE WITNESS: I picked up Hector Rivas at the courthouse in Madison.

THE COURT: And he related why he was at the courthouse in Madison?

THE WITNESS: Yeah. He beat up Sarah Hamlin and was arrested for that.

THE COURT: Based on that testimony, and it comes from personal knowledge, I intend to allow the examination of this witness on this particular point, Mr. Calle.

MR. CALLE: I didn't hear that, I'm sorry, your Honor.

THE COURT: That's okay. Do you want a minute to confer with your client?

MR. CALLE: No, sir.

THE COURT: Based on this witness' personal knowledge from the defendant, of this relationship with this woman and the acts of violence, or the

acts of his arrest surrounding that relationship, based on your testimony, or your questions, I'm going to allow the district attorney to delve into this on redirect, sir.

MR. CALLE: I would just object to the arrest coming in. We weren't talking about his reputation, just as to his knowledge -- not to bring in his arrest, that's a rebuttal, that this man gave reputation -- I don't believe this man gave reputation testimony to which is to be impeached.

THE COURT: Well --

MR. CALLE: He just gave his personal observations. So I would object if a prior arrest of violence were to be entered into the jury's knowledge at this time.

If you want to say what the relationship is with Sarah Hamlin, that's fine. I could ask him other quest ons that will maybe perhaps cover it. But to get into his arrest, I find that's too prejudicial, at this point.

THE COURT: I appreciate that. However, normally I wouldn't allow it, on a simple arrest to be

brought before a jury, since they are certain presumptions attached and final dispositions may be different than what the charges were. However, given the nature of the questions, the fact that these alleged acts of violence arose to a level of the police intervening, causing an arrest to be made, I think that's significant and I think that the degree of violence is fair game for the prosecutor on redirect, and if that level reached the point where the police were called to intervene, an arrest was, in fact, made, I think that's significant, and I'm going to allow it.

Would you bring the jury back, please.

And based on that offer of proof, it's quite obvious I'm going to allow -- change my ruling on the objection.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Will the record reflect the jury is present and has returned to the courtroom.

Go ahead, Mr. Fitzpatrick.

BY MR. FITZPATRICK:

Q Mr. Brosh, you were aware of who Sarah Hamlin is?

A Yes.

Q And you're aware that she, in the past, made several complaints against this defendant for beating her?

A Well, I don't know of the complaints that were made.

Q You know the defendant was arrested on more than one occasion for assaulting her?

A I know of one occasion.

Q And do you know which occasion that was?

A Uh -- I guess he beat Sarah Hamlin up, and I picked him up from the police department.

Q Do you know what time? In '84 and '85, or in '86?

A I don't really recall, to be honest with you.

Q Do you know if that was the time when he attempted to strangle her?

A I don't really -- didn't know the details. I just know there was a problem.

Q Do you know that was the time when he threatened to kill her?

MR. CALLE: I object to the line of questioning. There's no evidence that Mr. Rivas

attempted to strangle Miss Hamlin --

THE COURT: I'll sustain --

MR. CALLE: -- nor evidence that he attempted to kill her.

THE COURT: I'll sustain the objection.

Do you know, personally, any circumstances surrounding that incident where you picked him up at the courthouse, sir?

THE WITNESS: The only thing I know, she was beat up by Hector Rivas, and I picked up Hector Rivas from the courthouse. That's all I know.

BY MR. FITZPATRICK:

Q Do you know, Mark, that she has since moved out of the Central New York area?

A Yes.

Q Do you know why she's moved out of the Central --

MR. CALLE: Objection.

THE COURT: Overruled.

Q Just if you know why.

A I guess she wanted to get away from Hector Rivas.

MR. CALLE: Objection.

THE COURT: Overruled, sir.

MR. CALLE: He says he guesses.

THE COURT: Overruled, sir.

MR. FITZPATRICK: Thank you, Mark.

RECROSS-EXAMINATION BY MR. CALLE:

Q Mark, did you know the relationship of Sarah and Hector?

A Yes.

Q What type of relationship was it?

A They were lovers.

Q Did they live together?

A Um -- at one point, I think they did, yeah.

Q Did you know that Sarah Hamlin used to batter Mr. Rivas?

A I knew they had some problems. I didn't know who was battering who. I really didn't care, to be honest with you.

Q Did you know that Sarah Hamlin, the next day, withdrew the charges that were the cause of Mr. Rivas' arrest?

A No, I didn't.

Q That, in fact, she admitted to the police that she lied?

A No, I didn't.

Q Nothing further.

THE COURT: Okay. Anything else?

MR. FITZPATRICK: No, your Honor.

THE COURT: Thank you, sir. You may step down. Watch your step there.

(Witness excused.)

MR. FITZPATRICK: Lori Brosh.

THE COURT: Hang on just a minute, please.

(Photographs were marked for identification as People's Exhibit Numbers 25 and 26, this date.)

THE COURT: Hi, how do you do?

MS. BROSH: Good.

THE COURT: Keep your voice up nice and loud. If you don't understand any question, ask him to repeat it. You can't answer by saying mm-hmm. You have to say yes or no.

MS. BROSH: Okay.

THE COURT: Thanks.

* * *

L O R I F. B R O S H , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good morning, ma'am. Tell us your full name, please.
A Lori Brosh.
Q And your maiden name, Lori?
A Lori Fleming.
Q And your husband obviously just testified a few moments ago, yes?
A Yes.
Q And when were you engaged?
A (No verbal response.)
Q He didn't remember either. Were you married back in March of '87?
A No, we were not. I believe we were engaged right before that.
Q You were certainly dating and seeing each other then?
A Yes.
Q All right. Now, do you recall, Lori, an occasion when you and your husband and some friends were socializing

at Coleman's on March the 27th of '87?
A Yes, I do.
Q And do you remember what time you arrived at Coleman's that night?
A For happy hour, it was approximately -- I was there after my husband. I went with my girlfriends 6, after work, 6:30.
Q Time -- 6, 6:30?
A Yeah.
Q Did you know Hector Rivas back in March of '87?
A Yes, I did.
Q And did you see him there that night?
A Yes, I did.
Q Do you know when he got there?
A He was there when I got there.
Q All right. And when did you leave Coleman's?
A We left Coleman's, I would say, 9:30, 9:15. We were home by 10:00.
Q Are you sure that you were home by 10?
A Yes, I'm sure.
Q And how long a drive is it from Coleman's to your house, approximately?
A Approximately fifteen minutes, but we stop sometimes to eat on the way home after happy hour.

Q Did you stop on this occasion?
A I believe we probably did, though I'm not sure.
Q Fine. And when you left Coleman's, was Mr. Rivas there?
A No.
Q He had left?
A Yes, he did.
Q Are you sure of that?
A I'm sure.
Q Did you have a camera with you that night?
A Yes, I did.
Q And did you take some photos?
A Yes, I did.
Q And did other people use this camera to take photos, as well?
A That's possible.
Q All right. I want to show you -- I want to show you Exhibit 17 and ask if you recognize that photo.
A Yes, I do.
Q And how do you recognize it?
A As far as the -- there's my husband's friends.
Q Who are the people in the photograph?
A Chuck Barone, Gary Burkhardt, and Hector Rivas.
Q And was that photo taken the night of the 27th?

A Yes, it was.
Q And how about Exhibit 25?
A Yes.
Q Was that also taken the night of the 27th?
A Yes, it was.
Q Do you know the people in that photo?
A Hector -- I don't know who that girl is.
Q And do you know if you took that photo or not?
A I'm not sure if I took that photo.
Q And People's Exhibit 26, do you recognize that?
A Yes.
Q And what is that?
A Hector Rivas waving.
Q On the night of the 27th?
A Yes.
Q At Coleman's?
A Yes.
Q All right. Now, do you know if Mr. Rivas was drinking that night?
A Yes, he was.
Q Do you know what he drank or what he drank that night?
A Beer. I don't know what kind.
Q And do you know how much he had to drink?

A I have no idea.

Q Do you know, Lori, whether or not he was a smoker in March of '87?

A Yes, he was.

Q Do you know what brand he smoked in March of '87?

A Yes, but I'm not really -- it was a different brand.

Q All right. If you're not sure --

A Barclay.

Q -- don't say. Barclay?

A Yes.

Q Is that what you believe?

A Yes. Or Barclay or something.

Q I'm not sure where the accent is, myself.

MR. FITZPATRICK: Judge, I would offer 25 and 26 and 17.

THE COURT: All right. Mr. Calle?

MR. CALLE: No objection.

THE COURT: No objection? All right. Exhibit 17 is received. Exhibit 25 is received. And Exhibit 26 is received.

(People's Exhibit Numbers 17, 25, and 26 were then received into evidence.)

MR. FITZPATRICK: And I have no more questions for Ms. Brosh. Thank you very much. Stay right there.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Mrs. Brosh.

A Good morning.

Q Mrs. Brosh, what time did you and your husband leave Coleman's that evening?

A I would say between 9:15, 9:30, thereabouts.

Q Do you know when Hector Rivas left, in relation to your departure?

A I would say approximately half-hour before us.

Q So it could be 8:45, 9:15?

A Thereabouts.

Q Okay. Now, you say you went somewhere before you got home that evening?

A That's possible. I was not -- I was not sure of that.

Q But you got home about 10:00?

A Yes.

Q Now, those photos you took at Coleman's, there's one of Hector Rivas waving?

A Mm-hmm.

Q Was he leaving at that time, or was he just fooling around?

A I have no idea.

Q You don't know when you took it?

A No, I don't.

Q Okay. And did you have a reason for taking these pictures?

A I had just gotten back from vacation with my girlfriends and I had the camera with me, and we were just trying to get rid of the excess film, I believe.

Q Did Hector Rivas appear drunk to you?

A No.

Q Do you recall how many beers he had?

A Not at all.

Q Nothing further.

THE COURT: Anything else, Mr. Fitzpatrick?

MR. FITZPATRICK: No. Good luck with the baby.

THE COURT: Thanks very much. Watch your step.

(Witness excused.)

MR. FITZPATRICK: Call John Cassano.

THE COURT: Hi. Good morning.

MR. CASSANO: Good morning.

THE COURT: Okay.

* * *

J O H N N. C A S S A N O , J R . , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q John, good morning. Tell the jury, please, your full name.

A Um -- John N. Cassano, Jr.

Q John, how old are you?

A Twenty-nine.

Q Married or single?

A Married.

Q And wife's name?

A Renee.

Q Any kids?

A Yeah, five.

Q Five kids? Good for you.

Where do you work, John?

A Pizza Hut.

Q And which one?

A Western Lights.

Q What do you do there?

A The unit manager.

Q How long have you been at that location?

A I'm going to say, at the Western Lights location, since last April.

Q April of '92?

A April of '92, yes.

Q And where did you go to school? In this area?

A Uh -- yup. I went to Henninger High School.

Q And you've been working ever since you left high school?

A Yeah.

Q Were you working back in March of '87?

A Yes, I was.

Q Where were you working back then?

A Um -- I was working at Liquor Square as the front

end manager of the store.

Q And you were married back then, were you?

A Yes, I was.

Q And the Liquor Square, could you tell us where that's located?

A Um -- it's located on the corner of Erie Boulevard and Thompson Road.

Q I want to show you a diagram or map, John. It's Exhibit 3. It's received in evidence. Just acclimate yourself to some of the things: 690, Teall Ave., Midler Ave. Do you have some familiarity with this area?

A Yes, I do.

Q And there's an indication of Liquor Square being identified on the far right-hand side, is that --

A Yeah.

Q -- consistent with your recollection?

A Oh, yeah, that's definitely where it is.

Q I'll just hold it up for the jury one more time.

(Mr. Fitzpatrick displayed People's Exhibit Number 3 for the jury.)

BY MR. FITZPATRICK:

Q And this is the Liquor Square that you worked at?

A Uh -- yes, it is.

Q And what were your duties back in March of '87,

John?

A I pretty much had control of like the scheduling of the cashiers; ran register when needed; stock the front of -- help keep the front of the store stocked, merchandise. You know, here's the cash register. Pretty much what -- anything to do with the front half of the store I had to take care of.

Q And Liquor Square is a liquor store?

A Yeah. You would have hard spirits, your hard liquor and wine. No beer or anything like that, because it's a different license.

Q So, did they sell party goods, plates, napkins?

A No, nothing of that sort.

Q And what was your work schedule back in March of '87?

A Um -- I usually worked twelve-hour days, most of the time from 10 to 10, or 10 to 9, or 9 to 9, depending on the day of the week.

Q All right. Let me draw your attention to the specific day, Friday, March the 27th of '87. There's a calendar in front of me here, John, if you need to look at it.

Were you working that day?

A Yes, I was.

Q What hours did you work that day?
A I worked 10 to 10 that day.
Q 10 a.m. to 10 p.m.?
A 10 a.m. to 10 p.m.
Q Now, what steps would you take as you got closer to 10:00 closing time, what would you be doing?
A Closer to 10:00, pretty much I would end -- wind up in the front of the store, because I needed to start like an end-of-day procedure with the computer. One of the other managers would have to be upstairs to initiate that process, so that the computers would -- the cash registers would send the daily sales information up to the main computer in the office. That would usually occur about 9:30, when a manager would go up and get the program started, because it took about twenty minutes to run.
So usually at 9:30 I'd be the only person down on the sales floor for about ten or twelve minutes, at least.
Q And on that Friday night, March 27th, at 9:30, were you, in fact, the only one on the sales floor?
A Um -- yeah, to my knowledge, I was the only person in front, and there was, uh -- two other cashiers that I had, but it was so slow that night, I had sent them up the aisles to do some routine cleaning, because the place

was just notoriously dusty all the time. So they were up in the aisles cleaning some bottles and shelves.

Q Did you have regular clients that you were familiar with?

A Oh, yeah, definitely. Probably to this day you go stand there and the same people would go -- come through at the same time.

Q Now, you say it wasn't very busy after 9:30 that Friday night?

A No, it wasn't.

Q Do you recall a particular customer coming in that night?

A Yes, I do.

Q About what time was that, John?

A It was between 9:30 and 10:00

Q What drew your attention to this customer?

A Um -- the way the person drove into the parking lot and parked in the very first parking slot adjacent to the door, and at the rate the person was coming through the door, I looked to see if anyone else was on the sales floor, because my first thought was I was going to be robbed, because I never seen anyone bolt through the door that fast.

Q Do you remember anything about the vehicle?

A Yeah. It was, you know, light -- what I could see at the time, it looked like it was light gray or silverish color, you know. A big, two-door car. It wasn't like a subcompact car or anything, because it filled up the parking space.

Q Was it a man or woman?

A It was a man.

Q Describe the man as you remember him?

A Um -- when he come in through the door, I, I -- Hispanic person, um -- definitely over five foot tall, uh -- had a scar on his face and, you know, seemed to be in a -- very much of a hurry to get in and out of the store.

Q Do you remember anything about the way he was dressed?

A Uh -- no, I don't really recall too much what he was wearing.

Q Did you keep your eye on him?

A Oh, yeah. I watched.

Q What did you observe him do?

A He came through the door, went right through the -- like the little entranceway. There was a cart walk and turnstile; he went through there, immediately went across the front of the store, the very front aisle, went to the far wall, where we had the gins and vodkas on the outside

wall, and then the inner wall, if you were to turn and look, um, all the rums were on the opposite side, then went down towards the back of the store, picked up a -- some, some wines, because all the wines were in the very back half of the store, come back around to the other side, and then come right up to the register.

He caught my eye because, one, I didn't know where the other two employees were, and to my belief, I was the only one other management person on the floor. So I wanted to definitely keep an eye. It just didn't fit -- it didn't fit in right.

Q Did you have any conversation with this fella as he checked out?

A I tried to strike up some, but there was none, which was normal cash register -- normal register candor, normal conversation. I tried to strike up a conversation, but it was not -- just exchange your money, and, boom, right out the door.

Q Do you remember what he bought?

A Um -- yeah, there was a bottle of Almaden wine, um -- a bottle of rum, and then there was a third bottle -- um, it was a liquor, but I just don't recall what type it was.

Q Now, have you since this day checked your register

receipts from that date to determine if a bottle of Bacardi rum was sold between the hours of 9 and 10:00 at night?

A Yeah, yeah, they had me check the receipt, search out the sales receipt. There was a sale.

Q What time?

A That was like 21:40, if I recall, which -- that's, you know, 20 minutes to 10. And, you know, there's a rum, there was Almaden wine, so --

Q All right. Now I want to --

MR. FITZPATRICK: I'd like to have 28 marked, your Honor. It's a bottle of Bacardi rum.

(Evidence Bag containing Bacardi Rum Bottle was marked for identification as People's Exhibit Number 28, this date.)

BY MR. FITZPATRICK:

Q John, I've got in my hands Exhibit 28, which appears to be a bottle of Bacardi rum. Is this the type of liquor that that person purchased?

A Yes, it is.

Q Now, is there any way you can look at this bottle and determine from a label of some kind, or a mark, whether or not it was, in fact, sold from your store?

A Um -- pretty much the biggest distinction between Liquor Square and the other liquor stores in the area at the time was that Liquor Square had scanners, just like Wegman's grocery stores do. So we didn't mark things that didn't need it, because it was just a big cost for price tags.

Q And that one has a scanner?

A They would -- the producer would have the U.P.C. code that would stay with the product.

Q So, to be clear, although it certainly appears to be the same type of bottle, you can't say for certain that this came --

A I can't say for certain, yeah.

Q -- this came from Liquor Square?

John, do you see the person that came into your store on the night of March 27th --

A Yes, I do.

Q -- 1987 --

A Yes, I do.

Q -- and purchased this bottle of rum?

A Yes, I do.

Q Would you point to him and tell the jury what he's wearing?

A He's sitting right over there (Indicating); has a gray suit on, mauve tie, white shirt.

Q Okay, John. Thank you very much. And, for the

record, that's the defendant, Hector Rivas.

THE COURT: Okay.

CROSS-EXAMINATION BY MR. CALLE:

Q Mr. Cassano, is it a crime to spend money and leave quickly?

MR. FITZPATRICK: Judge, I object to that question; it's patently --

MR. CALLE: I withdraw it.

THE COURT: All right. Objection sustained as to the form of the question.

MR. CALLE: Yes.

BY MR. CALLE:

Q Mr. Cassano, there were other employees in Liquor Square on the evening of the 27th of March, 1987, correct?

A Yes, there was.

Q You weren't the only one in the store, were you?

A Uh -- no, there was other people working.

Q Can you recollect what other people were working there? I don't need their names, just their job description.

A Um -- two cashiers and, um -- the store's general manager.

Q Anyone else?

A That's all I can recall at the time.

Q Just generally speaking, is that basically the personnel for Liquor Square -- not necessarily that evening or that day?

A At that time of night, yeah. We'd always scale back to, you know, like a minimal staff, because it does tend to slow down, so you don't need to have as many people on that late at night, yeah, but it definitely -- pretty much was the norm to have that many people.

Q Now, sir, you said that you were a bit fearful of the gentleman who came into the store, when he came into the store, correct?

A Yes.

Q What gave you that impression?

A What gave me that impression? Um, just, uh -- being -- working in the retail business that long. Um -- he just come through the doorway too fast, off a normal pace. Our normal customers would just casually stroll into the store, because it was just like going to a grocery store. He just bolted in. And with someone doing that that late at night, you always have that sixth sense, what's going to go on. So I paid particular attention.

Q Was there a basketball game that evening?

A Yes, there was.
Q Do you know who was playing?
A Um -- I don't recall, but I know it was the N.C.A.A. East Regionals going on at the dome.
Q Is that a big affair up here?
A Yeah, that was a large event.
Q Did you ever see S.U. games, yourself?
A Oh, yeah. I've been in the dome a couple times.
Q People come in, buy liquor, and watch the games?
A Um -- people would come down. Most of them would be students trying to come in, but most of them will get turned away at the door, because the owner of the store would employ a -- used to employ a security service to check ID.s, and if there was, you know, any problems with ID., they wouldn't get in, because the students would try to get in.

But the older crowd, you know, they usually wouldn't come. It was mostly kids who would try to get in to buy liquor, to go up to the game and go into the -- up to the dome and have a good time.
Q Now, Mr. Cassano, on an earlier question you answered that the employees normally, generally, were there. Wasn't there, on the evening of the 27th of March, two cashiers, a store general manager, and now you're mentioning

that there was some sort of security person that was also employed there?

A Yeah. That person was always there. I mean, there was one there from 5:00 every day until closing, usually.

Q So, Mr. Cassano, that you're incorrect in giving an answer that there were only two cashiers and the store's general manager, aren't you?

A Uh -- no, no.

Q Aren't you?

A Because at the time, the security guard -- the only reason why I kept my eye on the person was that security guard wasn't behind me where he would normally stand at the cash register, so I didn't know where he was. He was outside the building somewhere, to the best of my knowledge, or in the building, or maybe in the bathroom that was in the front. I don't know where he was, because that's the first person I went to, and he wasn't there.

Q Well, Mr. Cassano, do you remember the security man's name?

A Um -- it could have been one of three, one of three people. They rotate. So it wasn't any given person that would be scheduled on either night. Depends on who could get out of their regular job to get there to do it.

Q Mr. Cassano, does the name Troy Prater ring a

bell with you?

A Yes, it does. He was one of the security guards.

Q Mr. Cassano, I'd like to show you this affidavit.

MR. CALLE: Must I have it marked, Judge?

THE COURT: Yes, please.

(Affidavit was marked for identification as Defendant's Exhibit C, this date.)

MR. CALLE: Could I have a moment, Ms. Alexander?

(Proceedings paused.)

MR. CALLE: Thank you very much.

BY MR. CALLE:

Q Mr. Cassano, I'd like to show you that.

MR. CALLE: Is this it?

COURT REPORTER: Yes.

BY MR. CALLE:

Q Could you tell this Court what that is, sir?

A Okay. Let's see. Yeah. This is a statement -- that looks like they -- no, that's my birth date.

Q I can't hear you, sir.

A It's a statement that the police department took from me when they came to -- first came to Liquor Square.

Q All right. What was the date on that?

A The 5th of May, at about 11:00.

Q Is that 1987?

A Yes, it is.

Q Okay. I ask you to read it, sir.

MR. CALLE: Judge, does he have to read the whole page, or just, could I direct him to where --

THE COURT: Just -- sure, direct him.

BY MR. CALLE:

Q I'd like to direct you to this paragraph here, sir. Would you read that?

THE COURT: To yourself.

A The very bottom starting right here (Indicating)?

Q Yeah.

THE COURT: Starting here? Okay. Go ahead.

Q To yourself, sir.

A (Witness complied.) Okay.

Q Now, Mr. Cassano, do you recognize this affidavit --

A Yeah.

Q -- Defense Exhibit C? There's a signature here. It says, "John," initial I, is it?

A What's that? No, N.

Q "N. Cassano, Jr.," is that your signature?

A Correct. Yes.

Q Sir, do you recall that you told the police that evening that Mr. Rivas pulled his car into the parking lot near the door where Troy Prater, the store security guard, was standing?

A Yeah. I recall telling them that.

Q Well, sir, did you sign this statement?

A Yes, I did.

Q Okay. So this statement that you signed back in 1987 indicates that this Liquor Square security guard was standing by the door --

A He was.

Q -- when Mr. Rivas allegedly parked the car, is that correct?

A He was by the door, outside of it.

Q Is that correct, sir?

A Yes.

Q Yet you couldn't recall him being there today when I asked you what employees were there that evening?

A I can recall him being there, but I didn't know where he was. I didn't know that he was behind me.

Q Yes, but sir, not to argue with you, but you said you, the cashiers, and the store's general manager were the only ones there at the time. Was Troy Prater the general manager at the time?

A No, he wasn't the general manager, but he also wasn't in direct employ under general management control. You did ask me what employees --

Q Sir, did you go look for Mr. Prater to tell Mr. Prater there is a very suspicious, fast-paced moving Hispanic man; I think he's going to rob me. Did you tell Mr. Prater that at all?

A No, I didn't tell him that.

Q Okay. Now, sir, it's your testimony that Mr. Rivas allegedly bought a bottle of Almaden, a bottle of Bacardi rum, and a third bottle, correct?

A Yes.

Q Okay. And you're sure about that, correct?

A Yeah, I am.

Q To the best of your knowledge?

A To the best of my knowledge.

Q As sure as you are about everything else that you said here today?

A Yes, I am.

MR. CALLE: I'd like to have this marked as Defense Exhibit D, if you would, please, Ms. Alexander.

(One-Page Affidavit was marked for identification as Defendant's Exhibit D, this

date.)

MR. CALLE: Thanks.

BY MR. CALLE:

Q Mr. Cassano, I'd like you to look at Defendant's Exhibit C, if you would. Use the same procedure the Judge allowed here with Defense C.

THE COURT: D.

MR. CALLE: This is D.

THE COURT: Okay. Go ahead, sir.

(Proceedings paused.)

A Okay.

Q Mr. Cassano, is that your signature on that affidavit at the bottom?

A Yes, it is.

Q And could we take it that you read this particular affidavit before you signed it?

A Yes, I did.

Q And it was dated in May of 1987?

A That's correct.

Q Mr. Cassano, this affidavit has to do with the receipt that you were talking about on direct examination, does it not?

A Yes, it does.

Q Okay. And you had said at approximately 20 to 10,

this receipt -- by the way, where did the receipt come from?

A The receipt was -- it actually wasn't the customer cash register receipt. It's what they called the journal tape receipt which recorded -- actually recorded the transactions at the same time -- um -- would put down the U.P.C. bar code symbol, plus the price, so that a particular item could be identified by going through that.

Q So would you answer me? This receipt came from Liquor Square's --

A Yes, it does.

A

Q -- business records?

A Yes.

Q The receipts are kept in the normal course of business?

A Yeah, they're kept --

Q After reading this affidavit, Mr. Cassano, do you recall what the receipt indicated was purchased at the hour that you said was about 20 of 10 -- actually here it's 10 of 10 p.m. on March 27, 1987.

A Um -- yeah. There was the rum, and an Almaden wine, and another bottle.

Q Well, does this affidavit just state that you sold a bottle of Ron Bacardi amber rum in a one-liter bottle?

A Yes, it does.
Q Does it mention anything on the receipt about a bottle of Almaden?
A No, it doesn't.
Q Does it mention anything about a third bottle?
A No, it doesn't.
Q Thank you, sir. Do you know if Mr. Prater saw Mr. Rivas come in at that hour?
A Do I know? Excuse me, what was that?
Q Do you know if Mr. Prater, the security guard, saw Mr. Rivas?
A Um -- I don't know.
Q What's the function of the security guard --
A Oh, he should --
Q -- of Liquor Square?
A His primary function was, one, to check the ID.s of people coming in the store. Uh -- you know, that was his primary responsibility; that's what the owner's responsibility was. And then, of course, if anything were to happen, to try to intervene.
Q So he was there for security --
A Yes, he was.
Q -- in the very real sense of the word, also correct?

A Right.

Q Mr. Cassano, did the police, to your knowledge, show a photograph of Mr. Rivas to Mr. Prater, the security guard?

A Uh -- not to my knowledge.

Q So you are the only one, to your knowledge, from Liquor Square, that says Mr. Rivas was in your store?

A Um -- I'm the only one that says that I saw him, yes, that I know of.

Q That you know of.

MR. CALLE: Can I take out the bottle?

MR. FITZPATRICK: Sure.

BY MR. CALLE:

Q By the way, Mr. Cassano, was it your testimony that you sent two girls down the aisles to dust?

A Yeah. There was -- there was two girls that were working, yes, that were dusting along the aisles somewhere out there. I don't know where they were -- I mean, because you can't see -- the way the store was set up at the time, I couldn't see them.

Q But you were watching, allegedly, Mr. Rivas go up one aisle, down another aisle, sort of like a rat in a maze?

A The path he took, yes, I could see where the girls were. They were on the other end, so I couldn't see

them from the end, and he was tall enough to be seen over the counters. I mean, if I walked through the store, right, you still can't even see me go through, because I'm too short.

Q How tall do you think Mr. Rivas is?

A Oh, he's about five-seven, five-eight, maybe five-nine, I don't know.

Q You think he's six feet?

A It's possible.

Q Do you remember how tall the girls were?

A Oh, both girls were shorter than I. One was maybe just barely five foot, four-eleven, somewhere in there, and I'd say the other one maybe about five foot even.

Q Was the general manager working that evening?

A Yes, he was.

Q That's Bill --

A William Hooven, yes.

Q Did you call Bill and say, "I got a strange, scary man in here. Come up front"?

A No, I kept my eye on him, and I was right near the phone, just in case I had to --

Q You had to keep your eye on him all that time, correct?

A Yes, I did.

Q Isn't it a fact you couldn't give a description of what he was wearing to the police?

A I wasn't paying attention to his description. I was watching -- I was watching what he was doing.

Q But you were watching him that whole time and you can't remember what he was wearing?

A At that point in time, um -- my mind was set at, maybe we were going to be robbed. So I was more interested in his actions, than what he was wearing.

Q Well, weren't you looking at him?

A I stood face-to-face with him right at the counter.

Q Okay. But you don't recall what he was wearing?

A No.

Q Mr. Cassano, I show you People's Exhibit 28. This is a bottle of Bacardi rum. Would you call that amber?

A Yeah, that's amber or dark rum, if you want to call it that.

Q Is there a dark Bacardi rum?

A Yeah, they do make a darker rum.

Q So is there a way someone could differentiate between dark rum and amber rum?

A Oh, sure. Dark rum is almost three shades of

deeper brown than that is.

Q Now, Mr. Cassano, this is the amber rum, is it not?

A Yes, it is, that's Bacardi amber rum, excuse me.

Q Did you ever tell the grand jury -- by the way, did you ever testify in the grand jury back in 1992?

A Yes, I did.

Q Did you ever tell the district attorney's office that the bottle that -- I'll withdraw that.

Did you ever tell the district attorney's office in the grand jury, that the Hispanic person, on the evening of March the 27th, 1987, purchased three bottles?

A Uh -- yeah, I did. I believe so.

Q Did you also state in the grand jury, the one you remember the most was the Bacardi dark rum?

A Bacardi dark, but most people coming in off the street, layman's terms, dark rum, you put two in front of them -- if you put a bottle of dark and a bottle of amber, they'll all pick up the amber, saying it's dark rum, because they don't understand the difference.

Q But, Mr. Cassano, we don't care about most people. Did you not classify this as amber rum here today?

A It's amber rum, yeah.

Q Did you not say that there's a dark rum that they

make?

A Yeah. There is a dark rum they make.

Q And did you not tell the grand jury in 1992, in the People of the State of New York against Hector Rivas, that the one you remember the most was the Bacardi dark rum?

A I was giving a description of dark rum versus a light rum.

Q Sir, that just requires a yes or a no. Sir, do you remember telling the grand jury, "The Hispanic person that made -- was in a hurry, purchased three bottles. The one I remember the most was the Bacardi dark rum;" do you remember giving that answer?

A Yeah, I remember giving that answer.

Q Thank you. Now, there's nothing on this bottle, this People's exhibit, that you can verify came from Liquor Square, can you?

A No, I can't.

Q So you don't know where this bottle was purchased, do you?

A It could have been purchased anywhere.

Q Did you -- so you don't know who purchased it, do you?

A He purchased it.

Q He purchased this bottle?

A Yes, he did.

Q You know that? How do you --

A He was the only Hispanic that come through that store between 9:30 and 10:00.

Q Well, Mr. Cassano, how can you say that this is the bottle he bought?

A It's the bottle.

Q It's the bottle; you're sure of it?

A Match, match up the U.P.C. with the register tape.

Q I beg your pardon, sir?

A Match up the U.P.C. code with the register tape.

Q Was that done?

A The police -- the police had the journal tapes. They went through it and matched --

Q I'll withdraw that.

Do you, Mr. Cassano, have any knowledge, based in fact to prove that this bottle came -- was purchased from your store by Mr. Rivas?

A No, I can't.

Q Thank you.

A No.

Q Thank you. Mr. Cassano, there's a scanner on there, is that right?

A Correct.

Q That bottle, the U.P.C. code, you know, is that what it's called?

A Yes.

Q U.P.C. code. Whatever. Mr. Cassano, there's no sticker on there that says Liquor Square, is there?

A Right.

Q Okay. Are you familiar with other liquor stores?

A Um -- at the time when I worked there, yes, I was with liquor stores in the area, yes, I was.

Q Do you know if every liquor store in this part of the country has a scanner, as opposed to a U.P.C. bar?

A At the time in Syracuse, Liquor Square was the only liquor store that had the scanning units at their registers. Thus anything that had U.P.C. codes provided by the manufacturer, we did not mark it, because there was no sense to mark it. Why waste a dollar on the sticker?

Q How can you make that statement, that no other liquor store had a scanner?

A As far as I know, we were the only one.

Q What's the basis in fact for that assertion, sir?

A Um -- everyone in the liquor business in this area knows each other, and people would come in from time to time to see how it worked, because there was other owners that were interested in it when we first went to it, to see if it was a viable way, you know, to cash out their products and run their

business and keep track of their inventory. So people were in and out. So there was other people looking to put it in, but to my knowledge, no one else had done it.

Q I'm not asking for your knowledge. I'm asking for the basis in fact for stating that your store was the only store that had it.

A We were the biggest liquor store, and we were always on the cutting edge of what's going on, as far as in that business.

Q Sir, is it fair to say you don't have any basis in fact, other than what you just related here today, to make that claim?

A Other than just what I related, yes.

Q Did you ever see a picture of Valerie Hill?

A Um -- no, I haven't, not that I can think of.

Q You don't know if Miss Hill purchased this bottle of liquor, do you?

A No.

Q For all you know, she could have purchased that bottle of liquor, is that correct?

A It's possible.

Q For all you know, that could have been purchased outside of Syracuse, correct?

A Very much so.

Q You don't know where that bottle was purchased, do you?

A No.

Q Okay.

MR. CALLE: I'm almost done, your Honor.

BY MR. CALLE:

Q Mr. Cassano, I call your attention to the first time you were shown a photograph of Mr. Rivas.

A Okay.

Q How many individuals' photographs were you shown on that particular time?

A The very first time I seen the photo?

Q Yes.

A Um -- I remember two pictures, three pictures at the most, maybe. They had a set of two different pictures, that I can recall.

Q Was it of the same man?

A Yeah.

Q It was of the defendant, Mr. Rivas?

A Yes, it was.

Q So you never chose between a number of individuals on that first identification, did you?

A No, not the first one.

Q What did the police do? Did the police say, "Is this the guy"?

A Actually, no. The first person they came in

contact with was Bill Hooven, the store's general manager, because when they came in, they asked to talk to the store manager, which was obviously him. Um -- so I directed him down to Bill, who was down at the other end of the store.

They were down there for a few minutes, and then they came back my way, because Bill came up with me and then said, "Well, that's -- he's the guy that's usually up front. You might want to talk to him."

Q By the way, how often did you work at Liquor Square that week?

A How often?

Q Yeah.

A I worked a regular week, a whole week that week, you know.

Q Regularly worked 10 to 10?

A Ten to ten. Um -- there was a couple 9:00s in there.

Q Five days a week, six days a week, seven days a week?

A I worked five days a week. I had Wednesday and Sunday off.

Q So you didn't work that Wednesday before the 27th, which would be March 25th, did you?

A No, I didn't.

Q For all you know, that liquor bottle could have been purchased on the 25th --
A Possibly.
Q -- from Liquor Square?
A Very possible.
Q And you said Sunday you're off?
A Sunday, yeah, because State of New York liquor stores are closed on Sunday.
Q By the way, would it be fair to say that at approximately 10:00 that evening, or some minutes before 10, that it was nighttime outside?
A Oh, yeah, it was dark.
Q Well, give -- do you know if you recall the lighting conditions of the parking lot outside?
A Um -- lighting of the parking lot wasn't the greatest lighting, but right in the little -- I don't know, like an alcove-type entranceway, we had an automatic sliding door. There was a little alcove light which threw enough light where you could see the people as they first broke the exterior wall and started to come into the alcove to go through the door, there was enough lighting there, and the lighting in the store was more than adequate -- almost too bright.
Q When did you first lay eyes on Mr. Rivas?

A When he came through the door.
Q Not before?
A Not before.
Q Nothing further.
MR. CALLE: Thank you, Judge.
THE COURT: Any redirect, sir?
MR. FITZPATRICK: Briefly.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q John, Bacardi, is that a brand name?
A Oh, yeah, that's, that's probably in the rum industry, probably the biggest rum company that I know of.
Q Do they make anything else, other than rum?
A Not that I know of.
Q When you check the register tapes for the night of March 27th, '87, between the hours of 9 and 10:00, how many Bacardi bottles were sold?
A One.
Q Whether it was dark, purple, red --
A Doesn't matter. It was one.
Q It was one bottle sold?
A One bottle.
Q Thank you, John.
THE COURT: Is that it?

MR. CALLE: Yes.

THE COURT: Thanks. Watch your step.

THE WITNESS: Yeah.

(Witness excused.)

MR. FITZPATRICK: Jim Crimi.

* * *

J A M E S C R I M I , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

THE COURT: Now, I want you to keep your voice up nice and loud, okay? You can't answer by saying mm-hmm; you have to say yes or no. And if you don't understand the question, ask him to repeat it. All right?

THE WITNESS: Yeah.

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Jim, good morning. Tell us your full name, please.
A My full name is James Crimi.
Q And, Jim, are you married or single?
A I'm single.
Q How old are you?
A Twenty-eight years old.
Q Where do you live?
A I live in the Village of Eastwood, Syracuse.
Q And how long have you lived in the Syracuse area?
A All my life.
Q And are you working now?
A Yes, I am.
Q What do you do?
A I'm an apprentice for an optician. I work for Empire Vision Centers.
Q Is that some type of program where you will eventually be an optician?
A Yes, it is.
Q How long does that take?
A Two to four years.

Q And how long have you been doing that?
A Two years.
Q Would you tell me, Jim, if you were working back in March of '87?
A Yes, I was.
Q What were you doing back then?
A Back then I was working for a company called O.M. Edwards in Syracuse.
Q What did you do for them?
A I was an electrical assembler.
Q And do you remember what days you worked, what hours you worked?
A Yes. I worked basically Monday through Friday.
Q Nine to five?
A (No verbal response.)
Q Thereabouts?
A Seven to three.
Q Seven to three. Okay. Back in March of '87, Jim, I want to ask where were you living back then?
A I was living in -- on Forest Hill Drive.
Q And that's here in the City of Syracuse, is it?
A Yes, it is.
Q Were you dating anybody back then in March of '87?
A Yes, I was.

Q Who was that?
A I was dating Susan Stonecipher.
Q Where did she live?
A She lived right around the corner on Hickok Avenue.
Q That was at 250 Hickok Ave.?
A Yes, it was 250 Hickok.
Q And how long had you been going with Susan back in March of '87?
A I've been with Susan about five years.
Q And did you know her downstairs neighbor, Valerie Hill?
A Yes, I did.
Q How did you know Valerie?
A Well, I visited Susan -- friendly -- and I had a relationship, so I became aware of the neighbor downstairs from spending time with Susan and her family at her house.
Q Say hi to you once in a while?
A Of course.
Q Once in a while?
A Like that, of course.
Q Did you know Valerie Hill's -- strike that.
Did you know a person by the name of Hector Rivas, that she had been dating?

A Yes, I did.
Q And how did you know Mr. Rivas?
A Well, I knew Valerie had a boy friend, and I had seen him at the residence.
Q Had you, on occasion, greeted him and said hello to him?
A Very occasionally.
Q And is this him here in the courtroom this morning?
A Yes, it is.
Q And is he sitting at the table over here with the pad in his hand there?
A Yes, it is.
Q All right, Jim. Now, how many times had you seen Hector Rivas prior to March of '87?
A Oh, several times, dozens of times.
Q All right. And did you know what type of vehicle he drove?
A Yes, I did.
Q Did you become aware, Jim, on March 30th -- and I've got a calendar here in front of me. Can you see that from where you are?
A Yes, I can.
Q Did you become aware on March 30th, 1987, a

Monday, that Miss Hill had been found dead?

A Yes. I remember that.

Q How did you become aware of that?

A I was at work that day. I heard over the radio.

Q What did you do when you learned that?

A I immediately dropped what I was doing and left work in a panic.

Q And went where?

A Directly to Susan's house.

Q Were you concerned about her?

A Absolutely.

Q All right. Now, did you and have you -- or, strike that.

Have you a recollection of that weekend, the Sunday, the 29th, Saturday the 28th, and Friday the 27th?

A Yes.

Q And I want to draw your attention to Friday, March the 27th of 1987, and ask if you recall that day.

A Yes, I do recall.

Q Did you, Jim, did you see Susan Stonecipher on that date?

A Yes, I did.

Q When did you first see her that day?

A Uh -- evening -- well, the first time -- yeah,

evening, I saw her when I picked her up from work.

Q You picked her up from her place of employment?

A Yes, I did.

Q Where did she work back then?

A At the time she worked at Nikki's Restaurant downtown.

Q I see. You picked her up after she got off work Friday night?

A Yes, I did.

Q Do you remember what time it was?

A I picked her up that evening about 8:00.

Q And do you remember what you did at 8:00 after you picked her up?

A Yes. We kind of cruised around. It was a Friday evening.

Q You were driving?

A Yes, I was.

Q Did she have a car back then?

A I think it was in the shop or something at the time. She did own a car. I picked her up on that specific date.

Q Would you regularly pick her up?

A Yes, regularly.

Q And what kind of car did you have?

A Um -- I was driving a 1947 Chevy, which is a --
Q Custom car?
A -- antique auto that I restored, and I show it.
Q All right. And I don't mean to be disrespectful, but did you drink at the time on that Friday?
A Oh, absolutely not. I don't drink, and I --
Q You don't drink?
A No. Absolutely not.
Q Now, after you picked up Susan and you cruised around, did there come a time when you took her home?
A Yes.
Q And were you living with her on Hickok Ave. back then?
A No, I wasn't living with her.
Q You had your own separate residence?
A Yeah. I was right around the corner, I lived.
Q And did you drop her off Friday night?
A Yes, I did.
Q And about what time did you drop her off, as best you recall?
A It was after 11:00, 11 or 12.
Q Somewhere in that neighborhood?
A Yes.
Q And you're -- in any event, you're certain it was

some time during the evening hours?

A Absolutely.

Q It was before midnight?

A Absolutely.

Q All right. When you dropped her off, did you see anyone?

A Yes, I did.

Q Who did you see?

A I saw Valerie Hill's boy friend's car in front of the house, next door to Susan's. It was kind of hanging out there.

Q How did you know it was Valerie's boy friend's car?

A Well, because I know the car. I spend a lot of time working on cars. I know cars very well. I noticed it was his vehicle, as I pulled up -- I pulled up facing his vehicle, and my headlights were on. Susan noticed, I noticed, we both looked, and, uh -- thought it was kind of different to see him just kind of sitting there.

Q Did you see someone in the car?

A Oh, yes, there was someone sitting in the car.

Q Who did you see in the car?

A It was Hector sitting in the car, smoking a cigarette.

Q All right. Did you have any conversation with him?
A No.
Q Did you acknowledge him in any way, with a wave or a gesture?
A No, I did not.
Q And do you know if the car was running or not?
A Uh -- no, I don't know if the car was running or not, but I do know that the parking lights were on in the car -- on the car.
Q And do you remember the license plate of that car?
A Yes, I do. The license plate read 1-RIVAS, or RIVAS-1.
Q So it was a custom plate?
A Yes, it was a personalized plate, nice car.
Q All right, Jim. Thanks very much. Mr. Calle, who's the defense attorney, may have some questions for you.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning to you.
A Good morning.
Q Is it Crimi, Mr. Crimi?
A Yes, it is.

Q Mr. Crimi, do you recall what time you arrived at 250 Hickok that evening of the 27th, March 1987?

A Uh -- yeah, I recall it was after 11:00.

Q Could it have been 11:00?

A Sure.

Q Do you recall where you parked your vehicle?

A Yes, I do.

Q When you parked your vehicle that time?

A Yes, I do recall.

Q Where was it?

A I parked the vehicle opposite side of Susan's residence.

Q So on the street?

A Yes.

Q By the way, any street lamps on that street in front of the house, 250?

A I believe there is one.

Q Where is that located, in relation to where Mr. Rivas' van was allegedly parked?

MR. FITZPATRICK: Excuse me, your Honor. He did not testify as to a van being parked there.

THE COURT: What vehicle did you see?

THE WITNESS: It was a Riviera car, two door, light color.

MR. CALLE: Honest mistake, Mr. Fitzpatrick.

BY MR. CALLE:

Q So where was this street lighting in relation to the vehicle?

A Jeez, probably three or four car lengths before the vehicle, maybe a street lamp after the vehicle, as well.

Q You don't know?

A Not clearly, no, I don't.

Q Were the interior lights on in the vehicle?

A No, they were not.

Q Did you enter the Stonecipher residence that evening?

A No, I did not enter.

Q Did you have occasion to see if Mr. Stonecipher's vehicle was parked in the driveway in front of his garage?

A I don't recall.

Q Do you recall if Miss Hill's vehicle was parked in front of her garage?

A No. My attention wasn't drawn to the driveway at that time.

Q So you can't recall?

A I do not recall.

Q So you left Susan Stonecipher at the front porch?

A Well, of course I waited until she entered the

house and then I proceeded on my way.

Q How long were you there?

A Oh, probably sat in the car for a very brief moment, a couple minutes, maybe three or four minutes.

Q Did you have occasion to notice if there were any lights on in the 248 residence of Hickok?

A No, I don't -- I don't recall if there was or was not.

Q You can't recall any of the lighting over there?

A No, I don't.

Q Do you recall hearing anything coming from inside the apartment?

A No.

Q Do you have knowledge as to that night in question, whether Susan Stonecipher arrived home before her parents that evening?

A I believe that evening she arrived after her parents.

Q Do you have any time estimate on that?

A Not exactly. Again, I would say it was in the 11 p.m., 12:00 area. It was light. She had worked all day and --

Q Do you know if her mother was up when she got home?

A No, probably not.
Q Well, I asked you if you know.
A No, I do not know.
Q Nothing further. Thank you, Mr. Crimi.

THE COURT: Anything, Mr. Fitzpatrick?

MR. FITZPATRICK: No. Thank you, Jim.

THE COURT: Thanks very much. Watch your step, Jim. Good luck to you in your business.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: We're going to take a recess. Don't form any opinions, discuss the case amongst yourselves, look at any media articles about it. Fifteen minutes.

COURT ATTENDANT: Right this way, please.

(Proceedings stand in recess.)

(Court and counsel are present. Proceedings resumed at this time.)

THE COURT: Would the record reflect that we're back in session with defense counsel, the attorneys, the defendant. Outside the presence of the jury.

Mr. Fitzpatrick is prepared to mark an exhibit, what will be labeled People's Exhibit 27,

which purports to be a videotape of the scene of the homicide, depicting the inside of Miss Hill's apartment. And I believe on the tape it will also display the body of Miss Hill as she was found.

Mr. Calle, before we bring in the jury, have you seen this tape, first of all, sir?

MR. CALLE: Yes, sir.

THE COURT: Okay. So you know, I haven't seen the tape. So, you have an objection, sir, as to showing this videotape, is that correct, sir?

MR. CALLE: Yes, sir. May I please have a brief moment, your Honor --

THE COURT: Yes.

MR. CALLE: -- before we continue?

THE COURT: Yes.

(Proceedings paused.)

MR. CALLE: It's defense's position, sir, that, in fact, this videotape, which I have viewed, does not add to the People's case; it's unnecessary. There's no dispute that Valerie Hill was killed; there have been pictures submitted, photographs, as evidence indicative of the body of Miss Hill on the day in question. I believe that, that the video that the district

attorney is asking the Court to admit is gruesomely inflammatory.

I -- defense's position is that it should not be deemed admissible. I don't -- the defense's position is that it's not relevant. It does not corroborate any other testimony. It does not complement any other evidence. The intention of the district attorney's office is as a motive of malice.

MR. FITZPATRICK: A little harsh, your Honor?

MR. CALLE: Well, I said the office, I wasn't referring to you. It's the sole purpose of this particular videotape to arouse the members of the jury, and prejudice them against the defendant. And I ask that it be excluded.

THE COURT: Mr. Calle, my understanding during the evidence that's been developed here, that's apparently being relied upon by the district attorney, is evidence to show that there was no break-in at this place; the personal habits of Miss Hill, in terms of being neat. There were some allegations about some cigarettes being found in the ashtray and whatnot. So I will,

though, give a limiting instruction as the same instruction I gave relative to the photographs of Miss Hill when they were displayed. And I'm going to allow the tape to be shown.

So we'll bring in the jury, please.

MR. FITZPATRICK: Patti, I have two things there -- no particular order.

(Documents were marked for identification as People's Exhibit Numbers 27, 29, and 30, this date.)

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: All right. Will the record reflect that the jury is present, counsel, the defendant.

Mr. Fitzpatrick, your next witness.

MR. FITZPATRICK: Thank you, your Honor. Jim Kimak, please.

THE COURT: Okay. Let's go.

* * *

J A M E S P A U L K I M A K , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good morning, sir. Tell the jury, please, your full name.

A James Paul Kimak.

Q And, Mr. Kimak, I see you are in uniform. By whom are you employed?

A Syracuse Police Department.

Q What do you do for them?

A I work in the crime laboratory.

Q What are your duties there, sir?

A I do color photography from taking pictures, all the way up to developing of film and printing the pictures. Also video work and I also respond to crime scenes.

Q How long have you been with the Syracuse Police Department?

A Since September 17th, 1972.

Q And how were you employed back on March 30th of '87?

A I was assigned to the crime lab.

Q Same duties that you have today --

A Yes. Yes, sir.
Q -- essentially? All right.
Did you, Mr. Kimak, respond to 248 Hickok Ave. on the afternoon hours of March 30th, 1987?
A Yes, sir.
Q And did you secure certain items of evidence in the apartment?
A Yes, sir.
Q What were your general duties that afternoon?
A That afternoon, I videotaped the crime scene and also prepared a sketch of the crime scene.
Q All right. Are you familiar with the apartment of Valerie Hill?
A Yes, sir.
Q Did you make an inspection of the apartment yourself?
A Yes, during my time there, yes.
Q And were you assisted by other officers?
A Yes, sir.
Q I want to show you two items of evidence that I've had marked. The first would be Exhibit 29, and I'd ask you, sir, if you can identify that.
A Yes, sir.
Q And tell the jury, please, what that is,

Exhibit 29.

A It's a piece of paper that was recovered in the rear bedroom of Valerie Hill's apartment.

Q How many bedrooms were there in Miss Hill's apartment?

A I believe there were two.

Q And was this -- did this bedroom that you recovered this note from -- or, strike that.

This note, this piece of paper, did that appear to be from the bedroom that she used?

A No, sir.

Q And when you recovered this piece of paper, what did you do with it?

A It was placed in a plastic bag and then returned to the crime lab. We sealed it, and then I put my initials and the date on top.

Q And I'm going to show you People's Exhibit 30 and ask if you can identify that, please.

A Yes, sir.

Q What is Exhibit 30?

A These are pieces of stationery that were recovered in her dining room on the bookshelf.

Q All right. Now, are they in the same condition that they were when you recovered them?

A No, sir.

Q And do you know what's different about them?

A They've been processed for latent prints.

Q All right, sir. Now, I want to show you People's Exhibit 22 and a photograph of the same, People's Exhibit 5. Have you seen those items before, sir?

A I don't recall --

Q All right.

A -- at this point.

Q All right. Did you at any time make a comparison of the papers in Exhibit 30 to the paper in Exhibit 22?

A I don't believe so.

Q All right, sir. And did you secure other items of evidence at the scene, that I haven't shown you here this morning, or this afternoon -- this morning?

A Yes, sir, I did.

Q And could you tell the ladies and gentlemen of the jury the extent of the search that was made at 248 Hickok Avenue?

A We went back over for a two or three-day period recovering evidence at the scene.

Q Were items such as bathroom, kitchen trash, recovered?

A Yes, sir.

Q Things of that nature?
A (No verbal response.)
Q And you indicated that one of your duties in the crime lab was videotape. Did you videotape this crime scene?
A Yes, sir, I did.
Q When did you do that?
A On the day of the recovery or the --
Q Do you remember what time?
A Approximately 1:30 in the afternoon.
Q I'm going to show you People's Exhibit 27 and ask if you can identify that?
A Yes, sir.
Q What is Exhibit 27?
A This is a copy of the original videotape that was taken on the 30th of March, 1987.
Q And how do you know that?
A I have my initials and my I.B.M. number on the label right here.
Q Have you viewed Exhibit 27 prior to coming into court here?
A Yes. Yes, sir, I have.
Q Does it fairly and accurately show the scene as you taped it back on March 30th of 1987?

A Yes, sir.

MR. FITZPATRICK: I'd offer that exhibit, your Honor.

MR. CALLE: No objection --

THE COURT: Okay. People's 27 --

MR. CALLE: -- other than the one we already put on the record.

THE COURT: Sure. Other than that, it's received.

(People's Exhibit Number 27 was then received into evidence.)

BY MR. FITZPATRICK:

Q Mr. Kimak, what I would like you to do would be to come down here, with the Court's permission, stand next to the monitor, and if you would, to, when appropriate, narrate to the jury what they're looking at.

A Yes, sir.

Q In a nice, loud voice, could you do that for us, please?

THE COURT: I'm going to give you a pointer, so you can describe --

THE WITNESS: Okay.

THE COURT: You're about to show that?

MR. FITZPATRICK: Yes, your Honor.

THE COURT: Okay. Mr. Calle, Mr. Rivas, we want to make sure that appropriate people can see this videotape, so we're going to do some moving around here. I haven't seen it, but go ahead and have a seat over there, please.

MR. CALLE: Yes, sir.

(Proceedings paused.)

MR. FITZPATRICK: Is this in the way of any --

MR. HULLIHEN: No.

MR. FITZPATRICK: No.

THE COURT: Before -- just hold that for a minute. Ladies and gentlemen, we're about to display for you the videotape that's been marked People's Exhibit Number 27. This videotape, from what I understand, is a videotape of the scene of Miss Hill's apartment. The videotape will, as I understand it, will also display Miss Hill's body to you. It will be on that tape.

Again, the same instructions I gave to you relative to the photograph, ladies and gentlemen, that you are certainly -- this videotape is not meant to inflame anyone's passions, and it's

meant solely for evidentiary purposes. So please take it in that context, and that's how it's being shown to you. Go ahead, Mr. Fitzpatrick.

MR. FITZPATRICK: Yes, your Honor.

(The videotape began playing at 12:01 p.m.)

THE WITNESS: Right here we're standing in the dining room area of Miss Hill's --

MR. CALLE: May I just -- I want to place on the record my objection to the lecture that will be given here. I think that the tape is self-explanatory, and I would object to any discussion of any description of any particular piece of tape.

THE COURT: Why don't we do this -- we'll show it once through with no comment, and then I will allow the district attorney to have this officer take us through the videotape; that way, if that's your objection, it -- I'd just like to see this videotape, and if it will expedite matters and prevent us from showing it twice, I'm going to let him testify about what his observations are.

Now you can do it once, a run-through, without any comment, and then a run-through again,

or we can show it once.

MR. CALLE: I'll just place on the record that I object to the commentary, when the tape is self-explanatory, and your Honor can do it whatever way he pleases.

MR. FITZPATRICK: Judge, there's no audio on the tape. The tape is not self-explanatory.

THE COURT: That's right, exactly right. So take your pick, Counselor, once or twice you want to see it?

MR. CALLE: Let's see it twice.

THE COURT: Okay. First time run through it with no comments by the office, and then --

(The videotape completed playing at 12:24 p.m.)

THE COURT: Patti, would you let the record indicate that the tape has been completed at this time?

Ladies and gentlemen, we're going to take our noon break. I'd ask you not to form any opinions or discuss the case, not to do any research, read anything in the media. And 2:00 we'll reconvene to pick this trial up.

Okay. The jury is excused. We'll see you

at 2. We can go off the record.

(A luncheon recess was taken.)

* * *

(March 19, 1993 - Afternoon Session)

(All parties are present. Proceedings resumed at this time.)

THE COURT: Why don't you just stand here, Jim?

MR. FITZPATRICK: I'm going to do the narration now.

THE COURT: Yes. I just want to put him in place, and then we'll -- would the record

reflect that we're in session. And counsel is here, the defendant is here, Officer Kimak is here, the jury is here, and I believe we were going to go back through the videotape with Officer Kimak.

If you'd like to step down. I had a pointer there.

MR. FITZPATRICK: It's right here.

THE COURT: It's right there on the table. Go ahead, sir.

Mr. Calle, do you and your client want to move over that way, sir?

THE DEFENDANT: I don't need to see it anymore. I've got my notes.

THE COURT: All right. If you would, Officer, as we're playing the tape, if you would just point out to the members of the jury what room we're viewing, various windows, doors, methods of entrance and exit, and so forth, that you observed in the apartment?

THE WITNESS: Yes, sir.

(The videotape began playing at 2:20 p.m.)

A I'm standing in the dining room area, showing the doors entering into the living room area, and just

spanning the room, itself, the dining room area. You'd be looking in an easterly direction, at this point.

This is a doorway going into the hallway, leading to the different bedrooms. Now we're in the living room area viewing in a southerly direction.

Q Do you know if that was a functional fireplace?

A I don't know, sir.

Q I notice as we're looking at the tape now we see the body of the victim, and apparently there's some type of blanket or covering of some kind on the lower portion of the body. Did you place that there?

A No, sir, I did not.

Q Did you learn who did?

A Yes, sir, I did.

Q And who placed that there?

A One of the officers on the scene, Officer Kiggins.

Q And in all fairness, would that be considered improper police procedure to have done that?

A Yes, sir.

Q Now, why did he do it?

MR. CALLE: Objection.

A I believe --

MR. CALLE: Relevance.

THE COURT: Sustained.

BY MR. FITZPATRICK:

Q Okay. What room are we in now, sir?

A I believe this is still the living room. This would be the -- I believe the front door, and the front windows facing in an easterly direction.

Q While we're on the subject of doors, how many doors were there to the apartment to get in and out?

A Two.

Q And would you describe them for us, please?

A Well, it would be the front door, which we just saw in the video. The other one would be the back door, which is off the kitchen.

Q What kind of shape was the front door in?

A The front door was sealed in plastic.

Q If I were to walk out that door, where would I be?

A You'd be on the front porch.

Q And the back door, what kind of shape was that in?

A When we got there, the back door was unlocked and open. That would have gone out to a hallway area with stairs going up to the second floor apartment, and also down to the driveway area.

Q All right. I just -- I don't know that the jury recalls, but we had testimony from Officer David Phinney that there was no front door to the apartment; that would be incorrect?

A That's correct.

Q Officer, I notice some of the lights are on. Do you know if they were on when you got there, or were they put on to assist you in taking the tape?

A When I did the video, the lights were on.

Okay. Now we're standing in the door of the living room area, spanning the dining room area, facing in a southwesterly direction right at this point.

Showing the entrance to the kitchen here, and the windows lining the driveway of the house, which are on the north side of the apartment.

Q The body of Miss Hill is now behind you as you're taking this?

A That's correct. Now I'm standing in the doorway from the dining room area into -- looking into the kitchen area, still facing in a westerly direction back from west to south.

Q Officer, let me just back up for a second, if I can. Now you said there were two doors, one that led out to the porch, and would that have been one of the doors in the

apartment that I'm pointing to?

A Yes, sir. That was the back door to the apartment which leads out to the back hallway.

Q Okay. And while you were taking this videotape, did you observe any type of note on the floor there by that door?

A I don't believe so.

Q Okay, sir.

A This would be -- the back door would be here (Indicating), this would be a doorway going into the hallway (Indicating), which leads to the bedrooms.

Q Were those slippers -- were those slippers on the floor there, or shoes, or --

A It appeared to be, yes.

Q Do you know which?

A No, sir, I don't.

Q Some evidence that there was animals in the house?

A Yes, sir.

Q Which -- what we're looking at there, what is it, on the side of the refrigerator?

A I believe to be on the floor area --

Q Yes.

A -- some kind of feed bowl.

Q Feeding bowl?

A Yes, sir.

Q You didn't see any evidence of cats actually walking around the house while you were taking this tape?

A No, sir. There were no animals in the apartment while we were there.

Q This here is now the bedroom in the apartment. We're looking in a northeasterly direction. This wall over here would be the south wall.

Does this appear to be the room that was actually functional as a bedroom?

A Yes, sir.

Q Is that some kind of currency on the dresser?

A I don't know, sir.

Q Can't make it out?

A Can't tell from this point.

THE COURT: What's that on the floor, do you remember that, sir?

THE WITNESS: This right here (Indicating), sir?

THE COURT: Yes.

THE WITNESS: That is a heating pad.

A Now we're panning the west wall in the bedroom showing the closet area and the windows over on this side,

be at the foot of the bed.

Q What is that, sir?

A This is the control for the electric blanket. There -- this is the hallway from the bedroom facing in a westerly direction, showing the back bedroom here and the door for it. You -- now we're viewing the bathroom area from the bathroom door, and we'd be facing in a southerly direction.

This is -- would be the bathroom door exiting into the hallway. Now I'm standing in the doorway of the back bedroom facing in a westerly direction.

Q Some exercise equipment there?

A Yes, sir. Showing a closet in that bedroom that -- uh, bedroom.

THE COURT: Did you open that door, or was it open when you videotaped it?

THE WITNESS: I don't recall, sir.

A Now I'm standing in the doorway to the back bedroom facing in an easterly direction.

Q All right, sir. Thank you very much. If you'd resume the stand.

THE COURT: And before we do that, Mr. Fitzpatrick, we had talked about it beforehand whether or not you wanted to continue to show the

entire videotape, and I had suggested probably that the close-ups of the face may not be necessarily pertinent to show again. However, over the lunch hour, I was thinking that perhaps if you think it may be relevant to future witnesses, and I've got the medical examiner in mind, continue on with the tape, if it might save us some later playing of it or having Dr. Mitchell have to review it or whatever, but I'd leave that up to you, sir.

MR. FITZPATRICK: All right. Thank you, sir. I think the jury has a recollection of the end of the tape. I won't show it at this time.

(The videotape completed playing at 2:34 p.m.)

(The witness resumed the stand.)

BY MR. FITZPATRICK:

Q Mr. Kimak, in making the observations you did of the apartment, did you see any signs of what would be called forced entry, any damage to either door, any breaking of the plastic that covered the door, or the windows, any breaking of locks on windows, anything like that?

A No, sir, I did not.

Q All right. Thank you very much, Mr. Kimak. I don't have any more questions. You just sit right there, please.

MR. CALLE: Just briefly, your Honor.

CROSS-EXAMINATION BY MR. CALLE:

Q Is it Officer Kimak?

A Yes, sir.

Q Officer Kimak, good afternoon. Officer, do you know where that red blanket was gotten from and then placed on Miss Valerie Hill?

A No, sir, I do not.

Q Would it be fair to say that you, in videotaping this scene, that you had an opportunity to make observations on the scene that day?

A Of what?

Q Of the murder scene that day?

A Yes, sir.

Q Officer, did you -- do you have any knowledge of how much currency was -- what was recovered from the apartment?

A No, sir, I do not.

Q Did you ever happen to come upon a packed suit-case?

A No, sir, not that I can recall.

Q Now, Officer, directing your attention to the bedroom, I understand this question was asked, but I'd like

to repeat it for the record -- there was at -- or at least one closet door that was open, do you recall if that closet door was open upon arrival at the scene?

A No, sir, I don't.

Q Now, there was a major bedroom and a spare bedroom, would you say that that's a fair description of the apartment?

A Yes, sir.

Q Now, directing your attention to the major bedroom, was that the bedroom with the electric blanket and the sketch that you photographed?

A Yes, sir.

Q Can you tell this Court, was that electric blanket on?

A I don't recall, sir.

Q Did you ever have an opportunity to touch the blanket?

A No, sir.

Q Officer, the spare bedroom in the -- the bed was made, was it not?

A Yes, sir.

Q The bedroom that we can designate Valerie Hill's bedroom, that bed was unmade, was it not?

A That is correct.

Q Did it give the appearance that it had been slept in, to your observation?

A At one time, yes.

Q In the living room, you focused in upon an end table that appeared to be -- appeared to be one or two pipes. Do you have any knowledge pertaining to what those pipes were used for?

A No, sir.

Q Would you take a -- conduct a search of the -- of the premises in addition to videotaping them?

A Yes, sir.

Q Do you recall if you found any marijuana by those pipes?

A Me, personally, no, sir.

Q Do you recall if marijuana was found?

A No, I don't recall.

Q So you don't have that knowledge now, correct?

A That's correct.

Q Officer, do you have a recollection of how many blankets you observed in that apartment?

A Three, possibly four.

Q And would it be fair to say one of those blankets was the red one?

A That's correct.

Q And would it be fair to say that another one was a blue blanket?

A Yes, sir.

Q And I -- that's the only two? Do you remember any others?

A The electric blanket --

Q That's right.

A -- on the victim's bed.

Q On the what? I didn't hear you after you said "electric blanket." I'm sorry, I didn't hear.

A On the victim's bed.

Q All right.

A And I believe there's also a blanket, or some kind of bed covering, in the rear bedroom or the spare bedroom.

Q Do you recall where the blue blanket was? Is that the one that was on the couch in the living room?

A That's correct, sir.

Q Did you seize evidence during the course of that search that day?

A That day? Yes, sir, I did.

Q Do you have the knowledge of -- if the red blanket was seized --

A Yes, sir, it was.

Q -- for examination?

A It was seized, but not by myself.

Q Do you have knowledge if the blue blanket was seized for examination?

A I do not know. I can't recall, at this point.

Q Do you recall, sir, any packs of cigarettes in the apartment during the course of your search?

A There may have been one, I believe, on the kitchen table.

Q Do you know what brand that was?

A No, sir.

MR. CALLE: Your Honor, if you will, I'd like to have this marked as a defense exhibit, please.

THE COURT: E.

MR. CALLE: Yes.

(Report was marked for identification as Defendant's Exhibit E, this date.)

BY MR. CALLE:

Q Officer, I show you what's been marked as Defendant's Exhibit E. Would you like to see it?

THE COURT: No, that's okay.

Q I ask you to take a look at that, please. Would you tell this Court what that is, sir.

A It's a crime lab field investigation report.

Q Okay. And I ask you to look through it and see if it would refresh your recollection as to whether the blue blanket was seized for examination. Specifically, the blanket that was on the living room couch.

Does that refresh your recollection as to whether the blue blanket was seized for evidence and examination?

A Not according to this sheet, sir, no.

Q I ask you to look at that to refresh your recollection as to the amount of currency that was seized from the apartment of Valerie Hill on March 30th, 1987.

Does that refresh your recollection as to the amount of currency seized from Valerie Hill's apartment?

A Yes, sir.

Q And what is that amount?

A $22.

Q Sir, if you were going to be taking a trip to Saratoga, would you have 22 -- more than $22 for your way on the trip?

A Depends. It all depends if I was going to use credit cards.

Q Well, sir, if you went away for the weekend, would you think that cash would be just as important as

credit cards?

A Yes, sir.

Q Officer, do you know where that $22 was recovered from?

A I believe it said her wallet.

Q And do you know what location?

A Kitchen table, sir.

Q Do you recall if her -- do you recall -- I apologize for talking backwards.

Do you recall if her purse was by that wallet on the kitchen table?

A No, I don't recall.

Q Officer, you mentioned on direct examination that there was no evidence of a break-in, as far as you could observe, correct?

A That's correct.

Q If there was evidence of a break-in -- I'll withdraw that.

What are you looking for when you're looking for evidence of a break-in or forced entry?

A Jimmy marks in the doors, door jambs, around the locks, any tampering with the windows, as far as the window locks.

Q Would it be fair to say that you were looking

for any evidence of a crime being committed, a crime regarding theft?

A Regarding burglary.

Q Burglary. And what is burglary, do you know, sir?

A Entering or remaining unlawfully in a building with the intent to commit a crime.

Q Well, sir, if I were to tell you that, in fact, $650 in airline tickets for a Bahamas vacation were missing, tickets that were picked up by Valerie Hill that afternoon, and only $22 was located in the apartment in which the victim was leaving to go away on a weekend excursion, in your best police knowledge, would you say that that could be an indication that money and airline tickets were stolen, if you know?

A Possibility.

Q Thank you.

THE COURT: Any redirect?

MR. FITZPATRICK: A couple questions.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q How long have you been a police officer?

A Nineteen and a half years.

Q Makes sense to you that a burglar would steal an

airline ticket made out in someone else's name?

A No, sir.

Q Okay.

MR. FITZPATRICK: Could I have this marked as People's Exhibit 31, a photograph.

(Photograph was marked for identification as People's Exhibit Number 31, this date.)

BY MR. FITZPATRICK:

Q Investigator, I'm going to hand you, Investigator, 31. Can you identify that for us, please?

A Yes, sir. That's the photograph of the kitchen table.

Q Can I borrow that for just one second? Thank you.

Does that fairly and accurately show the kitchen table as you saw it the afternoon of March 30th of '87?

A Yes, sir.

Q And taking a look at it, Officer Kimak, does that refresh your recollection as to whether or not there were any packs of cigarettes on the kitchen table?

A Yes, sir, it does.

Q And having had an opportunity to look at the photo taken six years ago, were any packs of cigarettes on

the kitchen table?

A No, sir, there were not.

MR. FITZPATRICK: I would offer Exhibit 31, your Honor.

MR. CALLE: No objection.

THE COURT: Any -- no objection? Then it's received.

(People's Exhibit Number 31 was then received into evidence.)

MR. FITZPATRICK: Thank you. That's all I have.

THE COURT: Officer, you talked, when you looked at the video, about the front door. You mentioned something about the plastic. Would you describe that, the condition of the front door for me again, please?

THE WITNESS: It was like sealed in like, like a weather seal, to keep the air out, a sheet of plastic over the front door.

THE COURT: Was the door able to be opened without breaking or disturbing this plastic?

THE WITNESS: No.

THE COURT: Did it give you the impression that the front door was not used?

THE WITNESS: That's correct.

THE COURT: Is that depicted in the videotape, sir?

THE WITNESS: Yes, sir, it was.

THE COURT: Mr. Calle, do you have any recross for the witness?

MR. CALLE: I do, your Honor, but I need a couple minutes time to find or locate a piece of paper. If you'll allow me that?

THE COURT: Come here and maybe I can help you.

(Counsel approached the bench. An off-the-record discussion ensued.)

MR. CALLE: Nothing further, Judge.

THE COURT: All right. Thanks, Officer.

THE WITNESS: Thank you, your Honor.

(Witness excused.)

MR. FITZPATRICK: I call Thomas Bland.

MR. CALLE: Your Honor, could we approach?

THE COURT: Sure.

MR. FITZPATRICK: Could I have these marked? In no particular order. Judge, I'll be there in one second.

THE COURT: Yolanda, would you see if you

can grab that officer.

COURT ATTENDANT: Yes, sir.

THE COURT: Just hold onto him for me.

(Proceedings paused.)

THE COURT: Did you get him?

COURT ATTENDANT: Yes, your Honor. He's still here.

THE COURT: All right.

MR. FITZPATRICK: Could I --

THE COURT: Mr. Calle, you had indicated to Officer Kimak that he be dismissed, and you had a question you wanted to ask him, and that's a question relative to whether or not the electric blanket was on or off. And you have a report that indicates that, in fact, it was on, is that correct?

MR. CALLE: Yes, sir. The electric blanket that was in Valerie Hill's bedroom, according to the police report, the electric blanket was on.

THE COURT: Mr. Fitzpatrick, are you prepared to stipulate that it was, in fact, on?

MR. FITZPATRICK: Not only that, Judge, I'm

prepared, and in a few moments, to call the officer that wrote that record, as I had been all along. And, yes, it was on.

MR. CALLE: Thank you very much.

THE COURT: Okay.

(Documents were marked for identification as People's Exhibit Numbers 32, 33, 34, and 35, this date.)

(People's Exhibit Numbers 32, 33, 34, and 35 were shown to Mr. Calle.)

MR. FITZPATRICK: All set, Judge.

* * *

T H O M A S J O S E P H B L A N D , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Sir, good afternoon. Would you tell the jury your full name, please?

A My name is Thomas Joseph Bland.

Q What do you do for a living?

A I'm employed by the City of Syracuse Department of Police.

Q How long have you been a Syracuse police officer?

A Twenty years, approximately, four months.

Q And what is your current assignment, sir?

A I'm an investigator with the vice section, Special Investigations Division.

Q Were you employed by the Syracuse Police Department back in March and April of 1987?

A Yes, sir.

Q What was your assignment back then?

A I was an investigator assigned to the police crime laboratory, criminalistics section.

Q Do you have any expertise, sir, in recovering latent fingerprints?

A Yes, I do, sir.

Q Would you tell the jury about that, please?

A I have been trained by the State of New York as an evidence technician back, I believe, around 1977, thereabouts. I have received training at Quantico, Virginia, F.B.I. Academy, on two -- a couple different occasions; Morris Fingerprint Laboratory in Morrisville, New Jersey, and processing several crime scenes since 1977, until this date in question here.

Q Now, back on March 30th of 1987, and today, subsequent to that, were you assigned to assist in the investigation of the death of Valerie Hill?

A Yes, sir, I was.

Q Did you respond to her apartment at 248 Hickok Ave.?

A Yes, sir, I did.

Q What day did you first respond there?

A I believe it was on a Tuesday, a day after the original finding of the victim.

Q All right. I have a calendar here, sir. Would that have been Tuesday, March 31st?

A Yes, sir.

Q And were you making efforts to secure fingerprints from certain items inside of the apartment?

A Yes, sir.
Q Were you successful in securing any prints?
A Yes, I was. Evidence that was recovered from the scene was transported back to our laboratory for processing in a more, more suitable atmosphere where we had the tools and the lighting and the equipment to process it, beyond what we had initially at the scene.
Q Did you secure any items, yourself, from the scene?
A Yes, sir, I did.
Q All right. I'd like to discuss some of those items with you. First of all, so the jury isn't confused, do you make identification comparisons of fingerprints?
A No, sir, I do not.
Q Your role in this investigation was to simply secure the fingerprints, themselves?
A Secure evidence and process that evidence for latent fingerprints, correct.
Q All right, sir. I want to show you a photograph marked for identification as People's Exhibit 32, and ask if you can identify that for the jury.
A Yes, sir, I can.
Q And what is Exhibit 32?
A It's an enlarged color photograph of the

refrigerator, depicting items in the refrigerator that were recovered and processed later on for latent fingerprints in our laboratory.

Q Did you process any items in the refrigerator for prints?

A Yes, sir, I did.

Q And were you successful in obtaining prints from any of the items?

A Yes, sir, I was.

Q What item -- what item or items?

A The large Blue Nun wine bottle that's depicted here in the top shelf of the refrigerator.

Q I'll show you Exhibit 32 marked for identification. Do you recognize that?

A Yes, sir, I do.

Q What is that?

A That is the wine bottle that's depicted in the enlarged color photograph of inside the refrigerator.

Q Thank you, sir. Does Exhibit 32 fairly and accurately show the refrigerator when you saw it on the 31st?

A Yes, sir, it does.

Q Now, once you -- first of all, how do you process -- how did you process this wine bottle, Exhibit 34?

A After recovering it from the scene, it was transported back to the laboratory where we could do it under better conditions. I believe I processed that with a gray powder, gray latent fingerprint powder.

Q Once you're able to observe a print on the bottle, what do you do with it?

A Photograph the print on a one-to-one camera, Polaroid M.P.-4, I believe.

Q What does that mean, one-to-one?

A One-to-one would be the exact size -- same size print as on the bottle, would be represented in the negative, itself. They'd be the same size, sir.

Q And then what did you do with those photographs once they're developed?

A Develop those fingerprints, or the photograph, they're originally photographed, if I felt that there was sufficient ridge detail on them and that, photograph them, process the film, print the photographs on a contact printer, which the photographs would be on a one-to-one basis; they will be sent -- they were sent to the identification section for comparison or elimination.

Q And what do you mean by ridge detail?

A Sufficient ridge detail, meaning that if you have fingerprints that may be overlapping, they may have no

value -- maybe have no value, or if they're a clear print where the ridges are defined clearly enough where you can depict enough points of identification or sufficient identification to send to an ID. officer for a comparison or elimination.

Q Investigator Bland, I'm going to show you People's Exhibit 33. Can you identify that for the ladies and gentlemen of the jury?

A Yes. Exhibit Number 33, again, is an enlarged color photograph depicting a shelf over the stove at the victim's residence, a cupboard which we had opened also shows the Bacardi liquor bottle and a few other, oh, assorted bottles that were found on the shelf, that I was going to recover, take back to the laboratory, and, again, process for latent prints.

Q Now, did you open the doors to that cupboard for the purpose of this photograph?

A Yes, I believe I did, sir.

Q Other than that, does it fairly and accurately show the way it appeared to you on the 31st of March, '87?

A Yes, sir.

Q And I want to show you People's Exhibit 28 and ask if you recognize that.

A Yes. People's Exhibit 28 are the plastic bag

containing the Bacardi rum bottle that appears in the photograph of Exhibit 33, I believe.

Q Exhibit 33, yes.

THE COURT: Do you want to see it?

MR. FITZPATRICK: This is 28, your Honor.

THE COURT: Thanks.

BY MR. FITZPATRICK:

Q Investigator, I'll show you what has previously been marked Exhibit -- People's Exhibit 6 and ask if you recognize that, sir.

A Yes. Exhibit 6 is an, an enlarged photograph depicting the table. I believe it's in the kitchen of the victim's residence, showing a brass ashtray, some cigarette butts, and assorted papers on the table. in the kitchen of that residence.

Q And I'll show you People's Exhibit 35 and ask if you recognize that, sir.

A Yes.

Q What is it -- go ahead. I'm sorry.

A I'm sorry. Exhibit 35 is the ashtray that was depicted in photographs of Exhibit 6. The ashtray that I recovered was also transported back to the laboratory for further processing.

Q Now, did you recover any fingerprints from the

bottle of Bacardi rum, Exhibit 28?

A Yes, I do believe I did, sir.

Q Did you recover any fingerprints from the brass ashtray, Exhibit 35?

A Yes, sir, I do.

Q And did you follow --

A Did, rather.

Q And did you follow the same procedure that you described for us a few moments ago, photograph them and send them over to the identification section?

A That's correct, sir.

Q All right.

MR. FITZPATRICK: Judge, I would offer Exhibit 33. It's a photograph of the Bacardi rum bottle, and the cover.

THE COURT: Mr. Calle, any objection to Exhibit 3 -- what is it?

MR. CALLE: 33.

THE COURT: 33.

MR. CALLE: None, sir.

THE COURT: All right. That's received.

(People's Exhibit Number 33 was then received into evidence.)

MR. FITZPATRICK: I would offer Exhibit 32,

your Honor, the photograph of the interior of Valerie Hill's refrigerator, specifically showing a bottle of Blue Nun.

THE COURT: Mr. Calle?

MR. CALLE: None, sir.

THE COURT: None. It's received, 32 is.

(People's Exhibit Number 32 was then received into evidence.)

MR. FITZPATRICK: And I would offer Exhibit 6, your Honor, a photograph of the kitchen table, including the brass ashtray.

MR. CALLE: None. No objection.

THE COURT: Okay. People's Number 6 is received.

(People's Exhibit Number 6 was then received into evidence.)

MR. FITZPATRICK: And that's all I have. Thanks very much, Investigator.

THE COURT: Any cross?

MR. CALLE: Maybe just one or two, Judge.

CROSS-EXAMINATION BY MR. CALLE:

Q Officer, did any other officers lift prints at the murder scene?

A I'm sorry, sir?

Q I'm sorry. My apologies.

Officer, good afternoon.

A Good afternoon.

Q Did any other police officer lift prints from the murder scene, besides yourself, that you know of?

A At this time, I don't recall any other officer at the scene lifting prints.

Q Okay. Nothing else. Thank you.

THE COURT: Okay. Thanks very much, Officer.

(Witness excused.)

MR. FITZPATRICK: Officer William Donohue.

(Fingerprint Charts were marked for identification as People's Exhibit Numbers 36 and 37, this date.)

* * *

W I L L I A M G R E G O R Y D O N O H U E, called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Sir, good afternoon. Would you tell the jury, please, your full name and what you do for a living?

A William Gregory Donohue. I'm a police officer for the City of Syracuse.

Q How long have you been with the Syracuse Police Department, sir?

A Over twenty years.

Q What's your current assignment with them?

A I'm assigned to the identification section.

Q What do you do there?

A My job is to compare fingerprints to known prints we have on file.

Q How long have you been doing that?

A Over ten years.

Q And do you have some training and expertise in the area of fingerprint identification?

A I do.

Q Would you tell the jury about that, please?

A In 1977 I started as an evidence technician. I

received training for that at the Onondaga Community College in 1980. I received the basic fingerprint course taught by the F.B.I. at Onondaga County Community College in 1984. I received the advanced latent fingerprint course taught by the F.B.I. up at Onondaga Community College.

I've worked since 1983 in the identification section under Senior Identification Officer Robert Clapper and Lieutenant Gary White. I've become a member of the State Automated Fingerprint Committee since 1986 and still am.

Q All right. Officer, now, let's start out here with a little education for everyone, myself included. What is a fingerprint?

A A fingerprint is a reproduction of the ridge detail on the last digit of your fingers; or palm prints would be the ridge detail of your palms.

Q And what causes a person to leave an impression such as a fingerprint, if they touch something?

A Well, you secrete through the pores in the ridges that coats the ridges, which makes that pliable upon touching any item, you -- you'll leave an impression or a copy of that print on the items you touch.

Q And has there ever been a reported instance of two different people have the same fingerprints?

A No, there hasn't.

Q And what do you look for from an unknown print in comparing it with a known print, to determine whether or not there is a match?

A First I look for a pattern, whether it's an arch, loop, or whirl, similar pattern description. Then I examine the points within the pattern, the ridge endings, the bifurcations, closures, and short ridges, which is called dots. I compare those to the unknown or the unknown print and these points have to be exact. They have to be an exact number of ridges away from one another, going in the same direction. There cannot be any deviation or else it's thrown out.

Q How many points of comparison do you need in order to make a match?

A I judge each latent on its own merits. I look at the ridge detail, the pattern, and I will not make an identification with, with -- I think less than eight points.

Q Is that a uniform standard?

A There is no uniform standard.

Q Some people may have a lesser number of points needed?

A I have heard of the F.B.I. making an identification with less.

Q Do you, yourself, your own personel standards

require eight points for comparison?

A That's correct.

Q Now, do I, or any other individual, when I handle an object, always leave a fingerprint?

A Not necessarily. It depends.

Q Go ahead.

A It depends on what you have touched prior to that, whether you're secreting at that time. There are cases when many postal employees will handle thousands of envelopes and not leave prints on them -- on the -- on the envelopes they handle.

Q All right. Even if I am secreting from my fingertips, might I touch an object and leave an unidentifiable print?

A That's correct, also.

Q How does -- how so?

A Depends on how you handle an object, how you set it, whether it rolls through, whether it slides through your fingertips.

Q And are some surfaces more conducive than others for the recovery of prints?

A They are. The smoother the surface, the better the prints would be left.

Q And might I destroy a print by an overlap, in

other words, touching the same area of an object twice?

A You could.

Q Okay. Now, do you have any judgment as to how long a fingerprint can last?

A No. There's no way of dating a fingerprint.

Q Are the recovery of fingerprints affected by temperature, moisture, things of that nature?

A They're affected by the environment in which they are stored, that's correct.

Q Okay. Now, were you asked, in your capacity as the identification expert, for the City of Syracuse Police Department, to compare any recovered fingerprints from the apartment of Valerie Hill?

A Yes, I was.

Q When did you make these comparisons?

A In April of 1987.

Q All right. And how many recovered fingerprints were submitted to you in April of 1987 for comparison?

A In '87, I believe there were over twenty individual photographs of latent prints.

Q Were there any prints, any identifiable prints that were recovered that you were unable to identify?

A Yes, there were.

Q How many?

A There were two on the telephone which I couldn't identify.

Q Two on the telephone in Miss Hill's apartment?

A That's correct. And --

Q Go ahead.

A And later I received photos of latents from the Stephen King book and there were three, I believe, in the Stephen King book which I couldn't identify also.

Q All right. And so with all the fingerprints that were submitted to you, those are the only prints that you've been unable to identify?

A I recall one on the Gordon's -- I believe there were seven all told that were negative prints.

Q And the only prints inside Valerie Hill's apartment that are unidentifiable, that you can't say who they belong to, were two prints on the telephone?

A That's correct.

Q All right. And you, personally, don't know who handled that telephone, I take it?

A No.

Q You don't know whether or not Officer Kiggins touched that phone, or emergency personnel touched that phone, so forth and so on?

A I can't say.

Q Now, were you asked to identify some prints that were recovered from Exhibit 28, which is a bottle of rum, Bacardi rum?

A I was.

Q And who submitted those recovered prints to you?

A I received those from the crime lab.

Q Okay. And whose prints, if any, were you able to identify on the Bacardi rum bottle?

A I believe they were the victim's prints on that.

Q All right. Now, you received a known set of fingerprints from the deceased, Valerie Hill?

A Yes, I did.

Q Where did you get those from?

A The medical examiner's office. Upon any investigation of a homicide, elimination prints are taken from the victim.

Q Do you remember how many of Miss Hill's prints were on this bottle of Bacardi rum?

A I believe two.

Q Two. No other identifiable prints were found on this bottle of rum?

A That's correct.

Q All right. Were you also asked to examine recovered prints from People's Exhibit 34, a bottle of Blue

Nun wine?

A I was.

Q And were you able to make any comparison on that?

A I did.

Q And whose prints, if any, did you find on that bottle of Blue Nun wine?

A I found the prints of Hector Rivas on the bottle of Blue Nun.

Q The defendant in this criminal action here today?

A That's correct.

Q How many identifiable prints of Mr. Rivas were found on that bottle of Blue Nun wine?

A Seven.

Q I want to show you what has been marked for identification as People's Exhibit 37. Do you recognize that?

A Yes.

Q Can you tell us what this is?

A It's the right thumb of Hector Rivas, the latent print, and I -- it's the inked impression on the left -- my left-hand side.

Q All right. Could you keep your voice up, Officer Donohue?

A Sure.

MR. FITZPATRICK: Judge, I'm going to offer this into evidence, People's Exhibit 37.

(People's Exhibit Number 37 was shown to Mr. Calle.)

MR. CALLE: No objection.

THE COURT: Okay. 37 is received.

(People's Exhibit Number 37 was then received into evidence.)

BY MR. FITZPATRICK:

Q You said there were seven prints of Mr. Rivas on that bottle of Blue Nun wine?

A That's correct.

Q Is this a representative print?

A That's correct.

Q And what are these numbers, sir, explain that to the jury.

A The numbers are the points of identification I located within the pattern of the fingerprint, itself.

Q I think you earlier indicated that you need eight points for a -- to be able to testify as to a positive match?

A I will not make an identification with anything less than eight.

Q In this case, you have at least fourteen points

of identification?

A There are at least -- there are more than fourteen within that pattern. The only reason I stopped at fourteen, because it was getting difficult to chart them, without crossing lines.

Q All right. Were there any other identifiable prints recovered from this bottle of Blue Nun wine?

A All the prints which I looked at from that bottle were Hector Rivas'.

Q All right. Did you also have occasion to examine some prints recovered from People's Exhibit 35, a brass ashtray from the kitchen table of the deceased, Valerie Hill?

A I did.

Q How many prints from this ashtray were recovered and submitted to you for your identification?

A I received two photos of latent prints on that photo to that ashtray.

Q Were they two separate prints?

A They were the same prints.

Q Same finger?

A Same finger, two different locations on the ashtray.

Q Okay. Do you happen to know what finger?

A It was the right index finger of Hector Rivas.

Q And I'll show you Exhibit 36 and ask if you recognize that, sir.

A Yes.

Q What is that?

A That is the chart of the print which was recovered on the ashtray and the left index -- or right, right index finger of Hector Rivas.

MR. FITZPATRICK: I'd offer Exhibit 36, your Honor.

MR. CALLE: No -- no -- may I see that?

MR. FITZPATRICK: Sure.

THE COURT: We're going to recess, ladies and gentlemen. Don't form any opinions about the case, don't talk about it. Take a short recess.

(Proceedings stand in recess.)

(All parties are present. Proceedings resumed at this time.)

THE COURT: Okay. We're back in session. The record should reflect the jury is present, counsel, the defendant.

Right before we broke, Mr. Fitzpatrick moved Exhibit Number 36 into evidence. Mr. Calle,

it is my understanding that you had no objection to that being received?

MR. CALLE: Yes, Judge.

THE COURT: That's correct? All right. Fine. It's received then.

(People's Exhibit Number 36 was then received into evidence.)

BY MR. FITZPATRICK:

Q And in this instance, Officer Donohue, you had -- if I judge this exhibit as you described the last one -- you had at least twelve points of comparison?

A That's correct.

Q All right, sir. I have no more questions.

CROSS-EXAMINATION BY MR. CALLE:

Q Officer Donohue -- is it O'Donohue or Donohue?

A Just Donohue.

Q Okay. Officer Donohue, bear with me now while I see if I can get this straight.

Can you give us the definition of unidentifiable prints?

A Unidentifiable prints would be a print which lacks sufficient ridge characteristics to make a positive identification.

Q Now, sir, and is that what you meant when you said you need eight points or more to make it identifiable?

A For me to make an identification, I need at least eight points of ID., plus pattern, it has to be in the same pattern.

Q Now, Officer, you received approximately twenty prints for this investigation?

A From the apartment, that's correct.

Q Would it be accurate to state that you didn't go over to the apartment and, quote, "dust for prints," did you?

A No. We have the crime lab who handles that task.

Q And can you explain to this Court what the term "dusting for prints" means?

A Dusting for prints refers to a way of developing latent fingerprints. Latent means hidden. By the use of powders you enhance the ridge characteristics on an item which you're looking for evidence on.

Q So based upon your participation in this investigation, you couldn't categorically state that there weren't other prints not to be found in the apartment, could you?

A I can only state what prints I received in my office, that's correct.

Q And you didn't dust --

A That's correct.

Q -- for -- in the apartment?

Now, you received from the apartment approximately twenty prints?

A There was in excess of twenty prints.

Q Okay. Are you ever sent prints that are perhaps a partial print, or other -- I don't know what the term is, let me see if I can get my paper here.

Basically, sir, my question is: Are only prints that could possibly be identified, lifted in the normal police procedure?

A No. There are a lot of latents lifted that aren't identifiable. They would be termed prints of no value, or insufficient ridge detail prints.

Q Sir, did you receive -- again, I'm concentrating just on this identification, just for your testimony.

Did you receive prints of no value from the crime lab?

A That's correct.

Q How many?

A Five or six.

Q So would it be accurate to state that those five or six prints of no value were unidentifiable?

A That's correct.

Q Have you worked on other murder investigations, sir?

A Yes, for the past ten years.

Q And during the course of these other investigations, how does twenty prints sent to you in this investigation match up to other prints sent to you on other investigations for murder?

A Depends on the crime scene in which is searched. If it's from a street scene, there may not be any prints sent up. If it's an apartment -- I'd have to say it's about average.

Q Twenty is average?

A Yeah.

Q You went to school for fingerprinting, did you not?

A That's correct.

Q And is there some sort of a guideline for taking prints that they advise you about?

A Guideline in what regard, sir?

Q In regard to what objects should be dusted for prints?

A They generally check for a point of entrance in most crime scenes; they check for anything that possibly could have been handled.

Q Do you know if there were any point of entrance --

A I have no idea. I was never there.

Q -- prints? So you don't know where the -- at the time you conducted your analysis, you didn't know what items these prints were lifted from, did you?

A I received photographs of prints. Some of them have in the photograph what, what the object was, and others are not labeled, that's correct.

Q Now, sir, out of this twenty-odd prints that you were sent for analysis, you say five or six prints were of no value. Can you describe what prints -- what the prints were, that were of value?

A Well, there were the prints on the ashtray, the prints on the Blue Nun bottle, there were several prints on the telephone, there were prints on a Molson bottle, prints on some drinking glasses.

Q So it would be accurate to state that out of all those prints, you found prints on the Blue Nun bottle, belonging to Hector Rivas?

A That's correct.

Q And prints on a brass ashtray, belonging to Hector Rivas?

A That's correct.

Q And no other prints were identified as Hector Rivas', correct?

A That's correct.

Q Now, sir, I believe you stated on direct examination that there was no way of dating a fingerprint?

A That's correct.

Q So, therefore, you do not run any tests to determine the age of the fingerprint because it's impossible to determine, correct?

A As far as I know, that's correct.

Q So you don't know when Mr. Rivas' fingerprints were imprinted on that Blue Nun bottle, do you?

A I don't.

Q And you do not know when Mr. Rivas' two prints were imprinted on that brass ashtray, do you?

A I don't.

Q If I were to tell you that Mr. Rivas --

MR. FITZPATRICK: Objection, your Honor. I can sense what's coming and if it's some type of testimony from the defendant, I object to it.

THE COURT: What? I don't know what he's going to say. Unlike you, I can't read minds.

MR. CALLE: Well, may we approach?

MR. FITZPATRICK: Well, I'm getting better at it in my travels.

THE COURT: I'm not going to sustain or overrule the objection, because there was not a question pending.

BY MR. CALLE:

Q Officer Donohue, if I were to tell you that Mr. Rivas was in Valerie Hill's apartment on Thursday --

MR. FITZPATRICK: I object to that, your Honor -- Judge, on what we discussed at the bench.

MR. CALLE: Well, let's go up again.

THE COURT: Ask your question and give your objection. I'll give the ruling. Let's go.

BY MR. CALLE:

Q If I were to tell you that Mr. Rivas was in Valerie Hill's apartment on a prior occasion than the 27th of March, 1987, is it possible that those prints could have come from an earlier occasion?

A It's possible.

MR. CALLE: Is that okay?

MR. FITZPATRICK: I didn't object.

MR. CALLE: You heard the question?

BY MR. CALLE:

Q Now, sir, am I correct in stating that you also took an analysis of fingerprints lifted from a Stephen King book?

A That's correct.

Q Okay. And that did not come from the apartment, as far as you know, correct?

A As far as I know, I don't know.

Q Okay. Could you tell us the results of that?

A They were negative.

Q What does that mean?

A They were identifiable fingerprints, but they were neither the victim's or Hector Rivas'.

Q In your background as a police officer -- this is my final question -- by the way, Officer, do you know how -- in your background as a police officer, would you be able to say if in any one apartment there would already be twenty fingerprints?

A It would be hard to calculate it. It depends on the size of the apartment, methods used to raise prints.

Q Well, sir, since there's no way to date fingerprints, let me ask you this question: Do fingerprints fade; and is there some sort of estimation as to when fingerprints begin to fade?

A Depends on the environment they're kept in.

Q Well, do you have any knowledge of how long the fingerprints can remain on an item?

A I -- I've heard of cases where they've been there for fifteen years, kept in a book.

Q So would it be fair to say that if Valerie Hill lived in an apartment for a year, there would be more than twenty fingerprints able to be lifted, in your estimation and in your background as a police officer?

A That I couldn't really answer because I, having dusted fingerprints and having been an evidence technician, you never know if you missed anything. I -- you dust the entire area; you use every method that you have to your -- which is available to you, to process a scene, and whether or not I missed one, I would never know.

Q Do you know if you dusted -- if the entire area was dusted in this investigation?

A I was never at the scene.

Q Is it common police procedure to dust the entire area of a murder scene?

A To process the entire scene, that's correct.

Q Process dust?

A Process fume.

Q Fume, what is that, sir?

A Fume is -- sometimes they use Super Glue and they

glue areas within the apartment, or they use an iodine fume which develops fingerprints on paper and such.

Q But you have no knowledge as to whether that was done in this investigation?

A No, I don't.

Q You took an analysis of fingerprints that were taken from a drinking glass, sir?

A Several glasses, yes.

Q Okay. Do you know what the results of that were?

A They were the victim's.

Q And you were only sent fingerprints from three different glasses?

A There were several glasses, I believe, yes.

Q And you were only sent fingerprints of one ashtray?

A That's correct.

Q And how many bottles of adult beverage did you have occasion to analyze prints from, if you know?

A I'd say at least four.

Q And out of that four, only Mr. Rivas' prints were found on the bottle of Blue Nun?

A That's correct.

Q And regarding the other three, one of those bottles was a Bacardi amber rum?

A The, the Gordon's gin, I believe the Gordon's gin bottle.

Q Well, go with that, if you prefer. Was Mr. Rivas' prints on the Gordon's gin bottle?

A No, they weren't.

Q Did you have an analysis from a Bacardi rum bottle?

A I did.

Q And were Mr. Rivas' prints found on the Bacardi rum bottle?

A No, they weren't.

Q And there was a fourth bottle, may I assume that Mr. Rivas' prints were not on the fourth bottle either?

A That's correct.

Q Now, sir, when did you conduct this analysis?

A Started back in April of '87.

Q Okay. And when did it complete?

A The prints from the apartment were processed within the month of April, and I believe I received a special request later to process the Stephen King book. That was the fall of '92, I believe.

Q So is the Stephen King book the only analysis for fingerprints that you conducted in 1992?

A No, there was some travel papers, brochure.
Q And that was also in the fall of 1992?
A That's correct.
Q And did you find Mr. Rivas' prints on the travel folder or the Stephen King book, you already answered?
A Neither.
Q Neither. One moment, please.

(Proceedings paused.)

BY MR. CALLE:

Q Sir, did you bring any of your affidavits in here today concerning this analysis?
A I brought a copy of my reports.
Q May I see --
A Sure.

(The reports were handed to Mr. Calle.)

MR. CALLE: Notes --

THE COURT: Can I see counsel at the bench?

MR. CALLE: Yes, sir.

(Counsel approached the bench. An off-the-record discussion ensued.)

THE COURT: Are you satisfied with that report?

MR. CALLE: Yes.

BY MR. CALLE:

Q Thank you.

A Sure.

Q Officer Donohue, one further question: On those police reports, regarding the results of your fingerprint analysis tests, okay, is that police report dated as to when it was typed?

A No, it isn't.

Q Can you tell this Court when you typed that up, or had that typed or, and you signed it?

A The 19th -- our follow-up reports were typed up in 1992.

Q Thank you very much.

THE COURT: Any redirect?

MR. FITZPATRICK: Briefly.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Officer, the prints, were there prints recovered from a Gordon's gin bottle?

A Yes, there were.

Q And those prints were identified as whose?

A The father of the victim.

Q Randall Hill?

A That's correct.

Q And you mentioned some prints recovered from a Molson bottle. Whose prints were those?

A Brother's of the victim.

Q David Hill?

A David Hill.

Q And you mentioned some prints recovered from the telephone that you were able to identify?

A That's correct.

Q Whose prints were those?

A They, I believe, were the victim's.

Q Valerie Hill?

A Or -- excuse me, they were the father's prints.

Q Randall Hill?

A Randall Hill.

Q All right. And the only prints of however many, twenty or some-odd prints that were recovered and turned into you for identification, you were able to identify all of them, with the exception of two from the telephone?

A From the apartment?

Q Correct.

A Correct.

Q Thank you very much.

MR. CALLE: Nothing further.

THE COURT: Thanks, Officer. You got that

report.

(Witness excused.)

THE COURT: Ladies and gentlemen, we're going to call it a day -- a week. I'm going to dismiss you now for the weekend. I'm going to say to you that Monday we will start at 10 a.m. I hope to start at 10 a.m. I have my morning's work before this trial. 10 a.m. on Monday.

Now, over the weekend, of course, the same admonition goes: not to form any opinions; not to talk about it amongst yourselves or with anybody else; certainly don't review anything that may have been printed or distributed through the news media; don't go up to Hickok Ave. and have a look around. As I say, if it becomes important enough that I think we ought to go, we will all go together. Certainly don't go off and do any independent research on finger-prints or anything else that may have arisen during the course of this trial.

And then we'll see you back in the jury room Monday at 10:00. Have a nice weekend, folks.

(The proceedings of March 19, 1993 were

adjourned at this time.)

* * *

CERTIFICATE

I, PATRICIA A. ALEXANDER, C.S.R.-R.P.R., an official reporter of the Supreme and County Courts, Fifth Judicial District, State of New York, do hereby certify that the foregoing is a true and correct transcript of my stenographic notes taken in the above-entitled matter, at the time and place first herein mentioned.

Patricia A. Alexander
PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

September 16, 1993
DATE

COPY



S T A T E O F N E W Y O R K
COUNTY COURT : COUNTY OF ONONDAGA

---

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

-against-

HECTOR M. RIVAS,

Defendant.

Indictment Number
92-1114-1

Index Number
92-2794

Volume IV

---

Onondaga County Courthouse
401 Montgomery Street
Syracuse, New York 13202
March 22, 1993

B E F O R E : HONORABLE J. KEVIN MULROY,
County Court Judge, and a Jury.

A P P E A R A N C E S : WILLIAM J. FITZPATRICK, ESQ.
Onondaga County District Attorney
Onondaga County Civic Center
421 Montgomery Street
Syracuse, New York 13202

RICHARD J. CALLE, ESQ.
Attorney for the Defendant

PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

P01273

# I N D E X


WITNESSES PAGE

DREW JAMES BUSKE

Direct Examination by Mr. Fitzpatrick. . . . . . . . 612

Cross-examination by Mr. Calle . . . . . . . . . . . 623

GARY PRATT

Direct Examination by Mr. Fitzpatrick. . . . . . . . 631

Cross-examination by Mr. Calle . . . . . . . . . . . 651

ROBERT C. LUCAS

Direct Examination by Mr. Fitzpatrick. . . . . . . . 666

Cross-examination by Mr. Calle . . . . . . . . . . . 676

ELIZABETH LEWIS

Direct Examination by Mr. Fitzpatrick. . . . . . . . 700

Cross-examination by Mr. Calle . . . . . . . . . . . 706

JOHN N. CASSANO, JR. (Recalled)

Direct Examination by Mr. Fitzpatrick. . . . . . . . 729

Cross-examination by Mr. Calle . . . . . . . . . . . 730

MARGARET BURKE FRIO

Direct Examination by Mr. Fitzpatrick. . . . . . . . 731

Cross-examination by Mr. Calle . . . . . . . . . . . 753

Redirect Examination by Mr. Fitzpatrick. . . . . . . 757

I N D E X (Continued)

WITNESSES PAGE

ELIZABETH LEWIS (Recalled)

Direct Examination by Mr. Fitzpatrick. . . . . . . . .758

Cross-examination by Mr. Calle . . . . . . . . . . . .797

JOSEPH FRANCIS FIELDS

Direct Examination by Mr. Fitzpatrick. . . . . . . . .811

Cross-examination by Mr. Calle . . . . . . . . . . . .818

KELLY WILLIAMS GREY

Direct Examination by Mr. Fitzpatrick. . . . . . . . .825

Cross-examination by Mr. Calle . . . . . . . . . . . .828

E X H I B I T S

| PEOPLE'S NUMBERS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| 5 | Photocopy of Letter to R. Lucas (Two-Sided) | - | 673 |
| 10 | Travel Brochure | - | 620 |
| 22 | Original Letter to R. Lucas from Valerie Hill | - | 674 |
| 29 | Note | - | 647 |
| 38 | Purse and Contents | 611 | 620 |
| 39 | Greeting Cards and Notes | 611 | 622 |
| 40 | Photograph | 611 | 622 |
| 41 | Photograph | 611 | 622 |
| 42 | Telephone Book in Plastic Bag | 611 | 643 |
| 43 | Note of Hector Rivas | 611 | 634 |
| 44 | Note | 611 | 637 |
| 45 | Greeting Card and Note | 611 | 637 |
| 46 | Note | 611 | 637 |
| 47 | Papers and Wallet Containing $22 | 611 | 638 |
| 48 | Cigarette Butts | 611 | 639 |
| 49 | Greeting Cards (Two) and Business Card | 611 | 642 |
| 50 | Photograph | 611 | 644 |
| 51 | Photograph | 611 | 639 |
| 52 | Photograph | 611 | 645 |
| 53 | Photograph | 646 | 647 |
| 54 | Letter to R. Lucas from Valerie Hill | 665 | 676 |

# E X H I B I T S

| DEFENDANT'S EXHIBITS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| F | Report of D. Buske | 626 | - |
| G | Syracuse Police Department Laboratory Reports (32 pp.) | 628 | - |
| H | (Inventory Report - Withdrawn) | 658 | - |
| H | Voluntary Affidavit of E. Lewis, Three Pages, Dated 5/19/87 | 805 | - |
| I | Voluntary Affidavit of E. Lewis, Two Pages, Dated 3/30/87 | 806 | - |

(Court and counsel are present. Proceedings began at this time.)

(Documents were marked for identification as People's Exhibit Numbers 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, and 52, this date.)

THE COURT: Okay. We're going to bring the jury in, gentlemen.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: All right. Good morning, ladies and gentlemen.

(The jurors collectively responded, "Good morning.")

COURT ATTENDANT: Good morning, your Honor.

THE COURT: Let the record reflect the jury is present, counsel, the defendant.

Mr. Fitzpatrick, would you call your next witness, please?

MR. FITZPATRICK: Yes, your Honor. Drew Buske.

THE COURT: Drew Buske.

MR. FITZPATRICK: Good morning, everybody.

(The jurors collectively responded, "Good

morning.")

COURT CLERK: Drew James Buske, D-R-E-W James B-U-S-K-E.

* * *

D R E W J A M E S B U S K E , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

THE COURT: Hi, how are you, sir?

THE WITNESS: Hi.

THE COURT: If you'll pull that microphone that red button, Drew.

(The witness complied.)

THE COURT: There you go. Thanks.

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Sir, good morning. Would you tell the jury, please, your full name and what you do for a living?

A Drew James Buske. I'm presently employed by Syracuse University in the security department.

Q And how long have you been employed there, sir?

A Three years.

Q And just in case you look a little droopy-eyed this morning, did you just get off work?

A Late last night I got off of work, yes.

Q Prior to working for Syracuse University, how were you employed?

A I was employed by the Syracuse Police Department for twenty-one years.

Q What did you do for them upon your retirement?

A Upon my retirement, I was employed -- assigned to the license division. Prior to that, I was a supervisor in the crime laboratory for four years.

Q And what was your rank at that time?

A I was a sergeant.

Q And back in March of '87, could you tell the jury how you were employed back then?

A In March of '87, I was assigned in the crime lab as a supervising sergeant.

Q Could you give us a brief idea as to what your duties were as the supervising sergeant in the crime laboratory?

A On a daily basis, I supervised the daily work activities of the personnel in the lab, and supervised the collection and preservation of evidence on major crime scenes, and the processing of that evidence, and storage of it, until it reached a court appearance.

Q During your duties at the crime laboratory, would it be your responsibility to respond to every homicide scene in the City of Syracuse?

A Yes, it would.

Q And did that include the homicide of Valerie Hill in March of 1987?

A Yes, it did.

Q And could you tell us, did you respond to 248 Hickok Ave. on March 30th of 1987?

A Yes, that afternoon I did.

Q What were your duties when you responded there that day?

A My responsibility -- it was my duty to get a brief description of what had initially been found at the scene, and to secure the scene and start documenting and photographing and collecting evidence.

Q And did you collect certain evidence -- items of evidence, yourself?

A Yes, I did.

Q Were you the only person collecting items of evidence?

A No, I wasn't.

Q When you got there, Mr. Buske, could you tell us whether -- tell the jury whether or not you made any attempt to ascertain whether there had been a break-in at 248 Hickok Ave.?

A Oh, yes. I conferred with the investigating officers in the C.I.D., investigators on the scene. They informed me that there was no sign -- no apparent sign of a forced entry; that they had gained entry through the back door. And once we were inside, we checked the apartment and we did not find any, any forced entry, as far as doors or windows in the apartment.

Q All right. And I want to draw your attention to a room that we have previously heard a description of, which I'll describe as the master or mainly used bedroom of the victim, Valerie Hill. Did you enter that room, sir?

A Yes, I did.

Q Did you make any observations of anything on her bed?

A As I recall, the room was secured and by that, I mean there was no force to any of the windows; the bed appeared to have been slept in; and I also observed that the electric blanket was in an on position. The dial on the control was on Number 8.

Q All right. Sir, I want to show you some items of evidence, if I may, that have previously been marked. I'll hand you People's Exhibit 38 and ask if you can identify that for us, sir. And by 38, I'm referring to the entire item.

A Yes. This is the purse belonging to the victim that I recovered from the kitchen. It was on -- the strap was hanging over the chair in the kitchen.

Q And did you do something particular with the contents of the purse?

A I went through the contents and separated it, individualized it, and bagged it in three separate bags, sir.

Q And you placed, for courtroom purposes, the three bags have been placed inside the purse?

A Yes.

Q All right, sir.

THE COURT: Just so I'm clear, Exhibit 38 is the purse containing three plastic bags --

MR. FITZPATRICK: Yes.

THE COURT: -- that are all marked just 38?

MR. FITZPATRICK: Yes. The plastic bags being the contents of the purse.

BY MR. FITZPATRICK:

Q Mr. Buske, I hand you People's Exhibit 39 and ask if you can identify that for us, please.

A Yes. This was evidence I collected that afternoon. I recovered it from a -- I believe it was a drawer in a spare bedroom in the apartment. What it is is a stack of greeting cards and personal notes that were the victim's, that she apparently saved.

Q Now, how were these notes, cards, so forth, how were they positioned inside this drawer?

A As I recall, they were just neatly piled pretty much the way they are in a drawer, just neatly saved, stacked.

Q Were there other things in the drawer?

A I believe there were other things, yeah. I don't recall exactly what, but these things I thought were important at the time.

Q And you collected those and secured them?

A Yes.

Q I want to show you, Mr. Buske, People's

Exhibit 10. First of all, for your point of reference, I want to show you the blue card contained in the plastic bag from which I'm removing Exhibit 10, and ask if you can identify Exhibit 10? Where did that come from?

A Yes. This is a group of magazines that I recovered from the kitchen table at the scene, on the 31st at 1:40 p.m.

Q And Exhibit 10 was one magazine from that group?

A Yes.

Q I want to hand you what has previously been marked as People's Exhibit 8 and this has previously been identified, the Exhibit 8, Mr. Buske, is the yellow piece of paper. Could you tell us where you located that, sir?

A Yes. I located this on a desk in the dining room, the bank book, and Exhibit 8, which is a customer copy of a vehicle repair.

MR. CALLE: I didn't hear the end of -- copy?

THE WITNESS: A copy of a customer copy of a vehicle repair sheet.

MR. FITZPATRICK: And for the record, your Honor, this is the receipt from Nye Ford --

THE COURT: Sure.

MR. FITZPATRICK: -- which we previously

heard testimony about.

BY MR. FITZPATRICK:

Q Mr. Buske, I want to hand you People's Exhibit 40 and ask if you can identify that for us, please.

A Yes. I believe this is a photo of the rear entry to the apartment at 248 Hickok Ave.

Q And would you tell us what type of lock appears to be on there?

A It appears to be a dead bolt lock.

Q And is there what I would refer to as a peephole in the door?

A Yes, there is.

Q And what are those -- what's the purpose of those strips of tape that have been around the door?

A When we leave a scene, we would tape the door with evidence tape, lock, lock the door, and put evidence tape over it, and then it would indicate to us that the scene was secured when we left. And upon returning to the scene perhaps the next day, the tape would still be intact. If it was broken, we'd realize the scene had been entered by someone else.

Q And I want to show you People's Exhibit 41. If you can identify that for us, please?

A Yes. This is a photo of the victim's bedroom.

It's an exact photo of the control mechanism for the electric blanket which was on the floor by the bed.

Q And you previously testified that was in an on position upon your arrival?

A Yes, sir, that's correct.

MR. FITZPATRICK: Your Honor, at this time, I would offer People's Exhibit 10, which is a travel brochure located on the kitchen table testified to by this witness.

THE COURT: Any objection to People's 10?

MR. CALLE: No, sir.

THE COURT: 10 is received.

(People's Exhibit Number 10 was then received into evidence.)

MR. FITZPATRICK: I would offer Exhibit 38, the victim's -- your Honor, the victim's purse and its contents.

THE COURT: Any objection to 38, sir?

MR. CALLE: No, sir.

THE COURT: 38 is received.

(People's Exhibit Number 38 was then received into evidence.)

MR. FITZPATRICK: I would offer Exhibit 39, your Honor, the bag containing notes and cards,

and I would point out that it's previously been stipulated between counsel and myself that these are in the handwriting of the defendant, Hector Rivas.

MR. CALLE: Well, there's no objection and that's correct regarding the stipulation.

THE COURT: Okay. Ladies and gentlemen, just for the record, and it's clear to you, the attorneys are, of course, allowed to stipulate that certain things are not in question. And what they've stipulated to is that Exhibit Number 39, the plastic evidence bag containing several cards and notes, and possibly letters, are, in fact, in the handwriting of the defendant, Hector Rivas.

MR. CALLE: I have one caveat to that, if I may, Judge, that's that the stipulation was made some weeks ago, and I haven't looked at the contents since.

MR. FITZPATRICK: Well, I didn't sneak anything in since then, but I'd be glad --

MR. CALLE: No. I'll take your word, but I just wanted to get that clear.

THE COURT: Sure. Yeah.

(People's Exhibit Number 39 was then received into evidence.)

MR. FITZPATRICK: And I would offer Exhibit 40, the photo of the door, and 41, the photo of the electric blanket control.

THE COURT: Any objection to 40, the photo of the door?

MR. CALLE: No, sir.

THE COURT: That's received.

(People's Exhibit Number 40 was then received into evidence.)

THE COURT: 41, the photograph of the electric blanket control.

MR. CALLE: Did you ask me a question?

THE COURT: 41, sir.

MR. CALLE: I'm sorry. No objection.

THE COURT: All right. 41 is received.

(People's Exhibit Number 41 was then received into evidence.)

MR. CALLE: If I may inquire, what was 41? Was that the photo of the electric blanket --

THE COURT: Yes, sir.

MR. CALLE: -- mechanism?

THE COURT: Control.

MR. CALLE: Yes. Thank you. No objection.

THE COURT: Control dial.

MR. FITZPATRICK: Thank you very much, Mr. Buske.

THE COURT: Any cross-examination of this witness?

MR. CALLE: If I may have a moment?

(Proceedings paused.)

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Mr. Buske.

A Good morning.

Q My apologies for the other day. I know you were here.

If I may, sir, very briefly, regarding the condition of the windows, sir, you say that they were secure. Is that your word? What was your word, that there appeared to be no forced entry?

A Yes.

Q Sir, could you tell this Court if you checked to see if they were all locked?

A I believe I did, yes.

Q You believe you did?

A According to my notes, they would indicate there was no forced entry, and the windows and doors were locked. Then I believe I checked the windows in every room of the house.

Q When you say you "believe," can we take it that you are not emphatically sure?

A Well, to the best of my memory, in going down through my notes, I'd be willing to assure that there wasn't any forced entry.

Q Well, regarding your notes, does it say all windows locked, or does it say no appearance of forced entry?

A It says no forced entry; doors and windows locked. I believe that's what it says.

Q Could I see those notes? Have you brought them with you?

A I don't -- I'm referring to the --

MR. FITZPATRICK: The lab sheet.

A -- the lab -- the front cover of the lab sheet, the blue sheet.

MR. CALLE: Got it? May I borrow yours?

(Handed to Mr. Calle.)

MR. CALLE: Thank you, Mr. Fitzpatrick.

MR. FITZPATRICK: I'm sorry, that's not the

right one.

BY MR. CALLE:

Q Sir, could you tell this Court what is meant by lock secure?

A May I see in what reference it's used in the report?

MR. CALLE: If I may present this?

THE COURT: Sure.

A No. This isn't my report. It's, it's the evidence report of the first evidence technician on the scene. There is a follow-up report that I filed, but in reference to this report, it means windows and doors locked, secure, no break-in found in his report. And I believe if you find my report, I'll make reference to the same point.

Q Did you bring your report with you today?

A No, I don't have it with me.

MR. CALLE: Judge, if I may show these?

THE COURT: Have you got it, Counselor?

MR. CALLE: Well, I have a report with Mr. Buske's name on it. I wonder if he would be able to find it.

THE WITNESS: No. This is the crime analysis report that I just commissioned. It's not the report I was referring to.

MR. CALLE: Thank you.

THE COURT: You got it now?

MR. CALLE: Yes. May I have a moment?

THE COURT: Okay. Is that the right one?

THE WITNESS: I haven't seen it. I believe it is.

THE COURT: Okay. If you've got the right one, let's mark it.

MR. CALLE: Yes, sir.

THE COURT: This is Defense Exhibit what, E? F, Defense F.

(Report was marked for identification as Defendant's Exhibit F, this date.)

MR. CALLE: If I may, your Honor, may I show the exhibit?

THE COURT: Sure.

BY MR. CALLE:

Q By the way, is it Mr. Buske, at this point? You're no longer with the police department?

A Right.

Q Yes. Mr. Buske, I ask you to look at the report which has been alluded to, and see if that report refreshes your recollection regarding the, the locked or unlocked status of the windows, and if it -- if it was ever memorialized in the report?

A I indicate the front door was locked and sealed.

I have no indication that there was any forced entry. To the best of my recollection, there wasn't.

Q Thank you, sir.

MR. CALLE: Oh, this is really yours. Do you want to hold onto that copy?

MR. FITZPATRICK: No, keep it.

BY MR. CALLE:

Q Now, Mr. Buske, on direct examination by Mr. Fitzpatrick, was it your testimony that the bedding, what is designated Valerie Hill's bedroom, appeared to have been slept in?

A It was -- it was not -- it appeared to be -- have been slept in, yes.

Q Now, if you know, sir, regarding Exhibit 38, the purse in the kitchen and its contents, do you know if there were -- if those items were dusted for fingerprints?

A I don't believe they were. I'm not --

Q I think just one final question, Mr. Buske, regarding Exhibit 40, the photo of the rear entry. Did I hear correctly that tape was placed for sealing of that door one day, and the following day the tape had been disturbed?

A I believe that particular photograph was probably taken when we left the apartment on the first day, to show that the door was secured and we had placed

evidence tape over the door.

Q You made a visual observation of the entire apartment, sir?

A Yes.

Q Do you recall if the closet doors were in an open position?

A I don't recall that. I'd have to review the photographs.

Q One moment now, if I may, and I'm almost done, Mr. Buske.

(Proceedings paused.)

MR. CALLE : I'd like to have this marked as Defense Exhibit G, if I may, your Honor. It's the Syracuse Police Department lab reports.

(Reports were marked for identification as Defendant's Exhibit G, this date.)

BY MR. CALLE:

Q Mr. Buske, I ask you to look at the signatures subscribed at the bottom of the first page of that defense exhibit. Is that your signature?

A It's my signature, yes.

Q May I have it back, please?

Mr. Buske, what was -- I'll withdraw that.

How is it that your signature is signed to the

lab reports, subscribed to the lab reports?

A As a commissioner of deeds, I was required -- commissioned each lab report as to the authenticity of the particular lab person that was making the findings on the report.

Q So you authenticate what the lab technician puts out?

A I authenticated her signature. She was signing the report.

Q So you were just a witness at this time? These lab reports have nothing to do with your function at the time?

A It's part of my function in the crime lab. It's not my finding; it's not my report. I'm just authenticating her signature as the technician, as to the findings of that examination.

Q Okay. So let me get this straight. I believe, Mr. Buske, all you did was witness the signature of the lab technician, as to what his findings were?

A Yes.

Q You did not subscribe to the accuracy of the contents of the lab reports, is that correct?

A No.

Q That is correct, or that is not correct?

A I didn't subscribe to the accuracy of the particular examination; as to the technician's signature.

Q Yes. Thank you very much. No further questions.

MR. FITZPATRICK: I have nothing further.

THE COURT: Thanks very much, Drew.

(Witness excused.)

MR. FITZPATRICK: Gary Pratt.

THE COURT: Good morning, sir.

MR. PRATT: Good morning, Judge.

* * *

GARY PRATT, called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good morning, sir.

A Good morning.

Q Would you tell the jury, please, your full name and what you do for a living?

A Gary Pratt, P-R-A-T-T. For the last fifteen years I've been employed for the City of Syracuse in the police department.

Q Could you tell us what your current rank and assignment is with the Syracuse Police Department?

A For the past nine years I've been assigned to the crime laboratory as an examiner, firearms examiner and investigator.

Q And how were you employed back in March of 1987?

A Also in the crime laboratory as an examiner and as a helper, as far as photographing, sketching, and other assignments that may be given to me.

Q Now, I heard you say that you're the Syracuse Police Department firearm examiner. Do you get involved in major felony cases that don't necessarily involve the use of

firearms?

A Yes. My primary job is firearms examining, but I do help out the lab and other assignments as they need me in.

Q And is that how you were employed back in March and April of '87?

A That's correct.

Q Gary, did you have an opportunity to respond to 248 Hickok Ave., specifically back on March the 30th, and subsequent days of 1987?

A That's correct. We received a call in the crime laboratory to that address of a possible suspicious death, possible homicide. And we responded, the whole crime laboratory, including our captain, to that location.

Q And what were your duties when you arrived there, sir?

A Once I arrived there, I helped with the photographing. I took black and white photographs, and then I was assigned in picking up evidence that may be germane to this particular case.

Q Did you make any observations of Miss Hill's body?

A Upon entering this apartment, walking through it, I walked into a living room area. I found a white female on

the ground, stomach down, with a red blanket over her.

Q Did you subsequently observe anything underneath the body?

A Once we started to remove the body, I discovered a phone book underneath the body.

Q Where exactly under the body was the phone book located?

A It was approximately the stomach-hip area.

Q And I'll show you what has previously been marked as People's Exhibit 42 and ask if you recognize that, sir.

A Yes. Exhibit 42 is this phone book. The cover has been removed from it, though. It's sitting in the back.

Q All right, sir. In your expertise in looking at that, is there some indication that it has been checked for fingerprints?

A Yes. I personally know it's been checked for fingerprints. I was there when it was done.

Q All right, sir. I hand you People's Exhibit 43, Mr. Pratt, and ask if you can identify that for us, please.

A Yes, I can.

Q What is that, sir?

A Exhibit 43 is a yellow notepaper that I recovered at the scene.

MR. CALLE: I didn't hear after "recovered."

THE COURT: At the scene.

THE WITNESS: At the scene, sir.

MR. CALLE: At the scene.

BY MR. FITZPATRICK:

Q And where, specifically, did you recover Exhibit 43?

A Exhibit 43 was found in an end table, in a drawer of that end table, in the living room.

(Handed to Mr. Calle.)

MR. CALLE: Oh, thank you.

(Proceedings paused.)

MR. CALLE: Okay. No problem. Thank you.

MR. FITZPATRICK: I would offer Exhibit 43, your Honor.

THE COURT: Exhibit 43?

MR. CALLE: No.

THE COURT: Any objection?

MR. CALLE: None, sir.

THE COURT: All right. It's received.

(People's Exhibit Number 43 was then received into evidence.)

MR. FITZPATRICK: By stipulation, your Honor, the author of the note is Defendant

Hector Rivas.

MR. CALLE: Yes, sir, that is correct.

THE COURT: Okay. Ladies and gentlemen, as you've heard, the attorneys have stipulated the yellow note contained in the plastic bag, constituting Exhibit Number 43, was written by the defendant.

BY MR. FITZPATRICK:

Q Mr. Pratt, I hand you People's Exhibit 44 and ask if you can identify that for us, please.

A Exhibit 43 is an -- Exhibit 43 or 44? Excuse me. 44 is a white piece of paper with writing on it, and that was also recovered in the end table in a drawer; that end table in the living room.

Q Same end table as you previously referred to?

A That is correct.

Q Now, I want to hand you People's Exhibit 45 and ask if you can identify this for us, please.

A Yes. Exhibit 45 is a piece of white paper with writing on it, and also a greeting card with writing on it. And that was recovered in a jewelry box in a bedroom.

Q And do you know, Mr. Pratt, which bedroom -- for our purposes during the course of the trial, we've been referring to what appeared to be the main bedroom as

Valerie Hill's bedroom, whether it was a bed with an electric blanket on it, is that the bedroom you recovered it from?

A That is the bedroom I'm referring to, yes.

Q All right, sir. And I'd like to show you People's Exhibit 46, an envelope containing three items in it. If you could identify those for us, please.

A Exhibit 46 is three pieces of yellow paper, Burns Brothers Piping Company on the bottom. There's handwriting on it. And they were recovered in the kitchen. There's a kitchen table, and these were recovered on the top of that kitchen table.

Q I'm showing you what has previously been marked and received into evidence as People's Exhibit 6. Directing your attention to three items of stationery appearing to have the writing "Burns Brothers" on them, are these one in the same items that you've just identified?

A That is correct.

Q All right.

MR. FITZPATRICK: Judge, at this time, I would offer People's Exhibits 44, 45, and 46.

THE COURT: Okay.

MR. CALLE: No objection.

THE COURT: Any objection to any of those

exhibits? That's People's 44, 45, and 46. They are received.

(People's Exhibit Numbers 44, 45, and 46 were then received into evidence.)

THE COURT: I'm just going to hold up for the jury, People's Exhibit 6 showing the kitchen table. I think they've seen this already, the kitchen table where the three Burns Brothers notes were recovered. Can everybody see it?

BY MR. FITZPATRICK:

Q I'm going to hand you, Mr. Pratt, People's Exhibit 47 and ask if you can identify those items for us, please.

A Yes. Contained inside Exhibit 47 is numerous paperwork, a wallet, and they were recovered also on this kitchen table.

Q Any currency in there, sir?

A There was $22; I presume it's still there. The bag is still -- was sealed.

Q All right.

MR. FITZPATRICK: I'd offer Exhibit 47, your Honor.

MR. CALLE: None. No objection.

THE COURT: Okay. 47 is received.

(People's Exhibit Number 47 was then received into evidence.)

BY MR. FITZPATRICK:

Q I want to show you, Mr. Pratt, People's Exhibit 51, a photograph. Can you identify what is in that photo, please?

A Yes. Exhibit 51 portrays the top of that kitchen table. In the foreground is a pack of matches; in the middle of that photograph is an ashtray; within that ashtray there are numerous cigarette butts.

Q And I want to show you Exhibit 48 and ask whether you can identify the photo and the bag's contents for us.

A Yes. Exhibit 48 is, in fact, those cigarette butts. There is a Polaroid picture which I personally took of the contents of that bag. And contained in that photograph are five Barclay cigarette butts and two Carlton cigarettes.

Q All right, sir.

MR. FITZPATRICK: I would offer 48 and 51, your Honor.

MR. CALLE: May I just see 48 and 51, please?

(People's Exhibit Numbers 48 and 51 were

handed to Mr. Calle.)

THE COURT: Let's deal, first of all, if we can, with Exhibit 48. Is there any objection to that being received?

MR. CALLE: No, Judge.

THE COURT: Okay. How about 51, sir?

MR. CALLE: No, sir. No objection.

THE COURT: All right. Then 48 is received and 51 is received.

(People's Exhibit Numbers 48 and 51 were then received into evidence.)

BY MR. FITZPATRICK:

Q I'm going to hand you People's Exhibit 49, Mr. Pratt. Can you identify that for us, please.

A Yes. Exhibit 49 was a card and also a business card, and I found both of these items on top of the refrigerator in the kitchen area.

Q And about the business card, does it on its face make any reference, or in your judgment, have any connection to the defendant, Hector Rivas?

A No. It's Ken's Painting, Unlimited.

Q All right.

MR. FITZPATRICK: Judge, I would offer 49, same stipulation, that the author of the

greeting card is the defendant.

THE COURT: Have you seen Exhibit 49, Mr. Calle, specifically the card contained therein, sir?

MR. CALLE: I don't recall. I have no independent recollection, sir.

THE COURT: Not only is counsel asking that be received, but he's also asking for a stipulation the defendant's handwriting is contained within that greeting card or in that exhibit.

MR. CALLE: Judge, not my client, nor myself, have a recollection as to whether we saw this card before, so --

THE COURT: Do you want to open it?

MR. FITZPATRICK: Okay, sir. I have opened these bags in my office previously, your Honor, that should be --

MR. CALLE: Thank you.

MR. FITZPATRICK: Your Honor, for the record, there's another greeting card. It appears to be a Christmas card that's not of any moment to the trial, as far as I'm aware, but the St. Patrick's Day, it's my understanding

that counsel was aware that it was authored by the defendant.

MR. CALLE: That's correct.

THE COURT: Then are we going to remove it, or are we going to just leave the St. Patrick's card, or is that other card going to remain?

MR. FITZPATRICK: I'll remove them, if it's all right with defense.

MR. CALLE: No, I would ask that it remain in as part of the exhibit.

MR. FITZPATRICK: Fine.

THE COURT: Is there any handwriting on that card?

MR. FITZPATRICK: Yes. It simply says, "Val and Hector," and then there's some preprinted, "A special holiday season." It's not signed, and it's not the defendant's handwriting. It's not authored by the defendant.

MR. CALLE: Evidently it was written to both Val and Hector.

THE COURT: Just so we're straight, then we're going to receive these items, but ladies and gentlemen, there are two contained within that bag, and I'm sure you followed the

discussion here, but the St. Patrick's card was authored by the defendant, as has been stipulated to. The Christmas card was not, I repeat, not authored by the defendant, and also has been stipulated to by the attorneys.

And 49 then is received, is that correct, sir, with those stipulations?

MR. CALLE: Well, Judge, I didn't understand what you meant by not offered by the defendant.

THE COURT: It's not the defendant's handwriting.

MR. FITZPATRICK: Not "authored."

MR. CALLED: Authored. I just heard "offered."

THE COURT: No, no.

MR. CALLE: Correct, sir, that's correct.

THE COURT: Okay. I appreciate the geographical --

MR. CALLE: I don't notice everything.

THE COURT: Fine. Then I'll receive Exhibit Number 49, with those stipulations.

(People's Exhibit Number 49 was then received into evidence.)

BY MR. FITZPATRICK:

Q Mr. Pratt, I've previously shown you Exhibit 42. I am now handing you People's Exhibit 50. Can you identify People's Exhibit 50, please?

A Yes. Exhibit 50 portrays the phone book. In the left-hand side of the phone book is the body of the victim.

Q And is it in the right portion as to where the phone book was, in relation to the body?

A That's correct. It's in the lower stomach-hip area.

Q What has been done to the body to facilitate the photo?

A What we have done is actually rolled the body over on the victim's back, exposing the book.

Q All right.

MR. FITZPATRICK: I would offer Exhibits 42 and 50, your Honor.

THE COURT: All right. Let's deal with 42, and that is a plastic bag containing a phone book. Any objection to that being received?

MR. CALLE: No, sir.

THE COURT: It's received, then.

(People's Exhibit Number 42 was then received into evidence.)

THE COURT: And Exhibit 50, the photograph

portraying this phone book in relation to the body when it was recovered.

MR. CALLE: That is -- defense objects to the photograph being exhibited as -- Judge, as designed to incite the passions of the jury against the defendant.

THE COURT: Can I see that photograph, please?

MR. FITZPATRICK: Yes.

(People's Exhibit Number 50 was shown to the Court.)

THE COURT: I'm going to receive it. There's nothing contained in the photograph that I find particularly gruesome or shocking. It's received.

(People's Exhibit Number 50 was then received into evidence.)

BY MR. FITZPATRICK:

Q I'm going to hand you People's Exhibit 52, Mr. Pratt. Can you identify that for us, please?

A Exhibit 52 depicts the sink area in the kitchen, showing several glasses and some dishes in the sink.

Q And did you secure and collect those glasses?

A Yes. I secured two, what I call old-fashion

glasses, and one drinking glass.

Q Is there a liquid in one of the glasses?

A Yes. The drinking glass, there is a liquid in it.

Q And were -- was the crime laboratory ever successful in identifying exactly what type of liquid that was, if you know?

A Not to my knowledge.

Q And were those glasses dusted for fingerprints?

A To my knowledge, they were.

Q All right. Is that the way the kitchen sink area fairly and accurately appeared on the afternoon of March 30th of '87, upon your examination?

A That is correct, sir.

Q All right.

MR. FITZPATRICK: I would offer Exhibit 52.

MR. CALLE: May I just see it momentarily.

MR. FITZPATRICK: Yes.

(People's Exhibit Number 52 was shown to Mr. Calle.)

MR. CALLE: No objection.

THE COURT: 52 is received.

(People's Exhibit Number 52 was then received into evidence.)

MR. FITZPATRICK: I'd like to have a photograph marked, your Honor, as People's Exhibit 53.

(Photograph was marked for identification as People's Exhibit Number 53, this date.)

BY MR. FITZPATRICK:

Q Mr. Pratt, you previously identified what has been received in evidence, Exhibit 49, the greeting cards and the business card?

A That is correct.

Q All right. I'd like to show you Exhibit 53 and ask if you can identify that for us, please.

A Exhibit 53 portrays the refrigerator; the doors have been opened. It also shows the top of the refrigerator, with numerous items on the top of this refrigerator.

Q And that is the interior of the, what we -- strike that.

Was the freezer area on top? Just one of those -- that type of refrigerator?

A That's correct. The freezer area is on top of the refrigerator.

Q And the doors were opened to facilitate the taking of this photo?

A That's correct.

Q And with that understanding, does it fairly and accurately show the refrigerator, freezer, and top of the refrigerator as it appeared on the afternoon of March 30th of 1987?

A It does.

Q Okay.

MR. FITZPATRICK: I would offer that, your Honor.

MR. CALLE: No objection.

THE COURT: 53 is received.

(People's Exhibit Number 53 was then received into evidence.)

MR. FITZPATRICK: Judge, I'm going to go back to the testimony of Officer Kimak and offer People's Exhibit 29, another note recovered -- and with the stipulation that it's the defendant's handwriting, I'd offer Exhibit 29.

MR. CALLE: No objection.

THE COURT: Okay. And 29, I've got a plastic bag with a piece of white paper in it, a single piece of paper. Is that correct?

MR. FITZPATRICK: Yes, your Honor.

THE COURT: Okay. Did you say there was a stipulation as to whose handwriting that was?

MR. FITZPATRICK: Yes, your Honor, the defendant's.

THE COURT: Mr. Calle?

MR. CALLE: Yes, sir.

THE COURT: Okay. Exhibit 29 is received, again, ladies and gentlemen, with the stipulations by the attorneys that it contains the handwriting of the defendant, Hector Rivas.

(People's Exhibit Number 29 was then received into evidence.)

BY MR. FITZPATRICK:

Q Mr. Pratt, I'm going to hand you some of the People's exhibits which are now in evidence and ask if you would publish the contents to the jury, starting with People's Exhibit 45, and just to refresh your recollection, as I hand you the exhibits, would you tell us where they were recovered from one more time?

A Exhibit 45 contains a greeting card and a white piece of paper; they were recovered in a jewelry box in a bedroom that would be the victim's bedroom.

Would you like me to read --

Q I'd like you to read it, yes.

A "Dear Val, just saying thanks for all the special moments" we've -- "you've given me. Love, Hector." And that

was on the greeting card and the white piece of paper. It says, "To you, darling, I say why."

Q And handing you People's Exhibit 44, I'd ask you follow the same process, remind us where it was recovered from, and tell us what it -- tell us what it says.

A This is a white piece of notepaper. It was found in the living room, and that was in the end table drawer. "Life is sure nice with you in it. Don't ever leave. Love ya'."

Q I'm going to hand you People's Exhibit 43. Please follow that procedure again.

A This is a yellow piece of notepaper. This was also found in the end table in the living room. "I just want to tell you that it's so wonderful to be near you. I love you so much, Val, don't ever go away. Hector."

Q And retrieving the St. Patrick's Day card and the envelope from Exhibit 49, tell us again where you got that and what that says?

A This greeting card was found on the top of the refrigerator. The handwriting inside says, "To you, Val, as my love for you grows." I have a happy -- "Have a happy St. Patrick's Day. Love, Hector."

Q Now, sir, I'm going to hand you the three Burns Brothers pieces of stationery that were recovered from the

kitchen table, People's Exhibit 46. And would you please read those to the jury?

A These were found on top of the kitchen table, as so stated. "Hi, babe. Well, another crazy day has gone by. I'm hoping that you're feeling better, along with everything else that's going on in your life. Hope to be with you or sit and talk with you. So very much to say. I hope your night went well at work. I miss you, Val. Love you, Hector." That's on one piece of paper.

Another piece of yellow paper, Burns paper, "Hi, baby. I'm just wanting to share things with you. I need to talk. It's a hard thing to say sometimes, but I really need you. Please, babe. It's from inside."

And the last piece of Burns paper, "Dear Val, I'm hoping that your day is going well for you and I sure hope that your cold is better. I guess when someone loves like we do, they should be at peace. I never knew that my trying to please you for the feelings your heart was giving would cause all of this. I'm doing the best I can and I know that you are, too. Thank you, babe. Take care. Love," looks like, "H.R."

Q Thank you, Mr. Pratt. Thank you very much.

(Proceedings paused.)

MR. CALLE: Thank you, Ms. Alexander.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Officer. Is it Officer Pratt?

A Officer-investigator.

Q Officer, if I may, I'd like to show you Exhibit, I believe, Number 49, of the People's. Would you please take out all the items that are there?

A (Witness complied.)

Q Would you tell this Court what -- how many items are there and what they are?

A Yes. There is a St. Patrick's Day card, which I have just read you the writing inside, along with an envelope. And also what appears to be a Christmas card, only because of the Christmas tree and the star on the front of it. And inside there, it says, "Val and Hector," in writing.

Q And that's unsigned, correct?

A Yes, it's unsigned.

Q Officer Pratt, there's a third item in there, is there no?

A I'm sorry, sir?

Q Is there a third item that says, "Ken's Painting," a business card?

A I'm sorry. I'm sorry.

Q That's all right.

A Yes, there is.

Q Would you read that, please?
A "Ken's Painting, Unlimited. Ken Briggs, owner." Do you want me to read everything on the card?
Q I don't think it's necessary, sir. Thank you.
Officer Pratt, to the best of your recollection regarding when you seized these items, in the course of your duties, Exhibit Number 49, is three items that seemed that they don't belong to each other. Could you explain how they wound up as one exhibit, if you know?
A They were --
Q I'm sorry, go on.
A They were signed notes or greeting cards, and we felt that they may have something to do with the case. They may be germane to the case. So we accepted them for further examination at a later date.
Q Did you know if any investigation was conducted regarding the business card in that item, Ken's Painting?
A Not to my knowledge, sir.
Q Would that be no?
A To my knowledge.
Q To the best of your knowledge --
A No.
Q -- you know of no investigation?
A I personally know of no investigation.

Q May I ask this question, sir: Were all notes, handwritten greeting cards, or business cards, secured, to the best of your knowledge?

A Um -- I am not absolutely sure. I believe we picked everything up that had some type of handwriting on it, that may be germane to the case.

Q So that would not exclude other handwritten notes from other people? It was just determined, that your -- to the best of your, your viewpoint, you didn't think that other handwritten notes were germane?

A That's correct, sir.

Q I'm very pleased you understood that question. I didn't know how I was going to say it.

Sir, to the best of your knowledge, after the work you've done six years ago, and the observations today, are any of these notes signed, to the best of your knowledge -- withdrawn.

Are any of these notes dated, to the best of your knowledge?

A I don't believe I saw a date on any of those notes.

Q All right. Officer Pratt, there was an exhibit containing notes that I believe you testified was recovered

from a jewelry box, is that correct?

A That is correct.

Q Can you tell this Court, sir, if there were any jewels of value in that box, to your knowledge?

A Uh -- I don't have that expertise, sir. If they were any value, if that's what you're asking.

Q Yes. Directing your attention, sir, to Exhibit, I believe it's 47, but I could be incorrect. But, specifically, sir, the wallet recovered from the kitchen table. Do you recall that particular item seized?

A I do.

Q Sir, was it your testimony that that particular item, that wallet, purse, whatever that was, was not tested for fingerprints?

A I am not aware of that. It may have been, but I'm not aware of that.

Q And was it your testimony here today that the total amount of currency recovered from Miss Hill's apartment was $22?

A Paper money, that is correct.

Q Sir, directing your attention, I believe, to Exhibit Number 52, I believe it's a photo of the sink area in the kitchen. Do you recall how many drinking containers were in that photo, offhand?

A I believe there was two old fashion glasses, one drinking glass, and a -- what I would call a coffee mug.

Q Yes. So that would be four containers for drinking liquids, if we add that up?

A That's correct.

Q Do you know if any other drinking glasses or containers were out of place in any of the areas of the apartment? What I mean by "out of place," do you know what that means, sir?

A I believe I know what you are getting at, yes.

Q All right. Thank you. Go ahead.

A Not to my recollection.

Q Were there any dirty dishes in the sink proper or glasses?

A Yes. If I recall, there was dishes in the sink, itself.

Q They appeared to be in need of washing, if you know?

A I don't recall.

Q I'd like to direct your attention to Exhibit 48, Investigator. I think this is it -- 51 -- if I may, would you take a look at that and explain to the jury what that is?

A Exhibit 48 is a plastic bag containing numerous

cigarette butts. There was also two pill boxes, and inside those pill boxes were matches that were found in the ashtray. Also, I included along with Item 48 the plastic bag is a Polaroid picture that I took, myself, of the cigarette butts and of the two pill boxes with the matches in them.

Q Now, Investigator, are you a smoker?

A No, I'm not.

Q Were you ever a smoker?

A I believe probably in my junior year of high school.

Q So we could say that that's no?

A It's been quite a few years.

Q Would you describe the photograph, the exhibit in those exhibits with the particular remains of the cigarettes lined up? Would you describe it, to the best of your ability?

A There's two cigarettes on the left-hand side -- excuse me, on the right-hand side of the photograph, which are white in color. And they have Carlton written on them -- at least one does, and the other one has the same type of striping as the Carlton. On the left-hand side of the photograph are five Barclay cigarettes. Some of them actually have Barclay written on them, and some of them just have a striping of a Barclay cigarette.

Q Now, sir, if you were to look at that photograph, and we were to go back, to go beyond your junior year of high school, but go back to maybe preschool, would you be able to find -- regarding the Barclay butts, would you be able to find any difference between one and the others?

A Oh, I'm not sure. Barclay was out when I was in junior high school, but --

Q I'm talking specifically about the photo, sir. Is there something independently different between one cigarette and others?

A Uh -- not to my knowledge.

Q Okay. Well, then, if I may be more direct, is it not a fact that four of those cigarettes, or most of those cigarettes are smoked right down to approaching the filter?

A That's correct.

Q And there is one cigarette that was perhaps smoked halfway, would that be fair to say?

A Halfway, quarter, quarter of the way, yes, that's correct.

Q But one is less smoked than the others, correct?

A That is correct.

MR. CALLE: If I may, I would like to have this marked as a Defense Exhibit H.

(Report was marked for identification as Defendant's Exhibit H, this date.)

BY MR. CALLE:

Q I'd like to show you this, Investigator Pratt, and ask you to look at it and tell us what that is.

A Exhibit H is our lab, lab worksheet. Normally we call it a blue sheet, because it's normally blue, but this has been reproduced. Contained within this sheet is information from the crime scene and also all the evidence that was collected at that crime scene.

Q Is your signature on that, sir?

A I believe it is not.

Q Have you ever seen this before?

A I have.

Q Okay.

MR. CALLE: I apologize to the Court also.

THE COURT: It's Defense Exhibit E?

MR. CALLE: Yes, sir.

THE COURT: Let's then strike Exhibit H, Mr. Clerk and Patti, refer to it as Defense Exhibit E.

(Defendant's Exhibit H was withdrawn.)

BY MR. CALLE:

Q Investigator Pratt, did you recover human hairs,

or what appeared to be hairs from the particular scene on that date in question?

A I believe I did.

Q And what did you do with those?

A After recovering hairs, I would take them back to the crime laboratory, seal them in a plastic bag. Eventually they would be turned over to one of our serologists that expertises in examining hairs.

Q And, sir, would you give the recommendation to have an analysis performed?

A That's the normal procedure, yes.

Q And, sir, did you recover cigarette butts from an ashtray in the nightstand?

A Was that the bedroom nightstand, sir?

Q If I may show you Number 19.

A Yes, I do remember that particular cigarette butt.

Q Where was that, sir, recovered from?

A That was in a nightstand that, to the best of my recollection, was in the bedroom -- the victim's bedroom.

Q And you recall what brand of cigarette butt that was?

A Newport Light, if I'm correct.

Q You remember the length of that cigarette when it was pushed out?

A No, sir, I don't.
Q So you couldn't tell us if it was smoked down to the filter, or if it was put out halfway?
A No, sir, I couldn't tell you that.
Q Now, sir, do you recall any other ashtrays -- I'll withdraw that question.
Sir, do you recall recovering a metal and gold, or gold metal pipe from the end table?
A Um -- you're taxing my memory. If it's on that sheet, sir, I'm sure I did.
Q Well, I'd like to show it to you, nonetheless. I believe the Judge would require that.
That appears down there?
A Yes, the Item 7 on this sheet, it's a pipe with residue and it was recovered from an end table in the living room.
Q Were any other pipes recovered from the scene?
A To the best of my knowledge, that is the only pipe that I recovered.
Q Sir, I draw your attention to Item Number 4.
A You are correct. There is another pipe, and it's marked as metal and gold and found on the end table.
Q Were both pipes found at the same location, based upon your recollection at this time?

A To the best of my recollection, it indicates they were both found on that end table in the living room.
Q Okay. Now, when you say "residue," could you explain what residue is?
A Any, any substance left in the pipe, I would consider as residue.
Q Was there ever a determination of what that residue was, to the best of your knowledge?
A To the best of my knowledge, no.
Q Sir, can you recall if there was an ashtray located by these two pipes on the end table?
A I don't recall, sir.
Q Do you recall any other ashtrays located throughout the apartment?
A Not to my recollection today.
Q Sir, do you recall recovering a red blanket?
A Yes.
Q Do you recall where you recovered the red blanket?
A It was recovered in the living room next to the victim.
Q When you first saw this red blanket, could you tell this Court where its location was?
A It, to the best of my recollection, it was

draped over the lower part of the victim's body.

Q Okay. So when you first arrived at the scene, this red blanket was draped over the victim's body, correct?

A When I entered that living room, that's, to the best of my recollection, where I found it, yes.

Q And to the best of your knowledge, what area of -- were there any other blankets located in the apartment?

A I'm sure there was, but I don't recall how many and where they were.

Q Could you tell the Court what was the basis of including one blanket and excluding the other blanket?

MR. FITZPATRICK: Objection, your Honor; there hasn't been any testimony that the other blankets were excluded.

Q Well, do you know --

THE COURT: Sustained.

Q Do you know if there was any other test done on any other blanket, sir?

A Not to my knowledge.

THE COURT: Was the red blanket tested?

THE WITNESS: Uh -- not to my knowledge, sir.

BY MR. CALLE:

Q Sir, do you recall seeing a packed suitcase?

A I don't recall.

Q One moment, please.

(Proceedings paused.)

BY MR. CALLE:

Q I'd just like to ask one final question pertaining to Exhibit Number 49, sir. If you would take out the St. Patrick's Day card.

A (Witness complied.)

Q Investigator, is that the card that was recovered from, I believe, the top of the refrigerator, by you?

A That is correct.

Q And this was recovered on March 30th, 1987?

A That's correct.

Q Okay. And this particular recovery, were there any others saved, as you called it earlier, or stacks of notes, love notes, as if it was being kept for a memento?

A I don't think I follow you, sir.

Q I'll withdraw the question.

You testified earlier that you located in some other area, stacks of notes, correct, that were neatly piled and stacked?

MR. FITZPATRICK: Judge, I think he's confusing that with the testimony of Mr. Buske.

MR. CALLE: Oh, all right. Perhaps I am.

Thank you, Mr. Fitzpatrick. I appreciate that.

BY MR. CALLE:

Q Investigator Pratt, were there any other notes or cards located on the top of the fridge, other than these three items that you recovered that day in question?

A Not to the best of my knowledge.

Q And that day in question was March 30th, '87?

A That's correct.

Q And to the best of your knowledge, is St. Patrick's Day always March 17th?

A To the best of my knowledge, that's correct.

Q And, sir, would you look at the condition of the St. Patrick's Day card.

A (Witness complied.)

Q To the best of your ability, can you tell us what condition that card is in?

A It's -- it appears to be in good condition, with a folded back portion. That's good condition.

Q I have nothing further.

THE COURT: Thank you, gentlemen. Any redirect?

MR. FITZPATRICK: No, your Honor.

THE COURT: Okay. Officer Pratt, thanks very much.

(Witness excused.)

THE COURT: At this time, ladies and gentlemen, I'm going to take a brief morning recess. Again, I remind you not to form any opinions; not to discuss the case amongst yourselves, or with anyone else; don't read anything about it. We'll be back shortly.

COURT ATTENDANT: Right this way.

(Proceedings stand in recess.)

(Letter was marked for identification as People's Exhibit Number 54, this date.)

(All parties are present. Proceedings resumed at this time.)

THE COURT: Would you reflect the jury is present, counsel, the defendant.

Your next witness, please.

MR. FITZPATRICK: Yes, your Honor. Robert Lucas.

THE COURT: Robert Lucas. Hi, good morning.

MR. LUCAS: Hi.

THE COURT: I'm going to ask you to pull that microphone in front of you and keep your voice up, please.

MR. LUCAS: Okay.

* * *

R O B E R T C. L U C A S , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Sir, good morning, Would you tell the jury your full name, please?

A Robert Claude Lucas.

Q Where do you live, Mr. Lucas?

A Cazenovia.

Q How long have you lived there?

A All my life, forty years.

Q Forty years old. Are you married or single, sir?

A Married.

Q Your wife's name?
A Susannah.
Q Any kids?
A One.
Q What is that child's name, and how old is he or she?
A Justin, three years old.
Q What do you do for a living?
A We sell farm equipment.
Q You say "we." Who is that?
A My brother and my father. It's a family operation.
Q How long have you worked in that family business?
A All my life.
Q Where is it located?
A Cazenovia.
Q Did you know the deceased here, Valerie Hill, sir?
A Yes, I did.
Q Would you tell the jury when you first met her?
A Uh -- 1981.
Q And did you develop a relationship with her at that time, sir?
A Yes, we did.

Q Did you at any point in your life, live with her?

A Yes, we did.

Q When was that?

A Roughly two years after we started going out, we lived together for a couple years.

Q So that would have been sometime in '83?

A Yes.

Q And did there come a time when Miss Hill moved to the City of Syracuse, Mr. Lucas?

A Yes, she did.

Q Were you still seeing her at that time?

A Yes, we dated.

Q And did there come a time when your relationship broke up?

A Yes, it did.

Q When was that?

A Uh -- that would be the spring of '86.

Q All right, sir. Despite the fact that you broke up, did you continue to see her or communicate with her?

A Yes, we did.

Q And what form would that communication take?

A Friendship.

Q Did you ever speak to her on the phone?

A Yes, I did.

Q And did you ever have a date with her after the spring of '86?
A No.
Q Did you ever inadvertently run into her?
A Occasionally we would meet, yes.
Q And did you begin -- strike that.
When did you become engaged to your current wife?
A Uh -- that would be January '88.
Q All right. And when did you start dating her?
A Uh -- right after Val and I broke up.
Q All right. I misspoke. I said current wife. You have only been married once, correct, Mr. Lucas?
A Right, yes.
Q All right. Now, did you know the defendant here, Hector Rivas?
A Yes, I did.
Q Did you become aware that your former girlfriend, Valerie Hill, had begun to date -- to date Mr. Rivas?
A Yes, I did.
Q When did you first become aware of that?
A Uh -- sometime in the spring of '86.
Q Sir, is that the reason you broke up with Valerie Hill?

A No. We had sort of drifted apart a year or so earlier. We stayed good friends, still dated at that time. But, uh -- that was kind of the final act, when she was going out with Hector, and then I started seeing my former wife -- previous wife.

Q All right.

THE COURT: Present.

THE WITNESS: Wife, whatever.

Q I hope your wife isn't in the courtroom, Bob.

Now, did there come a time, Bob, in February of '87 when you received a letter from Valerie Hill?

A Yes, I did.

Q Now, had that been the only letter you received from her in 1987?

A Yes, it was.

Q And had you ever received a letter from her in '86, if you recall?

A No, I don't think so. Not that I recall.

Q All right, sir. I want to show you what has been marked as People's Exhibit 54. I'll remove it from its plastic bag. Could you tell us what that is, Bob?

A That's the letter I received.

Q All right. Would you -- would you open it up, please, and just physically describe the letter for us? Don't

read it to us, but is it all on one sheet of paper, or what is it?

A It's on two sheets of paper, and a note.

Q All right. Do they appear to be two separate letters?

A Uh -- yes, I would say that they were the same letter, the same -- they arrived in the same envelope.

Q All right, sir. Are they on different types of paper?

A Yes, they are. One is lined and one is just blank paper.

Q All right. How many pages are there to the lined paper?

A Two pages.

Q And the unlined paper consists of how many pages?

A One.

Q Do you recognize the handwriting on the outside of the envelope?

A Yes, I do.

Q Do you recognize the handwriting on the two pages of lined paper?

A Yes.

Q And do you recognize the handwriting on the

unlined paper?

A Yes. They're Valerie's.

Q All of those items were written by Valerie Hill?

A Right.

Q And did you receive that sometime shortly or -- strike that.

Is the letter postmarked?

A Yes, it is.

Q What is the postmark?

A February 26.

Q Do you recall receiving the letter sometime shortly after that?

A Yes.

Q And did you then have any contact with Valerie Hill after receiving the letter?

A No.

Q Did you ever talk to her on the phone after February 26?

A After --

Q February 26th.

A Not that I recall, no.

Q All right, sir. I want to show you, Mr. Lucas, what has been marked as People's Exhibit 5. I'll retrieve those items for you. People's Exhibit 5. Have you ever

seen that item before? Strike that.

Exhibit 5 is a photograph of a letter, is that correct?

A Yes, it is.

Q Did you ever see the original of that letter?

A No, I did not.

Q And do you recognize the handwriting in Exhibit 5?

A It's Valerie's handwriting.

Q All right.

MR. FITZPATRICK: Judge, I would offer Exhibit 5, and to refresh your recollection, Exhibit 5 was the photograph of the torn letter recovered from the trash of the defendant's house on the night of March 30th, 1987, testified to by Officer Stassi.

(People's Exhibit Number 5 was handed to the Court.)

THE COURT: Mr. Calle, any objection to People's Exhibit Number 5 being received?

MR. CALLE: No, sir.

THE COURT: Okay. People's 5 is received.

(People's Exhibit Number 5 was then received into evidence.)

MR. CALLE: Is that --

MR. FITZPATRICK: I'd also, your Honor, offer People's Exhibit 22, which is the original letter.

MR. CALLE: Judge, may we briefly approach?

THE COURT: Sure.

MR. CALLE: Thank you, your Honor.

(Counsel approached the bench. An off-the-record discussion ensued.)

THE COURT: So do I understand, you're going to object to it again --

MR. CALLE: I believe my objection has previously been stated. So, at this time, there's no objection.

THE COURT: Okay. I'll receive Exhibit Number 30 -- excuse me, 22.

MR. CALLE: What was that number, your Honor?

THE COURT: 22, sir.

(People's Exhibit Number 22 was then received into evidence.)

BY MR. FITZPATRICK:

Q Now, I'm going to hand you People's Exhibit 5, Mr. Lucas. This is the photograph of the letter recovered

from the defendant's trash, which you've indicated you have never seen a copy of. I'm also going to retrieve from People's Exhibit 54, the single unlined page which is addressed to you. I would ask you to compare the first two sentences in both Exhibit 5 and Exhibit 54.

A First two lines are the same.

Q Verbatim?

A Yes.

MR. FITZPATRICK: Judge, I would offer People's Exhibit 54.

MR. CALLE: May I see it?

THE COURT: Yes.

(People's Exhibit Number 54 was handed to Mr. Calle.)

MR. CALLE: Thank you. No objection.

THE COURT: Can I see that exhibit, please?

MR. FITZPATRICK: Yes, your Honor.

(People's Exhibit Number 54 was handed to the Court.)

THE COURT: All right. Let me just get -- Mr. Calle, Mr. Fitzpatrick is offering People's Exhibit 54, I assume in its entirety. And you had no objection to that, is that correct, sir?

MR. CALLE: That's correct, sir.

THE COURT: All right. Then I'll receive Exhibit Number 54.

(People's Exhibit Number 54 was then received into evidence.)

MR. FITZPATRICK: That's all I have. Thank you very much, Mr. Lucas. Stay right there, please.

CROSS-EXAMINATION BY MR. CALLE:

Q Good morning, Mr. Lucas.

A Good morning.

Q Just about high noon.

MR. CALLE: May I see those exhibits here? This (Indicating) and 21.

(The exhibits were handed to Mr. Calle.)

BY MR. CALLE:

Q Mr. Lucas, would you please tell this Court again, if you would, when you first began dating Valerie Hill?

A Sometime in '81.

Q Do you remember what month?

A It was in the winter. I remember our first date, we had -- we went skiing.

Q When you say "winter," is that December, or is

that January, February?

A I really don't remember.

Q Well, it would be a year's difference, so to the best of your ability, would you determine what you mean, if you can?

A All I know is wintertime we went skiing.

Q So it could have been December of '81, or January, February of '82?

A No, it was '81, January, February.

Q January, February of '81?

A Yeah.

Q Thank you. And would you tell this Court when that relationship unfortunately broke up?

A In the spring of '86.

Q Do you know when Valerie Hill first began dating Hector Rivas?

A Probably sometime in May, I'm guessing, I would say May.

Q Would that be May of 1986?

A Yes.

Q So when you say your relationship broke up in the spring of '86, was that also May of '86?

A No, that was a little earlier.

Q And yet you recollect approximately what month --

A I'm going --

Q March, April, May?

A Probably the month before.

Q Was it your testimony here this morning that Hector Rivas was not the cause of your breakup with Valerie Hill?

A We had drifted apart earlier. We had become real good friends. We were still dating; that was, I guess, the final event. She started dating Hector, and then I started dating Susan.

Q So if I may just clarify this, when you say you broke up the month before May of '86, for purposes of convenience, may we quote, but not exactly April of 1986, you broke up, is it your testimony that you then, in fact, dated or kept in contact with each other?

A We were close friends.

Q All right. So you did date after you broke up, correct?

A When she moved into Syracuse the previous year before that, we'd still continued to go out, date. We weren't seeing anybody else, but we had talked about the relationship was not as strong as it was, and, uh -- things were failing, I'd guess you'd say.

Q So if I get this straight, the relationship,

basically, was over in April of '86, or a month before May of '86, correct?

A Yeah.

Q And yet you still continued to see each other approximately a month thereafter, correct?

A No, I don't think you've got the time frame quite right. She had moved out before we had lived together for two or three years, and she had got an apartment in Syracuse the previous year. At that point, it was a combination reason, closer to work for her, plus our relationship was starting to fall apart. But we had still continued to date and see each other and remained close friends.

We had a lot of connections through both families and whatnot, and we had become real, good friends.

Q So, if I may, and I -- believe me, I'm not attempting to badger you, sir. I'm -- I wouldn't think of it, but if I may, the relationship broke up a year before the spring of '86?

A Not really broke up, but we had started to drift apart, but we never really went out with anybody else.

Q So if I may, again, you had lived together for a number of years, and there came a year that she moved out?

A Correct.
Q And would that be 1985?
A Yes.
Q And between 1985 and spring of 1986, you still saw each other --
A Right.
Q -- on a social basis?
A No. We were still dating, but we were always discussing the future of our relationship. We didn't really feel that there was a future there, but we still just saw each other and continued going out.
Q So in 1985 something happened to the relationship, correct?
A Yes.
Q And based upon what happened with that relationship, Valerie Hill -- or, I'll withdraw that; that is unfair.
Based upon the fact that Valerie Hill and you had a change in this relationship --
A Mm-hmm.
Q -- that was part of the reason for her moving out?
A That, and it was closer to work, yes.
Q So there were two reasons: one, it was convenient

for work; and the other one was that you both mutually agreed that, in fact, the relationship wasn't going where both of you had anticipated it would go, correct?

A Yes, right.

Q And then during the course of this departure --

A Mm-hmm.

Q -- you still saw each other for approximately a year?

A Yes.

Q And that apartment that you two shared, could you tell us the street it's on? Don't give us the number.

A She lived at my house.

Q And would that be Albany Street?

A Yes.

Q And when you say your "house," was anyone else living there, or it was just you, alone?

A In the beginning of the relationship, there was another couple that lived there, also.

Q And what type of structure was this house? Was it a one-family house?

A Yeah, it was a one-family house. It was a big house.

Q So can you tell us, sir, how often during that year, during 1985 and the spring of 1986, how often you would

see each other?

A What's the time period?

Q 1985, when she moved out of the house, until spring of 1986, was it a regular meeting?

A Yes, it was. Usually weekends we'd get together. Like I say, we were still going out, with the hopes that maybe the relationship would be resolved, and if it didn't, that was fine, also. We figured we'd give it some time apart.

Q So you'd say you went out on a social basis, you and Miss Hill?

A Yes.

Q And after she took her apartment, was it in Syracuse that she moved out?

A Mm-hmm.

Q And moved into --

A Mm-hmm.

Q After she took her apartment in Syracuse, did she, in fact, ever spend any time overnight at your home on Albany Street?

A From '85 to '86?

Q Yes, sir.

A Yes.

Q Yes, she did?

A Yes.

Q And, I don't mean to pry into your private life, but did you two engage in sexual relations during that time?

A Yes, we did.

Q I apologize for that question.

A No need. I'm not ashamed of it.

Q Sir, then there came a time in the spring of '86 when this relationship that you shared, again broke down, broke down even farther, is that correct -- or further?

A In 1986, yes.

Q And is it your testimony that Hector Rivas did not cause that decision, in your mind, to break off this dating of Miss Hill?

A It wasn't any big final decision, no, but when she started dating him was about the same time that I started going out with Susan. And we decided that it was best that we just discontinue the relationship and stay friends.

Q Sir, did you give testimony at the grand jury, in the fall of 1992?

A Yes, I did.

Q Sir, I direct your attention --

MR. CALLE: Mr. Fitzpatrick --

Q (Continuing) -- to page 113, if you would. I believe Line 1. Do you remember being asked this question, Mr. Lucas: "When did you first meet him?" And I believe on the previous page "him" is indicative -- indicated by Hector Rivas.

Do you remember being asked this question: "When did you first meet him?"

Answer: "About a month before we broke up, I met him uptown"?

A Yes.

Q You remember being asked this question, sir, back in the fall of 1992 in the grand jury: "Where did you meet him?"

Answer: "In a bar uptown, Albert's"?

A Yes.

Q Sir, do you remember being asked this question in the grand jury: "That's in Cazenovia?"

Answer: "Yes, it is"?

A Yes.

Q And finishing, sir: Question: "Did you become aware that Valerie was seeing Mr. Rivas?"

Answer: "Oh, approximately a month later, yes"?

A Mm-hmm.

Q And, sir --

THE COURT: You have to say yes or no.

BY MR. CALLE:

Q Do you remember being asked this question: "Was that the reason for your breakup?"

Answer: "That was the final straw, yeah. We had lived together for probably three and a half years or so, and then because of her work in Syracuse, she had moved to Syracuse, got an apartment out here. We had stayed, well, going out, but not living together for probably a year before that, I'm going to say, or six months, something to that effect"?

A Yes.

Q So, sir, when you were asked this question: "Was that the reason for your breakup," and you answered, "That was the final straw," were you indicating that the fact that Mr. Rivas, Mr. Rivas was dating Valerie Hill was the final straw in your breakup with Miss Hill?

A We had talked about it for a long time, and at that point, she started going out with him; that was the end of it, yes.

Q So your answer would be yes?

A Yes.

Q Thank you, sir.

Now, sir, I would like, if I may, again, to show

you People's Exhibit 5 and --

MR. CALLE: Is this not marked? Is this supposed --

THE COURT: That's 54, the paper inside is marked, the whole envelope and its contents.

MR. FITZPATRICK: I have the plastic bag right here.

MR. CALLE: Oh, okay. Thank you.

BY MR. CALLE:

Q Mr. Lucas, during the course of between 1985 and the spring of 1986, how many letters did Miss Hill send you?

A From '85 to '86?

Q Yes, sir, if you know.

A I doubt many, because we were seeing each other usually weekends.

Q And how about from the spring of '86 up until March of 1987, how many letters did she send you?

A I don't recall any but the one.

Q Would that be this one that was submitted into evidence here today?

A Yes, right.

Q Sir, were both -- were all these three pages inside this envelope --

A Yes.

Q -- postmarked --

A Yes.

Q -- and sent to your address?

Sir, I'm going to ask you to read --

MR. CALLE: If I may, your Honor.

Q (Continuing) -- the small letter that you had read the first two lines of, or I believe you matched up the first two lines of People's Exhibit 5.

A The whole thing? Read the whole thing?

Q If the Judge allows.

THE COURT: If that's what you want to do, okay, yes, sir.

Q Please, sir, could you --

A "Hi, Bob. I was so glad to hear from you yesterday. You must have been reading my mind. I'm going to send you the original letter I wrote because it really says the things I want to. And no matter how many times I try to rewrite it, it just doesn't come out the same. Sorry it's so messy. Besides, after work last night, it's hard to really think of anything with much concentration" -- "with much concentration now, anyway." And then in small letters, "That doesn't make sense. I mean, it's hard to concentrate. I'm tired." "I'm glad you

can sort of understand how I feel. That's part of the battle anyway."

"There's so much I want to say, but it's hard to have a one-sided conversation. So I'll sit on it for a while."

"Can you tell your mom and grandmother I said hello. Maybe I'll be able to do it myself someday soon. I guess I've said enough for now. I'll say more later."

"Oh, Bob. Thank you, Val."

And then it says, "I have the other picture of you without the bathing cap."

Q Thank you, Mr. Lucas.

Mr. Lucas, do you recall the first two lines that Mr. Fitzpatrick asked you to read on direct examination?

A Do I recall them?

Q Yes.

A Yes.

Q I'm not going to ask you to say them.

A Right.

Q Do you recall reading them here today?

A Yes.

Q And I believe it was your testimony that they matched up verbatim with People's Exhibit --

A The first two lines.

Q -- 5, the first two lines? I'm going to direct your attention to the next two lines.

MR. CALLE: If I may read it, your Honor?

Q "I'm going to send you the original letter I wrote, because it really says the things I want it to. And no matter how many times I try to rewrite it, it just doesn't come out the same."

THE COURT: Now you are reading from Exhibit 54?

MR. CALLE: Yes, sir. Thank you.

THE COURT: All right.

BY MR. CALLE:

Q Did you hear what I just read, Mr. Lucas?

A Mm-hmm.

Q Mr. Lucas, based upon what I just read, would it be fair to say that Miss Hill wrote a couple of predecessors of this letter before finally sending this letter, based upon what she's writing in this letter?

MR. FITZPATRICK: Objection, your Honor.

Q If you know.

THE COURT: I'll let -- if you can answer it, is that, I guess what he's asking, does that refresh your recollection or change your

testimony about receiving any other letters prior to this one?

MR. CALLE: No, that's not my question.

THE COURT: Sorry.

MR. CALLE: I'll withdraw the question.

THE COURT: I'll have it read back, sir, if you want?

MR. CALLE: Well, no. Let me rephrase it, if I may.

BY MR. CALLE:

Q Mr. Lucas, Miss Hill writes, "I'm going to send you the original letter I wrote because it really says the things I want it to. And no matter how many times I try to rewrite it, it just doesn't come out the same."

Would that be a fair reading of what's inside this letter, the People's exhibit?

A It's -- the contents would be about the same, sir, yes.

Q Okay. Would it be fair to say that she wrote the letter a number of times, based upon what she wrote in this letter?

MR. FITZPATRICK: Objection, your Honor.

THE COURT: Sustained. Outside his knowledge.

BY MR. CALLE:

Q Does Miss Hill say in this letter, that she wrote this letter a number of times trying to get the right words?

MR. FITZPATRICK: Object to the form of the question, Judge.

THE COURT: No. I'll take it. Is that what's printed in 54?

THE WITNESS: "I'm going to send you the original letter I wrote because it really says the things I want it to. And no matter how many times I try to rewrite it, it just doesn't come out the same." Is that what you're talking about?

Q Yes, sir.

THE COURT: The question is: Is that what she says in the letter. And, apparently, it is?

THE WITNESS: Yes.

BY MR. CALLE:

Q Did she ever send you the other letter, the first or second attempt at this particular letter, sir?

A The only thing I received was that one letter.

Q And, again, if the Judge and district attorney allow me, all three of these pages were inside the

envelope postmarked February 26th, 1987, correct?

A Yes, that's correct.

Q Would it be fair to say that on the, the looseleaf paper, Mr. Lucas, there is a date on top that says, "Tuesday, February 24th, 1987"? Can you read that?

A Yes, there is.

Q And would it also be fair to say that on the third page, or the remaining page of the exhibit, there's just a line on top that says "Thursday"?

A Yes, that's correct.

Q Okay. Mr. Lucas, based upon your knowledge and your recollection here today, would February 26th be a Thursday in 1987?

MR. FITZPATRICK: I'll stipulate that it was, Judge. It would be the same as March of '87. I don't think that was a leap year, so it would be.

THE COURT: I can confirm it by getting my book.

MR. FITZPATRICK: Well, there is twenty-eight days in February, so it's got to be the same as March. So the 28th would have been a Thursday.

THE COURT: Okay.

BY MR. CALLE:

Q And do you recall what day you got these letters?
A Not exactly.

MR. CALLE: Your Honor, if I may, for the record, I'm asking the district attorney, Mr. Fitzpatrick, if he would stipulate that People's Exhibit 5 and People's Exhibit, I believe, 54, this is?

THE COURT: Yes.

MR. CALLE: That, in fact, the photograph indicating, "Hi, Bob," with the two same lines as, as Exhibit 54, notepaper, are that -- this photograph is somewhat of an enlargement and that, in fact, this photograph-stationery is the same size as the letter received by Mr. Lucas.

THE COURT: Okay.

MR. CALLE: Would you do that, Mr. Fitzpatrick?

MR. FITZPATRICK: Yes. I will stipulate to that.

MR. CALLE: Thank you.

THE COURT: Just -- February 26th was a Thursday?

MR. CALLE: Yes. Thank you.

MR. FITZPATRICK: Your Honor questions my

judgment on that?

THE COURT: Yes. I don't know how you do that. But the way you're going -- it would have taken me a week to figure that out.

BY MR. CALLE:

Q And, Mr. Lucas, it's correct that you never received People's Exhibit 5 in the mail?

A Correct.

Q And yet Exhibit 5 and Exhibit 54, they're both labeled on top in approximately the same right-hand corner as Thursday?

A I can't see from here.

Q I'm sorry.

A Yes, that's true.

Q Okay. And since you got People's Exhibit 54 with the stationery with the two similar lines as People's Exhibit 5, sent to you with a note saying, "Tuesday, February 24th," it would appear that People's Exhibit 5 and People's Exhibit 54 were written on the same Thursday?

THE COURT: What was the question?

MR. CALLE: Well, the question, sir, is that these two People's exhibits have the first -- same first two lines.

Q Correct?

A Correct.

Q And they're -- both in the right-hand corner have "T-H-U-R-S." written on top, correct?

A Correct.

Q And the one that you received, People's Exhibit 54, was sent along with another letter dated February 24th, 1987, correct?

A Correct.

Q So, therefore, the note that you received, the two notes you received inside the postmarked envelope dated February 26th, 1987, would it appear to you, sir, as a reasonable man, that these two exhibits would be -- first two lines were written on the same day, Thursday?

A I would presume; they're both dated Thursday.

Q So, therefore, although People's Exhibit 5 is not -- does not have a date on top, it just has the day of the week, Thursday, it would lead a reasonable man to, to deduce that, in fact, this was written on February 26th, 1987 --

A I would presume.

Q -- based upon the evidence that we have to work with, is that correct, sir?

A If you say so.

Q Well, sir, this Exhibit 5 was written, but not

sent to you, correct?

A Correct, yes.

Q This Exhibit 54 sharing the first two same lines, was sent to you?

A Correct.

Q And it was sent to you on February 26th, your letter was postmarked, correct --

A Correct.

Q -- 1987?

Okay. So it would appear that this particular one was -- Exhibit 5 was the predecessor of Exhibit 54?

MR. FITZPATRICK: Object to that, your Honor.

THE COURT: I'm going to sustain it. It still requires speculation.

MR. CALLE: Yes, sir. I understand.

BY MR. CALLE:

Q You never got Exhibit 5 in the mail at any time after February 26th, did you, Mr. Lucas?

A No.

Q You never got any letters sent to you after February 26th, did you, Mr. Lucas --

A Correct.

Q -- from Valerie Hill?

A Correct.

MR. CALLE: One moment, please --

THE COURT: Sure.

MR. CALLE: -- to consult with my client.

THE COURT: Mr. Calle, are you going to be a little while?

MR. CALLE: A few more, or perhaps one more.

(Mr. Calle and the defendant conferred off the record.)

MR. CALLE: Nothing further, Mr. Lucas. Thank you very much.

THE COURT: Any redirect?

MR. FITZPATRICK: Thank you, Bob.

THE COURT: Thanks very much, sir. You can step down.

THE WITNESS: Sure.

(Witness excused.)

THE COURT: Ladies and gentlemen, we'll take our noon recess. Before we do that, can I see counsel, please?

Yeah, folks. I'll excuse you for lunch. Don't talk about it, read about it, form any opinions, or take a drive anywhere. You know

what I mean.

I'll see you at 2:00, please.

(Counsel approached the bench. An off-the-record discussion ensued.)

(A luncheon recess was taken.)

* * *

(March 22, 1993 - Afternoon Session)

(Court, counsel, and the defendant are present. Proceedings resumed at this time.)

THE COURT: Would you have the record reflect that we're back in session, outside the presence of the jury. Counsel is present, the defendant is present.

There has to be some things, I think, placed on the record prior to the jury being

brought in. And I don't know if it's the D.A.'s request, or defense counsel's.

MR. FITZPATRICK: At my request, your Honor.

THE COURT: All right. Go ahead, sir.

MR. FITZPATRICK: Liz Lewis.

THE COURT: What we're doing here, gentlemen, we're taking Ms. Lewis' testimony outside the presence of the jury. And you want to take that testimony first, then make your point as to the purpose?

MR. FITZPATRICK: Yes, your Honor.

THE COURT: All right. Go ahead, sir.

* * *

E L I Z A B E T H   L E W I S , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Ms. Lewis, are you able to see this calendar, March of 1987 --
A Yes, sir.
Q -- in front of you?
A Mm-hmm.
Q I'd like to direct your attention to Friday, March the 27th, and ask if you recall having a phone conversation with the deceased, Valerie Hill, sometime in that evening or afternoon?
A Yes, I did. It was shortly before dinnertime.
Q Would you tell us what you mean by dinnertime?
A Would've been before 6, I would say around 5:30.
Q Would you tell us where you were and where Miss Hill was?
A I was at my home in Cazenovia and she was at her apartment in Syracuse.
Q Would you tell us whether or not you had a phone conversation with her at that time?
A Yes, I did.

Q And would you tell us whether or not the subject of Hector Rivas came up during that conversation?

A Yes, it did.

Q Would you tell us what Miss Hill said about that?

A She originally was planning on coming over that evening for dinner. We had talked about that the previous day. And she called to tell me that she was tired; she had had a very busy day, and she had spent a great deal of time, in her words, losing Hector.

Q Did she elaborate as to what she meant?

A Yes, she did.

Q Could you tell us what was said?

A She left her apartment early to go -- she had a lot of errands to do that day. She was going to get her car worked on; had to go to a travel agency; many other things. And she knew that he was following her when she first left home.

Q All right. Thank you very much. Stay right there.

THE COURT: Did you have a phone conversation with her?

THE WITNESS: Yes, I did.

MR. FITZPATRICK: I don't know if there's

any cross-exam.

THE COURT: I don't know. Counsel, is counsel aware of what the purpose of this witness' testimony is, before we get started with the cross?

MR. CALLE: Well, Judge --

THE COURT: If not, I'll make the district attorney state what his intentions are by offering this testimony, and maybe that will help you focus on your cross-examination.

So if you would, Mr. Fitzpatrick, would you state, for the record, what the purpose of calling this witness would be, and what your intentions are?

MR. FITZPATRICK: Yes. If your Honor will recall that last Wednesday afternoon the victim's father, Randall Hill, had been testifying, and I attempted to elicit testimony regarding what Miss Hill said immediately upon arrival at Candy's Restaurant at approximately 6:30 that evening.

Your Honor sustained the objection, subject to corroborative proof being required by the recent Court of Appeals case, People versus

Brown.

I submit that the testimony proffered is one aspect of that particular proof.

THE COURT: Okay. So it's going to be used to support a present sense impression by the victim as stated to her father at approximately 7:00 that evening when she met him for dinner, correct?

MR. FITZPATRICK: That's correct, right. It's being used to corroborate the accuracy of that report.

THE COURT: Okay. Accuracy. Given that, Mr. Calle, do you have any questions on cross-examination you want to pose to this witness? This will not, in any way, eliminate your ability to cross-examine if she is, in fact, called for the jury's purpose.

MR. CALLE: Judge, I would object to the calling of this witness and the testimony given, based upon the hearsay that was offered by this witness.

Secondly, I believe that there is no independent or corroborating testimony that, in fact, Miss Hill was followed earlier that

evening at approximately 5:30, in which Ms. Lewis claims that Miss Hill stated that he followed her -- that Mr. Rivas followed her.

Based upon that, I base my objection.

THE COURT: Okay. Do you have any questions you want to ask her on cross-examination to support or clarify your objections, or are you willing to let this testimony stand on its face and let me make a decision as to whether or not it constitutes corroboration for the present sense impression?

MR. CALLE: Well, if I may just clarify, are these questions going to be repeated in the presence of the jury here today, or --

THE COURT: If I allow it. If I overrule your objection of this testimony and allow it under the present sense impression hearsay exception carved out by the Court of Appeals in People versus Brown.

MR. FITZPATRICK: Judge, I'm not going to ask this witness in front of this jury as to what she and the victim talked about on the phone. I am offering this to corroborate --

THE COURT: Solely?

MR. FITZPATRICK: -- I am offering this to corroborate the victim's report to her father.

THE COURT: Okay. This will be used as corroborative evidence to support the recalling of Randall Hill, who I think has some testimony relative to what the victim may have said to him when she met him for dinner at approximately 7:00 that evening.

And that -- and you're right, Mr. Fitzpatrick, if I may state, that is going to be the present sense impression hearsay exception that counsel is going to elicit -- try to elicit from Mr. Hill.

MR. CALLE: And that --

THE COURT: She just establishes another piece of corroborative evidence required in -- by the Court of Appeals in that exception.

MR. CALLE: Understood. May I --

THE COURT: Sure.

MR. CALLE: Could I have a moment?

THE COURT: Sure. We both could use one.

(Proceedings paused.)

THE COURT: What I'm going to do is ask you to read back his questions again to me.

MR. CALLE: I do have some questions, your Honor, if I may.

THE COURT: Okay.

CROSS-EXAMINATION BY MR. CALLE:

Q Good afternoon, is it Ms..Lewis?
A Mrs.
Q Mrs. Lewis. Good afternoon, Mrs. Lewis.
Mrs. Lewis, who initiated the telephone call?
A Valerie called me that day.
Q And is it your testimony that she called you approximately 5:30 that evening, March 27th?
A Approximately, yes.
Q Do you recall any other part of that telephone conversation?
A Yes, I do.
Q Approximately how long did you speak for?
A Probably about ten minutes.
Q And what would a telephone call from 248 Hickok to your residence -- would that, in fact, be a local call?
A Yes, it would.

MR. CALLE: Judge, just for your information, I am just checking through something to make a determination as to whether I

want to ask the next question. I don't want to make any mistakes here.

THE COURT: Okay. Sure. Take your time.

MR. CALLE: Thank you.

BY MR. CALLE:

Q Mrs. Lewis, this telephone conversation you related here today, that was -- what is the date?

A March 27th.

Q March 27th, 1987.

A Friday night.

Q Okay. Did you testimony in the grand jury sometime around November 13th, 1992, regarding the case of the People versus -- against Hector Rivas?

A Yes, I did.

Q Okay.

MR. CALLE: Mr. Fitzpatrick, I direct your attention to Page 162, Line 16. Judge, there's approximately three pages. If you will allow me to ask the questions and answers?

THE COURT: Give it your best shot.

MR. CALLE: Okay. Thank you.

Line 16, Mr. Fitzpatrick.

BY MR. CALLE:

Q "Question" -- do you remember being asked this

question and giving these answers, ma'am?

"Question: Did you see or talk to her on Friday, March 20th?

Answer: Yes."

THE COURT: March 20th, sir?

MR. CALLE: Yes, sir.

THE COURT: Okay.

BY MR. CALLE:

Q Do you remember being asked that?

A Yes.

Q Okay.

"Question: When was that?

"Answer: She called -- it was before dinner, because she knew that we were expecting her for dinner, and stated she'd had a very busy day. She sounded very tired. She was upset. She had gone to get her car fixed. She bought her car at a car dealer out in Oneida, and -- Nye Ford, Nye Ford. She was going to have something done to her car. Hector had followed her. She also was going to pick up some plane tickets for a trip that she was planning, that he did not know about, that she was taking to the Bahamas.

She was tired and her father called and wanted to see her. She knew that Pat, his wife, was not doing"

"well, and she also was extremely -- I guess excited is the word, not excited in a good way. She related to me that that Thursday, the day before, she had come home from work" --

You remember giving that answer, basically?

A Yes.

Q Thank you.

"Question: This is during the phone conversation?

Answer: During this phone conversation.

Question: When you say 'excited,' what do you mean? Was she upset?

Answer: She was upset. And it took a lot to get her going. I mean, she would put up with a lot before, but when she got mad, she got mad. She was not crying, but she was irritated and excited, anxious, and told me that, 'You will not believe Hector's latest trick.' This is after" we -- I beg your pardon. "This is after -- it got to the point I was asking her on a daily basis, 'What did he do today?'

So she related the bit about following her to Nye Ford. And she said, 'You wouldn't believe what he did yesterday.' And I had spoken with her Thursday. This is after I knew to call her early before she went to bed. She had gone to bed and the phone rang; it was Hector. He was talking about wanting to see her. She said, 'No,' and she"

"hung up the phone. He called back again. She told him, you know, 'I just got home from work. I'm tired. I'm trying to go to sleep. Don't call me.' Hung up the phone again.

It rang again, so while it was ringing, she unplugged it, so to the person on the other end, it continues to ring, and she let it go for a good ten minutes, and plugged the phone back in, and it's still ringing. And she picked it up and she heard traffic. It was obvious it was a pay phone that was off the hook, because she could hear traffic going by.

Within five minutes he appeared at her door. This is -- to the best of my knowledge, this is the first time that she really showed him that she was mad; she was upset. She yelled at him, which I don't believe that she had done before. She screamed at him. She said about having called us in the middle of the night. She let him know she knew he had been following her, that -- just everything that he had been doing, she was recanting.

She was sick and tired of coming home and he had been in her apartment, he had taken things on more than one occasion, and she slammed the door in his face, which she had never done before.

There was times before I know in the middle of"

"the night if he'd come knocking at the door, instead of being concerned for her own safety, she was worried that he would wake the people upstairs up. And there were times if she let him in and let him talk for ten minutes, he would go away. But this time she didn't let him in. She really let him have it.

So in relating this story to me, she was extremely upset, more so than she had been probably -- one of the -- I would say, the most upset I'd ever heard her, or mad, I should say mad."

Do you remember giving that answer, to the best --

A Yes, I do.

Q -- to the best of your recollection?

A Yes, I do.

Q "Question: This was Friday between, around dinnertime, between 5 and 6?

Answer: Around dinnertime, yes. She was going to go have dinner with her dad instead" -- or, that was bad.

MR. CALLE: I'll do that again, if I may, Judge.

BY MR. CALLE:

Q "Question: This was Friday between, around dinnertime, between 5 and 6?"

"Answer: Around dinnertime, yes. She was going to have dinner with her dad instead.

Question: Did you see Valerie, or talk to her after that time?

Answer: No."

Do you remember being asked those questions and you giving those answers?

A I remember being asked about two phone conversations that I had with her on Friday, and I think that you have --

Q You think that what, ma'am?

A I think that they're a little confused in there, but I did have two phone conversations with her.

THE COURT: On Friday, ma'am?

THE WITNESS: On Friday, one in the morning and one later that day.

THE COURT: Friday, the 27th?

THE WITNESS: Friday, the 27th.

THE COURT: There was mention of Friday, the 20th. Is that a mistake, or was that --

THE WITNESS: No. I spoke with her on the phone, and I also saw her on Friday, the 20th.

BY MR. CALLE:

Q Well, your testimony in front of this grand jury indicates that the conversation that I had just read from your grand jury minutes, was held on March 20th.

A No, that phone conversation was held on March 27th. I saw her on March 20th. None of those things had happened yet.

Q Well, ma'am --

MR. CALLE: Well, if I may, I'd like to draw your attention to Page 159, Mr. Fitzpatrick, Line 19. And reading from the grand jury minutes -- I'm reading from the grand jury minutes of Ms. Elizabeth Lewis, recorded November 13th, 1992, Line 19, Mr. Fitzpatrick.

BY MR. CALLE:

Q "Question: I want to move forward to the point of March 20th, when you called Valerie's apartment and Hector answers the phone. You indicated that Valerie came to your apartment in Cazenovia that night and that you went out?

Answer: Um-hmm.

Question: Now, after that particular night, when is the next time you talked to Valerie? Why don't you describe what happened that next week, for the ladies and gentlemen of the grand jury?"

"Answer: That was on the 20th. I am not absolutely certain if it was Monday through Thursday before the 20th, or the beginning of the following week she related a time that her father had brought her home -- she had again been spending a lot of time with him" --

MR. FITZPATRICK: Judge, on Page 162 -- this is in the nature of an objection -- Mr. Calle asked -- or asked the witness if she recalled the --"Did you see or talk to her on Friday, March 20th?"

"Answer: Yes."

"Question: When was that?"

"Answer: She called" -- and Mr. Calle gave the five minute answer. I think the confusion is that's either a misprint or a mistake on the part of the witness back in, in front of the grand jury.

THE COURT: Well --

MR. CALLE: I would object.

THE COURT: I'll give you a chance on redirect to try and straighten it out. It's all somewhat confusing.

MR. FITZPATRICK: I'd just like to do it this afternoon.

MR. CALLE: Well, I would object to conjecture.

THE COURT: Look it, let's save it. Counselor, look it, I'll let you go.

BY MR. CALLE:

Q So, is it a fact, Ms. Lewis, that in your grand jury testimony that you gave back in the fall of '92, your answer to the question: "Did you see or talk to her on Friday, March 20th," was yes?

And then there was a question on Page 165, Line 8: "Question: Did you see Valerie or talk to her after that time?

Answer: No."

A That was referring to the conversation on the 27th. The last time I spoke with her was Friday evening, the 27th. I think maybe you should read the question before the answer that I gave you about the 20th --

Q Well --

A -- because --

Q With all due respect, Ms. Lewis, I read it in its entirety. All that is in between that, that last question: "Did you see or talk to her on Friday, March 20th?

Answer: Yes."

And I read the last question: "Did you see Valerie or talk to her after that time?

Answer: No."

And I read everything in between, and there's no reference to March 27th, the telephone conversation.

A Well, I had two telephone conversations with her on Friday, March 27th.

Q Well, ma'am, are you -- did you lie in the grand jury?

A No, I did not.

Q Or did you lie here today?

A I didn't lie then, and I'm not lying now.

Q Well, what -- would you admit here today that your testimony is contradictory to your testimony given in the grand jury on November 13th, 1992?

A Pertaining to that question only, and that -- in that there was some confusion about that, not necessarily on my part.

Q Well, with all due respect, Ms. Lewis, the question posed to you was: "Did you see or talk to her on Friday, March 20th?

Answer: Yes."

And then the follow-up question was:

"Question: Did you see Valerie or talk to her

after that time?"

And the answer is, "No," so --

A After Friday, March 27th.

Q Well, there's nothing in these grand jury minutes pertaining to March 27th, Ms. Lewis. Is there any other explanation that you can give?

MR. FITZPATRICK: Objection to the characterization, your Honor.

THE COURT: Sustained. I get the drift of what's happening.

MR. CALLE: Nothing further.

THE COURT: You want to do any redirect on this point or --

MR. FITZPATRICK: (No verbal response.)

THE COURT: All right. Now --

MR. FITZPATRICK: Are you satisfied, Judge; do you understand what happened?

THE COURT: I think so.

MR. FITZPATRICK: It took us twenty minutes to figure out.

THE COURT: I think so.

MR. FITZPATRICK: That's Mr. Suddaby. I'm sorry.

MR. CALLE: I'll object to that.

THE COURT: Would you read back

Mr. Fitzpatrick's direct?

(The requested portion of the record was read back by the court reporter.)

THE COURT: Okay. That's enough.

Well, let me see if I understand where we're at. Mr. Calle, obviously since this testimony is taken outside the presence of the jury, and as I understand it, it will not be offered to the jury at all, the whole purpose of your objection probably should lie when and if Mr. Hill takes the stand to recount a statement made by the victim to him, under the present sense impression rule.

I would submit to you, sir, that that's probably the best spot for your objection. And what I'll do is, prior to Mr. Hill taking the stand in front of the jury, I think -- we've already taken that offer of proof. I'll review again, outside the jury's presence, your objection to his proposed testimony.

MR. CALLE: Judge, just, if I may be heard, I believe that this young lady's testimony is being offered in accordance with People versus Brown. To corroborate what we anticipate

Mr. Randall Hill will be saying in front of the jury, it is the defense's position that the testimony given here today by Ms. Lewis is directly contradictory to the testimony she gave in the grand jury, back in November 13th, 1992, in that the -- basically, the conversation that she is relating occurred today, on March 27th, 1987, is recorded in the grand jury minutes as having occurred on March 20th.

I believe that, based upon the fact that there is direct contradictory testimony from the same witness, that this witness' testimony cannot be believed; and that she should -- it should fail to corroborate and to satisfy People versus Brown, in order to allow Mr. Randall Hill to testify in front of the grand jury.

THE COURT: Okay. I understand your objection.

I understand since there's no other questions for this witness, I want to thank you very much for coming in, ma'am. You're excused.

(Witness excused.)

THE COURT: May I ask who your next witness is going to be?

MR. FITZPATRICK: I'm going to call John Cassano very briefly.

THE COURT: So I don't have the jury running in and running out, where do we intend to fit Mr. Hill into this?

MR. FITZPATRICK: At your discretion.

THE COURT: I'd like to do it at the end of today, if it fits in with your --

MR. FITZPATRICK: All right. As long as the jury's out -- as long as the jury's out, would you like to hear my argument as to what corroborates -- what meets the requirement of People versus Brown?

THE COURT: Certainly. Might as well do it now and make the record now.

MR. FITZPATRICK: Number one, your Honor, we've introduced proof that the defendant has stalked the victim. You have upwards of fifty notes that he's left for her virtually on a daily basis since they broke up in January.

He accidentally shows up at places where she is, pops up at Coco's, wants to buy everybody a drink, so forth and so on.

MR. CALLE: Judge, I don't believe that's

part of the evidence.

THE COURT: I never heard that either.

MR. FITZPATRICK: At Coco's?

THE COURT: No, sir. My recollection --

MR. FITZPATRICK: Judge, you're right. It will be my next witness.

THE COURT: Oh, all right.

MR. FITZPATRICK: I apologize.

THE COURT: All right.

MR. FITZPATRICK: Kind of jumped a little bit up here.

THE COURT: That's okay.

MR. FITZPATRICK: The notes are in evidence. The, the Stonecipher indicate that at least sometime shortly after 2:30, Mrs. Stonecipher sees him sitting there doing what I would suggest again, just waiting for the victim.

Mr. Stonecipher comes home at about 3:30, sees the defendant sitting there. He peeks his head out the window about twenty, twenty-five minutes later, the defendant is still there.

The paperboy, Christopher Reynolds, comes up to the house about 4:15, 4:30. The defendant apparently has gotten -- got up to

leave another note somewhere on the porch, or in the house, and is walking away, glares at Mr. Reynolds. And when Mr. Reynolds leaves the house, the van is gone.

Then Mr. Cooney sees the defendant heading back into the city at about 5:30 in the afternoon. And this is very important, Judge: the defendant's only statement to Officer Brennan, he says that, "On my way to Coleman's," which was 6:00 at night, "I stopped by the victim's house to see if she was there."

His characterization of his earlier stop is, "Jeez, I just happened to be driving by to do a couple jobs. I thought I'd just stop by and see if she was there. So 2:00 I just kind of popped in and popped out," you know, totally inconsistent with the other eyewitnesses that he was there for two and a half hours waiting for this woman.

He says he's on his way to Coleman's about 6:00. We know the victim is home because she is on the phone, at some point, talking to the last witness. And, again, I would say Liz Lewis' recollection of this conversation

again corroborates what Valerie would have to say to her father. And --

THE COURT: Aren't we -- if I can stop you there -- aren't we using Ms. Lewis' testimony, aren't we applying further hearsay from the victim to substantiate Mrs. Lewis' statements -- again, to substantiate some prior event that's going to occur in the future? That's also hearsay. We seem to be building hearsay upon hearsay, or building exception upon hearsay upon hearsay.

MR. FITZPATRICK: Well, the only hearsay I'm offering to corroborate is that one thing, I mean --

THE COURT: Okay.

MR. FITZPATRICK: -- to take Liz Lewis out of it and simply have her first say that the victim is home at between 5:30, 5:45, whenever this phone conversation took place.

THE COURT: Okay.

MR. FITZPATRICK: Okay. Has -- is inconsistent with the defendant's statement that before I met my buddies at Coleman's, I stopped by just one more time to see if, if she

was there, and she wasn't there.

THE COURT: Okay. I see now.

MR. FITZPATRICK: He is not going to wait for her for two and a half hours, and leave forty-five notes in forty-five days, and then not be waiting for her when he knows she's home at 5:30, 6:00 every night.

But Brown doesn't say what has to be offered to corroborate. So I would say it could be the one piece of mosaic that your Honor could rely on, and the last piece of information that we could rely on to corroborate that, in fact, the victim was a half-hour late at Candy's Restaurant.

THE COURT: I'm worried about the words used in Brown about that, the events leading up to this exception must be at the time that they're perceived by the declarant, or made substantially contemporaneously with the time.

Here we're relying on a speculation that it occurred sometime after 5:30 or 7. I see --

MR. FITZPATRICK: Well, here's what I'm saying, Judge: What needs to be contemporaneous or shortly thereafter is the statement, itself.

THE COURT: Yes.

MR. FITZPATRICK: If I were to, you know, bring in six witnesses to say, "Monday, Tuesday, Wednesday, Thursday, and Friday, Hector Rivas said this to me, this to me, and this to me," that would all be twenty-four hours, seventy-two hours, ninety-six hours precedent, but nevertheless, would corroborate the fact.

THE COURT: Yeah.

MR. FITZPATRICK: The things did take place. But, in any event, Judge, I'm not asking for a ruling on that immediately.

THE COURT: Yes, I know. I know it's coming, so I want to clear my own head with it.

Well, Mr. Calle, do you want to add anything? What I'll probably do is sit on this for a while.

MR. CALLE: Yes, sir.

THE COURT: As long as Mr. Fitzpatrick let's me sit on it until he calls his --

MR. FITZPATRICK: People call Randall Hill, Judge.

THE COURT: I'll -- but I'll give you a

chance to be heard, sir.

MR. CALLE: Small one, if you would, Judge. Number one, I don't believe there's testimony that Mr. Rivas sat for two and a half hours in front of the building. I believe that he's put different times -- different times -- I'm sorry, I'm reverting back to New York City.

I believe that the time span in which he was seen on two different occasions may be two and a half hours, but I don't believe there was -- there's any testimony that he sat -- Mr. Rivas did, for two and a half hours.

And, secondly, I don't believe that there is any testimony that, in fact, the notes that were admitted into evidence were written by Mr. Rivas over the course of forty-five days. They had an affair, a relationship, a friendship for approximately one year. And most of those notes the People's witnesses admitted were not dated.

I would also state that this conversation theoretically took place at 5:30 or so, and that, in fact, what are we talking about? Are we

talking about two different times that Mr. Rivas allegedly followed Miss Hill? I mean, when we talk about contemporaneous, is the state of mind that's being introduced by Ms. Lewis, the state of mind after she was followed by -- theoretically, by Mr. Rivas earlier that day at the Ford place, or at some other location, or, basically, I believe his Honor's narrowed it on the head with basing the exception to the hearsay rule on hearsay. And I don't believe that this particular offer of proof satisfies People versus Brown. And I maintain my objection, and I give my gratitude for allowing me to speak.

THE COURT: Okay. Call -- let's get the jury in, please.

MR. CALLE: One moment, Judge. Before the jury comes in --

THE COURT: Well, hurry.

MR. CALLE: -- I object to Mr. Cassano being recalled. I believe that the district attorney's office has had an opportunity to examine this witness, and I don't -- I fail to see the purpose, nor the legal precedent, for

bringing Mr. Cassano back on.

MR. FITZPATRICK: Do you want an offer of proof?

THE COURT: No. Go ahead, bring the jury in.

Objection is overruled.

MR. CALLE: I understand.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: The record should reflect the jury is present, the counsel, the defendant.

Ladies and gentlemen, let me apologize for holding you up for forty minutes or so. We had some discussions on certain issues that need not concern you at this point. That's my explanation, so my apologies for being late.

And call your next witness.

MR. FITZPATRICK: Thank you, your Honor. Recall John Cassano.

COURT ATTENDANT: Just take a seat and you're still under oath.

MR. CASSANO: Thank you.

THE COURT: Yeah. I want you to under- stand, Mr. Cassano, you're still under oath from

the other day, sir. And I'd ask you to keep your voice up.

And go ahead, Mr. Fitzpatrick.

* * *

JOHN N. CASSANO, JR., recalled as a witness on behalf of the People of the State of New York, having been previously duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Mr. Cassano, first of all, thank you very, very much for coming back. This is -- I apologize to you.

During your testimony the other day when you were being cross-examined, I think it was on Friday of last week, you indicated, I think, to Mr. Calle that on or about the 27th of March, when you saw his client come into your store to buy a bottle of Bacardi rum, that you

believed this to be the weekend of the eastern regionals -- or something to do with the N.C.A.A. Do you recall -- have that in mind?

A Yeah, I do.

Q Do you remember what weekend that was, the weekend of the 27th?

A Yeah. The 27th was actually the Final Four Weekend in New Orleans, Louisiana.

Q Was there some degree of hysteria around the Syracuse area about that?

A Oh, yeah. Syracuse was pretty happy because S.U. was one of the Final Four teams. They had national championship dreams in their eyes, so --

Q Thank you very much. I don't know if Mr. Calle has any questions or not.

CROSS-EXAMINATION BY MR. CALLE:

Q Who won?

A Um -- who won? Indiana, by one last second shot.

THE COURT: I remember it well. Thank you, Mr. Cassano.

MR. FITZPATRICK: It's not why I brought you back.

(Witness excused.)

MR. FITZPATRICK: Call Peggy Burke.

THE COURT: Hi. How do you do, ma'am?

MS. BURKE FRIO: Hi.

* * *

M A R G A R E T B U R K E F R I O , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Good afternoon. Tell us your full name, please.

A My name is Margaret Burke Frio.

Q And is it Mrs. Frio?

A Yes.

Q And do you sometimes go by Peggy?

A I always go by Peggy.

Q All right. And back in March of 1987, what was your full name back then?

A Margaret Burke.

Q And could you tell us how long you've been married?

A Three years.

Q Do you have any kids?

A None.

Q And where do you live?

A In Sturbridge, Massachusetts.

Q Is that near any big city?

A Um -- it's about forty-five minutes from Boston.

Q Okay.

MR. FITZPATRICK: Can you turn that up a little?

THE COURT: Okay. I'm sorry.

BY MR. FITZPATRICK:

Q What town do you live in, ma'am?

A Sturbridge, Massachusetts.

THE COURT: And I guess that's near Boston, is it?

THE WITNESS: Forty-five minutes from Boston.

THE COURT: Relax.

THE WITNESS: Easy for you to say.

BY MR. FITZPATRICK:

Q Peggy, let -- may I call you Peggy?
A Yes.
Q How are you employed?
A I'm a nurse.
Q How long have you been a nurse?
A Um -- since 1981.
Q What were you doing for a living back in March of 1987?
A I worked at St. Joe's Hospital as a registered nurse on the pediatric floor.
Q What kind of patients did you treat there?
A Children, mostly children under sixteen, but occasionally they were older, newborns up to sixteen.
Q All right. Peggy, please keep your voice up, because everybody has got to hear what you have to say.

Now, how long had you worked at St. Joe's as of March of 1987?
A Um -- since 1981, in July.
Q Now, in connection with your employment, did you come to meet a woman by the name of Valerie Hill?
A Yes. I worked with Valerie.
Q When did you first meet Val?

A Um -- in 1984.
Q And what did she do at St. Joe's?
A Um -- she was a nurse at St. Joe's with me. We worked on the same -- we worked every other weekend, on the same weekend.
Q Okay. You sometimes had the same schedule, sometimes you had different schedules?
A Right.
Q What -- how would you characterize your relationship with her?
A We were good friends.
Q And did you know her to date -- or how long had you known her prior to her death?
A Since '84.
Q '84. So almost three years?
A Yes.
Q How many people did you know her to date in those three years?
A Two people.
Q Who were they?
A Bob Lucas and Hector.
Q And you're gesturing over to the right. Do you see Hector in the courtroom this afternoon?
A Yes.

Q And that's Hector Rivas, the defendant here?
A Yes.
Q Do you remember when you first met Hector Rivas?
A It was sometime in the spring of '86.
Q And was that in conjunction with some event that Valerie and you were at together?
A We had gone out after work and we stopped out for a drink, and Val said that she had wanted me to meet Hector, who she was seeing at the time, and that was the first time I met him.
Q Do you remember where it was that you met him?
A It was at Coleman's.
Q Okay. And how many times after the time at Coleman's in '86 did you see Hector and Val together?
A Probably at least three, that I can remember.
Q Were they social occasions?
A Yes. They were usually when I would be at Val's house, or occasionally when I was out with Val.
Q Okay. Now, did you become aware, Peggy, of a change in the relationship between Hector and Valerie, after the first of '87?
A Yeah. After -- um -- Valerie had come back from Christmas, when she went to visit her mom, you know,

when we talked about how the vacation went and she said that, um --

MR. CALLE: Objection as to what she said.

THE COURT: Yes. Sustained.

BY MR. FITZPATRICK:

Q You can't tell us what she said.

You mean after she came back from Christmas holiday to see her mother, there was a change in the relationship --

A Yes.

Q -- between Valerie and Hector?

A Yes.

Q Did you see them out socially after the first of the year?

A Yes. I saw them together twice after the first of the year.

Q How did you perceive them?

A The first time we had gone out, the six of us went out after work and went to Coco's.

Q All right. I'll talk about Coco's in a second.

A Okay.

Q I want to invite your attention to an occasion where you saw Valerie and Hector on February 18th or 19th of 1987. Do you have that occasion in mind?

A Yes.

Q All right. And you and I have discussed this several times. You have no recollection whether it was the 18th or the 19th?

A No, no, I don't.

Q But it, it was one of those two days?

A Yes.

Q And that would be a Wednesday or a Thursday. Now, would you tell us where were you when you first saw Valerie on that date?

A We had worked together that day, and it was a nice day. And I hadn't talked to Val for a long time, so we decided to go back to her house after work.

Q 248 Hickok Ave.?

A Yes.

Q Do you remember what time it was?

A Well, it was after we worked until 3:30, so it was probably after 4, when we left the hospital.

Q What did you do when you got to her house?

A We walked up to James Street and got a bottle of wine.

Q Where did you go on James Street?

A Um -- at the end of Hickok across the street, there was a liquor store there, and a bunch of buildings.

There was a liquor store there; we went there.

Q Do you know -- you don't know the name of the liquor store?

A I don't know the name.

Q But it's on James Street?

A Yes.

Q Do you know if Valerie shopped there prior to that date?

A I'm not really sure.

Q But, in any event, she went with you on that date?

A Yeah. We walked --

Q Do you remember what kind of liquor you bought?

A We bought a bottle of Blue Nun wine.

Q And anything else?

A No.

Q And what did you do then?

A Then we went -- we walked back to where she lived. And we were sitting out on the back -- on the steps, because it was sunny.

Q And I know February is generally pretty cold here. It was warm enough to sit outside?

A Yes. We thought it was warm enough to sit outside.

It was probably in the forties.

Q Were you -- I remember what the forties used to be like. Were you drinking any of the wine back then?

A Yeah. We had a glass -- we started and had a glass of wine.

Q Okay. Tell us what happened next.

A Um -- then Hector came over and had brought her, Valerie, some flowers. And so Valerie took the flowers and Hector and Valerie walked into the kitchen.

Q All right. Now, let me back up for just a moment. First of all, you and Val were on foot from the hospital?

A No. We drove from the hospital to the apartment.

Q One car?

A Two cars.

Q Where did Valerie park?

A In the driveway.

Q Where did you park?

A Behind her in the driveway.

Q Now, when Hector came up with the flowers, was he on foot or was he in a vehicle?

A I don't remember him in a vehicle, because we were sitting on the stairs, and he walked -- he had to walk

around our cars.

Q And did you observe Valerie make any reaction to Hector showing up with the flowers?

A She was not happy that he showed up with the flowers. And she -- I knew that, because she looked at me and kind of sighed and rolled her eyes.

Q Now, did the three of you then go inside the apartment?

A Not initially, just the two of them went in.

Q What did you do?

A And I just kind of was waiting there, outside still.

Q What do you remember happening next?

A Um -- the two of them were in the kitchen having a discussion and -- um -- and I was kind of waiting for Valerie to come back out.

Q Were you able to hear anything being said?

A Yeah. I could hear a few things.

MR. CALLE: Objection to what she --

THE COURT: Overruled. Well, the answer is, she could hear a few things, so I'll accept that portion of the answer.

BY MR. FITZPATRICK:

Q Did you recognize the people talking as Valerie

and Hector?

A Yes.

Q Tell the jury, please, what you heard Hector say, and what you heard Valerie say.

MR. CALLE: Objection.

MR. FITZPATRICK: It's statements by the defendant, your Honor.

THE COURT: Yes, but I'm worried about statements made by someone who's not here, i.e., Miss Hill.

MR. FITZPATRICK: I'm not offering anything that Miss Hill said to prove the truth of anything she asserted. These are conversations that the defendant participated in. His remarks would be, nonetheless, without --

THE COURT: Well, what did you hear the defendant say, first of all, ma'am, if you recall?

THE WITNESS: Hector was saying that he didn't want to end the relationship; and that he cared too much for her to end the relation ship; and what would he do, was -- I remember him saying, what would he do?

And at that point, I called to Val and

said, you know, "I can leave and we can get together later." And then we -- and she said, "No," and told me to come in the living room; that she definitely wanted me to stay.

And so I did go in the living room.

BY MR. FITZPATRICK:

Q And did you stay?

A I stayed, yes.

Q And did you hear any more of this -- any more comment on Mr. Rivas' part?

A Um -- not between him and Valerie, no.

Q Between him and you?

A Um -- the three of us did go into the, the living room and had a short conversation. And then Valerie excused herself and left the room.

Q And then what happened?

A And then -- um -- Hector and I were having a conversation and he said that Valerie and him were having some problems, and would I talk to Valerie on his behalf. And my response was, you know, whatever Valerie does is her business. And then Valerie returned to the room.

Q All right. Now, do you remember who left the apartment -- do you remember if anyone left the apartment later on?

A No, I don't.

Q So you don't know if you left and Hector was there, or Hector left and you were there?

A It's unclear to me right now.

Q Okay. Now, I want to take you to March 4th of '87. And you were about to relate that before, an incident at Coco's. First of all, what time did you get to Coco's on March 4th?

A It was after 4, because we had worked the day shift also.

Q And who went to Coco's?

A There was about six of us who went, and then people came after to meet us later. But initially there was six of us from work.

Q And who were these six people?

A People that worked on the pediatric floor on the day shift there.

Q Was this a planned get-together?

A We kind of said from the beginning of the week we would try to go out on the 4th.

Q Okay. And by the way, for those of us who don't know, Coco's is what, a bar, a restaurant, or both?

A Both, yeah.

Q And when you got to Coco's, did all six of you

sit together?

A Yes.

Q Where did you sit?

A Up -- we sat towards the back of the bar at a table, like a high table, like a -- right next to the bar.

Q And just socializing, the six of you, having a good time?

A Yeah.

Q Something happened regarding the waitress?

A The waitress came up to the table and said that, "This gentleman over here would like to buy all of us a drink." And so we all turned around to see who it was, and it was Hector.

Q Val make any reaction to seeing Hector?

A Yeah. She gave me a look and rolled her eyes again and said, "I can't believe this." And so she responded to the waitress, "No, thank you. We don't want a drink."

Q Okay.

A And the waitress walked away again.

Q And the six of you went about your conversation?

A Yeah -- yes. Valerie stayed right there and --

Q Did the waitress make another effort on Mr. Rivas' behalf?

A Then the waitress came over again and said that Hector would like to speak with Valerie.

Q Did Valerie leave the table?

A Um -- not, not immediately. She sat there for a minute and after, I'd say, one minute, she got up and went to talk to Hector.

Q Were you able to hear anything they said to each other?

A No.

Q Were you able to see what they were doing?

A They were disagreeing.

Q And how long did she stay with Mr. Rivas?

A I'd say about fifteen to twenty minutes.

Q She returned to your table?

A She -- yes.

Q How about Mr. Rivas?

A And he left the bar.

Q He left. Okay. Now, I want to take you ahead, Peggy -- and there's this calendar here --

A Thank you.

Q -- if you need to refer to it.

I want to take you ahead to Friday, March the 27th, and ask you if you worked that day.

A Yes, I worked the day shift on the 27th.

Q And what time did you get off work?

A Excuse me?

Q What time did you get off work -- or, excuse me, what time did you get to work?

A I was there from 7:00.

Q And did you see Valerie right at 7 a.m.?

A Yes. Valerie had worked the night shift the night before, so she was finishing up her shift and I was coming on. And we have a -- the night shift gives a report to the day shift. So we overlapped like by about a half-hour. So I saw her then.

Q And did you -- is that the last time you ever saw her?

A Yes.

Q All right. Is that the last time you ever spoke to her?

A Yes.

Q Okay. Now, did you know if she had any plans for that weekend?

A Yes. We discussed them that morning.

Q And did you work Saturday and Sunday, the 28th and 29th?

A No, no.

Q Did you make any effort to contact Miss Hill on

the 28th or 29th?

A No.

Q And did you work on the 30th, Monday?

A Yes, I did.

Q What time did you get to work?

A Um -- 7:00.

Q Do you know what time Valerie was scheduled to work on Monday, the 30th?

A At 7:00.

Q And did you see her at 7:00?

A No.

Q Did that cause you any concern?

A Yes. It was very unusual. She's very reliable.

Q What did you do about that concern?

A Um -- we started -- we went into report and then when we came out of report, at about quarter of 8, we started calling her apartment.

Q Any answer?

A No answer.

Q Now, when you say "we," you're making reference to who?

A The people I was working with.

Q Okay. Did there come a time when you were able to reach someone at her apartment, by phone?

A Say it again?
Q Did you -- did there come a time when you did come in contact with somebody at Val's apartment by phone?
A Um -- after noontime I had called and I had known that David was going over there, and talked to David. He was at the apartment.
Q Okay. And did he -- don't tell us what he said, but did David inform you that Valerie was dead?
A No. He told me to call his wife and speak with his wife.
Q Okay. And did you do that?
A I, I did.
Q Did you get another call before you did that?
A Yes.
Q Tell us about that call.
A Um -- I had just hung up the phone with David and someone from the floor called, called me and said that there is a phone call at the desk for me.
So I went out to the desk and she says, "It's Hector and he wants to talk to you." So I talked to Hector on the phone then.
Q You recognized his voice?
A Yeah.
Q Tell us what you said and what he said.

A Um -- I said, "Hello, this is Peggy." And he said, "This is Hector." Asked me how I was doing. And then asked if Val was at work today, and, and I said, "No." And he proceeded to ask me more questions about, you know, that, why wasn't she at work, and I said, "I don't know." He said, "Was she going away this weekend?" I said, "I don't know." And he said that there was a party in Cazenovia on Saturday night that he thought that she was going to, and I said, "I don't know."

And -- um -- then there was a kind of a long pause and then he said that he had a sore throat and that he couldn't talk anymore. And I said, "Fine," and we ended the conversation then.

Q All right. So you didn't give him any information about something happening to Val?

A No.

Q You didn't give him any information about your knowledge that she was supposed to take a trip that weekend?

A No.

Q Then he said he couldn't talk to you anymore because he had a sore throat?

A Yes.

Q All right. And now after that phone conversation, did you make a call to Sheri Hill?

A Yes, I did.

Q And you learned that Valerie was dead?

A Yes.

Q Now, I want to ask you just a couple of brief questions about Miss Hill's personal life and some of her habits.

Number one, you indicated that in the time you knew her, in some three years, that you knew her, would you characterize your relationship with her as being close?

A We were close friends, yes.

Q She dated two people during that period of time?

A Yes.

Q You indicated that she drank Blue Nun?

A Blue Nun wine, yes.

Q All right. Did you ever -- had you ever been at her house, other than the time on February the 18th or the 19th?

A Yes, I had been there on different occasions.

Q Would you describe her housekeeping habits for us, please?

A She was very neat.

Q Did you ever see her clean up in the kitchen?

A Yes. She was the type of person that if we had a

glass of wine, and then we were going to have a second glass of wine, then she'd clear away the, the cheese and the crackers we were eating, and any mess we had was cleaned, before we had our next bottle -- or glass of wine.

Q Do you smoke, Peggy?

A On occasion, I did.

Q Did you smoke back in March of '87?

A On occasion, yes..

Q Did you ever see Valerie Hill smoke?

A Yes.

Q Did you ever see her clean her ashtray on the kitchen table?

A Yes. If we had that glass of wine and she had a cigarette with it, before we got the second one, she'd kind of, would clean it away.

Q That was something you saw her do, in your presence?

A Yes.

Q Now, do you know what type of cigarette she smoked?

A Um -- Newport cigarettes.

Q Do you know where she kept the cigarettes in her house?

A She kept them in the freezer.

Q I'm not a smoker. Is that some secret to that? Is that to keep them fresh?

A She told me it kept them fresher because she didn't smoke them that often, so they wouldn't get stale.

Q Peggy, thank you very much. Please stay right there. The defense will have some questions.

THE COURT: Before you do that, I have a question. The conversation you had, or you witnessed, I guess, on February 18 or 19, you indicated that you saw Mr. Rivas and Ms. Hill go inside her apartment, and you sat out on the back porch, I guess, is that correct?

THE WITNESS: Yeah.

THE COURT: Were you able -- I guess you were, since you testified about it -- you were able to hear some of that conversation?

THE WITNESS: (No verbal response.)

THE COURT: Would you describe for us the tone of that conversation, or how you would describe that conversation? If you can, ma'am. If you're able to make that --

THE WITNESS: Valerie's tone was very different when we were sitting having a nice

conversation. Her tone was -- she was annoyed that, you know, we were having a conversation and she was interrupted. So she was annoyed. Kind of like, this isn't the time or the place.

THE COURT: Okay. All right. Thank you. Cross-examination.

CROSS-EXAMINATION BY MR. CALLE:

Q Good afternoon, Ms. Frio. How are you doing?
A Hi.
Q Hi, Ms. Frio. Were there other occasions in which you socialized with Miss Hill in which Hector Rivas showed up?
A Yes.
Q And when were they?
A Um -- the first time I met him was at Coleman's and Valerie had called him to -- and he came down. And that was the first time I met him.
Q Oh, and she wasn't angry at him apparently then, was she?
A No.
Q Okay. Were there any other occasions?
A Um -- the, the one time we were at Coco's.
Q That would be March 4th, 1987?

A Yes.
Q Okay. Now, you characterized their conversation as disagreeing?
A Yeah.
Q That conversation lasted for fifteen to twenty minutes?
A I would -- yes.
Q Would you say they were disagreeing the entire conversation?
A Yes.
Q And how did Hector Rivas -- did you see him leave?
A No. I saw Valerie come back.
Q And your characterization as disagreeing, could you tell us what you observed that would lead you to that characterization?
A Um -- I could tell from Valerie's facial expressions that she wasn't -- she wasn't happy; and that they weren't agreeing on what the two of them were talking about.
Q Well, you didn't overhear that conversation, did you?
A No.
Q Okay. So you don't know if they were disagreeing

at all, do you?

A Yes.

Q You do?

A Yes.

Q By the facial characteristics of Miss Hill?

A And her nonverbal gestures before she left the table --

Q Let me --

A -- and when she came back.

Q I'm sorry. Let me ask you a question, Ms. Frio: You're married, I presume?

A Yes.

Q If you were to go out with five of your girl-friends on a Friday night, and your husband would show up at the bar, would you be angry at him for showing up?

A No. I'd be glad he showed up.

Q Any more like you at home?

Now, Ms. Burke, I just have one final question: I can't argue with you here --

MR. FITZPATRICK: I should warn the witness, that means at least another fifteen questions are coming.

THE COURT: No. Come on. Let's go.

BY MR. CALLE:

Q You say that you had a conversation on the telephone with Mr. Rivas on March 30th, correct?

A Yes.

Q Okay. And you mentioned something about Val going away for the weekend, in your conversation here today, correct? I'll go slower. I apologize.

You mentioned today, when Mr. Fitzpatrick questioned you, that there was mention within this telephone conversation between you and Hector Rivas, on March 30th, 1987, about Val going away?

A Yes. He asked me if she was going away for the weekend.

Q Well, you had mentioned that, "Was she going away this weekend," were your words. Okay.

A (No verbal response.)

Q You're not sure what the words were, I guess?

A No. I know he asked me that because I was answering yes and no to the questions; that's how the conversation went.

Q So he's the party in this conversation that mentioned about Val going away for that past weekend, correct?

A Yes.

Q You did not offer that to him, that knowledge

of Val going away that weekend, did you?

A No.

Q Thank you very much.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Peggy, just one question: He did say to you that he had intended to see her Saturday night at a party?

A Yes, he did.

Q Okay. And his mention of her going away was a question to you, "Did she go away this weekend?"

A Right.

Q Okay. Thank you, Peggy.

THE COURT: I guess that's it. Thanks very much, ma'am. Watch your step there.

(Witness excused.)

MR. FITZPATRICK: Liz Lewis.

MR. CALLE: May we approach?

THE COURT: Yes.

(Counsel approached the bench. An off-the-record discussion ensued.)

COURT ATTENDANT: You've already been sworn, so please take a seat.

* * *

E L I Z A B E T H L E W I S , recalled as a witness on behalf of the People of the State of New York, having been previously duly sworn, was examined and testified, under oath, as follows:

THE COURT: Hello. Well, all right.

Ms. Lewis has been sworn prior, outside your presence. Okay. So she is and has been placed under oath, and you remain under oath, Ms. Lewis.

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Ms. Lewis, good afternoon. Tell us your full name.

A Elizabeth Lewis.

Q And is it Mrs. Lewis?

A Yes.

Q What is your husband's name?

A Bryant.

Q How long have you been married?

A I've been married eight and a half years.

Q Do you have any kids?

A Two.

Q And what are their names and ages?

A Patrick is seven and a half and Matt is six.

Q And where do you live?
A I live in Merrimack, New Hampshire.
Q How long have you lived there?
A We've lived there for five years.
Q And were you -- what do you do for a living?
A I am an assistant manager at a clothing store.
Q Back in March of '87, first of all, you were married back then?
A Yes.
Q And did you have your two kids then?
A Yes.
Q And where were you living back in March of 1987?
A We lived in Cazenovia, New York.
Q You and your husband, Bryant?
A And two children, yes.
Q Okay. What did you do back in March of '87 for a living?
A I stayed home.
Q Did you know the deceased, Elizabeth, Valerie Hill?
A Yes, I did.
Q When did you first meet Valerie?
A I met Valerie in the winter of 1981.
Q And how did you happen to meet her?

A My husband has a good friend named Bob Lucas who started dating Valerie, and I met him -- met her through Bob.

Q Was there ever a time when the four of you lived together?

A Yes, there was.

Q When was that?

A That was from 1982 until late 1983.

Q The whole four of you lived -- what was it, a large --

A A large house.

Q -- large house?

A Mm-hmm.

Q And other than that occasion, had you at any other time lived under the same roof with Valerie Hill?

A No, I had not.

Q And did you and she go to school together at all?

A No, we did not.

Q How would you characterize your relationship with her from '81 up until the time of her death in '87?

A We were very good friends, very close friends.

Q How often did you see her?

A Well, when I lived with her, I saw her every day.

After that, before she had moved to Syracuse, um -- I saw her quite often, probably at least three times a week. And then when she moved to Syracuse, I didn't see her as often, but we spoke on the phone almost every day.

Q Do you know why she moved to Syracuse?

A One of the reasons was to be closer to work. She had finished college at Cazenovia, and got a job at St. Joe's, and wanted to live closer, but also her relationship with Bob wasn't really heading in the direction she thought it should be. They were still seeing each other, but she was, I think, moving to try to make some decisions.

Q Was there any visible animosity between the two of them that you saw, between Valerie and Bob Lucas?

A No, not really. I mean, just drifting apart.

Q All right. Now, did you ever have occasion to visit her at her second apartment in Syracuse, at 248 Hickok Ave.?

A Yes, I did.

Q Would you tell us -- give us an idea as to how many times you visited Valerie there?

A Uh -- at that second apartment, probably I was pregnant most of the time that she lived there, so I would say six or seven.

Q And were you able to make any judgments or observations as to how she maintained the house, in terms of cleanliness?

A Very neat, always very, very, very neat.

Q And even when she lived with you?

A When we lived together, which was -- it was wonderful, she was very neat.

Q Now, did you, Ms. Lewis, have occasion to meet with the defendant here, Hector Rivas?

A Yes, I did.

Q And when did you first meet Mr. Rivas?

A I met him in May of 1986.

Q And would you describe the circumstances when you first met him?

A It was at a party. Valerie and I had gone to a party with Bob and Bryant -- I was married then to Bryant -- and we had been there for quite some time. We were all having fun; we were all drinking. And Valerie and I went into the kitchen of the home where the party was being held, and Hector entered the kitchen and started flirting with Valerie, and she was flirting a little bit back.

Valerie was not a beer drinker, and that's all they were serving at that party. She had brought a bottle of wine with her, but that was gone, too. Hector found

another bottle and poured us each a glass of wine.

Q Okay. And did you become aware that after that, Val was beginning to date him?

A Not immediately, not within the next week or two, but I'd say after another three, four weeks, yes.

Q And how would you describe Val's relationship with Hector when they first started going out, say in the late spring, early summer, of '86?

A It was very exciting to her. He wined and dined her, I guess are the words that I want to use. They traveled, went out a lot, socialized a lot. He was very nice, and they had a nice time together.

Q And were there occasions when you joined them for social events, occasions?

A Not during that summer, but yes, later, later into the year.

Q Now, did you mention that they liked to travel? Were you aware of any trips that they took together?

A Yes. I knew that they went to New York City, and I, on, I believe it was two separate occasions. One time they traveled to Canada together. I believe all of those trips were completed before September of that year.

Q Did you become aware of a Christmas trip that they took together?

A Yes.

Q Tell the jury what you know about that trip.

A Valerie was making plans to go see her mother, Icie, in Tennessee, for Christmas. Val's brother, David, and his wife, Sheri, and their son, Andy, was going. And earlier in the year, probably, I think it was around October, fall, Val had invited Hector to go with her for Christmas.

Q And to the best of your knowledge, did she, in fact, go on that trip?

A Yes, she did.

Q And did you see Val after she came back?

A Yes.

Q Did you make any observation about a change in the relationship between Mr. Rivas and Valerie, after she returned?

A Before and after, yes, she --

Q All right. Tell the jury what observation you made about that.

A Before they went -- um -- she made a comment to me that she wished that she had not asked him.

MR. CALLE: Objection, as to "comment."

THE COURT: Sustained. Yes.

BY MR. FITZPATRICK:

Q Without telling us what Valerie said.

THE COURT: Let me just say, the jury is instructed to disregard that answer. That answer has been stricken, and you're not to consider that answer.

BY MR. FITZPATRICK:

Q Did the relationship change after the first -- or about the time of the Christmas trip?

A Yes.

Q And just tell us, did Valerie see Mr. Rivas after the first of the year?

A Yes.

Q And were they still boy friend-girlfriend?

A Yes.

MR. CALLE: Objection to the question. It calls for a relation --

THE COURT: No. I'll allow the -- her to answer. She's made some observations, and because of those observations, she's drawn some conclusions that she can testify to.

And your answer was, "Yes," is that correct, ma'am?

THE WITNESS: Yes. Yes.

BY MR. FITZPATRICK:

Q Did they break up as boy friend and girlfriend?
A Yes.
Q When was that?
A That would have been when it was, or when she told me when it was, as far as I know.
Q As far as you know?
A Saturday, I believe it was the 25th of January, 25th, 26th, around there.
Q Of 1987?
A 1987, yes.
Q That's when she informed you that she and Hector -- or that's when you became aware that she and Hector were no longer dating?
A That following Monday was when she informed me of that.
MR. CALLE: I have an objection as to when --
THE COURT: Sustained.
MR. CALLE: -- as to form.
THE COURT: Sustained. The jury is, again, to disregard that as to what the victim may have told this witness.
BY MR. FITZPATRICK:
Q Now, I want to caution you, Liz, that you can tell us what you know, not what Valerie told you.

A Okay.

Q But you certainly were a very, very close friend of hers, correct?

A Yes, correct.

Q So there's no misunderstanding in the jury's mind, as far as you knew, from your very, very close friend, she and Hector were no longer dating, certainly as late as January of 1987?

A Correct.

Q All right. Now, were you aware of whether or not Mr. Rivas, after January 1987, would continue to attempt to see Valerie Hill?

A Yes. I was aware of that.

Q How often would he attempt to see her?

A At -- from January 25th on, it was, at first, every day.

Q And how long did that continue?

A To the best of my knowledge, that continued on into March.

Q Now, did you ever -- you've been to Valerie's apartment a number of times?

A Yes.

Q Did you ever see any notes allegedly written by Hector, that Valerie saved in her apartment?

A No, I did not see them.

Q Okay. Did you ever discuss those with Val? Don't tell us what was said, but did you ever discuss those with Val?

A Yes, I did

Q Did Mr. Rivas ever contact you during this time period, February and March of 1987?

A Yes, he did.

Q And what reasons would he give for contacting you?

A He would call looking for Valerie.

Q How often did he call you?

A I remember at least four occasions where he called.

Q On any of the occasions when he called, was Valerie -- strike that.

Were these calls to your home?

A Yes, they were.

Q On any of these occasions, was Valerie, in fact, at your home?

A Yes, she was.

Q Did you inform Mr. Rivas of that fact?

A No, I did not.

Q I want to ask you about an occasion on

March the 20th of 1987, when Val was scheduled to make a visit to your house. Do you have that occasion in mind?

A Yes.

Q And when was she supposed to come to your house?

A She was coming for dinner.

Q And that would be what time?

A 6, 6:30-ish; we ate early.

Q And this is on Friday, March the 20th?

A Friday, March 20th.

Q And did she arrive on time?

A She was a little bit late.

Q Did you make any effort to contact her?

A Yes, I did.

Q What -- how -- what efforts did you make?

A I called her apartment.

Q And anyone answer?

A Yes, they did.

Q Did you recognize the voice of the person that answered?

A The first time I called, yes, I thought I did, yes.

Q And who did you believe it to be?

A I believed it was Hector.

Q And did you have any conversation with him when

he answered the phone?

A No; I hung up.

Q Did you call back?

A Yes, I did.

Q And what occurred then?

A He answered again.

Q Any conversation on -- at that time?

A Not on my part, no. He -- on my part, no. He said, "Hello," three times.

Q And you hung up again?

A Yes, I did.

Q Now, did Valerie arrive at your apartment?

A Within ten minutes.

Q And is it physically possible for one to drive from Valerie's apartment, to your apartment, in March of '87, in under ten minutes?

A No.

Q Did you inform Valerie of the fact that Hector was at her apartment?

A Yes, I did.

Q Did you observe any physical or any visible reaction from her?

A She was angry.

Q Did you make any suggestions to her on that

occasion?

A That night we made several, yes.

THE COURT: I'm sorry. What did you say, ma'am?

THE WITNESS: That night we made several.

BY MR. FITZPATRICK:

Q Who do you mean by "we"?

A I'm sorry. My husband, Bryant, and I.

Q Don't -- Val -- tell us what suggestions you made to Valerie.

A We suggested that she change her locks. I suggested that she call the police. We suggested that she stay with us.

Q All right. Now, I want to take you to another incident, Elizabeth, talking about the, the late evening of March 25th, or the early morning hours of Thursday, March the 26th.

On that occasion, did you receive a phone call from Mr. Rivas?

A Yes, I did.

Q And where were you?

A Sleeping in bed.

Q And do you remember what time it was?

A Approximately 1:30 in the morning.

Q This phone call awoke you?
A It did.
Q And when you picked up the phone, did you recognize the voice of the caller?
A He identified himself.
Q As?
A Hector.
Q And was the sound of his voice consistent with being Hector?
A Yes, it was.
Q And would you tell us what, if anything, you remember him saying?
A I remember there were very few words that I understood him saying. He said Valerie several times; he was crying. He was speaking English, and then he would go into Spanish, which I do not understand. I could rare -- I really couldn't understand anything he was saying to me, um, throughout the whole conversation.
Q All right. Liz, are you a social drinker, yourself?
A Yes, I am.
Q Have you ever had occasion to see people that you believe to be intoxicated?
A Yes, I have.

MR. CALLE: Objection.

THE COURT: Overruled.

BY MR. FITZPATRICK:

Q Have you ever had occasion to hear people that you believe to be intoxicated?

A Yes, I have.

Q Did you make any judgment that morning, the morning of March the 26th, as to whether or not Mr. Rivas was intoxicated?

MR. CALLE: Objection.

THE COURT: Overruled.

A Yes, I did.

BY MR. FITZPATRICK:

Q Could you tell the jury what your judgment -- your best judgment is?

A His speech was slurred; he was crying, one minute -- impossible to understand. As I say, the only words I really picked up were when he identified himself at first, and then Valerie. Again, he was speaking Spanish at one point. He either had his hand over the phone, or he was not speaking into it, because I could hear him, but not well at all, so I hung up.

Q Did you tell Valerie about this?

A Yes, I did.

Q When did you tell her?
A I told her about this on Thursday, March 26th.
Q At about what time?
A It was in the morning. Val had worked the night before, so I knew that if I wanted to catch her before she slept for a while, I had to call early. So it was before 9:30.
Q Was it on the phone?
A Yes, it was.
Q Don't tell us what she said, but did she have a reaction?
A Yes, she did.
Q What was her reaction?
A She was extremely angry.
Q All right. Now, did you know, Liz, whether or not Val had any plans for that weekend, the plans for the 27, 28, and 29th of March, 1987?
A Yes.
Q What plans did you know her to have?
A She was going to visit her friend, Laura Adams, in Glens Falls, and was very excited about it.
Q Do you know when she was planning to leave?
A Saturday morning.
Q Do you know, to your knowledge, did Hector Rivas

know about this trip?
A Absolutely not.
Q Did you talk to her at any time later that day on Thursday, March the 26th, to Valerie Hill?
A On March 26th?
Q Yes.
A No, not later that day.
Q Did you talk to her at any time on the morning of Friday, March the 27th?
A Yes, I did.
Q And don't tell us what was said -- did you discuss this topic with Valerie Hill or not? Did you discuss with her, on the morning of Friday, March the 27th, the subject of your having gotten that 1:30 a.m. phone call?
A That was on Thursday.
Q Yes, I'm sorry if I'm being confusing to you. You have indicated to the jury that at 1:30 a.m. on Thursday morning, Hector Rivas called you in what you believe to be in an intoxicated state; yes?
A Yes.
Q And that later that day, you communicated that fact to Val?
A Yes.
Q I want to ask you, on the morning of Friday,

March the 27th, did you again discuss that topic with Valerie Hill?

A Yes.

Q Did you talk to Valerie Hill on the evening of March 27th?

A Yes, I did.

Q And about what time was that?

A It was before dinnertime, again probably 5:30.

Q And where were you?

A I was at home in Cazenovia.

Q And where was she?

A At home in her apartment, Syracuse.

Q Is that the last time that you spoke to Valerie Hill?

A Yes.

Q Did you make any effort to call her later that night?

A No, I did not.

Q And did you make any effort to call her on Saturday or Sunday?

A No, she was going away, no.

Q You believed her to be visiting her friend?

A Out of town, yes.

Q Now, I want to talk about your activities on

Saturday, March the 28th, Liz, specifically during the evening hours, say about 8 or 9:00 at night. Do you have a recollection of that night?

A Yes, I do.

Q What did you do that night?

A My husband and I had made plans to go out with Bob Lucas and his girlfriend, Susannah. We were going to a restaurant-bar in Cazenovia, and then we were going to a party.

Q Did you go to the restaurant-bar?

A Yes, we did.

Q And the name of that, please?

A Albert's.

Q And your best recollection as to what time the four of you got there?

A It was before 9.

Q Were the four of you -- did the four of you enter together?

A One after the other, yes, in a line, yeah.

Q Did you see Mr. Rivas there?

A Yes, I did.

Q And would you describe your encounter with him when you first saw him?

A I, I was the first one in. I opened the door, and

it was very crowded. And almost immediately he was in front of me. He said, "Hello"; he put his arms around me, was saying things like, "Hello, little mama. I'm so excited for you. I want to come see the baby." I had just had a baby. Um -- and that was about it. I walked past him.

Q Okay. Did he ever react like that before in your presence to you?

A No, no, not like that before, no.

Q Did you have any observations of him talking to anyone else in your group?

A Yes, I did.

Q Who was that?

A He then approached my husband, Bryant.

Q And were you able to hear anything that he said?

A I was standing next to Bryant, so, yes, I heard him say, "Congratulations," to Bryant. "I'm very excited for you," and Bryant walked past him, and that was the extent of it.

Q Anyone else in your group?

A Bob Lucas.

Q Bob Lucas?

A Yes.

Q Now, had Bob Lucas and Hector Rivas been on

friendly terms?

A Not at all, no.

Q And what, if anything, did you hear Mr. Lucas or did you hear Mr. Rivas say to Mr. Lucas?

A He approached Bob and he said, in a very upbeat tone, "Bob, I hear that you're building a new house. I'd love to do your plumbing for you."

Q Okay. Now, how long did you stay at Albert's?

A I would say about an hour and a half.

Q And where did you go from Albert's?

A We went to a party at Bob Giordano's house in Cazenovia.

THE COURT: I'm sorry. I missed that.

THE WITNESS: Bob Giordano.

THE COURT: Giordano?

THE WITNESS: Yes.

BY MR. FITZPATRICK:

Q And was this an "invitation only"-type thing, or was it just if everybody heard about it, they could go? What was it?

A Yeah, I'd say it was open.

Q And did you know Mr. Giordano?

A Yes.

Q And about what time did you get there?

A It was before 11.
Q And when you got there, was Mr. Rivas there?
A No.
Q Did you observe Mr. Rivas arrive at the party?
A I did not see him come in the door. I saw him enter the room where I was standing.
Q And what time was it that you first saw Mr. Rivas?
A I think it was around midnight.
Q And did you have any conversation with him?
A Yes, I did.
Q All right. I want you to take your time, as best you can recall, Ms. Lewis, I want you to tell us what you said to him, and what, if anything, he said to you. Take as much time as you need.
A He approached me; said, "Hello." He and I were standing alone, at that point. He made mention of, "It's too bad that Valerie's not feeling well, that she can't be here tonight." And I'm thinking, well, Valerie is out of town, so I don't know what you're talking about.
Q Did -- excuse me. Did you say that to him?
A No, I did not.
Q Okay.
A I did not say that; I thought it.

Q You were thinking that to yourself?
A Thinking that he wanted me to tell him where she was.
Q Continue, then, with the conversation.
(Proceedings paused.)
THE COURT: Go ahead, ma'am, if you would.
BY MR. FITZPATRICK:
Q Now, Ms. Lewis, we were interrupted at a point where Mr. Rivas was saying, "It's too bad that Val wasn't feeling too well;" that she wasn't home --
A That she wouldn't be there.
Q Was it your judgment that he had spoken to her that night?
A I did not believe that he had spoken to her, no.
Q Was that the impression he was trying to give?
A Yes.
Q Continue, then, with your recollection of the conversation; what was said by you and by him.
A I asked him, because I was kind of caught off-guard, "Why are you saying these things?" And, you know, I'm not going to say, you know, "She is not at home. She is out of town"; I didn't want to say that. Um -- and then we went right into a conversation, um, concerning some of the things that, um, I knew had taken place. I asked him

why he couldn't leave Valerie alone and get on with his life. I said -- told him that she was going through a very, very tough time; that she was trying to be there for her father, who was going through an awful time; she was very busy.

She had made it clear to him that they should not be seeing one another again. Actually, he had initiated that and said that they shouldn't see each other anymore. And then he said that he had never meant that; that he loved her very much.

We then started talking about -- I kind of piped in and said to him, "You've been pulling some very, very childish stunts lately," and --

Q Did you specify to him what stunts you were talking about?

A Yes, I did.

Q Tell us what you told him.

A I told him that first off, I was aware of what he had done earlier that week; that he had called her, left the phone off the hook, appeared at her door; that he had followed her --

MR. CALLE: I'm going to object to this. I don't believe that this witness is --

THE COURT: Yes. I'm going to take a

recess. Ladies and gentlemen, I'm going to ask you to step out, not to form any opinions, or talk about the case.

(The jurors left the courtroom.)

THE COURT: Rich, hold on a second.

MR. CALLE: Yes.

THE COURT: While we are still here and counsel's got an objection to this witness' testimony about this conversation, what's the basis of your objection?

MR. CALLE: Judge, I'd like the last question and answer read back, so I'll best be able to answer that.

THE COURT: Okay. Would you do that?

(The requested portion of the record was read back by the court reporter.)

MR. CALLE: Judge, there's no independent basis for what -- how she got this knowledge, Ms. Lewis. I believe that this knowledge is gained from hearsay conversations that Valerie Hill had with her, I believe, when she was -- during that, she's getting that, the gist of the conversation. What is the basis of, or fact of this knowledge?

THE COURT: Okay. I think I know what's coming, but go ahead.

MR. CALLE: The defendant's response to this accusation is meaningless without the jury knowing what this witness said.

THE COURT: All right. I know -- I know how I'm going to handle it. I'm going to overrule your objection. I'm going to give an instruction to the jury, though, that, of course, this witness is relying upon some events that may have been told to her by someone who's not here; and that they should be aware not to judge the truthfulness of those allegations.

MR. CALLE: Well, with all due respect, sir, I don't see how that, that -- quite possibly, how anybody could do that. What's happening is this conversation that this witness had with Valerie Hill is getting through.

THE COURT: The point is -- the point is, I don't mean to interrupt you -- but the point is your client, through his confirming or denying these allegations, are admissions or statements coming from him. And, therefore, he's admitting to these events happening or

accepting that they happened and, therefore, his response is important to describe these events.

MR. CALLE: Well, Judge, with all due respect, perhaps the witness can say that she made allegations of, of activities that Mr. Rivas had done, without specifying what these activities are; and that Mr. Rivas did not give any confrontational answer to them.

THE COURT: Well, I don't know that Mr. Rivas confirmed or did not confirm these activities taking place, and I, I guess I'll caution the witness that, you know, you're saying -- you're testifying here about a lot of activities allegedly done by this man. I want to know whether this man admitted or acknowledged that, "Yes, I did those activities," or whether or not he denied them or said nothing about those activities.

If he denied or said nothing about those activities, that, in my opinion, constitutes clear hearsay. But if he confirms, "Yeah, I guess I was kind of a jerk when I called or did this or did that," then that is, to me, is an

admission on the part of the defendant, and will be received into evidence.

Do you have anything else you want to add to that?

MR. FITZPATRICK: Not at all, Judge.

THE COURT: I want to caution the witness that I really don't want you to reiterate to this jury allegations you made to this defendant about things that happened. I really only want you to discuss any of those allegations he may have confirmed or admitted to you, or acknowledged, that were -- he did, in fact, do.

Do you understand what I've said to you here today?

THE WITNESS: (No verbal response.)

THE COURT: Okay. Thanks. We're going to take some time, too. The reporter can pass. We're adjourned. You can step down, ma'am.

(Counsel approached the bench. An off-the-record discussion ensued.)

(Proceedings stand in recess.)

(All parties are present. Proceedings resumed at this time.)

MR. CALLE: Your Honor, could we approach?

THE COURT: Sure.

(Counsel approached the bench. A discussion ensued, on the record, out of the hearing of the jurors.)

THE COURT: Let the record reflect that we're at the bench, at a bench conference. Ms. Lewis is on the stand. The record is clear as to where we're going with her testimony, but again, involving a conversation she had with the defendant at a party, about certain events that took place that this witness confronted the defendant with, and that the defendant may or may not have acknowledged to, have acknowledged to her as happening. This Court has instructed the witness to testify only about those events with the victim --

MR. CALLE: That she admitted.

THE COURT: Don't interrupt me.

MR. CALLE: I was helping you.

THE COURT: I just -- I have instructed this witness only to testify about those events that the defendant, himself, confirmed or acknowledged in the conversation with the witness as taking place with the victim.

I've instructed the witness not to reiterate

or comment on any event that was not acknowledged to have happened, or have occurred by the defendant that, in my opinion, would constitute hearsay evidence as being outside the scope of her direct knowledge.

In other words, she would be relying on statements made to her by the victim as to the truth or veracity of these events occurring. She's been instructed as to that. She's acknowledged that is, in fact, what she will limit her testimony to.

Any comments?

MR. CALLE: You want me to go first, or Mr. Fitzpatrick?

THE COURT: You go first, Mr. Calle.

MR. CALLE: Yes. Okay. The point is, in the grand jury minutes, she acknowledges that Mr. Rivas does not respond to any allegations, other than the fact of her coat being missing, not -- to allow the witness to restate these allegations, based on hearsay, and to have me try and impeach her credibility, based upon the grand jury minutes, is going to let the damage be done in front of the jury, at this point.

THE COURT: You mean, in other words, allowing her to testify about facts outside her grand jury testimony would open up the door; is that what you're saying?

MR. CALLE: Not exactly. What I'm trying to say is that she's already admitted in the grand jury that he does not respond, in fact, denies, on occasion, most of the allegations that she started to recite here earlier.

Now, to allow her to make those allegations and then to have hearsay that he didn't respond, allows the jury to hear what these allegations are, and damages the defense's case.

Based upon the grand jury minutes, the only acknowledgment that he, he admits to, is the fact of her coat being missing, and the other allegations that she's ready to spill forth, he does not respond, according to her testimony.

I'd like to draw your attention to it. I don't -- if your Honor wanted to see it -- the only thing he admits is -- and that's Page 168, Lines 19 down, and Page 169. Again, if I may, I don't think -- well, that he admits to her coat.

14 and 15, he admits that he took her coat from her house, but then when it goes to 18 to 25, there are other allegations that he denies or does not respond to.

So to have her mention these allegations puts in the jury's mind that that is what Val Hill told her, and, therefore, is inadmissible.

And there's another page after that, Judge, I believe, Page 170 -- let's see, 1 through 14, on the grand jury minutes of Ms. Elizabeth Lewis.

THE COURT: Do you want to respond?

MR. FITZPATRICK: I don't. I did not conduct the grand jury examination, Judge, but that goes to her credibility. She's been very, very consistent with me about what's she's told me about it.

THE COURT: Well, Mr. Calle has a point. She states that the things that she confronted Mr. Rivas with, he did not acknowledge.

MR. FITZPATRICK: Could I see that?

THE COURT: Yes, show him.

MR. FITZPATRICK: I did not read that, and he would not acknowlege that is what I was

saying to him as a denial, that he did these things. I do not read it that way.

THE COURT: My point is, though, Mr. Fitzpatrick --

MR. CALLE: It's not --

THE COURT: -- is that I think you'll admit to me that if she, she being the witness, was not present during these acts, and is relying upon Valerie Hill's recantation of those events, and then spewing them out here today as an allegation to the defendant that he either denies or doesn't acknowledge, aren't we letting in a lot of hearsay statements into evidence?

MR. CALLE: For the purpose --

MR. FITZPATRICK: If the defendant were to say that absolutely did not happen, I would say yes. If the defendant were to say, yes, I did all those things, or in some other way, that is not -- the other way, in the normal course of a conversation, this witness believes what she's saying to him to be true.

Now, take it from the defendant's point of view. He also believes them to be true,

because he did them, so he doesn't acknowledge to her what she already knows. He acknowledges to her his reasoning for doing them, which to me is tantamount to admission.

THE COURT: Admission by his silence?

MR. FITZPATRICK: No, no, no. He's -- the testimony you're going to hear, if she's consistent, to me, what she said to me is, Rivas saying, "Yes, but she wouldn't return my calls, and she never wants to see me, so that's why I had to do that."

THE COURT: Well, I'm just going to tell you this: I don't know what's going to come out of the witness' mouth. I've given her the instructions I have. And I'll tell you, Mr. Calle --

MR. CALLE: All right.

THE COURT: -- if something comes out and I -- through either direct examination or by your cross-examination -- am not satisfied that these acts that he's being confronted with are acknowledged by him, I'm going to strike her testimony.

MR. CALLE: Judge, just, may I just make a

record, Judge? I believe that what was stated earlier was the fact that she's entitled to testify to what Mr. Rivas told her, and basically to -- there is no admission, based upon her grand jury testimony.

So if we're going into this particular line of questioning, just to deduce whether there were admissions by the defendant, this witness' grand jury testimony just is proof right here that he --

MR. FITZPATRICK: Well --

MR. CALLE: Let me finish, Bill. It's proof right here that he does not make any admission to her allegation. And to allow the allegation -- to subject --

THE COURT: I'm not going to go by her grand jury testimony. You can impeach the daylights out of her, if you want. And if I'm convinced that you're getting her to admit that he did not admit these things, I will strike it.

MR. CALLE: However, the jury will have heard it.

THE COURT: Well, they've heard a lot. Well, hopefully, they'll follow my instructions to disregard this.

MR. CALLE: Yes, Judge.

THE COURT: Put her on notice.

MR. CALLE: I understand. You're all

right with me.

(Open court.)

THE COURT: Okay. I don't know if we've even acknowledged that we're all back together. Would you acknowledge the jury is present, counsel, the defendant. The witness, Ms. Lewis, is still on the stand. And we've had an extensive bench conference, which is memorialized on the record.

I don't know where you want to pick this up again, Counselor. I'll leave it up to you.

MR. FITZPATRICK: I know where I want to pick it up.

BY MR. FITZPATRICK:

Q Mrs. Lewis, since the jury is orientated when last we spoke, we were discussing a conversation that you had sometime in the vicinity of late Saturday night, March the 28th, early Sunday morning, March the 29th. You and the defendant were alone, and you were at the party at Mr. Giordano's house in Cazenovia.

Do you have that in mind?

A Yes.

Q Now, if you would just answer this yes or no: Did you accuse the defendant -- I don't know if accuse is

the right word -- or did you say to the defendant that, "I know," I, Elizabeth Lewis, "know some of the things that you have done"?

A Yes.

Q And did you outline some of those things?

A A few.

Q Did the defendant acknowledge to you in any way, in words or substance, as to whether or not he had done these things?

A Some of those things, yes.

Q Would you tell the jury what you outlined to him, that he acknowledged having done to the victim, Valerie Hill?

A He acknowledged having gone in her apartment when she was not there, and taking a coat that he had given her for her birthday. The reason he gave me was that she had not given him anything for his, so why should she have that. He --

Q You want to go on? Go on.

A He -- acknowledged -- we spoke briefly about some golf clubs that he had given her for Christmas. She wasn't terribly concerned with those, but just another thing he said she couldn't have those, those were at his house.

Um -- he, when approached about some of the things in general, the only thing that I elaborated on were a phone conversation and some -- and following her, he only stated to me that, "She wouldn't talk to me on the phone. I had to see her."

Q Is that by way of an explanation as to why he was following her?

A Yes.

Q And that is the extent of the conversation that you had regarding things that you confronted him with?

A No, not the full extent. I mean, some things that I said to him he acted as if he didn't hear me.

Q Okay. You've told the jury everything that you confronted him with, that he acknowledged having done?

A That he acknowledged having done, yes.

Q Now, did he talk to you that Saturday night, Sunday morning, about his current feelings for Valerie Hill?

A Yes.

Q Tell the jury what tense he used in his comments to you.

A "I loved her so much. She meant so much to me."

Q The past tense?

A Yes.

Q Did that strike you, that during the time of

that conversation --

A No, I can't say that right that minute I thought that was strange. I thought the whole conversation was strange that night, lying in bed, something else that he had said struck me as strange. During the conversation --

Q Okay.

A -- that night, I replayed that conversation on the way home, my husband and I talked about it, and when I replayed the whole thing, a lot of what he said was in the past tense.

Q About Valerie Hill?

A About how he felt about her, yes.

Q Now, was that the last time you saw or spoke to Hector Rivas?

A No.

Q And did you ever discuss the circumstances of his relationship with Valerie Hill with him again?

A No.

Q Okay. Thank you very much, Mrs. Lewis. If you'll stay right there.

CROSS-EXAMINATION BY MR. CALLE:

Q Ms. Lewis, the fact that Hector Rivas spoke of Valerie Hill in the past tense, would you say that that is

inconsistent with the realization that he was finally accepting the fact that their relationship was over?

A After the conversation we had, yes -- inconsistent, yes.

Q Inconsistent?

A Inconsistent.

Q What is the basis for that assertion?

A The -- my assuming that he was accepting that things were over?

Q You're saying that he was not accepting that fact, the relationship was over, based upon the fact that he was using past tense. I imagine what you are trying to do is assert that he knew she was dead, is that fair?

MR. FITZPATRICK: Objection, your Honor; that is a conclusion for the jury to decide, not the witness.

MR. CALLE: Well --

THE COURT: Well, no. If he wants to ask the witness if she made those assumptions --

MR. CALLE: Well, no, your Honor. Do you want me to rephrase the question?

MR. FITZPATRICK: I'll withdraw the objection, your Honor, if the witness wants to answer it.

MR. CALLE: Well, I'll rephrase the question.

BY MR. CALLE:

Q Have you ever had a relationship -- have you ever had a boy friend-girlfriend relationship with anyone prior to your marriage to your husband?

A Yes.

Q And when, in fact, that relationship is over, would it be fair to say that you referred to that person in the past tense?

A I suppose so.

Q So why is it that you cannot suppose that when Mr. Rivas was talking about Valerie Hill in the past tense on Saturday or Sunday morning of the 28th, 29th, that, in fact, he was not accepting the relationship was over?

A Because of the other things that he said in the course of that conversation.

Q And when you refer to the other things that he said, are you talking about what you related on direct examination with Mr. Fitzpatrick?

A I'm sorry. Am I what?

Q Are you talking about the other information Mr. Rivas related that you spoke about on direct examination with Mr. Fitzpatrick?

A Some of it, yes.

Q Now, you mentioned that back in 1981 or '82 you and your -- you and Mr. Lewis were living with Bob Lucas and Valerie Hill?

A That's right.

Q Did you ever smoke marijuana together, the four of you?

A Not my husband, no; not Bob. Val and I, yes, yes, we --

Q Well, who smoked marijuana at the house?

A Excuse me?

Q Who smoked marijuana at the house?

A Valerie and I.

Q Okay. But not Bob Lucas?

A Not with me. I don't know if he did with Val. Not with me.

Q All right. And that was in 1981 or '82?

A Yes.

Q And you mentioned that your husband -- Bryant Lewis, is that his name?

A Yes.

Q -- that he was good friends with Bob Lucas?

A Yes.

Q Okay. And do you know how long that friendship

was at that particular time that you all lived together?

A In 1981 or 1982?

Q Yes.

A I'd say they had been friends for at least six years.

Q Were you married to Bryant Lewis at that time?

A No, I was not.

Q So you all set up housekeeping over on Albany Street in Bob Lucas' --

A Yes, we did.

MR. FITZPATRICK: Object to the form of the question, your Honor.

THE COURT: Oh, I'll take it.

THE WITNESS: Nothing to be shamed of.

BY MR. CALLE:

Q And Bryant Lewis and Bob Lucas were good friends, would you say?

A Yes.

Q And would it be fair to say that you all were disappointed when Valerie Hill and Bob Lucas broke up with each other?

A No, I wouldn't say I was disappointed.

Q Well, Ms. Lewis, you never liked Hector Rivas, isn't that a fact?

A No, that's not a fact. I was very nice to Hector Rivas, as a matter of fact.

Q And was he bad to you?

A Was he bad to me?

Q Yes.

A In what way?

Q In any way.

A At what time?

Q During the course of the time that you knew him.

A No, he wasn't bad to me.

Q Now, when you went into -- was it Albert's -- on the next evening after the morning you received the phone call from Rivas --

A On Saturday, the 28th, yes.

Q And you received the phone call at 1:30?

A No. You asked me when I went into Albert's, which was Saturday, the 28th.

Q I understand. But the next question, when you received the phone call from Hector Rivas, allegedly approximately 1:30 in the morning, was that also Saturday, the 28th?

A No, that was early Thursday, the 26th.

Q When you went into Albert's on the 28th, did you mention to Hector, "What the hell are you calling me up

for at 1:30?"

A I did not say that to Hector at Albert's, no.

Q But was it your testimony that when you walked into the restaurant, there was Hector Rivas?

A Yes.

Q And he came over to you and he hugged you?

A He did.

Q Okay. You said that you felt that that is out of character for Mr. Rivas?

A No, I didn't say it was out of character for him. I said for him to be that way with me, at that point, yes, it was out of character.

Q And you didn't say, "Don't hug me. What are you calling me 1:30" --

A I didn't say a word. I walked past him.

Q Okay. Who were you with that night?

A My husband, Bryant, Bob Lucas, and his girlfriend, Sue.

Q Now, was it your testimony that Mr. Rivas said, "Hello, little mama," to you?

A Yes.

Q Okay. And had he ever called you "little mama" before?

A No. He was referring to my being a new mother.

Q Did you ever hear him speak Spanish to you?
A Yes, I did.
Q And what -- on what occasion was that?
A The phone call early in the morning on Thursday, the 26th.
Q Okay. Any other times?
A How many other times did he speak Spanish to me? He had never.
Q Ever?
A No other times.
Q No other times. It's just this one night at 1:30 on the 26th he spoke Spanish to you?
A On the phone.
Q By the way, when is the first time that you informed the district attorney's office of Hector Rivas' acknowledging certain allegations you made to him on the 28th of March, 1987?
A When was the first time that I --
Q You informed --
A -- I spoke to the district attorney?
Q You informed the district attorney of these acknowledgments.--
A I told the police about them.
Q -- to your allegations?

A The district attorney's office would have been prior to, just prior to November, but, yes, I originally told the police about it.

Q I'm going to ask that question again, only because I didn't hear the full answer.

When did you first relate to the authorities that, in fact, Mr. Rivas acknowledged certain allegations you made to him on the evening of March 28th, 1987?

A When originally questioned, which was not just one time, but many times over the course of many weeks when Valerie was first killed, to different people within the police department, we discussed that conversation. I cannot tell you for sure if I said to them exactly word for word the way I said it for someone else.

Q Okay.

MR. CALLE: I'd like to have this voluntary affidavit marked as a defense exhibit.

THE COURT: H again?

MR. CALLE: H. Thank you.

(Voluntary Affidavit was marked for identification as Defendant's Exhibit H, this date.)

BY MR. CALLE:

Q Is that it, Ms. Lewis? I'd like to show you the

voluntary affidavit, and ask you to look at it and tell this Court what it is, please.

A This is an affidavit taken sometime during the --

THE COURT: Try the bottom.

A May of 1987.

Q Okay. I would ask you if you would read it, please.

THE COURT: To herself?

MR. CALLE: To herself, of course, yes.

(The witness complied.)

MR. CALLE: For the moment while she's doing that, may I have this one marked?

THE COURT: Sure.

(Voluntary Affidavit was marked for identification as Defendant's Exhibit I, this date.)

THE COURT: You all set?

THE WITNESS: Yes.

THE COURT: Okay.

MR. CALLE: Yes. Thank you.

BY MR. CALLE:

Q Ms. Lewis, this particular paper that you just read, Defendant's Exhibit H, is this a voluntary affidavit?

A Yes, it is.

Q And it's got a heading up here, State of New York, County of Onondaga, City of Syracuse. And it's subscribed at the bottom, "Elizabeth G. Lewis"; is that your signature?

A That is.

Q Did you sign this particular affidavit?

A Yes, I did.

Q And would it be fair to say that it's dated the 19th of May of 1987, that was when you made and/or signed this affidavit?

A Yes. I'm sorry, yes. Mm-hmm.

Q Now, based upon what you just read now in relation to your, your answers given on direct testimony by Mr. Fitzpatrick, concerning the fact that Hector Rivas acknowledged going into Valerie's apartment when she was not there, taking a coat of Valerie's, and saying that the golf clubs he gave Valerie, she could not have them; that they were at his house; did you ever, in May of 1987, make that notation to the authorities in your voluntary affidavit?

A Not on that.

MR. FITZPATRICK: Objection, Judge. I object to the use of that as an improper -- it's not the proper use of the exhibit.

THE COURT: Overruled. Your answer, ma'am?

A Not on there, no.

BY MR. CALLE:

Q I show you now Defense Exhibit I, Ms. Lewis; it is a voluntary affidavit. I ask you to take a look at that one -- one moment, please.

(Proceedings paused.)

Q Yes, take a look at that, if you would.

THE COURT: Can you identify that for us, please, ma'am?

THE WITNESS: Monday, March 30th --

THE COURT: Not what the document --

THE WITNESS: I'm sorry.

THE COURT: I'm sorry.

THE WITNESS: Voluntary affidavit.

THE COURT: And whose is it?

THE WITNESS: Mine.

THE COURT: And the date it's given, ma'am, on the bottom?

THE WITNESS: March 30th, 1987.

THE COURT: Okay.

BY MR. CALLE:

Q Now, I ask you if you would read that to

yourself, ma'am, and let me know when you're through.

A (Witness complied.)

Q Thank you. Again, Ms. Lewis, on direct testimony by Mr. Fitzpatrick elicited from you was the fact -- were the facts that Hector Rivas acknowledged going into Val's apartment when she wasn't home, taking a coat of Val's, and refusing to give her her golf clubs back that he bought her.

Directing your attention to Defense Exhibit I dated March 30th, 1987, did you ever give Hector Rivas' acknowledgments to the authorities at that time?

A Conversation or acknowledgments?

Q These acknowledgments that Hector theoretically --

A Not on Monday, March 30th.

Q Not on March 30th?

A That's written down.

Q Now, you're telling this Court that the day Valerie Hill was discovered, and approximately six weeks later, you never gave statements pertaining to acknowledgments Mr. Rivas allegedly gave you on March 28th, 1987?

A No, I'm not saying that I never said them, but that it --

Q Well, ma'am -- I'm sorry.

THE COURT: Don't interrupt the witness. Go

ahead.

A I spoke with, within that time, and even later, probably fifteen to twenty different police officers, investigators. And I do know that that came up at some point. But, no, I cannot tell you that on there, my specific words were, were such as you just asked me here.

Q Well, ma'am -- ma'am, isn't it a fact that acknowledgments by Hector Rivas, regardless of general or specific, are nowhere located in these two voluntary affidavits that you discussed here today?

A In those two.

Q Well, Ms. Lewis, if I were to tell you these are the only two the district attorney gave the defense, are you stating that, in fact, the district attorney's office is withholding fifteen affidavits?

A No, I'm not. I didn't say that the fifteen other times that affidavits were taken. I said I spoke with --

Q Nothing further.

THE COURT: Any redirect, Mr. Fitzpatrick?

MR. FITZPATRICK: Just give me one second, Judge. I didn't think he was --

THE COURT: Sure.

(Proceedings paused.)

MR. FITZPATRICK: No. All set. Thank you

very much, ma'am.

THE COURT: Thank you. Watch your step there.

(Witness excused.)

MR. FITZPATRICK: People call Joe Fields.

COURT ATTENDANT: Right up here, sir, if you would.

* * *

J O S E P H F R A N C I S F I E L D S , called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Sir, good afternoon. First of all, thank you for waiting so patiently. I appreciated that.

Would you tell the jury, please, your full name and where you live?

A Joseph Francis Fields. I live at Ten Macari Street in Baldwinsville.

Q And how old are you, Joe?

A Forty.

Q Married or single?

A Single.

Q And what do you do for a living?

A I work at a bowling center.

Q What do you do there?

A I oil lanes, bartend, numerous, numerous other tasks.

Q Okay. You also bowl quite a bit, yourself, in tournaments?

A Yes, I do.

Q Have you ever been a professional bowler?

A No.

Q But you participate in a lot of tournaments in the northeast?

A Yes.

Q Joe, where were you living back in March and April of 1987?

A In Cazenovia.

Q And what did you do for a living back then?

A I originally moved there and I was working at a

bowling center there in Cazenovia, and then I later on worked part time and also painted as a house painter.

Q And were you -- were you dating anybody back in March and April of 1987?

A Yes, I was.

Q Who's that?

A Kelly Williams -- Kelly Williams Grey.

Q And have you subsequently broken up with her?

A Yes.

Q Now, do you know the defendant in this case, Hector Rivas?

A Yes, I do.

Q Do you see Mr. Rivas in the courtroom this afternoon?

A Yes, I do.

Q And would you describe what he's wearing for us, please?

A Gray suit with a red tie.

Q All right.

MR. FITZPATRICK: For the record, the defendant, Hector Rivas.

BY MR. FITZPATRICK:

Q How do you know Mr. Rivas?

A Uh -- he bowled at the bowling center, and he

was a patron at the bar. Through softball, he played in the same league in Cazenovia.

Q How would you characterize, in March and April of '87, your relationship with Hector Rivas?

A Fine.

Q How long had you known him prior to that time?

A I don't know, maybe a year, I would say.

Q Did you ever have any difficulties with him, any problems with him?

A Not at all.

Q Were you -- did you know Valerie Hill?

A No, I did not.

Q Were you made aware through news reports of the fact that Valerie Hill had been murdered in the City of Syracuse?

A Yes.

Q Did there come a time after that date, Joe, when you saw the defendant, Hector Rivas, at Albert's Restaurant?

A Yes, there was.

Q Do you remember when that was?

A I would say, approximately a week, two weeks after he was pulled in.

Q After the murder of Miss Hill?

A Yes.

Q And would you tell us what day of the week it was, if you remember?

A It was a Friday, Friday night.

Q Were you with anybody?

A I was with my girlfriend, Kelly.

Q Kelly Williams?

A Yes.

Q And what time did you arrive at Albert's?

A Approximately 10:30, 11; it was late in the evening.

Q And was it crowded?

A Yeah, a little bit. Not real, real crowded, but, you know, for Albert's, I would say it was a decent crowd, yeah.

Q What's the inside of the bar look like back in April of '87?

A I'm sorry, I didn't hear.

Q What did the inside of Albert's bar look like back in April of '87?

A It was an L-shaped bar, and he was at the corner of the short end of the L.

Q You say "he," you mean --

A Hector.

Q And did you acknowledge him?

A Yes, I did.

Q Tell us what happened.

A Well, he was drinking and quite drunk, I would say, and not totally, totally drunk, but, you know, on his way. And my girlfriend and I come in and we joined him. And we were at the bar, and we were talking and, of course, he was -- we got talking about what was going on, and, and et cetera, and --

Q When you say, "about what was going on," were you discussing Valerie Hill?

A Yes.

Q Did you make any gesture to him or he make any gesture to you?

A In what manner?

Q And did you have any physical contact with him? Did you shake hands?

A Well, yes, yes.

Q What did you do?

A Well, we were talking, and then he started crying because he was upset of what was going on. And I was consoling him. I hugged him and, et cetera, et cetera, because, you know, I mean, he was -- he was a friend, I mean, you know.

Q Okay. Go ahead. What happened next?

A So, it continued. We talked and he was crying, and et cetera. And my girlfriend got up to go to the bathroom, and Hector was in between us, and at that particular time, I stepped back to let her go by and Hector was like this (Demonstrating) on the har, still crying quite, quite a lot. And I stepped back up to the bar and I was shoulder to shoulder with him, and I heard him say, "Valerie, Valerie, I didn't mean to do it."
Q Did you acknowledge that he said that?
A No, I didn't say a word, but I was quite shocked.
Q Did you notice any change? Did he acknowledge you?
A He, after he picked up his head and he, he like instantly stopped crying.
Q Did he see you when he picked up his head?
A Yes, he did.
Q Did he say anything to you?
A No, he did not.
Q How long did you stay there?
A I was there for about another half-hour, forty-five minutes.
Q How long did you stay with Mr. Rivas?
A Well, he finished. He was around for about

another ten, fifteen minutes, finished his drink, and then left.

Q Did you have any conversation with him during that ten or fifteen minutes?

A No, I did not.

Q Did you react to this at all?

A No. I, I reacted -- I was dumbfounded, because at the particular time, to be perfectly honest, I didn't believe that Hector was guilty.

Q Did you tell anyone that night of what you heard him say?

A Yes, I did.

Q Who did you?

A My girlfriend, Kelly.

Q And are you certain that those are the exact words?

A Yes, I am positive.

Q All right, Joe. Thanks very much. Sit right there, if you would.

CROSS-EXAMINATION BY MR. CALLE:

Q Good afternoon, Mr. Fields.

A How are you?

Q Mr. Fields, I didn't get the time that you were

in this particular restaurant, Albert's?

A Approximately 10:30, 11:00, is when we arrived, yes.

Q And what date was that in April, do you have any idea -- 14th?

A It was on a Friday.

Q Friday. Friday in April. This was a Friday night in Albert's Restaurant. Was it crowded?

A Fairly.

Q What do you mean by "fairly"; were the seats -- most of the seats taken at the bar?

A No.

Q Is that unusual for Albert's?

A Well, they usually have a lull there; it's usually real crowded early evening, then they have a lull, and then right around midnight it picks right back up again.

Q So at this time, Hector Rivas is on the small side of the L?

A Yes.

Q And how many stools are there, if you recall?

A How many stools?

Q Are there stools by the bar?

A Sure.

Q And how many are there on the small side of the L?

A Three, four.
Q And Hector was by his lonesome?
A Yes, he was.
Q And how many drinks did you see Mr. Rivas finish?
A I would say three or four, but he had been drinking before I got there.
Q Well, you know that for a fact he had been drinking before you got there?
A I would -- yeah, I would definitely say that.
Q You know where he was drinking?
A No.
Q Do you know what he had to drink?
A I would say he was drinking rum and coke.
Q You don't have that knowledge by your observations, do you, sir?
A Well, not by my observations, but force of habit, because I am a bartender and I know what he'd drink.
Q You bartend?
A Yes.
Q Where is that?
A I used to be the bartender at Cazenovia -- the bowling alley.
Q At the bowling alley?
A Yup.

Q Okay. Did you ever bartend at Albert's?
A No, I did not.
Q So you're telling this Court that you are convinced that Mr. Rivas was drinking rum and cokes before you got in the bar, and saw him for the first time that evening, correct?
A Mm-hmm -- oh, yes, I'm sorry.
THE COURT: You have to say yes or no.
A Yes. I'm sorry.
Q Did he tell you he was drinking three or four rum and cokes before you got there?
A He didn't -- he didn't tell me that. I said he had three or four drinks while we were there, and they were rum and cokes.
Q But you said that he had drinks before you got there, correct?
A Obviously when I come in, he had -- he had already had a drink.
Q Okay.
A And --
Q And you said he was drinking other drinks before you got there?
A Yes.
Q And you say you know that because you've seen

Mr. Rivas drink in other areas where you were bartending, correct?

A Mm-hmm. Yes.

Q Would it be fair to say that whatever Mr. Rivas drinks on other occasions has nothing to do with what he was drinking that evening?

A No.

Q It wouldn't be fair to say that?

A Oh, yes, it would. I'm sorry.

Q Now, did your girlfriend hear Mr. Rivas say, "Val, Val, I didn't mean to do it"?

A No, she did not.

Q And this was after Val had been buried?

A Pardon me?

Q This is after Valerie Hill had been buried?

A Uh, yes.

Q And you're certain that these were the exact words?

A I'm absolutely positive.

Q And he didn't say, "Val, Val, I didn't mean to kill you"?

A No, he did not.

Q He didn't say, "Val, Val, I didn't mean to assault you," did he?

A No, he did not.

Q And you took these words as important, did you not, sir?

A I did.

Q And this was, the importance you gave this, would you say it was based upon the same knowledge of your clairvoyancy in knowing how much he drank before you got there?

A I don't know. I don't understand the question, I guess.

Q Now, you said that you knew Hector before this April occasion of '87?

A Yes, I did.

Q And you did not believe that Hector was guilty, according to -- as to what you said here today?

A That's correct.

Q Do you know if anyone else was in earshot of this particular statement that Mr. Rivas allegedly made?

A I don't believe so.

Q Do you know where the bartender was, in relation to Hector Rivas and yourself?

A No.

Q You don't know for a fact that Hector did not know you were there, do you?

A That I what?

Q I'll withdraw that question and see if I can restate it another way.

You mentioned that, in fact, your girlfriend got up to use the restroom?

A That's correct.

Q And you, you got up to help her move away from the bar, so to speak?

A Yes, yes.

Q And your girlfriend left?

A Yes, she went to the bathroom.

Q And you remained?

A Pardon me?

Q You remained?

A Yes, I did.

Q So you don't know if Hector knew you were there or not, do you?

A No.

Q I have nothing further. Thank you.

<u>REDIRECT EXAMINATION BY MR. FITZPATRICK</u>:

Q Mr. Fields, I don't know if this really needs clarification, but I'll do it anyway. When you got there, before you had seen Mr. Rivas have anything to drink, it was your judgment as a bartender for a number of years, and seeing people that hac

been drinking, that he was intoxicated?

A Yes.

Q And you had served him rum and cokes in the past?

A Yes.

Q All right. Thank you.

THE COURT: You can step down, Mr. Fields. Thanks. Thanks.

THE WITNESS: Thank you.

(Witness excused.)

MR. FITZPATRICK: Kelly Williams.

THE COURT: Step right up here, ma'am.

* * *

K E L L Y W I L L I A M S G R E Y, called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Kelly, good afternoon. Thank you for waiting so patiently. Would you tell the jury, please, your full name?

A Kelly Williams.

Q And Kelly, where do you live?

A Cazenovia.

Q How long have you lived there?

A I've lived there since 1985.

Q What do you do for a living?

A I work on computers at Crucible Steel.

Q How long have you done that?

A Since 1985.

Q And are you married or single?

A I'm divorced.

Q And back in March of 1987 and April of '87, did you date a person by the name of Joe Fields?

A Yes.

Q I want to take you back to springtime of '87, and ask if you recall being at Albert's bar with your boy friend, Joseph Fields, on a particular night.

A Yes.

Q And on this particular night, do you remember seeing Hector Rivas?

A Yes.

Q And can you be specific as to what night this was?

A No, I can't.

Q Do you remember what day of the week it was?
A It was either a Friday or a Saturday.
Q And do you recall seeing Hector Rivas and Joe Fields together at some point at the bar?
A Yes.
Q And do you remember about what time of night this was?
A Eleven or so.
Q Where were you when you saw them together?
A I was four or five feet from them.
Q What were you doing?
A Standing.
Q The best you remember, you were standing there?
A Yes.
Q Did you see a visible reaction from your boy friend as to something that Mr. Rivas said?
A Yes.
Q Did you hear what was said?
A No.
Q Did your boy friend, Mr. Fields -- don't tell us what he said -- but did he tell you what Mr. Rivas said?
A Yes.
Q Okay. And do you remember what that was, without telling us? Just yes or no.

A Yes.
Q Okay. Thank you very much, Kelly.
I'm sorry, I have one quick -- one quick question. Would you describe your boy friend's demeanor as he told you that?
MR. CALLE: Objection.
THE COURT: Excuse me. There is an objection pending. I'll allow it. You may answer.
A Shocked.
Q All right. Thank you very much.

CROSS-EXAMINATION BY MR. CALLE:

Q Ms. Williams, when was the first time you gave this information to Syracuse authorities?
A January 1993.
Q Where were you six years ago?
A Pardon?
Q Where were you six years ago when Valerie Hill was murdered?
A I was afraid.
Q And now you're not afraid?
A I'm still afraid.
Q Is that correct? But you came forward after the

indictment of Mr. Rivas, is that a fact?

A I was contacted.

Q You know Valerie Hill was dead -- she was dead two weeks. Theoretically you get information from your boy friend, which leaves him shocked and dumbfounded, and nobody does anything in the name of Valerie Hill, is that correct?

A Correct.

Q Did you come forward to the authorities, or did they come to you in 1993?

A They came to me.

MR. CALLE: I need a moment, your Honor.

THE COURT: Sure.

(Proceedings paused.)

BY MR. CALLE:

Q Do you recall Albert's bar that evening?

A Yes.

Q Okay. Tell me what it was like at the bar area in relation to the number of patrons.

A An average weekend evening.

Q What does that mean?

A Anywhere from twenty to thirty people.

Q At the bar?

A Yes.

Q And you said you were standing, is that correct?

A Yes.

Q Is that because there was no seat for you?

A I can't remember.

Q But you were standing. Was Joe Fields standing?

A Yes.

Q And when you came in -- did you know Hector Rivas prior to coming in that evening?

A Did I what?

Q Did you know Hector Rivas prior to going into Albert's on the evening in question?

A Yes.

Q And did you see him at the bar?

A Yes.

Q And where was he sitting at the bar?

A Down at the end. There is a, a booth at the end. They were -- Joey and Hector were standing down there.

Q At the booth?

A In front of it.

Q In front of the booth. Okay. Would that be the short -- is it fair to say that Albert's bar is an L-shape?

A Yes.

Q And what side of the L would that booth be on?
A The short end.
Q So they were standing in front of the booth behind the bar on the short end of the L at Albert's?
A Between the booth and the bar.
Q Was anyone sitting on stools in front of them?
A I can't remember.
Q Do you remember if anybody else was in the general vicinity of Joe and Hector?
A I can't remember.
Q What is your relationship with Joe Fields now?
A We're friends.
Q Did you marry him?
A No.
Q You were dating at the time?
A Yes.
Q Do you know if Joe Fields has gambling debts?
A No, I don't.
Q Was Hector talking to anyone else other than Joe at the time?
A I don't know.
Q Now, at the very moment when Mr. Rivas allegedly said something to Joe Fields which you were there to observe the shocked look on Mr. Fields' face, what were you

doing?

A Standing.

Q Were you going anywhere?

A No.

Q Were you drinking anything?

A Most likely.

Q Where is the ladies room in relation to where you were standing by this booth with Mr. Rivas and Mr. Fields?

A It's in the back of the building.

Q Was it anywhere near where you were standing?

A No.

Q So is it fair to say, neither you, nor Hector Rivas, nor Joe Fields, was sitting at the bar at the time this statement was allegedly made?

A Yes.

Q Where was Mr. Rivas' hands at that time, if you recall?

A I don't know.

Q Well, was he drinking?

A I assume so. I don't know.

Q Do you know how many drinks he had during the course of the time you were there with Joe?

A No.

Q Didn't buy you any?

A I don't remember.
Q Did he buy Joe any?
A I don't remember.
Q Now, did Joe buy you any?
A Me?
Q Yeah.
A Yes.
Q That you remember?
A I was dating him.
Q Thank you very much.

THE COURT: Any redirect?

MR. FITZPATRICK: All set. No, thank you. Kelly, thanks very much.

THE COURT: Thank you very much. Watch your step coming off there, ma'am. Thank you.

(Witness excused.)

MR. FITZPATRICK: Judge, I have two more witnesses; they're very short, but one of them is coming in from Florida and should be here for tomorrow afternoon session. If we could adjourn until then?

THE COURT: Okay. Ladies and gentlemen, what we'll do is we'll break for today. And because of scheduling of witnesses, we won't

reconvene until 2:00 tomorrow. So you won't have to be here until 2:00 tomorrow, then I'll ask you to be in the jury room until that time.

Of course, the same admonitions as I've said to you every time: you are not to form any opinions about the case; you're not to talk about it with anybody else; certainly don't begin to read about this or watch anything about it in the news media; don't go visit any place or do any independent research. And I'll see you back in that jury room 2:00 tomorrow. You're excused.

(The proceedings of March 22, 1993 were adjourned at this time.)

* * *

C E R T I F I C A T E

I, PATRICIA A. ALEXANDER, C.S.R.-R.P.R., an official reporter of the Supreme and County Courts, Fifth Judicial District, State of New York, do hereby certify that the foregoing is a true and correct transcript of my stenographic notes taken in the foregoing matter, at the time and place first herein mentioned.

Patricia A. Alexander
PATRICIA A. ALEXANDER, C.S.R., R.P.R.
Official Court Reporter

September 16 1993
DATE

S T A T E O F N E W Y O R K
COUNTY COURT : COUNTY OF ONONDAGA

COPY



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

Indictment Number 92-1114-1

-against-

Index Number 92-2794

HECTOR M. RIVAS,

Volume V

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Onondaga County Courthouse
401 Montgomery Street
Syracuse, New York 13202
March 23, 1993

B E F O R E : HONORABLE J. KEVIN MULROY, County Court Judge, and a Jury.

A P P E A R A N C E S :

WILLIAM J. FITZPATRICK, ESQ.
Onondaga County District Attorney
Onondaga County Civic Center
421 Montgomery Street
Syracuse, New York 13202

RICHARD J. CALLE, ESQ.
Attorney for the Defendant
5701 Northern Boulevard
Woodside, New York 11373

PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

I N D E X

WITNESSES PAGE

BEVERLY G. DORLAND

Direct Examination by Mr. Fitzpatrick. . . . . . . . 846

Cross-examination by Mr. Calle . . . . . . . . . . . 852

ERIK K. MITCHELL

Direct Examination by Mr. Fitzpatrick. . . . . . . . 865

Cross-examination by Mr. Calle . . . . . . . . . . . 892

Redirect Examination by Mr. Fitzpatrick. . . . . . . 915

SUSAN STONECIPHER

Direct Examination by Mr. Calle. . . . . . . . . . . 925

Cross-examination by Mr. Fitzpatrick . . . . . . . . 933

Redirect Examination by Mr. Calle. . . . . . . . . . 937

# E X H I B I T S

| PEOPLE'S NUMBERS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| 7 | The Dark Tower, Book by Stephen King | - | 919 |
| 28 | Bacardi Rum Bottle | - | 920 |
| 30 | Fingerprint Pages | - | 920 |
| 34 | Blue Nun Wine Bottle | - | 921 |
| 35 | Brass Ashtray | - | 921 |
| 55 | Blue Bathrobe | 844 | 878 |
| 56 | Sash from Blue Bathrobe | 844 | 879 |
| 57 | Photograph | 844 | 921 |

| DEFENDANT'S EXHIBITS | DESCRIPTION | MARKED | REC'D |
|---|---|---|---|
| J | Affidavit of Susan Stonecipher, Dated 3/30/87, Two Pages | 927 | - |

(Court, counsel, and the defendant are present. Proceedings began at this time.)

THE COURT: Would you put us in session then. And would the record reflect that counsel is present, the defendant is present. We are outside the presence of the jury.

We're going to discuss a witness that may be called by the People, Randall Hill. And, Mr. Fitzpatrick, we had had some discussion on this point prior to breaking yesterday, I guess. And is it still your desire to call Randall Hill and use that testimony under the present sense impression exception carved out by the Court of Appeals?

MR. FITZPATRICK: Yes, your Honor, I would, under that theory, and also as an excited utterance on the part of the deceased.

THE COURT: Okay. Mr. Calle, I know you've had a chance to review some of the case law in this matter. Do you have some comments or objections to that testimony coming in?

MR. CALLE: Yes, I do, Judge. Thank you for that. Defense would object. I believe that what we did yesterday with Elizabeth Lewis,

and I stand to be corrected, Mr. Fitzpatrick, but I believe that Ms. Lewis was in an attempt to, by the People --

THE COURT: Shut the door -- excuse me. Could we -- hey, sir, this isn't a restaurant, you know. Let's just get the people in here.

MR. CALLE: Judge, I believe it was an attempt by the office of the district attorney to get hearsay admitted, based on hearsay. I believe the case law that the district attorney is talking about in his first basis for the allowance of Mr. Hill to be recalled is, in fact, the People versus Brown, that was in the law journal, I believe, of March or February 18th, 1993.

Under that particular case, it was a basis in that the defendant -- there was some independent evidence that there were prior threats, prior abuse, and there was also an independent eyewitness.

On this particular case, there is no eyewitness account of threats; there is no record of abuse with the police, Alvord evidence; there's no independent eyewitness of

the alleged following of Miss Hill in her vehicle by Mr. Rivas in his vehicle on the 27th, when she was going to Candy's to have dinner with her dad.

Judge, I don't believe there's any corroborating observations, not that the Court, this Court must find corroborating observations, but there should be some independent validity to the account that is offered at this time: statements offered, made by eyewitnesses having an opportunity to observe and verify all or part of the events here. There is no eyewitness who had opportunity to observe and verify all or part of the event, being the following of Miss Hill by Mr. Rivas.

Judge, I would say that there were -- that the following are not sufficient or corroborated by Ms. Elizabeth Lewis. Ms. Lewis testified that on the 27th she had a telephone conversation with Miss Hill, and Miss Hill said that she, she was being followed earlier that day on the 27th. According to Miss Hill's (sic) grand jury testimony, I believe that she was sufficiently impeached, her grand jury testimony contradicts

herself.

There were questions asked and it's on the record as to when she had a conversation with her, and her answer was March 20th, 1987. And then she recounts, which is pretty much the same conversation she attributed yesterday on direct examination to that conversation on the 20th.

I believe subsequent to giving the same account, attributing it to March 20th, 1987, in the grand jury in 1992 she's now stating that this conversation took place on March 27th. I believe that her testimony is incredible. I believe that it's -- it was designed to allow Mr. Hill to, in fact, come up and testify.

I'm not casting dispersions on Randall Hill at this time. I'm just saying that I don't believe -- I don't believe -- here is what I'm saying, Judge: I think in the Court's discretion, the Court has to make a decision based upon safeguards, the reliability of the account, the believability of it.

I also, Judge -- I don't believe that it was made naturally in the present sense. I

don't believe that Miss Hill's statements were made to begin with, but that's not important. But, Judge, I argue against the fact that she was excited when she entered the -- when she entered the restaurant. She didn't tell her father, "Hector Rivas followed me, and he's outside waiting. Hector Rivas is out in the parking lot; he followed me here."

She left her house and she drove to the restaurant. She may or may not be correct in that Mr. Rivas was following her, but it wasn't to the point where, in fact, she stated that he kept up with her. According to the testimony, based upon my recollection, she lost him after going through certain other streets.

So I can't see how she was excited anymore at that point, basically, she was a half-hour late. It wasn't like she drove directly there. Evidently she took her time getting there, and I don't believe that she was excited at the time that she made these utterances, and I don't believe that it's an exception to the hearsay rule, based upon law.

I believe the Court in People versus Brown

said before present sense impression testimony is received, there must be some evidence, in addition to the statements, themselves, to assure the Court that the statements sought to be admitted were contemporaneously or spontaneously within the events described.

I don't believe that that is the case here. However, I'm not the judge. And, your Honor, thank you.

THE COURT: Okay. I think, to begin with, we should point out that, as the Court of Appeals does, that before we can have this type of testimony, present sense impression testimony, before it can be received, there must be some evidence in addition to the statements, themselves, to assure the Court that the statements sought to be admitted were made contemporaneously and spontaneously with the events described.

Now, let's go back to -- a little bit here. Obviously, the Court of Appeals has rejected the notion that corroboration must be had by an eyewitness or a person who was present with the declarant and who observed the same

events. They've expanded it beyond that. We have to establish that the statements were made under stress and of nervous excitement for the event, and before there's been time elapsed that would indicate time to contrive or misrepresent the, the events.

There's got to be some evidence in this case that clearly points to some events. Now, the district attorney has sought to establish that this defendant was in the area of the, of the victim, the declarant's house, from 2:00 right up until about 4:30. And then we have Ms. Lewis' statements made regarding a conversation with the victim. There's no other evidence that the defendant was in the area of the victim's home or the victim, herself, until at least 9:00 that evening.

This Court is not going to allow the testimony of Randall Hill as to statements made by Valerie Hill when she entered the restaurant to the effect that the defendant was in the area, or had followed her from her home to some portion near the restaurant, on the grounds that there has not been established enough

testimony that would link the defendant to the area of the victim's home at 5:30 that evening, or 6:30 that evening when the victim drove from her home to the restaurant.

I think there's -- I'm using my discretion in this case, but I don't think there's been sufficient corroboration of the circumstances surrounding the statements, and I'm not going to allow Randall Hill to retake the stand and to testify about the defendant's -- the victim's statements, nor do I think they fall under the excited utterance standard, since I don't think they were made contemporaneously with any event that could cause an excited utterance. They clearly fall under the present sense impression, and I'm not going to allow it.

Would you get the jury, please.

MR. FITZPATRICK: I take Exception.

(Bathrobe, Bathrobe Sash, and Photograph were marked for identification as People's Exhibit Numbers 55, 56, and 57, this date.)

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Good afternoon, ladies and

gentlemen.

COURT ATTENDANT: Good afternoon, your Honor.

THE COURT: Good afternoon. Here again, the jury, counsel, defendant.

Mr. Fitzpatrick, would you call your next witness.

MR. FITZPATRICK: I will, Judge, thank you. Beverly Dorland.

Good afternoon, everybody.

(The jurors collectively responded, "Good afternoon.")

THE COURT: Hello. Good afternoon.

MS. DORLAND: Hello.

THE COURT: Pull this microphone over. Yeah, you can do that. Thank you. Pull it over to you.

MS. DORLAND: Okay.

THE COURT: I'll ask you to keep your voice up nice and loud. If you don't understand the question that's been asked, ask them to repeat, all right?

MS. DORLAND: All right.

THE COURT: Thank you.

B E V E R L Y G. D O R L A N D, called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Ma'am, good afternoon. Would you tell us your full name, please?
A Beverly Grace Dorland.
Q And are you married or single, ma'am?
A Single.
Q Could you tell us what you do for a living?
A I'm an antique dealer.
Q And where do you live?
A Florida.
Q You live there year-round?
A No.
Q What year -- what months out of the year do you live in Florida?
A Up until April or May, depending on the season for doing shows here.
Q And where do you live when you are up in the Central New York area?
A Nelson Heights Road in Cazenovia.
Q And could I ask where you lived back in March and

April of 1987?

A Nelson Heights Road.

Q I see. And were you also single back then?

A Yes.

Q Oh. Had you been married prior to March and April?

A Yes, I had.

Q When did you get divorced?

A About seven months prior to this.

Q Prior to March of '87?

A Right.

Q Did you know the deceased, Valerie Hill?

A No, I didn't.

Q Do you know the defendant in this action, Hector Rivas?

A Yes.

Q And you're looking to your right. Is this Mr. Rivas in court today?

A Yes.

Q And how long had you known Mr. Rivas prior to March 27th of '87?

A Well, I had known of him, you know, I had seen him around town for over a year probably, but I had known him for about three and a half weeks.

Q Three and a half weeks. Had you ever dated him?
A No, not really.
Q Did you ever socialize with him --
A Yeah.
Q -- around?
A Yes.
Q And you were a friend of his and he a friend of yours?
A Yes.
Q Okay. I'd like to ask you what you were doing for a living back in March of '87?
A I was a dance teacher.
Q And do you remember -- and, Beverly, there's a calendar in front of me here.
I'd like to ask you if you remember going out the night of March the 27th of 1987?
A Yes.
Q And did the police question you about these events?
A Yes, they did.
Q Six years ago?
A Yes.
Q What time did you go out on Friday, March the 27th?

A After 10:30.
Q And did you go out with anyone?
A No, I went out myself, but it was to meet Charlie DeVaul and Dick Cargill who had said they were going to be out that evening. They were in the antiques business also.
Q And where did you go at 10:30?
A Down to Albert's in Cazenovia.
Q And that's a restaurant-bar?
A Yes.
Q And when you got to Albert's, what did you do?
A Had a few drinks, socialized with the people around me.
Q That evening or early the following morning, did you see Hector Rivas at Albert's?
A Yes.
Q Did you see him come into the bar?
A Yes, I did.
Q And you're certain of that?
A Positive, yes.
Q And what is your best recollection as to what time it was Mr. Rivas came to the bar?
A After 12:00, probably between 12:30 and 1:30.
Q And did you have any conversation with him?

A Yes.

Q Was that right away?

A No, it wasn't.

Q Tell us what you observed as Mr. Rivas entered the bar?

A All right. As he entered the bar, we made eye contact. And the words that went through my mind were, "My God, Hector, what did you do?" And as he started to go down the aisle, I said, "What is wrong with Hector? Something terrible is wrong with him." And I -- he usually, at that point, would have stopped to talk to me, and instead, he didn't.

I was going to say, "What is wrong," you know, and he continued on down to the bar, down the bar, and started to talk to two people at the other end. It was about five to eight minutes before he came back and did talk to me.

Q Go ahead.

A By that time, everything was fine. I kind of searched about to see if there was a problem, and there didn't feel like there was anything wrong. He was totally normal.

Q Did you have a conversation with him?

A Yes.

Q And how much time did you spend in his company from that point on, from 12:30 a.m. onward, or 1:30 a.m. onward?

A Well, we probably talked at the bar twenty minutes to a half an hour, and it was suggested that we all go out to breakfast. I believe it was his idea, but I'm not certain whether it was his or Charlie's. And Charlie asked Hector if he would bring a young woman home that needed a ride, and he said that he would do that and meet us later.

So, um, Charlie and Dick and I went into Syracuse to go to breakfast, and he joined us later.

Q So how much time was he out of your company?

A Probably an hour or so.

Q And he, he did meet you later that morning?

A Yes.

Q Do you remember where that was?

A It was at Perkins.

Q And did you, in fact, have breakfast with the defendant?

A Yes.

Q And how did you leave Perkins?

A Um, I went home with him in his car back to Cazenovia, anyway, home being Cazenovia. I had my own car

parked by Albert's, and he dropped me off at my vehicle.

Q All right. And I think that's all I have, Mrs. Dorland. Thank you very, very much.

If you'll stay right there, Mr. Calle is going to have some questions for you.

CROSS-EXAMINATION BY MR. CALLE:

Q Hello, Ms. Dorland.

A Hello.

Q Are you an entertainer?

A I have been.

Q Of course you mentioned on direct examination that you, depending upon the show, was it, or did you say snow?

A Uh, probably show, I did. I'm an antiques dealer now, and what -- when we go to shows where we buy and sell, it's called antique shows.

Q I see.

A And then I was a dance teacher, so -- we put on shows, too.

Q Did you know Hector before March 27th, 1987?

A Yes, for about three and a half weeks.

Q Three and a half weeks before March 27th?

A Yes.

Q Did you know him after March 27th?

A Yes. I saw him, you know, once thereafter, I believe, also in Albert's.

Q Okay. Did you ever know that he was dating Valerie Hill?

A I had heard he was dating someone. And about a year prior, I had seen him out with an attractive young woman, but I didn't know her or meet her. I didn't really know him then either, so --

Q On March 27th, 1987, did you know that Hector and Valerie Hill's relationship was just about over, if not completely over?

A Yes. I felt that it was over, um, even three and a half weeks prior to that, I did. I had been at his home inquiring about buying property. I had some money to invest and I had, had heard that he had property and knew how to purchase it with low money down, so forth. And I was at his home and there were two gray cats there at the time, and I inquired about them. I'm an animal lover. And he told me that they were his ex-girlfriend's, and that he was tending them for her.

So when he said ex, I assumed the relationship was over.

Q And that was about February of 1987 that he had

Valerie's --

A No, that was probably early March. It was about three weeks before.

Q So early March Mr. Rivas had Valerie Hill's cats over his house, taking care of them for Valerie Hill?

A That's what he told me, yes.

Q Did you know -- did you ever go over to Mr. Rivas' house any other time, other than that time?

A No.

Q So you had no reason to doubt that they were Miss Hill's cats, did you?

A No.

Q Now, directing your attention back to March 27th, Ms. Dorland, if you would, please, what did you do prior to going to Albert's?

A I was at home. I taught until late. I was teaching dance, and so I taught until late, came home, ate, fed my animals, took care of them, and decided later on to go out.

Q And now you went to Albert's at about 10:30 at night?

A Well, after 10:30. I don't know how close to 10:30 it was. It was probably between 10:30 and 11.

Q You went directly from your home?

A Yes. It's two and a half miles from my home to Albert's.
Q By the way, what street did you live on at the time?
A Nelson Heights Road.
Q Is that the street that Mr. Rivas lived on?
A Yes, it is.
Q Did you notice if he was in his house, if the lights were on when you left your home to go to Albert's?
A No, I didn't.
Q So you never dated Mr. Rivas. You get into Albert's on the 27th of March, 1987, around 10:30 or later. And sometime between 12:30 and 1:30 the following morning, the 28th, Hector Rivas comes in Albert's?
A That's correct.
Q And tell me, did you know he was there prior to you getting there?
A He wasn't there. I saw him come in.
Q Now, listen to the question, Ms. Dorland, if you would: Do you know if Hector Rivas was there?
A Was where?
Q At Albert's at any time before you arrived?
A No, that I don't know.
Q Well, Ms. Dorland, with all due respect, you said

you didn't know.

A How would I know if he was there before I had arrived? When I arrived, he was not there, and I saw him walk in.

Q Okay.

A I assumed that was the first time he had come in that evening.

Q You made an assumption?

A Yes.

Q You had no basis in fact for that assumption, did you?

A Well, I don't know. There weren't any other places really in town open in those days. So if he had left -- why would he leave? Where would he go? And why would he come back?

Q Well, is there another place called The Tavern?

A There is now. I don't know that there was then. I don't believe there was then.

Q Where is The Tavern located now?

A It's east of Albert's.

Q How far east, in relation to Albert's? A block away?

A About four buildings.

Q Four buildings away?

A Right.

Q Well, if I were -- well, what are the hours? Is The Tavern open at night? Is that a bar, to the best of your knowledge?

A Well, I haven't been there in a long time. As I say, I'm living in Florida, so, yes, it was open at night when it was open, but I believe it opened after this incident. I don't believe it was open at the time.

Q Well, you can be incorrect on that, could you not, Ms. Dorland?

A I beg your pardon?

Q You could be incorrect --

A Yes, I could.

Q -- on that assumption, also, could you not?

A Yes.

Q Now, there came a time when Hector made eye contact with you when he came into Albert's, correct?

A That's right.

Q And at that time, he didn't go over to you. He went to two other people, some other area inside Albert's, correct?

A That's correct.

Q Okay. Did you expect him to go over to you?

A Yes. He always had for three and a half weeks

that I had known him. Whenever we were at the same place, if I had arrived first, he always did go -- come over to me and then if he -- he may only speak to me for a few minutes, and then just go and speak with someone else, and then come back and talk to me. So it was unusual for him not to stop there first.

Q So did you feel slighted that he didn't stop at you first?

A No.

Q Do you know who he went over to talk to?

A I believe it was a man and a woman, but, no, I didn't really pay much attention to who he went to. It was very crowded that night.

Q Was Albert's usually crowded at 10:30 at night on Friday?

A Very, yes.

Q So these two or three people Hector went over to, they weren't locals, to your knowledge?

A I have no idea whether they were locals or whether they weren't.

Q You didn't know them?

A I didn't pay attention to whether I knew them or not. Actually, I don't know that I knew them or I didn't know them.

Q By the way, who were you with, Ms. Dorland?

A I had just gone down to meet, you know, Charlie DeVaul and Dick Cargill. Dick is an antique dealer. I was in the antiques business part time at the time, and Charlie DeVaul is an auctioneer that I've known all my life, since I was a little girl.

Q Now, is it your testimony that approximately eight minutes later, Hector came by and spoke with you?

A That's right, five to eight minutes later, short time after.

Q Okay. And were your words that there was nothing wrong then?

A Right.

Q Okay. So Hector enters the bar; you have this question in your mind as to why Hector looked so bad. And then eight minutes later, there's nothing wrong with him --

A Right.

Q -- according to your testimony?

A Right. Normally, if I --

Q Ma'am, ma'am --

A -- seen him look like that, I would have asked him what was wrong with him.

THE COURT: Ma'am --

THE WITNESS: Yes?

THE COURT: Try to focus in on just answering the questions.

MR. CALLE: Thank you, Judge.

BY MR. CALLE:

Q And then you had a half-hour conversation with Hector that evening, correct, Ms. Dorland?

A Yes.

Q And during the course of that half-hour conversation, did he appear to be disturbed or in any way that something was wrong with him?

A No.

Q At that point?

A No.

Q Did he appear to be any different than he was --

A No.

Q -- for the three and a half weeks you knew him before?

A No, not at all. He seemed fine.

Q Was he drunk --

A I don't think so.

Q -- to the best of your observations?

A I don't think so.

Q And did he buy you a drink?

A I don't remember, but probably. He was usually --

Q Do you remember -- go ahead, I'm sorry.

A I said I don't really know, but probably. He usually did. He bought drinks for a lot of people.

Q I'm sorry. Ms. Dorland, do you know if Mr. Rivas had a special drink he called his own?

A I don't.

Q Then a half-hour after you talked with Hector, and nothing seemed to be wrong with Hector since the five to eight-minute conversation he had with two or three other people, someone mentions that they go to breakfast, is that correct?

A That's right.

Q Okay. And at that point, Hector is requested by some other person to perhaps drive someone home, is that correct?

A Right.

Q Okay. Do you know what that girl's name is?

A Um, just from, from reading the affidavit, not by my own real knowledge. I guess it was Karen Fitzsimmons.

Q Okay. So Hector accommodates Miss Fitzsimmons and drives her home, to the best of your knowledge?

A That's right.

Q They left together?

A Right.

Q And did you all leave together?
A No.
Q Did you all exit Albert's door together?
A Approximately, within the same few minutes, yes.
Q Okay. And what was the mood at the time?
A Fine.
Q Is that -- was everyone having a real good time?
A Yes.
Q No one was a drag?
A No.
Q Not even Hector?
A No.
Q He wasn't disturbed?
A No.
Q Did you -- you didn't say, "Oh, my God. What's the matter with this guy"?
A No.
Q "Oh, my God. What did he do to himself," did you ever say anything to -- those things during the course of your interaction with him that evening?
A No, not after the initial --
Q Understood. Thank you.
You went to Eggplant that night, early Saturday morning?

A We were going -- that was our intended place we were going to go to, Eggplant, and I don't really know why we didn't end up there, whether it was too crowded or we just decided against it, or what.

Q Well, where did you wind up?

A We winded up at Perkins.

Q Perkins. My mistake. Did you tell Hector you weren't going to -- did anyone tell Hector --

A Well, somehow he found out, so I don't know how that happened. Perhaps he went to the Eggplant and didn't find us there, and went to Perkins, or maybe we called Karen's house. I don't know. Possibly Charlie did that. I don't know how he ended up finding us.

Q But you all seemed to be taking care of one another as friends this evening, correct?

A Right.

Q Did anyone remark to you, "What's the matter with Hector," during the course of that evening?

A No.

Q Then there came a time that you ate your breakfast, correct?

A Correct.

Q Anything unusual or disturbing occur during the breakfast meal?

A No, no.

Q Were you all laughing and carrying on?

A Yes.

Q It was six years ago; I guess it was a memorable occasion for you, Miss Dorland?

A Well, due to this it has become one, yes.

Q Then, Ms. Dorland, Hector drives you back to Cazenovia?

A That's right.

Q And he drops you off at your vehicle?

A Right.

Q Did he make a pass at you?

A No. He invited me back for a glass of wine.

Q I beg your pardon?

A He invited me back for a glass of wine to his home, but it was very, very late and we decided against it. But, no, he was perfectly polite.

Q Thank you very much.

THE COURT: Mr. Fitzpatrick.

MR. FITZPATRICK: Nothing, thank you, Beverly.

THE COURT: Thank you, ma'am. Watch your step coming off.

MR. FITZPATRICK: All set, your Honor.

(Witness excused.)

THE COURT: Yes, sir.

MR. FITZPATRICK: Your Honor, my final witness is Dr. Erik Mitchell.

THE COURT: Can I see you two at the bench, please.

(Counsel approached the bench. An off-the-record discussion ensued.)

* * *

E R I K K. M I T C H E L L, called as a witness on behalf of the People of the State of New York, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. FITZPATRICK:

Q Doctor, good afternoon. Would you be so kind as to tell us your full name and what you do for a living?

A Erik Krag Mitchell. I'm medical examiner for Onondaga County.

Q How long have you been medical examiner for this county?

A Since September of 1983.

Q And as medical examiner, would you tell the ladies and gentlemen of the jury, what your duties are?

A I'm responsible for the investigation of those deaths within this jurisdiction where there's a belief that a nonnatural event may have played a role in that death, or whether there's no physician available who can sign the death certificate.

In accordance with this set of duties, I also am engaged in other activities related to the investigation of death-injury in both living and the dead.

Q Do you, as a routine, respond to unnatural death scenes within this county?

A Yes.

Q And could you tell the jury, please, a little bit about your professional and educational background?

A Yes, sir. I graduated from Cornell in 1972, after which I came to Upstate Medical Center and got my M.D. in 1976. This was followed by a four-year training program in anatomic and clinical pathology. That would be, respectively, the study of the body's tissues and of the body's fluids and excretions, as they relate to an

understanding of disease and injury.

This was followed by a subspecialty training as an assistant to the chief medical examiner in Chapel Hill, North Carolina, with the further training being in forensic pathology or the legal aspects of pathology, understanding more of the mechanism by which someone is injured or dies.

Q Would you tell the jury, please, what an autopsy is?

A Well, an autopsy, for me, optimally has three phases: It will begin with an examination of the body of the deceased at the site of discovery, or at the location of injury and death; then it will proceed to an external examination of the body under controlled circumstances in my office; and, finally, to an internal examination of the body.

Now, during these various stages of investigation, a variety of types of documentation may be produced, and a variety of types of materials checked for further analysis.

Q Do you consider some of those materials in making any medical determinations in connection with your autopsy?

A I do.

Q And in the course of your professional career, Dr. Mitchell, approximately how many autopsies have you

performed or participated in in performing?

A I don't keep an account. It's over four thousand. But I, I have not -- I've kind of run out of fingers, so I don't know the number.

Q Now, sir, did you have occasion to respond to 248 Hickok Avenue sometime during the afternoon of March 30th, 1987?

A I did.

Q Do you remember what time it was that you got there, sir?

A I was there in the midafternoon, sometime between 3 and 4, to begin with. Before that, some members of my staff had been there preliminarily.

Q Did you observe the body of the deceased white female?

A I did.

Q And you subsequently learned her name to be Valerie Hill?

A Yes.

Q What observations at the scene did you make of the deceased, Valerie Hill?

A Well, the decedent was lying on the floor, a carpeted floor. And had some sort of nightshirt, and then over that nightshirt, a bathrobe. And then around her neck

had a cord that, that was of the same type of material of the bathrobe. It appeared to be the sash from the bathrobe. The body was face down. It was in rigor, which means that the musculature had stiffened and the -- it had begun to turn purple on the down side, which is a process we call livor or livor, depending on where you're trained.

There was some smearing of fecal material on around the anus, and then around the lower extremities.

Q Could you tell the jury what rigor, or rigor mortis is?

A The rigor, rigor mortis is the stiffening of the muscles that occurs after you die. Now, it has a very, very variable onset. And it has a somewhat variable pattern. What happens is that the chemicals that normally allow you to contract and utilize your muscles will, after you die, be released within the cells, and the cells will use up those chemicals. And as they do, the muscles are very stiff.

Rigor usually starts in the jaw and then it may start in the lower extremities, or it may start in the upper extremities. Eventually the whole body will become stiff. After a while, the chemicals that are responsible for this process are used up. And when they are used up, the body, once again, will become soft.

So there is a process of rigor where you stiffen, you go into rigor, you're in rigor for a while, and then you loosen. The factors that affect rigor would be primarily temperature, but also factors of physical activity and basic body condition.

There are a number of factors, I'm sure, also, that we do not understand and --

Q You also used the expression "livor." Would you tell the jury what livor, livor mortis is?

A Livor mortis, or livor mortis, depending on how you want to pronounce it, is the settling of blood that occurs after you die. If you consider your body rather like a sponge during life, fluid is being moved through that sponge by the energy of the heart.

Now, once you die, you are no longer pumping that fluid, and some will go to the side that is down. If you are lying face down, it will tend to go towards your face. If you're laying face up, the blood will tend to go to your back. If you're standing up, it would go towards your feet.

And so we look for livor and we look for how livor sets in to give us an indication of body position, or whether the body has been moved. And we also look at it to give us some indication of how long a body may have been in a

given location.

Livor originally will move around if you move the body, but after a while, the blood starts to seep out of the blood vessels into the tissues, and then you end up with something called fixed livor. In other words, livor that doesn't move when you move the body, because the blood is no longer able to move. It's no longer in the blood vessels.

Q Was livor fixed upon your observing Miss Hill's body?

A There was fixed and unfixed livor.

Q Was the livor -- was the fixed livor consistent with the position that you found her in in the living room?

A Yes, sir.

Q Now, was her body removed to the medical examiner's office?

A Yes, sir.

Q And that is located where?

A That's 330 West Onondaga Street.

Q Did you supervise the removal of the body?

A Yes, sir.

Q And upon returning to your offices at West Onondaga Street, did you conduct an external examination

of Miss Hill's body?

A I did.

Q And would you tell us what, if anything, you observed?

A The -- we began -- had the processes that have been described. She was coming out of rigor; in other words, she had gone into rigor, and it was possible while we were still there, it was fairly easy to break the process.

When somebody is in full rigor, right in the middle of the process, the muscles tend to be very, very stiff, and it's difficult to manipulate the extremities because of their rigidity. With her, it was fairly easy to break the rigor. She had a very dense purple discoloration of part of the face, with small petechiae. These are small hemorrhages into the skin surfaces above the level of the sash that was around the neck.

Below the level of that sash there were none of these petechiae. Now, the reason that I break the petechiae pattern down into above versus below, is that if you have a blood pressure and a lack of oxygen at an elevated blood pressure, especially in the veins, then you will tend to get small hemorrhages in the various tissue surfaces.

So the petechiae are evidence of the pressure

applied around the neck from the sash during life.

Q Could you tell the jury what a defensive wound is?

A A defensive wound is a wound that is incurred when you try to put between yourself and some potential threat of harm, one of your extremities. In other words, putting your hand or your arm or your leg up to ward off a blow or ward off other -- some other type of attack, and the types of wounds that we get under those circumstances we label as defensive wounds.

Q Did you observe any defensive wounds to the body of Valerie Hill?

A No, sir.

Q Did you next conduct an internal examination of Miss Hill's body?

A I did.

Q And what, if anything, did you observe in the way of trauma?

A There was a bruise that could not be well seen on the outside, because of the discoloration caused by livor, and the settling of blood. But to the right above the right eyebrow, there was a bruise that was red and swollen, and was something that had happened prior to the time that she lost blood pressure.

Further down, if you go and look inside the mouth, there were prominent petechiae, prominent hemorrhages into the mucosa; that is the lining of the mouth.

Then you get down into the neck, and in the neck there were hemorrhages of what we call the strap muscles. The strap muscles are a series of muscles that connect the front of the neck to between the area of the collarbone and the area of the tongue. And there were many hemorrhages into these muscles.

And also, there were two areas where you have bony or firm tissue in the neck: one place called the hyoid; it's a U-shaped bone. It's kind of like this (Indicating). And that U-shaped bone is at the base of the tongue. This particular bone when you're young, as was she, actually has two joints in it. Later on in life these may fuse and become a perfect bony U. She had hemorrhage involving one of the joints, and then she had fracture of the left side of the hyoid, in other words, the bone had been broken.

When you go to Adam's apple, larynx, the larynx, the voice box, there was, again, fracture of part of the bone -- of the bones, the projections of the larynx. There were a number of petechiae, these little hemorrhages we talk

about in the epiglottis. The epiglottis is the flap of tissue at the base of the tongue. It stands up something like my hand (Demonstrating). If you look into somebody's mouth, you can see that -- you can see it. And, again, if you block the blood flow out of the head during life, especially if there's a reduction in the amount of oxygen to the tissues, you will tend to get little hemorrhages, what we call petechiae, into the epiglottis.

Q Now, Doctor, I want to direct your attention to the bruise that you discovered upon your internal examination. First of all, can -- were you able to date that bruise, in terms of when it occurred prior to her death?

A Well, it was relatively fresh. I would expect it to have happened within twenty-four hours.

Q And would you, using your own head as an example, would you point to the jury as to where exactly the bruise was located?

A This was located on the right side of the head, right to the right of the right eyebrow (Indicating).

Q Could you make any determination as to whether or not such a bruise would have resulted in the victim being unconscious?

A It's not possible to say. It's possible that

unconsciousness resulted from that blow. It's also possible that there were -- unconsciousness did not result from that blow. There was no direct bruising of the brain.

Q So your opinion is that it's impossible to say?

A That is correct.

Q And would you tell us, in strangulation deaths, are you able to estimate the amount of time necessary that the oxygen has to be cut off from the brain for death to result?

A Well, there is a minimum time. If you allow some oxygen to get to the brain, you extend that time. So it can take quite a while for somebody to die in a strangulation death. But the minimum time would involve a couple of minutes to -- well, you can actually, if you block the carotids, you can probably knock somebody out within seven to ten seconds. But to have irreversible brain death is going to be closer to something along the lines of five minutes.

Q I want to show you some items here, sir, People's Exhibit 55. Can you identify that, Dr. Mitchell?

A Yes, sir.

Q What is that?

A This is the bathrobe removed from the body of Valerie Hill.

Q And Exhibit 56, can you identify that?

A Yes, sir.

Q What is Exhibit 56?

A This is the sash that is -- that appears to have the same type of cloth as the bathrobe that was wrapped around the neck, and which I removed. At the time I removed it, I cut it, but first I tied strings around the sash to preserve the wrappings around the neck, and then I cut between those two ties.

Q And why was it necessary to cut it?

A In order to get it off the neck.

Q I show you People's Exhibit 57, a photograph. Can you identify that, Doctor?

A Yes, sir.

Q What is Exhibit 57?

A Exhibit 57 is a picture of the deceased, taken to show the sash wrapped around the neck, and showing also some of the clothing around the upper chest, and showing a little bit of the right side of the head.

Q Do you know where the photo was taken?

A This photograph would have been taken -- well, I can't say for sure, somebody else -- it may have been a ruler of mine, but that is the ruler that is in there, is one that we have at the morgue, or is compatible to one

that we have in our morgue.

Q Does it show the shirt that she had on that you referred to?

A Yes, sir.

Q And was that the only clothing that she had on, the bathrobe and the shirt?

A Yes, sir.

Q And Exhibit 57, regardless of when it was taken, does it fairly and accurately portray the victim as she appeared at the time of your autopsy?

A Yes, sir.

MR. FITZPATRICK: I would offer 55, 56, and 57, your Honor.

THE COURT: Mr. Calle, any objection to 55, a plastic bag containing a blue bathrobe?

MR. CALLE: I'd like to see the photos, if I could, Judge, please.

THE COURT: Well, 55 is a plastic bag containing a bathrobe.

MR. CALLE: No, Judge. I hear you now. No, no objection.

THE COURT: All right. That's received.

(People's Exhibit Number 55 was then received into evidence.)

THE COURT: How about a plastic bag containing a sash or belt from that bathrobe?

MR. CALLE: No, sir, no objection.

THE COURT: All right. That's received.

(People's Exhibit Number 56 was then received into evidence.)

THE COURT: Now we're at Photo 57, or Exhibit 57, the photo depicting the victim with this object.

MR. CALLE: Yes, sir. I respectfully object, based upon the prior stated grounds.

THE COURT: I haven't seen it, so I'll reserve on it for now and we'll have a discussion at the end of the witness' testimony.

BY MR. FITZPATRICK:

Q Dr. Mitchell, in your opinion, would you expect someone to have suffered the type of death that Miss Hill suffered, to be able to speak during the strangulation period?

A This would depend upon the rapidity and the strength of force applied, you might be able to get some sound, but in this instance, we have fracture of the hyoid, a fracture of the larynx, so the likelihood is that the air was at least partially collapsed, inhibiting speech.

Q So your opinion is, speech would be unlikely?

A That is correct.

Q And did you see any evidence indicating that at the time of her death, the victim was menstruate?

A Yes, sir.

Q And what evidence did you see of that?

A There was a Tampax, and the endometrium was thin and red, that's the lining of the uterus, the endometrium.

Q You referred to some fecal matter being smeared on the victim's buttocks that you observed at the scene. Do you have that in mind, sir?

A Yes, sir.

Q Did you conduct an internal examination to see if there were any bruising or damage to the anus, itself?

A Yes, sir.

Q What, if anything, did you find?

A I found no evidence of any bruise.

MR. CALLE: I didn't hear that. I'm sorry.

A There was no evidence of any bruise.

BY MR. FITZPATRICK:

Q Did you find any evidence of semen or ejaculant?

A Not that I could see with the eye.

Q Did you have an opinion, Doctor, as to the

object -- or, strike that.

Do you have an opinion as to whether or not Miss Hill's anus was penetrated with something?

A Yes, sir.

Q And do you have an opinion as to what that something was?

A No, I can't say specifically what it was, no.

Q Can you say that it was or was not a male penis?

A It would be very unlikely to be a male penis.

Q Would you tell us why you find that, sir?

A The object that was inserted into the anus was then wiped, a wipe pattern of fecal material on the lower extremities. And to be able to do that with a male penis, would not fit the anatomy.

Q Does the body at death have a tendency to expel fluids and fecal material?

A Yes.

Q Do you have an opinion, Doctor, considering the following factors: considering that you found no evidence of semen or ejaculant, that you found no evidence of bruising or trauma to the inside of Miss Hill's anus, do you have an opinion as to whether or not this violation was ante-mortem or post-mortem?

A I can't state with any absolute certainty. I think it's more likely to be post-mortem than ante-mortem.

THE COURT: Would you explain what those two terms mean?

THE WITNESS: Okay. Ante-morten would be before death; post-mortem would be after death.

BY MR. FITZPATRICK:

Q Do you have any medical opinion, Dr. Mitchell, as to the significance of this type of violation to a person who's dead?

MR. CALLE: Objection. What does that mean, medical opinion or significance?

THE COURT: Yes.

MR. FITZPATRICK: I'll rephrase it.

THE COURT: I'll sustain the objection.

MR. FITZPATRICK: I'll rephrase the question.

BY MR. FITZPATRICK:

Q Have you encountered in your some four-thousand-plus autopsies, instances of anal violation of deceased people, particularly women?

A Yes.

Q Have you also read on the subject?

A Yes, sir.

Q And do you have an opinion as to the significance in conjunction with your autopsy of an anal violation of a woman, such as this?

A Yes, sir.

MR. CALLE: Objection.

THE COURT: Well, he's got an opinion. All right. So the next question is, what is the opinion?

BY MR. FITZPATRICK:

Q Could you tell us what that opinion is?

MR. CALLE: Objection.

THE COURT: All right. Wait a second. Could I see the attorneys, please.

(Counsel approached the bench. An off-the-record discussion ensued.)

THE COURT: As to the last question, the objection is sustained.

BY MR. FITZPATRICK:

Q Dr. Mitchell, did you make an examination of the stomach contents of Miss Hill?

A Yes, sir.

Q To educate the jury, would you tell us, is there a time that is consistent with all people as to the

digestive process being completed?

A There's a tremendous amount of variety between people as to how long it can take to empty the stomach. The largest number of people, though, eat at regular intervals, and by the time they eat, they've emptied their stomach.

So we're talking a number -- a few hours is the usual emptying time.

Q From the time of ingestion, until the time it's in the bowels?

A That is correct, but it does vary upon your physical condition, whether you've been injured or not, what you're eating, how much you're eating.

Q Miss Hill have anything in her stomach?

A Yes, sir.

Q What was that?

A She had about 250 milliliters, which would be about a cup of fluid, and then some chunky material that looked to be congealed grease. In other words, fatty material, that because of the drop in body temperature had turned to solid.

Q Were you able to make a determination as to what phase in the digestive process this material was in?

A It was not completely absorbed. And I cannot

identify what the substance -- or I cannot, just by eye, identify what the substance is.

Q Was there any alcohol in Miss Hill's stomach?

A Yes.

Q And were you able to get a reading as to the alcohol level?

A Yes, sir.

Q What was that?

A That was .16 grams percentum.

Q Now, if Miss Hill were to be alive and have .16 millimeters alcohol in her blood, would that be what you would expect on a Breathalyzer? Do you understand my question, Doctor?

A If she had .16 in her blood, you'd expect to get approximately that reading on the Breathalyzer.

Q All right. I'm talking about her stomach contents.

A Oh, on her stomach contents, no. If it's in the stomach, and not yet in the blood, you're not going to get it in the Breathalyzer.

Q All right. Were you able to determine what the alcholic content of her blood was?

A Yes, sir.

Q What was that?

A That was .03 percent.

Q Now, I want you to understand that this -- I'm asking you to make an assumption here. I want you to assume that the time of death was on any given day, but was sometime between 10:00 and midnight. Would that finding of .03 percent of alcohol in the blood be consistent with her having had a mixed drink or perhaps two mixed drinks at approximately 7 p.m. that evening?

MR. CALLE: Objection.

THE COURT: No. I'll allow the answer.

A It would not be consistent with that.

BY MR. FITZPATRICK:

Q Would the .03 percent of alcohol in her blood be consistent, assuming that she died sometime on any given day between 10:00 and midnight, with having had one or perhaps two mixed drinks at approximately 7 p.m., and then having had some wine to drink shortly before her death?

A Yes, sir.

Q Doctor, are you, as a medical examiner, or for that matter, any medical examiner, able to pinpoint with certainty the time of a person's death?

A No, sir.

Q Would you tell us, and tell the jury, most importantly, what factors affect the determination as to

determining, or an effort to determine the time of a person's death?

A Well, there are a variety of things that we use to try to establish when somebody died. We can break them down into factors that are from examining the body and then factors from examining other evidence.

If we look at the changes in the body, there are certain averages that we expect under average conditions. But there's still a great deal of variability between people.

If we look at other evidence that is often the strongest evidence, for instance, instead: Is the mail in; when does someone normally walk their dog; were people unable to get them by phone; was there a place they were expected to be; had an appointment and were not there; was the newspaper brought in. These are common things that we look for to try to establish whether somebody was alive or dead at a given time.

And we have to combine the anatomic factors from examining the body, and the other evidence, to get an impression of when somebody died, but we cannot narrow it to an exact time, except with very rare exceptions.

There are things like the Challenger explosion we can place the astronauts' deaths within a few minutes,

from reconstruction of the events. There was an explosion of a propane tank in Buffalo a number of years ago, and at the time of the explosion, somebody was blown against a wall, and at the same time, looked at his watch, and so that tells us when the people in the explosion were killed. But from the examination purely of the body, there is too much variability to give any time in the absolute sense.

Q Okay. Doctor, I want to direct your attention to a calendar of March of 1987 and indicate to you that I think I can say with some fair degree of safety, that there's some dispute during the course of this trial as to when it was exactly that Miss Hill died.

Taking strictly your observation of her body, is there anything inconsistent with her having died on the night of Saturday, March the 28th, 1987?

A No.

Q Again, taking strictly your observations, physical observation of her body, is there anything inconsistent with her having died during the evening hours of Friday, March the 27th, 1987?

A No.

Q Now, you indicated that in your efforts to offer an opinion as to the time of death, you take into

account other factors?

A Yes, sir.

Q All right. I want you to take into account the following factors in offering an opinion. I want you to take into account the fact that the victim, Miss Hill's cat, was seen outside on Saturday morning; and that was described by a neighbor as being very unusual. I want you to assume that no one saw Miss Hill after Friday, March the 27th, 1987 at approximately 7 p.m. to 8 p.m. that evening. I want you to assume further that no one had any physical -- in person or telephone contact with her after Friday, March the 27th, 1987.

I want you to assume that she had plans to visit a friend in the Schenectady area and made no contact whatsoever with that friend on either Friday night or Saturday morning. I want you to consider further that that friend attempted numerous times, both on Friday night and Saturday morning, to contact Valerie Hill by phone, and received no answer.

I want you to assume further that her car was found in a driveway with no additional mileage on it after Friday evening, the 27th. And, lastly, I want you to consider that her stepmother was gravely ill at St. Joseph's Hospital, and that she had been in almost daily contact

with her father regarding that fact.

Assuming all those factors, do you have an opinion as to whether it's more likely or less likely that Miss Hill died on the evening of Friday, March the 27th, 1987, as opposed to Saturday, the 28th?

MR. CALLE: Judge, I must object. Unspecified ground, unspecified grounds.

THE COURT: What -- Doctor, is this going to be a medical opinion, or is it going to be an opinion rendered like anybody else would render an opinion, based on those factors as described by Mr. Fitzpatrick?

THE WITNESS: It's going to include the medical aspects of the body, and the investigational aspects that we normally include in our medical evaluation.

THE COURT: Your objection is overruled.

BY MR. FITZPATRICK:

Q You may answer, Doctor.

A I would consider that it's more likely that she died Friday night, to possibly very early Saturday morning, would be the possibility that's given there -- I don't know when your overlaps are there with phone calls -- than to have been killed the following day.

Q Do you have an opinion, Dr. Mitchell, within a reasonable degree of medical certainty as to the cause of death of Valerie Hill?

A I do.

Q Would you tell the jury what that opinion is?

A Valerie Hill died as a result of being strangled.

Q Thank you very much, Doctor. You can stay right there. Mr. Calle will have some questions.

MR. CALLE: Judge, would it be out of the ordinary to request an afternoon adjournment now and give me a couple --

THE COURT: Sure. We'll take a fifteen-minute break. Don't talk about it or form any opinions.

(Proceedings stand in recess.)

(Court, counsel, and the defendant are present. Proceedings resumed at this time.)

THE COURT: Okay. Would you get the jury, please.

MR. FITZPATRICK: Judge, before resting, I just want to offer some exhibits.

THE COURT: Sure.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: We're all set, Yolanda, thanks.

Okay. Put us back in session. The jury is present, counsel, the defendant.

Mr. Calle, if -- I think he's rested. We're in cross-examination.

MR. CALLE: I had the impression he was going to introduce some exhibits. I beg your pardon.

CROSS-EXAMINATION BY MR. CALLE:

Q Good afternoon, Dr. Mitchell.

A Sir.

Q Dr. Mitchell, I understand that based upon your position as medical examiner for the county, you performed an autopsy on the deceased in question, correct?

A That's correct.

Q Okay. Did you make out the reports based upon your -- this autopsy, and publish its findings?

A Yes, sir.

Q Did you bring them with you here today?

A I brought some copies, yes, sir.

Q May I see what you have?

A Certainly.

MR. CALLE: If you'd allow me, Judge.

A Do you wish to see my complete file, or is it just specific reports?

Q Well, sir, what is in your complete file?

A That would be all paperwork that I have relating to this particular case, including our photographs and some photographs from the police.

Q Well, I don't believe that will be necessary. I just want the results of your findings on your medical examination.

THE COURT: You want the autopsy report, sir?

MR. CALLE: Yes, sir.

THE COURT: Hasn't that been furnished to you?

MR. FITZPATRICK: Yes, Judge.

MR. CALLE: Yes, sir, it has, but specifically what I'm looking for, Dr. Mitchell, is the report estimating the time of death.

THE WITNESS: There would be no such thing.

BY MR. CALLE:

Q Sir, is it not your normal course of business practice to estimate time of death when you perform an autopsy on a suspicious murder?

A It is my practice to make observations that can be used to help interpret the time of death, but we do not create a report trying to establish a time of death. As I've explained previously, there's such a degree of variability that when this question is posed, we must, in fact, discuss the parameters.

Q Well, Dr. Mitchell, if I were to tell you that the Syracuse Herald-Journal published March 31st, 1987 --

MR. FITZPATRICK: Well, Judge, I would object.

THE COURT: Let's hear what the question is.

MR. FITZPATRICK: Well, it doesn't do too much good if it's something with absolutely nothing to do with the witness, and the jury hears it. I mean, is it something he said to the Herald-Journal?

THE COURT: I don't know, that's why I have to hear the question. And if it's an improper question, this jury is going to be instructed to disregard it -- the question.

Go ahead, Mr. Calle, ask your question.

MR. CALLE: Yes, sir.

BY MR. CALLE:

Q In regards to the Herald-Journal published March 31st, 1987, there is an indication by a writer by the name of John Doherty that, in fact, your report indicated that she died -- that is Valerie Hill -- sometime Saturday or early Sunday morning. Can you explain that?

A I do not speak to the newspapers. You can, in fact, talk to the newspaper personnel and they will describe their great frustration in getting information from me concerning case material.

Q Yes, sir. But my question was: Could you explain the fact that they're saying the report indicated that she, Valerie Hill, died sometime Saturday or early Sunday morning; could you explain that?

A As I had no communication with them and generated no such report, I think you're going to have to turn to the person who wrote that article and ask him that question.

Q Sir, is it your testimony today that you never estimated Valerie Hill's time of death to be late Saturday or early Sunday morning, that is the 28th or the 29th of March of 1987?

A I have never tied myself to such a time.

Q Sir, did you ever state that it could have been the time of death, that is, late Saturday or early Sunday

morning?

A It, it could have been, yes.

Q Did you ever state that it could have been previously?

A Quite possibly.

Q Is that -- would that mean you don't recall if you did or you didn't?

A That is correct.

Q But you might have stated that she died late Saturday or early Sunday?

MR. FITZPATRICK: Excuse me, Doctor. I object to the question, "stated" when, to whom, under what circumstances?

THE COURT: Well --

Q At any time, sir.

THE COURT: Stated to anybody?

MR. FITZPATRICK: Well, he's stated, Judge, to this jury a few moments ago, that it could -- it was consistent with Saturday, so I would ask if he's trying to impeach him, that he identify the document or the recording that he's referring to.

THE COURT: Well, I don't think the doctor denied that, that he stated that.

MR. FITZPATRICK: No. I'm not suggesting that he did, but he's impeaching the witness about a statement. I'd like to have some foundation of the statement, so I can know whether or not Mr. Calle is recording it accurately, and perhaps I could have a chance to rehabilitate the doctor, if necessary.

MR. CALLE: Judge, if I may respond briefly. I'm not debating that this particular gentleman stated the possibilities of time of death; I'm just inquiring as to whether he ever stated this particular time of death at any time before.

THE COURT: Any other, other type of proceeding, or any other type of report, or to any other person --

MR. CALLE: Did he ever give him the opinion that the time of death was either Saturday or Sunday.

THE COURT: Okay. Fair question.

Have you, sir?

THE WITNESS: I have not given the opinion of a specific time of death, because that's not the way I function. I would -- I will have told

people to consider those times as possible.

BY MR. CALLE:

Q Do you know what an inference is, Dr. Mitchell?

A Yes, sir.

Q What is it, can you tell me?

MR. FITZPATRICK: Objection, your Honor.

THE COURT: Sustained.

BY MR. CALLE:

Q Dr. Mitchell, if I were to tell you that based upon the factors which the District Attorney Fitzpatrick had given you in your determination of Valerie Hill's time of death, if I were to give you different factors, investigatory factors, is there a possibility that that would change the estimated time of death?

A Yes, sir.

Q So if I were to tell you that, in fact, there was a busy signal at Miss Hill's residence on Saturday, the 28th, would that exclude her being killed on the 27th?

MR. FITZPATRICK: Judge, I object to the form of the question. Unlike Mr. Calle's example, my examples were based on the testimony and evidence that has been received in this trial. His example, there's absolutely no evidence before this jury of a busy signal on

Saturday morning.

THE COURT: But he's asking it with good faith.

MR. FITZPATRICK: Well, Judge, a hypothetical has to be based on facts that are in some manner, shape, or form, in evidence before a jury.

THE COURT: Or --

MR. FITZPATRICK: There's no evidence before this jury, nor is there any evidence --

THE COURT: Or factors that the witness is asked to assume.

MR. CALLE: Judge, that's my point. I believe this witness was asked to assume -- make certain assumptions.

THE COURT: Look it, I'm not, look it --

MR. CALLE: Yes, sir.

THE COURT: I've had this argument once just a minute ago.

MR. CALLE: I'm sorry.

THE COURT: You can ask your question, sir, and base it upon that, what you've stated.

MR. CALLE: I require a readback at this point, if I may.

THE COURT: Ask his question.

(The requested portion of the record was read back by the court reporter.)

A As long as no one else was responsible for having the phone busy, yes.

BY MR. CALLE:

Q Okay. Now, sir, if I were to tell you -- and I'm repeating Mr. Fitzpatrick's assumption -- that Valerie Hill's cat was outside her apartment on Saturday morning, stop for a minute and consider, if you would, do you have any basis to determine whether that cat was not outside her apartment on Friday night?

A I personally do not.

Q So you don't know when that cat got outside the apartment of Valerie Hill on the weekend in question, do you?

A I do not.

Q Therefore, sir, would it be fair to say without that information, your analysis is flawed as to the estimated time of death being more likely to be Friday night than Saturday?

A I was given a hypothetical with certain assumptions. I have to take those assumptions in that hypothetical.

Q Sir --

A If you give me another hypothetical, you will get another answer.

Q Dr. Mitchell, I'd like to direct your attention to rigor mortis. Actually, I do not like to direct your attention, but I must.

Would you be so kind, instead of me asking the question about rigor mortis, which is probably incorrect, would you again, for me, speak about rigor mortis and what happens after a body dies, in relation to rigor mortis, briefly, if you would?

A Rigor mortis is a process that occurs post mortem, in other words, after death, where there is release and use of certain chemicals within the muscles, that cause the same types of chemical activity that normally allow for muscle contraction. But instead of allowing the muscles to contract, the muscles become firm. They cannot extend and they cannot contract. They're -- as they're using this energy up.

When the energy has been used up, the muscles can once again become loose and flexible. Rigor mortis will begin typically in the jaw and then may go into the lower extremities or arms. There's some dispute between experience in some authorities as to exactly which is the

most likely. There is a time progression during rigor mortis, but it's quite variable from person to person, and it depends upon a variety of factors, including temperature, because temperature has tremendous influence on the speed of chemical reactions. Do you wish more?

Q Oh, no. I didn't know you were done. Now, you mentioned that averages of each body is different, sir. In particular, rigor mortis sets in, I believe you mentioned, and then it goes away, is that correct?

A That's correct.

Q What is the average time in which rigor mortis sets in and then goes away?

A We expect onset, usually, of rigor in the jaw within a few hours, and this is under the assumption of an average body temperature, of an average temperature around the body, an average level of activity. No such thing as seizure or something of this sort, and nor -- none -- nor the other -- some unknown factors impacting this.

Q Let me get this straight. You're saying that rigor sets in in the jaw within a few hours, or it leaves --

A Correct.

Q -- or it leaves?

A It begins in the jaw within a few hours.

Q Okay. When you --

A We --

Q I'm sorry.

A I don't know what you want from me now.

Q When you examined Miss Hill the first time you examined her, was at the scene?

A That was at the scene, yes, sir.

Q Was there rigor in the jaw?

A She had -- she was in full rigor. All or parts of the body were affected by rigor.

Q And, again, sir, what's the average time in which rigor sets in and then leaves?

A (No verbal response.)

Q Average, sir, based upon average conditions, is it not a fact that it's -- well, I'll let you answer the question.

A Well, with somebody at least, say, 75 degrees, of average body weight, with no other factors influencing rigor, you may get -- you may start to see rigor disappear at twenty-four hours. It may take forty-eight hours.

Q So it would be fair to say that between twenty-four and forty-eight hours that full rigor disappears, on the average?

A Well, if you take all the ones that are on average, you're taking all the people who do it much more

rapidly, plus all the ones that do it much more slowly on average, I guess would be something on there.

Q So, on average, full rigor disappears between twenty-four and forty-eight hours, is that correct?

A Or it's disappearing at least in that time frame.

Q However, on March 30th, when you examined the body for the first time, the body was in full rigor, correct?

A It had --

Q Wasn't that your testimony?

A It had rigor affecting all muscle groups, yes.

Q Would that be classified as full rigor?

A Yes.

Q And what time would you -- did you first observe this full rigor?

A I would have observed rigor at the scene, and then I observed it --

Q What time, sir?

A That would be sometime after -- somewhere around 3:30, or a little bit later.

Q 3:30 on a Monday?

A Mm-hmm.

Q So between twenty-four hours on average, would

be 3:30 Sunday, correct?

A That is correct.

Q The day before?

A That is correct.

Q And forty-eight hours would be 3:30 on Saturday, correct?

A Yes, sir.

Q So on average, your findings indicate, or at least one can assume that they indicate that Miss Hill's time of death was approximately 3:30 on Sunday, or 3:30 on Saturday, would be the twenty-four or forty-eight hour average time span for full rigor to start disappearing, is that valid?

A No. You -- what you're trying to do is disregard the variability to which I have previously testified. You're also disregarding some other findings that are present in the autopsy protocol. She had a fair amount of decompositional change inside -- in fact, her brain had sufficiently decomposed to have small holes in it. The tissues were flabby within.

In addition to that, there are other things from the scene. She was laying on a cool floor, which retards all of these processes. And I specifically checked, the basement was cool, so that there's -- that there would

be cooling of the body, all of which would retard these processes. The night temperatures were cool. And the house, itself, was cool, as I believe -- I, I believe it's about sixty-two degrees, if I remember correctly, in the house when that was measured. So that all of these processes would remarkably slow the -- have the potential, at least, for remarkably slowing both the onset and the relaxation of rigor.

In strict chemical reactions, we speak about something called the Q-ten. For every ten degree drop in temperature, we expect to have a reduction of the speed of a reaction by about the factor of two.

Q Dr. Mitchell, would you say that forty-eight hours is the outside time frame in which full rigor would start to disappear?

A It depends upon the conditions of storage of the body.

Q Sir, is it possible that Miss Valerie Hill's time of death was Sunday, March 29th?

A It's possible.

Q Sir, is it possible that Miss Valerie Hill's time of death was Saturday, March 28th?

A It's possible.

Q Sir, would you say that the estimated time of

death for Miss Hill, being the 27th of March, 1987, was on the outside edge of the possibility? Yes or no, sir.

A It -- I don't think that is a yes or no question.

Q I'm asking you if you could say that the death of Valerie Hill being attributed to Friday, March 27th, was on the outside edge of the possibility we've just discussed; yes or no?

A I don't believe that's a yes or no question. I don't think it can be answered and give a correct impression. In other words, the inference from what the response is, yes or no would be improper.

Q Well, is it fair to say that the time of death of Valerie Hill, being attributed to March 27th, 1987, is on the outside edge of a possibility? Would that be fair to say that?

A Probably.

Q Isn't it a fact that you did say those very words inside the grand jury when you testified in November of '92?

A It's possible. I would have to review that.

Q You did, sir. I direct your attention, Dr. Mitchell, to the bruise that Miss Hill suffered, I believe, on the right side of her head, and which you observed, I believe, in an internal exam; do you recall?

A Yes, sir.

Q I see. Were you able to estimate, Dr. Mitchell, when she received that bruise, based upon your observations at the time in 1987?

A I can't give an exact time, but it appeared to be a fresh bruise, something that probably happened within twenty-four hours of the time of the demise.

Q Oh, that's what I'm looking at, at the time of demise. I understand now. So you're saying that the bruise occurred either twenty-four hours before Miss Hill was killed, or twenty-four -- twenty-five (sic) hours after she was killed?

A No.

Q I don't know what you're saying.

A It occurred within twenty-four hours of the time of demise, but during life, so it's within the day before she died, or up to the time of demise.

Q Oh, I understand now. So this bruise that you observed on the right side of Miss Hill's head, that could have been on her head for twenty-four hours before she died?

A It's possible.

Q And your testimony was -- is you weren't able to determine if that bruise caused unconsciousness or not, is that correct?

A That is correct.

Q Dr. Mitchell, did you examine the body in its entirety, the outside area?

A Yes, sir.

Q Did you find any defensive wounds?

A No.

Q What about her fingernails, did you look into her fingernails at all?

A I did.

Q Did you find any evidence of other blood inside her nails, as to perhaps speculating that she was clawing or scratching in her defense at all?

A No.

Q What was the condition of those fingernails?

A They were unbroken.

Q And I just ask for clarification for my own mind, Dr. Mitchell, you said on direct examination by Mr. Fitzpatrick that the amount of alcohol that you found in the victim, either in her stomach or her blood, or both, if she had drunk adult beverage at approximately 7 p.m., the amount of alcohol or findings -- your findings of such were not consistent with her imbibing at 12 p.m. death, is that what I understood on direct examination?

A With the hypothetical presented by

Mr. Fitzpatrick, you would not have a .03 blood alcohol present at 10 or thereafter, if she had ingested the one to two drinks at 7.

Q So, therefore, it's your expert opinion that Miss Hill had imbibed in alcoholic beverages subsequent to 7:00 at night?

A Or she imbibed a larger amount orally.

Q And I just would like to establish something We're not talking about 7 p.m., we're talking between three and five hours before the demise, is that correct?

A Correct.

Q Now, Dr. Mitchell, when you arrived at the murder scene on the day in question, March 30th, 1987, that was about 3:30 in the afternoon?

A Somewhere about there. I haven't kept an exact record, or if I have it, I don't remember.

Q Was the victim on her front or her back side on the ground?

A She was lying face down.

Q Were you present when the body was turned over?

A Yes, sir.

Q And was that on your direction?

A I would certainly have been part of that decision.

Q When you say you would have -- you believed you were --

A Yes, sir.

Q -- in on that decision?

A Yes, sir.

Q You just can't recall?

A Well, this is something -- you're asking, was it at my direction. I would work in conjunction with the evidence technicians at the scene, and so it would be a mutual decision. I would not want to move the body before adequate evidence collection had taken place.

Q Were you -- were you involved with the investigation regarding blood samples or semen samples, if any were taken?

A I would retrieve those and they would be transferred to the police.

Q Did you retrieve those?

A Yes, sir.

Q What did you retrieve?

A Okay. A vaginal, oral, rectal, and cervical swabs all transferred to the Syracuse Police Department.

Q Oh, so you didn't perform any analysis of blood or semen or any samples of -- at the scene recovered?

A No. My office would be responsible for the

toxicology.

Q Well, do you have the results of the toxicology?

A I do.

Q And do any of those results link Mr. Rivas at all with the murder?

A I don't see how I can confere a blood alcohol or -- from any presence or absence of the drug, link a specific person. Drugs and alcohol don't have any names on them. I can't even tell you whether she drank Stolichnaya or wine.

Q My question, sir, has to do with, was there any blood samples taken which perhaps matched up with Mr. Rivas, if you know?

A You'd have to ask the Syracuse Police Department.

Q That was my question: Do I ask you or not. That's all. Thank you.

You mentioned something, livor or livor, sir, which is the settling of blood after death. Was the livor or livor consistent with the position in which you found the body?

A Yes, sir.

Q And if the body had been on the back side, these results would be inconsistent, based upon your

determination?

A I don't quite know for sure what you're after, but if you're trying to say that had she been moved post mortem, would the livor pattern have shown it?

Q Yes, sir.

A That would -- that would depend on how soon after demise she was moved. If you are moved before livor becomes so fixed, before it leaks out of the blood vessels into the tissues, and then becomes nonmoveable. If it's done while it's still moveable, you cannot tell from the livor pattern, unless you happen to observe the body before the blood has once again moved.

If you move a body after the livor has fixed, it then becomes apparent as long as the body is not placed back in a position consistent with the livor pattern.

Q Thank you, sir.

MR. CALLE: One moment, your Honor.

(Proceedings paused.)

BY MR. CALLE:

Q You mentioned that the victim was wearing, I believe you said she was wearing a nightshirt and a robe over the nightshirt, is that correct?

A Yes, sir.

Q And nothing else?

A Well, she had the sash around her neck.

Q I understand. But I'm talking --

A She had some jewelry. I'm talking items of clothing.

Q Yes, sir. Did you ever find or observe any -- anyone find a pair of panties?

A I don't remember them. I can review my photographs and see if I have something there.

Q Would you?

MR. FITZPATRICK: Dr. Mitchell, if it will save time, your Honor, I would stipulate there were no panties found within the immediate area of the body.

MR. CALLE: All right. Thank you.

I'll -- I just have a couple brief questions.

BY MR. CALLE:

Q Did you ever testify in the grand jury that full rigor mortis goes away after a period of one or two days?

A Probably.

Q Does that mean yes?

A Yes.

MR. CALLE: One moment, your Honor.

(Proceedings paused.)

MR. CALLE: Nothing further. Thank you.

THE COURT: Any redirect, Mr. Fitzpatrick?

MR. FITZPATRICK: Very briefly.

REDIRECT EXAMINATION BY MR. FITZPATRICK:

Q Have you also testified in front of the grand jury, Doctor, that prior to that particular testimony, you had not reviewed some of your notes and slides in connection with this case?

A That is correct.

Q And naturally when you prepare for trial, you did review your slides and your notes, is that true?

A That is correct.

Q And did you see some, as I think you indicated on cross-examination, some decomposition to the brain as you reviewed your slides in preparation for this trial testimony?

A Yes, sir.

Q Does that assist you in any way estimating the parameters of time of death?

A It tends to push the limits further out.

Q All right. I want to make sure the jury is clear

on this. What you're saying, if I may paraphrase, is that there are certain parameters within which it's possible that Valerie Hill died?

A Yes, sir.

Q And that to make a more accurate determination as to the accuracy of when exactly she died, you would take into account factors other than a mere observation of the body?

A Yes, sir.

Q And, again, you're saying that it's possible that she died on Saturday evening?

A Yes, sir.

Q And you're also saying that it's possible that she died and was killed on Friday evening?

A That is correct.

Q Would it have been possible that she had been killed on Thursday evening, March the 26th, during the late evening hours of March the 26th?

A It's less likely, but it's possible.

Q Okay. And when you make a determination as to average time, and when you testified in front of the grand jury as to rigor disappearing within twenty-four to forty-eight hours, you were speaking of the average, is that correct?

A That is correct.

Q And that would include the determination of average being 75 degree temperature?

A Average body weight, 75 degree temperature, average circumstances.

Q All right. Doctor, I hope we're clear on that. Thank you very much.

THE COURT: Anything else?

MR. CALLE: Nothing, sir.

THE COURT: I have a question -- a couple, if you don't mind. The bruise over the right -- I wasn't able to see -- your right eyebrow, I guess?

THE WITNESS: Yes, sir. It's over here (Indicating) towards the right temple.

THE COURT: You indicated because of the livor, you were unable to really observe it from your exterior examination, correct?

THE WITNESS: That is correct.

THE COURT: When you did your interior examination of the body, did -- you were able to conduct an interior examination of that area to better understand the extent of that injury?

THE WITNESS: Yes, sir.

THE COURT: Okay. With that injury, were there any lacerations around the eyebrow?

THE WITNESS: No.

THE COURT: All right. The extent of the injury that you observed internally, were you able to tell, would that have raised a bruise, a visible bruise on the outside, if the person remained alive?

THE WITNESS: I would expect that if this person remained alive, you'd have a very high probability of bruise, but you can't guarantee it, a visible bruise on the outside.

THE COURT: How about swelling of the tissue area around that?

THE WITNESS: Again, with, with this size bruise, you usually end up with some swelling.

THE COURT: That would have been visible to someone if they had seen it?

THE WITNESS: Yes, sir.

THE COURT: How rapidly after this injury would have been caused would that have been visible to the naked eye?

THE WITNESS: Well, that does vary from person to person.

THE COURT: Okay.

THE WITNESS: But usually within a few hours.

THE COURT: Okay. All right, Doctor, thanks very much for your time, sir. Appreciate it. You may step down.

THE WITNESS: Thank you.

(Witness excused.)

MR. FITZPATRICK: May I, Judge?

THE COURT: Are these questions or --

MR. FITZPATRICK: No. Judge, I would like to offer People's Exhibit 7, which is the Stephen King library book.

THE COURT: Okay. Mr. Calle, the People are offering People's Exhibit 10 (sic), a library book, Stephen King.

COURT CLERK: 7, your Honor.

THE COURT: 7?

COURT CLERK: 7.

THE COURT: Any objection to that?

MR. CALLE: No, sir.

THE COURT: That's received.

(People's Exhibit Number 7 was then received into evidence.)

MR. FITZPATRICK: Your Honor, I'd offer Exhibit 28. It's a bottle of Bacardi rum recovered from the victim's apartment.

THE COURT: Mr. Calle, Exhibit 28, a plastic bag containing a bottle of rum, Bacardi brand.

MR. CALLE: No objection.

THE COURT: That's received.

(People's Exhibit Number 28 was then received into evidence.)

MR. FITZPATRICK: I'd offer Exhibit 30, your Honor, several pieces of stationery recovered from the victim's apartment by Officer Kimak.

THE COURT: Mr. Calle.

MR. CALLE: No objection.

THE COURT: That's received.

(People's Exhibit Number 30 was then received into evidence.)

MR. FITZPATRICK: I'd offer Exhibit 34, your Honor, a bottle of Blue Nun wine recovered from the refrigerator of the victim, Valerie Hill.

THE COURT: Any objection to that?

MR. CALLE: No, sir.

THE COURT: That's received.

(People's Exhibit Number 34 was then received into evidence.)

MR. FITZPATRICK: I'd offer Exhibit 35, your Honor, a brass ashtray recovered from the kitchen table of the victim's apartment.

MR. CALLE: No objection.

(People's Exhibit Number 35 was then received into evidence.)

MR. FITZPATRICK: I renew my offer, your Honor, of People's Exhibit 57, a photo.

THE COURT: Same objection, Mr. Calle?

MR. CALLE: Yes, sir.

THE COURT: I'm going to receive that.

(People's Exhibit Number 57 was then received into evidence.)

MR. FITZPATRICK: Your Honor, my notes show that all the People's exhibits that have been offered, have been received. The only exhibits marked and not received -- and not offered are Exhibit 11, Officer Hodell's report, and Exhibit 24, Don Stonecipher's four-page affidavit. If that is consistent

with your Honor's notes, then the People rest.

THE COURT: Okay. I've got it as consistent with my notes. If not, we'll allow you to reopen and clarify any exhibits, sir.

The People have rested. Okay. We'll check it out.

MR. CALLE: Judge, I need a short recess, if you would.

THE COURT: Yes. Ladies and gentlemen, you've heard that the People have rested their case. At this time, I must entertain certain legal issues that need not concern you. Okay. I'm going to ask you to step out. Again, not to form any opinions or to discuss the case. We'll take a short recess with the jury. We're still in session, though.

MR. CALLE: Yes.

(Proceedings stand in recess.)

(Court, counsel, and the defendant are present. Proceedings resumed at this time.)

THE COURT: Would you reflect that the jury has been excused. Counsel is still present. Mr. Calle, at this time, sir, the People have rested their case. Do you have any

motions addressed to the People's case that we need to review at this time?

MR. CALLE: Just that the defense moves for dismissal, based upon the prosecution's failure to prove their case, prima facie.

THE COURT: Okay. Based on that motion, this Court denies counsel's motion. I feel that there have been enough facts established to warrant this case being sent to the jury for their determination as to the guilt or the innocence of this defendant.

Now, Mr. Calle, do you choose to present a case, sir?

MR. CALLE: Yes.

THE COURT: All right. I believe you had a witness you had called. I don't know if that witness is out there or not.

MR. CALLE: Yes. I'd like some time to inquire, perhaps ten to fifteen minutes, at most. I'm sure that the witness' testimony won't be more than ten minutes, at best.

THE COURT: Okay. Fine. Give you ten minutes. We're adjourned for ten minutes.

(Proceedings stand in recess.)

(Court, counsel, and the defendant are present. Proceedings resumed at this time.)

THE COURT: We're in session, ladies and gentlemen. Would you get the jury, please.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Will you reflect the jury is present, counsel, the defendant.

At this time, Mr. Calle, the People, having rested, does the defense choose to call any witnesses in this case?

MR. CALLE: Yes, sir.

THE COURT: And would you call that witness, please.

MR. CALLE: Susan Stonecipher, please.

THE COURT: Susan Stonecipher, please. Oh, there you are.

*          *          *

S U S A N S T O N E C I P H E R , called as a witness on behalf of the Defendant, having been duly sworn, was examined and testified, under oath, as follows:

MR. CALLE: Judge --

THE COURT: Hi. Good afternoon. Keep your voice up nice and loud for us, okay?

THE WITNESS: Okay.

MR. CALLE: Judge, may I approach with the district attorney, briefly?

THE COURT: Sure. Yeah.

(Counsel approached the bench. An off-the-record discussion ensued.)

MR. CALLE: Very good.

DIRECT EXAMINATION BY MR. CALLE:

Q Good afternoon, Miss Stonecipher.

A Good afternoon.

THE COURT: You'll have to do better than that. I'm just going to drop this down just a little bit. That chair doesn't go anywhere. You're the one that's got to.

BY MR. CALLE:

Q Miss Stonecipher, I direct your attention to the month of March, 1987. Could you tell this Court the street

on which you lived?

A On Hickok Ave.

Q And did you have any cause to know Miss Valerie Hill at that time?

A She was my neighbor downstairs.

Q So would it be fair to say you lived upstairs from Miss Hill?

A Yes, I did.

Q And that was with your mother, and your father, and your siblings?

A Yes.

Q And there came a time when you learned that Miss Hill was the victim of a crime?

A Yes.

Q And based upon your proximity and residence to Miss Hill, and some other factors, did you ever give a statement to Onondaga County authorities?

A Repeat that. I'm sorry.

Q Did you ever give a statement to Onondaga County --

A Yes, I did.

Q -- Onondaga County authorities?

A Yes, I did.

MR. CALLE: Your Honor, I'd like this

marked as a defense exhibit, if I may.

THE COURT: J, okay.

(Affidavit was marked for identification as Defendant's Exhibit J, this date.)

MR. CALLE: Thank you, Ms. Alexander.

BY MR. CALLE:

Q Miss Hill (sic), I'd like you to -- Miss Stonecipher, I would like you to take a look at Defense Exhibit J and tell this Court what that is.

A An affidavit.

Q I beg your pardon?

A It's an affidavit.

THE COURT: Whose affidavit, ma'am?

THE WITNESS: Mine. I'm sorry, mine.

THE COURT: That's okay.

BY MR. CALLE:

Q And when was it given?

A Let's see.

THE COURT: Bottom.

Q On the bottom.

A Okay. March 30th of '87.

Q Do you recall signing -- did you sign that affidavit?

A Yes, I did.

Q Do you recall signing that affidavit?

A Yes, I did.

Q Was it signed contemporaneously with the time it was typed up, that being March 30th, 1987?

A I believe so, yes.

Q Okay. Have you had occasion to read that affidavit?

A No.

Q Did you read it before you signed it?

A No, I don't believe so.

Q Would you read it here now today?

A Sure.

THE COURT: To yourself.

MR. FITZPATRICK: Judge, I'd object.

THE COURT: Yes. I'm going to sustain the objection. What's the purpose of reading it? She hasn't indicated her memory needs any refreshing.

MR. CALLE: Fine, sir. She said she never read it, that's my point.

THE COURT: Well --

MR. CALLE: All right.

BY MR. CALLE:

Q Miss Stonecipher, did you ever tell the Onondaga County authorities that on Saturday, the 28th day of March,

at approximately 8 or 8:30 in the morning, that you went in the basement of your home at 250 Hickok Avenue to get your work uniform shirt out of the dryer, and you encountered Miss Hill?

A That was not me, that was my mother.

MR. FITZPATRICK: Judge, I'd object.

THE COURT: Sustained. That's a leading question.

BY MR. CALLE:

Q Did you ever give a statement to the police?

A Yes, I did. The day of the incident.

Q Miss Stonecipher, did you ever see Miss Hill in the hallway retrieving her cat?

A Yes.

Q On the weekend in question?

A Friday.

Q Did you ever tell the authorities that you saw Miss Hill on Saturday?

A No. I don't recall.

MR. CALLE: I now would ask that this witness read this voluntary affidavit, Judge.

THE COURT: Well, read it in its entirety, or is there a part you want her to read?

MR. CALLE: I'd like her to read that part right there, ma'am, the last paragraph.

MR. FITZPATRICK: I have the same objection, your Honor. She hasn't indicated that she needs her memory refreshed, nor is he allowed to impeach his own witness.

THE COURT: She indicated that she didn't recall what she had said, so I'm going to let her see if her memory becomes refreshed.

THE WITNESS: May I read it?

THE COURT: To yourself, ma'am.

THE WITNESS: Okay.

(The witness read the affidavit.)

THE COURT: Okay.

BY MR. CALLE:

Q Finished?

A (No verbal response.)

Q Miss Stonecipher, did you ever sign an affidavit which stated that you saw Miss Hill on Saturday, March 28th?

MR. FITZPATRICK: I object to that question.

THE COURT: Sustained as leading.

MR. CALLE: Well, may we approach?

THE COURT: Sure.

(Counsel approached the bench. An off-the-

record discussion then ensued.)

BY MR. CALLE:

Q Miss Stonecipher, when was the last time you saw Valerie Hill alive, if you recall?

A Friday.

Q What date was that?

A 27th.

Q Of March?

A Yes.

Q Where did you see her?

A I seen her in the hallway.

Q Is that the hallway of 248-250 Hickok?

A Yes, yes.

Q Do you recall what time that was?

A I'd say around 8:30, 9:00.

Q Is that a.m. or p.m.?

A A.M.

Q And where were you in relation to Miss Hill?

A Repeat that. I'm sorry.

Q Where were you in relation to Miss Hill?

A I was going down the stairs to get my work shirt out of the dryer. She was in the hallway, in front of her door. Her cat had got out of her apartment, and she was trying to get the cat back into her apartment.

Q Did you see the cat?

A Yes, I did.

Q Where was the cat?

A He was in between her doorway and a pantry.

Q And this was on Friday morning?

A Yes.

Q Did you ever tell the authorities that you saw Miss Hill on Friday -- on Saturday morning, March 28th, in the hallway at 248-250 Hickok?

A I might have said that in my affidavit, with everything going on that morning -- see, I don't work Saturday mornings at all. And it was Friday morning that I go down in the basement and get my work shirts because I work a double on Friday.

Q Did you read Defense Exhibit J?

A Yes.

Q Does that refresh your recollection as to what you told the police on the 30th of March, 1987?

A Yes. That was the same day of the incident. Everything was really confusing that day. And they were asking, "Okay. What did you do?" This, that; this, that. "What day did you work?" And I did state Saturday, but as I recalled later, afterwards, I do not work Saturday mornings. I never work Saturday mornings. So it was Friday morning.

Q Well, let me ask you this, Miss Stonecipher: Did you ever see Miss Hill's cat out in the hall at all?

A Only that Friday.

Q If I were to tell you that the cat was in the hall on Saturday morning, would that refresh your recollection as to what day you saw Miss Hill?

A I wouldn't. My Saturday mornings don't usually start until like 11:00.

Q But, Miss Stonecipher, we're dicussing not your usual conditions, but specifically that weekend. So I would ask you if I were to tell you that the cat was out on Saturday morning, would that change your testimony here today as to what day you last saw Miss Hill?

A No.

MR. FITZPATRICK: I object to the form of the question.

THE COURT: Overruled. The answer is no?

THE WITNESS: No.

MR. CALLE: Nothing further. Thank you.

THE COURT: Any redirect or recross, Mr. Fitzpatrick?

CROSS-EXAMINATION BY MR. FITZPATRICK:

Q Miss Stonecipher, in addition to the affidavit

which Mr. Calle showed you, two days after you gave that, the police came back to you and reinterviewed you, isn't that correct?

A Yes.

Q And when you gave the first affidavit, it was on the same day when the woman downstairs from you had been found strangled and murdered?

A Yes.

Q And did you sleep at 250 Hickok Avenue --

A Yes.

Q -- that night?

A (No verbal response.)

Q Would I be fair in characterizing you as being a little bit upset on Monday, March the 30th?

A Very much so.

Q Your best recollection -- you're under oath here now, and these people want to hear what you have to say -- your best recollection, as you sit here, is that the last time that you saw Valerie Hill alive was the morning of Friday, March the 27th?

A Yes.

Q Is that what you indicated in the affidavit that you gave two days later?

A Yes.

Q And that affidavit was signed on April the 1st of 1987?

A Yes.

Q Did you -- do you know the defendant in this action, Hector Rivas?

A Yes.

Q Did you see him at 248 Hickok Avenue back in March of '87?

A Occasionally.

MR. CALLE: Object to the date.

THE COURT: I'm sorry?

MR. CALLE: Which date specifically?

MR. FITZPATRICK: I was referring just to the month.

THE COURT: To the month of March, '87, sir? Now I'll overrule the objection.

BY MR. FITZPATRICK:

Q Your answer was?

A Yes.

Q Did you see him -- did you ever see him enter the apartment, 250 Hickok Avenue?

A Yes.

MR. CALLE: Object. Beyond the scope of the direct exam.

THE COURT: No. I'll take that.

BY MR. FITZPATRICK:

Q Your answer is yes?

A Yes.

Q Were some of those occasions when Miss Hill was not home?

A Yes.

Q Did you ever hear him bang on the door and whine to get let in?

MR. CALLE: Objection as to the characterization.

THE COURT: Sustained.

MR. CALLE: As to "whining."

THE COURT: Sustained.

BY MR. FITZPATRICK:

Q Did you ever hear him bang on the door and ask to get in?

A Yes, I did.

Q Did you see him Friday night, March 27th, 1987?

A Yes, I did.

Q Do you remember as to about what time that was?

A It was anywhere between 11 and 1.

Q And you remember who you were with?

A My ex-boy friend.

Q What was his name?

A Jim Crimi.

Q What was Mr. Rivas doing when you saw him Friday night?

A Sitting in his car, parked with the parking lights on, smoking a cigarette, in front of my next door neighbor's house.

Q Thank you, Susan.

THE COURT: Any redirect?

REDIRECT EXAMINATION BY MR. CALLE:

Q Do you recall what the vehicle looked like?

A It was -- I don't know my cars, so it was a two-door, looked like bluish-silver-gray.

Q In which direction was it facing?

A It was facing forward. It was facing up, so if you were to go from -- okay, how can I explain this one. If you were coming up our street from the 100 block to the 500 block, he was going up, he was going up like to the 500 block, that's -- his car was facing that way.

Q Well, my question is, if I were to come out of 248-250 Hickok, would the vehicle be facing to the left or to the right?

A I don't get it.

Q You don't recall?

A I don't understand -- I don't understand what you're saying.

Q If you were to walk outside --

A Okay.

Q -- of your house, which direction was this vehicle facing, was it facing left or was it facing right?

A He was right there on the left.

Q Which direction were his headlights facing, left or right?

A He was facing the right.

Q He was facing right?

A The lights.

THE COURT: Were they pointed towards the area of the direction of your house, or away from the direction of your house?

THE WITNESS: Away. They're like -- okay. Here's the house right here, here's our driveway. He was like right there, right next to our driveway, right in front of our neighbor's house. Is that what you're asking me?

BY MR. CALLE:

Q So if I were to come out of your house on that

night in question, the vehicle would be on my left facing right?

A No. It would be on -- if I was facing my house, it would be on the left.

THE COURT: We've got some photographs here, Counselor, if that might help.

MR. CALLE: Yes. I wouldn't mind seeing the photograph.

THE COURT: Let's settle down, folks.

BY MR. CALLE:

Q I show you People's Exhibit 13. Miss Stonecipher, would you indicate to the jury where the vehicle was parked?

A Okay. Here's our driveway. He was parked right here, right here (Indicating) on the side, so if I was -- that's the left, right?

Q And which way was the vehicle facing?

A Diagonally. It was like right here on the road. Here's the street. He was like right here (Indicating) --

Q Is that a two-way street?

A -- parked. Yes.

Q Are you any relation to Police Officer Steven Stonecipher?

A He's a cousin, I believe.

Q Were you aware that he was involved with the investigation of this crime?

A No, not that I know of.

Q You never spoke to Steven about the case?

A I honestly don't even think I ever met Steven. There's a lot of Stoneciphers.

Q So would your answer be no, you never spoke to him about the case?

A No.

Q Do you know where Valerie Hill usually parked her vehicle?

A In her driveway.

Q Did she ever use her garage?

A A couple times she probably used the garage. I've always noticed her car in front of the garage, but she never --

Q On the night in question, was her car parked in the driveway in front of the garage?

A I don't recall.

MR. FITZPATRICK: Your Honor --

A I don't remember.

MR. FITZPATRICK: I'm sorry. I didn't mean to interrupt. I just want to establish if we were talking about the night of the 27th.

MR. CALLE: Yeah.

MR. FITZPATRICK: I'm sorry.

BY MR. CALLE:

Q You don't recall that?

A I don't recall it. I don't recall when -- I just ran in the house, so I don't -- I don't recall.

Q Where did Jim Crimi leave you off that evening?

A Right in front of our house.

Q And which direction was his car facing?

A His car was facing the opposite of Hector's, so here's -- here's -- Hector's is facing this way right here, Jim was like headlight to headlight.

Q Was Mr. Rivas' headlights on?

A Parking lights.

Q Was his interior light on?

A No.

Q Did you notice any specifics about the vehicle that would identify it as Mr. Rivas'?

A I seen him, eye contact, face to face.

Q This was between the hours of 11 p.m. and 1 a.m.?

A Yes.

Q Would you consent that that was nighttime?

A Yes.

Q And you used the front door that evening?

A Yes, I did.

Q Did you notice any other vehicles there that evening?

A I didn't -- I didn't go through the driveway way, so, no, I didn't.

Q How about on the street?

A I don't remember, no.

Q So only one vehicle you noticed, and that was Mr. Rivas', correct?

A I was scared of Hector, so, yes, I did notice his car.

Q Nothing further.

A I thought it was very strange --

THE COURT: That's okay.

MR. FITZPATRICK: I have nothing more.

THE COURT: You can step down, ma'am. Watch your step coming off.

(Witness excused.)

MR. CALLE: This is yours, do you want a copy?

THE COURT: Could we --

MR. CALLE: Judge, may we approach briefly?

THE COURT: Yes.

(Counsel approached the bench. An off-the-record discussion ensued.)

THE COURT: Ladies and gentlemen, we're going to break for the day. I want you in the jury room 10:00 tomorrow. Don't talk about the case, form any opinions, do any research, visit any scenes, read anything or watch anything in the news media. 10:00, please, tomorrow.

(The proceedings of March 23, 1993 were adjourned.)

*　　　*　　　*

C E R T I F I C A T E

I, PATRICIA A. ALEXANDER, C.S.R.-R.P.R., an official reporter of the Supreme and County Courts, Fifth Judicial District, State of New York, do hereby certify that the foregoing is a true and correct transcript of my stenographic notes taken in the foregoing matter, at the time and place first herein mentioned.

Patricia A. Alexander

PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

September 30, 1993

DATE

STATE OF NEW YORK COPY
COUNTY COURT : COUNTY OF ONONDAGA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

-against-

HECTOR M. RIVAS,

Defendant.

Indictment Number 92-1114-1

Index Number 92-2794

Volume VI

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Onondaga County Courthouse
401 Montgomery Street
Syracuse, New York 13202
March 24, 1993

B E F O R E : HONORABLE J. KEVIN MULROY,
County Court Judge, and a Jury.

A P P E A R A N C E S : WILLIAM J. FITZPATRICK, ESQ.
Onondaga County District Attorney
Onondaga County Civic Center
421 Montgomery Street
Syracuse, New York 13202

RICHARD J. CALLE, ESQ.
Attorney for the Defendant
5701 Northern Boulevard
Woodside, New York 11373

PATRICIA A. ALEXANDER, R.P.R.-C.S.R.
Official Court Reporter

## I N D E X


WITNESSES PAGE

SUSAN L. VOLZ

Direct Examination by Mr. Calle. . . . . . . . . . .961

Cross-examination by Mr. Fitzpatrick . . . . . . .967

JOHN EDWARD MARION

Direct Examination by Mr. Calle. . . . . . . . . . .973

Cross-examination by Mr. Fitzpatrick . . . . . . .974

MICHAEL J. OSTUNI

Direct Examination by Mr. Calle. . . . . . . . . . .993

Cross-examination by Mr. Fitzpatrick . . . . . . .998

LEONARD STEPHENS

Direct Examination by Mr. Calle. . . . . . . . . . 1002

BERNICE BARNETTE

Direct Examination by Mr. Calle. . . . . . . . . . 1007

Cross-examination by Mr. Fitzpatrick . . . . . . . 1009


## E X H I B I T S


| DEFENDANT'S EXHIBITS | DESCRIPTION | MARKED |
|---|---|---|
| K | Affidavit of Susan L. Volz, Dated 4/7/87, One Page | 963 |
| L | Affidavit of Joseph Morgan, Taken by Sergeant Michael J. Ostuni, Dated 8/2/88, One Page | 997 |

(In chambers discussion.)

THE COURT: Okay. Would the record reflect that we're in chambers with the district attorney, defense counsel, the defendant.

There has been application made by the Syracuse Newspapers, the Post-Standard Reporter John O'Brien, for a request for still photography during certain portions of this trial. Is that correct, Mr. O'Brien?

MR. O'BRIEN: Yes.

THE COURT: You've made application. All right.

Under the rules generated by the Chief Judge, I'm required to get the feelings of the attorneys.

Mr. Fitzpatrick, do you have any objection to still photography being conducted in this trial?

MR. FITZPATRICK: No, your Honor.

THE COURT: Mr. Calle, do you have -- have you -- well, Mr. Rivas, I guess, would you like to confer with your attorney --

THE DEFENDANT: Yes, I would.

THE COURT: -- before you make this

decision?

THE DEFENDANT: Yes.

(Mr. Calle and the defendant conferred off the record.)

THE COURT: Okay. Any objection --

MR. CALLE: No, sir.

THE COURT: -- from the defense?

Mr. O'Brien, I'm going to grant you that opportunity. Of course, you've done this before. I -- the position of your cameramen should be such that the jury is not distracted. I don't expect continuous shots. I don't know what noise the camera is going to make, but you know he is to be as nonintrusive as possible. Okay.

MR. O'BRIEN: He is not here. When he gets here --

THE COURT: Well, he gets the point. You don't have any, any idea what he's -- I don't want, obviously, somebody testifying --

MR. O'BRIEN: But him behind the jury box in the corner there, that's, I assume --

THE COURT: All right. All right.

MR. O'BRIEN: -- I assume --

THE COURT: He will have to enter the

side door. Maybe if he enters the front, if I see him, I will send the court attendant out to get him and usher him in through the side. I'm going to explain to the jury so they're not distracted and they understand what's happening.

MR. O'BRIEN: Thank you, Judge.

THE COURT: Now, do you want to, while we're in here, put this discussion -- your objection?

MR. FITZPATRICK: Sure.

THE COURT: Okay. (Addressing Mr. O'Brien): No, not yet. No, this is not open to the public, at this point.

(Mr. O'Brien left chambers at this time.)

THE COURT: Mr. Calle -- we're again, still in chambers.

Mr. Calle intends to call a Sergeant Kerwin. Sergeant Kerwin had provided, as recently as yesterday, information to the district attorney in the form of an affidavit. That affidavit was taken by a Syracuse police officer from an individual by the name of Joe Morgan. The affidavit was taken, I believe, in August of 1988.

In that affidavit, Mr. Morgan alleges that another person by the name of Patsy, last name Barricella, B-A-R-R-I-C-E-L-L-A, okay -- Officer Kerwin, in the course of his investigation, discovered this affidavit. Mr. Calle wants to subpoena the officer and question him about the Syracuse Police Department's investigation regarding -- surrounding this affidavit.

Mr. Fitzpatrick strenuously objects to this line of questioning and this area of questioning on the grounds -- well, I'll let you state your grounds.

MR. FITZPATRICK: Your Honor, my grounds are very simple, are that Mr. Morgan -- aside from any character defects that he may have, questioning his -- questioning his character, credibility -- is available. He's available to be subpoenaed and he's available to be examined in court to determine whether or not, in fact, these admissions were made.

More importantly, Patsy Barricella is also alive and available and able to be subpoenaed by the defense. This is what would

constitute evidence of this supposed admission or confession or whatever you want to call it. And to do it through the back door, without giving me the opportunity to cross-examine, is just unfair.

THE COURT: Mr. Fitzpatrick, one thing we should note: This information was turned over to the defense, I believe, just prior to the People resting in this case.

(Mr. Calle indicated nonverbally.)

THE COURT: Do you -- you know, counsel, obviously, doesn't have the resources at his disposal given the time constraints to locate Mr. Morgan.

I noticed I signed a Transport Order for his production yesterday. Have you -- has your office produced him? Is he in the city?

MR. FITZPATRICK: He is not in the city or the county, nor do I have any intention of bringing him. If directed, I will.

THE COURT: Well, the only way I think we can get around this thing, you know, to be fair to the defense here, I think this evidence is exculpatory.

MR. FITZPATRICK: I did, too. That's why I turned it over immediately upon receipt.

THE COURT: I know I also considered the fact that it was produced almost at the close of the People's case and, thus, you know, the Court pressing the defense to move on puts Mr. Calle at somewhat of an unfair advantage. He doesn't have the resources at his disposal, one, to locate this Joe Morgan and, two, to produce him here in twenty-four hours. I know that I signed a Transport Order for your office for this individual yesterday. The only way that we can get around this thing -- and I don't -- and I'm concerned about time now, if you can get Mr. Morgan here, I will substitute Mr. Morgan for Sergeant Kerwin for his examination. But, otherwise, we've handcuffed Mr. Calle, to some degree, and we're also going to delay this trial if Mr. Calle or I have to order the deputies to go get him. How long will it take you deputies to go to Sonyea, New York, wherever that is?

DEPUTY ADAMS: It's Rockland County.

MR. CALLE: Rockland, where? That's

where I live. What part?

THE COURT: Sonyea, S-O-N-Y-E-A.

DEPUTY WHITE: It's Groveland Correctional.

DEPUTY ADAMS: Groveland Correctional, about a six-hour ride.

THE COURT: Six-hour ride. So there goes today. I mean, you -- to be fair, he either can do one of two things: we adjourn this trial until sometime into next week for the production of Joe Morgan. I'll sign the transport. I'll order these guys to get him, and I have -- I will give Mr. Calle a chance to put -- or we put Sergeant Kerwin on the stand and --

MR. FITZPATRICK: Well, if you give me those options, Judge, I don't want to adjourn the trial.

THE COURT: Well, I can't think of another way to be fair in this case with this information. I think -- I'll tell you, I think counsel has an absolute right to explore this information. It's information that supposed -- alleges that he killed a woman on

Hickok Ave. And to dismiss it by saying, "Well, we can't get Joe Morgan here, and we don't want Sergeant Kerwin to talk about it," tough potatoes. I think that's improper. I think it's wrong, and it's unfair, especially given the fact that this information was produced by the police more than in the middle of this trial, at the end of your case.

MR. FITZPATRICK: And I apologize for that, as you know.

THE COURT: Well, you have no control over that, but you have to face the weight.

MR. FITZPATRICK: That's true. So you're telling me -- I mean, that is the only other way we'll handle it. He's got a chance to explore it with Officer Kerwin, or I'll hold the trial up and we'll get Mr. Morgan here by tomorrow.

DEPUTY WHITE: Yeah, he'd be obtained tonight.

THE COURT: What do you want to do?

MR. FITZPATRICK: Judge, here's the dilemma that I have -- and forgive me for thinking out loud -- but you know Joe Morgan is

a totally disreputable individual, and I don't want to inject him into this trial and create a phantom reasonable doubt. So if the defense is willing to pursue this and suggest to this jury that this is some reliable information, then I'd just as soon have it done through Officer Kerwin. And I would like some latitude in producing rebuttal evidence.

THE COURT: Well, I assume your rebuttal evidence is going to be Joe Morgan.

MR. FITZPATRICK: I have no intention of calling Joe Morgan and vouching for his credibility. I could not do that.

THE COURT: The point is, Mr. Fitzpatrick, people that report crime or participate in crime often are not reputable people, and their credibility is always subject to attack. But to dismiss somebody just because of his criminal record -- you consider him disreputable, that's not fair. That's not fair.

MR. FITZPATRICK: I think your Honor is missing my point, that Joe Morgan could very easily walk into this courtroom and do something disruptive.

THE COURT: Well, that's the chance we'll have to take. If he's going to make affidavits saying other people committed a crime, I'll take that chance about him being disruptive.

Mr. Calle, are you ready to pursue this information through Officer Kerwin, without delaying the trial and having Mr. Morgan produced?

MR. CALLE: Yes, sir.

THE COURT: Okay. That's what we'll do then.

MR. FITZPATRICK: Here are those two memos, Judge. I've just skimmed through them.

THE COURT: Let the record also reflect that there's also a memo that's been generated by the Syracuse Police Department that's just been discovered.

(The document was handed to the Court.)

THE COURT: Well, there's the memo. There is a memo here that's been produced -- generated April 1st of 1987, shortly after this homicide was discovered, from a police officer -- and I don't know the officer's name; I can't

read his name -- that he was informed by another police officer who was detailed in the area where the murder took place, to either question people or to make whatever observations.

He observed a vehicle with a certain registration, registered to a Mary Barricella, who, apparently, is some relation, driven by Pasquale, also known as Patsy Barricella, who drove back and forth in front of the residence three or four times, and the police considered this suspicious. They stopped the individual in question. This is the same Patsy Barricella who allegedly has admitted to killing a woman in that area. And I think this memo may lend some strength to that other evidence that we've been discussing. And all the more reason why I'm going to allow counsel to pursue the affidavit and the memo contained in this.

There's also another memo written by a Sergeant Tynan -- to Sergeant Tynan from Officer Hayes, who indicated that they spoke with Patsy Barricella regarding his actions on the night in question. And he stated -- "he,"

being Barricella -- that he did go by the address three or four times that night, but he was coming and going that way to avoid the traffic lights. He usually takes that way to go home. He had no information at all to offer about this case.

And, again, I reiterate this is the same Patsy Barricella who allegedly admitted to a Joe Morgan that he had killed a woman on Hickok Ave.

And now, I think, to prohibit defense counsel from exploring this area would be a denial of his rights to defend his client. I'm going to let him do it. You can do it through Officer Kerwin. I'd suggest, Counselor, maybe Officer Hayes and Officer Stephens. Stephens is the fella who saw this suspicious vehicle. And do you know who generated this, this assignment, Jack Hayes approved?

MR. FITZPATRICK: I don't, Judge. I --

THE COURT: Well, then, we want an Officer Stephens.

MR. FITZPATRICK: Well, I will produce whoever the defense wants, Judge, rather than --

THE COURT: Okay. And I see the vehicle was stopped by this writer. I don't know from -- P.O. -- here it is, Barnette. Who do you want produced, Mr. Calle?

MR. CALLE: I guess all of them, Judge.

THE COURT: Barnette and Stephens and -- well, I'll let you read that.

MR. CALLE: I need a moment to analyze this myself.

(The documents were handed to Mr. Calle for review.)

THE COURT: Sure.

MR. CALLE: This writer --

THE COURT: This writer, Barnette, it is up there in the left corner.

MR. CALLE: Stephens, Barnette. What about --

THE COURT: Do you want Jack Hayes? Talk to this guy?

MR. CALLE: Yes, sir. And there was another one, Altuni (sic).

MR. FITZPATRICK: Ostuni.

MR. CALLE: Ostuni.

THE COURT: Ostuni took the affidavit from

Joe Morgan. Okay. You want him brought in?

MR. CALLE: Well, I wouldn't mind talking to him.

THE COURT: Okay.

MR. FITZPATRICK: This afternoon?

THE COURT: Stephens, Barnette, Ostuni.

MR. FITZPATRICK: When do you want them?

MR. CALLE: And Hayes.

THE COURT: And Hayes. We may delay calling Kerwin, because Kerwin --

MR. FITZPATRICK: Kerwin has a very small role in all of this.

THE COURT: Do you want to go back now and speak to Kerwin yourself before we go into court, whether you want to start and whether he is -- he is even relevant now. We have the people who really participated in the case.

MR. CALLE: Yes, sir, I will.

THE COURT: You go talk to him --

MR. CALLE: Yes.

THE COURT: -- and let me know. I'll give you a few minutes.

MR. CALLE: Okay.

MR. FITZPATRICK: Stephens, Barnette,

Ostuni.

MR. CALLE: And Hayes.

MR. FITZPATRICK: And Hayes.

THE COURT: And Hayes.

MR. FITZPATRICK: May I have those?

THE COURT: Sure. Do you want copies of those memos?

MR. CALLE: I wouldn't mind, sir.

THE COURT: Do you want me to make them?

DEPUTY ADAMS: Do you want us to take him back out there?

THE COURT: Yes, if you would, please.

MR. FITZPATRICK: Judge, I'm going right outside. I'll be right back.

THE COURT: He will not need Kerwin now, but I'd like him here when the other witnesses are produced, to try to get a scenario, who fits where. 12:30 out there. I'd like those people out there 12:30, sir.

MR. FITZPATRICK: All right. I'll tell them.

(Proceedings stand in recess.)

(All parties are present. Proceedings resumed in open court at this time.)

THE COURT: Okay. Let the record reflect the jury is present, counsel, the defendant.

Good morning, ladies and gentlemen.

(The jurors collectively responded, "Good morning.")

THE COURT: I'm sorry for the delay. Mr. Calle, would you call your next witness, sir.

MR. CALLE: Yes, Judge.

(Proceedings paused.)

MR. CALLE: Defense would like to call Sue Volz.

THE COURT: All right. Sue, is that -- please, up here, ma'am. Good morning. Could you spell it, V-O-L-Z?

MS. VOLZ: Right.

THE COURT: Keep your voice up nice and loud, okay? I've got a microphone there for you. You can't answer a question by saying Mm-hmm; you have to say yes or no. Okay, ma'am. Thanks. Relax.

Go ahead.

*        *        *

S U S A N L. V O L Z , called as a witness on behalf of the Defendant, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. CALLE:

Q Good morning, Miss Volz.

A Good morning.

Q Miss Volz, I direct your attention to the month of March of 1987. Would you tell this Court if you were employed -- where was it that you worked?

A Albert's Restaurant.

Q And where is that?

A Cazenovia.

Q And what were your duties there?

A Waitress.

Q And in March of 1987, how long were you a waitress at Albert's?

A Seven years.

Q Now, specifically, ma'am, I direct your attention to March 27th, 1987, and I -- and we have a calendar here to give you an idea of the day of the week.

Can you tell this Court if you were working in your capacity as a waitress at Albert's Restaurant on that day or that evening?

A Yup -- yes.

Q Do you recall what your hours were that evening or that day?

A No, I don't.

Q Do you recall the time that you were at Albert's on that day in question?

A Depending on what shift I worked.

Q Do you recall what shift?

A It's the night shift. It's either 5 to 10 or 6 to 9.

Q So you're certain you were working there that day?

A No, I'm not certain.

Q But if you were working, you would -- you would work either the 5 to 10 shift, or the 6 to 9 shift?

A That's correct.

Q This is going to seem like a dumb question, ma'am, but do you recall seeing Hector Rivas at Albert's Restaurant on March 27th, 1987?

A I don't remember that far back.

MR. CALLE: If I may, your Honor, I'd like to have this marked --

THE COURT: Marked.

MR. CALLE: -- as Defendant's Exhibit -- what is it?

COURT REPORTER: I think it's K.

(Affidavit was marked for identification as Defendant's Exhibit K, this date.)

MR. CALLE: Thank you, Ms. Alexander.

If I might, your Honor, I'd like to show this to the witness and ask her to read it to herself.

THE COURT: Okay. First of all, ma'am, I'd like you to pick up Exhibit K there. Can you tell us what that is?

THE WITNESS: It says a voluntary affidavit.

THE COURT: Okay. Whose voluntary affidavit is it?

THE WITNESS: Mine.

THE COURT: Does your signature appear on it?

THE WITNESS: Mm-hmm. Yes.

THE COURT: Is there a date on that affidavit, ma'am?

THE WITNESS: April 7th, 1987.

THE COURT: Okay. Would you read that to yourself, please.

(The witness complied.)

THE COURT: Okay. Now, Mr. Calle, she's read it to herself. Go ahead, sir.

MR. CALLE: Yes.

BY MR. CALLE:

Q Ma'am, again, directing your attention to March 27th, 1987, did you ever make a statement indicating that you saw Hector Rivas?

MR. FITZPATRICK: Objection, your Honor. She's about to disclose the contents of the affidavit, which is improper.

THE COURT: Does that refresh your recollection as to when you may have -- whether you worked the March 27th date?

THE WITNESS: Yes, it does.

THE COURT: Okay. Does it refresh your recollection as to what hours you may have worked?

THE WITNESS: Yes, it does.

THE COURT: What hours were they?

THE WITNESS: 6 to 9.

THE COURT: Okay. Go ahead, Mr. Calle.

MR. CALLE: Thank you, Judge.

BY MR. CALLE:

Q Ma'am, does it refresh your recollection as to

whether you saw Hector Rivas at Albert's Restaurant on March 27th, 1987?

A No, it doesn't.

MR. CALLE: May we approach?

THE COURT: Sure.

(Counsel approached the bench. An off-the-record discussion ensued.)

BY MR. CALLE:

Q Miss Volz --

MR. FITZPATRICK: I'm sorry, Judge, may I speak to you again?

THE COURT: Sure.

MR. FITZPATRICK: Real quick.

(Counsel approached the bench. An off-the-record discussion ensued.)

BY MR. CALLE:

Q Miss Volz, is that affidavit a recorded recollection of the items that you signed to?

A I don't understand. Do you mean this piece of paper, did I sign this? Is this the same piece of paper I signed; is that what you're asking?

Q No, ma'am. What I'm asking is, what is that piece of paper?

A It's a statement -- it's an affidavit that I

gave an investigator or trooper, I believe, a trooper.

THE COURT: You gave it to a trooper, April when?

THE WITNESS: It says April 7th.

THE COURT: Okay. Does it relate to certain events that occurred on March 27th?

THE WITNESS: Yes, it does.

THE COURT: Okay. And did you relate in that affidavit certain events on March 27th?

THE WITNESS: What he had asked me, yes.

THE COURT: And you related what you recalled?

THE WITNESS: That's right.

THE COURT: And reading that affidavit, are you telling me that doesn't refresh your recollection as to what --

THE WITNESS: No, it doesn't. It only refreshes the investigator -- the trooper asking me the questions. I don't remember this night in question at all.

BY MR. CALLE:

Q But, Miss Volz, you signed that statement back on April 7th, 1987, correct?

A Yes.

Q And did you attest to the truth of that statement when you signed it?

A Yes, sir, or I wouldn't have signed it, I'm sure. But to this day, I don't know -- I don't remember this date, this night.

Q Well, would you not have attested to the truth of that statement if it were false?

A Well, to the best of my recollection, I would think that I would tell him the truth.

Q And does it relate if you saw Hector Rivas at Albert's Restaurant on March 27th, 1987?

A Yes, sir, it does.

Q And what time is stated there?

A I stated 7:30 to 8, around there, because I had been there an hour or so.

Q And is that p.m.?

A Yeah.

Q Thank you very much.

THE COURT: Any cross?

MR. FITZPATRICK: Briefly.

CROSS-EXAMINATION BY MR. FITZPATRICK:

Q Sue, good morning.

A Good morning.

Q I want to see if I have this straight. On April the 7th, which would have been, I believe, a Tuesday?

A Yes.

Q A trooper came to you and was asking you some questions?

A Yes.

Q And did the trooper direct your attention to Friday night, April (sic) the 27th, and ask you about that specific night?

A I don't remember that, if that was the specific night, but through my affidavit, it obviously -- that was the night he was speaking of.

Q All right. And you got to work at about 6:00 that night?

A Right.

Q I take that back. Actually, you were supposed to start work at 6:00?

A Which night? Is this the 27th or --

Q The 27th, Sue.

A Yeah, I was supposed to start work at 6. I probably got there quarter of.

Q And had you been at the bar earlier that day?

A No.

Q And your best estimation is that you had been there about an hour when you saw Mr. Rivas come in?

A Yes.

Q And you don't remember if you talked to him?

A (No verbal response.)

Q You have to say yes or no.

A Oh, no, I don't.

Q And you don't remember when he left?

A No.

Q And you don't remember how long he was there?

A No, I don't remember the night.

Q Okay. You got there at about quarter to 6. It's possible that he got there about quarter of 7, 7:00?

A Yeah, could be.

Q All right. Sue, would it -- are you familiar with the Syracuse area, Onondaga County, and Madison County?

A Yeah.

Q Where do you live, what county?

A Cazenovia, Madison County.

Q Did you travel to Syracuse often?

A Not too much.

Q Do you know where Coleman's Tavern -- Coleman's Restaurant is?

A No, I don't.

Q You have never been in the Tipperary Hill -- over in that area?

A No. My husband has.

Q A lot of husbands have, apparently.

Let me ask you this: Trooper comes in to see you and he directs your attention to a particular Friday night?

A Mm-hmm.

Q And asks if you saw Hector Rivas at the bar that night, right?

A Right.

Q You've seen Hector Rivas at Albert's Restaurant dozens of times?

A Many, yeah, many times.

Q Many times?

A Mm-hmm.

Q And you knew on April the 7th that Valerie Hill was dead?

A Yes, I did.

Q And you didn't know when she died?

A No, I had no idea.

Q And, in fact, you today don't even know when she died?

A No, I don't know which day she died.

Q You certainly don't recall anything remarkable that sticks in your mind today, about April (sic) 27th?
A No, I don't.
Q Or, excuse me, March 27th?
A No, I don't.
Q Okay. And in addition to asking if you had seen Hector Rivas, did the trooper also ask you if you recall what he was wearing?
A He showed me a picture of Hector and he asked me if this was what he had on.
Q What did you say?
A I said no, I thought he was wearing green, a green sweater, I believe.
Q A green sweater?
A That's not in this report, but --
Q I want to show you People's Exhibit 17. Do you recognize Hector Rivas in that photo?
A Yes, I do.
Q Do you know if that's the same photo the trooper showed you?
A No. The trooper showed me a photo, I believe it's just a small singular photo of him.
Q Do you see what Mr. Rivas is wearing?
A Yeah, I think there was in the same photograph.

I can't guarantee you that.

Q All right. But in any event, that was not what Hector Rivas was wearing when you saw him?

A Not according to the statement I gave.

Q Okay. Sue, thank you very much.

THE COURT: Anything else?

MR. CALLE: No, sir.

THE COURT: Okay. Thanks very much. Watch your step coming off there. I'll take this.

(Witness excused.)

MR. CALLE: Your Honor, the defense would like to call Ed Marion.

THE COURT: All right. Right up here, sir, if you would.

How are you doing, Mr. Marion?

MR. MARION: Good.

THE COURT: I'd just ask you to keep your voice up nice and loud, please.

MR. MARION: Okay.

* * *

J O H N E D W A R D M A R I O N , called as a witness on behalf of the Defendant, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. CALLE:

Q Mr. Marion, what do you do for a living, sir?

A I do refrigeration work.

Q In March of 1987, what employment did you have?

A I was in partnership with another man doing refrigeration work.

Q Basically the same business -- same type business?

A Still.

Q I direct your attention to March 28th, 1987. Do you recall you saw Hector Rivas at all that day or evening?

A I saw him at night.

MR. FITZPATRICK: I'm sorry, Rich, what time?

MR. CALLE: The 28th of March.

MR. FITZPATRICK: 28th.

THE COURT: Saturday night.

A Saturday, yeah, I saw him Saturday night.

BY MR. CALLE:

Q And where was that, sir?

A At a party on Route 20 at the Giordano residence.

Q Did you have the opportunity to speak with Mr. Rivas?

A I'm sure I talked to him. I always, every time I saw Hector, I always talked to him, said hello, whatever. I don't recall talking to him, no.

Q Do you recall seeing him?

A Yes, I do recall seeing him there.

Q Do you recall any actions that Mr. Rivas did that might strike you as unusual?

A No. He was just like Hector, whatever, just -- he was in a good mood and he was there all night, partying, dancing, and everything else, and I do remember that; that's about it.

Q Thank you very much.

THE COURT: Any cross, Mr. Fitzpatrick?

CROSS-EXAMINATION BY MR. FITZPATRICK:

Q Did you see him Friday night, Ed?

A I don't recall seeing him Friday night.

Q Were you at Albert's Friday night?

A I go to Albert's all the time. It's my father's place; he owns the place, so I don't -- I couldn't

tell you what night I was there, or what night I wasn't there.

Q Okay. I'm just curious as to -- you really don't -- you really, as you sit there now, you really don't remember seeing Hector Rivas on Saturday, March 28th, do you?

A I don't remember seeing him, no, not during the day, I didn't. I don't remember. I guess it was the basketball weekend. I don't remember it.

Q Would it be fair to say what you remember is that Saturday night he was at Bob Giordano's party?

A Yes.

Q Were you having a good time?

A Yes.

Q Did it appear to you that everybody else was having a good time?

A Yes.

Q And are you including Hector into that group as having a good time?

A Yes.

Q As you sit here today, do you remember anything specific about what Hector said or did?

A No.

Q You say he was dancing. Do you remember anybody

that he was dancing with?

A No, just everybody is -- it was just those parties got -- whatever, they're a lot of fun. Everybody dances with everybody.

Q Would it be fair to say, Ed, that if I mention the name of virtually anyone that was at that party, that your recollection would be that they were having a good time and dancing?

A Yes.

Q All right. Thanks, Ed.

MR. CALLE: Nothing further, sir.

THE COURT: Thanks for coming in. Appreciate your coming in, Ed.

(Witness excused.)

MR. CALLE: That's it.

THE COURT: Ladies and gentlemen, well, I'm just going to dismiss you for now, this morning. Don't talk about the case, don't form any opinions. I'd like you back in the jury room at 2:00 this afternoon. I anticipate this case -- and I always get in trouble when I do this -- but I'm going to anticipate -- I anticipate this case going to the jury tomorrow.

So I know there's been concerns maybe on your part, about when this is going to end. I anticipate tomorrow. I say that to you because I'd like you to begin making plans for getting this case to decide tomorrow, if you have to rearrange any plans, okay, but we'll break for now.

Again, don't form any opinions about the case, don't talk about it, don't read anything about it, don't go off and take a drive anywhere that may have come up during the trial.

I'll see you at 2:00. Okay. You're excused.

(The jurors were excused.)

THE COURT: Mr. Calle, Mr. Fitzpatrick.

(Proceedings stand in recess.)

(Court, counsel, and the defendant are present. Proceedings resumed at this time.)

THE COURT: Pat, would you put us in session, and let the record reflect that we're outside the presence of the jury, with the presence of counsel and the defendant.

There have been some events that have occurred over the last day in this trial that

we've been carrying on discussions in chambers, off the record, on the matters.

However, they've reached a point where, Mr. Calle, we -- you indicated that you needed to address these issues. So we'll do that at this time, sir, at your leisure.

MR. CALLE: Yes, sir. Judge, yesterday afternoon, approximately forty-five minutes before the prosecution rested, I was handed exculpatory material. Basically, it was a voluntary affidavit.

THE COURT: Hold on a second. Ma'am, this place is not a cafeteria. It is not a place to bring sodas into. It's not a place to eat. Would you take the stuff out, please.

I'm sorry, Counsel --

MR. CALLE: No problem, Judge.

THE COURT: -- to interrupt you.

MR. CALLE: Exculpatory material, that is a voluntary affidavit signed by one Joseph Morgan. Inside -- this affidavit was signed on the 2nd of August, 1988. And it was witnessed by a Sergeant Ostuni that in March of 1988, Patsy Barricella, B-A-R-R-I-C-E-L-L-A, asked

Joseph Morgan if he wanted to go drinking and then out to kill someone. Joseph Morgan asked, "What are you talking about?" And Patsy Barricella told him, "It's easy. I've killed someone before this." "I asked what he was talking about, and he told me he killed the girl on Hickok Ave."

Judge, based upon the fact that this particular item was handed to me just yesterday after the prosecution's case was about 98 percent completed, this very day I received two other reports from the Syracuse Police Department, and I understand that none of these reports were in the custody of the district attorney's office and, in fact, Mr. Fitzpatrick gave them to me contemporaneously with him receiving it.

And I -- there is a Sergeant Kerwin that is -- if I've got my dates mixed up, Mr. Fitzpatrick, when he wishes, he can tell me which papers were given on which day, yesterday or today.

However, there's another Syracuse Police Department interdepartmental memo which indicates, which indicates Chuck Godin, G-O-D-I-N, spoke

with Sergeant Kerwin, I believe this particular memo, signed by Sergeant Kerwin, Godin is memorialized as saying that he heard Joseph Morgan say he was in the rear yard where the girl was killed -- the girl who got murdered in Eastwood.

And I believe today this particular memo was given to me, Syracuse Police Department interdepartmental memo, C.I.D., to police officer -- from Police Officer Barnette, subscribed by Sergeant Barnette, I believe. When, I couldn't be certain. I can't read it -- April 1st, 1987.

Indicative is the fact that on April 1st, 1987 -- on the 31st of March, 1987, approximately 11:30, a Sergeant -- Officer Stephens, Leonard, Leonard Stephens was assigned detail to secure the house at 248 Hickok Avenue, where he noticed a suspicious car, the only car in the area at the time, circled and passed by 248 Hickok approximately three times. He then radioed ahead to Officer Barnette to stop the vehicle. Inside the vehicle, which was owned by a Mary Barricella, was Patsy Barricella.

Judge, based upon the fact that this information was given to defense just at this particular time, I feel it is appropriate to ask for a mistrial.

THE COURT: Okay. On the grounds that --

MR. CALLE: If I can, on the grounds that the defense has been unduly prejudiced by such a late turn of events here, that we do not have an opportunity to talk to Joseph Morgan, or to Chuck -- George Godin, G-O-D-I-N -- George Godin, Judge; that it in effect -- in that it negatively affects the defense's case.

THE COURT: And Patsy Barricella, too, I assume.

MR. CALLE: Yes, sir.

THE COURT: Okay. Mr. Calle, we have had these discussions in chambers before. At that time, I believe I gave you an opportunity, if you would like, for an adjournment. And the district attorney has indicated -- well, I've indicated to you that we know where Mr. Morgan is. He is an inmate at some state correctional facility. The deputies have indicated that they can have him back in Syracuse, after I sign a transport

order, by late tonight.

Now, I don't know, I could order them to detail a group tonight. It is a six-hour drive one way. There's -- we can have him back here tonight or by noon tomorrow. So that's Joseph Morgan.

Mr. Fitzpatrick has indicated that he has, in fact, spoken to Patsy Barricella, this other person who's potentially a suspect. He can have him down in court here within a half-hour for you to speak with him.

As to this George Godin, or whatever his name is, I don't see where he's that relevant. But, again, I ask you, sir, I've given you an opportunity for an adjournment. It's my understanding that you declined to have these people produced.

Do you -- do you want me to adjourn this case in order for you to -- for us to secure these people? Would you make -- rather make the points you want to make with the police officers who took this information? We have taken -- made the effort to produce, I believe, all the police officers involved in generating these memos for

you.

MR. CALLE: Well, sir, with all due respect to the Court --

THE COURT: Or you just feel the exculpatory nature at this stage unduly prejudices you, and that is the basis of your mistrial?

MR. CALLE: Yes, sir, that is the basis --

THE COURT: Okay.

MR. CALLE: -- for the mistrial application.

THE COURT: Okay. Mr. Fitzpatrick, would you like to be heard?

MR. FITZPATRICK: I appreciate counsel not questioning me as to when I received the material. He didn't have to do that, and I appreciate that. It is a fact that within seconds after I received it, I turned it over to him. And I think either on the record or in conference in chambers, I have expressed my deep dismay in taking a murder case to trial after six years and having every police officer that comes over here pop up with another memo-affidavit that is buried in a vault somewhere.

I oppose the motion for a mistrial for the

reasons that Mr. Morgan is available; Mr. Barricella is available; the police officers are all available; and the information has been provided to the defense.

THE COURT: Well, first of all, addressing the exculpatory nature of the memos, I have seen the memos. I have seen the affidavit. They are, in my opinion, exculpatory without a doubt. There is nothing to me to believe that these documents were not immediately turned over to defense counsel the moment the district attorney was apprised of these documents.

It is my belief -- I also share his displeasure at the fact that documents such as these were produced midway through a murder case, but, Mr. Calle, I'm going to deny your motion for a mistrial. I will, though, however, sir, if you demand or if you request an adjournment, to have these people brought in, I will grant you that. I think it is the least I can do for you at this stage, if you want them.

However, I have indicated to you that the police officers who generated these documents are available. You may question them. The Court

will give you some leeway in questioning them, if you want to establish whatever points you feel are important to establish with their testimony.

However, if you feel it's important to have the -- I'll call them, for lack of a better word, the suspect or suspects, i.e., Morgan and Barricella, produced to be placed upon this witness stand to answer questions, sir, you may have for them, I will grant an adjournment for that to take place. That's going to be a call you're going to have to make, Mr. Calle. And, certainly, talk --

MR. CALLE: Thank you, sir.

THE COURT: -- to your client about that, if that's what you want.

MR. CALLE: May we approach, Judge, briefly?

THE COURT: Sure.

(Counsel approached the bench. An off-the-record discussion ensued.)

MR. CALLE: Thank you. Okay.

THE COURT: Mr. Calle?

MR. CALLE: Yes, sir.

THE COURT: I guess maybe I'll spread it on the record. We've had some discussions at the bench. And the Court is prepared, if you desire, and only if you desire, to allow you to lead the witness, that would probably be Ostuni, as to the contents of Mr. Morgan's affidavit. And the Court would relax the hearsay rules to allow the contents of that statement to be stated in open court --

MR. CALLE: I follow you.

THE COURT: -- if you feel that would satisfy any need or desire to call Patsy Barricella or Mr. Morgan, himself.

But before you make this decision, I want you to make sure you've conferenced this with Mr. Rivas, and that your client is aware that, first of all, you can have more time to talk about it if you'd like, and I'd -- I will give you that office to do that, if you like, or whether you feel that's -- feel, as a defense tactic, this would be sufficient to make the point you want to raise in your defense as a defense tactic, or if you'd like these people called, sir.

So I'm giving you the option: more time to talk about it and think about it; give you a chance to relax the rules a little bit so the contents of that affidavit can be noted before the jury; or give you an adjournment and call these people in person.

MR. CALLE: Judge, I've had a conference with my client. And my client is in agreement with me in that if we could get the points across on the voluntary affidavit that was recorded by Officer or Sergeant Ostuni, that would be sufficient; and that we would decline the Court's gracious offer of the expenditure of securing the presence of Joe Morgan, who we understand is about six hours away, and that is -- I appreciate the fact of the relaxing of the hearsay rules, Judge, but I feel that defense's position is that although it will not be asked to be marked in evidence as a business record, the defense's position is that or would be that it is a business record, and that it is an exception to the hearsay rule.

THE COURT: And this document was -- this record we are talking about is the affidavit of

Joe Morgan?

MR. CALLE: Yes, sir.

THE COURT: Let me ask you this, Mr. Fitzpatrick: In light of my rulings in terms of relaxing the rule, do you still have an objection as to marking and receiving this affidavit without any further questioning as a business record, and making it an exhibit in the trial, or would you rather have counsel use it with the relaxed rules?

MR. FITZPATRICK: The latter, your Honor. And could I --

THE COURT: Okay.

MR. FITZPATRICK: -- and if I could, could I ask for an offer of proof as to exactly what he will try to elicit?

THE COURT: All right. I think what we'll do is that we will bring -- unless you, you can stand up and tell me what you intend to do, or we will bring Ostuni and give you a dry run with him.

MR. CALLE: Well, Judge, basically I'm going to ask him if -- what his function is, his employment, is he a sergeant with the police

department. I'll direct his attention to the 2nd day of August, 1988; was he on duty at the time; did he have -- was he involved with the investigation of the death of Valerie Hill. During the course of that investigation, did you happen to speak with a person by the name -- did you ever speak with anyone. And he'll say, "On that particular day" -- and, I imagine, he'll say, "Yes." If not, I'll ask him to look at the voluntary affidavit.

At that point, I'll ask him who that person was. And I will ask him, based upon the conversation that he had with Mr. Joseph Morgan, did that lead to another subject in the investigation of the death of Miss Hill.

And, at that point, I would ask what specifically led to this particular officer to make the decision that someone else should be investigated. Is that sufficient for the Court?

THE COURT: It's okay with me. Mr. Fitzpatrick is --

MR. FITZPATRICK: All right. I understand, Judge. Are any other officers going to be testifying?

THE COURT: Well, again, let's bring us to Officer Barnette. Do you intend on calling Officer Barnette?

MR. CALLE: And Officer Leonard Stephens, sir. And, as an offer of proof, Mr. Fitzpatrick, I would just ask Officer Leonard Stephens if he was on detail on March 31st, 1987, and where was he at approximately 11:30 p.m. He will elicit -- it will be elicited --

MR. FITZPATRICK: I am sorry to interrupt you, but I don't have any problem with those officers. I would just ask, in fairness to me, that Ostuni be called last.

THE COURT: All right. You want to start with Officer Stephens and/or Barnette, and then we'll move to Ostuni. Is that all right?

MR. CALLE: With all due respect, I would prefer the latter.

THE COURT: Well, all right. I'm not going to tell you who to call and when to call them. So if you want to call Ostuni first, go ahead.

MR. CALLE: Thank you, sir.

THE COURT: That's how we can proceed then, gentlemen.

MR. CALLE: Yes, sir.

THE COURT: I appreciate that this is not a withdrawal of your motion for a mistrial, except I want you to understand if we proceed this way, you're now not requesting -- and it's clear you are not requesting -- an adjournment to have these other people be produced.

You are satisfied that this -- if this evidence is elicited before this jury, that would satisfy any and all defense requests relative to this point, other than a mistrial, of course.

MR. CALLE: That, Judge, if you asked me, again, I might have a different answer; but at this point, yes, sir. That's exactly the way it is now.

THE COURT: And you've counseled that with your client and, and this is a defense tactic that --

MR. CALLE: Yes, sir.

THE COURT: I just want it clear.

Okay. Let's have the jury, please.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Okay. The record should reflect

the jury is present, counsel, and the defendant.

Mr. Calle.

MR. CALLE: Yes, sir.

THE COURT: Call your next witness, please.

MR. CALLE: Yes, sir.

THE COURT: Officer Michael Ostuni. They'll get them.

MR. CALLE: Yes, sir.

(Proceedings paused.)

THE COURT: Hi.

MR. OSTUNI: Your Honor.

THE COURT: Okay. Go ahead, sir.

MR. CALLE: Thank you, sir.

* * *

M I C H A E L J. O S T U N I, called as a witness on behalf of the Defendant, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. CALLE:

Q Good afternoon, Officer Ostuni.

A Good afternoon.

Q Officer Ostuni, what is your rank in the police department, sir?

A I'm a sergeant.

Q And is that the Syracuse Police Department?

A Yes, sir, it is.

Q Directing your attention to August 2nd, 1988, were you functioning in that capacity at that time as an officer?

A As an investigator, yes, sir.

Q As an investigator. And during your tenure as an investigator, did you ever happen to investigate, or aid in the investigation of the murder of Valerie Hill?

A I did.

Q Directing your attention to that date in question, August 2nd, 1988, Sergeant Ostuni, did you conduct any police business concerning that investigation?

A Yes, sir, I did.

Q Would you tell this Court, what was the nature of

that part of the investigation?

A During that part of the investigation, I had occasion to speak with an individual identified to me as Joseph Morgan. Mr. Morgan, at his request, was brought to the Criminal Investigations Division's office, where I had a conversation with him concerning possible knowledge that he may have regarding this investigation.

Q And did you have a conversation with him regarding his knowledge?

A I did.

Q And as directly so from that conversation, Officer Ostuni -- Sergeant Ostuni, what did you do with that information?

A That information was then transferred into written form, affidavit form.

Q Did you find that the information that you received from Joseph Morgan might have some pertinence to the investigation of the death of Valerie Hill?

A I didn't do anything further with the investigation, sir, at that time.

Q Okay. Did this advance the investigation at all, this conversation with Joseph Morgan?

A Not to my knowledge.

Q Did you develop any other leads in the

investigation --
A Not personally.
Q -- based upon this conversation?
A Personally, I did not, sir.
Q Well, Sergeant Ostuni, was there ever a name given to you by Joe Morgan that might be a subject for investigation of the murder --
A Yes, sir, there was.
Q -- of Valerie Hill? And what name was that?
A The name was Patsy Barricella.
Q You see that gentleman sitting at that table over there?
A Yes, sir.
Q Is that Patsy Barricella?
A I don't know, sir.
THE COURT: We'll stipulate that it's not.
MR. CALLE: Thank you, Judge.
BY MR. CALLE:
Q So based upon a conversation you had with Joseph Morgan, you then memorialized that conversation, and that conversation led to another subject regarding the investigation of the death of Valerie Hill, is that a fair -- is that a fair rendition of what happened, sir?
A The information would have been transferred by

me to the proper investigating persons, be it the district attorney's office -- I don't know where the information went from -- after that.

Q Okay. Sergeant Ostuni, what was that information?

A The information that was told to me by Joseph Morgan was that he had had a conversation in March of 1988 with Patsy Barricella, at which time Mr. Barricella, among other things, had indicated to him that he had committed a homicide, and that he had killed a female.

Q Do you know where he said he killed the female?

A I'd have to look at the affidavit, but I do believe that he said -- uh -- on Hickok Ave.

Q Do you know if Patsy -- I'll withdraw that.

So you took this information and you gave it to your superiors?

A Yes, sir.

Q Did he tell you anything else concerning the area of Hickok Avenue?

A I don't recall any specific information that he would have told me.

Q Okay.

MR. CALLE: May I have this exhibit marked for identification?

THE COURT: Sure. Yes, sir.

(Affidavit was marked for identification as Defendant's Exhibit L, this date.)

MR. CALLE: If I may, your Honor, I'd like to hand this to the witness.

BY MR. CALLE:

Q Ask you, Sergeant Ostuni, could you tell this Court what that is?

A This is a part of, of one sheet of the original -- of the affidavit which I typed out as told to me by Joseph Morgan.

Q Would you read the last two paragraphs, perhaps, if you would, to refresh your recollection?

A Sure. "Sometime during the last part of" --

Q No, to yourself. To yourself.

THE COURT: To yourself.

Q To yourself, sir. Sorry.

A (Witness complied.)

THE COURT: Does that refresh your recollection, sir, as to any other information that may have been divulged to you?

THE WITNESS: Yes, sir.

BY MR. CALLE:

Q Would you tell this Court if there was any other part of the conversation with Joseph Morgan that you recall

at this time?

A Yes, sir. He said that Patsy Barricella had told him that after the discovery of the homicide, he had driven by the scene of the homicide several times and had been stopped by the police.

Q And did Joseph Morgan ever tell you the reason Patsy gave him?

A That he had been stopped by the police?

Q No. The reason Patsy gave him for the murder.

A Yes, sir.

Q What was that?

A That God told him to do it.

Q Thank you, Sergeant Ostuni.

CROSS-EXAMINATION BY MR. FITZPATRICK:

Q That was God told him to do it?

A Yes, sir.

Q Okay. Now, let me go through a couple of things with you, sir. It's sergeant, right?

A Yes, sir.

Q Was it sergeant back then?

A No, sir. At that time I was investigator.

Q You didn't make sergeant because of that critical lead on the Hill homicide, did you?

A No, sir, I did not.
Q Well, let me ask you this, Sergeant: You know who Joe Morgan is?
A Yes, sir, I do.
Q Do you know his reputation?
A Yes, sir, I do.
Q He's a con artist, is that fair to say?
A Yes, sir.
Q He's a career criminal?
A Yes, sir.
Q He's a drunk?
A Yes, sir.
Q He's been in Marcy Psychiatric Hospital for the criminally insane?
A Yes, sir.
Q Did you know all those things when you took him out of jail back in August of '88?
A Yes, sir.
Q If someone gives you information on a homicide, of the nature that Mr. Morgan gave you, you're required by your police procedures to take an affidavit, or to take a report, aren't you?
A Yes, sir, we are.
Q No matter how outlandish it is, or how

unreliable the person is?

A That's correct.

Q Okay. And there's no question, is there, that Mr. Morgan knew that Mr. Barricella had been stopped in the area of Hickok Ave.?

A That's correct.

Q Even though the latter part of your affidavit -- I mean, he clearly told you that on August 2nd?

A Yes, sir.

Q And, in fact, Mr. Morgan contacted you from the Public Safety Building jail, didn't he?

A He initiated the contact, yes, sir.

A And it was -- the quid pro quo was, "I will give you some information on an unsolved homicide, if you, in turn, go see the D.A.'s office and see if I can get released from jail"?

A Yes, sir.

Q And you did that? You went to see an assistant district attorney, and Mr. Morgan got released on August 2nd of '88?

A That's correct.

Q And the deal was, as far as you understood it, he was going to help you maybe get some information on Patsy Barricella, or where Jimmy Hoffa was buried, or anything

else at all along those lines?

A Yes, sir.

Q He never contacted you again, did he, other than that one time?

A That's correct, sir.

Q And he had no, no information about Mr. Barricella at all, did he?

A That's correct.

Q And, in fact, he became a fugitive, didn't he?

A He did.

Q And eventually got rearrested for another crime, and got sent to state prison?

A Yes, sir.

Q And isn't it also a fact that if, you know, that Mr. Barricella is mildly mentally retarded?

A Yes, sir.

Q Are you aware of that?

A Yes, sir.

Q And he's a neighbor, isn't he, of Mr. Morgan's?

A They lived in the same block, within a few houses.

Q On Cloveridge Avenue?

A Cloveridge, yes, sir.

Q Which is also within a half-mile to a mile of

Hickok Ave.?

A Yes, sir.

Q Sergeant, thanks for your time.

MR. CALLE: Nothing further, thank you.

THE COURT: Thank you, Sergeant.

(Witness excused.)

MR. CALLE: Defense would like to call Officer Leonard --

THE COURT: Stephens.

MR. CALLE: -- Stephens, sir.

THE COURT: Leonard Stephens, please.

* * *

L E O N A R D S T E P H E N S, called as a witness on behalf of the Defendant, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. CALLE:

Q Officer Stephens, what is your position in the police department?

A Police officer.

Q Okay. Were you on active duty back on March 31st, 1987?

A Yes, sir, I was.

Q Okay. Directing your attention to that date, at approximately 11:20 p.m., do you have knowledge of where you were assigned?

A I was assigned homicide detail at 428 (sic) Hickok Ave.

Q Where was that, sir?

A Hickok Ave.

Q Do you remember the number?

A I believe it was 428 (sic) Hickok Ave.

MR. CALLE: Would the Court stipulate --

MR. FITZPATRICK: Yeah, I would certainly stipulate -- it was six years ago. Officer, it was 248 Hickok Ave.

THE WITNESS: Okay.

BY MR. CALLE:

Q Now, based upon that assigned detail, what, if anything, unusual occurred?

A During my course of duty, I was assigned out in front of the house, and I noticed a vehicle pass my location two to three times, at which time I radioed my

assisting officer, Officer Barnette, and had her stop the vehicle.

Q What, if anything, unusual was attributed to the vehicle?

A Repeat the question, sir.

Q Well, sir, that something unusual happened? What was unusual about this vehicle being in the area three times, if anything?

A It passed my location more than one time.

Q Do you recall how many times it passed your location?

A Two to three times.

Q And, sir, did any other vehicles pass by that location during that time?

A No other vehicles were passing my location on the street at the time.

Q So now there came a time when you then radioed a patrol officer regarding this vehicle?

A Yes, I did.

Q Okay. And do you know who you radioed?

A The assisting officer was Officer Bernice Barnette.

Q Thank you very much, sir.

MR. FITZPATRICK: Thank you, Officer. I

have no questions.

THE COURT: One question, sir: You say you're on a detail. What was your function in front of this house, at this hour of the night?

THE WITNESS: To make sure no one entered the location, without --

THE COURT: Speak right to the jury, Officer.

THE WITNESS: To make sure no one entered the house at the location I was assigned.

THE COURT: The house had been secured as a result of the investigation?

THE WITNESS: Yes, sir.

THE COURT: And your function was not to have anybody at night, while it was vacant, to go in there and disturb --

THE WITNESS: Yes, sir.

THE COURT: Other than authorized personnel?

THE WITNESS: Yes, sir.

THE COURT: And you made these observations while conducting this duty?

THE WITNESS: Yes, sir.

THE COURT: Were you located within the

house, or sitting on the front porch, or in your vehicle?

THE WITNESS: In my police vehicle parked directly in front of the house.

THE COURT: Okay. Thanks, Officer.

THE WITNESS: All right.

THE COURT: Thanks very much for coming down.

(Witness excused.)

MR. CALLE: Defense would like to call Officer Barnette.

THE COURT: Officer Bernice Barnette. Hi, Officer. Is that how you spell your last name?

MS. BARNETTE: Yes.

* * *

B E R N I C E   B A R N E T T E , called as a witness on behalf of the Defendant, having been duly sworn, was examined and testified, under oath, as follows:

DIRECT EXAMINATION BY MR. CALLE:

Q Good afternoon, Officer Barnette. Officer Barnette, what is your capacity as police officer?
A I'm a patrol officer.
Q And directing your attention to March 31st, 1987, at approximately 11:20 p.m., were you on duty in that capacity?
A Yes, sir.
Q And during the evening at approximately that hour, did you have a conversation with an Officer Stephens?
A Yes, sir.
Q And as a result of that conversation with Officer Stephens, what, if anything, did you do?
A I followed a vehicle that he pointed out.
Q Did you stop the vehicle?
A After observing a violation, yes.
Q And at that time, would you tell us where you stopped the vehicle?
A On Grant Boulevard at Teall Ave.
Q Do you know where the 240 block of Hickok is?
A Yes.

Q About how far away from 240 Hickok -- 248 Hickok, did you stop this vehicle?

A It's approximately six, seven blocks, short blocks.

Q How far did you follow the vehicle before you stopped it?

A Approximately that amount of blocks, six or seven blocks.

Q When is the first time you observed the vehicle?

A In the 200 block of Hickok.

Q Now, Officer Barnette, did you run a check of the owner of the vehicle?

A Did I do a -- run a check of the registered owner?

Q Of the vehicle, yes, ma'am.

A Of the owner? Yes, according to the plates.

Q And who owned that vehicle?

A A Patsy Barricella.

Q Who was driving the vehicle on March 31st, 1987, the vehicle that you saw in the 240 block of Hickok Avenue at 11:20 p.m.?

A A white male was driving. He had no id. on him at the time, so I could not be certain that it was the registered owner.

THE COURT: Who did he say he was?

THE WITNESS: He said he was Patsy Barricella.

MR. CALLE: Thank you very much.

CROSS-EXAMINATION BY MR. FITZPATRICK:

Q Bernice, how are you?

A Good.

Q The registered owner, does it refresh your recollection that it was actually his mother, Mary Barricella that is the registered owner of the vehicle?

A Yes.

Q And this, this young lad, Patsy, actually had no driver's license, did he?

A He had no id. on him.

Q Now, do you know where Cloveridge is?

A Yes.

Q And where is that location to where you stopped this fella?

A Cloveridge?

Q Yeah.

A It's in the -- it's in the same area, basically, several blocks --

Q Okay.

A -- north -- east of where he was -- where he was stopped.

Q All right. And Hickok Ave., if I get off 690, Teall Ave., and I go on Burnet, my -- if I make a left on Hickok, is that the first left I can make without running into Huntington School, or something like that?

A It's about the first or second left off Burnet.

Q You patrol that area, don't you?

A Yes, I did.

Q And there are no streetlights on Hickok --

A Not --

Q -- from, from Burnet --

A -- from Burnet to --

Q -- to James?

A Right.

Q Okay. And there are stop signs, though?

A Yes.

Q And you were making sure that no one goes through those stop signs?

A Yes.

Q Okay. Good for you. Thank you.

THE COURT: What time did you stop this vehicle, do you recall?

THE WITNESS: Sometime between 11 and quarter of.

THE COURT: P.M.?

THE WITNESS: P.M., right.

THE COURT: Fine. Anything else --

MR. CALLE: No, sir.

THE COURT: -- Mr. Calle?

BY MR. FITZPATRICK:

Q I'm sorry, sometime between 11 and 11 --

A 45.

Q 11:45. Okay.

THE COURT: Thanks for taking the time to come down here. Thank you. Okay. Watch your step coming off there, Officer.

(Witness excused.)

MR. CALLE: Defense rests.

THE COURT: Okay. Ladies and gentlemen, as Mr. Calle has announced, the defense, in this case, has rested their evidence.

Again, as we did at the end of the People's case, I'm going to ask you to step out just briefly for certain legal discussions that have to take place that need not concern you, of course. And I'll ask you to come back here

in just a moment.

Okay. So don't form any opinions or discuss it.

(The jurors were excused.)

THE COURT: Okay. The record should reflect the jury has been excused. Mr. Calle, you've rested your case. I assume, and I don't mean to speculate on what you're going to do, I assume you're going to renew your motions to dismiss this case?

MR. CALLE: Yes, sir.

THE COURT: Okay. And I assume they're based on the same grounds as before. And my ruling is, sir, that although there is some evidence that may give this jury some food for thought, it's still -- there's questions of fact which exist, which certainly would warrant sending this case to the jury for their determination of those questions of fact. And I will not interfere with those discussions.

And I find that there is a prima facie case that has been set forth, and your motion for dismissal is denied at this time.

Mr. Fitzpatrick, are you able to tell me

at this moment, sir, whether or not the People choose to present any type of rebuttal evidence?

MR. FITZPATRICK: Your Honor, if I produce any rebuttal evidence, it will be one short witness, and I promise I will have that person available first thing tomorrow morning.

THE COURT: My goal, gentlemen, is, as you know, we're going to be getting started a little later than usual. I'm going to do my best to shave my calendar down. I anticipate starting 10:30 tomorrow. I anticipate summation and charging of the jury tomorrow.

Mr. Fitzpatrick, I don't ask you to divulge too much, or anticipate too much. Do you feel that this witness, or this rebuttal evidence, will be very brief in nature, and not require us to get into 11:30 or 12:00?

MR. FITZPATRICK: I do anticipate that it will be very brief, Judge.

THE COURT: Okay. Is there any reason why you gentlemen should not, or cannot, be prepared to sum up tomorrow?

MR. CALLE: No, sir, no reason why we

cannot.

MR. FITZPATRICK: No.

THE COURT: All right. Then let me just, if you have some other matters you want to bring up about the charge, might as well do it now while the jury's out.

MR. FITZPATRICK: I would, Judge, based on the testimony of James Crimi, and the testimony of Joseph Fields, I would ask the Court to charge this jury that the People's proof is a combination of direct and circumstantial evidence.

THE COURT: I'll consider that.

You want a pure circumstantial charge, Mr. Calle, or do you have an objection to direct and circumstantial?

MR. CALLE: Yes, sir, I do. I think that it's purely circumstantial, and I believe that if there's anything, the direct evidence is contradicted, in that James Crimi puts the vehicle on the opposite side of the street, and Miss Stonecipher puts it on the side of the street of the house.

THE COURT: Let me just see. I don't mean

to cut you off. Crimi, as I understand it, he is the one that brought Miss Stonecipher home at about 11:00 or midnight that evening, and saw the defendant's vehicle there.

MR. FITZPATRICK: Yes, your Honor.

THE COURT: Fields, of course, is the fella who heard -- allegedly heard a statement made by the defendant.

MR. FITZPATRICK: Yes, yes, sir.

THE COURT: All right. I'll charge both direct and circumstantial.

MR. CALLE: Judge, then, if I may, may I request that you charge mere presence at the scene of the crime does not indicate guilt. I think that that would go hand in hand with the fact that the D.A. is calling their testimony direct. I think there should be a charge --

THE COURT: Well, well I'll reserve on that. What I may do, sir, is I may consider some other charge. I don't usually have a charge dealing with just mere presence at the scene. I usually charge that in an accomplice-type situation where the jury must determine whether the accomplice is, as a matter of law, is

responsible for the actions of the initial perpetrator -- but I understand what you're asking. I'll review my charges tonight and I will, if it's not in the circumstantial evidence charge, I may put it -- put something in there.

I just want you to know, I'm relucant always to recreate any new charges, given the intensive review by the appellate division of those matters, but I understand what you're asking. I'll review my charge in its entirety. And I think it's a fair request that you have, and I'll do my best to weave something in there, sir.

MR. CALLE: May I make application that perhaps you could put that directly after the direct evidence charge?

THE COURT: It may fall within the circumstantial evidence charge --

MR. CALLE: Yes, sir.

THE COURT: -- sir, which will follow the direct evidence charge.

MR. CALLE: Yes, sir.

MR. FITZPATRICK: Judge, I would also ask

you to charge, which I have had charged -- not to suggest that because I've had it charged before that it's somehow incumbent upon your Honor to do so, but I believe it's a boiler plate charge that circumstantial evidence can oftentimes be more compelling than direct evidence.

THE COURT: That's been ruled upon many times by the appellate division as being proper. I think it's in my circumstantial --

MR. FITZPATRICK: It's not in what was provided to me, but I would ask you to include that.

MR. CALLE: And I would object to that.

THE COURT: Are you sure it's not in there?

MR. FITZPATRICK: I'm sure, Judge. I just read it.

THE COURT: All right. I'll review that.

MR. FITZPATRICK: I have one last thing.

THE COURT: Sure.

MR. FITZPATRICK: In the charge, your Honor, I'm quoting from it, "The circumstantial facts proved must all be consistent with guilt and inconsistent with innocence." I would object

to the word "all." I could attempt to prove a circumstantial fact, and if the jury disregards it, doesn't mean the entire case should fall.

THE COURT: I guess I regret giving you this before I've had a chance to look at it. You seem to know more about it than I do at this time. I just know that is my standard circumstantial charge, and I haven't had any trouble yet from the high courts relative to that. So I'm reluctant to change anything. But I'll give your concerns some consideration. I'll let you know before we sum up tomorrow what exactly the language is going to be relative to these two requests.

Mr. Calle, do you have anything further we need to discuss, sir?

MR. CALLE: Judge, I believe the fact that the defendant was not testifying, that no unfavorable inference of guilt --

THE COURT: Yes.

MR. CALLE: -- should be inserted in the charge, if it's not already there.

THE COURT: Well, it will be now that you have requested that.

MR. CALLE: Also, your Honor, defendant's prior bad acts that were elicited from -- by Mark Brosh, I believe that I would like to have some sort of charge in there directing the jury --

THE COURT: I, I know we talked about this in chambers. That's an unusual request, given the fact that charge is usually given only if a defendant takes the stand. I appreciate the fact that certain statements about the defendant's prior conduct with another woman were elicited on cross-examination and were testified to. And I appreciate you wanting me to address that and to put it in its proper perspective before the jury. I don't have knowledge that I have a charge directly on that point. Again, sir, I will do my best to craft some language that would address that testimony and try to put it in its proper legal perspective before the jury.

I, again, will notify you, if that's possible to do. And if it is, I will give you a chance to review that charge prior to --

MR. CALLE: Thank you, sir. I have a

number of other requests, your Honor, alibi charge.

THE COURT: It will be given.

MR. CALLE: Your Honor, a charge pertaining to the silence of the defendant prior to his arrest. I would request that the Court instruct the jury that my client had a right to remain silent, and that silence does not indicate guilt.

THE COURT: I'm going to deny that request, sir, and this is the reason why: There is no indication here that the defendant gave what is commonly called or referred to as an admission or confession, in that he wasn't put in a situation where his Miranda rights were given, he makes a statement, and then it becomes -- it incriminates him, or that he chooses to exercise his rights and, of course, the jury should be advised he's under no obligation to speak with the police.

However, in this particular case, as to the facts, as I understand them, the defendant was given a ride down to the police station with the police, and didn't say anything in the car.

I'm concerned that if I draw attention to that by means of he was obligated not to say anything, it's going to twist the fact, and I don't think that it warrants a charge as to his silence.

The jury has the right to infer anything they want from his actions when confronted by the police. If he had asked for a lawyer or been denied a request of his Miranda rights, then, sure, I'd have to tell the jury that no person in this country is obligated to cooperate or speak with the police.

I'm reluctant to charge, just because he didn't say anything, that he was under some obligation not to say anything.

MR. CALLE: Well, Judge, that's not exactly what I was talking about. I was talking about, that the defendant's silence signified nothing. And I'd like the jury to be instructed that it must not be concluded -- in determining the silence, that is, it must not be concluded to be a determination of his guilt or innocence.

I believe Mr. District Attorney Fitzpatrick, with that particular witness, made a significant

point in that the police officer said he was very suspicious because he said absolutely nothing. I think that a rule of law being what it is, I think the jury should be instructed on it.

THE COURT: But, you know, Mr. Calle, I think then it gets me into interpreting what one should or should not do when confronted with a situation. And if I go off and interpret that someone doesn't have an obligation to speak, or has a right to remain silent, I'm getting into somebody's natural inclinations when confronted by some extraordinary event, such as the murder of a loved one.

I'm just relucant to interject what I think the jury should do with that silence, into this case. I think that's something they're going to have to determine whether or not it's significant, and what weight, if any, they want to attach to it. But for me to bring it to their attention and tell them they cannot attach any special weight to it interfers with the fact-finding process, and I'm relucant to do that, sir. And I appreciate your request.

I'll consider it, but I'm anticipating denying it.

MR. CALLE: Yes.

THE COURT: Anything else we need to --

MR. CALLE: No, sir. As I understand it, the remaining charges have already been prepared?

THE COURT: Sure. I will, again, sir, ask you to listen carefully to the charge as given by the Court, and I will, before this jury departs, give you an opportunity to object to any portions of the charge, or make further requests, other than what you've done here today.

If you want to reiterate, "Well, I want that silence charge," you can do that. But if there's something in there -- listen carefully, if you miss something or think something ought to be in there, you let me know and I'll give you an opportunity to be heard on that.

MR. CALLE: Yes, Judge. Judge, for the record, I do object to the Court's denial of my application.

THE COURT: Certainly. Okay. Anything else, gentlemen?

Let's bring the jury back in and dismiss them.

(The jurors entered the courtroom and were seated in the jury box.)

THE COURT: Okay. Would you reflect the jury is present.

Ladies and gentlemen, I want to thank you, of course, for your patience. I appreciate the fact of coming in and out and waiting in the jury room can be burdensome, and I appreciate that.

You will get this case to deliberate tomorrow. Tomorrow I will ask you to be in the jury room at 9:30. I may not get to you at 9:30, but I'm going to have you fill out some menu requests because I'm going to feed you lunch in the jury room tomorrow.

And we're going to press on. I anticipate you getting this case to begin deliberations at approximately 2:00 in the afternoon. I'm going to ask you, when you come to court tomorrow, to bring an overnight bag. I say this to you not to cause you any concern. I say this to you not because I'm speculating how long your

deliberations will take. I say this to you only because customarily I try to get cases to the jury in the morning. Since -- because I've got a very long calendar business tomorrow, that I can't control, I'm not going to get to you, I don't think, until 10 or 10:30. But I want you in the jury room at 9:30. You do what you want in that regard about bringing something for overnight, but I don't, by any means, make this statement to give you some indication that I think you're going to be out a long time or not. I have no idea. Nobody does. You don't. But I just -- I'm an old boy scout. I like to be prepared. And I'd like you to do that for me. If it's needed, fine. If it's not, it's not. That's fine, too.

Get a good night's sleep tonight. The case will be turned over to you tomorrow to make your decisions in this case. I'd like you all to be well rested. Certainly I don't want you to lay in bed tonight and be thinking about how you're going to decide this case, nor form any opinions about this case yet, nor are you to talk to anybody about the case.

I certainly don't want you to read anything.

I would ask you not to bring any newspapers tomorrow. Don't purchase any tonight. I don't know what's going to be in there, why take the chance of inadvertently seeing something. Don't listen to any news accounts of the case. Don't do any independent research about any issues. And I'll see you tomorrow at 9:30.

Okay. Good night.

Okay, gentlemen.

(The proceedings of March 24, 1993 were adjourned.)

* * *

C E R T I F I C A T E

I, PATRICIA A. ALEXANDER, C.S.R.-R.P.R., an official reporter of the Supreme and County Courts, Fifth Judicial District, State of New York, do hereby certify that the foregoing is a true and correct transcript of my stenographic notes taken in the foregoing matter, at the time and place first herein mentioned.

Patricia A. Alexander

PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

October 1, 1993

DATE

STATE OF NEW YORK COPY 1027
COUNTY COURT : COUNTY OF ONONDAGA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff, Indictment Number 92-1114-1

-against-

Index Number 92-2794

HECTOR M. RIVAS,

Volume VII

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Onondaga County Courthouse
401 Montgomery Street
Syracuse, New York 13202
March 25, 1993

BEFORE: HONORABLE J. KEVIN MULROY,
County Court Judge, and a Jury.

APPEARANCES: WILLIAM J. FITZPATRICK, ESQ.
Onondaga County District Attorney
Onondaga County Civic Center
421 Montgomery Street
Syracuse, New York 13202

RICHARD J. CALLE, ESQ.
Attorney for the Defendant
5701 Northern Boulevard
Woodside, New York 11373

PATRICIA A. ALEXANDER, C.S.R.-R.P.R.
Official Court Reporter

# INDEX


| | Page |
|---|---|
| SUMMATION BY MR. CALLE | 1029 |
| SUMMATION BY MR. FITZPATRICK | 1067 |
| COURT'S CHARGE | 1134 |
| VERDICT | 1197 |


* * *

## EXHIBITS


| Court's Numbers | Description | Marked |
|---|---|---|
| C | Jury Note | 1185 |
| D | Jury Note | 1185 |
| E | Jury Note | 1185 |
| F | Jury Note | 1187 |
| G | Jury Note | 1187 |
| H | Jury Note | 1187 |
| I | Jury Note | 1196 |
| J | Verdict | 1196 |


* * *

AB)



(MORNING SESSION - March 25, 1993)

(Whereupon, the jurors then entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen.

Let the record reflect that the jury is present, counsel is present, the defendant is present.

We're about to begin summations. Let me give some comments to the folks out there in the gallery. We've got a full house here today. Ladies and gentlemen, I appreciate your interest in this case. This is the time of the case when the attorneys will give their summations. In the interest of fairness, I think it's only appropriate that we as spectators give them the utmost courtesy. I'd ask you certainly if you're going to get up and leave, not to do so during the middle of their summations.

I'm advised that summations will last about an hour apiece. I intend to break after each summation, to give the reporter a break to change her paper and to rest her

fingers for a moment. That's when I'll do so. If you're going to leave or move about, do it then.

But let's be courteous to the attorneys here today, courteous to the jury, who wants to pay close and careful attention to the summations of the attorneys.

So on that note, Mr. Calle, if you are prepared to give your summation, sir, go ahead.

MR. CALLE: Thank you, sir. I have one request. I'd like to turn this lecturn around and face the jury.

THE COURT: Certainly, whatever you want, sir, you can use it.

SUMMATION BY MR. CALLE

MR. CALLE: Honorable Justice Mulroy, Mr. Fitzpatrick, ladies and gentlemen:

Good morning.

THE JURORS: Good morning (in unison).

MR. CALLE: Well, I ask you to bear with me as I attempt to encapsulate what I believe

we all witnessed during the course of this trial. I believe the Judge will caution you that what I say is not evidence, but it is my evaluation of what we all experienced and shared.

We emerged from this trial, I find, a bit more depressed, a bit more cognizant of the duty that you all undertook, perhaps unknowingly when you expressed your desire to serve, and I believe with more understanding of what it's about to serve as a juror and more understanding of the allegations against Mr. Rivas.

We are all inextricably linked here today. You, the jury, Justice Mulroy, Mr. Fitzpatrick, myself, and Hector Rivas. Yes, we're all linked to Hector Rivas.

I stand before you somewhat afraid after experiencing what we have shared together these last two weeks. I find something very disturbing, and it's not Hector Rivas.

I will attempt, if you will, to put in a capsule the trial in its entirety. What I mean by that is a one-box cartoon.

And everything that was undertaken here for the last two weeks, perhaps it can't be depicted in that cartoon, but you get a general sense of what happened here at this trial.

Now, I'd like you to put the caption underneath, "What's wrong with this picture?" I have seen an expedition of witnesses parade through this courtroom on a mission of hate. Whatever happened to truth and justice and the American way? Maybe we don't have the American way here. We have a way of the people who are on this mission of hate. I counsel you, do not join this expedition of hate.

On voir dire I expressed to you a statistic I had heard on the radio coming up here. The more an opinion is repeated, the stronger it becomes and the more likely it is to be believed.

Remember something. You, the jury in this case, are the People of the State of New York. The indictment is nothing but a decision to proceed to trial. It is not

a conviction. Only you, the jury, can deliver a verdict on this case. The indictment is an undertaking of a fact-finding mission. And I ask you to join the expedition for the truth, not for hate. If we join the mission for truth, justice will ultimately follow.

We have for the most part in this trial observed the People's case. You have to abide by the facts as you determine them from the witness stand. But I also asked you on voir dire to determine what you did not hear. Not only have we heard the People's case, but we observed the way in which it was presented, exhibited by the witnesses.

Yes, Mr. Fitzpatrick is the District Attorney of Onondaga County, but I am a former Assistant District Attorney in New York City. And I would not undertake this defense to trial if I were not the first member on the expedition for the truth. And you did not see the truth in this trial, and that is what, what makes me afraid.

I heard a colloquy just last night in

my hotel room, and there's a man and woman talking, probably about 50 years old. And the man says to the woman, "You look familiar." The woman says, "Were you at the St. Ive's Convention?" And the man says, "I couldn't make that." And the woman says, "Neither could I. I guess, I guess that's where we haven't met."

This makes about as much sense as the evidence does to convict Mr. Rivas.

You know, I had the opportunity to talk now not only with you, the jury, but some of the members of the audience during the course of this trial. You know what was repeated to me? "Mr. Rivas shows no emotion."

Here we have a man who is accused of strangling a young girl and then sexually desecrating her body, and the most interesting topic of interest is that Hector Rivas shows no emotion.

It was mentioned by the People's witnesses, when they came to his home on the 30th, inside the police car on the drive down to the

Public Safety Building, when he was told allegedly Valerie Hill is dead.

It must be seven, eight years ago. Did any of you see the Challenger explosion? Did you see when that young teacher's parents were looking up at the sky? Did anyone share a similar reaction to the parents watching? Surely I cannot assign them with no emotions like the observation of their daughter being drastically exploded.

People internalize. People don't show their emotion, especially in front of police officers. You have a right to remain silent. Is that an indication of guilt? You -- did you ever hear of the term "shocked"?

Ladies and gentlemen, I'd like you to all look at Mr. Rivas now, for you will never see a more perfect example of shocked, because he is not guilty.

I have seen a witness parade of bias and prejudice. It got to the point where I was convinced I was watching an info-mercial. Did it ever occur to anyone that the only

convincing witnesses that took that stand were the people that did not connect Mr. Rivas?

In a little while we'll go down my list of what witnesses were credible and what witnesses were incredible, but bear with me.

I got to the point where I was under the impression I wasn't observing a trial, I was observing a witch hunt. I ask you to say no to this witch hunt. This is New York State. This is the United States of America. Only you can make it right. You have the final say in the outcome of this.

To the Hill family I say it was not fair that Valerie's life was taken. But it should not be that we are going to not be fair to Mr. Rivas. That does not make it right.

Mr. Rivas is guilty, yes, of loving Valerie Hill. He is not guilty of her murder. Overwhelmingly this evidence fails to prove that he strangled Valerie Hill on March 27th, 1987 between the hours of 10 and midnight. And this must be proven beyond a reasonable

doubt by the District Attorney's Office. I have not had to prove anything.

Can any one of you sit here now and not have reasonable doubt? This is what you must concentrate on, and nothing else. Not the Hill family, not Judge Mulroy, not Mr. Fitzpatrick, not me. Nothing else.

We're all here isolated in our capsules of duty. Do not let anyone else's opinions affect you. You are the most important element in this trial. You decide. You assign reality. What you say counts, not what the newspapers say, not what the witnesses say, not what the audience says. You tell me what verdict would make you feel right about all of this.

I caution you, do not be intimidated. Do not let others tell you what to think. I ask you to ask yourselves this: What resulted when the People's witnesses were cross-examined by the defense? Did their stories hold up? Did your opinion change somewhat from first hearing it on direct examination?

There's no magic here. The truth will prevail. The truth did prevail. Hector Rivas is not guilty. I do not need to hear the final verdict. I await it so that everyone else will know.

Patsy Barricella admitted killing the girl on Hickok. God told him to do it. That's not Patsy Cicciarella -- or Barricella. (indicating). What's wrong with this picture?

This is an exhibit list, I believe typed up by Ms. Alexander, the court stenographer. There are approximately 57 -- I have down 60 exhibits, but I believe there are about 57 exhibits introduced into evidence by the People. Which ones incriminate Mr. Rivas? Let me go down the list briefly.

Number 1 is a calendar. The map, countywide, the map of the more Eastwood area. And a photo of Valerie Hill; very beautiful girl, what appears to be a high school or college yearbook photo.

There isn't a person in this room that isn't sad about her death, not one. Does that incriminate Mr. Rivas?

Evidence bag, Stephen King's book, "The Black Tower." What does that have to do with anything, other than perhaps Valerie Hill delivered it the next day?

Let me stop here for a moment. No fingerprints on the book. One would have to assume that Hector Rivas followed Valerie Hill, waited outside her house. While waiting inside her house, strangled her, sexually assaulted her, desecrated the body with fecal matter. Then for some reason put on all the lights, took the tickets for the Bahamas vacation, went outside, unlocked the car door, took one of the two library books. Then went out the front, sat in his vehicle, put on parking lights, had a cigarette. What is wrong with this picture?

Then he goes to Albert's, talks to two people five to eight minutes, and he's fine. And then hangs out to early morning eating breakfast at Perkins, making a pass at Miss Dorland. And then going out the next night to Giordano's party, where nobody sees anything wrong with him. Does that make

sense? It makes about as much sense as the Syracuse Police Department not investigating Patsy Barricella when he admitted killing the girl on Hickok because God told him to do it.

All right. We have a repair order of Nye Ford; yellow note from a travel agent; travel brochure; police report; photos, colored, of the house. Three, I believe. I do not have the exhibits in my possession.

I'll ask you to recall one photo in particular of the driveway on March 30th, 1987. The car is parked in front of her garage and the garage door is open. There's some testimony she always parked in the garage. There's other testimony she never did. There's some testimony she sometimes did. That's fair. Everybody draws their own conclusions.

That garage door had no electric door opener. If Valerie Hill were going to put the car in the garage, for whatever reason, she would have to arrive in her vehicle, get out of the car and pick up the door.

Is it impossible that someone was in the backyard and stopped her there? If we're talking about Friday night, well, the Stonecipher weren't home. Someone puts a knife to your throat and says "Open up the key to your apartment," what do you do?

I'm not saying that -- I don't know what happened, but the garage door is open. Why? Doesn't that strike you strange?

The rear door, always unlocked, sometimes locked, locked, dead bolt. You can't lock it with the key from the outside.

Is it impossible someone was in the vestibule? There were burglaries in the area. Mr. Stonecipher admitted to that. Was it so unusual? No.

Hector Rivas did it. Hector Rivas did it because the Hill family and the Lucas family were friends for 20 years, and I'm sure both families would have loved to have seen them get together. And you heard from Bob Lucas that when Valerie started dating Hector Rivas, that was the last straw.

So perhaps inadvertently Hector Rivas is guilty. In the minds of some, had he not dated Valerie and he kept to his own, well, then Valerie might have gone back with Bob Lucas and everything would be beautiful. But this is not "The Donna Reed Show." We have a man's life in the balance here.

Have you ever seen any letters of hate? All the letters, which we'll get to them -- we might as well get to them now. My client admitted to "All life is great in the world with you, Val. Don't ever leave. I love you. I want to get back together."

Well, they were seeing each other. Perhaps not in a relationship, but they did keep up -- some would like to call it an association.

Mr. Hill testified that the 17th, his birthday, she let him in the house. Randall that is. There's been police testimony, Mr. Rivas says he was there on the Thursday before the Friday that he's claimed to have

killed her. This is the same type of relationship that Bob Lucas described. They broke up, "But then we were seeing each other again."

Valerie Hill's dad's wife was terminally ill. A lot of pressure, a lot of things were going down, need some space.

I don't see any letters of hate. I see letters of love, of caring. I see a card, a St. Patrick's Day card was an exhibit, from Hector to Val. I see a Christmas card in that same exhibit bag, "To Val and Hector."

On -- to convict this man, you have to believe that he's a maniacal sexual sociopath. May -- does anyone believe this? Has any witness proved this?

The victim's photo, victim's photo, a photo of Hector Rivas, search warrant application. Search warrant was executed March 30th, 1987. The police believed there was evidence of a crime at Mr. Rivas's house in Cazenovia. On the same day they take Mr. Rivas in for a 10-hour interrogation and they don't give him his Miranda warnings.

They don't warn him about anything. He's a suspect for the search warrant, but he's not a suspect for a 10-hour interrogation.

What other names were given to the police that may have done this? Hector Rivas is the only name. Then he must be guilty. Who else would do this?

You are saying anybody that gets killed, you are going to suspect their loved one.

A photo of Rivas's home, the second photo, evidence, evidence, crumpled letter. I believe that might be the torn letter. I stand to be corrected.

We have to presume that Hector Rivas took the airline tickets, took the crumpled letter that night. Is that what enraged him, she wrote to Bob Lucas? Well, she wrote this letter February 26th, 1987. It was approximately a month old. Valerie in the letter itself says that she wrote that letter a number of times trying to get it right. If Valerie was such a good housekeeper, would she keep it around her house for a month?

To say that Hector took that letter that night, he took the airline tickets and burned the airline tickets or threw them out the car window, and then ripped up the torn letter in his house and put it in a garbage bag, that doesn't make sense. Not really. He took it February 26th.

Well, is the garbage bag that is hanging in the kitchen on the drawer, he doesn't throw out his garbage for a month? This is what the prosecution is asking you to believe.

Okay. Polaroid photo of letter. Okay. We'll get into the Polariod photos while we're here.

The police, their duty is, when they execute a search warrant, to photograph every area of the home. I guess it is to protect them from damage or from a lawsuit for a cause of damage. And I guess it's to protect them to gather evidence.

They go to -- the People's case asks you to believe that they go to Rivas's home. One camera doesn't work. The other camera has

run out of film. Where are the other Polaroid photos? This is a murder case. The entire police force is working on this case. And you have been shown a photo of a garbage bag. Why not a photo of the torn letter inside Rivas's house?

And what about this shrine? This man look like a lunatic who is going to leave lighted candles in an unattended closet filled with clothes? It was designed to put the noose around Hector Rivas's neck, stick him some more.

Okay. You want to argue with this? Have you seen a photo of this shrine? David Phinney says he didn't have the camera. Somebody else had the camera, but he doesn't know who. Mr. Stassi says Dave Phinney had the camera.

What did you hear on the stand? Did you hear unmotivated testimony or did you hear testimony designed to nail this man? Did you hear one side? I don't have access to the People's witnesses except for the first time on cross-examination. What happened?

Bacardi rum. This is the bottle Mr. Cassano says is definitely the one Hector bought. How does he know? He's been talking to the People's witnesses I bet. Was there any proof that that's the bottle Hector Rivas bought? No fingerprints.

Let's get into the fingerprints. I'm trying to cut my summation short so I won't bore you. But let's get into the fingerprints. Didn't the police say they take -- the entire area is dusted for fingerprints? Are you telling me only 20 prints came out of that entire apartment? And prints cannot be dated. Some prints as old as 15 years. Where is the proof those prints came from Hector Rivas on Friday night, the 27th? Why could not they have come the day before, or the 17th, on Mr. Hill's birthday?

The prosecution wants you to believe that they came from Hector. Sure they came from Hector, but what about the other ones? What about the ones that were unidentified. Did they identify, take Patsy Barricella's prints?

What about the purse and the wallet? No evidence of a break-in, yet no People's witness could say that those windows were locked. They tried to get -- offer and say they were secure. And they, they said that it was on the affidavit, the police report, but it wasn't. I mean where is the truth?

The Blue Nun bottle, only Valerie's prints are on the Blue Nun bottle. And three glasses and a coffee canister, no prints.

And the cigarettes, okay, they had to come from Friday night; they had to be smoked by Hector. Valerie is a social smoker. If you are a social smoker, you really don't buy your own cigarettes. You buy them -- buy your drink, but you bum cigarettes. Everybody bums cigarettes who smokes.

And what about the fact that one was a lot bigger? Some people smoke them down to the filter. Some people don't.

They're all Hector's. When did they come? Were they there Friday night? Where is the proof? Who puts Hector inside the

apartment? Where is the proof?

Two people. Susan Stonecipher, allegedly, my witness, puts Hector outside the apartment on Friday night. But listen to this for a second: Jim Crimi, her boyfriend, also puts him there. But Donald and Karen, the parents of Susan, don't put him there. That night they came home almost contemporaneously with Susan and Jim Crimi.

Jim Crimi knows about the cars. He said so on the stand. Yet Jim Crimi misidentified the vehicle. He said it was one vehicle and it was -- actually Mr. Rivas has a different vehicle. Jim Crimi said the vehicle was parked across the street, but Susan Stonecipher said the vehicle was parked on the same side of the street. Can we like cancel out these people?

Mr. Cassano. Yes, Mr. Cassano won't tell us there's a security guard unless I pump him for it. And he says he is not an employee; he is an independent contractor. Did he offer the information to the security guard that there's a dangerous man in

Liquor Square? No. He watches him the whole time. He could not give a description of his clothing.

Info-mercial we've got here. The videotape of the death scene. How could any member of a jury not be negatively affected by that? I ask you to be fair with that. No one's denying the cause of death of Valerie Hill, but we are denying that Hector Rivas was that cause.

And in all deference to the memory of Miss Hill, her apartment wasn't exactly spotless. There were dishes in the sink. There were glasses on the counter. There was an ashtray with cigarettes in the bedroom and the kitchen. There were closet doors open. The bed was unmade. An electric blanket was on. Doesn't that appear that she slept -- well, she didn't have any time to sleep Friday night or Friday all day. I profess to you she slept Saturday or sometime other than Friday. If she's so neat, wouldn't she turn the blanket off? Most people do that. You

have a fire hazard if you don't.

Anyway, there's a note in evidence bag, fingerprint pages. How could you say that these fingerprints came Friday night? I don't -- I ask you to not be fooled.

An inventory report, a photo, photo of Blue Nun, photo of Bacardi rum, Blue Nun, ashtray, photo of something else.

Does any of this evidence point to Mr. Rivas?

Fingerprint charts. Fingerprint charts. Well, I am not an expert, but it was one there that didn't appear to be matchable.

Purse and contents. You would think they would take a dusting of this purse and the contents. Either they didn't do it, which means they messed up the investigation, or they did it and they didn't like the results.

No evidence of a break-in? Well, those airline tickets, that documentation was worth about what, $650? If someone is stupid enough to commit that atrocity, I would think they could sell it. New York City, trying to sell

anything. And there's a buyer for anything.

And $22. Just taking a drive to Schnectady. They found $22 in the apartment. You can't tell me she didn't have more than that. I don't care how many credit cards you have. You are going to take a couple hundred dollars, $150 maybe, You are going to have some cash. You are going on a trip.

She was conscientious to fix the car at Nye Ford. She's not going to be conscientious to have money?

The windows weren't locked. The rear door is not secure. The garage door is open, when it never is or usually isn't. And there's $650 worth of airline tickets. And there's only $22 cash. Seems to me you could look either way, it appears to me here. It's not like there's $500 on the kitchen table.

Greeting cards and notes we've covered. Photo of a door. Photo of a blanket. Phone book. Note in evidence bag. Note in evidence bag. Card in evidence bag. Real incriminating stuff here. What are we doing here?

Papers found on the table, cigarette butts, greeting card with business card, telephone, telephone book with photo, ashtray photo. You know, just about to say we have everything but the kitchen sink, but Number 52 is the kitchen sink.

Buske's report, lab reports, photo of letter to Bob Lucas, Liz Lewis's affidavit. There's a real impartial witness if I ever saw one. Bathrobe, sash from robe, photo.

I think you get the idea. Which ones prove Hector Rivas strangled Valerie Hill and sexually assaulted her? Why is there no sexual assault charge here? If he did one, didn't he do the other?

D.A. can't prove sexual assault, just like he can't prove a Murder Two. Reasonable doubt, or lack there of reasonable credible evidence.

The Judge will read you a charge on inferring. We have here a guess upon a guess upon a guess he did it. Let's have an inference on a fact. The more an opinion is repeated, the stronger it becomes. You

see a fine example of this through the People's witnesses, each one, bang, bang, bang. You saw their opinions. And I ask you to determine who is telling the truth and who was lying.

The more an opinion is repeated, the stronger it becomes. This is the truth? It is not the truth. The truth is Mr. Rivas is not guilty. And no amount of blame, no amount of hate, no amount of revenge will bring back Valerie Hill. Blaming Hector Rivas is not the answer.

We sit here in 1993 trying a murder case that occurred in 1987. Patsy Cicciarella [sic] admitted killing the girl on Hickok. How many girls were killed on Hickok? What is wrong with this picture?

Oh, but Mr. Rivas, he was in the bar at Albert's that night, crying at the bar, drunk out of his mind, with Joe Fields and Katie Williams [sic]. Joe Fields says Mr. Rivas is sitting down; there's no one there; there is a lull in Albert's at 10:30. Katie Williams says they were by the booth in the back; it was packed; there were no seats;

they were standing.

You believe these people? Who do you believe? You better believe in yourselves because that's the most important aspect of your deliberations.

Patsy Cicciarella admitted to killing the girl on Hickok. Patsy Cicciarella suspiciously drives by 248 Hickok two, three, four times; the only car that passes by. The People would have you believe he's going home. How many times does he go home on that evening in question, the next day, the next night, March 31st, 1987? He didn't do it. Hector Rivas did it.

To find Mr. Rivas guilty, not only do you have to believe it beyond a reasonable doubt, but you have to believe that he was an obsessed, maniacal, stalker, killer, mental sociopath, who killed his victim, anally penetrates her, smears fecal material on her body, desecrating her, and then goes out and has a few beers at Albert's and nothing is wrong.

Wow. This is a little far-fetched, isn't it?

Oh, but he was silent? He spoke to the police for 10 hours in the polygraph room, which is set up with videotape, but nothing was videotaped.

Guilty by suspicion, not by the law.

I'm almost done. Let's -- let's take a short run down the witness list. I'm sure being the quality attorney he is, Mr. Fitzpatrick will give you a rundown. I'll make mine brief, okay. And I may have left one or two out, but I'm not perfect.

Number one, Randall Hill. Partial credible; partial incredible. His daughter.

Number two, David Hill. Partial credible. Came out all right.

Number three, Elizabeth Michael. I believe she was a librarian. This is the one who testified that the library book had "Midstate Library" stamped on the pocket.

Are you going to tell me that Hector Rivas was smart enough not only after he committed the vile deed, but to go and unlock the door of Valerie's car, take only one of the two library books, look in the back and

know it goes back to the Cazenovia Library, and then there's no fingerprints on the book?

All right. I won't belabor the point.

Four, Anita Balducci. She was credible.

Five, Ann Reiser, the travel agent -- no, Cynthia Reiser, the travel agent. She was credible.

Six, Sergeant Brennan. Yeah, I'd say he was credible.

Seven, David Phinney. He contradicts Mr. Stassi. He didn't come out too good in my book. Incredible.

Eight, Tom Stassi. He was kind of incredible, too. He -- he saw the flashes going off. I don't know, maybe he was having some midlife crisis with these flashes.

But how many flashes went off? We only saw one picture. Nobody goes to get the film. We have a murder case here that everybody on the force is investigating it. They see this weird shrine with the votive candles inside a closet, burning seven hours. Nobody goes to get film. They take a picture of a

garbage bag. Well, then if this is the quality of investigation that the police force did, no wonder they charged Mr. Rivas.

Where are we. Donald Stonecipher. I think he was okay. Credible.

Karen Stonecipher, she was credible. But, you know, let's couple Karen with Susan, my witness. Karen Stonecipher says that cat was never out of the apartment, never except that Saturday, indicating Valerie Hill was killed. How'd they get the indication Valerie Hill was? What? The cat had to go. The killer let the cat out.

I'll tell you, if there's a killing, if any of you have cats, that cat can't be found. My apartment was burglarized once. We didn't find my cat for two days. He was in the apartment.

Well, anyway, Karen Stonecipher says that that cat was out on Saturday. That is the only time that cat was out. Susan Stonecipher, who originally said she saw Valerie Hill Saturday morning, March 28th, 1987, in the hallway getting her cat, who's

never out of the apartment, but then she changed it to Friday. But Karen Stonecipher says it was Saturday.

These are not my witnesses. A man's life is in the balance, and they're people here on this evidence that want to see you convict him. Would you like to be convicted on -- under these circumstances? The District Attorney asked you if you would like yourself to sit on a jury judging yourself. I ask you, would you like to be convicted under these circumstances?

By the way, Susan Stonecipher has a cousin on the force, who she doesn't know if he was on the investigation, but let's just leave it at that.

Eleven, Chris Reynolds, he's the paperboy. Well, I say he was credible, but I'm giving it to him. I'm fair. Okay. But I believe Pete Cooney points at Mr. Rivas on some other location in his vehicle, maybe Burnet Avenue, about the same time Chris Reynolds puts him at Valerie Hill's house. So, I don't know.

Let's see. Pete Cooney. Enough said.

Karen -- we did that one.

Mark Brosh. Well, Mark Brosh said that he didn't think that Hector killed her. You saw the District Attorney make a big play about some other evidence that came out, hoping for the kill. But the evidence of any bad act is not being mean. Another bad act was committed.

All right. Let's speed through this. Now, 15 is John Cassano again. Did he ever tell me what the score was? I couldn't hear over the laughter.

Sixteen, Jim Crimi. We covered him, in contrast to Susan Stonecipher.

Lori Brosh, no problem. She had her own agenda. She was credible enough.

Jim Kimak, the police officer, he's credible.

William Donohue, he's credible.

All these officers are credible; do not incriminate Mr. Rivas.

Tom Bland.

Bob Lucas. Bob Lucas, he's partial.

He wouldn't admit until I pressed him that, in fact, Hector Rivas was the cause of him not dating Valerie anymore. So, I mean the Lucas family knows their family 20 years, but they're not the jury, you are.

I'm coming to a close here. Okay.

Drew Buske, he's credible.

Pratt, Gary Pratt was credible.

Elizabeth Lewis, incredible witness. She's the one who lived with her then-fiance, now-husband, in a house Bob Lucas owned on Albany Street, with Bob Lucas and Valerie Hill. I'm sure she has a lot of hate in her heart.

Peggy Frio. Nice girl. She is the one who worked at the hospital.

Bev Dorland. Credible, also.

We covered Joe Fields and Katie Williams. Incredible. Susan Stonecipher, incredible.

Dr. Erik Mitchell. All right. Now, I promise I'm finishing up here. Dr. Erik Mitchell admitted saying in 1987 that, in fact, he estimated the time of death of Miss Hill to be late Saturday or

early Sunday. On redirect, redirect of Dr. Mitchell by Mr. Fitzpatrick, he says that he admitted in the grand jury that it was on the outside limits of possibility that Miss Hill was killed on Friday night.

Okay. He had to with the 24/48-hour example we were talking about. All right. Well, then he testified by questioning of Mr. Fitzpatrick that that was before he did the brain analysis and saw that decomposition of the brain.

Well, let me ask you a question. Are you telling me that in 1987 Dr. Mitchell estimated time of death to be Saturday night or Sunday morning, and in the grand jury he kept to those estimates, although he did say possibly there was a possibility for Friday, but now he's convinced that it's a good chance it was Friday based upon the brain analysis?

Well, you know what that means. That means that Dr. Mitchell, after he testified in the grand jury in October, November of 1992, then went back and analyzed the brain.

Why? To pinpoint more strongly Friday night.

This is a farce. When did he do it? Did he do it the same day that Katie Williams filled out her affidavit, which was January of 1993?

You are being duped if you think that this man is guilty. And I asked you to isolate yourselves, to give yourselves a higher standard of authority when you deliberate. You may not like him. You may not like me. You may like D.A. Fitzpatrick. I do, too. But that's not the issue. The issue is did the District Attorney prove his case beyond a reasonable doubt. And I submit to you that he did not. And I will recall to your attention right now that not only in Mr. Fitzpatrick's opening did he say he was going to prove that Mr. Rivas killed Valerie Hill, he said he was going to prove that no one else could have. You all remember that? I ask you, did he prove that no one else killed Valerie Hill or that I must have missed something?

Then we got Ed Marion, Sergeant Ostuni,

Police Officer Stephens, Police Officer Barnette, my witnesses.

Patsy Cicciarella admitted to killing the girl on Hickok; God told him to do it. I'm not saying he did it, but doesn't that cast doubt one way or the other? Can you not be affected by this?

Lastly, just to give you a little bit of what the D.A.'s case is, Hector Rivas stalks Valerie Hill. Doesn't the word "stalk" give you an opinion of what -- where the intent is coming from? "Stalk," it sounds so sinister.

Let's see. He tried to get back with her. Never did you hear on the People's case anyone saying that they took a complaint from Valerie Hill to tell Hector Rivas to leave her alone. Not one complaint. Did you hear any evidence of Valerie Hill's locks being changed? No, because they weren't. She was not afraid of him.

They want you to think he had a key, but on February 24th, or something around there, Karen Stonecipher says he's knocking on the door. If he had a key, wouldn't he use

it?

No evidence of a break-in. No evidence of a burglary. No evidence, not in these 57 exhibits designed to repeat an opinion so that you will more firmly believe it, that statistic is a truth. It is not the truth.

Hector Rivas knows he's going to kill Valerie Hill, so he calls up Mark Brosh, who he hadn't spoken to for six months, sets up his alibi at Coleman's. Lies in wait for Miss Hill; commits the deed; puts on all the lights; leaves fingerprints; takes letters and travel brochures; goes in the car, takes one library book; goes to Albert's. Has a good old time. Nothing wrong with him. Same old happy fella.

What makes more sense, that Mr. Rivas committed the crime or that he did not?

What evidence was taken from his home to indicate that he committed the deed?

There appears to be something wrong with justice in Onondaga County, and that's what makes me afraid. You, the jury, have no

ax to grind. You, the jury, are not prejudiced one way or the other. You, the jury, are the only ones whose opinion counts. That is probably the most disturbing part of this case. I ask you to be your own selves. I ask you not to be duped, not to be swayed, not to be fooled.

I have been one person conducting this defense. I have been fighting the police department and the District Attorney's Office. And the years they've had to prepare for this case. The indictment of Mr. Rivas occurred October -- November of 1992. There's something disturbingly wrong with this picture and only you can make it right. And I ask that you do.

I thank you.

THE COURT: Thank you.

We'll take a brief recess, ladies and gentlemen. Don't form any opinions. Don't talk about the case.

(Whereupon, a recess was then taken.)

THE COURT: We are all set?

MR. CALLE: Yes.

THE COURT: Okay. All set?

MR. FITZPATRICK: All set.

THE COURT: David, would you -- Michael, we're all set, please, Captain.

(Whereupon, the jurors then entered the courtroom.)

THE COURT: All right. We're back in session. The record should reflect the jury is present, counsel, the defendant.

At this time, ladies and gentlemen, Mr. Fitzpatrick will deliver his summation.

Sir.

SUMMATION BY MR. FITZPATRICK

MR. FITZPATRICK: Thank you, Judge.

Good morning everybody.

THE JURORS: Good morning (in unison).

MR. FITZPATRICK: Thank you very much for having served on this jury. No case in a criminal trial can ever be brought to conclusion without people like yourselves that are willing to sacrifice their time and energies and decide what happened in a

criminal case. I appreciate that very definitely, and I know your fellow citizens in Onondaga County appreciate it as well. And if there is nothing else that is true in this trial, it is true that there is justice in Onondaga County.

Ten days ago all of us, I think, were a little bit different than we are right now. I don't think anybody in this room and certainly nobody on this jury had any idea how inhuman one person could be to another person, and how warped that person's definition of love could be. I don't think we knew the depth to which one person's obsession, not love but obsession with another human being could take him.

Those things I think have changed all of us, but other things don't change. They remain the same, because I'm willing to bet that during the course of this trial, and certainly after this trial, we are all going to hug our kids a little bit harder, we're all going to kiss our wives or husbands a little bit longer, and we are all going to

tell our moms and dads that we love them just a little bit more.

And I will bet that days, weeks, months from now all of you, like you have had all of your lives, will have dreams about things that you are going to do, and places you are going to see, and people you are going to meet, and exciting things, wonderous things that are going to happen to you that Valerie Hill no longer has.

But most importantly, just like ten days ago, just like today, you all have the same good common sense and intelligence that caused the People of this State to ask you to sit on this jury. And we know something now that we didn't know ten days ago. And what we know now beyond any reasonable doubt is that Hector Rivas stalked this woman two and a half months, and finally strangled her and killed her in a jealous rage on March the 27th of 1987.

Let me just say a few words about Mr. Calle's summation, and then move on to what I think the evidence has proven

overwhelmingly.

I take an offense to the suggestion that this is a mission of hate. It always kills me that when a defendant's friend testifies against him in a criminal trial, he's suddenly no longer a friend; he's now on a mission of hate.

Joe Fields is on a mission of hate. "Val, Val, I didn't mean to do it." And he hates this man, the same man that he hugged, which he felt sorry because he felt he didn't do it, and now he's on a mission of hate.

And all the other people, the Broshs, friends of his, Peggy Burke, Liz Lewis, acquaintances and friends of his, now they're on a mission of hate.

When he asked you numerous times what's wrong with this picture, as if this was a cartoon, you take these photographs with you into this jury room and you look at the body of the 28-year-old woman who had everything in this world to live for, taken away by him because he is obsessive, and you

look at that picture and you say what's wrong with this picture. Because it didn't have to happen. All he had to do was get it through his head that the answer was no.

The people in the audience tell Mr. Calle that they don't think he shows any emotion. And he explains that to you. And then five minutes later he tells you that he's not guilty because Saturday night he didn't show any emotion. Which is it, emotional or isn't he?

It's not what Bev Dorland said about when he walked in the bar after having committed his deed on 248 Hickok.

I don't know who Patsy Cicciarella is, but he's going to be very upset when he reads the paper in the morning he admitted killing. Barricella, Patsy Barricella. God help him. This is a poor mentally retarded kid who lives two doors down from a con artist. He had been stopped by the police. Suddenly becomes the prime suspect in the defense's mind.

And it wasn't four times. The officer's testimony was that he drove by two or three times. And if you go away from someplace and go back to someplace, that's two times. The poor kid doesn't even have a license.

But Patsy Cicciarella, or Barricella, or whatever his name was, was waiting in the driveway and put a knife to Valerie Hill's throat, or might have been waiting in the vestibule and put a knife to her throat as she came.

I guess her father failed to mention -- and, by the way, Randy, you came out okay. You came out partially credible, I guess, and partially incredible. That's better than most of the people did.

But I guess the partially incredible part was where he forgot to tell us that his daughter was dressed in a bathrobe when she sat down in Candy's Restaurant to have dinner before this knife was put to her throat.

And don't get smoke-screened by these barriers in the area. You've got to take the whole answer. "Yeah, two years ago some

kids broke into our house." Two years before this girl was murdered. A lot of other things, and that is why he emphasized what we say is not evidence. It is the people, what the people have to say that's evidence.

Crimi and Stonecipher absolutely said that Rivas's car was parked on the other side of the street. She even described the headlights exactly the same way. It is not my fault that Mr. Calle didn't use a photograph.

He wants to know why there's no sexual assault charge against his client. Because the thing happened six years ago. Statute of limitations is five years. That's with all sexual assault charges. The other reason is he violated this woman after she was dead.

You want to take 20, 30 minutes to explain to the jury that the cops screwed up, they didn't take a picture of the shrine. There it is. I'll do it in 20 seconds. They screwed up. They should have taken a

picture of that shrine. They didn't. You think they made it up? You think they put it in the reports and put in there about -- made up the story about the Madonna, a picture of the victim, the candles, coins in a bowl?

I thought it was Oscar awards earlier. We got a -- everyone got rated by the defense, credible, incredible. "Anybody that hurts me is incredible."

Joe Fields, Joe Fields is incredible. He's never cross-examined about a thing. He cross-examines his former girlfriend, Kelly Williams. If that wasn't absurd, I don't know what was. All these little balloons that they float out there. Kelly isn't credible.

Joe Fields has a gambling problem. What -- well, sitting down there now, the jury, you're supposed to think that Joe Fields has a big gambling problem. What that has to do with this trial I don't have any idea.

And remember when he started the trial, it was police conspiracy. The cops conspired, they worked backwards to get at Hector.

Only two cops got bad ratings: Stassi and Phinney. Everybody else got superlative ratings. They were all credible, including maybe the most important witness, and I don't want to characterize him as such, but maybe the most important witness in this case, John Brennan. Why? Because he told us what the defendant had to say. And he was rated as credible.

So I think I'll take out the two pages where I was going to argue why you should believe Brennan. There is no reason not to believe him. They -- he wants you to believe him, too.

The issue about the cat, remember that? What Mrs. Stonecipher is saying about the cat being outside, that is unusual. What is different from her daughter is the fact that the cat was unattended, not the fact that the cat was outside. The fact that the cat was outside unattended, without Valerie Hill there.

He made a rather incredible statement that Mr. Brosh didn't think that Hector Rivas

killed Valerie Hill. I don't recall that. You can have his testimony read back if you want. I know what he did say. He said that Hector Rivas was a gentleman around women, and we had a little different opinion about that when he left the stand.

And this thing about Dr. Mitchell. Why go back to analyze the brain? Maybe he can't see the forest through the trees, but why go back to look at notes and slides and records? To prepare for trial. There are different phases of the criminal process. There's arrest. There's grand jury. There's trial. Not every case arrested goes to grand jury. Not every case in the grand jury goes to trial. Dr. Mitchell does several hundred autopsies a year; many of them are of people who died as a result of violence. He prepared himself for this trial. I don't think he should be penalized for that.

When you go into the jury room -- enough of the defense's summation. When you go into the jury room, one of the things they don't do, aside from not providing coffee

for you, is they don't give you a list and say, "This is what you should do."

Mrs. Madonna will be your foreperson. She will be the person that speaks for you when you come back into court and have a question or want a readback, or whatever. But as a suggestion, only as a suggestion, let me suggest to you an analysis that you can explore.

First of all, go in there and get comfortable, be civil with one another, listen to what each other has to say. And you can retrieve any or all of these exhibits. Look at them yourself. And I would ask you again perhaps to say to yourself, "Look, we know that the People have the burden of proof. We knew that probably before we ever came into court, but we certainly know it now because Judge Mulroy has told us that. We know that Mr. Fitzpatrick, representing the People, has the burden of proof."

With that in mind, what is the defense that Mr. Rivas has raised? Is it this, that, or whatever. And I'll talk about that

in a second. And keep in mind that he has retained his own attorney, Mr. Calle, who has very, I think, aggressively fought for his client's cause. But maybe we should say what is the cause, because I suggest to you that the defense is not one of reasonable doubt, but the defense is one of unreasonable doubt. There can't be a doubt which is unreasonable.

It is the defense of alibi. You will hear the Judge charge you that the defense has raised the defense of alibi, and he will tell you what the law is in that regard.

The defense chose to present Sue Volz, the young lady who testified just yesterday. And saying, "I could not have killed Valerie Hill because I was at Albert's tavern at 7:00 on Friday, March 27th," this is absurd. This is ridiculous. The defendant himself has asserted through credible Officer Brennan that he was at Coleman's from 6:30 to 11:00. And this is amply corroborated, at least the 6:30 part of it, by his own friends, Mark and Lori Brosh.

Is there any question he was at Coleman's at 6:30? I just don't understand it. I would suggest that Ms. Volz has made an honest mistake. And is not unlike the honest mistake that Susan Stonecipher made when she said that she saw Valerie Hill alive on Saturday, and then in a little more calm moment, not with having a medical examiner downstairs removing the body of her neighbor, she said, "No, I was mistaken, it was on Friday morning."

And remember this: Sue -- I don't want to harp on this too much, because Mr. Calle didn't even mention her, but it is a defense that's been raised and I don't want to leave anything untouched. When her attention, Sue Volz's attention was drawn to Friday, the 27th, some 12 or 13 days later, she said, "Oh, yes, I saw Hector Rivas, but, no, he wasn't wearing those clothes," the clothes that we know for a fact he was wearing that night.

We now come to the second defense or second prong of the same defense. "I'm not

sure that Patsy Barricella is the killer."

Now, you have to, you have to appreciate this. Not only is Patsy Barricella -- and I'm really offended by people like Joe Morgan, who doesn't pick an identifiable person who can be brought in and interrogated and put under oath. No, he picks the weakest person maybe he knows, the two houses away neighbor, a young man who, unfortunately, is mentally retarded, but still I am sure is able to function in society, and he lays it on him.

Why? Because he knows that the poor kid got excited because he got stopped by the police because he drove by the homicide scene.

But Patsy Barricella has got to be the luckiest killer in the history of crime, because on his random psycho journey through the streets of Eastwood to find a victim to kill, he not only finds a victim who's home, who let's him in, who sits down, let's him smoke some Barclay cigarettes, let's him have some Bacardi rum, he finds a victim

who just happens to have been stalked for two and a half months by somebody else; the same person that admitted to Joe Fields that he did it. You talk about luck, it defies description.

They float out this theory to suggest that this is a reasonable doubt. I say to you it is not only an unreasonable doubt, it's not a doubt at all. If this raises a doubt in your mind about the guilt of this defendant, don't even suggest that anybody can be convicted of a crime anywhere in the world, because all you need is a Joe Morgan, who spent time in a psychiatric hospital himself, an alcoholic con artist, to say, hey, pick a name, I'll pick a name, you know, then throw the smoke screen out in front of the jury and let the D.A. spend two weeks trying to defend and six weeks trying to prove that the guy I mentioned, who may not even exist, didn't do it.

Joe Morgan, what a joke. And I don't want to spend any more time on that because,

frankly, I already told you I thought you were intelligent and I'm not going to spend a lot of time on what should be obvious anyway.

Then we have got the Saturday morning and the third defense, if we count them up, the Saturday night surprise. Let's be 100, 100 percent clear as to what Dr. Mitchell said. He said, "It is possible," repeat, possible, "that the victim was killed on either Friday night or Saturday night, based solely upon my initial external examination of the body of Valerie Hill." I don't think it could be any clearer that that is what he said. And as he told the grand jury, rigor mortis, the stiffening of the body after death, normally begins to pass off within 24 to 48 hours.

If we were looking at a calendar, this would put the normal time of death or the normal median time of death sometime Saturday afternoon. Could it have been 16, 17, 18 hours earlier? Absolutely. Absolutely.

Heating conditions refer, first of all,

to 75 degrees. It wasn't the temperature of the house. The temperature of the house was 62 degrees. Valerie Hill kept the heat down, as we now know. That's why she had plastic on the front door. Basement underneath her, cold floor. And the nights, as you might expect, in March of 1987 were cold as well.

He had a chance to review autopsy sectional slides of the brain. He considered the temperature factors. And most importantly, when he tells you what an autopsy is, it is not just medical stuff on a slab in the morgue. It is a constellation of all the other circumstantial factors that lead him into an opinion as to what is most likely the time of death. Friday night.

Please, please, if someone in the jury room says, geez, I have a reasonable doubt, Dr. Mitchell says she could have died Saturday, don't look for a conviction, in any case, where the body isn't found within 24 hours, because you're playing right into this defendant's scheme. Because

Dr. Mitchell is going to say the same thing in any case he ever testifies to, because -- well, because I think that's what he'll do. Namely, that "I am not Jack Klugman. I cannot tell you she died at 6:30 on Tuesday, the 4th of July." That's not the way it works in the real world.

He wants you to think, Hector Rivas wants you to think that she died Saturday night because even though he hasn't really presented an alibi for that night either, he has presented some witnesses that have been with him. And he's just, he's just Mr. Social Butterfly on Saturday night. He rushes up to Liz Lewis, gives her a big hug. Ed Marion remembers him dancing up a storm.

And the library book. You know, when I took this case six months ago and began to look into it, I said, you know, the library book, it's going to be important. I'm going to look for a jury that knows not to be fooled by a defendant. The cunning of it all, the library book. And the beautiful irony

of it is I think it will help you convict.

How do we know for sure that Valerie Hill didn't return it? Defense attorney suggests that she did. See, what Hector didn't know, and what he couldn't have known, was that at Nye Ford they took the odometer reading. And we know, don't we, for a fact that she left Nye Ford; that she drove down Route 5; she went into the Village of Fayetteville; she picked up her airline ticket; she went home to the eastside of the City of Syracuse; she went to Candy's Restaurant; she drove back and parked her car.

What was the odometer reading at Nye Ford and what was the odometer reading in her driveway? That indicated a travel of approximately 32 and a half miles. And when Investigator Stassi retraced those routes to testify to you, it was 33 miles. So we know that she didn't drive to Cazenovia to return that book. Nice try.

Is it likely that she threw her cat out on Saturday morning? Is it likely that this

woman, who every single person that knows her, whether they loved her or just knew her, says was a thoroughly decent, caring, conscientious human being, pediatric nurse, one of most demanding nursing jobs you can have, caring for sick young children, is it likely or even remotely possible that she just said the hell with Laura and Doug Adams, I ain't calling her, and then she hides in her apartment all day, even though she's looking forward to the trip to get away from Hector, and to not answer the phone, knowing that her stepmother is dying at St. Joseph's Hospital, to not be seen by anyone? It is inconceivable. She died Friday night and we know it. The defense is attempting to assert that she didn't.

Reminds me of a story. And I don't mean to get sarcastic, and I apologize for that if it's offensive. It is just my nature. But, you know, let me just tell you. There is an old case. This private investigator, he's testifying. And he's hired by a husband who wants to know if his wife is cheating on him.

And he says, "Yeah, I saw her. You know, I followed her. She left the house and she was supposed to go bowling, but she did not go bowling. She went to a hotel room and she met a guy, pretty good looking guy, in the lobby of the hotel. Had a couple drinks and sat and talked for a while. And they were kissing and hugging and everything. Then they got in an elevator, they got off on the sixth floor and went to a room. I rushed into the parking lot and I looked on the sixth floor and I saw her through the drapes. And she was now dressed, you know, rather comfortably, bottle of champagne chilling, and they were embracing and kissing."

And the husband says, "Well, was she sleeping with him or not?" He says, "Well, I don't know. At that moment they pulled the drapes."

I say, damn, another reasonable doubt. And that's what this defense is all about, an unreasonable doubt.

There's no reasonable doubt that

Hector Rivas killed Valerie Hill on Friday night. Perhaps he should have stuck with the defense that he himself offered six years ago, before he hired Mr. Calle. "Val, Val, I didn't mean to do it."

The Judge will talk to you about the defense theories, prosecution theories. Theories are not to be based on surmise and speculation.

I want to talk to you about what the People have proved to you beyond any shadow of a doubt. And I want you to keep in mind some basic concepts which I think are important.

Number one, we are never going to know exactly what happened the night of March 27th. That's a fact. We are never going to know minute by minute, step by step what this defendant did and what Valerie Hill did. We have a remarkable, I must say, array of witnesses that are able to piece this together for us fairly closely. But what happened when Valerie let him into that apartment, I can point to you what the physical evidence indicates,

but I can't tell you for certain. I certainly can't tell you what the dialogue was. I can't tell you who sat where.

And, you know, witnesses remember a garage door open, garage door closed; lights on, lights off. I told you, this thing happened six years ago. And when you think about it, you say is that unusual?

Well, think about this: Remember I gave you the example of the Kennedy assassination on voir dire. The President of the United States was assassinated 30 years ago, and it was on videotape. We actually had a film of it. You know how many books have been written about what happened that day? Over 700 and counting.

So when you talk about the criminal trial involving Valerie Hill, don't have someone walk into the jury room and say, "So, gee, I don't know exactly what happened. I just can't vote to convict." Say, "Hey, time out here."

Another thing, and this is important, Hector Rivas didn't wake up Friday morning and

say, "I'm going to kill Valerie Hill today." And I don't even think he went to her apartment that night intending to kill her. In fact, I seriously doubt that he did. I think he went there for the same reason he had been stalking her for the last two and a half months. "Please, Val, take me back. Please, Val."

We'll talk about a few notes that Mr. Calle wants to suggest to you aren't that important in a minute.

Third concept, this doesn't take a rocket scientist to figure this out. Killers are stupid. They don't always act smart. Sometimes in addition to killing people, they do other stupid things as well, like get drunk and admit that you killed a girl to a friend at a bar.

Because the fourth thing I want you to remember, remember I asked you about alcohol. You probably were thinking, you know, maybe the District Attorney's going to prove this guy was drunk when he killed Valerie Hill. I don't know if he was or he wasn't.

If he says that he was, fine. He certainly had had something to drink that night. But I'm talking about alcohol lowering your defense mechanism, saying things -- you've all heard someone say something under the influence of alcohol that they'd kind of like to grab back.

It's almost like being a kid. You know, your sister comes to the door or something and your three-year-old kid, you know, yells out, "Hey, Dad, fat Aunt Mary's here."

Well, unfortunately, Aunt Mary is fat, and the kid is honest. That is the way people under the influence can be. "Val, Val, I didn't mean to do it. Liz, I loved her so much. She meant so much to me." And then they want to tell you that's because he realizes the relationship is over.

He leaves, he leaves 53 notes in 54 days and doesn't realize until Saturday night the relationship is over.

Let's look at the People's case. And I want to talk about it not -- I'll talk about

it individually, but keep this in mind: You know, you can take one piece from a building and say, "What is this? This is nothing. It's nothing." You put all the pieces of the building together and all of a sudden you have a pyramid.

So I'm going to talk about it piece by piece. And I want to talk first about what this case is all about, obsession. It isn't about love. It's about obsession.

Let me read some of these notes to you. They're in evidence. You can take them all in and look at them.

This is Exhibit 39. You haven't had a chance to see any of these yet. Thank God she was a saver of these. Maybe she knew what was coming.

Valentine's Day, Christmas. There is one Christmas card here.

"For my dear Valerie. Dear Valerie, Merry Christmas. For the special person in my life."

Look at them all. Look at them all. It's ridiculous.

"Dear Val, I hope that you can start giving with the love that you like to get back. I truly wish the best. No more joking. Thank you for what you let me give you. I was just starting."

"I'm sorry so much for the times that I've given you." This is a new note. "I never knew that I was just passing time. Bless you in your moments with whoever. Happy Valentine's Day, Hector." As if she had the audacity to see someone else.

"You mean so much to me. I'll work with you and stand beside you until the end, so then we can have the world with the sunshine and everything in it."

The guy ought to work for Hallmark if he gets another job.

"I know you have been thinking things out. Tell me if you need my help. I know what you need in this life and I could do it all with you. I'm not like anyone you've ever had before." That was the understatement of the year. "It's a special love that can grow."

"Hi Babe, I'm just sitting here feeling hurt over all this mess that I've cause in us."

"Hi Val, I stopped by to talk to you, but I guess I'm late again. I really understand this joke now. I guess you're having fun now. Enjoy yourself. Thank you for a good laugh."

"Val, I'm very sorry, very sorry. Try to understand my pain."

"Dear Val, I want to say thank you for your company tonight. I so much want to be held in your arms. Thinking of the warm evenings with you beside me."

"I need you."

"Dearest Val, Thank you for letting me use the phone. I miss you today and every day. I give to you my heart with the sunshine. Love, Hector."

"Valerie, I'm sorry, very sorry for my own pain. Sorry I didn't get here sooner. I shouldn't surprise you like this any more. Have fun now."

"A flower for Val."

"Hi Baby, I want to tell you how much I love you today. I hope you have a nice time. I miss you. I hope we can see each other soon."

"Val, please give us a chance. Remember us and love us."

You get the picture. What is this? You know, you listen to Mr. Calle, you get the impression the guy left a couple of notes. "I got a flat tire. I've got to go to the garage" or something. "I had a flat tire" or something.

Take a look at the videotape. You see it as recently as that day or a couple days before she died. He sends her roses. Look at the notes on the table.

Exhibit 46, you remember these. These are sitting on the kitchen table. Burns Brothers stationery. I don't know. You can make your own judgment. Appear to be written with the same pen.

"Hi Baby, I'm just wanting to share things with you. I need to talk. It's a hard thing to say sometimes, but I really

need you. Please, Babe, it's from inside."

"Hi Babe, Well, another crazy day has gone by. I'm hoping that you're feeling better, along with your" -- "along with everything else that's going on in your life. Hope to be with you or sit and talk with you. So very much to say. I hope your night went well at work. I miss you, Val. Love you, Hector."

"Dear Val, I'm hoping that your day is going well for you. And I sure hope your cold is better." Take a look at the picture. You see a little bottle of cold medicine by the sink. "I guess when someone loves like we do, they should be at peace. I never knew that my trying to please you for the feelings your heart was giving would cause all of this. I'm doing the best I can, and I know you are, too. Thank you, Babe. Take care. Love, H.R."

And these are some, some other exhibits:

"Don't ever go away, Hector."

Get that piece of paper.

"Please call me today, H.R."

Flower card, probably with his roses:

"Life is sure nice with you in it. Don't ever leave."

There, don't ever go to the Bahamas without me. I'll -- let me suggest -- that was not on the note. I'm paraphrasing what I think the proof has said. This is obsession. This is not love.

Now, we get to convict him because he's obsessed with her, because he left her a lot of notes? No. But don't take that out of the mosaic.

The word that Mr. Calle was right in knowing I would use, "stalking" her, stalking this poor girl.

Liz Lewis says letters/notes virtually every day. He tells John Brennan and he tells Liz Lewis, "Yeah, I was following her. She wouldn't talk to me."

Peggy Burke sees him show up unannounced with flowers on the 18th or 19th of February. They went to the kitchen and she can hear him pleading with her, "Please, Val."

Coco's, March 4th. Here is something as simple as wanting to go out with your friends

for a drink after work and you have -- and, again, it's demonic. And she does the only reaction she could, because of the decent person she was. She rolls her eyes and says, "Oh, God." She doesn't want to go over, and finally she goes over, she talks with him. "I want to buy everybody some drinks."

March 17th. You'd think she'd get a moment's peace on her father's birthday, with his wife dying. Pulls into the driveway. Guess who pops out of the driveway, rushes up to the car? Probably thinks she had dinner with another guy.

Don't convict him for obsession and stalking. Don't convict him just for stalking her.

What about his alibi? I'll call it a false alibi, because that's just what it is. Now, I agree it's difficult for someone to say where they were six years ago, but it's not that difficult to recall where you were three days ago. And I want you to remember what the defendant said to

John Brennan.

And I've offered these here facts to you as a chart, an alibi chart. You can use it. You can't take this with you into the jury room because it's something I'm using for demonstrative purposes.

You want to sit down when you deliberate, Mrs. Madonna, if you want to have everybody do it, that is up to you. You may not need to if you recall this.

This is what Brennan says the defendant says: "Right around 2:00 I'm at 248 Hickok Avenue. I don't stay. I just make a judgment that Valerie's not home. I leave. I do some errands. I go home."

And he gets home, Cazenovia, sometime in that area. What does he do? Leaves Cazenovia at 5:00 and goes to, where else, 248 Hickok. Get's there about 5:30, 6:00. Not home. Left a note under her kitchen door. I don't know which one of the 53 notes that was, but I assume it was one of them.

Goes to Coleman's. Stays at Coleman's to 11 p.m., you know, drinks. No dispute. That's what

he said to Brennan.

Brennan, remember he is credible by the defense's standards.

Stays at Coleman's to 11:00. "I leave and I go to Albert's." And he arrives in Albert's. I don't know if Brennan tells us when he gets to Albert's, but we know from Officer Stassi it's about a 40-minute drive from Coleman's. So figure he got there shortly before midnight.

There's a big hole in that story. It is huge. I'll talk to you about it right now.

Karen and Donald Stonecipher, no ax to grind with anybody. The defendant, Karen says she sees him sometime around here, 248 Hickok. Donald says he sees him 3:30, 248 Hickok. Looks out of his window about 20 minutes later, sees him at 248 Hickok.

Chris Reynolds delivered the paper. There's no -- there is not a single contradiction between Christopher Reynolds and Peter Cooney, by the way. Reynolds says around 4:30 sees him at 248 Hickok.

Let me tell you what Cooney adds to this. Take this. This you can take with you into the jury room. Please do. Cooney says that he passes the defendant at about 2:00. Cooney heading west into the city; the defendant heading east, in the neighborhood of DeJulio's Army & Navy Store, less than what, half a mile at most from the victim's house.

I submit to you, by his own admission, he is on his way to the victim's house. Cooney sees him at DeJulio's. DeJulio's.

And what do we, what do we get from this? Do you, do you think that he was here and then he left, and then he came back and then he left, and he came back and then he left and he came back? Nonsense.

I submit to you that a reasonable person can conclude that from 2:00 to almost 4:30 or 5:00 he is doing what he does best, stalking Valerie Hill, just sitting there.

He wants me to prove that he's a sexual

psychopathic deviant. I wish that the rules of evidence would allow anything remotely close to that to come into a criminal trial. They don't. So -- but if that doesn't prove something significant, I don't know what does. 2:00 to 4:30 sitting there, waiting and waiting and waiting. And then what does he do? He's upset about something.

Reynolds remembers that, remembers that look in his face. So he leaves there. Cooney at 5:30 sees him in Manlius. Only now he is not driving his van. He's driving his "One Rivas," whatever the car was, two-door, silver-colored car or gray-looking colored car. Where? Heading back into the city.

Do we know where he's going? Why, yes, we know where he's going. Why do we know where he is going? Because he told us where he was going. He stopped on his way to Coleman's to see if Val was home.

So here he is back at 248, by his own admission. Wait a minute. Wait a minute. Something is wrong here. He says Val wasn't home. We know she was home. We know that at

5:30 or 5:45 Valerie Hill was at 248 Hickok. She's on the phone talking to Liz Lewis. And Laura Adams, calling from Schnectady, is getting a busy signal sometime that evening. And we know that at 6:30 she's supposed to meet her dad at Candy's, but she doesn't get there till almost 7.

Why? Why is she a half hour late? Why is the defendant not being candid with us about her being home?

She is up at Candy's half an hour late. The defendant we know was, was at her house and we know she was home.

What do Mark and Lori Brosh say? They say -- and I don't think you could find two nicer people. They -- I don't know, I forgot how they rated on Mr. Calle's scale.

But they say that from 6:30, thereabouts, to no later than 9:30 the defendant is at Coleman's. This is not rocket science. They remember they were home before 10. They remember it takes about 15 minutes to get home. They remembered the defendant

left about a half hour before they did.

Where is the reasonable doubt about the accuracy of that report? They say the defendant is at Coleman's. Do we see a rather large gap developing here?

John Cassano, folks. Again, I forgot where he came on the scale. But everybody should be so lucky, if they were ever involved in a serious incident where a loved one was hurt, to have a fine and observant young man as John Cassano near the scene of the crime, because there isn't any shred of doubt in his mind that at 9:40 p.m. the defendant is in Liquor Square buying a bottle of Bacardi rum and some other liquor. And he confirms it by looking at a computer-generated register tape.

That man was in Liquor Square. And he must have forgotten to tell John Brennan about that, because John Brennan, who talked to him from 3 to 5:30, made no mention of the defendant being at Liquor Square.

Jim Crimi and Susan Stonecipher, they say 11:00 to 1:00. Where else? 248 Hickok Avenue.

Take a look at this map. Concentrate for a second. You're not in the jury box, you're home in your -- where you feel comfortable, either in the family room, kitchen, living room, whatever. Let me tell you a story. Remember now, you are not the jury. You're just listening to me and I am a salesman. I'm trying to convince you of something.

Here is what I convince you of: I want to convince you that a person had a relationship with a woman and they broke up about 60 days before she died. And during that 60-day period this person called her, saw her, phoned her, left her notes, sent her flowers, popped up on the job, popped up in her driveway, popped up at her workplace, popped up in the restaurants where she went out, every single day, every single day. And on Friday, March the 27th, that person, coming from the east -- or, excuse me, coming -- heading east, stopped by at her house and left. Then he went home this way (indicating) to Cazenovia. And then he came back this

way (indicating), stopped by her house again. And then he went to Coleman's restaurant, and he stayed there and he had something to drink. And then he drove home, all the way home, and never stopped at her house.

On a scale of one to ten, the believability of that is zero. Zero. "Thank you, Mr. Fitzpatrick. I don't think I'm going to be purchasing anything today. And I don't think I'm going to purchase that."

He stopped at the house, he stopped at the house every solitary chance he got. I don't even -- I have sat through eight days of trial. I don't even know what the guy did for a living. I had heard some reference about plumbing. When the hell has the guy got time to be a plumber? What do plumbers do? Did he plumb?

And then the final piece to this mosaic, Bev Dorland. Credible. So I don't have -- you know, I don't have to get into a lot of argument why I believe her. 12:30 a.m. the defendant walks into Albert's and

Bev Dorland says to herself, "My, God, Hector, what did you do?" Seems he's not so nice. Everyone says he's always the same or so seldom Hector didn't look different. But then we get a witness who says he didn't look like himself. "I wanted to say to him what happened, what did you do?"

Don't convict, though, because his alibi is completely false. Don't convict him because he's obsessed with her. Don't convict because he was stalking her. Don't convict him because his alibi is a total fabrication.

(Whereupon, there was then a brief pause in the proceedings.)

THE COURT: Thanks, Patti.

MR. FITZPATRICK: The defendant's reaction to cops, John Brennan. John Brennan says around 2:30 he's assigned to drive to Hector Rivas's house. Unbeknownst to Brennan, Rivas has, coincidentally, stayed home during the day because, as he told Peggy Burke, he's got a sore throat.

Brennan says to him, very simply --

and Brennan is credible, right -- Brennan says to him, "Would you be willing to come with me and talk to me about Valerie Hill?" And I'm not -- Mr. Calle suggested I'm trying to use the defendant's silence. I'm not trying to use the silence at all. What did he -- he didn't stay silent. What did he say? He said, "Sure. Can I get dressed?"

Excuse me. And then during the questioning Brennan says, "You know" -- and I'm paraphrasing Brennan -- "You know, Mr. Rivas, I'm a little confused." He got the chance to ask the question. "I'm a little confused. You leave a note every day. You stop by every day. You're there at 2, at 6. And you drive home from Coleman's, you don't stop. You don't try to get ahold of her Saturday. You don't leave a note on Saturday. You don't call her on Saturday. You don't try to see her on Sunday. You don't call her on Sunday. You don't leave a note on Sunday."

What do you think the defendant knows,

that he had no way of knowing unless he was there?

And then at 5:30, 5:30, hours before anybody executed a search warrant in Cazenovia, "Mr. Rivas, Valerie Hill is dead." Okay. Maybe that was the reaction he had as he's sitting there now. I don't know.

I suggest to you, ladies and gentlemen, that he knew, he knew better than anyone, he knew better than Dr. Mitchell did, that Friday night he killed that woman.

Don't convict him for that alone, though, because I want you to look at the crime scene. What do I mean by that? Did I put these pictures in to horrify you? No. What do we know is missing from the apartment? An airline ticket.

Mr. Calle suggests to you, with his New York City experience, that this would be an important thing for a burglar to steal, an airline ticket. He may have forgotten that I grew up in a place called Brooklyn, New York. And in Brooklyn, New York we don't steal airline tickets, because I don't

think the burglar is going to show up at American Airlines and say, "I'm Valerie Hill. I'd like a window seat, please." He's not going to leave the house Friday night with a sweatshirt that says "I Killed Valerie Hill."

But think about it. Use your intelligence. That's why I've asked you to be here. What's important about the airline ticket? "Val, don't ever go away. Don't ever leave me, Val. Can't live without you, Val." What do you think his reaction was to her going, committing the horrible, horrible sin of wanting to get away for a couple of days by herself? What do you think his reaction was?

And what else is missing? The Stephen King book. And we know, and I've already told you -- Mr. Calle never mentioned it, and I don't even know if he heard during the course of the trial -- we know that she did not go to the Cazenovia Library on Saturday, but somebody knew that book was overdue. Perhaps when she got the call on Tuesday, was so upset because she thought

it had to be returned, she might have mentioned it to this defendant.

What else do we know about the, about the nature of the crime scene? Did the ticket get burnt up in the fireplace? I don't know. I don't know. The killer can answer that. I do not know.

Fingerprints. Fingerprints. Juries love fingerprints. I can tell you this from experience, that I've been in front of a hundred or so and I know the jurors love fingerprint evidence. And I prepared in this case -- and I'm telling you folks, I make a comfortable living with my, with my wife, but I'm telling you I wish I had a nickle for every time I walked into a courtroom and heard a defense lawyer say to a jury, "Where are the fingerprints? My client's fingerprints aren't there."

And here am I, getting ready for this trial, salivating. I've got my nice charts all set out, got my fingerprints all ready for you. And what does he do? He says, "Forget about the fingerprints. They don't matter." No fair.

There's only two, the entire apartment, the entire apartment, there's two fingerprints the police can't identify. Where are they? On the phone. On the phone. Inconceivable, along with a million other things, that the unknown stalker, burglar, Cicciarella, Barricella, whatever his name was, went to make a phone call as well.

Remember, medical personnel, police officers are there. Police officers sometimes don't like to talk on the radio, no, because the press sometimes have scanners. They don't like to talk about it, attract a lot of attention. Sometimes they're a little careless and they use the phone.

What about the prints of the defendant? There are his prints on the Blue Nun bottle. And more importantly, there are seven of them.

Give the defense his due. Prints can last for years. They can last certainly for times when the defendant may have been an invitee into that apartment. But this is a bottle of wine that has no other prints

on it except those of, those of the defendant, and not one or two, that have lasted through repeated touching.

Remember how Officer Donohue told us if we touch something, sometimes prints overlap, they become useless. There are seven identifiable prints of the defendant on the bottle of Blue Nun wine.

Valerie's prints are on the drinking glass found on the counter and the bottle of Bacardi rum.

I do not know if the defendant was wearing gloves that night. I do not know if his prints on the Bacardi rum bottle were smeared. I do not know if he put it in a paper bag and handed it to Val, and she took it out of the bag and poured him a drink and put it in her cupboard. But I know that at 9:40 that night Hector Rivas bought a bottle of Bacardi rum from Liquor Square, which is less than a half a mile from the victim's house, and I know that he failed to tell Officer Brennan about that.

Five of the defendant's brand of cigarettes are in the ashtray. I do not smoke, but I watch TV -- well, they don't have cigarette ads on TV, no, but I read magazines and I drive around. And I have never up until this trial heard of Barclay cigarettes. And this defendant had 50 or so crushed packs of Barclay cigarettes at his house. And I know there are five Barclay cigarettes in that ashtray. And I know that's not something that should be dismissed, because I'm suggesting to you he was chain-smoking there that night. And I know that he touched that ashtray. And I know that Valerie Hill was neat. And I know that by habit Valerie Hill would clean out the ashtray, unless, of course, she was lying dead in another part of the apartment.

And I know that three of the defendant's -- I won't call them love letters, I'll call them obsession letters were sitting on that kitchen table. And I know when -- and you know that there was no forced entry. The killer was let in, just like she let him in

earlier in the week. Wasn't February 23rd or 4th. It was March 23rd or 4th. Banging on the door four or five minutes, "Please, Val, let me in. Please, Val, let me in." Finally she let's him in, which is probably telling us as to why she let him in this night.

This is not a reckless woman that opens the door for Patsy Barricella.

"Who is it?

"It's me.

"Who's me?

"Patsy Barricella.

"What are you doing here?

"God told me to come here. I want to steal your airline ticket.

"Oh, come on in. Come on in. Help yourself."

Can't say what I was about to say. Common sense? Absolutely nonsense.

Nature of the crime scene. Take a look at pictures of the poor woman's body. Not -- take a look at them. What kind of rage has to be in a person to wrap that belt

around her neck so tight that the only way the medical examiner can get it off is by cutting it off?

Is this what -- this is a burglar that gets caught and says I'm going to stay for three, four minutes -- and I apologize to the Hill family, but this has got to be said -- I'm going to stay here for four minutes while I crush the life out of you? And there's not going to be a struggle?

This woman was in good health. She was in good shape. Most of -- if every one of you women on this jury is in good physical health, what would you do if you were confronted with an intruder? What would you do? Would your nails be intact? Would a lamp in your house be knocked over? Would magazines be strewn about, table knocked down, glass broken?

Not a single defense wound on her body. Why? Because she not only let the killer in, she trusted him. And perhaps most significantly when you look at that body, the anal violation postmortem, does

that make any sense at all?

Give the defense his due. This maniacal burglar strangles her. Now he says I'm going to send a message to this woman, this bitch. I'm going to do something to her. I'm going to leave my calling card here. What kind of disgusting rage has to be in a human being? How much time does it take to build up where he would do that to a dead woman?

I told you I would do two things. I would convince you beyond a reasonable doubt that this defendant did it, and I will convince you that no one else could have done it. And if you're not convinced by that crime scene that no one else could have done this, I don't know what else I could do.

The Judge is going to tell you that if the total evidence points to both innocence and guilt, then you must go with innocence. That's not a surprise to anybody. If there's a theory that fits innocence in this case, find the defendant not guilty. But it's a

theory that has to be based on evidence or lack of evidence, not a guess. You are not here to do Mr. Calle's job. He's done it very well for this defendant. The defendant picked him. He's done the best he could with what he had to work with. His investigator and he worked very hard on this case. But let me just tell you that there is no room for guessing and speculation and surmising.

The evidence supports one theory, and one theory only, that this defendant is guilty. If someone says in that jury room, "Gee, there is no eyewitness. There is no signed confession," number one, remind them of the promise they made a week ago; and, number two, look the person in the eye and say, "You don't have to give me a name, but give me a theory. Give me a theory."

Was it a burglar? A burglar that is let in, that steals an airline ticket and a library book, and gets out -- commits a horrible crime, with not a sign of a struggle, leaves not a fingerprint, a hair, a fiber?

A boyfriend that no one knows about, as Mr. Calle suggested on his opening statement, a mystery boyfriend? Everybody, every friend, every relative said she dated two men in six years: Bob Lucas and Hector Rivas.

A random psycho killer that just happened to pick her apartment? She doesn't struggle with him? She let's him in? She looks through her peephole and says come on in? And he so hates this girl that he does that to her?

But don't convict him because of his obsession, the stalking, his false alibi, his reaction to the police, his -- the nature of the crime scene. Don't convict just because of that. Take a look at his house.

We seem to have adopted the word "shrine" for this thing in his house. Look at the things in his house.

And I apologize. I've gone over my intended time, but I'll be done in about ten minutes. And I mean it.

Look at his house. He's smoking Barclay cigarettes. The shrine, I already told you we

should have taken a picture of the shrine. Okay. It is what it is. Well, what is it? Well, it's got religious significance. The Virgin Mary is there; candles; there is a bowl of coins; there is a photo of Valerie Hill.

Is there an innocent explanation for this and a guilty explanation for this? Well, I gave you the guilty explanation for it. It is a memorial. It is what it is. It is a memorial to Valerie Hill. She is dead. I know she's dead and here is a shrine in my closet.

What is the innocent explanation? I don't know. My wife will tell you that, you know, I -- when I was courting her, I would do a lot of strange things to get her to go out with me, but I never remember putting a picture in the closet, lighting some candles and making an offering to it.

His jacket is downstairs, laundered. And there's a note in the trash. You get a little sense of what Valerie Hill is like. There is a note in the trash. And look at,

look at the type of paper, which is Exhibit 30, which is recovered from her house. You know, because I'm thinking to myself, well, what if Mr. Calle makes the argument, hey, she wrote the note to Bob Lucas while she is at the house and that's how it winds up out in his trash. Kind of strange. Well, he didn't even make that argument, and I hope I didn't make it for him.

But here is -- compare this type of paper, if you can put it together, and this type of paper from her house. It's exactly the same. You get fingerprint dust on it. And these markings here, they attempted to lift what was written there and they couldn't do it. It's the exact same, exact same kind of paper. It is from her apartment and it is addressed to Bob, "Hi, Bob." And it is exactly the same as the letter he got sometime in late February.

Did she write them at the same time? Probably. Did he take it from her house Friday night? Absolutely not. He took it sometime, I suggest, earlier in that week.

And look at the rage. You know, we talk about motive and means and opportunity. The person that did this had to have a motive. And his motive is she's going to the Bahamas; she won't answer me; she's ignoring me. This is, this is maniacal rage. And he tears the letter up into 16 pieces and throws it in his trash earlier in the week and forgets about it. Puts it in a newspaper, wraps it up, forgets about it. Never thinks the cops are going to be there with a search warrant, or he would have blown out the candles.

But don't convict him on that alone. And then the -- and I apologize because she is here, but the -- she got a bad rating from the defense, Liz Lewis. Why is Liz Lewis important? Because she knows, Liz Lewis knows better than anybody what's inside Valerie Hill and what Valerie Hill and Hector Rivas are all about. Look at what she told us that we know. She knew she kept the house neat, as did Peggy Burke. She knew that Val and Hector were done, in

in Val's mind, by the end of January of '87. She knew that Hector Rivas tortured -- no, "tortured" is an overstatement -- harassed, stalked this woman every day from the time of their breakup until the time of her death. She knew that on March 20th Hector was at Val's house without Val's permission.

Remember the phone calls, Hector answers the phone. Val shows up. Her reaction? Anger.

She knew that she, Liz Lewis, wanted Val to go to the police and to change her locks. Knew that Hector called her, Liz Lewis, drunk at 1:30 a.m. the day before he killed Valerie, and that when Liz told Valerie, Valerie was angry.

And remember what he says to Mr. Brennan about their relationship on Thursday, the day before the murder. "Oh, I stopped by, spent a half hour with her. It was great." Just, hey, we are just kind of two ships passing in the night, having a great time playing the game of life. What a bunch of crap.

This woman is furious at this stalker because he now is involving her best friend at 1:30 in the morning, who's got kids. Calls her up drunk, babbling, blatting on the phone. You don't think she mentioned that to him on Thursday?

Knew that Hector was unaware that Valerie was visiting Laura Adams, and that's confirmed by Laura Adams and Peggy Burke.

Knew that Hector was acting inappropriately Saturday night. Gave a totally false impression that he had spoken to her that night; that she was home sick.

Knew that Hector spoke of her in the past tense Saturday night. "I loved her so much. She meant so much to me." And the defense tells you, well, he knew the relationship was over. Yeah, finally, the only way he would know the relationship was over, he killed her.

But don't convict him because of that alone. Convict him because he admitted it. When all is said and done, he tells Joe Fields.

Why don't you believe Joe Fields? Go in the jury room, let somebody stick up their hand and put their two cents in and say, "I don't believe Joe Fields." Well, somebody please look at that person and say, "Why? He didn't think he did it."

He's there having a drink with the guy. He gives him a hug. He's slobbering in his beer. The guy is crying, blatting, talking about Valerie. Knows he had been picked up by the police. And right at the time that they're talking about Valerie and Joe gets up, and I would suggest to you Hector thinks he's not within earshot, "Val, Val, I didn't mean to do it."

Convict him because of all of those things. Not one, not two, but all of them, because within those eight things there are a couple dozen reasons why Hector Rivas is guilty.

It's the night of Friday, March 27th, 1987. Valerie Hill, with everything to look forward to, has just come home. She is going to get away for the weekend, get away

from the harassment, the flowers, the phone calls and the notes, just for the weekend. She's excited.

She goes through her brochures and she's looking about the Bahamas. Boy, I'm going to have fun. Maybe I'll meet somebody.

Straightens up and, I suggest to you, she gets ready for bed. She turns on the electric blanket. She is in her bed clothing. She's got a heating pad out. Perhaps, perhaps because she's having discomfort from her period. She is on the budget. She keeps the heat down low. And that's why she has that electric blanket. And she's preparing or is actually in bed. And it's after 9:00 at night.

And the defendant, while she is doing those things, has left Coleman's and is now on his way, not to kill Valerie, but to do what he has done, there's no mystery about it, what he's done for the 60 days before March 27th. And he's got to have a bottle of booze to go with him. So he buys a bottle of Bacardi and gets something

else.

And while Valerie is looking forward to tomorrow, Hector is looking forward to one more chance. And he knocks and he comes in and they talk, perhaps at the kitchen table. I suggest to you that Valerie pours -- or Hector pours a bottle of Blue Nun wine for her, which is a bottle of some type of alcohol, or there is a glass of some type of alcoholic beverage still on the kitchen counter. Hector has his usual. Valerie pours. Her prints are on the bottle.

Does he notice the brochure on the kitchen table? He's chain-smoking. Would you expect the dialogue to be any different than it had been for the previous two months? "Val, Val, I can't live without you. Val, don't ever leave me. Val, don't ever go away. Life is sure nice with you in it."

But now, now she commits the horrible crime. She stands firm. She stands firm. It's over. Leave me alone. I mean I'm going away without you. I'm going to the Bahamas. And that sets off this jealous

rage in this defendant.

There's a blow struck to her head. Maybe she was knocked out. She's certainly stunned by it. There's no struggle. She never expected this.

She's now in the living room, or she's dragged to the living room. There is a phone book propped up under her pelvis for leverage. He grabs the belt off her robe and he ties it tight enough to choke the life out of her. And we know the rest.

But it isn't enough. No one leaves Hector Rivas. He violates her, so that forever more that will be the last image of Valerie Hill.

And the rage subsides and he collects himself. He hasn't been thinking right. Now he's got to do a lot of things. He needs to get his act together. Prints, now there is no time to wipe them all away. What did I touch; what didn't I touch. Wait a minute. I have been here before. That's -- I'm not worried about prints.

The airline ticket, did he burn it in the ashtray or in the fireplace because it had -- ripped it up because it had his prints, or did he throw it out the car window? I don't know. But I've got to get rid of that airline ticket.

The book, I'll take the book. These things that will come in handy. Hector doesn't know about Laura Adams. So I'll mention Valerie being sick Saturday night, and the book and the library. I'll be out. I'll be seen by every human being in Cazenovia Saturday night.

He was outside. The coast is clear. No one sees him leave the house. Gets in his car and begins to calm down. Has a cigarette.

Something bad happens. Susan Stonecipher and Jim Crimi come home. It's a little, it's a little after 11. They see him. Does he see them? I would imagine so. Do they recognize -- does he know that he was recognized? I don't know.

Now he's got a problem. Maybe they

won't recognize me. Maybe a jury six years from now won't believe them. I've got to drive around. I have got to be seen. I'll go to Albert's. Good place to go. Saturday I will return the book, be all over the place Saturday night.

Sunday all is quiet. Not going to try to contact her. Wait, wait, waiting. When are they going to find the body? Can't go to work Monday. I know, I have got a sore throat. I can't take it anymore. I've got to call her. I'll ask for Peggy Burke.

"Is Peggy Burke there?

"Yeah. Hold on."

Peggy Burke gets on the phone.

"Hi, Peg. Where's Val?

"She's gone away for the weekend.

"Is she late? Everything okay?

"Yeah, yeah, yeah. Yup.

"Well, I've got a sore throat. I've got to go."

And the cops come. And you know the rest.

Folks, six years is a long time. There's

a lady up there holding a scale of justice. Look real close at her. She doesn't have a calendar on her. There ain't no time of justice.

As you look at the last six years, this defendant has done whatever he's done in that six years. I've done a lot in that six years. I had three children that I didn't have six years ago. The Berlin Wall has come down. Who would have believed that six years ago? We have four million more new Americans than we did six years ago. New lives, new births, new immigrants. People dreaming about this and that.

The man who said "Time heals all wounds" never met Randy or Icie Hill, because it doesn't.

The time -- this case is about time. The time has come. This woman had rights. No one is going to argue that. She had the right to vote. She had the right to remain silent if somebody wanted to question her. And she had the right to be left alone, be left alone. She had the right to be left

alone. She had the right to live.

And if he couldn't get it through his head, after the times that she told him, and the notes, and the calls, why? He didn't have to do what he did that night.

Folks, I went to law school for three years. And we had professors and teachers and people that came and lectured to us. And they tried to tell us about one thing, something Mr. Calle doesn't think we have in Onondaga County, and it's called justice. It's called justice. You can define it any way you want. I went through three years of law school. I have heard 60 different versions of it.

Today is justice. You are justice in this case. Six years is over. The deceit is done.

You are the killer and you're going to pay for it.

THE COURT: Ladies and gentlemen, we are going to break right now and I'm going to give you about 40 minutes to eat your lunch. It should be in the jury room.

I ask you not to form any opinions or to discuss the case. I'll bring you back and give you the final charge at about 1:30.

You're excused.

(Whereupon, a luncheon recess was then taken.)

* * *

(AFTERNOON SESSION - March 25, 1993)

MR. CALLE: Sorry I'm late, Judge.

THE COURT: That's okay.

Hi, fellas. Take your hats off. Okay. Let's do it.

(Whereupon, the jurors then entered the courtroom.)

THE COURT: Rich, can I see you a minute.

(Whereupon, an off-the-record discussion then ensued between the Court and counsel

at the bench.)

COURT'S CHARGE

THE COURT: All right. We're back in session. The record should reflect the jury is present, counsel, the defendant, present.

Miss Cathcart, again, I -- during the course of my charge to you, I don't think you'll have a problem, but if I look up in that direction, just give a nod if everything is going all right for you.

Members of the jury, following the summations of the attorneys, it now becomes my duty to instruct you, that is charge you as to the law applicable to this case.

Before doing so, I'd like to personally commend these attorneys for their able manner in which they've conducted themselves as advocates in this case, and I compliment them. They're both gentlemen and it's been a privilege to preside over this case with them before us.

And I also, members of the jury, thank you

for your devotion and patience and attention.

It now is of utmost importance the final words to you in this case be given to you in a calm and a quiet atmosphere. Trial by jury in criminal cases forms the very basis and is the heart of the true administration of justice in our country, in this state, and in our community. It should not be a game of wits or theatrics. It is intended as a procedure by which we quietly, rationally, and objectively attempt to ascertain the truth.

You, as jurors, and I, as the Court, have a great responsibility in determining that a just result is reached both on the law and on the facts. We have now arrived at that phase of your work where you'll be instructed on the law, then retire to your jury room for your final deliberations.

You'll find that my instructions are divided into two main parts. First a general statement of the law that is applicable to all jury trials in criminal cases, and then a statement of the law that is particularly

applicable to the charge to be submitted to you for your consideration.

During the course of their summations the District Attorney and defense counsel respectively have commented on the evidence and have suggested to you certain inferences and conclusions that you might reasonably and logically draw from the evidence. The summations of counsel are, of course, not evidence.

However, if the arguments of counsel strike you as reasonable and logical and supported by the evidence, you may, if you so conclude, adopt them.

On the other hand, if you find such arguments to be unreasonable or illogical or unsupported by the evidence, you may reject them.

In the final analysis, it is the function of the jury to draw their own inferences or conclusions from the evidence as you recollect the evidence and as you find such evidence credible and believable.

You are bound to accept the law as I

instruct, whether you agree with it or not.

You must not infer from any of my rulings or anything I may have said during the trial that I hold any personal views for or against this defendant.

Further, you are not under any circumstances to draw any inference or conclusion from an unanswered question, nor may you consider any testimony which has been stricken from the record.

In deciding the credibility, that is the believability of any particular witness, you may use the same tests used in your everyday affairs to determine the reliability or unreliability of statements made to you by others. Among the factors to be taken into account in evaluating and assessing the testimony of a witness are the interest or lack of interest the witness has in the outcome of the case; any bias or prejudice that the witness may have; the age, the appearance, the manner in which the witness testified; the opportunity that the witness had to observe the facts testified to; and the

probability or improbability of that testimony when viewed in light of all the other evidence in the case.

You, the jury, are the sole and exclusive judges of the facts. It is the duty of the jury to decide each and every issue of fact which has arisen during the course of the trial. No one, not counsel, nor the Court, may presume to tell you how those issues of fact should be decided.

I repeat, you and you alone are the sole and exclusive judges of the facts. The credibility, that is the believability of each witness is itself an issue of fact solely and exclusively within the province of the jury. With respect to each witness you must determine to what extent you find that testimony credible and acceptable. With respect to any individual witness, you may accept in whole or in part such testimony you believe and find credible and reject in whole or in part such testimony you find unworthy of credit or belief.

In resolving each and every issue of

fact, you must do so solely on the issues in the case and on that evidence alone. You may not consider or speculate concerning matters not in evidence or matters outside the case.

As I have just stated, you, as jurors, are the sole and exclusive judges of the facts. On the other hand, I am the sole and exclusive judge of the law. These responsibilities are separate and distinct, and each is of equal importance.

As the judge of the law, it has been my function to regulate the course of the trial and to determine what evidence under the law was admissible. My other -- my rulings in each instance were solely on the law. My other function is to instruct you on the law specifically applicable to this case.

Now, my instructions to you on the law must be accepted by you, whether you agree with them or not. If you have any ideas of your own of what the law is or what you think it ought to be, it's now your duty under oath

to cast aside your own ideas of the law and to accept the law exactly as I give it to you.

Please remember that all of us, the Court, counsel, jury, the People, and the defendant, are all bound by the laws of the State of New York exactly as those laws apply.

I remind you that each attorney is an officer of the Court, owing a high duty to his client. His function is to represent his client to the best of his ability. If in the interest of advocacy the attorneys have done or said anything which you deem to be objectionable, you must not let such feelings interfere with your primary duty here, and that is to be fair to both the defendant and to the People.

As I have instructed you before, any arguments of counsel made during the course of the trial are not evidence and should not be considered by you as such. Nor should any colloquy or exchange between the attorneys, among themselves or the Court, be considered by

you as any evidence, for they are not.

During the course of the trial I may have put some questions to the witnesses. When I did so, it was because I believed the jury required enlightenment on some particular point. My questions to the witnesses and the witnesses' answers may be considered by you just as you consider any other question and answer.

However, you should not attach any special weight to the testimony simply because I asked the question.

During the trial I have made rulings on motions and objections. My rulings are solely on the basis of the law. Such rulings should not be considered by you as giving any indication or creating any inference that I have any opinion as to issues of fact, which are exclusively within your determination.

Before discussing the constitutional safeguards surrounding every person accused of a crime, let me emphasize that an indictment is simply an accusation required by law solely

for the purpose of informing the defendant of the offenses with which he is charged. It's simply a paper writing. It is not, I repeat, evidence of anything. The allegations set forth in the indictment are allegations only. They are not evidence.

As I say, the indictment is merely the device required by law to inform the defendant of the charges against him and to bring such charges to trial. Put another way, a defendant is never required to prove anything. On the contrary, the People, having accused the defendant of the crimes charged, have the burden of proving the defendant guilty beyond a reasonable doubt. The People have the burden of proving the defendant's guilt as to every fact and every element that's essential to convict. The burden never shifts. It remains on the People, and the presumption of innocence remains with every defendant from the beginning of the trial until such time when during final deliberations the jury may be convinced that the People have proved the defendant's

guilt beyond a reasonable doubt.

Therefore, if in your minds during your final deliberations the People have not borne their burden of proof and the presumption of innocence has not been overcome by proof which convinces you beyond a reasonable doubt, then, of course, you must find the defendant not guilty.

If in your minds during your final deliberations you are satisfied from all the evidence that the People have borne their burden of proof and that the presumption of innocence has been overcome by evidence which convinces you beyond a reasonable doubt, then you must find the defendant guilty.

Without a doubt, one of the most important safeguards in our law is the presumption of innocence. It simply says all persons charged with a crime and brought to trial are presumed to be innocent unless proved guilty beyond a reasonable doubt.

The law, therefore, presumes this defendant to be innocent unless proved guilty

beyond a reasonable doubt. The standard of proof required by law in every criminal case is proof of guilt beyond a reasonable doubt. That standard, however, does not require the People to prove the defendant guilty beyond all possibility of doubt or beyond a shadow of a doubt. It requires the People to establish the defendant's guilt beyond a reasonable doubt.

Our law requires that before this jury may convict the defendant, each of you must be satisfied that the credible evidence is sufficient to convince you beyond a reasonable doubt that the defendant is, in fact, guilty. The evidence must satisfy you beyond a reasonable doubt that the defendant is, in fact, the person who committed the crimes charged. The evidence must also establish beyond a reasonable doubt each and every essential element of the crimes charged, as I shall define those elements to you at the close of the charge.

What does the law mean when it requires proof of guilt beyond a reasonable doubt?

When is a doubt of guilt a reasonable doubt under our law? A doubt of the defendant's guilt, to be a reasonable doubt, must be a doubt for which some reason exists. The doubt, to be reasonable, must, therefore, arise because of the nature and the quality of the evidence in the case or from the lack or insufficiency of the evidence in the case. The doubt, to be a reasonable doubt, should be one which a reasonable person acting in a matter of this importance would be likely to entertain because of the evidence or because of the lack or insufficiency of the evidence in the case.

A doubt of guilt is not reasonable if, instead of being based on the nature and the quality of the evidence or the insufficiency of the evidence, it is instead based on some guess or whim or speculation unrelated to the evidence in the case.

Also, a doubt of guilt is not a reasonable doubt if it is based merely on sympathy for the defendant or from the mere desire by

a juror to avoid a disagreeable duty.

I, therefore, repeat, a doubt of a defendant's guilt, to be a reasonable doubt, must arise either from the nature and the quality of the evidence in the case or from the lack or insufficiency of the evidence in the case.

Therefore, the first duty of each juror is to consider and weigh all the evidence in the case and decide which you believe is credible and worthy of your consideration. The next duty of each juror is to determine whether that juror has, in fact, a reasonable doubt of the defendant's guilt, as that term is defined in our law.

A reasonable doubt, our law says, is an actual doubt, one which you are conscious of having in your mind after you have considered all the evidence in the case.

If after doing so you then feel uncertain and not fully convinced of the defendant's guilt, and you are also satisfied that in entertaining such a doubt you are acting as a reasonable person should act in a matter

of this importance, then that is a reasonable doubt of which the defendant is entitled to the benefit.

I repeat, it is the duty of each juror to carefully review, weigh, and consider all the evidence in the case. If after doing so you find that the People have not proved the defendant's guilt beyond a reasonable doubt, as I have defined that term to you, then you must find the defendant not guilty.

On the other hand, if you are satisfied that the People have proved the defendant's guilt beyond a reasonable doubt, as I have defined that term to you, then you must find the defendant guilty.

Our law provides that in determining your verdict or considering the evidence in this case, you may not consider or speculate concerning matters relating to sentence or punishment. You must not discuss such matters, nor should your deliberations in any way be influenced by such matters. If you render a verdict of guilty, I am required to impose a sentence in accordance with the law.

The jury has no function relating to sentence or punishment and such matters are wholly immaterial to your deliberations.

Our law provides that both the People and the defendant may as a matter of right call and examine witnesses, and each party may cross-examine every witness called by the other party. There is, of course, no duty upon the defense to call any witnesses, since, as I've already explained to you, it's always encumbent upon the People to prove each and every essential element of the crimes charged beyond a reasonable doubt, and this burden never shifts.

However, it is not the number of witnesses called which is controlling upon your judgment, but it is the quality of the testimony which must prevail.

In this case, as in most criminal cases, your decision on the issues of fact, which you are required to determine, and also on the ultimate issue of fact, the guilt or innocence of the defendant, will turn on your estimate of the credibility of

each witness's testimony and the weight to be accorded such testimony. In a criminal case, each side, the People and the defendant, may call witnesses to establish their respective versions of the facts which bear on the guilt or innocence of the defendant. You, the jury, must determine the credibility of each such witness and the appropriate weight to be accorded that testimony.

In simple terms, that means you, the jury, must decide whether the witness has testified truthfully or whether the witness has testified falsely. Or if you are satisfied that the witness has not consciously testified falsely, whether the recollection of the events about which they testified to is accurate and reliable or inaccurate and unreliable.

There is no magic formula, ladies and gentlemen, by which a jury can evaluate the credibility or believability of a witness. Each of you brings to this jury all of the experience acquired in your private lives. In your everyday affairs you make a judgment on the reliability or unreliability of statements

made to you by others. The same tests which you apply in your everyday dealings you should apply in your deliberations as jurors.

May I suggest a few tests which you may wish to use:

Is the witness an interested or disinterested witness? If the witness is interested in the outcome of the trial on one side or the other, you may consider such interest in determining how much credit or weight you will give to that testimony.

A witness is an interested witness when by reason of relationship, friendship, antagonism, or prejudice, in favor of or against one party or the other, that testimony, in your judgment, is biased or likely to be biased towards the side that witness favors.

On the other hand, a disinterested witness is one who has no interest whatsoever in the outcome of the trial; a factor which you may consider in determining the credibility and weight to be given to the testimony of such a witness.

Another test you may wish to consider is the test of reasonableness. Is the testimony of the witness plausible and, therefore, likely to be true, or is it implausible and unlikely to be true? This test is based on experience and common sense.

Testimony is plausible and believable if, based on your experience, it is more likely to be true than untrue.

Another test you should consider is the test of consistency. To determine whether or not the testimony is worthy of belief, it should be weighed with or without the testimony of other witnesses with equal opportunity to observe and recall the same events. Is the testimony consistent or inconsistent with other testimony in this case?

To determine whether you believe -- you will believe any special -- any such witness, you may consider whether any -- their testimony at this trial is inconsistent with any other prior statement they may have given.

Another test in determining the credibility of any witness you may also wish to consider is the demeanor and manner of testifying on the stand. Did the witness strike you as being intelligent, frank, open, and certain, or unintelligent, evasive, deceptive, or unsure? Did their memory of the events concerning which they testified about appear to you to be accurate or hazy? Did they have an opportunity to really see, hear, and know the events concerning which they testified about?

Should you in the course of your deliberations conclude that any witness has intentionally testified falsely to a material fact during the course of the trial, you are at liberty to disregard all of that testimony on the principle that one who testifies falsely as to one material fact may also testify falsely as to other facts.

You are not required, however, in all circumstances to consider such a witness as totally unworthy of belief. You may accept so much of that testimony you believe to

be true and reject only such part which you conclude is false.

By these processes or tests that I have described, you, the jury, as the sole judges of the facts, should be able to determine which of the witnesses you believe, what portions of their testimony you are willing to accept, and what weight you will give to such testimony. In deciding the issues of fact, and the ultimate issue of fact, the guilt or innocence of the defendant, you will consider only that evidence on the part of each side which you consider is credible. Please bear in mind that it is not the number of witnesses called or the length of time taken by each witness on each side, but, rather, the convincing quality of the total evidence, the weight and affect that it has on your mind, which should influence your decision.

The defendant did not testify in this case. I charge you that the fact that he did not testify is not a factor from which any inference unfavorable to the defendant

may be drawn.

You will recall that certain police officers have testified in this case. You should use the same tests in evaluating their testimony that you will use in evaluating the testimony of any other witness.

In other words, the mere fact that a witness is a police officer, you should not attach any special weight to that fact merely because that person is a police officer.

You will recall that the witness Dr. Erik Mitchell testified and he gave testimony concerning his qualifications as an expert in the field of forensic medicine, pathology, in his duties as medical examiner. Here's what the law has to say about his opinions relative to his testimony:

Where scientific, technical, or other specialized knowledge will assist the jury to understand the evidence or to determine a fact in issue, our law permits a witness qualified as an expert, by knowledge, skill, experience, training or education, to state his opinion on questions in controversy upon

the trial for the information of the Court and the jury.

Please understand that the opinions stated by each expert who testified before you were based on particular facts as the expert himself observed them or as the attorney who questioned him asked such expert to assume.

To assist you in deciding any questions in controversy at trial, you may consider the opinion of an expert together with the reasons given for such opinion, if any. You may also consider the qualifications and credibility of such expert. You may reject an expert's opinion if you find the facts to be different from those which serve as the basis of his opinion. You may also reject an expert's opinion if after careful consideration of all the evidence in the case, expert and otherwise, you disagree with the expert's opinion.

In other words, you and you alone are to form your own opinions or to draw your own conclusions as to any questions in

controversy in the case.

In summary, the opinions of experts are subject to the same rules and tests concerning the reliability of testimony as any other witness in this case.

You will recall that Mark Brosh testified on cross-examination as to his opinion of the defendant's character and conduct towards women, and on redirect examination was asked about his knowledge of the defendant's conduct towards his former girlfriend, Ms. Hamill.

I now charge, and I emphasize, that under no circumstances are you to consider the defendant's conduct towards his former girlfriend as proof that he committed the crime with which he is charged in this case.

You may consider the defendant's conduct towards his former girlfriend only for the purpose of assisting you in making your evaluation of Mark Brosh's credibility. In other words, to aid you in making your determination of what weight you will give to the testimony of Mark Brosh, particularly as to the weight of his testimony concerning

the defendant's character.

The People have the burden of proving identity beyond a reasonable doubt. You, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant as testified to by the witnesses in this case before you may convict him. With respect to the crime charged herein, if you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find him not guilty.

Identification testimony is an expression of belief or impression by the witnesses. Its value depends upon the opportunity the witness has to observe the offender at or about the time of the offense and to make a reliable identification.

In appraising the identification testimony of a witness, you should consider and examine all the circumstances surrounding the identification of the defendant. For example, what were the lighting conditions at the scene of the crime? What was the distance

between the witness and person identified? Did the witness have an unobstructed view of the person identified? Did the witness have an opportunity during their observations to observe and remember the facial features, the body size, the hair, skin color, and the clothing of the person identified? How much time elapsed during the identification of the person? During that period of time, how long did the witness actually observe the person? Had the witness seen the person before or after the incident? Did the person identified have distinctive features which an eyewitness would be likely to remember and recall?

These are some of the factors you must weigh in deciding whether the witness, in fact, had an opportunity to observe and, therefore, to remember the person they identified. You jurors may also consider any other facts that you may find relevant in your determination of the accuracy of this identification, including the accuracy of the descriptions the witnesses gave to the

police, or anyone else, shortly after they made their identifications.

You jurors must also evaluate the credibility of any identification witness in the same way as any other witness; consider whether or not he or she is truthful and consider whether he or she had the capability and opportunity to make a reliable identification of the person they identified.

You have heard the testimony of certain witnesses who claim they saw the defendant at various locations on March 27th/28th, 1987. From your evaluation of the witness's opportunity during these observations to observe and remember the person's facial features, body features, and clothing, and upon your assessment of his or her ability to observe, to reason, and to remember, along with any other credible evidence before you, you will determine whether you are satisfied beyond a reasonable doubt, with respect to the crime charged, that this defendant was the man who, in fact, was observed at the locations testified to by the witnesses.

I further remind you that mere presence at that scene of the crime is insufficient to establish guilt.

Again, the burden of proof is on the prosecution to prove beyond a reasonable doubt that it was the defendant who committed each crime charged in this indictment.

Ladies and gentlemen, there is a defense that's been raised here of alibi. I will tell you in regard to the defense of alibi that the following is the law:

The People contend that the crime was committed -- excuse me. The People contend the crime charged was committed on or about March 27, 1987. As I've instructed you, the People have the burden to prove to your satisfaction beyond a reasonable doubt not only all of the essential elements of the crime charged here, but also that this defendant is the person who committed it.

In this case the defendant has introduced evidence that he was not present at the place alleged by the People at the time of

the alleged murder of Valerie Hill, but was, in fact, at some other location. On the basis of such testimony, the defendant contends that he could not have committed the crime.

The defense has -- the defense has presented what is commonly known as an alibi. You must consider and evaluate the alibi testimony just as you would any other testimony. If the alibi testimony has created a reasonable doubt in your mind that the defendant is not the person who committed the crimes charged here, then you must find him not guilty.

I instruct you, however, that the defendant has no burden to prove that he is not the person who committed the crimes charged. The burden is and remains on the People to prove that he is the person who, in fact, committed the crimes charged.

Therefore, even if you did not credit or even disbelieve the testimony, the People must, nevertheless, prove to your satisfaction beyond a reasonable doubt that the defendant

is the person who committed the crime before you may find him guilty.

There are two types of evidence, direct and circumstantial. As a legal matter, there is no distinct -- excuse me. As a legal matter, there is no distinction between the weight to be accorded to either of the two types of evidence. A fact may be established by circumstantial evidence as sufficiently and completely as by direct evidence.

Direct evidence consists of testimony of witnesses as to what they saw or heard or experienced with any of their senses in relation to the crimes charged, or some fact which is relevant to the issue of the defendant's guilt or innocence. An example of direct evidence is testimony of a witness who says, "I saw this," "I heard that," or "I did this." That is direct evidence.

A fact may also be established by proof of other facts from which the existence of the fact in issue may be naturally inferred by the jury. The latter is called circumstantial

evidence. An example of circumstantial evidence would be if in the wintertime you look out your bedroom window at midnight and observe there is no snow on the ground, and then you look out of that window at 7:00 in the morning and see snow on the ground with shoe prints in the snow. Now, you can infer that while you were asleep it snowed during the night and that a person walked there after the snow began to fall. You didn't see the snow falling or the person walking, but the fact that you saw the snow and the marks in the snow is sufficient to establish that it snowed and that someone was in the vicinity of your home during the hours of midnight to 7:00 a.m. You cannot infer who that person was without more evidence.

Now that I have given you an example of circumstantial evidence, I will charge you as to the law applicable to circumstantial evidence. I do so because the People have relied substantially upon circumstantial evidence as proof against the defendant in this

case.

In attempting to prove facts by circumstantial evidence, there are certain rules to be observed that reason and experience have found to be essential to the discovery of truth and the protection of innocence. The circumstances themselves, before you -- excuse me. The circumstances themselves, before you can consider them, must be established beyond a reasonable doubt by direct proof and not left to rest on inference. In other words, the inference cannot be based upon an inference; it must be itself based upon direct evidence.

In other words, if a witness is on the stand and says, "I saw this," "I saw that," if in your mind the totality of all the evidence in that regard adds up to an inference that the law permits you to make, then you may do it. But you cannot base your inference upon an inference made by the witness.

The inference sought to be drawn from the facts and circumstances proved by direct evidence must be clear, reasonable, strong, and

logical. There must be a logical and clear connection between the facts proved by direct evidence and the proposition sought to be proved by inference. No inference is reliable which is drawn from direct evidence which itself is uncertain. Whenever it is sought to establish a fact by circumstantial evidence, the circumstances from which the inferences sought to be drawn must themselves be established beyond a reasonable doubt by direct evidence.

When considering the value of circumstantial evidence, bear in mind that such evidence is not to be discredited because it is circumstantial. Circumstantial evidence may often be more reliable evidence of -- reliable evidence or proof than direct evidence. And when all the material facts taken together lead naturally, logically, irresistibly, and exclusively to the conclusion of the defendant's guilt beyond a reasonable doubt, and at the same time are inconsistent with his innocence, then you have a highly satisfactory form of proof which may not be

disregarded, and a verdict of guilty based thereon may often be more satisfactory than one rendered upon the testimony of witnesses whose memories must be relied on, or who are otherwise interested in the outcome of the case.

Circumstantial evidence is of no value if it is viewed to be consistent with either the hypothesis of guilt or the hypothesis of innocence. To be of value it must point solely and only in the direction of guilt and be inconsistent with innocence. Remember that it must point solely and only in the direction of guilt; keep in mind the backdrop of reasonable doubt in that regard. It must appear that the inference of guilt is only -- is the only one that can be fairly and reasonably drawn from the facts and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence.

If the facts constituting the circumstantial evidence create only a suspicion, no matter how strong the suspicion is, it is not sufficient in law on which to

predicate a verdict of guilty.

So, in summary, in order for circumstantial evidence to have any real value, three factors must exist:

The facts from which the inference of guilt is sought to be drawn must be clearly and satisfactorily established beyond a reasonable doubt by direct evidence and not be conjecture.

The inference of guilt must flow naturally, logically, and exclusively from the established facts and must exclude beyond a reasonable doubt every hypothesis or theory but that of the defendant's guilt.

The hypothesis or theory of guilt must be inconsistent with the hypothesis or theory of innocence.

In order to convict the defendant on circumstantial evidence, the People must prove the defendant guilty beyond a reasonable doubt. If circumstantial evidence meets these standards, it constitutes one of the highest forms of evidence which the law demands, and neither jurors nor the Court can

consciously disregard it. Whether it meets such a standard in this case is for you, the jury, to decide.

Ladies and gentlemen, there is one count, one charge which will be submitted for your determination. That charge is the crime of Murder in the Second Degree, in violation of Section 125.25(1) of our Penal Law, which reads as follows:

"A person is guilty of Murder in the Second Degree when, with intent to cause the death of another person, he causes the death of such person."

For you to find the defendant guilty of this crime, the People must prove to you beyond a reasonable doubt the following three elements:

That on or about March 27th, 1987, in this county, the defendant strangled Valerie Hill with the belt from her bathrobe.

That at the time the defendant strangled Valerie Hill, he intended to cause her death.

A person intends to cause the death of another person when his conscious aim or

objective is to cause the death of that person.

The intent to kill need not have been present in the defendant's mind for any specific period of time before he strangled Valerie Hill, as alleged in the indictment. It is sufficient if you find that such intent to kill was in the mind of the defendant when he strangled Valerie Hill.

Since we cannot read a person's mind, their intent may be inferred from their acts and conduct. You may rely on the facts and circumstances surrounding the act to determine the issue of intent. The People bear the burden of proving beyond a reasonable doubt that the defendant possessed the requisite intent. No direct evidence of the defendant's alleged intent to cause the death of Valerie Hill was presented, and as to this element the People are relying on circumstantial evidence.

The law provides that a defendant's intent to cause the death of another may be proven by circumstantial evidence; that is,

a jury is permitted to find that such intent existed by drawing a reasonable inference from other facts proved by direct evidence.

You will recall that I have already given you extensive general instructions as to proof of facts by the use of circumstantial evidence and the rules you must follow in your consideration of such evidence. All of such instructions are fully applicable to this element concerning the defendant's alleged intent to cause the death of Valerie Hill.

The law provides that in any case involving a charge of intentional killing, that is a charge of murder, the People are not required to show or prove any particular motive or reason for the killing. A defendant's motive or reason is not a necessary or material element which must be proved in a murder case. It is legally sufficient in a murder case if the People prove an intentional killing, regardless of what a defendant's motive or reason for the killing might have been.

However, a jury may consider the existence

of motive or the lack of motive as a factor in determining whether or not there was an intent to kill.

And the third element is:

The defendant's act caused the death of Valerie Hill.

The death of the person alleged to have been killed must be proved by direct proof. The People claim that they have met this burden of proof by the testimony of Dr. Erik Mitchell, who told you of his examination of the body of the deceased, Valerie Hill. He told you the details of an autopsy he performed and his opinion of the cause of death. It is your duty to determine whether or not Valerie Hill's death has been established by the People beyond a reasonable doubt.

If the People have proven all of those elements to your satisfaction beyond a reasonable doubt, you may find the defendant guilty of the crime of Murder in the Second Degree.

However, if the People have failed to prove one or more of those elements to you

beyond a reasonable doubt, then you must find the defendant not guilty of Murder in the Second Degree.

Ladies and gentlemen, your verdict in this case must be unanimous. That is you all must agree.

Mrs. Madonna, you, because of your status as the first person sworn, are the foreperson of this jury. Your function will be twofold, ma'am. It will be your function, when this jury has reached a verdict, to stand up in open court and announce that verdict. Your other function is when the jury needs to communicate with the Court for any reason, for instructions, testimony read back, exhibits, for whatever reason, any communication between the jury and the Court must be done in writing by a note signed by you. I don't care who writes the note. I prefer the person with the best handwriting take that task. But you must sign it, Mrs. Madonna, before it leaves that jury room, seal it up in an envelope and send it out.

As I think I've indicated, the jury verdict must be unanimous. You all must agree before a verdict can be reached.

Now, I appreciate that this trial has been a couple weeks and there's been several witnesses. Mrs. Madonna and, of course, ladies and gentlemen, if you desire the testimony of a witness be read back to you, we can accomplish that. Mrs. Alexander has the skill to research that testimony and read back word for word what that testimony was.

However, when you draft -- if you draft a note to me requesting testimony be read back, please try to be as specific as possible as to what portion of their testimony you're looking for. If you say "We want the testimony of Erik Mitchell," you are going to hear the "Good morning, Doctor," and his education. And that's fine if that's what you want. If you're looking for something specific, try to pinpoint in your note, as in my example here, "Well, we want to know what you base your opinion on as to the cause

of death," or whatever it is, and we'll focus in on that testimony. All right.

If you want the cross-examination on that particular point regarding testimony read to you as well, you have an absolute right to that. Please put in your note, "We want the direct and cross-examination of," as in our hypothetical, "Dr. Mitchell's testimony regarding this point." If you don't ask for the cross-examination, you will only hear the direct examination.

So, please, if you want to hear the cross, say the direct and cross on this point. Otherwise you will -- you're just going to hear the direct of any witness called by either side.

If you want the exhibits sent in, you have an absolute right to have those exhibits sent in to you; either all of them or the ones you request. That must be done also by means of a note, please, that you want those items. Send out a note and they will be sent in for your inspection.

Now, and this is important, if you want

any legal instructions, by the way, read back to you, send out a note asking that, too. I cannot send in any legal instructions for you to read. That would be too easy. I'm required to bring you back in here to court and have me read it to you in open court.

So don't send out a note saying, "Please send in what circumstantial evidence is." I can't do it.

Bear in mind this: If you request testimony to be reread, be advised it will take some time for the court reporter to find that testimony. Under the rules of law, a jury may not, I repeat, may not deliberate in a case while a note is pending. So if you send a note out of that jury room looking for testimony, your deliberations must stop.

And, Mrs. Madonna, that will be your function to make sure that happens.

I'm going over this as advice. You are not bound to follow it. I would only suggest to you that perhaps if it's possible

in your deliberations, to try to gather as much of the testimony you're going to want read back and send it all out at once. And be prepared for a lengthy wait if it is a lot of requests. Okay.

If you want the law read back to you, I can get you back in here in a minute, because I've got it right in front of me. Obviously, it will take Mrs. Alexander a little longer to find that testimony.

Just bear in mind that when the notes are pending, you've got to stop deliberations. Again, Mrs. Madonna, all of you must be present in the room to deliberate. If a juror steps outside to go to the rest room or goes outside in the alcove to have a cigarette -- I don't know what the smoking arrangements are -- you've got to stop your deliberations. All of you must be together when you deliberate.

Okay. Those are just some of the rules that I have for you.

Okay. Would you swear the court attendants.

THE CLERK: Yes, Your Honor.

THE COURT: Hold on. We've got to get them in here.

While we are waiting for the court attendants, Mr. Fitzpatrick, do you have any objections or requests to charge?

MR. FITZPATRICK: No, Your Honor.

THE COURT: Mr. Calle, any objections to the charge or requests to charge, sir?

MR. CALLE: None that weren't previously --

THE COURT: Okay.

MR. CALLE: -- noted.

THE COURT: Did I touch upon all your requests I said I was going to touch upon?

MR. CALLE: Yes, sir.

THE COURT: All right. Thank you.

We're going to swear the attendants, please.

(Whereupon, the court attendants were then duly sworn in.)

THE COURT: Ladies and gentlemen, I'm now going to send you out to deliberate. I'd ask that Mrs. Cathcart and Mr. Hullihen -- I hope I pronounced that right -- remain seated.

Ladies and gentlemen, good luck in your deliberations. If I can assist in any way, please let me know. Good luck, ladies and gentlemen.

(Whereupon, the jurors were then excused to commence deliberations at 2:19 p.m.)

(Whereupon, an on-the-record discussion then ensued outside the presence of the jury.)

THE COURT: Okay. Would the record reflect that the jury has been excused. We have left behind Mrs. Doris Cathcart and Mr. Daniel Hullihen.

This is a call, really, made by the defense. But, Mr. Calle --

MR. CALLE: Yes?

THE COURT: -- do you have any objection -- what is your position on Mr. Hullihen being excused from this jury, sir?

MR. CALLE: If the alternate remains, I have no objection.

THE COURT: All right. Are you telling me that after deliberations have commenced, that you would not permit Mr. Hullihen under

any circumstances to enter the deliberations?

MR. CALLE: Yes, sir.

THE COURT: Okay. Mr. Hullihen, you are excused, sir. Here is what you can do: Whatever you want, basically. You're at liberty now, sir, to, obviously, discuss this case with any of the attorneys or anyone present. You are not required to, sir. I want you to understand that. Your thoughts on this case are personal and private, if you want to keep them that way, and nobody certainly should press you for your opinions. You're at liberty to read the paper, to speak with the media, or whatever you want, sir. That is your decision.

If, however, you don't wish to speak to anybody and you are pestered in that regard, let me know and I'll deal with it. Okay?

DANIEL HULLIHEN: (No verbal response.)

THE COURT: Thank you. I can't -- it is difficult for me to express my appreciation and the appreciation of the people of this community for taking ten days

out of your life to donate to this as an alternate juror. It seems like being in the bullpen, you know, waiting to go in the game and you don't go in. But you have been an important part of this and the people of this community are very grateful for your service, sir. And I personally thank you.

You are free to go, sir.

DANIEL HULLIHEN: Thank you, sir. My pleasure, by the way.

(Whereupon, Daniel Hullihen, an alternate juror, was then excused.)

THE COURT: Mrs. Cathcart, we're going to hold you, ma'am, for a period of time. And it's -- it's been a long trial. There's no reason to think that the jury -- something will happen there that may cause you to enter the deliberations. However, to be sure and, obviously, for the financial expense of having to retry that, the attorneys have suggested that we hold you at least for a while pending the deliberations. And we'll review that status at a later time today.

DORIS CATHCART: (No verbal response.)

THE COURT: Soon as I get a court attendant in here, we will take you to a separate room. You're required to be kept sequestered, apart from the jury and in some other location. I'll do my best to make you as comfortable as possible and give you something to read, if that's what you desire --

DORIS CATHCART: (No verbal response.)

THE COURT: -- in this case.

Okay, ma'am?

DORIS CATHCART: (No verbal response.)

THE COURT: Well, just hold on until I get somebody.

(Whereupon, an off-the-record discussion then ensued.)

THE COURT: If you would, go with the captain, ma'am. You can take some reading material, anything but the newspaper, please, or anything about this, okay.

All right. You guys know where to go.

(Whereupon, Doris Cathcart, an alternate juror, was then sequestered.)

THE COURT: One final note, gentlemen. If a note is sent out requesting the exhibits be sent in, do I have your permission, Mr. Calle, to send those exhibits in without reconvening court and bringing the jury back?

MR. CALLE: Certainly, Judge.

THE COURT: Okay, Mr. Fitzpatrick?

MR. FITZPATRICK: Yes, Your Honor.

THE COURT: Have we determined, gentlemen, that you've got all the exhibits out on the table and you've agreed upon that, those are the exhibits, right, that have been received into evidence?

Why don't you take a quick look, Mr. Calle, to assure yourself that nothing is in there that shouldn't be in there.

And with that we'll close the record. Okay.

(Whereupon, a recess was then taken at 2:24 p.m.)

(Whereupon, the jurors then entered the courtroom at 4:00 p.m.)

THE COURT: Okay. The record should reflect that we're back in session. The

jury is present, counsel, the defendant.

I've got three notes that will be marked in a moment. Court Exhibit C, which is a note from the foreperson, Ms. Madonna, indicating that they request the following:

"All exhibits presented by the People and the defense."

We sent them all in to you. There is a videotape, I want you to be aware of that, that's marked as an exhibit. If you want to see the videotape, that is one thing. We'll have to come back into court and we will give that to you in court.

So you want to see it, you're welcome to it, but you will come back in court. And that's fine, too.

And you want testimony read back of Liz Lewis, and you've got all of it, and Nurse Peggy Burke. You'll have all of that.

Court Exhibit D is: "Can the smokers have a place to go to have a cigarette?" And the answer is yes, they may.

Again I caution you that you are not to deliberate while that's taking place. And

I don't know how long it takes, but I'd like you to move it along, if that's possible.

And Court Exhibit E: "Could we get some hot chocolate, please?"

Okay. Have we accommodated you in that respect?

KARA KRAYNAK: Yes.

THE COURT: Okay. Fair enough.

Mrs. Alexander, do you want to -- that's fine.

Again, I'll look up at you, Mrs. Cathcart, if I can, to make sure you can hear okay.

At your pleasure.

Yes, they asked for all the testimony, so we'll do the redirect.

(Whereupon, the requested portion of the record, the entire testimony of Elizabeth Lewis and Margaret Burke Frio, was then read back by the court reporter.)

THE COURT: Thank you.

All right. Ladies and gentlemen, I'm going to send you back to the jury room. We're going to make plans, if there's no verdict by quarter after 6, 6:30, to send you

to dinner.

So I'll send you back in to continue your deliberations.

Okay.

(Whereupon, the jurors were then excused to continue deliberations at 5:08 p.m.)

(Whereupon, an on-the-record discussion then ensued outside the presence of the jury.)

THE COURT: Would you mark these up.

(Jury Notes marked for identification as Court Exhibits C, D, and E, this date.)

(Whereupon, a recess was then taken.)

THE COURT: Patti, we're going to mark this one as Exhibit F when you get a chance.

(Whereupon, the jurors then entered the courtroom at 6:23 p.m.)

THE COURT: Okay. Patti, put us in session.

The jury is present, counsel, the defendant.

There's been a note from the jury, Mrs. Madonna, indicating: "Will we be able to see exhibits from the defense?" And that

will be Exhibit F.

And I indicated to you that all the exhibits that you are to see -- strike that.

You have all the exhibits that were received into evidence.

We're going to take you to dinner now. All right. We've got the vans outside to take you out to dinner. You'll be accompanied by court attendants. Okay.

You are not to discuss the case during this period of time. You're not to attempt to watch or read anything about the case in the media.

When you're finished with dinner, we'll bring you back and get back to work.

Okay. So we'll break now. And, Captain, you take charge.

(Whereupon, the jurors were then excused for a dinner recess at 6:25 p.m.)

(Whereupon, an on-the-record discussion then ensued outside the presence of the jury.)

THE COURT: About 8 -- 7:45 we are going to shoot for.

MR. CALLE: Can I take you up on that

phone call?

THE COURT: Yeah. Sure. Sure. About quarter of.

MR. FITZPATRICK: You want us back here 7:45?

THE COURT: Yeah, please. About a quarter of 8.

(Whereupon, a dinner recess was then taken.)

(Jury Notes marked for identification as Court Exhibits F, G, and H, this date.)

(Whereupon, the jurors then entered the courtroom at 9:20 p.m.)

THE COURT: Okay. We're back in session, Patti. The jury is present, counsel, the defendant.

I've received two notes that have been marked. Exhibit G, a request from the foreperson for some Tylenol.

We sent in something. I don't know what it is. I hope it's sufficient. If it's not, let us know. We'll try to accommodate you.

And Court Exhibit H, which is a note

from the foreperson, Mrs. Madonna, that says: "Can we return to the courtroom to hear again the definition reasonable doubt and explanation of Murder Two. If possible, in more understandable terms."

Listen, I'm going to read what I read to you before. I am not going to alter what I have said, and I don't think I'm going to get into an explanation of why that is I'm not going to. I will read it slow and read it as many times as you ask me to read it.

The standard of proof required by law in every criminal case is proof of guilt beyond a reasonable doubt. That standard, however, does not require the People to prove the defendant guilty beyond all possibility of doubt or beyond a shadow of a doubt. It requires the People to establish the defendant's guilt beyond a reasonable doubt.

Our law, therefore, requires that before this jury may convict the defendant, each of you must be satisfied that the credible

evidence is sufficient to convince you beyond a reasonable doubt that the defendant is, in fact, guilty. The evidence must satisfy you beyond a reasonable doubt that the defendant is, in fact, the person who committed the crimes charged. The evidence must also establish beyond a reasonable doubt each and every essential element of the crimes charged, as I shall define those elements for you.

What does the law mean when it requires proof of guilt beyond a reasonable doubt? When is a doubt of guilt a reasonable doubt under our law? A doubt of the defendant's guilt, to be a reasonable doubt, must be a doubt for which some reason exists. The doubt, to be reasonable, must, therefore, arise because of the nature and the quality of the evidence in the case or from the lack or insufficiency of the evidence in the case. The doubt, to be a reasonable doubt, should be one which a reasonable person acting in a matter of this importance would be likely to entertain because of

the evidence or because of the lack or insufficiency of the evidence in the case.

A doubt of guilt is not reasonable if, instead of being based on the nature and the quality of the evidence or the insufficiency of the evidence, it is instead based on some guess or whim or speculation unrelated to the evidence in the case.

Also, a doubt of guilt is not a reasonable doubt if it is based merely on sympathy for the defendant or from the mere desire by a juror to avoid a disagreeable duty.

I, therefore, repeat, a doubt of a defendant's guilt, to be a reasonable doubt, must arise either from the nature and the quality of the evidence in the case or from the lack or insufficiency of the evidence in the case.

Therefore, the first duty of each juror is to consider and weigh all the evidence in the case and decide which you believe is credible and worthy of your consideration. The next duty of each juror is to determine

whether that juror has, in fact, a reasonable doubt of the defendant's guilt, as that term is defined in our law.

A reasonable doubt, our law says, is an actual doubt, one which you are conscious of having in your mind after you have considered all the evidence in the case.

If after doing so you then feel uncertain and not fully convinced of the defendant's guilt, and you are also satisfied that in entertaining such a doubt you are acting as a reasonable person should act in a matter of this importance, then that is a reasonable doubt of which the defendant is entitled to the benefit.

I repeat, it is the duty of each juror to carefully review, weigh, and consider all the evidence in the case. If after doing so you find that the People have not proved the defendant's guilt beyond a reasonable doubt, as I have defined that term to you, then you must find the defendant not guilty.

On the other hand, if you are satisfied that the People have proved the defendant's

guilt beyond a reasonable doubt, as I have defined that term to you, then you must find the defendant guilty.

The first count of the indictment charges the defendant with the crime of Murder in the Second Degree. Murder in the Second Degree is defined as follows:

"A person is guilty of Murder in the Second Degree when, with intent to cause the death of another person, he causes the death of such person."

For you to find the defendant guilty of this crime, the People must prove to you beyond a reasonable doubt the following three elements:

That on or about March 27th, 1987, in this county, the defendant strangled Valerie Hill with the belt from her bathrobe.

That at the time the defendant strangled Valerie Hill, he intended to cause her death.

And the defendant's acts caused the death of Valerie Hill.

Some definitions:

A person intends to cause the death of

another person when his conscious aim or objective is to cause the death of that person.

The intent to kill need not have been present in the defendant's mind for any specific period of time before he strangled Valerie Hill, as alleged in the indictment. It is sufficient if you find that such intent to kill was in the mind of the defendant when he strangled Valerie Hill.

Since we cannot read a person's mind, their intent may be inferred from their acts and conduct. You may rely on the facts and circumstances surrounding the act to determine the issue of intent. The People bear the burden of proving beyond a reasonable doubt that the defendant possessed the requisite intent. No direct evidence of the defendant's alleged intent to cause the death of Valerie Hill was presented, and as to this element the People are relying on circumstantial evidence.

The law provides that a defendant's intent to cause the death of another may

be proven by circumstantial evidence; that is, a jury is permitted to find that such intent existed by drawing a reasonable inference from other facts proved by direct evidence.

You will recall that I have already given you extensive general instructions as to proof of facts by the use of circumstantial evidence and the rules you must follow in your consideration of such evidence. All of such instructions are fully applicable to this element concerning the defendant's alleged intent to cause the death of Valerie Hill.

The law provides that in any case involving a charge of intentional killing, that is a charge of murder, the People are not required to show or prove any particular motive or reason for the killing. A defendant's motive or reason is not a necessary or material element which must be proved in a murder case. It is legally sufficient in a murder case if the People prove an intentional killing, regardless of what a defendant's motive or reason for the killing might have been.

However, a jury may consider the existence of motive or the lack of motive as a factor in determining whether or not there was an intent to kill.

If -- I'll read the three elements again. To find the defendant guilty of Murder in the Second Degree, the People must prove to you beyond a reasonable doubt the following three elements:

(1) That on or about March 27, 1987, in this county, the defendant strangled Valerie Hill with the belt from her bathrobe;

(2) That at the time the defendant strangled Valerie Hill, he intended to cause her death; and,

(3) That the defendant's act caused the death of Valerie Hill.

If the People have proven all of those elements to your satisfaction beyond a reasonable doubt, then you must find the defendant guilty of Murder in the Second Degree.

However, if the People have failed to prove one or more of those elements to your satisfaction beyond a reasonable doubt,

then you must find the defendant not guilty.

That's all.

(Whereupon, the jurors were then excused to continue deliberations at 9:29 p.m.)

(Jury Note marked for identification as Court Exhibit I, this date.)

(Verdict marked for identification as Court Exhibit J, this date.)

(Whereupon, an on-the-record discussion then ensued outside the presence of the jury.)

THE COURT: You guys know we have a verdict?

MR. CALLE: No.

THE COURT: Yes.

MR. CALLE: Oh, really?

(Whereupon, the defendant entered the courtroom at 10:40 p.m.)

THE COURT: Don't want any outburst, okay, folks. There's things that have to be done after the verdict and I want you to keep your emotions outside the courtroom, please.

Mike, bring her in and set her someplace else -- no, I don't want her in the courtroom.

I think just set her out there.

VERDICT

(Whereupon, the jurors then entered the courtroom at 10:41 p.m.)

THE COURT: Okay. All right. We are in session. Let the record reflect the jury is present, counsel, the defendant is present.

I've received a note that's been marked Court Exhibit J, from Mrs. Madonna, the foreperson, indicating that, "We, the jury, have reached a verdict."

Mrs. Madonna, would you please rise. I want you to listen to the court clerk, please.

THE CLERK: Madam Foreperson, has the jury agreed upon a verdict?

MICHELLE MADONNA: Yes, we have.

THE CLERK: And is that verdict a unanimous verdict?

MICHELLE MADONNA: Yes, it is.

THE CLERK: In the case of

The People of the State of New York vs. Hector Rivas, Indictment Number 92-1114-1, charging the defendant, Hector Rivas, with Murder in the Second Degree, how do you find the defendant, Hector Rivas, guilty or not guilty?

MICHELLE MADONNA: Guilty.

THE COURT: Guilty.

THE CLERK: Thank you, ma'am.

THE COURT: Remain seated, Mr. Calle.

THE CLERK: Gentlemen, would you like the jury polled, sir?

MR. CALLE: Yes.

THE COURT: Ladies and gentlemen, you've heard the verdict that has been announced by your foreperson. When you hear your name called, if you agree with that verdict, indicate so by saying "Yes."

If you disagree with that verdict, indicate so by saying "No."

THE CLERK: As to each of you individually, Michelle Madonna, is that your verdict, ma'am?

MICHELLE MADONNA: Yes, it is.

THE CLERK: Linda Pertillar, is that your

verdict, ma'am?

LINDA PERTILLAR: Yes.

THE CLERK: Edward Dunn, is that your verdict, sir?

EDWARD DUNN: Yes.

THE CLERK: David Claus, is that your verdict, sir?

DAVID CLAUS: Yes, sir.

THE CLERK: Joseph Latocha, is that your verdict, sir?

JOSEPH LATOCHA: Yes, it is.

THE CLERK: Nancy Hitchcock, is that your verdict, ma'am?

NANCY HITCHCOCK: Yes, it is.

THE CLERK: Kara Kraynak, is that your verdict, ma'am?

KARA KRAYNAK: Yes.

THE CLERK: David Kuss, is that your verdict, sir?

DAVID KUSS: Yes.

THE CLERK: Paul Sealy, is that your verdict, sir?

PAUL SEALY: Yes.

THE CLERK: JoAnn -- I'm sorry. Joan Skutt,

is that your verdict, ma'am?

JOAN SKUTT: Yes.

THE CLERK: Jill Luzzi, is that your verdict, ma'am?

JILL LUZZI: Yes.

THE CLERK: And Katherine Barreca, is that your verdict, ma'am?

KATHERINE BARRECA: Yes, it is.

THE CLERK: Thank you.

THE COURT: Ladies and gentlemen, the verdict stands.

This is what we are going to do, ladies and gentlemen. I will, of course, thank you for your efforts on behalf of the people of this community, for your time and patience and devotion in the case. It was a difficult case.

I'd like to send you just back to the jury room and hold you for a few minutes, if you'll bear with me a little bit longer, and then I'll have you released.

But if you'll return to the jury room now, and I'm going to hold you for a few minutes, and I'll come down there with you and

personally talk with you.

You may step down.

(Whereupon, the jurors were then excused at 10:44 p.m.)

(Whereupon, an on-the-record discussion then ensued outside the presence of the jury.)

THE COURT: Mr. Calle.

MR. CALLE: Yes, sir?

THE COURT: You can do this a couple of ways, sir. I can reserve your -- given the hour, given the situation we have here tonight, I will reserve your rights to move against this verdict until the day of sentencing.

However, do you have any motions, before I release the jury, to make?

MR. CALLE: No, sir.

THE COURT: Okay. I will reserve all other posttrial motions --

MR. CALLE: Thank you, sir.

THE COURT: -- for the day of sentencing.

THE CLERK: 4/7 is --

THE COURT: Let's give it -- let's give counsel some time here.

THE CLERK: Okay. Then we will do it after your vacation.

THE COURT: How much -- Mr. Calle, I will work on your schedule, given the fact you are coming from out of town, sir. If it's not before April 8th, it will have to be after April 20th.

MR. CALLE: Any day after April 20th, sir.

THE COURT: Okay. We'll make it April 23rd.

THE CLERK: April 23rd, Your Honor.

THE COURT: April 23rd for sentencing. And I'll also hear motions. If you're doing anything in writing, get them in before --

MR. CALLE: Yes, sir.

THE COURT: -- before then, Mr. Calle.

MR. CALLE: Yes, sir.

THE COURT: Mr. Rivas is held without bail at this time. And the bail will be exonerated back to you, sir.

MR. CALLE: Thank you, sir.

THE COURT: Okay. Gentlemen, we're adjourned.

MR. CALLE: Thank you, sir.

(Whereupon, the proceedings then concluded at 10:45 p.m.)

* * *

C E R T I F I C A T E

I, PATRICIA A. ALEXANDER, CSR-RPR, an Official Court Reporter of the Supreme and County Courts, County of Onondaga, Fifth Judicial District of the State of New York, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes taken in the above-mentioned matter at the time and place first above mentioned.

Patricia A. Alexander

PATRICIA A. ALEXANDER, CSR-RPR
Senior Court Reporter

Date: October 4 1993
Syracuse, New York

**Motion and Sentencing Minutes, Dated May 12, 1993 (Pages 1275-1301)**

COUNTY COURT OF THE STATE OF NEW YORK

COUNTY OF ONONDAGA : CRIMINAL TERM : PART I

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

HECTOR M. RIVAS,

Defendant.

NYSID 1375082H

Index Number 92/2794

Indictment Number 92-1114-1

Murder 2°

Sentence

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Onondaga County Courthouse
401 Montgomery Street
Syracuse, New York 13202
May 12, 1993

B E F O R E : HONORABLE J. KEVIN MULROY, Justice, without a Jury.

A P P E A R A N C E S :

WILLIAM J. FITZPATRICK, ESQ.
Onondaga County District Attorney

AND: GARY T. KELDER, ESQ.
Assistant District Attorney

RICHARD D. PRIEST, ESQ.
Attorney for the Defendant
333 East Onondaga Street
Syracuse, New York 13202

JOHN A. CIRANDO, ESQ.
Of Counsel to Richard D. Priest,
Attorney for the Defendant
Onondaga Savings Bank Building
Syracuse, New York 13202

THE DEFENDANT - Present in Person

Janice Marozzi-Brown, C.S.R.-R.P.R.
Senior Court Reporter

COURT CLERK: Hector Rivas.

THE COURT: This is the case of the People versus Hector Rivas. Mr. Rivas appears here with his attorneys on Indictment 92-1114-1.

At first the record should indicate that Mr. Richard Priest and Mr. John Cirando have been, in fact, substituted as attorneys representing Mr. Rivas. This is true, gentlemen?

MR. CIRANDO: Yes, your Honor.

MR. PRIEST: Yes, your Honor.

THE COURT: You are aware of that, Mr. Rivas?

THE DEFENDANT: That's correct, your Honor.

THE COURT: The record should also reflect from the district attorney's office, at least for the motion argument, Mr. Gary Kelder is present. There has been a motion submitted on behalf of the defense to set aside the jury verdict in this matter. I have reviewed that motion and the addendum that was submitted by Mr. Cirando.

Gentlemen for the defense, who will be

FORM SEL-711

arguing this motion?

(Proceedings paused.)

THE COURT: Flip a coin.

(Laughter.)

MR. PRIEST: Judge, Mr. Cirando will argue the factual basis.

THE COURT: Go ahead, Mr. Cirando.

MR. CIRANDO: Thank you, your Honor. Briefly, your Honor is fully familiar with the facts of the case, as having presided at the trial; however, as the Court is well aware, during the course of the trial a certain affidavit, just prior to Mr. Fitzpatrick resting, came to the attention of the Court and the defense attorney.

It is our contention that that affidavit, together with the other materials that were furnished to the Court at that time, were clearly exculpatory evidence, which the Court indicated, and I think Mr. Fitzpatrick also indicated. Therefore, the question becomes, number one, why wasn't it turned over earlier? And, number two, did it materially affect the defense of the case.

As the Court indicated at the time, I think the quote was, "You've placed the defense in an untenable position and you've seriously handcuffed the defense." Obviously, if any defense attorney at the start of trial, or prior to trial, knew that someone else had allegedly confessed to the crime for which his client is being charged with, and being tried for, that there would be a materially different strategy presented to the Court.

The district attorney in his response does not dispute the factual allegation that it was, in effect, a negligent failure to turn this information over. Therefore, it is clear that the, as you said -- the Court -- the defense was handcuffed and placed in an untenable position.

THE COURT: Let me ask you this: Am I the one that decides that? I mean, I made those statements, but I wouldn't speak on behalf of the defense. I don't know whether my perceptions of what the defense was or was not at trial was of any import in this particular case.

MR. CIRANDO: I would hope, as the Judge,

as the arbiter of the situation, you would be in the best position to fairly -- unlike an advocate -- determine what the affect of the material is. I think your analysis was fair and was based on the proceedings as you observed them at the time.

Obviously, one advocate would say one thing, another would say another. The Court, as the arbiter of what actually happened or what it would do, I think fairly and accurately summarized the situation.

THE COURT: All right.

MR. CIRANDO: The case -- obviously the case, the prosecution's case had been concluded before this information came out, and there was no opportunity to cross-examine any of the prosecution witnesses in regard to that.

THE COURT: Okay. Let's talk about that. You say there was no opportunity to cross-examine. It seems to me the case law in this area reflects a mandate by our appellate courts to certainly allow a defendant the right to a fair trial. When you talk about "opportunity to cross-examine," let's focus in on that particular

point. As I recall the situation and events, defense counsel, who was given several options when this information came to light, he was given an option to -- uh -- for a delay, an adjournment in the case; he was given an option to call these witnesses and have them produced by the district attorney's office; and he was given an opportunity to bend the rules of evidence, so to speak, and be granted great leeway in his cross-examination.

I would ask you, Mr. Cirando, how do you justify the fact that he made his decision in this case, and maybe that was part of his trial strategy?

MR. CIRANDO: If I could answer that briefly?

THE COURT: Sure.

MR. CIRANDO: I can't answer why he made that decision, to be honest with you. It's difficult for me to understand it. Looking at the opportunity to cross-examine, I think we really hit an issue here, the entire strategy. The Court, being a prior seasoned trial attorney, is well aware of the fact that at the onset of a

FORM SEL-711 REPORTERS PAPER & MFG CO

case, you have a certain strategy you're going to implement. If you know before you start a trial that there is another party who stated that, "So and so committed the murder and killed somebody," certainly you're going to base your trial upon that -- even the voir dire, you may voir dire. You may tell the jury in your opening, "Certainly this horrible crime took place, we all feel bad about it, we're going to find out, somebody is going to tell you who did it, but it's not going to be Hector Rivas." That is the type of thing you do in the trial, if you have the information at the inception, the beginning of the case.

As each of the police officers came up, "Did you cross-examine so and so" -- I'm not going to use the names, the Court is aware of them. "You took an affidavit from so and so. Where did that affidavit go? Where are the transmittal letters? Did you cross-examine or did you bring in or question so and so after you received this information? What further work did you do?" I mean, there is an entire theory of each of these things that builds up. You lose

that opportunity. You have lost your chance to take and have a fair trial.

The fact of this disclosed at the very end of the People's case cannot take out of the jurors' minds the prior thirty-nine people who testified; we have not had the opportunity to cross-examine. I think the Court and everybody agreed, it's very prejudicial in that circumstance. I see how it can happen. Certainly, nobody is saying -- it's one of those things that happens.

THE COURT: You're not saying it's an intentional --

MR. CIRANDO: No, sir. I have no basis of saying it's intentional, whatsoever. Insofar as the C.H.A.I.R.S. Report is concerned, the district attorney in their answering affidavit that I received about 9:00, indicated that the matter, the Morgan affidavit was initially overlooked by the prosecutor.

THE COURT: Are you saying then the district attorney knew or should have known about this information, and failed to disclose it, or they were just negligent, or --

MR. CIRANDO: I think they were negligent, and the case law holds them accountable for their negligence.

THE COURT: Okay. Mr. Kelder.

MR. KELDER: With respect to the claim of prejudice, basically it boils down to whether there was a meaningful opportunity to use the information that was disclosed. We just heard a rendition of the possible ways that the strategy may have been altered.

The key strategy, however, would have remained the same. The defense in this case was, and could only have been, that the defendant didn't do it, and, therefore, someone else did it.

It is also a double-edged sword because of the late disclosure. It is our position, and some of this was laid out in our affidavit, the defendant may have actually benefited from the late disclosure. It was the prosecution that was handicapped, in terms of being able to rebut this alleged exculpatory information, after all, there is a record in this case that what we had here was a statement by a con man

under circumstances in which he was in jeopardy, claiming that an individual with a mental disability offhandedly remarked that he had slain a woman in the location of the homicide.

It is our position that that material, that evidence was not highly material; that there would have been no reasonable probability, even had it been developed from the very start of the trial, that it would have altered the outcome in this case.

Certainly the defense had more than ample opportunity, given the Court's -- the option this Court gave them to make meaningful use of that testimony. They got the substance of Morgan's affidavit in. They were able to make references to what he said the other individual told him. They were able to examine the officers about the other suspects driving by the location of the homicide after it occurred. The only thing they can't get in in respect to disclosed materials, was the earlier investi-gation where the officers had interviewed Morgan because some anonymous caller said he had some potential information, and it turned

FORM SEL-711 REPORTERS PAPER & MFG. CO.

out he didn't.

So it's our position that they have not demonstrated that they were denied a meaningful opportunity to make use of this information. I should also add, your Honor, because they made this claim in their papers, and they made it here today saying this Court has already assessed the situation and deemed that there was an unfair disadvantage to the defense. In our papers we make reference to the surrounding text to your Honor's comments and to use -- it's abundantly clear when the Court made those remarks, they were referring to the difficulty that the defense would have at that point in locating and transporting those witnesses and, in addition, the difficulty that the defense would have in simply going forward without an adjournment. Those difficulties and thus we would submit this Court's concern about unfair disadvantage were removed when the prosecution offered to locate and transport those witnesses if the defense wished them to testify, and this Court's repeated offers of an adjournment.

We would also point out, your Honor, in

terms of precedent, not one of the cases that the defense cites has any bearing on this case. We have cited a number of cases where disclosure under similar circumstances occurred during the course of trial. In fact, in the Smith case, decided by the Court of Appeals, the disclosure of allegedly exculpatory information occurred during summations, at which time the trial court allowed the proceedings to be reopened, and allowed the defense to call that witness.

In the Stritiron case, also decided by the Court of Appeals, just as in this case, alleged exculpatory information was disclosed at the close of the People's case. In both cases the Court of Appeals found that given the options that were available to the defense because of the conduct of the trial judge, they were not deprived of a meaningful opportunity to use the information.

THE COURT: Mr. Cirando, your relief here requested is solely for a motion to set aside the jury verdict. You request no other alternative, is that correct?

MR. CIRANDO: They have indicated in their

response they have not raised any factual allegations to our claims that it was a negligent failure to turn it over, number one.

Number two, or that they haven't controverted the -- our claims that the chief investigator in the district attorney's office previously was aware of this through his participation in the investigation, and the negligence regarding this showing up on the Chair's report, then -- then doing nothing for it.

In addition, I don't think any of the cases that Mr. Kelder has relied on refer to situations where the prosecutor's office was negligent in failing to turn the information over until the point where they did.

Number two, I think the Court's remarks speak, speak for themselves. I don't think Mr. Kelder can put words in the Court's mouth.

In addition, I have some experience in the field of criminal law, and I am unsure of any case where the prosecution has been prejudiced by the nondisclosure to the defense of exculpatory evidence.

THE COURT: Um --

MR. KELDER: If I could be heard with respect to those points? It is not our position that the prosecution was not prejudiced by nondisclosure; it is our position that the prosecution was also put at some disadvantage as a result of the option the defense elected in this defense, mainly bring this information in through third-party witnesses.

Secondly, we do contest the allegations in their papers regarding the knowledge of the chief investigator. We regard that allegation as patently unfounded.

Initially, that claim was made because of an error in faxing and the defense was under the erroneous assumption that the August '88 memorandum -- or affidavit, rather, by Mr. Morgan, was provided to the chief investigator. That was untrue and, in fact, it bears emphasis that that affidavit from Mr. Morgan did not, was not obtained during the course of the original investigation more than a year earlier, but much later and in the context of a different investigation. So we do dispute that allegation.

FORM SEL-711 REPORTERS PAPER & MFG. CO

And, finally, everything -- every one of the cases we cited in our memoranda deal with situations where the nondisclosure could be said to be the result of either negligence or design. If that weren't true, there would be no Brady issue to begin with. These days if the information at least is specifically requested, it doesn't matter whether it's negligence or design.

In addition, one more point, we're not prepared right now to concede and it hasn't been conceded in our papers that the information which was disclosed, in fact, was exculpatory as a matter of law. We are willing to assume arguendo it was exculpatory because it may lead to the production of admissible evidence. It certainly was not material --

THE COURT: Well --

MR. CIRANDO: With all due respect to Mr. Kelder, his last statement, Mr. Fitzpatrick indicated, and the Court agreed, that this was indeed -- the affidavit was, indeed, exculpatory evidence. So I think that issue should be laid to rest.

Number two, if Mr. Kelder is disputing the facts, then I guess you have to have a hearing.

THE COURT: That's -- well, that was -- I was driving at that, Mr. Cirando, whether or not you had alternative relief you were seeking, other than granting of the motion. You seem to be saying now that if the motion is denied, in the alternative you want a hearing to explore what -- whether this material is exculpatory. I don't think there is any question about that. I think anyone looking with any knowledge of criminal law can understand that an alleged confession by someone else to a crime certainly is material; it's exculpatory. I don't know if I have the right to make a finding to that effect, but I think it's fair to say that that is true.

What type of hearing would you like, and what do we explore, the issue of whether it's exculpatory? It certainly will be determined on appellate review. What other issues would you like to bring up in that hearing, if we, in fact, had one?

MR. CIRANDO: Hearing would indicate the district attorney's office should have had

knowledge of that affidavit sooner, either through their impropriety -- not impropriety, but negligence regarding the C.H.A.I.R.S. Report.

THE COURT: You want to know whether it's a knowing or willful failure to disclose on their part?

MR. CIRANDO: (Indicating affirmatively.) And also the knowledge of the chief investigator, which would be imputed to the district attorney's office when he became a member of the office, insofar as I think the analogy in our papers was the Smith case in the Court of Appeals. If they're disputing this, had I received this in time indicating there was a dispute, I would have obviously put a Reply in indicating there should be a hearing.

MR. KELDER: We dispute the latter claim only because it's -- it's a personal attack on a member of our office, but our point is, it's immaterial. It does not matter here as a matter of law whether or not there was negligence or design. All that matters is whether -- because this is not a case of nondisclosure, all that matters here is whether this Court can answer the

question, did the defense have a meaningful opportunity to use the information that was disclosed. So a hearing is unnecessary.

THE COURT: I also find --

MR. CIRANDO: Excuse me. There is no personal attack, your Honor.

THE COURT: I'm aware of that. Listen, I find that when this information was disclosed, there was, in my opinion, a meaningful dialogue that led me and satisfied me, and I believe it satisfied Mr. Calle, there was no intentional, or knowing, or willful disclosure (sic) of material by the district attorney's office. That was a nonissue when the information was disclosed.

I believe the record will indicate that counsel made no allegations that it was any willful failure to disclose on the part of the People. I found, after listening to an explanation of how this material came to be, that there was no knowing or willful failure to disclose on the part of the district attorney.

To have a hearing on that issue, I think, would just clutter the record, and I see nothing

FORM SEL-711 REPORTERS PAPER & MFG. CO.

in the record that would indicate otherwise from my previous decision.

Mr. Cirando, I'm going to deny your motion to set aside the verdict in this matter. I find that the defendant's right to a fair trial was not violated where the defendant was given a meaningful opportunity to use the exculpatory material to cross-examine the People's witnesses, or to use as evidence in his own case. I cite People versus Cortigo, 70 N.Y. 2d. 868. I don't believe you're entitled to a mistrial if because there were less drastic means utilized by the Court to alleviate the prejudice that may have been present, such as leeway in the rules of evidence as to hearsay, and I find that there was a thorough examination of this issue by counsel before the jury.

I cite People versus Young, 48 N.Y. 2d. 995. Also, all the evidence was disclosed prior to the close of the People's direct case. There was no indication earlier disclosure would have alleviated or changed or influenced the defendant's trial strategy, citing People versus Clark,

89 A.D. 2d. 820; also People versus Smyers, 167 A.D. 2d. 773.

I, at the time this information was disclosed, offered and made and took great steps to offer counsel an adjournment. I gave him leeway in his questioning. I offered to force the People to produce the witnesses. I offered to allow hearsay and leading questions in his cross-examination of the witnesses. The defense attorney, at that stage, elected for his trial strategy to use these other methods and employ these other methods, and satisfied himself that that information relative to that exculpatory material was, in fact, put before the jury, and the jury had full and fair opportunity to evaluate that evidence, and they apparently rejected that evidence, nor did it create any reasonable doubts in their mind as to the guilt of this defendant.

So, on those grounds, Mr. Cirando, I will deny your motion to set aside the jury verdict in this case.

I would ask counsel if they have -- now have any other legal reasons why I should not

sentence this defendant?

MR. PRIEST: I know of no other legal reason why he should not be sentenced.

THE COURT: People move sentencing in this case?

MR. FITZPATRICK: We do.

THE COURT: Mr. Fitzpatrick, would you like to be heard on behalf of the People?

MR. FITZPATRICK: On behalf of the People, Judge, I would like to very briefly express my gratitude to some of the people that brought this case, I think, to a successful conclusion.

I'd like to mention John Brennan, Sergeant of the Syracuse Police Department, who I have had the pleasure of working with for over a decade now. I think without his testimony, the jury's verdict might not have been as easy as it was. I'd like to thank the two gentlemen from my office that helped put this case together, Mr. Tynan and Mr. Martinez. I would like to very much thank the Hill family for their support of me and my office over the last six months. They have been on an emotional roller coaster since this incident happened six years ago.

Last thing I would like to say, Judge, is that just that in many cases that you investigate where the crime is homicide, as the prosecutor, you begin to vicariously know the victim, and whether we like to admit it or not, many times victims sometimes contribute to their own demise. This was absolutely not the case involving Valerie Hill.

In eight months or nine months of working with this case, I've yet to find a single individual to speak ill of her, and she had so much going for her, so many things to live for, and it was just so, so awful what this defendant did.

I just really can't think of a better candidate for a maximum life sentence, your Honor.

THE COURT: Thank you. Mr. Priest, on behalf of the defendant, Mr. Rivas.

MR. PRIEST: Judge, I'm somewhat handcuffed, I guess, to use the words, because I'm not really familiar with the trial, itself. I did not sit through any of the trial. I'm not familiar with what took place there. I am familiar only with

the small part of it that I've read. I've talked to the defendant extensively.

On behalf of the defendant, I can say I think it was a horrible crime. I think everybody has seen the videos. It was looked into, the facts, everybody realizes it's something that shouldn't have happened here, shouldn't happen anywhere. I think everybody feels very sorrowful about it.

The little I've seen of the trial, I think the district attorney did an outstanding job in convicting this man on the evidence that was before him. It was four or five years, I believe, before it was even brought forth.

We stand now with the issue of whether he's guilty or not behind us, Judge, because the jury has spoken, and at this time, this Judge has to sentence this man and has to sentence him upon a verdict that is rendered. Decisions have all been made.

Hector Rivas, as we know, has really no prior criminal record, only very minor things, I think, in the past. He feels very strongly about the facts, that he did not do this, that he's not

guilty. Again, that is not an issue now.

I would just like the Court to take into consideration his past, his meaningful work style in assessing the personality here. Thank you, Judge.

THE COURT: Thank you. There's three people I want to address here today at sentencing. The first, Mr. Fitzpatrick. I been around a long time and we know each other, but the people of this county are well served by you, and they were well served in this case. You took a case that other people kept on the shelf and refused to act on it. You showed the people of this community that you had the courage to gather what you had, you had the skill to bring it into this courtroom, the perseverance to stay with it over the many years that it lingered, and you have my admiration and you have the thanks of this community, because you brought justice to this community, and I'm impressed by you. I continue to admire you and your skills.

MR. FITZPATRICK: Thank you.

THE COURT: As to Valerie Hill, a young lady who, I guess, we all got to know a little bit at

this trial, she apparently, from all of the information I got about her, did nothing but contribute good. She gave of herself to other people in her profession as a nurse, and apparently her mistake in life was getting involved with you, Mr. Rivas, and that's unfortunate, and I hope she's at peace.

As to you, Mr. Rivas --

MR. FITZPATRICK: Judge, I don't mean to interrupt you, I, I don't want to jump ahead of you; the defendant hasn't had an opportunity to speak.

MR. PRIEST: I was going to mention that. You may continue.

THE COURT: Mr. Rivas, I'm sorry, I didn't give you an opportunity.

THE DEFENDANT: Go ahead, you finish.

THE COURT: You first.

THE DEFENDANT: I would like to say to this Court and everybody here, especially Mr. Fitzpatrick and Valerie's father, that I looked in the eye at the funeral, he asked me if I had anything to do with this. I look him in the eye again and I say, "no," and until my dying day

I say, "no," because I didn't do it. I did nothing but care about the person. If that constitutes what I'm going through today, then for that I'm sorry, and for whoever else suffered in this matter, including myself and my family, and her family. That's what I have to say. I remain innocent.

THE COURT: Okay. Well, in your heart, in your eyes maybe you are, sir. In the eyes of the law, you are guilty. You are guilty of murder. You are guilty of taking the life of a young and precious person, and for that, sir, you will pay.

You will pay with a sentence imposed by this Court for your conviction for the crime of Murder in the Second Degree with a penalty of life in prison, with a minimum of twenty-five years. You have thirty days to file a Notice of Appeal in this case. If you cannot afford an attorney, one will be assigned free of charge. Counsel will represent your interests in that appeal, I'm sure. There is a surcharge of $155 I will impose. It's mandated by law.

Thank you, gentlemen.

MR. FITZPATRICK: Thank you, your Honor.

MR. CIRANDO: Thank you, your Honor.

MR. PRIEST: Thank you, Judge.

(Conclusion of proceedings.)

* * *

C E R T I F I C A T E

STATE OF NEW YORK )
COUNTY OF ONONDAGA ) ss.:
CITY OF SYRACUSE )

I, JANICE MAROZZI-BROWN, C.S.R.-R.P.R., Senior Court Reporter to the County Court, do hereby certify that I attended the foregoing proceeding and took a stenotype report of the same, and the foregoing is a true and accurate transcript of the proceedings held herein.

Janice Marozzi-Brown
JANICE MAROZZI-BROWN, C.S.R.-R.P.R.
Senior Court Reporter

11-18-93
DATE