# Exhibit B

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF ONONDAGA : CRIMINAL TERM

---

THE PEOPLE OF THE STATE OF NEW YORK,

vs.

Indictment No. 92-1114-1

Motion/Bail

HECTOR RIVAS,

Defendant. NYSID 1375082H

---

Criminal Courts Building
Syracuse, New York 13202

April 20, 2015

B e f o r e:

HONORABLE THOMAS J. MILLER,
Judge

A p p e a r a n c e s:

WILLIAM J. FITZPATRICK ESQ.
District Attorney, Onondaga County
BY: ROBERT MORAN, ESQ.
Assistant District Attorney and
JAMES MAXWELL, ESQ.
Assistant District Attorney

LANGONE AND ASSOCIATES
Attorneys for the Defendant
600 Old Country Road
Garden City, New York 11530
BY: RICHARD M. LANGONE, ESQ

BOUSQUET HOLSTEIN, PLLC
Attorneys for the Defendant
110 West Fayette Street
Syracuse, New York 13202
BY: SIDNEY L. MANES, ESQ.

Case 13-2974, Document 173, 09/03/2013, 1036780, Page97 of 196



APPEARANCES CONTINUED:

EDWARD W. KLEIN, ESQ,
Attorney for the Defendant
217 Montgomery Street
Syracuse, New York 13202

Defendant Present in Person

Reported by:

Ann A. Makowiec
Supreme Court Reporter

* * * *

THE CLERK: Hector Rivas.

THE COURT: Could the attorneys please approach?

(Whereupon, Counsel approached the Bench and an off-the-record discussion ensued.)

THE COURT: Mr. Langone, Mr. Manes, you each represent Hector Rivas?

MR. LANGONE: Yes, your Honor.

MR. MANES: Yes, your Honor.

THE COURT: This is Hector Rivas present with you gentlemen?

THE DEFENDANT: Yes, your Honor.

THE COURT: Good morning, sir.

THE DEFENDANT: Good morning.

THE COURT: Rob Moran, as well as Jim Maxwell appear on behalf of the District Attorney's Office.

Just some housekeeping things. First of all, Mr. Rivas has moved to vacate his conviction in accordance with Criminal Procedure Law Section 440.10(1)(h). The motion is predicated on the March 11th, 2015, decision of the Second Circuit Court of Appeals which found that the defendant received constitutionally ineffective assistance of counsel at his trial in 1993.

Accordingly, the Second Circuit remanded this matter back to District Court with a mandate to issue a Writ of Habeas Corpus unless the state takes concrete and substantial steps, in their words, to expeditiously retry Mr. Rivas.

By a letter dated April 16th, 2015, Mr. Moran indicated that there was no opposition to the Criminal Procedure 440.10 motion.

Accordingly, the motion to vacate the defendant's conviction is hereby granted in accordance with CPL Section 440.10(1)(h) based upon a finding that the defendant was deprived of the effective assistance of counsel at his prior trial.

At our last Court date on March 25, 2015, I asked Mr. Langone to inform the Court by today's date as to whether he would be representing Mr. Rivas for purposes of a retrial, whether Mr. Rivas would be hiring another attorney or whether it would be necessary for me to assign an attorney per the Second Circuit Court decision. I would like to give a trial date. So I would like to move this case along.

Mr. Langone, did you want to be heard with regard to the issue of counsel, sir?

Case 18-2974, Document 178, 09/03/2015, 1600780, Page100 of 116



MR. LANGONE: Yes, your Honor. We would make an application to grant informal poor person status to Mr. Rivas in light of the circumstances of twenty-two years of incarceration. I would request the appointment of counsel. Mr. Rivas does have counsel of choice that he'd like to retain and -- but it's a logistical matter. The family doesn't have the funds at this point, but at some point there may be another counsel coming into the case. But for the moment, certainly, we would request appointment of local counsel, and I would request, with permission of the Court, to stay on board at least for purposes of the motion practice in this case because I've got such history and familiarity with the facts and circumstances.

