Rickner | Moskovitz

Joshua S. Moskovitz, Principal | (212) 300-6506 | josh@rmcivilrights.com

August 14, 2026

<u>BY ECF</u>
Hon. Brenda K. Sannes
United States District Court
Northern District of New York
100 S. Clinton Street
Syracuse, New York 13261

Re: *Rivas v. Onondaga County* et al., No. 19 CV 844 (BKS) (CBF)

Dear Judge Sannes,

We write as counsel for Plaintiff Flora Rivas pursuant to the Court's Order of August 7, 2026 (Dkt. 222) granting Ms. Rivas permission to file this reply in response to Defendants' opposition to Plaintiff's motion to compel (Dkt. 209). We also respond, as the Court directed, to Defendant Mitchell's letter motion seeking to depose Ms. Rivas.

## I. Plaintiff's Motion to Compel

Defendants' opposition to Plaintiff's motion to compel is without merit. The requested discovery covers two areas: (1) Plaintiff's subpoena to William Fitzpatrick for documents concerning Mr. Fitzpatrick's efforts to undermine the proposed settlement and force the case to trial; and (2) Plaintiff's discovery requests to Onondaga County for documents on the same topic. Plaintiff also seeks, and Defendants oppose, the deposition of Mr. Fitzpatrick about the foregoing issues.

Defendants' objections should be overruled and the discovery ordered produced. Indeed, Defendants lack standing to challenge the subpoenas served on Mr. Fitzpatrick. *See Malmberg v. United States*, No. 5:06-CV-1042 (FJS/GHL), 2010 U.S. Dist. LEXIS 28784, at *3 (N.D.N.Y. Mar. 24, 2010) ("A party ordinarily lacks standing to challenge a non-party subpoena with a motion for a protective order or to quash unless the party is seeking to protect a personal privilege or right." (citing *Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975)). Before addressing the legal errors in Defendants' letters, we begin by addressing the disingenuous claims Defendants make about the facts.

### A. Factual Errors in Defendants' Opposition

#### (i) The *Proposed* Settlement

The County's opposition rests on a central error: that the amount of the *proposed* settlement was public information. The County makes much of the fact that the Court's General Order 47 "does not prohibit or limit . . . a party from disclosing the ***final*** resolution

R|M

and ***settlement reached.***" *See* Dkt. 221 at 3 (emphasis added). And yet, in the same breath, the County argues that there could be no final resolution nor settlement until the County Legislature approved of such. *Id.* ("'any settlement by the County over the amount of $10,000 requires approval of the Onondaga County Legislature'"). Despite the County's concession that there was no final resolution nor settlement, the County spends most of its opposition arguing that the amount of a settlement approved by the County cannot be confidential. This is irrelevant since no final resolution nor settlement was reached. It is precisely *because* the parties had not yet reached a final settlement that the amount of the *proposed* settlement remained confidential and subject to the General Order 47.

On January 30, 2026, when *The Post-Standard* published an article quoting Mr. Fitzpatrick lambasting the amount of the *proposed* settlement, there was no settlement because the legislature had not yet approved it. That is precisely what the County maintains. *See* Dkt. 221 at 3. Until the legislature convened on February 4, 2026 – and until it voted to adopt the recommended settlement – there was no "settlement" amount that could be made public, there was only a *proposed* settlement amount that could not be made public without violating General Order 47. Thus, the entire thrust of Defendants' opposition (and presumably their expected basis for opposing Plaintiff's intended motion for sanctions) is misplaced.

The *proposed* settlement amount was no different than any other statement made in a confidential mediation. It reflects the parties' views and assessments of the risk of taking the case to trial and the benefit of resolving it without a trial. Mediations and settlement conferences commonly end with an agreement by the negotiating parties to recommend to their clients (and insurance carriers, by analogy to the County Legislature here) to accept the recommended settlement. If Defendants' current position carried the day, anyone with knowledge of a proposed settlement – including an attorney who works for one of the parties – could take that information and publicly campaign against the proposed settlement with impunity. That would defeat the spirit and purpose of confidential settlement discussions and General Order 47.

