UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

FLOR RIVAS, Executor of the Estate of Hector Rivas, also known as FLORA RIVAS, formerly known as SIDNEY MANES, Administrator of the Estate of Hector Rivas,

Plaintiff,

v.

ONONDAGA COUNTY AND ERIK MITCHELL,

Defendants.

Civil Action No.: 5:19-cv-844 (BKS/CBF)

**ONONDAGA COUNTY'S REPLY BRIEF REGARDING STATUTE OF LIMITIATIONS, *MENS REA*, THE APPROPRIATE SCOPE OF TRIAL, AND APPLICABLE *BRADY* STANDARD**

Date: August 28, 2026

John G. Powers, Esq.
Mary L. D'Agostino, Esq.
Amanda C. Nardozza, Esq.
Hancock Estabrook LLP
1800 AXA Tower 1, 100 Madison Street
Syracuse, NY 13202
Tel: 315-565-4500

*Attorneys for the County*

## ARGUMENT

### I. PLAINTIFF'S CLAIMS ARE TIME BARRED BECAUSE THE *HECK* BAR DISSOLVED UPON VACATUR OR ABATEMENT *AB INITIO*.

Plaintiff's opposition fails to undermine the County's position that the claims here are time barred.

#### A. *Plaintiff's accrual argument ignores the disjunctive rule in* McDonough[1] *and* Smalls[2] *for fair-trial claims*

Plaintiff argues that the accrual rule for a fair trial "could not be clearer" under *McDonough*, arguing that the statute of limitations ("SOL") begins to run when "the criminal proceedings … have terminated." Opp. Br. at 1.

The problem with Plaintiff's oversimplification of *McDonough* is that it ignores the decretal holding of *McDonough*: that the SOL will begin to run on a fair trial claim "once the criminal proceeding has ended in the defendant's favor, *or* a resulting conviction has been invalidated within the meaning of *Heck.*" *McDonough,* 588 U.S. at 119-20 (emphasis added). Plaintiff's argument renders one-half of the fair trial accrual rule, which has been recognized by the Supreme Court and the Second Circuit, as surplusage. *See Smalls*, 10 F.4th at 138 ("The Supreme Court phrased its accrual rule disjunctively, making clear that invalidation of a conviction within the meaning of *Heck* ***or*** termination of an ongoing criminal proceeding in the defendant's favor would be sufficient to trigger the statute of limitations." (bold emphasis added).

In advancing her argument, Plaintiff's position effectively collapses those two *disjunctive alternatives* into one where she argues that even if the conviction has been invalidated within the meaning of *Heck*, accrual *must* still wait favorable termination of any potential future criminal

---

[1] *McDonough v. Smith*, 588 U.S. 109 (2019).

[2] *Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021).

prosecution or trial. This *ipse dixit* assertion is irreconcilably at odds with the holding of *Smalls* and *McDonough*. To be clear, Plaintiff's position may describe the rule applicable to a § 1983 malicious-prosecution claim (for which favorable termination is itself an element), but *Smalls* expressly distinguished fair-trial claims from malicious-prosecution claims and rejected the proposition that *McDonough* simply imported malicious prosecution's favorable-termination requirement into the accrual rule for § 1983 fair-trial claims. *Id.* ("[T]he notion that *McDonough* established malicious prosecution's favorable-termination requirement as the accrual rule for section 1983 fair-trial claims is inconsistent with the rule announced in *McDonough*."); *see also Williams v. City of New York*, No. 21-CV-3005 (ENV) (RML), 2025 WL 2782810, at *11 (E.D.N.Y. Sept. 27, 2025) (noting the Second Circuit's refusal "to treat favorable termination as an element of fabrication-of-evidence claims").

Plaintiff's reliance on *DiBlasio v. City of New York*, 102 F.3d 654 (2d Cir. 1996) is an obvious attempt at misdirection.[3] As an initial matter, *DiBlasio* was not a statute of limitations case and did not even address the question of accrual. *See generally DiBlasio*, 102 F.3d at 654, *et seq*. *DiBlasio* recognized that *Heck*'s bar is coextensive with the favorable termination requirement in the context of a 1983 *malicious prosecution* claim—not a *fair trial* claim. *See id.* at 657-59. Indeed, this is the precise distinction criticized by the dissent in *Poventud*. *See Poventud v. City of New York*, 750 F.3d 121, 161 (2d Cir. 2014) (Jacobs, J.) ("The majority recites that it complies with the favorable termination rule of *DiBlasio,* but then tries to narrow the rule to the particular constitutional claim there at issue: malicious prosecution."). *Smalls* rejected Plaintiffs' *DiBlasio* argument that malicious prosecution and fabrication claims are

[3]Plaintiffs criticize the County for not discussing the 1996 *DiBlasio* decision as applicable, but it is the Plaintiff who is in the wrong. *DiBlasio* was a malicious prosecution claim that has no applicability to due process claims. *See Jackson v. Barnes*, 749 F.3d 755, 761 n.3 (9th Cir. 2014) ("We reject defendants' contention that *DiBlasio* … requires us to hold that Jackson's claim is *Heck* barred. The holding of *DiBlasio* is limited to malicious prosecution cases, and therefore has no bearing on Jackson's Fifth Amendment claim against Barnes.").

synonymous, holding that that "the notion that *McDonough* established malicious prosecution's favorable-termination requirement as the accrual rule for section 1983 fair-trial claims is inconsistent with the rule announced in *McDonough*." *Smalls*, 10 F.4th at 138.

