UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

FLOR RIVAS, Executor of the Estate of Hector Rivas, also known as FLORA RIVAS, formerly known as SIDNEY MANES, administrator of the estate of Hector Rivas,

Plaintiff,

-against-

ONONDAGA COUNTY, CITY OF SYRACUSE, WILLIAM FITZPATRICK, DR. ERIK MITCHELL, and "JOHN DOES 1-10",

Defendants.

No. 19 Civ. 844 (BKS) (CBF)

# PLAINTIFF'S TRIAL BRIEF

Rickner Moskovitz LLP
14 Wall Street, Suite 4C
New York, New York 10005
(212) 300-6506

Scott A. Korenbaum, Esq.
14 Wall Street, Suite 4C
New York, New York 10005
(212) 587-0018

*Attorneys for Plaintiff Flora Rivas,*
*Executor of the Estate of Hector Rivas*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

BACKGROUND ........ 1

I. Jury Instructions on the Fabrication of Evidence Claim ........ 3

II. Jury Instructions on the Brady Claim ........ 5

A. The Brady Information ........ 6

B. Favorability and Materiality ........ 8

C. Requisite Mental State for Plaintiff's Monell Brady Claim ........ 11

III. Damages ........ 17

CONCLUSION ........ 18

# TABLE OF AUTHORITIES

## CASES

*Brady v. Maryland*, 373 U.S. 83 (1963) .......... passim

*Fraser v. City of New York*, 20-cv-04926, 2021 U.S. Dist. LEXIS 69324 (S.D.N.Y. Apr. 9, 2021) .......... 11, 15

*Goldberg v. Town of Rocky Hill*, 973 F.2d 70 (2d Cir. 1992) .......... 16

*Hudson v. New York City*, 271 F.3d 62 (2d Cir. 2001) .......... 12

*Jimenez v. City of N.Y.*, 190 F.4th 145, 2026 U.S. App. LEXIS 27423 (2d Cir. 2026) .......... 11, 12

*Nnodimele v. Derienzo*, 13-CV-3461, 2016 U.S. Dist. LEXIS 83357 (E.D.N.Y. June 27, 2016) .......... passim

*Owen v. City of Independence*, 445 U.S. 622 (1980) .......... 15, 16

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) .......... 5, 13

*Rivas v. Fischer*, 687 F.3d 514 (2d Cir. 2012) .......... 2, 9, 13

*Rivas v. Onondaga Cnty.*, 19 CV 844, 2025 U.S. Dist. LEXIS 183290 (N.D.N.Y. Sep. 18, 2025) .......... 16

*Spicer v. Roxbury Correctional Inst.*, 194 F.3d 547 (4th Cir. 1999) .......... 13

*Strickler v. Greene*, 527 U.S. 263 (1999) .......... 5, 13

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) .......... 13

*United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004) .......... 5

*Wepnner (Estate of Boyd) v. County of Erie*, 2025 U.S. Dist. LEXIS 215559 (W.D.N.Y. Nov. 2, 2025) .......... 14

Plaintiff Flora Rivas, as Executor of the Estate of Hector Rivas (Flora's uncle), submits this trial brief pursuant to the Court's Trial Order dated June 5, 2026 (Dkt. 200). Trial in this case is scheduled to commence on November 30, 2026.

## BACKGROUND

Hector Rivas was convicted in March 1993 of the 1987 murder of Valerie Hill. Onondaga County District Attorney William Fitzpatrick prosecuted the case. The evidence against Rivas was circumstantial. The time of death was a critical issue. Fitzpatrick, who tried the case against Rivas, contended that Ms. Hill was last seen alive on March 27, 1987; she was found dead on March 30 at approximately 1:00 p.m. In that window, the only day that Rivas did not have an alibi was March 27. Dr. Erik Mitchell was the Onondaga County Medical Examiner in 1987. He performed an autopsy of Ms. Hill that indicated the time of death was unknown. A note in the autopsy file states: "Appears as though [decedent] was there appx. 2–3 days" based on the fact that she was "[l]ast seen Friday by the father." However, a search warrant application says: "Dr. Mitchell's preliminary estimate on the time of Death of the Victim, Valeri[e] Hill was sometime saturday the 28th of March afternoon, and sunday morning the 29th of March 198[7]."

