# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

---

SIDNEY MANES, administrator of the estate of HECTOR RIVAS,

Plaintiff,

v. Case No.:

ONONDAGA COUNTY, CITY OF SYRACUSE, 5:19-cv-00844-BKS-TWD

WILLIAM FITZPATRICK, DR. ERIK MITCHELL, AND "JOHN DOES 1-10",

Defendants.

---

DEPOSITION

---

WITNESS: PETER TYNAN

DATE: Wednesday, December 20, 2023

START TIME: 12:14 p.m., ET

END TIME: 1:21 p.m., ET

REMOTE LOCATION: Remote Legal platform

REPORTER: Zack Shoup, CER-15887

JOB NO.: 21976

A P P E A R A N C E S

RICKNER PLLC
14 Wall Street, Suite 1603
New York, New York 10005
By: ROBERT RICKNER, ESQUIRE
rob@ricknerpllc.com
Appearing for Plaintiff

LAW OFFICES OF ROBERT F. JULIAN
2037 Genesee Street, Suite 2
Utica, New York 13501
By: ROBERT JULIAN, ESQUIRE
Appearing for Defendants Mitchell and Fitzpatrick

THE LAW OFFICE OF MARK A. VENTRONE
214 North State Street
Syracuse, New York 13203
By: MARK VENTRONE, ESQUIRE
info@mventronelaw.com
Appearing for Defendant Onondaga County

INDEX OF TESTIMONY

EXAMINATION OF PETER TYNAN: PAGE
By Mr. Rickner 9

INDEX OF EXHIBITS

(available for download)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 35 | Mitchell Note | 26 |

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties that the presence of the Referee be waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved until the time of trial;

IT IS FURTHER STIPULATED AND AGREED that this deposition may be utilized for all purposes as provided by the Federal Rules of Civil Procedure;

AND FURTHER STIPULATED AND AGREED that all rights provided to all parties by the Federal Rules of Civil Procedure shall not be deemed waived and the appropriate sections of the Federal Rules of Civil Procedure shall be controlling with respect thereto.

FEDERAL REMOTE STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys of record for all parties to the above-entitled action, that:

Pursuant to Rule 30(b)(4) of the Federal Rules of Civil Procedure, this deposition will be conducted by remote videoconference with the oath being administered remotely and a court reporter creating an accurate written record; that, if necessary, the parties agree that each witness can be identified with picture identification;

No attorney, nor any party or witness, shall capture any still photographs, nor record, by video or audio, any part of these deposition proceedings;

Each attorney agrees to instruct their witness that there is to be no communication with anyone outside of the identified and participating group, by chat, text, email, or other means during the deposition;

There shall be no other person in the room with the witness during their deposition;

Any phone or electronic device in the room with a witness shall be identified and not read, referred to, or otherwise used during the witness' deposition, unless agreed to by all counsel on record.

P R O C E E D I N G S

THE REPORTER: Good afternoon. We are now on the record. Today's date is Wednesday, December 20th, 2023 and the time is approximately 12:14 p.m., Eastern Time.

My name is Zack Shoup and I'm the officer designated by Remote Legal, 11 Broadway, Suite 456, New York, New York, to take the record of this proceeding.

This is the deposition of Peter Tynan taken in the matter of Manes, versus Onondaga County, Case Number 5:19-cv-00844-BKS-TWD, filed in the United States District Court, Northern District of New York.

Would all Counsel please identify themselves for the record starting with the noticing attorney, and state who they represent?

MR. RICKNER: Hello. Rob Rickner, Rickner, PLLC. I represent the plaintiff. Good afternoon.

MR. JULIAN: Robert Julian. I represent Defendants Fitzpatrick and Mitchell.

MR. VENTRONE: Mark Ventrone for the County of Onondaga.

THE REPORTER: Thank you.

This deposition is being taken remotely on behalf of the plaintiff and is being conducted

pursuant to the procedural rules and laws of the state which governs this matter.

As such, all parties agree to this means of capturing the official record, which may include recording by audio and/or audiovisual means, and agree not to oppose admission of this proceeding on the basis of the personnel or method by which the testimony in this proceeding was captured.

Do all parties so stipulate?

MR. RICKNER: Plaintiff so stipulates.

MR. JULIAN: Yes.

MR. VENTRONE: Yes. Defense does.

THE REPORTER: Thank you.

And I will now swear in the witness.

Mr. Tynan, could you please state and spell your full name for the record?

MR. TYNAN: Sure. Peter D. Tynan, T-Y-N-A-N.

THE REPORTER: Sorry. Hold on a moment. Did you spell your name?

MR. TYNAN: Yes. T-Y-N-A-N.

THE REPORTER: Thank you. Could you please raise your right hand?

Do you swear or affirm that the testimony you shall give today in this proceeding will be the

truth, the whole truth, and nothing but the truth?

MR. TYNAN: I do.

WHEREUPON,

P E T E R T Y N A N,

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE REPORTER: Thank you. You may put your hand down.

The witness has been sworn and Counsel, you may begin.

EXAMINATION

BY MR. RICKNER:

Q What is your current rank or what rank did you retire on, Mr. Tynan?

