UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FLOR RIVAS, Executor of the Estate of Hector Rivas, also known as FLORA RIVAS, formerly known as SIDNEY MANES, Administrator of the Estate of Hector Rivas,<br><br>Plaintiff,<br><br>v.<br><br>ONONDAGA COUNTY and DR. ERIK MITCHELL,<br><br>Defendants. | Civil Action No.: 5:19-cv-844 (BKS/CBF) |

**DEFENDANT ONONDAGA COUNTY'S TRIAL BRIEF**

This Trial Brief is submitted on behalf of Defendant Onondaga County (hereinafter, the "County" or "Defendant").

**NATURE OF THE CLAIMS TO BE TRIED**

This is a lawsuit brought pursuant to 42 U.S.C. § 1983 by the Estate of Hector Rivas ("Plaintiff") alleging claims arising out of his 1993 prosecution, conviction, and subsequent incarceration for the murder of Valerie Hill in March of 1987. Following the Court's summary judgment decision in *Rivas v. Onondaga Cnty.*, No. 5:19-CV-00844, 2025 WL 2675826, at *1 (N.D.N.Y. Sept. 18, 2025) (Sannes, C.J.), there are two limited *denial of fair trial* due process claims remaining to be tried before the Jury in a trial that will commence on November 30, 2026:

1. **Claim 5**: - **§ 1983 14TH AMENDMENT FAIR TRIAL – FABRICATION OF EVIDENCE** - Against Defendant Dr. Erik Mitchell for allegedly fabricating evidence regarding his opinion that the victim "could have died as early as the evening of Friday, March 27"—

*i.e.*, the "window of death estimation."[1] This claim is also being brought against the County via *Monell* based on Dr. Mitchell's status as a "municipal policymaker."[2]

2. **<u>Claim 7</u>: § 1983 14TH AMENDMENT FAIR TRIAL – CIVIL *BRADY*** Against Onondaga County (*via a Monell* municipal policy maker claim) for Onondaga County District Attorney William Fitzpatrick's[3] alleged failure to turn over *potential Giglio* impeachment material undermining Dr. Mitchell's testimony.[4]:a

Plaintiff previously confirmed to the Court on the record that no additional theories will be pursued at trial. *See* Transcript from In-Person Conference at 3:10-16; *see also* Dkt. No. 252.

## FACTUAL BACKGROUND OF THE CASE

This case is about the brutal murder of 28-year-old Valerie Hill in her own home in the Eastwood area of the City of Syracuse at some point during a weekend in March of 1987 (*i.e.*, between approximately 9 p.m. on Friday March 27, 1987 and noon on Monday March 30, 1987). The last person to see Valerie alive was her father, who had dinner with her on the evening of Friday, March 27, 1987. Valerie had made plans to drive early to Glens Falls on the morning of Saturday, March 28, 1987 to see her friends (Laura and Doug Adams) having told them that she would arrive between 11:00 a.m. and 12:00 p.m.

Valerie never arrived that Saturday morning. Despite continually attempting to phone Valerie throughout the weekend, Laura Adams had no success in reaching her. During the same weekend, Valerie's stepmother was in the hospital with a life-threatening illness. Valerie never

---

[1] *Id.* at *12, *see also* fn 17.

[2] Id. at *18.

[3] DA Fitzpatrick is no longer a party to this action. *See infra*.

[4] Id. at *21-22.

checked in with her family regarding her stepmother's condition during the weekend, worrying her father and brother.

Ultimately, Valerie's father found her around noon on Monday, March 30, 1987 lying face down, half-naked, on her living room carpet with the belt of her bathrobe coiled around her neck. Investigators would later determine that she was most likely strangled from behind. There was no indication of any forced entry into her home nor any signs of a struggle.[5] There was no indication of a burglary either, as nothing appeared to have been stolen from the home. All signs pointed to her having been killed by someone she knew.

Numerous witnesses told the police that Valerie had been having ongoing trouble with her ex-boyfriend, 35-year-old Hector Rivas, with whom she had recently ended a relationship. Specifically, Valerie had been having problems with Mr. Rivas continually showing up to her house unannounced and without permission, or otherwise randomly appearing where she was out with friends. At times, when she arrived home, Mr. Rivas would already be present *inside* her apartment. Mr. Rivas admitted to police that Ms. Hill had broken up with him, but he acknowledged that because he did not want to break up with her, he was visiting her house on a daily basis to try to convince her to get back together. Mr. Rivas admitted to having gone to Valerie Hill's house twice on March 27, 1987, the last day she was seen alive, but he claimed that she was not home when he did so. The criminal jury also heard that Mr. Rivas had previously engaged in domestic violence, having previously "beaten up" his former girlfriend Sarah Hamlin.

During the ensuing weekend, Mr. Rivas apparently decided to cease his habitual daily visits to her residence and work, but instead made conspicuous and unusually long visits on both Saturday and Sunday to a busy bar in Cazenovia, where he lived, some 22 miles away. To further

---

[5] Valerie's hands and wrists did not show sign bruising or abrasions, nor did she have any broken or bent fingernails, or material underneath her fingernails.

cement his alibi, Mr. Rivas called Valerie Hill's employer—St. Joseph's Hospital—on Monday morning and spoke with Valerie's co-worker and friend, Margaret Burke, asking to speak with Valerie. Upon learning that Valerie had not reported to work, he asked Ms. Burke about her whereabouts and remarked, implausibly, that it was "too bad" Valerie had been sick over the weekend because he had expected to see her at a party he attended. This struck Ms. Burke as strange because she was aware that Valerie had planned to spend the weekend visiting friends in Glens Falls.

Later that day, members of the Syracuse Police Department picked up Mr. Rivas in Cazenovia and transported him to the Criminal Investigation Division in Syracuse for questioning. Notably, Mr. Rivas did not inquire why the police wished to question him. During the interview, he provided a detailed account emphasizing his conspicuous presence in Cazenovia throughout the weekend. Nevertheless, his account left several significant, unexplained gaps of approximately three to four hours in his whereabouts, including the period between approximately 9:00 p.m. and midnight on Friday, March 27, 1987.

Dr. Erik Mitchell, who was the Onondaga County Medical Examiner at the time, inspected Valerie Hill's body at the crime scene in the early afternoon of Monday, March 30, 1987 and then performed an autopsy early that evening. Notably, Dr. Mitchell determined from his examination that Ms. Hill's corpse was at the end of the *rigor mortis* phase—*i.e.*, the period where all of the muscles in the body are stiff and rigid due to the cessation of adenosine triphosphate from the muscles. The period in which *rigor mortis* begins, is present, and then abates *generally* occurs within 36 hours, but may occur over a time period of up to six days. The fact that Ms. Hill was last seen the previous Friday night by her father was consistent with what Dr. Mitchell had observed relative to the stage of her *rigor mortis* beginning to abate, and the other available circumstantial

evidence. As a result, Dr. Mitchell wrote down in his notes that the time of death window was "2 – 3 days." Dr. Mitchell would consistently adhere to this initial opinion throughout the criminal process.

