UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

FLOR RIVAS, Executor of the Estate of Hector Rivas, also known as FLORA RIVAS, formerly known as SIDNEY MANES, Administrator of the Estate of Hector Rivas,

Plaintiff,

-against-

ONONDAGA COUNTY and DR. ERIK MITCHELL,

Defendants.

**DEFENDANT MITCHELL'S SUPPLEMENTAL TRIAL BRIEF ON THE ISSUE OF ABSOLUTE IMMUNITY PRECLUDING READING HIS CRIMINAL TRIAL TESTIMONY TO THE JURY**

**Civil Action No. 5:19-cv-844 (BKS/CBF)**

**Hon. Brenda K. Sannes, Chief United States District Judge**

## I. A. THE COURT SHOULD NOT PERMIT THE READING OF MITCHELL'S CRIMINAL TRIAL TESTIMONY BEFORE THE CIVIL JURY BECAUSE OF HIS ABSOLUTE IMMUNITY.

Mitchell's benefit of absolute immunity will be diminished immeasurably if his testimony at the criminal trial is read to the jury while Mitchell remains a named defendant in this case. It will adversely impact his right to a fair trial because the only avenue by which plaintiff's alleged vague fabrication theory can be placed before the jury is through his testimony that the window of death of 2-3 days, with Friday being more likely, is based upon non-science. The only time Dr. Mitchell gave those opinions was in the criminal jury trial. That testimony is privileged. The Second Circuit in *Jovanovic v. City of New York*, 486 Fed. Appx. 149 (2012), the Second Circuit stated in a parallel factual setting:

> "A person suffers a constitutional violation if an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result. (citations omitted) Jovanovic cannot show causation—i.e., that the alleged fabrication of evidence led to a deprivation of his liberty. That is because the only avenue by which the testimony could reach the jury was through Bonilla's testimony, for which he enjoys absolute immunity."

The same is true in the case at bar. Plaintiffs have not identified investigative recklessness or fabrication outside of Mitchell's trial testimony. Their expert, Dr. Spitz, who did not read the entire Rivas trial transcript prior to his deposition, only Dr. Mitchell's courtroom and deposition testimony, disagreed with Mitchell's range of death opinion at trial. Dr. Spitz acknowledged Mitchell did not deviate from the standard of care in performing the autopsy or in his investigation before his trial testimony. He simply disagrees with the opinions given by Mitchell at trial as to range of death, his testimony that the brain slides showed decomposition and his trial testimony that the appearance of the brain seen by Mitchell at autopsy was a useful data component to arrive at his range of death testimonial opinion at trial.

## II. B. A LIMITING INSTRUCTION WILL NOT UNDO THE PREJUDICE TO MITCHELL

There in fact exists in the 9th Circuit Pattern Jury Charges, a charge that contemplates this circumstance. Mitchell will not argue as a matter of black letter law there are appellate decisions that specifically prohibit the reading of Mitchell's criminal trial testimony. Rather, our argument is that the facts in this case cry out for this court to either dismiss Mitchell from the case or not permit the reading of his criminal trial testimony. Mitchell is before this court individually with further claims against him of gross negligence.

Mitchell's trial testimony is the only point in this case wherein he offers the opinion that Friday was the more likely day of Valerie Hill's murder. It is this opinion coupled with his testimony that the floor of the Hill apartment was cool extending rigor and that the brain slides were helpful in determining range of death with Friday being the more likely. Without this testimony, plaintiffs have no factual proof of fabrication or that Mitchell's testimony provided causation resulting in the verdict. In fact, there is no fabrication. Mitchell opined that the decedent was likely

dead for 2 to 3 days on the day he found her based on the coolness of the apartment, the appearance of her brain and the existence of rigor. He did not know of Rivas or his alibi. Therefore, plaintiffs exclusively rely upon Mitchell's absolute testimonial immunity to make the case against him. Coupled with the notion that Mitchell was potentially influenced by the Department of Health investigation commenced 10 days before trial, if this is permitted by the court, Mitchell's absolute testimonial immunity is utterly compromised and places him in jeopardy of a verdict including punitive damages against him.

Mitchell deeply appreciates the court's interest in protecting Mitchell's immunity. In part that is because a curative instruction, no matter how well-crafted, will likely be ineffective. Curative instructions have been studied and are well understood to be ineffective.

The court's pre-trial conference observation that Mitchell's trial testimony was essential to the Monell/Brady claims and therefore, a curative instruction was the likely remedy to cure any prejudice to Mitchell is a noble offer which is unlikely to cure the prejudice. In part that is because Mitchell's criminal trial testimony is also essential to make the civil case against him. In a leading law journal article regarding jury instruction the following is cautioned:

> Fifth, if it is intolerable for a verdict to be influenced to any degree by a particular prohibited kind of evidence or a particular forbidden reference, evidentiary instructions should not be relied upon, instead the evidence should be kept from the jury altogether and if the evidence reaches the jury, the result should be a mistrial unless the error would be harmless even without a curative instruction. (David Alan Sklansky, Stanford Law Review, Vol. 65 : 407 at pg. 456)

That is absolutely the case here – the forbidden reference, Mitchell's opinion that Friday was the more likely day of death, must be kept from the jury. To be sure, Professor Sklansky concludes that jury instructions are sometimes followed, but sets forth his opinion as noted above regarding the risk benefit of the jury being true to the instruction. For Mitchell, his testimony in the

criminal trial should not be read to the jury because the risk is great with no benefit at all to Mitchell.

