**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

FLOR RIVAS, Executor of the Estate of Hector Rivas, also known as FLORA RIVAS, formerly known as SIDNEY MANES, administrator of the estate of Hector Rivas,

Plaintiff,

5:19-cv-00844 (BKS/CBF)

v.

ONONDAGA COUNTY and DR. ERIK MITCHELL,

Defendants.

---

**Appearances:**

*For Plaintiff:*
Rob Rickner
Joshua S. Moskovitz
Rickner Moskovitz LLP
14 Wall Street, Suite 4C
New York, New York 10005

Scott A. Korenbaum
The Law Offices of Scott A. Korenbaum
14 Wall Street, Suite 4C
New York, New York 10005

*For Defendant Onondaga County:*
John G. Powers
Mary L. D'Agostino
Amanda C. Nardozza
Hancock Estabrook LLP
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202

*For Defendant Mitchell:*
Robert F. Julian
Robert F. Julian, P.C.
2037 Genesee Street
Utica, New York 13501

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Plaintiff Flor Rivas, executor of Hector Rivas's estate, brought this 42 U.S.C. § 1983 action against Defendants Onondaga County and Dr. Erik Mitchell, stemming from Hector Rivas's prosecution for the murder of Valerie Hill. A jury trial on Plaintiff's remaining claims is set for November 30, 2026. Presently before the Court are the parties' motions in limine. At the final pretrial conference held on November 20, 2026, the Court granted in part, denied in part, and otherwise reserved ruling on the motions, noting that a written decision would follow on certain of the issues discussed. This is that decision.

## II. DISCUSSION

The Court assumes familiarity with the factual and procedural background of this case, discussing below only those facts necessary to explain its decision.

### A. Scope of the Fabrication of Evidence Claim

The County has filed a motion in limine seeking "confirmation that Plaintiff intends to proceed solely upon the fabrication-of-evidence theory that Dr. Mitchell fabricated his time-of-death estimate in March 1987." (Dkt. No. 331, at 1 (emphasis omitted)). Alternatively, it seeks an order "precluding Plaintiff from introducing evidence or otherwise advancing any new or previously undisclosed theory of fabrication at trial." (*Id.*). Plaintiff opposes these requests, arguing that the claim also encompasses Mitchell's alleged conduct during the 1992 reinvestigation of Hill's murder. (*See* Dkt. No. 337, at 12–13).

The Court agrees with Plaintiff. As the County notes, district courts have discretion to preclude new theories of liability not disclosed in a pleading or discovery. *See Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701–02 (2d Cir. 2010); *see also In re Methyl Tertiary Butyl*

*Ether (MTBE) Prods. Liab. Litig.*, 117 F. Supp. 3d 276, 294 (S.D.N.Y. 2015). Here, however, all agree that the operative complaint articulated a theory that Mitchell revised his time of death estimate sometime in 1992. (*See* Dkt. No. 16, ¶¶ 65–71; *see also* Dkt. No. 331, at 2; Dkt. No. 337, at 12).

The County contends that, in discovery, Plaintiff failed to amend contention interrogatory answers representing that she would elaborate on the factual basis for that theory of liability at a later date but never did so. (Dkt. No. 331, at 2, 3–4). It also points to language in Plaintiff's summary judgment briefing appearing to confine her fabrication theory to March 1987. (*Id.* at 2 & n.1, 4; *see also* Dkt. No. 152, at 32 ("Plaintiff's claim arises from the forensic evidence Mitchell fabricated and provided to investigators on March 30, 1987, years before Rivas was arrested or charged with Hill's murder." (emphasis omitted))).