THE COURT: I know that's true both of you as well as Mr. Manes. It just so happens that while you were speaking, Mr. Langone, Ed Klein walked in; and I have spoken with Mr. Klein previously about this possibility. Mr. Rivas, Mr. Klein is an excellent attorney. He's very experienced. I've had the pleasure of having him here in trial, previously; and Mr. Klein, if you would be willing, sir, I'd like to appoint you to

Case 15-2374, Document 178, 09/03/2015, 1600780, Page101 of 116



represent Mr. Rivas. Would you be willing to accept the assignment?

MR. KLEIN: I would, your Honor. We have previously spoken about it, and I have indicated I would do that if it were to arise.

THE COURT: Well, thank you. Thank you. Okay.

Let me talk to you about a trial date, perhaps the issue of bail.

At this point I'd like to set a trial date, however, Richard here at the Bench you've indicated you're anticipating sort of an extended motion practice. You didn't want me to go ahead and set a trial date was my impression. What are your thoughts with regard to that?

MR. LANGONE: Well, Judge, I understand the Court's desire to keep control of this docket. We would recommend that if you set a trial date you set it far enough out, perhaps November or December. As I indicated to the Court, I do perceive that there will be extensive motion practice in this case.

I have an eleven thousand page transcript, a brief due in the Second Circuit in June that I just started on. So I'm -- I'm in up to my knees

Case 18-2974, Document 178, 09/03/2015, 1600780, Page102 of 116



so to speak. So, personally, it would be a great help to me to have the motion schedule for me to file motions in July. I could file an omnibus motion, basically all pretty much all at once for the Court to dispose of, but I just need some time in light of this appeal in the Second Circuit.

THE COURT: Richard, pardon me for a second.

MR. LANGONE: Yes.

THE COURT: Mr. Klein, let me ask you about your availability as far as a trial calendar. I'm hearing November, December, I'd like to move this case along as quickly as possible. I'll certainly work, you know, with all of the attorneys regarding that. What's your thoughts?

MR. KLEIN: I think, given the history and what's been said here this morning, I think November, December, is moving it along in light of the history of the case.

THE COURT: Do the People want to be heard regarding this?

MR. MORAN: That time frame works for us, Judge. I would suggest, if it's okay, perhaps the first week in December --

THE COURT: First week in December.

MR. MORAN: -- to give us some time both to clear the Thanksgiving holiday and enough time before Christmas to get it in.

THE COURT: December 7th is that first full week, gentlemen. What I'd like to do, based on what you've indicated today, is schedule this matter for trial on December 7th. If you'd like it moved up and you're able to do that, I'd be happy to accommodate that as well. If it needs to be moved back further, I'll certainly work with all of you. So twelve, seven is our trial date.

The last time we were together, Richard, you indicated that you wanted to be heard on the issue of bail. I'm certainly willing to listen to that. I've got a trial that I'm starting up in a little while, so, go ahead if you'd like.

MR. LANGONE: Yes, your Honor. Mr. Rivas right now is entitled to the presumption of innocence as the prior conviction has now been vacated. Therefore, the monopoly of rights involving with the CPL to which he is entitled to which includes the consideration of bail pending trial.

I would say this, sir, that with respect

to the ultimate question of risk of flight, there is none. Mr. Rivas has served almost twenty-two and a half years on this life sentence. He's basically almost served the minimum on his sentence. As I had indicated previously to the Court, there has been no disciplinary history on the part of this man. He has a blemish free institutional record. He was on bail twenty-two, twenty-three, years ago. If he were, God forbid, let's say make believe he were reconvicted, he would -- this Court would be able to consider all of the good things he's done during his time of incarceration and could impose a sentence of actually fifteen years to life.