Now-Second Circuit Judge Denny Chin, when he was a District Judge, addressed this precise situation in *Bernard v. Galen Grp.*, 901 F. Supp. 778 (S.D.N.Y. 1995). Judge Chin held that disclosing "the terms of certain settlement offers (***including specific dollar amounts***) that had been made during the mediation process . . . clearly violated . . . the Court's guidelines governing the Mediation Program." *Id.* at 779 (emphasis added). Based on that conclusion, Judge Chin determined that "sanctions will be assessed." *Id.* The "Court's guidelines governing the Mediation Program" that Judge Chin found to have been violated

R|M

by the disclosure of proposed settlement amounts are substantially the same as, and indistinguishable in spirit from, the relevant provisions of General Order 47.[1]

The disclosure of the *proposed* settlement amount, in addition to Mr. Fitzpatrick's other misguided efforts to derail the recommended settlement – which the County now accepts were actions taken in Mr. Fitzpatrick's official capacity (see below), and thus, are actions ascribed to the County – violate the Court's General Order 47 and the spirit of the Court's confidential mediation process. Judge Chin explained in *Bernard* why such conduct threatens the integrity of the Court's mediation process:

> The Second Circuit . . . has discussed the importance of confidentiality provisions in another alternative dispute resolution context: pre-argument conferences held pursuant to the Second Circuit's Civil Appeals Management Plan for purposes of seeking the resolution of cases on appeal. The Court observed in that context as follows:
>
>> It is essential to the proper functioning of the Civil Appeals Management Plan that all matters discussed at these conferences remain confidential. The guarantee of confidentiality permits and encourages counsel to discuss matters in an uninhibited fashion . . . If participants cannot rely on the confidential treatment of everything that transpires during these sessions then counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute. This atmosphere if allowed to exist would surely destroy the effectiveness of a program . . . .
>
> These considerations apply with equal force to this Court's Mediation Program. Participants in the Mediation Program rely on the understanding that all matters discussed during the mediation process will be kept

[1] *Compare Bernard*, 901 F. Supp. at 779 ("Mediation is a confidential ADR process in which a disinterested third party directs settlement discussions but does not evaluate the merits of either side's position or render any judgments . . . . Discussions at the mediation conference, including any statement made by any party, attorney or other participants, should be confidential and not reported, recorded, placed in evidence, made known to the assigned judge, or construed for any purpose as an admission."), *with* N.D.N.Y. G.O. 47 § 3.8 ("Mediation is confidential and private. No participant in the mediation process or any portion thereof may communicate confidential information acquired during mediation without the consent of the disclosing party. . . . All written and oral communications made in connection with or during the mediation session, any positions taken and any views of the merits of the case formed by any participant, including parties, counsel and the mediator, are privileged and confidential.").

RICKNER MOSKOVITZ LLP
Joshua S. Moskovitz, Principal | (212) 300-6506 | josh@rmcivilrights.com

R|M

> confidential, and the breach of the applicable confidentiality provisions threatens the integrity of the entire Program.

901 F. Supp. at 783-84 (citations omitted). These same concerns apply to what happened here.

**(ii) Defendants have Responsive Information**

Mr. Fitzpatrick claims he has "fully complied" with Plaintiff's subpoena, Dkt. 219 at 2; and the County asserts that it has no responsive documents, Dkt. 221 at 2 ("The County will not have any additional, responsive documents to produce."). These assertions are misleading and wrong.

Plaintiff's July 16, 2026, letter motion to compel (Dkt. 209) sets forth at pages 3 to 4 deficiencies in Mr. Fitzpatrick's response to Plaintiff's subpoena. Mr. Fitzpatrick claims, incorrectly, that "[t]he only aspect of which plaintiff presently complains is the lack of production of a 'call log'" and that "my Office does not maintain a call log." Dkt. 219 at 2. As explained in Plaintiff's opening letter, Mr. Fitzpatrick produced a screenshot of text messages with a reporter on a cell phone. *See* Ex. 1 (enclosed here). Mr. Fitzpatrick has said nothing in response to Plaintiff's point that "there are telephone call logs available for calls made from a cell phone." Dkt. 209 at 3. It appears Mr. Fitzpatrick hopes the Court will overlook this point. Mr. Fitzpatrick's cell phone log should shed light on when he called, or was called, by *The Post-Standard* reporter – a point that Defendants make much of, as discussed below.