Plaintiff cites inapplicable caselaw that otherwise predates *McDonough* and *Smalls*. The Supreme Court's decision in *McDonough* and the Second Circuit's interpretation of *McDonough* in *Smalls v. Collins* represented a "*new"* understanding of accrual rules for fair trial claims. *Smalls*, 10 F.4th at 136 (McDonough *did* ...announce *a new accrual rule* for fabricated evidence claims") (emphasis added). It is unsurprising that caselaw prior to these decisions may be inconsistent. [4] Plaintiffs' simplistic approach to accrual seeks to capitalize on the uncertainty in the accrual rules pre-McDonough /*Smalls,* while completely ignoring the import of their holdings. *McDonough* and *Smalls* clarified that the accrual rule for fair trial due process claims had *two prongs* that were applied in the disjunctive. This was a clear change to the state of the law as prior fair trial accrual cases never mentioned this disjunctive standard.

The reason for the two disjunctive prongs of the accrual standard is explained in *McDonough*. The first accrual trigger—the requirement that the "criminal proceedings … ended in the defendant's favor"—applies where the prosecution, for some reason, did not end in a conviction, as occurred in *McDonough* itself. *McDonough,* 588 U.S. at 119-20 (a criminal prosecution not resulting in conviction still raises *Heck* concerns). The other trigger—where the resulting *conviction* has been invalidated within the meaning of *Heck*—applies where the prosecution actually did end in a conviction, ensuring that any subsequent § 1983 action does not undermine the conviction as per *Heck*. *Id*. at 119-21. This dichotomy between the two

[4] By way example, district court cases as recent as 2018 were applying a completely different accrual standard for a fair trial claims. *See, e.g., Sherman v. Holecek*, No. 316CV01342BKSDEP, 2018 WL 4119119, at *5 (N.D.N.Y. Aug. 29, 2018). The standard has been clearly evolving over the last six years such that citation to any authority that pre-dates *McDonough* and *Smalls* will likely be stale and inaccurate.

disjunctive accrual rules was also alluded to by the Second Circuit in *Smalls*. *Smalls*, 10 F.4th at 139 (2d Cir. 2021) ("[t]his requirement may be satisfied where *a criminal conviction has been invalidated* or *a criminal prosecution has been terminated in the criminal defendant's favor* because, in such circumstances, there is no risk that a section 1983 plaintiff's claim will impugn an existing conviction or the basis for an ongoing prosecution")(emphasis added). Applying this dichotomy here, since there was a conviction, the latter accrual trigger, *i.e., invalidation of the conviction*, is the one that applies.

*Smalls* repeated the Supreme Court's guidance on the various ways that a conviction could be deemed "invalidated" under *Heck* (thus accruing the SOL), including when the "conviction or sentence has been [1] reversed on direct appeal, [2] expunged by executive order, [3] declared invalid by a state tribunal authorized to make such determination, [4] or called into question by a federal court's issuance of a writ of habeas corpus." *Smalls*, 10 F.4th at 137 (quoting *Heck,* 512 U.S. at 487). In a conclusory manner, Plaintiff argues without authority that neither the Second Circuit's grant of *habeas* relief in 2015 nor the County Court's CPL 440.10 order vacating Plaintiff's conviction on April 15, 2015 satisfies this standard. Established law clearly establishes the opposite.

Indeed, caselaw confirms a common sense conclusion that a state court CPL § 440.10 decision vacating a criminal conviction satisfies the accrual threshold of a conviction being "declared invalid by a state tribunal." *See, e.g., Poventud v. City of New York*, 750 F.3d 121, 138 (2d Cir. 2014) (finding that state court order vacating conviction pursuant to CPL satisfies the *Heck* threshold that "the conviction or sentence has been...declared invalid by a state tribunal authorized to make such determination"); *Johnson v. United States*, 759 F. Supp. 3d 425, 448-49 (S.D.N.Y. 2024) (*Heck*-bar lifted once convictions were vacated pursuant to CPL § 440.10 order

issued in November 2021); *Ravenell v. Cnty. of Nassau*, No. 18-CV-6010, 2019 WL 5423435, at *7 (E.D.N.Y. Oct. 21, 2019) (a "conviction has been invalidated" under *Heck* where it has been "reversed or vacated"); *Lynch v. McDonough*, No. 03-CV-556A(F), 2005 WL 1561454, at *5 (W.D.N.Y. July 1, 2005)[5] ("[p]laintiff may or has already obtained a ruling invalidating his conviction, either in a New York court on a habeas corpus petition or a motion pursuant to New York Criminal Procedure Law § 440.10")

Based on the plain application of the *McDonough/Smalls* accrual standard, the statute of limitation accrued on April 20, 2015, the date Onondaga County Court Judge Thomas Miller vacated Mr. Rivas's conviction pursuant to New York State Criminal Procedure Law ("CPL") § 440.10. His claims are therefore time barred.

Plaintiff's citation to *Arrington v. LoTempio*, No. 22-CV-6141-FPG, 2023 WL 375098, at *4 (W.D.N.Y. Jan. 24, 2023) appears to attempt to capitalize on the confusion among the courts following *McDonough* regarding the new accrual rules. *Arrington* relied on an NDNY case from 2019, *Thomas v. Mason*[6], which it cited for the proposition that "reversal of a conviction and remand for a new trial does not constitute a favorable termination" and that a fabricated evidence claim "accrued upon [plaintiff's] ultimate acquittal, not the reversal of his initial conviction." *Id.* at *3.[7] *Thomas v. Mason* ultimately relied upon pre-*McDonough* caselaw and did not observe the change in the accrual rules brought about by *McDonough*. 2019 WL 6111572, at *2-3. *Arrington* continued in this mistake, never mentioning the new disjunctive accrual rules, while at the same time collapsing the accrual question into a simple "favorable termination" question—*i.e.*, eliminating the disjunctive inquiry. 2023 WL 375098, at *4.