Rivas, who was Ms. Hill's ex-boyfriend, was detained and questioned the day Ms. Hill's body was found. Given his alibi and the time of death, he was released. Five years later, soon after Fitzpatrick was elected District Attorney, his office conducted a re-investigation of the murder. By then, Mitchell had come under scrutiny for sordid allegations of unscrupulous conduct. This included improperly disposing of body parts, stealing cadavers and body parts and using them as part of an unsanctioned "training

course," and other highly disreputable conduct that undercuts his scientific credibility. DA Fitzpatrick was aware of certain of these allegations, and there is strong evidence that he was aware of more than he now admits.

During the re-investigation, Mitchell told the District Attorney's Office that Ms. Hill could have died on March 27, the only date that Rivas did not have an alibi. Peter Tynan, DA Fitzpatrick's lead investigator, prepared a note after interviewing Mitchell that said Mitchell stated the "body ha[d] decomp, including brain (swiss cheese)," and "pushes [time of death] limits further out. (Good!!!)." There is no scientific support for Mitchell's claim that the brain slides showed decomposition that supports his opinion of March 27 as the possible time of death.

Mitchell testified in the grand jury and at trial that Ms. Hill could have died on March 27. Even though his testimony was critical, and thus, his scientific credibility was a key issue, DA Fitzpatrick did not disclose to Rivas' defense counsel information about Mitchell's professional improprieties. Had the jury heard this information, it would have good reason to discount Mitchell's credibility and disbelieve his time-of-death testimony.

In 2012, the Second Circuit held that Rivas had made "a credible and compelling showing of actual innocence." *Rivas v. Fischer*, 687 F.3d 514, 518 (2d Cir. 2012). In the course of that decision, the Second Circuit addressed the withheld *Brady* material and concluded, that "a reasonable juror would discredit Mitchell's testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony in the criminal trial." *Id.* at 546. In 2015, the Second Circuit granted Rivas habeas

relief on the grounds that he had received ineffective assistance of counsel. Tragically, Rivas died of cancer before he could be retried.

On September 18, 2025, this Court issued a Memorandum-Decision and Order (Dkt. 165) denying the County's motion to dismiss, granting Fitzpatrick's motion for summary judgment on the ground of absolute immunity, and granting in part and denying in part Mitchell's motion for summary judgment. The claims that remain for trial are an individual-capacity claim against Mitchell for fabrication of evidence, and *Monell* claims against the County based on Mitchell's fabrication of evidence and Fitzpatrick's withholding of *Brady* evidence.

## I. Jury Instructions on the Fabrication of Evidence Claim

"[A]n evidence fabrication claim has three essential elements: (1) that a defendant created false information; (2) that the defendant forwarded, or caused the information to be forwarded, to the prosecution; and (3) that the fabricated evidence was material, that is, that it would be likely to influence a jury's decision if a jury were to consider it." *Nnodimele v. Derienzo*, 13-CV-3461, 2016 U.S. Dist. LEXIS 83357, at *19 (E.D.N.Y. June 27, 2016). Here, the Court should instruct the jury that the only issue it needs to decide is whether Mitchell fabricated evidence regarding Ms. Hill's time of death because it will be undisputed that Mitchell supplied this information to the DA's Office and it was material.

Ms. Hill's time of death was material as a matter of law. That is how District Judge Allyne R. Ross charged the jury in *Nnodimele*. 2016 U.S. Dist. LEXIS 83357, at *19 ("[the parties'] only disagreement is whether the self-identification statements are material as a matter of law. This court holds that they are."). Judge Ross's reasons for taking that approach are the same reasons this Court should do so here.

> The materiality inquiry in the context of this fair trial claim is more abstract than its *Brady* counterpart because it concerns the general quality of the false information and its probable effect on a hypothetical jury. The materiality inquiry for *Brady* claims, by contrast, considers the probable effect on the actual criminal trial that took place, taking into account the totality of the evidence presented to the jury. In other words, because the evidence fabrication claim is not tethered to an actual criminal trial—and serves to compensate plaintiff for all harm occasioned by the fabrication—the analysis of materiality is absolute rather than relative. It is forward-looking rather than retrospective. . . . This court has no difficulty resolving this materiality question as a matter of law.