A Sergeant of detectives.

Q Okay. I guess I'll try to call you Sergeant Tynan, but if I don't, my apologies.

A Call me Peter or Tynan -- whatever. That's fine.

Q Excellent. I do try to be a bit formal, just for the record, but -- have you ever had your deposition taken before?

A Yes.

Q How many times?

A Like, testify in court and depositions and

everything, or?
Q No. No. I actually mean just a deposition, like a civil matter. Effectively, what we're doing today.
A Just a few times.
Q Okay. Were any of those with respect to your work as a law enforcement officer?
A I believe so. Yes.
Q Okay. And you may remember these ground rules from your prior deposition, or you may have been instructed by Mr. Julian. But this is just to make sure that we get the best transcript possible.
So the first, and you're doing a great job of this -- I ask these long, rambling questions. You may know exactly where I'm going, but please wait until I finish my question before jumping in with an answer. Can you do that for me?
A Sure.
Q Great. You're doing a good job of answering verbally, but even though we're on camera, you can't do nods of the head or hand gestures. You need to actually say verbally what your response is so the court reporter can take it down. Can you do that for me?
A Yes, sir.
Q If you ask a -- if -- withdrawn.

If you answer a question, I'm going to assume you understood it. So please, if anything I say confuses you, tell me and I'll rephrase. Can you do that for me?

A Yes, sir.

Q You've taken an oath, and even though you're sitting in a conference room, it's the same rules as though you're in court, meaning you have to tell the truth, the whole truth, and nothing but the truth. Can you do that for me?

A Yes, sir.

Q You may want to take a break, and that's absolutely fine. Just understand that if you take a break, you have to answer the pending question first. Do you understand?

A Yes, sir.

Q You will be given the chance, if you so choose, to review the transcript and make any corrections. However, please note that if you do make any changes to the transcript, I can comment on it at trial. Do you understand?

A Sure. Yes, sir.

Q Don't be offended by this question. We ask everyone. Do you have any medical reason why you couldn't give full and complete testimony besides the

ordinary passage of time?

A Do I have any reason -- what? What'd you say?

Q Is there any medical reason why you couldn't give full and complete testimony today, like you hit your head?

A No.

Q Okay. I had a client -- I had a witness once who hit his head, and he said, "You know what? I don't remember anything at the end of the --" so I got to check.

Are you represented today?

A Yes, sir.

Q Okay. Who is your attorney?

A Are you my attorney? No. I'm not represented. I'm just here because I was asked by Mr. Julian to be here. I'm not represented yet.

Q Okay. Yeah. No. Understood. That's just what I wanted to clear up. Now, did you do anything to prepare for this deposition?

A Yes, sir.

Q What did you do to prepare?

A I met with Mr. Julian yesterday.

Q Okay. How long did you meet?

A Half hour, hour, yesterday in his office.

Q Okay. Did you review any documents?

A Yes, sir.
Q What documents did you review?
A Some exhibits from July and November in regards to this matter.
Q Okay. And did you learn anything about the case from Mr. Julian?
A Just that apparently the -- some relatives of Hector Rivas were bringing action against the county for -- for something to do with the case or the prosecution or something.
Q And prior to that conversation with Mr. Julian, did you know anything about this pending lawsuit?
A I think I heard about it. I heard that -- that Rivas died in prison, and at some point, I think I heard about this, but that's all -- that's about it.
Q Did you hear that his conviction had been overturned?
A I think -- I think I heard that -- I may have, because I know that when somebody gets convicted, I think when they're in prison and if there's still a -- some kind of an appeal or something, a lot of times it just gets dismissed or something. That's all I know.
Q Understood. Now, I just want to go a little bit through your background. When did -- where did you

start your career in law enforcement?
A Syracuse Police Department.
Q And how many years were you with the Syracuse Police Department?
A 20 years.
Q And did you have any particular -- well, withdrawn.
What year did you start?
A 1972.
Q Would it be correct to say then that you stopped in 1992?
A Actually, I think it was January, February 1993, but yes. Just a few months past that 20-year mark.
Q Okay. When you were at the Syracuse Police Department, I assume you started as a patrol officer or something like that, but after that period as a patrol officer, did you have any particular station or role?
A Yes. Most -- almost entirety of my career was in criminal investigation division, or CID, as we call it.
Q Now, does the CID cover robberies, murders, or is homicide separated?
A It's not separated. It's any major crime. Yes.

Q Okay. And so that would include homicides?
A Yes, sir.
Q Okay. During your time as a homicide -- well, withdrawn.
During your time at the CID, did you have any interactions with Erik Mitchell?
A Yes, sir.
Q How often do you think that you interacted with Erik Mitchell?
A While he was the medical examiner, at least once a month, I would say, at least.
Q Okay. And what types of -- withdrawn.
As you sit here today, are you aware that there have been, you know, certain allegations about Erik Mitchell improperly disposing body parts, mismanaging his office, and things of that nature?
A Yes, sir.
Q When do you think you first became aware of those types of allegations?
A Well, I think it was summer of '90 -- '92 or '93.
Q Would this have been when you were working at the DA's office?
A At that time, I was at the DA's office. Yes, sir.