Ultimately, the case was submitted to an Onondaga County Grand Jury who returned a two-count indictment against Mr. Rivas, with one count of second-degree murder proceeding to trial. The ensuing trial was prosecuted by Onondaga County District Attorney William Fitzpatrick ("DA Fitzpatrick") in 1993. In addition to the mountains of circumstantial evidence indicating that Mr. Rivas was the person who killed Ms. Hill (including Rivas's confession to doing so to a friend)[6] DA Fitzpatrick also called Dr. Mitchell as a witness and elicited testimony from him regarding the so-called time of death window. Dr. Mitchell testified consistently with what he had originally put in his notes during his initial examination—*i.e.*, that the window was 2 -3 days.

It is important to note that during the criminal trial, Dr. Mitchell expressly acknowledged the uncertainty and qualified his opinion, stating that: (i) "it was impossible to determine an exact time of death" and that (ii) a time of death on Friday March 27th "was "probably" "on the outside edge of possibility." Mr. Fitzpatrick's theory of the case, as exhibited by his closing statement, did not overstate or overplay the importance of Dr. Mitchell's testimony or otherwise disregard the qualification with which Dr. Mitchell had identified the time of death window. Indeed, he merely reiterated to the Jury that Dr. Mitchell had testified it "was possible" that Ms. Hill had died on Friday, March 27, 1987.

On March 3, 1993, just two weeks before Mr. Rivas's trial started on March 17, 1993, a newspaper article detailed accusations from three employees in the Medical Examiner's office that

[6] As Chief Judge Sannes observed the following: "To be sure, … there was considerable circumstantial evidence of Rivas's guilt and testimony from a witness who claimed to have overheard Rivas admit to the murder." *Rivas*, 2025 WL 2675826, at *22.

Dr. Mitchell had undertaken "unethical and possibly illegal practices over the past five years." The allegations included, *inter alia*, that Dr. Mitchell had (1) exhibited "bizarre behavior" since 1987; (2) ordered employees to "dice up brains and other organs and flush them down the sink," instead of properly disposing of them; (3) improperly handled mercury and "other toxic chemicals," endangering county employees; and (4) "threw a scalpel at an employee" during an autopsy. The article further reported that at least two state agencies, the Department of Health and the Department of Environmental Conservation, were investigating Dr. Mitchell for some of this alleged conduct.

Several days later, a subsequent newspaper article reported that the Medical Examiner had held a press conference, where DA Fitzpatrick was present and apparently supported Dr. Mitchell, referring to him as "a brilliant pathologist." The article also reported that the County Attorney's Office and the Medical Examiner's Office Advisory Board were conducting an investigation into the matter.

While DA Fitzpatrick was aware that this publicly-available information contained accusations that Dr. Mitchell was a bad manager of his office and employees and that he had made inappropriate decisions regarding the treatment of body parts, he did not view those articles as falling under his automatic disclosure obligations under *Brady/Giglio*, because the accusations had nothing to do with Dr. Mitchell's credibility or the merits of the case.

Ultimately, Mr. Rivas was convicted by a jury of second-degree murder and was later sentenced to an indeterminate term of imprisonment from twenty-five years to life. In 2015, the Second Circuit conditionally directed the district court to issue a writ of *habeas corpus* releasing Mr. Rivas from prison if he was not retried. The sole basis for Mr. Rivas's release was a finding that Mr. Rivas's criminal defense counsel was constitutionally ineffective. *See Rivas v. Fischer*,

780 F.3d 529, 552 (2d Cir. 2015). On April 20, 2015, the Onondaga County Court granted Mr. Rivas's motion vacating his judgment of conviction and set bail at $500,000.

On July 10, 2016, while the Onondaga District Attorney's Office was preparing for a second criminal trial, Mr. Rivas died of cancer, which resulted in the dismissal of the indictment. The Estate of Hector Rivas brought this action on July 13, 2019.

## SECTION II:

## ANTICIPATED LEGAL, EVIDENTIARY, OR UNIQUE ISSUES AT TRIAL

### A. THE BASIC ELEMENTS TO BE CONSIDERED AND DECIDED

Generally, "'[t]he right to a fair trial [][is] guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amendment.'" *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010) (quoting *Cone v. Bell*, 556 U.S. 449, 451 (2009)). Both of the claims are variants of this right asserted under the Due Process Clause, which each have their own discrete elements.

#### (1) DENIAL OF THE RIGHT TO A FAIR TRIAL CLAIM – FABRICATION OF EVIDENCE

In a § 1983 suit alleging the denial of a fair trial because of fabricated evidence, a plaintiff must show that "an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). Black's Law Dictionary defines "fabrication" as "[f]alse information invented to deceive others." *Fabrication*, BLACK'S LAW DICTIONARY (12th ed. 2024). Thus, even as the common vernacular suggests, the term fabrication does not just implicate a falsehood, it suggests the intentional creation or manufacture of that falsehood with the purpose of deceiving others.

***The fabrication must be knowing***: A fabrication is the creation of false evidence and

therefore "requires a plaintiff to prove that a defendant's use of inaccurate information was 'knowing, as opposed to mistaken.'" *Davis-Guider v. City of Troy*, No. 23-589, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (quoting *Barnes v. City of New York*, 68 F.4th 123, 129 (2d Cir. 2023); *Ashley v. City of New York,* 992 F.3d 128, 143 (2d Cir. 2021)(fabrication claim requires "that the defendant knowingly make a false statement or omission"); *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) ("government officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly").

***The fabrication must be material***: In a *fabricated evidence* fair trial claim, the jury must consider a materiality element that focuses on whether the fabricated evidence was "likely to influence a jury's decision." *Ashley*, 992 F.3d at 142

***The fabrication must have caused the loss of liberty***: *See* discussion *infra* in Section I(B).

(2) DENIAL OF THE RIGHT TO A FAIR TRIAL CLAIM – CIVIL BRADY

A civil Brady claim requires the Plaintiff to show: (1) the defendant withheld or suppressed exculpatory or impeaching evidence from the criminal defendant, as those terms are defined by Brady v. Maryland, and its progeny; (2) that the withholding by the defendant was intentional; (3) that the withheld or suppressed evidence was material to the outcome of the trial; and (4) that the conduct caused a loss of liberty. *See Bellamy v. City of New York*, 914 F.3d 727, 751 and n.4 (2d Cir. 2019); *see also Morant v. City of New Haven*, No. 3:22-CV-630 (SVN), 2026 WL 1455712, at *2 (D. Conn. May 24, 2026) (agreeing that a civil Brady claim has a causation element).

***The withholding or suppression must be intentional***: *See* full discussion *infra*.

***The jury must determine whether the withheld evidence is material***: One of the elements of proof for a *Brady* fair trial claim is whether the suppressed disclosure was "material" to the outcome of the criminal trial. *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014).

This requires a plaintiff to demonstrate by a preponderance of the evidence that the omitted disclosure would create a "'*reasonable probability of a different result*'" in the original criminal jury's verdict. *Id.* (*quoting Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)); *see also Turner v. United States*, 582 U.S. 313, 324 (2017) ("[E]vidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." (internal quotations omitted)). The question of materiality must be decided by the jury "in the context of the *entire [criminal] record*." *Turner*, 582 U.S. at 324.