That risk is demonstrated in a scholarly examination of the effects of limiting instructions on jurors, concluding that while limiting instructions was effective with high need for cognition jurors, they were ineffective and frequently counter-productive for low need for cognition (NFC) jurors. NFC is defined as individual differences in the tendency to engage in and enjoy cognitive activity. (The effects of limiting instructions about emotional evidence depend on need for cognition. Matsuo, Itoh, Psychiatry, Psychology and Law 2017 Jan. 16 : 24(4) 516-529) Thus, the article concludes that limiting instructions have a high likelihood of not being followed because many jurors lack the cognitive capacity to follow the instruction, particularly when emotional evidence is the topic of the instruction.

It has been reported by earlier researchers that this conclusion is accurate:

> Although early research demonstrated limiting instructions to be effective, the majority of extant empirical research indicates that jurors do not adhere to limiting instruction. (Lieberman and Arndt, Understanding The Limits of Limiting Instructions, Psychology, Public Policy and Law 2000, Vol. 6 No. 3, 677-711 at pg. 703)

Lieberman and Arndt report that limiting instructions are "relatively ineffective and sometimes produce a backfire effect, resulting in jurors being more likely to rely on inadmissible information after they have been specifically instructed to disregard it". Supra at pg. 677. See also The Impact on Juror Verdicts of Judicial Instruction to Disregard Inadmissible Evidence: A Meta Analysis of Law and Human Behavior 30(4) 469 2006 including, "Judicial Instruction to Ignore the Inadmissible Evidence Does Not Effectively Eliminate Inadmissible Evidence Impact."

It is highly unlikely after hearing plaintiff's cross-examination of Mitchell with regard to collateral issues (presumably they cannot cross him on his trial testimonial immunity) such as body parts, placing tissue down drains, etc. which Mitchell denies and the opinions of Dr. Spitz as well as

permitting evidence that Mitchell could have been influenced by the March 1993 probe to give fabricated testimony, the notion that the jurors can set aside his opinion as to Friday being the likely day of death as a fabrication is simply a bridge too far.

Dr. Spitz, given Mitchell's testimonial immunity, cannot opine that Mitchell's opinion that Friday was the more likely day of death because the trial is only time Mitchell offered that opinion.

Moreover, Spitz cannot testify Mitchell's failure to take the temperature of the decedent was a fabrication, reckless or a deviation from the standard of care since he did not so opine in his expert disclosure/report or deposition.

This case is distinguished from *Marshall v. Randall*, 719 F3d 113 (2d Cir. 2013). In *Marshall v. Randall* the grand jury testimony of the defendant was used for impeachment only as to a fact. In the case at bar, the court is asked to allow all of Mitchell's testimony in the criminal trial in plaintiff's case in chief, providing both facts and opinion to the jury, an entirely different and highly prejudicial use of testimony of a defendant who has absolute immunity in his testimony. The jury, drawn over several hours, will be asked to ignore Mitchell's testimony as to Mitchell's potential liability, including punitive damages, but to apply the testimony to the County's liability.

The future implications this case holds for Medical Examiners is staggering. Plaintiffs back door proof against Mitchell by using his trial testimony which is immune against the County who is defending his conduct in the Civil Rights claim against it. No jury could be reasonably asked to decipher that scenario and peel away any prejudice to Mitchell realized from hearing his trial testimony. The court will effectively be asking the jury to evaluate his trial testimony for fabrication or recklessness as against his employer, the County, but ignore it in evaluating his conduct. We respectfully assert that the claims of the individual—in this case, the Rivas Estate,

must yield to the dictates of public policy. Of course, in the case at bar plaintiffs have a remedy—discontinue the at best fragile case against Mitchell and proceed against the County.

This scenario is contrary to the United States Supreme Court decision in *Rehberg v. Paulk*, 566 US 356 (2012) underscored the absolute immunity of a trial grand jury witness even though Paulk was the sole witness to link the plaintiff's 1983 claim. The Supreme Court's view of a witnesses 1983 trial testimony is salient to the case at bar, concluding that the absolute immunity for witnesses must take precedence over the individual litigant's rights.

In *Briscoe*, however, this court held that the immunity of a trial witness sued under section 1983 is broader: In such a case, a trial witness has absolute immunity with respect to any claim based on the witness's testimony. When a witness is sued because of his testimony, the court wrote, "the claims of the individual must yield to the claims of public policy". 460 U.S. at 332-333 (quoting *Calkins v. Sumner*, 13 WIS. 193, 197 (1860). Without absolute immunity for witnesses, the court concluded, the truth-seeking process at trial would be impaired. Witnesses "might be reluctant to come forward to testify" and even if a witness took the stand, the witness "might be inclined to shade his testimony in favor of the potential plaintiff" for "fear of subsequent liability." 460 U.S. at 333. *Rehberg v. Paulk*, 566 U.S. 356 (2012).

The limiting charge proposed by the County does not remedy Mitchell's loss of immunity. Mitchell is the sole witness linking plaintiff's causation – i.e., his testimony established the likelihood of the decedent's murder occurring on Friday when Rivas lacked an alibi. Mitchell was consistent in his opinion that the window of death was 2-3 days, but his trial testimony based on hypothetical facts that were not a part of his original opinion – only that she was las seen alive on Friday night.

Mitchell has his career at stake. An adverse verdict could affect his license to practice medicine. A punitive damages verdict could result in Mitchell personally being required to pay the award.

It is difficult to determine how the sparsely proposed liability charge remedies this transgression of Mitchell's rights and the risk he is being subjected to. The overwhelming research associated with limiting charges is not only are they ineffective and juries frequently do not follow them, but the charges can also create a backfire effect, resulting in jurors being more likely to rely upon Mitchell's testimony in evaluating his liability.

Dated: November 12, 2026

Respectfully submitted,

ROBERT F. JULIAN, P.C.

Robert F. Julian, Esq.
*Attorneys for Defendant Erik K. Mitchell*
2037 Genesee Street
Utica, New York 13501
(315) 797-5610
Robert@rfjulian.com