But read in context, that language acknowledged that—in light of Mitchell's asserting witness immunity—Plaintiff's claim did "not arise from [his] grand jury or trial testimony, or preparation to testify." (*See* Dkt. No. 152, at 32). And the Court's summary judgment decision was not limited to Mitchell's March 1987 conduct. (*See* Dkt. No. 165, at 22 ("In this case, Plaintiff contends that Mitchell fabricated evidence by forwarding to police his 'March 30, 1987 report' *and* 'other statements' concluding that Hill could have died as early as the evening of Friday, March 27." (emphasis added)); *see also id.* at 8, 30 (discussing Mitchell's 1992 conduct)). So the Court cannot conclude that the County lacked sufficient notice that Plaintiff's theory of fabrication included evidence from the 1992 reinvestigation—at least to the extent such evidence is consistent with Mitchell's assertion of witness immunity. *Cf. Loral Fairchild Corp. v. Victor Co. of Japan*, 911 F. Supp. 76, 79 (E.D.N.Y. 1996) ("The Federal Rules of Civil Procedure are designed to eliminate surprise."). The County's request to preclude Plaintiff from

using 1992 evidence in support of her fabrication of evidence claim is accordingly denied. *See Lalonde v. City of Ogdensburg*, No. 8:22-CV-00164, 2026 WL 879705, at *14, 2026 U.S. Dist. LEXIS 68772, at *41 (N.D.N.Y. Mar. 31, 2026) ("District courts have broad discretion in deciding whether an issue is precluded by a party's response to contention interrogatories." (citation modified)); *Int'l Cards Co. v. MasterCard Int'l Inc.*, No. 13 Civ. 2576, 2017 WL 1133425, at *4 & n.1, 2017 U.S. Dist. LEXIS 43789, at *10 & n.1 (S.D.N.Y. Mar. 24, 2017).

**B. *Brady***

At the pretrial conferences, the Court has discussed the parties' positions on various legal issues related to Plaintiff's claim under *Brady v. Maryland*, 373 U.S. 83 (1963). Although the Court will decide several of those issues at trial, it provides the following rulings to guide the parties' presentation of the evidence, assuming familiarity with the *Brady* legal framework. (*See* Dkt. No. 165, at 36 (summary judgment decision explaining elements of § 1983 *Brady* claim)).

**1. Favorability**

To begin, the parties have submitted supplemental briefing on the issue of favorability—the first *Brady* element—including whether it is a question of law for the Court, or must be decided by the jury. (Dkt. No. 337, at 10–12; Dkt. No. 338, at 3–16).

Favorable "[i]mpeachment evidence is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) (citation modified); *cf. Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." (citation modified)). "*Brady* and its progeny require more than just the disclosure of *quid pro quo* agreements; they require that the prosecution disclose any evidence impeaching a witness's

credibility." *Jimenez v. Graham*, No. 11-CV-6468, 2022 WL 2789217, at *4, 2022 U.S. Dist. LEXIS 125819, at *10–11 (S.D.N.Y. July 15, 2022) (collecting cases). Courts have long "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974), and that "[i]n evaluating bias and interest, the jury should be informed that the witness hopes for leniency," *see Annunziato v. Manson*, 566 F.2d 410, 414 (2d Cir. 1977).[1] Although in some cases the question of favorability must be resolved by a factfinder, *see Walker v. City of Buffalo*, No. 22-cv-00520, 2025 WL 828242, at *6–7, 2025 U.S. Dist. LEXIS 47995, at *17–19 (W.D.N.Y. Mar. 17, 2025), it may also be determined as a matter of law, *see Nnodimele v. Derienzo*, No. 13-cv-3461, 2016 WL 3561708, at *8, 2016 U.S. Dist. LEXIS 83357, at *24–25 (E.D.N.Y. June 27, 2016).

Here, a March 3, 1993 article reflects that Mitchell had been accused of "possibly illegal practices"—including ordering William Sawyer to "illegally dispose" of "toxic chemicals" by "mixing them with medical waste," and having "workers dice up brains and other organs and flush them down the toilet." (Dkt. No. 151-14, at 1). It further reported that the New York State Department of Environmental Conservation ("DEC") was investigating the complaints concerning "toxic wastes." (*See id.* at 2). In turn, a March 6, 1993 article contains a picture of Mitchell—standing next to District Attorney William Fitzpatrick—denying the allegations at a press conference, including the allegation that he had "order[ed] Sawyer to illegally dispose of hundreds of chemicals at the lab by mixing them with medical waste." (Dkt. No. 323-2, at 2).