I would note to the Court that the decision of the Second Circuit in this case was that for the first time ever the Second Circuit acknowledged in this case a colorable claim of actual innocence. Again, the facts were almost six years, over five years after -- he was not indicted for almost five years after the homicide occurred because it was Eric Mitchell the medical examiner's opinion that the death occurred between Saturday and Sunday and the People knew they could not convict him during that period of time. It

was only until after Dr. Mitchell was -- viewed brain slides and other evidence that all of a sudden he decided to go back into the file and look at and this changed his opinion with respect to time of death to -- to open the window to include Friday when Hector Rivas did not have an alibi. We know that when the brain slides -- we know that the bases upon which he made his medical determination as to extending the time of death were -- were debunked by Dr. Cyril Wecht in his affidavit in his testimony at the Federal hearing.

So this is a case of questionable, questionable, real issues of reasonable doubt here and the Second Circuit determined that. Now, I don't know what the district attorney's is going to come back with going forward, but as it stands and in light of the fact that it took him over five years to indict Mr. Rivas in the initial matter, he has no incentive to flee in this case. He has family ties that have stayed with him throughout the period of -- of incarceration. He has relatives here in this Courtroom right now. He's married. He has a wife, Marilyn, who lives in the Bronx, who's got a stable residence. She's employed. There is -- there is no indication, no

Case 18-2974, Document 178, 09/03/2019, 1600780, Page106 of 116



reason to believe that he would not be amenable to process of this Court.

So for those reasons, Judge, in light of the amount of time that's gone by, the factual weakness of the case, family support, we would respectfully submit that he be released in his own recognizance. I have no problem -- we have no objection to a GPS bracelet, if that's the Court's desire, and that's -- that's our request at this time, your Honor. Thank you.

THE COURT: Thank you. Do the People want to be heard?

MR. MORAN: I do, Judge.

First, in response to Mr. Langone's comments about Dr. Mitchell. I don't believe that the record supports the idea that Dr. Mitchell changed his opinion, that Dr. Mitchell's opinion was in fact a hard she died on Saturday. I don't think that's true. There was and there's going to be, I'm sure, some argument and some expert testimony at the trial in this case regarding exactly what the time of death was, but he didn't change his opinion. His opinion was always, as these things are at the margins, flexible, meaning they can't tell with precision whether we are

Case 15-2974, Document 175, 09/03/2015, 1600780, Page107 of 216



talking about two days or three days past the time of death.

The evidence at the trial in this case will be that Valerie Hill was murdered on that Friday night. That nobody saw her after about eight p.m. on that date. One of the pieces of evidence that was used at the trial in 1993 and that we expect to be at the trial in this case is that she had her car repaired that afternoon and that the odometer reading had been taken.

We know from there she went and picked up some airline tickets that she had purchased through a travel agent and that after that she went home. That route was reconstructed as part of the evidence in this case, and we were able to substantiate the idea that she went from the car repair to pick up her tickets then home. That car never moved from Hickok Avenue, meaning as of Friday night when she got home that car never moved again.

She had planned to take a trip to Saratoga to visit a friend either in the evening of the 27th or the morning of the 28th. She never showed up for that planned weekend with her friend. She did not answer repeated phone calls from multiple

Case 15-2974, Document 175, 09/03/2015, 1600780, Page108 of 316



people Saturday or Sunday morning which was unusual for her at the time.

There will be evidence in the case or at the trial of this case of Mr. Rivas's obsession with Miss Hill. They had a relationship. She had terminated that relationship. For months, he had pursued her obsessively. There was an avalanche of letters sent to her by Mr. Rivas. There were daily visits, sometimes multiple times in the same day, where Mr. Rivas would come to Hickok Avenue looking for her. He would enter her apartment on occasion without her notice when she wasn't home, he followed her and he called her friends sometimes in a drunken state asking where she was and what was going on with her and inquiring about the relationship.

Mr. Rivas made some statements as part of the investigation in this case. Those statements were refuted by other more credible witnesses. His account of his visits to Hickok Avenue that night were inconsistent with other evidence. He claims to have visited Hickok on the 27th at about two p.m., then had returned to Cazenovia, made some plans to return back to Syracuse to go to Coleman's and then stopped by at her apartment at

six p.m., that she wasn't home, that he slipped a note under her door at six p.m. on the 27th. Other witnesses, neighbors and the like observed Mr. Rivas at that address at about three forty-five staying until about four thirty, give or take, and there were some discrepancy between some of the witnesses but they put him there that afternoon for a relatively long stretch of time. He claimed that she wasn't home at six o'clock, yet other witnesses said they spoke to her on the phone at her apartment at about five thirty.