Likewise, Mr. Fitzpatrick claims, "[e]very other item requested was produced," Dkt. 219 at 2, but that is doubtful. Mr. Fitzpatrick has produced none of his communications with the other reporter who quoted Mr. Fitzpatrick.[2] The photograph he produced of text messages with *The Post-Standard* reporter (*see* Ex. 1) has a message redacted (without a privilege log) and other messages that are blurred or simply not produced. The emails Mr. Fitzpatrick sent to *The Post-Standard* reporter and Legislator Brian May, *see* Ex. 2 (enclosed here), were sent by Mr. Fitzpatrick's assistant. This leaves unanswered whether Mr. Fitzpatrick has emails from his own email address that were not produced. The fact that Mr. Fitzpatrick previously claimed "none exist" in response to Plaintiff's subpoena for relevant communications with the press, *see* Dkt. 209-3, when, in fact, Mr. Fitzpatrick exchanged text messages with *The Post-Standard* reporter, makes us doubt his current claim that no additional responsive documents exist.

---

[2] *See* Laura Robertson, *Central Current*, "Onondaga County Legislature rejects $1M settlement to end decades-long legal saga" (Feb. 5, 2026), *at* https://centralcurrent.org/onondaga-county-legislature-rejects-1m-settlement-to-end-decades-long-legal-saga/.

As for the County's claim that the County "will not have any additional, responsive documents to produce," Dkt. 221 at 2, that is clearly untrue. Indeed, the County *included* such a document in its opposition. *See* Dkt. 221-3. The County claims this document is a "copy of the February Session Agenda Packet, which was originally linked on the County's public website on Thursday, January 29, 2026." Dkt. 221 at 4. This document is potentially significant because it includes a proposed resolution stating the amount of the proposed settlement. The County suggests that the press learned the amount of the proposed settlement from this "Agenda Packet."

We have good reasons to doubt this is true. First, we did not see this document posted on the County's website prior to the February legislative session. Rather, we saw a two-page agenda, like the first two pages of the "Agenda Packet," which does not mention the settlement amount. Second, there are aspects of the "Agenda Packet" submitted by the County that suggest it may not have been the version that was posted on the County's website, and the County's opposition includes no sworn statement from a person with actual knowledge that this "Agenda Packet" (as opposed to the two-page agenda) was posted publicly prior to the February legislative session.

It is hard to miss that the County carefully avoids claiming the press learned of the proposed settlement amount from this "Agenda Packet," and Mr. Fitzpatrick never denies that he revealed the proposed settlement amount to *The Post-Standard* reporter. We have endeavored to learn whether *The Post-Standard* reporter and the *Central Current* reporter were supplied this "Agenda Packet" prior to the February legislative session, but neither has confirmed they received it.

Thus, by the County's own argument, the discovery Plaintiff seeks is relevant and potentially critical to the question of when and how the confidential proposed settlement amount was disclosed. Moreover, the County sidesteps the fact that Plaintiff has also sought documents concerning Mr. Fitzpatrick's efforts to lobby legislators to not adopt the recommended settlement. *See* Dkt. 221-2. By contacting legislators directly, *see* Ex. 2, to try to persuade them to reject a settlement that had been recommended by the County's own attorneys, Mr. Fitzpatrick (a lawyer admitted in New York) violated Rule 4.2(c) of the New York Rules of Professional Conduct. The County chooses to ignore this other aspect of Plaintiff's discovery demands, which will support Plaintiff's expected sanctions motion.

**(iii) Fitzpatrick's Conduct**

Mr. Fitzpatrick makes the astonishing claim that his statements to the press were "communicated in a dispassionate manner." Dkt. 219 at 2. This is one of those statements: "It's a million dollars that could be going to school kids or police officers or ambulance services or anything . . . . **Instead it's going to this scumbag's family. It makes me sick.**" Dispassionate this statement is not.

R|M

Similarly, Mr. Fitzpatrick denies that he campaigned to block the proposed settlement and instead claims that he "was contacted by either the press or members of the Legislature" and in response, he gave his "professional opinion . . . that the proof of guilt underlying the prosecution of Hector Rivas was sound." Dkt. 219 at 1. Whether Mr. Fitzpatrick provided his "professional opinion" after being contacted by the press or members of the Legislature – or whether, in fact, he affirmatively contacted the press or legislators to influence them and influence public perception about the proposed settlement – is a factual issue that Ms. Rivas seeks to uncover with the discovery she has demanded.