[5] report and recommendation adopted, No. 03 CV 556A, 2005 WL 1785263 (W.D.N.Y. July 26, 2005).

[6] No. 1:17-CV-626 (DJS), 2019 WL 6111572, at *2-3 (N.D.N.Y. Nov. 18, 2019).

[7] As an initial matter, that is not what happened here—*i.e.*, here, Judge Miller simply vacated the conviction.

Indeed, the logic of *Arrington* cannot withstand scrutiny. In *Arrington*, the alleged fifth amendment violation concerned the flipping of plaintiff's co-defendant at trial. *Id*. at *2. The plaintiff was convicted, but the conviction was reversed and remanded for a new trial. *Id*. at *2. Under the disjunctive standard articulated in *McDonough* and confirmed by *Smalls*, the plaintiff's conviction was invalidated and thus there was no *Heck* concerns unless the constitutional violation would also similarly affect the follow-on prosecution. This was the holding of *Poventud v. City of New York*, which recognized that with civil *Brady* claims, once the original tainted conviction is invalidated, there is no *Heck* concern for the retrial because the *Brady* information is then already known. *Poventud*, 750 F.3d at 134 (thus, "[e]ven when a defendant is retried, a § 1983 suit concerning the earlier trial could not impeach the new trial's result") (citing *Smith v. Gonzales*, 222 F.3d 1220, 1222 (10th Cir.2000)). The Second Circuit recognized *Heck* was not implicated by a retrial because the retrial "could not replicate the constitutional violations at issue since the defendant must, by definition, have been made aware of the *Brady* material before *vacatur*." *Id*. (cleaned up).

So too here. Plaintiff's claims allege the County's liability for *Brady* violations by DA Fitpatrick and a fabricated time of death opinion by Dr. Mitchell during the first trial. Neither of those alleged unconstitutional conditions could have been repeated in the retrial; thus, under *Poventud*, Plaintiff's alleged constitutional deprivation flowing from his first conviction (which was then invalidated) would not be *Heck* barred by the possibility of retrial. *Poventud*, 750 F.3d at 134 (thus, "[e]ven when a defendant is retried, a § 1983 suit concerning the earlier trial could not impeach the new trial's result"). *Arrington* did not appear to conduct any of this analysis or otherwise apply the disjunctive standards articulated by *McDonough* and *Smalls*. *Arrington* is not sound precedent for this case to rely upon in deciding the statute of limitations question.

*B. In any event, at the absolute latest, the claims accrued upon Mr. Rivas's death on July 10, 2016.*

Even if the Court were to reject the April 20, 2015 vacatur date as the trigger for accrual, the County respectfully submits that Plaintiff's claims are still untimely because they otherwise accrued immediately upon Mr. Rivas's death on July 10, 2016.

Indeed, on the date that Mr. Rivas died, all the "pragmatic concerns" identified by *McDonough* evaporated. *See McDonough*, 588 U.S. at 118 (describing the concerns as "avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments" citing *Heck*, 512 U.S. at 484–85). There was no living defendant, no possible retrial, no future conviction, and no ongoing criminal proceeding capable of being impugned by a civil action as of that date. The later ministerial dismissal of the indictment by the criminal court did not make this any less true on the date Mr. Rivas died.[8] When Mr. Rivas passed away there was a "'complete and present cause of action.'" *Wallace v. Kato*, 549 U.S. 384, 388, (2007).

Plaintiff argues that, under *People v. Mintz*, 20 N.Y.2d 770 (1967), the criminal proceeding did not terminate until the County Court formally dismissed the indictment on July 14, 2016. That argument conflates the later procedural order documentation with the actual event that caused abatement. *Mintz* held that "the entire criminal prosecution has abated by reason of [the defendant's] death." 20 N.Y.2d at 771. The Court then directed the trial court to vacate the judgment and dismiss the indictment because, after death, the appeal could not be heard, the conviction could not be enforced, and "there is no person to try." *Id.; see also People v. Matteson*, 75 N.Y.2d 745, 747 (1989) (death during direct review abates the appeal and "all

[8] *See, e.g.*, *Chmurny v. State*, 392 Md. 159, 165 (2006) ("*As a purely housekeeping measure* and more as an officer of the court, counsel would be authorized to bring to the court's attention that the defendant has died, offer evidence of that fact, and move, as trial counsel did here, to dismiss the counts that proceeded to verdict." (emphasis added)).

proceedings in the prosecution *from its inception*" (emphasis added)).

"Abatement" in this sense means the definitive end of the criminal proceeding at the moment of abatement—*i.e.*, the moment of death. In the legal context, "abatement" is defined as:

> The negation of a criminal trial and verdict after a convicted defendant has died before exhausting all legal appeals. The case reverts to the beginning point *as if the trial and conviction had never occurred.*

ABATEMENT, Black's Law Dictionary (12th ed. 2024) (emphasis added). *People v. Matteson*, 75 N.Y.2d 745, 747 (1989) (the death of a defendant abates "all proceedings in the prosecution *from its inception*" (emphasis added)). Thus, the case does not abate when the indictment is dismissed, it abates when the death occurs. That is why the Court of Appeals indicated in *Mintz* that the "criminal prosecution *has abated*" (past tense) even though the dismissal of the indictment had not yet occurred. 20 N.Y.2d at 770.