*Id.* at *20.

Here, it is undisputed that Mitchell's opinion that Valerie Hill could have died on March 27 was necessary to Fitzpatrick's decision to present the case to the grand jury. As the Court has already noted: "According to Fitzpatrick, '[h]ad Dr. Mitchell's opinion been inconsistent with [his] theory of the prosecution [he] would not have undertaken to present this matter to the grand jury when [he] had and under the circumstances then present.'" Dkt. 165 at 8 (citing Fitzpatrick's Affirmation, Dkt. No. 141-2, ¶ 19). The Court has recognized the singular importance of Mitchell's opinion that the murder could have occurred on March 27. *Id.* at 40 ("Fitzpatrick's overarching theory of the prosecution through the investigation and trial was that Hill must have died on the evening of March 27 or early in the morning of March 28."); *id.* at 41 ("[A]ll the circumstantial evidence, no matter how convincing, would have been essentially useless to the prosecution's theory without Mitchell's testimony that it was possible Hill died during the period for which Rivas had no alibi."). On this record, there is no reasonable dispute that Mitchell's time-of-death opinion was material.

To the extent Defendants argue to the contrary by pointing to evidence introduced at the criminal trial that is consistent with guilt, that argument must fail for the following reasons articulated by Judge Ross in *Nnodimele*:

> Defendants argue to the contrary, but the premise of their argument is flawed: they improperly focus on the potency of this evidence relative to "the vast amount of other evidence that can be fairly deemed incriminating" to suggest the possibility "that the criminal jury did not view the self-identification statements as being anywhere as significant as the identification of the plaintiff as the perpetrator of the robberies by his victims." This argument is compelling in the context of a *Brady* claim, where materiality is determined by reference to evidence adduced at the criminal trial, but it is inapposite in the context of an evidence fabrication claim, where the materiality standard is different. Accordingly, the proposed instructions explain to the jury that this element of the evidence fabrication claim is satisfied as a matter of law.

*Nnodimele*, 2016 U.S. Dist. LEXIS 83357, at *21-22. The same is true here.

Accordingly, the Court should instruct the jury that the materiality element of the evidence fabrication claim is satisfied as a matter of law, and that the only issue for the jury to resolve is whether Mitchell fabricated evidence of Ms. Hill's time of death.

## II. Jury Instructions on the *Brady* Claim

We begin by addressing legal issues concerning the proper jury instructions on Plaintiff's *Brady* claim. "'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)); *see also Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc).

The Court directed the parties to address several related issues during the October 16, 2026 conference. The first was whether the information that was withheld about Mitchell was *Brady* is an issue that should be decided as a matter of law. For the reasons explained in section B below, the Court should instruct the jury that the information was favorable and material. The other issue the Court directed the parties to brief concerned the mental state of a civil *Brady* claim. For the reasons explained in section C below, assuming there is an intent requirement in a civil *Brady* claim when the *Brady* violation was committed by the prosecutor, as opposed to a police officer, there is no factual dispute that DA Fitzpatrick withheld the information intentionally. He admits he did. The jury should be charged accordingly. Defendants' argument that the jury must decide whether DA Fitzpatrick acted in bad faith by knowingly violating clearly established law or acted with an intent to deprive Rivas of his constitutional rights are both incorrect statements of the law.

A. The Brady Information

At issue on Plaintiff's *Brady* claim is information about Mitchell's conduct prior to and contemporaneous with Rivas's 1993 trial. The Court summarized this *Brady* information as follows: "The specific allegations Plaintiff argues should have been disclosed are that Mitchell had: (1) directed the disposal of body parts and fluids by flushing them down the toilet, (2) taken cadavers and body parts without permission to bury them as part of an unsanctioned forensics training course, and (3) engaged in other highly disreputable conduct that dramatically undermines his regard for scientific and medical protocols." Dkt. 165 at 37 (cleaned up). The Court gave a fuller description of the most significant *Brady* materials as follows:

> A March 3 article detailed accusations of three ME office employees—including Dr. David Rigle and toxicologist William Sawyer—that Mitchell had undertaken "unethical and possibly illegal practices over the past five years." The allegations included, inter alia, that Mitchell had (1) exhibited "bizarre behavior" since 1987; (2) ordered employees to "dice up brains and other organs and flush them down the sink," instead of properly disposing of them; (3) improperly handled mercury and "other toxic chemicals," endangering county employees; and (4) "threw a scalpel at an employee" during an autopsy. According to the county health commissioner—who had met with the county executive concerning the allegations—Mitchell admitted some and denied others. The article further reported that at least two state agencies, the Department of Health and the Department of Environmental Conservation, were investigating Mitchell for some of this conduct.
>
> A second article, published days later, documented a press conference Mitchell held to rebut the accusations. It included a picture of Fitzpatrick standing next to Mitchell and stated that he had called Mitchell "a brilliant pathologist." During the press conference, the article recounted, Mitchell denied that he had flushed brains and other body parts, and that he had ever endangered anyone. In addition to the two state investigations, the article reported that the county attorney's office and ME office advisory board had also been investigating Mitchell.

Dkt. 165 at 9-10 (citations omitted) (citing Dkt. 151-14 and 151-15).

The press conference – where Mitchell denied that he had flushed brains and other body parts and declared, "I am not a mad scientist," Dkt. 151-15 – took place less than two weeks before Rivas' trial began. Fitzpatrick attended and spoke at that press conference. The record also includes a memo issued by the County Department of Law a week after the press conference concerning a team "designated" by the County Executive "to inquire into alleged improper conduct at the Medical Examiner's Office." Dkt. 151-10. The improper conduct, confirmed by the District Attorney's Office investigation, included (1) A photograph taken of a non-employee next to a corpse; (2) a photograph of Dr. Mitchell's now wife posing "playfully" in front of a corpse, (3) the DEC investigation into unsafe storage of toxic waste and improper disposal of body parts; (4) illegally retaining body parts, including whole

skeletons, for research by Dr. Mitchell and others, including the related DOH investigation; and (5) other conduct that calls into question the reliability of Dr. Mitchell's Medical Examiner's Office.

It should be noted that the *Brady* material does not just include the newspaper articles about the improper conduct, but also the conduct itself. The newspapers have information about what Dr. Mitchell was doing, but the true *Brady* material is the improper conduct itself.

B. Favorability and Materiality

The jury should be instructed that the undisclosed *Brady* information is favorable and material because there is no factual dispute for the jury to decide on these elements.

Beginning with favorability, there is no reasonable question that the *Brady* information is "evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *Rivas*, 377 F.3d at 199. This Court's decision on summary judgment explains:

> This [*Brady*] information could potentially have altered the jury's assessment of Mitchell's credibility. *See Rivas*, 377 F.3d at 199. That Mitchell had allegedly improperly disposed of body parts and allowed them to be used in an unapproved field exercise might very well have caused jurors to lose "faith" in his ability to properly handle deceased bodies generally, and by extension his ability to properly examine them. *Friedman*, 618 F.3d at 153. Similarly, the fact that Mitchell was accused of job-related misconduct—for which he was under investigation by two state agencies—would have led the jury to doubt whether he could be trusted to competently perform other parts of his job.

Dkt. 165 at 37-38 (footnote omitted).

This conclusion is consistent with the Second Circuit's assessment in its initial habeas decision in this case: "we think a reasonable juror would discredit Mitchell's

testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony in the criminal trial." *Rivas v. Fischer*, 687 F.3d 514, 546 (2d Cir. 2012). This Court cited that statement in its summary judgment decision, Dkt. 165 at 38, and pointed out that "**Fitzpatrick himself acknowledged in his deposition that if a jury learned that Mitchell 'was improperly storing body parts or improperly disposing of them,' it might believe that Mitchell was not 'performing other parts of his job adequately .'**" *Id.* at 38 n.32 (emphasis added).

Thus, there is no genuine dispute for the jury to resolve about the favorability of the *Brady* material. Accordingly, the Court should charge the jury that this information was favorable. Judge Ross took this approach in *Nnodimele* for similar reasons. *See* 2016 U.S. Dist. LEXIS 83357, at *24 ("this court agrees with plaintiff that the evidence at issue is favorable as a matter of law"); *id.* at *78 (charging the jury: "I instruct you as a matter of law that it was favorable to plaintiff").