Q Okay. And did you move smoothly between the Syracuse Police Department and the DA's office?
A I didn't understand you.
Q That wasn't a very good question. Thank you. What I'm asking is that -- did you go straight from the Syracuse Police Department to the DA's office?
A I did.
Q And was there a particular reason that you went to the DA's office?
A Yes, sir.
Q What was that reason?
A I was -- I was offered the position of chief investigator.
Q Were you offered that position by William Fitzpatrick, the DA?
A Yes, sir.
Q Had you known him prior to that?
A Yes, sir.
Q And did you work on investigations together?
A Yes, sir.
Q Now, going back to your time working at CID, did you have any particular impressions of Erik Mitchell during that time period?
A Yes, sir.
Q And what was your impression of Erik Mitchell?

A Well, I thought he was brilliant. He was a very likable guy. He is -- he had a good sense of humor. He was a little quirky, but as far as his -- I consider his expertise in his position, and he was very helpful, and he would always help you out no matter -- no matter what. Yes.

Q Understood. When you say "help you out," what do you mean?

A Well, I was a -- I used to be an instructor at the police academy. I used to teach death investigations, and I would discuss that with him. And you know, he would -- sometimes he would give me a couple of slides to show in class and discuss some of the death investigations with me, like a lot of -- any unattended death. That's why.

Q And an unattended death means that you weren't aware of somebody being present at the time that they died?

A Right. And we were unsure of -- anything other than a natural death, you know, could it be accidental, suicide, homicide, so forth.

Q Did you have any role in investigating the Nanette Gordon case?

A No, sir. But I'm aware of it. Yes.

Q Okay. And did you have any role in

investigating the death of Valerie Hill?
A Yes, sir.
Q Okay. And I want to talk about the first investigation. That would have been in, what, 1986, 1987?
A Yeah. I think it was 1987, but I'm not sure.
Q And what was your role in the investigation of the death of Valerie Hill in 1987?
A Not completely sure, but I remember that I was at the -- at the actual scene the day her body was discovered. I believe at that time also, I was sergeant of detectives, and I may have -- I think I might have directed some of the investigators in their roles that day. After that, you know, we -- lengthy follow up following wherever the investigation would take us.
Q Understood. And at any point while you were at the scene where Valerie Hill died, did Erik Mitchell show up?
A I -- I -- somebody from the medical examiner's office would have shown up. Whether it was him or not, I'm not certain.
Q Okay. Do you know how long that was after the body was found?
A No, sir.
Q During the course of the investigation of the

Valerie Hill murder, were there any suspects?

A Certainly anytime a woman is killed in this manner, certainly statistically and intuitively, you have to consider that it was a boyfriend or an ex-boyfriend. Yes. So I would say Hector Rivas was certainly somebody that we were -- we were looking at. Yes.

Q Okay.

A I know that --

Q Now --

A -- he is a suspect.

Q Right. Were there any other suspects?

A No, sir.

Q You remember that Hector Rivas was not prosecuted until sometime after 1987; is that fair to say?

A Yes, sir.

Q Okay. Do you know why Hector Rivas was not prosecuted in 1987 or 1988?

A My opinion?

Q Yes.

A In my opinion, there was enough to arrest him based on our police investigation. The district attorney's office at the time did not want him arrested and forced prosecution because they felt that there

might not be -- at that time, there might not be enough evidence, or you know, totality of the evidence to convict him. And that was the -- that was the main point that -- not that there wasn't enough to arrest him. There wasn't enough to convict him.

Q Right. Now, did Hector Rivas have, I guess what you would call an alibi?

A At some point, I remember that he presented to us that he was drinking at a bar on the west end, and I also remember that he had a Polaroid photo of him with some other people at this bar.

Q Okay. At any point during the investigation, did Dr. Mitchell make a determination as to when he thought Valerie Hill died with respect to the day that her body was found?

A It's -- I -- could you -- could you repeat that?

Q Yeah. Absolutely. Obviously, Valerie Hill died before you found the body, right?

A I'd say that's accurate.

Q And there is some question as to how long before her body was found she died, right?

A Yes, sir.

Q Okay. In the initial investigation in 1987, did Erik Mitchell ever express to you any conclusions

about when she may have died with respect to when her body was found?
A As I recall, he said that she died at least two days before her body was found.
Q Now, was the fact that Hector Rivas had a potential alibi for some of the days prior to when her body was found a factor in determining that he couldn't be prosecuted successfully for that murder?
A No. Not in -- not in my opinion. No.
Q Now, at any point -- withdrawn.
So, after you were recruited to the district attorney's office by DA Fitzpatrick, were you instructed to look through cold cases to try to get convictions?
A Yes. We -- we discussed cold cases. Yes, sir.
Q I'm asking a slightly different question. Did DA Fitzpatrick ask you to go look at some cold cases to see if they could possibly be prosecuted?
A Well, he didn't have to tell me to look. I'm the one that worked on the cold cases, so yes. I was very aware of them.
Q Okay, I guess, then, I should reframe my question. When you say you worked on cold cases, was that a particular assignment that you were provided at the district attorney's office?