***The conduct must have caused the loss of liberty***: *See* discussion *infra* in Section I(B).

### B. DAMAGES CAUSATION

For both of the above due process claims, the Plaintiff has the burden of proving damages causation or is relegated to nominal damages. In *Santiago v. Fischer*, the Second Circuit addressed the issue of damages causation for § 1983 claims where the plaintiff's injury is a wrongful incarceration. 158 F.4th 397, 409 (2d Cir. 2025). The Second Circuit held that the causation element requires the finder of fact to "*reconstruct what would have occurred* had proper procedure been observed." *Id.* (emphasis added) (quoting *Patterson v. City of Utica*, 370 F.3d 322, 338 (2d Cir. 2004)) (internal citations omitted). After doing so, should the Jury conclude that conviction "would have [occurred] even in the absence of the wrongful conduct, the plaintiff is entitled only to nominal damages." *Santiago*, 158 F.4th at 409; *see also Rentas v. Ruffin,* 816 F.3d 214, 223 (2d Cir. 2016) ("when a defendant has deprived the plaintiff of liberty, but the adverse action would have been taken even in the absence of the wrongful conduct, the plaintiff is entitled only to nominal damages.") (cleaned up) (citing cases).

Thus, separate from the element materiality, the element of the damages causation will also

require the civil jury to evaluate the outcome of the criminal trial based on the evidentiary record before the criminal jury.

### C. EVIDENTIARY ISSUES REGARDING FABRICATION CLAIM

#### (1) PLAINTIFF'S IDENTIFICATION OF WHAT WAS FABRICATED & ABSOLUTE IMMUNITY

At summary judgment, this Court found that Dr. Mitchell was entitled to absolute immunity for his testimony before the grand jury and at trial. *See Rivas*, 2025 WL 2675826 at *11 (dismissing all claims "to the extent they arise from Mitchell's testimony"). Under clear Second Circuit and Supreme Court case law, Plaintiff cannot pursue a claim for damages against Dr. Mitchell for any injury caused by his testimony. *See Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) (a plaintiff's claim must exist independently of any grand jury testimony and may not be "based on" that testimony).

In order to circumvent the application of absolute immunity, Plaintiff has disclaimed any claim against Dr. Mitchell based on his testimony at trial or the grand jury. As defined by this Court, Plaintiff alleges fabrication based on an allegation "that Mitchell fabricated evidence by forwarding to police his '*March 30, 1987 report*' and "*other statements*" concluding that Hill could have died as early as the evening of Friday, March 27." *Rivas*, 2025 WL 2675826 at *12 (citing the summary judgment record). Plaintiff's summary judgment proof indicates: (1) the so-called "*March 30, 1987 report"* is a reference to page 17 the Medical Examiner's Report, where Mitchell wrote "*appears as though deced. Was there appx. 2-3 days*;" and (2) "*other statements*" refers to Dr. Mitchell's statement to Investigator Tynan where he stated that Ms. Hill had been dea "not less than two days." [Dkt. 152 at pgs. 25-26] Plaintiff has not identified any other purported fabricated statement.

*Plaintiff's theory against Dr. Mitchell limits it to nominal damages*

This stated theory requires the Court to limit the fabricated evidence claim against Dr. Mitchell to nominal damages. In *Jovanovic v. City of New York*, the Second Circuit considered a fabrication claim against an investigating official (Bonilla) for fabricating evidence that led to plaintiff's conviction. 486 F. App'x 149, 152 (2d Cir. 2012) (summary order). Like here, the Second Circuit noted that the investigator was entitled to absolute immunity for his testimony, but that the plaintiff had alleged that the fabrication (the lie) pre-dated the testimony and was conveyed to the prosecution prior to Bonilla's testimony. *Id.* The Second Circuit held that the claim as alleged failed to satisfy the element of damages causation because the only way the alleged "lie" could impact the criminal jury is through Bonilla's testimony, for which he was immune:

> [Plaintiff] Jovanovic *cannot show causatio*n—i.e., that the alleged fabrication of evidence led to a deprivation of his liberty. That is because *the only avenue by which the testimony could reach the jury was through Bonilla's testimony*, for which he enjoys absolute immunity

*Id.* (emphasis added); *see also Carr v. City of New York*, No. 11 CIV. 6982 SAS, 2013 WL 1732343, at *7 (S.D.N.Y. Apr. 19, 2013) ("plaintiff "cannot show causation—i.e., that the alleged fabrication of evidence led to a deprivation of his liberty—because the only avenue by which the testimony could reach the jury was through [Officer Barosa's] testimony, for which he enjoys absolute immunity")[7].

Thus, under *Jovanovic*, at best, Plaintiff is entitled to nominal damages for its claim against Dr. Mitchell.

---

[7] The holding in *Jovanovic* is in tension with the Second Circuit's earlier decision in *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000). We submit the tension between these two holdings is resolved in *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 394 (E.D.N.Y. 2013), which focuses on the issue of causation relatives to the different periods or reasons for incarceration. If, for example, Plaintiff could show that Hector Rivas experienced a period of incarceration that was caused by the alleged fabricated statements on March 27, 1987, that was independent of the incarceration caused by the grand jury or trial testimony, than that denial of liberty could hypothetically support a stand-alone claim for damages. It is respectfully submitted that there is no such evidence in this case.

To the extent that the Court disagrees, we nonetheless raise this issue to the Court now relative to when it comes time for the Court to evaluate the sufficiency of the evidence under Fed. R. Civ. P. 50. We also ask the Court to give the following charge to the Jury, relying, in part on, *Marshall v. Randall*, 719 F.3d 113, 117 (2d Cir. 2013):

> Dr. Mitchell cannot be held liable for any statement or assertion he made during his testimony during the criminal trial or to the grand jury. I instruct you that you may not consider his testimony to either the criminal or grand jury as a basis to hold him liable for fabrication of evidence. Rather, Plaintiff has the burden to demonstrate that he fabricated some evidence independent of his testimony that separately caused Mr. Rivas's incarceration in order to succeed on its fabrication claim.

(2) KNOWING V. RECKLESS FABRICATION

The parties have already provided the Court lengthy briefing on the issue of whether a reckless mental state is sufficient to qualify as a fabrication that violates the due process clause. For the reasons set forth in its supplemental briefing, *see* Dkt. Nos. 213 and 227, the County continues to maintain that required level of *scienter* in the Second Circuit is "knowing" and that finding liability upon a reckless mental state would be reversible error. The County relies on at least eight separate Second Circuit decisions for this proposition, the Supreme Court's decision in *Napue v. Illinois*[8], and plain meaning definition of the term "fabrication." Indeed, the phrase *reckless fabrication* is an oxymoron.

The County further notes that if this Court finds for the first time in this Circuit that recklessness is sufficient to sustain a denial of fair trial claim, then Dr. Mitchell would still be entitled to qualified immunity in any event. *C.f. Dean*, 162 F.4th at 567-68 (implying that it is not clearly established that even a recklessly incorrect opinion of a medical examiner violates the due process clause).

[8] "Freestanding fabrication theories, by contrast, derive from the Supreme Court's decision in *Napue v. Illinois.* And because a *Napue* violation requires knowledge,[58] a freestanding fabrication claim does as well." *Dean v. Phatak*, 162 F.4th 555, 567 (5th Cir. 2025).