---

[1] In light of these long-standing principles, and for the reasons stated at the November 20 conference, the Court remains unpersuaded that the test for favorability was meaningfully different in 1993. (*Contra* Dkt. No. 338, at 5–12).

That article, too, reported that the DEC had been investigating Mitchell, in addition to the state health department, his own advisory board, and the county attorney's office. (*Id.*).

If Mitchell was accused of criminal conduct shortly before trial, and then held a press conference denying the allegations—with the district attorney standing by him—Mitchell would have had a motive to curry favor with the district attorney, and this evidence would have been admissible at the criminal trial to impeach Mitchell for bias. *Cf. Annunziato*, 566 F.2d at 414; *see also Davis*, 415 U.S. at 317–18. The County contends that Mitchell was accused of conduct that was *illegal*, but not *criminal*. The Court notes, however, that different evidence appears to suggest otherwise. (*See* Dkt. No. 323-6, at 15, 16 (November 1993 district attorney's office memorandum referring to allegations underlying DEC investigation as criminal); *see also* Dkt. No. 323-7, at 3 (November 1993 district attorney's office press release doing same)). In the event Mitchell was accused of criminal conduct, such information would seem to be favorable as a matter of law—*i.e.*, no reasonable fact finder could conclude that this evidence lacked "the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *See Rivas*, 377 F.3d at 199; *see also Nnodimele*, 2016 WL 3561708, at *8, 2016 U.S. Dist. LEXIS 83357, at *24–25 (instructing jury that the favorability "element [was] satisfied as a matter of law" because "[n]o reasonable jury could find that [the relevant information was] not exculpatory"). The Court will defer ruling on whether to submit this element to the jury until after hearing the evidence at trial.

**2. Suppression**

Turning to the next *Brady* element, the parties disagree as to when evidence is deemed suppressed by the prosecution. (Dkt. No. 337, at 5–10; Dkt. No. 338, at 16–21).

Under *Brady*, "the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). And defense counsel need not "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004). But "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)); *see also United States v. Ramsey*, No. 20-860, 2021 WL 5022640, at *2, 2021 U.S. App. LEXIS 32357, at *8 (2d Cir. Oct. 29, 2021). "Documents that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation." *Payne*, 63 F.3d at 1208.

In light of these principles, Plaintiff argues that "due diligence" has no bearing on the *Brady* analysis. (*See* Dkt. No. 337, at 6–10). She seeks to instruct the jury that, among other things, (1) "[d]efense counsel are allowed to rely on the completeness of the state's disclosure of evidence," and (2) "defense counsel is not required to conduct a blind search of public records to see whether [impeachment evidence] exists, or to try to unearth the existence of such information that [is] unknown to him." (Dkt. No. 270, at 10 (citing Transcript of Jury Instructions at 957–58, *Fraser v. City of New York*, No. 20 Civ. 4926 (S.D.N.Y. Mar. 20, 2023), Dkt. No. 178); *see also* Dkt. No. 262-4, at 27–28).

Plaintiff's proposed instruction from *Fraser* is unwarranted in this case. The *Fraser* court tailored its instruction to the facts of that case, which did not involve potential impeachment material publicly reported in local newspapers. (*See* Dkt. No. 262-4, at 28 ("In particular,

defense counsel is not required to conduct a blind search of public records to see whether an officer was ever named as a defendant in a lawsuit, or to try to unearth the existence of lawsuits that are unknown to him.")).