We know she went to dinner that night with her father at about seven p.m. He says he left Coleman's at about eleven and that he went directly to Albert's in Cazenovia.

Other witnesses, employees of a liquor store which was on the route between Coleman's and Miss Hill's apartment, say that Mr. Rivas himself came in at about nine fifty and purchased two bottles of alcohol both consistent with bottles recovered at the scene where her body was recovered on Monday.

Further, witnesses placed Mr. Rivas's car outside of her apartment between ten thirty and eleven that night, maybe even as late as one.

o'clock in the morning on Hickok Avenue.

His months, Judge, of obsessive behavior and pursuit of Miss Hill mysteriously end on the 28th and 29th where he makes no efforts to contact her presumably, according to our reading evidence, because he knew she was dead.

Finally, Judge, two more things. The crime scene, this was not a burglary. There was no sexual assault, although there was some violation of Miss Hill. It was a brutal humiliation and murder of a twenty-eight year old nurse who otherwise was not involved in any kind of scenario where you would expect that to happen.

Finally, Judge, Mr. Rivas made a sort of drunken confession where he says Valerie, Valerie, I didn't mean to do it, overheard by one of his friends.

Judge, I summarize the evidence because, ultimately, this case is going to go to trial, and the evidence that this jury is going to hear in 2015 is not substantially different than what it heard in 1993, and we'll see what that jury thinks of this evidence, but this evidence is, in the People's opinion, strong. He we look forward to having a day in Court and putting this case before

a new jury in 2015.

For the reasons, Judge, I've laid out, we do think Mr. Rivas is a flight risk, and we are asking you to either set no bail or set one million dollars cash or two million dollars bond.

THE COURT: First, before I rule on the -- on the bail issue. Mr. Moran, it's my recollection that our last time that we were all together that the People announced ready for trial.

MR. MORAN: We did.

THE COURT: Now that this has been vacated, are the People re announcing their readiness for trial?

MR. MORAN: We are, Judge.

THE COURT: Okay. Taking into consideration what Mr. Langone has said on behalf of the defendant, as well as what Mr. Moran has said on behalf of the People, I am going to set a bail in the amount of five hundred thousand dollars cash or bond; five hundred thousand cash or bond. I will adjourn this matter for thirty days to May 26th for control purposes.

Why don't I give you a motion schedule today as well. Your motions should be filed on or

before June 4, People's response June 11th. We'll argue motions here in Court on June 18th.

MR. LANGONE: Your Honor --

THE COURT: Yes.

MR. LANGONE: July is impossible to do this because June is when I have this appeal due.

THE COURT: Absolutely.

MR. LANGONE: Could we make it July 4th or that's not going to work, July 4th.

MR. MORAN: Can we approach, Judge, to discuss dates?

THE COURT: Where is Ed? Is Ed still in the Courtroom? Ed, come on up, please.

(Whereupon, Counsel approached the Bench and an off-the-record discussion ensued.)

THE COURT: Okay. Pretrial conference May 26th. Motion schedule is as follows: Defendant to file any motions on or before August 10. People's response nine, fourteen; September 14. We'll argue motions here in court on September 21st. See you back here May 26th. Thank you.

MR. MORAN: Thank you.

MR. LANGONE: Thank you.

THE COURT: Trial date December 7th.

* * * *

CERTIFICATE

This is to certify that I am a Senior Court Reporter of the Fifth Judicial District; that I attended and reported the above-entitled proceedings; that I have compared the foregoing with my original minutes taken therein, and that it is a true and correct transcript thereof and all of the proceedings had therein.

Ann A. Makowiec,
Official Court Reporter

Dated: April 28, 2015