Mr. Fitzpatrick has produced carefully culled documents concerning certain communications he had with the press and County legislators. Those documents do not support Mr. Fitzpatrick's claim that he was "contacted by . . . . members of the Legislature." Indeed, the email Mr. Fitzpatrick chose to provide that was sent on his behalf to Minority Leader Brian May indicates that Mr. Fitzpatrick affirmatively contacted Mr. May. Likewise, Mr. Fitzpatrick's subpoena response states that he provided his "memo" on the case to Legislative Chair Watts "in person" on the day of the February legislative session. *See* Dkt. 209-2 at 2. There is no indication that Legislative Chair Watts contacted Mr. Fitzpatrick to obtain his legal opinion. The County's attorneys have confirmed that Mr. Fitzpatrick did not provide advance notice that he was contacting County legislators concerning the proposed settlement. Thus, Mr. Fitzpatrick's violation of Rule 4.2(c) of the New York Rules of Professional Conduct is clear.[3]

### (iv) This Was Not Business as Usual

The County erroneously suggests that the events leading up to the rejection of the proposed settlement were carried out in the normal course pursuant to governing laws and rules. Nothing could be farther from the truth. The County's attorneys have acknowledged: "We share, and are sensitive to, your frustration with the lack of certainty and regularity in this process, **which has been unprecedented**." None of what happened here was normal or acceptable. Mr. Fitzpatrick's conduct was highly unusual and violated the New York Rules of Professional Conduct. Mr. Fitzpatrick intentionally violated the parties' efforts to attempt in good faith to resolve this matter for the agreed-upon amount. In doing so, Mr. Fitzpatrick engaged in tortious interference and violated N.Y. Rule of Professional Conduct 8.4(e), which provides that a "lawyer . . . shall not . . . engage in conduct that is prejudicial to the administration of justice."

---

[3] Mr. Fitzpatrick also violated Rule 3.6(a), which provides, "A lawyer who . . . has participated in a criminal or civil matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." That is precisely what Mr. Fitzpatrick's statements to the press were intended to do and accomplished.

R|M

(v) **The First Amendment Does Not Protect Mr. Fitzpatrick**

In a ham-handed effort to shield Mr. Fitzpatrick's misconduct, Defendants press the argument that Mr. Fitzpatrick was acting in his professional capacity. *See* Dkt. 219 at 2 ("Plaintiff seemingly casts aside any consideration of the fact that everything requested in the subpoena concerned actions taken by me as the elected chief prosecutor for the county."); Dkt. 221 at 5 ("The District Attorney, as a citizen and elected official of the County, had a First Amendment right to oppose and/or comment on the propriety of the proposed settlement amount."). This is a dubious proposition given that no such duties are delegated to a county district attorney under state law. More important, it overlooks that *Garcetti v. Ceballos*, 547 U.S. 410 (2006), held that statements made by public employees pursuant to their official job duties are not protected by the First Amendment. Thus, the County is obviously wrong that "[t]he District Attorney, as . . . [an] elected official of the County, had a First Amendment right to oppose and/or comment on the propriety of the proposed settlement amount."

Accepting Defendants' argument leads to the conclusion that Mr. Fitzpatrick's actions are imputed to the County. Since the County is a party to this case, its conduct is governed by the Federal Rules of Civil Procedure, relevant provisions of Title 28 of the U.S. Code (including 28 U.S.C. § 1927), and the Court's orders, local rules, and inherent powers. For an agent of the County to engage in a campaign to circumvent a settlement, recommended by the County's own attorneys and the court-appointed mediator, warrants severe sanctions and penalties. *See Bernard*, 901 F. Supp. at 779.

**B. Legal Errors in Defendants' Opposition**

"The decision whether to reopen discovery is within a district court's discretion." *Moroughan v. Cty. of Suffolk*, 320 F. Supp. 3d 511, 515 (E.D.N.Y. 2018). Good cause exists to permit this discovery because it did not exist when discovery was open; the discovery sought is limited and will not delay trial; and Defendants will not be prejudiced. Plaintiff could not have sought this discovery earlier because the events at issue had not happened yet and were entirely unforeseen – as the County's attorneys described them, they were "unprecedented." *See* Dkt. 198 at 3.

All of the factors that courts considering in deciding whether to reopen discovery, *see Fredericks v. Borden*, No. 9:17-CV-00015 (BKS/DJS), 2024 U.S. Dist. LEXIS 191109, at *42 (N.D.N.Y. Oct. 21, 2024), weigh strongly in Plaintiff's favor. The discovery sought will not delay trial, which is several months away. While the County objects to this discovery, that is surely because they are concerned about what it will show. Ms. Rivas has no idea why Defendant Mitchell objects to this discovery, which does not involve him. He is injured by Mr. Fitzpatrick's misconduct as much as anyone. Instead of the case being resolved and Mitchell's potential liability being extinguished, he must now defend himself (and incur the

R|M

cost of doing so); and by going to trial, he risks substantial liability and further damage to his already tarnished reputation.