This timing is illustrated by *People v. Santiago*, 67 A.D.2d 843, 843 (1st Dep't 1979). In *Santiago*, unbeknownst to the Appellate Division, it heard oral argument on an appeal from a criminal defendant and issued an order reversing the conviction and dismissing the indictment, all of which occurred *after* the defendant had died. *Id*. Under the Plaintiff's theory here, the court's actions and issued decision would have still been a valid and binding because the indictment was not yet dismissed. But the Appellate Division ruled that because the defendant had already died, it "*lacked jurisdiction*" at the time of oral argument and its issued decision—even though the case had not yet been formally dismissed. *Id*. *c.f., People v. Endruschat*, 283 N.Y.S.2d 124, 125 (Erie Co. Ct. 1967) (appellate decision issued after the defendant's death, but before the criminal proceedings were dismissed, must be vacated). As a result, upon death, a criminal prosecution is deemed abated *ab initio*. *See People v. Cruciani*, 238 A.D.3d 462, 465-67 (1st Dep't 2025).

The dispute regarding whether the end of the prosecution by death or the later post-death ministerial act of dismissal of the indictment is answered conclusively by the underlying accrual rule. The only reason the Plaintiff's fair trial claims did not accrue earlier was because of the tolling effect of *Heck v. Humphrey*. The caselaw is clear—including as reaffirmed in *McDonough*—that the first moment the *Heck* bar is lifted, the cause of action accrues. *McDonough*, 588 U.S. at 115 (the SOL accrues the moment "plaintiff has a complete and present cause of action") (internal quotations omitted).[9]

Based on the law set forth above, as of July 10, 2016, the State could no longer retry Mr. Rivas. There was no living defendant, no possible retrial, no future conviction, and no ongoing criminal proceeding capable of being impugned by a civil action—nor any jurisdiction to continue to prosecute. Since it cannot be disputed that there was no possibility of Mr. Rivas being retried and reconvicted as of the date of his death, that is unquestionably the latest day the *Heck* bar was lifted and, thus, the accrual of the statute of limitations.

Because the three-year limitations period accrued no later than July 10, 2016, it expired on July 10, 2019. Plaintiff filed this action on July 13, 2019. The claims are therefore untimely.

## II. THE PROPER *MENS REA* FOR PLAINTIFF'S CLAIM IS KNOWING (RATHER THAN RECKLESS) FABRICATION.

Plaintiff's argument that the *mens rea* requirement for a Fourteenth Amendment due process fabrication of evidence claim includes recklessness ignores *many* Second Circuit cases indicating that the fabrication must, in fact, be *intentional* or *knowing*. *See, e.g., Davis-Guider v. City of Troy*, No. 23-589, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (in addition to establishing that the evidence is wrong or mistaken, a plaintiff must *also* offer "proof of *scienter*"

[9] See also *D'Ambrosio v. Marino*, 747 F.3d 378, 385–86 (6th Cir. 2014) ("[b]ecause D'Ambrosio's civil rights claims did not accrue until his state conviction was vacated and the *Heck* bar was lifted, the two-year statute of limitations does not bar his current claims").

*i.e.*, that the evidence was "*knowingly* fabricated.") In *Davis-Guider*, the Second Circuit squarely addressed the issue of scienter and could have, but did not, include recklessness as part of the standard. *See id*.

Numerous other Second Circuit cases confirm that the standard is *knowing*. *See, e.g.*, *Carruthers v. Colton*, 153 F.4th 169, 189 (2d Cir. 2025) ("[t]he fabrication element requires only that the defendant knowingly make a false statement or omission")[10]; *Rentas v. Ruffin*, 816 F.3d 214, 224 (2d Cir. 2016) (fabrication requires "knowingly created false information" by a government official who "specifically intend[ed] to deprive a plaintiff of his right to liberty")(internal quotations omitted); *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) (a plaintiff must prove a defendant's fabrication was "made knowingly"); *Ashley v. City of New York*, 992 F.3d 128, 143 (2d Cir. 2021) ("The fabrication element requires...that the defendant knowingly make a false statement or omission."); *Steinbergin v. City of New York*, No. 21-536, 2022 WL 1231709, at *3 (2d Cir. Apr. 27, 2022) ("Steinbergin must establish that an "investigating official" "fabricate[d] information" against him, ..., or otherwise "that the defendant knowingly ma[de] a false statement or omission" against him"); *c.f., Ricciuti v. N.Y.C. Transit Auth.*,124 F.3d 123, 130 (2d Cir. 1997) (an unconstitutional fabrication requires the defendant "to *deliberately* manufacture false evidence against an arrestee")(emphasis added); *Lalonde v. City of Ogdensburg,* No. 8:22-CV-00164 (LEK/DJS), 2026 WL 879705, at *15 (N.D.N.Y. Mar. 31, 2026) ("[p]laintiffs have presented no evidence of intentional fabrication that would meet the scienter requirement of their claim" (emphasis in original).

In the time period since the County filed its initial brief, the Second Circuit has *again* clearly set forth the required *mens rea* for a fabrication claim:

---

[10] In evaluating the pleaded facts, the Second Circuit evaluated the false statement for intentionality: "[n]ot only were these allegations not conclusory, but, construed favorably to Carruthers, they were also sufficient to support a plausible claim *that filing this false information was intentional."* Id. at 191 (emphasis added).