Likewise, the Court should charge the jury that the *Brady* information is material. This Court has held that "the information concerning Mitchell's improprieties was material." Dkt. 165 at 40. The reasons for this conclusion lead to the same conclusion that the jury should be instructed that the *Brady* information is material:

> Fitzpatrick's overarching theory of the prosecution through the investigation and trial was that Hill must have died on the evening of March 27 or early in the morning of March 28. Notably, Fitzpatrick's expert states that, based on his review of the trial transcripts, Rivas was "indisputably alibied" for the remainder of the relevant period. This theory was reflected in Fitzpatrick's summation and he admitted that, if the evidence showed that Hill had in fact died later, he would have had "to overcome [that fact] somehow and account for [Rivas's] whereabouts." Thus, had a jury found

> Mitchell uncredible and disbelieved his testimony establishing that Hill could have been killed on March 27, it "would have undermined a critical element of the prosecution's case."
>
> Information concerning Mitchell's credibility would have been especially relevant considering other trial evidence suggesting that his three-day window of death estimation was a stretch. Mitchell himself acknowledged that Hill having died as early as March 27 was on the "outside edge of possibility." Additionally, he only raised the 62-degree apartment temperature and decomposition in Hill's brain—which he testified on re-direct examination was reflected in Kodachrome slides that he now admits "are not in themselves the definition of decomposition"—as relevant factors for the first time on cross-examination. Had it been made aware of the withheld evidence bearing on Mitchell's credibility, a jury might well have viewed these seemingly post-hoc rationalizations for the window of death estimation as particularly suspect.

Dkt. 165 at 40-41 (citations omitted).

The Court also disposed of Defendants' likely rejoinder (*viz.*, "there was considerable circumstantial evidence of Rivas's guilt and testimony from a witness who claimed to have overheard Rivas admit to the murder," *id.* at 41):

> [A]ll the circumstantial evidence, no matter how convincing, would have been essentially useless to the prosecution's theory without Mitchell's testimony that it was possible Hill died during the period for which Rivas had no alibi. The jury would then have been left with the testimony concerning Rivas's confession, pitted against the defense's evidence that a different person had confessed to murdering a woman on the same street where Hill lived. Although, under these circumstances, the Court cannot conclude that "the undisclosed evidence would have rendered the evidence as a whole insufficient to support a conviction," or that Rivas's acquittal would have been certain had the relevant evidence been disclosed, that is not required. Rather, in light of the entire record, the Court concludes that there is a reasonable probability that "the result of the proceeding would have been different."

*Id.* at 41-42 (citations omitted).

There is no reasonable dispute that the *Brady* information was material. Thus, the Court should charge the jury that the suppressed *Brady* information was material.[1]

C. Requisite Mental State for Plaintiff's *Monell Brady* Claim

We now turn to the question of what mental state, if any, is required to establish that the County is liable under *Monell* for the prosecutor's failure to turn over *Brady* information. As discussed at the last conference, the Second Circuit has left this question open:

> [T]he [district] court dismissed Jimenez's claim on the finding that he failed to plead an underlying constitutional violation adequate to support Monell liability. This ruling stemmed from the court's view that "the presence of a Brady violation, without a further showing of intent, is an insufficient 'constitutional tort' for *Monell* purposes."
>
> In support of that view, the court cited two of our cases: *Fappiano* and *Bellamy*. But neither of those cases in fact so held. In *Fappiano*, we took care to clarify that we have "never" addressed whether "anything less than an intentional *Brady* violation establishes a § 1983 due process claim for damages" and we expressly "decline[d] to do so." *Fappiano v. City of New York*, 640 Fed. App'x 115, 118 (2d Cir. 2016) (summary order). And in *Bellamy*, we again made clear that we have never "conclud[ed] . . . that a civil Brady claim requires a showing that the non-disclosure was intentional." *Bellamy v. City of New York*, 914 F.3d 727, 751 n.23 (2019). In treating the *mens rea* requirement applicable to civil *Brady* claims as a settled issue, the court misread our precedents.