A No. Cold cases become cold cases when somebody -- the investigation kind of stops or is suspended because it -- and then it becomes cold. But I worked on the homicides from the day they happened, and so anytime after that, some period of time after that, I guess you could call it a cold case. But for almost 20 years, I worked almost every single homicide that happened in Syracuse.
Q Understood. So when you say when you were working on cold cases, you mean these were your own cases and they had gone cold?
A Yes, sir.
Q That is said --
A And not only my cases, but if I didn't work on the case and I was aware of the case. Yes.
Q Okay. So when you went to the district attorney's office, would it be correct to say that you, at least in your mind, had a list of cold cases that you're interested in reinvestigating?
A Yes, sir.
Q Did you discuss that with DA Fitzpatrick?
A Yes.
Q Okay. As a result of that discussion, did you bring DA Fitzpatrick some cold cases that you thought maybe could be prosecuted?

A We discussed them. Yes, sir.

Q Okay. But what I'm asking is that did you literally show up to DA Fitzpatrick's office with one or more cases and say, "These are cold cases that I think we need to reinvestigate and look into"?

A Well, that's not exactly how it happened. We would discuss the case. We -- we would discuss cases, then whatever -- whatever case that we might have settled on, he said, "Well, why don't you start putting some of the reports together?" And that's how it would start.

Q Okay. Well, I'm going to represent to you that DA Fitzpatrick testified that you brought the Hector Rivas case to him as a case that needed to be reinvestigated. Is that comport with your memory?

A Yes. It's just what we just discussed. We discussed cold cases, and this was one of them, and once he agreed to take a look at it, then I started getting the reports together, and then after the reports, maybe any affidavits were around or maybe go to the evidence room to make sure all the evidence was there and available, you know, et cetera.

Q Understood. Did DA Fitzpatrick work on the Valerie Hill case at the district attorney's office when the crime first occurred?

A I'm pretty sure Bill Fitzpatrick wasn't even in the DA's office at the time. He --

Q So prior to -- I'm sorry. Please continue.

A He might have been there from, I think, '88 to '92, at least. Yeah.

Q With respect to the Valerie Hill murder, do you remember who first brought that case up in discussing reinvesting it?

A Yeah. It would have been me. Yes.

Q What about the Valerie Hill case made you think, "You know, this is one we need to reinvestigate"?

A I -- could you repeat the question? Because I'm trying to understand it.

Q Fair enough. Was there a particular reason that the Valerie Hill murder came to your mind as a cold case that needed to be looked into further?

A Yes.

Q What was it?

A Well, it was a case where, you know, a woman was murdered savagely and he was a suspect and our investigation showed that, you know, in all probability he did it and there was probably enough for an arrest. And sometimes the, you know, the prior district attorney didn't feel there was enough for conviction. That's why we wanted Bill Fitzpatrick to look at it, because he's a

different kind of prosecutor.

Q What do you mean by, "he's a different kind of prosecutor"?

A Well, he -- he prosecuted several cases that I'm aware of, that -- and I was with him -- that previous district attorneys did not feel there was enough to prosecute, and he took the reins on the cases and he followed them through.

Q Was there any additional evidence that you felt needed to be developed in order to successfully prosecute Hector Rivas as part of this reinvestigation?

A Not that I -- not that I can pinpoint right now. No.

Q During your reinvestigation, did you ever have any discussions with Erik Mitchell?

A All right. Can you ask that again then, please?

Q Okay. I want to make sure I get this correct. So at some point you begin reinvestigating the Valerie Hill murder and Hector Rivas as a suspect, right?

A Yes, sir.

Q About when was that?

A I'd say 1992, probably.

Q As part of that reinvestigation, did you talk to Erik Mitchell?

A I don't believe so. No.
Q As part of that reinvestigation, do you know if William Fitzpatrick spoke with Erik Mitchell?
A I don't know. I think Erik Mitchell at some point was gone from the -- from the ME's office. That might -- I think that was '93, though, so. I'm sure that -- I'm sure that somebody must have talked to Erik Mitchell. Yes.
Q I'm going to share an exhibit.
THE REPORTER: Mr. Rickner, would you like this one marked?
MR. RICKNER: Yes. Absolutely. What is it? 35?
THE REPORTER: Believe we're on to 35.
(Exhibit 35 marked for identification.)
BY MR. RICKNER:
Q All right. Now, this is a note. It's Bates-stamped, I guess, 008955 in red on the bottom left. First, Sergeant, is this your handwriting?
A We can't see the exhibit.
Q Really?
MR. JULIAN: We can see the top part of it.
MR. RICKNER: Okay. Let's see if this works.