(3) EVIDENTIARY ISSUES ASSOCIATED WITH PLAINTIFF'S ATTEMPTED CHARACTER ASSASSINATION OF DR. ERIK MITCHELL

The Court anticipates that the Plaintiff will try to impugn Dr. Mitchell at trial with a whole host of unproven and unsubstantiated professional allegations lodged against him over the course of his career as a board-certified pathologist. Dr. Mitchell is a party in this case and is not a retained expert witness even though Plaintiff's theory of liability against him appears to be premised upon proving that his 1987 opinions regarding rigor mortis are scientifically unsustainable. Throughout the prior post-criminal trial habeas litigation, and indeed in the summary judgment record in this case, the Plaintiff has argued the evidentiary significance of professional allegations against Dr. Mitchell that post-date the criminal trial. This is improper and the Court should bar any reference to such allegations because they are completely irrelevant to the two issues in this case, which are: (1) whether Dr. Mitchell lied in some of his investigation paperwork in March of 1987; and (2) whether DA Fitzpatrick intentionally violated his *Brady/Giglio* disclosure requirements in March of 1987 by failing to provide Mr. Rivas's criminal defense counsel with impeachment evidence known to Fitzpatrick at the time.

As an initial matter, any investigation or allegation against Dr. Mitchell that occurred *after* the criminal trial could obviously *not* have been used as impeachment at trial and thus is not relevant to the *Brady/Giglio* claim. This includes, by way of example, the criminal investigation that was begun in July of 1993, Dr. Mitchell's resignation in November of 1993, various written complaints about Dr. Mitchell that post-dated the trial, or that were otherwise not known to DA Fitzpatrick. Plaintiff has also signaled that it intends to ask Dr. Mitchell questions about professional allegations lodged against him in Kansas from his work there in the 2000s. None of this information is relevant to the civil *Brady* claim.

Rather this body of documentation is inadmissible character evidence intended to distract

the jury and paint a picture that Dr. Mitchell is a bad or incompetent pathologist. This type of evidence is governed by Rule 608(b), 609, and 403 of the Federal Rules of Evidence ("FRE"). First, mere allegations regarding wrongdoing are not admissible. Under FRE 608(b)—except for approved convictions under FRE 609--extrinsic evidence "is not admissible to prove specific instances of a witness's conduct or support the witness's character for truthfulness." Extrinsic evidence includes, of course, documents (reports, press releases, newspaper articles, etc.) and witnesses (Messrs. Sawyer, Rigle, *etc*.). As a bright line rule, such extrinsic evidence is not admissible.

Plaintiff's counsel should also be prevented from inquiring into such matters. Indeed, to the extent that 608(b) allows questions regarding "specific instances of a witness's conduct" such questions are only permitted if they are "probative of the character for truthfulness or untruthfulness." None of the professional allegations against Dr. Mitchell appear to accuse him of being dishonest, lying, or fraud of any sort. Plaintiff is clearly trying to improperly malign him as a bad pathologist based on mere unproven allegations and accusation. Asking questions about such things without having to prove those allegations is "trial by insinuation." *C.f.* 1 McCormick On Evid. § 39, n.6 (9th ed.) ("'trial by insinuation and innuendo' rather than a trial by properly introduced evidence" "cannot be countenanced").

Such conduct *also* runs afoul of Rule 403. Again, the professional allegations against Dr. Mitchell are not probative of the straightforward claim against him or his credibility. But trial by insinuation tends to distract the jury from the real issues, create a strong motive for Dr. Mitchell to defend himself and offer rebuttal proof that the accusations are unsubstantiated, which necessarily creates trials within the trial on unnecessary, collateral, and irrelevant issues.

To the extent that Plaintiff's counsel intends to question Dr. Mitchell regarding any

allegation of professional misconduct under the premise that they would be permitted to do so under FRE 608(b), they should be required to make a pre-trial proffer so that Court can fairly determine whether the question is probative of untruthfulness (of course, extrinsic evidence remains inadmissible) or should otherwise be precluded under FRE 403 due to unfair prejudice, confusion of the issues, the potential to mislead the jury, undue delay, or wasting time.

As a side note, there is a newspaper article from March 6, 1993 that pre-dates the criminal trial (in which DA Fitzpatrick is depicted) that potentially has a limited relevance to the *Brady/Giglio* claim and *may* be admissible for that limited reason. However, even to the extent that is the case, Plaintiff's counsel should *still* not be permitted to ask *Dr. Mitchell* questions about the allegations in the article. But for its limited relevance as potential *Brady/Giglio,* the article is *still* extrinsic evidence of unproven allegations of bad acts. Allowing Plaintiff's counsel to ask Dr. Mitchell questions about the article, or confront him with its allegations, would be allowing them to use article for an improper purpose. But for its potential link to the *Brady/Giglio claim,* the article would be completely irrelevant and inadmissible under FRE 608(b). FRE 105 recognizes that certain evidence may be admissible and proper for one purpose but not for other purposes. The civil *Brady* claim is not being brought against Dr. Mitchell and there is no non-gratuitous reason to confront him with the unproven allegations from the newspaper article. The Court should preclude Plaintiff from doing so.

In addition, under FRE 105, the County requests that the Court give the following instruction when the article (if deemed admissible by the Court) is admitted and/or published to the Jury:

*Limiting Instruction on March 6, 1993 Newspaper Article*

> Plaintiff is offering a newspaper article titled "Medical Examiner Calls Critics Liars" from March 6, 1993 into evidence in support of his claim regarding alleged

> *Brady* violation by District Attorney William Fitzpatrick. The exhibit is being offered to demonstrate what information was known or potentially known by DA Fitzpatrick prior to the trial about the nature of a pending administrative investigation regarding Dr. Mitchell. That is the sole purpose for the document's admission. The assertions and allegations contained in the article are hearsay and are unproven and as such are not admissible for their truth. You may *not* consider this exhibit for the truth of the matters asserted in it.

## B. CIVIL *BRADY* ISSUES

### 1) A CIVIL *BRADY* CLAIM REQUIRES A SHOWING OF SPECIFIC INTENT

As discussed at length in previous briefing, the Second Circuit (and this Court) have *never* held that § 1983 damages may be awarded for a *Brady* violation absent a showing of *specific intent* to withhold. Plaintiff has recently argued that intent is only a cursory requirement, arguing that only *general intent*—rather than *specific intent*--should apply. This is inconsistent with Circuit and Supreme Court law.

In *Valentin v. City of Rochester*, the appellant specifically argued that the trial court erred by requiring at trial "a showing of *specific intent* by the prosecution to withhold or suppress exculpatory material." *Valentin v. City of Rochester*, 783 F. App'x 97, 98 (2d Cir. 2019) (summary order) (emphasis added). In response, the Second Circuit held that its precedent "has suggested, if not conclusively decided, the contrary"—suggesting that "intentional misconduct" by the prosecutor is required. *Id.* at *99-100. The Second Circuit thereby affirmed the district court's requirement of "specific intent" rather than "general intent." This is also consistent with the Circuit's holding relative to specific intent being a pre-requisite other types of § 1983 due process claims. *C.f. Gorman v. Rensselaer Cnty.*, 910 F.3d 40, 47–48 (2d Cir. 2018) ("[b]ased on the Supreme Court's directive that only deliberate conduct implicates due process, we join the consensus view of the circuit courts: a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to

interfere with the family relationship.")