More importantly, in applying the "knew or should have known" rule, the Second Circuit has deemed impeachment evidence "not suppressed by the government" when "the information at issue was publicly available." *United States v. Sayegh*, No. 24-2080-cr, 2025 WL 3188814, at *3, 2025 U.S. App. LEXIS 29801, at *7 (2d Cir. Nov. 14, 2025). In *Sayegh*, the government failed to disclose "an unrelated guilty plea of one of [the defendant's] co-conspirators," as well as "an unrelated civil lawsuit" against a government witness—both of which the defendant could have used to undermine that government witness's credibility. *Id.*, 2025 WL 3188814, at *2, 2025 U.S. App. LEXIS 29801, at *6–7. Yet the government did not suppress that information, the Second Circuit explained, because the relevant U.S. Attorney's Office had "publicized" the co-conspirator's indictment before trial, and "the allegations arising from the civil suit filed were a matter of public record." *Id.*, 2025 WL 3188814, at *3, 2025 U.S. App. LEXIS 29801, at *8.

Here, then, were the jury to conclude that Rivas's defense counsel "should [have] know[n] of" the relevant information "and fail[ed] to obtain [it] because of lack of diligence in his own investigation," it could determine that Fitzpatrick did not suppress that information. *See id.* (quoting *Payne*, 63 F.3d at 1208). The Court intends to instruct the jury on the standard articulated in *Sayegh* and *Payne*.[2]

[2] Unlike the County, (*see* Dkt. No. 338, at 17), the Court does not understand the Second Circuit's *Brady* suppression standard to have changed in 2015. *See Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). In any event, the Court need not address this argument in light of its decision to instruct the jury pursuant to *Sayegh* and *Payne*.

### 3. The Required Mental State

As to the required mental state, the Second Circuit has "never addressed whether anything less than an intentional *Brady* violation establishes a § 1983 due process claim for damages." *Jimenez v. City of New York*, 190 F.4th 145, 171 (2d Cir. 2026) (citation modified). The County has nonetheless urged that Plaintiff must prove that Fitzpatrick had a specific intent to suppress exculpatory material. (*See* Dkt. No. 281, at 16–18). But the summary order on which it relies in inapposite. In that case, the discussions of intent in both the district court's and the Second Circuit's decisions explained principally that the plaintiff there had not plausibly alleged more than negligent conduct. *See Valentin v. City of Rochester*, No. 11-cv-6238, 2018 WL 5281799, at *14–15, 2018 U.S. Dist. LEXIS 182601, at *36–38 (W.D.N.Y. Oct. 24, 2018), *aff'd*, 783 F. App'x 97, 99–100 (2d Cir. 2019).

Although courts generally agree "that the 'no fault' *Brady* standard does not apply to claims for damages," they "disagree about the precise standard that does apply." *Nnodimele*, 2016 WL 3561708, at *5, 2016 U.S. Dist. LEXIS 83357, at *13. This Court finds persuasive and adopts the Seventh and Ninth Circuits' view that no "bad faith requirement" applies. *Id.*, 2016 WL 3561708, at *5, 2016 U.S. Dist. LEXIS 83357, at *14–16 (collecting cases). So evidence concerning Fitzpatrick's "subjective mindset and beliefs" as to the information at issue—including "whether he believed it was *Brady* material and why" and similar considerations, (Dkt. No. 281, at 18)—is irrelevant. Rather, if Plaintiff proceeds on a theory of intentional suppression, she must prove that Fitzpatrick withheld the *Brady* material voluntarily and deliberately, and not "as the result of mistake, accident, negligence, or any other innocent reason." *See Nnodimele*, 2016 WL 3561708, at *5, 2016 U.S. Dist. LEXIS 83357, at *15.

### 4. Expert Testimony of Attorney Robert J. Masters

Next, Plaintiff has moved to preclude the testimony of Robert J. Masters, (Dkt. No. 262-1, at 9–15), an attorney identified as an expert who reviewed Fitzpatrick's "professional conduct" related to Rivas's prosecution, (Dkt. No. 262-3, at 6).