The County objects to "the purported topic of discovery," arguing that it is not relevant to the claims or defenses in the case. Dkt. 221 at 6. The County's argument is misplaced because the Court has broad authority to oversee cases before it and ensure that the Court's authority and rules are not undermined.

> Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates. These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (cleaned up).

> In addition, it is firmly established that the power to punish for contempts is inherent in all courts. **This power reaches both conduct before the court and that beyond the court's confines**, for the underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, **regardless of whether such disobedience interfered with the conduct of trial**.

*Id.* at 44 (cleaned up) (emphasis added). Thus, the Court has broad discretion to permit discovery concerning the violation of its orders and rules – and, in this case, the indecorous actions of Mr. Fitzpatrick, acting apparently as a County official, to try to dissuade county legislators from accepting their own attorney's recommendation to settle this case.

Given the limited nature of the discovery sought, the County will not be prejudiced. The County claims that "reopening discovery would significantly prejudice the County" and "divert its already limited resources." Dkt. 221 at 6. It is likely the County's outside counsel has spent more time opposing Plaintiff's discovery demand than it would have taken to produce the discovery.

It appears the County is prejudiced by reopening discovery only when it is the Plaintiff who is seeking discovery. For the past two months, the County has engaged in conducting wholesale new discovery. The County has produced **more than 3,000 pages** of never-before-produced documents regarding the County's efforts to re-prosecute Hector Rivas,[4] and the County has served ***ten*** subpoenas for records from law enforcement agencies

[4] Plaintiff will be filing a Rule 37 motion shortly concerning this enormous discovery violation.

that were neither sought during discovery nor relevant nor admissible to any of the issues at trial in this case.

These are not, as the County claims, "routine trial preparation" materials. Dkt. 221 at 7. The subpoenas demand "all police/arrest records" or "all incarceration records" for Mr. Rivas, none of which are part of the underlying criminal trial nor could not be used to cross-examine or impeach any witness who will testify at trial. These are precisely the kinds of "shotgun" subpoenas that are not permissible "trial subpoenas." *See Revander v. Denman*, No. 00 CIV. 1810 (RJH), 2004 U.S. Dist. LEXIS 628, at *4 (S.D.N.Y. Jan. 21, 2004) ("Defendant's argument that the subpoenas are trial, as opposed to discovery, subpoenas is belied by their broad scope. Subpoenas calling for 'any and all records' are exactly the kind of 'shotgun' subpoenas that should not be issued on the eve of trial.").[5]

It is hard to understand why the County's outside counsel has undertaken great effort to subpoena records that cannot be used at trial, if we accept the County's own arguments elsewhere. *See* Dkt. 213 at 25-26 ("Evidence of guilt or innocence that the criminal jury did not hear is inadmissible. . . . [N]either Plaintiff nor Defendants should be allowed to rely on evidence outside of the criminal trial record to try to argue 'what really happened' based on evidence outside the scope of the criminal trial."). Mr. Rivas cannot testify at trial (he is dead) and he did not testify in the underlying criminal matter. Thus, the records the County has subpoenaed concerning Mr. Rivas's "police/arrest records" and "incarceration records" are clearly not for impeachment and cross-examination.

Ignoring the irony of their conflicting positions, Defendants seek to reopen discovery to permit the deposition of Flora Rivas, a point that she now addresses.

[5] None of the cases the County cites support its argument that subpoenaing ten separate government entities for "all police/arrest records" or "all incarceration records" is "routine trial preparation, not renewed discovery." Dkt. 221 at 7. In *Joseph P. Carroll Ltd. v. Baker*, No. 09 CIV. 3174 SHS, 2012 U.S. Dist. LEXIS 51869, at *3-4 (S.D.N.Y. Apr. 12, 2012), the subpoenaed document was a single transcript of the plaintiff's testimony in related litigation. In *Malmberg*, 2010 U.S. Dist. LEXIS 28784, at *8, the court permitted post-discovery subpoenas that were "very limited in scope and relate to information revealed during Plaintiff's expert's deposition." This is nothing like the County's omnibus subpoenas. *Malmberg* also explained that "when a party is aware of the existence of documents before the discovery cutoff date and issues discovery requests including subpoenas after the discovery deadline has passed, then the subpoenas and discovery requests should be denied." *Id.* (cleaned up). That is precisely what the County has done here. Finally, the County cites *Revander*, which is odd because *Revander* **denied** the requested subpoenas for the same reason the County's subpoenas are improper here: they were clearly not trial subpoenas.