> For purposes of this inquiry, an official "fabricates information" when he knowingly elicits false statements and testimony from a witness.

*Batista-Reyes v. Paul*, No. 23-461, 2026 WL 2386336, at *15 (2d Cir. Aug. 17, 2026) (citing cases)(quotation in original).

Nor does Plaintiff dispute that "knowingly" and "recklessly" are two entirely distinct mental states, with recklessly being a lesser level of scienter. *See, e.g., United States v. Van Mead*, 773 F.3d 429, 433 (2d Cir. 2014) ("the Supreme Court has distinguished between offenses that have 'a stringent mens rea requirement,' demanding that a defendant act knowingly, intentionally … and those offenses commonly characterized as sounding in strict liability, negligence, or recklessness"); *see also In re Payne*, 707 F.3d 195, 204 (2d Cir. 2013) (noting that "recklessness" was a "lesser mens rea" level than intentional or knowingly (emphasis added)); *S.E.C. v. Harcharik*, 353 F. App'x 636, 638 (2d Cir. 2009) ("knowingly" is "a more stringent standard than extreme recklessness").

Plaintiff argues that the Second Circuit has held recklessness sufficient in two "analogous" contexts in *Velardi v. Walsh* and *Manganiello v. City of New York*. But both of those cases assessed *mens rea* related to specific Fourth Amendment elements, probable cause and malice, respectively, *not* Fifth/Fourteenth Amendment Due Process. In *Velardi v. Walsh*, a search warrant violated the Fourth Amendment when it issued upon a warrant affidavit containing false statements knowingly or recklessly made in support of probable cause. 40 F.3d 569, 573 (2d Cir. 1994). The court cited the required mental state for such claims clearly—*i.e.*, as requiring "deliberate or reckless misrepresentation"—based on a 1978 Supreme Court case *Franks v. Delaware*. *See id*. at 574. In 1978, in *Franks*, the Supreme Court clearly defined the *mens rea* for a Fourth Amendment violation flowing from a search warrant application as "knowingly and intentionally, or with reckless disregard for the truth" *Franks v. Delaware*, 438

U.S. 154, 155 (1978). In *Manganiello v. City of New York*, the Second Circuit discussed the elements of a Fourth Amendment malicious prosecution claim considering the elements of malicious prosecution claim, but discussed otherwise discussed recklessness *only* in the context of the "definition of malice." 612 F.3d 149, 164 (2d Cir. 2010).

Obviously, neither of these cases dealt with fabrication or civil *Brady* claims. Neither was articulating standards under the Due Process clause. But beyond that, the cases demonstrate that when the Second Circuit, or the Supreme Court for that matter, wants to include recklessness in a required *mens rea*, they plainly and clearly state it to be the case. Here, the caselaw discussed above all uniformly describes the *mens rea* for fabrication as "knowingly." *See also*, *McDonough*, 588 U.S. at 121 ("a criminal defendant who believes that the criminal proceedings against him rest on *knowingly fabricated* evidence to defend himself at trial and, if necessary, then to attack any resulting conviction through collateral review proceedings") (emphasis added). It is respectfully submitted that the Second Circuit has spoken on the issue and that this Court should not be making new law.

Plaintiffs also argue that because the underlying district court in *Morse v. Fusto* charged the jury on a fabrication claim instructing that recklessness was sufficient, it is entitled to some weight on this question. And even though the issue was never raised on appeal, Plaintiff argues that the Second Circuit could have *sua sponte* corrected it if it found it to be erroneous. First, there does not appear to be any precedent for the Second Circuit conducting its own independent *sua sponte* review of the trial record *following a jury verdict* to correct errors that are not raised by the parties for review (with the exception of jurisdiction). *See* 2A Fed. Proc., L. Ed. § 3:849, *Review of issues not raised on appeal* ("an argument not advanced in the district court or in the briefs on appeal is deemed waived" and "an appellate court will generally not address an issue

not raised by the parties on appeal"). Moreover, the Second Circuit *did* flag the problem with the "propriety" of the Jury Instruction in footnote 4, but implied that the inclusion of "reckless" in the jury instruction was cured by the jury's separate finding on the verdict form that the fabrication was "knowing." *Morse*, 804 F.3d at 544, n.4. Rather, than supporting Plaintiff's position, the Second Circuit's treatment of the issue in footnote 4, especially in conjunction with its definition of the *men rea* requirement in the decision, undermines rather than supports Plaintiff's argument.

Finally, Plaintiff argues that the Court should disregard Second Circuit precedent and follow the Third Circuit's decision in *Mervilus v. Union Cnty*., 73 F.4th 185 (3d Cir. 2023). In the County's moving brief, it discussed all the legal problems and inadequate policy assumptions underlying the *Mervilus* decision, including its conflation of the Fourth and Fourteenth Amendment standards. To the extent this Court was inclined to make new law, those reasons still advocate against adopting the reasoning in *Mervilus*. More importantly, as set forth above, the Second Circuit has clearly spoken on the issue of *mens rea* for fabrication claims[11]. Any Third Circuit precedent to the contrary is therefore irrelevant. *Chen v. Holder*, 367 F. App'x 237, 238 fn. (2d Cir. 2010) ("[p]etitioner's counsel is reminded that cases from other circuits are not binding precedent in this Court").