*Jimenez v. City of N.Y.*, 190 F.4th 145, 2026 U.S. App. LEXIS 27423, at *59 (2d Cir. 2026). *Jimenez* ultimately reversed the district court's dismissal of the *Monell Brady* claim because

[1] While *Fraser v. City of New York*, 20-cv-04926, 2021 U.S. Dist. LEXIS 69324 (S.D.N.Y. Apr. 9, 2021) and *Nnodimele* declined to charge the jury that the *Brady* information was material as a matter of law, that is not because those courts did not think they could. Rather, the courts found the materiality question was reasonably disputed based on the importance of the suppressed evidence and the evidence presented in the criminal trial. Neither decision dictates that outcome here because neither involved *Brady* evidence that is as critical as in this case. *See* Dkt. 165 at 42 ("all the circumstantial evidence, no matter how convincing, would have been essentially useless to the prosecution's theory without Mitchell's testimony").

the allegations in the complaint, construed in the plaintiff's favor, were consistent with an intentional *Brady* violation. *Id.* at *59-61.[2]

This case is not controlled by cases where a *police officer* has withheld favorable evidence, which is the more common civil *Brady* claim. Unlike those cases, this case involves a *prosecutor* withholding *Brady* information. Courts have analyzed these two claims differently. Additionally, this case is not controlled by cases addressing individual § 1983 liability, because the *Brady* claim here arises only under *Monell*. As the Second Circuit noted in *Jimenez*: "An extensive body of case law governs the *mens rea* requirements applicable to such claims," *i.e., Monell* claims. *Jimenez*, 2026 U.S. App. LEXIS 27423, at *59.

In this case – where the *Brady* information was withheld by a prosecutor and the claim arises only under *Monell* – the jury should be charged that the relevant intent for the non-disclose of the *Brady* information is a general intent to not provide the information to the defendant and that it is not a specific intent to violate the accused's constitutional rights. This charge should be given as part of the Court's general instructions on the elements of a § 1983 claim. In charging the *Monell* claim, there should be no mention of intent. This conclusion is supported by well-established legal guideposts and is consistent with the way other district court judges have handled similar cases.

First, "[s]ection 1983 does not require any intent to violate constitutional rights." *Hudson v. New York City*, 271 F.3d 62, 68 (2d Cir. 2001).[3] "As a result, § 1983 plaintiffs need

---

[2] While not part of the body of the *Jimenez* decision, the Second Circuit's slip opinion includes this statement in the summary of its decision: "we find that the district . . . erred in holding that a *Brady* violation must be intentional to give rise to *Monell* liability." Slip Op. at 3, *available at* https://ww3.ca2.uscourts.gov/decisions/OPN/25-776_opn.pdf.

[3] *Hudson* held that the district court erred in giving the following jury instructions: "The plaintiff claims that the defendants . . . intentionally or with reckless disregard violated the plaintiff's

only demonstrate intent where the underlying constitutional deprivation, such as an equal protection violation under the Fourteenth Amendment, calls for it. And § 1983 does not itself import an intent standard into an underlying constitutional deprivation that lacks such a requirement." *Id.*

The due process right to receive favorable evidence known by the prosecution does not have an intent component. *See Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) ("a true *Brady* violation" requires proof that favorable evidence was "suppressed by the State, *either willfully or inadvertently*") (emphasis added) (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004), in turn quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Indeed, *Brady* itself held that the prosecution's failure to disclose favorable evidence violates due process "*irrespective of the good faith or bad faith of the prosecution.*" *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (emphasis added); *see also United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) ("Where the government's suppression of evidence amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant.") (citations omitted); *accord Spicer v. Roxbury Correctional Inst.*, 194 F.3d 547, 558-59 (4th Cir. 1999) ("[T]he *Brady* requirement applies regardless of the prosecutor's motives or good faith. . . . [W]here, as here, the prosecution has acted in good faith but simply misunderstood the scope of its *Brady* obligation, constitutional error has occurred if the exculpatory evidence at issue is material." (citations omitted)).

constitutional rights by unlawfully searching his apartment without a warrant"; and described § 1983 as providing redress "against any person who intentionally deprives a citizen" of a federally secured right. 271 F.3d at 68 (cleaned up).