MR. JULIAN: Yep.
BY MR. RICKNER:
Q Can you see the whole note now?
A Yes, sir.
Q Is this your handwriting?
A It looks like it is.
Q Okay. Is that your sort of first name signature, "Peter," at the bottom?
A I can't see it.
MR. JULIAN: Yeah. We still don't have the whole exhibit.
MR. RICKNER: How's this?
MR. JULIAN: We've got a parenthesis of "(Good)" but we still don't have any -- if there's anything below that.
MR. RICKNER: There is. You know what? I'm going to close this down and just have -- I was hoping that just because it was such a big exhibit, we might be able to do this on the screen. Let me have Ms. Herb (phonetic) handle this one, if we can get you a hard copy. Okay?
THE WITNESS: Okay.
MR. RICKNER: I'm also going to -- I'm just going to go off the record for two seconds and actually call her just to make sure --

THE REPORTER: I was going to ask, if we're trying to work out an exhibit thing, should we go off the record? I'll take us off.

MR. RICKNER: Yes, please. Thank you.

THE REPORTER: 12:43 p.m., Eastern Time. We're going off the record.

(Off the record.)

THE REPORTER: 12:47 p.m., Eastern Time. We are back on the record.

MR. RICKNER: Thank you.

BY MR. RICKNER:

Q Now, looking at this Exhibit 35, a copy of which you now have in hard copy in front of you, at the bottom, do you see the word "Peter"?

A Yes.

Q Is that your handwriting?

A I would say yes.

Q Okay. And just going up a little bit, there's an acronym "TOD." Does that mean time of death?

A I would say yes.

Q Okay. And does seeing this note refresh your recollection as to whether or not you spoke with Dr. Mitchell as part of the reinvestigation?

A I don't know how I -- where this information come from. I don't remember talking to him, but I may

have. I'm not saying I didn't, I mean.

Q Understood. I would say this. Based on your own practices as an investigator, does this note represent the kind of note that you would make following a conversation with a witness?

A No. Actually, I'd write a report on it, some kind of a memo or report so it can go in the file.

Q Well, looking at this note, do you believe that the information reflected in it came from a conversation with Dr. Mitchell?

(Pause.)

I'm sorry. Did I get a -- maybe the answer was clipped.

A Maybe the way you -- I don't know. Can you answer -- ask it again, please?

Q Yeah. Absolutely. I'm just saying is, do you believe that the information on this note came from Dr. Mitchell?

A I'm not certain. I could -- it could have. It says -- it says, "Regarding Dr. Mitchell." Does that mean -- it's about Dr. Mitchell, but I -- it could have come from Dr. Mitchell, could have come from somebody else in the ME's office, or -- I mean it says -- you know, the information sounds like it did come right from the medical examiner's office. And I didn't -- I

don't -- there's no date on the note either. I have no idea when this was.

Q Understood. Now, do you remember the time of death being an issue with respect to prosecuting Hector Rivas?

A The -- the issue of the time of death came up. Yes, sir.

Q Okay. And would it be correct to say that to successfully prosecute him, the time of death had to be before the period of time where Hector Rivas claimed to have an alibi?

A No. The -- as I recall, our investigation showed that she had talked to somebody on the phone on Friday and that she wasn't heard from since. So in my mind, the time of death could have been anytime after she wasn't heard from or -- seen or heard from.

Q Right. Would it be correct to say that Hector Rivas claimed to have an alibi for Saturday and Sunday?

A I don't remember about Sunday, but I do remember him saying -- it was something about being at the Coleman's bar up on the west end, and he had a picture of him with some of his friends. That, I do remember.

Q The note, "Pushes time of death limits further out," parentheses, "(Good.)" What do you understand

that to mean?

A Okay. Repeat the question. I just looked at the note again. Repeat the question, please.

Q The line, "Pushes time of death limits further out," parentheses, "(Good!!!)" exclamation points, what does that mean?

A It means whatever the limits of time of death would be further out, which could -- in my mind, it means that any time to when she last talked to somebody. It pushes that time of death limit out.

Q Right. And by "Good," that means that is stronger evidence against Hector Rivas, right?

A I would -- I would interpret it that way, too.

Q So by Erik Mitchell pushing the time of death further out, it makes the case against Hector Rivas stronger; is that right?

MR. JULIAN: Form.

MR. VENTRONE: Yeah. I'll object to the form.

MR. RICKNER: You can answer.

THE WITNESS: I can answer -- what? What Dr. Mitchell said? Can you repeat the -- I don't understand the question how you're asking it, sir. I'm sorry.

MR. RICKNER: No. That's fine. I want

you to -- if you're confused, I want you to tell me. What I'm saying is --

THE WITNESS: Well, I'm not -- I just don't understand the question.

BY MR. RICKNER:

Q Would it be correct to say that if Dr. Mitchell was able to push the time of death out, it would make the case against Hector Rivas stronger?

MR. JULIAN: Objection.

THE WITNESS: Dr. Mitchell could only push the time of death out to the time that we knew she was alive.

BY MR. RICKNER:

Q Right. Yes. And by pushing it closer to Friday, the time she had last spoken to somebody, did that make the case against Hector Rivas stronger?

MR. JULIAN: Object to the form.

THE WITNESS: (Whispering.)

MR. RICKNER: You can answer, by the way, even if there's an objection.

THE WITNESS: Okay. I didn't know that. Well, you keep saying if he pushed it out, and I keep saying that he can only push it out to the time that we knew she was alive. And that's as far as you can push it. If there was a -- if there was an issue of the time

of death -- and I know there was controversy about something that -- was it -- was it two days or three days? But it was at least -- he said it was at least two days, that I recall.