As a side note, the County does not concede that the alleged *Brad*y material was withheld at all. We predict that the undisputed evidence presented at trial will indicate that Hector Rivas's defense counsel was in possession of the newspaper article regarding Dr. Mitchell, but chose not to use it. Plaintiff, who bears the burden of proof, chose not to disclose Mr. Calle's trial file nor to depose him. So, there will be no evidence presented at trial from Mr. Calle as to what was and was not disclosed to him. We anticipate that this will present a sufficiency issue that the Court will have to consider under FRCP 50.

2) SPECIFIC INTENT IS SHOWN OR NOT *VIA* CIRCUMSTANTIAL EVIDENCE

"Intent [to violate *Brady*] may be shown through circumstantial evidence [of the defendant's state of mind] that suggests the defendant *intentionally withheld evidence*." *Carmon v. City of New Haven*, No. 3:23-CV-00944 (JCH), 2025 WL 2680668, at *16 (D. Conn. Sept. 18, 2025). The issue of intent involves "subjective issues" that "squarely implicate[]"the witness's "state of mind, motive, sincerity or conscience" *Id*. (quoting *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984)); For example, "[i]ntentionality may be deduced based on [the defendants] pattern of deviating from what they described as typical practice." *Rosario v. City of New York*, No. 18 CIV. 4023 (LGS), 2021 WL 199342, at *7 (S.D.N.Y. Jan. 20, 2021). Moreover, the degree to which particular information has "obvious" exculpatory value or only marginal value is relevant to the question of intent. *Bolt v. City of New York*, No. 22-CV-3318 (DG)(PK), 2023 WL 11916695, at *12 (E.D.N.Y. Sept. 15, 2023) (finding an inference of intentionality where the withheld information was "of obvious exculpatory value" and at the time of the non-disclosure). Intentionality, for example, can be also inferred where a police officer takes measures to "hide" exculpatory information from the prosecutor. *Valentin v. City of Rochester*, No. 11-CV-6238 CJS,

2018 WL 5281799, at *13 (W.D.N.Y. Oct. 24, 2018), *aff'd* 783 F. App'x 97, 98 (2d Cir. 2019). This Court has described the inquiry as a search for "circumstantial evidence from which malicious intent can be inferred." *Jeanty v. City of Utica*, No. 616CV00966, 2021 WL 149051, at *16 (N.D.N.Y. Jan. 14, 2021), *adhered to on reconsideration at* 2021 WL 2525061 (N.D.N.Y. Apr. 15, 2021), *aff'd sub nom. Jeanty v. Cerminaro*, No. 21-1974-CV, 2023 WL 325012 (2d Cir. Jan. 20, 2023).

Thus, based on the above case law specific intent can be shown or disproved based on considerations that include: (1) the subjective mindset and beliefs of DA Fitzpatrick regarding the purported non-disclosed evidence is relevant—*i.e.,* whether he believed it was Brady material or not, and why; (2) whether the non-disclosure was a deviation from his normal practice or the customary practices of the time; (3) where the purported evidence fell on the relevancy scale between obvious and marginal; (4) whether or not there is any circumstantial evidence that he attempted to hide, obscure, or misdirect the potential evidence; and (4) what motive (if any) there was to withhold.

(3) MATERIALITY AND DAMAGES CAUSATION WILL BE A MAJOR FOCUS AT TRIAL

In the summary judgment decision in this case, this Court considered the "considerable circumstantial evidence of [Mr.] Rivas's guilt" in evaluating whether there was a jury question on the issue of materiality. *Rivas*, 2025 WL 2675826, at *22. Ultimately, it will be for the jury to determine, upon consideration of the allegedly suppressed evidence in the context of the entire trial record, whether there is a reasonable probability that disclosure of that evidence would have produced a different result in Mr. Rivas's criminal trial. To the extent that Plaintiff suggests that materiality presents a question of law for the Court, there is no precedent for that proposition, which would be inconsistent with this Court's previous decisions. *See, e.g., Jeanty*, 2021 WL

149051, at *19 (requiring a plaintiff to demonstrate a "reasonable probability" of a different result is threshold necessary to create "*a genuine issue of material fact sufficient* to survive summary judgment") (Sannes, C.J.) (emphasis added); *c.f. Egan v. New York City*, No. 16 CIV. 1479 (PGG), 2018 WL 4926445, at *15 (S.D.N.Y. Oct. 10, 2018) ("materiality … is a question that must be resolved by a jury" (citing cases)).

In order to resolve the questions of fact as to materiality and causation for both fair trial claims, the civil jury at trial will thus need to hear and consider the relevant evidence presented to the previous criminal jury. *Nnodimele v. Derienzo*, No. 13CV3461ARRRLM, 2016 WL 3561708, at *11 (E.D.N.Y. June 27, 2016*)* ("[t]he jury in this trial is entitled to understand the nature and quality of that inculpatory evidence [presented to the criminal jury] so it may properly assess the reasonably probable effect of the evidence allegedly withheld"). The "strength" of the original inculpatory evidence is highly relevant to the *Brady* standard on multiple levels, because the second prong requires an objective assessment of the importance of the purported exculpatory evidence in light of the record as a whole in determining whether disclosure is required. *See, e.g., Fuentes v. T. Griffin*, 829 F.3d 233, 249 (2d Cir. 2016) ("a *materiality* analysis requires a careful, balanced examination of *the nature and strength of the evidence presented*, as well as an evaluation of the potential impact of the evidence on the witness's credibility.")

As already indicated, Defendants intend to introduce the entire criminal trial transcript via publishing it with stand-in readers in the witness stand. This will provide the jury with the entire criminal record in order for it to examine "*the nature and strength of the evidence presented"* of both guilt and innocence.

While Defendant's counsel will not argue that Mr. Rivas was guilty, counsel intends to argue vigorously in summation how the facts of the criminal trial impact the issues of materiality

and damages causation, including (1) that based on weight, nature, and quality of the evidence presented to the criminal jury that the omitted evidence would not have created a "reasonable probability of a different result" in the original criminal jury's verdict; (2) that in light of the weight, nature, and quality of the evidence presented to the criminal jury, the criminal jury's verdict was still "worthy of confidence"; (3) that relative to damages causation, Mr. Rivas would have been convicted even in the absence of the allegedly fabricated or suppressed evidence[9]; and/or (4) otherwise emphasize the weight of the exculpatory evidence contained in the criminal record as probative of its probable effect on the criminal jury. *C.f. Nnodimele*, 2016 WL 3561708, at *11 (the "jury in this trial is entitled to understand the nature and quality of that inculpatory evidence [presented during the criminal trial] so it may properly assess the reasonably probable effect of the evidence allegedly withheld").