Preliminarily, the County points out that Plaintiff failed to comply with the Court's pretrial scheduling order, which required that "motions to preclude expert testimony" be filed by the due date for dispositive motions, (Dkt. No. 312, at 3–5 (alteration adopted) (quoting Dkt. No. 64, at 3); Dkt. No. 132). *See Palmer v. Cora Italian Specialties, Inc.*, No. 20-cv-398, 2025 WL 2888048, at *2, 2025 U.S. Dist. LEXIS 280517, at *4 (N.D.N.Y. June 25, 2025) (noting that the uniform pretrial scheduling order sets a due date for a *Daubert*-based motion in limine). Plaintiff indicates that she does not object to Masters's qualifications, but argues that the proposed testimony is inadmissible under Federal Rules of Evidence 401, 402, 403 and 702. (*See* Dkt. No. 262-1, at 14). She further notes that Masters's opinions contradict the Court's summary judgment *Brady* and *Giglio* analysis. (*Id.* at 10–11). Under these circumstances, despite Plaintiff's failure to bring any *Daubert*-based motions in limine by October 31, 2024—the summary judgment motion deadline—the Court will consider her relevancy challenge to Masters's testimony.

The County seeks to examine Masters "regarding matters within the scope of his disclosed opinions, including his analysis of the alleged *Brady* violations." (Dkt. No. 245, at 1; *see generally* Dkt. No. 312). Masters has opined that the prosecution's *Brady* and *Giglio* obligations in 1993 "were far less demanding" then "[t]oday's standards." (Dkt. No. 141-30, at 15). Specifically, he declared that although "[t]oday's standards would likely compel the prosecution to notify the defense of any unresolved investigations into a professional witness'

competence or integrity," in 1993, "common law did not require the prosecution to notify [defense counsel] of pending and unresolved investigations and complaints regarding" Mitchell. (*Id.*).

Despite Masters's assertions, in its summary judgment ruling—and again above, *see supra* Section II.B.1—this Court rejected the County's argument that Plaintiff "is attempting to hold [it] 'to the present interpretations' of *Brady* and *Giglio*," which, it says, have "expanded over the years." (Dkt. No. 165, at 36). To be sure, expert testimony may at times be admissible to describe "sound professional standards" under *Brady* and *Giglio*, as well departures from those standards. *See Restivo v. Hessemann*, 846 F.3d 547, 579–80 (2d Cir. 2017) (quoting *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013)). But Masters's *Giglio* analysis did not consider the impact of the investigations and complaints on Mitchell's motive to curry favor with the district attorney. Because the County has not identified a disclosed opinion of Masters's regarding *Brady* and *Giglio* which would be relevant in "help[ing] the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), it does not appear that Masters's testimony concerning *Brady* and *Giglio* is admissible at trial.

### C. Evidentiary Issues

To provide additional guidance for the parties' presentation of evidence, the Court addresses the admissibility of the March 30, 1987 search warrant affidavit and note written by Investigator Peter Tynan.

#### 1. Search Warrant Affidavit

The County contests the search warrant affidavit's admissibility under Federal Rule of Evidence 602 and as hearsay. (Dkt. No. 285, at 2–3 & n.1). However, the affidavit was prepared in March 1987, (*see* Dkt. No. 323-1, at 2–3), and no party contests its authenticity. It therefore

falls within the ancient documents exception to the rule against hearsay. *See* Fed. R. Evid. 803(16) (providing for exception to bar against hearsay for "statement[s] in a document that was prepared before January 1, 1998, and whose authenticity is established").

Although "courts have disagreed" as to whether Rule 805's multiple hearsay rule "applies to statements in ancient documents," the Third and the Seventh Circuits have concluded that it does. *See Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 189–91 (3d Cir. 2016) (en banc); *see also United States v. Hajda*, 135 F.3d 439, 443–44 (7th Cir. 1998). The Second Circuit has not yet addressed this question, but this Court will follow the Third and Seventh Circuits' approach. Here, the affidavit states: "[T]he Onondaga County Medical Examiners office, Dr. Mitchell's preliminary estimate on the time of [d]eath of the victim . . . was sometime [S]aturday the 28th of March afternoon, and [S]unday morning the 29th of March 198[7]." (Dkt. No. 323-1, at 3). Applying the multiple hearsay rule, if the evidence at trial is sufficient to support a finding that this language reflects a statement Mitchell made, Plaintiff may introduce it as the statement of a party-opponent against Mitchell and the County. *See* Fed. R. Evid. 801(d)(2)(A), (D); *cf.* Fed. R. Evid. 104(b).