R|M

## II. Deposition of Flora Rivas

Unlike the discovery Plaintiff seeks, which concerns events that occurred long after discovery closed, Defendants now seek to depose Flora Rivas about matters that are decades old, even though Plaintiff identified Ms. Rivas in Rule 26(a)(1) disclosures that were served in ***2020***. At no point during ***more than four years of discovery*** did any of the defendants seek to depose Ms. Rivas.

The only explanation Defendants offer so far for seeking Ms. Rivas' deposition now is that following the death of Sidney Manes, "Ms. Rivas was appointed as the Administratrix. That altered Ms. Rivas circumstance as she now becomes the face of the case." Dkt. 218 at 1.[6] Defendants are wrong. Ms. Rivas was not appointed "Administratrix" of her uncle's estate; she was appointed Executor because Mr. Rivas left a Last Will and Testament that named Flora Rivas as the backup Executor of his Will. We mention this because Defendants have long known that Ms. Rivas was the backup executor on Mr. Rivas's Will. Defendants knew that Ms. Rivas would become the Executor (and substituted as Plaintiff) if Mr. Manes died. Given Mr. Manes' age, it made sense for Mr. Rivas to have a backup Executor. For that same reason, if Defendants had acted with due diligence, they would have deposed Ms. Rivas during the years of open discovery.

Defendants have said nothing to explain why they did not seek Ms. Rivas's deposition years ago. Indeed, on March 31, 2022, the County made the following representation to the Court about depositions: "**County will not seek, but will be represented at, depositions of other parties and non-party witnesses.**" Dkt. 85 (emphasis added) (attached here as Ex. 3). During the parties' August 6 conferral, the County offered no explanation for not seeking to depose Ms. Rivas during discovery.

Thus, at least four of the six relevant factors weigh heavily against Defendants' application. The request is opposed; Plaintiff will be prejudiced if the request is granted; Defendants were not diligent in seeking this discovery, and the need for this discovery was foreseeable.

Mr. Mitchell contends that Ms. Rivas' deposition "was agreed upon by Plaintiff's counsel before this Court." Dkt. 218 at 1. However, as the excerpt of that conference reveals

[6] Mr. Mitchell filed his letter motion seeking to depose Ms. Rivas before conferring with Plaintiff's counsel about the matter. Indeed, Mr. Mitchell's counsel had agreed to confer with Plaintiff's counsel and the County about this issue at 4:30 p.m. on August 6, and for unexplained reasons, Mr. Mitchell filed his letter at 2:43 p.m. and his counsel did not attend the agreed-upon 4:30 meet and confer. While Mr. Mitchell's counsel had failed to inform Plaintiff's counsel of his intention to not appear at the conferral, it appeared that the County's attorney was aware of that fact. During the conferral, the County took the same position as Mr. Mitchell's counsel about the reason they now seek to depose her: that she is now "the face" of Plaintiff's case.

RICKNER MOSKOVITZ LLP
Joshua S. Moskovitz, Principal | (212) 300-6506 | josh@rmcivilrights.com

(which Mr. Mitchell failed to enclose with his letter motion), the Court *clearly* understood that there was only the *possibility* of an agreement: "THE COURT: So the parties ***might*** agree to a deposition prior to trial if the mediation is unsuccessful. MR. KORENBAUM: Correct." Dkt. 221 at 7 n.11 (emphasis added). The parties had not, at that point, conferred substantively about the matter and Plaintiff had not yet heard what reasons Defendants sought to take Ms. Rivas' deposition or their explanation for failing to do so years ago. Having now heard from Defendants on those points, Plaintiff objects to Ms. Rivas' deposition for the reasons set forth herein.

If the Court grants Defendants' request for this deposition, we respectfully request that the Court include the following limitations: (1) the deposition must occur at Plaintiff's counsel's attorney's office, (2) the deposition should be limited to two hours, and (3) Defendants may not use any documents that were not produced during discovery, or that have been subpoenaed since discovery closed. Allowing the County to use documents they withheld in discovery and have now improperly subpoenaed would be deeply unfair to Plaintiff and effectively reward the County's disregard for the Federal Rules of Civil Procedure and this Court's orders governing discovery.

Respectfully,

Joshua S. Moskovitz
Rob Rickner

Scott A. Korenbaum
THE LAW OFFICE OF SCOTT A. KORENBAUM

Enc.

cc: All Counsel of Record