### III. SCOPE OF EVIDENCE TO BE USED AT TRIAL – PROPER USE OF THE CRIMINAL CASE TESTIMONY AND EXHIBITS

Plaintiff *largely* concedes the County's central point that "what happened in the underlying criminal trial is relevant to the claims in this case." Dkt. No. 225 at 11. The parties' disagreement following this central area of agreement, principally appears to be one of trial presentation. Plaintiff nevertheless characterizes resolution of these issues as "premature"—even

[11] It does not appear that any Second Circuit cases have cited to or followed *Mervilus*; its only reference occurring in the summary judgment decision issued in this case.

though trial is imminent and the manner by which the 1993 criminal record will be presented necessarily affects the parties' witness preparation, exhibit designations, motions *in limine*, and the parties' pretrial submissions. It is therefore an appropriate subject to address now rather than kicking the can down the road.

**A. Plaintiff's proposed limits on the admission of the underlying criminal trial transcripts are mostly improper**

1) The County never took the position that the entire criminal transcript should be "supplied" to the jury.

After conceding that "what happened in the underlying criminal trial is relevant," Plaintiff nonetheless argues that the County should *not* be able to read the entire 1,300-page transcript to the Jury because it would "probably fall asleep" and would make "deliberations impossible" (presumably assuming the Jury would be able to read and peruse the transcript in the jury room). Pls. Br. at 11. This is a straw man argument because it is not what the County has proposed.

2) The County advocated for an appropriate way to publish prior testimony to the Jury.

The County envisions that during its case-in-chief, it will present all inculpatory portions of the criminal trial testimony in question-and-answer format, with a person in the witness box answering the *exact* questions posed in the criminal trial with the *exact* answers given in the criminal transcript. Cross examination would be handled the same way, presumably by opposing counsel. This is a well-accepted way of publishing prior testimony in a subsequent trial, in a manner that is less boring and more engaging for the Jury. There should be no principled argument against this method.

Plaintiff also argues against the re-presentation of prior testimony through live witnesses. Pls. Br. at 16. Plaintiff argues that this presents unanswered procedural questions, and potential awkwardness with witnesses not being able to remember their testimony from 33 years ago, or

unable give the same answers on cross examination. *Id*. To a certain extent, the awkwardness described Plaintiff's counsel is legitimately concerning. But, the reason why the County has contemplated putting in prior criminal testimony through live witnesses is that it will make the presentation more engaging and interesting (and less boring) for the Jury. In order to cure the potential problems and concerns raised by Plaintiff, the County suggests that where a live witness is called to present their prior testimony that they be instructed that they are to read their prior testimony exactly as provided in the criminal transcript. This should not be considered any different than the conventional way prior testimony is published to the Jury through a question-and-answer format. Indeed, the federal common law provides trial judges with great latitude in determining how, precisely, admitted evidence will be published to the jury.[12] *See also United States v. Gary*, 74 F.3d 304, 311 (1st Cir. 1996) ("Although Hopkins did not appear personally in the second trial, his testimony from the first trial was read in full to the jury. It was read with counsel for the government and for Gary each reading their respective parts *and a third person* reading Hopkins' responses." (emphasis added))[13]; *United States v. Salim*, 664 F. Supp. 682, 686 (E.D.N.Y. 1987) ("the court's law clerks read the edited deposition transcript to the jury").[14]

3) <u>Plaintiff's argument that this Court should conduct a secondary Rule 403 culling of evidence already admitted at the criminal trial will likely be a reversible error</u>.

Plaintiff argues that the scope of the evidence previously presented—and deemed admissible and relevant at the criminal trial—should nonetheless be re-reviewed and potentially

[12] *See, e.g., United States v. Robinson*, 586 F.3d 540, 544 (7th Cir. 2009) ("Robinson's 2003 statement was published to the jury and read out loud by Agent Ferguson during his testimony"); *Summerall v. Sec'y, Fla. Dep't of Corr*., No. 3:19-CV-1099-TJC-LLL, 2022 WL 3282717, at *7 (M.D. Fla. Aug. 11, 2022)(prosecutor provided transcripts to jury to follow along with the recordings which were in evidence; "[b]efore the recordings were published to the jury, the trial court read an instruction advising that the recordings were evidence, and the transcripts were not evidence but only provided to help the jury when listening to the recordings"); *Allam v. Harry*, No. 1:14-CV-01940, 2017 WL 1273892, at *3 (M.D. Pa. Feb. 21, 2017) ("[a]lthough admitted into evidence, the letter from Allam to K.S. was not published to the jury until the prosecution read portions of the letter during its closing argument").

[13] *abrogated on other grounds by United States v. Garraway*, 18 F.4th 33, 36 (1st Cir. 2021).

[14] *aff'd* 855 F.2d 944 (2d Cir. 1988).

excluded by this Court at trial under Fed. R. Evid. 403, including based on considerations that it might be unfairly prejudicial. This is an idea that is a catastrophe waiting to happen.

The law is clear that the element of materiality in a civil *Brady* case is measured based on the "***entire record***" submitted to the criminal jury. *Jeanty v. Cerminaro*, No. 21-1974-CV, 2023 WL 325012, at *4 (2d Cir. Jan. 20, 2023) (emphasis added) (assessing materiality "in light of the entire record of the criminal trial"); *Rivas v. Onondaga Cnty.*, No. 5:19-CV-00844 (BKS/TWD), 2025 WL 2675826, at *22 (N.D.N.Y. Sept. 18, 2025) ("In assessing materiality, the Court *must* 'evaluate the withheld evidence *in the context of the entire record*." (emphasis added)). If the civil trial court is going to start making new and different admissibility determinations on evidence previously considered by the underlying criminal jury, then the civil jury will not be able to measure materiality according to the controlling standard.