Neither the Supreme Court nor the Second Circuit (nor any reported decision of a district court that we could find) has held that a civil *Brady* claim – based on a *prosecutor's* suppression of favorable evidence – requires a showing of bad faith or specific intent to violate *Brady*. In *Wepnner (Estate of Boyd) v. County of Erie*, No. 22-cv-00519 (W.D.N.Y.), District Judge Meredith A. Vacca concluded: "Contrary to the County's argument, Plaintiff does not need to prove that prosecutors intentionally suppressed favorable evidence—that requirement applies to § 1983 *Brady* claims against police officers, not prosecutors." 2025 U.S. Dist. LEXIS 215559, *126-27 (W.D.N.Y. Nov. 2, 2025) (citations omitted).

No sound reason exists to impute a subjective intent element in a civil *Brady* claim. Prosecutors are already given absolute immunity for such claims, as Fitzpatrick received here. Dkt. 165 at 20. Adding a subjective intent requirement to the *Brady* rule would undermine the prophylactic purpose of the rule, which is to ensure prosecutors turn over favorable evidence to an accused regardless of the prosecutor's own assessment of the evidence. A subjective intent requirement also would engender gamesmanship in post-conviction *Brady* challenges where prosecutors would be asked to justify, *post hoc*, why they withheld favorable evidence. This would significantly erode the *Brady* rule.

The few cases that have adopted a bad faith requirement for a civil *Brady* claim are unpersuasive because they address *Brady* violations by ***police officers***, not prosecutors. The two claims are analyzed differently, as Judge Ross noted in *Nnodimele*:

> Some courts require a plaintiff to show that the defendant acted in bad faith in order to prove a violation of that plaintiff's constitutional rights based on *Brady*. The rationale for this view is that the police officer's *Brady* obligation to the prosecutor is not identical, and should not be analyzed in the same manner as the prosecutor's *Brady* obligation to the defense.

*Nnodimele*, 2016 U.S. Dist. LEXIS 83357, at *13-14 (citations omitted); *see also Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 396 n.6 (4th Cir. 2014) ("[P]olice officers and prosecutors have different obligations with respect to the disclosure of exculpatory evidence. Under *Brady*, a prosecutor violates the Constitution whenever he fails to disclose material, exculpatory evidence, ***even if the nondisclosure was purely accidental.*** " (emphasis added)).[4]

Judge Ross noted that "[t]he Seventh and Ninth Circuits, while agreeing that mere negligence does not support a *Brady* claim, have declined to impose a bad faith requirement," *id.* at *14; and concluded that "this court joins the view adopted by the Seventh and Ninth Circuit," *id.* at *15-16. Accordingly, Judge Ross declined to charge the jury on bad faith and instead, determined that "an intent instruction is appropriate as part of the general language concerning deprivation of a constitutional right." *Id.* That intent instruction expressly *excluded* specific intent: "With regard to intent, it is not necessary to find that the defendants had any specific intent to deprive plaintiff of his constitutional rights in order to find in favor of the plaintiff." *Id.* at *74. That charge should be given here.

Second, because Fitzpatrick is not facing individual liability – that is, the only remaining *Brady* claim is a *Monell* claim – Fitzpatrick's good faith or bad faith is irrelevant. A "municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983." *Owen v. City of Independence*, 445 U.S. 622, 638 (1980). That is precisely what

[4] Even for police officer *Brady* violations, a specific intent or bad faith requirement is inconsistent with *Brady*. Those decisions, as Judge McMahon explained in *Fraser*, "effectively add[] an element to the traditional *Brady* analysis, which — in the criminal context — requires a State to disclose exculpatory evidence 'irrespective of the good faith or bad faith of the prosecution.'" *Fraser*, 2021 U.S. Dist. LEXIS 69324, at *12 (quoting *Brady*, 373 U.S. at 87).

the County wants to do here: contend that the *County* is not liable because *Fitzpatrick* acted in good faith. And the "good faith" that the County wants to argue is simply qualified immunity, which is unavailable to the County. *See Rivas v. Onondaga Cnty.*, 19 CV 844, 2025 U.S. Dist. LEXIS 183290 at *41 n.28 (N.D.N.Y. Sep. 18, 2025) ("As Plaintiff correctly notes, 'no immunity, either qualified or absolute, is available' to the County." (citing *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 74 (2d Cir. 1992)). We have found no case that allowed a municipal defendant to defend a *Monell Brady* claim by asserting the prosecutor's subjective belief about the law – a belief that was, incidentally, contrary to clearly established law, *see id.* at 36-37; Pl.'s Mot. *In Limine* at 4-5.