BY MR. RICKNER:

Q Right. And by pushing it back three days to Friday or the morning of Saturday, that makes the case against Hector Rivas stronger; is that right?

MR. VENTRONE: Object to the form.

MR. JULIAN: Objection.

THE WITNESS: That -- it -- it made it -- it made it more probable in my mind, based on what -- nobody heard from or saw this woman again, after Friday.

BY MR. RICKNER:

Q And it also pushed the time of death to a point where Hector Rivas did not have this alibi in the bar; is that right?

MR. JULIAN: Object as to form.

THE WITNESS: I don't -- the -- the alibi that he presented, I think, was for Saturday night. I don't know if -- I don't recall right now what his alibi for Friday was or -- or Sunday.

BY MR. RICKNER:

Q Well, I don't believe he had an alibi for Friday. So if he didn't have an alibi for Friday,

putting the time of death to Friday makes the case against him stronger, right?

A I would say so.

MR. JULIAN: Objection.

MR. VENTRONE: Object to the form.

BY MR. RICKNER:

Q Now -- I'm going to take this down. I'm going to try to take -- oh. Sorry. I didn't realize it's only on my screen for reference.

Do you recognize the name Susan Stonecipher?

A I know the name Stonecipher. I don't remember Susan Stonecipher. Can you expand on --

Q Sure. I -- yeah. Susan Stonecipher initially stated, I'm just going to represent this to you, that she saw Ms. Hill on Saturday. Does that refresh your recollection?

A No.

Q With respect to the reinvestigation, did you do -- well, I skipped over a step. My apologies.

As part of the reinvestigation, did you re-interview witnesses?

A I'm sure we did.

Q And did you conduct those interviews yourself or were you assisted by other officers or detectives?

A Either -- could have been either or both.

Q Okay. As you sit here today, do you remember?
A Do I remember talking to witnesses or talking to -- I -- I -- once again, I don't understand your question.
Q What I'm asking is do you remember if you were the one who handled the investigation entirely yourself or if you were -- reinvestigation -- or if you were assisted by other people?
A I'm sure I was assisted by other people.
Q Now, prior to the indictment, did you discuss the results of your reinvestigation with DA Fitzpatrick?
A Of course. Yes.
Q Did you have a meeting at one point where you, DA Fitzpatrick, and possibly others sat down and discussed the evidence that you had against Hector Rivas?
A Sure. Yes, sir.
Q And do you remember what DA Fitzpatrick said with respect to the evidence against Hector Rivas when you sat down to review it?
A No. We -- we -- as I recall, and we -- well, what our normal procedure on something like this is we set up a little bit of a war room, like we call it, and it's maybe a designated spot at the DA's office where we could more control our files and paperwork. And if we

had evidence from the police department there, it had to be in a secure location, and so on and so forth.

So -- and I don't know. I can't remember if -- and it's another, again, I don't know if it happened in this case, but it's normal for the police department to then assign a detective to the DA's office to assist with the investigation. Also, it was normal for the DA's office to assign a prosecutor to the case too, which might not just have been Bill Fitzpatrick. Could have been another prosecutor.

Q As part of this re investigation, do you remember Erik Mitchell reviewing some slides?

A I don't remember, but it's -- once again, it's possible.

Q Do you remember Erik Mitchell coming to any new conclusions with respect to Valerie Hill's murder during the reinvestigation phase?

A Could you -- could you ask the question again so --

Q Sure. During the reinvestigation phase, 1992, do you remember Erik Mitchell coming to any new conclusions?

A No. I remember that -- that -- like I said before, that he said that she was dead at least two days and we knew that -- that she was -- she was -- she

wasn't seen after Friday. That would make it three days. So, do I remember Erik Mitchell saying change of something? Not particularly. No.
Q Do you remember Erik Mitchell saying that he now had more evidence that it was more likely to be three days rather than two days?
A No.
MR. VENTRONE: Object to the form.
MR. RICKNER: You can answer.
THE WITNESS: I did. I said no, sir. I don't.
BY MR. RICKNER:
Q How long do you think this reinvestigation took overall?
A How long did it last? It's -- it's hard to hear you.
Q Oh. I'm sorry. And you may be able to turn up the volume on the TV, by the way. I don't know if you have a remote or something. I mean, I can shout louder.
A I'm just saying that -- I think that the volume is good. I think when you turn away from your mic or something, it's muffled. That was muffled or something.
Q Oh. I'm sorry. Thank you. It's okay. Now I

can't remember.
How long did the reinvestigation into the Valerie Hill murder take?
A I don't remember. But I can tell you that from the time we started looking into it would have ended probably the time he was indicted.
Q So it could have been several months?
A I'm sure -- I'm pretty sure it was several months. Yes.
Q Now, are you still with the DA's office?
A I am not. I'm retired.
Q Congratulations. When did you retire?
A From the DA's office?
Q Yes.
A From the DA's office?
Q Yes.
A You're nodding. You got to say --
Q I said yes.
A Okay. I retired from the DA's office. I believe it was 1999, November.
Q Now, you may know from the news or somewhere else that, you know, Hector Rivas's conviction was overturned and they started investigating it a third time. Did you have any part of that third investigation?