(4) THE JURY WILL BE FLYING BLIND ON THE ACTUAL *BRADY* RULES

At a recent oral argument, Plaintiff argued that *Brady* standards are black and white and should be decided by the Court as a matter of law. Not only is there no authority for that position (and Plaintiff's never moved for summary judgment on that issue), but it is also not consistent with Second Circuit precedent. Indeed, "[t]he *Brady* rule *is a general rule*, as it does not identify specific materials that prosecutors must turn over to defendants, but rather asks – after the fact – whether the failure of those prosecutors to turn over certain evidence denied the defendant a fair trial – *a question that is a matter of judgment rather than one with a clear, obvious answer*." *McCray v. Capra*, 45 F.4th 634, 641 (2d Cir. 2022) (emphasis added). The Jury should be instructed that this decision is often a judgment call.

[9] *Rentas*, 816 F.3d at 223 (the relative to the issue of causation a jury must consider whether "the submission of the non-fabricated evidence would have resulted in [the plaintiff's] loss of liberty [at the criminal trial] even in the absence of the fabricated evidence.").

And while Plaintiff may argue that such decisions are easy, "*the Supreme Court has 'never held that the Constitution demands an open file policy*,'… and not every document that *could* be used to impeach a witness is so devastating that depriving a defendant of it 'undermine[s] confidence in the outcome of the trial."' *Id*. at 642 (emphasis added) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) and *Smith v. Cain*, 565 U.S. 73, 75 (2012)).

In fact, several of the intricacies of *Brady/Giglio* disclosure rules indicate that the pendency of an administrative investigation based on unproven allegations that perhaps relate to professional competency but not truth telling would not have tended to indicate that DA Fitzpatrick would have no obligation to turn over the allegedly withheld newspaper article.

***a. The alleged impeachment evidence must have existed at the time of trial to qualify.***

"[E]xculpatory evidence must exist at the time of the trial to qualify as Brady material." 2 Fed. Prac. & Proc. Crim. § 256 *Discovery by the Defendant—"Brady" Material* (4th ed.) (citing *United States v. Wolf*, 860 F.3d 175, 193 (4th Cir. 2017)); *see also U.S. v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005) ("As such evidence did not exist at the time of trial, it was not Brady material.")

***b. No obligation to disclose evidence equally available to the defendant by the exercise of due diligence—such as newspaper articles.***

"If the evidence is equally available to the defendant by the exercise of due diligence, most circuits have held the government is not obligated under Brady to produce it." 2 Fed. Prac. & Proc. Crim. § 256 *Discovery by the Defendant—"Brady" Material* (5th ed.); *Davis v. Guzman*, No. CV 22-7306-JWH (KS), 2024 WL 4700788, at *7 (C.D. Cal. Sept. 18, 2024)[10] (no requirement to turn over "**Los Angeles Times article**" because it was "within the public domain"); *Buford v. United States*, No. 508CR00242RDPHNJ7, 2019 WL 636982, at *6 (N.D. Ala. Feb. 14, 2019) ("**media**

[10] *report and recommendation adopted*, No. 2:22-CV-07306 JWH (KS), 2024 WL 4700601 (C.D. Cal. Oct. 31, 2024).

**coverage**" is "publicly available information" available to a defendant "had he exercised due diligence."); *Feldman v. United States*, Nos. 93 CIV 6668 and 89 CR 765, 1993 WL 497868, at *2 (S.D.N.Y. Dec. 2, 1993) (government was not required to disclose information contained in **a published article in a journal** available to the public because "the article is material of which defendant knew or should have known, and, as such, its disclosure by the government was not required under Brady."); *Siguenza v. Uribe*, No. CV1108020SSSAGR, 2023 WL 9686723, at *31 (C.D. Cal. Aug. 9, 2023)[11]("[t]he detective's statements appeared in **a published newspaper article** and, thus, Petitioner's trial counsel and the prosecutor had equal access to them").

**c.** ***No obligation to turn over inadmissible evidence.***

"[O]nly admissible evidence can be material, for only admissible evidence could possibly lead to a different verdict." *U.S. v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009)

d. ***No obligation to turn over impeachment evidence relative to collateral matters***.

"It is well settled that evidence which merely impeaches the witness's credibility as to a 'collateral' matter is not material." *People v. Clausell*, 182 A.D.2d 132, 143 (2d Dep't 1992) (Mangano, J., dissenting) (citing *People v. Battee*, 122 A.D.2d 526, 527 (4th Dep't 1986) (requested information about the victims drug-related activity "absent a connection to the crime charged, … was collateral and it was not otherwise the kind of material required by the courts to be supplied to defendant for use to impeach a witness"); *see also People v. Pavao*, 59 N.Y.2d 282, 288–89 (1983) ("It is well established that the party who is cross-examining a witness cannot introduce extrinsic documentary evidence or call other witnesses to contradict a witness' answers concerning collateral matters solely for the purpose of impeaching that witness' credibility.").

e. ***Purported impeachment evidence based on unproven accusations either doesn't qualify as Brady or is per se not material because it is not probative of truthfulness.***

---

[11] *report and recommendation adopted,* No. 2:11-CV-08020-SSS-AGR, 2024 WL 643213 (C.D. Cal. Feb. 14, 2024)

> Civil lawsuits against government law enforcement witnesses that offer only unproven allegations or that have settled "lacking any adverse findings" are not "probative of the witness' truthfulness." *United States v. Clanton*, 769 F. Supp. 3d 147, 155 (E.D.N.Y. 2024) (quoting *United States v. Ahmed*, No. 14-CR-277 (DLI), 2016 WL 3647686, at *3 (E.D.N.Y. July 1, 2016)); *see also United States v. Jackson*, No. 19-CR-356 (ARR), 2020 WL 6558215, at *3 (E.D.N.Y. Nov. 9, 2020) (finding that because "[a]ll of the civil lawsuits brought against the government's witnesses are either currently pending or have already ended in settlement without any admission of wrongdoing by the defendant or adverse credibility finding by the court," there was "no reason to believe that the underlying files are likely to contain material that is relevant to the credibility of the witnesses"); *C.f., United States v. Avasso*, 23 F. App'x 33, 35 (2d Cir. 2001) (summary order) (withheld evidence regarding an administrative investigation into the investigating agent did not warrant a new trial under Brady because the accusations were "at best" "only mildly probative of the agent's credibility").

### C. HANDLING THE *MONELL* ISSUE AT TRIAL

Upon further reflection, and in light of the Court's ruling on summary judgment that both Dr. Mitchell and DA Fitzpatrick are municipal policymakers within the meaning of *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), we do not believe that there is any remaining proof necessary to establish *Monell* liability if the principal claims are established. Therefore, we do not, at present, believe that it would make sense to charge the jury on *Monell* if there is no further question of fact for it to decide beyond the principal claims. Accordingly, we would suggest that the jury instructions and verdict form be simplified to simply address liability against either Dr. Mitchell [on Claim 5] or liability premised on the conduct of DA Fitzpatrick [on Claim 7].

If the Jury returns a verdict on either claim or both, the Court may affix judgment as appropriate based on its prior decision against the County finding the alleged constitutional tortfeasors to be municipal policymakers under *Pembaur*. To the extent that liability is found against Dr. Mitchell on Claim 5, the County would be deemed jointly and severally liable. To the extent liability is found on Claim 7, the County would be identified on the ensuing Judgment to be the sole judgment debtor.