The County argues, however, that the warrant affidavit's language does not demonstrate that the affiant had personal knowledge of Mitchell's statement as required by Rule 602. (*See* Dkt. No. 285, at 3 n.1). As the Advisory Committee has explained, Rule 803 does not "dispense[] with the requirement of firsthand knowledge," and such knowledge "may appear from [the declarant's] statement or be inferable from the circumstances." *See* Fed. R. Evid. 803 advisory committee's notes to 1972 proposed rules; *see also Columbia First Bank, FSB v. United States*, 58 Fed. Cl. 333, 337 (2003) (applying Rule 602 to statement in ancient document). Here, Defendants represent that Mitchell denies making this statement, and that the affiant is available

but was never deposed. The Court will rule at trial on whether sufficient evidence exists to allow "a reasonable trier of fact [to] believe [that the affiant] ha[d] personal knowledge" of Mitchell's statement from his participation in the investigation. *See Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 764 (2d Cir. 1991); *cf.* Fed. R. Evid. 104(b).

**2. Peter Tynan Note**

In its motions in limine, the County argues that the Tynan note constitutes inadmissible hearsay, and that Plaintiff cannot "lay the proper foundation." (Dkt. No. 285, at 3–6). Tynan was the Chief Investigator at the District Attorney's Office. (Dkt. No. 342-1, at 4). The note states in relevant part: "Re: Dr. Mitchell . . . body has decomp, including brain (swiss cheese). Pushes T.O[.]D. limits further out. (Good!!!)," and appears to be signed "Pete" or "Peter." (Dkt. No. 342-2, at 1). Plaintiff has represented that the County electronically produced the Note—scanned between pages from Mitchell's autopsy and "a handwritten list of circumstantial factors supporting the prosecution's theory regarding [Hill's] time of death"—"in a 1,847-page PDF entitled, 'Hector Rivas Trial Box 6.'" (Dkt. No. 322, at 20–21). At oral argument, the County did not dispute these facts regarding the location of the Tynan note. Also at oral argument, the County conceded the note's authenticity, and Mitchell did not contest it.

Plaintiff expects to introduce Tynan's deposition testimony at trial. During his deposition, Tynan did not specifically remember writing the note. (*See* Dkt. No. 342-1, at 8–9). He nevertheless testified that it contained his handwriting, that the acronym "T.O.D." stood for "time of death," and that the information "could have" come from Mitchell. (*See id.* at 7–8). He also acknowledged that the note contained "the word 'Peter,'" (*id.* at 29). *Cf. United States v. Al Farekh*, 810 F. App'x 21, 24–25 (2d Cir. 2020) (discussing authentication of handwritten letters under Fed. R. Evid. 901(b)(4)). In addition to Tynan, Plaintiff is expected to call District

Attorney Fitzpatrick to testify regarding the investigation that led to the indictment and prosecution of Hector Rivas.

There is no dispute that the note falls within the ancient documents exception to the hearsay rule because it was prepared before January 1, 1998. *See* Fed. R. Evid. 803(16). Again, applying the multiple hearsay rule, in the event Plaintiff presents sufficient evidence at trial to support a finding that the note reflects a statement Mitchell made during the investigation—including the note's discussion of "decomp" in Hill's "body" and "brain," (Dkt. No. 342-2, at 1)—it would be admissible as the statement of a party-opponent against Mitchell and the County. *See* Fed. R. Evid. 801(d)(2)(A), (D). The Court will defer ruling on the admissibility of the note until trial to assess the sufficiency of that evidence. *See* Fed. R. Evid. 104(b).

## III. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the relevant motions in limine are **DENIED in part** and otherwise **RESERVED** as set forth above.

**IT IS SO ORDERED.**

Dated: November 23, 2026
Syracuse, New York

Brenda K Sannes

Brenda K. Sannes
Chief U.S. District Judge