This is particularly true with respect to Plaintiff's self-serving examples of purportedly irrelevant and cumulative testimony; like for example, that the victim had visited an auto mechanic during the day on Friday March 27, 1987. *See* Dkt. No. 225 at 12–13. But that fact was essential to the prosecution proving the amount of mileage between the auto shop and the victim's home in Eastwood—demonstrating that the victim's car *never* moved out of the driveway after she returned home from dinner with her father on Friday evening. This was *such* a critical fact—especially considered together with the mysterious return of the Steven King library book[15] in Cazenovia—that DA Fitzpatrick featured this evidence in his closing statement.[16] Obviously, it is a fact relevant to both time of death and Hector Rivas's complicity

---

[15] Had Mr. Rivas proceeded to second trial, the second criminal jury would have heard testimony that Mr. Rivas's fingerprints and handprints were recovered from that book. *See* Dkt. No. 213-3.

[16] The Nye Ford testimony, for instance, established not only that Hill had her car serviced on March 27, 1987, but also the vehicle's contemporaneous odometer reading. That mileage evidence was later compared to the route from Nye Ford to Fayetteville, then Hill's residence, Candy's Restaurant (where she had dinner with her father, *i.e.*, the last point that she was seen alive), and back to her residence—a route measured by Investigator Stassi at

in her murder.[17] It is easy to understand why Plaintiff would want this Court to start striking relevant criminal trial evidence that the criminal jury actually already considered, but that would seriously corrupt the record for the Jury's consideration of the issue of materiality (and causation). The court should not entertain such objections.

4) <u>The Court agrees that a limiting instruction is appropriate</u>

The County agrees that a limiting instruction at the outset of trial is appropriate. The jury should be advised that it will hear evidence concerning the prior criminal proceedings, briefly informed of that evidence's relevance, and instructed on any limits governing its consideration.

5) <u>External or new evidence of guilt or innocence</u>

Plaintiff appears to agree that evidence bearing on guilt or innocence outside the criminal-trial record should be excluded, *but* appears to ask the Court to apply the restriction more rigidly against the County. To be sure, the County developed *substantial* post-release forensic evidence (unavailable at the time of criminal trial) that supports Mr. Rivas's guilt. *See, e.g.*, Dkt. No. 213-3. It was therefore not necessarily in the County's competing litigation interest to advocate for the exclusion of that inculpatory evidence. But that is the position that the County advocated for and what is good for the good is good for the gander.

6) <u>Procedural history following the conviction being vacated</u>

Plaintiff argues that the Jury must be allowed to hear that the underlying conviction was overturned, that Mr. Rivas remained incarcerated pending retrial, and that he died before the

approximately thirty-three miles. The prosecution relied on that mileage comparison in summation to argue that the mileage on Hill's vehicle accounted for her Friday travels and did *not* support the defense theory that she later drove to Cazenovia to return the library book between Saturday afternoon and Sunday morning (the Nye Ford witness observed the book in the backseat on Friday too).

[17] Similarly, the travel evidence likewise did considerably more than place Hill at an agency on Friday. Her plans to travel to the Bahamas were part of the prosecution's theory concerning her intent to separate herself from Rivas and, thus, a motive for him to murder her (indeed, defense counsel directly contested that significance in opening). The prosecution later invoked those plans as part of its reconstruction of Hill's state of mind and activities immediately before her death.

retrial occurred. Defendants do not completely agree with this proposal; however, how to handle this issue should discussed in advance and presented to the Jury either as a stipulation or an instruction, with some (but not all) of the information conveyed to the Jury. The County does not want the Jury to be left with the wrong impression that this a "wrongful conviction" case.

7) <u>Opening and closing arguments</u>

The parties appear to agree that opening and closing arguments are important to the issue of materiality and can come in at trial.

8) <u>Evidence on issues other than materiality, such as fabrication, credibility, etc</u>.

In its moving brief, the County correctly observed that evidence bearing on issues *other than materiality*—such as whether Dr. Mitchell fabricated his time of death testimony, whether any *Brady* violation was intentional, credibility, etc.— is not confined to the criminal-trial record and is instead governed by the Federal Rules of Evidence.

Plaintiff argues that such decisions should be deferred and that the County should *first* provide Plaintiff with an advance preview of *all* of its witnesses' testimonies so that Plaintiff can make advance objections. The County declines to comply with such a suggested procedure. Plaintiff had a full opportunity to conduct discovery and depose Dr. Mitchell and Mr. Fitzpatrick to explore all potentially relevant topics. They provide no authority for the extraordinary proposition that the County must provide, in effect, additional pretrial discovery mapping out the substance of its witnesses' trial testimony.

9) <u>Plaintiff's purported Rule 26 (c) objection</u>

Plaintiff argues that the County should not be permitted to call any witness not disclosed in its Rule 26 initial disclosures. That is an issue to address once witness lists are filed and should be governed by the controlling standard if and when it comes up.