Adopting an intentionality requirement for a *Monell Brady* claim would defeat the purpose of the Supreme Court's conclusion that municipalities do not enjoy immunities available to individual officers under § 1983. Such a rule would defeat the plain language of Section 1983 to provide a damages remedy for "all" individuals harmed by State actors' constitutional violations. Even circuits that have required bad faith for police officer *Brady* claims have assumed that prosecutors are subject to *Brady*'s no-fault standard of care. *See Owens*, 767 F.3d at 396 & n.6 (summarizing case law).

In light of these principals, it would be error to adopt the County's position that the jury must consider whether Fitzpatrick acted in good faith or bad faith in failing to turn over the *Brady* information based on his subjective beliefs about what the law required. Instead, the Court should adopt the approach taken by Judge McMahon and Judge Ross and charge the jury that it must find only that Fitzpatrick intentionally withheld the *Brady* information, meaning he did so consciously, and that it does not need to find that Fitzpatrick had any

specific intent to deprive Rivas of his constitutional rights. The Court should also instruct the jury that Fitzpatrick's belief about what the law required him to disclose is irrelevant. The County's proposed approach would also invade the Court's province of deciding the law and will require the Court to advise the jury that Fitzpatrick's and the County's view of the law is wrong. *See* Dkt. 165 at 36 ("Fitzpatrick cites principally to New York state case law in support of his assertion that prosecutors' *Brady* and *Giglio* obligations have expanded over the years. But none of those state decisions support this assertion." (citations omitted)).

## III. Damages

Plaintiff has proposed jury instructions concerning the following damages suffered by Hector Rivas: (1) loss of liberty; (2) pain and suffering for the experience of being incarcerated; and (3) mental anguish, and any shock or discomfort that Mr. Rivas suffered because of the defendants' conduct. Pain and suffering can relate to physical pain and suffering or to emotional distress that results directly from, or as a natural consequence of, the alleged wrong. Ms. Rivas notes these categories of damages are typical in wrongful conviction cases. *See Nnodimele*, 2016 U.S. Dist. LEXIS 83357, at *85-86.

A nominal damages charge would be inappropriate.

> [T]his court cannot agree with defendants that a reasonable jury could find defendants liable but refuse to award compensatory damages entirely. *See Morse v. Fusto*, No. 07-CV-4793, 2013 U.S. Dist. LEXIS 123823, 2013 WL 4647603, at *22 (E.D.N.Y. Aug. 29, 2013), *aff'd*, 804 F.3d 538 (2d Cir. 2015) (finding no error in decision to remove nominal damages charge from jury instruction on evidence fabrication claim because the claim itself requires plaintiff to show deprivation of liberty caused by the evidence fabrication and therefore leaves no room for situation contemplated by nominal damages charge); *see also Kerman v. City of N.Y.*, 374 F.3d 93, 124 (2d Cir. 2004) ( "where the plaintiff was indisputably deprived of his liberty, and the conduct of the defendant responsible for the deprivation was found to be unlawful, we have held that the plaintiff is entitled to compensatory, not merely nominal,

> damages"). Accordingly, this court does not include a nominal damages charge in its proposed language.

*Nnodimele*, 2016 U.S. Dist. LEXIS 83357, at *28-29.

CONCLUSION

The Court should instruct the jury in accordance with the legal principles articulated above, as articulated in Plaintiff's proposed jury instructions.

Dated: New York, New York
November 4, 2026

Rob Rickner
Joshua Moskovitz
Rickner Moskovitz LLP
14 Wall Street, Suite 4C
New York, New York 10005
(212) 300-6506

Scott A. Korenbaum, Esq.
14 Wall Street, Suite 4C
New York, New York 10005
(212) 587-0018

*Attorneys for Plaintiff*