A No, sir.
Q Between, let's say, 1999 and today, did anybody ever come and talk to you about the Valerie Hill murder or the Hector Rivas criminal case and conviction?
A Not that I remember. No.
Q When was the last time you spoke with William Fitzpatrick?
A I think -- I think it was about two weeks ago from today.
Q What'd you discuss?
A He asked me to give Bob Julian a call regarding this case.
Q Did you discuss the case?
A No.
Q Prior to that conversation, had you ever had any conversations with -- well, withdrawn.
From, let's say, the time that Hector Rivas was convicted until the present day, is that the only conversation you've had with DA Fitzpatrick that relates to Hector Rivas or this case or the Valerie Hill murder?
A So, we're talking how many years? No. I have no idea at all. Nothing that I recall, so.
Q Okay. Do you have any reason to believe that you would have, at any time after your retirement, discussed this case, the Valerie Hill murder or the

Hector Rivas prosecution and conviction with William Fitzpatrick?

A Not that I recall. No.

Q When was the last time you spoke with Erik Mitchell, if you remember?

A Erik Mitchell? I can't remember. It was a long time ago, probably, you know, like 15, 20 years ago.

Q Okay. Now, at some point, the DA's office and William Fitzpatrick started investigating Erik Mitchell; is that right?

A Yes, sir.

Q Were you part of that investigation?

A I was.

Q Okay. When did you first begin that investigation?

A I think it was the summer of '93.

Q And what sparked that investigation?

A I think that somebody made a complaint to the DA's office about an autopsy, an improper autopsy or something.

Q Do you know when that complaint was made?

A Do I know when the complaint was made? No. I don't.

Q As of the result of that investigation, did

you uncover any conduct that could be illegal with respect to Dr. Mitchell?

A Yes, sir.

MR. JULIAN: Object to the form.

BY MR. RICKNER:

Q What was that?

MR. JULIAN: Form.

THE WITNESS: What was -- what was the illegal activity?

MR. RICKNER: Yes.

THE WITNESS: Well, I can describe some things, and whether they're illegally -- illegal by the penal law or improper or not procedural, I'll just describe them that way. Okay?

BY MR. RICKNER:

Q Yeah. Please. During your investigation, what did you uncover about Dr. Mitchell?

A Well, there was a complaint that -- we found that -- we heard -- I guess I heard from some people working there that they had flushed some body parts down the drain in the -- the ME's office, and I think the Department of Environmental Conservation was called in.

We heard that he had maybe seized some body parts, for research or whatever, without the express permission of family.

We heard that he sponsored or conducted some -- some -- they were like a teaching exercise where animals were bought and then buried, you know, for research. And then his office also either sponsored or had something to do with another exercise on a farm, not in this county, but that maybe some body parts from the ME's office were used in that exercise.

We -- we had a complaint that a female member of the ME's office was staging some photos over dead bodies and had a complaint about that.

We had a complaint about somebody who was not a member of the ME's office actually partaking in actual parts of a -- of a legitimate autopsy, that somebody -- that some body parts, particularly like a skull or a spine, were -- were used by the ME's office for display or research or teaching or whatever, but these particular body parts were not supposed to be there. They were supposed to be returned to a grave or returned to a funeral home or return to a whatever, but -- or he didn't have permission to have them at all.

Yes. I think that that about does it.

Q And based on your investigation, did you find that these allegations were credible?

A In my opinion, yes.

Q Now, did DA Fitzpatrick ever attempt to

prosecute Erik Mitchell based on these allegations?
A Did he attempt to prosecute him? I -- you mean -- I -- no.
Q Do you know why Erik Mitchell wasn't prosecuted as a result of this investigation?
A I believe so. Yes.
Q Do you know why he wasn't prosecuted?
A Do I know why?
Q Yes.
A I think -- I -- I believe so.
Q And what's the reason?
A Well, I was present at the office of the county executive when Erik Mitchell offered his resignation.
Q And tell me what happened at that meeting.
A Well, as I recall, we were having a meeting at the executive -- county executive's office, Nick Pirro. And Erik Mitchell was going to be there, and Erik Mitchell's attorney was going to be there, and Mr. Fitzpatrick was going to be there, and I was there.
And I think Mr. Pirro discussed some of the -- I wouldn't say the allegations, but the fallout from any adverse publicity that might become the medical examiner's office due to the facts, you know, uncovered during our investigation. What would it do for public

confidence in that office?

And Erik Mitchell, I believe, as I recall, said, "Well, then, would you feel better if I offered my resignation?" I think Mr. Pirro said yes, he would accept it.

Q Do you remember Erik Mitchell's attorney and DA Fitzpatrick arguing?

A Their -- yes. They had some words. Yes.

Q What were they arguing?

A I don't remember. I don't remember what they were arguing about, but I remember that Mr. Cominsky, he got a little loud -- or -- with Mr. Fitzpatrick, and then Mr. Fitzpatrick said something to Mr. Cominsky, and that's the part I remember.