The County expressly reserves its right to challenge the Court's prior ruling both in its Rule

50 motion or on direct appeal as appropriate, however. It is respectfully submitted that in making decisions regarding *Brady* disclosures, District Attorney Fitzpatrick was acting as the assigned prosecutor "prosecuting a criminal matter" on behalf of the State of New York and was not acting as the head of his office. We acknowledge the interpretation of subsequent cases "narrowing" of the holding of *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) to only allegations relating to the determination whether to prosecute. *See discussion in Bellamy*, 914 F.3d at 758. Nonetheless, we submit the doctrine set forth in *Baez* has been over-narrowed in an illogical way because the definition of prosecutorial conduct in the current interpretation of the *Baez* doctrine is radically more narrow than the definition of prosecutorial conduct that would trigger the absolute immunity doctrine. We submit these two standards should be coextensive.

At present, we wish to preserve this issue for appeal to ask the Second Circuit to reconsider what appears to be the current trend in interpreting the application of *Baez*.

### D. OTHER EVIDENTIARY/RULE 50 ISSUES

The County refers the Court to the separate *in limine* motions filed by the County. In addition, the County flags the following issues for the Court in advance of trial:

#### A. DR. SPITZ WAS UNWILLING TO TESTIFY THAT DR. MITCHELL'S TIME OF DEATH ANALYSIS VIOLATED THE STANDARD OF CARE FOR PATHOLOGISTS.

As Dr. Mitchell's counsel has already flagged, Plaintiff's expert, Dr. Daniel Spitz, was unwilling to opine that Dr. Mitchell's time of death opinion fell below the medical standard of care for pathologists. We anticipate that Dr. Spitz's trial testimony will not deviate from his prior deposition testimony. This is a failure of proof that requires the dismissal of the claim against Dr. Mitchell in his individual capacity.

An opinion that may be wrong but is still given within a physician's established standard of care is certainly not a fabrication, and cannot even be considered *reckless* under Second Circuit

authority. *See Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 549 F. App'x 34, 37 (2d Cir. 2014) (summary order) ("*Reckless conduct* is 'at the least, conduct which is highly unreasonable and *which represents an extreme departure from the standards of ordinary care* ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" (emphasis added) (quoting *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000)).

B. THE COUNTY CANNOT BE SUBJECT TO LIABILITY FOR PUNITIVE DAMAGES

It is well established that municipalities are immune from punitive damages under 42 U.S.C. § 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). In *City of Newport*, the Supreme Court expressly held that punitive damages cannot be imposed against a municipality for the unconstitutional conduct of its officials, reasoning that such awards would improperly punish taxpayers rather than the individuals responsible for the alleged misconduct. *Id.* at 266–71.

The Second Circuit has consistently applied this prohibition. *See Ciraolo v. City of New York*, 216 F.3d 236, 239–42 (2d Cir. 2000) (reversing an award of punitive damages against a municipality notwithstanding the existence of an unconstitutional municipal policy); *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d 101, 122 (2d Cir. 2006) (recognizing that municipalities are immune from punitive damages under § 1983).

Here, Plaintiff's surviving claims against Onondaga County arise under § 1983 and seek to impose municipal liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Even if* Plaintiff establishes a constitutional violation attributable to a County policy or custom, punitive damages remain unavailable against the County as a matter of law. *See Ciraolo*, 216 F.3d at 240–42.

Accordingly, the County respectfully requests that the Court preclude Plaintiff from seeking punitive damages against Onondaga County and instruct the jury that punitive damages may not be awarded against the County under any circumstances presented by this case.

C. A DIFFERENCE OF OPINION BETWEEN PATHOLOGISTS IS NOT FABRICATION

Particularly instructive is *Sutton v. Bell*, which is a case where it was contended that the medical examiner fabricated a time of death window based upon an opposing expert's difference of opinion. In finding there was no evidence of fabrication, the court stated as follows, and cited the following cases, which also support judgment as a matter of law on the fabrication claim against Dr. Mitchell:

> Although these experts disagree about the interpretation of the slides, disagreement between experts does not transform an expert's opinion into a falsehood. *See Hoover v. Newland,* 307 F. App'x 56 (9th Cir. Jan.6, 2009) (expert's opinion was not rendered false because it differed from testimony and opinions of all other experts in case); *Sistrunk v. Armenakis,* 292 F.3d 669, 675 & n. 7 (9th Cir.2002) (en banc) (clearly inaccurate testimony by expert was not found to be false), *cert. denied,* 537 U.S. 1115, 123 S.Ct. 874, 154 L.Ed.2d 792 (2003); *United States v. Workinger,* 90 F.3d 1409, 1416 (9th Cir.1996) (disagreement with analysis did not transform opinion into falsehood); *Campbell v. Gregory,* 867 F.2d 1146, 1148 (8th Cir.1989) (finding an expert's opinion which differed from that of another expert and the treatise cited by the other expert was not false). Therefore, a difference in opinion and disagreement among the experts is not a legally sufficient basis to establish falsity of a fact. Indeed, when an assertion that testimony is perjured rests on mere speculation, it is insufficient to establish a claim under *Napue. See United States v. Aichele,* 941 F.2d 761, 766 (9th Cir.1991).

*Sutton v. Bell*, No. 3:06-CV-388, 2011 WL 1225891, at *9 (E.D. Tenn. Mar. 30, 2011).[12] As is also prescient to this case and the claim against Dr. Mitchell, the district court continued with its findings observing:

---

[12] *amended*, No. 3:06-CV-388, 2011 WL 13309012 (E.D. Tenn. Sept. 2, 2011), and *aff'd sub nom. Sutton v. Carpenter*, 617 F. App'x 434 (6th Cir. 2015), and *aff'd sub nom. Sutton v. Carpenter*, 617 F. App'x 434 (6th Cir. 2015).

> The issue with which the Court is concerned i**s not one of objective fact but one of differences in experts' time-of-death opinions which, quite frankly, are based on subjective interpretations of several factors.** Simply because Petitioner's experts disagree with the State's experts does not mean the State knowingly presented false evidence in violation of Petitioner's due process rights. **None of the experts testified that Dr. Harlan's testimony was false**, and the evidence before the Court does not include an affidavit, a deposition, or any testimony from Dr. Harlan regarding the truthfulness or falsity of his trial testimony.
>
> * * *
>
> **The experts disputed, to some extent, the validity of the methodology used by Dr. Harlan**, and they disagreed with his estimated time of death. **But opposing experts who criticize the prosecution's expert witness and the basis of his testimony falls far short of proof of false testimony**. *See Workinger,* 90 F.3d at 1416 (holding disagreement between experts did not transform an expert's testimony into a falsehood). Certainly, **the record reveals that determining time of death is not an exact science and that the accuracy of that determination might have been improved had other scientific tests been performed**. However, absent any evidence that Dr. Harlan actually made any false statement of fact or **that he did not honestly and conscientiously arrive at the opinions he expressed** at Petitioner's trial, habeas relief is not warranted. Accordingly, **the conflicting expert opinions, which amounted to nothing more than a mere disagreement among the experts, does not demonstrate Dr. Harlan's testimony was false**.