10) Arguments regarding guilt and innocence

Plaintiff argues that it is purportedly the County's position that it may argue that Mr. Rivas was guilty to the Jury. The County has never taken that position and, in fact, took the *opposite* position in its moving brief. However, the County did observe that parties can certainly argue the issue of materiality both ways—*i.e.*, that the weight, nature, and quantity of circumstantial evidence of guilt was so strong (or so weak) that the omitted *Brady* information would not have (or would have) created a "reasonable probability of a different result" in the original criminal jury's verdict. That is just arguing a standard that the Jury is being instructed to determine—that is entirely proper. *C.f.*, *Nnodimele v. Derienzo,* No. 13CV3461ARRRLM, 2016 WL 3561708, at *11 (E.D.N.Y. June 27, 2016). (the "jury in this trial is entitled to understand the nature and quality of that inculpatory evidence [presented during the criminal trial] so it may properly assess the reasonably probable effect of the evidence allegedly withheld").

## I. The Relevance of the Pre-1993 Brady Practices

Plaintiff *entirely* misses the point of Section IV of the County's supplemental brief arguing that the County is purportedly attempting to secure a qualified immunity finding for Mr. Fitzpatrick (who is now a non-party to this case). That was obviously not the intent of the County's argument.

The County's actual argument begins with the well-settled proposition that the County is not liable under *Monell* for Mr. Fitzpatrick's conduct *unless* Plaintiff proves that he did, in fact, he did violate the constitution. For Plaintiff to establish Mr. Fitzpatrick violated the due process clause by withholding *Brady* material—*i.e.*, a civil *Brady* claim—Plaintiff must prove that Mr. Fitzpatrick's purported *Brady* omission was *intentional*. *See Fappiano v. City of New York*, 640

F. App'x 115, 118 (2d Cir. 2016) ("We have never held that anything less than an intentional *Brady* violation establishes a § 1983 due process claim for damages….). Thus, if Mr. Fitzpatrick's *subjective* intent is what is at issue at the time he made his decisions in 1993, then it must be based on his knowledge and view of his *Brady* obligations as the doctrine existed ***at that time***. Stated differently, if Mr. Fitzpatrick became aware only years after Mr. Rivas's conviction of some new, different, or evolved understanding of his *Brady* obligations, that later-developed caselaw would be irrelevant to determining his state of mind when he made the challenged disclosure decisions at the 1993 criminal trial. That is the simple point made in the County's supplemental brief. Plaintiff's rejoinder about qualified immunity completely misses the point.

Plaintiff also argues that this Court has already decisively addressed this issue in its summary judgment decision. *See Rivas*, 2025 WL 2675826, at *19 (the Court rejects Fitzpatrick's and the County's argument that Plaintiff is attempting to hold them 'to the present interpretations' … Defendants have not articulated any alternative standard with which they would have the Court evaluate Fitzpatrick's conduct….").  Respectfully, that is not our reading of this passage of the decision, which did not appear to be an assessment of the intentionality of Mr. Fitpatrick's *Brady* choices.

Plaintiff also argues that intent is not an element of a civil *Brady* claim citing to *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) and *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995). But these were <u>criminal</u> cases assessing violations of *Brady*, not for damages, but to determine the validity of criminal conviction. With <u>civil</u> *Brady* claims, intent is a required element of the burden of proof. *See Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) ("We have never held that anything less than an intentional *Brady* violation establishes a § 1983 due process claim for damages….); *Rivas*, 2025 WL 2675826, at *19 ("[t]he Second Circuit has

suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional").

Plaintiff nevertheless appears to contend that intentionality is established merely by proving that Fitzpatrick knew the underlying information existed and consciously did not disclose it—even if he genuinely believed it was exculpatory. This is obviously not what "intentional" means in this context, which is illustrated in the case law.

"Intent [to violate *Brady*] may be shown through circumstantial evidence [of the defendant's state of mind] that suggests the defendant intentionally withheld evidence." *Carmon v. City of New Haven*, No. 3:23-CV-00944 (JCH), 2025 WL 2680668, at *16 (D. Conn. Sept. 18, 2025). "Intentionality may [also] be deduced based on [defendants] deviating from what they described as typical practice." *Rosario v. City of New York*, No. 18 CIV. 4023 (LGS), 2021 WL 199342, at *7 (S.D.N.Y. Jan. 20, 2021). In *Jimenez v. City of New York,* the district court found that because "reasonable jurists disagreed," "that lack of consensus" regarding whether the withheld information was required to be disclosed under *Brady* created an inference that the non-production was *not willful or intentional." Jimenez v. City of New York*, No. 23 CIV. 06751 (NRB), 2025 WL 935233, at *18 (S.D.N.Y. Mar. 27, 2025) (emphasis added) ("lack of consensus clearly demonstrates that any alleged *Brady* violation was not so glaringly intentional or flagrant as would be required to satisfy the civil *Brady* standard"). This caselaw speaks to a specific intent standard that requires an intent to withhold knowledge of the obligation to disclose.

## CONCLUSION

For these reasons, as well as those set forth in the County's opening brief, the County respectfully requests that the Court hold that Plaintiff's remaining claims are time-barred. In the

alternative, the County respectfully requests that the Court hold that (i) Plaintiff must prove knowing fabrication, (ii) the criminal-trial record is admissible for the limited purposes of materiality, causation, and damages, and (iii) the 1993 *Brady* landscape is relevant to any claimed intentional civil *Brady* violation.

Dated: August 28, 2026
Syracuse, New York

Respectfully submitted,

**HANCOCK ESTABROOK, LLP**

By: [signature]

John G. Powers, Esq. (No. 508934)
Mary L. D'Agostino, Esq. (No. 520301)
Amanda C. Nardozza, Esq. (No. 704370)
100 Madison Street, Suite 1800
Syracuse, New York 13202
(315) 565-4500 (Office)
(315) 565-4700 (Facsimile)