Q Do you remember these allegations coming out earlier in 1993 as part of an investigation by the county?

MR. VENTRONE: Object to the form. Go ahead.

THE WITNESS: I -- I don't, but I remember that -- I mean, I remember something about that. Yes. But I don't remember anything specific. I remember that the county was looking into some other complaints about the ME's office. And it was in the newspaper, I believe, so.

BY MR. RICKNER:

Q Do you remember DA Fitzpatrick ever saying that he wanted to try to protect Erik Mitchell?

A No, sir.

Q During the investigation, was Erik Mitchell still testifying as a witness in criminal prosecutions?

A I don't remember, but I'm certain that he was. I mean, he was the -- he was the ME.

Q At any time, did DA Fitzpatrick ever tell you in sum and substance that his opinion of Erik Mitchell had changed and that he couldn't rely on him anymore as a medical examiner?

MR. JULIAN: Object to the form.

MR. VENTRONE: Yeah. Object to the --

MR. RICKNER: You can answer.

THE WITNESS: Well, I can -- I can say in my opinion is I think Mr. Fitzpatrick had the same opinion of Erik Mitchell that we liked Erik Mitchell. We thought he was doing a good job.

On the other hand, when I presented to Mr. Fitzpatrick everything that we uncovered at the ME's office, I think was -- she shared my opinion that something had to be done because some of the allegations were so outrageous that -- I go by the old adage that if it's in the front page of the newspaper the next day,

you want to live with that, so.

BY MR. RICKNER:

Q Would it be correct to say that as a result of everything that had been uncovered during your investigation, DA Fitzpatrick was worried know juries, if they heard it, might not believe Mitchell and he couldn't get convictions?

MR. JULIAN: Object to the form.

THE WITNESS: In my opinion, no. That was -- it was more about the public confidence in the ME's office and also to -- I mean, to -- to make the injured people, the relatives or whoever, of -- of the folks were involved, we wanted to make them feel better too. We had to make -- make them feel that there was some consequences for what they went through.

BY MR. RICKNER:

Q And during this meeting that you described, do you remember DA Fitzpatrick making any accusations to Erik Mitchell?

A No, sir.

Q Do you remember him accusing anything -- withdrawn.

Do you remember DA Fitzpatrick accusing Erik Mitchell of something that ultimately then made his lawyer angry?

A No. I don't -- I don't recall what made the lawyer uncomfortable. No.

Q Prior to that meeting with the county executive, had you had any meetings with DA Fitzpatrick about your investigation into Erik Mitchell?

A I'm sure I did.

Q During your investigation of Erik Mitchell, did you keep DA Fitzpatrick informed of everything that was relevant?

A I'm sure I did.

MR. RICKNER: And -- you know -- withdrawn.

I don't think I have any further questions actually. Counselor?

MR. JULIAN: No.

MR. VENTRONE: Nothing by me. We're all set. Thank you.

MR. RICKNER: Do we know if we have the county attorney yet?

MR. JULIAN: County executive?

MR. VENTRONE: County exec?

MR. RICKNER: Exec.

THE REPORTER: Sorry. Before we go off record, real briefly, same questions as the first one. Mr. Tynan, would you like to read and sign the

transcript? I think that was brought up at the beginning.

MR. VENTRONE: Let's wait for --

MR. RICKNER: Can we wait -- can we wait until Bob comes back?

THE WITNESS: We -- Mr. Rickner, are you all set with me?

MR. VENTRONE: Peter, just have a seat for a minute.

MR. RICKNER: One second. Can you just go nab Bob for me quickly so we can wrap this up? I don't want to hold the witness any further.

MR. VENTRONE: He's checking to see if Pirro's here.

MR. RICKNER: Okay.

THE REPORTER: Want me to take us off record for a moment?

MR. RICKNER: Yeah. One second. Let's just wait until everybody comes.

THE REPORTER: Is that a yes? We're taking off record? Sorry -- he's back.

MR. JULIAN: Not yet. No.

MR. VENTRONE: Do we need him to sign?

MR. JULIAN: I don't really care.

MR. VENTRONE: No. We're good with that,

Rob.

THE REPORTER: Okay. Mr. Rickner, would you like to order the original transcript?

MR. RICKNER: I am. Yeah. Of course.

THE REPORTER: Same question for Mr. Julian. Would you like to purchase the original -- the copy of the transcript?

MR. JULIAN: Same deal.

MR. VENTRONE: Same deal.

THE REPORTER: Same deal as before? All right.

MR. VENTRONE: Nothing for me.

(Off the record - counsel confer.)

THE REPORTER: 1:20 p.m., Eastern Time. We're going off the record.

(Proceedings concluded at 1:20 p.m.)

(Read and Sign waived.)

* * * * *

CERTIFICATE OF REPORTER

I, Zack Shoup, hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the proceedings were recorded by me and thereafter formatted into a full, true, and correct transcript of same;

I further certify that I am neither counsel for nor related to any parties to said action, nor in any way interested in the outcome thereof.

DATED, this 9th day of January 2024.

Zack Shoup, CER-15887
Digital Reporter