*Id.* (emphasis added); *see also id.* at *8 ("although Petitioner's habeas experts disagreed with Dr. Harlan's time-of-death opinion, **none of his experts testified Dr. Harlan's time-of-death opinion was scientifically impossible**" (emphasis added)); *see also Sutton v. Bell*, No. 3:06-CV-388, 2011 WL 13309012, at *5 (E.D. Tenn. Sept. 2, 2011) ("Indeed, the substantial circumstantial evidence presented in this case was more compelling than an expert's opinion of an estimated time of death."), *aff'd sub nom. Sutton v. Carpenter*, 617 F. App'x 434 (6th Cir. 2015).

### F. DISTRICT ATTORNEY WILLIAM FITZPATRICK'S ATTENDANCE AT TRIAL

By virtue of the Court's previous summary judgment decision, all claims against Onondaga County District Attorney William Fitzpatrick were dismissed and he is no longer a party to this case. *See* Dkt. No. 165. Nevertheless, his conduct and decisions remain central to Plaintiff's

surviving *Monell* claim against Onondaga County concerning the alleged failure to disclose impeachment evidence before Hector Rivas's criminal trial. For this same reason, even though he is no longer a party, the outcome of the trial on this claim is important to him.

Thus, while DA Fitpatrick is not *technically* a party, as a practical matter, he is still much more than an ordinary non-party witness. We anticipate that DA Fitzpatrick will be present for as much of the trial as his important, on-going duties will allow. The County has inquired whether Plaintiff's counsel will waive any technical compliance with FRE 615(a) as it relates to DA Fitzpatrick, to which we understand they are still deliberating as to that question. If the answer is negative, the County may deem Mr. Fitzpatrick as its client representative, but we will cross that bridge when we get to it.

In addition, to avoid potential jury confusion concerning Fitzpatrick's role in this litigation, the County respectfully requests that the Court provide the following preliminary instruction:

*District Attorney William Fitzpatrick Limiting Instruction*

> District Attorney William Fitzpatrick is not currently a party to this lawsuit. However, as I will be instructing you later on in this case, Plaintiff has alleged a claim against Onondaga County that it is legally responsible for certain evidentiary disclosure decisions made by Mr. Fitzpatrick prior to the criminal trial of Hector Rivas. As a result, even though Mr. Fitzpatrick is not a party to this case, his conduct and decisions may be at issue in resolving the claim alleged against the County.
>
> Given that his conduct is at issue in the case, when his professional duties will allow him, Mr. Fitzpatrick may be present at various stages of this trial, including being present at counsel table. While you should consider Mr. Fitzpatrick's testimony in resolving the claims before you, you should not draw any inference one way or another from Mr. Fitzpatrick's presence or absence at different points of time during trial regarding any matter that you are being charged to decide.

## G. IMPEACHMENT WITH LEARNED TREATISES

Under Federal Rule of Evidence 803(18), a "statement contained in a treatise, periodical, or pamphlet" is not hearsay if (1) "the statement is called to the attention of an expert witness on

cross-examination or relied on by the expert on direct examination" and (2) the publication is established as *a reliable authority* by the expert's admission or testimony, *by another expert's testimony*, or by judicial notice." Fed. R. Evid. 803(18). "If admitted, the statement may be read into evidence but not received as an exhibit." *Id.*

Importantly, an expert witness need not personally acknowledge the publication as authoritative before it may be used during cross-examination. As the Advisory Committee explained, "[t]he rule does not require that the witness rely upon or recognize the treatise as authoritative, thus avoiding the possibility that the expert may at the outset block cross-examination by refusing to concede reliance or authoritativeness." Fed. R. Evid. 803(18), Advisory Committee Notes to 1972 Proposed Rules. Rather, the publication's reliability may be established independently through another expert's testimony or judicial notice.

> The exception lets any qualified passage from books or articles be read into evidence but not "received as an exhibit." Obviously it is still lodged and made part of the record, and passages of a book or article may be read during questioning if its authority is established, by counsel or an expert or other appropriate witness. Also, the proponent can make an appropriate visual presentation of pertinent passages, by enlargement projected on a screen or otherwise.

4 Federal Evidence § 8:102 ("Learned Treatises") (4th ed.)

Moreover, "[t]here is no requirement in the rule that learned treatises used pursuant to Fed. R. Evid. 803(18) be disclosed to the opposing party prior to trial." *BCR Land Servs., Inc. v. Bryers Props., WA, LLC*, No. 2:23-CV-00208-CWD, 2024 WL 555138, at *4 (D. Idaho Feb. 12, 2024) (denying motion in limine); *Hotard v. Avondale Indus., Inc.*, No. CV 20-1877, 2022 WL 4551425, at *8 and n. 12 (E.D. La. Sept. 29, 2022) ("the book chapter by Dr. Lemen is not subject to the expert disclosure requirements and may be admissible as a statement in a learned treatise"); *Maltese v. Smith Transp., Inc.*, No. 3:19-CV-00060, 2021 WL 4394318, at *1 (W.D. Va. Sept. 25, 2021) ("[t]he parties agree that Fed. R. Evid. 803(18) does not itself require disclosure of such

literature to opposing counsel prior to trial").

Nonetheless, in the interest of transparency and orderly trial preparation by the parties, the County provides notice that it *may* rely upon the following publications during its cross-examination of Dr. Spitz, subject to establishing the foundation required by Rule 803(18):

*Books*

1. Werner U. Spitz, *et al., Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation* (Werner U. Spitz ed., 3d. 1993).
2. Vincent J.M. DiMaio & D. Kimberley Molina, *DiMaio's Forensic Pathology*, (3d ed. 2022).
3. Claus Henssge et al., *The Estimation of the Time Since Death in the Early Postmortem Period* (Bernard Knight ed., 2d ed. 2002).

The County further reserves the right to use other relevant scholarly publications, including peer-reviewed studies and review articles, during expert cross-examination, provided the requirements of Rule 803(18) are satisfied.

## H. Sequestration of Witnesses.

As set forth in the County's motion *in limine* #27 (see Dkt. No. 261), the County respectfully requests that pursuant to Rule 615 of the Federal Rules of Evidence, all non-party fact witnesses, with the exception of DA William Fitzpatrick, be excluded from the courtroom so that they do not hear the testimony of other witnesses. This request does not apply to party witnesses or expert witnesses.

## I. Fidelity to a Party's Proposed Order of Witnesses.

To facilitate orderly trial preparation, minimize unnecessary delays, and promote judicial economy, the County respectfully requests that the Court direct each party to (1) disclose the anticipated order of witnesses for the following trial day no later than the preceding evening; and (2) promptly notify opposing counsel of any anticipated changes in the order of witnesses. Such a procedure will promote fairness, efficiency, and professionalism while allowing counsel to prepare

adequately for witness examinations.

## **CONCLUSION**

This Trial Brief is submitted for the limited purpose of identifying key legal issues anticipated to arise at trial. It is not intended to address every potential legal issue, exhaustively analyze the applicable legal standards, or summarize the evidence expected to be presented.

The County reserves the right to raise additional legal and evidentiary arguments as appropriate during trial.

Dated: November 4, 2026
Syracuse, New York

Respectfully submitted,

HANCOCK ESTABROOK LLP

By: 

Mary L. D'Agostino, Esq.
John G. Powers, Esq.
Amanda C. Nardozza, Esq.
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202
(315) 565-4500

COUNSEL FOR DEFENDANT ONONDAGA COUNTY